# UNITED STATES DISTRICT COURT
### District of Kansas

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                        **Case No. 16-20032-01-06-JAR**

LORENZO BLACK,
KARL CARTER,
ANTHON AIONO,
ALICIA TACKET,
CATHERINE ROWLETTE, and
DAVID BISHOP,

        Defendants.

---

## UNITED STATES' MOTION FOR RECONSIDERATION OF THE COURT'S APPOINTMENT ORDER (Doc. 146) AND OBJECTIONS

---

The United States of America, by and through its undersigned counsel, respectfully moves this Court to modify its *Appointment Order*, filed on October 11, 2016, for the following reasons: (i) the United States did not consent to the appointment of a special master as ordered, particularly without any limitation on the total fees and expenses to be incurred and without opportunity to review or certify the reasonableness of fees and services of the

special master; therefore, the United States cannot be required to pay the expenses of the special master appointed in this criminal case; (ii) the special master review directed by the Court's Order creates expenses disproportionate to the needs of the case and the expenses are excessive and unreasonable; and (iii) the instant case is not the proper forum to address the policies and practices of independent contractor and non-party CCA.

In light of the United States' re-evaluation of the prosecution of this case, and its determination that it will forgo use of CCA video surveillance recordings, the special master should be directed to review a specific group of audio phone call recordings that are relevant to the indicted case and the government's ongoing investigation.

I.    <u>Motion for Reconsideration</u>

Pursuant to D. Kan. Rule 7.3, a motion for reconsideration of a non-dispositive order must be based on "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error or prevent manifest injustice."  "A motion to reconsider is not a second chance for the losing party to make its strongest case or to dress up arguments that previously failed."  *Voelkel v. General Motors Corp.*, 846 F. Supp. 1482, 1483 (D. Kan.), *aff'd*, 43 F.3d 1484 (10th Cir. Dec. 21, 1994) (table).

> A court's rulings "are not intended as first drafts, subject to revision and reconsideration at a litigant's pleasure." *Quaker Alloy Casting v. Gulfco Industries, Inc.*, 123 F.R.D. 282, 288 (N.D. Ill. 1988). A motion to reconsider is appropriate if the court has obviously misapprehended a party's position, the facts, or applicable law, or if the party produces new evidence that could not have been obtained through the exercise of due diligence. *Comeau v. Rupp*, 810 F. Supp. 1172, 1175 (D. Kan. 1992); *see Refrigeration Sales Co. Inc. v. Mitchell-Jackson, Inc.*, 605 F. Supp. 6, 7 (N.D. Ill. 1983), *aff'd*, 770 F.2d 98 (7th Cir. 1985). A motion to reconsider is not appropriate if the movant only wants the court to revisit issues already addressed or to hear new arguments or supporting facts that could have been presented originally. *Comeau v. Rupp*, 810 F. Supp. at 1175.

*Koch v. Koch Industries, Inc.*, 6 F. Supp. 2d 1207, 1209 (D. Kan. 1998). The decision whether to grant or deny a motion to reconsider is committed to the court's sound discretion. *Hancock v. City of Oklahoma City*, 857 F.2d 1394, 1395 (10th Cir. 1988).

The United States seeks reconsideration based upon the new evidence concerning the compensation of the special master, which could not have been determined and known prior to the Court's publication, in its order, of the payment arrangement, as well as to correct clear error or to prevent manifest injustice.

## II.    Relevant Background

The United States obtained video recordings from the Corrections Corporation of America (CCA), which contained video recordings of attorney-

client visitation rooms.   The videos were obtained in response to a subpoena seeking:

> All video footage or still images currently retained by the Corrections Corporation of America (CCA) depicting any internal or external surveillance video or still images taken between July 2014 and April 12, 2016 at the CCA facility in Leavenworth, Kansas.

