1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF KANSAS
2

3  UNITED STATES OF AMERICA,

4     Plaintiff,

5     v.

6  LORENZO BLACK (01),              Docket No. 16-20032

7  KARL CARTER (02),
                                    Kansas City, Kansas
8  ANTHON AIONO (03),

9  ALICIA TACKETT (04),             Date:  10/28/2016

10 CATHERINE ROWLETTE (05),

11 DAVID BISHOP (06),

12    Defendants.

13
   ..........................
14
                 TRANSCRIPT OF DISCOVERY CONFERENCE
15          BEFORE THE HONORABLE JULIE A. ROBINSON
                UNITED STATES DISTRICT COURT JUDGE
16
   APPEARANCES:
17
   For the plaintiff:
18
   Debra L. Barnett            D. Christopher Oakley
19 United States Attorney's    United States Attorney's
   Office                      Office
20 301 North Main Street       500 State Avenue
   Suite 1200                  Suite 360
21 Wichita, KS 67202           Kansas City, KS 66101

22 Duston J. Slinkard
   United States Attorney's
23 Office
   444 SE Quincy
24 Topeka, KS  66683

25

```
 1                       APPEARANCES

 2                      (continued)

 3    For the Defendant      John Jenab
      Lorenzo Black:         John Jenab Law Firm, PA
 4                           110 South Cherry Street
                             Suite 103
 5                           Olathe, KS 66061

 6    For the Defendant      David J. Guastello
      Karl Carter            The Guastello Law Firm, LLC
 7                           4010 Washington Street
                             Suite 501
 8                           Kansas City, MO 64111

 9    For the Defendant      Jason P. Hoffman
      Anthon Aiono           Hoffman & Hoffman
10                           Core First Bank & Trust Bldg.
                             100 E. 9th Street
11                           Third Floor East
                             Topeka, KS 66612
12
      For the Defendant      Kathleen A. Ambrosio
13    Alicia Tackett         Ambrosio & Ambrosio Chtd.
                             800 SW Jackson
14                           Suite 817
                             Topeka, KS 66612
15
      For the Defendant      Michael M. Jackson
16    Catherine Rowlette     Attorney at Law
                             727 South Kansas Avenue
17                           Suite 2
                             Topeka, KS 66603
18
      For the Defendant      Cynthia M. Dodge
19    David Bishop           Cynthia M. Dodge, LLC
                             233 SW Greenwich Drive, #10
20                           Lee's Summit MO 64082

21    For the Movant         Melody Brannon
      Federal Public         Kirk C. Redmond
22    Defender's Office      Office of Federal Public
                             Defender
23                           117 SW 6th Avenue
                             Suite 200
24                           Topeka KS 66603

25
```

```
 1                        APPEARANCES

 2                       (continued)

 3   For the Interested      Melanie Morgan
     Party Michelle          Morgan Pilate, LLC
 4   Reulet                  926 Cherry Street
                             Kansas City, MO 64106
 5
     For the Interested      Jonathan Laurans
 6   Party David Lougee      Attorney at Law
                             The 1609 Law Building
 7                           1609 West 92nd Street
                             Kansas City, MO 64114
 8
     For Interested Party    Alyssa Brockert
 9   Corrections             Crow & Associates
     Corporation of          302 Shawnee Street
10   America                 PO Box 707
                             Leavenworth, KS 66048
11
     Also Appearing:
12
     David R. Cohen, Special Master
13
     Wayne Bigelow, CCA-Leavenworth
14
     Craig Beam, United States Marshals Service
15
     Henry Herron, Internal Revenue Service
16   Criminal Investigation

17   John Seuber, United States Secret Service

18   Gary Hart, Attorney at Law

19

20

21

22

23

24

25
```

16-20032 USA v Lorenzo Black, et al  10.28.2016                    4

```
 1                    (Court called to order.)
 2               THE COURT:  All right.  We are here in
 3    United States versus Lorenzo Black, et al.  The case
 4    number is 16-20032.  And appearing for the government.
 5               MS. BARNETT:  Debra Barnett, Assistant
 6    United States Attorney.
 7               MR. OAKLEY:  Chris Oakley, Assistant United
 8    States Attorney.
 9               MR. SLINKARD:  Duston Slinkard, Assistant
10    United States Attorney.
11               THE COURT:  All right.  And for the
12    defendants.
13               MS. BRANNON:  From the Federal Public
14    Defender Office, Melody Brannon and Kirk Redmond.
15               MR. JENAB:  Your Honor, for Mr. Black, John
16    Jenab.  We have filed a waiver of appearance.
17               MR. GUASTELLO:  Mr. Carter appears in person
18    and in custody with counsel David Guastello.
19               MR. HOFFMAN:  Mr. Aiono appears not but by
20    and through counsel Jason Hoffman, Your Honor.
21               MS. AMBROSIO:  Your Honor, Ms. Tackett
22    appears by counsel Kathleen Ambrosio.  She filed a
23    appearance of waiver, too.
24               MR. JACKSON:  Your Honor, Catherine Rowlette
25    appears in person and by counsel Mike Jackson.
```

1          MS. DODGE:  Cynthia Dodge on behalf of David

2     Bishop who appears in person.

3          THE COURT:  All right.  Anyone else?

4          MR. LAURANS:  Jonathan Laurans for

5     interested party David Lougee.

6          MS. MORGAN:  And Melanie Morgan on behalf of

7     Mitchell Reulet who has filed a motion to become part of

8     this litigation as an interested party.

9          THE COURT:  All right.  And that motion is

10    pending in front of me, Miss Reulet's motion to

11    intervene.

12         All right.  So also with us today is David Cohen

13    who is the court's appointed special master.  I won't

14    take the time to introduce Mr. Cohen by his very

15    extensive qualifications and experience but the

16    appointment order did include a link to his website if

17    you have any questions about that.

18         We're here to take up the matters that are

19    addressed in a discovery conference order that was

20    issued under Mr. Cohen's signature.  Let me just say at

21    the outset, the appointment of special masters in

22    criminal cases is not something that most of us have had

23    a great amount of experience with, but he works under my

24    direction and in close consultation with me.

25         The order that he issued with all of the

1    directives, consider it my order.  In fact, anything

2    that you receive from him under his signature is the

3    same as receiving something from me under my signature.

4    So he prepared this order after our conferral and issued

5    it by his signature.  And -- but I just say that at the

6    outset so there's no question that anything that comes

7    from him comes from me and shall be complied with

8    because it is, in fact, my order.

9          So consistent with that, there are a number of

10   questions that are posed in the discovery conference

11   order.  And before we get to that though, I want to

12   start by directing your attention to pages 5 and 6 of

13   the discovery conference order, the status quo section,

14   and also pages 2 and 3, in particular footnotes 1 and 2

15   because these are the directives that I have given in

16   this discovery conference order.  And I'd like to start

17   by learning whether these have been complied with and,

18   if not, what is the status of steps towards compliance.

19         So we'll start with that and then we'll go on to

20   talk about the questions in the order itself.  Let me

21   just also say at the outset that the government

22   yesterday filed a motion to reconsider the appointment

23   of Mr. Cohen.  That motion is not yet under advisement.

24   The defendants have not had a chance to respond in view

25   of the fact that it wasn't filed until yesterday.  So I

1    thought one thing we ought to talk about also, and let's

2    do that now, is to set a response deadline for the

3    defendants at which point I'll consider it under

4    advisement and determine whether to have a hearing or

5    just issue an order.

6         So, Miss Brannon, let's talk about what would be

7    a workable response deadline.

8              MS. BRANNON:  Your Honor, I think November

9    14th is a Monday.

10             THE COURT:  All right.  And I don't know if

11   anyone other than you intends to file a response, but I

12   think that's a reasonable deadline for response.  So

13   we'll make November 14th be the response deadline to the

14   motion to reconsider.  I will not need any reply I don't

15   believe.  The government has filed a very lengthy, I

16   think it's 27-page, motion to reconsider.  So I'll

17   consider it under advisement with the filing of the

18   response on or about November 14th.

19        Okay.  So let's return to the directives in the

20   discovery conference order.  Let's start with the

21   footnotes on page 2 and 3.  So footnote No. 1 in this

22   order says, Are there records of when, how why CCA has

23   produced video recordings to the government?  This

24   question is not limited in time, nor as to who might

25   have those records.  And then footnote No. 1 says, If

1  so, the special master directs these records be

2  preserved as well as the video recordings that were

3  produced.

4      And this directive is really addressed to the

5  U.S. Attorney's Office but also to CCA and Securus.  And

6  it really is based on the fact that the court has

7  learned thus far that, although there may have been

8  times that either audio or video were subpoenaed by the

9  government, there are other times that they obtained

10  them in some other way from CCA.  Whether that's through

11  the marshal making an oral request or a written request,

12  I don't know.  The government's never been clear about

13  that.  So this seeks to determine are there records of

14  how these things were -- how, when and why these things

15  were obtained?  And, if so, we want those records to be

16  preserved.

17      In a similar vain, with respect to the audio

18  recordings on page 3, footnote 2 asks, Are there records

19  of when, how and why Securus has produced audio

20  recordings to the government?  Again not limited in

21  time, nor as to who might have those records.  And, if

22  so, the court directs that these records be preserved as

23  well as the audio recordings that were produced.

24      So with respect to this directive to preserve any

25  records of acquisition or production is what it really

9

1    says, any records of production by CCA or Securus of

2    video and audio recordings, that these be preserved, has

3    that been complied with?

4              MS. BARNETT:  With regard to this case, Your

5    Honor, I'm advised we've not retained -- or not obtained

6    any records directly from Securus.  Records that we

7    would obtain related to CCA would have been through the

8    Marshal Service that we obtained those records, and it

9    could have been a number of different ways.  As the

10   court has already talked about, it could have been with

11   the grand jury subpoena.  It may have been by sending a

12   request to the marshals, whether that's through an

13   e-mail or some sort of other written document.  I hate

14   to say a letter but it might have been a letter, a memo

15   of some sort making a request.

16         What I will tell the court is we understand right

17   now nothing in our office as related to obtaining

18   information from CCA should be destroyed or gotten rid

19   of in any way.  So within our office we have, I guess,

20   put a lockdown, so to speak, on information or records

21   that we would currently have.

22             THE COURT:  And you do understand that it

23   goes beyond the bounds of the *Lorenzo Black* case?

24             MS. BARNETT:  Yes.  Yes.

25             THE COURT:  All right.  Because, as you

 1   know, there are Rule 41 motions pending in dozens and

 2   dozens of other cases in this district in this division

 3   and in other divisions, and so all of this is relevant

 4   to that as well.

 5         So what you're telling me is that you have, in

 6   fact, through some sort of lockdown procedure, preserved

 7   all e-mails, all handwritten notes of, I suppose,

 8   conversations where you made a request to the Marshal

 9   Service, any communications back from CCA, Securus, the

10   Marshal Service, or anyone else involved in the

11   acquisition -- in the production of videos or audio

12   recordings in this case and beyond this case?

13         MS. BARNETT:  Well, I will tell the court,

14   as the court was previously advised, our -- we've gone

15   through a new computer refresh, I guess is what they

16   call it.  We have all of the Kansas City computers that

17   have been set aside and maintained.  They're not -- they

18   were subject to destruction.  They are not.  They are

19   being held pursuant to this litigation.  We have since

20   been asked -- I think Mr. Slinkard was asked about

21   preserving Topeka's computers.  I don't know if it was

22   all of them or specific computers.

23         MR. SLINKARD:  It was all of them.  And

24   yesterday Miss Morgan made preservation requests based

25   upon her motions that she'd filed.  Checked with our

1    computer information systems manager.  All of the hard

2    drives of all of the computers used by any Topeka

3    attorney that were refreshed during the -- during the

4    routine replacement process were still available.  And

5    so those have all been retained at this point as well.

6              THE COURT:  All right.  And the Wichita

7    computers?

8              MR. SLINKARD:  At this point no one has

9    asked.  And the court's original directive, when it

10   inquired -- when you inquired and we responded I believe

11   the September 7th hearing, was the Kansas City.  So

12   we've had those since then.  I asked yesterday about

13   Topeka and they were still here.  And so I asked --

14   directed that they be retained.  I have not made any

15   inquiry of him regarding Wichita.  So I could do that if

16   that's the court's direction.  Be happy to.  But we

17   haven't at this point, so I don't have any information.

18             THE COURT:  Okay.  I want it to be

19   district-wide, all three divisions.

20             MR. SLINKARD:  Okay.

21             THE COURT:  Yeah.  So you've accomplished

22   Kansas City.  You're in the process of Topeka.  And

23   you'll now be in the process of -- of Wichita as well,

24   okay, audio and video.  All right.

25             So let's go to the status quo section then.  And

1    this, for the most part, has to just do with

2    preservation of a number of things, and it refers you to

3    pages 7 and 8 of the appointment order for the

4    itemization.  So we'll walk through that.

5         But skip to the second paragraph of the status

6    quo section and that has to do with the making of

7    forensic images of the personal computers of Erin

8    Tomasic, Kim Flannigan, Pauletta Boyd, and also any

9    computer used to view the video recordings produced in

10   this case, and also preservation of all e-mails

11   regardless of the device used to send and receive them,

12   and other documents related to these video and audio

13   recordings at CCA-Leavenworth or any other detention

14   facility.  So with respect to the preservation of

15   e-mails, Miss Barnett, is that included in what you've

16   already told me?

17             MS. BARNETT:  Honestly, Your Honor, our

18   e-mails are already preserved automatically.  But, yes,

19   they're available, Your Honor.

20             THE COURT:  Okay.  And then the forensic

21   imaging, has that been accomplished of those computers?

22             MR. SLINKARD:  It has not, Your Honor.  That

23   is something that I want to bring to the court's

24   attention today and was part of my conversation with the

25   system's manager as well.

16-20032 USA v Lorenzo Black, et al  10.28.2016                13

1      Based on the conversation with him -- and so the

2  court's aware, the -- the replacement of computers was

3  conducted on a rolling basis.  I don't have the dates

4  for Wichita because until this morning I wasn't aware

5  they were at issue.  They would have been, I believe,

6  the first office and a week or two before.  All the

7  computers that were replaced in Topeka were replaced on

8  August 26th and August 29th.  All the computers that

9  were replaced in Kansas City were replaced on August

10  31st and September 1st.

