# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | **Case No. 16-CR-20032-JAR** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Government's Motion to Terminate** |
| | ) | **"Phase III" of the Special Master's** |
| **LORENZO BLACK,** | ) | **Investigation; Memorandum of** |
| **KARL CARTER,** | ) | **Points and Authorities; Affidavit of** |
| **ANTHON AIONO,** | ) | **Steven D. Clymer; Exhibits** |
| **ALICIA TACKETT, and** | ) | |
| **CATHERINE ROWLETTE,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

The United States of America, by and through its counsel of record, Assistant United States Attorney Steven Clymer, appointed as Special Attorney pursuant to 28 U.S.C. § 515 to represent the United States in connection with Phase III of the Special Master Investigation, hereby moves this Court to terminate to Phase III of the Special Master Investigation in advance of the presentation of evidence at the hearing now scheduled for January 18, 2018.

This motion is based on the files and records of this case, relevant files and records from the cases of *United States v. Dertinger*, Case No. 2:14-CR-20067-JAR, and *United States v.*

*Herrera-Zamora*, Case No. 2:14-CR-20049-CBM, and the attached memorandum of points and authorities, affidavit of Steven D. Clymer, and exhibits.     .

Respectfully submitted,

Steven D. Clymer
Special Attorney for the United States

## MEMORANDUM OF POINTS AND AUTHORITIES

## I

## Introduction

The government moves this Court to terminate "Phase III" the investigation that the Court, through a court-appointed special master, is conducting in this case. The allegations that serve as the rationale for the investigation – claims of widespread and ongoing government violations of the attorney-client privilege and the Sixth Amendment right to counsel of inmates at CCA-Leavenworth by capture and use of video recordings of attorney-inmate meetings and audio recordings of inmate-to-attorney telephone calls – have proven unfounded, both generally and, with the exception of a recent and yet unproven claim by defendant Carter, as to the defendants in this case. Any inmate who believes that his Sixth Amendment right to counsel has been violated can raise that claim in his own case, as Carter has done, and the United States will cooperate with the defense and the Court in specific cases to ensure that individual defendants' rights are protected and vindicated. But there is no *evidence* suggesting that the constitutional rights of any of the defendants in this case were violated, merely yet unproven allegations by one of the remaining defendants. Under these circumstances, investigation into the internal operations and decision-making of the United States Attorney's Office for the District of Kansas ("USAO") is improper. Under the separation of powers doctrine, federal district courts do not have authority to inquire into the internal workings of a co-equal branch of government, especially where, as here, that inquiry is untethered to specific claims asserted by the criminal defendants in the case.

The government requests that the Court rule on this motion before presentation of evidence in the form of testimony or otherwise at the hearing set for January 18, 2018.

## II

## Background

### A. The Appointment of the Special Master and the Phase III Investigation

On October 11, 2016, based on allegations of government violations of the attorney-client privilege and the Sixth Amendment rights of inmates housed at CCA-Leavenworth during the investigation and prosecution of this case – which involves contraband smuggling into that facility and related federal criminal offenses – this Court appointed a special master to conduct an investigation. [Docket #146]. Initially, this investigation involved, for the most part, examining the practices of CCA-Leavenworth and its telephone service provider related to the video recording of inmate activities, including meetings with attorneys, and audio-recording of telephone calls. [Docket #176, 177, 183, #184, #186, #187, #193, #214]. This investigative activity was referred to as Phase I and Phase II.

These phases of the investigation did not reveal *any* violations of the Sixth Amendment rights of the defendants named in this case. Nor did they produce any evidence of ongoing or widespread violations of the Sixth Amendment rights of other CCA-Leavenworth inmates. There was some circumstantial evidence, in the form of inconsistent accounts of conversations between a defense attorney and prosecutors, from which it was possible to infer that a Special Assistant U.S. Attorney (SAUSA) who no longer works for the USAO or a federal agent watched a soundless video recording of a single meeting between inmate Richard Dertinger and his attorney. *See, e.g.*, Docket #253 at pp. 33-37. Dertinger raised a constitutional claim in his own criminal prosecution based on this evidence, and was afforded an opportunity to fully litigate that claim. He has since pled guilty and been sentenced. *See United States v. Dertinger*, Case No. 2:14-CR-20067 at Docket #562 (entry of amended judgment). Similarly, relying on investigation by the special

master, defendant Carter now claims that recordings were made of meetings and telephone calls in which he discussed legal matters with counsel and that these recordings were shared with the government.  [Docket #333].[1]

