IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,    )
                             )
              Plaintiff,     )
                             )
v.                           )        No. 16-20032-02-JAR
                             )
KARL CARTER,                 )
                             )
              Defendant.     )
_____)

**RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

The United States of America, by and through Assistant United States

Attorney James A. Brown, hereby responds to "Defendant's Motion to Dismiss the

Superseding Indictment for Prosecutorial Misconduct and Memorandum in

Support," filed by Defendant Karl Carter as Document 333 in this case. The

government suggests that the motion be denied for the reasons set forth below.

## I.    RELEVANT BACKGROUND

The relevant facts relating to Defendant's motion to dismiss, arise from two

cases, one that was filed by the United States Attorney's Office ("USAO") in the

Western District of Missouri ("WDMO" or "the WDMO case"), and the instant

case, which was filed in the District of Kansas ("the Kansas case" or "the instant

case").

1

### A.    The WDMO Case

On June 26, 2014, Defendant was charged in a criminal complaint in case number 14-CR-00193-DGK-1 in the WDMO.  (WDMO Docket Sheet (Attach. A), Doc. 1, Complaint.)  On the same date, Travis Poindexter entered the case as counsel to represent Defendant on behalf of the Federal Public Defender.  (*Id.*, Doc. 6.)  On July 8, 2014, the grand jury issued an indictment, charging Defendant with being a felon in possession of a firearm and aiding and abetting possession with intent to distribute a controlled substance.  (*Id.*, Doc. 13.)

On September 5, 2014, Poindexter withdrew as counsel for Defendant, and J. Justin Johnston entered his appearance for Defendant as new counsel.  (*Id.*, Doc. 33.)  Thereafter, between September 9, 2014, and May 27, 2015, Johnston met with Defendant on five occasions at Corrections Corporation of America ("CCA"), which is now known as CoreCivic, where Defendant was being held in custody. (Doc. 333-1 filed in D. Kan. 16-CR-20032-JAR.)  More specifically, Johnston met with Defendant on:

- September 10, 2014

- February 20, 2015

- April 16, 2015

- May 20, 2015

- May 27, 2015.

(*Id.*)  Subsequent to this series of meetings—on June 4, 2015—Defendant filed a plea agreement (WDMO Docket Sheet, Doc. 53), and on July 6, 2015, the district court accepted Defendant's plea and adjudicated him guilty (*id.*, Doc. 58).

On October 5, 2015, Johnston met with Defendant on another occasion at CCA.  (Doc. 333-1 filed in D. Kan. 16-CR-20032-JAR.)  On May 23, 2016, the WDMO district court sentenced Defendant to 230 months' imprisonment. (WDMO Docket Sheet, Docs. 89, 90.)  On May 24, 2016, the WDMO district court filed its judgment.  (*Id.*, Doc. 90.)

B.    **The Kansas Case**

On March 28, 2016, a grand jury sitting in the District of Kansas issued a subpoena to CCA seeking production of all "inmate recorded calls" for twelve inmates, beginning from July 1, 2014, "until notified recorded calls are no longer needed."  (Doc. 253, Memorandum and Order Directing Phase III Investigation ("Phase III Order") at 11.)  In response to this subpoena and other requests, CCA produced audio recordings of phone calls made by inmates at CCA dating back to at least 2011.  (*Id.*)  The government requested the calls in furtherance of an investigation focused on drug and contraband trafficking at CCA.

On April 9, 2016, Defendant was indicted in this case on charges related to trafficking drugs and contraband at CCA.  (Doc. 1.)  On April 11, 2016, Defendant's present counsel, David J. Guastello, was appointed to represent him.

3

(Doc. 15.)  On May 4, 2016, the grand jury issued an indictment, charging Defendant and the other named defendants in this case on charges relating to trafficking drugs and contraband at CCA.  (Doc. 52.)  On March 16, 2017, the grand jury issued a superseding indictment bearing similar charges.  (Doc. 213.)

## C.    Relevant Findings of the Special Master

### 1.    Phone Calls

After reviewing various reports prepared by the Special Master regarding the recording of phone calls at CCA, this Court made several notable findings in its Phase III order relative to recorded phone calls made by inmates at CCA to their attorneys.  (*See* Doc. 253.)  This Court noted that "the investigation has revealed that the CCA-Leavenworth has produced audio recordings of telephone calls dating back to at least 2011."  (*Id*. at 11.)  And, "[f]or the time period from November 26, 2012 to December 15, 2016, in connection with the CCA investigation, the government obtained audio recordings of 182,084 inmate outgoing phone calls from the 121 Securus pay telephones[1] installed at CCA."  (*Id*. at 21.)

---

[1]    "The Securus Call Platform is a web-based interface that allows users to obtain access to information related to calls made on Securus telephones."  (Doc. 214, Special Master's Report at 2 n.1.)  "Inmates at CCA-Leavenworth are provided with a total of 121 pay-telephones.  The inmates can use these telephones to contact individuals outside the prison, including their attorneys.  Pursuant to the contract, the hardware and software for these pay-telephones is installed and maintained by Securus."  (*Id*. at 10-11.)  "Normally, any call made by an inmate on

Based on the Special Master's reports, this Court noted that under CCA's call monitoring policy, inmates are required to sign a form acknowledging that all inmates' calls, except properly placed phone calls to attorneys, are monitored or recorded. (*Id.* at 16.) The form states:

> "**Corrections Corporation of America reserves the authority to monitor (this includes recording) conversations on any telephone located within its institutions**, said monitoring to be done to preserve the security and orderly management of the institution and to protect the public. **An inmate's use of institutional telephones constitutes consent to this monitoring. A properly placed phone call to an attorney is not monitored**. You must contact your unit team to request an unmonitored call."

(*Id.* (quoting Govt. Ex. 11).)

