```
 1                  UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF KANSAS
 2

 3   UNITED STATES OF AMERICA,

 4        Plaintiff,

 5   v.                          Docket No. 16-20032-JAR

 6   KARL CARTER,                Kansas City, Kansas
     ANTHON AIONO,               Date:  05/15/2018
 7   DAVID BISHOP,
                                 Day 1
 8        Defendants.            Pages 1-315
     ...................
 9
                            REDACTED
10          TRANSCRIPT OF MOTIONS HEARING
         BEFORE THE HONORABLE JULIE A. ROBINSON
11            UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Government:   Mr. Steven D. Clymer
                           Department of Justice - USAO
14                         Lrm Eckert, William
                           100 S. Clinston Street
15                         Suite 9000
                           Syracuse, New York 13261
16
                           Mr. Duston J. Slinkard
17                         Office of United States Attorney
                           444 Southeast Quincy
18                         Suite 290
                           Topeka, Kansas 66683-3592
19
                           Mr. Stephen R. McAllister
20                         Office of United States Attorney
                           500 State Avenue
21                         Suite 360
                           Kansas City, Kansas 66101
22
     For the Defendant Karl Carter:
23                         Mr. David J. Guastello
                           The Guastello Law Firm, LLC
24                         811 Grand Boulevard
                           Suite 101
25                         Kansas City, Missouri 64106
```

APPEARANCES:

(Continued)


For the Defendant Anthon Aiono:
                    Mr. Jason P. Hoffman
                    Hoffman & Hoffman
                    CoreFirst Bank & Trust Building
                    100 East Ninth Street
                    Third Floor East
                    Topeka, Kansas 66612

For the Defendant David Bishop:
                    Ms. Cynthia M. Dodge
                    Cynthia M. Dodge, LLC
                    312 S.W. Greenwich Drive
                    #10
                    Lee's Summit, Missouri 64082

For the Movant Federal Public Defender:
                    Ms. Melody J. Brannon
                    Mr. Kirk C. Redmond
                    Mr. Branden A. Bell
                    Office of Federal Public Defender
                    117 Southwest Sixth Street
                    Suite 200
                    Topeka, Kansas 66603

For the Special Master David R. Cohen:
                    Mr. David R. Cohen
                    David R. Cohen Co., LPA
                    24400 Chagrin Boulevard
                    Suite 300
                    Cleveland, Ohio 44122

                    Ms. Alleen VanBebber
                    VanBebber Law Firm, LLC
                    2029 West 95th Street
                    Leawood, Kansas 66206


_____

Kelli Stewart, CSR-KS, CRR-MO, RPR, CRR, RMR
Official Court Reporter
259 U.S. Courthouse, 500 State Avenue
Kansas City, Kansas 66101

I N D E X

Federal Public Defender's Witnesses:                    Page

LESLIE WEST
   Direct Examination By Ms. Brannon                      32
   Cross Examination By Special Master Cohen              39
   Cross Examination By Mr. Clymer                        43

SPECIAL AGENT JEFF STOKES
   Direct Examination By Mr. Bell                         45
   Cross Examination By Mr. Guastello                    124
   Cross Examination By Ms. Dodge                        130
   Cross Examination By Special Master Cohen             144
   Cross Examination By Mr. Clymer                       154
   Redirect Examination By Mr. Bell                      169
   Recross Examination By Mr. Guastello                  173
   Recross Examination By Special Master Cohen           174

SCOTT RASK
   Direct Examination By Mr. Bell                        178
   Cross Examination By Special Master Cohen             227

ERIN TOMASIC
   Direct Examination By Special Master Cohen            267

E X H I B I T S

   Federal Public Defender's

| Exhibits | Offered | Received |
|----------|---------|----------|
| 401 | 11 | 11 |
| 402 | 11 | 11 |
| 403 | 11 | 11 |
| 404 | 11 | 11 |
| 405 | 11 | 11 |
| 406 | 11 | 11 |
| 407 | 11 | 11 |
| 408 | 11 | 11 |
| 409 | 11 | 11 |
| 410 | 11 | 11 |
| 411 | 11 | 11 |
| 412 | 11 | 11 |

E X H I B I T S

Federal Public Defender's

| Exhibits | Offered | Received |
|----------|---------|----------|
| 413 | 11 | 11 |
| 414 | 11 | 11 |
| 415 | 11 | 11 |
| 416 | 11 | 11 |
| 417 | 11 | 11 |
| 418 | 11 | 11 |
| 419 | 11 | 11 |
| 420 | 11 | 11 |
| 421 | 11 | 11 |
| 422 | 11 | 11 |
| 423 | 11 | 11 |
| 424 | 11 | 11 |
| 425 | 11 | 11 |
| 426 | 11 | 11 |
| 427 | 11 | 11 |
| 428 | 11 | 11 |
| 429 | 11 | 11 |
| 430 | 11 | 11 |
| 431 | 11 | 11 |
| 432 | 11 | 11 |
| 433 | 11 | 11 |
| 434 | 11 | 11 |
| 435 | 11 | 11 |
| 436 | 11 | 11 |
| 437 | 11 | 11 |
| 438 | 11 | 11 |
| 439 | 11, 72 | 11 |
| 440 | 11 | 11 |
| 441 | 11 | 11 |
| 442 | 11 | 11 |
| 443 | 11 | 11 |
| 444 | 11 | 11 |
| 445 | 11 | 11 |
| 446 | 11 | 11 |
| 447 | 11 | 11 |
| 448 | 11 | 11 |
| 449 | 11 | 11 |
| 450 | 11 | 11 |
| 451 | 11 | 11 |
| 452 | 11 | 11 |

E X H I B I T S

Federal Public Defender's

| Exhibits | Offered | Received |
|----------|---------|----------|
| 453 | 11 | 11 |
| 454 | 11 | 11 |
| 455 | 11 | 11 |
| 456 | 11 | 11 |
| 457 | 11 | 11 |
| 458 | 11, 119 | 11, 119 |
| 459 | 11 | 11 |
| 460 | 11 | 11 |
| 461 | 11 | 11 |
| 462 | 11 | 11 |
| 463 | 11 | 11 |
| 464 | 11 | 11 |
| 477 | 106 | 106 |
| 479 | 109 | 109 |
| 480 | 103 | 103 |
| 491 | 204 | 204 |
| 492 | 100 | 100 |
| 494 | 207 | 207 |
| 497 | 198 | 198 |
| 498 | 117 | 117 |
| 503 | 51 | 51 |
| 508 | 48 | 48 |
| 512 | 97 | 97 |
| 521 | 11 | 11 |
| 524 | 312 | 312 |
| 537 | 11 | 11 |
| 541 | 179 | 179 |
| 542 | 193 | 193 |
| 545 | 218 | 218 |
| 547 | 214 | 213 |
| 554 | 219 | 219 |

1

2                         E X H I B I T S

3    Special Master's
     Exhibits              Offered           Received
4
         Rask 1            233               233
5        Tomasic 1         274               274

6        Rask 2            235               235
         Stokes 2          146               146
7        Tomasic 2         278               278

8        Tomasic 3         280               280

9        Rask 4            237               237
         Stokes 4          153               153
10       Tomasic 4         281               281

11       Rask 5            247               247
         Tomasic 5         284               284
12
         Rask 6            248               251
13
         Rask 7            - - -             255
14       Tomasic 7         290               290

15       Rask 8                              257
         Tomasic 8         291               291
16
         Tomasic 9         294               294
17
         Tomasic 11        296               296
18

19

20

21

22

23

24

25

```
 1                  (9:05 a.m., proceedings commenced).

 2                  THE COURT:  All right.  You can be seated.

 3  All right.  We're here in United States versus Lorenzo

 4  Black, et al.  The case number is 16-20032.  We'll start

 5  by having the parties state your appearances, please.

 6                  MR. CLYMER:  Good morning, Your Honor.

 7  Steven Clymer for the United States.  I'm accompanied

 8  this morning by United States Attorney Stephen

 9  McAllister, Criminal Chief Duston Slinkard and Special

10  Agent John Seubert.

11                  THE COURT:  All right.

12                  MS. BRANNON:  Your Honor, the Federal Public

13  Defender appears through Melody Brannon, Kirk Redmond,

14  and Branden Bell.

15                  MR. GUASTELLO:  May it please the Court.

16  David Guastello on behalf of Karl Carter, who's filed a

17  waiver of appearance.

18                  MR. HOFFMAN:  Good morning, Your Honor.  Mr.

19  Aiono appears by and through counsel, Jason Hoffman.

20  He's also filed a waiver of appearance.

21                  MS. DODGE:  Good morning, Your Honor.

22  Cynthia Dodge on behalf of David Bishop, who appears in

23  person.

24                  SPECIAL MASTER COHEN:  Sorry.  David Cohen,

25  Special Master.
```

```
 1              MS. VANBEBBER:  Alleen VanBebber.  I'm
 2     appearing today for the first time, Your Honor, by
 3     appointment of the Court as counsel to the Special
 4     Master.  I am a member of the bar of this court.  My
 5     Kansas court number is 10214.
 6              THE COURT:  All right.  Thank you.  All
 7     right.  There are a number of, of course, pending
 8     motions in this case, not that all of them are
 9     necessarily noticed up for today.  But there are a
10     number of Rule 41 motions filed by defendants, there is
11     the FPD's motion for order to show cause.  Mr. Carter
12     has filed a motion to dismiss indictment.
13              There are-- there's a motion for order
14     lifting stay by the FPD that relates to subpoenas *duces*
15     *tecum* which I may hear argument on but basically as of
16     today continue to be under advisement.  There are some
17     motions to quash.  One of those I ruled on yesterday, I
18     believe it was to quash the subpoenas of I think Mr.
19     Bigelow and Ms. Thomas, I don't remember which-- who are
20     CCA or CoreCivic employees.  But there's been an order
21     entered on that as of yesterday evening.  Yes, Mr.
22     Bigelow and Ms. Thomas.  That's ruled on, that's
23     Document 470.
24              There's a motion to quash Special Master's
25     subpoena *duces tecum* that was directed to Tom Beall.
```

1    That's pending.  There-- and that's Document 461.  And

2    then there were some prior motions to quash subpoenas

3    *duces tecum* that related to subpoenas issued on Mr.

4    Clymer.  I consider those moot.  Mr. Clymer has not

5    received a subpoena *duces tecum* for purposes of today's

6    hearing, so those are essentially moot.  So that's

7    what's pending.

8                This case was originally noticed up, I think

9    I described it as a hearing on the Special Master's

10   latest report which indicated that the government was

11   not complying with his investigation despite a court

12   order that everyone comply.  And the FPD also filed a

13   motion for order to show cause on that same issue.

14               So this has been noticed up as an

15   evidentiary hearing.  I know that both the FPD and the

16   defendants and the Special Master have subpoenaed a

17   number of witnesses, I'm unaware if the government has,

18   but I am considering this an evidentiary hearing.

19               So I don't know that we necessarily need

20   opening statements, maybe we can go directly to the

21   evidence, but I don't know, there may be some

22   preliminary matters that someone wishes to raise.

23               Mr. Bell.

24               MR. BELL:  Thank you, Your Honor.  First, as

25   the Court noted, this is going to be an evidentiary

1    hearing so we'd request to sequester the witnesses.

2            THE COURT:  All right.  Mr. Bell has

3    requested that the rule be invoked so the witness

4    sequestration rule will be invoked.  So anyone who's

5    present in the courtroom now who is subpoenaed as a

6    witness must leave.  Obviously Mr. Seubert-- is it Mr.

7    Seubert, is the case agent and represents the party, he

8    can stay.  But anyone else who's been subpoenaed.

9            I will leave it up to the parties to police

10    their witnesses, but the meaning of this rule is that

11    the witnesses are not to discuss their testimony with

12    anyone, any other witnesses.

13            MR. BELL:  And just a point-- I'm sorry,

14    just a point of clarification, Your Honor.  I understand

15    Agent Seubert will be allowed to remain seated at the

16    counsel table for the government, but I just want to

17    make sure that he's also covered by the sequestration

18    order to the extent that he can't discuss other

19    witnesses' testimony with other witnesses who have yet

20    to testify or things of that nature.

21            THE COURT:  All right.  I think that's fair.

22    So, Mr. Seubert, do you understand that you're under the

23    rule.  You're allowed to stay in the courtroom because

24    you represent the party.

25            MR. SEUBERT:  Yes, Your Honor.

 1                THE COURT:  Okay.  All right.

 2                MR. BELL:  Another preliminary matter, Your

 3    Honor.  We have a number of exhibits that we think can

 4    be entered and it would be faster to just move to enter

 5    them now.

 6                THE COURT:  Okay.  I'm going to ask you all

 7    to come up and use the microphone.  I'm really having

 8    trouble hearing all of you.

 9                MR. BELL:  Your Honor, I think it might be

10    easier, we have a number of exhibits that are

11    essentially court pleadings or other statements by the

12    United States Attorney's Office that we think can be

13    entered sort of en masse.  I'd like to start off by

14    noting that according to what we have, the following

15    exhibits have already been admitted, and those would be

16    Exhibits 401 through 464, as well as Exhibit 521 and

17    537.

18                THE COURT:  All right.  You're offering them

19    for today's hearing.  They've already been admitted, I

20    think that's appropriate.  We need to give everyone time

21    to make sure I guess that they've been admitted.  But

22    subject to that determination, I will admit 401 through

23    464 and 521 and 537.

24                MR. BELL:  And then, Your Honor, for

25    purposes of today's hearing for exhibits that have not

1    been admitted in a prior proceeding, we'd ask the Court

2    to admit-- and does the Court have an exhibit list

3    before I start rattling off numbers?

4              THE COURT:  I don't have it in front of me.

5    Is it a part of your binder?

6              MR. BELL:  May I approach?  I have a copy.

7              THE COURT:  Yes.

8              MR. BELL:  All right.  Those exhibits would

9    be Exhibit 476, 477, 478, 479, 480, 481, 482, 487, 488,

10   489, 490, 492, 497, 498, 502, 503, 504, 508, 536, 541,

11   542, 543, 544, 545, 546, 547, 552, 553, and 554.

12             But for those last two, 553 and 554, those

13   are all either pleadings that the government filed or

14   they are transcripts of prior proceedings in this case

15   or excerpts of prior proceedings either in this case or

16   in the *Dertinger* case and in the *Huff* case and in

17   underlying cases.  All the statements that we would be

18   moving to admit in those exhibits would all be

19   admissions by either the United States Attorney's Office

20   or by the United States Marshals Service under

21   801(d)(2)(D).

22             553 is a pleading that we filed early in

23   this case.  We're not offering it for the truth but only

24   for its effect on the receiver.  And then 554 is a

25   transcript of an interview of an interpreter in the

 1   *Herrera-Zamora* case that's entered by stipulation

 2   between ourselves and the United States Attorney's

 3   Office.

 4              THE COURT:  All right.  Let me-- some of

 5   these I can tell probably aren't an issue.  Let me start

 6   with those.  So there's a number of transcripts.

 7   There's 476, which is a sentencing transcript in the

 8   *Huff*, *Ashley Huff* case.  There's 478, which is an

 9   excerpt of a hearing transcript that was Mr. Seubert's

10   testimony.  And some of these I can't tell what they

11   are.  Let me back up.

12              Mr. Clymer?

13              MR. CLYMER:  Yes, Your Honor.

14              THE COURT:  Are there any of these-- any of

15   the exhibits that you object to?

16              MR. CLYMER:  Your Honor, I-- I take at his

17   word Mr. Bell's description of 401 through 464 and 421

18   through-- and 437 [sic] are to be admitted.  I haven't

19   confirmed that, but I have no reason to doubt that.  So

20   there's no reason to discuss those I suppose.

21              On the other ones, Your Honor, many of them

22   to me are-- it's not self-evident that they're relevant

23   to this proceeding.  They may be, they may not be.  I

24   just don't know, because it's not clear to me from the

25   150 exhibits that were provided to me here recently what

1   the relevance are to the issues that this Court has

2   identified as before it today.  So it very well may be

3   that I have no objection to all or most of these but I

4   just can't say at this time.

5              And I'd suggest to the Court that we simply

6   proceed as the Court I expect typically does, which is

7   at the time the exhibit is offered to a witness.  If

8   there's a motion, at that point we would be able to

9   better tell whether it's relevant or not.

10             THE COURT:  All right.  That's fair.  We'll

11  proceed in that manner, Mr. Bell.

12             MR. BELL:  Thank you, Your Honor.

13             THE COURT:  All right.  Anything more from

14  the FPD as a preliminary matter?

15             MR. BELL:  No, Your Honor.  Thank you.

16             THE COURT:  Anything from the government as

17  a preliminary matter?

18             MR. CLYMER:  I had one thing, Your Honor.

19  Of the witnesses that the Federal Public Defender

20  subpoenaed today, as the Court knows, there are a number

21  of employees of the United States Attorney's Office.  I

22  asked the public defender for an order when they would

23  be testifying so they wouldn't have to sit around

24  outside court all day because they have to do the

25  public's business.  And I didn't get a response to that

 1   request.  I'd just ask that we have some sort of

 2   indication of when those witnesses should be here so

 3   they're not all sitting around.

 4              THE COURT:  Okay.  That's fair.  Can you

 5   start with who you anticipate calling this morning

 6   that's from the U.S.-- well, from the U.S. Attorney's

 7   Office?

 8              MR. BELL:  Certainly, Your Honor.  And I

 9   e-mailed Mr. Clymer this morning that list and that

10   order.  He probably hasn't seen it yet.

11              MR. CLYMER:  I haven't seen it.

12              MR. BELL:  If you'll give me just a moment.

13              THE COURT:  Okay.

14              MR. BELL:  The witnesses that-- you said the

15   witnesses from the United States Attorney's Office we'll

16   be calling-- that may be called today?

17              THE COURT:  Yes.  This morning and maybe

18   this afternoon.  I know it's rough because you don't

19   know exactly, but--

20              MR. BELL:  Sure.  We would plan to call Mr.

21   Rask, Ms. Flannigan.  I think after that would be Mr.

22   Steeby.  I'm sorry, I take that back.  The order from

23   the U.S. Attorney's Office will be Mr. Rask, Ms.

24   Flannigan, Ms. Barnett, Mr. Steeby, Ms. Boyd, Mr. Beall,

25   Mr. Welch, Ms. Metzger, Mr. Oakley, Mr. Hunt, Mr. Zabel,

1    and Ms. Catania.

2              THE COURT:  In that order?

3              MR. BELL:  In that order.  And that's all of

4    the U.S. Attorney's Office employees we intend to call,

5    so I don't know if we will necessarily get to them all

6    this morning or today, but that's all of them that we

7    intend to call in order.

8              THE COURT:  Okay.  But you are calling other

9    witnesses, law enforcement and CoreCivic, and those are

10   interspersed in that order of proof?  In other words,

11   are you calling all the AUSAs before you call other

12   witnesses?

13             MR. BELL:  No, you're correct, they are

14   interspersed.

15             THE COURT:  Okay.  So best-- best guess like

16   in the next three or four hours, who will you be

17   calling?  Who's your first few witnesses, in other

18   words?

19             MR. BELL:  It would be Leslie West, Jeff

20   Stokes and then Mr. Rask, Ms. Flannigan, Ms. Barnett,

21   Mr. Steeby, Ms. Boyd, and then Agent Seubert.  And I

22   imagine that's going to probably take us through the

23   first few hours.

24             THE COURT:  Okay.  All right.  Anything more

25   from you, Mr. Clymer?

```
 1              MR. CLYMER:  No, Your Honor.  Thank you.
 2              THE COURT:  All right.  Anything from Mr.
 3    Guastello, the defense, Ms. Dodge--
 4              MR. GUASTELLO:  Nothing, Your Honor.
 5              THE COURT:  -- Mr. Hoffman?
 6              MS. DODGE:  No, Your Honor.
 7              THE COURT:  Ms. VanBebber?
 8              MS. VANBEBBER:  Yes, Your Honor.  Your
 9    Honor, we are having a little trouble hearing you as
10    well.  I think maybe it's not turned on.
11              COURTROOM DEPUTY:  Steve is working on
12    adjusting that.
13              THE COURT:  I'm not sure this is even on.
14    Is it on?
15              MS. VANBEBBER:  Now it is.
16              THE COURT:  All right.
17              MS. VANBEBBER:  Your Honor, I have a
18    procedural matter to-- to bring up, which I would hope
19    would either shorten or not-- at least not elongate the
20    hearing.  And so I'm going to ask for a ruling at the
21    very beginning of this procedure unless, of course, Mr.
22    Clymer has no objection, in which case it would be moot.
23              I refer all counsel to 28 C.F.R. 16.23.
24    This is in regard to the *Touhy* regulations under which
25    some of the witnesses in this case have been directed
```

1   not to answer any except certain questions that have

2   been allowed by the Deputy Attorney General.

3           The difference here is that 28 C.F.R. 16.23

4   says that any attorney in charge of the case at the time

5   is authorized to disclose to any person the testimony,

6   the relevant unclassified material, documents,

7   information, anything that's held by any attorney or

8   investigator of DOJ, the attorney in charge may preside

9   as she sees fit.

10          In this particular case, the attorney in

11   charge until it was referred to-- by Mr. Beall as the

12   acting U.S. Attorney was in the hands of Debra Barnett.

13   First in the hands of Erin Tomasic, and then the

14   Criminal Chief Debra Barnett took over as the attorney

15   in charge in this case.  She had the sole authority -

16   unless she chose to refer it or ask Mr. Beall to refer

17   it - to make the decisions that are to be made when

18   *Touhy* is at issue.

19          If she found nothing in *Touhy* to warrant

20   non-disclosure, then anyone in that office was entitled

21   to give information to the Special Master as had been

22   ordered by the Court.  She never made any objections to

23   anything that was asked to my knowledge, nor did she

24   ever raise *Touhy* and tell somebody under *Touhy* not to

25   answer the questions.

 1          Subsequently, I think we need to make-- need

 2    to make a distinction here between the Deputy Attorney

 3    General's denial of the ability to answer questions

 4    today between the time when the case was referred to the

 5    U.S. Attorney's Office [sic] and the time when

 6    disclosures were made in the past by the attorney then

 7    in charge who did not seek to either refer the case or

 8    tell somebody not to answer because of *Touhy*.  And if we

 9    can make that distinction based on the date of referral,

10    then it should make things go a lot faster.

11          THE COURT:  And that would've been the date

12    that the U.S. Attorney, then Mr. Beall, referred this

13    matter to the Department of Justice?

14          MS. VANBEBBER:  Correct.

15          THE COURT:  And so your argument-- from that

16    date of demarcation, anything that was disclosed, told,

17    provided to the Special Master before that date would've

18    been under the authority of the attorney in charge, who

19    under the regulations has the authority to invoke *Touhy*

20    or not to invoke *Touhy*, to disclose or not to disclose

21    pursuant to *Touhy*.

22          MS. VANBEBBER:  That is my understanding of

23    the C.F.R. and I have found no case law that was any

24    different.

25          Now, certainly neither the Special Master

 1   nor I assume any of the other lawyers in this room are

 2   planning to not honor *Touhy* when the witness is required

 3   to decline to testify from the point of which this case

 4   was referred and the DAG gave authority.  But prior

 5   disclosures, it's-- you can't unring the bell.

 6           And so I would submit that those witnesses

 7   ought to be-- we ought to be careful that those

 8   witnesses are not told that they have to decline to

 9   testify about matters that were disclosed when the

10   original AIC didn't deny it.

11           THE COURT:  All right.  Thank you.  Mr.

12   Clymer.

13           MR. CLYMER:  A couple points, Your Honor.

14   First, I'm not sure I understand counsel's argument.

15   Obviously whatever disclosures have been made to the

16   Court are evidence and we don't suggest and haven't

17   suggested that the Court can't rely on those disclosures

18   in making decisions with respect to the motions you've

19   identified.

20           It's the case that the Deputy Attorney

21   General's Office has instructed witnesses in this case

22   who are employees of the Department of Justice that they

23   have authorization to answer some questions that have

24   been specified and not answer others.  And that's the

25   authorization that's in existence right now, and those

 1  witnesses are duty bound by federal law to comply.

 2          I think if counsel has some argument that

 3  the *Touhy* regulations have somehow been waived or

 4  nullified by some earlier disclosures, I am aware of no

 5  case law and no authority whatsoever supporting that

 6  proposition.  I would suggest to the Court that if the

 7  Special Master takes that position, it was incumbent on

 8  him or his counsel to have filed something in writing so

 9  I could respond to it in writing and the Court could be

10  fully informed.

11          And we let the parties know months ago that

12  it was likely that many of the questions or all the

13  questions being posed were not going to be authorized

14  for purposes of answering today.  So this-- the present

15  position of the Department can come as no surprise to

16  anybody involved in this litigation.

17          THE COURT:  All right.  So just for clarity,

18  so-- and I've got, you know, the summaries of what the

19  Deputy Attorney General is allowing these witnesses to

20  be asked.  But to the extent that someone wants to ask

21  one of these witnesses about something that this-- that

22  witness has themselves already disclosed or the United

23  States Attorney's Office has already disclosed or a

24  document that was provided in the course of the Special

25  Master investigation, are you taking the position that

1  the witness can't be asked about something that is

2  already disclosed?

3              MR. CLYMER:  No.  The witnesses can be asked

4  about anything the parties want to ask about, but the

5  witnesses as employees of the Department of Justice are

6  not authorized to answer or make certain statements.

7              THE COURT:  That's what I meant.

8              MR. CLYMER:  Yeah, I'm sorry.

9              THE COURT:  So in other words, you're taking

10  the position that even if it's a subject matter that's

11  already in the court record, already been provided by

12  the U.S. Attorney's Office to the Special Master,

13  already perhaps even been-- this witness has told the

14  Special Master, you're still going to-- the Deputy

15  Attorney General is still directing that witness not to

16  answer that particular question?

17             MR. CLYMER:  Judge, that's a good question

18  and I have to go through the record very carefully to

19  answer it.  But it is the case that witnesses who, for

20  example, already testified in the *Dertinger* hearing have

21  full authority to testify today about those very matters

22  they were asked about.

23             In fact, I offered the public defender's

24  office to simply make the *Dertinger* hearing part of the

25  record in this case in lieu of the testimony.  They want

1    the ability to examine those witnesses themselves, which

2    is understandable, so we said fine.  I plan to make the

3    *Dertinger* transcript-- move the *Dertinger* transcript in,

4    and they're fully capable or they're fully able under

5    the Deputy Attorney General's instructions to answer

6    questions about what they've already testified about.

7            So I'm not quite sure exactly what areas the

8    Special Master's counsel says were disclosed earlier and

9    not subject to disclosure.  Now, I can sit down and talk

10   to them at a break and try to identify what those areas

11   are.  But I do know with respect to at least some -

12   perhaps many or most - of the areas where they've

13   already made disclosures, the Deputy Attorney General

14   has told them they are authorized to answer questions

15   today.

16           THE COURT:  All right.  And it could be that

17   the questions are framed in a manner to ask the witness

18   to only answer this with respect to a conversation or

19   whatever, prior testimony or whatever before a date

20   certain, I don't know.

21           By the way, what is the date of the

22   referral?  And I don't know if you know or that's

23   something Mr. McAllister or Mr. Beall would know, but we

24   do need to establish what the date was that this U.S.

25   Attorney's Office sent their referral letter, a letter

1    to DOJ.

2              MR. CLYMER:  I don't know that off the top

3    of my head, Judge.  But, quite frankly, under the *Touhy*

4    regulations I think it has no relevance.

5              THE COURT:  Well, I-- I think it goes to

6    this issue.  Now, this issue may not have legs, I don't

7    know, but I think the way to proceed is I will take the

8    issue raised by counsel to the Special Master under

9    advisement.  I will want you to provide that date

10   because it may or may not have relevance, depending on

11   my ruling.

12             I will allow everyone to brief on this issue

13   after the fact.  And that's assuming it actually arises

14   in the course of questioning, that this-- this issue

15   about whether anything that was disclosed prior to the

16   referral to the Department of Justice is outside the

17   scope of *Touhy* or not.  It's something I'll take under

18   advisement.  So I'll allow briefing.  I will need to

19   know as soon as you can tell me that date because as

20   these issues arise in the course of testimony, we'll

21   need to know where we're at on that.

22             And then I'll allow-- to the extent it has

23   to do with things that have been disclosed before the

24   date of referral, I'll allow the parties to proceed by

25   proffer until I can resolve this issue and determine

 1    whether it's admissible or not.

 2            MR. CLYMER:  Judge, so I'm clear, what

 3    specific event do you want me to give the date?  The

 4    date I was appointed, the date it was referred?

 5            THE COURT:  I think it would be the date of

 6    referral.  I assume you were appointed after the

 7    referral.

 8            MR. CLYMER:  That's correct.

 9            THE COURT:  So I think the argument of

10    counsel to the Master is that the attorney in charge

11    locally in the U.S. Attorney's Office had the authority

12    to invoke *Touhy* and did not invoke *Touhy*.  But after it

13    was referred, from the date it was referred on, the

14    attorney in charge-- this U.S. Attorney's Office lost

15    that authority.  The authority lodged exclusively in the

16    Department of Justice.  The Department of Justice has

17    invoked *Touhy*, and so I think the Special Master's

18    counsel is arguing that's a line of demarcation.

19            MR. CLYMER:  Very well.

20            THE COURT:  That's an issue I'll take under

21    advisement.

22            MR. CLYMER:  And just to put down a marker,

23    Judge, I think their understanding of the *Touhy*

24    regulations in terms of who has authority is simply

25    wrong.  So that's why I say it was much better to have

1    this briefed ahead of time.  But I don't think their

2    understanding is even correct as a legal matter, aside

3    from the factual issues.  But again, we can resolve that

4    similarly, Your Honor.

5            THE COURT:  We can resolve it after the

6    fact.  We'll proceed with a proffer and build this

7    record and then I'll take briefing and then decide then

8    what to do with this.

9            MR. CLYMER:  Thank you, Your Honor.

10           THE COURT:  Okay.  Let's see.

11           MR. REDMOND:  Your Honor, can we weigh in on

12   that?

13           THE COURT:  Yes, please.

14           MR. REDMOND:  Thank you.  Your Honor, first

15   to answer the Court's question, I believe Document Entry

16   298 indicates that on June 30th of 2017, the issue was

17   referred by Mr. Beall to the Department of Justice.  And

18   on the 14th of July of 2017, the Department of Justice

19   sent a letter to the Court and the Special Master saying

20   it appointed Mr. Clymer as a special assistant-- or

21   Special Attorney to assist the U.S. Attorney's Office

22   for the District of Kansas.

23           THE COURT:  Okay.  Wait a minute, I-- 298

24   doesn't match up with what you're saying.  You said--

25   okay.  So what are you saying the date was?  The first

16-20032-JAR   USA v. Lorenzo Black   (REDACTED)   05.15.18   27

 1  date was July?

 2          MR. REDMOND:  June 30th of 2017.

 3          THE COURT:  There's something in the court

 4  document-- or docket that reflects that?

 5          MR. REDMOND:  Yes, I believe so.  It's also

 6  reflected in our Exhibit 481 that we've submitted to the

 7  Court.

 8          THE COURT:  I don't-- I'm not finding

 9  anything-- anything filed on June 30th, but what did you

10  say, 4--

11          MR. REDMOND:  Oh, I'm sorry.  The filing was

12  actually made 10-20 of '17 and I'm looking at

13  Document 298, Page 4.

14          THE COURT:  Okay.  I don't have that.

15  That's the Special Master's first status report

16  regarding the Phase III investigation?

17          MR. REDMOND:  That is correct, Your Honor.

18          THE COURT:  Do you-- do you have that handy?

19          MR. BELL:  May I approach?

20          THE COURT:  Yes.  So according to the

21  Special Master's report on Page 4, he had an e-mail from

22  the U.S. Attorney's Office dated June 30th in which they

23  had not referred it at that time but stated that we are

24  anticipating-- they're talking about whether they have a

25  conflict matter to go to the deputy AG.

 1          Ultimately on July 14, 2017, DOJ sent a

 2    letter to the Court and Special Master saying it had

 3    appointed you, Mr. Clymer, as special attorney.  And

 4    that's attached as an exhibit.

 5          So at least the communication from the

 6    Department appointing Mr. Clymer apparently was dated

 7    July 14.  When the request for the referral was made

 8    apparently was sometime between June 30th and July 14th,

 9    2017.  If you have something, a date more specific, Mr.

10    Clymer, you can let us know, that would be helpful.

11          Bonnie.  Bonnie.

12          MR. REDMOND:  And, Your Honor, I would also

13    like to make the federal defender's position clear as to

14    the arguments made by counsel to the Special Master.  We

15    concur and for a couple of different reasons.  And I

16    want to make clear what the remedy is that we'll be

17    asking for from the Court.

18          The government has consistently indicated

19    that it's going to assert various privileges under 28

20    C.F.R. 16 dash-- or dot 21 in *Touhy versus Ragen*.  We

21    did not at that time-- at the time that we made our

22    filing note precisely what the contours of those

23    assertions would be, but in January of this year in

24    Document No. 385 we filed a memorandum of law regarding

25    proper assertion of the privilege and the authority

1     related to that proposition.

2             And we began with the proposition consistent

3     with the Special Master's position that it is

4     undoubtedly the duty of the Court to determine whether a

5     privilege has been properly asserted.

6             There's additional authority from the Tenth

7     Circuit for that proposition that we cited in the first

8     footnote of that filing, which is *Sperandeo*, that's

9     S-P-E-R-A-N-D-E-O, *For and on Behalf of the NLRB*, which

10    is a 1964 Tenth Circuit case where the Court said it is

11    for the Court and not the governmental agents-- agency

12    or executive branch to determine whether documents

13    sought to be withheld under a claim of privilege are

14    entitled to the protection of that privilege.  It's the

15    Court's job to determine whether the privilege has been

16    validly asserted.  And we think that for three reasons

17    that we outlined in that filing from the-- in

18    Document 385 that the government has waived any relevant

19    privilege.

20            The first is a failure to timely assert that

21    privilege.  The Tenth Circuit has been pretty clear

22    about this in *United States versus Ary*, A-R-Y, which is

23    518 F.3d 775.  The Tenth Circuit found that a party did

24    not assert a privilege in a timely fashion by waiting

25    six weeks to assert it.  Here, the government has waited

1    more than a year to assert any relevant privileges,

2    during that time instead promising cooperation.  So I

3    think that there has been a waiver but because of the

4    government's inaction.

5              Our second position, again I think

6    consistent with the Special Master's counsel, is that

7    the government has not asserted privilege in any-- in a

8    way that makes the Court-- or gives the Court an

9    opportunity to actually review the validity of that

10   privilege assertion.  The Tenth Circuit has consistently

11   held, as we laid out in Document 385, that assertions of

12   privilege are not considered unless they're presented in

13   a deliberate, considered and specific manner.  Blanket

14   claims are insufficient.

15             In addition, the government has to rely on

16   record evidence for the Court to use in evaluating the

17   validity of the assertion and the privilege.  They've

18   done no such thing.  They've simply written a letter

19   that says, King's X, we're not going to let these people

20   say these things.

21             The third and I think the most important is

22   that I think the-- what the government is attempting to

23   do is engage in selective waiver, which the Tenth

24   Circuit in the *Quest Communications* case says can't be

25   done.  Once the government discloses information, it

1    waives the privilege as to all other communications

2    dealing with the same subject matter.

3            And the government here has repeatedly

4    disclosed information regarding this subject matter

5    through Ms. Tomasic's statements to the Court, from

6    sponsoring Ms. Flannigan's testimony in the *Dertinger*

7    hearing.  The government cannot then say, well, now

8    we're going to stop.  We're only going to disclose what

9    we want.  I mean, the Tenth Circuit has directly

10   rejected that notion.  And so I think that the-- those

11   are the three reasons that we think that there's a

12   waiver.

13           Should the government persist in invoking

14   *Touhy* and refusing its witnesses to answer questions, I

15   want to make clear what remedy we're going to be asking

16   for.  We understand that under *Touhy versus Ragen* the

17   Court cannot hold those witnesses or Mr. Clymer in

18   contempt.  The Court can, however, draw adverse

19   inferences from those witnesses refusing to testify,

20   especially in a circumstance where the Court determines

21   that the invocation of the privilege was illegitimate.

22   That's what we're going to be asking if those witnesses

23   don't testify.

24           THE COURT:  I understand.  All right.

25   Anyone else have any preliminary matters before we

1    proceed?  All right.  If not, Ms. Brannon, are you

2    prepared to call your first witness?

3                MS. BRANNON:  We are, Your Honor.  We'd call

4    Leslie West.

5                        LESLIE WEST,

6    called as a witness on behalf of the Federal Public

7    Defender, having first been duly sworn, testified as

8    follows:

9                    DIRECT EXAMINATION

10   BY MS. BRANNON:

11      Q.  Good morning.  Could you tell us your name,

12   please?

13      A.  Leslie West, ma'am.

14      Q.  And what city do you currently reside in?

15      A.  Leavenworth, Kansas, ma'am.

16      Q.  Did you previously work for CCA-Leavenworth?

17      A.  Yes, ma'am.  From September of 2013 to October of

18   2016.

19      Q.  All right.  And if we could talk just for a

20   moment about what you did before you worked for CCA.

21      A.  I was in the United States Army from 2005 to

22   2013.  I worked as a corrections specialist.

23      Q.  All right.  And what does it mean that you worked

24   as a corrections specialist?

25      A.  I did corrections in operations, both in military

1    prisons as well as in Guantanamo Bay and Iraq.

2        Q.   Can you tell me again the date that you went to

3    work for CCA?

4        A.   September of 2013.

5        Q.   So you went directly from the military to CCA?

6        A.   Yes, ma'am.

7        Q.   And when you first were employed at CCA, what was

8    your job?

9        A.   I was a correction officer, so I worked the

10   housing units on the floor.

11       Q.   And were you promoted?

12       A.   I was promoted three times.  First to lieutenant

13   and then to captain and then unit manager finally.

14       Q.   How fast did that happen?

15       A.   I worked for CCA from September of '13 until the

16   summer of 2015 and I got promoted to lieutenant.  And I

17   was lieutenant for three months, which is assistant

18   shift supervisor.  And then I was a captain until the

19   following December and I laterally promoted to unit

20   manager.

21       Q.   During that time were you aware of CCA's policy

22   regarding the recording of attorney-client phone calls?

23       A.   Yes, ma'am.

24       Q.   What was CCA's policy during that time when you

25   first started?

1    A.  We weren't supposed to record attorney-client

2    privileged phone calls at all, or visits.

3    Q.  Did that change regarding the phone calls and the

4    policy?

5    A.  No, ma'am.

6    Q.  Do you know what inmates were told when they were

7    booked into CCA regarding attorney-client phone calls?

8            MR. CLYMER:  Objection, unless there's a

9    foundation that there's a basis to answer that question,

10   Your Honor.

11           MS. BRANNON:  I asked if she knew.

12           THE COURT:  All right.  Reframe the

13   question.

14   BY MS. BRANNON:

15   Q.  During that time that you worked for CCA, did you

16   know or have any involvement with the book-in procedure

17   with inmates?

18   A.  During the time I was a unit manager, ma'am, I

19   was over the intake pod, so my case managers and case

20   counselors that worked directly under me were

21   responsible for intake of inmates.

22   Q.  So were you aware of information that inmates

23   were given during that intake process?

24   A.  Yes, ma'am.

25   Q.  And did that include information regarding

1   attorney-client phone calls?

2       A.   The information that they would've gotten

3   would've been from the inmate handbook.

4       Q.   Was it CCA's policy that every inmate that was

5   booked in was to be given an inmate handbook?

6       A.   During the first 72 hours of intake an inmate is

7   supposed to either meet with their case counselor or--

8   (reporter interruption).   Or case manager.   And then

9   during that time within the 72-hour mark, they would be

10  issued certain pieces of paper they'd sign based on PREA

11  and communicable diseases, and that they should receive

12  a handbook at that time.

13      Q.   Were you familiar with the forms they were to

14  sign?

15      A.   Yes, ma'am.

16      Q.   Did you ever actually book in inmates?

17      A.   Yes, ma'am.

18      Q.   Okay.   So we talked about the policy.   Can you

19  tell us about the actual practice at CCA about handing

20  out these handbooks?

21      A.   On several different occasions it was difficult

22  even for management to get ahold of an inmate rule book.

23  They were pulled at least twice for revisions, which

24  means pulled from the facility, not just our offices but

25  even from the inmates during the shakeout so they can be

1   changed and re-issued.

2        It was common that you'd be having a discussion

3   with the inmate especially related to discipline or-- or

4   a procedural matter and you'd say, well, that's in the

5   rule book when they would ask you and they'd say, well,

6   I don't have one, or I never received one.

7   Q.   So there were times that rule books were not even

8   available to the officers?

9   A.   Yes, ma'am.

10   Q.   So can you give us an estimate of how often the

11   handbook was revised during the time you worked there?

12   A.   At least twice I know that we pulled them for

13   revisions.  And that was during the time I was a captain

14   and unit manager.  So when I was an officer, I may not

15   have been aware.

16   Q.   Do you know whether there were revisions to the

17   policy regarding attorney-client phone calls?

18   A.   No, ma'am, I don't know.

19   Q.   Were you ever approached by inmates asking what

20   the policy was to obtain an attorney-client--

21   confidential attorney-client phone call?

22   A.   I was approached on a couple of different

23   occasions, I would say five, where an inmate would say,

24   I went through the correct procedure, I put in a request

25   form to be able to ensure that my attorney was taken off

1    the list.  But when I tried to call them on the housing

2    unit phones, the little blurb that's placed at the

3    beginning that says, you know, "your phone call is being

4    recorded" is still playing.  How do I ensure that my

5    attorney's number is actually blocked?

6        We could refer them to the rule book but

7    typically I would ask them to put in a information

8    request to the couple of people that were authorized to

9    block numbers.

10        On a couple of different occasions I e-mailed

11    attorneys and said, the inmate you represent, you know,

12    is concerned that perhaps your phone number isn't

13    blocked, will you please call the front desk number,

14    give them the phone number, and talk to the front desk

15    attendant and she'll try to ensure that your number is

16    blocked as well.

17        Q.   Do you know how often you contacted an attorney

18    in that regard?

19        A.   I believe twice for that specific purpose.

20        Q.   At the time inmates are booked in, you mentioned

21    that there are a number of forms that they sign.

22        A.   Yes, ma'am.

23        Q.   One of those included a form regarding

24    attorney-client phone calls; is that right?

25        A.   I've never seen a form like that, ma'am.  The

1    only written information that we received during the

2    time I was unit manager and captain would be the rule

3    book given to them.

4        Q.   How was information regarding attorney-client

5    phone calls conveyed to non-English-speaking inmates?

6        A.   We do have-- I have seen before rule books in

7    Spanish, ma'am.  Beyond that, at the time we didn't

8    have-- (reporter interruption).  At the time we didn't

9    have counselors or case managers who spoke Spanish, but

10   we did have a phone system.  So you could call this

11   phone number, press the right button for the right

12   number.  You could speak into it and then an interpreter

13   would give whatever verbal instruction to that inmate in

14   whatever language you needed.

15               MS. BRANNON:  May I have just one moment,

16   Your Honor?

17               THE COURT:  Yes.

18               MS. BRANNON:  No further questions.  Thank

19   you.

20               THE COURT:  Mr. Guastello, Mr. Hoffman, Ms.

21   Dodge?

22               MR. GUASTELLO:  No questions, Your Honor.

23               MR. DODGE:  No, Your Honor.

24               THE COURT:  Mr. Cohen.

25               SPECIAL MASTER COHEN:  Thank you, Judge.

```
 1                   CROSS EXAMINATION
 2   BY SPECIAL MASTER COHEN:
 3      Q.   Good morning, Ms. West.
 4      A.   Good morning, sir.
 5      Q.   I know I tried to subpoena you and it didn't get
 6   there, so you're here voluntarily; is that right?
 7      A.   Yes, sir.
 8      Q.   Thank you for coming.  When did you say that you
 9   started, in September 2013 at CCA?
10      A.   Yes.  Yes, sir.
11      Q.   And when did you leave?
12      A.   I was put on administrative leave in April, but I
13   was actually fired in October of 2016.
14      Q.   Okay.  Just to follow up briefly on a couple of
15   questions that Ms. Brannon asked you.  I think I
16   understood you to say that there were times when inmates
17   would arrive and you wouldn't have a handbook available;
18   is that right?
19      A.   Yes, sir.
20      Q.   So they didn't receive one?
21      A.   No, sir.
22      Q.   Is there a time period within which they're
23   required to get one under CCA procedure?
24      A.   Not that I'm aware of, sir.
25      Q.   I read somewhere that there was like a 72-hour
```

1  window within which you were allowed to give it to them.

2  If you didn't give it to them within that first, you

3  know, hour that they came in there was a grace period;

4  is that right?

5          MR. CLYMER:  Objection to what counsel has

6  read, Your Honor.  I'd ask that he just ask the question

7  to the witness, not a statement.

8          SPECIAL MASTER COHEN:  I'll restate it.

9          THE COURT:  I'll overrule.  I'll overrule.

10 BY SPECIAL MASTER COHEN:

11     Q.  Is there a period within which inmates were

12 supposed to get the handbook?

13     A.  Inmates were required to meet with their

14 counselor or case manager in that 72-hour window and

15 that was the time in which a handbook was to be given.

16     Q.  So it could be 72 hours before an inmate would

17 receive a handbook?

18     A.  72 hours is not including weekends and holidays,

19 so it would be-- you know, in some certain situations it

20 could be five, six days.

21     Q.  Okay.  And if an inmate didn't get a handbook

22 within that five or six-day period, is it possible they

23 never got it because there weren't any to give?

24          MR. CLYMER:  Objection.  "Is it possible,"

25 speculation.

1          THE WITNESS:  Yes.

2          THE COURT:  Overruled.

3          THE WITNESS:  Yes, sir, it's possible.

4    BY SPECIAL MASTER COHEN:

5      Q.  Do you know that that occurred?

6      A.  I know that on several different occasions I

7    spoke to an inmate who had said-- especially when I'd

8    ask them to refer to the rule book and they would say, I

9    don't have one, I never received one.

10     Q.  Any understanding or estimate of how frequently

11   that happened, the percentage of inmates that never got

12   a handbook?

13     A.  You were more likely to talk to an inmate who

14   didn't have a handbook than one that did.

15     Q.  Was there a handbook posted in the pod, like a

16   plastic-covered handbook that they could-- you know,

17   generally available?

18     A.  No, sir.  When I was a housing unit officer

19   several times when I was trying to refer to something in

20   the handbook, I would have to ask other inmates in the

21   pod who had one, borrow it, give it back, that kind of

22   thing, sir.

23     Q.  You said that you contacted defense counsel on

24   occasion?

25     A.  Yes, sir.

1      Q.   Who was that, do you recall?

2      A.   I remember one in particular.  I know I contacted

3   Shazzie Naseem by e-mail once.

4      Q.   And for the purpose of communicating what to him?

5      A.   That an inmate wanted to get ahold of him and he

6   was concerned that his-- that his phone calls were still

7   being recorded, sir.

8      Q.   The inmate was concerned that his phone calls

9   were being recorded?

10      A.   Yes, sir.

11      Q.   Do you remember what it was that the inmate--

12   what it was that caused the inmate that concern?

13      A.   Sir, it was the blurb at the beginning of a

14   Securus phone call that says, you know, please be

15   advised your-- I'm unaware of the exact verbiage, but

16   please be advised that your phone call is being

17   recorded.

18      Q.   So when an inmate makes a call from the pod on a

19   Securus pay phone, there is sometimes a recording when

20   the inmate makes the call warning him that his phone

21   call might be recorded; is that correct?

22      A.   Yes, sir.

23      Q.   And you're saying that the inmate was concerned

24   because he was hearing that recording and didn't expect

25   to?

1        A.  Yes, sir.

2            SPECIAL MASTER COHEN:  That's all I have,

3    Judge.  Thank you.  Thank you.

4            THE WITNESS:  Yes, sir.

5            THE COURT:  Mr. Clymer.

6                  CROSS EXAMINATION

7    BY MR. CLYMER:

8        Q.  Ms. West, why were you terminated at CCA?

9        A.  Sir, my termination letter stated that the United

10   States Marshals Service had terminated my security

11   clearance.

12       Q.  And do you know why that happened?

13       A.  No, sir.

14       Q.  Did you know you were under criminal

15   investigation?

16       A.  I was questioned, sir.

17       Q.  Did you know you were under criminal

18   investigation?

19       A.  No, sir.

20       Q.  Did there ever come a time when an inmate who

21   knew from the recording that his calls were being

22   recorded and came to you for assistance, did you ever

23   refuse to give them assistance?

24       A.  No, sir.

25       Q.  Did you ever say to them, tough luck, there's no

 1   way you can have a call without it being recorded?

 2       A.   No, sir.

 3       Q.   Every time that happened, you tried to assist

 4   them.   Correct?

 5       A.   Yes, sir.

 6       Q.   And you thought that that was part of your job

 7   responsibilities?

 8       A.   Definitely, sir.

 9            MR. CLYMER:   Thank you.   No further

10   questions.

11            THE COURT:   Anything further?

12            MS. BRANNON:   Nothing, Your Honor.

13            THE COURT:   All right.   May Ms. West be

14   excused or is she subject to recall?

15            MS. BRANNON:   Your Honor, she's here

16   voluntarily.   We don't have her under subpoena, so I

17   assume she can be released.

18            THE COURT:   All right.   You're excused.

19   Thank you.

20            THE WITNESS:   Yes, Your Honor.

21            THE COURT:   Call your next witness.

22            MR. BELL:   Your Honor, we'd call Jeff

23   Stokes.

24            SPECIAL AGENT JEFF STOKES,

25   called as a witness on behalf of the Federal Public

1  Defender, having first been duly sworn, testified as

2  follows:

3               MR. BELL:  May I proceed?

4                    DIRECT EXAMINATION

5  BY MR. BELL:

6     Q.  Would you state your name for the record?

7     A.  Jeff Stokes.

8     Q.  Mr. Stokes, what do you do for a living?

9     A.  I'm a special agent with the Kansas Bureau of

10  Investigation.

11    Q.  As part of that role, were you tasked to

12  investigate what would later become the *Black* case?

13    A.  Yes.

14    Q.  And was that generally the time when you were

15  investigating it known as just a CCA contraband

16  trafficking case?

17    A.  Yes.

18    Q.  When did you first become involved in that

19  investigation?

20    A.  I would say fully involved in-- by March of 2016.

21    Q.  As part of that investigation, an inmate gave a

22  proffer on March 17th, 2016.  Does that date sound

23  familiar to you?

24    A.  It does.

25    Q.  And you didn't attend that proffer session?

1      A.   If it was a second proffer, yes, I did not attend

2   it.  Correct.

3      Q.   All right.  That was a proffer session attended

4   by another agent named Glen Virden?

5      A.   Yes.

6      Q.   And you wrote a report about that proffer

7   session.  Correct?

8      A.   Correct.

9      Q.   And the report you wrote was based on a recording

10  of the proffer session?

11     A.   Correct.

12     Q.   So you didn't attend it, there was a recording.

13  Glen Virden did attend it and Erin Tomasic attended that

14  as well?

15     A.   I don't recall if she attended or not without

16  reviewing the report.

17     Q.   Okay.  Well, generally what did you review in

18  anticipation of your testimony today?

19     A.   My transcripts from the last hearing.

20     Q.   From the last time you testified in the *Dertinger*

21  hearing?

22     A.   Correct.

23     Q.   Anything else?

24     A.   No.

25     Q.   During that March 17th, 2016 proffer session that

1    you listened to the audio of, the agents discussed the

2    feasibility of doing a controlled buy inside CCA.

3    Right?

4        A.  Without reviewing the report, I-- I don't recall.

5        Q.  You don't recall if there was a discussion on

6    March 17th, 2016 about doing a controlled buy inside of

7    CCA?

8        A.  I don't recall, no.

9        Q.  Would it refresh your recollection to look at

10   your testimony from the *Dertinger* hearing?

11       A.  Possibly, yes.

12       Q.  All right.  I'm going to show you what's been

13   marked as Exhibit 508 and I direct your attention to

14   Page 143 of that exhibit.

15       A.  Yes, sir.

16       Q.  I'm going to look at Line 24 down there.

17           MR. CLYMER:  What page number, counsel?

18           MR. BELL:  127.

19   BY MR. BELL:

20       Q.  And then it goes on to the following page.

21       A.  It would be 143.

22           MR. BELL:  143, I apologize.

23           THE WITNESS:  Starting with Line 24 you

24   said?

25   BY MR. BELL:

1   Q.   You don't need to read it out loud, just read it

2   to yourself and see if it refreshes your recollection

3   about a discussion of a controlled buy on that date.

4   And just let me know when you've finished reading if it

5   jogs your memory or not.

6   A.   Yes.

7   Q.   All right.   I'll take that back.   And generally

8   does this appear to you to be a transcript of your

9   testimony in the *Dertinger* hearing?

10   A.   That page looks like it.

11   Q.   143?

12   A.   Yes.

13        MR. BELL:   Your Honor, at this time I'd move

14   to admit Exhibit 508.

15        THE COURT:   Any objection?

16        MR. CLYMER:   No, Your Honor.

17        THE COURT:   Exhibit 508 admitted.

18   BY MR. BELL:

19   Q.   Okay.   Do you now recall that there was a

20   discussion during that proffer session about doing a

21   controlled buy inside of CCA?

22   A.   What I remember is the proffer prior to that, I

23   don't recall the date.   There was a discussion about a

24   controlled buy, but I don't recall any discussion during

25   that proffer of a controlled buy.

1      Q.   All right.  So was there a discussion about doing
2  a controlled buy at CCA before March 17th or after
3  March 17th?
4      A.   It should've been before.
5      Q.   All right.  Was it in February?
6      A.   I don't recall without looking at the report.
7      Q.   I see.  Were you present when that discussion was
8  had?
9      A.   Yes.
10     Q.   Was Ms. Tomasic present when that discussion was
11 had?
12     A.   I believe so, yes.
13     Q.   Who else was present when that discussion was had
14 and without naming the cooperator?
15     A.   I believe it was myself, as you said Erin
16 Tomasic, I believe it was Senior Special Agent Glen
17 Virden with the KBI.  I believe Matt Cahill, retired
18 deputy marshal.  Possibly John Seubert, Secret Service
19 special agent.  Without looking at the report I wouldn't
20 recall if there was any more, but that's who I think I
21 remember.
22     Q.   Fair to say there may be other people that were
23 there, but you know the people you just named were
24 there?
25     A.   Yes.

1    Q.  All right.  During that proffer session-- or

2   during that discussion I should say about the controlled

3   buy, the cooperator informs the assembled group that

4   there are cameras inside the attorney-client visitation

5   rooms at CCA?

6    A.  If he did, I don't recall that.

7    Q.  Do you recall any discussion involved with a

8   controlled buy about how there are cameras inside the

9   attorney-client rooms at CCA?

10   A.  I think there was a discussion, I don't remember

11  the context, I-- I don't recall.

12   Q.  Okay.  So you do know there was a discussion

13  about cameras in the rooms, you just don't remember the

14  exact wording?

15   A.  I don't recall if there was or not.

16   Q.  I show you what's been marked as Exhibit 503.

17  I'll represent to you this is a pleading that the

18  government filed in this case.  I turn your attention to

19  the eighth page there.  In that pleading is there a

20  discussion about what the inmate said during the

21  discussion about the controlled buy as it relates to

22  cameras in the attorney-client rooms?

23        MR. CLYMER:  Objection, Your Honor.  I think

24  this witness is being asked to read from a document he

25  didn't write, that I don't know if he's ever seen

1    before.  It asserts some facts.  I believe counsel can

2    try to refresh his recollection with it, but I don't

3    think counsel can question him about the substance of

4    what's in this document.

5              MR. BELL:  I move to admit Exhibit 503.

6              THE COURT:  Any objection?

7              MR. CLYMER:  I don't know what the relevance

8    is, Your Honor.

9              THE COURT:  All right.  Exhibit 503

10   admitted.

11   BY MR. BELL:

12      Q.  Agent Stokes, is there a discussion on Page 8 of

13   Exhibit 503 about-- about the controlled buy?

14      A.  (Pause).

15      Q.  I'll make it easier for you.  I want you to look

16   at the last paragraph on Page 8 of 503.  "At the

17   conclusion of the proffer interview, the investigators

18   discussed using the cooperator to purchase drugs and

19   contraband from another inmate at CCA at the direction

20   of the investigators."  Did I read that sentence

21   correctly?

22      A.  I believe so, yes.

23      Q.  The next sentence, "During the discussion the

24   cooperator reported that he believed the attorney-client

25   rooms contained video cameras and he believed the CCA

1    staff could activate audio monitoring without an

2    inmate's knowledge." Did I read that correctly?

3        A.  Yes.  But the paragraph before that says in early

4    March.  I was not present for that.  So if there was

5    conversation about that after the proffer had ended, I

6    wouldn't have been present for that.

7        Q.  All right.  So there was-- I want to make sure I

8    have this right.  There is a discussion about doing a

9    controlled buy and you were present for that proffer.

10   Right?

11       A.  Yes.

12       Q.  There is another proffer session that you were

13   not present at but which you listened to the recording

14   of?

15       A.  Correct.

16       Q.  And in that proffer session, that's where the

17   inmate stated that he believed there were cameras in the

18   attorney-client rooms at CCA?

19       A.  Not that I recall hearing.

20       Q.  But you'd agree with me that that's what

21   Exhibit 503 says?

22       A.  That's what this document says.

23       Q.  Okay.  So when did you become aware that there

24   are cameras in the attorney-client rooms at CCA?

25       A.  It was after August of 2016.

1      Q.   So it wasn't until August of 2016 that you became

2   aware that there were cameras in the attorney-client

3   rooms at CCA?

4      A.   Yes.

5      Q.   When did you become aware that those cameras

6   recorded video of the meetings that occurred in those

7   rooms?

8      A.   When I met with the Special Master.

9      Q.   And when was that?

10      A.   I don't recall the date.

11      Q.   Can you ballpark it for me?

12      A.   2016.  It was after August.  I don't recall the

13   date.

14      Q.   So at some point after August 2016 is when you

15   first became aware that there were recordings of the

16   meetings in the attorney-client rooms at CCA?

17      A.   Yes.

18      Q.   All right.  Didn't know about it at any point

19   before then?

20      A.   No.  I-- I don't recall.

21      Q.   Okay.  So had you had any discussion with anybody

22   about recordings in the attorney-client rooms prior to

23   meeting with the Special Master?

24      A.   Well, I've had discussions about using the video

25   for other purposes, but there possibly could've been

1    attorney-client-- I'm sorry, recordings from

2    attorney-client rooms.  I was not sure.  I had not

3    looked at the video at that time.

4        Q.  Okay.  So let's back up for a second.  When did

5    you first have any idea, whether you knew it for sure or

6    not, that there were cameras in the CCA attorney-client

7    visitation rooms?

8        A.  I'm sorry.  Can you repeat that question?

9        Q.  Sure.  When is the first time you became aware of

10   the possibility, whether you knew it for sure or not,

11   that there were cameras in the attorney-client rooms at

12   CCA?

13       A.  It would've been August of 2016.

14       Q.  Okay.  So before August of 2016, you don't even

15   have any idea that there are physically cameras in the

16   rooms?

17       A.  I would not know, no.

18       Q.  All right.  And then when did you first become

19   aware of the possibility, whether you knew it for sure

20   or not, that those cameras recorded the meetings that

21   occurred in the attorney-client rooms?

22       A.  Sir, can you repeat that question one more time,

23   please?

24       Q.  When did you first become aware of the

25   possibility, whether you knew it for sure or not, that

1    the cameras in the attorney-client rooms were actually

2    recording the meetings?

3        A.    I wouldn't recall who told me or-- or anything

4    like that, but it would've been in August of '16 when we

5    had the emergency hearing that there was the-- the

6    possibility of.

7        Q.    All right.  So you made reference to the

8    emergency hearing.  That was in response to a motion our

9    office had filed.

10        A.    Yes.

11        Q.    So if I understand your testimony correctly, you

12    weren't aware of the possibility that these meetings

13    were recorded in the attorney-client rooms until you

14    were informed about the pleading that we had filed?

15        A.    I wouldn't know what an attorney-client room is

16    at CCA, so I-- I don't know.

17        Q.    Okay.  So when did-- let's back up another step.

18    When did you first become aware that there were

19    attorney-client rooms at CCA?

20        A.    I don't recall that.

21        Q.    Was it before this investigation started?

22        A.    (Pause).

23        Q.    Or a better question.  Is it before you start--

24    you became involved in this investigation?

25        A.    I never really thought about that.  I mean, I

1  used to work in a jail and there's attorney-client rooms

2  in correction facilities, so I guess I was aware most

3  correction facilities probably have attorney-client

4  rooms, along with other visitation rooms.

5    Q.  So you assumed that they-- if I understand your

6  testimony correctly, you assumed most jails have those

7  rooms.  CCA functions as a jail so CCA should have those

8  rooms?

9    A.  I would assume so, yes.

10    Q.  Okay.  At a certain point a subpoena was issued

11  to CCA for all of their surveillance video?

12    A.  I know that now, yes.

13    Q.  Were you involved in the discussions about the

14  wording of the subpoena or what to request from CCA as

15  part of that subpoena?

16    A.  No.

17    Q.  Did you even know that the subpoena was going to

18  be issued?

19    A.  No, I don't believe so.

20    Q.  Did you know that the investigative team,

21  including Ms. Tomasic, was going to request video from

22  CCA?

23    A.  I don't recall if-- if it was mentioned to me or

24  not.

25    Q.  When did you first become aware that the United

1    States Attorney's Office had requested video from CCA?

2        A.  I don't recall that.

3        Q.  Would it have been before the subpoena was

4    issued?

5        A.  I don't believe so, no, but I don't-- I don't

6    recall.  I can't say for sure yes or no.

7        Q.  Would it have been after the subpoena was issued?

8        A.  I don't recall.

9        Q.  All right.  How did you first become aware that

10   the request to CCA had been made?

11       A.  I don't recall that.

12       Q.  Okay.  Well, at some point you became aware?

13       A.  Yes.

14       Q.  Was that before the August emergency hearing as

15   you called it?

16       A.  It would've been so, yes.

17       Q.  Would it have been before you acquired the video

18   from the U.S. Attorney's Office?

19       A.  I don't recall.

20       Q.  Well--

21       A.  Most likely.

22       Q.  Well, I'm not trying to be difficult, but at some

23   point you took physical possession of the video.  Right?

24       A.  Yes.

25       Q.  All right.  So at some point-- so at least as

1   early as that date you knew that they had requested the

2   video because you had it in your hands.  Right?

3       A.  Yes.

4       Q.  Okay.  When did you pick up the video from the

5   U.S. Attorney's Office?

6       A.  I don't recall the exact date, but it was in July

7   sometime.

8       Q.  Sometime in July?

9       A.  Yes.

10      Q.  There was a hearing as part of the *Black* case on

11  July 21st.  Did you attend that hearing?

12      A.  I don't believe-- I don't recall.

13      Q.  Why did you pick up the video from the U.S.

14  Attorney's Office?

15      A.  There was certain portions of the video that I

16  was interested in looking at.

17      Q.  So-- so let's work backwards from the time you

18  picked up the video.  You picked up the video.  The

19  reason you picked up the video is that there are certain

20  portions of the video you wanted to look at.  Right?

21      A.  Yes.

22      Q.  And so your interest in looking at those portions

23  of the video necessarily had to occur before you picked

24  up the video?

25      A.  I'm sorry.  Could you say that again?

1    Q.   Sure.   You became interested in the video earlier
2  than the point when you actually acquired the video.
3  Right?
4    A.   Yes.
5    Q.   So-- and when you became interested in the video,
6  before that you had to be told that the U.S. Attorney's
7  Office had the video.   Fair?
8    A.   I know Secret Service had possession of the
9  original drives.   I think I was told-- I don't recall
10  exactly how it worked, but there was copies made and the
11  copies is what I was going to pick up from the U.S.
12  Attorney's Office.
13    Q.   And so you're certain that that all occurred at
14  some point obviously before you picked them up in July,
15  so could it have been June when you became aware?
16    A.   I don't recall.
17    Q.   Is there something that could refresh your
18  recollection about these dates, e-mails, a calendar,
19  something that we could take a break and you could look
20  at?
21    A.   I don't believe so, no.
22    Q.   So whatever discussion there was about obtaining
23  the video, you weren't involved in that?
24    A.   No, not that I recall.
25    Q.   Did you ever learn the purpose of why the U.S.

1  Attorney's Office had acquired this video?

2      A.  As part of the investigation.

3      Q.  As part of the investigation into trafficking of

4  contraband within CCA.  Right?

5      A.  Among other things, yes.

6      Q.  So as part of that-- of obtaining that video as

7  part of that review, you would necessarily want to look

8  at the video of certain areas within the CCA facility.

9  Right?

10     A.  Yes.

11     Q.  And those areas would be the ones where you

12  suspected or had information that contraband was being

13  passed?

14     A.  Yes.

15     Q.  So if the video did not include areas that you

16  had information were being used for contraband

17  trafficking, the video wouldn't be entirely helpful to

18  you?

19     A.  Repeat that question, please.

20     Q.  Yeah.  If the video wasn't comprehensive, if it

21  didn't include all the areas that you had heard that

22  contraband was being trafficked in, it wouldn't be

23  entirely helpful.  Fair?

24     A.  It possibly could, I...

25     Q.  But your intent, at least as it was explained to

1    you, for getting the video was to examine the rooms or

2    the areas where you had evidence that contraband was

3    being trafficked in?

4        A.  Well, in my possession of the video, the intent

5    was not necessarily for the trafficking of contraband

6    but for some other stuff that had happened.

7        Q.  But you understand that the original intent

8    behind getting the video, I think as you said, was to

9    investigate the case?

10             MR. CLYMER:  Objection to speculation about

11   what the intent was.

12             THE COURT:  Overruled.

13             THE WITNESS:  I wasn't involved in those

14   conversations--

15   BY MR. BELL:

16       Q.  But you were--

17       A.  -- not that I recall.

18       Q.  I'm sorry, I didn't mean to interrupt you.  You

19   understood the intent behind getting the videos was as

20   part of the investigation into contraband trafficking?

21       A.  Like I said, I wasn't involved in those

22   conversations so if there was other intent I wouldn't

23   have been involved in that.

24       Q.  And again, sir, I didn't ask if you were involved

25   in it, I'm asking your understanding of the intent

1    behind getting them was.

2        Was your understanding of the intent by getting

3    the videos to investigate contraband trafficking at CCA?

4        A.   As part of it, yes.

5        Q.   And one of the areas that you had information

6    that was being used in the contraband trafficking was

7    the attorney-client rooms.  Right?

8        A.   Yes.

9        Q.   So if it stands to reason that you wanted video

10    of every area that you had information was involved in

11    trafficking, that would--

12             MR. CLYMER:  Objection, argumentative.

13             THE COURT:  Overruled.

14    BY MR. BELL:

15        Q.   It would stand to reason that a request for video

16    would've included the attorney-client rooms?

17        A.   I apologize.  The previous question I might've

18    misunderstood.  Could you repeat that, please?

19        Q.   You had information that contraband was being

20    trafficked in the attorney-client rooms at CCA?

21        A.   No.  I said yes, but I-- no.  The information we

22    had about the attorney-client rooms is possibly

23    information being provided to-- to defendants, not--

24        Q.   Sir, is it your-- is it your testimony then that

25    you had no information that contraband was being

1   trafficked in the attorney-client rooms?

2       A.   I don't recall that, no.

3       Q.   Agent Seubert worked with you on this case?

4       A.   Yes.

5       Q.   So if there had been an allegation that

6   contraband was being trafficked in the attorney-client

7   rooms, Agent Seubert would probably know about it?

8       A.   I don't know.

9       Q.   Did Agent Seubert ever tell you that there was an

10  allegation or information that contraband was being

11  trafficked in the CCA attorney-client rooms?

12      A.   If he did, I don't recall.

13      Q.   Have you reviewed Agent Seubert's testimony from

14  the *Dertinger* hearing?

15      A.   No, sir.

16      Q.   Were you involved in the discussion about

17  abandoning a specific-- a request for video from

18  specific areas?

19      A.   No.

20      Q.   At CCA?

21      A.   No.

22      Q.   So at some point you became interested in the

23  videos and you came and picked them up from the U.S.

24  Attorney's Office.  What was it that you were looking

25  for?

1    A.   I was looking for after Richard Dertinger, the

2    defendant in another case who was also implicated in the

3    distribution of contraband inside CCA.  Through other

4    proffers we had obtained information that he had gained

5    information that we were looking at his activities in

6    CCA for the distribution of contraband through his

7    attorney.

8         So after-- we knew that-- the date the proffer

9    went out in discovery.  So after that date, when there

10   was an attorney-client meeting, we wanted to see

11   Defendant Dertinger after that meeting when he goes back

12   to his pod, you know, who he's talking to, see what

13   their reactions are, if they're using the phones.

14        During the course of the investigation we know

15   other inmates-- inmates involved if they were trying to

16   hide their activities would use other inmates' PIN

17   numbers to use the phone.  Is other inmates using other

18   inmates' PINs?  We wanted to get those phone recordings.

19   Q.   So you wanted to look at the video to study what

20   Mr. Dertinger would do after he returned to the pod from

21   meeting with his attorney?

22   A.   Well, we don't know if he actually returned to

23   his pod or not because inmates have other programs they

24   go to.  You know, where do they go inside the facility

25   after that meeting?  If he went to his pod, yes, I'm

1    interested in that pod video.

2        Q.  So you were interested in what Mr. Dertinger did

3    after he had left a meeting with his attorney?

4        A.  Yes.

5        Q.  And those activities you mentioned would've

6    occurred-- him making telephone calls, that would've

7    occurred in the pod.  Right?

8        A.  If he went other places, I don't know if they had

9    access to phones in other-- other places of the facility

10   or not.

11       Q.  So you pick up the videos at some point in July?

12       A.  I don't recall the date, but yes, it was-- it was

13   July.

14       Q.  And who did you pick them up from?

15       A.  Pauletta Boyd.

16       Q.  What discussion did you have with Ms. Boyd about

17   the videos?

18       A.  She provided me a instruction sheet, the docking

19   station for the-- the hard drives and the hard drives

20   themselves.

21       Q.  Did she provide you the software necessary to

22   watch the videos?

23       A.  I don't recall if it's software you load on the

24   computer or if the player is imbedded in the hard

25   drives.  I-- I don't recall if I had to put something on

1    my computer or not.

2        Q.   You don't remember if she gave you software to

3    watch or not?

4        A.   There may have been a disk, I'm not sure, with a

5    player or software.   I-- I'm not that tech savvy either.

6        Q.   So you're-- and this happens at the U.S.

7    Attorney's Office?

8        A.   Where we had the conversation, yes.

9        Q.   With Ms. Boyd?

10       A.   Yes.

11       Q.   So you're in her office getting these videos,

12   she's explaining how they work.  Aside from Ms. Boyd,

13   who else is present?

14       A.   I don't believe anybody else.

15       Q.   And while you were at the office, who else do you

16   speak to about being there to get the videos?

17       A.   I don't recall.

18       Q.   Did you speak to Ms. Tomasic?

19       A.   I don't know if I just showed up to get the

20   videos or if I was there working that day, I-- I don't

21   recall that.

22       Q.   You said you don't know if you were there working

23   that day.  What do you mean by that?

24       A.   Sometimes we work out of the-- the U.S.

25   Attorney's Office.

1    Q.    So sometimes you would just set up with a

2    computer at a-- at a desk somewhere in the office and

3    work there?

4    A.    Yes.

5    Q.    But you don't recall if that day was one of those

6    days or not?

7    A.    I don't recall.

8    Q.    Were you required to sign in when you came to the

9    U.S. Attorney's Office?

10    A.    I have a key card to get in.

11    Q.    All right.    So there is a-- assuming for a moment

12    that those entries are logged, we could look at the log

13    entry and get an idea of maybe when you picked up the

14    videos?

15    A.    Possibly, yes.

16    Q.    All right.    Do you recall speaking to anyone else

17    besides Ms. Boyd when you were going to pick up the

18    videos?

19    A.    I don't recall.

20    Q.    So she handed you the videos, maybe you talked to

21    some other people, maybe you don't.    At a certain point

22    you leave the building with the videos?

23    A.    I assume so, yes.

24    Q.    You don't recall leaving with the videos?

25    A.    I don't recall what I did, no.    I mean, obviously

1    I had to leave the building with the videos.

2       Q.   And then-- so you got this box of the hard drives

3    and the docking station.  You're carrying it out to your

4    car?

5       A.   Yes.

6       Q.   And where do you put the videos?

7       A.   In my vehicle.

8       Q.   All right.  And then where do you go?

9       A.   I don't recall.  I don't know if I went to my

10   office or I-- I don't remember what I did that day.  I

11   remember the conversation I had with-- with Ms. Boyd,

12   but I don't really remember anything else about that

13   day.

14      Q.   So you said you didn't know if you had gone to

15   your office.  Are you recalling-- are you referring to

16   the office that's at your home or a different office?

17      A.   I do have an office at my home, but I-- also we

18   have a KBI office in-- in Lenexa.

19      Q.   So you have this box of videos, you don't know if

20   you go to the office in Lenexa or to your home with them

21   or somewhere else?

22      A.   I don't recall what I did, no.

23      Q.   At some point the videos end up at your house?

24      A.   They did.

25      Q.   Do you remember any other place the videos had

1    been before they ended up at your house?

2        A.  No.

3        Q.  Did KBI ever make their own copy of these videos?

4        A.  No.

5        Q.  When do you remember taking the box of videos out

6    of your car and taking them inside your home?

7        A.  I don't recall.

8        Q.  Was it the same day you picked them up?

9        A.  I don't recall.

10        Q.  Sir, you mentioned earlier that your interest in

11    the videos was that some people had said that Mr.

12    Dertinger's attorney had given him either information or

13    a document that alerted him to your investigation--

14        A.  Yes.

15        Q.  -- is that right?  Some-- some of those people

16    told you that his lawyer had just given him information?

17        A.  Without reviewing the documents, but yeah, that's

18    my recollection.

19        Q.  And some of them said that she had given Mr.

20    Dertinger the actual physical document?

21        A.  Yes.

22        Q.  Were there multiple people that made these

23    claims?

24        A.  I don't recall how many, but yes, it was

25    multiple.

1      Q.   So at least two?

2      A.   At least.

3      Q.   And these people were saying-- repeating

4  something that either Dertinger directly told them or

5  something that Dertinger had told somebody else?

6      A.   My recollection, yes.

7      Q.   And all of these people were telling you this,

8  cooperating in order to attempt to get a reduction in

9  their sentence?

10     A.   I believe that was their motive, yes.  But that's

11 why we wanted the video, was to corroborate their

12 statements.

13     Q.   So at a certain point, we don't know when, you

14 pick up the video.  At certain point, we don't know

15 when, you get to your home with the video.  How long

16 after the video had been in your home did you start to

17 attempt to review it?

18     A.   I picked them up in July sometime and I know I

19 went on vacation in late July.  So it would've been

20 probably within a week or two of picking up the videos,

21 but I don't recall the exact time frame.

22     Q.   All right.  So at some point between the time you

23 picked them up in July and the time you went on vacation

24 in late July is when you would've attempted to view the

25 videos?

1     A.  Yes.

2     Q.  And you were looking for, if I understand your

3  testimony correctly, what Mr. Dertinger did after he met

4  with his attorney?

5     A.  Correct.

6     Q.  And the thinking was that if he talks to people

7  inside the facility who are also subjects of the

8  investigation or makes phone calls, that that might

9  corroborate this idea that his attorney was giving him

10  information?

11     A.  Yes.

12     Q.  Now, at the time that you began your review of

13  the videos you also had an index that showed you what

14  videos showed which area of the facility; is that right?

15     A.  Correct.

16     Q.  And is that something Ms. Boyd had given you?

17     A.  I believe she did.

18     Q.  All right.  So do you think she gave it to you

19  when you went there to pick up the videos?

20     A.  I don't know if it was then or before, but I

21  believe it was Ms. Boyd that provided it to me.

22     Q.  I'm sorry, I didn't catch that last statement.

23  What was that?

24     A.  I don't know if she gave it to me when I picked

25  up the videos, but I believe it was Ms. Boyd that

1    provided it to me, but I don't remember exactly when.

2        Q.  All right.  So you may have received an index at

3    some point before you got the videos?

4        A.  I don't recall.

5        Q.  Do you remember how you got the index; e-mail,

6    letter?

7        A.  I don't recall.

8        Q.  Okay.  So let me show you what's been marked as

9    Exhibit 439.

10       A.  Yes, sir.

11       Q.  Do you recognize Exhibit 439 as the index that

12   you were given?

13       A.  It looks like it, yes.

14       Q.  And that's the index that you reviewed or that

15   you used when you were reviewing the video?

16       A.  It looks like it, yes.

17            MR. BELL:  Your Honor, I'd move to admit

18   Exhibit 439.

19            THE COURT:  I think it's already admitted.

20   401 through 464 previously admitted.

21            MR. BELL:  I think that's right.

22            THE COURT:  Yeah, it's admitted.

23            MR. BELL:  All right.

24   BY MR. BELL:

25       Q.  So there's Exhibit 439, we've put it on the

1    screen in-- in front of you.  Now, you said that you

2    picked a specific-- when you started to review this

3    video at your home, you picked a specific time and date

4    to look at; is that right?

5        A.  Yes.

6        Q.  You picked a specific time and date because you

7    had paired up when Mr. Dertinger's lawyer had visited

8    him with the video?

9        A.  We know what date the proffer was provided to Mr.

10   Dertinger's attorney, and then we knew the day she had

11   visited CCA after that.

12       Q.  All right.  So-- but you had picked a specific

13   time and date to review because it was a date that Mr.

14   Dertinger's lawyer had come to visit Mr. Dertinger?

15       A.  Yes.

16       Q.  All right.  So you're sitting at your computer,

17   there's some sort of menu that lets you pick a specific

18   date and time that you want to look at.  You consult

19   the-- the visitation log that shows you when his lawyer

20   visited him, you find a date and you plug that date into

21   the-- the video system?

22       A.  It sounds right, but I don't recall exactly how I

23   did that.

24       Q.  All right.  At some point you found the video

25   from the date you were looking for?

1      A.   What I believe is who it was, yes.

2      Q.   Okay.   After you had done that, you watched the

3  video for, what, about an hour, hour-and-a-half?

4      A.   I wasn't recording my time, so that's just a

5  guess.

6      Q.   All right.   And you told-- did you tell either

7  Ms. Tomasic, Mr. Oakley or Ms. Flannigan about how far

8  you had gotten as part of your review?

9      A.   I wouldn't have told Mr. Oakley or Ms. Flannigan.

10  But if I did tell Ms. Tomasic, I don't remember that

11  conversation.

12      Q.   All right.   But what you would've told her is

13  that I've paired up the video to a visitation by

14  Dertinger's lawyer?

15      A.   I don't remember if I told her that or not.

16      Q.   What discussions did you have with anyone in the

17  U.S. Attorney's Office about looking at the

18  video-recordings of the meetings in the attorney-client

19  rooms at CCA?

20      A.   I know I had said to Ms. Tomasic that I had

21  possibly seen the defendant walking down a hallway.   It

22  was from the back, walking-- walking away from the

23  camera.   That's the only conversation I've had with

24  that.

25      Q.   Okay.   Maybe I asked a bad question.   What

1    discussions did you have about viewing the video of the

2    attorney-client rooms with any member of the United

3    States Attorney's Office?

4        A.   Oh, I apologize.  So before I looked at the video

5    we had talked about what I was going to do and--

6        Q.   All right.  Let me stop you right there.  You

7    said "we."  Who's "we"?

8        A.   I'm sorry.  Myself and Erin Tomasic.

9        Q.   All right.  And who else was present?

10       A.   I don't recall if anyone else was present or not.

11       Q.   Was that conversation in person?

12       A.   It was in person.

13       Q.   And it was here in the U.S. Attorney's Office?

14       A.   I believe so, yes.

15       Q.   So at some point before you get the videos you

16   have a conversation with Ms. Tomasic about what you're

17   going to be doing or looking for?

18       A.   And I don't remember if it was before I got the

19   videos or if I already had the videos, but it was before

20   I reviewed them.

21       Q.   All right.  And I cut you off so go ahead, what

22   was the rest of your answer?

23       A.   That was my answer.

24       Q.   All right.  So you had a discussion with Ms.

25   Tomasic about what you were going to do with the videos.

 1    And at some point during that conversation the topic of
 2    video-recording within the attorney-client rooms comes
 3    up?
 4        A.   That if I happened to see any attorney-client
 5    meetings I was not to look at that.  I was to, you know,
 6    flag that time and use a filter team or a taint agent
 7    to-- to review that.
 8        Q.   And that would've been sometime in July 2016?
 9        A.   I believe so.  I didn't document that time.
10        Q.   All right.  So earlier when I asked you when were
11    you aware of even the possibility that meetings in the
12    attorney-client rooms were recorded, you said in August
13    when we filed an emergency motion.
14            But if I understand your testimony now correctly,
15    it's that you had a discussion about the possibility of
16    having recordings of those meetings in July; is that
17    right?
18        A.   I still was not sure if-- I was not sure if the--
19    the rooms were even recorded.  Like I said, I used to
20    work in a jail and the attorney-client rooms was the
21    door-- the video was to the door.  So if I was-- I don't
22    know if the attorney-client rooms were recorded or not,
23    so I didn't know there was a possibility of them or not.
24        Q.   But there's a discussion with Ms. Tomasic and you
25    in July of 2016 about what to do in response to that

1    possibility?

2        A.   Yes.

3        Q.   All right.  So would it be fair to say that you

4    first became aware of the possibility of attorney-client

5    recorded meetings at CCA during your conversation with

6    Ms. Tomasic?

7        A.   That's fair, yes.

8        Q.   And is she the one who raised the topic or did

9    you?

10       A.   I don't recall.

11       Q.   Would you agree with me that if you had raised

12   the topic, then you must've found out about the

13   possibility before that discussion?

14       A.   I-- I don't recall.

15       Q.   Okay.  So at some point you get this index and it

16   lists, according to the DVR drive, what each DVR drive

17   records, what camera angle it's showing; is that right?

18       A.   Yes.

19       Q.   I'm referring to Defense 439.  And listed there

20   is Attorney Room, Attorney Room 4, Attorney Room 5,

21   Attorney Room 6, 7, 8, and 9.  Right?

22       A.   Yes.

23       Q.   And so when you are looking at the video for this

24   meeting, you are looking for evidence that will

25   corroborate that Mr. Dertinger's lawyer has given him

1    some kind of information, whether it's information or a

2    document?

3        A.   Yes.  But I don't know if this is the drive I was

4    looking at or not.

5        Q.   Well, when you first got the video-- so you have

6    six DVRs in a box.  Right?

7        A.   Yes.

8        Q.   And they're labeled 1, 2, 3, 4, 5, 6?

9        A.   I believe so, I don't...

10       Q.   And so you have to decide, all right, I'm looking

11   for corroboration of this evidence.  So you've got to

12   choose which of those DVRs, which of the six you're

13   going to pull to look at first?

14       A.   Yes.

15       Q.   And to do that I imagine you had to consult the

16   index to see what was on each of these DVRs?

17       A.   Yes.

18       Q.   So you're trying to make a decision about which

19   DVR to pull out of the box first.  You look at the index

20   and that tells you what's on each DVR?

21       A.   Yes.

22       Q.   All right.  So you consult that index and then

23   you make a decision about which DVR to pull out first?

24       A.   I believe so, yes.

25       Q.   Okay.  And the DVR you choose is DVR 6?

1    A.   I don't recall which DVR.  I had three of

2    interest; 3, 5, and 6.

3    Q.   Let me show you-- do you still have Exhibit 508

4    in front of you?

5    A.   Is this 508?  I have 5-0--

6    Q.   You should have 508, your prior testimony.  Do

7    you have that up there in front of you?

8    A.   No.  I have 503 right here.

9    Q.   All right.

10    A.   I believe you took my testimony.

11    Q.   Fair enough.

12         THE COURT:  508 has been admitted by the

13    way.

14         MR. BELL:  Thank you, Your Honor.

15    BY MR. BELL:

16    Q.   I'm sorry, I'm referring to 508.  Do you have 508

17    in front of you?

18    A.   I have 508 now, yes.

19    Q.   All right.  So I want to turn your attention to

20    Page-- it's marked on the top right corner as Page 155.

21    And if you'd let me know when you've reached that.

22    A.   Okay.  I'm there.

23    Q.   All right.  And I'm going to read from Line 17 on

24    and you let me know if I've read correctly.

25         You're asked this question:  "So if you-- if you

1    were looking at attorney-client meeting rooms on the

2    disk that you were looking at, it had to have been DVR 6

3    you were looking at if what I said is correct; is that

4    right?  Does that make sense to you?"

5         And then your answer was:  "It makes sense, yes."

6         Did I read that correctly?

7    A.   You read that correctly, yes.

8    Q.   All right.  So also let's turn to Page 123 of

9    that exhibit.

10   A.   Okay.  I'm there.

11   Q.   I'm going to start at Line 5.  You were asked a

12   question:  "Do you remember which of the six you loaded

13   into the docking station to view?"

14        Your answer:  "I don't recall exactly which one,

15   it was-- I think it was either 5 or 6."

16        Did I read that correctly?

17   A.   You did read that correctly.

18   Q.   And then at a certain point, if you'll turn to

19   the next page which is Page 124.

20   A.   Yes.

21   Q.   You're being questioned by Mr. Rask?

22   A.   Yes.

23   Q.   On Line 13 this reflects Mr. Rask gave you a copy

24   of Government Exhibit 10, which is the index?

25   A.   Yes.

1    Q.  You were asked to review it.  Turn to the next

2    page.  Tell me if I've read-- after you've reviewed it,

3    I'm going start at Line 6 of Page 125, you let me know

4    if I read this accurately.

5        You were asked the question:  "So as you're

6    looking at that index, does that help you remember which

7    DVR you inserted or what camera angle you may have been

8    searching for as you were understanding the system?"

9        Answer:  "I still don't remember exactly what

10   drive.  I believe it could be 5 or 6 or maybe even 3, I

11   just don't recall."

12       Did I read that correctly?

13   A.  You did read that correctly.

14   Q.  From these pages, Agent Stokes, would you agree

15   with me that you didn't mention the possibility of maybe

16   you looked at Drive 3 until Mr. Rask gave you the

17   exhibit to look at-- the index to look at?

18   A.  Because I didn't remember.  And once I looked at

19   the exhibit, then it refreshed my memory of what I was

20   interested in.

21   Q.  So would you agree with me that even as you sit

22   here today, it's possible that the video that you looked

23   at was DVR 6?

24   A.  There's a possibility, yes.

25   Q.  And you only looked at one of the DVRs.  Right?

1    A.  I don't recall.  I believe so.  I-- it was so

2  long ago, I just don't recall.

3    Q.  And the first part of that prior testimony I read

4  to you, did you agree when the Special Master questioned

5  you that it was likely that the one you had picked was

6  DVR 6?

7    A.  I don't recall which video it was.  I--

8    Q.  Do you remember seeing a room that appeared like

9  a meeting room when you were reviewing the video?

10    A.  If I remember, it was-- I saw a empty room or

11  rooms.  I don't recall.

12    Q.  All right.  It was a room with a table and a

13  couple chairs but no one was in it?

14    A.  I-- I don't recall.

15    Q.  So what would it have been about DVR 6 that

16  would've prompted you to choose that DVR to look at?

17    A.  Well, if I was to look-- if that was the video I

18  looked at, which I don't know, he would've been meeting

19  with his attorney in those rooms.  There's other stuff

20  in that-- that DVR too, hallways and other stuff.

21    Q.  Okay.  So other than the attorney rooms that are

22  listed there, is there anything that would've obviously

23  grabbed your attention as video that you would've wanted

24  to see on DVR 6?

25    A.  I don't recall at that time.

1    Q.  All right.  And to be clear, you're attempting to
2    review the video to corroborate the allegation that Mr.
3    Dertinger's lawyer has either given him information or
4    actually handed him a document in one of these attorney
5    rooms.  Right?
6    A.  I wanted the conversation he was having with
7    other people or-- on the phones or seeing who he's
8    meeting with after the meetings.
9    Q.  You know that you can request video from certain
10   pods or certain areas from CCA marked as certain days.
11   Right?
12   A.  Yes.
13   Q.  In fact, you did that a number of times during
14   this investigation?
15   A.  I don't know if I requested the video or not.
16   Q.  You were aware that other members of the team,
17   including Deputy Cahill, had requested specific video
18   from CCA as part of this investigation?
19   A.  Yes.
20   Q.  And so you knew that that was something that you
21   could do?
22   A.  Yes.
23   Q.  And you were looking for a specific reaction of
24   Dertinger either in the pod or on his way between-- from
25   the attorney room when he gets to the pod.  Right?

1    A.  Or wherever he went after the meeting.

2    Q.  All right.  So from this index can you tell where

3  Mr. Dertinger goes, which hallway he's in after he's

4  done meeting with his attorney?

5    A.  I didn't get that far along.

6    Q.  You think that's something that you could've

7  known from just watching the video?

8        Which of these camera angles is going to show you

9  the hallway that leads to an attorney-client meeting

10  room?

11    A.  I don't know.  I'm not that accustomed with this

12  system or I'm not that accustomed with CCA in general.

13    Q.  And I-- I think that's my point, sir.  If your

14  goal was to find out what he was doing between the times

15  when he left the attorney room and the time that he

16  received-- went back to his pod, you would have to know

17  where the names-- what CCA calls the-- the hallways.

18  Right?

19    A.  Yes.

20    Q.  But you didn't know that, did you?

21    A.  I was going off the index.

22    Q.  Well, the index doesn't say what they are, does

23  it?

24    A.  Well, it says what the cameras are named.

25    Q.  All right.  Does the camera name tell you where

1   in the facility that it's located at?

2       A.  I'm sure it does, I just don't understand it.

3       Q.  So let's say that you wanted to find out-- you

4   wanted to watch Mr. Dertinger from-- walking from the

5   attorney room to wherever he's going after he's done

6   meeting with his lawyer.

7       A.  Correct.

8       Q.  You would agree with me that from the index that

9   you had, that that wouldn't tell you that information?

10      A.  It probably does, I just don't understand it.

11      Q.  Right.  Well, that's--

12      A.  If I worked there, it might be a different story.

13      Q.  Right.  So just from looking at this document,

14  you don't know which of these camera angles are going to

15  tell you which hallway that would be?

16      A.  No, I don't know.

17      Q.  And so you don't-- and just looking at this

18  index, you don't know which hallways or which series of

19  hallways or passageways or whatever Mr. Dertinger is

20  going to take until he gets to his pod.  Right?

21      A.  After the meeting?

22      Q.  Right.

23      A.  I don't know, no.

24      Q.  All right.  So the hour-and-a-half that you're

25  looking at this video, you can't-- you're not looking

1    for hallways or his walk back from an attorney-client

2    meeting room because you don't know which camera angle

3    those hallways are on, do you?

4        A.   No.   And in the first place I'm still trying to

5    get accustomed to the system.

6        Q.   All right.   So you could've made a request

7    specific to CCA that said, I want video on this date of

8    these-- the hallways leading from the attorney-client

9    rooms to Mr. Dertinger's pod.   Right?

10       A.   It's possible we could've, yes.

11       Q.   And CCA-- because they work there, like you said,

12   they would know which hallways you're talking about.

13   They could've said, no problem, here you go.   Right?

14       A.   I believe so, yes.

15       Q.   Same way with the pod video.   You could've asked

16   CCA, I want to see video from the pod on this date.

17   Right?

18       A.   It's possible, yes.

19       Q.   And then you wouldn't have had to learn a new

20   system or deal with getting the videos from the U.S.

21   Attorney's Office or anything like that, they would just

22   show up on a disk and you'd plug it into your computer?

23       A.   Yes.

24       Q.   But if you wanted to look at the attorney-client

25   video, you had to look at these.   Right?

1    A.  I did not want to look at the attorney-client

2    video.

3    Q.  Okay.  At what point did you communicate the

4    results of your search to anyone at the U.S. Attorney's

5    Office?

6    A.  Like I said, I had a brief conversation with Erin

7    Tomasic that I possibly saw the defendant walking down a

8    hallway being escorted by what looked to be a CCA

9    employee.

10   Q.  All right.  So at a certain point you saw what

11   you thought was Mr. Dertinger walking down a hallway

12   with a CCA guard or employee?

13   A.  It was from the back and it was short hair,

14   slender, white male.  I mean, it's-- there's quite a few

15   people in there like that, but I-- to me it sort of

16   looked like him.

17   Q.  Did you communicate this to her in person, over

18   the phone, over e-mail?

19   A.  I don't recall, but I believe it was in person.

20   Q.  Was that-- it would've been here at the U.S.

21   Attorney's Office?

22   A.  Most likely, yes.

23   Q.  Would it have been before or after Judge

24   Robinson's emergency hearing about the video-recording?

25   A.  I believe it would've been before.

1          Q.   And what were you told by Ms. Tomasic in regards

2     to the review of the video?  To keep looking or to stop

3     or--

4          A.   At what point?

5          Q.   At that point when you told her that you thought

6     what you believed-- you had found what you believed to

7     be Mr. Dertinger.

8          A.   I don't recall the conversation after that.

9          Q.   So you don't recall her giving you any

10    instructions to change or modify what you were doing?

11         A.   Not that I recall, no.

12         Q.   Who else was present for that discussion?

13         A.   I-- if anybody was, I don't remember anybody

14    being there.

15         Q.   Does Ms. Tomasic ever ask you if you had found

16    any attorney-client recorded meetings in your search of

17    the video?

18         A.   I don't recall her asking me that, no.

19         Q.   Did anyone ever ask you that?

20         A.   Not that you recall, no.

21         Q.   Did you ever review any meeting or did you ever

22    review a video of any meeting between two people at CCA?

23         A.   When I met with the Special Master, he did show

24    me a video of the defendant meeting with his attorney

25    and he asked me if that looked familiar.

 1     Q.   And what did you tell him?

 2     A.   No.

 3     Q.   Aside from that, during your review in July and

 4  early August of these videos, did you ever see a video

 5  of two or three people meeting in-- in a room?

 6     A.   Not that I recall, no.

 7     Q.   Is it your testimony that the only video you saw

 8  was Mr.-- what could be Mr. Dertinger and a guard

 9  walking down a hallway?

10     A.   Well, there was lots of video that I saw because

11  I had thumbnails up so there was lots of video going.

12  But pertinent-wise, no, the only thing I remember is

13  seeing who I thought could've possibly been the

14  defendant.

15     Q.   At a certain point does Ms. Tomasic discuss using

16  a taint agent or a filter agent with you?

17     A.   Yes.

18     Q.   And why-- what was the-- how did that discussion

19  go?

20     A.   She asked if we should use a taint agent and I--

21  I thought maybe I can review it because it wouldn't be

22  fair to another agent to take time out of their caseload

23  to review this when I could do it.  And, like I said

24  before, if it-- there happens to be a meeting between a

25  attorney and their client, I would, you know, flag that

1    and log that time, yeah, so it could be reviewed by

2    someone else.

3        Q.    So when does this discussion occur?

4        A.    I don't recall that.

5        Q.    Is it before or after you have the videos?

6        A.    I don't recall.

7        Q.    The discussion about having a filter agent was in

8    response to the possibility of there being recorded

9    attorney-client meetings in the videos?

10       A.    Possibility, yes.

11       Q.    And the assumption at that point would be that

12   that those meetings would implicate the attorney-client

13   privilege.  And when you think there might be privileged

14   materials in something, you should use a filter agent to

15   review it first?

16       A.    It was my understanding, yes.

17       Q.    And so Ms. Tomasic expressed to you the idea that

18   if these recordings are on there, they're potentially

19   privileged and we should use a filter agent?

20       A.    Yes.

21       Q.    And your response was, well, we're not certain

22   that they're on there.  So if I come across them, I will

23   flag them and just not look at them?

24       A.    I said if I happen to run across anything, yeah,

25   I would not look at that, I would flag that probably by

1    logging the time, I don't remember exactly how I-- I put

2    that.

3        Q.    So the way that these camera angles are set up,

4    though, you wouldn't run across an attorney-client

5    meeting when you're reviewing something else, you would

6    have to affirmatively choose one of the attorney rooms?

7        A.    I don't know.    I-- I had not looked at the video,

8    I didn't know how it was set up, how I was going to do

9    things.

10        Q.    All right.    So when you go to the video, the

11    first thing you do is look at the index to choose which

12    DVR you're going to look at first.    You presumably see

13    that DVR 6 lists a bunch of attorney rooms in there.

14            What communication, if any, did that prompt you

15    to have with anyone at the U.S. Attorney's Office to

16    relay:    You guys realize that this DVR says it's got a

17    bunch of attorney rooms on it?

18        A.    I don't know if I ever relayed that to them.

19        Q.    So it didn't surprise you enough to prompt you to

20    have any communication with them?

21        A.    I don't recall.

22        Q.    All right.    I want to talk about recorded phone

23    calls for a moment.

24        A.    Yes.

25        Q.    As a part of this investigation into the

1   contraband trafficking, the investigative team acquired

2   thousands of recorded phone calls?

3   A.   I'd say that's fair, yes.

4   Q.   Of those thousands of recorded phone calls, about

5   240 of them had recorded conversations between

6   defendants and their attorneys?

7   A.   I don't know.

8   Q.   Was it your job to review recorded phone calls as

9   part of this investigation?

10   A.   I reviewed some, yes.

11   Q.   What instructions, if any, were you given by the

12   United States Attorney's Office about what to do if you

13   ran across what you believed to be a conversation

14   between a defendant and an attorney?

15   A.   I don't know if I was ever given instruction.

16   Q.   All right.  Did you ever come across a

17   conversation between who you believed to be an attorney

18   and a defendant?

19   A.   Not in the *Black* case.

20   Q.   Did it happen in a different case?

21   A.   Yes.

22   Q.   And how did you respond when you-- or what did

23   you do in response to that belief?

24   A.   I stopped listening to the phone call and I told

25   Erin Tomasic about it.

1    Q.   And was that in the *Huff* case?

2    A.   *Greg Rapp, et al.*, yes, but she was a defendant

3    in that case, yes.

4    Q.   So you stopped listening and you notified Ms.

5    Tomasic about it?

6    A.   Yes.

7    Q.   What instructions did Ms. Tomasic give you

8    regarding that call after you had notified her?

9    A.   She said don't listen to the phone calls.

10   Q.   Plural, don't listen to the phone calls, or just

11   that call?

12   A.   Well, attorney-client calls is what I meant.

13   Q.   All right.  So at some point as part of the

14   investigation into Rapp or Huff, which-- let's back up a

15   second.  Those cases were related.  Right?

16   A.   Yes.

17   Q.   Dertinger was never charged in the *Black*

18   investigation--

19   A.   Correct.

20   Q.   -- right?  Huff was never charged in the *Black*

21   investigation?

22   A.   Correct.

23   Q.   But they were both suspects as part of the CCA

24   contraband investigation?

25   A.   Yes.

1   Q.   So you were reviewing Ms. Huff's phone calls as

2   part of the contraband investigation?

3   A.   I don't know if I reviewed Ms. Huff's calls

4   personally as part of the *Black* investigation.

5   Q.   Were you told why you were supposed to be

6   listening to her calls?

7   A.   We were furthering the investigation, getting

8   ready for trial on-- on Mr. Rapp and Mr. Dertinger.

9   Q.   So in order to get ready for trial on Mr.

10   Dertinger and Mr. Rapp, you were listening to recorded

11   phone calls of Ms. Huff?

12   A.   I've listened to some of her calls, yes, but

13   that's not where I ran into the attorney-client call.

14   Q.   When did you run into the attorney-client call?

15   A.   I don't remember the date.

16   Q.   All right.  Why were you listening to her calls

17   at the time you were-- what-- what reason was given to

18   you to listen to her calls at the time you ran across

19   the attorney-client call?

20   A.   It was not her calls that were the

21   attorney-client calls.  I guess I'm not understanding

22   your question.

23   Q.   And I'm not sure I understand your answer so

24   let's back up a second.  You said that you overheard a

25   call between an attorney and a client as part of

1    something other than the *Black* investigation or *Black*

2    case?

3        A.   Yes.

4        Q.   All right.  Who was the defendant that you heard

5    speaking on the phone on that recorded call?

6        A.   Greg Rapp.

7        Q.   All right.  And once you had listened to that

8    call, you notified Ms. Tomasic about it?

9        A.   Yes.

10       Q.   And she told you, yeah, don't listen to it?

11       A.   Correct.

12       Q.   And she told you don't listen to it because it's

13   potentially privileged because it's a communication

14   between an attorney and a client?

15       A.   Yes.

16       Q.   Were there other calls between what you believed

17   to be an attorney and a defendant that you reviewed as

18   part of either *Black*, *Rapp*, *Huff* or any of the other

19   related cases?

20       A.   Not that I recall running into, no.

21       Q.   All right.  So how was it-- let's talk about the

22   call you did run across.  How did you realize it was a

23   call between an attorney and a client?

24       A.   I assumed it was because they started talking

25   about some court hearings, so I assumed it was going to

1   be his-- his attorney.

2       Q.  Okay.  And how long into the conversation did it

3   take before you realized that that's what it was?

4       A.  I'm just estimating, but, you know, 10, 15, 20

5   seconds.  I don't know.

6       Q.  All right.  And so it's only at that point that

7   you get instruction from the U.S. Attorney's Office,

8   yeah, don't listen to those calls.  If you run across

9   something you think is an attorney-client call, you

10  shouldn't listen to them?

11      A.  Correct.

12      Q.  Before then you hadn't received any instructions

13  about what to do in that situation?

14      A.  Not that I recall, no.

15      Q.  So you also worked as an agent on the

16  investigation into Ashley Huff?

17      A.  Yes.

18      Q.  And part of your work on that case involved

19  reviewing recorded phone calls?

20      A.  I've listened to some of her calls, yes.

21      Q.  Ms. Huff had a lawyer in that case?

22      A.  She did, yes.

23      Q.  Her lawyer is named Bill Sessions or William

24  Sessions?

25      A.  From what I recall, yes.

 1      Q.   You also discovered that Ms. Huff spoke to

 2   another lawyer about her case?

 3      A.   I was told that, yes.

 4      Q.   That lawyer was a friend of Ms. Huff's mother?

 5      A.   I don't know.

 6      Q.   I want to show you what's been admitted-- or I'm

 7   sorry, marked for identification as Exhibit 512.  The

 8   bottom part of Exhibit 512 includes an e-mail address

 9   under the "from" portion of it.  Do you recognize that

10   e-mail address as belonging to Erin Tomasic?

11      A.   Yes.

12      Q.   And that date of this communication is

13   March 11th, 2016?

14      A.   Yes.

15      Q.   To your knowledge, Ms. Tomasic was still employed

16   by the United States Attorney's Office at that time?

17      A.   To my knowledge, yes.

18           MR. BELL:  Your Honor, I'd move to admit

19   Exhibit 512.

20           MR. CLYMER:  No objection, Your Honor.

21           THE COURT:  512 admitted.  We're going to

22   take a-- a break after you inquire about this exhibit.

23           MR. BELL:  Yes, Your Honor.

24   BY MR. BELL:

25      Q.   So Exhibit 512 is an e-mail sent by Ms. Tomasic

1   to Matthew Cahill.  Correct?

2      A.  Yes.

3      Q.  Mr. Cahill is a retired Deputy United States

4   Marshal?

5      A.  Yes.

6      Q.  And the context of this e-mail is a request Ms.

7   Tomasic is making to Deputy Cahill for recorded

8   telephone calls from CCA?

9      A.  That's what it appears, yes.

10     Q.  And she has asked for recordings or calls made

11  from CCA to certain telephone numbers?

12     A.  That's what it appears, yes.

13     Q.  And the middle number that she has put there is

14  "mom's lawyer friend."  Did I see that correctly?

15     A.  That's what it says, yes.

16     Q.  Ms. Huff was known to use other people's PIN

17  numbers to make phone calls out of CCA?

18     A.  I believe so, but I don't recall, but...

19     Q.  All right.  So in this request she's asking for

20  anybody else's calls except for Ms. Huff, Mr. Dertinger

21  and somebody else to mom's lawyer friend?

22     A.  That's what it says, yes.

23     Q.  Okay.  So she's asking for calls made perhaps by

24  Ms. Huff to a person she knows to be a lawyer?

25     A.  To mom's lawyer friend.

1    Q.  Right.

2         MR. BELL:  Your Honor, I am done questioning

3    the witness about this exhibit if you'd like to take a

4    break.

5         THE COURT:  All right.  Let's take a break

6    for 15 minutes.

7         (Recess).

8         THE COURT:  All right.  You can be seated.

9    You can proceed.

10        MR. BELL:  Thank you, Your Honor.

11   BY MR. BELL:

12   Q.  As a part of your work on this case, you attended

13   a sentencing hearing for Ashley Huff on August 3rd,

14   2016?

15   A.  Yes, I believe so.

16   Q.  Before that August 3rd hearing, you spoke with

17   Ms. Tomasic in preparation for the hearing?

18   A.  I'm sure I did, but I don't recall what the

19   conversation was.

20   Q.  All right.  You spoke with Ms. Flannigan in

21   preparation for the hearing?

22   A.  I don't recall if she was there or not.

23   Q.  Did you-- you assisted Ms. Tomasic or Ms.

24   Flannigan in preparing for that hearing?

25   A.  I don't recall.

 1     Q.  I'm going to show you what's been marked as
 2  Defense Exhibit 492.
 3     A.  Yes.
 4          MR. CLYMER:  I'm sorry, what was that
 5  number?
 6          MR. BELL:  492.
 7  BY MR. BELL:
 8     Q.  Does 492 appear to be a pleading filed in Ms.
 9  Huff's case?
10     A.  It looks like it, yes.
11     Q.  And on the third page of that document is it
12  signed by Scott Rask?
13     A.  Yes.
14     Q.  And does Mr. Rask identify himself as an
15  Assistant United States Attorney?
16     A.  Yes.
17          MR. BELL:  Your Honor, I'd move to admit
18  Exhibit 492.
19          MR. CLYMER:  No objection.
20          THE COURT:  492 admitted.
21  BY MR. BELL:
22     Q.  So let me turn to-- your attention to the second
23  page of this document where it states that, "Ms. Tomasic
24  reported that she decided to listen to one of Ms. Huff's
25  calls before a contested sentencing hearing scheduled

1    for August 3rd, 2016."  Did I read that correctly?

2        A.    It looks like it, yes.

3        Q.    And during that call that she describes-- did I

4    read this correctly from Paragraph 2, "During the

5    conversation Ms. Tomasic stated that the friend held the

6    phone in a manner so that it picked up some of the

7    conversation with Mr. Session."  Did I read that

8    correctly?

9        A.    Yes.

10        Q.    So in preparation for the sentencing hearing on

11    August 3rd, Ms. Tomasic listened to a call that included

12    a conversation between Ms. Huff and her lawyer, Mr.

13    Sessions.

14        A.    It looks like it, yes, from that document.

15        Q.    What conversations did you have with Ms. Tomasic

16    about this call?

17        A.    I don't recall.  I remember some conversations

18    about-- a conversation between possibly Ms. Huff and her

19    mother's friend who is an attorney, but I don't recall -

20    if I had a conversation - the content of that

21    conversation.

22        Q.    So you don't remember if there was a conversation

23    with Ms. Tomasic about a call with Ms. Huff and her

24    lawyer both on the line?

25        A.    I don't recall, no.

 1     Q.  If there had been a conversation about such a

 2   call, that would've been inconsistent with Ms. Tomasic's

 3   earlier statement to you not to listen to calls between

 4   an attorney and a client?

 5              MR. CLYMER:  Objection, Your Honor,

 6   completely hypothetical.

 7              THE COURT:  Overruled.  Answer if you can.

 8              THE WITNESS:  Can you repeat the question,

 9   please?

10   BY MR. BELL:

11     Q.  Sure.  If there was a conversation about a phone

12   call between Ms. Huff and her lawyer, Mr. Session,

13   listening to that call would've been inconsistent with

14   the directions she gave you when you ran across the--

15   that kind of call in the *Rapp* case?

16     A.  I believe so, yes.

17     Q.  And so I have your testimony correctly, you're

18   not saying that you never had a conversation with Ms.

19   Tomasic about this call between Ms. Huff and her lawyer,

20   you just don't remember if you did?

21     A.  I don't remember if I did or not.

22     Q.  Let me show you what's been marked as Defense

23   Exhibit 480.

24     A.  Okay.  Organize these.

25     Q.  Does Exhibit 480 also appear to be a pleading

 1  filed in Ms. Huff's case?

 2      A.  It appears so, yes.

 3      Q.  And on the fourth page of the document is it also

 4  signed by Scott Rask?

 5      A.  On the third and fourth.

 6              MR. BELL:  Your Honor, I'd move to admit

 7  Defense Exhibit 480.

 8              MR. CLYMER:  No objection.

 9              THE COURT:  480 admitted.

10  BY MR. BELL:

11      Q.  So let me turn your attention to the second page

12  of Exhibit 480, Paragraph 3.  In this statement it says,

13  "According to AUSA Kim Flannigan, in connection with

14  preparing for the sentence hearing on August 3rd, 2016,

15  this particular call was marked as an exhibit.  So AUSA

16  Flannigan and the case agents were aware of this

17  particular call that 'involved Mr. Session.'"  Did I

18  read that correctly?

19      A.  Yes.

20      Q.  Do you remember any conversation about marking a

21  specific call as an exhibit for the August 3rd hearing?

22      A.  I don't recall, no.

23      Q.  You were one of the case agents on the

24  investigation?

25      A.  Yes.

1    Q.   It goes on to state, "Case agents may have also
2    listened to this recorded call."  Did I read that
3    correctly?
4    A.   Yes.
5    Q.   Did you listen to this call?
6    A.   That call doesn't sound familiar to me, no.
7    Q.   So is your testimony that you know you didn't
8    review it because you'd remember if you did, or that you
9    just don't remember if you did or not?
10    A.   I don't recall if I listened to that or not.  It
11    doesn't sound familiar, no.
12    Q.   It goes on to state, "AUSA Flannigan does not
13    recall ever personally listening to this call, though
14    she may have been present when the recorded call was
15    played in preparation for the sentence hearing."  Did I
16    read that correctly?
17    A.   Yes, you did.
18    Q.   And as part of preparing for the sentencing
19    hearing on August 3rd, were recorded calls played?
20    A.   I don't recall if they were or not.  I'd have to
21    review the transcript.
22    Q.   Well, not at the hearing.
23    A.   Oh, I'm sorry.
24    Q.   I mean, that's a bad question.  In preparation
25    for that hearing were recorded calls played?

1    A.  I don't recall if I was involved in the

2  preparation of that-- that hearing or not.  I know that

3  week and part of the week prior I was gone on vacation.

4    Q.  So it may have occurred in preparation for this

5  hearing, but you don't recall if it did or not?

6    A.  Yeah, I don't recall.

7    Q.  At some point you learned that Ms. Huff's

8  attorney had filed a motion saying that the government

9  had listened to calls between her and her attorney?

10    A.  If I did, I don't remember that, no.

11    Q.  Were there any conversations that you had with

12  any members of the United States Attorney's Office about

13  Mr. Session's allegations that you had listened to calls

14  between him and his client?

15    A.  That I had?

16    Q.  That anyone had on the investigation team.

17    A.  I don't recall that, no.

18    Q.  Did you learn at some point that he had made that

19  allegation?

20    A.  It sounds familiar, yes, but I-- I don't

21  remember.

22    Q.  Let me show you what's been marked as

23  Defense 477.  Does Exhibit 477 appear to be a pleading

24  filed in the *Huff* case?

25    A.  Yes.

1    Q.   Turn to Page 8.  Does Erin Tomasic's signature

2    appear on this pleading?

3    A.   It does.

4              MR. BELL:  Your Honor, I'd move to admit

5    Exhibit 477.

6              MR. CLYMER:  No objection.

7              THE COURT:  477 admitted.

8    BY MR. BELL:

9    Q.   Does this appear to be a response filed by Ms.

10   Tomasic to that allegation?

11   A.   It appears so, yes.

12   Q.   So let me turn your attention to the second page,

13   Paragraph 2.  Does Ms. Tomasic's written response start

14   with the word here, "However, there is no allegation,

15   nor is there any evidence, that any recording concerning

16   this defendant has been requested by or provided to the

17   USAO or any other government agency."  Did I read that

18   correctly?

19   A.   Yes.

20   Q.   So you know that you had requested Ms. Huff's

21   calls.  Right?

22   A.   That I had requested Ms. Huff's calls?

23   Q.   The government had requested Ms. Huff's calls.

24   A.   They had requested Ms. Huff's calls, yes.

25   Q.   And here Ms. Tomasic writes-- she doesn't deny

1  it, she's just saying that Ms. Huff can't prove it.

2  Right?

3      A.  Can you repeat that question for me, please?

4      Q.  Right.  Ms. Tomasic's response here does not deny

5  that they requested the calls, the government requested

6  the calls, she's just saying that Ms. Huff can't prove

7  it.

8      A.  I don't know what she's saying there.

9      Q.  The last sentence of Paragraph 2, "In any event,

10 there is no allegation nor is there any evidence that

11 any recorded calls have been provided to the USAO in

12 this case."  Did I read that correctly?

13     A.  Yes.

14     Q.  Was there evidence that recorded calls had been

15 turned over to the USAO in that case?

16     A.  From the *Huff, et al.*, case?  Yes, we had

17 requested calls.

18     Q.  Is that statement true then, that sentence right

19 there?

20     A.  That sentence, yes, it's not true.  We had

21 requested calls.

22     Q.  Paragraph 3.

23     A.  But without reading this whole document, I don't

24 know the context of that.

25     Q.  Paragraph 3 starts with the allegation by Mr.

1  Session, put in quotes, "Confidential legal

2  communications have been used by the United States in

3  pending litigation and have been disclosed in discovery

4  to other defendants and their counsel."  Did I read that

5  correctly?

6      A.  Yes.

7      Q.  And the document goes on to say, "There is no

8  allegation nor is there any evidence that the alleged

9  activity has occurred in this case."  Did I read that

10  correctly?

11      A.  That's what it says, yes.

12      Q.  However, at least from looking at these prior two

13  exhibits, there was evidence that they had reviewed

14  attorney-client recorded calls in this case?

15          MR. CLYMER:  Objection, Your Honor, it

16  misstates what the document says.  It says "confidential

17  legal communications."

18          THE COURT:  All right.  I'll sustain as to

19  that phraseology.

20  BY MR. BELL:

21      Q.  Were you aware of any effort that Ms. Tomasic or

22  Ms. Flannigan made to alert Ms. Huff or Mr. Sessions

23  that they had heard a call recorded between the two of

24  them?

25      A.  I was not a part of that, no, I'm not aware of

1    any.

2        Q.   At some point the government entered into a

3    sentencing agreement with Ms. Huff?

4        A.   If I remember right, yes.

5        Q.   The sentencing agreement called for her to

6    receive a lower sentence than she was otherwise facing?

7        A.   I believe so, yes.

8        Q.   As a condition of receiving that sentencing

9    agreement, she had to withdraw her pending motions?

10       A.   Without looking at the agreement, I-- I don't

11   recall.

12       Q.   I'm going to show you what's been marked as

13   Exhibit 479.

14       A.   Yes.

15       Q.   Does 479 appear to be the sentencing agreement in

16   Ms. Huff's case?

17       A.   It appears so, yes.

18       Q.   And on the eighth page does it have the

19   signatures of Ms. Tomasic and Mr. Rask?

20       A.   Yes.

21            MR. BELL:  Your Honor, I'd move to admit

22   Exhibit 479.

23            MR. CLYMER:  No objection.

24            THE COURT:  479 admitted.

25   BY MR. BELL:

1    Q.   Let me turn your attention to the second page of
2    that document.   There's a paragraph titled "Defendant's
3    Agreements"?
4    A.   Yes.
5    Q.   And among those agreements under Paragraph B
6    requires her to withdraw any pending motions before the
7    Court; is that correct?
8    A.   Yes.
9    Q.   And so that would've included the allegation
10   regarding the listening to the phone call?
11   A.   Sorry, I couldn't hear you.
12   Q.   That would've included the allegation about
13   listening to her attorney-client phone call?
14   A.   I assume so, yes.
15   Q.   So during your work reviewing the phone calls on
16   this case, you recognized a call being between an
17   attorney and a client just because of the things they
18   were talking about?
19   A.   Correct.
20   Q.   The content of the call?
21   A.   Correct.
22   Q.   Are there other instances where you've heard a
23   recorded call and someone picked up and a receptionist
24   picks up the phone and says "law office," or something
25   to that--

1    A.  I don't recall if I did or not.

2    Q.  And the call that you listened to inadvertently,

3    the person didn't identify that they were a lawyer or

4    a-- with a law office when they answered the phone call?

5    A.  Correct.

6    Q.  So you didn't have any way of knowing until you

7    had listened to some content of the call that it was a

8    call between an attorney and a client?

9    A.  Yes.

10    Q.  So you know you're not supposed to listen to

11    calls between attorneys and clients.  Aside from

12    listening to the content and figuring out it might be a

13    call between an attorney and client, what steps do you

14    do to make sure that you don't listen to one of those

15    conversations?

16    A.  I just don't play it.

17    Q.  All right.  And how-- when you say "don't play

18    it," do you mean at some point after you've determined

19    that it's a call between an attorney and a client?

20    A.  Correct.

21    Q.  All right.  So what do you do beforehand to make

22    sure that you don't even hit "play" on a call between an

23    attorney and a client?

24    A.  I don't know who's-- who they're calling so I

25    start listening and realize that, hey, this might be an

1    attorney and I stop listening.

2    Q.  And so when you say you realize it might be an

3    attorney and you stop listening, does that depend on,

4    again, the content of the call itself?

5    A.  Yes.

6    Q.  Are there any steps that you take before you

7    listen to the content of the call to try and determine

8    whether if it's a call between an attorney and a client?

9    A.  No.

10    Q.  Have you ever been told by the U.S. Attorney's

11    Office that there are certain steps you should take

12    before listening to a call to determine whether it's

13    between an attorney and a client?

14    A.  None that I remember.

15    Q.  Would you agree with me that just listening to

16    the content of the call itself, it's sometimes difficult

17    to tell that a person might be talking to their lawyer?

18    A.  I'd have to-- under that circumstance, I-- I'd

19    have to listen and see, I...

20    Q.  Well, if-- for instance, if no one answers the

21    phone and says "law office" or thank you for calling the

22    law office and they just jump right into the

23    conversation, there's nothing about that first part of

24    the call that would tell you it's a call between an

25    attorney and a client?

1     A.   Correct.

2     Q.   You've reviewed I imagine hundreds of recorded

3  calls as part of this case?

4     A.   At a minimum, yes.

5     Q.   Do defendants often talk about-- on those calls

6  to-- about their case or what sort of sentences they're

7  facing?

8     A.   Yes.

9     Q.   Do they also talk about plea deals they've been

10  offered?

11     A.   If they do, I don't remember specific

12  conversations.  But yes, I mean, they most likely talk

13  about that.

14     Q.   They might talk about suppression motions that

15  they might file or want to have filed or have filed?

16     A.   Like I said, I don't remember any specific

17  conversations.  But yeah, it's possible they talk about

18  that.

19     Q.   And they might ask for advice, like should I take

20  this deal, should I take this to trial, stuff like that?

21     A.   Again, no specific circumstances I remember.  But

22  yes, I mean, I'm sure they talk about stuff like that.

23     Q.   And your understanding is if those questions or

24  comments or communications are made to someone who's not

25  a lawyer, then it's fair game, right, you can listen to

1    those calls, there's nothing privileged about them?

2        A.   Well, I-- if they're talking personal stuff, I

3    really don't care about that either.  I mean, I'll

4    minimize calls, you know, fast-forward a little bit, you

5    know, to see if there's anything relevant to my

6    investigation.

7        Q.   Right.  And so but my question was:  Your

8    understanding is when they're talking about their case,

9    about suppression motions, asking for advice about trial

10   or taking a plea deal, unless they're either-- talking

11   to a lawyer, then there's nothing legally that would

12   stop you from listening to those calls?

13       A.   Because there's a preamble before every phone

14   call that says these are not privileged and subject to

15   recording and monitoring.

16       Q.   So the only thing that makes them hands-off and

17   that you can't listen to them is if the person on the

18   other end of the phone is a lawyer.  Right?

19       A.   I don't know if those are actually privileged,

20   but I'm not going to listen to attorney-client calls

21   because it's not worth it.

22       Q.   Would you agree with me that it's difficult for

23   you to know whether the person on the other side of the

24   line is a lawyer or not?

25       A.   Reviewing phone calls, I mean, I-- through the

1    course of the investigation you figure out-- you

2    recognize voices, who's family.  If there's a new voice

3    then, yeah, I'm going to perk up a little bit and-- and

4    see who they're trying-- they're talking to.

5       Q.   Would you agree with me that it's difficult to

6    determine whether the person on the other side of the--

7    other end of the call is an attorney or not?

8       A.   It just depends.  I mean, I'd have to listen to

9    that specific instance.

10      Q.   Did you take any steps to match attorneys' known

11   telephone numbers to the call detail reports that you

12   get to see if there are calls to a law office?

13      A.   I hadn't-- I have not before.

14      Q.   Do you take any steps to even see if any of the

15   calls are made to the person's listed attorney in the

16   case before you start reviewing the calls?

17      A.   I don't know if I'd know how to get their

18   attorney's number unless it was listed in the phone book

19   or something like that.

20      Q.   Have you ever attempted to do so?

21      A.   No.

22      Q.   All right.  As you sit here today, Agent Stokes,

23   given sort of the inherent shortcomings, is it possible

24   that you've listened to a call between a defendant and

25   an attorney and just based on the content not realized

```
 1   that that's what you were listening to?
 2       A.   I don't want to say yes and I don't want to say
 3   no.  I mean, I don't know.
 4       Q.   It's just-- it's possible, but you--
 5       A.   I don't believe I have.
 6       Q.   It's possible, you just don't know?
 7       A.   I don't believe I have, no.
 8       Q.   Okay.  One of the people that you-- or agencies
 9   that you worked with in this investigation was the
10   United States Marshal's Office?
11       A.   Yes.
12       Q.   Are you familiar with supervisor United States
13   Marshal Michael Thibault?
14       A.   Yes.
15       Q.   I'm going to show you what's been marked as
16   Exhibit 498.
17       A.   Yes.
18       Q.   Does 498 appear to be a transcript of a
19   proceeding in *United States versus Imon Wright*?
20       A.   It appears so, yes.
21       Q.   If you would turn to the 19th page of
22   Exhibit 498.  I apologize, Page 17.
23       A.   Yes.
24       Q.   At Line 11 does the transcript begin to record
25   statements made by Marshal Thibault?
```

1        A.  It appears so, yes.

2             MR. BELL:  Your Honor, I'd move to admit

3    Exhibit 498.

4             MR. CLYMER:  Your Honor, I have an objection

5    because I don't believe it's relevant.

6             THE COURT:  I'm not sure I know what the

7    relevance is either, but I'll allow it subject to

8    connection.  Exhibit 498 admitted.

9    BY MR. BELL:

10       Q.  Let me now turn your page to-- attention to

11   Page 19 of the exhibit.  And I'm going to direct your

12   attention down to Line 23 of Page 19.

13       A.  Yes.

14       Q.  Does that start with a question by the Court, it

15   says:  "What's the marshal's policy on audio-taping?"

16       A.  Yes.

17       Q.  Marshal Thibault responds:  "Your Honor, all the

18   cameras, just like here in the courthouse, are recorded

19   on motion."  Did I read that correctly?

20       A.  Yes.

21       Q.  "The main reason we have cameras at CCA and here

22   is strictly for security."  Did I read that correctly?

23       A.  Yes.

24       Q.  So then let me turn your attention to the next

25   page.  Starting at Line 9 Marshal Thibault says:  "All

1   people going in and out of CCA are videotaped, manual

2   recorded.  And it cuts two ways.  We also have video

3   evidence of attorneys doing things at CCA they shouldn't

4   have.  So the cameras are there for security.  I can

5   assure you, in 20 years of me doing this that no video

6   or audio-recordings have been made surreptitiously to be

7   used against the public defender or their defendants or

8   anybody else."  Did I read that correctly?

9       A.  Yes.

10      Q.  Does it appear to you from these statements that

11  at least Marshal Thibault knows that there's cameras

12  that record at CCA?

13      A.  Yes.

14      Q.  And that he knows that there are-- those cameras

15  include the cameras that record in the attorney-client

16  rooms at CCA?

17      A.  I don't know much about the-- the cameras there,

18  so I can't say yes or no to that.

19      Q.  Would you also look at the first page of that

20  document.  Is this transcript made of a hearing that

21  occurred on August 5th at 1:34 p.m.?

22      A.  Yes.

23      Q.  All right.  So August 5th at 1:30 p.m., Marshal

24  Thibault is telling people-- or at least telling Judge

25  James that there is recording at CCA.  Right?

 1        A.   That's what it appears, yes.

 2        Q.   Let me show you Exhibit 458.  Do you recognize

 3   Craig Beam as being an employee of the United States

 4   Marshals Service?

 5        A.   Yes.

 6        Q.   Does this appear to be an e-mail Craig Beam sent

 7   on August 5th, 2016, at 3:43 p.m.?

 8        A.   Yes.

 9        Q.   Same day, just a couple hours later?

10        A.   Appears so, yes.

11             MR. BELL:  Your Honor, I'd move to admit

12   Exhibit 458.

13             MR. CLYMER:  May I have a moment, Your

14   Honor, just to look at it?  I was a step behind there.

15             THE COURT:  I'm sorry?

16             MR. CLYMER:  No objection.

17             THE COURT:  458 admitted.

18   BY MR. BELL:

19        Q.   On that date, two hours later after Marshal

20   Thibault's statement, does Mr. Beam write, "I've just

21   spoken with Warden Linda Thomas.  The video from the

22   inmate visitation rooms is not recorded."  Did I read

23   that correctly?

24        A.   Yes.

25        Q.   So it appears that Mr. Beam, at least repeating

1    the language from Ms. Thomas, thinks they're not

2    recorded.  Marshal Thibault thinks they are recorded.

3         What did you learn from the United States

4    Marshals Service about whether there was recording in

5    those rooms?

6    A.  I don't know if I've learned anything from the

7    marshals service.

8    Q.  Did you ever ask the marshals service whether

9    there were recordings in those rooms?

10    A.  I did not, no.

11    Q.  Agent Stokes, you've talked about a lot of topics

12    today.  Are there any written statements you've made,

13    reports, e-mails or things like that that concern the--

14    any of the topics that we've testified about-- or that

15    you've testified about?

16    A.  If there is I don't-- I don't remember off the

17    top of my head.

18    Q.  Would those be preserved I would assume by the

19    KBI?

20    A.  Any report I've written has gone to our case file

21    and sent, you know, out in discovery.

22    Q.  Okay.  E-mails also be preserved by the KBI?

23    A.  Yes.

24    Q.  At a certain point were you ordered to turn over

25    your laptop to the Special Master?

1    A.   Yes.

2    Q.   Before that order you knew that the Court had

3  impounded all of the computers that belonged to the

4  United States Attorney's Office?

5    A.   I had heard that, yes.

6    Q.   Did you-- what conversations did you have about

7  whether that order applied to your laptop?

8    A.   I know I had a conversation with my boss to find

9  out what I needed to do and I-- from there I don't know

10  what he did.

11    Q.   All right.  Was that-- and that was before or

12  after the judge ordered your laptop taken?

13    A.   That was way before.

14    Q.   All right.  So way before the judge makes an

15  order about your laptop, you have a conversation with

16  your boss about what you should do with your computer.

17    A.   Yes.

18    Q.   And what are you told?

19    A.   After-- I don't know who he talked to, most

20  likely our legal counsel, didn't know exactly if that

21  applied to the KBI or not so I was told don't manipulate

22  anything, don't delete anything.  You know, if ordered

23  by the Court to turn it over, we would do that.

24    Q.   So-- and in that-- you were told by the KBI don't

25  change anything and don't delete anything on your

1    laptop?

2        A.    Yeah, don't manipulate it in any way.

3        Q.    So did you then preserve all-- all the e-mails on

4    your laptop or did you delete some?

5        A.    I don't delete e-mails.    I mean, I put stuff in

6    the deleted folder but that doesn't get emptied.    But I

7    believe the KBI has all the e-mails on the-- the master

8    server or whatever that is.

9        Q.    So the boss that you had the conversation with,

10    who was that?

11        A.    Doug Younger.

12        Q.    I'm sorry?

13        A.    Doug Younger.

14        Q.    Younger.    And then at a certain point you were

15    ordered to turn over the laptop.    And between the time

16    that you had the conversation with the KBI and the time

17    you turned over the laptop, you hadn't changed or

18    deleted anything on it?

19        A.    No.

20        Q.    There's one point I want to make very clear

21    because I think I asked some bad questions and-- and I

22    may have confused myself.

23            When did you first become aware that the video

24    that had been obtained from the CCA would include video

25    from the attorney-client rooms?

1    A.   I-- I don't recall--

2    Q.   All right.

3    A.   -- exactly when.

4    Q.   But it would've been some point, if I remember

5    your prior testimony correctly--

6                   MR. CLYMER:  I'm going to object to counsel

7    characterizing prior testimony.  I think the record will

8    characterize the prior testimony.

9                   THE COURT:  All right.  I think it's

10   appropriate to frame the question this way, so I'll

11   overrule.

12   BY MR. BELL:

13   Q.   If I understand your prior testimony correctly,

14   it was, you did not know that there were attorney-client

15   videos in the batch of video that you had gotten from

16   the CCA until we had filed our motion in front of-- with

17   Judge Robinson; is that right?

18   A.   In having a conversation with Erin Tomasic, you

19   know, before I viewed the videos, I mean, there was a

20   conversation.  If there is any attorney-client video,

21   you know, not to watch that obviously.  But I believe I

22   didn't actually know there actually was attorney-client

23   rooms being recorded until later.

24   Q.   Okay.  So you're aware of the possibility when

25   you had the conversation with Ms. Tomasic and then you

1    become certain about it later on?

2        A.    Thinking about it now, yes, that sounds fair.

3        Q.    And the conversation you had with Ms. Tomasic

4    about what to review, that would've occurred after you

5    got the videos?

6        A.    I can't say yes or no to that, I don't recall

7    when.

8        Q.    Okay.  But it certainly would've been-- become

9    once you knew you were going to be looking at them?

10        A.    Yes.

11        Q.    Okay.  And that was late July I think you said?

12        A.    Early, mid.  I-- I don't know.  I know I went on

13    vacation in late July.

14        Q.    All right.

15            MR. BELL:  Just a moment.  I have no further

16    questions.  Thank you, Mr. Stokes.

17            THE WITNESS:  Thank you.

18            THE COURT:  All right.  Questions from

19    defense counsel?

20            MR. GUASTELLO:  Briefly, Judge.

21                      CROSS EXAMINATION

22    BY MR. GUASTELLO:

23        Q.    Agent Stokes, how are you doing today?

24        A.    Good.  How are you?

25        Q.    I'm doing well, thank you.

1            My name is David Guastello.  I represent Karl
2    Carter in the *U.S. v. Black* case.
3        A.  Yes.
4        Q.  You indicated previously that you started gearing
5    up in your capacity of investigation for *U.S. v. Black*
6    in March of '16?
7        A.  Yes.
8        Q.  And how were you gearing up for that?
9        A.  Well, prior to that we had started getting
10   information about the introduction of contraband into
11   CCA, but we were preparing for a trial in another case
12   when we ran across that information.  Other agents and
13   the marshals service became involved.  And once our
14   trial settled, then we moved over to assist with the
15   investigation into CCA.
16       Q.  And you participated in that investigation?
17       A.  I did.
18       Q.  At what point during that course of that
19   investigation did Mr. Carter become a target?
20       A.  I don't recall exactly when.
21       Q.  Eventually was there a search warrant that was
22   executed on CCA?
23       A.  There was.
24       Q.  Okay.  Did you participate in the execution of
25   that search warrant?

1      A.  I did.

2      Q.  Okay.  So you were physically present at CCA?

3      A.  I was.

4      Q.  Okay.  And do you recall the date or dates when

5   that search warrant was executed?

6      A.  I believe if I'm right it was April 8th, 2016,

7   into the morning of April 9th.

8      Q.  So that would've been April 8th and 9th of 2016?

9      A.  If I remember right, yes.

10      Q.  You were there.  Were other members of the KBI

11   there?

12      A.  Yes.

13      Q.  Were there other law enforcement agencies that

14   were present?

15      A.  Yes.

16      Q.  What were those agencies?

17      A.  If I remember all of them right, it was the KBI,

18   U.S. Marshals Service, U.S. Secret Service, the Internal

19   Revenue Service.  I believe the Kansas Highway Patrol

20   was there.  I don't recall if there was any others or

21   not.

22      Q.  So today at least your recollection was there

23   were I believe at least five law enforcement agencies

24   that participated?

25      A.  I would say yes.

 1    Q.   Okay.  Were there any members of or employees of

 2   the U.S. Attorney's Office that were present for the

 3   execution of that search warrant?

 4    A.   Yes.

 5    Q.   Who were those members?

 6    A.   Erin Tomasic and Chris Oakley.

 7    Q.   Anybody else?

 8    A.   If there was, I don't recall.

 9    Q.   And what were your duties as they relate to the

10   execution of the search warrant?

11    A.   I was assigned to conduct interviews.

12    Q.   So you were interviewing the-- the inmates at

13   CCA?

14    A.   Correct.

15    Q.   Did you participate in any other capacity?

16    A.   There was some guards there I interviewed as

17   well.

18    Q.   And obviously all of the individuals that you

19   interviewed were in custody.  Correct?

20    A.   Yes.

21    Q.   Okay.  Presumably were they all at

22   Leavenworth-CCA on-- for federal charges?

23    A.   I don't know if it was all federal charges or

24   not.  I know a majority of them were, yes.

25    Q.   Was it at least your understanding that at the

1    time of your interview of those inmates, that at least

2    with regard to the charges that brought them to CCA,

3    they were represented by attorneys?

4        A.   Yes.

5        Q.   Did you make any attempts to notify any of their

6    attorneys prior to their interview?

7        A.   I did not, no.

8        Q.   Did certain members of law enforcement

9    participate in a tour of the facilities of CCA?

10       A.   I don't know if they were or not.

11       Q.   Let me back up.  Was there a-- an employee or

12   agent of CCA that helped or participated with law

13   enforcement during the execution of the search warrant?

14       A.   I wasn't actually involved in going in and

15   executing the search warrant in the pods.  I was, like I

16   said, there to interview.  So if that was the case, I

17   was not a part of that and I wouldn't know.

18       Q.   During your time inside of Leavenworth-CCA, did

19   you observe various security cameras and bubble cameras

20   throughout the facility?

21       A.   About the only-- the only thing I remember, I

22   remember looking at one of the-- call it a bubble or

23   something like that where the-- where a CCA guard would

24   sit.  I think I remember maybe seeing a screen with some

25   camera views.  I-- but without-- I don't recall if--

1    what that actually was and what it was looking at.

2        Q.  Okay.  So you at least observed some surveillance

3    capabilities within the facility?

4        A.  Yes.

5        Q.  Agent Stokes, I know that you covered a great

6    deal of ground with the previous questioning by Mr.

7    Bell.  And I think that you indicated that you have

8    previous statements that relate to the subject matter in

9    which you testified here today?

10       A.  Yes.

11       Q.  Okay.  Some of those statements and reports I

12   assume pertain to *U.S. v. Black*.  Right?

13       A.  Yes.

14       Q.  I assume some of those reports do not pertain to

15   *U.S. v. Black*?

16       A.  Yes.

17       Q.  Okay.

18            MR. GUASTELLO:  Judge, I believe that

19   pursuant to Federal Rule of Procedure 26.2 that we

20   should be allowed to have any of those statements as

21   they pertain to Agent Stokes' testimony here today.  I

22   don't know that I necessarily need them for the

23   remainder of my examination, but I would ask that those

24   be produced at some time or an order to that effect.

25            THE COURT:  All right.  Any objection?

1          MR. CLYMER:  Judge, as a legal basis there's

2     no ground for that.  Rule 26.2 doesn't apply when the

3     government hasn't called a witness.  That said, I'm not

4     familiar with all those reports and it may be that the

5     U.S. Attorney's Office in its discretion is willing to

6     provide those, I don't know.

7          So my suggestion, Your Honor, is that

8     counsel meet with members of the U.S. Attorney's Office

9     so they can discuss the issue.  If it turns out that the

10    U.S. Attorney's Office is unwilling to provide the

11    reports, counsel can file a motion and litigate it in

12    due course.

13         THE COURT:  All right.  That's fair.  Why

14    don't you all talk about it.  You're not asking for

15    those to be produced while this witness is still on the

16    stand, but--

17         MR. GUASTELLO:  No, I'm not, Judge.

18         THE COURT:  All right.

19         MR. GUASTELLO:  Thank you.  I have nothing

20    further.

21         THE COURT:  All right.  Ms. Dodge.

22         MS. DODGE:  Yes, Your Honor.

23                  CROSS EXAMINATION

24    BY MS. DODGE:

25    Q.  Good afternoon, Mr. Stokes.

1       A.   Good afternoon.

2       Q.   I don't believe I heard the question.  How long

3  have you been a KBI agent?

4       A.   Just over five years.

5       Q.   And did you have any prior law enforcement

6  experience?

7       A.   I did.

8       Q.   How much?

9       A.   About 14-and-a-half years.

10       Q.   As what?

11       A.   A deputy sheriff in Crawford County, Kansas.

12       Q.   So you're familiar with jails?

13       A.   I used to work in one, yes.

14       Q.   Okay.  I'm just curious; the jails that you

15  worked in, did any of them have camera equipment?

16       A.   Yes.

17       Q.   Did they routinely monitor attorney/clients in

18  the jails?

19       A.   The jail I worked in it didn't record-- if I

20  remember right, it didn't record the actual room, it

21  recorded the doorway going into that room.

22       Q.   You had mentioned earlier that you wrote the

23  report but you didn't attend the proffer--

24       A.   Yes.

25       Q.   -- in this-- in this case that you were being

1    questioned about.  How often has that happened?

2        A.  It doesn't happen that often.

3        Q.  Who asks you to write those reports if you're not

4    in attendance of the proffer?

5        A.  Well, there was a lot of interviews and proffers

6    going on, I know Senior Special Agent Virden had fell

7    behind.  Plus, since I wasn't able to attend that

8    proffer and didn't know what it was about and I was one

9    of the case agents, we thought it might be good for me

10   to actually review the-- the audio of the proffer and

11   write the report so I can, you know, be aware of the

12   content of the proffer.

13       Q.  So you volunteered?

14       A.  I-- I believe I did.

15       Q.  Now, how do you know that the recording takes

16   place from the get-go when they sit down to proffer?

17       A.  Because there's usually a preamble at the

18   beginning of the proffer saying-- state the-- the date,

19   the time, who's present, what the purpose of the-- of

20   the recording is for.

21       Q.  Usually?  So that implies that sometimes that

22   doesn't happen.

23       A.  I can't say if other agents do that or not.  But

24   I know when I do one, it's-- I always say what the date,

25   time, purpose, who's present.

1    Q.   But you don't-- since you're not in attendance,
2    you don't hear anything prior to that that's not being
3    tape-recorded?
4    A.   Yes.
5    Q.   Yes what?
6    A.   Obviously I don't know what was said before that
7    unless I was told something.
8    Q.   Okay.  So your report could be missing some
9    information?
10    A.   Not from the recording.
11    Q.   Not from the recording, but anything that
12    would've taken place prior to or after the recording?
13    A.   Correct.
14    Q.   Okay.  Did you follow up with anybody on that
15    just to make sure?
16    A.   No.
17    Q.   Okay.  You also mentioned that you knew there
18    were copies being made of the videos, the videos of the
19    CCA, when you were getting ready to-- to pick them up.
20    I've got a couple of questions about that.
21        Who instructed you to go get the-- the videos,
22    the copies?
23    A.   I don't recall.
24    Q.   Did any of the AUSAs on the case ask you to go do
25    that?

1    A.  I don't recall if-- who did or-- or what the
2    context of that was.
3    Q.  Okay.  You went and picked it up from I think you
4    said Pauletta Boyd?
5    A.  Correct.
6    Q.  All right.  But you knew that there were being
7    copies made, I think you also said something about one
8    for the Secret Service; is that right?
9    A.  From my understanding, the originals from CCA
10   were in the custody of the Secret Service and they made
11   a copy, and that's what I picked up.
12   Q.  How many copies were made?
13   A.  To my understanding, just one.
14   Q.  Just one, and you had it?
15   A.  I believe so.
16   Q.  Okay.  But you don't recall when you first
17   started viewing it where you were?
18   A.  I was at my house.
19   Q.  Oh, you-- you watched it on your computer at
20   home?
21   A.  Yes.
22   Q.  Okay.  Did you-- do you remember taking those
23   videos or those disks elsewhere to watch?
24   A.  No.
25   Q.  So at home do you use your own personal e-mail?

 1      A.  No.

 2      Q.  Any chance that you would've communicated on a

 3  personal e-mail system to any of the USA-- or AUSAs in

 4  this case?

 5      A.  No.

 6      Q.  Prior to this case did you have any occasion to

 7  tour or visit CCA?

 8      A.  I've been to CCA on a few previous occasions.

 9      Q.  Was that to interview a witness or a-- a

10  defendant?

11      A.  I believe so.

12      Q.  Why else would you have gone to CCA?

13      A.  I know one time I went I actually served a DNA

14  search warrant on two inmates.

15      Q.  I'm sorry, you what?

16      A.  Served a DNA search warrant on two inmates.

17      Q.  Okay.  So you were taking buccal swabs?

18      A.  Yes.

19      Q.  All right.  So where did those take place when

20  you did those buccal swabs?

21      A.  Inside the facility somewhere.

22      Q.  Inside the facility somewhere.  Did-- did you

23  call in advance to say, hey, I need to schedule an

24  appointment with or do you guys just get to show up and

25  say I'm here to see such and such?

1      A.  We usually have to make an appointment.

2      Q.  You make an appointment?

3      A.  Yes.

4      Q.  So they know you're coming so they can get the

5  client brought up from wherever they are, right--

6      A.  Whatever they have to do.

7      Q.  -- or the defendant?

8      A.  Yes.

9      Q.  Okay.  So did you go into like those witness

10 rooms where the attorneys go?

11     A.  I have no idea where they took me.

12     Q.  You have no idea where they took you into CCA to

13 take a buccal swab?

14     A.  I don't know what those rooms were where they

15 took me.

16     Q.  How long did it take you to get to a room?

17     A.  I wasn't timing myself so-- we had to go through

18 a few doors.  I don't know, maybe a minute or two.  I--

19 I don't know.

20     Q.  Okay.  And how big were the rooms that you were

21 in?

22     A.  Weren't very big at all.

23     Q.  And you never looked up and saw a camera?

24     A.  No.

25     Q.  And so you had also been to CCA - if I understand

1    you - prior to this not just for buccal swabs but also

2    to interview a defendant maybe?

3        A.    Yes.

4        Q.    And where did you interview that defendant?

5        A.    In a room somewhere.

6        Q.    In a room somewhere.    And the defendants that you

7    interviewed on this case when the search warrant was

8    executed, and I think I understood you to say you didn't

9    really-- you weren't in charge or you weren't part of

10   collecting evidence, you were in charge of interviewing

11   defendants.    Did I get that right?

12       A.    I wouldn't say I was in charge.    I was part of

13   the interview teams.

14       Q.    Okay.

15       A.    We paired up.

16       Q.    All right.    And who made that decision, who was

17   going to interview who, how did that go down?

18       A.    We paired up.    You know, I know I was with Agent

19   Seubert and I know we were given instructions that if

20   it's a defendant on a case that you have worked, we are

21   not to interview that person.    So anybody I interviewed

22   I didn't have a-- a previous case with.

23       Q.    Okay.

24       A.    Just like Defendant Dertinger, I could not

25   interview him.

1    Q.  So if you had questions about something, who
2    organized this, who's in charge?
3    A.  If you had to put who was in charge, I believe my
4    boss.  He's the one that wrote out the operations plan
5    and everything for the execution of the search warrant.
6    Q.  So was your boss present that day?
7    A.  Yes.
8    Q.  All right.  And if-- if you had a question, you'd
9    just go to your boss, turn to him literally?
10    A.  I don't know if he was physically with me the
11    whole time, but...
12    Q.  Okay.  Well, there's-- there's five different law
13    enforcement agencies, and I'm just trying to get a sense
14    of who's in charge of what everyone is going to do.  Was
15    there a master plan before you go in there?  I mean,
16    this is a pretty big deal.  Right?
17    A.  Correct.
18    Q.  Okay.  Five law enforcement agencies.
19    A.  Correct.
20    Q.  So more than five agents from five different,
21    right, law enforcement?
22    A.  Oh, yes.
23    Q.  At least a minimum of five and the pictures would
24    show more.  And then you've got two AUSAs there.
25    Correct?

1      A.   Correct.

2      Q.   Were they telling anybody what to do?

3      A.   I wasn't with them the whole time, so I can't say

4   if they were or not.

5      Q.   Well, the times that you were with them, were

6   they telling anyone what to do?

7      A.   I don't recall.

8      Q.   Okay.  So you interview witnesses with one other

9   agent; is that right?

10     A.   Correct.

11     Q.   And these witnesses are suspects in what?

12     A.   The trafficking of contraband inside CCA.

13     Q.   But not all the ones listed on *U.S.A. v. Black*?

14     A.   Correct.

15     Q.   Is this where these other 95 potential people

16  come from when Ms. Tomasic mentioned that to the Court

17  earlier in the year?

18     A.   Where they come from?

19     Q.   That there were 95 additional defendants

20  involved, potentially involved in this case?

21     A.   I don't know the exact number.

22     Q.   Okay.  Were there multiple defendants, potential

23  suspects?

24     A.   Yes.

25     Q.   Okay.  And-- and those were folks that you had

1   interviewed?

2       A.  Without-- some of them possibly, yes.

3       Q.  Okay.  It's not a trick question.  I mean, you're

4   an agent and you're one of the case agents in this case.

5   Right?

6       A.  Yes.

7       Q.  Okay.  I'm just a little dumbfounded at-- I'm not

8   trying to trick you, I just want to know what your

9   decisions are in this case.  You're a case agent who's

10  investigating and interviewing defendants or a potential

11  defendant.  Right?

12      A.  Correct.

13      Q.  You take your cases to the prosecutor and then

14  the prosecutor decides whether or not there's a case to

15  prosecute.  Correct?

16      A.  Typically, yes.

17      Q.  Okay.  So you form an opinion about the case you

18  were working on before you present it to the prosecutor;

19  is that fair?

20      A.  Yes.

21      Q.  Okay.  So that-- that's kind of what I'm getting

22  at.  You took interviews of defendants or potential

23  defendants, they were defendants in already another

24  case.  Right?

25      A.  Yes.

1    Q.  Or they wouldn't have been there.

2    A.  Correct.

3    Q.  Okay.  And then you presented those reports, did

4    you write them up right then and there?

5    A.  Not right then and there.

6    Q.  Did you record them?

7    A.  Yes.

8    Q.  Did you present those recordings then to Ms.

9    Tomasic or Mr. Oakley?

10   A.  When I write a report, let's say an interview

11   report, I'll record it and review the recording to write

12   the report.  I'll write the report, put the recording

13   onto a compact disk, attach that to the report, let--

14   KBI report processing does their thing and sends that

15   report to wherever we decide to send it to, which in

16   this case was the U.S. Attorney's Office?

17   Q.  Okay.  Now, those recordings that you took, you

18   say you put that on a disk and you give that to the U.S.

19   Attorney's Office.  Right?

20   A.  Correct.

21   Q.  All right.  Do you know if those are handed over

22   in any of the discovery?

23   A.  I'm not a part of that, no.

24   Q.  You're not a part of that?

25   A.  No.

1    Q.  And the AUSA doesn't say, hey, Agent Stokes, was

2   there a voice recording of your interview?  Do you have

3   that?

4    A.  Well, when they get the report it will say what

5   the attachments are and the attachments-- whether it's a

6   CD or, you know, whatever paper attachment or whatever

7   it is.

8    Q.  Have you ever been present in a proffer when the

9   recording is taken and the defense attorney asks the

10  AUSA, I would like a copy of that recording?  Have you

11  ever been present when that's happened?

12   A.  I don't recall if I-- it doesn't sound familiar,

13  so I don't know if I-- that's ever happened in my

14  presence or not.

15   Q.  Has it ever happened in your presence when an

16  AUSA has refused to provide a copy of the defendant's--

17  the attorney's client's statement?

18   A.  That doesn't sound familiar to me.

19   Q.  Okay.  Has any-- in your five years of being with

20  the Kansas Bureau of Investigation-- and you testified

21  that you've listened to hundreds of phone conversations.

22   A.  At least, yes.

23   Q.  Yeah.  In your experience then with this office,

24  have you had any AUSAs ask you to review phone

25  conversations just prior to their-- of a defendant just

1    prior to their trial or their hearing or during?  Have

2    you ever had them do that?

3       A.   I have listened to phone calls, you know, up and

4    to-- we didn't go to trial, but I was still listening to

5    phone calls because there was hundreds.  So still listen

6    to phone calls, yes.

7       Q.   Did the attorney explain to you why they wanted

8    you or what you were to be listening for, why they

9    wanted you to listen to it?

10      A.   I was-- I was still in investigative mode, still

11   listening to the calls.  And I don't know if I was

12   directed, I don't know if that's a fair statement or

13   not.  I was still listening to phone calls from phone

14   calls I've had from the months prior.

15      Q.   Have you ever testified in trial or any kind of

16   hearings besides this one?

17      A.   Yes.

18      Q.   Have you ever had or been asked by a prosecutor

19   to impeach a prior person's statement, a statement-- a

20   prior statement from someone in the case?

21      A.   I don't know if I have or not.

22      Q.   Okay.

23              MS. DODGE:  I have nothing further.

24              THE COURT:  Mr. Cohen.

25              SPECIAL MASTER COHEN:  Thank you, Judge.

```
 1                    CROSS EXAMINATION
 2   BY SPECIAL MASTER COHEN:
 3      Q.   Good afternoon.
 4      A.   Good afternoon.
 5           SPECIAL MASTER COHEN:   Judge, I just want to
 6   make sure that the sequestration order that you imposed
 7   this morning means that anybody in this courtroom is not
 8   allowed to convey anything that's happening in here to
 9   anybody who left; is that correct?
10           THE COURT:   That's correct.   They're not to
11   discuss the content of any of the testimony that's
12   happened in this courtroom with any witnesses that are
13   sequestered.
14           SPECIAL MASTER COHEN:   Thank you.
15   BY SPECIAL MASTER COHEN:
16      Q.   Agent Stokes, I'm going to repeat to you
17   something that I think I heard you say, I want to make
18   sure I got it right.
19      A.   Yes.
20      Q.   You said, "I'm not going to listen to
21   attorney-client phone calls because it's not worth it."
22      A.   Yes.
23      Q.   And so during your I think it's close to 20 years
24   in law enforcement if you ever come across a recorded
25   attorney-client phone call, you're going to minimize it;
```

 1    is that right?

 2        A.  I wouldn't even say minimize, I just won't listen

 3    to it.

 4        Q.  Okay.  And you said something similar when we had

 5    a colloquy the last time that you were on the stand and

 6    I was asking you questions.  Do you recall that?

 7        A.  I'd have to look at my transcript, I...

 8        Q.  Okay.  I'm going to show you a document that I

 9    have marked Special Master Stokes 2.

10            MR. CLYMER:  Your Honor, may I have a copy

11    of this too?

12            SPECIAL MASTER COHEN:  Yes, sir.

13    BY SPECIAL MASTER COHEN:

14        Q.  Do you recognize this document?

15        A.  It looks like an e-mail I-- I authored.

16        Q.  And that's an e-mail that you, according to this,

17    sent March 10th, 2016; is that right?

18        A.  It looks like it, yes.

19        Q.  And it-- you sent it to Erin Tomasic, Matt

20    Cahill, Glen Virden and Henry Herron and John Seubert;

21    is that correct?

22        A.  Yes.

23        Q.  Is Mr. Herron in the courtroom right now?

24        A.  Yes.

25        Q.  And Mr. Seubert is in the courtroom right now?

```
 1        A.   Yes.
 2             SPECIAL MASTER COHEN:  I'd like to move
 3   admission of this exhibit, please.
 4             THE COURT:  Any objection.
 5             MR. CLYMER:  I don't know the relevance,
 6   Your Honor.
 7             THE COURT:  Subject to connection, Special
 8   Master Stoke's Exhibit 2 admitted.  You can publish it.
 9   BY SPECIAL MASTER COHEN:
10        Q.   Can you read me, Mr. Stokes, the first two
11   sentences of that document?
12        A.   "After talking to Erin, she wants us to be
13   uniform in the way we are documenting the calls we are
14   currently listening to."
15        Q.   A little slower for the court reporter, please.
16        A.   Sorry.  "I've attached a spreadsheet I was using
17   when documenting the calls I listened to during the
18   Rapp, et al., case so we can use that."
19        Q.   One more.  One more sentence.
20        A.   I'm sorry.  "It has the call number column, date
21   column, time column," and then parenthesis, "in this
22   column I put the pertinent time during that particular
23   call," end quote or parenthesis, "a column to put a
24   synopsis of the call and the person called if known."
25        Q.   Okay.  So you're describing the spreadsheet that
```

1    you put together about the calls you listened to in the

2    *Rapp* case; is that right?

3        A.   Correct.

4        Q.   And if you'll turn the page.  This is the first

5    page of that spreadsheet; is that right?

6        A.   Yes.

7        Q.   Can you read me what it says under "info

8    discussed" in Column 9?

9        A.   "Ashley with someone.  Richard will take a plea

10   to set me free.  Session said Richard delusion.

11   Richard's attorney advising to pull his plea.  Session

12   showed e-mail communication where I suggested he provide

13   my personal identifiers."

14       Q.   And under the "person called" in the column next

15   to that, what does it say?

16       A.   "Mom's lawyer friend."

17       Q.   And who is Mr. Sessions?

18       A.   That would be Ashley Huff's attorney.

19       Q.   Can you turn the page, please.

20       A.   Yes.

21       Q.   Can you read the first line under the synopsis of

22   Call No. 23?

23       A.   "Session wait and push off sentencing until right

24   before trial or right after.  Richard not going to take

25   plea for less than--"

 1        Q.   That's fine.

 2        A.   I'm sorry.

 3        Q.   And so in your synopsis you're writing about

 4   Ashley Huff's attorney; is that right?

 5        A.   It appears so, yes.

 6        Q.   Mr. Sessions?

 7        A.   Yes.

 8        Q.   And the next column on the right, what does it

 9   say?

10        A.   "Mom's lawyer friend."

11        Q.   There's a phone number there, (916) 206-4575; is

12   that right?

13        A.   Yes.

14        Q.   Do you recall when the Federal Public Defender

15   was asking you questions, they put up an exhibit that

16   showed that Erin Tomasic was making the request for

17   calls to mom's lawyer friend at this phone number?

18        A.   Yes.

19        Q.   And do you recall that that was after the date of

20   this March 10th, 2016 memo?

21        A.   Without reviewing the document, I-- with the

22   date.

23        Q.   Line 24, what does it say on the right side

24   there?

25        A.   "Mom's lawyer friend."

1    Q.  So that's another call to a lawyer?

2    A.  I believe so.

3    Q.  Line No. 61, can you read what that says under

4  "Synopsis"?

5    A.  "Session said he thinks Richard pleaded because

6  Ethan Conrad and Michael Hilton added to witness list.

7  Session at COP and said Richard never mentioned that she

8  was involved.  Session said--"

9            THE COURT:  Slow down, please.

10            THE WITNESS:  I'm sorry.  "Session said he

11  doesn't think judge will give a shit if Richard writes

12  an affidavit, but he is willing to give it a try."

13  BY SPECIAL MASTER COHEN:

14    Q.  And finally on Page 60-- the last page, Line 66,

15  just read the first line, please.

16    A.  "Session on phone with mom and mom's friend."

17    Q.  And again, who is Mr. Session?

18    A.  Ashley Huff's attorney.

19    Q.  I want to turn to video.  You saw this earlier,

20  this is the camera roster.  Do you remember that

21  document?

22    A.  Yes.

23    Q.  And, again, there were six disks.  Do you recall

24  that?

25    A.  Yes.

 1    Q.   Do you see under DVR 2 it says "pod" a whole
 2   bunch of times?
 3    A.   Yes.
 4    Q.   Do you see under DVR 3 it says "pod" a whole
 5   bunch of times?
 6    A.   Yes.
 7    Q.   Under DVR 4 it says "pod" a few times?
 8    A.   Yes.
 9    Q.   DVR 5 it says "pod" a few times?
10    A.   Yes.
11    Q.   DVR 6, does it say "pod" anywhere?
12    A.   Not that I see.
13    Q.   Does it say "attorney room"?
14    A.   Yes.
15    Q.   Does it-- did you see "attorney room" anywhere
16   else on any of the pods [sic]?  And I'll point you to
17   No. 5 at the very bottom.  It says "low custody
18   attorney."
19    A.   Yes.
20    Q.   Did you see any other statement of attorney, that
21   word "attorney" on any of the other DVRs?
22    A.   Not that I've seen, no.
23    Q.   We agreed, you'll recall when I questioned you
24   before, that you pulled DVR 6.  Do you remember that?
25    A.   I possibly could've.  I didn't remember exactly

 1  what DVR I pulled.

 2      Q.  Okay.  Well, the record in *Dertinger* will speak

 3  for itself.  And I would--

 4              SPECIAL MASTER COHEN:  One second, Judge.

 5  I'm going to point the parties to Page 155 of the

 6  *Dertinger* transcript dated 6-20-17.

 7              THE COURT:  Is that-- I think that

 8  transcript is in evidence or at least--

 9              MR. BELL:  It's Exhibit 508, Your Honor.

10              THE COURT:  Exhibit 508, which is Agent

11  Stokes' testimony.  All right.  Page 155.

12              SPECIAL MASTER COHEN:  Thank you.

13  BY SPECIAL MASTER COHEN:

14      Q.  Do you have that in front of you?

15      A.  I'm looking for it.  508?

16      Q.  Yep.

17      A.  Yes.

18      Q.  If you could please turn to Page 155.

19      A.  Yes.

20      Q.  About halfway down I'm asking a question.  It

21  says, "So if you," Line 17.

22      A.  Yes.

23      Q.  Can you read my question and your answer, please?

24      A.  "So if you-- if you were looking at

25  attorney-client meeting rooms on the disk that you were

1   looking at, it had to have been DVR 6 you were looking

2   at if what I said is correct; is that right?  Does that

3   make sense to you?"

4       Answer:  "It makes sense, yes."

5   Q.   And you said that when it came to looking at

6   video, you didn't even know if there was attorney-client

7   video until August, August of 2016?

8   A.   Correct.

9   Q.   And when you went to look at the video, what you

10  were looking for was evidence of what Dertinger did

11  after Rokusek visited with him in an attorney-client

12  room; is that right?

13  A.   Correct.

14  Q.   And you were hoping to find, for example, that

15  Dertinger went to the pod and shared information with

16  other inmates; is that right?

17  A.   Or wherever he went after.

18  Q.   Okay.  We agree, though, that Disk No. 6 doesn't

19  have any pod video.  Correct?

20  A.   Correct.

21  Q.   The only video that Disk 6 has that might've

22  showed Dertinger was attorney rooms; is that right?

23  A.   Correct.

24  Q.   I'm going to show you what's been marked as

25  Special Master Stokes 4.  Do you recognize this

1    document?

2        A.   I do.

3        Q.   Can you tell me what it is?

4        A.   It's an e-mail authored by me to Pauletta Boyd.

5        Q.   What's the date?

6        A.   January-- I'm sorry, January.  July 12th, 2016.

7        Q.   Before August 2016.  Correct?

8        A.   Correct.

9        Q.   What does it say?

10       A.   "Pauletta, did we get in video from the attorney

11   visitation rooms, law library and pods at CCA?"

12              THE COURT:  Are you offering this exhibit?

13              SPECIAL MASTER COHEN:  I'm sorry.  Yes,

14   Judge, I'm offering this exhibit.

15              MR. CLYMER:  No objection.

16              THE COURT:  Special Master Stokes Exhibit 4

17   admitted.

18              SPECIAL MASTER COHEN:  Could I have a

19   moment, Judge?

20              THE COURT:  Yes.

21              SPECIAL MASTER COHEN:  I have nothing

22   further.  Thank you, Agent Stokes.

23              THE WITNESS:  Thank you.

24              THE COURT:  Mr. Clymer.

25              MR. CLYMER:  I'm just getting some exhibits

1    from the public defender, Your Honor.

2            THE COURT:  I'm sorry?  I'm sorry, you're

3    looking for what?

4            MR. CLYMER:  May I retrieve some exhibits

5    from the witness, Your Honor?

6            THE COURT:  Sure.

7                    CROSS EXAMINATION

8    BY MR. CLYMER:

9      Q.  I'm going to show you, Special Agent Stokes,

10    what's been marked as Special Master Exhibit Stokes 2 I

11    believe is what it was characterized as.

12     A.  Yes.

13     Q.  And if you'll turn to the second page, I want to

14    turn to the phone call that's Entry No. 8 that the

15    Special Master asked you about where it has the

16    reference to mom's lawyer's friend.  Actually it's 9,

17    I'm sorry, mom's lawyer friend as the person called.

18     A.  Correct.

19     Q.  Do you see the area code for that person?

20     A.  Yes.

21     Q.  Do you know where the (916) area code is?

22     A.  I don't know, no.

23     Q.  Have you ever been to Sacramento, California,

24    Agent Stokes?

25     A.  I have, yes.

1    Q.  Have you?

2    A.  Yes.

3    Q.  Do you recall by any chance seeing that (916) is

4    a Sacramento area code?

5    A.  If I did, I don't recall.

6    Q.  Do you know how far it is from Leavenworth,

7    Kansas to Sacramento, California?

8    A.  It's probably over 1,000 miles.

9    Q.  In your experience as an agent here, have you

10   ever known of an attorney from Sacramento, California

11   representing an inmate at CCA-Leavenworth?

12   A.  No.

13   Q.  You're not a lawyer, are you?

14   A.  No.

15   Q.  Do you know what effect on the attorney-client

16   privilege there is when a third person who's not the

17   lawyer and not the client is involved in a conversation?

18   A.  Can you repeat that question, please?

19   Q.  Sure.  I'll give you a specific.  In terms of

20   attorney-client privilege, do you know what effect it

21   would have on the privilege if Mr. Sessions, a person

22   hypothetically from Sacramento, California who's not

23   representing a client, and a client of Mr. Sessions, all

24   three of them were in a conversation, would that be a

25   privileged conversation to your knowledge?

1         A.   I don't know.

2         Q.   I'd like to show you Exhibit 458.  That was a

3    e-mail message I believe from Marshal Beam; is that

4    correct?

5         A.   Yes.

6         Q.   And Mr. Bell asked you some questions about

7    representations that are made in that e-mail.  Were you

8    involved in the e-mail communications anywhere described

9    on Exhibit 458?

10        A.   I was not.

11        Q.   And the-- the person who made the representations

12   that Mr. Bell asked you about, Craig Beam, do you know

13   him?

14        A.   Yes.

15        Q.   Who is he?

16        A.   He's the chief deputy for the U.S. Marshals for

17   the District of Kansas.

18        Q.   Is he available, to your knowledge, to be

19   subpoenaed and called and explain the basis for his

20   assertions in this document?

21        A.   Yes.

22        Q.   I'm now going to show you what's been marked as

23   498.  This was the-- the transcript of the Imon Wright

24   detention hearing on August 5th, 2016, that Mr. Bell

25   asked you about.

1       A.   Yes.

2       Q.   Does that look familiar to you?

3       A.   It does.

4       Q.   Were you present at that hearing?

5       A.   I was not.

6       Q.   And I don't recall off the top of my head now the

7    name of the person, the marshal or deputy marshal whose

8    comments were quoted by Mr. Bell.  Do you remember the

9    name of that marshal?

10      A.   Marshal Thibault, Michael Thibault.

11      Q.   Do you know him?

12      A.   Yes.

13      Q.   Where does he work?

14      A.   Here in Kansas City.

15      Q.   Is he available to be subpoenaed to testify to

16   explain the basis for his comments in that transcript?

17      A.   To my knowledge, yes.

18      Q.   Do you know the basis for the statements he made

19   in that transcript?  Do you personally know?

20      A.   No.

21      Q.   Do you know the-- personally know the basis for

22   the statements that Marshal Bell [sic] made in the

23   e-mail message we just looked at?

24      A.   No.

25      Q.   I now want to direct your attention to Page 155

1    of Exhibit 508.  This was the passage Mr. Cohen just

2    asked you about and I think Mr. Bell asked you about it

3    as well, about which of the six DVRs you were looking at

4    at your house, the DVRs from CCA-Leavenworth.  And I'm

5    going to read again the question, the question and

6    answer that was presented to you.

7          The question from Mr. Cohen:  "So if you-- if you

8    were looking at attorney-client meeting rooms on the

9    disk that you were looking at, it would had to have been

10   DVR 6 that you were looking at.  And if what I said is

11   correct, is that right?  Does that make sense to you?"

12         Answer:  "It makes sense to me, yes."

13         Do you remember that question and answer?

14   A.   Yes.

15   Q.   Okay.  Were you looking at attorney-client

16   meeting rooms on the disk?

17   A.   No.

18   Q.   So if you weren't looking at attorney-client

19   meeting rooms, you weren't necessarily looking at DVR 6,

20   were you?

21   A.   Correct.

22   Q.   Did you tell the Court at that hearing it

23   could've been DVR 3, DVR 5, or DVR 6 you were looking at

24   and you simply couldn't remember?

25   A.   Yes.

 1    Q.  Did you do your best to testify truthfully based
 2  on your recollection of those events?
 3    A.  Yes.
 4    Q.  At the time you got those DVRs and took them back
 5  to your house, had you ever looked at video evidence
 6  from CCA-Leavenworth before?
 7    A.  Yes.
 8    Q.  How often?
 9    A.  Not very.
10    Q.  Okay.  And when you had done it before, had you
11  subpoenaed individual clips to look at?
12    A.  I had not, no.
13    Q.  But somebody else had?
14    A.  I don't know if it was under subpoena or if the
15  marshals just requested them.
16    Q.  Had you ever gotten an entire DVR drive with
17  multiple megabits of information on it before?
18    A.  No.
19    Q.  When you pulled that up on your screen, what
20  would you see?
21    A.  It's been so long ago, I don't remember the
22  layout or anything like that.  I remember seeing
23  thumbnails, you know, multiple, whether it was 16, 18,
24  32.  You know, I don't remember.
25    Q.  When you say thumbnails, what do you mean by

1    thumbnails?

2        A.   Small little pictures of different camera angles.

3        Q.   And you were trying to find a camera that showed

4    activity at a certain date and time?

5        A.   Correct.

6        Q.   Did it take you some time to familiarize yourself

7    with the process?

8        A.   Yes.

9        Q.   Were you aware if-- when CCA-Leavenworth turned

10   that information over to the Secret Service by way of

11   subpoena, if they kept an original copy or did the

12   Secret Service have the original copy?

13       A.   I believe the Secret Service had the original

14   copy.

15       Q.   So would it have been possible for you to go back

16   to CCA-Leavenworth and say, burn me a copy of this

17   hallway at this time at this date?

18       A.   No.

19       Q.   Why not?

20       A.   Because the-- if my understanding was right, the

21   Secret Service had swapped out the DVR, so they had

22   the-- the actual video and I don't believe CCA had the--

23   had any of that prior video.

24               MR. CLYMER:   You have to excuse me, Your

25   Honor.   There's a document I thought I had up here and I

1  appear not to have.  I found it.

2  BY MR. CLYMER:

3      Q.   I'm going to show you what's been marked as

4  Exhibit 480.  This was the United States' supplemental

5  notice of clarification and correction in the *Ashley*

6  *Huff* case.

7      A.   Yes.

8      Q.   Mr. Bell asked you some questions about

9  representations that were made on that document.  I want

10  to ask you a few follow-up questions about that.

11      A.   Yes.

12      Q.   Now, if you look at Page 2 of Exhibit 480 on

13  Paragraph 2, the first-- that paragraph says, "During

14  this call--" or it says in part, "During this call, Ms.

15  Tomasic reported that Ms. Huff called her (Ms. Huff's)

16  mother's friend.  While Ms. Huff was talking to the

17  friend, her mother was talking to Ms. Huff's defense

18  counsel, William Session, on another telephone."  Do you

19  see that?

20      A.   Yes.

21      Q.   So based on that description, how many people

22  were involved in conversations during this event?

23      A.   It appears there was three, maybe four.

24      Q.   Okay.  And when you say three or four, let's try

25  to figure out who was doing what.  Who was Ms. Huff, the

1    inmate at the time, apparently talking to?

2        A.    Talking to the friend of her mother.

3        Q.    And do we know who that person is from this

4    document?

5        A.    I don't know, no.

6        Q.    Do you know of your own personal knowledge who

7    that person is?

8        A.    I don't know his name, no.

9        Q.    Is there any indication that that person is an

10   attorney representing Ms. Huff?

11       A.    Not-- I don't know.

12       Q.    Okay.  So we have that conversation.  And then

13   who else is involved in this event?

14       A.    William Session.

15       Q.    And who else?  There's one other person.  There's

16   the mother's friend, there's Ms. Huff, there's Mr.

17   Session and somebody else.

18       A.    Maybe the mother.

19       Q.    The mother.  And who is the mother talking to?

20   If you look at the second sentence, I think it will tell

21   you.

22       A.    Right.

23       Q.    Mom was talking to?

24       A.    Was talking to-- to Ms. Huff's defense counsel,

25   to William Session.

1    Q.  Okay.  So mom is talking to Mr. Session.  Ms.

2    Huff, who's the inmate, is talking to mom's friend who

3    we don't know who it is.  Right?

4    A.  Correct.

5    Q.  And during this conversation it sounds like

6    there's two telephones being used.  Right?

7    A.  It appears so, yes.

8    Q.  Okay.  And at some point during the conversation

9    Ms. Huff appears to have been able to talk to Mr.

10   Sessions through two telephones.  Does that sound like

11   what happened here?

12   A.  It sounds like what happened, yes.

13   Q.  Do we know where the other two people were at

14   that time?

15   A.  I don't know, no.

16   Q.  Somebody had to hold the telephones though.

17   Right?

18   A.  Correct.

19   Q.  So somebody had to be listening or hearing what

20   was being said.  Correct?

21   A.  Correct.

22   Q.  Do you know what effect on the attorney-client

23   privilege there is when there are four people involved

24   in a conversation, only one is a client and only one is

25   an attorney?

1    A.    I don't know, no.

2    Q.    I'd like to now direct your attention to the next

paragraph on that Page 2 of exhibit-- Public Defender

Exhibit 480.

5         The next paragraph discusses the recording of

6    this call that involved Mr. Sessions; is that right?

7    A.    It appears so, yes.

8    Q.    What does the last sentence say of that

9    paragraph?

10    A.    "AUSA Flannigan knew this call was provided to

11    Mr. Session as part of the discovery in the case-- in

12    this case."

13    Q.    And Mr. Session was Ms. Huff's attorney.

14    Correct?

15    A.    Correct.

16    Q.    So Mr. Session, Ms. Huff's attorney, had the call

17    and knew it was intercepted.  Correct?

18              MR. BELL:  Objection, calls for speculation.

19              THE COURT:  You can answer if you can, if

20    you know.

21              THE WITNESS:  According to this it appears

22    so, yes.

23    BY MR. CLYMER:

24    Q.    And he would've gotten it from the government.

25    Correct?

1        A.   Correct.

2        Q.   So it would've been obvious that the government

3   had that call as well?

4        A.   Correct.

5        Q.   So Mr. Sessions was perfectly capable of raising

6   any claim that Ms. Huff may have had based on the

7   government having had this phone call.  Correct?

8        A.   Correct.

9        Q.   Are you familiar with the case that's before the

10  Court, *United States versus Black*?

11       A.   Yes.

12       Q.   Is Ms. Huff a defendant in this case?

13       A.   No.

14       Q.   Is her case disposed of?

15       A.   Yes.

16       Q.   Did she have the ability to raise this in her

17  case, this claim?

18       A.   She could have, yes.

19       Q.   And, in fact, you were shown, were you not, a

20  document, Defense Exhibit 477, which was a government

21  response to a claim that Mr. Sessions made on behalf of

22  Ms. Huff in her own case.  Correct?

23       A.   I'm sorry.  Can you repeat that question?

24       Q.   Sure.  Take a look at Exhibit 4-- the Public

25  Defender Exhibit No. 477.

 1      A.   Yes.

 2      Q.   That's a response by the government to a claim

 3   made in Ms. Huff's case about a violation of her rights.

 4   Correct?

 5      A.   Correct.

 6      Q.   Okay.  So she not only had an opportunity to, she

 7   did raise a claim in her own case.  Correct?

 8      A.   Correct.

 9      Q.   A person who you were questioned about regarding

10   the video at CCA-Leavenworth was Richard Dertinger.

11   Correct?

12      A.   Yes.

13      Q.   Was Richard Dertinger a defendant in the case

14   that's before this Court?

15      A.   No.

16      Q.   Was Richard Dertinger a defendant in an entirely

17   different case?

18      A.   Yes.

19      Q.   Mr. Dertinger, to your knowledge, did he raise

20   claims regarding his Sixth Amendment rights in his own

21   case?

22      A.   Yes.

23      Q.   And you testified in a hearing in that case.

24   Correct?

25      A.   I did.

1    Q.   Did you watch any video of any attorney meeting

2  with any defendant who's charged in the case before this

3  Court?

4    A.   Not that I remember seeing, no.

5    Q.   Did you listen to any recording of a phone

6  conversation between any attorney and any defendant in

7  this case?

8    A.   No.

9    Q.   To your knowledge, did anybody else on the

10  investigative team listen to any recording of any

11  conversation between any attorney and any defendant in

12  this case?

13    A.   Not that I'm aware of, no.

14    Q.   To your knowledge, did any investigator or

15  Assistant U.S. Attorney watch any video of any defendant

16  in this case meeting with an attorney?

17    A.   Not that I'm aware of, no.

18    Q.   How long have you been an agent in this district?

19    A.   Five years, a little over five years.

20    Q.   Do you know many of the public defenders?

21    A.   No, just in passing.

22    Q.   Okay.  Do you know what they look like?  I don't

23  mean do you know them personally, do you know what they

24  look like?

25    A.   I know names and faces, yes.

 1    Q.   Do you know the people, for example, sitting at

 2  counsel table here?

 3    A.   Yes.

 4    Q.   Do you know these other attorneys who are sitting

 5  here?

 6    A.   I've seen them in other hearings.

 7    Q.   Did you at any time during the investigation or

 8  prosecution of the *Black* case listen to any recorded

 9  call involving any of these attorneys?

10    A.   No.

11    Q.   Did-- to your knowledge, did any federal

12  prosecutor or agent listen to any call involving any of

13  these attorneys?

14    A.   Not that I'm aware of, no.

15    Q.   To your knowledge, did any prosecutor or

16  investigator watch any video of any of these attorneys

17  meeting with any client?

18    A.   Not that I'm aware of, no.

19              MR. CLYMER:  Nothing further, Your Honor.

20              THE COURT:  Any further questions by anyone?

21  If so, we're going to take a lunch break.  We're going

22  to take a lunch break.

23              MR. BELL:  Oh, I'm sorry.

24              THE COURT:  Unless you can tell me it's 30

25  seconds or less.

1          MR. BELL:  I don't know if I could keep that

2   promise.

3          THE COURT:  How about two minutes?

4          MR. BELL:  I can do two minutes.

5          THE COURT:  All right.

6          MR. CLYMER:  Could I keep time, Your Honor?

7          THE COURT:  I'm sorry?

8          MR. CLYMER:  I'm just kidding.

9                    REDIRECT EXAMINATION

10  BY MR. BELL:

11     Q.  Do you have Exhibit 508 in front of you?

12     A.  I thought I did.  I don't believe--

13     Q.  All right.  Let's see if we can do it without the

14  exhibit.

15     A.  I don't believe I do.

16     Q.  Do you remember Mr. Clymer asked you some

17  questions about the-- whether you had seen an attorney

18  room when you looked at the DVR recordings?  Just now do

19  you remember those questions?

20     A.  I believe so, yes.

21     Q.  And he stressed the point that when you answered

22  Mr. Cohen's questions, Mr. Cohen inserted the

23  conditional "if what I said is true, that you probably

24  looked at DVR 6."  Do you remember those questions?

25     A.  Yes.

1    Q.  And the part that was omitted from that is the--

2    the condition is that you had said that when you looked

3    at the video that you had seen an empty room with a

4    table and a couple chairs.  Right?

5    A.  I don't know if I said room or rooms or-- I don't

6    recall.

7    Q.  I guess we are going to need 508.  If you could

8    find Exhibit 508 and look at Page 36.

9    A.  I don't have 508 in front of me.

10            MR. BELL:  Did you take 508?

11            MR. CLYMER:  Did I take some of--

12            MR. BELL:  Those are the exhibits.

13            MR. CLYMER:  I'm sorry.

14   BY MR. BELL:

15   Q.  Let's try it again.  508, Page 36 or 1-- or yeah,

16   Page 36 at the bottom right.

17   A.  That would be 36, the Bates stamp number?

18   Q.  Yes.

19   A.  Yes.

20   Q.  All right.  So if you look at that page, you were

21   asked on Lines 8 through 16 about whether what you saw

22   was an empty room with a table and a couple chairs.

23   Right?

24   A.  Yes.

25   Q.  And you're talking about what you saw on the

 1  video from CCA when you reviewed it.  Right?

 2      A.  Yes.

 3      Q.  And so you saw an empty room about 8-by-10 with a

 4  table and a couple chairs in it?

 5      A.  I said maybe an 8-by-10 room with a table and a

 6  couple chairs, yes.

 7      Q.  All right.  And you said that you may have

 8  assumed or you thought that it was probably an

 9  attorney-client room?

10      A.  I said I don't know if it was an attorney

11  visitation room or not.

12      Q.  Okay.  But it seemed to you like it might be one?

13      A.  It could be, yes.

14      Q.  And that was the basis of Mr. Cohen's questions

15  about if I'm right that that was an attorney-client

16  room, then you had to have looked at DVR 6 because

17  that's the only one that's got attorney-client rooms.

18  Correct?

19      A.  I believe the index showed "low custody attorney"

20  on 5.

21      Q.  Right.  And then did you understand or was it

22  explained to you that that was actually a hallway?

23      A.  At that time I didn't know.

24      Q.  Okay.  Well, then let me try this again.  If you

25  saw an empty room with a table and a couple of chairs

1    and it was 8-by-10, would you agree with me that that

2    was most likely an empty attorney-client room based on

3    what you know about CCA?

4        A.    Based on what I know about CCA, I can't say that

5    other-- another room with some tables and chairs would

6    be on even 1, 2, 4.

7        Q.    Is there any other room within CCA that you know

8    of, other than the attorney-client room, that would fit

9    that description?

10       A.    I've not been through all of CCA, so I can't say

11   yes or no.

12       Q.    So it would be fair to say that based on what you

13   know of CCA, the only room that would fit that

14   description is the attorney-client room?

15       A.    I don't know that, no.

16       Q.    But you don't know of any other room that would

17   fit the description?

18       A.    And again, I haven't been through the-- the whole

19   facility.

20               MR. BELL:    I have no further questions.

21               THE COURT:    All right.    Anyone else?    Mr.

22   Guastello, did you have--

23               MR. GUASTELLO:    Judge, I just have just that

24   one question.

25               THE COURT:    I'm holding everybody to the

```
 1   two-minute rule.
 2              MR. GUASTELLO:  Less than two minutes.
 3                    RECROSS EXAMINATION
 4   BY MR. GUASTELLO:
 5      Q.  Agent Stokes, you indicated that you did
 6   interview some inmates during the execution of the
 7   search warrant?
 8      A.  I did, yes.
 9      Q.  Okay.  What part of the-- of CCA did you conduct
10   those interviews?
11      A.  If I remember right there were a few different
12   rooms.  Actually I can't say that, I don't know if it
13   was one room or if I was in a-- in a couple different
14   rooms.
15      Q.  Was there a table in that room?
16      A.  Yes.
17      Q.  Were there a couple of chairs in that room?
18      A.  Yes.
19      Q.  Was it similar to the video that Mr. Bell was
20   just describing to you?
21      A.  Actually, I don't believe it was because the room
22   I was in was carpeted.  I remember that.
23      Q.  So it was a carpeted room with a chair and a
24   table?
25      A.  Right.
```

1      MR. GUASTELLO:  Nothing further, Judge.

2      THE COURT:  Ms. Dodge?

3      MS. DODGE:  No, Your Honor, I have nothing.

4      THE COURT:  Mr. Cohen.

5                  RECROSS EXAMINATION

6  BY SPECIAL MASTER COHEN:

7    Q.  Mr. Clymer asked you some questions about

8  attorney-client privilege.  Do you recall that?

9    A.  Yes.

10   Q.  Is it safe to say that you don't know all the law

11 surrounding whether the attorney-client privilege

12 applies?

13   A.  I would say that's fair, yes.

14   Q.  When you said that you don't listen to

15 attorney-client phone calls, do you think to yourself I

16 wonder if the attorney-client privilege applies?

17   A.  I'm not going to listen to calls-- I-- I would

18 think that it applies, yes.

19           SPECIAL MASTER COHEN:  Thank you.

20           THE COURT:  All right.  Anything more, Mr.

21 Clymer?

22           MR. CLYMER:  No, Your Honor.

23           THE COURT:  All right.  Is Special Agent

24 Stokes released from his subpoena or is he subject to

25 recall?

 1              MR. BELL:  He would be subject to recall,

 2    Your Honor.

 3              THE COURT:  He is subject to recall?

 4              MR. BELL:  Oh, I apologize.  I understand he

 5    has a training obligation that he needs to get to; is

 6    that right?

 7              THE WITNESS:  Actually it-- it's a week-long

 8    course that started yesterday, so I can't attend that.

 9              MR. BELL:  Okay.  Well, I apologize for the

10    inconvenience, but if it's not going to further

11    inconvenience, I'd like him subject to recall.  I would

12    anticipate that he would need a reasonable amount of

13    time to get back to the courthouse should we need him.

14              THE COURT:  All right.  Do you office in

15    Topeka or-- or you office here in town or work out of

16    your home?

17              THE WITNESS:  My office is in Lenexa, ma'am.

18              THE COURT:  Okay.  All right.  You're

19    subject to recall, but that would be a phone call and

20    enough notice to get back downtown.

21              THE WITNESS:  Yes, ma'am.

22              THE COURT:  All right.  Otherwise you're

23    released to go at this time.  Let's take a break until

24    2:00.

25              MS. BROCKERT:  Your Honor--

1           THE COURT:  Yes.

2           MS. BROCKERT:  -- if I may.  I'm sorry.

3  Alyssa Brockert, I'm counsel for CoreCivic.  We have two

4  employees here that were called to testify today.  And

5  given that this is I think the second witness on the

6  FPD's list, I was wondering if there would be a way that

7  we could release them for the day and they could be back

8  tomorrow at 9:00?

9           THE COURT:  Who are-- Mr. Bigelow and Ms.

10  Thomas, is that who you're talking about?

11          MS. BROCKERT:  Yes, that's correct.

12          THE COURT:  Are you planning to get to them

13  this afternoon?

14          MR. BELL:  I doubt it, Your Honor.  We have

15  no objection to that request.

16          THE COURT:  All right.  What time do you

17  want them to be here tomorrow morning or tomorrow?

18          MR. BELL:  11:00, I think it probably would

19  be safe.

20          THE COURT:  All right.

21          MS. BROCKERT:  Thank you, Your Honor.

22          THE COURT:  All right.  We'll be in recess

23  now until 2:00.

24          (Recess).

25          THE COURT:  All right.  You can be seated.

 1  All right.  Mr. Clymer.

 2             MR. CLYMER:  Your Honor, before we proceed,

 3  may I address the Court, Your Honor?

 4             THE COURT:  Yes.

 5             MR. CLYMER:  Your Honor, over the lunch

 6  break it occurred to me that there was some uncertainty

 7  in my mind about the Court's remarks regarding how we

 8  would proceed with the U.S. Attorney and Department of

 9  Justice employees, and the Court said we'd proceed by a

10  proffer.

11             I understood the Court to mean that the

12  attorney who wanted to question the witness would make a

13  proffer to the Court about what they expected to get out

14  of the witness, not that the witness himself or I would

15  provide any information, because that also would be

16  prohibited by the *Touhy* regulations.

17             THE COURT:  I understand.

18             MR. CLYMER:  Okay.  So the proffer the Court

19  anticipated was from counsel.  Correct?

20             THE COURT:  Correct.

21             MR. CLYMER:  Thank you, Your Honor.  I just

22  want to clarify.

23             THE COURT:  From counsel, from documents

24  they want to proffer for later determination of

25  admissibility.

 1          MR. CLYMER:  Thank you, Your Honor.

 2          THE COURT:  Okay.  All right.  Ms. Brannon.

 3   Mr. Bell.

 4          MR. BELL:  Yes, Your Honor.  Before we call

 5   our next witness I'd move to admit Exhibit 484 by

 6   stipulation of the parties.

 7          THE COURT:  Exhibit 484?

 8          MR. CLYMER:  So stipulated.

 9          THE COURT:  484 admitted.

10          MR. BELL:  Your Honor, at this time we would

11   call Scott Rask.

12                    SCOTT RASK,

13   called as a witness on behalf of the Federal Public

14   Defender, having first been duly sworn, testified as

15   follows:

16                DIRECT EXAMINATION

17   BY MR. BELL:

18     Q.   Would you state your name for the Court?

19     A.   Scott Rask.

20     Q.   Mr. Rask, how are you employed?

21     A.   I'm with the U.S. Attorney's Office.

22     Q.   And what do you do there?

23     A.   I'm an Assistant United States Attorney.

24     Q.   Are you currently in a supervisory role in that

25   position?

 1      A.  Yes.  Yes, I am.

 2      Q.  And how long have you been in that supervisory

 3  role?

 4      A.  Approximately 18 months.

 5      Q.  So you were in that role on May 10th, 2017?

 6      A.  Yes, I was.

 7      Q.  On that date Ms. Tomasic told you that she had

 8  listened to a recorded conversation between Ashley Huff

 9  and her attorney.

10      A.  I am not authorized to answer that question.

11      Q.  Let me show you what's been marked as

12  Exhibit 541.  Is Exhibit 541 a pleading that was filed

13  in the *Ashley Huff* case?

14      A.  Correct.

15      Q.  And does it have your signature on it?

16      A.  It does.

17          MR. BELL:  Your Honor, I'd move to admit

18  Exhibit 541.

19          MR. CLYMER:  No objection.

20          THE COURT:  541 admitted.

21  BY MR. BELL:

22      Q.  On the second page of that document, does it have

23  a date of a conversation-- does it mention a date of

24  May 10th, a conversation that you had with Ms. Tomasic?

25          MR. CLYMER:  Your Honor, I'll stipulate that

 1   the document says what the document says.

 2              THE COURT:  All right.  The document speaks

 3   for itself.

 4              MS. VANBEBBER:  Excuse me.  What was the

 5   number of the document?

 6              MR. BELL:  541.

 7   BY MR. BELL:

 8      Q.  You filed this pleading in June of 2017?

 9              MR. CLYMER:  Objection, Your Honor.  The

10   document speaks for itself.

11              THE COURT:  All right.  Granted.

12   BY MR. BELL:

13      Q.  Mr. Rask, why did you wait until June 19th to

14   disclose the information that you learned on May 10th?

15      A.  I'm not authorized to answer that question.

16              THE COURT:  Let's stop for a minute here.

17   Mr. Clymer.

18              MR. CLYMER:  Yes, Your Honor.

19              THE COURT:  This witness has answered

20   several questions now that he's not authorized to answer

21   the question.  Who was the responsible official who

22   referred the decision-making to the Deputy Attorney

23   General?

24              MR. CLYMER:  I was, Your Honor.

25              THE COURT:  All right.  I refer you to 28

1    C.F.R. 16.24(c), 16.24(c) and ask what steps did you as

2    the responsible official take to negotiate limits on the

3    demands of the Special Master and the FPD before

4    referring the matter to-- well, I guess I should ask

5    what steps were taken before the matter was referred to

6    the-- to the DAG to negotiate limits on the--

7              MR. CLYMER:  I can describe some of those,

8    Your Honor.  When the Special Master-- before he issued

9    subpoenas, before there were any subpoenas issued, this

10   Court set a hearing for the January 18th date.  That was

11   the first date you set a hearing.  And at the time you

12   set it, there was no indication that it was an

13   evidentiary hearing.

14             There was an exchange of e-mail between

15   myself and Mr. Cohen where I asked him not to issue any

16   subpoenas because I'd like to discuss matters with him.

17   I had sent him-- there were a couple of communications

18   that I had sent to him where I expressed concerns about

19   the nature of the proceeding and I wanted to discuss it.

20   He told me that he was going to go ahead and issue a

21   subpoena.  So that was my first effort to try to avoid

22   this situation.

23             After that, Your Honor, I've made multiple

24   attempts to try to have a non-evidentiary hearing before

25   this Court to discuss matters.  At one point when the

1    case was still set for January 18th, I filed a motion to
2    bifurcate the proceedings so that we would have a
3    hearing to discuss matters and then we would separately
4    have an evidentiary hearing at some point after.  The
5    Court denied that.
6            Similarly, I don't recall the date right
7    now, but we filed a motion for a status conference a
8    couple months ago.  I don't believe the Court has ruled
9    on that.  I don't believe any of the parties have ever
10   responded to that motion.
11           THE COURT:  Well, when I asked about
12   negotiation, I wasn't talking about in the context of
13   the hearing.  Typically what happens is the government
14   and the party that's seeking testimony or information
15   meet and confer and negotiate the limits of what the
16   person can be asked about.
17           MR. CLYMER:  Well, I understand that, Your
18   Honor.  In addition to what I just described, I also
19   filed motions to quash.  And those motions were opposed
20   by both the Special Master and the Federal Public
21   Defender.  There was no effort to try to-- there was
22   clearly no common ground between our position and their
23   position.
24           THE COURT:  Well, your position was zero.
25   Right?

1              MR. CLYMER:  Well, my position, Your Honor,

2    was not zero because some of the materials that Mr.

3    Cohen requested in his original request we turned over.

4    So our position was not zero.

5              THE COURT:  Okay.  What was that?

6              MR. CLYMER:  One of the things he requested

7    were grand jury matters, we disclosed that.  He also

8    requested information about the position the government

9    had taken with respect to various conflict issues and

10   asset forfeiture issues.  We provided that information

11   as well.

12             In addition, with respect to the subpoenas

13   to individuals, as my letters to Mr. Cohen and Ms.

14   Brannon indicate, we agreed to allow testimony as to

15   some matters but did not allow testimony as to others.

16             THE COURT:  All right.  So there was a--

17   you're telling me there was a negotiation process?

18             MR. CLYMER:  There-- there were efforts to

19   try to narrow the scope, Your Honor.  There were not

20   discussions directly between counsel and-- there were

21   discussions with Mr. Cohen, not between counsel and the

22   Federal Public Defender.

23             THE COURT:  All right.  And you have now

24   provided-- you've filed the notice for both the Special

25   Master's subpoenas and the FPD's subpoenas describing

1    the limits of-- the limits of authority under which

2    the-- a particular witness can testify.

3             If it is unclear whether an answer is

4    permitted within the stated limited authority in your

5    pleading, are you someone that can make the call?

6             MR. CLYMER:  I believe I can give the

7    witness guidance about what the parameters of their

8    authority are.

9             THE COURT:  All right.  So if there-- if

10   there comes a time when there-- if it's unclear and

11   whether-- whether the-- the notice allows the question

12   or not, you will be advising the witness whether or not

13   to testify to that?

14            MR. CLYMER:  I'm-- I would be available to

15   do that if the Court believes that's appropriate.

16            THE COURT:  All right.

17            MR. CLYMER:  And I'll say this, Judge, my

18   understanding of the regulations is that the-- the

19   witness requires authority to make the disclosures.  So

20   if the witness is uncertain, they will have to not

21   answer.  So the process that you proposed I think is a

22   good one because it might be that after I speak to the

23   witness I'll be able to make some at least partial

24   disclosure of what the attorney is looking for.

25            THE COURT:  Well, I wasn't proposing it.

1           MR. CLYMER:  Oh.

2           THE COURT:  I was asking because I wasn't

3    sure whether you were in a position to make the call or

4    whether the Deputy Attorney General were to have to be

5    consulted with it.  That's why I asked.

6           MR. CLYMER:  And I-- I believe that I'm as

7    bound by the direction from the Deputy Attorney

8    General's Office as the witnesses are.  But if there's

9    some area of ambiguity, I'll do my best to try to

10   resolve it if I can.

11          THE COURT:  Okay.  So as I said before at

12   the outset, the way to proceed-- and I think maybe to

13   speed things up now, the witness can say "I must

14   decline," similarly to what Mr. Rask has said.

15          I-- I didn't ask-- I think there's been two

16   questions now that he's answered that way.  I didn't ask

17   what the grounds under *Touhy* would be.  I mean, you

18   know, there's defined bases for not answering a question

19   under that regime.  And, of course, *Touhy* recognizes

20   that there are rules of evidence and there are

21   privileges as well.

22          And so let's talk about that.  I think it

23   would be best for the record if you would state what the

24   basis is for not answering a particular question.

25          MR. CLYMER:  I'm not sure I'm permitted to

1   go through all the internal deliberations by the

2   Department of Justice.  And ultimately, Your Honor, I

3   didn't make the decision and I can't speak to the

4   factors that the DAG considered with respect to any

5   individual question that was posed.

6          I can tell the Court generally what the

7   factors are and which ones I think are applicable to

8   certain questions, but I-- I don't want to speak for the

9   Office of the Deputy Attorney General.  I don't think I

10  can.

11          THE COURT:  Oh, I know what the factors are.

12  I mean, such things as-- you know, we can go through

13  them.  But I guess for clarity what you're saying is you

14  will state the grounds or you will not?

15          MR. CLYMER:  I will do by best, Your Honor,

16  to describe what I believe the factors are that play--

17  I'll say generally, Your Honor, at the outset all of the

18  questioning in the *Touhy* notices that I received from

19  the public defender's office and from the Special Master

20  calls for information that is not disclosable under

21  Rule 16.

22          One of the factors that *Touhy* demands that

23  we look at are the rules applicable to the case before

24  the Court.  Because this is a criminal matter, Rule 16

25  is applicable.  The Federal Public Defender's *Touhy*

1    notice cites to the provision under Rule 16 that says

2    they're entitled to information or documents that are,

3    quote, material to the defense.

4          They're simply wrong about that.  There is

5    case law, and it's cited to my letter of September 12th

6    to Mr. Cohen.  The Supreme Court has said that passage

7    in Rule 16 means information that rebuts the

8    government's case-in-chief at trial.  It doesn't pertain

9    to information about a defendant's claim that somehow

10   his constitutional rights were violated.

11         And so here you have a non-defendant.  The

12   Federal Public Defender, as the Court knows, doesn't

13   represent any defendant in the case and neither does the

14   Special Master.  So at the outset they're not entitled

15   to rely on Rule 16 and Rule 16 doesn't--

16         THE COURT:  But we have-- we have two

17   defendants that are present.

18         MR. CLYMER:  And neither one submitted a

19   *Touhy* notice, Your Honor.  And so the-- so at the

20   outset, Rule 16 doesn't apply.  But even if it did apply

21   to the Special Master or the public defender or to the

22   extent it applies to the defendants who are in the case,

23   the information they're requesting does not fall within

24   the things that are required by Rule 16.

25         And so here, there's no legal basis for the

 1   questioning that they're asking to conduct.  That's the

 2   first of a number of factors.  There's other

 3   considerations too, but I'll just say that's one thing

 4   that overlays all this questioning and--

 5            THE COURT:  All right.  Let me-- let me stop

 6   you for a minute.  So with respect to the two named

 7   defendants in this case, Mr. Carter and Mr. Bishop,

 8   you're not taking the position that they had to file

 9   *Touhy* notices in order to engage in cross examination

10   that's within the scope of the *Touhy* summaries, are you?

11            MR. CLYMER:  I'm taking the position, Your

12   Honor, that if they want to have an Assistant U.S.

13   Attorney making disclosures that fall within the

14   protections of the *Touhy* regulations, they have to

15   comply with those regulations.

16            This is-- I mean, we are not in the

17   process-- I mean, if they filed a motion to dismiss,

18   they certainly can ask questions in connection with

19   their motion to dismiss, and I understand that.

20            THE COURT:  All of this is in connection

21   with the motion to dismiss.  The motion to dismiss

22   alleges intentional violations of the Sixth Amendment.

23   So that's what this whole hearing really is about.

24            MR. CLYMER:  And we are not calling, for

25   example, Mr. Rask as a witness in connection with that

1    motion, so their examination of him is not a cross

2    examination.  And it's our position that they are as

3    bound by the *Touhy* regulations as the-- as the other

4    attorneys in the room are.

5              THE COURT:  All right.  So as we proceed,

6    the witness will pursuant to your instructions decline

7    to answer, and I'll turn to you and if you can state a

8    basis for that at that time, I'll-- I'll hear from you.

9              MR. CLYMER:  Okay.  And so the Court is

10   aware; with respect to Mr. Rask, only the public

11   defender, if I recall correctly, submitted a *Touhy*

12   notice.  I don't believe Mr. Cohen did.  He'll correct

13   me if I'm wrong, I may not recall, but I don't believe

14   he did.

15             And none of the questions that the Federal

16   Public Defender posed-- Mr. Rask has authority to answer

17   none of those questions.  So if Court would like, I'll

18   go get the questions and I'll go down one-by-one and--

19             THE COURT:  No, let's let them ask them.  I

20   think they are entitled to make a record on them.  As I

21   said, I'm going to proceed by proffer anyway so they

22   need to make their record with the questions.  Similar

23   as if somebody were going to invoke the Fifth Amendment,

24   the questions still have to be asked.

25             MR. CLYMER:  Okay.

1           THE COURT:  And then I'll give you the

2    opportunity, if you choose, to tell me the basis for

3    what-- what under *Touhy* prohibits this question.  And

4    the reason why I think it's important, if you can do

5    that, because if your objection is just a general

6    evidentiary objection - and you've been raising those

7    all along - I do have the ability to rule on those now.

8    And so I'd just like to have that clear.

9           MR. CLYMER:  And, Judge, I agree with you on

10   that.  I think we're on all fours on that.

11          THE COURT:  Okay.  All righty.  All right.

12   Mr. Bell.

13   BY MR. BELL:

14     Q.  Mr. Rask, can we agree that instead of saying

15   "I've been instructed that I have to decline to answer,"

16   or whatever the formulation sentence, that you just say

17   the word "decline" and that will stand in for the longer

18   sentence just in the matter of expediency?

19     A.  I would prefer to answer that I'm not authorized

20   to answer a question if that's what's asked of me.

21     Q.  Fair enough.  Ms. Tomasic gave you the

22   information or told you the information about what she

23   had listened to in Ms. Huff's case on May 10th, 2017.

24     A.  Is that a question?

25     Q.  Yes.

 1      A.   I'm not authorized to answer that question.

 2      Q.   You did not immediately notify Ms. Huff of what

 3  you had learned.

 4      A.   I'm not authorized to answer that question.

 5      Q.   You waited until June 19th, 2017, to alert anyone

 6  about what you had learned.

 7      A.   I'm not authorized to answer that question.

 8      Q.   In fact, you did not directly notify Ms. Huff at

 9  all.

10      A.   I'm not authorized to answer that question.

11      Q.   Because at the time you had filed your notice on

12  June 19th, Ms. Huff had already been sentenced.

13      A.   I'm not authorized to answer that question.

14      Q.   And you filed the notice on the Court's ECF

15  system.   Correct?

16      A.   That's what Exhibit 541 shows.

17      Q.   But Exhibit 541 does not indicate that you

18  actually mailed this notice to Ms. Huff.

19           MR. CLYMER:   Your Honor, objection.   The

20  document speaks for itself.

21           THE COURT:   I'm not sure the notice

22  provision of the document necessarily speaks for itself,

23  so answer it if you can.

24           THE WITNESS:   Can you repeat your question,

25  please?

 1   BY MR. BELL:

 2       Q.   Certainly.  You did not e-mail the exhibit itself

 3   to Ms. Huff, the notice itself to Ms. Huff.

 4       A.   I'm not authorized to answer that question.

 5       Q.   After June 19th, 2017, you spoke with Ms.

 6   Flannigan.

 7       A.   We work together, I've spoken with her since

 8   June 19th, 2017, yes.

 9       Q.   Ms. Flannigan was the co-prosecutor on the case

10   with Ms. Tomasic.

11       A.   She was counsel of record, yes.

12       Q.   I show you what's been marked as Exhibit 542.

13   And Exhibit 542 a pleading filed in the *Ashley Huff*

14   case?

15       A.   Did you ask if it was a pleading filed?

16       Q.   Yes.

17       A.   That is correct.

18       Q.   All right.  Does it have your name on the third

19   and fourth page?

20            MR. CLYMER:  Again, Your Honor, I believe

21   the document speaks for itself.

22            THE COURT:  It's not in evidence.

23            THE WITNESS:  Yes, that is my name on the

24   third and fourth page.

25            MR. BELL:  Your Honor, I'd move to admit

 1    Exhibit 542.

 2              MR. CLYMER:  No objection.

 3              THE COURT:  542 admitted.

 4    BY MR. BELL:

 5       Q.  At the time that Ms. Flannigan was prosecuting

 6    this case with Ms. Tomasic, Ms. Flannigan was Ms.

 7    Tomasic's supervisor?

 8       A.  During part of the time, yes.

 9       Q.  Ms. Flannigan told you that she knew there was a

10    recorded call that involved Mr. Sessions?

11       A.  I'm not authorized to answer that question.

12       Q.  Ms. Flannigan told you that the call had been

13    marked as an exhibit.

14       A.  I'm not authorized to answer that question.

15       Q.  She told you that she may have even been present

16    when the call was played in preparation for a hearing?

17       A.  I'm not authorized to answer that question.

18       Q.  Neither Ms. Tomasic nor Ms. Flannigan told you

19    that they had notified Mr. Sessions or Ms. Huff about

20    this call.

21       A.  I'm not authorized to answer that question.

22       Q.  In fact, you learned that Mr. Sessions had

23    alleged this very thing in a pleading in Ms. Huff's

24    case.

25       A.  I'm not authorized to answer that question.

1    Q.   And you learned that Ms. Tomasic and Ms.

2    Flannigan responded and they didn't deny it, they just

3    said that Mr. Sessions couldn't prove it.  Right?

4    A.   I'm not authorized to answer that question.

5    Q.   Based on your conversations with Ms. Tomasic and

6    Ms. Flannigan, even though they said Mr. Sessions

7    couldn't prove it, they knew it had happened.

8    A.   I'm not authorized to answer that question.

9    Q.   But they didn't-- they were not candid about that

10   with Judge Murguia when they responded to Mr. Session's

11   allegations.

12   A.   I'm not authorized to answer that question.

13   Q.   Now, you filed this supplemental memorandum on or

14   about June 19th.  I'm going to turn your attention to

15   the last page of the document where it says certificate

16   of service.

17              MR. CLYMER:  Your Honor, may I be heard for

18   a moment?

19              THE COURT:  Yes.

20              MR. CLYMER:  Your Honor, one of the

21   requirements in the *Touhy* regulations that the Court is

22   aware is that counsel submits a *Touhy* notice to the

23   government and they specify the areas of inquiry they

24   expect to make, and that gives the government a chance

25   to assess whether or not to authorize responses.

1           None of these areas of inquiry that he asked

2    now are in the *Touhy* notice.  And as a result, I

3    question whether it's appropriate to permit this litany

4    of questions to go on.

5           THE COURT:  Mr. Bell, do you have the *Touhy*

6    notice handy to you?

7           MR. BELL:  I do, Your Honor.  If you'll give

8    me just a moment, I will find where it is in the

9    request.  As a threshold matter, if they say he can't

10   testify about anything, I don't know that it necessarily

11   matters whether it was in a request or not, but...

12          THE COURT:  All right.

13          MR. BELL:  Paragraph 4.  So does the Court

14   have a copy of our *Touhy* request?

15          THE COURT:  I thought I did and apparently I

16   don't have it on the bench with me.

17          MR. BELL:  I have a single copy so I'll just

18   read for the Court.

19          MS. VANBEBBER:  I can provide that.

20          THE COURT:  I have Mr. Clymer's notice.

21   It's not-- the summaries aren't included as part of

22   that, I don't think.  Maybe they are.  Just a minute.

23   Yes, the summaries are included.  Okay.  Just a minute.

24   I have them.

25          MR. BELL:  So--

 1              THE COURT:  Well, let me make sure I have
 2   one for Mr. Rask.
 3              MR. BELL:  So I'm looking at an April 30th,
 4   2018 letter that we sent to Mr. Clymer.
 5              THE COURT:  I don't have that.  If it's
 6   short, you can just read it to me.  But I do need to get
 7   a copy-- I don't have-- for some reason I don't have the
 8   summaries up here.
 9              MS. VANBEBBER:  The document summaries I
10   have.
11              MR. BELL:  Your Honor, while we're waiting,
12   I can just read for you what's in our request.
13              THE COURT:  Okay.  That's fine.
14              MR. BELL:  This is on Page 8 of our request,
15   it's under Paragraph 3 from Mr. Rask.  "His awareness
16   and actions concerning his knowledge that in January
17   2017--" I'm sorry, strike that.
18              It's Paragraph 4.  "His awareness that
19   prosecutors in his office obtained attorney-client phone
20   calls made from CCA-Leavenworth and what, if any, action
21   he took to investigate whether these calls were listened
22   to or reviewed by any member of his office."
23              In addition, it would fall under Paragraph 6
24   which is reads, "Any and all meetings, discussions, and
25   communications following the May 10th, 2017 meeting with

1    SAUSA Tomasic in which he and the USAO analyzed what

2    remedial actions, if any, were necessary, to include

3    correcting the record of statements made by SAUSA

4    Tomasic in this case and/or any other cases."

5              THE COURT:  All right.  It sounds to me like

6    it's squarely within that summary.  So proceed.

7    BY MR. BELL:

8        Q.  So, Mr. Rask, let me turn your attention to

9    Page 3 of Exhibit 541.  There's a certificate of service

10   there, and it indicates that you filed this notice in

11   the CM/ECF system.  Ms. Huff had been sentenced by this

12   point.  Would she have had access to the CM/ECF system?

13       A.  I don't know.

14       Q.  At this point was Mr. Sessions even still her

15   lawyer?

16       A.  I'm not authorized to answer that question.

17       Q.  Did you take any follow-up actions to make sure

18   that Mr. Sessions communicated these notices of

19   correction to Ms. Huff?

20       A.  I'm not authorized to answer that question.

21       Q.  During your May 10th meeting, Ms. Tomasic did not

22   just disclose details about the *Huff* case but also about

23   the *Herrera-Zamora* case on May 10th.  Right?

24       A.  Is that a question?

25       Q.  Yes.

1        A.   I'm not authorized to answer that question.

2        Q.   Let me show you what's been marked as

3   Exhibit 497.

4              THE COURT:  Did you intend to offer 541?

5   You didn't offer it.

6              MR. BELL:  I did.  I thought that I-- it was

7   admitted, but if not--

8              THE COURT:  541 is in evidence, I'm sorry.

9   BY MR. BELL:

10       Q.   All right.  So, Mr. Rask, I've just handed you

11  what's been marked Exhibit 497.  Do you recognize this

12  as a pleading that was filed in the *Herrera-Zamora* case?

13       A.   That is correct.

14       Q.   Does it have your signature on the fifth page?

15       A.   Yes, it does.

16             MR. BELL:  Your Honor, I'd move to admit

17  Exhibit 497.

18             MR. CLYMER:  No objection.

19             THE COURT:  497 admitted.

20  BY MR. BELL:

21       Q.   During this May 10th meeting, Ms. Tomasic told

22  you that not only she listened to an attorney-client

23  phone call in the *Huff* case but had also done so in the

24  *Herrera-Zamora* case.

25       A.   If that's a question, I'm not authorized to

 1    answer that.

 2       Q.   Another Assistant United States Attorney was

 3    prosecuting this-- the *Herrera-Zamora* case with Ms.

 4    Tomasic.

 5                MR. CLYMER:  Your Honor, I'd ask that

 6    counsel state questions, not statements or assertions of

 7    fact.  He continues to simply state assertions of fact.

 8                THE COURT:  All right.  Let's state it in a

 9    question format.

10    BY MR. BELL:

11       Q.   Was there another prosecutor besides Ms. Tomasic

12    on the *Herrera-Zamora* case?

13       A.   Yes, there was.

14       Q.   Was that prosecutor named David Zabel?

15       A.   That is correct.

16       Q.   On May 10th, 2017, before Ms. Tomasic spoke with

17    you about what she had done in the *Herrera-Zamora* case,

18    she first discussed it with Mr. Zabel.

19       A.   I'm not authorized to answer that question.

20       Q.   In this document in Paragraph 6, does it appear

21    to say that Mr. Zabel had no idea, at least up to

22    February 22nd, 2017, that Ms. Tomasic had listened to

23    any attorney-client call?

24                MR. CLYMER:  Objection, the document speaks

25    for itself.

1          MR. BELL:  He's the author of the document.

2  I want to know what his intent--

3          THE COURT:  All right.  Answer it if you

4  can.

5          THE WITNESS:  Can you repeat the question,

6  please?

7  BY MR. BELL:

8     Q.  Certainly.  Does this document indicate that at

9  least as late as February 22nd, 2017, Mr. Zabel had no

10  idea that Ms. Tomasic had listened to a recorded

11  attorney-client call in the *Herrera-Zamora* case.

12     A.  I'm not authorized to answer that question.

13     Q.  I want to show you what's been marked as

14  Exhibit 521.  Do you recognize Exhibit 521 as a letter

15  that Erin Tomasic wrote to Judge Robinson?

16          THE COURT:  This one is admitted.

17          THE WITNESS:  That's what it purports to be.

18  BY MR. BELL:

19     Q.  In this letter she describes her actions.  And

20  although she doesn't name the case, you know the case

21  that she's referring to as the *Herrera-Zamora* case?

22          MR. CLYMER:  Objection, Your Honor.  The

23  document speaks for itself and counsel is simply making

24  assertions based on the text of a document.

25          MR. BELL:  I'm asking what he understands

1    what the-- the reference in the document to be, which

2    case it's to.

3                    THE COURT:  All right.  That's a fair

4    question.  You can answer it if you-- if you can.

5                    THE WITNESS:  Would you please ask me the

6    question again?

7    BY MR. BELL:

8        Q.  Certainly.  In the third full paragraph of

9    Exhibit 521, Ms. Tomasic describes her conduct in a

10   particular case.  Is that a fair characterization?

11                   MR. CLYMER:  Objection, Your Honor.  The

12   document speaks for itself.

13                   MR. BELL:  It's a necessary foundation

14   question for the next one.

15                   THE COURT:  All right.  Proceed.

16   BY MR. BELL:

17       Q.  Is that a fair characterization, Mr. Rask?

18       A.  Are you referring to the paragraph that starts

19   with "shortly thereafter" or the third paragraph that

20   starts with "prior to submitting"?

21       Q.  The third paragraph that says "prior to."

22       A.  I'm sorry, Mr. Bell, would you mind repeating

23   your question again?

24       Q.  She's describing her conduct in a particular case

25   in that paragraph.  Correct?

1    A.   I'm not authorized to answer that question.

2    Q.   Does-- are the circumstances she describes in

3    Paragraph 3 match the circumstances she told you about

4    how she came to review a call in the *Herrera-Zamora*

5    case?

6    A.   I'm not authorized to answer that question.

7    Q.   So the paragraph after that that does begin

8    "shortly thereafter," it says, "She discussed her

9    decision regarding the handling of the calls with two

10   AUSAs, one who was assigned to the case at issue."  Did

11   Ms. Tomasic identify who those two AUSAs were?

12   A.   I'm not authorized to answer that question.

13   Q.   Is one of those AUSAs Dave Zabel?

14   A.   I'm not authorized to answer that question.

15   Q.   Was the other AUSA Kim Flannigan?

16   A.   I'm not authorized to answer that question.

17   Q.   She then-- there's a sentence where she says, "I

18   again discussed the matter with an AUSA assigned to the

19   case at issue."  Do you know that AUSA to be Dave Zabel?

20   A.   I'm not authorized to answer that question.

21   Q.   And then Ms. Tomasic relates that, "That AUSA

22   stated I did not have an obligation to bring the matter

23   to the attention of my supervisor."

24        MR. CLYMER:  Objection.  I ask that counsel

25   pose a question, and the document speaks for itself.

1              THE COURT:  I don't know what the question

2    is.

3              MR. BELL:  I'm about to, I'm about to ask

4    the question.

5    BY MR. BELL:

6        Q.   Does that match what either Tomasic or Zabel told

7    you about her conversation with Zabel?

8        A.   I'm not authorized to answer that question.

9        Q.   Did you uncover any information whatsoever that

10   any AUSA, whether it be Zabel or anyone else, told Ms.

11   Tomasic that she didn't have to notify her supervisor

12   about what she had done in this case?

13       A.   I'm not authorized to answer that question.

14       Q.   So Ms. Tomasic disclosed her actions in the

15   *Herrera-Zamora* case to you on May 10th, 2017, but you

16   had begun asking Ms. Tomasic questions about the

17   *Herrera-Zamora* case some months before then.

18              MR. CLYMER:  Objection, assumes facts not in

19   evidence.  It's a compound question, assumes a fact that

20   hasn't been established.

21              MR. BELL:  That's fine.

22   BY MR. BELL:

23       Q.   Let me show you Exhibit 491.  Is Exhibit 491 an

24   e-mail chain that you are included on?

25       A.   That is correct.

1     Q.   And does it have e-mails between yourself, Ms.

2    Tomasic, Mr. Zabel, along with forwarding-- forwarded

3    messages from Mr. Welch, with copies to Ms. Flannigan

4    and somebody from the Department of the Professional

5    Responsibility Office in D.C.?

6               MR. CLYMER:   Your Honor, the document speaks

7    for itself.

8               MR. BELL:   He's got to authenticate it

9    before I can admit it.

10              THE COURT:   It's not in evidence.

11              THE WITNESS:   Yes, those people are part of

12   the e-mail chain.

13   BY MR. BELL:

14    Q.   And all those people are Department of Justice

15   employees?

16    A.   To the best of my knowledge.

17              MR. BELL:   Your Honor, I'd move to admit

18   Exhibit 491.

19              MR. CLYMER:   No objection.

20              THE COURT:   491 admitted.

21   BY MR. BELL:

22    Q.   So the question I asked you before the objection

23   was whether you had begun asking Ms. Tomasic questions

24   about her conduct in *Herrera-Zamora* months before

25   May 10th.   In this Exhibit 491 do you-- is there an

1  e-mail from Ms. Tomasic to you on January 5th, 2017?

2      A.  Yes, there is an e-mail on January 5th, 2017 to

3  me.

4      Q.  And in that e-mail Ms. Tomasic is telling-- is

5  forwarding you the inquiry she made to Lanny Welch and

6  to PRAO, which was the Office of Professional

7  Responsibility division; is that right?

8              MR. CLYMER:  Objection, Your Honor, the

9  document speaks for itself.

10             THE COURT:  This is 491 you're asking about?

11             MR. BELL:  Yes, Your Honor.

12             THE COURT:  All right.  I think it's

13  permissible to ask him this question.

14  BY MR. BELL:

15     Q.  So she's forwarding you the inquiry she made to

16  Mr. Welch and to the PRAO office, along with their

17  response; is that right?

18     A.  I'm not authorized to answer that question.

19     Q.  Had you asked Ms. Tomasic a question or made an

20  inquiry of her that prompted her to forward this

21  information to you?

22     A.  I'm not authorized to answer that question.

23     Q.  In response to that e-mail, do you ask Ms.

24  Tomasic several other questions about the case?

25     A.  I'm not authorized to answer that question.

1      Q.   And does that also occur on January 5th?

2      A.   I'm not authorized to answer that question.

3      Q.   What prompted you to start asking Erin Tomasic

4   questions about this case in January of 2017?

5      A.   I'm not authorized to answer that question.

6      Q.   Did Ms. Tomasic tell you that the initial taint

7   agent on the *Herrera-Zamora* case was someone named Maria

8   Castleberry?

9      A.   I'm not--

10              MR. CLYMER:  Objection, the document speaks

11   for itself.

12              THE COURT:  I do think it speaks for itself

13   to the extent you're going to go through this content.

14              MR. BELL:  And I just have one follow-up

15   question.

16   BY MR. BELL:

17      Q.   Did you ever confirm whether Ms. Castleberry

18   actually ever served as a taint agent on the

19   *Herrera-Zamora* case?

20      A.   I'm not authorized to answer that question.

21      Q.   Let me show you what's been marked as

22   Exhibit 494.  Do you recognize Exhibit 494 as an e-mail

23   chain that includes Mr. Zabel, Tanya Treadway, Ms.

24   Tomasic, yourself, and Tris Hunt?

25      A.   That is correct.

 1      Q.   At that time were all those people employees of
 2   the Department of Justice?
 3      A.   That is correct.
 4              MR. BELL:  Your Honor, I'd move to admit
 5   Exhibit 494.
 6              MR. CLYMER:  No objection.
 7              THE COURT:  494 admitted.
 8   BY MR. BELL:
 9      Q.   In this exhibit or in this e-mail chain does Mr.
10   Zabel tell Ms. Treadway about how the prosecution team
11   obtained the defendant's recorded telephone calls in the
12   *Herrera-Zamora* case?
13              MR. CLYMER:  Objection, the document speaks
14   for itself.
15              MR. BELL:  I'm asking for his-- I mean, I
16   can read three paragraphs of it, but it's generally his
17   characterization of it.
18              THE COURT:  All right.
19              MR. CLYMER:  Your Honor, if I may, I don't
20   think counsel has to read three paragraphs if it's in
21   evidence.  The three paragraphs are already in evidence.
22              THE COURT:  That's true, but I won't
23   preclude him from reading them either if it's a
24   published exhibit-- or if it's an admitted exhibit, it
25   can be published.

1          MR. CLYMER:  Well, I think it's problematic

2   to ask a witness to characterize it, Your Honor.

3          THE COURT:  All right.  Why don't you

4   confine it to what it actually says.  I mean, I'm not

5   going to preclude you from asking more, although it's

6   pretty clear the witness won't answer it, but you can

7   make your record.

8   BY MR. BELL:

9     Q.  All right.  So let's turn to the first page of

10  Exhibit 494.  The latter-- the bottom part of it is the

11  e-mail from Mr. Zabel to Ms. Treadway.  Do you see where

12  on the document that I'm talking about?

13    A.  Yes.

14    Q.  In that paragraph does Mr. Zabel talk about how

15  the government got a first batch of Mr. Herrera-Zamora's

16  recorded telephone calls?

17    A.  The e-mail references a first batch.

18    Q.  Does the e-mail also reference a second batch of

19  calls that the prosecution team obtained on the eve of

20  trial?

21    A.  The e-mail references a second batch.

22    Q.  Does Mr. Zabel's position as stated in the e-mail

23  state, "My position is that these calls do not need to

24  be turned over for the following reasons"?

25          MR. CLYMER:  Your Honor, objection.  I

1   believe that Mr. Zabel's position is outside the

2   knowledge of this witness.  And to the extent that the

3   document describes Mr. Zabel's position, the document is

4   in evidence.

5             MR. BELL:  I don't understand.  He wants me

6   to read from it or he doesn't want me to read from it.

7             THE COURT:  I agree the document speaks for

8   itself.  You are asking him about what Mr. Zabel's

9   position is, Mr. Zabel apparently states his position in

10  this document.  So the document on this-- on this matter

11  speaks for itself.  If you want to read it into

12  evidence, that's fine.

13            MR. BELL:  All right.

14  BY MR. BELL:

15    Q.  Turning your attention back to the first page of

16  the document-- or I'm sorry.  So the document we'll just

17  state-- Mr. Zabel states, "My position is that these

18  calls do not need to be turned over for the following

19  reasons."  You understand that he's referring to the

20  second batch of documents?

21            MR. CLYMER:  Objection to the witness

22  stating his understanding of what Mr. Zabel said.  Mr.

23  Zabel said what he said.

24            THE COURT:  All right.  You can answer it if

25  you can.

 1              THE WITNESS:  I'm not authorized to answer

 2      that question.

 3      BY MR. BELL:

 4         Q.  In this document Mr. Zabel says that, "None of

 5      these calls from the second batch were reviewed by any

 6      member of the prosecution team whatsoever."

 7              MR. CLYMER:  Objection, the document says

 8      what it says, Your Honor.

 9              MR. BELL:  I'll just read from it.  I mean,

10      I'm happy to do that.

11              THE COURT:  It's admitted.  Is this for a

12      question, though?

13      BY MR. BELL:

14         Q.  Did you later discover that that was not true?

15         A.  I'm not authorized to answer that question.

16         Q.  Mr. Zabel then talks about in this e-mail that

17      Mr. Herrera-Zamora's attorney had filed a motion

18      alleging the prosecution had listened to his recorded

19      attorney-client calls to adjust its trial strategy.

20              MR. CLYMER:  Again objection, the document

21      speaks for itself.  Counsel is just characterizing the

22      document, Your Honor, without asking questions.

23              THE COURT:  No, I think the question has to

24      do with some conduct after this document.  Is that

25      correct?

1              MR. BELL:  It is, Your Honor.

2              THE COURT:  All right.  You can answer it if

3    you can.

4    BY MR. BELL:

5       Q.   The follow-up, did you later learn that Mr.

6    Herrera-Zamora's attorney's allegation was accurate?

7       A.   I'm not authorized to answer that question.

8       Q.   Did you later learn that, in fact, someone had

9    listened-- in your office had listened to a recorded

10   attorney-client phone call in an attempt to gain a trial

11   advantage?

12      A.   I'm not authorized to answer that question.

13      Q.   In this exhibit does Mr. Zabel explain how he and

14   Tomasic convinced the attorney to withdraw the

15   allegation by assuring the attorney that no one had

16   listened to any recorded attorney-client phone calls?

17      A.   I'm not authorized to answer that question.

18      Q.   Did you later discover that that assurance that

19   had been made to Mr. Herrera-Zamora's attorney was, in

20   fact, false?

21      A.   I'm not authorized to answer that question.

22      Q.   On December 29th of 2017, a prosecutor in your

23   office named Sheri Catania spoke with an interpreter who

24   does contract work in your office.

25      A.   I'm not authorized to answer that question.

1      Q.   The two of them spoke about Ms. Gardner's-- or

2    the interpreter's work for your office specifically on

3    the *Herrera-Zamora* case.

4      A.   I'm not authorized to answer that question.

5      Q.   The interpreter is a Spanish language

6    interpreter, to your knowledge?

7      A.   I'm not authorized to answer that question.

8      Q.   And she was a Spanish language interpreter who

9    was doing contract work on the Herrera-- *Herrera-Zamora*

10    case.

11      A.   I'm not authorized to answer that question.

12      Q.   On December 29th, during the conversation the

13    interpreter tells Ms. Catania that during her work on

14    the *Herrera-Zamora* case she came across attorney-client

15    phone conversations.

16           MR. CLYMER:  Your Honor, I'd ask that

17    counsel pose questions.  Again, he's simply making

18    assertions of fact that are not established in the

19    record.

20           THE COURT:  All right.  To speed this up;

21    Mr. Bell, your questions, whether stated that way or

22    not, I want everyone to be clear, you're asking "is that

23    correct" or "is that true."  Right?

24           MR. BELL:  Yes.

25           THE COURT:  Okay.

1   BY MR. BELL:

2       Q.   During this December 29th, 2017 conversation does

3   Ms. Gardner tell Ms. Catania that during her work on the

4   *Herrera-Zamora* case she came across attorney-client

5   phone calls?

6              MR. CLYMER:  Objection, outside the scope of

7   this witness' knowledge.  He's asking about a

8   conversation between an interpreter and another AUSA.

9              THE COURT:  Overruled.  I don't know whether

10  he has knowledge or not.  If he does, he can answer.

11             THE WITNESS:  I'm not authorized to answer

12  that question.

13  BY MR. BELL:

14      Q.   Did Ms. Catania relay that information to you?

15      A.   I'm not authorized to answer that question.

16      Q.   Did Ms. Catania also relay that the interpreter

17  had told Ms. Tomasic that she found an attorney-client

18  call?

19      A.   I'm not authorized to answer that question.

20      Q.   And that Ms. Tomasic had told the interpreter to

21  continue reviewing the calls anyway.

22      A.   I'm not authorized to answer that question.

23      Q.   And also that the-- Ms. Tomasic told the

24  interpreter to come to the office and listen to some

25  recorded calls actually during the *Herrera-Zamora* trial.

1      A.   I'm not authorized to answer that question.

2      Q.   And that Ms. Tomasic told the interpreter that

3   the reason she wanted her to review those calls is

4   because she wanted to know what the defense was going to

5   be at trial?

6      A.   I'm not authorized to answer that question.

7      Q.   Ms. Tomasic was trying the *Herrera-Zamora* case

8   with Mr. Zabel; is that right?

9      A.   That is correct.

10      Q.   On January 4th, 2018, did you and Emily Metzger

11   interview the interpreter?

12      A.   I'm not authorized to answer that question.

13      Q.   During that January 4th interview, does the

14   interpreter tell you the same things that she told Ms.

15   Catania?

16      A.   I'm not authorized to answer that question.

17      Q.   I'm going to show you what's been marked as

18   Exhibit 547.  Do you recognize Exhibit 547 as a pleading

19   in the *Herrera-Zamora* case?

20      A.   I do.

21      Q.   Does the fourth page have your signature on it?

22      A.   It does.

23           MR. BELL:  Your Honor, I'd move to admit

24   Exhibit 547.

25           MR. CLYMER:  Your Honor, this document is a

1    sealed document.  The government has no objection to it

2    being admitted under seal.  I believe the public

3    defender agrees with this position.

4              THE COURT:  Is it still under seal?

5              MR. BELL:  We were forced to agree that it

6    would be under seal in order to get it.  This is an in

7    camera notice.

8              THE COURT:  All right.  Judge Murguia has

9    not unsealed it?

10             MR. BELL:  He has not.  He's allowed it for

11   purposes of this hearing, but it has not been unsealed.

12             THE COURT:  All right.  It will be admitted

13   under seal, which means since this is an open courtroom

14   you're not allowed to question about the contents of the

15   document.

16             If I determine to make a fact finding based

17   on this, I will be unsealing it for purposes of the

18   evidentiary record.

19   BY MR. BELL:

20     Q.  By filing a notice in camera, you know that that

21   means the defense won't get a copy of it; is that right?

22             THE WITNESS:  Your Honor, may I consult with

23   Mr. Clymer?

24             THE COURT:  Yes.

25             MR. CLYMER:  Your Honor, could I ask the

 1  reporter to read back the question so I make sure I got

 2  it?

 3              THE COURT:  Sure.

 4              (The question was read back).

 5              (Government counsel and witness confer).

 6              THE WITNESS:  Thank you, Mr. Bell and Your

 7  Honor.

 8              Yes, that was my understanding.  That with

 9  it being filed in this fashion, it would not at that

10  point be provided to defense counsel.

11  BY MR. BELL:

12     Q.  Why didn't you want Mr. Herrera-Zamora or his

13  defense attorneys to know about the contents of this

14  document?

15     A.  I'm not authorized to answer that question.

16     Q.  At the time you filed this-- the Document 547,

17  Mr. Herrera-Zamora had a pending motion to vacate his

18  conviction?

19     A.  I don't remember the exact pleading, but there

20  was something to that effect pending, yes.

21     Q.  And it was based on an allegation that the

22  prosecutors had intentionally listened to his

23  attorney-client communications?

24     A.  Taking your representation, Mr. Bell, I think

25  that's the general nature of what was in that pleading.

1    I haven't read it in a while.

2        Q.    But at some point you-- did you make a decision

3    that you want-- you didn't want Mr. Herrera-Zamora to

4    know about the contents of Exhibit 547?

5        A.    I'm not authorized to answer that question.

6        Q.    At a certain point you wrote a report about an

7    interview or summarizing the interview that you had with

8    the interpreter.

9        A.    I'm not authorized to answer that question.

10        Q.    Let me show you what's been marked as

11    Exhibit 545.  Does Exhibit 545 appear to be a document

12    you authored?

13        A.    I assisted in the authorship.

14        Q.    Other than you, who else authored 545?

15        A.    I'm not authorized to answer that question.

16        Q.    Did you adopt this writing when it was submitted

17    to the Court as a truthful account of what's described

18    inside of it?

19             Let me ask it in a different way.  Did everyone

20    that helped you write this document work for the United

21    States Attorney's Office?

22        A.    I'm not authorized to answer that question.

23        Q.    All right.  Then who else helped you write

24    Exhibit 545?

25        A.    I'm not authorized to answer that question.

 1      Q.   Did you submit Exhibit 545 to other people?  I

 2   mean, obviously I have it so you at least gave it to

 3   somebody in my office.  Is there anybody else outside

 4   your office that you gave it to?

 5      A.   I'm not authorized to answer that question.

 6      Q.   All right.

 7           MR. BELL:  Well, let's just try it.  I'll

 8   move to admit Exhibit 545.

 9           MR. CLYMER:  Your Honor, this document is

10   also under seal.  We have no objection to it being

11   admitted under seal.

12           THE COURT:  It was filed in the *Zamora* case

13   under seal?

14           MR. BELL:  Yes, Your Honor.

15           THE COURT:  All right.  I'll admit it under

16   seal.  Again, I'll make a determination of whether to

17   unseal it, if necessary.

18   BY MR. BELL:

19      Q.   Aside from the interview you conducted of the

20   interpreter, were you aware that a second interview of

21   the interpreter occurred on March 21st, 2018?

22      A.   I'm not authorized to answer that question.

23      Q.   Let me show you what's been admitted by

24   stipulation as Exhibit 554.

25           MR. CLYMER:  Your Honor, with respect to

 1  554, it's admitted by stipulation under seal.

 2            THE COURT:  All right.  So noted.  Admitted

 3  under seal, under advisement whether to remain under

 4  seal.

 5  BY MR. BELL:

 6     Q.   Have you read Exhibit 554?

 7     A.   I'm not authorized to answer that question.

 8     Q.   Are you aware of any inconsistencies between

 9  Exhibit 554, which is the later interview of the

10  interpreter, and Exhibit 545, which was your summary of

11  what the interpreter said?

12     A.   I'm not authorized to answer that question.

13     Q.   How many times in your office have you heard

14  attorney-client phone calls that were recorded at CCA?

15     A.   I'm not authorized to answer that question.

16            MR. CLYMER:  Your Honor, may I speak to the

17  witness for a minute for legal advice?

18            THE COURT:  Yes.

19            MR. CLYMER:  May I speak to Mr. Bell for a

20  second?

21            THE COURT:  Yes.

22            (Counsel confer).

23            (Government counsel and the witness confer).

24            THE WITNESS:  Mr. Bell, would you please

25  restate the question?

```
 1   BY MR. BELL:
 2      Q.  Certainly.  How many times have you listened to
 3   recorded attorney-client telephone conversations?
 4      A.  Never.
 5      Q.  How many times have you become aware that other
 6   prosecutors in your office have listened to recorded
 7   attorney-client telephone conversations?
 8              MR. CLYMER:  I'm going to have to-- if we're
 9   going to do this, Judge, I'm going to have to talk to
10   him every time because he doesn't have-- he doesn't have
11   authorization to answer any of this.  So it may be that
12   he can answer, but I'm going to have to unfortunately--
13              THE COURT:  That's fine.
14              MR. CLYMER:  Thank you, Your Honor.
15   Appreciate your indulgence.
16              (Government counsel and the witness confer).
17   BY MR. BELL:
18      Q.  Other than the calls that were identified in the
19   Huff case, the Herrera-Zamora case, and the Black case,
20   how many times, to your knowledge, have other
21   prosecutors in your office listened to recorded
22   conversations between an attorney and the client?
23      A.  In my 20 years in the office, I don't have a
24   specific number, but I know it is what I would say is a
25   handful, very small number.
```

1    Q.  So as I understand the testimony, aside from even

2    the calls that we've talked about in *Black* and *Huff* and

3    *Herrera-Zamora*, there are a number of other times where

4    a prosecutor has listened to a recorded conversation

5    between an attorney and their client?

6    A.  I wouldn't say a number of times, what I said was

7    a handful.  So when I say a handful, that would be three

8    to five times.

9    Q.  And those three to five times that you know of,

10   did the prosecutor take any steps to notify the defense

11   attorney that they had inadvertently come into

12   privileged material?

13              MR. CLYMER:  Objection, states a fact not in

14   evidence.

15              THE COURT:  Overruled.

16              MR. CLYMER:  May I be heard on this, Your

17   Honor?

18              MR. BELL:  I'll withdraw the question, I

19   think I-- I think I can fix this.

20              THE COURT:  All right.  Go ahead.

21   BY MR. BELL:

22   Q.  Those three to five handful of times that you're

23   talking about, did those prosecutors intentionally

24   listen to attorney-client telephone conversations?

25   A.  Not to my recollection.

1      Q.   So it was done inadvertently?

2      A.   Correct.

3      Q.   Did those prosecutors, to your knowledge, notify

4   the defense attorneys that they had inadvertently

5   acquired privileged material?

6           MR. CLYMER:   Objection to the "privileged,"

7   Your Honor.   There's no-- no testimony that these were

8   privileged conversations.

9           THE COURT:   All right.   Rephrase the

10  question.

11  BY MR. BELL:

12     Q.   Did the prosecutors notify the defense attorneys

13  that they had inadvertently listened to their

14  conversations with their client?

15     A.   To my recollection, they did.

16     Q.   Which prosecutors to your recollection had

17  listened to conversations between attorneys and their

18  clients?

19          MR. CLYMER:   I'll need to speak to the

20  witness again, Your Honor.

21          THE COURT:   Okay.

22          (Government counsel and the witness confer).

23          MR. CLYMER:   Your Honor, could we see the

24  Court at sidebar on this?

25          THE COURT:   Yes.

1            MR. CLYMER:   Thank you.

2            (Proceedings had at the bench, outside the

3    hearing of open court). █

1 ████████████████████████████████████

2 ████████████████████████████████████████

3          (Proceedings continued in open court).

4          MR. BELL:  Your Honor, I don't have any

5 other questions for Mr. Rask.  Thank you.

6          THE COURT:  All right.  Mr. Guastello,

7 anything from you?

8          MR. GUASTELLO:  No questions, Your Honor.

9          THE COURT:  Ms. Dodge, anything from you?

10          MS. DODGE:  Your Honor, I would note for the

11 record that we actually-- Mr. Guastello and I did join

12 in on the *Touhy* requests for all of these witnesses

13 under 17(b) and the subpoenas.  We joined in-- I sent an

14 e-mail on December 22nd of 2017 to Steve Clymer joining

15 in on the *Touhy* requests with a letter that Mr.

16 Guastello on behalf of our clients did join in, I

17 believe under Document 339 that was filed with the Court

18 for miscellaneous relief, that we had asked for that as

19 well.

20          And-- and I just wanted to make a note for

21 the record that we had sent the *Touhy* request to Mr.

22 Clymer.  That was in the earlier-- and, of course, the

23 hearing kept getting delayed.  And then as the Court

24 probably recalls, just of late both Mr. Guastello and I

25 also joined in again for these 17(b) subpoenas that were

1    issued as well.  So I would like that to note that for

2    the record.

3             MR. CLYMER:  If Ms. Dodge-- I don't remember

4    this, I take her word for it.  If they-- if they sent a

5    *Touhy* notice some time ago before an earlier hearing, I

6    consider that applicable to this hearing.  You know, I

7    don't remember this document.  I apologize for giving

8    the Court any improper information.  I'm sure if Ms.

9    Dodge said it, it happened as she described it.

10            THE COURT:  Well, what I'm hearing is she

11   didn't send a notice, she joined in the notice that was

12   sent by--

13            MR. CLYMER:  I think that's sufficient,

14   Judge.

15            THE COURT:  Okay.

16            MR. CLYMER:  I don't need her to repeat the

17   exact things.  I don't know whether she joined both the

18   public defender's notice and the Special Master's notice

19   or one or the other, but I'll take her word for it.

20            MS. DODGE:  We joined in on the-- on the

21   FPD's notice and all of their *Touhy* requests.

22            And then I don't believe I have any

23   questions for Mr. Rask, but just as a-- a matter of

24   clarity for myself, and I'm not familiar with 16.26 or--

25   or any of these rules that we're talking about under

1    *Touhy* until-- until this very case.  But I'm confused as

2    to the basis on when someone can answer some of the

3    stuff but then they get to use it as a shield and not

4    answer other stuff, even though it's pertinent to the

5    same subject material.

6              And I-- I guess I want to make sure that

7    we're on the record here that I find that problematic.

8    I don't find that consistent under the rules under 28

9    C.F.R. 16.26.  No-- there has been no delineation by Mr.

10   Clymer here on the record as to why this is privileged

11   or how it's privileged or if it's privileged.

12             And-- and I-- I find the witness'

13   statements, "I'm sorry, I can't answer that" versus

14   "yes" or "no" or "maybe" or gives some part, I find that

15   inconsistent and I don't think that the government is

16   able to create laws to turn around and use as a shield

17   to-- to negate or to neglect to be able to answer to

18   their own unclean hands.  And so that's my problem with

19   this and I just want to make sure that that was on the

20   record.

21             THE COURT:  All right.  And I-- you know, at

22   the close of this I will call for post-trial briefing,

23   post-hearing briefing, and that's certainly an argument

24   you might make about the effect of the very thing that

25   you're talking about and whether that has any effect at

 1   all on the implication of *Touhy*.

 2           And, frankly, I'm going to have to make some

 3   determinations as to whether there's been valid

 4   invocations of *Touhy* after I take all of the evidence.

 5   That will be part of my analysis.  So I'll be inviting

 6   you all to brief to the extent you want to.

 7           All right.  Mr. Cohen, do you have any

 8   questions?

 9           SPECIAL MASTER COHEN:  I do, Judge.  Thank

10   you.

11                    CROSS EXAMINATION

12   BY SPECIAL MASTER COHEN:

13     Q.  Good afternoon, Mr. Rask.

14     A.  Hello.

15     Q.  This is an odd procedure, would you agree?

16     A.  I'm sorry?

17     Q.  This is an odd procedure, would you agree?  You

18   don't have to answer it.

19     A.  May I consult with Mr. Clymer?

20     Q.  No, no, you don't need to answer.

21           THE COURT:  Question withdrawn.

22   BY SPECIAL MASTER COHEN:

23     Q.  I've never done anything like this, so it's odd

24   to me.  I'm going to ask you some questions and I expect

25   you to answer that you're not authorized to answer.  And

1    I just want to make sure I understand what you mean when

2    you say that.

3         I believe that when you say that, you're not

4    saying "I don't know," you're saying, "I know but I

5    can't answer, I don't have authority to answer."  Is

6    that fair?  Do I understand that correctly?

7              THE WITNESS:  May I consult with Mr. Clymer,

8    Your Honor?

9              SPECIAL MASTER COHEN:  Of course.

10             (Government counsel and the witness confer).

11             THE WITNESS:  Thank you, Your Honor and Mr.

12   Cohen.

13             Would you mind restating your question

14   again, please?

15   BY SPECIAL MASTER COHEN:

16   Q.   Sure.  When you say "I am not authorized to

17   answer that question," does that mean that you know the

18   answer but you're not-- you don't have the authority to

19   give the answer as opposed to "I don't know"?

20   A.   As an employee of the Department of Justice,

21   there are certain areas in which I'm authorized to

22   answer.

23   Q.   Right.

24   A.   And so when I give that answer of not being

25   authorized, I'm not seeking to communicate whether I

1    know or don't know but just that I'm not authorized to

2    answer that-- that question.

3       Q.   Okay.  Did you ever read the appointment order,

4    the Special Master appointment order that Judge Robinson

5    put on appointing me as Special Master in the *Black*

6    case?

7       A.   Yes, I did.

8       Q.   And do you remember that it ordered the United

9    States Attorney's Office, quote, "shall provide full

10   cooperation to the Special Master," does that sound

11   right?

12      A.   Or words to those effect, yes.

13      Q.   Do you believe that order, therefore, applied to

14   you?

15      A.   Yes.

16      Q.   Did any member of the United States Attorney's

17   Office ever suggest or direct that you not cooperate

18   with me or confer with me?

19      A.   (Pause).  No.

20      Q.   Why did it take you so long to answer that

21   question?

22      A.   I'm trying to analyze what I'm authorized to

23   answer and what I'm not authorized to answer.

24      Q.   Thank you.  Did you ever suggest or direct that

25   anybody within the United States Attorney's Office not

1    cooperate or confer with me?

2        A.    I'm not authorized to answer that question.

3        Q.    Did you ever direct Erin Tomasic not to confer

4    with me?

5        A.    I'm not authorized to answer that question.

6        Q.    Do you know whether any member of the United

7    States Attorney's Office gave me documents?

8        A.    I'm sorry, I didn't hear all of what you said.

9        Q.    Gave me documents.

10       A.    Yes, I know that you were given documents.

11       Q.    Did any member of the United States Attorney's

12   Office advise you not to provide me with documents or

13   other materials in connection with my investigation;

14   Phase III, Phase II or Phase I?

15       A.    No.

16       Q.    Did you ever advise anybody in the United States

17   Attorney's Office not to provide me with documents or

18   other materials in connection with my investigation;

19   Phase I, II, or III?

20       A.    I'm not authorized to answer that question.

21       Q.    Did you ever tell Dave Zabel-- is that how you

22   pronounce his last name?

23       A.    Correct.

24       Q.    Did you ever tell Dave Zabel or Kim Flannigan

25   that you were angry with them for providing documents to

1    Erin Tomasic?

2        A.   I'm not authorized to answer that question.

3        Q.   Did Erin Tomasic ever ask you-- I'm going to

4    change that question.

5            Did Kim Flannigan ever ask you to contact Erin

6    Tomasic because she had questions about what to do with

7    documents that she had after she left the office?

8        A.   I'm not authorized to answer that question.

9        Q.   Were you Erin Tomasic's superior in that office?

10       A.   At one point I was her supervisor.

11       Q.   I know that there's been changes in positions

12   within the office.  Can you describe to me when you were

13   and were not her superior?

14       A.   Around October of 2016 is when I became the

15   supervisor in the Kansas City branch office.

16       Q.   And she reported to you at that time?

17       A.   Correct.

18       Q.   Who did she report to before that time?

19       A.   Ms. Flannigan.

20       Q.   And did her reporting to you come to an end after

21   that October date?  Was she still reporting to you when

22   she left the office?

23       A.   Ms. Tomasic?

24       Q.   Yes, I'm sorry.

25       A.   Correct.

1     Q.   Thank you.  Do you remember you took an oath here
2   today?
3     A.   Yes.
4     Q.   Is that the first time you've done that in court?
5     A.   No.
6     Q.   Can you repeat to me what the oath was?
7     A.   Word-for-word, no.
8     Q.   Give me a-- give me your best approximation.
9     A.   That I'll tell the truth, the whole truth and
10   nothing but the truth.
11     Q.   Do you think the whole truth includes not telling
12   me things that you're not authorized to tell?
13               MR. CLYMER:  Objection, argumentative.
14               THE COURT:  Overruled.  Answer it if you
15   can.
16               THE WITNESS:  I have not explored the--
17   well, I-- would you repeat your question, please?
18               SPECIAL MASTER COHEN:  Could the court
19   reporter please read it back?
20               (The question was read back).
21               THE WITNESS:  The *Touhy* regulations have
22   been affirmed and upheld in a number of courts and found
23   to be appropriate and correct.  And so I think that as
24   how they apply, then yes, that allows us to answer these
25   questions truthfully.

 1    BY SPECIAL MASTER COHEN:

 2        Q.    Do you know what the Ninth Commandment is?

 3                MR. CLYMER:    Objection, relevance.

 4                THE COURT:    Sustained.

 5    BY SPECIAL MASTER COHEN:

 6        Q.    I'm going to show you what's been marked Special

 7    Master Rask 1.    Can you tell me what this document is?

 8        A.    It's an e-mail.

 9        Q.    From?

10        A.    From me.

11        Q.    Date?

12        A.    August 15th, 2016.

13        Q.    To whom?

14        A.    Ms. Metzger, Ms. Barnett, Ms. Flannigan, Mr.

15    Oakley, Ms. Tomasic, and then copied to Ms. Capwell.

16        Q.    And who is Ms. Capwell?

17        A.    She's an AUSA in our office.

18                SPECIAL MASTER COHEN:    Judge, I would move

19    to admit this document.

20                THE COURT:    Any objection?

21                MR. CLYMER:    No, Your Honor.

22                THE COURT:    Special Master Rask Exhibit 1

23    admitted.

24                SPECIAL MASTER COHEN:    Thank you, Judge.

25    BY SPECIAL MASTER COHEN:

1    Q.  In this e-mail you're acknowledging that Ms.

2    Capwell is identifying some issues that are important;

3    is that right?

4         MR. CLYMER:  Your Honor, Mr. Cohen did not

5    submit any *Touhy* request, nor did the public defender or

6    any other party with regard to anything even remotely

7    approaching this e-mail.  As a result, Mr. Rask does not

8    have authority to answer any questions about this

9    e-mail, other than having authenticated it.

10        THE COURT:  All right.  So noted.

11        SPECIAL MASTER COHEN:  I'm happy, Judge, for

12   him to say he doesn't have authority.

13        THE COURT:  All right.  You're not

14   offering-- well, you're offering it, but he-- all right.

15   Mr. Rask has acknowledged, he's testified that it is, in

16   fact, an e-mail from him to the others.  So I can admit

17   it on that basis.  You're just saying he doesn't have

18   authority to testify about it.

19        MR. CLYMER:  Exactly.  I have no objection

20   to its admission, Your Honor.  I'm sorry.

21        THE COURT:  All right.  Exhibit 1 is

22   admitted but ask your question, knowing that Mr. Rask is

23   going to decline because of his lack of authorization.

24   BY SPECIAL MASTER COHEN:

25   Q.  Mr. Rask, in this e-mail you are telling Carrie

1    Capwell that she's identified issues of privilege that

2    are important; is that right?

3        A.    I'm not authorized to answer that question.

4        Q.    And Ms. Capwell asks about waiver of work product

5    and attorney-client privilege as being issues associated

6    with the Special Master's investigation; is that right?

7        A.    I'm not authorized to answer that question.

8        Q.    Mr. Rask, I'd like to show you what is marked

9    Special Master Rask 2.  Can you please tell me what that

10   is?

11       A.    It appears to be a portion of an e-mail chain.

12       Q.    From whom to whom?

13       A.    Starting at the bottom, from Mr. Welch to--

14       Q.    I'm sorry.  I mean just the-- the top part.

15       A.    The top is from Ms. Barnett to me, copying Ms.

16   Flannigan, Ms. Tomasic, Mr. Oakley, Mr. Slinkard, Ms.

17   Metzger and Mr. Beall.

18            SPECIAL MASTER COHEN:  I'd like to move to

19   admit that exhibit please, Judge.

20            MR. CLYMER:  No objection, Judge.

21            THE COURT:  Special Master Rask No. 2

22   admitted.

23   BY SPECIAL MASTER COHEN:

24       Q.    And maybe three inches down, Mr. Rask, there's a

25   line that says "on August 10th," and that's something

 1   that you wrote below that; is that right?

 2       A.   Correct.

 3       Q.   And that's something you wrote to Deb Barnett?

 4       A.   That is correct.

 5       Q.   Does that set out your position with regard to

 6   attorney-client recordings?

 7       A.   I'm not authorized to answer that question.

 8       Q.   Is it your position that-- I'll withdraw that.

 9            Mr. Rask, I'd like to show you something that has

10   been marked Special Master Rask 4.  And do you-- can you

11   tell me on the top there who the e-mail is from and to?

12       A.   It's from Ms. Tomasic to Ms. Metzger and I'm

13   copied.

14            MR. CLYMER:  Your Honor, before Mr. Cohen

15   continues with this, could I have some time to look at

16   it?  I'm just seeing these for the first time, this one

17   is fairly lengthy.

18            THE COURT:  All right.  Go ahead.

19            MR. CLYMER:  Thank you, Your Honor.

20   BY SPECIAL MASTER COHEN:

21       Q.   Mr. Rask, if you'll turn to Page 2 of that

22   document.  This is part of an e-mail thread, would you

23   agree?

24       A.   Correct.

25       Q.   And the very last bit of that thread is an e-mail

1    from Ms. Tomasic to Emily Metzger and you; is that

2    right?

3        A.    Correct.

4        Q.    And the subject is "Special Master"?

5        A.    That is true.

6        Q.    And the date sent is February 6th, 2017?

7        A.    Correct.

8        Q.    The second paragraph there's a couple sentences

9    there.  There's a (1), (2).  Do you see that?

10       A.    Yes, sir.

11       Q.    And it says on "October 31st, 2016--"

12              MR. CLYMER:  Your Honor, I'm going to object

13   to counsel reading the document if it's not admitted.

14   And if it's admitted, it speaks for itself.

15              SPECIAL MASTER COHEN:  Move to admit, Judge.

16              THE COURT:  Any objection?

17              MR. CLYMER:  No objection, Your Honor.

18              MS. VANBEBBER:  The number is what?

19              SPECIAL MASTER COHEN:  I'm sorry, that's

20   Special Master Rask 4.  I skipped 3, I don't have a 3.

21              THE COURT:  Admitted.

22   BY SPECIAL MASTER COHEN:

23       Q.    This e-mail says that Deb Barnett instructed you

24   to instruct Erin Tomasic to have no contact with me; is

25   that correct?

1    A.  I'm not authorized to answer that question.

2    Q.  Same page at the very top.  This is a

3  continuation of the e-mail from Emily Metzger to Erin

4  Tomasic copying you; is that right?

5            MS. BRANNON:  Judge, I'm sorry, to

6  interrupt.  But because there are only a couple of

7  copies, could we use the ELMO?

8            THE COURT:  Yeah.  Once it's admitted - it

9  is admitted - if you could publish it on the ELMO.

10            SPECIAL MASTER COHEN:  Thank you.  Thank

11  you, Bonnie.

12  BY SPECIAL MASTER COHEN:

13    Q.  Mr. Rask, do you see at the bottom of Page 1 this

14  is an e-mail from Emily Metzger to Erin Tomasic copying

15  you?

16    A.  That is correct.

17    Q.  Dated February 21st, 2017?

18    A.  That is correct.

19    Q.  And if I flip this over, she-- she - Ms. Metzger

20  - is saying to Ms. Tomasic that she doesn't waive any

21  objection the office might have; is that right?

22    A.  I'm not authorized to answer that question.

23    Q.  And next it says, I, the Special Master, indicate

24  we can likely come to an understanding or agreement

25  regarding her speaking with me; is that right?

1     A.   I'm not authorized to answer that question.

2     Q.   Do you know whether I and your office ever

3  reached any agreement on that point?

4     A.   I'm not authorized to answer that question.

5     Q.   Moving back down to the bottom of Page 2.  The

6  first sentence of the second paragraph after-- after

7  No. 2 in parens, Deb had that conversation with you

8  about having no contact not only with me but also having

9  no contact with the Court or other court personnel; is

10 that right?

11    A.   I'm not authorized to answer that question.

12    Q.   And then at the very top of Page 1, second

13 paragraph, Erin is telling you and Emily actually she is

14 looking forward to and has no problem talking to me; is

15 that right?

16    A.   I'm not authorized to answer that question.

17            MR. CLYMER:  Your Honor, may I speak to Mr.

18 Cohen for a second?

19            THE COURT:  Yes.

20            (Government counsel and the Special Master

21 confer).

22            MR. CLYMER:  Your Honor, could we see the

23 Court at sidebar?

24            THE COURT:  Yes.

25            MR. CLYMER:  I'm sorry to delay things,

1    Judge.

2            (Proceedings had at the bench, outside the

3    hearing of open court). ███

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    ███████████████████████████████████████

2        ███████████████████████████████████████████

3    ██████████████████████████████████████████

4    ██████████████████████████████████████████

5    ██████████████████████████████████████████

6    ████████████████████████████████████████

7        ██████████████████████████████████████████████

8    █████████████████████████████

9            (Proceedings continued in open court).

10   BY SPECIAL MASTER COHEN:

11       Q.   Mr. Rask, I'm going to give you something marked

12   Special Master Rask 5 and again ask you to identify what

13   it is.

14       A.   It's an e-mail chain on four pages.

15       Q.   And are you a recipient or drafter of any of

16   those e-mails?

17       A.   I'm a recipient.  And I also-- I do see one spot

18   where I authored a couple sentences.

19       Q.   Okay.  And the very last e-mail in that thread,

20   which is the first one on the document at the top there

21   dated Monday, August 8th, you're a recipient of that.

22   Correct?

23       A.   Correct.

24       Q.   Is it fair to infer that you received the entire

25   thread?

1      A.   As a result of that, yes.

2      Q.   And the-- that last e-mail is from Kim Flannigan

3  to you and copying Erin Tomasic; is that right?

4      A.   Correct.

5      Q.   And right below that is an e-mail from you to

6  Erin; is that right?

7      A.   Correct.

8      Q.   And you say that you understand her concern?

9      A.   I'm not authorized to answer that question.

10     Q.   May I--

11          THE COURT:   It's not admitted yet.

12          SPECIAL MASTER COHEN:   I would move to admit

13  this, please, Judge.

14          THE COURT:   All right.   Any objection?

15          MR. CLYMER:   To admission, no, Your Honor,

16  no objection.

17          THE COURT:   Exhibit 5, Rask Exhibit 5

18  admitted.

19          MR. CLYMER:   And again, Your Honor, with

20  respect to this e-mail too, we never got notice of any

21  line of inquiry with respect to this e-mail.

22          THE COURT:   I understand.

23  BY SPECIAL MASTER COHEN:

24     Q.   And part of that thread, Mr. Rask, in the middle

25  there it shows on August 8th that Erin Tomasic is

1   writing to you and to Kim Flannigan and she's voicing a

2   concern she has with Deb's management.  Who is Deb?

3       A.  I'm not authorized to answer that question.

4       Q.  Was Deb Barnett a manager in the office of Erin

5   Tomasic?

6       A.  Yes, she was.

7       Q.  Above that you write, "Erin, I totally understand

8   the concern."  Is that right?

9       A.  That's what that sentence says.

10       Q.  I'm also going to hand you Exhibit Special Master

11   Rask 6.  And can you tell me with-- this is again an

12   e-mail, who wrote it and to whom it was sent?

13       A.  It begins with some portion of an e-mail from Ms.

14   Tomasic to me and Ms. Flannigan.  I then responded to

15   Ms. Flannigan and copied Ms. Tomasic and Mr. Oakley.

16       Q.  So the top part of this thread is an e-mail that

17   you wrote to Kim Flannigan.  Correct?

18       A.  Correct.

19           SPECIAL MASTER COHEN:  Move to admit Rask 6,

20   please.

21           MR. CLYMER:  I haven't had a chance to look

22   at it, Your Honor.  May I take a look at it?

23           THE COURT:  Yes.

24           MR. CLYMER:  Your Honor, I have an objection

25   to the relevance of this document.  I'd like to discuss

```
 1   it with the Court at sidebar.
 2              THE COURT:  Okay.  Can I see the document?
 3              SPECIAL MASTER COHEN:  And I-- I can answer
 4   the question.
 5              THE COURT:  Do you want to come to the
 6   sidebar?
 7              MR. CLYMER:  I'm sorry, Your Honor.  I was
 8   waiting for the--
 9              (Proceedings had at the bench, outside the
10   hearing of open court). █
11        ████████████████████████████████████████████
12   ████████████████████████████████████████████
13   █████████
14        ███████████████████████████████████
15   ███████████████████████████████████████████████
16   ███████████████████████████████████████████████
17   ███████████████████████████████████████████████
18   ██████████████████████████████████████
19        ███████████████████████████████████
20   ██████████████████████████████████████
21   █████████████████████████████████████████████
22   ████████████████████████████████████████████
23   █████████████████████████████████████████████
24   █████████████████████████████████████████████
25   ███████████████████████████████████████████
```

1　████████████████████████████████████

2　　　　████████████████████████████████████████████

3　████████████

4　　　　　　　　(Proceedings continued in open court).

5　　　　　　　　THE COURT:  Exhibit 6 admitted.

6　BY SPECIAL MASTER COHEN:

7　　　Q.  Mr. Rask, do you remember when in 2016 Erin

8　Tomasic went into Judge Robinson's chambers to drop off

9　some materials after hours?

10　　　A.  I don't remember the date.

11　　　Q.  Is it fair to say it was early August?

12　　　A.  I know it was August.

13　　　Q.  Do you think it was before August 24th?

14　　　A.  I don't know.

15　　　Q.  Okay.

16　　　　　　　SPECIAL MASTER COHEN:  I'm sorry, Judge.

17　This is admitted, am I correct?

18　　　　　　　THE COURT:  Yes.

19　BY SPECIAL MASTER COHEN:

20　　　Q.  And this is an e-mail, Mr. Rask, from you to Kim

21　Flannigan.  Am I correct?

22　　　A.  Correct.

23　　　Q.  You're copying Erin Tomasic and Chris Oakley?

24　　　A.  Correct.

25　　　Q.  Is it fair to say here that you're questioning

1    Deb's role and capacity?

2        A.   I'm not authorized to answer that question.

3        Q.   You state that she demonstrates a lack of

4    interest and involvement in the case.

5            MR. CLYMER:  Judge, objection.  The document

6    speaks for itself, it's in evidence.  Mr. Cohen knows

7    the witness is not authorized to answer any questions

8    about this.  I don't understand--

9            THE COURT:  Sustained.

10           MR. CLYMER:  -- the point.

11           THE COURT:  I'll sustain as to questions

12   about what's said in this document.  It does speaks for

13   itself.

14           Why don't we take about a ten-minute break.

15   We'll take a ten-minute break.

16           (Recess).

17           THE COURT:  All right.  You can be seated.

18           MR. CLYMER:  Your Honor, I want to go back

19   to Special Master Rask 6, the exhibit we went to sidebar

20   on.  It's my understanding that your Phase III order

21   describes the entry into chambers as occurring on

22   August 25, 2016.

23           THE COURT:  That sounds right.

24           MR. CLYMER:  This-- this e-mail message is

25   August 24, 2016, which makes it irrelevant to that

1  topic.  I renew my objection to this and ask that the

2  Court remove it from the record.

3          THE COURT:  I'm going to admit it subject to

4  my thinking-- ultimately concluding whether it's-- it's

5  relevant or not.  What Mr. Cohen said was that there

6  were other e-mails as well as perhaps testimony that

7  went-- surrounded the-- I guess the issue as to whether

8  Ms. Tomasic's entry into chambers was directed by Ms.

9  Barnett and was emblematic of her poor management.  And

10  so this e-mail speaks to poor management.

11          I understand it precedes the entry, but I

12  assume what he's trying to show is that the

13  mismanagement preceded the entry as well and that the

14  entry was perhaps a consequence of that, I don't know.

15  But all subject to connection obviously.  If ultimately

16  I don't see the connection, then I don't see what

17  relevance this will have, I'll just disregard it.  But

18  I'll admit it for now.

19          MR. CLYMER:  Thank you, Your Honor.

20          SPECIAL MASTER COHEN:  Thank you, Judge.

21  BY SPECIAL MASTER COHEN:

22  Q.  Just one question about this.  So did Kim take a

23  meeting, the meeting you recommended?

24  A.  I'm not authorized to answer that question.

25  Q.  And the meeting that he recommends-- excuse me,

1    the meeting that you recommend Kim get with Tom, Emily

2    and Deb, is that Tom Beall, Emily Metzger and Deb

3    Barnett?

4        A.   I'm not authorized to answer that question.

5        Q.   Are Tom Beall, Emily Metzger and Deb Barnett at

6    that point in time senior management in the Office of

7    the United States Attorney?

8        A.   Yes, they were.

9        Q.   And, I'm sorry, that was August 24th of 2016,

10   correct, that e-mail?

11       A.   Correct.

12       Q.   I'd like to show you Special Master Rask 7.  And

13   am I correct this is an e-mail from Erin Tomasic to you

14   dated January 17th, 2017?

15       A.   The top portion is.

16       Q.   And besides sending it-- Erin sending that e-mail

17   to you, she also sent it to Kim Flannigan; is that

18   right?

19       A.   That's correct.

20            SPECIAL MASTER COHEN:  Judge, I just want to

21   give Mr. Clymer a second to look at it.

22            THE COURT:  Okay.

23            MR. CLYMER:  Your Honor, again, we received

24   no notice of this-- any line of inquiry with respect to

25   this communication.  As a result, we never had a chance

 1    to give the witness instructions about authorization, so

 2    he's not authorized to any questions about this.

 3                THE COURT:  I understand.  I will admit

 4    Exhibit No. 7, understanding that any questions about

 5    the content of it this witness is-- is not authorized to

 6    answer.

 7                SPECIAL MASTER COHEN:  Thank you, Judge.

 8    I'd like to publish that document.

 9    BY SPECIAL MASTER COHEN:

10       Q.  Mr. Rask, in the second paragraph Erin writes

11    about Deb's misrepresentation.  Do you see that?

12       A.  I'm not authorized to answer that question.

13       Q.  You can't tell me that you see or do not see the

14    sentence that says something about Deb's

15    misrepresentation?

16                MR. CLYMER:  Judge, I'm going to object to

17    this because the document speaks for itself and Mr.

18    Cohen knows the witness is not authorized to answer.  I

19    don't see the point in making him repeat that over and

20    over and over.

21                SPECIAL MASTER COHEN:  All right.  I

22    withdraw the question and--

23                THE COURT:  I'll sustain.

24                SPECIAL MASTER COHEN:  I withdraw the

25    question and apologize.

 1    BY SPECIAL MASTER COHEN:

 2        Q.   I'll ask one more question, Mr. Rask.  Do you

 3    agree that there was a misrepresentation by Deb?

 4        A.   I'm not authorized to answer that question.

 5        Q.   Two more.  I'm going to show you what's been

 6    marked as Special Master Rask 8.  Can you tell me what

 7    this is, please?

 8                    THE COURT:  Did you say 8?

 9                    SPECIAL MASTER COHEN:  Yes, Judge.

10                    THE WITNESS:  It's an e-mail from Ms.

11    Barnett to several individuals in the office.

12    BY SPECIAL MASTER COHEN:

13        Q.   Including you.  Correct?

14        A.   Correct.

15        Q.   By the way, I'm sorry, going back to the last

16    document, that was dated January 17th, 2017.  Correct?

17        A.   The top portion of the e-mail string has that

18    date, yes.

19        Q.   That's about five months after the e-mail that I

20    showed you before that, is that right, the August 24th

21    e-mail?

22        A.   Almost five months, yes.

23        Q.   And you said that-- returning to Rask 8.  This is

24    an e-mail from Ms. Barnett to you and others.  Correct?

25        A.   Mine is not marked with a number, so is it the

 1   most recent one that you gave me that you're referring

 2   to now?

 3       Q.  Yeah.

 4       A.  I just wanted to make sure I knew which one you

 5   were referring to.

 6       Q.  Thank you.

 7           MR. CLYMER:  Your Honor, to expedite things,

 8   we have no objection to the admission of this into

 9   evidence and we had no notice of this.  And again, the

10   witness is not authorized to answer any questions.

11           THE COURT:  All right.  Exhibit 8, what's

12   the date of this e-mail again?

13           SPECIAL MASTER COHEN:  August 9th, 2016,

14   Judge.

15           THE COURT:  Okay.

16   BY SPECIAL MASTER COHEN:

17       Q.  In addition to you, Mr. Rask, Debra Barnett also

18   sent this e-mail to Chris Oakley, Erin Tomasic, Kim

19   Flannigan, Thomas Beall, Duston Slinkard, Emily Metzger

20   and Kay MacNeil; is that right?

21       A.  Correct.

22       Q.  And she's talking about a hearing with the Court

23   regarding CCA video?

24       A.  I'm not authorized to answer that question.

25       Q.  Do you see where-- the first sentence, it says,

1    "I believe it went very well"?

2        A.   I see that.

3        Q.   Do you recall receiving an e-mail in response to

4    this from Chris Oakley that said, "Right.  And Waterloo

5    was a victory"?

6        A.   I'm not authorized to answer that question.

7              SPECIAL MASTER COHEN:  One second, Judge.

8    That's all I have, Judge.  Thank you, Mr. Rask.

9              THE COURT:  Mr. Clymer.

10             MR. CLYMER:  No questions, Your Honor.

11             THE COURT:  All right.  May Mr. Rask be

12   excused subject to recall for the reasons that we

13   discussed at the bench?  Yes?

14             MR. BELL:  (Nods head up and down).

15             THE COURT:  Okay.  Mr. Rask, you are excused

16   but you are subject to recall.

17             THE WITNESS:  Thank you.

18             MR. CLYMER:  Before we bring the next

19   witness in, Your Honor, may I address the Court?

20             THE COURT:  Yes.

21             MR. CLYMER:  I'll wait until Mr. Rask

22   leaves.  I made a mistake, Your Honor, I thought it was

23   a different witness next, I'm sorry.

24             THE COURT:  Okay.  Next witness.

25             SPECIAL MASTER COHEN:  Just a moment,

1   please.  Judge, we do have an issue with the next

2   witness that we should chat about before she's called.

3   It's my understanding that the Federal Public Defender

4   is going to call Ms. Tomasic, and it's further my

5   understanding that Mr. Clymer has not had any discussion

6   with Ms. Tomasic regarding her *Touhy* obligations.

7           MR. CLYMER:  Can I clarify that?

8           SPECIAL MASTER COHEN:  Yes, please.

9           MR. CLYMER:  Your Honor, I have not spoken

10  to Ms. Tomasic personally to my knowledge ever.  I did

11  speak with an attorney who I believe represents her, Mr.

12  Deatherage, and I communicated to Mr. Deatherage that

13  the Department of Justice's *Touhy* position with respect

14  to his client was laid out in a publicly-filed document,

15  which was the notice of-- the *Touhy* notice that I filed

16  with this court.  I gave a copy of that to Mr.

17  Deatherage.  That's the extent of our communication with

18  Ms. Tomasic's counsel regarding the *Touhy* obligations.

19          SPECIAL MASTER COHEN:  So, Judge, I guess

20  I'm just concerned or trying to understand if-- if I ask

21  a question of Ms. Tomasic that the government believes

22  she's precluded from answering pursuant to her *Touhy*

23  obligations, what happens?  In other words, are you

24  going to object based on *Touhy*, is she going to answer

25  on her own?

1          MR. CLYMER:  My understanding-- would the

2    Court like me to answer Mr. Cohen?

3          THE COURT:  Well, all right, so as I

4    understand it, you filed your notice indicating the

5    bounds, the parameters under which all of these

6    witnesses, these government witnesses-- I guess I should

7    say Department of Justice witnesses could testify,

8    including Ms. Tomasic, who's no longer a Department of

9    Justice employee.

10          MR. CLYMER:  Correct.

11          THE COURT:  Nonetheless, it looks to me by

12    your notice that you are treating her as if she's under

13    the bounds of *Touhy*; is that fair?

14          MR. CLYMER:  And the regulations so state,

15    yes.

16          THE COURT:  All right.  So I don't think we

17    know until she gets on the stand whether she's going to

18    honor that or not.  Maybe you know, I don't know.

19          MR. CLYMER:  I do not know.

20          THE COURT:  And what-- what do the

21    regulations say about a former employee who chooses not

22    to honor that?

23          MR. CLYMER:  They-- they don't say anything,

24    Your Honor.

25          THE COURT:  What are the penalties

1   associated with that?

2         MR. CLYMER:  I don't believe that the

3   regulations say that there's any penalties associated

4   with that.

5         THE COURT:  All right.  Well, we'll see--

6   we'll see what her position is I guess.  Let's-- let's

7   get her started on the stand.

8         MR. BELL:  Call Erin Tomasic.

9         SPECIAL MASTER COHEN:  Judge, may I ask how

10  late the Court intends to go this evening?

11        THE COURT:  Well, the building closes at

12  5:00 because we have limited funds for security, but

13  we'll try to go a little past that.  I'm used to getting

14  in trouble for doing that, so it won't be the first

15  time.  I would say no later than 5:30.

16        SPECIAL MASTER COHEN:  5:30, Judge.

17        MR. BELL:  Your Honor, just so you know, I

18  consulted Mr. Cohen.  I think for this witness we're

19  going to go a little bit out of order.  I think Mr.

20  Cohen will go first, we'll go after him and then the

21  other defendants.

22        THE COURT:  All right.  That's fine.

23        MR. CLYMER:  Judge, there's a few matters

24  that I think would be helpful to discuss before we break

25  today.  So if you wanted to stop this witness a little

1   before the time you wanted to call it quits for today,

2   it might be helpful.

3            THE COURT:  Okay, will do.

4                ERIN TOMASIC,

5   called as a witness on behalf of the Federal Public

6   Defender, having first been duly sworn, testified as

7   follows:

8            MR. DEATHERAGE:  Your Honor?

9            THE COURT:  Yes.

10           MR. DEATHERAGE:  May I address the Court,

11  please?

12           THE COURT:  Yes.

13           MR. DEATHERAGE:  My name is-- my name is

14  Bill Deatherage and I represent Ms. Tomasic.  And we

15  would-- we request that Mr. Clymer on behalf of the

16  government tell her if she's not authorized to answer

17  something that's asked of her, just so there's no

18  misunderstanding.  We do have the government's response

19  to the *Touhy* disclosures, but they're subject to

20  interpretation.

21           THE COURT:  All right.  We have-- I don't

22  think you were in here, but we had a colloquy just a

23  minute ago about this very issue.  And, Mr. Clymer, I

24  think we ought to engage in that in the hearing of Ms.

25  Tomasic and Mr. Deatherage again.

1            As I understand it, the government is taking

2    the position that Ms. Tomasic, although she's a former

3    employee of the Department of Justice, is nonetheless

4    subject to the *Touhy* regulations; is that fair?

5            MR. CLYMER:  That's correct, Your Honor.

6            THE COURT:  And you, in fact, as part of

7    your notice have included the bounds of what the

8    Department of Justice has authorized Ms. Tomasic to

9    testify to; is that correct?

10           MR. CLYMER:  That's correct, Your Honor.

11           THE COURT:  All right.  And then I went

12   further and asked you if Ms. Tomasic as a former

13   employee decides that she can answer questions beyond

14   the authorization, what the penalties for that would be,

15   if any.

16           MR. CLYMER:  And, Your Honor, I-- I want to

17   be very careful here because I don't want to be accused

18   of saying anything to deter testimony.  My answer to you

19   was specifically the regulations do not speak to that.

20   So I am not-- I am not taking a position.  And I will if

21   the Court asks me to, but I'm not taking a position

22   about whether there could be other sanctions or not.

23   I'm simply saying, to my knowledge, the regulations do

24   not speak to that.

25           THE COURT:  All right.  Understood.  All

1   right.  Mr. Deatherage, anything more?

2               MR. DEATHERAGE:  Our understanding is that

3   there are certain penalties, Your Honor, possible

4   penalties.  And that's why we want to be careful.

5               Ms. Tomasic intends-- at this point intends

6   to abide by the government's direction, and so-- but we

7   need to know what that is when a question is asked.

8               THE COURT:  All right.  Understood.  All

9   right.

10              MR. CLYMER:  Your Honor, I'm sorry, can I

11  make one suggestion then, Your Honor?  I don't want to

12  keep jumping up and interrupting because things have

13  taken a long time already today.  Can I suggest that if

14  Ms. Tomasic is uncertain, that she ask to speak to me

15  and Mr. Deatherage?  That might be the easier way to do

16  it.  If that's okay with Mr. Deatherage and the Court,

17  rather than me standing up.

18              MR. BELL:  I-- I think the proper procedure

19  is for him to stand up and say.  He's the one--

20  (reporter interruption).  The proper procedure is for

21  him to stand up and assert it on behalf of the

22  government, not for her to have to confer with the

23  government about whether it is or it's not a privilege.

24              MR. CLYMER:  It's not a privilege.  They

25  keep saying that, Your Honor.  It's not a privilege.

1          THE COURT:  I know it's not a privilege, but
2    it's an-- I don't know what you call it, an invocation
3    of rights under a regulation.  The way it's been
4    proceeding with the other witnesses is they're asked a
5    question and they understand the scope of what they've
6    been-- what they're allowed to testify to and what
7    they're not and they answer.  If they have a question,
8    then they ask you.  But the witness has been the one
9    that has-- has initiated that.
10          Why don't we-- why don't we stop and read
11   what-- what you have written in your notice about the
12   government's position about the scope of Ms. Tomasic's
13   testimony.
14          All right.  So-- and this is-- you've given
15   two of these notices, one to the FPD and one to Mr.
16   Cohen.  I don't know if they're exactly the same.  But
17   the one I have in front of me is "her duties as the
18   lead--" these are permissible lines of inquiry.
19          Her duties as the lead prosecuting attorney
20   in the *Black* case; her duties as the lead prosecuting
21   attorney in *Herrera-Zamora*, along with AUSA Zabel; her
22   policy and practice in disseminating inmate phone calls
23   in discovery; communications by or between herself,
24   Flannigan, Rokusek in August 2016 relating to the
25   *Dertinger* matter.  I won't read that verbatim.

1          Her conduct and circumstances in entering my

2    chambers to deliver materials related to this case as

3    discussed in the September 7th hearing; when, where,

4    how, why and what cases she listened to recordings of

5    attorney-client phone calls; her conversation with

6    defense attorneys in February 2017 where she and AUSA

7    Zabel demanded the defense withdraw their motions,

8    including her basis for their request, but this

9    authorization does not extend to discussions with other

10   U.S. Attorney Office employees when defense counsel was

11   not involved in those discussions.

12          The basis for and circumstances surrounding

13   the termination of her association with the U.S.

14   Attorney's Office; and any conversations she may have

15   had with, including instructions she or others gave, to

16   the interpreter assigned to listen to inmate calls in

17   the *Herrera-Zamora* case; the circumstances under which

18   the interpreter relayed any results of that

19   interpretation.  This authorization is limited to

20   communications with the interpreter and not internal

21   U.S. Attorney Office communications.

22          So that's the parameters.  Hopefully that

23   helps Ms. Tomasic recall.

24          All right.  Mr. Cohen, are you ready to

25   proceed?

```
 1                  SPECIAL MASTER COHEN:  Thank you, Judge.

 2                  THE COURT:  And we'll go until about 5:15,

 3       5:20.

 4                          DIRECT EXAMINATION

 5       BY SPECIAL MASTER COHEN:

 6           Q.   Good afternoon, Ms. Tomasic.

 7           A.   Good afternoon.

 8           Q.   Welcome back to Kansas City.

 9           A.   Thank you.

10           Q.   I'm going to first begin asking you about my

11       order of appointment.  Are you aware that when the Court

12       appointed me as Special Master in this case to pursue an

13       investigation that it ordered all United States

14       Attorney's Office personnel to, quote, "provide full

15       cooperation to the Special Master"?

16           A.   Yes, I am.

17           Q.   And did you believe that that order applied to

18       you personally?

19           A.   Yes, I did.

20           Q.   Did anybody in the United States Attorney's

21       Office ever suggest or direct that you not cooperate or

22       confer with me?

23                  THE WITNESS:  Can I answer that?

24                  MR. CLYMER:  Your Honor, I believe the

25       witness is asking me a question.
```

1        THE COURT:  Yes.

2        MR. CLYMER:  And this might be part of the

3  package I need to speak to somebody about after court

4  because it's not listed on the authorization.  And so

5  the answer is:  Until we can talk about it, I can't say.

6        THE COURT:  Well, I-- I sort of agree with

7  Mr. Bell's argument, which is that's what this hearing

8  is about, that's what I guess precipitated this hearing

9  was an order to show cause.  And that's what's pending

10  in front of me as well as other motions; that the U.S.

11  Attorney's Office had ceased cooperating with the

12  Special Master.  So I think this is within the scope of

13  what everyone knew was going to be testified to.  You

14  know what--

15        MR. CLYMER:  I couldn't agree-- Judge, I

16  couldn't agree with you more on that and-- but what we

17  have to operate on are the *Touhy* notices that we get.

18  And I-- I don't know why that's not in the *Touhy* notice

19  we got.  I can't-- all I could operate on was what I was

20  given.

21        And so the problem is, Judge, I-- the

22  regulations apply to me too and I can only make

23  decisions based on what I'm given notice about.  And the

24  reason I'm raising this is I understand why the Court

25  would want these questions answered, I don't take issue

1   with that.  I understand why Mr. Cohen wants to ask the

2   questions.  We were never given notice like we should've

3   been given notice about this.  If we did, we wouldn't be

4   having this conversation.  I'm sorry, Your Honor.

5              THE COURT:  All right.  You're advising Ms.

6   Tomasic to decline to answer that until further notice

7   from you?

8              MR. CLYMER:  No, Your Honor.  I am saying

9   that Ms. Tomasic does not have authorization from the

10  Department of Justice to answer this because we were not

11  given notice about this line of inquiry.  And I'm also

12  saying that I am inclined to go back to the Department

13  to see if they will authorize this line of inquiry.

14             THE COURT:  Okay.  Understood.

15             THE WITNESS:  So my response is:  I've been

16  directed not to answer the question.

17  BY SPECIAL MASTER COHEN:

18    Q.  Did you ever request to meet with me during my

19  investigation?

20             THE WITNESS:  Your Honor, what would be

21  easiest for me is if I look to Mr. Clymer and if he

22  signals I'm not allowed to answer, if he would do so.

23  Otherwise I would like to answer.

24             THE COURT:  All right.

25             MR. CLYMER:  I don't want to give signals to

1   the witness that are not part of the record, Your Honor.

2   I'm sorry.  I-- I'm not comfortable having non-recorded

3   communications with Ms. Tomasic.

4            THE COURT:  All right.  So then you need to

5   give her a signal verbally on the record.

6            MR. CLYMER:  I think the easiest--

7            THE COURT:  If she looks at you, she's

8   asking for your advice is what she's saying.

9            MR. CLYMER:  Very well.  Your Honor, can I

10   just make a suggestion?  There are certain areas of

11   inquiry that the public defender and the Special Master

12   gave us notice about.  We--

13            SPECIAL MASTER COHEN:  I agree.  I'll

14   withdraw the question and move on.

15            MR. CLYMER:  And by tomorrow we might have

16   an answer for this.

17            THE COURT:  All right.  Move on.

18   BY SPECIAL MASTER COHEN:

19      Q.  Ms. Tomasic, I'm just going to ask you about some

20   documents.  This is marked Special Master Tomasic 1, Tom

21   1.

22      A.  Yes, I recognize it.

23      Q.  This is an e-mail from Kim Flannigan to you dated

24   January 31st, 2017, is that right, on top?

25      A.  Yes, that's correct.

1    Q.   And it contains an e-mail from Emily Metzger to
2   Kim Flannigan, Debra Barnett and you.  Correct?
3    A.   That's correct.
4    Q.   So before I ask you about this document, I'm
5   going to ask you some questions about your entry into
6   chambers.  Do you remember that event?
7    A.   Yes, I do.
8    Q.   Early in the day you stopped by chambers and
9   dropped off some materials.  Correct?
10    A.   That's correct.
11    Q.   Later in the day, around 5:30-ish, you also
12   stopped by chambers to drop off additional materials.
13   Correct?
14    A.   That's correct.
15    Q.   Did you ask any supervisors if you could do that?
16   This is-- the matter of chambers is explicitly something
17   you are allowed to discuss.
18    A.   Okay.
19         MR. CLYMER:  Your Honor, I-- I have to check
20   something here, Your Honor, I'm sorry.  I'm trying to
21   read the e-mail so I wasn't paying attention.  The
22   authorization does not extend to discussions about this
23   event within the United States Attorney's Office,
24   whether such discussions occurred before or after the
25   entry.

1          SPECIAL MASTER COHEN:  Oh, okay.

2          THE WITNESS:  Without going into any

3  discussions, I believed I had authorization to go up

4  there.

5  BY SPECIAL MASTER COHEN:

6     Q.   From whom?

7     A.   Authorization from Debra Barnett and Emily

8  Metzger.

9     Q.   Had you tried to reach Ms. Barnett before 5:00 to

10 obtain authorization?

11    A.   I had attempted to contact Ms. Barnett for

12 multiple days by e-mail and she was non-responsive.  So

13 based on that and also with the knowledge that she was

14 not in the office, Ms. Flannigan and I made contact with

15 Ms. Metzger.

16    Q.   When you made contact with Ms. Metzger, did Ms.

17 Metzger in turn say, we need to get ahold of Deb

18 Barnett?

19          MR. CLYMER:  Your Honor, again that goes to

20 internal conversations.

21          THE WITNESS:  I've been directed not to

22 answer the question.

23 BY SPECIAL MASTER COHEN:

24    Q.   Did you await authorization from Ms. Barnett

25 before you went to Judge Robinson's chambers?

1              MR. CLYMER:  That would be internal

2    conversations.

3              THE COURT:  Well, I tend to disagree with

4    that particular question.  It's a yes or no question.

5              MR. CLYMER:  But I-- implicit in the

6    question, Your Honor, is that there was authorization

7    given by somebody in the U.S. Attorney's Office.

8              THE COURT:  She already testified to that.

9              THE WITNESS:  Yes, I did await authorization

10   from Debra Barnett.

11   BY SPECIAL MASTER COHEN:

12     Q.  Was there any discussion with Ms. Barnett and Ms.

13   Metzger about your having to obtain-- your having to

14   obtain access to chambers by getting a United States

15   Marshal to escort you?

16             MR. CLYMER:  Again, Your Honor, I don't know

17   what my role is here.

18             THE COURT:  Well, when she asks you for

19   advice-- are you asking him for advice on this

20   particular question?

21             THE WITNESS:  Yes, Your Honor.

22             THE COURT:  All right.

23             MR. CLYMER:  I don't believe it's within the

24   authorization, Your Honor.

25             THE COURT:  All right.  I would agree

1   because it goes specifically to a conversation, as

2   opposed to the prior question which is were you awaiting

3   authorization.  That's not a conversation, that's not a

4   discussion.

5          MR. CLYMER:  I understand, Your Honor.

6          THE WITNESS:  I've been instructed not to

7   answer the question.

8          SPECIAL MASTER COHEN:  Your Honor, I would

9   move to admit Special Master Tomasic 1.

10          MR. CLYMER:  No objection, Your Honor.

11          THE COURT:  Tomasic 1 admitted.

12   BY SPECIAL MASTER COHEN:

13      Q.  This is an e-mail from Kim Flannigan where it

14   says "on August 26th."  Is that correct?

15      A.  That's correct.

16      Q.  Did you believe that you would find chambers

17   locked when you went there at 5:30?

18      A.  I did.

19      Q.  Were you surprised when the door was open?

20      A.  I was.

21      Q.  What did you do when the door was open?

22      A.  I, along with the Deputy U.S. Marshal, stepped

23   inside the threshold and he rapped on the door frame and

24   we began saying "hello, hello."

25      Q.  Who answered the door?

1    A.   It was a law clerk, and I don't recall her name.

2    Q.   Meredith Schlachter ring a bell?

3    A.   It does.

4    Q.   Do you remember what you said to Ms. Schlachter?

5    A.   I do not recall.  I remember I made a joke and

6    she-- but I don't remember the exact language.

7    Q.   Was the joke something along the lines of, "I

8    asked the United States Marshal to break us in"?

9    A.   If that's what she recalls.  I have no

10   independent memory of exactly the language I used.  I

11   have read Judge Robinson's portion of the transcript

12   from September 7th, and that does ring a bell from Judge

13   Robinson's portion of the transcript.

14   Q.   Is it fair to say that was a joke and you had no

15   intention to actually break in to chambers?

16   A.   Absolutely.

17   Q.   When you went into Judge Robinson's chambers

18   after hours, Deb Barnett and Emily Metzger knew that you

19   were going to do that.  Correct?

20          MR. CLYMER:  Objection.  Outside the scope

21   of this witness' knowledge and it could only be known

22   based on internal communications.

23          THE COURT:  So is this a *Touhy* objection?

24          MR. CLYMER:  Yes.  Well, part of it is and

25   part of it isn't.  Part of it is outside the scope but,

1    in addition, there's also a *Touhy* problem because it

2    relies on internal communications.

3            THE COURT:  All right.  So it's not outside

4    the scope because she might have personal knowledge.

5    But if you're saying that you're advising her, not that

6    she asked for it, but that you're advising her that it's

7    within the bounds of *Touhy*, you've made your record on

8    that.

9            SPECIAL MASTER COHEN:  Judge, I-- I ask the

10   court reporter to repeat the question.  I don't believe

11   that I asked for internal communications.

12           (The question was read back).

13           MR. CLYMER:  I guess I'll say it

14   differently, Judge, because I think you're right, it's

15   either/or.  In other words, the only way she could know

16   that is based on internal communications.  If there were

17   no communications, then it's outside her knowledge.

18           THE COURT:  All right.  So you're advising

19   her not to answer the question?

20           MR. CLYMER:  Yeah, I am, Your Honor.

21           THE WITNESS:  I have been instructed not to

22   answer the question.

23   BY SPECIAL MASTER COHEN:

24   Q.  Did there come a time that there were press

25   reports with regard to your entry into chambers?

1    A.   Yes, there did.

2    Q.   Is it upsetting you today even, what the content

3  of those press reports was?

4    A.   Yes.

5    Q.   What did the reports say?

6    A.   Nationwide it said, it implied that I broke into

7  Judge Robinson's chambers to steal evidence.

8    Q.   Was that true?

9    A.   No, it was not.

10    Q.   Did you seek to have that reported correctly?

11    A.   Yes, I did.

12    Q.   How did you seek to have it reported correctly?

13    A.   I made a request of the U.S. Attorney.

14    Q.   Who exactly?

15    A.   Tom Beall.

16    Q.   What did Mr. Beall do?

17    A.   Nothing.  To my knowledge at least.

18    Q.   Did Kim Flannigan and Emily Metzger say anything

19  to Mr. Beall?

20         MR. CLYMER:  Your Honor, I believe that that

21  again is outside the scope of the witness'

22  authorization.

23         SPECIAL MASTER COHEN:  I'm sorry, you're

24  right.

25         THE WITNESS:  I've been instructed not to

 1  answer the question.

 2  BY SPECIAL MASTER COHEN:

 3      Q.  I'd like to show you a document marked Special

 4  Master Tom 2.  Can you just tell me what this is,

 5  please?

 6      A.  This is an e-mail-- this is an e-mail chain

 7  between Kim Flannigan, Tom Beall.  Copying Debra

 8  Barnett, me, Emily Metzger, Chris Oakley and Jim Cross,

 9  who was the media point of contact for the district.

10      Q.  What is a media point of contact?

11      A.  He works for the U.S. Attorney and he helped

12  issue press releases.  And so if the U.S. Attorney wants

13  to focus on a particular subject, the media spokesperson

14  will drum up press releases along those lines.

15              SPECIAL MASTER COHEN:  Move for admission of

16  this document, Judge.

17              MR. CLYMER:  I'm not sure I see the

18  relevance, Your Honor, so I object on relevance grounds.

19              THE COURT:  Overruled.  Exhibit 2, Tomasic

20  Exhibit 2 admitted.

21  BY SPECIAL MASTER COHEN:

22      Q.  And you said this is-- excuse me.  You said this

23  is an e-mail from Kim Flannigan to Tom Beall and copies

24  you and others.  Correct?

25      A.  That's correct.

1       Q.   Does--

2       A.   And the portion you have up is responding to the

3  e-mail below from Tom Beall.

4       Q.   Do you know whether Kim believed Tom or the

5  United States Attorney's Office owed you an obligation

6  to straighten out the record?

7       A.   Yes, it was very clear that Kim Flannigan and

8  other AUSAs in the district believed that Tom Beall had

9  an obligation to correct the record.

10      Q.   I'm going to hand you a document marked Special

11  Master Tom 3.  Can you please tell me what it is?

12      A.   Special Master Tom 3 is an exhibit containing an

13  e-mail exchange between Kim Flannigan and Tom Beall and

14  no one else is copied.  And the e-mail contains an

15  attachment, which is a letter-- well, no, actually it

16  doesn't contain the attachment printed out.

17      Q.   Am I correct that you are not listed as a

18  recipient?

19      A.   Not that I see, no.

20      Q.   So on this e-mail thread you are not listed as a

21  recipient or a-- an author.  Correct?

22      A.   That is correct.

23      Q.   Have you seen this document before?

24      A.   Yes, I have.

25      Q.   Does it appear to be, in fact, an e-mail thread

 1   between Kim Flannigan and Tom Beall?

 2       A.   It does.

 3            SPECIAL MASTER COHEN:  Move to admit Special

 4   Master Tom 3.

 5            THE COURT:  Any objection?

 6            MR. CLYMER:  Objection, relevance.

 7            THE COURT:  All right.  Subject to

 8   relevance, I'm going to admit.

 9   BY SPECIAL MASTER COHEN:

10       Q.   Almost at the bottom of this document there's an

11   e-mail from Thomas Beall to Kim Flannigan marked

12   September 8th.  Do you see that?

13       A.   I do.

14       Q.   And did Mr. Beall suggest-- do you know whether

15   Mr. Beall suggested to Debra Barnett and Emily Metzger

16   that they didn't know--

17       A.   I was not--

18       Q.   -- about your entry?

19       A.   I was not privy to any communications in that

20   respect.  I-- I do know that Ms. Flannigan was drafting

21   a letter and she had guidance from Mr. Beall as to how

22   she had to draft the letter to not damage the

23   reputations of certain people at the top of the

24   administration.

25       Q.   Reputations of who?

1    A.   Debra Barnett and Emily Metzger.

2    Q.   I'm showing you again Special Master Tom 3 where

3    Mr. Beall writes at the top, "They did not understand

4    that aspect."  Is that what you're referring to?

5    A.   Yes.

6    Q.   So he is directing Ms. Flannigan there?

7    A.   That's correct.

8              MR. CLYMER:  Objection, calls for a

9    characterization.  The document speaks for itself.

10             THE COURT:  All right.  I'll sustain.

11   BY SPECIAL MASTER COHEN:

12   Q.   I'm going to show you a document marked Special

13   Master Tomasic 4.  And if you would just look at the

14   bottom half of that and tell me what it is.

15   A.   That is an e-mail from me to Tom Beall on-- sent

16   on September 9th, 2016.

17             SPECIAL MASTER COHEN:  Move to admit this

18   document, Judge.

19             THE COURT:  Any objection?

20             MR. CLYMER:  Relevance, Your Honor.

21             THE COURT:  All right.  I'll admit it.

22   BY SPECIAL MASTER COHEN:

23   Q.   The part where you're writing to Mr. Beall, you

24   state-- you say that, "The judge inferred I may have

25   accessed her chambers for nefarious reasons."  Is that

1    true that you entered her chambers for nefarious

2    reasons?

3        A.   No, I did not.

4        Q.   Why did you enter her chambers after 5:30?

5        A.   Because I was directed to do so by Debra Barnett

6    and Emily Metzger.

7        Q.   Do you believe the record was ever corrected in

8    that regard in the press?

9        A.   I do not.  Well, I take that back.  Recently at a

10   hearing in *United States v. Dertinger,* Kim Flannigan was

11   finally able to testify.  And she acknowledged that she

12   had been involved in the decision to send me up to

13   chambers and that she was the one who actually called

14   the U.S. Marshals.  But the decision, as were all

15   decisions in *Black*, was left to Debra Barnett and Emily

16   Metzger.

17       Q.   Did the press ever correct its reportage?

18       A.   No, it did not.

19            MR. CLYMER:  Objection, relevance.  Your

20   Honor, more generally with respect to this line of

21   inquiry, as I understand it, the purposes of this

22   hearing are with respect to the Rule 41 issue and the

23   issues regarding cooperation with the Special Master.

24            I'm not sure the relevance of getting the

25   differing views about whether the instructions were to

1    slip something under your door or into your chambers has

2    any bearing on those issues.

3            THE COURT:  Well, this is within the scope

4    of the *Touhy* summary, it's within the scope of what you

5    allowed her to testify to.  I-- I think it has

6    relevance.  It's part-- it happened in the course of the

7    *Black* investigation.  There was a lot of suspicion

8    surrounding that because the DVRs had just been

9    delivered to my chambers a couple of hours before this.

10   So I think it raised some suspicion that maybe there was

11   a nefarious reason.

12           This witness is now given the opportunity to

13   explain otherwise, and I think she should be able to do

14   so.  I think it's highly relevant.

15           SPECIAL MASTER COHEN:  Thank you, Judge.  I

16   would also observe that I was specifically directed by

17   you in an order to pursue this line of inquiry.

18   BY SPECIAL MASTER COHEN:

19   Q.  Ms. Tomasic, I'm going to show you Special Master

20   Tomasic 5, which is an e-mail thread I ask you to

21   identify for me-- well, just identify this document for

22   me, please.

23   A.  This is an e-mail exchange between Dave Zabel and

24   Tris Hunt and Tom Beall that was forwarded to me from

25   David Zabel.

1    Q.   You got this in the normal course of business?

2    A.   I did.

3         SPECIAL MASTER COHEN:  I move to admit

4    Special Master Tomasic 5, please.

5         THE COURT:  Do you want a continuing

6    objection?

7         MR. CLYMER:  Your Honor, I'll reiterate

8    without arguing my relevance objection.

9         THE COURT:  All right.  I'll note a

10   continuation objection to relevance on these e-mails

11   that pertain to this entry into chambers issue.  I

12   assume that's what this is about.  Overruled.  Exhibit

13   No. 5 admitted, Tomasic No. 5 admitted.

14   BY SPECIAL MASTER COHEN:

15   Q.   What's the date of the last e-mail?

16   A.   With actual substance was September 8th, 2016.

17   Q.   And the last e-mail is from whom?

18   A.   Tom Beall to David Zabel and Tris Hunt.

19   Q.   I'm sorry.  So look at the very bottom of the

20   first page.  Am I correct that that's actually an e-mail

21   from Dave Zabel to Tom?

22   A.   Yes.

23   Q.   And it's signed "Dave and Tris."  Correct?

24   A.   Yes.

25   Q.   And so that means it's from Dave Zabel and Tris

1    Hunt?

2        A.  Yes, they co-wrote it.

3        Q.  And they're also in the United States Attorney's

4    Office?

5        A.  Yes, in the District of Kansas.  Would you like

6    me to--

7        Q.  What is their characterization of what Deb said

8    about your dropping things off after hours at chambers?

9        A.  Well, that it was incomplete and that important

10   parts had been left out that made it appear that I went

11   up there for a different purpose.

12       Q.  And do you understand that they knew that you had

13   received approval?

14       A.  Yes.

15       Q.  And they're asking Tom to correct the record?

16       A.  That's correct.

17       Q.  Do you think it was widely known in the office

18   that you were following directions when you went to

19   Judge Robinson's chambers?

20       A.  I do.

21       Q.  Do you think it was widely believed in the office

22   that upper management didn't support you?

23       A.  I know that for certain.

24       Q.  Did other people ever say that?

25               MR. CLYMER:  Could you repeat the question,

 1    Mr.--

 2    BY SPECIAL MASTER COHEN:

 3       Q.   Did other people ever say that?

 4            MR. CLYMER:   I believe that's outside the

 5    scope of this witness' authorization.

 6            THE WITNESS:   I do know of a conversation

 7    that took place outside of work, so I don't think it

 8    would count.

 9            Leon Patton, who had been in the office for

10    some time, found a video of antelope being chased by

11    wolves.  And he jokingly showed it to me and others and

12    said that Erin was the antelope that the first wolves

13    kind of-- or the mother antelope shoved down so the

14    wolves could get them.  And the wolf was Deb.  And he

15    sort of was making light of it, but he said it-- outside

16    of work he said it was the worst case of management not

17    supporting the people in the office and not being

18    truthful that he had seen in his 30-plus years.

19    BY SPECIAL MASTER COHEN:

20       Q.   Did Mr. Patton ever say something like that to

21    Ms. Metzger?

22            MR. CLYMER:   If the witness is looking at

23    you or me, Your Honor, without knowing the

24    circumstances, my suspicion is it's outside the scope of

25    authorization.

```
 1   BY SPECIAL MASTER COHEN:
 2       Q.  Did you ever hear something along the lines of
 3   Mr. Patton saying "we're terrified"?
 4                   MR. CLYMER:  Same answer, Your Honor, from
 5   me.
 6                   THE WITNESS:  I know that we all were.
 7   BY SPECIAL MASTER COHEN:
 8       Q.  I'm showing you something marked Special Master
 9   Tomasic 6.
10                   SPECIAL MASTER COHEN:  I'm sorry, I only
11   have one copy of this.  I'll let you look at it in just
12   a moment.
13                   THE WITNESS:  Yes, I recognize it.
14   BY SPECIAL MASTER COHEN:
15       Q.  Can you tell me what it is, please?
16       A.  This is the first complaint I submitted to the
17   Office of Professional Responsibility outlining what I
18   believed to be a violation of the ethical rules,
19   specifically duty of candor.  And the complaint was
20   lodged against Tom Beall, Emily Metzger and Debra
21   Barnett, and a roughly 28-page document that outlines
22   what happened with respect to me being directed to go up
23   to chambers and then efforts to correct the record by
24   many people in the office and-- and the outcome of that
25   effort.
```

1          THE COURT:  Given that it's a 28-page

2    document, I'm going to-- if you're going to offer it,

3    I'm going to make that subject to Mr. Clymer and others

4    having an opportunity to fully review it, which I

5    imagine will happen this evening.

6          SPECIAL MASTER COHEN:  That's fine, Judge.

7    I'm just going to point to two sentences in it.

8          MR. CLYMER:  Your Honor, I'm going to object

9    to any use of this at this time.  To have provided this

10   to Mr. Cohen in the first instance was likely a

11   violation of the *Touhy* regulations.  I'm not threatening

12   or suggesting, I'm just stating my view about how the

13   regulations work.

14          People who are employees of the United

15   States Attorney's Offices have reputations.  Typically

16   it's well-known within the Department that OPR matters

17   are highly confidential because they are accusations,

18   they are not findings of responsibility.

19          I'm troubled that Mr. Cohen did not notify

20   me about this ahead of time, that this was sprung on-- a

21   surprise.  He chose not to make a copy of this

22   particular exhibit, unlike the rest of the exhibits he's

23   handed to me.  So I had no opportunity to say anything

24   before the witness described what it was.  I think

25   that's extremely improper, I'm very troubled by that.

1          I'd ask that the Court hold off on any

2    further discussion of this document until I've had time

3    to think about it and read a copy of the document.

4               THE COURT:  All right.  That's fair.

5               SPECIAL MASTER COHEN:  I don't believe I've

6    moved for admission of it and I withdraw it.

7    BY SPECIAL MASTER COHEN:

8       Q.  Ms. Tomasic, I'm going to change subjects on you.

9    With regard to audio-recordings of CCA inmates--

10      A.  Uh-huh.

11      Q.  -- did those audio-recordings reside anywhere

12   within the United States Attorney's Office computer

13   system?

14      A.  I would think that they would be on-- there would

15   be no uniform answer to that because it would depend on

16   how each individual AUSA kept his or her calls.  But

17   generally they would arrive to the office on disks and

18   then once they were prepared to go out in discovery,

19   they would be on the cloud.

20      Q.  When you say "on the cloud," does that mean a

21   drive, computer drive within the office?

22      A.  I don't know the answer to that.  It was-- it was

23   set-- there were different drives on the system and one

24   was designated as cloud, and that's where all the

25   discovery was kept.

 1      Q.   I'm showing you your document marked Special

 2  Master Tomasic 7.  Can you tell me what that document

 3  is, please?

 4      A.   That is an e-mail exchange between me and

 5  Pauletta Boyd.  And then lower down from Pauletta Boyd

 6  to Debra Barnett and David Steeby, me, and Kim

 7  Flannigan.

 8      Q.   And what is the subject matter of this e-mail?

 9      A.   CCA calls.

10      Q.   Can you tell me what the--

11          SPECIAL MASTER COHEN:  Well, I'd like to

12  move admission of this exhibit, please.

13          MR. CLYMER:  May I have a chance to look at

14  it, Your Honor?

15          THE COURT:  Yes.

16          MR. CLYMER:  Your Honor, I-- based on the--

17  what's on the document itself, I don't-- the relevance

18  is not self-evident, so at this point I have an

19  objection to it.

20          THE COURT:  All right.  Like the others that

21  have-- you've raised the relevance objections to, I'll

22  admit it, but subject to my determination later whether

23  it's relevant.

24  BY SPECIAL MASTER COHEN:

25      Q.   If a call was on the cloud, does that mean that

1    any United States Attorney-- anybody in the United

2    States Attorney's Office could access it?

3        A.   In the discovery drive, it's my experience yes.

4        Q.   Do you understand that there were ways for

5    inmates to block the recording of a call at CCA?

6        A.   That was my understanding.

7        Q.   Did you know how that worked?

8        A.   I did not.  And based on your report, I know what

9    I suspected how it worked was wrong.

10       Q.   I'd like to show you document Special Master

11   Tomasic 8.

12       A.   This is an e-mail from Kim Flannigan to Debra

13   Barnett, Emily Metzger, Scott Rask, Erin Tomasic, Chris

14   Oakley and Tom Beall.  Subject, CCA phone system.  And

15   it was sent on August 17th.

16            SPECIAL MASTER COHEN:  Move to admit.

17            MR. CLYMER:  May I have a moment, Your

18   Honor?

19            THE COURT:  Yes.  This is No. 8 you said?

20   Tomasic Exhibit 8?

21            SPECIAL MASTER COHEN:  Yes, Judge.

22            MR. CLYMER:  No objection, Your Honor.

23            THE COURT:  Exhibit 8 admitted.

24   BY SPECIAL MASTER COHEN:

25       Q.   By the way, Erin, if you would have the press say

1    one thing, what would it be?

2              MR. CLYMER:  Objection, relevance.

3              THE COURT:  I'm not sure I understand the

4    relevance.  I'll sustain.

5              SPECIAL MASTER COHEN:  I'll withdraw it.

6    BY SPECIAL MASTER COHEN:

7       Q.  Is it fair to say that this e-mail is between the

8    top supervisors in the United States Attorney's Office?

9       A.  Yes, it is.  And then Chris Oakley and I are

10   copied because we were counsel of record in *Black*.

11      Q.  And is it fair to say that the e-mail is

12   expressing a lack of understanding about how attorney

13   calls are blocked?

14      A.  Yes, it is.

15             MR. CLYMER:  Your Honor, I just-- I have to

16   object to the characterization about the e-mail between

17   top supervisors.  The e-mail is from one Assistant U.S.

18   Attorney to others.  And the author is expressing some

19   uncertainty, not the remainder of the people on the

20   e-mail message.  I'd just ask that it be characterized

21   properly if it's going to be characterized at all.

22             SPECIAL MASTER COHEN:  I'm sorry if I

23   misspoke.

24             THE COURT:  I don't know if I'm going to

25   accept your testimony about what this characterizes and

1  what it doesn't and who these folks are and whether they

2  were top management or not.  Most of them-- they were

3  all in management positions with the exception of

4  whether Kim Flannigan and Scott Rask were both at the

5  same time.  But other than Ms. Tomasic and Mr. Oakley,

6  everybody else had a supervisory position in the office

7  that's on this e-mail chain.

8  BY SPECIAL MASTER COHEN:

9      Q.  Do you know anything about a link referenced at

10  the hearing?  Do you know what that means?

11     A.  I believe that one of the defense attorneys who's

12  not here today brought it up.  It was an elderly

13  gentleman who represented-- I can't recall his name, but

14  he brought up the link and we didn't know what he was

15  talking about.

16     Q.  Are you aware-- have you ever received an e-mail

17  that contained a clickable link, a link that you could

18  click on that would allow you to access phone calls?

19     A.  I've never received an e-mail, no.

20     Q.  Do you know whether that sort of link exists?

21     A.  I know one legal assistant explained that she

22  obtained phone calls that way.

23     Q.  From whom?

24     A.  Someone at the U.S. Marshals Service.

25     Q.  But the phone calls were made at CCA?

1      A.  I don't know, I assume so.

2      Q.  I'm showing you what's marked as Exhibit Special

3  Master Tom 9.  Can you please tell me what that is?

4      A.  That is an e-mail from Diana Shew, who was

5  in-house counsel for CCA, to Erin Tomasic and Chris

6  Oakley.  And it's dated August 19th, 2016.

7      Q.  Excuse me.

8          SPECIAL MASTER COHEN:  Move for admission,

9  Judge.

10         MR. CLYMER:  May I have a moment, Your

11 Honor?

12         THE COURT:  Yes.

13         MR. CLYMER:  No objection.

14         THE COURT:  Exhibit 9 admitted.

15 BY SPECIAL MASTER COHEN:

16     Q.  This is an e-mail from you to Diana Shew; is that

17 right?

18     A.  That's right.

19     Q.  Diana Shew works for whom?

20     A.  CCA corporate headquarters in Nashville,

21 Tennessee.

22     Q.  Do you know what procedures there were at CCA to

23 make unrecorded legal calls?

24     A.  Based on this e-mail, I learned that an inmate

25 could go to a counselor's office and place a call from

1   the counselor's office and that would not be on a

2   recorded line.

3       Q.   Did you know that before you received this

4   e-mail?

5       A.   I don't recall if I knew that.

6       Q.   In fact, this e-mail suggests that the inmate

7   handbook doesn't explain that procedure; is that right?

8           MR. CLYMER:   Objection, the document speaks

9   for itself.

10          THE COURT:   Overruled.   You can answer it if

11  you can.

12          THE WITNESS:   Could you ask the question

13  again?

14  BY SPECIAL MASTER COHEN:

15      Q.   This e-mail suggests that the CCA inmate handbook

16  doesn't say anything about that sort of procedure; is

17  that right?

18      A.   That is what the e-mail suggests.

19      Q.   When an inmate goes to a counselor's office to

20  use the phone, is the counselor still in the office?

21      A.   I do not know the answer to that.

22      Q.   If the counselor is still in the office, would

23  you consider that a private phone call between the

24  inmate and his attorney?

25      A.   I suppose if the counselor is listening in, then

1    it wouldn't be private.  I don't know-- I'm speaking in

2    the vernacular, not in a legal sense, because I don't

3    know what the law would be on that.

4        Q.    I'm showing you what's been marked docket--

5    excuse me, Document No. Special Master Tom 11.  I

6    skipped 10.

7                    THE COURT:  10 or 11?

8                    SPECIAL MASTER COHEN:  11, I skipped 10.

9    BY SPECIAL MASTER COHEN:

10       Q.    Can you please tell me what that is, Erin?

11       A.    That is an e-mail from Matt Cahill to Glen

12   Virden, John Seubert, Jeff Stokes, Doug Younger, Erin

13   Tomasic, and Henry Herron and Craig Beam dated

14   March 31st, 2016.

15                   SPECIAL MASTER COHEN:  Move to admit.

16                   MR. CLYMER:  May I have a moment, Your

17   Honor?

18                   THE COURT:  Yes.  I think we'll make this

19   the last line of inquiry for the evening.

20                   SPECIAL MASTER COHEN:  Thank you, Judge.

21                   MR. CLYMER:  No objection.

22                   THE COURT:  Exhibit 11 admitted.

23   BY SPECIAL MASTER COHEN:

24       Q.    Who are all those folks you just mentioned; Matt

25   Cahill, Glen Virden, John Seubert, Jeff Stokes, David

1    Younger and Henry Herron and-- I'm sorry, and Craig

2    Beam?

3        A.    Well, Craig Beam was not-- he works for the U.S.

4    Marshals Service and he's an upper-level supervisor.

5    Glen Virden is a KBI agent.  John Seubert is seated here

6    in the courtroom, he's a Secret Service agent.  Jeff

7    Stokes is a KBI agent.  Doug Younger is a group

8    supervisor with KBI, and Henry Herron is an IRS agent.

9        Q.    Why was Cahill writing all of those folks and you

10   this e-mail?  What's their relationship?

11       A.    They were all agents-- except for Craig Beam and

12   technically Doug Younger was also not on the case, but

13   everyone else was assigned to investigate the *Black*--

14   what eventually became known as the *Black* case.

15       Q.    The body of the e-mail refers to Ms. Kinney?

16       A.    Uh-huh.

17       Q.    And CO Lajiness?

18       A.    Yes.

19       Q.    Who are they?

20       A.    Ms. Kinney worked at CCA, and I don't believe she

21   works there anymore.  And CO Lajiness-- Lajiness also

22   worked at CCA, but I don't think he works there anymore.

23       Q.    Does this e-mail suggest that Matt Cahill

24   obtained from Mr. Lajiness information about phone calls

25   that were being made by an inmate?

1    A.   Let's see.  So it looks like he is asking for and

2   ordering a reverse to that phone number (816) 446-0772.

3    Q.   So I just want to make sure I got an answer to my

4   question.  Does it look like Matt Cahill is asking Mr.

5   Lajiness for information about phone calls made from an

6   inmate at CCA?

7    A.   It does.

8    Q.   It looks like he got it just by making a phone

9   call to Mr. Lajiness or an e-mail?

10    A.   It looks like he called Ms. Kinney.

11    Q.   And Ms. Kinney directed Lajiness to supply the

12   information requested; is that right?

13    A.   I don't know about that.  And then it says he

14   spoke with Lajiness, so it looks like maybe he spoke

15   with both of them, but I do not know.

16         SPECIAL MASTER COHEN:  This is probably as

17   good of spot as any, Judge, to stop for the evening.

18         THE COURT:  All right.  For I guess Ms.

19   Tomasic's purposes, how much longer do you think you're

20   going to be on your examination in the morning?  And

21   I'll ask everyone else as well so there's some idea.  I

22   know she's traveling from out of town.

23         SPECIAL MASTER COHEN:  I'm bad at this,

24   Judge.  I would say an hour-and-a-half or less.

25         THE COURT:  All right.  Mr. Bell?

1          MR. BELL:  30 minutes, maybe 45.

2          THE COURT:  Okay.  All right.  So a good

3   chunk of the morning anyway.

4          MR. CLYMER:  Your Honor, could I ask that

5   Mr. Cohen provide to us all the remaining exhibits he

6   plans to show this witness?  The public defender was

7   gracious enough to give us their exhibits.  It makes

8   things go a lot easier.  I don't have to read them as

9   the Court is waiting to decide whether I have an

10  objection or not.

11         THE COURT:  All right.  That's fair, if you

12  can do that, Mr. Cohen.

13         SPECIAL MASTER COHEN:  I'm happy to do that,

14  Judge.

15         THE COURT:  Yes.  Mr. Bell?  Well, let's go

16  ahead and-- and let Ms. Tomasic go for the evening.

17  Have her come back at 9:00 tomorrow.  And then I know

18  there's some other matters we need to take up before we

19  fully recess.

20         All right.  So Mr. Cohen is going to provide

21  copies of the additional exhibits you intend to offer

22  tomorrow to Mr. Clymer.

23         MR. GUASTELLO:  Judge, and I would join in

24  that request on behalf of Mr. Carter.  If we could go

25  ahead and get a copy of all the exhibits that Mr. Cohen

1    has-- has introduced and intends to introduce, that will

2    be helpful.

3              MS. DODGE:  I'd motion the Court for that as

4    well because I don't have them.

5              THE COURT:  All right.

6              SPECIAL MASTER COHEN:  That's going to take

7    a little work, but I will do it.

8              THE COURT:  All right.  Anything more?

9    There was something else someone wanted to take up.  Mr.

10   Clymer.

11             MR. CLYMER:  May I approach?

12             THE COURT:  Yes.

13             MR. CLYMER:  Your Honor, I represented to

14   the Court that I would try to make contact with the

15   Department of Justice as soon as I could about two

16   matters, as I recall.  One was whether Mr. Rask could

17   have authorization to identify the AUSAs whom, to his

18   knowledge, had listened to attorney-client calls and

19   then reported it to their counsel.  A couple in his 20

20   years.  I think he said three to five in his 20 years.

21   And the second was about responding to questions from

22   Mr. Cohen based on the e-mail traffic regarding

23   discussions about not cooperating with Mr. Cohen's

24   investigation.

25             I am-- I want to talk about the second

1   topic, not the first.  I am very mindful of the Court's

2   sequestration rule and I didn't need the reminder from

3   Mr. Cohen to know what it meant.  I've been an attorney

4   a long time and so I well understood it.

5           It would be helpful for me in order to

6   discuss with people at main Justice what the issues are

7   for us to decide about authorization if I could talk to

8   Mr. Rask and the other witnesses who are involved in

9   those issues.

10          If the Court doesn't want me to do it, I

11   certainly won't do it, but I don't know enough about the

12   background I think to give a full description.  So I'm

13   happy not to do it and I will follow the Court's orders.

14   But I'm just letting the Court know I will be a better

15   informed communicant with the Department of Justice if I

16   could speak to them about the e-mail traffic.  And I

17   leave it to the Court to decide what-- which way it

18   wants me to go on this.

19          THE COURT:  Okay.  So obviously you would

20   want to ask Mr. Rask about the-- who the three to five

21   were.  But who else--

22          MR. CLYMER:  That's not what I would ask.

23   What I would do is-- Mr. Cohen wanted to question Mr.

24   Rask about some statements in e-mail traffic that

25   involved Mr. Rask, Ms. Metzger, Ms. Barnett, Mr. Beall,

1   regarding conversations regarding cooperation with the

2   Special Master.  That all was news to me.  I hadn't seen

3   those e-mails before I saw them in court today.

4           As I said at sidebar, if I had known-- if I

5   got notice under *Touhy* about that line of inquiry in

6   those e-mails, we might've gotten a different answer

7   about authorization.  And so I'm going to go back and

8   see.  But the more I know about that back-story, the

9   more information I can provide to DOJ.

10          So I just want to know if the Court is

11  willing to make an exception to the sequestration order

12  and allow me to talk to those AUSAs about those matters.

13  And I'm not-- I'm not asking you to, Judge, I'm just

14  telling you there's a choice here.  I'm-- obviously

15  whatever the Court instructs me to do I'm going to do.

16  So if you want me to not speak to them about it, I

17  won't.  If you are going to give me permission to speak

18  to them, I'll be more informed when I speak to the

19  Department of Justice.

20          THE COURT:  All right.  Mr. Bell.

21          MR. CLYMER:  And I'm certainly not going to

22  coach them about how to answer questions or anything

23  like that.  I wouldn't do that.

24          MR. BELL:  Well, I'm a little surprised.

25  The caption for the order to show cause was about their

1    failure to cooperate with the Special Master.  I'm sorry

2    to hear that these e-mails which are internal were never

3    shared with Mr. Clymer and now he's being surprised by

4    them.

5            That being said, I don't want there to be

6    any internal communications with these witnesses about

7    what they told who now that they're being surprised with

8    these e-mail communications or anything like that.  If

9    that means they're going to decide not to answer

10   questions, then so be it.  But I don't think that they

11   should have an opportunity to - for lack of a better

12   term - get their stories straight, which I think would

13   violate the heart of the rule and the sequestration

14   order in the first place.

15           THE COURT:  All right.  Mr. Cohen.

16           SPECIAL MASTER COHEN:  First I want to make

17   clear that my comment about sequestration was not for

18   Mr. Clymer's benefit.  I'm quite sure he knows what

19   sequestration was.  I saw that somebody came into the

20   courtroom who I thought had not gotten the word about

21   sequestration, so I stated it for the benefit of the

22   witness who came into the-- into the courtroom.

23           Also, honestly, Judge, this is not an easy

24   question, but I think I agree with the Federal Public

25   Defender that at this juncture it seems to me that--

1  that we should sit with things as they are.  I don't

2  think that it would lead to a greater finding of the

3  truth, and I'm concerned about comments being shared

4  with witnesses.

5       And I also believe that-- it's, frankly, a

6  little hard for me to believe that the subject matters

7  that I'm asking about weren't on the United States

8  Attorney's Office's radar.  It's been why I'm appointed

9  two years ago.  So I really can't understand how it is

10  that these questions that I'm asking are a surprise.

11  Maybe the documents that I'm showing are a surprise, but

12  the subject matter can't be.

13       THE COURT:  All right.  I'm not going to

14  allow you to discuss this with the witnesses and to

15  essentially ask them more questions about the subject

16  matter of Mr. Cohen's questions.  I understand that may

17  mean you don't get Department of Justice authorization,

18  I'm not sure you were going to get it anyway, I don't

19  think you know that either.  But I know you'll-- you're

20  telling me that you'll seek it, but I don't think you

21  should talk to the witness in the meantime.

22       MR. CLYMER:  Very well, Your Honor, then I

23  certainly won't.

24       Your Honor, am I correct in assuming that

25  Mr. Cohen is going to provide me the exhibits for all of

1    his witnesses, not just this particular witness?

2              THE COURT:  Have you--

3              SPECIAL MASTER COHEN:  Right.  So, Judge,

4    let me explain what a poor job I've done.  I was in

5    Cleveland without a paralegal and what I did was took

6    all of the documents witness by witness and put them

7    into folders and made copies, made the wrong number of

8    copies apparently, not realizing that I needed probably

9    three more than I made.  Not only that, I only put

10   labels on the first one so all the copies don't have

11   labels.

12             Not only that, but some of the documents

13   that I have been proffering, for example-- and I'm

14   making this up.  For example, Rask 1 is actually the

15   same-- going to be the same as Barnett 3.  It's the same

16   document.  I did a poor job.

17             And so the only way that I know how to fix

18   that at this juncture is to take my folders, go through

19   them and-- and add the exhibit number and make more

20   copies and hand them out.  That's going to take some

21   time.  I apologize that-- that that happened.  Frankly,

22   I've never done anything like this before and didn't

23   know how to do it correctly.  And so that's where we

24   are.

25             THE COURT:  How many documents are we

1    talking about do you think for the rest of the-- I mean,

2    as far as what you intend to offer?

3              SPECIAL MASTER COHEN:  Two-thirds of that

4    (indicating).

5              THE COURT:  All right.  Well--

6              MR. CLYMER:  I believe we can give Mr. Cohen

7    access to the U.S. Attorney's Office copy machine.

8              THE COURT:  Well, I think what we can do is

9    have you scan them and then e-mail them tonight rather

10   than try to make copies.  Now, they won't have the

11   exhibit numbers on them.  You write the exhibits

12   numbers-- you have a set that has the exhibit numbers

13   written on them.  I think what you need to do is scan

14   them and then just e-mail them, not try to make six sets

15   of copies tonight.

16              As long as that's accomplished this evening,

17   everybody can access them hopefully electronically and

18   print them out or whatever they're going to do before

19   tomorrow morning.

20              SPECIAL MASTER COHEN:  That's fine, Judge.

21   I just need--

22              THE COURT:  What you're telling me is

23   there's duplication.

24              SPECIAL MASTER COHEN:  There is.

25              THE COURT:  So I don't know how you want to

1   handle that, whether you want there to be duplication,

2   whether you're going to be able to figure out as you go

3   through here and only give them one.

4           SPECIAL MASTER COHEN:  I don't think I can

5   do that, Judge.  I think there will be duplication.

6           THE COURT:  Okay.

7           SPECIAL MASTER COHEN:  I apologize.

8           THE COURT:  I mean, if you pull them all out

9   and scan them, that can be done pretty quickly.

10           SPECIAL MASTER COHEN:  I just need e-mail

11   addresses to send them to.

12           THE COURT:  All right.  So why don't we do

13   that.  We have a high-speed scanner, we can get that

14   accomplished, so-- all right.  What else?

15           MR. CLYMER:  That's all I had, Your Honor.

16   Thank you.

17           MR. BELL:  Your Honor, regarding the

18   sequestration order, we'd ask that you also direct the

19   potential witnesses not to read any media accounts of

20   other witnesses' testimony that may be reported in the

21   media.

22           THE COURT:  All right.  Well, I will ask

23   everyone who's had witnesses here so far, the FPD's

24   office and Special Master, to direct the witnesses who

25   have testified.  And then the U.S. Attorney to direct

1   the-- or Mr. Clymer to direct everyone that's associated

2   with the U.S. Attorney's Office as well as the

3   investigative agencies to avoid media coverage as well

4   in case there are any reports about what witnesses said.

5   All right?

6           MR. CLYMER:  Yes, Your Honor.

7           THE COURT:  You'll take care of all the

8   government and law enforcement witnesses.  Well,

9   actually that-- Mr. Clymer, if you will talk to Ms.

10  Tomasic, I'll ask the FPD to talk to all the CCA

11  witnesses and anybody else that's not a government

12  witness.  Okay?

13          MR. CLYMER:  I'm not sure if Ms. Tomasic's

14  attorney is still here, Your Honor, I'll check.

15          THE COURT:  Okay.  Either you or Mr. Cohen

16  can get ahold of them and tell them that.  All right.

17  What else?

18          MS. DODGE:  I would just renew my objection

19  to the use of 28 C.F.R. that I-- I think that it's being

20  improperly used and I don't think that he's complied

21  with the rule completely in that I still haven't heard

22  on what grounds these *Touhy* objections are being made.

23  I don't know the factors-- I don't know the bases under

24  I think it's 16.23-- or 26, I'm sorry.

25          THE COURT:  Well, I invited Mr. Clymer at

1    the outset of this hearing to give me the bases, he's

2    declined that.  I don't know if I can force him to do

3    that.

4                  You told me Rule 16 in general, but in terms

5    of the actual *Touhy* what you said was you didn't know

6    what the deliberative processes were of the ultimate

7    decision-maker, which is the Deputy Attorney General.

8    And as I understand it, that's why you weren't doing

9    that.  Is that correct?

10                  MR. CLYMER:  No, Your Honor, I didn't

11   decline to give the Court the basis.  I said that I

12   would be happy to explain what I think the factors are.

13   In fact, Your Honor, in the September 12th, 2017 letter

14   that I sent to Mr. Cohen I think describes in detail the

15   privileges that are at issue, the-- the rules of

16   procedure that are at issue, and other issues that are

17   in the *Touhy* regulations.

18                  THE COURT:  Well, that's in the form of the

19   brief, but now we're at an evidentiary hearing and there

20   are actual questions.  And there are a lot of questions

21   that these witnesses have been directed to decline to

22   answer and we have not had a record from you on the

23   basis for those declinations.

24                  MR. CLYMER:  If the Court would like, first

25   thing in the morning I'll do my best to make a record.

```
 1              THE COURT:  Okay.  And maybe going forward
 2   as well.  I mean, I-- you know, or maybe you can just do
 3   it sort of in a general way, not-- rather than even
 4   question by question.  If you can say to the extent this
 5   witness is going to testify or be asked about these
 6   topics, this is the basis for why they've been told to
 7   not--
 8              MR. CLYMER:  I'll do that in the morning,
 9   Your Honor, if the Court gives me an opportunity to.
10              THE COURT:  Okay.  That's great.
11              MS. DODGE:  Your Honor, one more thing.
12   Also I believe that the FPD-- at least I've seen it, I
13   can't tell you what document number it is, but I believe
14   that they have provided Mr. Clymer with the Touhy
15   questions and-- and information that they wanted from
16   Scott Rask, at least that's what I've witnessed.  And I
17   believe this indicated questions that they-- or topics
18   that they wanted to cover, which Mr. Guastello and I
19   joined in on, absolutely were under the umbrella of what
20   he was being questioned about today.  So I would also
21   just bring that just for the record purposes.  Mr.
22   Clymer has got a copy of that.
23              THE COURT:  All right.  I should say this--
24   and you can have a continuing objection along these
25   lines.  And, as I said, I will invite post-hearing
```

1    briefing.  But the parameters of what I can rule on

2    contemporaneously are limited by virtue of the *Touhy*

3    regulations.  I can rule that-- I can rule on the

4    question of whether a question is within the scope of

5    what the government has said they will agree the witness

6    can answer, I can rule on that.  I am not going to rule

7    on whether they have invoked a valid *Touhy* basis.

8            So if he makes that record tomorrow or even

9    if he does it question by question, I'm not going to

10   rule on it because essentially what I would be doing is

11   trying to compel that witness' answer.  That witness'

12   answer cannot be compelled.  If they've been instructed

13   not to answer, they've been instructed not to answer.

14   And me ruling that, you know, they-- that that's not a

15   legitimate basis would essentially be the judge

16   compelling them to answer, which I can't do.

17            MS. DODGE:  I understand.

18            THE COURT:  I can ultimately, though, find

19   that the particular question there wasn't a proper

20   invocation of *Touhy* and maybe draw an adverse inference

21   from that or, you know, make a fact finding about it or

22   something.  But I'm not going to be ruling

23   contemporaneously at least with respect to invocations

24   of *Touhy*.  I will be ruling contemporaneously on

25   objections under the Federal Rules of Evidence.  That's

1    pretty standard.

2              So I think the better practice is to make a

3    record, Mr. Clymer, and if we need to do that

4    prospectively with questions to some extent or another,

5    make a record.  But the record is made, I'm not going to

6    be ruling at least at this point.  All right?

7              Okay.  What else?

8              MR. BELL:  Last item.  We are going to

9    release Patricia Cook from her subpoena or we've already

10   done so.  The government stipulated to an e-mail which

11   is the only reason we had her here.  I believe Mr. Cohen

12   is going to release her as well.

13             SPECIAL MASTER COHEN:  Right.

14             MR. BELL:  So it's on the record she's

15   released.

16             MR. SLINKARD:  On that point, Your Honor,

17   the-- I discussed this with Mr. Bell earlier in the day,

18   but I think there was some confusion.  It was indicated

19   to the Court at one point that FPD Exhibit 484 was being

20   admitted by stipulation.  That was erroneous.  It was

21   actually-- should've been FPD Exhibit 524 that we were

22   stipulating to the admission of.  And that was the

23   e-mail that obviated the need for Ms. Cook to testify.

24             THE COURT:  524 is admitted by stipulation.

25   Okay.

1              MR. SLINKARD:  And so--

2              MR. BELL:  484 is not admitted.

3              THE COURT:  But 484 is not.

4              MR. SLINKARD:  Is not admitted at this time.

5              THE COURT:  Okay.  Got it.  Okay.

6              MR. CLYMER:  One other very brief matter,

7    and I appreciate your patience, Your Honor.  I want to

8    introduce attorney Todd Wallace, who's with counsel's

9    office with Secret Service who's present here today.

10   He'll be here tomorrow as well.

11             THE COURT:  Thank you.  Nice to meet you.

12   Okay.  Million dollar question, are we going to finish

13   tomorrow?

14             MS. BRANNON:  If not, Your Honor, do you

15   plan to go into Thursday?

16             THE COURT:  I'm sorry?

17             MS. BRANNON:  If we do not finish tomorrow,

18   do you plan to go into Thursday?

19             THE COURT:  Well, it's a little problematic

20   as I'm supposed to be in Topeka at noon on Thursday.

21   We'll see.

22             Okay.  All right.  We'll be in recess.

23   Let's-- I have an 8:30 status conference actually with

24   you, Ms. Brannon, at 8:30 and we'll take that up here.

25   And then let's plan on all getting together here at 8:45

1  so if there's anything else to hash out, we've got 15

2  minutes to do that before we get Ms. Tomasic back on the

3  stand.  All right?

4            So we'll recess until 8:45 for this case

5  tomorrow.  All right.  Have a good evening.

6            SPECIAL MASTER COHEN:  Thank you, Judge.

7            MR. CLYMER:  Thank you.

8            (5:39 p.m., proceedings recessed).

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4

5        I, Kelli Stewart, a Certified Shorthand Reporter and

6    the regularly appointed, qualified and acting official

7    reporter of the United States District Court for the

8    District of Kansas, do hereby certify that as such

9    official reporter, I was present at and reported in

10   machine shorthand the above and foregoing proceedings.

11       I further certify that the foregoing transcript,

12   consisting of 314 pages, is a full, true, and correct

13   reproduction of my shorthand notes as reflected by this

14   transcript.

15       SIGNED May 25, 2018.

16

17

18

19            /s/ Kelli Stewart

20            Kelli Stewart, CSR, RPR, CCR, RMR

21

22

23

24

25