```
1              UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF KANSAS
2

3    UNITED STATES OF AMERICA,

4         Plaintiff,

5    v.                        Docket No. 16-20032-JAR

6    KARL CARTER,              Kansas City, Kansas
     ANTHON AIONO,             Date:  05/16/2018
7    DAVID BISHOP,
                               Day 2
8         Defendants.          Pages 316-397
     ...................
9

10            TRANSCRIPT OF MOTIONS HEARING
         BEFORE THE HONORABLE JULIE A. ROBINSON
11            UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Government:   Mr. Steven D. Clymer
                          Department of Justice - USAO
14                        Lrm Eckert, William
                          100 S. Clinston Street
15                        Suite 9000
                          Syracuse, New York 13261
16
                          Mr. Duston J. Slinkard
17                        Office of United States Attorney
                          444 Southeast Quincy
18                        Suite 290
                          Topeka, Kansas 66683-3592
19
                          Mr. Stephen R. McAllister
20                        Office of United States Attorney
                          500 State Avenue
21                        Suite 360
                          Kansas City, Kansas 66101
22
     For the Defendant Karl Carter:
23                        Mr. David J. Guastello
                          The Guastello Law Firm, LLC
24                        811 Grand Boulevard
                          Suite 101
25                        Kansas City, Missouri 64106
```

```
 1      APPEARANCES:

 2      (Continued)

 3

 4      For the Defendant Anthon Aiono:
                        Mr. Jason P. Hoffman
 5                      Hoffman & Hoffman
                        CoreFirst Bank & Trust Building
 6                      100 East Ninth Street
                        Third Floor East
 7                      Topeka, Kansas 66612

 8      For the Defendant David Bishop:
                        Ms. Cynthia M. Dodge
 9                      Cynthia M. Dodge, LLC
                        312 S.W. Greenwich Drive
10                      #10
                        Lee's Summit, Missouri 64082
11
        For the Movant Federal Public Defender:
12                      Ms. Melody J. Brannon
                        Mr. Kirk C. Redmond
13                      Mr. Branden A. Bell
                        Office of Federal Public Defender
14                      117 Southwest Sixth Street
                        Suite 200
15                      Topeka, Kansas 66603

16      For the Special Master David R. Cohen:
                        Mr. David R. Cohen
17                      David R. Cohen Co., LPA
                        24400 Chagrin Boulevard
18                      Suite 300
                        Cleveland, Ohio 44122
19
                        Ms. Alleen VanBebber
20                      VanBebber Law Firm, LLC
                        2029 West 95th Street
21                      Leawood, Kansas 66206

22

23      _____

24          Kelli Stewart, CSR-KS, CRR-MO, RPR, CRR, RMR
                       Official Court Reporter
25          259 U.S. Courthouse, 500 State Avenue
                    Kansas City, Kansas 66101
```

1                          I N D E X

2
    Federal Public Defender's Witnesses:                    Page

3
    WAYNE BIGELOW
4     Direct Examination By Mr. Redmond                      339
      Cross Examination By Special Master Cohen              351
5     Cross Examination By Mr. Clymer                        369
      Redirect Examination By Mr. Redmond                    373
6     Recross Examination By Special Master Cohen            378
      Recross Examination By Mr. Clymer                      379

7
    LINDA THOMAS
8     Direct Examination By Mr. Redmond                      380
      Cross Examination By Special Master Cohen              386
9     Cross Examination By Mr. Clymer                        389
      Redirect Examination By Mr. Redmond                    390

10

11

12                       E X H I B I T S

13    Federal Public Defender's
        Exhibits               Offered            Received
14
             465                 329                329
15           466                 329                329
             467                 329                329
16           468                 329                329
             469                 329                329
17           470                 329                329
             471                 329                329
18           472                 329                329
             473                 329                329
19           474                 329                329
             475                 329                329
20           476                 329                329
             478                 329                329
21           481                 329                329
             482                 329                329
22           483                 329                329
             484                 329                329
23           485                 329                329
             486                 329                329
24

25

1

2                       E X H I B I T S

3    Federal Public Defender's
     Exhibits              Offered           Received

4         487               329               329
5         488               329               329
          489               329               329
6         490               329               329
          493               329               329
7         495               329               329
          496               329               329
8         499               329               329
          500               329               329
9         501               329               329
          502               329               329
10        504               329               329
          505               329               329
11        506               329               329
          507               329               329
12        509               329               329
          510               329               329
13        511               329               329
          513               329               329
14        514               329               329
          515               329               329
15        516               329               329
          517               329               329
16        518               329               329
          519               329               329
17        520               329               329
          522               329               329
18        523               329               329
          524               329               329
19        525               329               329
          526               329               329
20        527               329               329
          528               329               329
21        529               329               329
          530               329               329
22        531               329               329
          532               329               329
23        533               329               329
          534               329               329
24

25

E X H I B I T S

Federal Public Defender's

| Exhibits | Offered | Received |
|----------|---------|----------|
| 535 | 329 | 329 |
| 536 | 329 | 329 |
| 538 | 329 | 329 |
| 539 | 329 | 329 |
| 540 | 329 | 329 |
| 543 | 329 | 329 |
| 544 | 329 | 329 |
| 546 | 329 | 329 |
| 548 | 329 | 329 |
| 549 | 329 | 329 |
| 550 | 329 | 329 |
| 551 | 329 | 329 |
| 552 | 329 | 329 |
| 553 | 329 | 329 |
| 554 | 329 | 329 |

Special Master's

| Exhibits | Offered | Received |
|----------|---------|----------|
| Barnett 1 | 395 | 395 |
| Beall 1 | 395 | 395 |
| Bigelow 1 | 395 | 395 |
| Boyd 1 | 395 | 395 |
| Catania 1 | 395 | 395 |
| Flannigan 1 | 395 | 395 |
| Kinney 1 | 395 | 395 |
| Metzger 1 | 395 | 395 |
| Oakley 1 | 395 | 395 |
| Seubert 1 | 395 | 395 |
| Steeby 1 | 395 | 395 |
| Thomas 1 | 395 | 395 |
| Welch 1 | 395 | 395 |
| Zabel 1 | 395 | 395 |
| Barnett 2 | 395 | 395 |
| Bigelow 2 | 395 | 395 |
| Boyd 2 | 395 | 395 |
| Flannigan 2 | 395 | 395 |
| Oakley 2 | 395 | 395 |
| Seubert 2 | 395 | 395 |
| Steeby 2 | 395 | 395 |

E X H I B I T S

| Special Master's Exhibits | Offered | Received |
|---|---|---|
| Barnett 3 | 395 | 395 |
| Bigelow 3 | 395 | 395 |
| Boyd 3 | 395 | 395 |
| Catania 3 | 395 | 395 |
| Metzger 3 | 395 | 395 |
| Oakley 3 | 395 | 395 |
| Seubert 3 | 395 | 395 |
| Steeby 3 | 395 | 395 |
| Barnett 4 | 395 | 395 |
| Beall 4 | 395 | 395 |
| Bigelow 4 | 395 | 395 |
| Boyd 4 | 395 | 395 |
| Flannigan 4 | 395 | 395 |
| Metzger 4 | 395 | 395 |
| Oakley 4 | 395 | 395 |
| Seubert 4 | 395 | 395 |
| Barnett 5 | 395 | 395 |
| Beall 5 | 395 | 395 |
| Bigelow 5 | 395 | 395 |
| Boyd 5 | 395 | 395 |
| Flannigan 5 | 395 | 395 |
| Metzger 5 | 395 | 395 |
| Oakley 5 | 395 | 395 |
| Seubert 5 | 395 | 395 |
| Barnett 6 | 395 | 395 |
| Beall 6 | 395 | 395 |
| Bigelow 6 | 395 | 395 |
| Boyd 6 | 395 | 395 |
| Flannigan 6 | 395 | 395 |
| Metzger 6 | 395 | 395 |
| Oakley 6 | 395 | 395 |
| Seubert 6 | 395 | 395 |
| Barnett 7 | 395 | 395 |
| Beall 7 | 395 | 395 |
| Bigelow 7 | 395 | 395 |
| Flannigan 7 | 395 | 395 |
| Metzger 7 | 395 | 395 |
| Oakley 7 | 395 | 395 |

E X H I B I T S

| Special Master's Exhibits | Offered | Received |
|---|---|---|
| Barnett 8 | 395 | 395 |
| Beall 8 | 395 | 395 |
| Bigelow 8 | 395 | 395 |
| Flannigan 8 | 395 | 395 |
| Oakley 8 | 395 | 395 |
| Barnett 9 | 395 | 395 |
| Beall 9 | 395 | 395 |
| Bigelow 9 | 395 | 395 |
| Flannigan 9 | 395 | 395 |
| Oakley 9 | 395 | 395 |
| Barnett 10 | 395 | 395 |
| Bigelow 10 | 395 | 395 |
| Flannigan 10 | 395 | 395 |
| Barnett 11 | 395 | 395 |
| Bigelow 11 | 395 | 395 |
| Flannigan 11 | 395 | 395 |
| Bigelow 12 | 395 | 395 |
| Barnett 13 | 395 | 395 |
| Bigelow 13 | 395 | 395 |
| Barnett 14 | 395 | 395 |
| Bigelow 14 | 395 | 395 |
| Kinney 14 | 395 | 395 |
| Bigelow 15 | 395 | 395 |
| Barnett 16 | 395 | 395 |
| Bigelow 16 | 395 | 395 |
| Tomasic 16 | 395 | 395 |
| Tomasic 17 | 395 | 395 |
| Tomasic 19 | 395 | 395 |
| Tomasic 20 | 395 | 395 |
| Tomasic 21 | 395 | 395 |
| Tomasic 22 | 395 | 395 |
| Tomasic 25 | 395 | 395 |
| Tomasic 46 | 395 | 395 |

```
 1                    (8:48 a.m., proceedings commenced).
 2                    THE COURT:  All right.  We are back on the
 3   record in-- Ms. Dodge, is Mr. Bishop here?
 4                    MS. DODGE:  He is not, Your Honor.  And I
 5   need to file a waiver and, I'm sorry, I have not done
 6   that.
 7                    THE COURT:  Okay.  But you are going to
 8   waive his appearance today?
 9                    MS. DODGE:  Yes.
10                    THE COURT:  Okay.  We're back on the record
11   in United States versus Lorenzo Black, 16-20032.  And it
12   looks like all counsel are of record.  All parties
13   except for Mr. Bishop, who has waived appearance, and
14   Mr. Carter, who's also waived appearance.
15                    So are the parties ready to proceed?  Where
16   are we at at this point?
17                    MR. SLINKARD:  Your Honor, the morning has
18   been fraught with a great many negotiations--
19   conversations I should say.  And by the way this
20   hearing-- the previous hearing spilled into this one, we
21   were just in the process of trying to have a little bit
22   of further conversation with defense counsel.
23                    If the Court would be inclined to stand easy
24   for a moment, we're going to have some matters to
25   present, but we-- if we could talk for a minute, that
```

1    might shape what we present.

2              THE COURT:  Okay.  I don't want to rush you.

3    I mean, if you think you're going to present something

4    that will either cause me to continue this hearing or at

5    least narrow the hearing, I mean, you can use time to do

6    that I'll suggest to you.  Ms. Brannon.

7              MS. BRANNON:  We would make the request if

8    we could just have a few minutes to talk.

9              THE COURT:  Okay.  So we will be in recess

10   subject to call, just let me know when you're ready.

11             (Recess).