The subpoena sought existing surveillance video recorded by the CCA Leavenworth facility in the ordinary course of its operation.   None of this video was recorded by CCA at the direction of the United States Attorney's Office.   The video was provided on six digital video recorder drives (DVRs) containing approximately three terabytes of data per DVR.   These drives were retained by the case agents and one complete copy was made for the United States Attorney's Office.   However, the material on the drives was never fully reviewed, and no video recordings of any attorney-client meetings were located or viewed by United States Attorney's Office personnel.[1]

On August 3, 2016, the Federal Public Defender emailed Assistant United States Attorneys Debra Barnett and Duston Slinkard to advise that she recently learned that CCA recorded attorney-client meetings at CCA.   At that time, the goal of all concerned was to fix a problem rather than engage in

---

[1] Kansas Bureau of Investigation Special Agent Jeff Stokes represented that he viewed a portion of the CCA recordings and he did not see any attorney-client meetings on the video he reviewed.

a meaningless battle.   As such, this was perceived as a general inquiry, not specific to any case, nor was the instant case mentioned.   Assistant United States Attorney Barnett then inquired of the United States Marshal's Service, who contacted the CCA Leavenworth warden.   The warden informed the United States Marshal's Service that meetings in the CCA attorney-client rooms were not recorded.   This information was relayed to the Federal Public Defender on August 4, 2016.   The Federal Public Defender expressed concern that the information conflicted with other information received, including information provided by a Special Assistant United States Attorney.

On August 5, 2016, the Federal Public Defender filed the original motion for return of property in this case.   Acting United States Attorney Thomas Beall along with Assistant United States Attorneys Barnett and Slinkard met with the Federal Public Defender and other members of the defense bar on August 8, 2016, at the Federal Public Defender's Office in Topeka, Kansas, to discuss the concerns raised by the Federal Public Defender.   During this meeting, the United States indicated that it had never intentionally sought any video recordings of attorney-client meetings at CCA, and the United States agreed that any such recordings should be submitted to the custody of the Court.   The possible appointment of a special master was discussed in general terms.   At some point, the possibility of a recalled or sitting federal magistrate

judge serving as special master was discussed, again in general terms. As the discussion progressed, more specific discussions occurred regarding the scope of the master's duties and who the master should be, but the parties did not reach an agreement on these issues.

On August 9, 2016, the Court held an initial emergency hearing on the Federal Public Defender's motion. During the hearing, the United States agreed to relinquish the video evidence to the Court's custody and the parties jointly moved for the appointment of a special master. The Court directed the parties to submit briefing on the issue of appointment of a special master.

On August 15, 2016, the Federal Public Defender filed a motion for the Court to impound additional evidence related to telephone recordings (Doc. 105) and a memorandum of law concerning the appointment of a special master (Doc. 106). Upon review of the memorandum of law, it was clear to the United States that the parties' views on the appropriate scope of a special master were widely divergent. Nevertheless, the United States continued to seek the appointment of a special master under extremely limited circumstances. Specifically, the United States requested that a master, preferably a recalled Magistrate Judge, be appointed for the following limited duties –

(1)     Excise and retain video recordings of attorney-client meetings at CCA from the DVRs in the Court's custody;

(2)     Provide copies of video recordings without attorney-client meetings to the government and Coordinating Discovery Counsel;

(3)     Excise and retain audio recordings of attorney-client telephone conversations at CCA;

(4)     Provide copies of audio recordings without attorney-client conversations to the government and Coordinating Discovery Counsel;

(5)     Identify any privileged attorney-client communications in the computers seized from CCA's inmate law libraries and excise any such communications; and

(6)     Provide images of law library computers without attorney-client communications to the government and Coordinating Discovery Counsel.

(Transcript of August 16, 2016, Hearing, pages 71-72; Doc. 133, pages 1-2.)

At the September 7, 2016 hearing, the Court discussed the appointment of a special master, inquiring whether the parties consented.   Specifically, the Court engaged in the following discussion with counsel for the United States.

**The Court**:         ....

Here's what my intent is, and I've alluded to this before.   To have the special master start by acting as if that person is a Taint Team and going through all of the audio-recordings and video-recordings law library imaging, all of that, to go through that with the goal of culling out attorney-client contacts versus non-attorney-client contacts.   And then perhaps going a step further and looking at the attorney-client contacts and if, for some reason, that person in their expertise thinks it's not a privileged communication, identifying that group and then making some sort of recommendation to me.

7

To start with that I think misses the point of why I think a master or an expert needs to be appointed in this case.  It could be ultimately that that's where this person needs to go and that's what the government apparently wants, but I think what the master needs to start with is a determination of whether there were Sixth Amendment violations, the extent of the Sixth Amendment violations, CCA's involvement in the violations, the U.S. Attorney's Office in the violations, whether there have been any other problematic violations in terms of Rule 6(e) or other ethical considerations.   All of which then informs me as to what's the appropriate remedy.