11      So it's our belief at this time that -- and I

12  should say the computers that were replaced on that

13  rolling basis had been in service for approximately five

14  years.  So it's our belief at this time that, at least

15  with respect to the *Black* case, the matters the court's

16  inquired about would all be contained on those computers

17  that were taken out of service and the hard drives

18  retained.

19      Of the computers of the named individuals,

20  there's one laptop that was assigned and used by

21  Miss Flannigan.  One laptop that was assigned and used

22  by Miss Tomasic.  And eight potential computers that

23  were under -- were used by or under the control of

24  Miss Boyd, including checking those out to others who

25  needed them on a -- on a litigation support basis.  Of

1    those one is still in use and was not replaced.  That is

2    a workstation or desktop-type computer, tower-type

3    computer.  There were five laptops under Miss Boyd's

4    control and two workstations under her control that were

5    replaced.  With respect to imaging them --

6              THE COURT:  Okay, so stop.  So you're saying

7    that basically the cyclical replacements all were

8    completed by September 1 --

9              MR. SLINKARD:  Yes.

10             THE COURT:  -- the number of devices?

11             MR. SLINKARD:  Yes.

12             THE COURT:  So but obviously what's

13   pertinent or may be -- may be the new ones but obviously

14   the old ones.  So where are the old ones and can those

15   be imaged, the hard drives?

16             MR. SLINKARD:  The hard drives are available

17   for all of them.  What -- what presents a challenge is

18   the way the laptop drives work.  Because they leave

19   secured space, they are automatically encrypted.  And

20   the only way to access those hard drives, as I

21   understand it, is using the chassis of the laptop that

22   goes with the drive, and those chassis are preserved.

23   Those laptop hard drives are preserved and then the hard

24   drives which are not encrypted for all the desktop

25   printers are preserved.

1           With respect to imaging them, my understanding

2    from our computer manager is that he didn't believe we

3    presently had the capability to image the laptop drives.

4    He thought we probably did the desktop drives.  But if

5    the laptop drives that are encrypted are imaged, it's

6    just imaging encrypted data that would not itself be

7    accessible.  And it's an open question because no one

8    that -- we've never had reason to try it, whether you

9    can, for example, take -- let's call it Laptop A, make

10   an encrypted image -- make an image of the encrypted

11   drive in Laptop A, replace the original drive with the

12   imaged drive and see if it's successful in Laptop A.

13   We've never had reason to do that.

14           Point being, Your Honor, is the drives are

15   available.  And subject to concerns that was -- was not,

16   frankly, my purview that Miss Barnett may address with

17   you, if production is later ordered, they are available.

18   They are retained with respect to all the computers in

19   Topeka, all the computers in Kansas City, including

20   those computers.  And I'll make the communication with

21   the manager about holding on to all the drives in

22   Wichita.

23           But with respect to imaging them, we may not have

24   the capability, at least at the present time, for the

25   laptops.  And there's also going to be the open question

1    of whether an image of the encrypted laptop drives will

2    actually be accessible by anyone to view.  It may be

3    using the chassis of the computer.  It may not.  We

4    simply don't know.

5              THE COURT:  Well, it seems to me that based

6    on that then the preservation -- all right.  So whose

7    custody is all this in at this point?

8              MR. SLINKARD:  Currently all of those drives

9    are being held by the computer systems manager for our

10   office.

11             THE COURT:  All right.  It seems to me that,

12   although I really just wanted to preserve -- if we're

13   talking about actual equipment and not just an image to

14   preserve, we may need to impound those and put those in

15   a vault somewhere.  I don't consider that production

16   because the court won't be touching them or accessing

17   them, but at least they're secured somewhere.  What kind

18   of volume of equipment are we talking?  I'm sure we

19   probably have the space to put it in a vault but --

20             MR. SLINKARD:  The drives themselves, only

21   because I've seen the drives as they were pulled out

22   during the refreshed and stacked up, the drives

23   themselves are not particularly -- I would say are in

24   the neighborhood of a banker's box for each location.  I

25   have no idea on the laptop cores or chassis themselves.

1    I don't know how many total laptops we're talking about.

2    You know, obviously they're all the size of a laptop.

3    But how many, I do not know.

4              THE COURT:  All right.  Well, I think I'm

5    going to order that those be impounded and just held

6    secured for the time being and just similar to the hard

7    drives of the videos and audios that are impounded and

8    nobody's looking at those at this point, although

9    obviously those were produced as part of production.  I

10   mean, the court does intend to have the special master

11   start looking at those.  But with respect to the hard

12   drives for the computers themselves, I'd like to get

13   those impounded.  I'll defer on the whole question of

14   laptops and chassis and hardware at this point.  I don't

15   know that we necessarily need to impound that.  And I'll

16   have Mr. Cohen talk to you all further about that later

17   after the hearing.

18             MR. SLINKARD:  Just a couple of questions in

19   light of the court's order.  I don't know whether the

20   hard drives from the laptops were actually removed from

21   them since the whole machine was being replaced.  On the

22   desktops, they removed the hard drives because it

23   contained our data and the desktop shells were going to

24   be recycled, remitted to the company, whatever.

25             On the laptops, I don't know whether the drives

```
1    were actually removed or left in the computers.  I'm
2    assuming if they were left in the computers, the court
3    wants impoundment of the computer with the drive in it.
4              THE COURT:  Right.  But these are -- these
5    are laptops that are in service or not in service?
6              MR. SLINKARD:  They are not in service.
7              THE COURT:  Okay.  So I think it would make
8    sense to impound them.  I don't want to impound things
9    necessarily that are in service.  It sounds like --
10             MR. SLINKARD:  There is one workstation
11   computer in service only.
12         The other issue with respect to that, judge, is
13   simply they're in three locations.  So in terms of the
14   mechanics of impoundment, I assume that you want the
15   impoundment to be delivering them to the court clerk's
16   office here in Kansas City.
17             THE COURT:  Right.
18             MR. SLINKARD:  It will probably take us a
19   week or so to get them transported and all here to be
20   turned in if that's acceptable.
21             THE COURT:  Okay.  That's fine.  After the
22   hearing I think Mr. Cohen contemplates talking to you
23   all and also talking to perhaps some others, but that's
24   something you all can talk about further.
25         Did you have something, Miss Morgan?
```

1          MS. MORGAN:  Yeah, judge.  I know we had

2    been talking about computers, you know, that have gone

3    out of service here in this district.  But because

4    Miss Tomasic actually works in the Western District of

5    Missouri, I don't know what her computer status would be

6    in her office in the Western District of Missouri and

7    whether she had a laptop that she used there and whether

8    any of that had to do with business in Kansas.

9          THE COURT:  I wasn't aware she worked in the

10   Western District of Missouri.  Is that something new?

11         MS. BARNETT:  I -- I don't know how long

12   she's been a Social Security SAUSA with the Western

13   District, Your Honor.  She is a Western District Social

14   Security SAUSA.  A couple days a week I think she works

15   over there.

16         THE COURT:  She is appointed in both

17   districts?

18         MS. BARNETT:  Yes.

19         THE COURT:  She offices in Missouri as well

20   as Kansas?

21         MS. BARNETT:  Yes.  Mr. Oakley says that --

22   the officing -- officing in both offices is just recent.

23   I mean, up until recently she's primarily been in our

24   office here in Kansas City, but she's had the -- I call

25   them the SAUSA-ship.  She's had that with the Western

1  District of Missouri for -- we don't know for sure, but

2  we can find out if you want to know, Your Honor.

3          THE COURT:  Yeah, follow up on that.  If

4  it's fairly recent and she's only there a couple days a

5  week, I'm not real clear on what you're saying.  But

6  follow up on that and let me know.  And if we need to,

7  we can have further conversation about that,

8  Miss Morgan.

9      Okay.  So, Mr. Cohen, was there something?  I

10 noticed you slipped a note to Mr. Treaster.  Was there

11 something else you wanted me to ask about this?

12          MR. COHEN:  I was trying to remember the

13 timing of when Miss Tomasic met with Miss Rokusek, and I

14 think that was before September 1st; is that right?

15          MS. BARNETT:  Yes.  I think it was the first

16 week of August, maybe the 4th or 5th.

17          MR. COHEN:  Miss Tomasic's work in Missouri

18 also postdates that period of time; right?  In other

19 words, her -- the -- the trick on those computers and

20 preserving them is to ensure that whatever happened on

21 those computers with regard to watching the videos is

22 preserved.  And so I'm not concerned if she was working

23 in Missouri on Social Security matters if that had

24 nothing to do -- if at that time in Missouri she wasn't

25 viewing videos.

1           MS. BARNETT:  Which we would believe --

2     which we believe would be the situation.  But if you

3     want us to check on that for certain, we will do that.

4           MR. COHEN:  Thank you.

5           MS. BARNETT:  Okay.

6           THE COURT:  We do.

7       Okay, Miss Brannon.

8           MS. BRANNON:  Judge, just one other area, if

9     I may.  We're talking about computers and e-mails and so

10    forth but there are other means of communication,

11    primarily cell phones and texts.  We don't know how

12    those are necessarily synced in the U.S. Attorney's

13    Office.  But if there are cell phones independent would

14    have text messages or that sort of communication that

15    might pertain to this, we would ask that be preserved as

16    well.

17          THE COURT:  Can you speak to that,

18    Miss Barnett?  I don't know if there are iPads and cell

19    phones and that are work-related -- work-related or at

20    least used for work.

21          MS. BARNETT:  We have iPads within the

22    district that are issued to some AUSAs but not every

23    AUSA.  I will have to check to see if Miss Tomasic had

24    an iPad issued to her from our office.

25       Most of us, the attorneys, have iPhones, as I'm

1   indicating here.  With our iPhones, we have the

2   capability of texting.  They do not however sync up with

3   our computers as I understand it, and I have a very

4   limited knowledge of how all this works.  But I know if

5   I text on my iPhone, it does not necessarily show up on

6   my computer at my desk.

7         However, I am able to check all of my e-mails

8   that I receive at my computer at my desk on my iPhone.

9   So the e-mails that go to my computer go to my iPhone

10  and vice versa.

11        With regard to the texts, I believe the texts

12  would just be with the iPhone itself.  But I can check

13  on that also, Your Honor, if you want me to.

14              THE COURT:  All right.  Mr. Cohen, do you

15  have any questions or concerns about this?

16              MR. COHEN:  More than I can ask very quickly

17  right now, so we'll chat about it.

18              MS. BARNETT:  Thank you.

19              THE COURT:  All right.  Let's move on to the

20  rest of the status quo section, and all of this speaks

21  to just preservation, not production.  And just to

22  remind you that, for purposes of preserving and

23  maintaining the status quo, this order encompasses not

24  only the U.S. Attorney's Office but CCA-Leavenworth and

25  CCA and the U.S. Marshal Service.  And so the

16-20032 USA v Lorenzo Black, et al  10.28.2016                          23

1    categories -- and they're itemized in bullet points on

2    pages 7 and 8 of the appointment order.  Let's walk

3    through those and see what the status is of those.

4         So the first, Determine what, if any, steps were

5    taken by CCA or other pretrial holding facilities to

6    protect confidential audio communications such as

7    blocking certain phone numbers or warning callers, and

8    whether those measures were communicated to either

9    detainees or their attorneys.

10         Wait a minute, I think I'm looking -- no, I'm

11    sorry, let's -- it's really on page 8 where -- or the

12    bullet points where it talks about identify --

13         Mr. Cohen, let me talk to you about this, in

14    terms of just the preservation on pages 7 and 8.

15              (The Court conferring with Mr. Cohen.)

16              THE COURT:  All right.  So I'm not going to

17    walk you through these bullet points on 7 and 8 because

18    they go beyond what we're talking about for

19    preservation.  That's really a section, of course as you

20    know, called additional investigative duties that the

21    master is not doing at this time.  The court, in those

22    pages of the order, was indicating areas that the

23    investigation might expand to but might not expand to,

24    but at this point it's too early to say.

25              But back to the status quo section of the

1    discovery conference order.  Essentially what the court

2    is ordering is preservation of all information and

3    sources of information that may be relevant to the

4    matters on pages 7 and 8.  So that's just preservation

5    of e-mails and documents and notes and, you know, all

6    sources of information that may pertain to that.  So

7    it's very generic.

8            Again, I go back to your initial statement,

9    Miss Barnett, that you have all sort of understood this

10   anyway, have locked down all of this information; is

11   that correct?

12           MS. BARNETT:  Yes, Your Honor.  And because,

13   as the court may remember, the Department of Justice has

14   its own archive systems and everything, so we do have a

15   number of things that were preserved even before the

16   court asked us to preserve or protect some of this

17   information.

18           But I would want to make it clear though this is

19   with regard to our materials in the U.S. Attorney's

20   Office.  We don't have any control over CCA and their --

21   their records or what they're doing with their

22   materials.  So I just want to make that clear to the

23   court.

24           THE COURT:  All right.  Obviously there may

25   be communications between your office and CCA and/or the

16-20032 USA v Lorenzo Black, et al  10.28.2016                    25

1    Marshal Service, and so you do have control at least

2    with respect to incoming and outgoing communications and

3    sharing of information or whatever interactions you've

4    had with these other entities.

5              MS. BARNETT:  Correct, we have control over

6    our side of that equation or communication.

7              THE COURT:  All right.  I think we're ready

8    now to move on to what the discovery conference order

9    asks.

10             MR. LAURANS:  Excuse me, Your Honor.

11             THE COURT:  Yes, Mr. Laurans.

12             MR. LAURANS:  I don't want to beat a dead

13   horse, I'm a little confused.  Procedurally it seems to

14   me there's a gap.  Could the court perhaps order a

15   mechanism through which the U.S. Attorney's Office is

16   directed today to make clear communications to CCA and

17   Securus and the marshals to comply with this order?

18   Because what I'm hearing from Miss Barnett is, well,

19   we're just doing our part; we don't have control over

20   these other people.  You certainly have enough control

21   to get the video and telephone calls with a grand jury

22   subpoena and without one.