On May 17, 2017, over government objection, this Court ordered the special master to conduct "Phase III" of his investigation, which was to focus on the conduct of the United States Attorney's Office.  [Docket #253].  The Phase III order required the special master to "focus on two key questions about the conduct of the USAO: (1) has the government listened to audio recordings of any attorney-client telephone calls of defendants charged in this case, defendants in other cases who have filed motions for relief, or CCA inmates who are subjects or targets of the ongoing investigation?; and (2) has the government viewed any video recordings of communications in the attorney-client conference rooms at CCA of any of the above described defendants or inmates?"  *Id*. at pp. 9-10.  The Court further ordered inquiry into whether the government used any evidence derived from such conduct and, if so, how it was used.  *Id*. at p. 23; *see also id*. at pp. 45-47.  The Phase III order further tasked the special master to investigate whether the USAO or any investigative agencies had "interfered or attempted to interfere with a defendant's attorney-client relationship, such as investigating or seeking forfeiture of attorney fees or alleging conflicts of interest."  *Id*. at p. 46.[2]   Both the original "appointment order" and the

_____

[1] Carter's motion to dismiss the indictment demonstrates that there is no need for the special master's Phase III investigation to address claims of constitutional violations.

[2] More recently, in response to a motion from the Office of the Federal Public Defender [Docket #262], who does not represent any defendant in this case, this Court ordered that Phase III be expanded to include investigation of an unauthorized after-hours entry by a former Special Assistant United States Attorney on August 25, 2016, into the Court's chambers to deliver documents that this Court had ordered produced as part of its inquiry in this case.  [Docket #323]. This entry was video-taped.  The United States Attorney already met with this Court to discuss this incident and is willing to discuss the matter further with the Court and the special master.  The government must, however, decline to disclose privileged information concerning the incident through in-court testimony or document production.

"Phase III order" require the government to cooperate with the special master, including by producing documents and disclosing information. [Docket #146 at p. 13-14; #253 at p. 7].

**B. The Special Master's Initial Written Demand for Documents and Information from the Government and the Government's Response**

In a letter dated July 10, 2017, the special master demanded fourteen broad categories of documents and information from the government. [Docket #298-7]. In a responsive letter dated September 12, 2017, a "special attorney" for the Department of Justice ["DOJ"], appointed pursuant to 28 U.S.C. § 515, explained that federal regulations located at 28 C.F.R. § 16.21 *et seq*., known as the "*Touhy* regulations," prohibited production or disclosure of most (but not all) of the requested documents and information. This responsive letter explained, among other things, that the requested materials were not discoverable under applicable Federal Rules of Criminal Procedure, and were attorney work product and/or otherwise privileged, law enforcement sensitive, or subject to grand jury secrecy rules or other federal law limiting disclosure or production. [Docket #298-9].

The government's position was based in part on results of the Phase I and Phase II investigations, which uncovered no Sixth Amendment violations of the rights of the defendants in this case or anyone else, and the fact that the requested information was not necessary to address any claim of any defendant whose case is pending before this court.

The government's letter explained that "[a] district court lacks constitutional and supervisory authority to investigate the operations and decisions of an executive-branch agency like a United States Attorney's Office," and provided citations to legal authority supporting this assertion. The letter concluded by noting that the government's "response to your requests therefore is not only required by the *Touhy* regulations and the substantive law that they command

[government counsel] to consider, it is consistent with constitutional limits on a district court's authority to demand information from a co-equal branch of government." *Id*. at p. 24.

As it had represented in the September 12, 2017 letter, the government later produced to the special master some of the requested information. [See Affidavit of Steven D. Clymer]. Further, although the government's letter explained that the government could not disclose certain requested grand jury information because federal law prohibited this without a showing of particularized need for disclosure and a court order, Docket #298-9 at p. 19, when the Court later found that there was such need and ordered disclosure [Docket #307], the government produced that information to the Court and the special master. [Docket #311; Affidavit of Steven D. Clymer].