In order to properly place an unmonitored phone call to the inmate's attorney, the inmate and his attorney must follow a procedure employed by CCA to enable blocking of calls to a phone number designated by the inmate's attorney:

> [T]he only way attorney-client calls are *not* recorded or monitored is if the inmate places the call from one of the 121 Securus pay phones installed at CCA, *and* all calls to that attorney's phone number have previously been designated as 'private' within the Securus system. And the only way calls are designated as private is if the inmate's attorney has initiated the CCA phone call procedure. The procedure requires that an inmate's attorney, and no one else, initiates this 'private' designation by faxing a letter to CCA, on the attorney's letterhead, directing CCA to block all calls to the attorney at the phone number(s) identified in the letter. Upon receipt of such letter, CCA personnel input the attorney's

---

a Securus telephone is recorded" unless the call connects with a telephone number designated as "private." (*Id.* at 11.) "Securus is supposed to refrain from recording calls to these 'Private' numbers." (*Id.*)

> phone number(s) into the Securus system such that all calls placed
> from Securus phones at the CCA-Leavenworth location to that
> attorney's phone number(s) are rendered private and are not
> recorded by the Securus system.

(*Id*. at 17 (emphasis in original).)

In one of his reports the Special Master reported that during the time period in question, an inmate from CCA called "David J. Guastello" on three occasions on unspecified dates; and an inmate from CCA called "J. Johnston" on five occasions on unspecified dates. (Doc. 183, at 5.) Defendant's instant counsel claims that two of the calls to "David J. Guastello" were calls Defendant made to him. (Doc. 333, at 4), and that all five of the calls to "J. Johnston" were calls Defendant made to Justin Johnson, who was Defendant's counsel in the WDMO case (*id*.).

### 2.    Video Recordings

The Special Master noted that the government obtained video recordings of over 700 attorney-inmate meetings that occurred between November 24, 2015, and May 16, 2016. (Doc. 214, at 2.) The report concluded that none of these video recordings contained audio recordings of the meetings at issue. (*Id*.) Furthermore, the report tentatively concluded that neither the Kansas United States Attorney's Office ("Kansas USAO") nor any law enforcement officer actually viewed any of these videos. (*Id*. at 26-27.) Defendant suggests that the government obtained videos of Defendant and Johnston discussing the WDMO case based on visitation logs showing Defendant met with Johnston on six occasions between September

6

10, 2014, and October 5, 2015.  (Doc. 333, at 4-5.)  He does not claim that such videos actually exist or have ever existed.

## II.   DISCUSSION

Defendant argues that the government violated his constitutional rights under the Fifth and Sixth Amendment, and also committed prosecutorial misconduct, in both the WDMO case and in the instant case, by:

- allegedly obtaining and viewing six videos of meetings between Defendant and Johnston during the pendency of the WDMO case ("the WDMO videos");

- obtaining five phone calls between Defendant and Johnston, while Defendant was incarcerated at CCA, during the pendency of the WDMO case, on unspecified dates ("the WDMO calls"); and

- obtaining two phone calls between Defendant and Guastello, while Defendant was incarcerated at CCA, during the pendency of the instant case, on unspecified dates ("the Kansas calls").

(Doc. 333, at 4-5.)

Based on this conduct, Defendant argues that this Court should dismiss the superseding indictment with prejudice in the instant case because: (1) the government committed "prosecutorial misconduct in obtaining, reviewing, and disseminating the attorney-client telephone communications between defendant Carter and his attorneys as well as the unlawful video recording of attorney-client meetings between Carter and his attorneys" (Doc. 333, at 7); (2) "the government's intentional obtaining and possessing of the video recording of attorney/client

meetings between Carter and his attorneys constitutes a violation of Defendant Carter's Fifth and Sixth Amendment rights" (*id*.); and the government has failed "to follow this Court's order to cooperate with the requests of the Special Master, and its destruction of evidence in direct violation of this Court's order for preservation of evidence" in the *Black* investigation (*id*.).

None of these grounds justifies dismissal of the superseding indictment. First, none the communications between Johnston and Defendant in the WDMO case, consisting of the WDMO calls and the WDMO videos are relevant in any way to this case; this Court should disregard them for purposes of deciding the instant motion. Second, Defendant does not bear his burden to show that any of the communications at issue, including the WDMO calls, the WDMO videos, and the Kansas calls, are privileged. Third, even if any such communications were privileged, Defendant cannot show that he is entitled to any remedy—let alone the remedy of dismissal—unless he can show that the government used the communications in a manner that prejudiced him, which he has not done.

### A.    Legal Authorities:  Attorney-Client Privilege

#### 1.    The attorney-client privilege is not a constitutional right; it is a rule of evidence, whose application is narrowly construed.

"[S]tanding alone, the attorney-client privilege is merely a rule of evidence; it has not yet been held a constitutional right." *Howell v. Trammell*, 728 F.3d

1202, 1222 (10th Cir. 2013) (quotation marks omitted)).  However, "when the [F]ifth and [S]ixth [A]mendments are considered together, the individual accused of crime does seem to have a right to attorney-client privilege." *Howell*, 728 F.3d at 1222 (citing *Note, The Attorney–Client Privilege: Fixed Rules, Balancing, and Constitutional Entitlement*, 91 Harv. L.Rev. 464, 485 (1977) (discussing interaction of Sixth Amendment right to counsel and Fifth Amendment right against self-incrimination)).

The Supreme Court has noted that "[t]estimonial exclusionary rules and privileges contravene the fundamental principle that the public . . .  has a right to every man's evidence." *Trammel v. United States*, 445 U.S. 40, 50 (1980) (internal quotation marks omitted).  Citing this rationale, the Tenth Circuit, in speaking about the attorney-client privilege, has noted that "[t]he privilege 'must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'" *In Re Grand Jury Proceedings*, 616 F.3d 1172, 1183 (10th Cir. 2010) (quoting *Trammel*, 445 U.S. at 50) (internal quotation marks in quotation from *Trammel* omitted).