12             THE COURT:  All right.  You can be seated.

13   All right.  We are back on the record in *United States*

14   *versus Black*, *et al.*  And all parties and counsel are

15   present.

16             So I think there is an announcement to make

17   to the Court, I don't know who wants to do that.

18             MR. McALLISTER:  May it please the Court.

19   Your Honor, Steve McAllister, U.S. Attorney for the

20   District of Kansas.  And the government would like to

21   make a motion and then a little explanation about that

22   motion.

23             THE COURT:  All right.

24             MR. McALLISTER:  But at this time the

25   government would move to dismiss the charges against Mr.

 1  Carter and Mr. Bishop.

 2           The government has been engaged in

 3  discussions with the various parties interested in this

 4  case, the Special Master, the Federal Public Defender's

 5  Office and counsel for the remaining defendants.  And I

 6  think we've agreed that we would all welcome the

 7  opportunity to work together to try to come up with a

 8  proposed standing order that could be used when it comes

 9  to recorded calls at facilities going forward, and I

10  think that would be in the interest of all the parties

11  and the Court.

12           The government would also anticipate that

13  for the most part then the Special Master and the

14  Federal Public Defender's Office would-- they may have a

15  couple more witnesses, but that this hearing would

16  largely then be adjourned and we could set a date in the

17  future for a status conference.  And if we are unable to

18  work out things, including some possible additional

19  retrospective relief, then we could come back to the

20  Court, if necessary, to continue the hearing.

21           THE COURT:  All right.  Thank you, Mr.

22  McAllister.  Anyone else want to weigh in at all on

23  anything?

24           MS. BRANNON:  Judge, I think as part of

25  this-- we have a number of motions pending before the

1    Court.  We would ask the Court just to hold off and hold

2    those in abeyance until at least the status conference

3    that the Court sets.

4           Part of this agreement is that we would go

5    ahead and move to admit our remaining exhibits that have

6    not yet been admitted.  It's our understanding there

7    would be a stipulation to that.

8           MR. McALLISTER:  The government would

9    stipulate to that with the same-- I'll let Mr. Clymer

10   speak.

11          MR. CLYMER:  Your Honor, there is a

12   stipulation with respect to the remaining exhibits by

13   both the Federal Public Defender and the exhibits that

14   Mr. Cohen has marked and distributed to the parties.

15          With respect to some of the Federal Public

16   Defender's exhibits, Your Honor, there are-- some are

17   going to either be sealed or have to remain under seal.

18   I'll give the Court those numbers if you'd like.

19          THE COURT:  Okay.

20          MR. CLYMER:  438 is a grand jury subpoena.

21   464 is a under-seal audio-recording that's already been

22   sealed I believe.  469 is a grand jury subpoena.  471 is

23   a grand jury subpoena.  473 is a grand jury subpoena.

24   475 is a grand jury subpoena.  I'm going to have to ask

25   Ms. Brannon a question about 501, so I'm going to hold

 1   off on that for a second, Your Honor.  And as soon as

 2   I'm done with the other list I'll ask her about that.

 3              And then 544 through 547.  So 544, 545, 546,

 4   and 547 are all documents presently under court seal I

 5   believe and they should remain under seal.  And finally

 6   554 is a document that's already under seal and we'd ask

 7   that it remain under seal.

 8              THE COURT:  Okay.

 9              MR. CLYMER:  And I'll just ask Ms. Brannon

10   about 501.

11              MS. BRANNON:  Judge, while he's looking for

12   that, we have also reserved the right to move to unseal

13   these if it becomes necessary in our view.  And also, as

14   the Court noted, it's at the Court's discretion whether

15   to unseal these as necessary for findings in this case.

16              The other thing we would put on the record

17   is that there's nothing about our agreement and holding

18   this in abeyance that is intended to hinder any other

19   litigation or the Court's investigation in this case.

20   And we would ask if the Court could set a status

21   conference in perhaps the first or second week of June,

22   we would be able to have a deadline and report back to

23   the Court on that.

24              THE COURT:  All right.  We will need to make

25   a record by at least exhibit number of those FPD and

 1  Special Master exhibits that are being moved, are being

 2  admitted by stipulation.  And I've got the list here, of

 3  course, of those that are under seal pending ruling on a

 4  motion to unseal or the Court's sua sponte unsealing to

 5  make fact findings.

 6           But I-- can you give me the other exhibit

 7  numbers that should be admitted for the record?

 8           MR. CLYMER:  I'll get the Special Master's

 9  exhibits, Your Honor.  And Exhibit 501 that I mentioned

10  does not have to be sealed.

11           THE COURT:  Okay.

12           MR. CLYMER:  And I should just point out,

13  Your Honor, as well if things don't work out the way

14  everyone hopes and we re-open the hearing, the

15  government reserves its right to make relevance

16  objections to all these exhibits.

17           THE COURT:  Okay.

18           MS. BRANNON:  Judge, and before we get to

19  Mr. Cohen' exhibits, there is also an agreement that

20  those will be admitted by stipulation with the

21  reservation for the relevancy objections that the

22  government has.

23           The other agreement we have is that the

24  witnesses who have testified or been subpoenaed will

25  remain under sequestration.  And we've talked to the

1    Court about a couple of exceptions pertaining to Mr.

2    McAllister and Mr. Slinkard on that, but I believe that

3    covers what we have to present to the Court.

4              THE COURT:  All right.  So I understand, the

5    witnesses remain under sequestration with the proviso

6    that Mr. McAllister and Mr. Slinkard may talk to those

7    witnesses to conduct their own investigation or their

8    own-- to be able to ask questions about certain pending

9    cases of those witnesses--

10             MS. BRANNON:  That's correct.

11             THE COURT:  -- or those prosecutors I should

12   say.  Okay.

13             All right.  Mr.-- I'll ask Mr. Bell and then

14   Mr. Cohen to tell me the exhibit numbers that are

15   admitted by stipulation, subject to a-- any relevance

16   objections if the hearing goes forward.

17             MR. BELL:  Thank you, Your Honor.  Those

18   would include Federal Public Defender Exhibits 465

19   through 476, 478, 481 through 490, 493, 495, 496, 499

20   through 502, 504 through 507, 509 through 511, 513

21   through 520, 522 through 536, 538 through 540, 543

22   through 544, 546, 548 through 554.

23             THE COURT:  All right.  All of those

24   exhibits are admitted by stipulation subject to

25   relevance objections.

1           Mr. Cohen.

2           SPECIAL MASTER COHEN:  Judge, with the

3    Court's permission, I think it would probably take five

4    minutes for me to in a very boring fashion read off all

5    of my exhibits numbers.  What I propose instead, without

6    wasting the Court's time with what would be a boring and

7    administrative matter, it would be easier after the

8    hearing to meet with Mr. Clymer, come to an

9    understanding of what the agreed exhibit list is and

10   present it to the Court.  And then it would be much

11   quicker and easier I think for the Court.

12           THE COURT:  All right.  Is that acceptable,

13   Mr. Clymer?

14           MR. CLYMER:  Yes, Your Honor.

15           THE COURT:  All right.  So I'll show that

16   Special Master's exhibits, per an agreed exhibit list to

17   be submitted, will be admitted by stipulation, subject

18   to relevance objections.

19           MR. CLYMER:  One question for the Court,

20   Your Honor.  Does the Court already have a record of the

21   exhibits Mr. Cohen has already used with witnesses?

22           THE COURT:  Not an index, no.

23           MR. CLYMER:  Okay.  So we should do all of

24   his exhibits.

25           THE COURT:  Okay.

1           MR. CLYMER:  All right.

2           SPECIAL MASTER COHEN:  Thank you, Judge.

3           THE COURT:  Okay.  All right.  Anything

4    else?  Mr. Guastello?

5           MR. GUASTELLO:  I just have a couple of

6    additional issues.  I wanted clarification.  Is the

7    government moving to dismiss with regard to Mr. Carter

8    with prejudice?  I don't know if I caught that or not.

9           MR. McALLISTER:  The answer to that, Your

10   Honor, would be yes.  In the interest of justice, this

11   litigation has drug on and-- and gotten involved in all

12   sorts of things and in large part in fairness to these

13   defendants, who have been delayed a considerable amount

14   of time, we would dismiss with prejudice.

15          THE COURT:  All right.  I will not be able

16   to grant the motion to dismiss yet until the settlement

17   is completed.  And hopefully at the status conference if

18   everything is ironed out and papered, I can enter the

19   order at that time.

20          So I'm keeping all pending motions in

21   abeyance, but-- including the government's motion to

22   dismiss these two defendants with prejudice.

23          MR. GUASTELLO:  And then, Judge, with that

24   understanding, at the conclusion of Agent Stokes'

25   testimony yesterday I did move pursuant to Rule 26.2 for

1    his statements.  I believe the government's position was

2    that they would contact me and discuss with me what

3    statements that there are that would fall under that

4    rule and then provide those statements to me.

5              THE COURT:  All right.  So that's agreed as

6    well?

7              MR. McALLISTER:  Your Honor, may I add one

8    thing?  I-- I believe I was not clear, but the

9    government's intention was to dismiss these two

10   defendants with prejudice now, not-- not subject-- we

11   are going to go forward with trying to come up with a

12   prospective resolution and we will consider possible

13   other retrospective relief.  But with respect to these

14   two, the government does not oppose dismissing them now.

15             THE COURT:  The only thing that gives me

16   pause is that this case doesn't exist, the Special

17   Master's investigation is attached to this case, the

18   Circuit has limited it to this case.  And so I don't

19   know how we keep that open with the dismissal of these

20   two defendants at this point, unless anyone has some

21   ideas how to accomplish that.

22             I mean, I suppose if you all wanted to

23   stipulate that the Special Master's investigation stays

24   open, although it's-- I don't know-- I don't know

25   logistically how we do that without a pending case.

1          MS. BRANNON:  Your Honor, I-- I think if the

2    Court held that motion open, I don't know that it would

3    prejudice either of these two defendants.  And I

4    understand the Court's concern.  I think we wanted to

5    make sure that the Court knew that the motion to dismiss

6    was not contingent on reaching a settlement agreement.

7          THE COURT:  Okay.

8          MS. BRANNON:  It was-- it had to do with how

9    we handle the rest of the hearing and other things that

10   Mr. McAllister said.

11         THE COURT:  Okay.

12         MS. BRANNON:  But we understand the Court's

13   concern.  We think there are other arguments that would

14   justify it, but I-- I don't have the objection-- or I'm

15   not-- I don't think that we have any objection to the

16   Court keeping that motion under advisement for the time

17   being.

18         MS. DODGE:  On behalf of Mr. Bishop, Your

19   Honor, I just had a courtroom and a district federal

20   judge witness-- (reporter interruption).  I've never had

21   this happen before.

22         THE COURT:  It's a different courtroom and

23   there's wind-- it sounds like we're in a wind tunnel.  I

24   don't know why.

25         MS. DODGE:  On behalf of Mr. Bishop, I just

1    had a courtroom full of witnesses, including a federal

2    district judge hear the United States Attorney agree to

3    dismiss my client's case with prejudice on behalf of

4    David Bishop.

5            We do not object to that being held in

6    abeyance long enough for us to figure out or for the--

7    for the rest of the folks to figure out where we are on

8    that.  So I take it from his word and from the record

9    that he will do that.  So what the Court deems to be

10   appropriate, Mr.-- on behalf of Mr. Bishop we would

11   agree.