If the expert says no Sixth Amendment violations, you know, we don't need to get to remedies.   But I think we can probably agree at this point that there have been significant Sixth Amendment violations, although, you know, there may be some dispute – there apparently is some dispute about the audio-recordings and maybe perhaps about the video-recordings, I don't know.

But in any event, what I want this person to start with is a determination based on this record, and any other further investigation the person in their expertise thinks should happen, to determine the – the nature of the violations, the scope of the violations, the extent of the violations of Sixth Amendment and other rights of the defendant.   And then to go the next step and help me decide what the appropriate remedies would be.

As I sit here, there's a lot of remedies that come to mind, but I guess the three categories of remedies that immediately come to mind are – would the appropriate remedy be just to sanction?  CCA is not a party to this case.   But to the extent the government did something wrong, to sanction them, if that's what the finding was.   That might be one remedy if it were appropriate.

Another remedy might be exclusion of this evidence or exclusion of part of the evidence.   That might be a remedy.  Another remedy might be much more grave, and that might be a dismissal of the case outright.   That would be probably the worst

8

remedy one might consider.   But that would be the second stage of the determination based on the findings as to what the nature, extent, and scope of the violations are and who the violations were by.

If I then determine that exclusion of none of the evidence were appropriate, then it seems like the next step would be some sort of process by which this neutral person would determine what's admissible and what is privileged.   And we would go through that.   And that, of course, is the most labor-intensive process of all, given the – you know, the volume of the recordings at issue.   So that's what my intent is.

The Court has no money to do this.   I've done a lot of checking. There – there really is not a fund for this.   Given that the reason we're here is because of violations perhaps by – by CCA, which contracts with the Department of Justice through the U.S. Marshals Service, and given that at least there are allegations that the U.S. Attorney's Office improperly, whether it's intentionally or inadvertently, disclosed privileged communications, it seems to me that the Department of Justice should pay for this.

So I know the justice – I know the U.S. Attorney's Office can – you know, agrees that there should be a master appointed, ***but I need to make a record as to whether the U.S. Attorney's Office consents to the process I've just outlined.   Because if that's the case***, then I will be entering an order and that order will say that the Department of Justice will pay for this process in the stages that I've described.

So I'll hear from you, Ms. Barnett, on that.

**Ms. Barnett**:       ***No, Your Honor, we do not consent to that***.

**The Court**:       What do you consent to?

**Ms. Barnett**:       We consent to having a special master look at the recordings that have been provided to the Court and

excise out the material that shows contacts with counsel, either through the phones or through the attorney-client interview rooms at CCA. Excising that material out. And then the rest of the materials that would arguably be permissible evidence for us to use and provide in discovery, then to be given back to the government and to defense counsel in the case so that the case could go forward.

**The Court**:     So essentially you want to tie the Court's hands and preclude me from fashioning any remedy, other than to give you what you would be entitled to or would want anyway, which would be to have non-privileged communications and to have somebody go through that and do all of that work for you?

**Ms. Barnett**:     Your Honor, frankly, if the issue is cost, I would certainly be willing to try to sit down with the defense and try to work out another solution. Maybe –

**The Court**:     The defense can't pay for it. They don't have a fund. The Court doesn't have a fund. The Department of Justice has the fund. This isn't a civil matter where the parties split costs. I've done – I mean, I've looked into that. There's no funding mechanism, other than through Department of Justice, if I'm going to appoint a special master. And Rule 53 says that that has to be done with the consent of the parties. *So you're telling me you're not going to consent*?

**Ms. Barnett**:     *No*.

**The Court**:     All right. Well, that's fine. I do have another avenue in mind and I'll just – I'll just go the other avenue. Because I am going to appoint someone, a master, expert, or otherwise, and I am going to order Justice Department to pay for it, because there's no other funding mechanism available. And we're here because of Justice Department, not because of the defense, not because of the Court, so …

All right. I – *I needed to make a record of that because my order will indicate that it's not with the consent of the*

10

> ***government.***  I don't know if it's with the consent of the defense,
> I need to get a record from you on that as well, Ms. Brannon.

(Doc. 118, pages 144-150; emphasis added.)