23             So I'm hoping that perhaps there's -- I mean, I

24   don't see counsel for CCA, Securus, or the marshals

25   here.  And I had this problem in a motion that was

1    granted by you last month to get some video and I just

2    want to make sure that there's a mechanism in place to

3    at least communicate to these people your order.

4              THE COURT:  I can tell you that Mr. Cohen

5    has been in touch with attorneys from CCA.  I'm not sure

6    about Securus.  Are you the CCA attorney?

7              MS. BROCKERT:  Yes, Your Honor.  Alyssa

8    Brockert.  I'm the local counsel for CCA.

9              THE COURT:  Tell us your name again, please.

10             MS. BROCKERT:  Alyssa Brockert.  I've been

11   in communication with CCA, the corporate office, as well

12   as the Leavenworth detention facility.  I also e-mailed

13   Mr. Cohen last month.  I'm not sure he received my

14   e-mail.

15             MR. COHEN:  I did.  Thank you.

16             MS. BROCKERT:  We invited Mr. Cohen to visit

17   our facility, to answer any questions he might have,

18   also to discuss any preservation orders CCA -- might

19   pertain specifically just to CCA.

20             In response to -- to the information retained by

21   the AUSA's office, one -- unless we need it -- unless

22   CCA needs it for internal use, they don't retain

23   anything that they provide to the AUSA's office.  So,

24   for instance, if video recordings or audio recordings

25   are requested, they would pull that from the DVR,

1    transfer it to a terabyte drive and then give the

2    terabyte drive to the AUSA's office.  Eventually that

3    DVR would record over.  So we don't keep a copy of the

4    terabyte drive.  We don't keep anything that we've

5    pulled.

6         So as far as any future information that you're

7    asking be -- be stored, we would want to know

8    specifically if you're wanting us to go ahead and pull

9    all of the current video.  We did obviously remove the

10   video recording pursuant to your order from the attorney

11   conference rooms.

12        And but again obviously we can talk with

13   Mr. Cohen.  I am here.  I am making notes.  We do intend

14   to comply and cooperate as fully as possible with the

15   court's and Mr. Cohen's orders.

16             THE COURT:  All right.  And when -- when a

17   request is made by you by -- to you by the U.S.

18   Attorney's Office or the Marshals Service or otherwise

19   for recordings, whether they're audio or video, do you

20   all keep a record of that request whether it's a phone

21   conversation or whatever it might be?

22             MS. BROCKERT:  Well, pursuant to our

23   contract with the U.S. Marshal Service -- and I keep

24   saying "our."  I'm local counsel only.  I don't

25   necessarily speak on behalf of CCA.  But my

1  understanding is that pursuant to the CCA's contract

2  with the U.S. Marshals Service, the information that's

3  retained by CCA is considered property of the U.S.

4  Marshal Service.  So whatever request is made from the

5  U.S. Marshal Service, be it oral or written or e-mailed,

6  it's provided.  Otherwise, we require the formal

7  procedure with regard to either a search warrant or

8  grand jury subpoena which then involves our counsel.

9  But with regard to requests by the U.S. Marshal Service,

10  it -- any of those methods could be used to obtain

11  information.

12        We certainly do retain e-mails and -- and letters

13  that are submitted and it filters through a very small

14  department in the -- in the facility.  So it should be

15  easy to obtain anything that is written.  As far as oral

16  goes, there would be no way to collect that information.

17            THE COURT:  All right.  Thank you,

18  Miss Brockert.

19        Mr. Laurans, so we've talked about the U.S.

20  Attorney's Office and CCA.  The other leg of this stool,

21  so to speak, is the Marshal Service.  And Mr. Cohen will

22  be in conversation with them as well.  I can tell you

23  that Mr. Miller -- I don't know if he's here -- but he's

24  been very helpful, and the Marshal Service in general

25  has been very helpful, in terms of some other requests

1   the court has had in this case.  So --

2              MR. LAURANS:  Thank you, judge.

3              MR. COHEN:  Just ask if counsel for Securus

4   is present.

5              (No response.)

6              MR. COHEN:  Thank you.

7              THE COURT:  All right.  Mr. Cohen, are you

8   ready to work on the questions?

9        And I don't know -- I guess I should find out

10  from you, Miss Barnett or Mr. Oakley, whoever, in the

11  discovery conference order it's -- based on Mr. Cohen's

12  extensive review of the record, he had some idea of some

13  people that may have firsthand information to answer

14  some of these questions.  I don't know if any of those

15  folks are here such as Miss Brockert or whether you

16  conferred with them and that's how you're going to

17  answer some of these questions.  I mean, what -- what is

18  -- how do you intend to proceed?

19             MS. BARNETT:  Actually, Your Honor,

20  Mr. Oakley reached out to the agents that were

21  identified.  Excuse me, having trouble with the chair.

22  So we can provide answers to the questions that are

23  related to the way that the U.S. Attorney's Office or

24  Secret Service received the information or the evidence

25  in the case.

16-20032 USA v Lorenzo Black, et al  10.28.2016          30

1          But there are some of the questions -- and we've

2    kind of mapped out the ones that we think that CCA is in

3    a far better position to respond to those if CCA's

4    counsel can address those, because we simply don't know

5    internally how certain things occur there or would not

6    want to try to explain it.  It would be better if

7    somebody at CCA could explain that to Mr. Cohen.

8          So we're prepared to go forward and give answers

9    to the questions that we feel we can answer about our

10   own internal processes and procedures.

11             THE COURT:  All right.  Mr. Cohen, let's

12   proceed.

13             MR. COHEN:  Hello.  My name is David Cohen.

14   I'm from Cleveland.  Go Tribe.  And what I propose that

15   we do -- I'm going to sit down obviously, so I apologize

16   if I'm not looking at you directly.  But I think that

17   what we ought to do is go through this discovery order

18   topic by topic and not person by person.  And I'll just

19   ask you to give me the information that you have about a

20   given topic.  The information might be something that

21   the AUSA's Office provides.  It might be something CCA

22   wants to get up and chat about.  It might be something

23   the Marshal -- Marshals Office or Secret Service or

24   Securus talks about.

25             So I'm not going to divide it up by who speaks.

16-20032 USA v Lorenzo Black, et al  10.28.2016                    31

1    I'm going to divide it up by topic.  And really it's as

2    an informal a chat as you can have in a courtroom in

3    front of a judge.  But I just want to try and get some

4    information so that I can understand what we have and

5    how it works so that I can, as quickly as possible, get

6    you all what you need, which is video and audio that

7    isn't privileged.

8         I understand that the government has said we'll

9    just forego the video altogether, that might make it a

10   lot simpler depending on whether -- that's where we end

11   up, and also that you may request only very few audio

12   recordings.  I still need to know how it was gathered,

13   how it's kept, how I can view it, what problems I might

14   have, whether metadata was kept and so on.

15        So let's just go through this.  We'll have a

16   conversation.  If you have anything that is relevant on

17   that topic, raise your hand and tell me.  Doesn't matter

18   who you work for or how you got that information.  Does

19   that make sense?

20             MS. BARNETT:  Yes.

21             THE COURT:  Except that I'd like you, when

22   you do that, to identify yourself by name so the court

23   reporter can identify who you are and the court as well.

24             MR. COHEN:  So I'm looking at the discovery

25   order at page 2 on the top and we'll just go through

1    this.  And we'll add now I expect, as I mention in here,

2    that after this formal hearing maybe some of us will get

3    together and we'll sit around a desk and you'll show me

4    how it works on a computer and talk about how the

5    software works, that kind of thing.

6           But we'll start on the top of page 2 with the

7    video recording operation at CCA.  And if somebody could

8    explain, you know, how that works.  There are a whole

9    bunch of cameras that are all recording.  They go on

10   to -- the recording goes onto a hard drive.  How is that

11   segregated?

12          There's a list of hard drives that show which

13   cameras.  How is that list created?

14          Is that the only -- is that for sure the only

15   thing that could possibly be on that hard drive because

16   of the hardware?  Those kinds of things.

17          So that's the question.  Who wants to start?

18              MR. BIGELOW:  I'm Wayne Bigelow.

19              THE COURT:  We're going to need you all to

20   come forward.  I'm sorry, we're having a great deal of

21   difficulty hearing even the lawyers.  So I'll ask the

22   lawyers to also use the lectern, anyone who --

23   Mr. Bigelow, right here at this lectern, you can use

24   that microphone.

25              MR. BIGELOW:  All right.  I'm Wayne Bigelow.

1    I'm the Security Threat Group Coordinator at Leavenworth

2    Detention Center and I basically in -- in my purview,

3    with covering the gang situations there and individuals,

4    I have occasion to make recordings of phone calls.

5          As far as the Pelco, or video system, we have six

6    DVRs that are in a room that record video over a 24-hour

7    period in different parts of the facility from the

8    parking lot to the hallways and the dorms where the

9    individuals -- the inmates are kept.

10          I believe -- I'm not an expert on this but I

11    believe that the -- each one of the DVRs recycle every

12    so many days.  I think it's every 30 days and then they

13    record over, and we can access those to make video

14    recordings.

15                MR. COHEN:  Who is the expert?

16                MR. BIGELOW:  Our IT officer is Charles

17    Atkins.

18                MR. COHEN:  Can you spell his name for me?

19                MR. BIGELOW:  A-T-K-I-N-S.

20                MS. BROCKERT:  I'm just going to interject.

21    Alyssa Brockert again.  The DVR -- there are no hard

22    drives.  They -- they're DVRs that record over.  Nothing

23    is stored on that.  And -- and the 30-day period is the

24    -- is usually the minimal time frame for rerecording

25    where it starts to record over.  It depends on the size

1   of the recording that's being stored on that DVR.  So

2   there's a capacity to each DVR.  And depending on the

3   number of cameras associated with that DVR or the amount

4   of data that's starting to collect, it can be anywhere

5   from 30 to 90 days before it starts to roll over.

6        CCA does not, unless there is a specific incident

7   that occurs that we need for our -- if internal

8   processes need to pull video or unless there's a request

9   received, it just continues to -- to feed over itself --

10             MR. COHEN:  I understand.

11             MS. BROCKERT:  -- and nothing is retained.

12             MR. COHEN:  It sounds like this is something

13   I'll need to chat with Mr. Atkins about.  But a given

14   DVR is receiving video from only certain cameras?

15             MR. BIGELOW:  That's correct.

16             MS. BROCKERT:  Right.

17             MR. COHEN:  So if there are ten cameras in

18   attorney-client rooms, they are going to one DVR let's

19   say and not to another DVR?

20             MR. BIGELOW:  That's correct.

21             MS. BROCKERT:  Potentially.  And I wouldn't

22   know which -- which cameras.  I'm not sure if some of

23   the cameras in the attorney's rooms were one DVR and

24   some -- how that's set up.  But, yes, that's

25   potentially.

16-20032 USA v Lorenzo Black, et al  10.28.2016                    35

1              MR. COHEN:  Okay.  Mr. Atkins presumably

2    would know?

3              MS. BROCKERT:  We would hope so.

4              MR. COHEN:  What that suggests is that I

5    would only need to review a small subset of what has

6    been produced; is that right?

7              MS. BROCKERT:  Yes.  And I'm skipping ahead

8    a little bit to your order, but in regards to the camera

9    roster --

10             MR. COHEN:  Right.

11             MS. BROCKERT:  -- how that was created, it

12   is my understanding, after speaking to the warden, that

13   that camera roster is automatically created,

14   automatically pulled based on which cameras are assigned

15   to which DVR.  So each DVR has a roster of what is -- is

16   the feed that's being -- being recorded onto that DVR.

17       And when it's downloaded onto the terabyte drive,

18   it was our understanding that that camera roster was

19   downloaded as well.  So it is something that's

20   available.  It was not something that was created, we

21   believe, outside the -- the purview of a software system

22   that we record the data on.

23             MR. COHEN:  So information was downloaded

24   from the DVR to the hard drives that were produced to

25   the court.

1          MS. BROCKERT:  Once we received -- once CCA

2    received the request, they pulled what they had and --

3    and transferred it to a terabyte drive at which point we

4    then gave the drives to the AUSA office.

5          MR. COHEN:  Tell me who "they" is and what

6    they did actually.

7          MS. BROCKERT:  Who "they" is?

8          MR. COHEN:  They.

9          MS. BROCKERT:  I'm not sure who the

10   individuals were that actually did the downloading.

11         MR. BIGELOW:  At the previously the -- the

12   previous IT guy.

13         MS. BROCKERT:  Kenneth --

14         MR. BIGELOW:  Kenneth Lageness.

15         MS. BROCKERT:  Kenneth Lageness was the

16   individual sort of integral with this initial request.

17   He no longer works at CCA.  We do know where he's

18   working now but we're not sure if we would be able to

19   get him to come and speak to you about this.  But

20   Mr. Bigelow essentially replaced most of Mr. Lajiness'

21   duties; correct?

22         MR. BIGELOW:  Well, I deal with the Securus

23   stuff.

24         MS. BROCKERT:  Since he's left, there's been

25   no person that is -- exactly did his job that's been

1    replaced.  So he would be the one that could really

2    speak particularly to this -- this response to this

3    subpoena.

4            MR. COHEN:  What is his last name, please?

5            MS. BROCKERT:  It's Lageness.  And I believe

6    it is spelled L-A-G-I-N-E-S-S.

7            MR. BIGELOW:  L-A-J.

8            MS. BROCKERT:  L-A-J -- L-A-J-I-N-E-S-S.

9            MR. COHEN:  If you were to receive a request

10   today for video, who would do it?  Who would make that

11   transfer as Mr. Lajiness did?

12           MR. BIGELOW:  It would be Mr. Atkins.

13           MS. BROCKERT:  Mr. Atkins.

14           MR. COHEN:  There's a lot -- a lot to read

15   and I've tried to read it all at least once, and I think

16   that I understand that there -- that the Secret Service

17   played a role in making the copies.  I don't know if

18   this is something the government wants to chat about.

19   Go ahead.

20           MR. OAKLEY:  Yes, I can.

21           THE COURT:  You -- actually, you can stay as

22   long as you use the microphone.  You can stay there.