**C. The Special Master's Report Concerning the Government's Response to the Initial Request for Documents and Information, and the Court Order Setting a Hearing**

On October 10, 2017, the special master responded to the government's September 12, 2017 letter in a report. [Docket #298]. In that report, the special master acknowledged, without further explanation, that "[f]rom the Special Master's perspective . . . the [government] may have valid bases upon which to refuse production of information . . . ." *Id*. at p. 8.

The report was consistent with the government's position that the allegations triggering the Phase III investigation are groundless. It explained that "the Special Master's *initial* investigation suggested that '[defense bar] suspicions of regular incursion into attorney-client communications . . . are groundless,'" *id*. at p. 8 (emphasis in original), and did not indicate that further investigation had cast doubt on this initial conclusion. The report further explained that "the Phase III investigation to date suggests there is only one instance where the OUSA [Office of the United States Attorney] even made a request for video-recordings of meetings at CCA between inmates and their attorneys, and the OUSA did not actually view any such meeting." *Id*. at 9.

Significantly, the special master's report made no mention of any evidence of constitutional violations and instead appeared to abandon the original rationale for the Phase III investigation:

> As the Special Master noted earlier, "there is a widespread undergrowth of mistrust between the Office of the United States Attorney for the District of Kansas and defense counsel," Report at 25-26 (docket no. 214). The Court ordered the Phase III investigation in order to cure (or at least improve) this situation.

*Id*. at p. 9. These and other aspects of this special master report are described in detail in "Brief of the Department of Justice Special Attorney Concerning the Special Master's Report Dated October 20, 2017." [Docket #306].

On October 25, 2017, this Court set a hearing, which was later rescheduled to January 18, 2018, "to discuss the Special Master's findings concerning the government's failure to comply with the Phase III investigation and the appropriate response and/or remedies for such." The scheduling order also provided that "[t]he Court will also consider at this hearing any other issues the parties may want to address related to the Phase III investigation." [Docket #300, #308].

**D.  The Special Master's Agreement that Many of the Government's "Points" are "Well-Taken"**

On November 16, 2017, the special master sent an e-mail message to government counsel with some questions, including the following inquiry: "to whom should I send formal discovery requests, such as subpoenae?" [Exhibit 1]. The government responded in a letter dated November 24, 2017. Among other things, the letter "encourage[d] [the special master] to refrain from issuing further demands for documents or information from the government by subpoena or otherwise before the hearing set for January 18, 2018." [Exhibit 2 at p. 2] The government's letter explained that: "[y]our appointment and investigation were triggered by allegations of widespread and ongoing violations of the Sixth Amendment and attorney-client privilege involving CCA Leavenworth and the United States Attorney's Office for the District of Kansas ['USAO']. Your

investigation has helped demonstrate that there is no evidence supporting those allegations." *Id*. On November 30, 2017, the special master sent an e-mail message to government counsel stating in part that "I believe many of the points in your letters to me are well-taken." [Exhibit 3].

### E.  The Special Master's Production Order and Subpoenas

Nonetheless, the special master then filed a production order, demanding that government counsel produce on or before January 2, 2017, 13 broad categories of documents and materials, some of which duplicate requests in the special master's July 10, 2017 request. [Docket #317]. The Special Master also caused a subpoena to be served on government counsel making the same demands. [Exhibit 4]. Many of the categories explicitly describe internal USAO attorney work product generated during the litigation in this case, such as "[a]ny and all documents and materials created by AUSA Emily Metzger or any other USAO-DKan personnel, whether or not they were sent to any USAO-DKan personnel, concerning retention, preservation, and production of materials which relate to or concern *Black*, or the Investigation" and "[a]ny and all documents and materials sent or given to or received by Metzger in response to her instructions concerning retention, preservation, and production of materials which relate to or concern *Black*, or the Investigation."[3] *Id*. at p. 4.

The categories described in the production order and subpoena *duces tecum* encompass documents, materials, and information that are not discoverable under the Federal Rules of

---

[3] Elsewhere, the production order explains that:

> "*Black*" means the underlying case of *U.S. v. Lorenzo Black*, Case No. 2:16-CR-20032, U.S. District Court for the District of Kansas, and its named defendants and any interested parties. Unless not applicable, it also means those cases and individuals who have filed motions seeking relief arising out of the underlying case, which are noted on [an] attached list [of eight other federal criminal cases].

Criminal Procedure and are expressly prohibited from inclusion in a subpoena under Fed. R. Crim. P 17(h), privileged, law enforcement sensitive, and/or safeguarded by other federal laws.