## 2.    Defendant has the burden to establish the privilege.

"A party claiming the attorney-client privilege must prove its applicability, which is narrowly construed.  The party must bear the burden as to specific

questions or documents, not by making a blanket claim." *In re Foster*, 188 F.3d 1259, 1264 (10th Cir. 1999) (internal citation omitted). "The privilege is to be construed narrowly. When it is raised as a bar to the production of preexisting documents given by a client to his attorney to aid in legal representation, it protects only that material which would have been privileged in the hands of the client." *Matter of Grand Jury Subpoena Duces Tecum Issued on June 9, 1982, to Custodian of Records*, 697 F.2d 277, 278-79 (10th Cir. 1983) (internal citations omitted). "It is not the Government's responsibility to sort out what is privileged from what is not; the burden of establishing a privilege is on the one who asserts it." *Id*. at 280.

### 3.    Not all attorney-client communications are privileged.

#### i.    The communication must relate to legal advice, legal strategy, or a confidence relating thereto.

Clearly established law provides that the attorney-client privilege applies only to those communications between an attorney and client that relate to legal advice, legal strategy, or a confidence of a defendant's that was revealed for the purposes of securing such legal advice.

> The attorney-client privilege protects "'confidential communications by a client to an attorney made in order to obtain legal assistance' from the attorney in his capacity as a legal advisor." *In re Grand Jury Subpoena Duces Tecum Issued on June 9, 1982*, 697 F.2d 277, 278 (10th Cir. 1983) (quoting *Fisher v. United States*, 425 U.S. 391, 403, 96 S. Ct. 1569, 48 L.Ed.2d 39 (1976)). **"[T]he mere fact that an attorney was involved in a**

**communication does not automatically render the communication subject to the attorney-client privilege**," *Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1550-51 (10th Cir. 1995); **rather, the "communication between a lawyer and client must relate to legal advice or strategy sought by the client**," *United States v. Johnston*, 146 F.3d 785, 794 (10th Cir. 1998).

Although this description of the attorney-client privilege suggests the privilege only applies one way, operating to protect the client's communications to a lawyer, it is generally also recognized that "**the privilege will protect at least those attorney to client communications which would have a tendency to reveal the confidences of the client**." Kenneth S. Brown, *McCormick on Evidence* § 89 (6th ed. 2006); *see also United States v. Defazio*, 899 F.2d 626, 635 (7th Cir. 1990) ("Communications from attorney to client are privileged only if they constitute legal advice, or tend directly or indirectly to reveal the substance of a client confidence."). However, "when an attorney conveys to his client facts acquired from other persons or sources, those facts are not privileged." *In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984) (internal quotation omitted); *see also McCormick* § 89 (The "prevailing rule [of the attorney-client privilege] does not bar divulgence by the attorney of information communicated to him or his agents by third persons[, n]or does information so obtained become privileged by being in turn related by the attorney to the client in the form of advice.").

*In re Grand Jury Proceedings*, 616 F.3d 1172, 1182–83 (10th Cir. 2010) (internal footnotes omitted; alterations in original; emphasis added).

To be protected by the attorney-client privilege, the confidential disclosure must relate to the obtaining of legal advice. For example, the Supreme Court has described the attorney-client privilege as applying to "[c]onfidential disclosures by a client to an attorney made in order to obtain legal assistance," *Fisher v. United*

11

*States*, 425 U.S. 391, 403 (1976), and has instructed that the privilege "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege," *id*. *See also United States v. Merida*, 828 F.3d 1203, 1209 (10th Cir.), *cert. denied*, 137 S. Ct. 325 (2016) ("In order to be covered by the attorney-client privilege, a communication between a lawyer and and client must relate to legal advice or strategy sought by the client.") (internal quotation marks and emphasis omitted).

> ii. **The privilege is waived by voluntary or inadvertent disclosure of a protected communication to a third party**.

The attorney-client privilege is based on confidentiality and is waived if the holder of the privilege discloses the substance of a communication to a third party.

> **Because confidentiality is key to the privilege, "[t]he attorney-client privilege is lost if the client discloses the substance of an otherwise privileged communication to a third party."** *United States v. Ryans*, 903 F.2d 731, 741 n. 13 (10th Cir.1990). This court has stated, "the confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived. The courts will grant no greater protection to those who assert the privilege than their own precautions warrant." *Id*. (quotation and alteration omitted). This court has also held that "[c]ourts need not allow the claim of attorney-client privilege when the party claiming the privilege is attempting to utilize the privilege in a manner that is not consistent with the privilege." *United States v. Bernard*, 877 F.2d 1463, 1465 (10th Cir.1989). **"Any voluntary disclosure by the client is inconsistent with the attorney-client relationship and waives the privilege."** *Id*.

*In re Qwest Communications Intern. Inc.* 450 F.3d 1179, 1185 (10th Cir. 2006) (emphasis added) ("*In re Qwest*").  Significantly, even if a client *inadvertently* discloses the substance of a privileged communication to a third party, the privilege is lost.  *United States v. Ryans*, 903 F.2d 732, 741 n.13 (10th Cir. 1990) ("The attorney-client privilege is lost if the client discloses the substance of an otherwise privileged conversation to a third party.  This is true even if the disclosure is inadvertent.") (internal citations omitted).

### iii. It is generally accepted that a prisoner who places a call from an institutional phone with knowledge that the call is subject to being recorded has impliedly consented to the recording, and has thereby waived any privilege.