12           THE COURT:  Okay.  I'm mindful that we need

13   to get this accomplished.  We need to get them dismissed

14   as quickly as possible, I am mindful of that, but-- and

15   I'm mindful that you haven't negotiated this contingent

16   on the settlement.  But we can't in my mind accomplish

17   the settlement with no case attached, given that the

18   settlement includes keeping open the possibility of

19   another hearing, keeping open the possibility of the

20   Special Master's investigation continuing.  So that's my

21   thought.  Mr. Guastello.

22           MR. GUASTELLO:  And, Judge, just very

23   briefly with regard to Mr. Carter.  We would have no

24   objection to-- to keeping that-- that motion open and

25   this case open for the time being.  He is currently

1    serving a 230-month sentence on another case, so it's

2    not like we're in a situation where this is the sole

3    matter that's keeping him in custody currently.

4              THE COURT:  Thanks for reminding me of that,

5    because both Mr. Carter and-- well, Mr. Carter is on

6    bond.

7              MR. GUASTELLO:  Mr. Carter is in custody.

8    Mr. Bishop is on pretrial release.

9              THE COURT:  Mr. Bishop is on bond.  So Mr.

10   Carter is serving another sentence.  He was an inmate at

11   the time of this investigation, so he has another

12   controlling sentence.

13             MR. GUASTELLO:  Yes, Judge.

14             THE COURT:  I understood that.  And Mr.

15   Carter is on bond and will remain on bond-- or Mr.

16   Bishop, I'm sorry, is on bond and will remain on bond.

17   All right.

18             MR. McALLISTER:  And, Your Honor, the

19   government would just like to say if you wanted to

20   dismiss Mr. Bishop and retain Mr. Carter, I believe

21   that's agreeable to all of the parties.

22             THE COURT:  All right.  All right.  Well,

23   then I will grant-- I will grant the motion to dismiss

24   Mr. Bishop with prejudice now.  So you'll have that

25   happy news to report to Mr. Bishop when you see him.

1    And Mr. Carter, I'll hold that motion in abeyance.

2            All right.  So unless there's anything else

3    to announce, I think we can-- you want to call two

4    witnesses from CCA before we adjourn the hearing?  Mr.

5    Clymer.

6            MR. CLYMER:  Your Honor, I don't want to end

7    this on a bad note, but I just want to make sure there's

8    no misunderstanding.  We obviously reserve all claims,

9    arguments that we would have been able to make if things

10   don't work out.  We don't expect that's going to be

11   necessary, but I just want to make clear that we

12   haven't-- we're not waiving any arguments or claims or

13   positions we've taken.

14           THE COURT:  Understood.

15           SPECIAL MASTER COHEN:  And, Judge, in the

16   same way, my understanding is that this hearing is

17   adjourned, will be adjourned, but is being held open in

18   case things don't work out.  And also that we're not

19   going to be recalling Ms. Tomasic today, but that she's

20   subject to recall if-- if that becomes necessary.

21           THE COURT:  All witnesses are subject to

22   recall unless they were previously given leave, and I

23   think there was one or two that were told they didn't

24   have to come back.  But Ms. Tomasic is subject to

25   recall, as are all other witnesses who have testified or

 1    not yet testified.

 2              SPECIAL MASTER COHEN:  Thank you, Judge.

 3              THE COURT:  Okay.  All right.  So let's put

 4    these other two witnesses on.  Is this something we can

 5    do before we close-- I mean, we can get it done within

 6    the next hour or two?

 7              MR. REDMOND:  I think less than ten minutes

 8    apiece, Your Honor.

 9              THE COURT:  Okay.  All right.

10              MR. MELTZER:  My name is Hal Meltzer, and I

11    represent Linda Thomas and Wayne Bigelow.  And in light

12    of the fact that there is no case or controversy now

13    with regard to these folks, and I understand that

14    there's this idea of the motion to dismiss with

15    prejudice being held in abeyance, the motion to dismiss

16    has already-- I mean, it's clear that that's going to

17    happen.

18              I believe that there's no case or

19    controversy, there's no standing then for these two

20    witnesses to be called and their subpoena should be

21    quashed.  We ask that you do that before they testify.

22              There's no reason for these two people to be

23    testifying here in this case at this point that have--

24    from CCA.  They have had access-- the Special Master has

25    had access to them.  They have been interviewed by the

1   Federal Public Defender's Office.  They-- their

2   testimony really goes to no issue that's still pending

3   for this Court and at this point in time, given the fact

4   that the charges against these two remaining criminal

5   defendants are gone.

6           THE COURT:  Well, Mr. Meltzer, I strongly

7   disagree with you.  The parties are obviously in the

8   process of negotiating a settlement that involves

9   prospective and retrospective relief.  And I don't know

10  what they're contemplating in terms of retrospective

11  relief, although I do with respect to these two

12  defendants and that is a dismissal.

13          But with respect to prospective relief, and

14  I'm aware of all of the testimony that's been given

15  regarding the recording system at CoreCivic.  I still

16  have some questions in my mind as to how the-- the

17  system works.  And I think those questions go directly

18  to how the prospective relief should be fashioned in

19  terms of how the government will go about getting

20  recordings and ensuring that the recordings don't have

21  attorney-client privileged calls.

22          So I do think these two witnesses are--

23  their testimony is very material to what the parties are

24  trying to accomplish in this case that's still open.

25          MR. MELTZER:  And I understand that their

1    testimony may be relevant and material to certain

2    issues, but I don't believe that there's standing any

3    longer, given the dismissal of those-- of those two--

4    the effective dismissal with prejudice of those two

5    criminal defendants in this case.

6              THE COURT:  Okay.  Well, I disagree.

7    There's one-- there's one defendant who has not been

8    dismissed, and that's Mr. Carter.

9              MR. MELTZER:  And I understand that's

10   because it's held in abeyance, but the motion to dismiss

11   has been made with prejudice that there's no-- there's

12   no-- it's not a matter of acceptance or unacceptance.

13   They've dismissed with prejudice, that's it.

14             THE COURT:  All right.  Your argument is so

15   noted.  All right.  Let's proceed.  Mr. Redmond.

16             MR. REDMOND:  We call Wayne Bigelow.

17                      WAYNE BIGELOW,

18   called as a witness on behalf of the Federal Public

19   Defender, having first been duly sworn, testified as

20   follows:

21                   DIRECT EXAMINATION

22   BY MR. REDMOND:

23      Q.  Good morning, Mr. Bigelow.

24      A.  Good morning.

25      Q.  You've testified before in this case?

16-20032-JAR    USA v. Lorenzo Black    05.16.18    340

1    A.   I have.

2    Q.   We have a couple of discrete areas of inquiry.  I

3    promise I won't take too much of your time.  Okay?

4    A.   All right, sir.

5    Q.   So you currently work at CoreCivic?

6    A.   I do.

7    Q.   And you are the director of the security threat

8    group?

9    A.   I am.

10   Q.   And say one more time what that is.

11   A.   I directly deal with the inmate population that

12   may or may not be involved in gang activity.  So I-- I

13   interview with intelligence information I might get from

14   the marshals service and other law enforcement agencies

15   to determine whether we have that situation in the

16   purpose of housing.  So that if we have rival

17   situations, we don't house them-- so that we may avoid

18   an incident.

19   Q.   Okay.  And one of the other jobs that you have at

20   CCA is to assist in the process of privatizing attorney

21   telephone numbers?

22   A.   That is correct, sir.

23   Q.   And you took that job over when?  Late 2015?

24   A.   Right.  It was in December of 2015 I started

25   training with it.

 1    Q.  I am going to show you what has been marked and

 2   admitted as Defendant's Exhibit 551, Mr. Bigelow.

 3    A.  Okay.

 4    Q.  Do you recognize that?  Or more specifically, is

 5   that an e-mail between you and Michael Kenyon?

 6    A.  Yes, it is.

 7    Q.  And who is Michael Kenyon?

 8    A.  Michael Kenyon was the senior accounts manager at

 9   Securus, which was the telephone platform that we used

10   at the time.

11    Q.  Okay.  And I want to get back to that point in a

12   second.  But on the second page of the e-mail it is

13   dated December 10th of 2015; is that correct?

14    A.  Yes, sir.

15    Q.  And that is the day that you were e-mailed your

16   password for your Securus account; is that right?

17    A.  Yes, sir.

18    Q.  So that's the date that you started in the

19   process-- or you started-- sorry about that.  That's the

20   day that you began being involved in privatizing

21   attorney telephone numbers?

22    A.  That's correct.

23    Q.  And did you have any experience with the Securus

24   platform at that point?

25    A.  No.

1    Q.   And did you receive any training either at CCA or

2    through Securus before you began the process of

3    privatizing attorney-client phone numbers?

4    A.   It was-- it was kind of a process we were going

5    through.  When I was granted this, that was granting me

6    access so that I could learn how to-- how to do it.

7    Q.   But you had never done it before?

8    A.   I had not.

9    Q.   And they don't like fly you down to Florida for

10   like a week-long training or anything?

11   A.   Not at all.

12   Q.   Okay.  So-- and, in fact, what you tell Mr.

13   Kenyon is that-- you asked him to please bear with you

14   as you obviously have a lot to learn?

15   A.   Correct.

16   Q.   Was that a fair description--

17   A.   It is.

18   Q.   -- of your experience when you began?

19   A.   Yes, sir.

20   Q.   Okay.  And since that time, have you had

21   additional training or is it something you sort of had

22   to end up learning by doing?

23   A.   Learning by doing.

24   Q.   Okay.  I am showing you what's been marked and

25   admitted as Defendant's Exhibit 550.  Is that another

1  e-mail between you and Mr. Kenyon?

2      A.  Yes, sir.

3      Q.  And this e-mail, the date is July 27th of 2016?

4      A.  Yes, sir.

5      Q.  And that is the date that Mr. Kenyon e-mails you

6  information on how to add a number to the Securus list

7  as a private number; is that correct?

8      A.  Yes, sir.

9      Q.  So you didn't have that access for approximately

10  seven months; is that right?  How would you have

11  privatized a number between December of 2016 [sic] and

12  July 27th of 2016?

13      A.  How-- could you repeat that, sir?  I'm sorry.

14      Q.  Yes, sir.  Yeah, that's a bad question.  Let me

15  back up to the e-mail.  What it says is-- Mr. Kenyon

16  sends you instructions on how to add a number to the

17  list as a private number.  Do you see that on Page 1?

18      A.  I do.

19      Q.  Okay.  So that was-- was that the first time when

20  you were working with the Securus system that you had to

21  privatize a telephone number?

22      A.  I don't believe it was the first time.  Mr.

23  Lajiness had-- was instrumental and was actually doing

24  that procedure when I took the position as a-- as a

25  security threat group coordinator.  And so that's who I

1    received a majority of my training from.

2        And this was-- this may have been a situation

3    where, in fact, like you say, I may have needed to do

4    that and I wasn't familiar and-- and Mr. Kenyon sent me

5    this to kind of walk me through it.

6    Q.   And by "this," you mean a list of instructions

7    about how to privatize a number?

8    A.   That's correct.

9    Q.   Okay.  And on Page 2 of that e-mail, you're

10   telling Mr. Kenyon that what you're trying to do is

11   call-- is prevent calls to attorneys from being

12   recorded; is that right?

13   A.   That's correct, yes, sir.

14   Q.   And that is what the instructions on Page 1 of

15   the e-mail let you-- or let you know how to do that; is

16   that right?