On October 11, 2016, the Court issued an *Appointment Order*, which described the duties of the special master in four separate sections – Initial Duties Phase I, Initial Duties Phase II, Complementary Duties, and Additional, Investigative Duties.   (Doc. 146, pages 5-7.)   "Phase I" duties include, among other things, an evaluation of the materials along with an assessment of the time, labor, and cost to index, cull, and segregate the privileged and confidential materials.   This evaluation includes a determination about the volume of the recordings which, at a minimum, include six, three-terabyte DVRs with video recordings and an unknown number of telephone calls.

"Phase II" begins after the submission of the feasibility report required by Phase I, and the Court's determination whether the master should proceed. The activities outlined in Phase II are essentially the duties outlined in the United States' *Supplemental Memorandum in Support of Proposed Order to Appoint a Special Master, and Offer to Present Evidence*. (Doc. 133, pages 1-2.)

The "Complementary Duties" are much more extensive.   These duties include   providing   periodic   reports,   making   formal   or   informal

11

recommendations to the parties regarding any matter pertinent to the master's other duties, meeting with the parties, employing staff, formulating agendas for attorney conferences, assisting with court scheduling, aiding with case management, compiling data, assisting with media inquiries, coordinating related litigation, interpreting and enforcing agreements between the parties, suggesting strategies for the negotiation of issues, and/or monitoring compliance with structural injunctions. The Court also authorizes the special master to "[a]ssist with legal analysis of the parties' motions or other submissions, whether made before, during, or after trials, and provide the Court with formal and informal recommended rulings on those motions," and "[d]irect, supervise, monitor, and report upon implementation and compliance with the Court's Orders, and make findings and recommendations on remedial action if required."[2] (Doc. 146, page 6.)

The "Additional, Investigative Duties" explicitly outline the duties that the Court "continues to consider." (*Id.* at 7.) Specifically, the Court acknowledges that the Federal Public Defender requests that the master "investigate whether, and the extent to which, the Government has violated the Sixth Amendment and/or Fed. R. Crim. P. 6(e) in this and other criminal

---

[2] It appears that these duties would allow the special master to investigate and make findings on the allegations of defense counsel as set forth in their presently filed motions.

cases." [3]    Although the various aspects of such an investigation are enumerated in great detail, the Court noted that it "has chosen to limit the Special Master's duties to those to which the Government consents *at this time*."    (*Id.*)

III.    Argument

The United States, having withdrawn at the September 7, 2016 hearing its consent to the process employed by the Court, requests reconsideration of the Court's appointment of a special master for three reasons: first, under the doctrine of sovereign immunity, the United States cannot be required to pay the special master expenses in this criminal case over its objection; second, the level of financial contribution required of the District of Kansas is disproportionate, unreasonable and excessive; and, finally, the instant case is not the proper forum in which to address, at the expense of the United States, the policies and practices of CCA, an independent contractor and non-party. See *Atlantic Richfield Company v. American Airlines, Inc.*, 98 F.3d 564, 572 (10th Cir. 1996) (noting that "[d]istrict courts have discretion to apportion the compensation of a special master among the parties"); *Brock v. Ing*, 827 F.2d

---

[3] The Federal Public Defender has not alleged or requested that the special master investigate violations of Rule 6(e).

1426, 1428 (10th Cir. 1987) ("In a given case, fairness may suggest that the expense [of the Special Master] be borne by [only] one of the parties.").

> A. The District Court May Not Order the United States Department of Justice to Pay Costs of a Special Master to Which it does Not Consent in a Criminal Case.

During the Court's inquiry of counsel for the United States at the September 7, 2016 hearing, the United States' initial desire to seek appointment of a special master was withdrawn when the United States declined to consent when questioned by the Court. The initial request for appointment was extremely limited and did not include the duties described by the Court during the September 7 hearing or identified in the *Appointment Order*. For example, the United States did not consent to the master employing others or determining privilege. The duties outlined by the United States did not include assisting with media inquiries, court scheduling, case management, and/or the legal analysis of the parties' motions or other submissions (to include providing formal and informal recommended rulings). (Doc. 146, pages 4-6.) The United States did not and has not consented to any of the duties outlined in the "Complimentary Duties" or the potential "Additional, Investigative Duties." (*Id.*, at 6.) And, to the extent the special master's duty to provide legal analysis and recommended rulings or remedial action on motions may be construed as an investigative, fact-finding role for

14

potential Sixth Amendment violations, the United States has expressly and repeatedly objected to that. The *Appointment Order*'s inclusion of duties similar to those outlined in the United States' September 6 pleading does not constitute the United States' consent to the process employed or to the payment of the special master fees and expenses. Further, the *Appointment Order* fails to recognize that the consent of the United States was withdrawn. (*Id.,* at 2 and 4.)