23   I'm fine with that.

24           MR. OAKLEY:  Yes, Your Honor.  My

25   understanding is --

```
 1                 THE COURT:  Go ahead and be seated.
 2                 MR. OAKLEY:  My understanding, the United
 3    States Secret Service Agent, Special Agent Andrew
 4    Matushek, physically went to CCA.  He had coordinated
 5    with CCA to know what type of DVR, the make and model,
 6    and so he physically brought -- brought them brand new
 7    blank DVRs and physically took the DVRs that CCA had.
 8    So he obtained the originals.
 9                 MR. COHEN:  He met -- presumably he met
10    with -- Mr. Atkins gave him these.
11                 MR. OAKLEY:  I believe it was Mr. Lajiness.
12                 MR. COHEN:  Lajiness.  Received the copies
13    from Mr. Lajiness.
14                 MR. OAKLEY:  He physically got the
15    originals.
16                 MR. COHEN:  I see.  The original DVRs?
17                 MR. OAKLEY:  Yes.
18                 MR. COHEN:  Go ahead.
19                 MR. OAKLEY:  He took them back and made a --
20    duplicate copies.  For drives one through three, and
21    five through six, he simply did this using the File
22    Manager application and the Windows operating system.
23    However, he had an issue with DVR No. 4.  And so in
24    order to make the copy of that one, he used a program
25    called FTK Imager Lite along with the -- the File
```

1    Manager application.  He then labeled the exterior of

2    the box with each DVR number and provided the U.S.

3    Attorney's Office with a copy and both.  The original

4    and the copy have been provided to the court.

5              MR. COHEN:  And there was reference to some

6    white ones and some black ones.

7              MR. OAKLEY:  We're not sure what that

8    references to, if that refers to the color of the

9    exterior box.  I'm not sure.

10             MR. COHEN:  I think -- so --

11             MR. OAKLEY:  We don't have --

12             MR. COHEN:  I think a copy made of the copy

13   as to some of them?

14             MR. SLINKARD:  No.  Well, again the under --

15   the understanding that I have is the same as Mr. Oakley

16   had is the -- what Secret Service obtained from the CCA

17   facility was the original drive CCA had been using.

18   They provided them with blank drives that CCA could use

19   for their purposes moving forward, took the DVRs of

20   CCA's, then they duplicated those.

21             I may have this exactly backwards because I

22   handled them at the earlier hearing when turning them

23   in.  My recollection is that the larger boxes that I

24   believe were white in color are the DVRs that were the

25   copies that were made for the U.S. Attorney's Office

1   that were surrendered to the court and the smaller box

2   packaged DVRs, which I believe may have been black in

3   color, were the original drives --

4               MR. COHEN:  Originals.

5               MR. SLINKARD:  -- by Secret Service and

6   copied onto the white box drives.

7               MR. COHEN:  I understand.  That's helpful.

8   Thank you.  All right.  This is something that I -- this

9   next question I anticipate we'll talk more about after

10  we're done, but with whom will I sit to learn how to

11  actually view these and how the software works?

12              MS. BARNETT:  I think Pauletta Boyd in our

13  office is probably in the best position to maybe try to

14  sit down.  She actually prepared directions, as I

15  understand it, for defense counsel in anticipation of

16  the evidence.

17              THE COURT:  We're having trouble hearing

18  you.

19              MS. BARNETT:  I'm sorry, Your Honor.  She --

20  Pauletta Boyd can actually sit down with you and explain

21  that.  However, Miss Boyd is out yesterday afternoon and

22  today on vacation time.  So but I do believe she'll be

23  back next week, but she would be the one who I think

24  could do the best job talking you through it.

25              THE COURT:  Is there someone that can assist

 1    him this afternoon since he's here from Cleveland?

 2             MS. BARNETT:  Well, we can try.  We have the

 3    software and the instructions here with us right now.

 4    So we could sit down and try or get maybe one of our IT

 5    people to help with it, although they -- they didn't

 6    have any exposure to it whatsoever.

 7             MR. COHEN:  I think I saw at one point

 8    Miss Rokusek's investigator kind of knew how this

 9    worked.  Is he here?

10             MR. REDMOND:  No.

11             MS. MORGAN:  I'm going to text him right

12    now.  I'm going to text him and see if he's available.

13             MS. BRANNON:  I thought Miss Rokusek was

14    going to call in to be part of this hearing.  Perhaps

15    not.  But he is the one, in fact, that assisted the

16    court in looking at these videos originally and I think

17    he had a fairly good working knowledge of it and we'll

18    try to get him here this afternoon.

19             MR. COHEN:  Yeah, I mean, I would just like

20    to get started.  Okay.  Did I identify correctly, the

21    software?  I called it DX8100.

22             MR. OAKLEY:  I believe so.  That's the label

23    on the disk that I have.

24             MR. COHEN:  That may be Windows version

25    specific.  So I think there might be one that if I have

 1    Windows 10 I might need something different, but we'll

 2    have to figure that out.

 3         Okay.  I think that I already know the answer to

 4    this, I think you've partly addressed it, and that is

 5    about the index or folder structure.  It sounds like

 6    that is there.  I think given what you've told me that,

 7    to the extent there's metadata, it's been copied, but do

 8    you know?  Have you been able to chase that down?

 9              MS. BARNETT:  We haven't had access to it,

10    so we -- we don't know if --

11              MR. COHEN:  That's okay.

12              MS. BARNETT:  Do I understand correctly

13    you're asking us if we know there's metadata there?

14              MR. COHEN:  More in particularly if the

15    copying process would have retained all the metadata on

16    to the copy?

17              MR. SLINKARD:  Secret Service made the copy,

18    so I -- we have no idea.

19              MS. BARNETT:  Don't know.

20              MR. COHEN:  And that was Mr. Matushek; is

21    that right?

22              MR. OAKLEY:  Yes, sir.

23              MR. COHEN:  And he's not here?

24              THE COURT:  Are you here?

25              MR. OAKLEY:  He's not here, but of course

16-20032 USA v Lorenzo Black, et al  10.28.2016                    43

1    one of them's the original.  So presumably the metadata

2    would still be contained on the original.

3             MR. COHEN:  Good point.

4             MR. OAKLEY:  To the extent using the File

5    Manager system transfers the metadata, then presumably

6    it's on the copy.  But I'm not for sure the answer on

7    that.  He may know.

8             MR. COHEN:  Miss Brockert, do you know over

9    the last several -- several years how often there has

10   been production of video or audio to the government?

11            MS. BROCKERT:  I don't know that.  I -- the

12   -- I usually get involved when there's a subpoena or

13   search warrant but rarely what -- really just as a

14   subpoena.  Search warrants are usually done without my

15   knowledge.  As far as the informal request from the U.S.

16   Marshals Service, I would have no idea.

17            MR. COHEN:  And I guess this next one would

18   be a question for you, Miss Brockert, and that is what

19   is CCA's normal video recording retention policy?  You

20   have talked a little bit about it kind of records over

21   itself every 30, say, 120 days.  Is that the answer?  Is

22   there anything more to that?

23            MS. BROCKERT:  Only if we have to -- if

24   there's an incident, there's an injury to an inmate or a

25   fight or there is -- somebody notices that there might

16-20032 USA v Lorenzo Black, et al  10.28.2016                    44

1    have been introduction of contraband or something into

2    the facility, then they'll pull that tape for -- and

3    hold on to it and if it becomes necessary use in the

4    future.  So really in those cases there might be some

5    video that is still in the possession of CCA for its own

6    internal use.  And again I would have no way of knowing

7    specifically what that pertains to but I know the

8    facility could make that available.  I'm just not sure

9    how much.  Looking back we have to do --

10            MR. COHEN:  I understand and you're still

11   doing that today.  You're still recording over?

12            MS. BROCKERT:  Yes, its -- the DVRs that

13   were seized by the -- by the AUSA's office -- or by the

14   Secret Service essentially were replaced and now they're

15   recording over.  And then again if there's an issue,

16   then we'll pull that video.  But otherwise it's just

17   recording over and over again.

18            MR. COHEN:  Okay.  So the next question goes

19   to you also but probably more directly to Sergeant

20   Bigelow, and that is can you explain to me how this OMS

21   works?  The Offender Management System, every inmate's

22   got a GPS chip?

23            MR. BIGELOW:  What was your question again,

24   sir?

25            MR. COHEN:  How does the Offender Management

1    System work?  Can you explain that to me, what it is and

2    how it works?

3              MR. BIGELOW:  Specifically it's our way of

4    keeping track of our inmate population.  What they're --

5    we've got information on what they're charged, whether

6    or not they're adjudicated or non-adjudicated and what

7    their classification level is according to what their

8    charge is based on their charge and their history.

9              MR. COHEN:  So it has nothing to do with

10   knowing where they are in Leavenworth at a given moment?

11             MR. BIGELOW:  Just in our facility.

12             MR. COHEN:  Just that -- there at

13   Leavenworth, not where they are in Leavenworth?

14             MR. BIGELOW:  (Witness nods head.)

15             MR. COHEN:  Okay.  So I misunderstood.

16             THE COURT:  I'm not understanding.  I

17   thought there was a system that you were able to tell

18   when an inmate was in their pod versus when they had

19   gone to medical versus when they were in an

20   attorney-client room.

21             MR. BIGELOW:  No, ma'am, not specifically.

22   We -- I can go into the system and put the individual's

23   federal ID number in or their name and pull them up and

24   it will show me a profile.  It will tell me where

25   they're housed.  I can check whether or not they're

1    adjudicated or non-adjudicated, what their

2    classification level is.  I mean, there's a -- there's a

3    lot of information there but I cannot chart their

4    movement inside the facility with that system.

5              MR. COHEN:  Okay.

6              THE COURT:  And there is -- just so I

7    understand, so there is no other system or other way of

8    keeping track of, for example, when an inmate leaves

9    their pod for a reason such as to go to medical or to

10   meet with their lawyer or to go to the visitor room?

11             MR. BIGELOW:  No, ma'am.  If they leave the

12   facility for court or for a medical appointment or

13   something of that nature, then we -- we do, that shows

14   up.

15             MS. BROCKERT:  That's in the OMS system.

16   It's only their arrival to the facility and then any

17   moves outside of the facility gets recorded in that

18   Offender Management System.  So if they have an outside

19   doctor appointment or court appearance, that will show

20   up in the Offender Management.

21             When they're in the facility, the only way to

22   really monitor their movement is through their case

23   manager who would certainly need to be made aware of any

24   time they leave an area that they're not supposed to be

25   in for that specific time of day.

1          THE COURT:  Okay.  But no logging in, for

2    example, when they're meeting with their lawyer?

3    There's no -- there's no log of where the offender is.

4    Now there is a log though that shows when lawyers come

5    to visit.

6          MS. BROCKERT:  That's correct, yes.

7          THE COURT:  And how does that work?

8          MS. BROCKERT:  Essentially the attorneys,

9    normally they'll either make a request of I'm going to

10   be here on this date and can I, please, see my client,

11   or they'll -- they can just show up if they know

12   specifically when.  Because there are times during the

13   facility where they're in lockdown, if there's count or

14   if they're eating, and visitation really can't occur at

15   that time.

16         But once that occurs, they'll sign in.  They're

17   handed a visitor's badge and have to go through the

18   security system, and then they are directed to a

19   conference room and the inmate is retrieved and brought

20   to them in that conference room and the meeting occurs

21   and they sign out when they leave.

22         MR. COHEN:  So the log of visitors who come

23   to meet with inmates includes attorneys, other folks as

24   well, including sometimes, for example, agents who are

25   interviewing inmates to find out what they know.  And is

16-20032 USA v Lorenzo Black, et al  10.28.2016                    48

 1    that all one log or are attorney -- is the attorney

 2    visitor log separate?

 3                MS. BROCKERT:  I believe the sign-in sheet

 4    is for everybody; family members, attorneys.  You sign

 5    in and those logs are -- are retained.  I'm not sure how

 6    far back they've gone but the -- both the logs and any

 7    written request to meet with the inmate have all been

 8    retained.  So that's all available for inspection.

 9    Obviously if -- if we're going to produce them, we'd

10    need to redact any personal information that might be on

11    there.

12                THE COURT:  Are they specific to time,

13    time-in, time-out?

14                MS. BROCKERT:  That -- yes, yes.

15                MR. JACKSON:  Your Honor, I have a copy of

16    what we're talking about visitation-wise if that would

17    help.

18                MR. COHEN:  Can you identify yourself

19    please, sir.

20                THE COURT:  This is Michael Jackson,

21    attorney for Catherine Rowlette.

22                MR. JACKSON:  Here you are.

23                MR. COHEN:  Thank you, sir.

24                MR. JACKSON:  Sure.

25                THE COURT:  Thank you, Mr. Jackson.

16-20032 USA v Lorenzo Black, et al  10.28.2016                    49

```
 1                MR. JACKSON:  Yes.
 2                MR. COHEN:  Where did you get this, sir?
 3                MR. JACKSON:  That came from government
 4    discovery.  On the sticky note it gives the file
 5    location.
 6                MR. COHEN:  And were there any redactions in
 7    here?
 8                MR. JACKSON:  No.
 9                MR. COHEN:  Do you know whether this
10    includes --
11                MR. JACKSON:  Attorney-client -- attorney
12    names.
13                MR. COHEN:  It does include attorney names,
14    yes?
15                MR. JACKSON:  Yes.
16                MR. COHEN:  It does include non-attorney
17    names?
18                MR. JACKSON:  Yes, it does.
19                MR. COHEN:  Do you know whether it includes,
20    for example, names of agents visiting with inmates?
21                MR. JACKSON:  I didn't see any in there, no.
22                MR. COHEN:  I'm sorry, who produced it?
23                MR. JACKSON:  That was produced by the
24    government and I've got the file location there.
25                MR. COHEN:  So this runs from August 2014
```

1    through March of 2016; is that right?

2              MR. JACKSON:  No, it's inclusive of all the

3    time that the inmate would have been at CCA.  So if

4    you'd look at a different individual, their start date

5    would be different.

6              MR. COHEN:  I see this is particularly to an

7    inmate.  I understand now.