In addition, the special master caused the service of subpoenas demanding that the following present and former employees of the USAO appear and testify at the January 18, 2017 hearing: United States Attorney Thomas Beall, First Assistant United States Attorney Emily Metzger, Assistant United States Attorney ["AUSA"] and Criminal Chief Debra Barnett, AUSA Kim Flannigan, former Special AUSA ["SAUSA"] Erin Tomasic, Systems Manager David Steeby, and Litigation Support Specialist Paulette Boyd. Each subpoena was accompanied by a summary of the testimony sought from the witness, as required by 28 C.F.R. § 16.23(c). (These subpoenas and accompanying summaries are attached as Exhibits 5A through 5G.) Each summary describes categories of information that are not discoverable under the Federal Rules of Criminal Procedure and are privileged, law enforcement sensitive, and/or safeguarded by other federal laws.

## III

## Argument

### A. A Federal District Court Generally Lacks Authority to Investigate the Operations and Decision-Making of a United States Attorney's Office or to Remedy Government Misconduct That Does Not Occur in the Context of a Specific Case.

It is well established that federal courts have certain inherent powers, such as "the power to control admission to [their] bar[s] and to discipline attorneys who appear before [them]" and the power to vacate their own judgments "upon proof that fraud has been perpetrated upon the court." *Chambers v. NASCO*, 501 U.S. 32, 43-44 (1991). But "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44. This

---

*Id*. at p. 3. It further explains that "'the Investigation' means the three phases of investigation authorized by the Court in *Black* and conducted by the Special Master appointed by the Court." *Id*.

is particularly true when the federal government is a party.  "A district court does not have general supervisory powers over the co-equal executive branch of government."  *United States v. Dominguez-Villa*, 954 F.2d 562, 565 (9th Cir. 1992).  "[G]iven the constitutionally-based independence of each of the three actors court, prosecutor and grand jury . . . a court may not exercise its 'supervisory power' in a way which encroaches on the prerogatives of the other two unless there is a clear basis in fact and law for doing so."  *United States v. Chanen*, 549 F.2d 1306, 1313 (9th Cir. 1977).

    In addition to this limited power to investigate, federal courts possess limited authority to order the executive branch to take certain action.  Federal courts' supervisory powers allow them "within limits, [to] formulate procedural rules not specifically required by the Constitution or the Congress."  *United States v. Hasting*, 461 U.S. 499, 505 (1983).  Courts have authority to sanction individual attorneys who commit misconduct in specific cases.  *Id.* at 506 n.5.  And courts can refer instances of misconduct to the DOJ's Office of Inspector General (OIG) or Office of Professional Responsibility (OPR).  *See* 28 C.F.R. §§ 0.29a(b)(2) (giving OIG the responsibility to "[i]nvestigate[ ] allegations of criminal wrongdoing and administrative conduct on the part of Department employees"), 0.39a(a)(1) (giving OPR the responsibility to "[r]eceive, review, investigate and refer for appropriate action allegations of misconduct involving Department attorneys that relate to the exercise of their authority to investigate, litigate or provide legal advice").

    But courts do not have authority to order changes in the internal policies or procedures of a United States Attorney's Office.  *See Laird v. Tatum*, 408 U.S. 1, 15 (1972) (declining to "have the federal courts as virtually continuing monitors of the wisdom and soundness of Executive action"); *United States v. Bolden*, 353 F.3d 870, 875 (10th Cir. 2003) ("Disqualifying the entire

USA's office from representing the government raises important separation of powers issues."); *United States v. Silva-Rosa*, 275 F.3d 18, 22 (1st Cir. 2001) (for a court to "dictate to the executive branch whom it can appoint to serve as its prosecutors" would "trigger weighty separation of powers concerns"); *United States v. Lau Tung Lam*, 714 F.2d 209, 210 (2d Cir. 1983) ("[T]he federal judiciary's supervisory powers over prosecutorial activities that take place outside the courthouse is extremely limited, if it exists at all.").