Because a voluntary or inadvertent disclosure of a communication to a third party constitutes a waiver of any attorney-client privilege, it is not surprising that courts have overwhelmingly held that notice to an inmate warning that jailhouse calls are subject to recording and monitoring destroys any reasonable expectation of confidentiality in the communications, without which, no privilege ever attaches to the monitored communications.  In effect, a recording device is deemed to be a third party to whom disclosure of the communication is being made.  *See United States v. Hatcher*, 323 F.3d 666, 674 (8th Cir. 2003) (finding no attorney-client privilege attached to calls between inmates and attorneys because "the parties to these conversations were aware that they were being recorded by the prison" and "[t]he presence of the prison recording device destroyed the attorney-client

privilege"; further noting: "Because the inmates and their lawyers were aware that their conversations were being recorded, they could not reasonably expect that their conversations would remain private. The presence of the recording device was the functional equivalent of the presence of a third party."); *United States v. Mejia*, 655 F.3d 126, 132-34 (2d Cir. 2011) (holding that a prisoner's communication that the prisoner knows is being recorded by prison authorities is not covered by the attorney-client privilege because the prisoner could not intend such call to be confidential; further declaring that "[t]he fact that the call was being recorded amounts essentially to the presence of an unsympathetic third party—[Bureau of Prisons]—listening in"); *United States v. Lentz*, 419 F. Supp. 2d 820, 827-28 (E.D. Va. 2005) (concluding, based on well-settled principles involving privilege, "that an inmate's telephone conversations with counsel are not protected by the attorney-client privilege where, as here, the inmate is notified at the outset that the calls are recorded and subject to monitoring" because the inmate "could not reasonably have assumed that his conversations with [counsel] would be confidential," and the inmate's decision to proceed with conversation despite notification "is no different from [defendant] electing to proceed with these conversations notwithstanding the known presence of a third party within earshot of the conversation"). *See also Watson v. Albin*, 2008 WL 2079967 at *5 (N.D. Cal. May 12, 2008) (finding attorney-client privilege waived where inmate placed

calls from jail on a monitored phone line); *United States v. Eye*, 2008 WL 1701089 at *13 (W.D. Mo. Apr. 9, 2008) (finding defendant waived his attorney-client privilege by calling his attorney when he well knew that the calls could be monitored and recorded by CCA).

Courts, including the Tenth Circuit, have applied this principle in analogous contexts that apply equally here. *See, e.g.*, *United States v. Faulkner*, 439 F.3d 1221, 1222-25 (10th Cir. 2006) (finding, for purposes of Title III's consent requirement, that defendant-inmate "impliedly consented to recording" of his calls with non-attorney associates while being detained at CCA, where:  (1) defendant-inmate received an orientation manual upon arrival, which stated that the "[t]elephones are subject to recording and monitoring," (2) inmates are advised during orientation that their calls "could be" recorded, (3) inmates receive an inmate handbook warning that "[t]elephone conversations may be monitored and/or recorded for security reasons," (4) signs posted over the phones announce that calls are subject to monitoring, and  (5) "it appears that when a call is placed from CCA, a recorded voice states, "This call is subject to monitoring and recording") (internal quotation marks omitted; alterations in *Faulkner*).  *See also United States v. Van Poyck*, 77 F.3d 285, 291 (9th Cir. 1996) (finding, in Fourth Amendment context, that defendant had no expectation of privacy in jailhouse calls he made to non-attorney associates and consented to the taping of such calls

"because he (1) signed a form warning him of monitoring and taping; (2) read signs above the phones warning of taping; and (3) read a prisoner's manual warning of the recordings"); *United States v. Footman*, 215 F.3d 145, 154-55 (1st Cir. 2000) (finding, for purposes of Title III's consent requirement, that defendant-inmate consented to monitoring and recording of his calls to non-attorney associates, where, in order to use phones, inmates are required to sign a form stating that they understand that their calls will be monitored and recorded, stickers on the phones stated that calls are being recorded, and at the start of each call a pre-recorded messages advised both parties to the call that all calls will be recorded except approved attorney calls).

## B.    None of the calls at issue are privileged.

In light of these authorities defining the contours of the privilege, no basis exists for this Court to conclude that any of the calls at issue here, i.e., the five WDMO calls or the Kansas calls, are privileged.  According to the case law reviewed above, before a call may be covered by the privilege, the holder of the privilege must establish two propositions, namely:  (1) that such call contains communications relating to legal advice, legal strategy, or confidences relating thereto; and (2) the holder has not consented to disclosure of the communication to third parties, which would operate as a waiver.  The holder of the privilege here, i.e., the Defendant, cannot make these showings as to the calls at issue.

16

First, the existing record does not establish that any of the communications in the WDMO calls or the Kansas calls related to legal advice, legal strategy, or confidences relating thereto.  The existing record is bereft of evidence relating to the content of the calls.  At this point, any conclusion that these calls included communications relating to legal advice, legal strategy, or confidences relating thereto would be based on pure speculation.

Second, Defendant has waived any potential attorney-client privilege in the calls at issue because Defendant made the calls from an institutional phone with knowledge that the call was subject to recording, thereby waiving any privilege. Any inmate making a call from one of the available phones at CCA is warned at least five times that the call is subject to monitoring by:

- the inmate's receipt of an "Intake Booking Packet" upon entry into the facility advising that "[CCA] reserves the authority to monitor (this includes recording) conversations on any telephone located within its institution. . . . An inmate's use of institutional telephones constitutes consent to this monitoring.  A properly placed phone call to an attorney is not monitored" (Doc. 214, Special Master's Report, at 15-16);

- the inmate's receipt of an "Inmate Handbook" advising that attorney telephone calls "are subject to being recorded if they do not request that they be restricted" (*id*. at 16 (capitalization and emphasis omitted);

- a small sign on each Securus telephone instructing that "Calls are subject to monitoring and recording" (*id*. at 17, 19);

- other signs near the phones advising in English and Spanish, that "ALL CALLS MAY BE RECORDED/MONITORED" (*id.* at 17-19); and

- a message, with a Spanish option, warning that "This call is subject to monitoring and recording," which plays when a recipient answers a call made from an inmate (*id.* at 19, 20 n.15).

Because Defendant made the calls at issue in the face of these numerous and unambiguous warnings, he waived any privilege as to the substance of the matters communicated in the calls. *See supra* at pp. 13-15 (citing authorities). To be sure, the Tenth Circuit's rule and rationale in *Faulkner*, holding that an inmate's knowing choice to use a monitored phone at CCA constituted consent to monitoring for purposes of satisfying the consent exception to the Wiretap Act, governs this inquiry. There, the Tenth Circuit explained that a prisoner's knowledge that his calls are subject to recording equates to implicit and voluntary consent to such recording:

- "**It is generally accepted that a prisoner who places a call from an institutional phone with knowledge that the call is subject to being recorded has impliedly consented to the recording.**" *Faulkner*, 439 F.3d at 1224 (emphasis added).