17   A.   That's correct, yes, sir.

18   Q.   Okay.  And I am showing you what's been marked

19   and admitted as Defendant's Exhibit 548, sir.  Is this

20   another e-mail between you and Mr. Kenyon?

21   A.   Yes, sir, it is.

22   Q.   And it's dated September 12th of 2016?

23   A.   It is.

24   Q.   Okay.  And I'm directing your attention to the

25   third page of the e-mail at the very top of the page.

1        Was the reason that you sent this e-mail to get

2   instructions on how to clean up numbers that you had

3   inputted incorrectly?  And I'm looking at the second

4   line of the very top of Page 3 of the e-mail.

5       A.   That's-- that's what it says, sir, yes.

6       Q.   And I mean, everybody makes mistakes.  If you

7   keyed the number in incorrectly to the system--

8       A.   Right.

9       Q.   -- then the call is not privatized.  Right?

10      A.   That's correct.

11      Q.   Okay.  So this is then you and Mr. Kenyon are

12  trying to work through the process of getting some

13  numbers fixed; is that right?

14      A.   That's correct.  As I recall-- and I'm trying to

15  recall this and as I recall this, the-- what I had been

16  doing was I was putting the 1 and then the area code and

17  spacing between the-- the prefix and the number.

18      Q.   Uh-huh.

19      A.   And the spacing is not required, nor is the 1.

20  And that's what-- that's what I was having difficulty

21  with.

22      Q.   Okay.  And so if you were inputing the number

23  with the 1 in front of it, that means that it wasn't

24  being accurately entered into the Securus database?

25      A.   The system wouldn't allow it-- wouldn't accept it

1   and I couldn't understand why that was.

2       Q.   And I have a-- I have a question for you about

3   the middle of Page 2 on the e-mail.  Mr. Kenyon asks you

4   if you're looking for other numbers that may have been

5   entered incorrectly.  And he says if so, those are

6   included in the attached spreadsheet.

7           So was there a spreadsheet of numbers that had

8   been inputted incorrectly that Mr. Kenyon sent you?

9       A.   I don't recall that, sir.

10      Q.   Okay.  Do you have any reason to doubt that Mr.

11  Kenyon sent you a spreadsheet?

12      A.   I do not.

13      Q.   Okay.  And were the numbers on that spreadsheet

14  inputted incorrectly for the same reason that you

15  described for-- before, that there was a 1 in front or

16  for different reasons?

17      A.   I'm sorry, I don't recall.

18      Q.   Okay.  That's okay.  So you have a lot of

19  responsibilities at CCA in terms of figuring out who's

20  in what gang and how to keep them apart; is that fair to

21  say?

22      A.   That's fair.

23      Q.   What percentage of your time do you devote to

24  privatizing telephone numbers?

25      A.   Well, as we speak today, I don't-- I don't do

1    that much with it because we've streamlined the process

2    and I think it improved it, so...

3        Q.   Okay.  And I wanted to ask you about that because

4    you told the Court that you no longer work with Securus.

5    Please explain what you mean by that.

6        A.   Well, we have a-- a new platform we use now

7    called ICSolutions.  It's a different company.

8        Q.   Okay.  Is there a different process now for

9    inputting telephone numbers for privatization?

10        A.   There is.

11        Q.   What is that process?

12        A.   We've got two avenues to go with it.  We provide

13   the-- a form that was generated so that the inmates

14   could complete this form, adding the information about

15   their attorneys and their attorney numbers.  They place

16   that in the mailbox in the housing unit.  The forms are

17   provided in the housing unit near the phones.

18        Q.   Okay.

19        A.   They put it in the mailbox, because one of my

20   duties that I have is I retrieve the mail every morning.

21   So that way I get it directly and I can go ahead and

22   process it that day so as not to prolong the-- the

23   process.

24            And I-- what I do then is I scan that form and I

25   send it to Praeses, which is a company associated with

1    ICSolutions.  And they verify the numbers to make sure

2    they are, in fact, attorney numbers.  And then they

3    respond back with an e-mail stating that those numbers

4    have been, in fact, set as privileged and whether or not

5    they are or not, so that I can get back to the inmate to

6    let them know-- notify them that it has been done so

7    that they-- they no longer need to be concerned about

8    that.

9        Q.   Do they receive a written documentation?

10       A.   Yes, they do, sir.

11       Q.   Okay.  And how long has this been going on?

12       A.   I'm going to say we've probably been doing that

13   since August or September of '16.

14       Q.   Okay.  I have one more piece of paper to show

15   you, Mr. Bigelow.  This is what's been marked and

16   admitted as Defendant's Exhibit 484.  Is this an e-mail

17   between you and the marshals service?

18       A.   Yes, sir, it is.

19       Q.   And it's dated November 17th of 2016?

20       A.   That's correct.

21       Q.   The first-- the marshal has responded to this

22   e-mail by asking you if the subpoena requirement is new.

23   "Normally, we just call up there and the next thing a

24   disk shows up."  What does that mean?

25       A.   When I started with this process, we-- the U.S.

1    Marshals Service is our contracting agent.

2        Q.   Yes, sir.

3        A.   And I would receive-- sometimes I would receive

4    forms that were generated by the U.S. Attorney.  I may

5    receive an e-mail from one of the deputy marshals or

6    sometimes a phone call.  And they would request these--

7    these phone calls, whether they would-- and the phone

8    logs and-- placed on recordings.

9        Q.   Okay.

10       A.   And we would comply with that and generate those

11   and see that they got them.

12            When Warden Thomas came to our facility, at that

13   point we took-- she reviewed this and it was determined

14   that we needed to change some things and then we

15   required a subpoena to obtain those documents or the--

16   the recorded calls as well.  So that's when we put that

17   in effect.  So that's where this reference comes from.

18       Q.   A subpoena from everyone?

19       A.   Yes.

20       Q.   U.S. Attorney, marshals office, whoever?

21       A.   Anyone that required that.

22       Q.   Anyone that's asking for phone records?

23       A.   That's correct.  And with that process, we-- we

24   receive the subpoena, I-- I forward them on to our

25   attorney for verification to make sure it's authentic,

1    and then we get approval from them and then we proceed.

2       Q.  Okay.  I have just a couple more questions.

3    Before this change to-- Praeses you said?

4       A.  Yes.

5       Q.  When you were still on the Securus platform and

6    there was an attorney-- let me back up.

7           When you were still on the Securus platform, did

8    CCA undertake any efforts to notify attorneys, say that

9    were on the panel or the Federal Public Defender Office,

10   that they needed to get their numbers privatized?

11      A.  No.

12      Q.  Is there a sign in the lobby?

13      A.  No.

14      Q.  Were any letters sent by anybody from CCA that

15   you're aware of?

16      A.  We didn't.  But with that-- anytime those phone

17   calls are made from the housing units, if that number is

18   not set as privileged between attorney and the client,

19   the attorney and the inmate as well on both sides of

20   that will hear a recording that states that this-- this

21   call is recorded and may be monitored.

22      Q.  Is that still true?

23      A.  That's correct.

24      Q.  Okay.

25              MR. REDMOND:  That's all I have, Your Honor.

1    Thank you very much.  You may have some other folks who

2    want to ask questions.

3                THE WITNESS:  All right, sir.

4                THE COURT:  All right.  Mr. Guastello.

5                MR. GUASTELLO:  I have no questions, Your

6    Honor.

7                THE COURT:  Ms. Dodge?

8                MS. DODGE:  No, Your Honor.

9                THE COURT:  Mr. Cohen?

10               SPECIAL MASTER COHEN:  Thank you, Judge.

11                         CROSS EXAMINATION

12   BY SPECIAL MASTER COHEN:

13      Q.  Good morning, Mr. Bigelow.

14      A.  Good morning.

15      Q.  Good to see you again.

16      A.  How are you?

17      Q.  We visited a few times in prison.  Correct?

18      A.  We have.

19      Q.  I'm happy to be out here instead of in prison

20   visiting with you.

21          You talked about how-- you talked about how

22   requests would come to you and Mr. Lajiness and

23   predecessors for-- for calls and those requests came in

24   different ways.  I want to just go over some of the ways

25   that that occurred.

 1      A.   All right.

 2      Q.   I'm going to begin by showing you Bigelow 1.  Do

 3   you recognize this document, sir?

 4      A.   Yes, sir.  It's an administrative subpoena.

 5      Q.   Okay.  And this was sent to you and Mr. Lajiness;

 6   is that right?

 7      A.   Yes, sir.

 8      Q.   Just one second.  Okay.  And you recognize this

 9   as a-- what's called an administrative subpoena because

10   that's what it says on the top?

11      A.   Yes, sir.

12      Q.   And this came to you June 6 of 2016, correct,

13   down at the bottom left-hand corner?

14      A.   Yes, sir.  I see that now, yeah.

15      Q.   And so that was one way that calls were requested

16   of you, you received what I would call an administrative

17   subpoena; is that right?

18      A.   Yes, sir.

19      Q.   Okay.  I'm showing you Bigelow 2.  What is this

20   document?

21      A.   This is a request form from the U.S. Marshals,

22   the District of Kansas, requesting information it looks

23   like.

24      Q.   And that came in April 26th of '17?

25      A.   Yeah, April 26th.  That's correct, yes.

1    Q.    Would you agree this is not a subpoena?

2    A.    I would.

3    Q.    Down on the bottom of this it says, "Note:

4  Attorney-client conversations will not be included in

5  these recordings."  Do you see that?

6    A.    I do.

7    Q.    How does-- how does CCA ensure that

8  attorney-client conversations aren't included in the

9  recordings that are being requested using this form?

10    A.    I don't understand, I'm sorry.

11    Q.    Well, the form says, "Attorney-Client

12  conversations will not be included--"

13    A.    Right.

14    Q.    -- "in these recordings."  So what does CCA do to

15  ensure that attorney-client conversations aren't

16  included when it gives the recordings that are being

17  requested?

18    A.    When we receive a-- a subpoena-- now, this being

19  a request, at this-- at this time we didn't.

20    Q.    I'm sorry, you didn't?

21    A.    At this time and date on-- in April 26th, we

22  didn't-- we didn't go through and glean for these

23  conversations-- for these phone numbers from the-- from

24  the record.  If they had been privileged, they wouldn't

25  record, they couldn't be recorded because they weren't

 1  recorded in the system so they wouldn't be able to be

 2  reproduced.

 3     Q.   Okay.  So if there were any attorney-client

 4  conversations, you believed they weren't privileged,

 5  therefore they were produced?

 6     A.   That's correct.

 7     Q.   Understood.  A similar form on Bigelow 3.  Oops.

 8  I'm sorry.  I've given you the wrong copy.  Here.

 9     A.   That's all right.

10          MR. CLYMER:  And, Your Honor, we have no

11  objection to the admissibility of all the Special Master

12  Bigelow exhibits.

13          THE COURT:  All right.  I think-- well--

14          SPECIAL MASTER COHEN:  Yeah, I thought that

15  we had gone on the record saying--

16          THE COURT:  By stipulation.

17          SPECIAL MASTER COHEN:  -- that there was no

18  objection to any of my exhibits.  Thank you, Mr. Clymer.

19          MR. CLYMER:  There's one exhibit that we had

20  some issues with that I have to talk to you about, about

21  redaction.  Not one of these though.

22          SPECIAL MASTER COHEN:  All right.  Thank

23  you.

24  BY SPECIAL MASTER COHEN:

25     Q.   And this is March-- March of '15?

 1     A.   Yes, sir.

 2     Q.   Essentially the same form?

 3     A.   Yes, sir.

 4     Q.   Same sentence on the bottom about attorney-client

 5   conversations?