At the September 7, 2016 hearing, the Court commented that the reason for the current issue was due to "violations perhaps by – by CCA, which contracts with the Department of Justice through the U. S. Marshals Service, and given that at least there are allegations that the U.S. Attorney's Office improperly, whether it's intentionally or inadvertently, disclosed privileged communications, it seems to me that the Department of Justice should pay for this." (Doc. 135, page 148.) A short time thereafter, the Court again observed that "we're here because of the Justice Department . . ." so the Court intended to order the Department of Justice to pay for the special master over the objection and without the consent of the United States. (*Id.*, at 150.)

In its October 11, 2016 Appointment Order, the Court references several cases in footnote number 2 indicating that, under Fed. R. Civ. P. 53 or the inherent power of the Court, it may appoint a special master in criminal cases.

15

Although the United States does not take issue with that general proposition of appointment, Congress has not clearly and unequivocally waived sovereign immunity in regard to the assessment of such costs in a criminal case. The law seems well-settled that the Court may apportion the costs of a special master under Rule 53 to the United States **in a civil case** if the United States is a party. But whether the district court has that same power in criminal cases is not at all settled. While the district court in some instances has ordered the United States to pay the costs of a special master in criminal cases, see, e.g., *United States v. Stewart*, No. 02 CR. 395 JGK, 2002 WL 1300059, at *10 (S.D.N.Y. June 11, 2002) ("The government will pay the costs of the Special Master."), those cases do not reflect that such payments were ordered over the objection of the United States, or that the doctrine of sovereign immunity was even raised or considered. Because there is no specific waiver of sovereign immunity authorizing the imposition of special master fees and expenses against the United States in the Federal Rules of Criminal Procedure, it does not appear that this Court has the inherent authority to impose such fees and expenses.[4]

---

[4] Sovereign immunity can be raised at any time, including for the first time on appeal. See *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1539 (10th Cir.1992) ("As a general rule we refuse to consider arguments raised for the first time on appeal unless sovereign immunity or jurisdiction is in question.")

16

Sovereign immunity provides that the United States may not be sued without its consent. *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 411–12, 5 L. Ed. 257 (1821) (Marshall, C.J.) ("[t]he universally received opinion is, that no suit can be commenced or prosecuted against the United States") Absent statutory waiver, courts may not assess costs against the United States. *United States v. Chemical Found., Inc.*, 272 U.S. 1, 20, 47 S.Ct. 1, 8, 71 L.Ed. 131 (1926). The statutory waiver must be "unequivocally expressed." See *United States v. Idaho*, 508 U.S. 1, ——, 113 S.Ct. 1893, 1896, 123 L.Ed.2d 563 (1993) (citations omitted). " 'Any such waiver must be strictly construed in favor of the United States,' [ ] and not enlarged beyond what the language of the statute requires [ ]." *Id.* (quoting *Ardestani v. INS*, 502 U.S. 129, –——, 112 S. Ct. 515, 520, 116 L. Ed. 2d 496 (1991), and citing *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 685–86, 103 S. Ct. 3274, 3277–78, 77 L. Ed. 2d 938 (1983)). Defendant's argument is one of first impression in this court. The First Circuit Court of Appeals recently addressed the sovereign immunity defense in *United States v. Horn*, 29 F.3d 754 (1st Cir. 1994). There the court considered whether sovereign immunity prevented a district court from using its supervisory powers to assess attorneys' fees and costs against the government for prosecutorial misconduct in a criminal case. It concluded a court could not use its supervisory powers to bypass sovereign immunity. *Id.* at 767. In considering whether there was a statutory waiver to allow fee awards in criminal cases, the court stated, "[T]here is no such statute or rule applicable here—and appellees, to their credit, do not pretend that one exists." *Id.* at 764. The court also pointed out "the fact that [costs] are routinely awarded against the government in civil cases (under 28 U.S.C. § 2412) is of no assistance to the appellees in this case." *Id.* at 765. The point of the First Circuit's statements are equally applicable here.