8              MS. BRANNON:  If I may, this is Melody

9    Brannon.  Just in terms of the records that are kept for

10   attorney visitation, CCA requires us to schedule

11   24 hours ahead of time for anyone we're seeing.  We can

12   do that by phone or by e-mail.  So there should be an

13   e-mail record of that as well.

14        When we arrive, there is a sign-in at the front

15   desk that has who we are, who we're seeing.  Then

16   there's also another CCA guard who has a spreadsheet of

17   which attorneys are meeting with which clients in which

18   rooms.  That is not -- it doesn't follow exactly because

19   sometimes they switch the rooms around, but there should

20   be at least three sets of records on these visitations.

21             MR. COHEN:  Miss Brockert, do you know

22   anything about the last log she said, the spreadsheet?

23   And is that electronic this -- attorneys where they're

24   meeting with clients?

25             MS. BROCKERT:  I can't speak to that.

```
1              MR. BIGELOW:  It's printed -- it's printed
2    for the beginning of the day, issued to -- the lobby
3    officer has a copy.  The receptionist has a copy and we
4    have an officer that is -- that their position is to --
5    to pick up the inmates and to coordinate with the lobby
6    on getting the attorneys in and out of their given areas
7    they're supposed to meet with inmates.
8              MR. COHEN:  Do you think you could produce
9    to me all of the records that have to do with
10   attorney-client meeting rooms for the period that
11   matches for every inmate in every room that matches the
12   video recordings?
13             MS. BROCKERT:  Yes.  We -- I would need to
14   go back and make sure I had a list of the inmates that
15   were showing up on the list of video recordings because
16   again we didn't retain any copies of that information.
17   So I just need to know which inmates you're talking
18   about and we could pull that.
19             MR. COHEN:  Every inmate who met with an
20   attorney during that period of time.
21             MS. BROCKERT:  Okay.
22             MR. COHEN:  Thank you.
23             MS. BROCKERT:  During March 2014 through --
24             MR. COHEN:  (Nods head.)
25             MS. BROCKERT:  Yeah, that can be provided.
```

1              MR. COHEN:  It sounds like there's more than

2     one --

3              MS. BROCKERT:  -- log.  I'll pull whatever

4     it is that we -- that CCA retains.

5              MR. COHEN:  Does the government have any

6     concern about that?

7              MS. BARNETT:  Well, I think our only

8     concern -- I thought I understood you're asking for --

9     just for the log of an attorney meeting with a client.

10    We would want to make sure it doesn't also capture an

11    agent meeting with somebody and reveal the possibility

12    of cooperation or an ongoing investigation.

13             MR. COHEN:  Right.  So I think you'll need

14    to work together because at least one of those logs

15    probably contains more than just attorney names.  I

16    understand I don't need it, don't want it and shouldn't

17    get it.

18        I asked this of Miss Brockert but I may as well

19    ask you too, may as well ask the government, can you

20    give me any idea of how often you've received records,

21    video or audio, in the last five years, just choose a

22    number?

23             MS. BARNETT:  No, I really can't.  We don't

24    have a central filing system where we log every time we

25    would make a request to CCA or the marshals.  Our

1  recordkeeping system is really very case and file

2  specific.

3            MR. COHEN:  How would you go about, if the

4  court asked you to produce information regarding all

5  requests for the last five years that you've made of the

6  marshals or CCA, whoever it was to, or Securus, for

7  audio and video recordings, how would you compile that?

8            MS. BARNETT:  Several different ways to make

9  sure we captured it as many times as possible.  It would

10 be actually polling employees and staff and it would

11 actually be a physical pulling of every file that has

12 been opened in our office for the last however many

13 years and actually physically going through them.

14       Bear in mind though, up until recently we're

15 mandated by our own internal policies, once a case is

16 closed because of an end of prosecution or we've decided

17 an investigation will go no further, we have

18 requirements about purging or the destruction of

19 information in our files.  So it may be there are some

20 files we closed or purged back in May that we wouldn't

21 have then a record of whether or not we'd made a request

22 in that case and it would just simply be up to

23 somebody's memory.

24            MR. COHEN:  Would the request be made to --

25 to whom would the request normally be made?  I've heard

1    the marshals.  I've heard Securus.  I've heard CCA.

2    Some of those, all of those, how does it usually happen?

3              MS. BARNETT:  With regard to our Kansas City

4    office, I think -- and if I understand you correctly who

5    would we ask for that evidence, I think generally it

6    goes through the marshals because our office works

7    closely with the Marshal Service, and the marshals are

8    perceived to be the people that are in charge of CCA.

9              MR. COHEN:  And you don't know about their

10   record retention?

11             MS. BARNETT:  No, I do not.

12             MR. COHEN:  Judge, do we know who we would

13   ask at the U.S. Marshal Service about their record

14   retention?

15             THE COURT:  Mr. Craig Beam is here.

16   Mr. Beam.

17             MR. COHEN:  Hi.

18             MR. BEAM:  Hello.  My name's Craig Beam.

19   I'm the chief deputy with the U.S. Marshals Service here

20   in the District of Kansas.  The Marshal Service does not

21   keep a log whenever a request is made to us to go to CCA

22   for recording.  It's strictly a case-by-case basis.  So

23   I cannot think of a way where we would be able to pull

24   all of the requests that were made.  So it would be much

25   like how Miss Barnett referred to it, we would have to

16-20032 USA v Lorenzo Black, et al  10.28.2016                    55

1    poll each individual and agency and rely on their memory

2    to see if -- what was requested of CCA through us.

3              MR. COHEN:  How often does it occur?

4              MR. BEAM:  It's hit and miss.  I mean,

5    sometimes we receive a lot of them.  Sometimes we don't

6    receive any for several weeks.

7              MR. COHEN:  And that's audio and video,

8    requests for audio and video?

9              MR. BEAM:  Correct.

10             MR. COHEN:  When you receive a request for

11   audio, you go to Mr. Atkins or Lajiness or somebody in

12   that role?

13             MR. BEAM:  I personally don't know.  We have

14   a COR contract oversight specialist position in our

15   office who generally makes a request to CCA if the

16   request is made of our agency.

17             MR. COHEN:  You said COR?

18             MR. BEAM:  Right, Contracting Officers

19   Representative.

20             MR. COHEN:  Who is that?

21             MR. BEAM:  Currently it's Patricia Cook.

22   She's in our office here in Kansas City.  That's not to

23   say every request is made through her but generally I

24   would say the majority of them are.

25             THE COURT:  Mr. Beam, so when a request is

1    made, I assume it's made by -- and I'm speaking to jail

2    calls, not video, made by name of the detainee and isn't

3    there typically a time parameter, I want every phone

4    call or of Joe Blow, or more often I want the jail calls

5    Joe Blow between January 1 and June 1?  How does that

6    work?

7            MR. BEAM:  Yes, typically it could be an

8    agent, a case agent involved in the inmate's case.

9            THE COURT:  It's not necessarily initiated

10   by a call from the U.S. attorney, it could be just an

11   agent?

12           MR. BEAM:  Right.

13           THE COURT:  Okay.

14           MR. BEAM:  And that -- and of course we want

15   to know -- if the inmate's been there for several weeks

16   or months, we would obviously need to have a time frame

17   to tell CCA we need calls from, you know, the first of

18   the month to the last of the month or whatever the case

19   may be.

20           THE COURT:  So the reason I ask that, I

21   mean, because so the requests are given to you with some

22   sort of parameter detail that you then have to convey to

23   CCA.  So doesn't somebody take a note of that if it's a

24   phone call or a -- isn't there e-mails or something that

25   -- I mean, the court would be able --

1          MR. BEAM:  I can check.  I can check.  I'm

2    not aware of any log that we keep on that.  Generally

3    we're just kind of the go-between between the case

4    agents or and CCA typically.

5          MR. COHEN:  And the requests for -- we've

6    been talking about requests for video that you make to

7    CCA.  There are requests for audio that -- is that made

8    to CCA or made to Securus?

9          MR. BEAM:  I can't speak to CCA on what

10   Securus capabilities are or what it contains.

11         MR. COHEN:  I guess what I'm asking is do

12   you go ever directly to Securus or do you just go to

13   CCA?

14         MR. BEAM:  CCA.

15         MR. COHEN:  So you don't have any -- if a

16   request is made for audio recordings of phone calls by

17   an inmate at Leavenworth, an agent asked you to procure

18   that, you would never call Securus, you would go to CCA

19   and they would presumably go to Securus?

20         MR. BEAM:  Correct.

21         MR. COHEN:  All right.

22         MS. MORGAN:  Melanie Morgan.  I would move

23   to join in this litigation because phone calls that have

24   been acquired of my client, at least some of them, are

25   being acquired by a subpoena, a DEA subpoena that is

1   just broadly requesting all of her telephone calls.  So

2   I guess my concern would be a subpoena is issued to CCA,

3   is it going directly to CCA and they are complying with

4   the subpoena directly or is it being directed to the

5   U.S. Marshals Office as the conduit to CCA?

6           MS. BROCKERT:  We receive subpoenas

7   directly.  Particularly in this case we receive

8   subpoenas directly and have responded to them directly.

9   Now because we contract with Securus for our audio

10  recording, if we receive a subpoena, eventually that

11  information comes from Securus.  We -- but we are the

12  ones that make that request.  It comes through us and

13  then we pass it on to the individual issuing the

14  subpoena.

15          MR. COHEN:  Okay.  Judge, we've been going

16  for a while.  Do you think we might take a ten-minute

17  smoke 'em if you got 'em?

18          THE COURT:  Yeah, let's do that, I'd like to

19  talk to you for a few minutes.  So let's reconvene at

20  noon and what's our best estimate on how far we are?  I

21  mean, are we going to need to take a lunch break as well

22  or do you -- I can't tell where you're at.  I guess we

23  can talk about it on the break.

24          MR. COHEN:  That's fine.

25          THE COURT:  All right.  Let's be in recess

16-20032 USA v Lorenzo Black, et al   10.28.2016            59

 1    for 15 minutes.

 2              (Recess.)

 3              MR. COHEN:  Thank you, judge.  Welcome back.

 4    So we're going to pick up where we left off and that is

 5    on page 3 of the discovery order and that is to say

 6    audio recordings.  And I understand that Securus isn't

 7    here, so I think this may mostly be directed,

 8    Miss Brockert, to you and to Mr. Bigelow, and again if

 9    you don't mind taking the lectern.  If you could,

10    explain to me how the audio recording works, how you

11    obtain audio records when requested and also about the

12    blocking of attorney phone calls.

13              MR. BIGELOW:  The procedure as it stands now

14    is that attorneys that request to have a phone number

15    blocked, they will send me a fax or a letter with their

16    -- their firm letterhead on it and the list of numbers

17    that they are requiring to be and we -- I set them in

18    there as -- there's a category for attorney-client

19    privilege and that's the block that we put them under.

20              I install each of the numbers individually with

21    the -- when I finish the procedure, I just put the --

22    pluck the number in, I check the box on it that says

23    "attorney-client privilege" on it and then there's a --

24    a box at the bottom of the screen that -- that gives the

25    -- I put in the firm number, their -- or the attorney's

1   number, both, whichever's on the -- on the letterhead,

2   and then at the bottom it says "create" and that

3   establishes the -- the number as -- as not being able to

4   be monitored or recorded.  And -- and after that

5   procedure, then it will come back up, display the screen

6   to show me it's actually been completed.

7          At that point I will fax that letter back to the

8   -- to the law firm with a letter stating the date, which

9   is usually the same day, that this procedure was done

10  and those numbers that were on the -- on the letter that

11  they have, in fact, been -- been set up to where they

12  can no longer be recorded or monitored.  And I -- I then

13  I get a confirmation obviously back from the fax and I

14  file those.

15         MR. COHEN:  So you described you're sitting

16  in a computer when you do this.

17         MR. BIGELOW:  Yes, sir.

18         MR. COHEN:  And is the -- is it a piece of

19  software that you're using to do what you just

20  described?

21         MR. BIGELOW:  It's a -- it's a -- the

22  computer that Securus actually owns.  It's a -- it's a

23  desktop and it's got the Securus platform on it.  I have

24  a password obviously and I log in and go through this

25  process.

1            MR. COHEN:  And you said you receive letters

2     and then fax something back.  Is that something that

3     Securus asks you to do?

4            MR. BIGELOW:  No, sir.  No, sir.

5            MR. COHEN:  You just do that?

6            MR. BIGELOW:  I've been doing it since this

7     whole thing came about.  And I was -- initially I was

8     getting phone calls and I obviously didn't know who

9     these people were.  So I requested them to send me

10    some -- something in documentation so I could have

11    something tangible and that's how it evolved.  I decided

12    on myself that these individuals wouldn't have any way

13    of knowing whether I'd actually did it or not, so I

14    composed a letter and -- and run it by the Warden Thomas

15    and she gave it her blessing and that's the way we been

16    doing it.

17           MR. COHEN:  And I think I read that you

18    haven't been doing this for a real long time.

19           MR. BIGELOW:  I actually took this position

20    the last week of December 2015.  I've actually been

21    doing it for probably, I'm going to say, about seven

22    months physically.

23           MR. COHEN:  Do you know who did it before

24    that?

25           MR. BIGELOW:  Mr. Lajiness did it.

1          THE COURT:  Okay.  So there's also been some

2     testimony, some evidence that some folks have tried to

3     do what you just described, some attorneys have supplied

4     a phone number and said, hey, this is -- I'm an

5     attorney, and if a call goes out to me or call comes in

6     from me, I suppose, I don't know if that ever happens,

7     the system should know that it shouldn't be recorded but

8     that it was recorded.  Do you know how or why that would

9     happen?

10         MR. BIGELOW:  I can't speak to that.  I

11    don't know that the system is designed to identify those

12    numbers.  I mean, the process that I go through puts

13    them in there and identifies them because we've

14    established that that's through this process that that

15    number is not to be listened to.  But without that, I

16    don't know how the system can recognize it.  I'm really

17    not an expert on the system.

18         MR. COHEN:  Do you know, is every outgoing

19    call recorded unless the system has been told not to

20    record it because there's an attorney number?