On the rare occasions in which a federal district court has undertaken an investigation into the internal operations or decisions of a federal prosecutors' office, federal appellate courts have made clear that doing so is improper. *In re United States*, 398 F.3d 615 (7th Cir. 2005), involved a more limited judicial investigation than the one here. There, a federal district court judge was troubled by the government's successful application to a different federal judge for an order vesting the government with broad discretion over disclosure of grand jury matters to a civil litigant. *Id.* at 616-17. The judge who was troubled by this government conduct "threatened to hold the [AUSA who sought the disclosure order] in criminal contempt of court, and he demanded to know who within the United States Attorney's Office participated in the decision to file such a request and why they had approved it." *Id.* at 617. The government sought recusal by a petition for a writ of mandamus. The Court of Appeals agreed that mandamus was an appropriate remedy, but focused on the propriety of the investigation rather than the identity of the judge.

> Yet many of the [government's] arguments deal more with what is being done (an investigation of decision-making within the U.S. Attorney's Office) than with which judge is doing the investigation. One form of relief fairly comprised within the petition's scope is a halt to the inquest. We conclude that the inquiry is inappropriate and must cease; this makes it unnecessary to decide whether someone other than Judge Holderman is the right person to preside.

*Id.* at 617.

After describing the district court judge's efforts to determine what had occurred within the United States Attorney's Office leading up to the government's application for the grand jury disclosure order, the appellate court explained:

> The fundamental problem with this inquiry is that the United States Attorney is not answerable to a judge for the deliberations among his staff. The intra-office conversations and memoranda that the judge wants to see are covered by multiple privileges. *See, e.g., United States v. Zingsheim*, 384 F.3d 867 (7th Cir.2004), which holds that federal judges may not insist that prosecutors reveal deliberative or pre-decisional materials. A federal court must evaluate lawyers' final submissions – that is, must review outputs rather than inputs. How the United States reaches its litigating positions, who said what to whom within the prosecutor's office, and so on, are for the Attorney General and the President to evaluate. The Judicial Branch is limited to assessing counsel's public deeds.
>
> Judges often are tempted to seek a larger role in the conduct of litigants that appear frequently before them. See also, e.g., *In re United States*, 345 F.3d 450 (7th Cir. 2003). Temptation may be especially strong for a judge who spent many years as a prosecutor before donning the robe. (Judge Holderman served for six years as an Assistant United States Attorney in the Northern District of Illinois.) But temptation must be resisted in order to maintain separation between executive and judicial roles, and between the formulation and evaluation of positions in litigation. In the rare situations when a prima facie case of criminal contempt has been made out, and the contempt is not committed in the judge's presence (and thus amenable to summary disposition), the judge must turn the matter over to a prosecutor rather than assume an inquisitorial role inappropriate to the Judicial Branch.

*Id*. at 618; *see also id*. at 619 ("Our legal system does not contemplate an inquisitorial role for federal judges.").

A similar outcome resulted upon review of another effort to inquire into prosecutorial decision-making, again involving an inquiry more limited than the one that the special master is attempting here. In an identically-named decision, *In re United States*, 503 F.3d 638 (7th Cir. 2007), a federal district court judge "propounded [a] set of interrogatories to the United States Attorney" concerning a cooperating defendant's eligibility for a government motion under U.S.S.G. § 5K1.1 and, until it received answers to its questions, refused to act on a government motion to have the court either accept or reject the defendant's guilty plea. *Id*. at 639-40. The

Court of Appeals granted a government petition for a writ of mandamus, requiring that the district court rule on the government's motion "without requiring access to information about ongoing investigations or deliberations within the Executive Branch." *Id.* at 643. It explained:

> The judge's interrogatories seek the names of case agents and witnesses, ask the prosecutor to disclose the status of ongoing investigations, and direct the prosecutor to reveal tentative conclusions such as whether Heath has so far provided "enough" assistance and how the prosecutor thinks that Heath would react to a lower sentence imposed before her cooperation has been completed. These are questions a United States Attorney might well ask of an Assistant United States Attorney; they are not appropriate questions for the Judicial Branch to ask of the Executive Branch. Multiple privileges cover the internal deliberations of the Executive Branch, just as they do for the Judicial Branch's internal deliberations. As we explained in *In re United States*, 398 F.3d 615, 618 (7th Cir.2005), "[h]ow the United States reaches its litigating positions, who said what to whom within the prosecutor's office, and so on, are for the Attorney General and the President to evaluate. The Judicial Branch is limited to assessing counsel's public deeds." See also, e.g., *Cheney v. United States District Court*, 542 U.S. 367 (2004); *United States v. Zingsheim*, 384 F.3d 867 (7th Cir.2004).