- "**We are dealing here with incarcerated persons who received very specific warnings about particular phones**. To be sure, the prisoners at CCA did not have the opportunity to choose another, unmonitored phone. But loss of some choice is a necessary consequence of being confined, and prison inmates have very few expectations of privacy in their communications. Rarely are choices in life totally free from opportunity costs; something must be foregoing whenever one comes to a fork in the road. **The real issue is whether imposition of a condition is acceptable, so that a choice**

> **subject to that condition is considered a voluntary, consensual one.  Because of the undeniable need to control prisoner communications to the outside world, we have no hesitation in concluding that a prisoner's knowing choice to use a monitored phone is a legitimate 'consent' under the Wiretap Act**.  *Id*. at 1224-25 (internal quotation marks, citations, and alterations omitted; emphasis added).

In sum, Defendant cannot bear his burden to establish either that the WDMO calls or the Kansas calls are subject to the attorney-client privilege.  Defendant cannot establish that the substance of any of the calls related to legal advice, legal strategy, or confidences relating thereto; and, in any event, Defendant knowingly consented to the recording of his calls and thereby waived any privilege.  Accordingly, none of the calls at issue are subject to the attorney-client privilege.

## C.    The WDMO videos are not privileged.

Based on the case law defining the contours of the privilege discussed above, no basis exists for concluding that the six alleged WDMO videos contain content subject to attorney-client privilege.  The Special Master has noted that the videos obtained by the government contain no audio.  (Doc. 214, at 2 (noting none of video recordings obtained by government include audio).)  Soundless video of an attorney-inmate meeting cannot, standing alone, reveal attorney-client privileged information unless a participant is using sign language or the viewer can read lips.  Although communication can be non-verbal, *see*, *e.g*., Fed. R. Evid. 801(a) (defining "statement" for purposes of the hearsay rule to include "nonverbal

conduct, if the person intended it as an assertion"), non-verbal, non-written communicative conduct (other than sign language), standing alone without accompanying verbal or written context or later explanation from a participant is too rudimentary to enable a viewer to discern either (a) whether the involved parties are exchanging information for the purpose of obtaining legal advice or strategy or (b) the content of any such exchange. Defendant does not provide a description of the contents of the alleged videos, nor does he represent that the parties on the videos made specific signs, lip movements, or gestures that clearly conveyed the substance of their conversations.

Moreover, if Johnston and Defendant conducted their conversations in full view of CCA personnel or in the presence of third parties, Defendant has waived any privilege. That is to say, if Defendant used sign language or revealed his lip movements to any third party or in the view of any third party, he knowingly disclosed verbal or nonverbal communication that could possibly be privileged and thereby waived any privilege. The record is not clear if this is the case.

Thus, because the alleged videos have no audio, and Defendant has given this Court no basis to conclude that any viewer could discern the specific substance of the communications of the parties on the video, this Court has no basis to conclude that the parties' communications were subject to the attorney-client privilege. Moreover, it might be the case that Defendant disclosed his

non-verbal gestures to third parties, resulting in waiver of the privilege.

### D.    Legal Authorities:  Sixth Amendment

Because, for the reasons explained above, the WDMO calls, the WDMO videos, and the Kansas calls are not subject to the attorney-client privilege, no basis for a Sixth Amendment claim lies as a result of the government's alleged intrusion into these communications.  But even if they were privileged, Defendant would not be entitled to any relief or remedy under the Sixth Amendment because Defendant cannot show that the government has used these communications in a manner that has prejudiced his counsel's ability to provide effective assistance of counsel to Defendant.

The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for defense."  U.S. Const. amend. VI.  The Sixth Amendment right contains three basic components:

- the right to be represented by counsel in a criminal proceeding that could result in imprisonment;

- the right to counsel of one's choice; and

- the right to effective assistance of counsel.

*United States v. Nichols*, 841 F.2d 1485, 1496 n.7 (10th Cir. 1988).  *See also Argersinger v. Hamlin*, 407 U.S. 25, 37 (1972) (holding that "absent a knowing and intelligent waiver, no person may be imprisoned for any offense, whether classified as petty, misdemeanor, or felony, unless he was represented by counsel

at his trial"); *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) (acknowledging "the right of a defendant who does not require appointed counsel to choose who will represent him," subject to limitations); *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (stating "the right to counsel is the right to effective assistance of counsel") (internal quotation marks omitted).  A violation of the Sixth Amendment right to counsel of choice may be found without a showing of prejudice and is deemed structural error, but "a violation of the Sixth Amendment right to *effective* representation is not 'complete' until the defendant is prejudiced." *Gonzalez-Lopez*, 548 U.S. at 146-47 (emphasis in original).

Importantly, the Sixth Amendment right attaches *after* a defendant is charged with an offense, not before:

> The Sixth Amendment right . . . is offense specific.  It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.

*McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) (internal quotation marks omitted); *see also id*. at 172 ("the Sixth Amendment right to counsel attaches only to charged offenses").  *Accord United States v. Williston*,  862 F.3d 1023, 1034 (10th Cir. 2017) (stating Sixth Amendment right to counsel "does not attach until adversarial proceedings begin," and noting "[t]he initiation of adversarial proceedings is

triggered by a formal charging event, such as an indictment, an information, an arraignment, or a preliminary hearing").

Where the Sixth Amendment right to effective assistance of counsel attaches, this right includes the ability to speak candidly and confidentially with counsel free from unreasonable government interference. *See Weatherford v. Bursey*, 429 U.S. 545, 554 n.4 (1977) ( "One threat to the effective assistance of counsel posed by government interception of attorney-client communications lies in the inhibition of free exchanges between defendant and counsel because of the fear of being overheard.").