 6     A.   Yes, sir.

 7     Q.   And this is not a subpoena, you would agree?

 8     A.   It is not.

 9     Q.   I'm showing you what I've marked Bigelow 4.  I'll

10   take these back from you.

11     A.   All right.  Sure.

12     Q.   Do you know who Kathy Clem is?

13     A.   She's a case manager at our facility.  At this

14   time I believe that she was a-- a counselor with the

15   unit team.  Now she's a case manager.

16     Q.   "At this time" meaning May of 2013?

17     A.   Yes, sir.

18     Q.   Which is what the date of this e-mail is?

19     A.   That's correct.

20     Q.   This is an e-mail from Securus--

21     A.   That's correct.

22     Q.   -- to her.  Correct?

23     A.   Yes, sir.

24     Q.   And it's-- it says, "There's a file created from

25   folder Kevin Lawrence ready for you to download using

1    the link." Explain to me what's going on here. What is

2    the link and what is the file?

3        A.  Well, I can-- I'm not familiar with why Ms. Clem

4    would be getting any of this, to be honest with you.

5    The link that they would be discussing would be-- we

6    have the capability of downloading a phone file into a--

7    a folder, if you will. And then it can be-- once it's

8    authorized through Securus at that time, then it could

9    be stored and burnt to a disk.

10           In that situation, unless it was-- unless it was

11   downloaded into a file, you'd have a 24-hour window to

12   reproduce it.

13       Q.  So if I understand you correctly, Ms. Clem could

14   click on that image and use it to download phone calls?

15       A.  Yeah, she-- she would have to-- and it appears

16   that that's what happened. She was given authorization

17   from Securus to do that, because the-- you had-- we had

18   to-- to do that no matter who it was. If you had the--

19   access to the system, then we would-- we would download

20   it into a file and e-mail that to Securus. Securus

21   would approve it and e-mail us back with a notification,

22   which would be this, saying that it was ready to

23   reproduce.

24       Q.  Could that e-mail be forwarded for someone else

25   to download?

1    A.   Not at that time.

2    Q.   Meaning that--

3    A.   Initially, prior to requesting permission from

4    Securus, it could be sent and the-- the individual

5    requesting the file clicks on the link and then Securus

6    would give them authority.

7    Q.   Okay.  Once Ms.-- was it Clem, had downloaded

8    those files, she would have them, she could forward the

9    files; is that right?

10   A.   No.

11   Q.   Once she downloaded the files from Securus and

12   had them on her computer?

13   A.   Prior-- she could prior to getting authorization

14   from Securus, yes.  But once she got authorization from

15   Securus, she couldn't forward them to anybody.  She

16   would have to go ahead and-- and file it in a folder or

17   reproduce it on a disk.

18   Q.   She could burn them to a disk and then give the

19   disk?

20   A.   Right.

21   Q.   I understand.  I'm showing you Bigelow 5.  Who is

22   Dane Hundley?

23   A.   Dane Hundley was the gentleman that had-- pardon

24   me, held my position before I took it.

25   Q.   Okay.  And this is an e-mail from Agent Michael

1    Stokes to Dane Hundley.  Correct?

2       A.  Yes, sir.

3       Q.  And he is requesting, quote, "a fresh pull on

4    everything on these inmates," and then he lists a whole

5    bunch of them.  And then he says, "I'd like to do the

6    audio via the download link and other stuff."

7           Do I understand that to mean that-- that Agent

8    Stokes is requesting that he receive these calls via a

9    download link?

10      A.  I suppose that-- I suppose that-- that could be

11   perceived that way.  I-- I honestly am not familiar with

12   this and can't speak to it because I'm not sure about

13   it, but...

14      Q.  Okay.

15      A.  I-- I believe it's possible, yes.

16      Q.  I'm showing you Bigelow 6.  And, again, this is

17   to-- excuse me, from Dane Hundley to Sherry Anderson.

18   Do you know who Sherry Anderson is?

19      A.  I do not.

20      Q.  And he's explaining, "What I can do is download

21   any phone calls that he made when he was here.  And when

22   they are downloaded they will send you an e-mail

23   notification.  This e-mail gives you a direct link with

24   instructions on how to obtain the phone calls, 24-hour

25   access.  This is more efficient."

1          So it appears that Ms.-- Mr. Hundley is

2    explaining that there's a downloadable link; is that

3    right?

4        A.  Yes, sir.

5        Q.  Any reason that-- any reason you can think of

6    that a downloadable link in an e-mail couldn't be

7    forwarded to anybody?

8        A.  No, I don't know why it couldn't be forwarded to

9    anybody.  But there again, they have to have approval

10   from Securus to be able to reproduce them.

11       Q.  I'm showing you Bigelow 7.  I'm sorry.

12       A.  That's all right.

13       Q.  This is an e-mail that you're sending; is that

14   right?

15       A.  Yes, ma'am-- yes, sir, uh-huh.

16       Q.  To Patricia Cook, who is a United States Marshal?

17       A.  That's correct.

18       Q.  So most of the documents that I've been showing

19   you except for that very first one have not been--

20   there's been no mention of a subpoena --

21       A.  Correct.

22       Q.  -- would you agree?  In this document there is a

23   mention of a subpoena.  And I'm curious about it because

24   we're in April of '16, and we've seen documents both

25   before and after this date.

1        A.    Uh-huh.

2        Q.    And here at the bottom Patricia Cook is saying,

3    "I have a request from Bradley Gaines of Homeland

4    Security for phone calls."

5        A.    Uh-huh.  Yes, sir.

6        Q.    And Patricia Cook is saying, "Let me find out who

7    this guy is," and I think it's you and maybe I'm getting

8    this wrong who is saying, "I will e-mail him and tell

9    him he needs a subpoena."

10       Can you explain what the difference is between

11   this event and the others we've looked at?

12       A.    Well, I actually--

13       Q.    I'm sorry?  If I mischaracterized that, please

14   correct me.

15       A.    I'm sorry?

16       Q.    If I mischaracterized the e-mail thread, please

17   correct me.

18       A.    I actually remember this situation.  What

19   happened was I didn't know who this person was.

20       Q.    Uh-huh.

21       A.    So I contacted my investigator, who was Ms.

22   Kinney at the time, and she says for me to get with Ms.

23   Cook with the marshals service and-- and ask her if she

24   knows.  And that's how-- so I e-mailed Ms. Cook and she

25   responded by saying she'll find out who he is and get

1    back to me.  And when she did, she says he needs a

2    subpoena for this.

3        Q.   Okay.  So for some reason this fellow with

4    Homeland Security was required to obtain a subpoena to

5    get these calls?

6        A.   That's correct.

7        Q.   I'm going to show you Document No. Bigelow 8.

8    And this is an e-mail from Ken Lajiness, whom you worked

9    with, to Larry Duncan of the marshals service and also

10   Deborah Kinney; is that right?

11       A.   Yes, sir.

12       Q.   Two months after the e-mail we just looked at.

13   This is in June of 2016.  Do you agree?

14       A.   Yes, sir.

15       Q.   And here it says, "Can you get me the phone calls

16   for Mr. Wilkins?  Instead of having them burned to a CD,

17   can you send me a link?  If not, a CD is okay."  Is that

18   right?

19       A.   Yes, sir.

20       Q.   No mention of a subpoena?

21       A.   That's correct.

22       Q.   I'm showing you Bigelow 9.  This is an e-mail to

23   you from Kyle Twaddle or Twaddle?

24       A.   Yes.

25       Q.   Is that right?

1    A.   That's correct, sir.

2    Q.   June 20th of 2016, about the same time as the

3    last one?

4    A.   Uh-huh.

5    Q.   Who is Mr. Twaddle?

6    A.   As I recall, he was with Department of Justice.

7    I think maybe he was DEA, I'm not-- I haven't dealt with

8    him for a while, but I think as I recall that's who he

9    was.

10    Q.   Okay.  And he's just faxing over another

11    administrative subpoena.  So this is a reference to a

12    subpoena?

13    A.   That's correct, sir.

14    Q.   I'm showing you Bigelow 11, an e-mail from you to

15    Deborah Kinney.  Correct?

16    A.   Yes, sir.

17    Q.   August of 2016, just a little bit after the last

18    one.  And here you are saying, "I must have the request

19    from you and/or a subpoena."  So here you're-- unless

20    I'm-- I guess I'm not understanding this because it

21    says--

22    A.   Well, I sent this to Brian Guthrie, who's a U.S.

23    Marshal--

24    Q.   Uh-huh.

25    A.   -- because Mr. Ryan was-- as I recall, I believe

1    was a postal inspector and he was calling me directly

2    wanting this information.  And I told him at the time

3    that I had to have authorization or a subpoena from the

4    U.S. Marshals Service.

5         Q.   I'm showing you Bigelow 12.  This is an e-mail

6    thread.  And if you would look at Page 2, it includes--

7    the original e-mail is from you to Michael Kenyon.

8    Michael Kenyon is with Securus; is that right?

9         A.   Yes, sir.

10        Q.   And it copies Deborah Kinney at CCA?

11        A.   Yes, sir.

12        Q.   And the date of this is October 31st of 2016?

13        A.   Yes, sir.

14        Q.   Are inmates allowed to celebrate Halloween?

15        A.   Pardon me?

16        Q.   Are inmates allowed to celebrate Halloween?

17        A.   Not that I know of.

18        Q.   Every day.  Right?

19        A.   Yeah.

20        Q.   And you write, "I understand inmates now are

21   provided a form to complete and turn in that I am to

22   scan and send to someone at Prius..." I think maybe it's

23   Praeses?

24        A.   Praeses, but I wasn't sure of the pronunciation.

25        Q.   I'll give you auto-correct on that.  "... to be

1   verified and then put in the system as attorney private

2   calls." So the form you're referring to here is

3   something new; is that right?

4       A.   At the time it was, yes.

5       Q.   Yeah.  In your experience was the-- the efforts

6   to privatize phone calls, attorney phone calls, would

7   you say that that was-- sometimes it didn't work quite

8   right?

9       A.   I think that's safe to say, yeah.  There were

10  mistakes made.

11      Q.   The Securus system, as I recall, I might not get

12  this exactly right, when-- when you went into the system

13  to privatize a number, there was a-- a pull-down menu

14  and it said something like site, facility, global,

15  something like that.  And if you privatized a number for

16  a site, it wouldn't mean that a phone call to that

17  number wouldn't be recorded if somebody was in a

18  different site?

19      A.   Correct.

20          MR. CLYMER:  Your Honor, I'm going to

21  object.  I'm not sure that's a-- it's a run-on prolonged

22  question, it's more of an assertion.  I'd ask he just

23  ask the witness.

24          SPECIAL MASTER COHEN:  I'll rephrase it.  It

25  was a multi-part question.

```
 1   BY SPECIAL MASTER COHEN:
 2       Q.  You understood me though?
 3       A.  I did.
 4       Q.  So I will go through it bit by bit.  The Securus
 5   interface that you used had a pull-down menu that
 6   allowed you to choose site, facility, global.
 7       A.  Correct.
 8       Q.  One of those three things.  When you were
 9   privatizing a number, you would have to choose one of
10   those three things?
11       A.  Yes, sir.
12       Q.  If you privatized a number with a site, did that
13   mean that for that site it wouldn't be recorded to that
14   attorney's phone number.  Correct?
15       A.  That's correct, sir.
16       Q.  But if the inmate was making a call from a
17   different site, even within CCA from a different site,
18   his number wouldn't be privatized and it would be
19   recorded?
20       A.  That's correct.
21       Q.  I'm showing you Bigelow 14.  I gave you my copy.
22       A.  Sorry.
23       Q.  This is an e-mail from you to Shannon Armstrong.
24   Can you tell me who Shannon Armstrong is?
25       A.  Sir, I do not recall.
```

1     Q.   If you look maybe an inch-and-a-half down, it

2    says Shannon Armstrong's e-mail address.  Does that

3    remind you at all?