*United States v. Sommers*, 864 F. Supp. 902, 904 (S.D. Iowa 1994).   See also

*United States v. Knight*, 315 Fed. App'x 435 (3d Cir. 2009) ("The Federal Rules

of Civil Procedure are not applicable to criminal cases); *United States v.*

*Campos*, Cr. No. S–95–0020 EJG, 2008 U.S. Dist. LEXIS 16230, at *1 (E.D.Ca. Feb. 19, 2008) (finding federal rules of civil procedure inapplicable in criminal cases).   Because Congress has not expressly authorized the payment of the special master's fees and expenses in a criminal case, see *Horn*, 29 F.3d at 767 (fee-shifting against the government can be accomplished only in conjunction with the passage of a statute or a sufficiently explicit rule having the force of a statute that authorizes such an award), the Court should not rely on its inherent authority to require the United States to bear those costs in this case.

In *Horn,* the First Circuit was not addressing compensation of a special master, but rather the assessment of costs and attorneys' fees imposed as a sanction against the federal government in a criminal case.   The court held that principles of sovereign immunity bar a federal district court, exercising its supervisory power, from so doing.   In reaching its conclusion, the First Circuit considered the "unavoidable tension" between the doctrines of sovereign immunity and supervisory powers.   *Id.* at 763–64.   The First Circuit stated that "sovereign immunity ordinarily will trump supervisory power in a head-to-head confrontation."   *Id.*   After all, "if Congress has not waived the sovereign's immunity in a given context, the courts are obliged to honor that immunity."   *Id.*

> One of the main purposes of sovereign immunity is to guard against judicial interference in executive functions, see Larson [v. *Domestic & Foreign Commerce Corp.],* (1949), 337 U.S. [682] at 704, 69 S. Ct. [1457] at 1468–69 [(1949)], and the notion of a judicial override operating ex proprio vigore would largely frustrate this purpose. In any event, the proposed detour runs headlong into a stone wall: Congress, not the courts, is the government's authorized representative for purposes of waiving sovereign immunity. See supra p. 13 and cases cited; see also *Hans v. Louisiana*, 134 U.S. 1, 21, 10 S. Ct. 504, 509, 33 L. Ed. 842 (1890) (declaring that, because the "legislative department of a State represents its polity and its will," "the legislature, and not the courts, is the judge" of when sovereign immunity ought to be waived).

*Horn*, 29 F.3d at; see *United States v. Droganes*, 893 F. Supp. 2d 855, 884 (E.D. Ky. 2012), (agreeing with First Circuit's decision in *Horn* and rejecting contrary conclusion from Fifth Circuit in *F.D.I.C. v. Maxxam, Inc.*, 523 F.3d 566 (5th Cir. 2008) (court may always impose monetary sanctions against the government when it frustrates the court's Article III functions), and the Ninth Circuit in *United States v. Woodley*, 9 F.3d 774 (9th Cir. 1993) (district court *may* be able to impose monetary sanctions against the government in limited circumstances)) aff'd, 728 F.3d 580 (6th Cir. 2013).

In affirming the district court's decision in *Droganes*, the Sixth Circuit Court of Appeals observed that a corollary of sovereign immunity is the principle that,

> monetary claims potentially disruptive of the public fisc are similarly barred absent Congress's consent.  See *United States v.*

19

> *Horn*, 29 F.3d 754, 761 (1st Cir. 1994); *see also* Aaron Tang, *Double Immunity*, 65 Stan.L.Rev. 279, 292-94 (2013) (describing immunity from monetary judgment as "the second layer of sovereign immunity"). Though neither the primary principle nor its corollary spring from certain origins, *see Horn*, 29 F.3d at 761, both are firmly entrenched in modern law. That is not to say sovereign immunity is absolute. Congress can waive it, but only by an unequivocal expression in statutory text. *Lane v. Pena*, 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996). Such a waiver will not arise by implication, nor by incident of a "statute's legislative history" without sufficient clarity in the text itself."