21         MR. BIGELOW:  To my knowledge, yes, sir, if

22    it's not been -- been put under privilege or blocked,

23    every call is recorded by Securus.  Now, the process I

24    have to go through to -- to record on a disc, I have to

25    get -- I have to get an e-mail from Securus to get

1   permission to make the recording and that process has to

2   be done within a 24-hour period.

3           MR. COHEN:  I'm sorry, can you explain that

4   again to me, what you just said?

5           MR. BIGELOW:  When I get a request for a

6   phone -- a record --

7           MR. COHEN:  From?

8           MR. BIGELOW:  -- on a -- from -- from --

9   it's usually the Marshal Service.

10          MR. COHEN:  Okay.

11          MR. BIGELOW:  If I get a subpoena and it's a

12  subpoena, they'll ask me for those, I need it for such a

13  date and from the time the individual arrived at the

14  facility until they left or a specific time frame.  Then

15  I go in, go through a process where I pull those calls

16  up and flag them for -- to be recorded.  And then the

17  system is set up to where it sends an e-mail to Securus

18  to make that request.  And then I get a response back

19  from Securus giving me authorization to make those

20  recordings, and I have to do it within a 12-hour period.

21          MR. COHEN:  I see.  And so you're -- you

22  yourself make those recordings --

23          MR. BIGELOW:  Yes, sir.

24          MR. COHEN:  -- or copies --

25          MR. BIGELOW:  Yes, sir.

16-20032 USA v Lorenzo Black, et al  10.28.2016                    64

1          MR. COHEN:  -- of the recordings?  How do

2    you do that?

3          MR. BIGELOW:  It's just a regular desktop

4    that has the ability to burn DVDs and CDs and I go

5    through the process.  And once I have the -- the e-mail

6    authorization from Securus, then I just put the disc in

7    and download the file of recordings onto the disc.

8          THE COURT:  When you send the e-mail to

9    Securus for getting -- to get authorization --

10          MR. BIGELOW:  Yes.

11          THE COURT:  -- do you give them the name of

12    the person and the time frame that you want?

13          MR. BIGELOW:  Well, it -- it e-mails them a

14    file and the list of the phone calls.  So, yes, they

15    would have the names.

16          THE COURT:  I'm not understanding.

17          MR. BIGELOW:  They would have the names of

18    the inmates.  The inmates, when they make calls outside

19    the facility, have -- have to use their PIN ID number or

20    their federal ID number to access the phone system.

21          THE COURT:  Okay.  But that wasn't my

22    question.  My question is I think what you've described

23    is you contact Securus and say I have a request to make

24    copies of certain recordings by a person's name and for

25    a particular time period; correct?  You send an e-mail

16-20032 USA v Lorenzo Black, et al  10.28.2016                65

1    request to Securus to get that authorization?

2              MR. BIGELOW:  I send them an e-mail but I

3    don't give them a specific request by this individual.

4    I'm -- according -- as far as they know, I'm the only

5    one requesting it.

6              THE COURT:  Okay.  So what are you

7    requesting authorization for then?  I'm not

8    understanding.

9              MR. BIGELOW:  To -- to make a physical

10   recording of the phone calls.

11             THE COURT:  So you send an e-mail to Securus

12   that says I need authorization to make a copy of a

13   recording, period?

14             MR. BIGELOW:  That's right.

15             THE COURT:  You don't tell them of who, of

16   what time frame, just I need authorization?

17             MR. BIGELOW:  Well, the -- the way the

18   system is, it's a step process.  And the process I go

19   through, once I've -- I've established the calls,

20   they're flagged and the number of calls and the dates

21   involved and -- and it -- it -- I can't do random --

22   several random inmates.  It would be one individual.

23             THE COURT:  Okay.

24             MR. BIGELOW:  And then the system has my

25   e-mail address and I just -- I just click "create image"

16-20032 USA v Lorenzo Black, et al  10.28.2016                    66

1    and that sends the e-mail automatically to Securus.

2              THE COURT:  Okay.  So if I were to see this

3    e-mail because of the multiple steps you go through on

4    the platform or whatever, the e-mail's going to tell me

5    information about what it is you're recording what

6    dates?

7              MR. BIGELOW:  Yes.

8              THE COURT:  And it's going to be specific to

9    an inmate?

10             MR. BIGELOW:  Yes.

11             THE COURT:  That inmate's name may not be on

12   there or would it be on there?

13             MR. BIGELOW:  Well, yes, it would be.  It

14   would be their inmate name and PIN number, yes.

15             THE COURT:  Okay.  And that information's

16   going to be in the substance of the e-mail?

17             MR. BIGELOW:  That's correct.

18             THE COURT:  And that's an e-mail that CCA is

19   preserving in its system?

20             MR. BIGELOW:  No.

21             THE COURT:  Even though I'm --

22             MR. BIGELOW:  It would be -- it would be in

23   Securus' system as I understand it.

24             THE COURT:  Even though your system

25   generates an e-mail?

16-20032 USA v Lorenzo Black, et al  10.28.2016          67

1          MR. BIGELOW:  Right.

2          THE COURT:  Does your system not preserve

3    outgoing e-mails?

4          MR. COHEN:  I think I understand.  It's a

5    Securus computer that you're using?

6          MR. BIGELOW:  That's correct.

7          MS. BROCKERT:  Right, e-mail --

8    auto-generated e-mail from the system.  It's his Securus

9    login that's sending an auto-generated e-mail from the

10   system.  It doesn't go through CCA's e-mail procedures.

11         THE COURT:  Okay.  We're going to need

12   Securus to preserve that.  And obviously they're not a

13   party to this litigation but they are producing evidence

14   that's part of this case and a number of other cases in

15   which the courts -- this court has pending motions.  We

16   need all of that preserved.

17         MS. BROCKERT:  We do have a contact with

18   Securus and I will reach out to them this afternoon and

19   make sure that's being done.

20         THE COURT:  All right.  That contact person,

21   also if you can provide that name to Mr. Cohen.  I know

22   he'll want to talk to them as well.

23         MR. COHEN:  Is that Mr. Martin?

24         MS. BROCKERT:  Who's your --

25         MR. BIGELOW:  Michael Kenyon.

1              MS. BROCKERT:  Michael Kenyon.

2              MR. COHEN:  Do you know what position he

3    holds, Mr. Bigelow?

4              MR. BIGELOW:  He's -- as I understand his

5    title is the district supervisor for the system.

6              MR. COHEN:  I think we probably tried --

7    need to speak with Mr. Martin too, his Securus' counsel.

8         Thank you, this has really been very helpful.  I

9    appreciate your -- I do have some more questions.  So I

10   understand then that when you make a request for a

11   recording that you ask Securus essentially for

12   permission to do it.  They authorize you to do that.

13   The request that you make identifies which recordings,

14   the inmate, and the time that you're requesting

15   authorization for.

16             MR. BIGELOW:  Yes, sir.

17             MR. COHEN:  They say yes.  You make those

18   recordings.  Securus never knows who it is that

19   originally requested it.  They don't know that it was

20   Agent Jones or the government.  All they know is that

21   you're asking for permission.

22             MR. BIGELOW:  That's correct, sir.

23             MR. COHEN:  Do they ever say no?

24             MR. BIGELOW:  Haven't so far.

25             MR. COHEN:  Do you have any idea why they

1  would say no if they did?

2              MR. BIGELOW:  I do not, sir.

3              MR. COHEN:  Okay.  I'm being asked to listen

4  to some of these recordings.  How do I do that?

5              MR. BIGELOW:  You would -- you would either

6  have to have a -- a copy of a recording or access to the

7  system.

8              MR. COHEN:  The copies that you make that

9  you then give to, let's say, Agent Jones, can he just

10 put that in his computer and double chick on it and

11 listen?  Is it that simple?

12             MR. BIGELOW:  Yes, sir.

13             MR. COHEN:  And do you know, is the -- is

14 the recording of that phone call somehow tagged as to

15 when it was made?

16             MR. BIGELOW:  When I do it, I -- I just use

17 a felt-tip and I put on there the information that was

18 requested.  I also print up a list or a log

19 corresponding with the -- the graduation of the calls on

20 the disc so they corresponded so they know the times and

21 the dates in reference to.

22             MR. COHEN:  The Securus system produces a

23 log of the file -- of the files that are on the disc?

24             MR. BIGELOW:  Yes.

25             MR. COHEN:  And that corresponds with the

1    recordings?

2            MR. BIGELOW:  Yes, sir, it does.

3            MR. COHEN:  I'm not sure, Mr. Bigelow,

4    whether you know the answer to this question.  The

5    recordings that have been produced to the court, is

6    there a log that -- kind of log of all of those

7    recordings?  Does anybody know?

8            MR. BIGELOW:  Any of them that I have made,

9    sir, there is.

10           MR. COHEN:  So you believe that the

11   recordings the court has also have a log identify them?

12           MR. BIGELOW:  Yes, sir.  I do not provide

13   the -- the disc recording without the log.  I do both.

14           MS. BARNETT:  Mr. Cohen, there is an agent

15   here who could address that if you would allow him to.

16           MR. COHEN:  That would be great.

17           THE COURT:  Tell us your name and come

18   forward.

19           MR. HERRON:  Special Agent Henry Herron, IRS

20   Criminal Investigation.  The discs that the agents get

21   to review, they come with several files on there.  The

22   audios are MPEG files.  There is a file on there called

23   Index HTML.  When you click on that index, it does not

24   go out to the web.  It simply opens up a browser that

25   then has a list of calls associated with each MP3 file

1    that then will tell you the date the call was made, the

2    number it was made to, the PIN number that was

3    associated with that call, the length of the call in

4    seconds I believe, and there may be one other piece of

5    that on there that I'm forgetting right now.

6         If you attempt to look at the files individually,

7    you will not be able to discern which is which.  You

8    have to view it -- at least the discs that we get, you

9    have to view it through the index; otherwise, all you're

10   going to get is machine language or machine code

11   associated with each file.  So you have to open the

12   index.  And then the index can also be printed, which is

13   what the gentleman here is referring to as the log.

14   That can be printed from the screen and it will have all

15   that same information in it.

16         MR. COHEN:  And does it identify only the

17   phone number that the inmate is calling?

18         MR. HERRON:  No.  And to be -- to be exact

19   here, these are all outgoing calls.

20         MR. COHEN:  Right.

21         MR. HERRON:  These are not incoming calls

22   and these are the number dialed.  If that inmate dials

23   one number and then gets on the phone with somebody,

24   they make a three-way call and put the phones together

25   and talk, you don't know who's doing the talking on the

1    other end.  You just know the number that was dialed

2    from that inmate's -- or associated with that PIN.

3         Also, these PINS are often -- outside of CCA

4    policy often shared or sold or however exchanged between

5    inmates.  So you can -- you can ask for phone calls for

6    a particular inmate or for a particular number.  And if

7    he made that number -- that call using another inmate's

8    PIN, then you would get information associated with

9    that.

10        So it's not just a matter of getting just that

11   one inmate's call if you're doing an investigation, you

12   have to be aware that they know we're listening and they

13   try to circumvent that by using another inmate's PIN

14   number.  So you will see the PIN numbers on there.

15        What it does not show is the name of the party

16   called.  There's no way to know that.  There's just the

17   phone number, the duration.  The other piece of

18   information, it will tell you if the call was a hang-up.

19             MR. COHEN:  I'm sorry?

20             MR. HERRON:  If the call was a hang-up.  In

21   other words, on the CCA audios, if the call party

22   refuses to accept the call -- which there is a preamble

23   at the beginning of each call that we get.  There's a

24   preamble that states this call is being monitored or

25   recorded, proceed at your own risk basically.  It also

1    asks whether or not the receiving party chooses to

2    accept that phone call.  If they say no, then it's a

3    hang-up.

4              MR. COHEN:  And that recording comes on upon

5    the phone being answered?

6              MR. HERRON:  No.  If I had an example here

7    today, as soon as you click on that call -- if we wanted

8    to listen to it, as soon as we click on that call,

9    there's a preamble comes up says -- I believe it

10   announces this is Securus -- it's kind of a machine

11   language -- or machine voice, This is Securus.  This

12   call is being monitored and/or recorded.  There may be a

13   little bit of -- of other information on there like how

14   much more time the inmate has on his PIN number, that

15   sort of thing.

16        But the thing that we get is the preamble warning

17   them this call is being recorded.  They choose to go

18   forward with the call and then the call gets placed to

19   the receiving party.  That party then has to agree to

20   accept the call.  If they refuse to accept it, then it's

21   listed on the log as a hang-up I believe.  If they

22   accept it, then the two parties are linked together and

23   the conversation begins.

24             MR. COHEN:  So when an inmate makes a call,

25   there are two machine language recordings.  One is when

 1    the inmate places the call and he hears your call's

 2    going to be recorded.

 3              MR. HERRON:  Yes.

 4              MR. COHEN:  Also when the call is connected,

 5    somebody picks up on the other end, there is a recording

 6    that says this is being recorded and someone can then

 7    choose to continue with -- the recipient can choose to

 8    continue with the call or hang up.

 9              MR. HERRON:  Right.  With the exception that

10    the inmate may not get to hear the portion where the --

11    where the equipment is asking the receiving party

12    whether or not they want to take it.  All the -- if I

13    understand it correctly, the inmate does not get to hear

14    that portion of it.  All they know is whether or not the

15    call gets -- gets continued.  So...

16              THE COURT:  But when you -- so when you

17    listen to this, you do hear two preamble recordings?

18              MR. HERRON:  No, at first --

19              THE COURT:  On the MP3 there's the one the

20    inmate hears when he or she places the call.

21              MR. HERRON:  Correct.

22              THE COURT:  Then when the call is answered,

23    another recording that says this call may be monitored,

24    et cetera?

25              MR. HERRON:  The first thing you hear is

1    that this call may be recorded or monitored.  The second

2    one that you may hear is the one where it's advising the

3    received party this is a call from CCA, is kind of how

4    it's laid out.  On the other end what's happening is

5    whether or not they agree to accept it.

6              THE COURT:  Okay.  But let's focus on that

7    one.  The recipient of the call, the recording that they

8    hear through the Securus system, This is a call from

9    CCA, does it then go on to say this call may be

10   monitored or recorded?  Do they get that same warning,

11   the recipient gets that same warning the person placed

12   the call got?