*Id.* at 641.

In yet a third case by the same name, the First Circuit granted the government's petition for mandamus, terminated a judicial investigation, and ordered the judge's recusal where the district court continued its own investigation into alleged government misconduct in the grand jury where the DOJ's OIG and OPR had concluded that there was no misconduct. *In re United States*, 441 F.3d 44, 67-68 (1st Cir. 2006). The appellate court observed that "[a] judge's investigation of a prosecutor's office under the label of government misconduct . . . poses the risk that the line will be crossed 'between executive and judicial roles, and between the formulation and evaluation of positions in litigation.'" *Id.* at 67 (quoting *In re United States*, *supra*, 398 F.3d at 618). Although "the court's inherent supervisory authority undoubtedly provided some authority to investigate misconduct as to the grand jury proceedings," this authority was "subject, of course, to the broader constitutional principle of the separation of powers." *Id.* at 58. The "constraints" of the separation

of powers "mean that there must be some reasonable basis for a district court to launch an inquiry" into claims of government misconduct. *Id.* And "there are limits on who should investigate and how the investigation should be done." *Id.* Because the "the government had twice referred the matter to independent DOJ officials for investigation, and they had found nothing," it was improper for the district court to continue the investigation. *Id.* at 61.

The Phase III investigation oversteps the boundaries described above. This Court has authority to render decisions based on the USAO's publicly-filed documents and in-court representations. It does not have the authority, either directly or through a special master, to conduct an investigation into the internal operations and decision-making of the USAO or DOJ. If the Court is concerned about conduct by the USAO, it can refer its concerns to the Department of Justice OIG or OPR for appropriate investigation.

**B. Further Investigation is Also Unwarranted Because There is No Evidence of Ongoing or Widespread Violations of the Sixth Amendment Rights of CCA-Leavenworth Inmates and No Evidence of any Violations of the Sixth Amendment Rights of Any Defendant in this Case.**

Even if a federal district court had constitutional authority to conduct its own investigation into the internal operations of the U.S. Attorney's Office, there would be no basis for such an investigation in this case because the defense allegations that triggered the appointment of the special master have proven baseless. Further, there is but a single allegation, by defendant Carter, that any defendant in this case suffered a violation of his or her Sixth Amendment right to counsel or attorney-client privilege, and Carter can litigate that claim through his motion to dismiss.

In his March 16, 2017 report, the special master "tentatively conclude[d]" that "(1) neither the OUSA nor any law enforcement officer actually viewed any of the video-recorded attorney-client meetings that were seized from CCA-Leavenworth in May of 2016; and (2) neither the OUSA nor any law enforcement officer have ever before obtained (much less actually viewed)

video-recordings of attorney-client meetings at CCA-Leavenworth." Docket #214 at 26. Moreover, the government's September 12, 2017 letter response to the special master asserted that "it is almost certain that no USAO employee or law enforcement official viewed any CCA video of an attorney-inmate meeting" and that "the record remains devoid of evidence that any defendant named in the *Black* case suffered a violation of his or her Sixth Amendment right to counsel." Docket #298-9 at 12, 17 (emphasis omitted). The government's letter specifically asked: "If you believe that any of the preceding or following assertions are inaccurate or incomplete, or there is material information that I have not but should consider, please let me know." *Id*. at pp. 10-11 (emphasis omitted). The special master has not identified any inaccuracies in these statements and indeed remarked that "I believe many of the points in your letters to me are well-taken." [Exhibit 3]. Similarly, the Federal Public Defender, who received a copy of the government's September 12, 2017 letter to the special master when it was filed as an exhibit to the special master's report dated October 20, 2017 [Docket #298-9], has not identified any errors or material omissions in these assertions.

Even if someone from the USAO had viewed video of an attorney-inmate meeting at CCA, there likely would not have been a Sixth Amendment violation. Soundless video of an attorney-inmate meeting cannot, standing alone, reveal attorney-client privileged information unless a participant is using sign language or the viewer can read lips. Although communication can be non-verbal, *see, e.g*., Fed. R. Evid. 801(a) (defining "statement" for purposes of the hearsay rule to include "nonverbal conduct, if the person intended it as an assertion"), non-verbal, non-written communicative conduct (other than sign language), standing alone without accompanying verbal or written context or later explanation from a participant is too rudimentary to enable a viewer to discern either (a) whether the involved parties are exchanging information for the purpose of

obtaining legal advice or strategy or (b) the content of any such exchange. *See, e.g., United States v. Merida*, 828 F.3d 1203, 1209 (10th Cir.), *cert. denied*, 137 S. Ct. 325 (2016) ("In order to be covered by the attorney-client privilege, a communication between a lawyer and client must relate to legal advice or strategy sought by the client.") (citation and emphasis omitted).