Where the prosecution intentionally intrudes into the attorney-client relationship in the absence of a countervailing governmental interest, a Sixth Amendment violation will lie and prejudice is presumed:

> Because we believe that a prosecutor's intentional intrusion into the attorney-client relationship constitutes a direct interference with the Sixth Amendment rights of a defendant, and because a fair adversary proceeding is a fundamental right secured by the Sixth and Fourteenth Amendments, we believe that absent a countervailing state interest, such an intrusion must constitute a *per se* violation of the Sixth Amendment. In other words, we hold that when the state becomes privy to confidential communications because of its purposeful intrusion into the attorney-client relationship and lacks a legitimate justification for doing so, a prejudicial effect on the reliability of the trial process must be presumed. In adopting this rule, we conclude that no other standard can adequately deter this sort of misconduct.

*Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995). In the Tenth Circuit's view, this "per se rule recognizes that such intentional and groundless prosecutorial intrusions are never harmless because they necessarily render a trial fundamentally unfair." *Id*. (internal quotation marks omitted).[2]

However, where the intrusion occurs in a context where the government acts with a legitimate law enforcement purpose, a Sixth Amendment violation will lie only if the defendant can show that he was prejudiced by the intrusion. *See id*. (noting per se rule does not "affect[] the analysis to be undertaken in cases in which the state has a legitimate law enforcement purpose for its intrusion" and that "[s]uch cases would, of course, require proof of 'a realistic possibility of injury to [the defendant] or benefit to the State' in order to constitute a violation of a defendant's Sixth Amendment rights") (quoting *Weatherford*, 429 U.S. at 558) (first and second alterations added; third alteration supplied in *Haworth*). *See, e.g.*, *Weatherford*, 429 U.S. at 554, 557-58 (finding no Sixth Amendment violation

---

[2]    Even so, in *Haworth*, the Tenth Circuit noted that the Court in *United States v. Morrison*, 449 U.S. 361 (1980), had left open the question of whether "intentional and unjustified intrusions upon the attorney-client relationship may violate the Sixth Amendment even absent proof of prejudice." 70 F.3d at 1140. Some Federal courts of appeals have decided that, in light of *Morrison*, an intentional intrusion into the attorney-client relationship does not give rise to a presumption of prejudice. *See, e.g.*, *United States v. Steele*, 727 F.2d 580, 586 (6th Cir. 1984) ("Even where there is an intentional intrusion by the government into the attorney-client relationship, prejudice to the defendant must be shown before any remedy is granted.") (citing *Morrison*).

occurred, where undercover agent attended meetings between defendant and

attorney, because undercover agent did not communicate substance of

conversations or defense strategy to government and the intrusion was not

purposeful); *Morrison*, 449 U.S. at 365-66 (assuming without deciding that a Sixth

Amendment violation occurred where federal agents met with represented

defendant without counsel's permission and advised defendant she could benefit

by cooperating with them, but reversing Sixth Circuit's dismissal of indictment

with prejudice for assumed violation because defendant "has demonstrated no

prejudice of any kind . . . to the ability of her counsel to provide adequate

representation in these criminal proceedings," and "[t]here is no effect of a

constitutional dimension which needs to be purged to make certain that [defendant]

has been effectively represented and not unfairly convicted").

Prejudice can result from "the introduction of evidence gained through the

interference against the defendant at trial, from the prosecution's use of

confidential information pertaining to defense plans and strategy, and from other

actions designed to give the prosecution an unfair advantage at trial." *Williams v.*

*Woodford*, 384 F.3d 567, 585 (9th Cir. 2004).

Whether the intrusion is intentional or not, the remedy for a Sixth

Amendment violation must be tailored to the harm suffered by the defendant. *See*

*Haworth*, 70 F.3d at 1142-43. In *Morrison*, the Court instructed that "[c]ases

involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not necessarily infringe on competing interests."  449 U.S. at 364.  The Court's approach "has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial."  *Id*. at 365.  Naturally, no remedy is appropriate where no prejudice has occurred.  *See id*. at 366 (noting "[t]he remedy in the criminal proceeding is limited to denying the prosecution the fruits of its transgression" and declining to apply a remedy where defendant failed to demonstrate "prejudice of any kind . . . to the ability of her counsel to provide adequate representation in these criminal proceedings").

### E.    Application of the Sixth Amendment in the Instant Case

#### 1.    Defendant's Sixth Amendment right to effective assistance of counsel is at issue in this case.

Defendant's Sixth Amendment right to effective assistance of counsel is the component of the Sixth Amendment right that is at issue in this case.  As noted, this right includes the ability to speak candidly and confidentially with counsel free from unreasonable government interference.  *Weatherford*, 429 U.S. at 554 n.4.  Defendant claims that his Sixth Amendment right has been violated in this manner.

2.    **No Sixth Amendment right to the effective assistance of counsel in this case arises from any action by the government with respect to the WDMO calls or the WDMO videos.**

A criminal defendant's Sixth Amendment right to counsel is offense specific and attaches when a prosecution is commenced by way for formal charge, preliminary hearing, indictment, information, or arraignment. *McNeil*, 501 U.S. at 175. Thus, Defendant's Sixth Amendment right to counsel *in this case* attached when the government filed its criminal complaint on April 9, 2016. (*See* Doc. 1, Complaint.) And because Defendant's communications with Johnston (referenced in the WDMO calls and WDMO videos) occurred *before* April 9, 2016, Defendant had no cognizable Sixth Amendment right to the effective assistance of counsel in this case when he engaged in these communications. Accordingly, Defendant cannot claim that the government violated his right to effective assistance of counsel in this case by obtaining his communications in the WDMO case. In effect, only the Kansas calls identified by Defendant are relevant to this Court's consideration of Defendant's motion.