4     A.   It does not.

5     Q.   OPKansas.org, I don't know what that means.

6     A.   I think it's Overland Park, but I just don't

7    recall who it is.

8     Q.   Okay.  And this is in December of 2016?

9     A.   Yes, sir.

10     Q.   And you write down there in the middle, "I

11    received your request for phone records.  I'll be glad

12    to get those.  I will need a subpoena."  Do you see

13    that?

14     A.   Oh, okay.  "I received your request for..."

15     Q.   Do you see that language?

16     A.   Yes, sir.

17     Q.   And then right above that Shannon Armstrong

18    writes, "What specific do I need to be stated in it?  I

19    have never done one for this before."

20     A.   Yeah.

21     Q.   Do you see that?

22     A.   Yes, sir.

23     Q.   Have you ever used a Securus account to live

24    monitor an inmate's phone call, listen to it as the

25    inmate is making it?

1    A.   No.

2    Q.   Do you know that that can be done?

3    A.   I-- I have never done it, so I'm not sure if

4  there's any way to do it differently than when I monitor

5  recorded calls.

6    Q.   Do you know that it's true-- do you know whether

7  it's true that a phone call that was made by an inmate

8  let's say for the last five years is still in the system

9  and can be downloaded today?

10   A.   It is.

11   Q.   And unless it-- unless-- well, put it this way:

12  If the phone call was recorded, it's in the system and

13  it can be downloaded?

14   A.   That's correct.

15   Q.   If it was privatized, it was never recorded and

16  it's not in the system?

17   A.   That's correct.

18   Q.   I'm showing you Bigelow 15.  I'm sorry.  This is

19  a two-pager.  I'm going to be asking you about this

20  right here.

21   A.   Okay.

22   Q.   This is an e-mail between Vicki Buhl of KBI and

23  Troy Rhodes of KBI, do you know those individuals?

24   A.   I do not, sir.

25   Q.   Troy Rhodes writes to Vicki Buhl, "FYI.  I got a

1    Securus account."  Do you see that?

2       A.  Yes, sir.

3       Q.  And I'm going to ask you to turn the page.  And

4    the second e-mail from the bottom is from Michael Thode

5    or Thode to Vicki Buhl.  Do you see that?

6       A.  Yes.

7       Q.  And it says, "Contact Mr. Taylor about Sedgwick

8    County Securus access.  You should be able to at least

9    get temporary access for this case."

10          If somebody gets a Securus account, that means

11   they can listen to all of the recordings that have been

12   recorded within their site, is that right, within their

13   level of access?

14      A.  I can't speak-- I'm not certain about that, sir.

15   I'm not familiar with that.

16      Q.  Almost done, sir.  Bigelow 16.  This is an e-mail

17   from you to Julie Whitaker in September of 2016.

18   Correct?

19      A.  Yes, sir.

20      Q.  Who is Julie Whitaker?

21      A.  I don't recall, sir.  I'm assuming she's an

22   attorney from the address on the e-mail.

23      Q.  And this talks about trying to privatize a phone

24   number.

25      A.  Right.

1    Q.   And it says one number was wrong and the correct

2    number is, you know, what it is there.

3    A.   Right.

4    Q.   So when it was input incorrectly until it was

5    corrected, that means that telephone calls to that

6    inmate were-- excuse me, from the inmates to that

7    attorney were recorded; is that right?

8    A.   Yes, sir, that's definitely possible.

9    Q.   If an-- if an attorney's phone number was put in

10   for privatization purposes incorrectly, inmates making a

11   phone call to that attorney would hear the message you

12   referred to saying your phone call is being recorded; is

13   that right?

14   A.   Both attorney and inmate would.

15   Q.   And the attorney and the inmate would hear that,

16   having-- having made efforts to privatize their phone

17   number and believing that those efforts were successful;

18   is that right?

19   A.   That's correct.

20        SPECIAL MASTER COHEN:  One second please,

21   Your Honor.  Thank you very much.  I appreciate your

22   answering my questions.

23        THE WITNESS:  No problem.

24        THE COURT:  Mr. Clymer.

25             CROSS EXAMINATION

BY MR. CLYMER:

Q.   Mr. Bigelow, can you tell us again the date the system switched over from Securus to the new system you have now roughly?

A.   It was roughly June 26th of '17.

Q.   June 26th of 2017?

A.   Yes, sir.

Q.   And approximately when did the process switch over to where you'd require a subpoena to produce inmate phone calls?

A.   I'm going to say it was-- it was roughly the middle of summer in 2016.

Q.   So the e-mail traffic that you just looked at that Mr. Cohen showed you regarding things that occurred before the switchover, that would've been about a process that's no longer in place; is that right?

A.   That's correct.

Q.   In the old days when it was still Securus and you still didn't require a subpoena, when an attorney sent in a request to privatize his or her phone number, to your knowledge, did anybody share that information with the U.S. Attorney's Office?

A.   No, sir.

Q.   So the U.S. Attorney's Office wouldn't have any way of knowing which attorneys had gone through the

1    process and which had not?

2        A.   No, sir.

3        Q.   Would the U.S. Attorney's Office have any way of

4    knowing whether the number was properly privatized or

5    not?

6        A.   No, sir.

7        Q.   Would the U.S. Attorney's Office have any way of

8    knowing which one of the selections on that drop-down

9    menu Mr. Cohen asked you about took place?

10       A.   No, sir.

11       Q.   That was all internal.  Correct?

12       A.   Correct.

13       Q.   When Mr. Redmond was questioning you, if I heard

14   right and I may not have, you said there's now two

15   avenues to get a phone number privatized; is that right?

16       A.   Yes, sir.

17       Q.   And I think you mentioned the first one where the

18   inmate did it, but I don't think you mentioned the

19   second one.  Can you tell us the second one?

20       A.   Absolutely.  If an attorney has numbers that they

21   want set as privileged, then they just send me a

22   letterhead.  They can fax it, they can mail it, however.

23   And then what I do at that point is I scan that to

24   Praeses.  Praeses will verify that information, just

25   like they do with the verification form from the

1    inmates.

2         And then when they respond back by e-mail and

3    saying these numbers are verified, you can go ahead,

4    they have been set as privileged, then I contact the--

5    I'll send a form letter back and let the attorney know

6    that that has been done.

7    Q.   So just like with the inmate now, the attorney

8    gets notification that his or her phone number is now

9    privatized?

10   A.   That's correct, sir.

11   Q.   How long does the process take between the time

12   say an inmate puts that form in the box and the time he

13   or she-- or I guess it's a he, he gets the notice back

14   that the number has been privatized?

15   A.   I will scan those and send those up that day that

16   I received the form.  I receive it about 6:00 in the

17   morning.  And then when I get finished with my duties in

18   the mailroom, why, I'll go ahead and do that.  So I'm

19   going to say a lot of times I'll get it by that

20   afternoon.  If there's some difficulty in getting those

21   numbers verified, it may take two or three days.  But

22   it's usually within a few days on the outside.

23   Q.   So within a few days of putting the document in

24   the box, the inmate will have received a form telling

25   him your number-- this number has been privatized?

1      A.  Yes, sir.

2      Q.  Do you ever get requests from inmates that you do

3   the scanning process and you send it off to Prius [sic]

4   and it comes back and they reject it because it wasn't

5   an attorney number?

6      A.  I have.  It's been very rare but I have.

7      Q.  It has happened then.  Is the time lapse when an

8   attorney-- or time interval when the attorney makes the

9   request about the same?  Is it within a week?

10     A.  Yes, sir, as a rule.

11     Q.  I'm going to show you what's been marked as

12  Special Master Thomas 1.  And just out of curiosity, are

13  these the forms for inmate requests that you referred to

14  before?

15     A.  Yes, sir.

16          MR. CLYMER:  Nothing further, Your Honor.

17  Thank you, sir.

18          THE COURT:  All right.  Anything further?

19          MR. REDMOND:  Yes.  Thank you, Your Honor.

20              REDIRECT EXAMINATION

21  BY MR. REDMOND:

22     Q.  Mr. Bigelow, you told Mr. Cohen that you could

23  send out phone records if you had either a subpoena or

24  authorization to do so.  Was that accurate?

25     A.  Not today.

1    Q.  Okay.  Tell me what you meant.

2    A.  I require a subpoena today from whomever.

3    Q.  Okay.  So there was a number of exhibits that Mr.

4    Cohen showed you that it appeared it wasn't a subpoena,

5    even in 2017.  Can you explain why that would be?

6    A.  I cannot.

7    Q.  Okay.  I am showing you what's been marked and

8    admitted as Defendant's Exhibit 511.  Does that appear

9    to be an e-mail from Erin Tomasic to you, cc'd to

10   Deborah Kinney?

11   A.  That's correct, sir, it does.

12   Q.  And she had asked you for a number of phone

13   calls; is that right?

14   A.  Yes, sir.

15   Q.  There's no indication in here that she had

16   subpoenaed these phone calls, is there?

17   A.  No, sir.

18   Q.  And that would be July 13th of 2016?

19   A.  That's correct.

20   Q.  So is there an exception for the U.S. Attorney's

21   Office?

22   A.  No, sir.

23   Q.  Okay.  So can you explain why there was no

24   subpoena issued for the phone records referenced in

25   Exhibit 511?

1    A.  I would say a mistake was made.

2    Q.  Okay.  I am showing you what's been marked and

3  admitted as Defendant's Exhibit 515.  Does that appear

4  to be an e-mail to Mr. Lajiness from Mr. Cahill?

5    A.  It is.

6    Q.  And for the record, Mr. Lajiness was your

7  predecessor in this job?

8    A.  Mr. Lajiness was a-- was the IT gentleman at the

9  facility at the time, but he was the individual that was

10  doing this process when I took my position.

11    Q.  Yeah, I don't mean he was in the security threat

12  group, he was privatizing phone calls?

13    A.  He was.

14    Q.  Okay.  And the e-mail is from Matthew Cahill from

15  the marshal's office?

16    A.  Yes, sir.

17    Q.  Dated June 2nd of 2016?

18    A.  Yes, sir.

19    Q.  And it is a request for phone calls from a

20  particular inmate?

21    A.  Yes, sir, it is.

22    Q.  And, again, there's no subpoena referenced?

23    A.  That's correct.

24    Q.  Okay.  So did this happen on a fairly regular

25  basis that things occur without a subpoena just by

```
 1   e-mail?
 2              MR. CLYMER:  Your Honor, I'm going to object
 3   that this happens, because there's no indication in this
 4   document that anything happened.
 5              THE COURT:  Overruled.  Answer it if you
 6   can.
 7              THE WITNESS:  No.
 8   BY MR. REDMOND:
 9      Q.  Okay.  I believe you testified that when you
10   fixed some of these numbers in the Securus-- when you
11   were still in the Securus platform, or the method by
12   which you did that, did you then do anything to go in
13   and privatize those numbers retroactively?  Does that
14   make any sense as a question?
15      A.  As I recall, that's-- that particular situation?
16      Q.  Yes, sir.
17      A.  The gentleman from Securus when I discussed that
18   with him, I told him what I had done and he went in and
19   did it himself.
20      Q.  Okay.
21      A.  Corrected those.
22      Q.  After you made the--
23      A.  And set those as being private.
24      Q.  I'm sorry, I did not mean to interrupt you.  So
25   after those corrections were made, Mr. Kenyon went in
```

 1    and retroactively set those numbers to private?