*United States v. Droganes*, 728 F.3d 580, 589 (6th Cir. 2013). Although *Droganes* argued that the district court's inherent authority to sanction trumped the government's sovereign immunity, the Sixth Circuit found the argument problematic in several respects.[5]

Because there is no express waiver of sovereign immunity that authorizes the district court to require the United States to pay for the special master's fees over its objection in a criminal case, the Court may not use a Civil Rule of Procedure to imply waiver, which must be expressly stated and narrowly construed. *Kane Cty., Utah v. United States*, 772 F.3d 1205, 1215 (10th Cir. 2014) (waivers of sovereign immunity are construed narrowly and conditions upon the waiver strictly observed). Moreover, because the Federal

---

[5] "[I]t is hardly clear that a district court has any such authority in the criminal context. See Aleo, 681 F.3d at 305 n. 13; id. at 306 (Sutton, J., concurring). Second, most circuits faced with similar arguments have suggested that the government's sovereign immunity wins when it comes head-to-head with a lower court's inherent authority. See, e.g., United States v. Horn, 29 F.3d 754, 761-66 (1st Cir. 1994); Coleman v. Espy, 986 F.2d 1184, 1191-92 (8th Cir. 1993); Barry v. Bowen, 884 F.2d 442, 444 (9th Cir. 1989). We see no good reason to chart a different course at this time." Droganes, 728 F.3d at 590.

Rules of Criminal Procedure do not include a provision authorizing the district court to appoint a special master, or to apportion any part of those costs to the United States in a criminal case in the manner that it expressly does so in the Federal Rules of Civil Procedure, by implication, Congress did not waive sovereign immunity so as authorize the court to apportion the costs of a special master to the United States in a criminal case.   See *Lindley v. F.D.I.C.*, 733 F.3d 1043, 1055–56 (11th Cir. 2013) ("Congress is presumed to know the content of existing, relevant law, and . . . where Congress knows how to say something but chooses not to, its silence is controlling.") (quoting *Griffith v. United States*, 206 F.3d 1389, 1394 (11th Cir. 2000) (quotation marks, citations, and alterations omitted); cf., *Touche Ross & Co. v. Redington*, 442 U.S. 560, 572 (1979) ("Obviously, then, when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly.").

    B.   <u>The Financial Exposure to the United States is Disproportionate to the Needs of the Case and is Excessive and Unreasonable.</u>

The *Appointment Order* directs that the "[t]he Special Master shall be compensated at his current rate of $500 per hour, with the Government bearing 100% of this cost."   (Doc. 146, pages 11-12.)   The Court also stated that "[i]t is expected that the Special Master will employ IT professionals and others to assist with performance of the Initial Duties."   (*Id.,* at 4 n.5, and 6.)

The materials to be reviewed by the special master pursuant to the *Appointment Order* include six, three-terabyte DVRs with video recordings and an unknown number of telephone calls. Open source Internet research suggests that it could take 900 to 1000 hours to watch one terabyte of video, or approximately 40 days, depending on the quality of the recordings. As such, one, three-terabyte DVR could arguably require 2,700 to 3,000 hours, or 120 days, at 24 hours per day, to watch in its entirety. Even were the special master to examine but one-sixth of one DVR by spot checking, it could arguably take 450 hours to review and evaluate one DVR. The cost to the United States could be $225,000.00 for this review. Spot checking one-sixth of the six DVRs could cost the United States approximately $1,350,000.00.

As indicated by CCA, the DVRs operated in a rolling manner of recording, capturing new video from the various attached cameras until full and then starting over by recording over the oldest footage. According to an index provided by CCA, DVRs 1 and 2 each have recordings from 16 different cameras. DVR 3 has 30 different cameras recording images onto it. DVRs 4 and 5 contain footage associated with approximately 32 cameras each. DVR 6 contains recordings from 28 cameras. Each DVR, CCA reported, could hold recordings from 30 to 90 days for each camera, depending on the level of activity recorded. It appears that these DVRs contain recordings made from

approximately 154 different cameras, covering a time period of 30 to 90 days for each camera. In other words, there could be 30 to 90 days of video to review for 154 different camera angles, or 4,620 to 13,860 days of video to review, in its entirety or by spot checking.

During an initial hearing in this case, the Court verbally estimated the cost of a special master at $500,000.00 or more. Based upon the foregoing information, such amount is likely underestimated, perhaps significantly. Even if the costs associated with the special master are limited to $500,000.00, however, such an amount would be more than 120% of the total amount the United States Attorney's Office for the District of Kansas obligated in Fiscal Year 2016 for litigation-related expenditures supporting its entire caseload. In addition, like most federal government agencies, the United States Attorney's Office for the District of Kansas is currently operating under a Continuing Resolution and has only been provided with funding through December 9, 2016 (70 days). A $500,000.00 expense amounts to five times the amount of funding the office has available for non-payroll expenditures while operating under the Continuing Resolution.