13             MR. HERRON:  Yes, I believe so.  I believe

14   the recipient gets -- from the agent point of view, we

15   don't know who the recipient is until -- until Securus

16   completes that call.

17             THE COURT:  I understand that but we're -- I

18   just want to make sure that -- and is this something

19   that we'll hear when we listen to the MP3 recordings,

20   we're going to hear two of these warnings?  I know

21   there's a -- there's a piece of it, when someone answers

22   the call, This is a call from CCA, you can or cannot --

23   you can accept this call or not and they may hang up and

24   not, I know they hear that.  But do the MP3 recordings

25   also record the system telling the recipient, Your call

1    may be monitored or recorded?

2            MR. HERRON:  I do not -- I cannot say for

3    sure right now that it -- that we hear that portion of

4    the call to the recipient where it warns them that it's

5    being recorded.  I don't remember off the top of my head

6    if the recipient version of that is audible to us.  I --

7    we do know that the recipient hears a part where, This

8    is a call from CCA.

9            THE COURT:  Okay.  All right.  I understand.

10           MR. COHEN:  Do you have direct interaction

11   with Securus yourselves?

12           MR. HERRON:  No.  We -- as an agent, I

13   wouldn't even know how to contact Securus.  The only

14   reason I know Securus exists is because when you click

15   on the tape it tells you this -- it gives you the

16   Securus preamble.  When you pull up the index that's in

17   the set of files on the disc that we get, the actual

18   browser that pops up I believe actually has Securus'

19   logo on it.

20           MR. COHEN:  I understand.  Very helpful.

21   Thank you.

22           MR. HERRON:  Yes.

23           MR. COHEN:  Mr. Bigelow, the copy of the

24   recordings that the court has, did you make that?

25           MR. BIGELOW:  I made -- I believe I made

1    some of them, sir, not all of them.  There was -- there

2    was -- as I understand, there was a few and I -- I

3    assisted Mr. Lajiness but I was in -- at that time I was

4    in the training phase.  So...

5              MR. COHEN:  So the two of you --

6              MR. BIGELOW:  Yes.

7              MR. COHEN:  -- would have made them?

8              MR. BIGELOW:  Yes.

9              MR. COHEN:  Okay.  And this is a question

10   that I would ask Securus but, Miss Brockert, I'm forced

11   to ask you.  Do you know what their policy is as far as

12   retention of these recordings?

13             MS. BROCKERT:  No, I don't, sorry.  I can't

14   answer that at all.

15             MR. COHEN:  Okay.  I think without Securus

16   here, we're probably at the end of what I can learn

17   about the audio recordings unless someone else has

18   something to offer.

19             THE COURT:  Do any of the attorneys want to

20   speak to my question, which is when you receive a call

21   from a client, do you hear a recording that the call may

22   be monitored or recorded?

23             MS. MORGAN:  I think I can speak for most of

24   the attorneys here that we do not have that on our end.

25   There is not a call that says this is a recorded call

1     from CCA.  It alerts us to the fact it is coming from a

2     detention facility, it is a collect phone call, if it

3     happens to be a collect phone call, but not that it is a

4     recorded phone call.

5                THE COURT:  Anyone disagree with that?

6                MR. JACKSON:  Yeah, that's not my

7     recollection, judge.  Mike Jackson.  I think if you

8     listen to it, it will --

9                THE COURT:  Come up to the microphone.

10                MR. JACKSON:  -- it will tell you, you'll be

11     able to tell.  Now as a business practice, I always say,

12     before the client starts talking, that, oh, this is a

13     conversation between an attorney and client and it's

14     privileged.

15                THE COURT:  Okay, wait, back up.  So when

16     you get a call from a client at CCA, you have heard a

17     recording that the call -- that -- what does it say?

18     Tell me what the recording says.

19                MR. JACKSON:  It says this is a call from a

20     person at CCA-Leavenworth.  This call may be monitored

21     or reviewed.  I can't say if that happens all the time.

22     There are some calls that are collect calls and I'm not

23     sure they work that way.  But that was my experience.

24                THE COURT:  All right.  Thank you.

25                MR. JACKSON:  Okay.

1            THE COURT:  Has anyone else on any calls,

2     even if it's not all the time, heard -- heard a warning

3     that the call may be recorded or monitored?

4            MS. BRANNON:  Judge, there are probably

5     different categories of calls.  If we were the ones who

6     notified CCA that we did not want our legal calls

7     recorded, it may be that there's a different recording

8     that shows up at that point.  Because certainly if we

9     heard "this call may be recorded or monitored," we would

10     have done something about it because it's our

11     understanding it was not to be recorded even though we

12     found out that it was.

13         There is a system set up so they can call certain

14     offices directly.  Other calls have to be collect and

15     there may be a different recording if it's a collect

16     call or if, for example, it was to an attorney's cell

17     phone that may not have been on the list.

18         It is supposed to be set up, if they are notified

19     that our phone calls are not to be recorded from this

20     number, there should be no such recording on our end of

21     it and there should be no recording that we heard on our

22     end of it.

23            THE COURT:  All right.  It would be

24     interesting to know if Mr. Hart was here, and I don't

25     think he is, since he sent the requisite notice again

16-20032 USA v Lorenzo Black, et al  10.28.2016                    80

 1   and again on an annual basis but learned through

 2   Mr. Jackson's investigation nonetheless some of his

 3   calls were recorded.  It would be interesting to know

 4   those calls -- what kind of recording those calls had

 5   Mr. Hart received.  There's several of you that want to

 6   speak to this.  Mr. Slinkard and Miss Brannon,

 7   Mr. Laurans.

 8              MR. SLINKARD:  The way Miss Brannon just

 9   described it is what the agents were just flagging me to

10   get my attention.  Their understanding is the recording

11   that the recipient would hear that is not recorded on --

12   the note -- I'm going to call it a notice to avoid

13   ambiguity -- the notice of possible recording that a

14   recipient of the call would hear, that is not recorded

15   on the phone call that we -- they, we, whoever would

16   obtain because it's on a line with the recipient.  If

17   the recipient doesn't accept, then it never is

18   connected.  It's a hang-up and nothing on the

19   recipient's line is ever recorded.

20        But that notice would only be for recipients who

21   were themselves going to be subject to recording.  Like

22   Miss Brannon indicated, if the call was to a recipient

23   who had opted out from recording, they would not get

24   that recorded notice that this might be a recorded call

25   because it wasn't going to be a recorded call.  That's

1    the agent's understanding of why they believe that they

2    understand that that notice is provided to the recipient

3    of the call.  But defense attorneys who have properly

4    opted their number out from recording wouldn't have

5    received that notice because the call isn't subject to

6    recording, it's been opted out.

7              THE COURT:  All right.

8              MR. SLINKARD:  Mr. Hart is here, judge.

9              THE COURT:  He is.  I'm sorry.

10             MS. BRANNON:  Just to be clear, even though

11   we didn't get that and they weren't supposed to be

12   recorded, they were recorded.  That's one of the reasons

13   we're here.  Also the phone calls, Mr. Hart, I believe

14   those were subpoenaed directly from Securus.

15             MR. HART:  Gary Hart.  Your Honor, I believe

16   your question was what was on the recordings --

17             THE COURT:  Because you --

18             MR. HART:  -- when I receive a call.

19             THE COURT:  Yes.

20             MR. HART:  My clients are told to call me

21   collect and I tell them that I've made a request of CCA

22   not to monitor or record the calls, and I have received

23   written confirmation from CCA that they're not recording

24   them.  So I cannot say with specificity that every

25   single call doesn't have some kind of a warning on it

1  like it's being recorded but I've always interpreted

2  that as some kind of a mistake in the system because

3  I've -- since 2001 I've been under the belief that none

4  of my calls are recorded, though the affidavit I

5  submitted back in September there were some calls that

6  were, in fact, recorded even though I had written

7  confirmation that they weren't recorded.  I don't know

8  if that answers your question or not but...

9          THE COURT:  Well, what will be interesting

10 is to listen to the MP3 recordings of calls to you and

11 since they weren't -- presumably weren't hang-up calls,

12 you accepted them, whether -- whether the system had

13 that warning or not and whether it had it consistently

14 or not.  That's just something that we might want to

15 look at.

16         MR. HART:  Well, the calls Securus gave me,

17 these would have been ones that they improperly

18 recorded.  And I believe when I clicked on the index, it

19 does have the -- the warning on there but this -- these

20 are ones they weren't supposed to be recorded in the

21 first place.

22         THE COURT:  I understand.

23         MR. HART:  And to another question the

24 master asked, Securus has told me that they have a

25 five-year retention policy.  So anything prior -- well,

16-20032 USA v Lorenzo Black, et al  10.28.2016

1    it's a rolling five years.  So you back up five years

2    from now and they're -- they're purging everything

3    unless you take some action or the court takes some

4    action to tell them to quit purging them.

5                    MR. COHEN:  You're --

6                    MR. HART:  And the -- the -- when I asked

7    Securus for calls, they sent me an e-mail, which I think

8    is similar to what the CCA representative was saying,

9    that gave me a link that I could click on and it's only

10   good for 24 hours.  And I could click on that link and

11   it will download all those calls onto a disc that I

12   would have to put in my computer.  After 24 hours, the

13   link wasn't good anymore.

14                   MR. COHEN:  When you refer to the five-year

15   purging, are you saying they're purging calls they have

16   recorded or purging the phone numbers you gave them that

17   indicated they shouldn't record that phone number?

18                   MR. HART:  No, purging recordings.

19                   MR. COHEN:  Okay.

20                   MR. HART:  I don't know Securus ever

21   receives, other than what Mr. Bigelow indicated what he

22   enters into the system, Securus system, an attorney

23   request not to have their calls monitored.  And it shows

24   up on the Securus system in a column called P-R-I-V for

25   private is where it shows up on the printouts that I've

16-20032 USA v Lorenzo Black, et al   10.28.2016                   84

1    received from Securus.

2            MR. COHEN:  And you don't know whether

3    there's a life to how long a phone number is private?

4    For example, you don't know whether that is supposed to

5    last forever or just has to be renewed every year?  Do

6    you have any knowledge of that?

7            MR. HART:  I have never been told that I

8    have to renew it.  I -- as a matter of business

9    practice, I have renewed it about five times.  I put it

10   in an affidavit as part of this case.  I think -- I

11   think I did it in 2001, 2011, 2012 and 2014, but I just

12   do that as a matter of practice to try to make sure that

13   the number's in there.

14           MR. COHEN:  Thank you.

15           MR. HART:  Okay.

16           MR. COHEN:  Mr. Jackson, you submitted what

17   has been referred to as Exhibit 449 and it -- can you

18   explain to me how you compiled that?

19           MR. JACKSON:  The discovery received from

20   the government, we had four sets of discovery so far;

21   two DVDs, one terabyte hard drive, and now we've gotten

22   a thumb drive.  On the terabyte hard drive, it's called

23   Volume 2A.  There's recordings of approximately 39

24   inmates and they're organized by the inmate's name.  If

25   you open those up, you first get the MPG3 files.  You

1    have to go to the index, which is an HTML file which is

2    an Internet link, and as far as I know that takes me to

3    Securus and would go through Internet Explorer.  But if

4    you get to that point, you do have information on each

5    call, including most importantly the phone number

6    called.

7          Because I had 39 of these, I figured that there

8    might be attorney-client conversations among the

9    recordings.  So it was a matter of matching up the

10   inmate with his attorney, determining the attorney's

11   phone number, and then doing a search within that

12   inmate's folder and it worked and my results are that

13   449.

14          MR. COHEN:  So that's just a list of what

15   you found using a couple hour's time and knowing some

16   attorneys' phone numbers?

17          MR. JACKSON:  That's correct.  Yeah, I

18   referred to the visitation log, the attorney

19   registration database for Kansas, and -- and a lot of

20   cases I just went through each phone call.

21          MR. COHEN:  You said the audio recordings

22   that you were given were on -- you identified it a disc

23   drive?

24          MR. JACKSON:  Yeah, they're on the terabyte

25   drive and you have to go to Volume 2A and from there you

 1    go to -- I believe it's called CCA calls and then that

 2    will get you to the individual inmate's name.

 3              MR. COHEN:  And that was produced to you by

 4    the government?

 5              MR. JACKSON:  Pardon?

 6              MR. COHEN:  I'm sorry, that was produced to

 7    you by the government?

 8              MR. JACKSON:  Yes.

 9              MR. COHEN:  Can I ask the government if they

10    know how that was produced, how it was manufactured?

11              MS. BARNETT:  It's my understanding that we

12    took the disc that we were provided with the information

13    on it and then we put it onto a thumb drive or some

14    other electronic media, provided it to defense counsel

15    and that's how we produced it.

16         If you -- I don't know if you're asking for the

17    specifics of the programs or whatever, but we could get

18    that information for you.  And then of course the

19    original, I call it original but it's really just a copy

20    of the recordings that we were given, we've since turned

21    over to the court.

22              MR. COHEN:  But you were first given, let's

23    call that the original, you procured yourself from whom?

24              MS. BARNETT:  The phone calls, we got them

25    from the Marshals Service.

1           MR. COHEN:  And the Marshal Service

2     presumably got them from?

3           MS. BARNETT:  From CCA.

4           MR. COHEN:  CCA or Securus?

5           MS. BARNETT:  CCA.

6           MR. COHEN:  Mr. Bigelow and Mr. Lajiness,

7     okay.

8           MR. JACKSON:  I can show you how that works,

9     you know, after this hearing if that would help.

10          MR. COHEN:  Yes, thank you.

11          THE COURT:  Before -- I don't know, do you

12    have other questions of Mr. Jackson at this point?

13          MR. COHEN:  No, judge.

14          THE COURT:  Because Mr. Laurans was the one

15    we didn't call on earlier had something to say.

16          MR. LAURANS:  All I'm going to say, in terms

17    of categories of warnings, I think that there may also

18    be categories.  Depending upon whether the inmate has

19    prepaid the call or whether it's collect, you get

20    different warnings.  And the problem for most of us, I

21    think, are that we have clients in different

22    jurisdictions and different phone companies but you get

23    a different warning from every facility if it's a

24    collect call as opposed to whether it's a prepaid call,

25    right.