Similarly, even if someone from the USAO had heard recorded CCA attorney-inmate telephone calls, there would not necessarily have been a violation of the attorney-client privilege or the Sixth Amendment right to counsel.  Numerous federal courts have concluded that the attorney-client privilege does not apply to calls where the participants are informed that they are being recorded.[4]  And to show a violation of the Sixth Amendment right to counsel, a defendant must show both "purposeful intrusion" by the government, as well as prejudice.  *Weatherford v. Bursey*, 429 U.S. 545, 558 (1977).  That is, there must be some "communication of defense strategy

---

[4] *See United States v. Hatcher*, 323 F.3d 666, 674 (8th Cir. 2003) (finding no attorney-client privilege attached to calls between inmates and attorneys because "the parties to these conversations were aware that they were being recorded by the prison" and "[t]he presence of the prison recording device destroyed the attorney-client privilege"; further noting: "Because the inmates and their lawyers were aware that their conversations were being recorded, they could not reasonably expect that their conversations would remain private. The presence of the recording device was the functional equivalent of the presence of a third party."); *United States v. Mejia*, 655 F.3d 126, 132-34 (2d Cir. 2011) (holding that a prisoner's communication that the prisoner knows is being recorded by prison authorities is not covered by the attorney-client privilege because the prisoner could not intend such call to be confidential; further declaring that "[t]he fact that the call was being recorded amounts essentially to the presence of an unsympathetic third party—[Bureau of Prisons]—listening in"); *United States v. Lentz*, 419 F. Supp. 2d 820, 827-28 (E.D. Va. 2005) (concluding, based on well-settled principles involving privilege, "that an inmate's telephone conversations with counsel are not protected by the attorney-client privilege where, as here, the inmate is notified at the outset that the calls are recorded and subject to monitoring" because the inmate "could not reasonably have assumed that his conversations with [counsel] would be confidential," and the inmate's decision to proceed with conversation despite notification "is no different from [defendant] electing to proceed with these conversations notwithstanding the known presence of a third party within earshot of the conversation"). *See also Watson v. Albin*, 2008 WL 2079967 at *5 (N.D. Cal. May 12, 2008) (finding attorney-client privilege waived where inmate placed calls from jail on a monitored phone line); *United States v. Eye*, 2008 WL 1701089 at *13 (W.D. Mo. Apr. 9, 2008) (finding defendant waived his attorney-client privilege by calling his attorney when he well knew that the calls could be monitored and recorded).

to the prosecution," *id.* at 558, or the intrusion must "ha[ve] or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense," *Morrison*, 449 U.S. at 365.

There is no evidence that the USAO became privy to confidential attorney-inmate communications of the defendants in this case, much less that the USAO purposefully intruded into these defendants' attorney-client relationships or obtained information that would prejudice these defendants. There is simply no "reasonable basis for . . . an inquiry" in this case. *In re United States*, 441 F.3d at 58.

**C. Further Investigation is Unnecessary Because Any Affected Defendants Can Assert Constitutional Claims in Their Own Cases.**

Even if there were a basis to believe that the government violated the Sixth Amendment rights of some inmates during its investigation of contraband smuggling at CCA-Leavenworth by improperly recording, reviewing, and using privileged communications gleaned from inmate-attorney meetings and/or telephone calls, and even if federal district courts had authority to conduct investigations of United States Attorney's Offices for evidence of such violations, there would be no reason to do so here. This is because any defendant who suspects that there has been unconstitutional intrusion into his communications with legal counsel has an adequate and well-established means of seeking redress. Defendant Carter's recently-filed motion to dismiss [Docket #333] conclusively proves this point.