3.    **Defendant cannot establish that his Sixth Amendment right to effective assistance of counsel was violated in the instant case because he cannot establish that he suffered prejudice as a result of the government's conduct.**

"[A] violation of the Sixth Amendment right to *effective* representation is not 'complete' until the defendant is prejudiced." *Gonzalez-Lopez*, 548 U.S. at 147

(emphasis in original).  *Accord Weaver v. Massachusetts*, --- U.S. ----, 137 S. Ct. 1899, 1910 (2017).  As noted, "[p]rejudice can result from "the introduction of evidence gained through the interference against the defendant at trial, from the prosecution's use of confidential information pertaining to defense plans and strategy, and from other actions designed to give the prosecution an unfair advantage at trial."  *Williams*, 384 F.3d at 585.

Here, Defendant has not even attempted to establish prejudice based on these metrics.  Defendant's trial has not yet occurred, so the government obviously has not introduced any evidence that could be contained in the calls against him. Moreover, since Defendant made all of the calls at issue from an institutional phone with knowledge that the calls were subject to being recorded, he impliedly consented to such recording, *Faulkner*, 439 F.3d at 1224, and thereby waived any claim that the calls contained *confidential* information about defense plans and strategy.  *See Haworth*, 70 F.3d at 1142 (describing Sixth Amendment violation as occurring when "the state becomes privy to *confidential* communications because of its purposeful intrusion into the attorney-client relationship") (emphasis added). Furthermore, Defendant cannot show that the government has even listened to the calls or viewed the videos[3], which would be necessary to any showing of prejudice.

---

[3]    The Special Master has "tentatively conclude[d] that (1) neither the [USAO] nor any law enforcement officer actually viewed any of the video-recorded attorney-client meetings that were seized from CCA-Leavenworth in May of 2016;

Finally, Defendant has not explained how the contents of either the WDMO calls or the WDMO videos could even be used by the prosecution to Defendant's disadvantage *in this case*, which arises in a different prosecution in a different district based on different facts.  The WDMO calls and WDMO videos are undoubtedly irrelevant to Defendant's instant claim.

Defendant might argue that he does not have to show actual prejudice, based on the Tenth Circuit's comments in *Haworth*, where the Court stated that prejudice will be presumed when a prosecutor intentionally intrudes into the attorney-client relationship without legitimate justification.  *See Haworth*, 70 F.3d at 1142 (establishing "per se rule" that "a prejudicial effect on the reliability of the trial process must be presumed" in cases where "the state becomes privy to confidential communications because of its purposeful intrusion into the attorney-client relationship and lacks a legitimate justification for doing so").

But *Haworth*'s "per se rule" should not be applied in this case for two reasons.  First, the government doubts that this "per se rule" is still good law, given the Supreme Court's view that prejudice must be shown, rather than presumed, for Sixth Amendment violations of the sort alleged here.  *See Morrison*, 449 U.S. at 365-66 (reversing Sixth Circuit's dismissal of indictment for assumed Sixth

---

and (2) neither the [USAO] nor any law enforcement officer have ever before obtained (much less actually viewed) video-recordings of attorney-client meetings at CCA-Leavenworth."  (Doc. 214, at 26-27.)

Amendment violation because defendant demonstrated no prejudice); *Weatherford*, 429 U.S. at 557-58 (no Sixth Amendment violation found where undercover agent attended meetings between defendant and attorney but agent did not communicate substance of conversations to government); *Gonzalez-Lopez*, 548 U.S. at 147 ("[A] violation of the Sixth Amendment right to *effective* representation is not 'complete' until the defendant is prejudiced.") (emphasis in original).

Second, in obtaining the calls or videos, the government did not intentionally intrude into the attorney-client relationship or otherwise seek attorney-client calls or videos that it knew or believed were privileged.  Indeed, for many years before the government obtained the calls at issue, the law of the Tenth Circuit has been clear that (1) the attorney-client privilege is waived by voluntary or inadvertent disclosure to a third party, *see In re Qwest*, 450 F.3d at 1185; and (2) that a prisoner who places a call from an institutional phone with knowledge that the call is subject to being recorded has impliedly consented to the recording, voluntarily disclosed his communication to a third party, and waived the privilege, *Faulkner*, 439 F.3d at 1224-25.  In light of this legal landscape, the government had no reason to believe that obtaining phone calls from CCA by inmates who had been warned that their calls were being recorded implicated the attorney-client privilege.  Further, no legal precedent existed to put the government on notice that obtaining soundless videos from CCA meeting rooms could contain privileged information

or otherwise implicate the attorney-client privilege.  That no such precedent existed is understandable, given that the privilege only applies to specific information (legal advice, legal strategy, or confidences relating thereto), and such specific information can hardly be gleaned from a soundless video.  Thus, because the government had no reason to believe that the soundless videos contained privileged content, the government did not intentionally intrude on the attorney-client relationship by obtaining them.

In sum, Defendant has not and cannot establish a violation of his Sixth Amendment right to effective assistance of counsel.  Defendant has not shown that the government has used any of the calls at issue in any manner that has prejudiced his right to receive effective assistance of counsel.  And because the government did not intentionally intrude into the attorney-client relationship by obtaining CCA calls or soundless videos, *Haworth*'s "per se rule" is not applicable.

### F.    The government has not engaged in prosecutorial misconduct, so Defendant is not entitled to relief on this basis.

Defendant asserts that this Court should dismiss the superseding indictment because of (1) the alleged "flagrant attorney-client privilege violations committed by the government," (2) the government's "lack of willingness to follow this Court's order to cooperate with the requests of the Special Master," and (3) "its destruction of evidence in direct violation of this Court's order for preservation of evidence."  (Doc. 333, at 7.)  As to this latter ground, Defendant claims that the

government spoiled evidence in bad faith by reformatting a hard drive on a computer used by the USAO to play soundless videos from CCA. (*Id*. at 10-12.) Defendant claims such spoilation will "likely prevent the Special Master and the Court from learning the extent of the government's intrusion into defendant Carter's constitutional rights." (*Id*. at 10.)