 2        A.   That's correct.

 3        Q.   Okay.  Did he send you any verification of that

 4    or he just told you he did it?

 5        A.   I'm-- he sent me an e-mail, as I recall.

 6        Q.   Okay.  The new company that you referenced during

 7    your testimony with Mr. Cohen, Praeses?

 8        A.   Yes.  The phone platform is ICSolutions and

 9    Praeses is affiliated.  They're the-- the company that

10    does our verification and our setting these numbers as

11    privileged.

12        Q.   Okay.  And by "verification," you mean verifying

13    the phone number belongs to an attorney?

14        A.   That's correct.

15        Q.   And the-- you said that the phone numbers-- the

16    inmate receives written confirmation that a

17    privatization has occurred?

18        A.   Yes, sir.

19        Q.   Do you get cases in which where their-- the

20    privatization is rejected?

21        A.   Actually I had one about a week ago.  That the

22    inmate submitted two numbers and one of the numbers was

23    not verifiable, so it was-- it was rejected.  The other

24    one was put in as private.

25        Q.   Okay.  And so Praeses, do you know how they do

1    the verification?

2        A.   I assume they call the numbers.  I don't know

3    exactly what the process is, no.

4        Q.   Okay.  You don't know?

5        A.   No.

6        Q.   That's fair enough.  Thanks for your time, sir.

7                    RECROSS EXAMINATION

8    BY SPECIAL MASTER COHEN:

9        Q.   Do you know, Sergeant Bigelow, why CCA began to

10   use ICSolutions instead of Securus?

11       A.   I do not, sir.

12       Q.   You said something about Praeses being the entity

13   that does the privatization with ICSolutions--

14       A.   Yes, sir.

15       Q.   -- is that right?  You used Praeses before with

16   Securus, didn't you?

17       A.   No, sir, I didn't.

18       Q.   Do you recall a conversation that we had at CCA

19   where I made a photocopy of a phone list that you had?

20   You pulled it off the wall and there were a bunch of

21   phone numbers?

22       A.   Yes, yes.

23       Q.   And on that phone list was the-- the phone number

24   for Praeses.  Does that ring a bell at all?

25       A.   Yes, sir.

16-20032-JAR    USA v. Lorenzo Black    05.16.18    379

1    Q.  And that was before you were using ICSolutions?

2   At the time you were using Securus?

3    A.  It may have been.  It may have been.  I just

4   don't recall it, but it may have been, yes.

5    Q.  Okay.  I think we went over this, I just want to

6   make sure that I got it right.  If a call is recorded by

7   Securus to an attorney, that attorney's phone number is

8   later-- later put in the system as being an attorney

9   phone number and, therefore, calls to that number should

10  not be recorded, that doesn't remove or delete the phone

11  calls that were made to that number before?

12   A.  That's correct.

13   Q.  Thank you.

14        MR. CLYMER:  May I, Your Honor?

15        THE COURT:  Yes.

16              RECROSS EXAMINATION

17  BY MR. CLYMER:

18   Q.  If an inmate or an attorney submits a number and

19  you go through the process you described and the number

20  is rejected, do they get notice of that as well?

21   A.  That's correct, yes, sir.

22        MR. CLYMER:  Thank you, Your Honor.

23        THE COURT:  All right.  Anyone else?  All

24  right.  Mr. Bigelow is excused or subject to recall?  Is

25  he subject to recall at any point?

1          MS. BRANNON:  Subject to recall, Your Honor.

2          THE COURT:  All right.  Subject to recall.

3   All right.  Is the next witness going to be brief or

4   will it take some time?

5          SPECIAL MASTER COHEN:  I was concurring with

6   co-counsel and I didn't hear what was happening.

7          MR. REDMOND:  Call Ms. Thomas.

8          SPECIAL MASTER COHEN:  I have one form, I

9   don't think it will take very long.

10         MR. REDMOND:  Less than five minutes.

11         THE COURT:  All right.  Let's proceed.

12                    LINDA THOMAS,

13   called as a witness on behalf of the Federal Public

14   Defender, having first been duly sworn, testified as

15   follows:

16                 DIRECT EXAMINATION

17   BY MR. REDMOND:

18     Q.  Good morning.  Could you state your name for the

19   record, please?

20     A.  Linda Thomas.

21     Q.  Ms. Thomas, what do you do for a living?

22     A.  I'm the warden at the Leavenworth Detention

23   Center.

24     Q.  Since when?

25     A.  March of 2016.

 1    Q.   Okay.   There's been some testimony that fairly

 2    soon after you took over as warden at CCA that you

 3    changed the policy for how phone calls were

 4    disseminated; is that fair?

 5    A.   Fair.

 6    Q.   Okay.   And could you describe what the policy was

 7    before?

 8    A.   I believe the-- the procedure was that the

 9    request would be submitted and then we would fill the

10    request.   "Request" meaning telephone call request would

11    be submitted and then we would fill the request and

12    provide it to the party that requested it, the law

13    enforcement agency, namely the U.S. Marshals Service.

14    Q.   Okay.   And so what did you change the policy to?

15    A.   I asked my staff to have a system by which we

16    document who requested the records.

17    Q.   Yes, ma'am.

18    A.   And date, who requested it.   And then once we

19    filled the request, we document who we provided the--

20    the information to and how we provided the information,

21    whether it be-- sometimes we provide documents through

22    our transportation staff.   And so I requested that we do

23    that, so we can get a receipt of who we've provided it

24    to.

25    Q.   Okay.   So under the old system, somebody would

1    request a-- some phone calls and there would be no

2    documentation of that request that was kept by CCA?

3        A.   I wouldn't say that.

4        Q.   Describe-- tell me how I'm wrong then.

5        A.   Because if an e-mail came, I don't know that they

6    kept it or not.  It's possible-- and records, e-mails

7    are always in my opinion able to be obtained.  So I

8    think that in that regard, the records could be

9    obtained.  But the-- if it was a telephone call

10   obviously or a--

11       Q.   Sure.

12       A.   -- some other form, maybe not.

13       Q.   And so the reason or part of the reason that you

14   changed the policy was to ensure that when your facility

15   is dispersing phone calls that that is being documented?

16       A.   The reason I changed it is because that's just a

17   good practice from my experience.

18       Q.   That good practice you mean by documenting how

19   the phone calls were being sent out and to who?

20       A.   Correct.

21       Q.   Okay.  So now, you know, without getting into

22   your sort of like internal server operation, what method

23   is used to store those requests?  Do they all go to a

24   commonplace?

25       A.   The request from the requester for records?

1    Q.  Yes, ma'am.

2    A.  Yes.

3    Q.  Okay.  And so then you can do a simple search and

4    figure out who CCA has sent phone calls to?

5    A.  I'm sorry.  Would you repeat that?

6    Q.  So it would be much simpler now for you to search

7    and determine who CCA has sent phone calls to?

8    A.  That is the intent, yes.

9    Q.  Okay.  Do you-- does your new policy require that

10   a subpoena be issued before you will send phone calls to

11   someone?

12   A.  Yes.

13   Q.  And is that true if it's a-- the requester is the

14   U.S. Attorney's Office?

15   A.  Yes.

16   Q.  And is that true if the requester is the U.S.

17   Marshal's office?

18   A.  Yes.

19   Q.  And is that true in all cases or are there

20   exceptions made?

21   A.  All cases.

22   Q.  Okay.

23   A.  I believe.

24   Q.  One more smaller topic.  In August of '16 did you

25   receive a-- some phone calls asking about the cameras in

1    attorney-client visitation rooms?

2        A.   I believe so.

3        Q.   Was one of those phone calls from the U.S.

4    Marshals Service, specifically from Craig Beam?

5        A.   Yes.

6        Q.   And did Mr. Beam ask you if some of the

7    attorney-client visitation rooms were monitored by

8    camera?

9        A.   I don't believe-- I don't recall exactly how the

10   question was posed.  I won't say that he used the word

11   "some."  And I can't say that was the way the question

12   was presented.

13       Q.   Can you just sort of summarize your memory of

14   that conversation then?

15       A.   My memory is that I initially received an e-mail,

16   if I'm remembering correctly, from someone from the U.S.

17   Marshal's Office.  And the question was:  Do you have

18   cameras in your attorney-client rooms?  And I said, I

19   don't know, I would have to check.

20            And I did go proceed myself personally because

21   I-- I made an attempt to reach a number of my staff and

22   couldn't reach them.  By-- sometime shortly thereafter I

23   believe I received a phone call, and I believe that's

24   when Mr. Beam called.

25       Q.   Okay.

1    A.  And I said I would check.  I got up, I went to I

2   believe it was-- now that I know, it was attorney-client

3   room 1.  I looked, there was no camera.  So I came back

4   and I said no.  I asked one of my staff, and I said no,

5   there are no cameras in the attorney-client room.

6    Q.  Who was it that you talked to, if you remember,

7   from your staff?

8    A.  The front lobby officer, Ms. Moore.

9    Q.  Okay.  And so the-- did you talk to anybody else

10   before you responded to Mr. Beam?

11    A.  No.

12    Q.  Okay.  You just went to look at an

13   attorney-client visitation room, saw no camera, reported

14   that there was no cameras?

15    A.  That's correct.

16    Q.  And that-- that was ultimately incorrect; is that

17   fair?

18    A.  That was ultimately incorrect, yes.

19    Q.  Okay.  But that was the sort of back-story as to

20   how Mr. Beam was telling people in the district that

21   there was no cameras at CCA?

22    A.  I presume, yes.

23    Q.  Okay.

24        MR. REDMOND:  That's all I have.  Thank you

25   for your time.

1           MR. GUASTELLO:  I have no questions for this

2    witness.

3                       CROSS EXAMINATION

4    BY SPECIAL MASTER COHEN:

5    Q.   Good afternoon, Warden.  How are you?

6    A.   Good afternoon.  Thank you, I'm fine.

7    Q.   Last time I saw you it was inside barbed-wire?

8    A.   I believe so, yes.

9    Q.   Do I understand it correctly that CCA actually

10   has a contract with the United States Marshals Service?

11   A.   Yes.

12   Q.   And do you know what that contract says about

13   recorded phone calls?

14   A.   I believe it directs us to record phone calls.

15   Q.   Does it say anything about access to those phone

16   calls by anybody?

17   A.   I don't have a recollection of that.

18   Q.   So you don't recall whether it says, for example,

19   that any phone calls are considered the property of the

20   United States Marshals Service?

21   A.   Sounds familiar, but I don't want to attest to it

22   because I don't recall.

23   Q.   But you-- you now have a procedure in place you

24   believe that requires a subpoena regardless-- a subpoena

25   regardless of who is asking for phone calls; is that

 1  right?

 2     A.  I have a procedure in place, yes.

 3     Q.  Regardless of who is asking for phone calls, the

 4  procedure today is that they have to submit a subpoena

 5  to receive them; is that right?

 6     A.  Yes.

 7     Q.  Okay.  It was the case that Securus was the

 8  system, the software that CCA was using for inmate calls

 9  and inmate recording of calls; is that right?