The United States Attorney's Office continues to want to assist the Court and defense counsel in resolving the issues created by CCA, a non-party to this litigation. Consequently, the office inquired as to what, if any, money the

23

office could contribute to resolving this situation.    The level of financial contribution from the United States ordered by the Court for this one case, unfortunately, is excessive and unreasonable under the circumstances.    The expense is also, in light of the discussion in section C below, and the willingness of the United States to forego use of certain evidence, disproportionate to the needs of the case, reaffirming its excessiveness and unreasonableness. At a minimum, the number of hours for the special master should be narrowly tailored with a not-to-exceed amount set at a level more in-line with the narrower scope of duties proposed by the United States for the Special Master. Moreover, it is unreasonable to require the United States to bear the expense of investigating the policies and practices of independent contractor and non-party CCA.  If parties other than the United States request review of the policies and practices of non-party and independent contractor CCA with regard to materials not intended for use by the United States, then the expenses of such review should not fall to the United States, which did not direct the activity, recordings, or the policies and practices of CCA.

C.    Alternative Resolutions that Narrow the Scope of the Special Master's Duties

The United States continues to disavow any desire to make evidentiary use of any potentially privileged recordings.   The United States, when asked

24

about any video recording of attorney-client rooms at CCA, immediately sought information through appropriate channels, and was thereafter completely surprised and disappointed to learn that the initial information provided by the CCA warden was inaccurate and that such recording routinely occurred at the facility.    In the aftermath of that revelation, the United States fully cooperated in efforts, with defense counsel, to submit within a short time frame the subject recordings into the Court's custody and preliminarily agreed to the appointment of a special master to provide any needed review.

In light of the significant time and resources involved in resolving the current issues, the United States has, since assuring the protection of the subject recordings through the Court's custody, undertaken review of its current prosecution to determine what, if any, potential need it has for any of the currently impounded materials that may be available for use following review by a special master.    As a result of this review, the United States can now definitively represent that it does not seek return of any video recordings currently subject to impoundment.    Furthermore, the video recordings that raised the Federal Public Defender's initial concern have not been disseminated or reviewed by the United States Attorney's Office, except as noted in footnote 1 herein, and have remained in the custody of the Court since their delivery pursuant to the Court's *Memorandum and Order* (Doc. 102).

The audio recordings of telephone calls giving rise to the Federal Public Defender's subsequent concern were also collected and submitted to the Court's custody where they, too, have remained.  The United States does not seek return of any video materials and seeks only a very limited group of non-privileged audio telephone call recordings.  Consequently, any review by a special master may be very narrowly defined and tailored in scope.

Although certain impounded materials could be used by the United States in its prosecution of the case and in an ongoing investigation, and, though the United States would welcome full review of all material, the associated expense involved in doing so is unreasonable, excessive and disproportionate to the needs of the case.  Therefore, the United States will forgo the use of the video evidence and, again, withdraws any request for the video recordings obtained from CCA.  As to the audio phone call recordings, the United States will submit a limited request to the special master *in camera*.

When the litigation of the Federal Public Defender's motion began, a clear goal was to prevent the dissemination of recordings made by CCA that might disclose potentially privileged attorney-client communications.  That goal has been satisfied with the impoundment of the recordings at issue.  The impounded materials can be reviewed, segregated, and excised in a manner that is efficient and fiscally responsible as discussed above.

26

Wherefore, the United States respectfully requests that the Court reconsider its *Appointment Order* and find that it cannot assess the fees and expenses of the special master to the United States in this criminal case, or, in the alternative, revise and limit the scope of the special master's inquiry and appropriately limit the fees and expenses to be incurred.

Respectfully submitted,

THOMAS E. BEALL
Acting United States Attorney

s/ Debra L. Barnett
DEBRA L. BARNETT
Assistant United States Attorney
United States Attorney's Office
301 N. Main, Suite 1200
Wichita, Kansas 67202
316-269-6481
K.S.Ct.No. 12729
debra.barnett@usdoj.gov
Counsel for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

s/ Debra L. Barnett
DEBRA L. BARNETT
Assistant United States Attorney