1         Because I get a lot -- I'm an appellate
2    post-conviction lawyer most of the time, so I'm getting
3    calls all the time from people I don't know that are
4    inquiries.  They've already been sentenced.  So it's
5    going to make a difference whether I take a collect call
6    from a stranger whereas I'll take a prepaid call from
7    anybody.  And the warnings do differ.
8              THE COURT:  And the warnings differ from
9    perhaps CCA and one of the other jail detention
10   facilities?
11             MR. LAURANS:  In Missouri, for example.
12             THE COURT:  Or in Kansas.
13             MR. LAURANS:  Correct.  I think the warnings
14   are also -- whether or not you're warned of the
15   recording, I think that may be where some of the
16   confusion is.  Unless Securus can come forward and say
17   that the -- this call may be subject to monitoring and
18   recording is on both the prepaid and the collect, and
19   I'm not -- I'm not sure the -- of either, but I do know
20   I get a different warning, a difference series of
21   warnings on a prepaid call as opposed to a collect call.
22             MR. COHEN:  I'd like to move on to the topic
23   of the law library computers.  Is that -- Miss Brockert,
24   is that going to be you talking about that?  Thank you
25   for coming today.

16-20032 USA v Lorenzo Black, et al  10.28.2016                89

1           MS. BROCKERT:  I'll answer what I can.  I

2    can give you the name of the person that manages the law

3    library and could give more specific information.  She

4    wasn't able to be here in person today.  Her name is

5    Cynthia Collins.  And let me make sure that I'm right

6    about her.  She is the education staff member at

7    CCA-Leavenworth's facility.  But I do have some general

8    information that I can give to you.

9           MR. COHEN:  Go ahead.

10          MS. BROCKERT:  With regard to the law

11   library computers, it's my understanding that in

12   response to some of this -- my understanding was that

13   the -- the computers themselves at some point were

14   seized pursuant to a search warrant.  Throughout the --

15   this investigative process everything, all the hard

16   drives were -- were seized.  The physical -- we had to

17   replace the computers essentially because they were gone

18   and were not going to be returned any time soon.

19          So what was on the computers was -- I believe it

20   was Lexis, a search -- law library search engine I'm

21   sure we're all familiar with.  And I don't believe that

22   there was any other real -- there was no Internet

23   access.  The inmates at CCA do not have access to e-mail

24   through those computers.  And so as far as communicating

25   with attorneys through those computers, there would be

16-20032 USA v Lorenzo Black, et al  10.28.2016                90

1  no way to do that.

2       However, we -- in my discussions with corporate

3  and sort of going down the rabbit hole, we talked about

4  how if you have the right education and ability you

5  could measure key strokes and you could pull -- if

6  somebody was making notes -- there are word processing

7  software that were on the computer, so if somebody was

8  making notes, if an inmate was making notes about his

9  case and saying, you know, next time ask my attorney,

10  remind me to do this, or I need to ask my attorney about

11  this, whether or not if -- if there was metadata that

12  was preserved on those computers as a result of that

13  document being created or printed, or if you could

14  measure the key strokes to determine what was -- what

15  was done.

16       So in answer to your question with regard to how

17  much attorney-client privilege might be available or

18  privileged information might be available on those

19  computers, that would be the only way that that would be

20  -- be available.

21            MR. COHEN:  Can an inmate save a document?

22            MS. BROCKERT:  I don't -- they can save it

23  on the -- there is a hard drive on each computer.  So if

24  they wanted to, they could save it on the -- on the

25  actual computer itself.  It would be on the hard drive

1    at that point.  It obviously wouldn't be recommended

2    because they're public computers so -- and I believe

3    that's something that I'm not sure if that's discussed

4    with them.  But if it was, it could potentially be on

5    the hard drive.

6              MR. COHEN:  Okay.  So, I mean, maybe they

7    didn't even mean -- maybe they did mean to, but I just

8    want to know what I might find.  And so it could be that

9    a -- an inmate saved a document.  The computer has the

10   capacity of doing that?

11             MS. BROCKERT:  It does.

12             MR. COHEN:  Okay.  Is there any way that you

13   can think of to use the computer to send a message to

14   somebody else?  For example, I save a document called

15   "look at this" and Inmate 2 comes along 10 minutes later

16   and knows to look for a document "look at this" and

17   opens it, is that possible?

18             MS. BROCKERT:  I believe it is possible.  I

19   believe that the -- there -- the computers are subject

20   to review by the facility employees.  So that would be

21   -- that would be something that would be monitored just

22   to make sure there was no improper communication going

23   on for the safety and security of the institution.  But

24   it could be -- it could be done potentially, yes.

25             MR. COHEN:  Okay.  So these computers were

 1   seized.  How many in -- seven is it?

 2           MS. BROCKERT:  I believe it was six or

 3   seven.  I think six is what I'm remembering.

 4           MR. COHEN:  And the court has those; is that

 5   right?

 6           MR. SEUBER:  No.

 7           MR. OAKLEY:  And the reason we brought this

 8   to the attention of the court and this -- our concern

 9   was we were told that they did not have access to

10   Internet or e-mail but we conceived of a situation,

11   since they did have access to a Word program, that it

12   was possible that they had drafted a letter to an

13   attorney.  And so under that theory is why we brought

14   the court's attention to the law library computers.

15           MR. COHEN:  Why do you want them at all?

16           MR. OAKLEY:  We have some information that I

17   would -- I would prefer to not share openly, but as you

18   indicated, it's possible to pass on information.

19           MR. COHEN:  I'm sorry.  Okay.  Do you know

20   what other programs, what programs are actually on the

21   computers?

22           MS. BROCKERT:  I'm not sure what the -- the

23   operating software is or whether it's Microsoft or what

24   the word -- Word or Word Perfect.  I'm not sure what the

25   software is.  That would be something that Miss Collins

16-20032 USA v Lorenzo Black, et al  10.28.2016                    93

1    could probably answer for you.

2              MR. COHEN:  Where are these computers now?

3              MR. OAKLEY:  They are in Secret Service's

4    evidence vault, or at least an image of them are.

5              MR. COHEN:  All right.  So let's talk about

6    that.  There's an image of the computers.  Where is the

7    original hard drive that was seized?

8              MR. OAKLEY:  Well, my understanding is that

9    the United States Secret Service physically removed the

10   CPUs and collected them as evidence and then used a

11   software program called Tableau device.

12             MR. COHEN:  I'm sorry, called?

13             MR. OAKLEY:  Tableau, T-A-B-L-E-U, device.

14   I think it's a software and hardware program that

15   allowed them to create a read-only image of the drive.

16   They then ran software on that read-only copy to verify

17   it was, in fact, an exact copy and then -- then uploaded

18   the data to a -- to a secure server where it currently

19   resides.

20             MR. COHEN:  And so they still retain the

21   original CPUs?

22             MR. OAKLEY:  Yes.

23             MR. COHEN:  The images and the server, all

24   of those?

25             MR. OAKLEY:  The server is not -- the data

1    was uploaded to a Secret Service server but they have

2    the original CPUs and they are read-only --

3              MR. COHEN:  Read-only.

4              MR. OAKLEY:  -- copy of the data that was

5    obtained from those original CPUs.

6         Additionally, a Secret Service agent using a

7    program called Internet Evidence Finder then created two

8    discs that he pulled any Word documents, did not review

9    them but had a software program put them on a disc.

10   Those were marked and may contain attorney-client

11   privilege are sealed and in evidence.

12             MR. COHEN:  Just Word documents?

13             MR. SEUBER:  Sir, John Seuber, Secret

14   Service.  It was any Word-based pdf or text-type file

15   that would be -- possibly contain material and then that

16   was, as Mr. Oakley indicated, downloaded to two DVDs and

17   secured in our evidence locker.

18             MR. COHEN:  That -- is that the only

19   evidence the government would want to look at itself?

20             MR. OAKLEY:  Yes.

21             MR. COHEN:  So I don't need to look at

22   anything else really?  I just need to look at those

23   text-based files because that's all you would

24   conceivably use?

25             MR. OAKLEY:  That's correct.

1           MR. COHEN:  Okay.  So if I came out to

2   Leavenworth, would I be able to chat tomorrow with

3   Miss Collins, for example, or Mr. Atkins and all those

4   other names we've heard today?

5           MS. BROCKERT:  I can certainly see what we

6   can do.  I know tomorrow's a Saturday so I'm not sure

7   what the schedule is for those employees, but I can get

8   working on that this afternoon and give you an update

9   e-mail.

10          MR. COHEN:  Thank you.  I'm pretty tuckered

11  out, judge.

12          THE COURT:  I bet.  All right.  I just want

13  to stress this whole preservation issue again.  And

14  although I have the assurance obviously of the U.S.

15  Attorney's Office they're preserving evidence and

16  Miss Brockert's assurance she's going to talk to Securus

17  with the investigative agencies, I look to the U.S.

18  Attorney's Office to make sure they're preserving

19  whatever they need to preserve.  Are there any other

20  discovery issues before we break for the day?

21  Miss Brannon?

22          MS. BRANNON:  Your Honor, if -- I don't know

23  if this falls within discovery.  We wanted to point out

24  a couple of things.

25          THE COURT:  Why don't you come up.  You're

1   very soft spoken.

2            MS. BRANNON:  I wanted to point out

3   Mr. Bussell is here to help access the video.  I believe

4   he knows how to do that.

5        We also -- the government made a reference to

6   purging case files at some point and I didn't really

7   catch what the parameter of that was.  But if there is

8   an ongoing system that purges government case files,

9   we'd ask that that cease until this investigation is

10  done.  I don't really know everything it encompasses.  I

11  just heard about it from Miss Barnett today.

12           THE COURT:  All right.  Miss Barnett, what I

13  understood you to say is DOJ has an archive system.  But

14  in terms of purging, you have an internal policy.  Is it

15  a manual purge of actual paper files?

16           MS. BARNETT:  Yes, it is a manual purge but

17  I understand that the court wants us to maintain

18  whatever records we have with regard to any requests to

19  CCA for video recordings or audio recordings.  So I will

20  take --

21           THE COURT:  Investigative -- or even just

22  anything to do with that whether it's conversations with

23  investigators or direct conversations with CCA, et

24  cetera.

25           MS. BARNETT:  I will take the steps to

1    preserve those things, Your Honor.

2            MR. COHEN:  That would be directly or

3    indirectly.

4            MS. BARNETT:  Yes.

5            MS. BRANNON:  Lastly we don't want to miss

6    one category of evidence which we remain concerned

7    about, video conferencing.  There was the capacity to

8    video conference with clients from the courthouse at

9    CCA.  We don't know anything about whether that was

10   recorded or how it was turned over or anything of that

11   nature, but we didn't want to lose track of that.

12           THE COURT:  Okay.  So Mr. Cohen will be in

13   conversation with CCA and Securus about the video

14   conferencing itself.  I know for a while it was shut

15   down, or at least no one was using it out of concern for

16   privacy and privilege, but I think it's back up and

17   operational.  So that's something else we need to

18   explore with CCA and with CCA specifically I think.

19           Okay.  The *Reulet* motion to intervene I'm going

20   to grant consistent with granting Mr. Laurans --

21   Laurans' similarly filed a motion to intervene on behalf

22   of his client.  That's not to say I'm going to grant

23   every individual motion to intervene.  There are dozens

24   of these Rule 41 motions pending in front of me and

25   Judge Murguia and Judge Crabtree and I'm not sure if

1   there are any other judges that have them at this point.

2        But that is something that I actually had a

3   preliminary conversation with Mr. Cohen about because

4   the -- all the judges remain concerned about these and

5   it doesn't make sense to me, at least at this time, to

6   do some sort of piecemeal decision-making on these.  But

7   for now they're all sort of in a holding pattern and at

8   some point I'll be -- I've already talked to my

9   colleagues about it, and at some point I think we'll

10  make a decision whether one judge ought to manage those

11  or whether they should remain disbursed.  But in the

12  interim I will grant the motion to intervene,

13  Miss Morgan, at this time.

14       All right.  So we're going to break.  It's about

15  five till 1:00.  I think what Mr. Cohen wants to do at

16  this point is have a fairly brief conversation with the

17  Assistant U.S. Attorneys privately and then maybe after

18  that take a break for lunch and I think what he'd like

19  to do is, say, at 2:30 have a conference with -- I'm

20  sorry, I met you.  Ms. Rokusek's investigator who's

21  here to help him with the -- looking at the videos and

22  to talk to you, Miss Brannon, and any other defense

23  counsel that want to be a part of that conversation.  If

24  you all can meet here at 2:30, then we'll have a private

25  conference room available for you to do that.

1          Miss Brannon, can you be available at 2:30?  Is

2    that a problem?

3              MS. BRANNON:  Your Honor, I'm presenting a

4    CLE at 3:30 today over in Western District.

5              THE COURT:  Okay.  So that is a problem.

6              MS. BRANNON:  I can work around that.

7              MR. COHEN:  Why don't we make it

8    two o'clock.

9              THE COURT:  All right.  Then -- and you

10   don't have to stay for the whole time obviously.  All

11   right.  So meet here at two o'clock and Ms. Scheurer

12   will get everybody back to a conference room.  But in

13   the meantime, as soon as we break, I know he'd like to

14   talk to the three AUSAs who are here.

15         Do you want to talk to Miss Brockert or anyone

16   else before they leave the building?

17             MR. COHEN:  Yes.

18             THE COURT:  Okay.  Why don't I recess and

19   you can kind of come up with a plan of action hopefully

20   is convenient for everyone and then we'll recess the

21   hearing portion of this for now.  All right.  Thank you

22   all for being here and appreciate your assistance.

23             (Proceedings adjourned.)

24

25

1                      CERTIFICATE

2        I certify that the foregoing is a correct

3   transcript from the record of proceedings in the

4   above-entitled matter.

5      DATE:  November 10, 2016

6

7                  /s/Kimberly R. Greiner
                   KIMBERLY R. GREINER, CSR, RMR, CRR
8                  United States Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25