The Sixth Amendment attaches upon initiation of formal criminal proceedings. *United States v. Williston*, 862 F.3d 1023, 1034 (10th Cir. 2017). Once this occurs, a defendant has the right, under Fed. R. Crim. P. 16(a)(1)(B)(i), to receive from the government upon request "any relevant . . . recorded statement by the defendant" that the government knows about and possesses. Under federal law, the term "statement" encompasses "a person's oral assertions" and "nonverbal

conduct, if the person intended it as an assertion." Fed. R. Evid. 801(a). In short, an indicted defendant has a right to discover whether the government possesses any video or audio recordings that capture relevant "statements" made during meetings or telephone calls with legal counsel. Using this information, a defendant is entitled to seek appropriate legal redress for any constitutional violations. *See, e.g.*, Fed. R. Crim. P. 12(b)(3)(C) (motions to suppress).

Indeed, two defendants in this district, Richard Dertinger and Juan Antonio Herrera-Zamora, recently raised claims in their own criminal cases alleging violations of their Sixth Amendment rights based on allegations of the government's capture and use of their communications with legal counsel. *United States v. Dertinger*, Case No. 2:14-CR-20067-JAR, Docket #498; *United States v. Herrera-Zamora*, Case No. 2:14-CR-20049-CBM, Docket #181. And, as noted, defendant Carter has now raised a similar claim. There is no reason to believe that this means of legal redress is unavailable to any other defendant who believes that his Sixth Amendment rights were violated. And the United States will comply with its obligations under Rule 16 in any case in which they are implicated. Accordingly, Phase III of the Court-ordered special master's investigation is unnecessary.

### D. Further Investigation Is Not Warranted in Order to Fashion Any Prospective Remedy.

Further investigation is not warranted in order to fashion any prospective relief. This Court has indicated that further investigation may be warranted so that the court "might fashion an order that prospectively cures any problems, that is, precludes the audio and/or video recording of attorney-client conversations in the future." Doc. 253 at 43. This possibility does not warrant continuation of the Phase III investigation. CCA-Leavenworth is not a party to this criminal case. And although courts' power "extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the

implementation of a court order or the proper administration of justice," *United States v. New York Telephone Co.*, 434 U.S. 159, 174 (1977), there are no constitutional violations in this criminal case that would justify keeping this investigation open.

Moreover, it is worth noting that no statutory or constitutional provision prohibits a detention facility from recording attorney-client communications. The Sixth Amendment does not protect attorney-client communications in the abstract, but only in "criminal prosecutions." U.S. Const. amend. VI. Accordingly, the Supreme Court has never held that "whenever conversations with counsel are overheard the Sixth Amendment is violated." *Weatherford*, 429 U.S. at 551. Instead, the Sixth Amendment is violated only if the contents of the conversation are communicated to the prosecution team or otherwise harm the defense. *Id.* at 554-55. Recording of inmate communications may risk inadvertent disclosure of privileged information to the prosecution, but it is not prohibited by the Constitution.

This Court has also suggested that this investigation may be justified to remedy "a long-simmering culture of distrust occasioned by the prosecutorial practices of several prosecutors in the Kansas City, Kansas division of the USAO" even if the court "ultimately finds that the government has not engaged in misconduct." Doc. 253 at 41, 44. As discussed above, there are serious separation-of-powers problems with a federal court ordering changes in the internal workings of a U.S. Attorney's Office. As part of an independent branch of the government, the U.S. Attorney's Office has the right to set its own policies and make its own judgments about the conduct of its employees. If those employees engage in misconduct in a particular case before the court, then the court may take appropriate remedial action. But, as noted above, "[a] district court does not have general supervisory powers over the co-equal executive branch of government." *Dominguez-Villa*, 954 F.2d at 565 (holding that the district court exceeded its authority by

requiring agency counsel to review the personnel files of law enforcement witnesses and requiring department heads to "sign off" on amount of impeachment material disclosed to the defense).  It would therefore be inappropriate and unconstitutional for the Court to attempt to prospectively require the U.S. Attorney's Office to adopt specific internal policies or procedures.

## IV

## Conclusion

For the reasons set out above, the government respectfully requests that this Court terminate Phase III of the special master's investigation.

## Certificate of Service

I hereby certify that on the 18th day of December, 2017, the foregoing was electronically filed with the clerk of the court for the District of Kansas using the CM/ECF system, which will send a notice of electronic filing to all counsel.

*S/Deanna Lieberman*
Deanna Lieberman
Paralegal Specialist
United States Attorney's Office
Northern District of New York