These claims are factually and legally inaccurate. First, as argued above, the government did not violate Defendant's Sixth Amendment right to effective assistance of counsel by intruding into calls or videos protected by the attorney-client privilege. Defendant has utterly failed to bear his burden to demonstrate that the privilege was applicable to any of the calls or videos at issue. Defendant cannot make this showing as to the WDMO calls or the Kansas calls since he made the calls from an institutional phone with knowledge that the calls were subject to being recorded, thereby impliedly consenting to such recording and waiving any privilege. *See Faulkner*, 439 F.3d at 1224. Defendant cannot make this showing as to the WDMO videos because the videos are soundless, making it nearly impossible for any viewer to discern the substance of the parties' discussions, and Defendant could have disclosed his non-verbal gestures to third parties. Moreover, Defendant cannot showing that he was prejudiced by the government's alleged conduct by any metric, for purposes of establishing a Sixth Amendment violation,

such as use by the government of the calls or videos to the Defendant's disadvantage in the instant case.

Likewise, Defendant's claim that the government has displayed a "lack of willingness to cooperate with the requests of the Special Master" (Doc. 333, at 7) is both inaccurate and irrelevant.  To the extent the government has been able, consistent with the constitutional doctrine of separation-of-powers and the regulations of the Department of Justice, by which the government is bound, the government has cooperated with the Special Master's investigation, especially during Phases I and II.  And where the government has not readily complied with the Special Master's requests during Phase III, it has acted out of a constitutional duty to guard its prerogatives as a co-equal branch of government based on the separation-of-powers doctrine, upon which the U.S. Constitution is based.  *See United States v. Dominguez-Villa*, 954 F.2d 562, 565 (9th Cir. 1992) ("A district court does not have general supervisory powers over the co-equal executive branch of government."); *United States v. Chanen*, 549 F.2d 1306, 1313 (9th Cir. 1977) ("[G]iven the constitutionally-based independence of each of the three actors court, prosecutor and grand jury . . . a court may not exercise its 'supervisory power' in a way which encroaches on the prerogatives of the other two unless there is a clear basis in fact and law for doing so.").  (*See also* Doc. 336, Govt.'s Mot. to

Terminate Phase III at 10-15 (detailing government's view of application of separation-of-powers doctrine in instant case).)

Moreover, the Special Master's investigation is not even relevant to Defendant's case. Defendant's case is resolvable by this Court based on its own facts, without regard to how the government has acted in other cases. To resolve the instant motion, this Court need only determine: (1) whether the relevant calls at issue, i.e., the Kansas calls, were subject to the attorney-client privilege; (2) whether the government has listened to the calls; (3) if so, whether Defendant's instant counsel's ability to perform effectively was prejudiced as a result; and (4) if so, whether a remedy can be tailored to the injury suffered. Whether the government has satisfactorily accommodated the Special Master's requests in the larger *Black* investigation is irrelevant to each of these questions.

Finally, the government denies that it has spoiled evidence in bad faith. The government has fully explained its reasons for reformatting the computer to the Special Master, and none of those reasons were borne of a bad faith motive as Defendant suggests. Moreover, the government's reformatting of the computer has no relevance whatsoever to the instant case. That is, Defendant's claim of spoliation goes to whether the government viewed any of the six WDMO videos; however, the WDMO videos bear no relevance to this case because the soundless communications on these videos were made in connection with the WDMO case

six to 20 months *before* the Complaint in this case was filed, on April 9, 2016.

(Doc. 1, Complaint; Doc. 333-1 (visitation log from CCA reflecting that Johnston

met with with Defendant on 8/22/14, 9/10/14, 2/20/15, 4/16/15, 5/20/15, 5/27/15,

and 10/5/15).)  The remoteness in time of the videos in relation to the Complaint,

as well as the fact that they are soundless, cuts sharply against any inference that

the WDMO videos contain any attorney-client information that is relevant to this

case or that the prosecution could use to Defendant's disadvantage.

Accordingly, no basis exists in fact or law for this Court to find that the

government has committed prosecutorial misconduct.  Defendant has not sustained

his burden to show that the calls relevant to the instant motion, i.e., the Kansas

calls, are subject to the attorney-client privilege.  Whether the government has

satisfactorily accommodated the Special Master's requests in the *Black*

investigation is irrelevant to resolution of the instant motion, which can be decided

exclusively upon the facts of this case, without regard to facts in other cases.  And

the government's reformatting the computer could not have impacted Defendant's

rights in this case because the WDMO videos are irrelevant to the instant case and

Defendant's instant motion.

Even so, if this Court were inclined to find that the government engaged in

prosecutorial misconduct, dismissal of the superseding indictment is not an

appropriate remedy because the alleged prosecutorial misconduct was not

prejudicial to Defendant.  The Supreme Court has concluded that "a district court exceeds its powers in dismissing an indictment for prosecutorial misconduct not prejudicial to the defendant[.]"  *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 (1988).  Rather, the Court explained, in deciding to dismiss an indictment, district courts may not rely on their supervisory power alone; rather, they must comply with the harmless error inquiry prescribed by Federal Rule of Criminal Procedure 52(a).  *Id.* at 254-55.  That rule provides that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."  Fed. R. Crim. P. 52(a).

Here, Defendant cannot claim that his substantial rights were affected by the government's obtaining of the relevant calls at issue—the Kansas calls.  His substantial rights were not affected because these calls were not subject to the attorney-client privilege; but even if the privilege applied, Defendant cannot show that the government used the calls in a manner that negatively affected Defendant's counsel's ability to perform effectively.  Because Defendant's substantial rights have not been affected by the conduct about which Defendant complains, dismissal of the superseding indictment to remedy any claim of prosecutorial misconduct is unwarranted.

WHEREFORE, the government respectfully requests that this Court deny

Defendant's motion to dismiss the superseding indictment.

Respectfully submitted,

THOMAS E. BEALL
Acting United States Attorney

/s/ *James A. Brown*
James A. Brown #14254
Assistant United States Attorney
444 SE Quincy Ave., Ste. 290
Topeka, KS  66683
Tel:  785-295-7683
James.Brown2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on December 29, 2017, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system, which will

send a notice of electronic filing to the counsel of record in this case.

/s/ *James A. Brown*
James A. Brown #14254
Assistant United States Attorney