10     A.  That is correct.

11     Q.  And today it's ICSolutions?

12     A.  Yes.

13     Q.  And when did that switch take place roughly, do

14  you know?

15     A.  I believe-- I don't recall.  I-- I believe it was

16  mid-2016 or '17, but I'm not sure.  I would have to--

17     Q.  Do you know why CCA switched?

18     A.  I don't.

19     Q.  When CCA switched from Securus to ICSolutions, do

20  you know whether the process to privatize a phone number

21  changed?

22     A.  The process?  Would you please elaborate what you

23  mean by a process?

24     Q.  I guess I'm not even sure what I mean.  Let's say

25  that the actual mechanisms that CCA would use to ensure

1    that a private number was made private.  For example,

2    maybe it used to be the case that Mr. Bigelow would type

3    it in, and under ICSolutions there was a different

4    mechanism.

5        A.    Okay.  So currently with ICS Solutions, we

6    provide the forms to ICS Solutions and they investigate

7    or process the-- the request and then they do the

8    privatization.

9        Q.    And so does Mr. Bigelow today ever privatize a

10   number himself or is it always ICSolutions or Praeses?

11       A.    I can't answer that.  I don't know.

12       Q.    You know that I visited CCA several times?

13       A.    Yes.

14       Q.    And do you know that I asked CCA to produce to me

15   documents?

16       A.    Yes.

17       Q.    Did you work with CCA, maybe chat with Alyssa

18   Brockert, CCA's attorney, during that process?

19       A.    It's possible.  I don't recall.  I-- I don't

20   recall if I did or didn't.  It's possible.  I do recall

21   now.  I mean, Alyssa came to the facility with you, I do

22   recall her coming to the facility with you.

23       Q.    Do you recall that CCA would receive forms from

24   the United States Attorney's Office or the marshals

25   service requesting phone calls?  Do you remember what

1  that form looked like?

2    A.  Some, yes.

3       SPECIAL MASTER COHEN:  One second please,

4  Judge.

5  BY SPECIAL MASTER COHEN:

6    Q.  I'm handing you what's been marked Bigelow 2.

7  Does that look familiar to you at all?

8    A.  Yes.

9    Q.  You've seen forms like that before?

10   A.  Yes.

11   Q.  I'll take this back.  Do you know that I asked

12 for all of the forms that CCA had of this kind?

13   A.  I can't say that I know that, no.

14   Q.  Do you know that I asked the United States

15 Marshals Service for all of the forms that they had of

16 this kind?

17   A.  I don't know that.

18   Q.  Would it surprise you to learn that they had

19 forms of this kind that you didn't and you had forms of

20 this kind that they didn't?

21   A.  Would it surprise me?  No.

22       SPECIAL MASTER COHEN:  I think that's all I

23 have.  Thank you, Judge.  Thank you very much, Warden.

24       THE WITNESS:  Thank you.

25             CROSS EXAMINATION

 1   BY MR. CLYMER:

 2       Q.  Warden Thomas, if the marshals service is doing

 3   an internal investigation at your facility, do they have

 4   to use a subpoena to get phone calls?

 5       A.  Do they have to--

 6       Q.  In other words, do you require that they do so?

 7       A.  Now, yes.

 8       Q.  Even if it's an internal investigation?

 9       A.  Yes.

10           MR. CLYMER:  Thank you.  No further

11   questions, Your Honor.

12                    REDIRECT EXAMINATION

13   BY MR. REDMOND:

14       Q.  Warden, just one question.  In a second on the

15   monitor in front of you is going to be what we have

16   marked and admitted as Defendant's Exhibit 458.  This

17   exhibit says that you told the marshal's office that

18   there are cameras but that they did not record.

19           I'm just trying to figure out precisely what

20   happened in that conversation.  Can you enlighten us?

21   Just read the first couple of lines-- or the second line

22   of the e-mail that's highlighted.

23       A.  (Witness reads).

24       Q.  Are we talking about a second conversation you

25   had with the marshal's office?

1    A.   I don't recall having that conversation about the

2   cameras don't record.

3    Q.   Okay.  Thank you.

4    A.   Uh-huh.

5              THE COURT:  All right.  Anyone else?  All

6   right.  May Warden Thomas be excused subject to recall?

7              MR. REDMOND:  She may.

8              THE COURT:  All right.  Subject to recall,

9   you're excused.

10             THE WITNESS:  Thank you.

11             THE COURT:  All right.  Does that complete

12   the evidence before we adjourn the hearing?

13             MS. BRANNON:  Your Honor, I think the one

14   thing left is that we want to make sure that all of the

15   Special Master's exhibits are admitted.  I don't know,

16   there was a reference to redaction.

17             MR. CLYMER:  I could-- I could talk to

18   counsel about that and I'll explain.

19             THE COURT:  Okay.  What we could do is you

20   all do that over a prolonged lunchtime or whatever.

21   Maybe we could reconvene at 2:30 or so and just make a

22   quick record.  But otherwise, the hearing is adjourned,

23   so not everyone needs to be here unless they want to for

24   that.  That's all we'll do.

25             We'll have you read the exhibit numbers in

1    the record and make also a record on those that you want

2    to be redacted.  We've already made a record I think on

3    those under seal, or maybe not with his, I know we did

4    with the FPD's exhibits.

5              All right.  So why don't we reconvene at

6    2:30 just to accomplish that.

7              MR. CLYMER:  Your Honor, if everything seems

8    to be in order and I can catch an earlier flight out,

9    could I have Mr. Slinkard stand in for me?

10             THE COURT:  Sure.

11             MR. CLYMER:  Thank you.

12             THE COURT:  All right.  Oh, let's talk about

13   a status conference.  What time frame were you thinking

14   from now?

15             MS. BRANNON:  Judge, if we could look at the

16   first full week of June.

17             MR. SLINKARD:  I think--

18             THE COURT:  Not a lot of availability.

19   Well--

20             SPECIAL MASTER COHEN:  Judge, I'm going to

21   be in San Francisco for the opioid case that week.

22             THE COURT:  Okay.  How about the week of

23   June 11th?  So we could maybe do this on the 12th.  That

24   trial settled.  Right?

25             COURTROOM DEPUTY:  That trial settled.  We

1    have the PI hearing on the 11th, but I was trying to

2    move Willie Jones up because we have two trials on the

3    18th.  But we could do it.

4                THE COURT:  Do we have time on the 11th?

5                COURTROOM DEPUTY:  No, because that's the PI

6    hearing.

7                THE COURT:  Okay.  Well, let's try and do

8    this the morning of the 12th.  All right.  How about--

9    because it may not take that long.  How about June 12th

10   at 9:00 a.m.?  That's a Tuesday.

11               MS. BRANNON:  Yes, Your Honor.

12               THE COURT:  Does that work?

13               SPECIAL MASTER COHEN:  Yes.  Thank you,

14   Judge.

15               THE COURT:  Okay.  And it will just be a

16   status conference.  We won't-- if things fall apart, we

17   won't have a hearing, an evidentiary hearing or anything

18   like that, just a status conference as to how things are

19   proceeding, progressing.  Okay.  Anything else?

20               MR. REDMOND:  No, Your Honor.

21               THE COURT:  All right.  The hearing is

22   adjourned for now.  Still open but adjourned.  And we'll

23   see you back, Mr. Slinkard, at 2:30, and Mr. Cohen.

24               MR. SLINKARD:  Yes, Your Honor.

25               THE COURT:  Okay.  We'll be in recess.

1              (Recess).

2              (The following proceedings were placed on

3    the record with Mr. Clymer, Mr. Slinkard, Special Master

4    Cohen and the court reporter present).

5              MR. CLYMER:  This is Steve Clymer and

6    Special Master David Cohen and we're here after hours in

7    the judge's courtroom to describe the Special Master

8    exhibits that had been admitted into evidence and the

9    ones that are subject to reservation.

10             Yesterday, which was May 15th, three

11   witnesses testified.  A witness named Stokes had two

12   exhibits admitted; Stokes No. 2 and Stokes No. 4.  Those

13   are Special Master exhibits.  With respect to a witness

14   named Rask, R-A-S-K, there were the following Special

15   Master exhibits admitted without reservation:  1, 2, 4,

16   6, 7, and 8.  Those were all Rask exhibits.

17             MR. SLINKARD:  Excuse me, that's incorrect.

18             MR. CLYMER:  I'm sorry.  1, 2, 4, 5-- 5, 7

19   and 8.  I'm sorry.  Thank you, Mr. Slinkard.  5, 7 and

20   8.  Rask Exhibit 6 was admitted subject to linkup and

21   there was a relevance objection still pending.

22             Third, Erin Tomasic began her testimony

23   yesterday and Tomasic 8, Tomasic 9, and Tomasic 11 of

24   the Special Master's exhibits were admitted without

25   reservation.  The following Tomasic exhibits were

1   admitted subject to linkup with an outstanding relevance

2   objection: Tomasic 1 through 5, Tomasic 7, and Tomasic

3   8. Tomasic 6 was withdrawn.

4          Today the Special Master used with a witness

5   named Bigelow, Bigelow 1 through 16, all those were

6   admitted. And with Thomas, No. 1, Special Master Thomas

7   No. 1 was also used with Bigelow and admitted.

8          Now I'm going to describe exhibits that were

9   not introduced when a witness was testifying but have

10  been admitted by stipulation subject to a relevance

11  objection.

12         Tomasic No. 16, No. 17, 19 through 22, 25,

13  and 46. Barnett 1 through 11, 13, 14, and 16. Beall 1

14  and Beall 4 through 9. Boyd 1 through 6. Catania 1 and

15  3. Flannigan 1, 2 and 4 through 11. Kinney 1 and 14.

16  Oakley 1 and 19. Seubert 1 and 6. Steeby 1 through 3.

17         I'm sorry, Seubert 1 through 6, not 1 and 6,

18  1 through 6. Steeby 1 through 3. Zabel 1. Welch 1.

19  Metzger 1 and 3 through 7.

20         (Counsel confer).

21         MR. CLYMER: Thank you. Oakley 1 through 9,

22  not 1 through 19.

23         There are two that will be redacted by the

24  Special Master. Tomasic No. 15 will be redacted by

25  removing every page after the first page of the exhibit.

1  And Metzger No. 4 will be redacted to remove a certain

2  name that appears in multiple places in the exhibit.

3              (Counsel confer).

4              MR. CLYMER:  I think I've already listed

5  that.

6              MR. SLINKARD:  No, you didn't.

7              MR. CLYMER:  All right.  These two are

8  admitted subject to stipulation with the reservation of

9  a relevance objection.

10             SPECIAL MASTER COHEN:  And I agree with Mr.

11 Clymer's recitation.

12             MR. CLYMER:  Thank you very much.

13             (1:07 p.m., proceedings recessed).

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E
 2
 3
 4
 5     I, Kelli Stewart, a Certified Shorthand Reporter and
 6  the regularly appointed, qualified and acting official
 7  reporter of the United States District Court for the
 8  District of Kansas, do hereby certify that as such
 9  official reporter, I was present at and reported in
10  machine shorthand the above and foregoing proceedings.
11     I further certify that the foregoing transcript,
12  consisting of 81 pages, is a full, true, and correct
13  reproduction of my shorthand notes as reflected by this
14  transcript.
15     SIGNED May 25, 2018.
16
17
18
19          /s/ Kelli Stewart
20          Kelli Stewart, CSR, RPR, CCR, RMR
21
22
23
24
25
```