1               UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF KANSAS
2

3    UNITED STATES OF AMERICA,

4         Plaintiff,

5    v.                          Docket No. 16-20032-02-JAR

6    KARL CARTER,                Kansas City, Kansas
                                 Date:  10/10/2018
7

8         Defendant.             Day 7
     ....................        Pages 1732-2067

9

                 TRANSCRIPT OF MOTIONS HEARING
10          BEFORE THE HONORABLE JULIE A. ROBINSON
                UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For the Government:   Mr. Steven D. Clymer
                           Department of Justice - USAO
14                         Lrm Eckert, William
                           100 S. Clinston Street
15                         Suite 9000
                           Syracuse, New York 13261
16
                           Mr. Duston J. Slinkard
17                         Office of United States Attorney
                           444 Southeast Quincy
18                         Suite 290
                           Topeka, Kansas 66683-3592
19
                           Mr. Stephen R. McAllister
20                         Office of United States Attorney
                           500 State Avenue
21                         Suite 360
                           Kansas City, Kansas 66101
22

23

24

25

```
 1   APPEARANCES:

 2   (Continued)

 3   For the Defendant Karl Carter:
                         Mr. David J. Guastello
 4                       The Guastello Law Firm, LLC
                         811 Grand Boulevard
 5                       Suite 101
                         Kansas City, Missouri 64106
 6
     For the Movant Federal Public Defender:
 7                       Ms. Melody J. Brannon
                         Mr. Kirk C. Redmond
 8                       Mr. Branden A. Bell
                         Office of Federal Public Defender
 9                       117 Southwest Sixth Street
                         Suite 200
10                       Topeka, Kansas 66603

11   For the Special Master David R. Cohen:
                         Mr. David R. Cohen
12                       David R. Cohen Co., LPA
                         24400 Chagrin Boulevard
13                       Suite 300
                         Cleveland, Ohio 44122
14
                         Ms. Alleen VanBebber
15                       VanBebber Law Firm, LLC
                         2029 West 95th Street
16                       Leawood, Kansas 66206

17

18

19

20

21

22
     _____
23
          Kelli Stewart, CSR-KS, CRR-MO, RPR, CRR, RMR
24                    Official Court Reporter
             259 U.S. Courthouse, 500 State Avenue
25                   Kansas City, Kansas 66101
```

```
 1                    I N D E X

 2
     Special Master's Witnesses:                    Page
 3
     LEON PATTON
 4     Direct Examination By Ms. VanBebber           1867
       Cross Examination By Mr. Clymer               1879
 5
     CHRISTOPHER OAKLEY
 6     Direct Examination By Ms. VanBebber           1883
       Cross Examination By Mr. Bell                 1925
 7     Cross Examination By Mr. Clymer               1965
       Redirect Examination By Ms. VanBebber         1983
 8     Recross Examination By Mr. Bell               1988
       Recross Examination By Mr. Clymer             1996
 9     Recross Examination By Mr. Bell               1997
       Recross Examination By Mr. Clymer             1998
10

11   Federal Public Defender's Witnesses:           Page

12   PETER JOI
       Direct Examination By Mr. Redmond             1738
13     Examination By the Court                      1756
       Cross Examination By Ms. VanBebber            1759
14     Cross Examination By Mr. Clymer               1762

15   JUSTIN GELFAND
       Direct Examination By Mr. Redmond             1806
16     Cross Examination By Ms. VanBebber            1818
       Cross Examination By Mr. Clymer               1820
17
     TAMMY LOEHRS
18     Direct Examination By Mr. Bell                1832
       Cross Examination By Mr. Clymer               1846
19     Redirect Examination By Mr. Bell              1853
       Recross Examination By Special Master Cohen   1854
20     Recross Examination By Mr. Clymer             1860
       Redirect Examination By Mr. Bell              1861
21     Recross Examination By Special Master Cohen   1862

22   TERRA MOREHEAD
       Direct Examination By Mr. Bell                1999
23     Cross Examination By Ms. VanBebber            2040

24

25
```

1                    E X H I B I T S

2    Special Master's
     Exhibits              Offered              Received

3
             1010             1864                 1865
4            1011             1864                 1865
             1013             1864                 1865
5            1014             1864                 1865
             1015             1864                 1865
6            1016             1864                 1865
             1017             1864                 1865
7            1019             1864                 1865
             1020             1864                 1865
8            1028             1864                 1865
             1029             1864                 1865
9            1030             1864                 1865
             1031             1864                 1865
10           1032             1864                 1865
             1033             1864                 1865
11           1034             1864                 1865
             1035             1864                 1865
12           1068             1864                 1865
             1069             1864                 1865
13           1070             1864                 1865
             1071             1864                 1865
14           1072             1864                 1865
             1073             1864                 1865
15           1074             1864                 1865
             1075             1864                 1865
16           1076             1864                 1865
             1077             1864                 1865
17           1078             1864                 1865
             1079             1864                 1865
18           1080             1864                 1865
             1081             1864                 1865
19           1082             1864                 1865
             1083             1864                 1865
20           1084             1864                 1865
             1085             1864                 1865
21           1086             1864                 1865
             1087             1864                 1865
22           1088             1864                 1865
             1089             1864                 1865
23           1090             1864                 1865
             1091             1864                 1865
24           1092             1864                 1865

25

1                          E X H I B I T S

2      Special Master's
       Exhibits                Offered              Received

3
              1093             1864                 1865
4             1094             1864                 1865
              1095             1864                 1865
5             1096             1864                 1865
              1097             1864                 1865
6             1098             1864                 1865
              1099             1864                 1865
7             1100             1864                 1865
              1101             1864                 1865
8             1102             1864                 1865
              1103             1864                 1865
9             1104             1864                 1865
              1105             1864                 1865
10            1106             1864                 1865
              1113             1864                 1865
11            1114             1864                 1865
              1115             1864                 1865
12            1116             1864                 1865
              1117             1864                 1865
13            1119             1864                 1865
              1120             1864                 1865
14            1121             1864                 1865
              1122             1864                 1865
15            1123             1864                 1865
              1124             1864                 1865
16            1125             1864                 1865
              1126             1864                 1865
17            1127             1864                 1865
              1128             1864                 1865
18            1129             1864                 1865
              1130             1864                 1865
19            1131             1864                 1865
              1132             1864                 1865
20            1145             1864                 1865
              1146             1864                 1865
21            1147             1864                 1865
              1148             1864                 1865
22            1149             1864                 1865
              1150             1864                 1865
23            1151             1864                 1865
              1152             1864                 1865
24

25

16-20032-JAR  USA v. Karl Carter (Black)  10.10.18          1737

```
 1                        E X H I B I T S

 2       Special Master's
 3       Exhibits              Offered          Received

 4          1153                1864              1865
            1154                1864              1865
 5          1155                1864              1865
            1156                1864              1865
 6          1157                1864              1865
            1158                1864              1865
 7          1159                1864              1865
            1160                1864              1865
 8          1161                1864              1865
            1162                1864              1865
 9          1163                1864              1865
            1164                1864              1865
10          1165                1864              1865

11

12       Federal Public Defender's
         Exhibits              Offered          Received
13
            558                 1805              1806
14          557                 1738              1739
            579A                1951              1951
15          611                 1959              1959
            677**               1805              1806
16

17       Government's
18       Exhibits              Offered          Received

19          40                  1996              1996

20
    ** Denotes admitted under seal
21

22

23

24

25
```

```
 1                   (8:31 a.m., proceedings commenced).
 2              THE COURT:  All right.  You can be seated.
 3    All right.  I'm not sure who's calling the next witness.
 4              MR. REDMOND:  I believe the Special Master
 5    has deferred to us.  We call Peter Joi.
 6              THE COURT:  I'm sorry?
 7              MR. REDMOND:  We call Peter Joi.
 8                        PETER JOI,
 9    called as a witness on behalf of the Federal Public
10    Defender's Office, having first been duly sworn,
11    testified as follows:
12                   DIRECT EXAMINATION
13    BY MR. REDMOND:
14      Q.  Sir, would you state your name for the record,
15    please.
16      A.  Peter Joi, J-O-I.
17      Q.  And what do you do for a living?
18      A.  I'm a law professor and an attorney.
19      Q.  Where are you a law professor at?
20      A.  Washington University in St. Louis.
21      Q.  Okay.
22              MR. REDMOND:  So I would move into admission
23    Exhibit No. 557, which is Mr. Joi's curriculum vitae.
24              THE COURT:  557?
25              MR. REDMOND:  Yes, Your Honor.
```

1           MR. CLYMER:  No objection.

2           MS. VANBEBBER:  No objection.

3           THE COURT:  557 admitted.

4    BY MR. REDMOND:

5       Q.  Now, Professor Joi, you previously testified in

6    this case; is that right?

7       A.  I did, yes.

8       Q.  Do you remember approximately when that was?

9       A.  I believe it was August or maybe early September,

10   2016.

11      Q.  Okay.  And how did that come about?  When were

12   you contacted by our office?

13      A.  I was contacted by you shortly before I

14   testified.  I'm not exactly sure how long before, but it

15   wasn't more than a few weeks, if my recollection is

16   correct.

17          You told me that you had obtained my name from

18   someone at the University of Kansas who had suggested

19   that I might be useful as an ethics expert on a matter

20   that was going to be the subject of a hearing.

21      Q.  And I believe before you testified or during your

22   testimony in 2016, we submitted a version of your

23   curriculum vitae into evidence.  Is there-- are there

24   material differences between that curriculum vitae and

25   the one we've submitted today?

1       A.   Yes, three major ones.

2       Q.   Could you tell us about those?

3       A.   Since that time I've been elected to the ALI, the

4   American Law Institute.  Also, I believe on my original

5   one I had indicated a textbook, a professional

6   responsibility textbook, that was not yet published.

7   That has since been published.

8            And the third thing is this past-- actually end

9   of summer, early fall, I was, I guess, designated as

10  someone by the National Conference of Bar Examiners to

11  work on the Professional Responsibility Exam.  So I'm a

12  professional responsibility expert for the NPRE.

13      Q.   And what's your textbook called?

14      A.   Pardon me?

15      Q.   What is your textbook?  What's it titled?

16      A.   Oh, it's "Professional Responsibility" in

17  something like cases and, you know, it has-- but it's

18  main title is "Professional Responsibility" and it's by

19  West Publishing.

20      Q.   Okay.  When you first testified before the Court,

21  do you remember what the subject of that testimony was?

22      A.   Yes.  At that time there were some videos of

23  client-attorney conferences inside CCA-Leavenworth that

24  had come to light that-- that these client meetings had

25  been videotaped.  At least at that point it was

1    understood that there was no audio to the videotapes,

2    but I testified to the fact that attorney-client

3    privilege could also cover videoed conferences even if

4    there wasn't verbal communication, because communication

5    would still be present at such conferences.

6        Q.   Okay.   Thank you.   We're not-- because you've

7    already testified extensively on that topic, we're not

8    going to revisit it today.   What we're going to talk

9    about today is phone calls.   Did you review any

10   materials prior to your testimony in this case?

11       A.   Yes, I did.

12       Q.   Could you tell us what those were?

13       A.   Well, I reviewed some pleadings.   I reviewed a

14   report that someone in your office had prepared

15   reviewing literally, I guess, thousands of telephone

16   calls.   There were various pleadings, both from your

17   office and also from the U.S. Attorney's Office that I

18   reviewed.   I reviewed some testimony and also I reviewed

19   various court orders, including a court order from Judge

20   Robinson concerning Phase III of the Special Master's

21   work.

22       Q.   Okay.   My next set of questions, Professor,

23   concerns the attorney-client privilege and the Sixth

24   Amendment.   Is it fair to say you've written extensively

25   about both?

1    A.   Yes, I have.

2    Q.   Are they the same thing?  Do they completely

3  overlap?

4    A.   No, they don't.  No.

5    Q.   Could you explain the differences?

6    A.   All right.  Well, in-- you just want me to focus

7  on the Sixth Amendment and attorney-client privilege, or

8  should I work in client confidentiality as well?

9    Q.   That would be fine, yes, sir.

10    A.   All right.  So, I mean, they're all distinct.  So

11  if we start with client confidentiality and

12  attorney-client privilege, client confidentiality

13  includes everything a lawyer learns in the

14  representation of a client.  So it's very broad.  When I

15  teach it, I-- I always draw a big circle for students,

16  and then inside that big circle I have a smaller circle,

17  which is attorney-client privilege.

18        And attorney-client privilege covers

19  communications between an attorney and a client where

20  the client is either seeking legal advice or the

21  attorney is giving legal advice.  So you need

22  communication, you need a client, you need the attorney,

23  and you need the legal advice.  So that makes

24  attorney-client privilege.

25        The Sixth Amendment is the Sixth Amendment right

1   to counsel.  Attorney-client privilege is critical to

2   the Sixth Amendment right to counsel because without

3   having confidential communications with an attorney, the

4   Sixth Amendment right basically is-- is meaningless.  So

5   the state or the government could listen in on all

6   conversations, we wouldn't have independent legal

7   representation of individuals.  Discussions of trial

8   strategy, facts of the case would-- would no longer be

9   confidential.

10         It's the same way that-- you know, it's just

11  really an aspect of the Sixth Amendment that-- that is

12  well understood and critical.  And attorney-client

13  privilege itself as a concept I think has-- the long

14  tradition of it recognizes how clients need to be able

15  to have protected communications with their attorneys.

16      Q.  So there are ethical rules governing the

17  attorney-client privilege; is that fair to say?

18      A.  Yes, it-- it covers attorney-client privilege and

19  also client confidentiality.

20      Q.  What are those rules?

21      A.  Okay.  Well, so, first of all, the client

22  confidentiality rule is 1.6.  Kansas follows in most

23  respects the Model Rules of Professional Responsibility.

24  So Kansas Rule 1.6 and the Model Rule are essentially

25  the same, and that covers all the communications which

1    would include attorney-client privilege.

2         There are a couple of rules that are triggered

3    when someone tries to intrude on attorney-client

4    privilege.  So Kansas Rule 4.4, which deals with a

5    lawyer's obligation in representing a client to respect

6    the-- the rights to others.  There are two provisions.

7         4.4(a) has a prohibition against an attorney, in

8    the course of representing a client, in doing anything

9    to obtain evidence of the other party, which would

10   include-- in the comment it says that includes intrusion

11   into the attorney-client relationship.

12        And then 4.4(b) deals with what a lawyer is

13   supposed to do if they come into possession of material

14   that belongs to an opposing party or to another third

15   party that-- that might include attorney-client

16   communications.

17        And then Rule 8.4--

18   Q.   Could I stop you for just a second, Professor?

19   A.   Okay.

20   Q.   Rule 4.4(b), what duty does it impose on an

21   attorney who comes into the possession of privileged

22   information?

23   A.   Okay.  So explicitly Rule 4.4(b) deals with

24   material that may have been inadvertently sent, and the

25   requirement is to notify the sender that you've received

1    the material.  So, like I said, that explicitly is

2    covered there.

3          There isn't anything in the rule that talks

4    about, at least in 4.4(b), about material that may not

5    have been inadvertently obtained.  However, I-- I think

6    a reasonable reading and one that there's some support

7    in terms of ABA opinion on the matter and at least

8    something that I have written, and my co-author, both of

9    us, have written about, is that even if it wasn't

10   inadvertently sent, let's say somebody anonymously sent

11   you the material or somebody surreptitiously obtained

12   the material and gave it to you, at a minimum, we

13   believe that when you read the rules together, it would

14   require notifying the-- if an attorney is involved,

15   notifying the attorney who's involved that you're now in

16   receipt of those materials.

17   Q.   Okay.  I apologize, I interrupted you.  I think

18   you were starting to talk about Rule 8.4?

19   A.   Yeah.  And 8.4(d) focuses on conduct that is

20   prejudicial to the administration of justice.  This

21   concept of conduct that might be prejudicial to the

22   administration of justice would include interfering with

23   a substantial right of another person.  And so there are

24   cases in-- in 4.(a)-- 4.4(a) also uses this wording

25   about substantial rights of another person.

1    And there are cases where if a person is found to

2  have violated 4.4(a), they're oftentimes also found to

3  have violated 8.4(d), because that interfering with the

4  substantial rights of another, which would include the

5  Sixth Amendment right to counsel, would also be

6  prejudicial to the administration of justice.

7    Q.  Is the same true of the attorney-client

8  privilege, that violating the attorney-client privilege

9  would be--

10    A.  Yes, that's a substantial right--

11    Q.  Okay.

12    A.  -- because that's part of the Sixth Amendment

13  right.

14    Q.  Now, we've talked about this through the prism of

15  the ethics rules.  Is a violation of the ethics rules

16  necessarily a violation of the Sixth Amendment in this

17  context?

18          MR. CLYMER:  I'm going to object, Your

19  Honor, to the phrase "in this context" because I-- I

20  don't know what that means.

21          THE COURT:  All right.  Reframe the

22  question.

23  BY MR. REDMOND:

24    Q.  Is a violation of the ethics rules necessarily a

25  violation of the Sixth Amendment?

1    A.   Not necessarily.

2    Q.   Okay.   So the-- when you're examining the

3  applicability of the ethics rules, is that relevant to a

4  determination of whether the Sixth Amendment has been

5  violated?

6    A.   Yes, it can be very relevant.

7    Q.   How so?

8    A.   Well, again, when-- when the ethics rule

9  violation overlaps with the attorney-client privilege

10 issue, then that directly implicates the Sixth

11 Amendment.

12   Q.   Okay.   Professor, I'm going to ask you to make a

13 couple of assumptions.   No. 1, I'm going to ask you to

14 make the assumption that attorneys and clients are

15 talking on a recorded telephone line.   The client is in

16 a detention facility.   And when the client calls the

17 attorney, the following preamble plays, "This call is

18 subject to recording and monitoring."

19        If an attorney has privatized their phone calls,

20 meaning that they have submitted paperwork to CCA that

21 they subjectively believe means that their phone calls

22 will not be recorded, and they get a phone call and hear

23 that preamble, do they have any ethical obligations?

24   A.   I-- I think they've taken the step of

25 privatizing.

1    Q.   Yes.

2    A.   They could reasonably rely on they've fulfilled

3   what the institution says you need to do to have a

4   private conversation, and I think that's reasonable for

5   them to rely on that.

6    Q.   Okay.  And a different set of facts now.  That

7   same phone call is made from a correctional facility to

8   an attorney but that attorney had-- did not know that

9   there was a privatization process that could

10   potentially-- they could avail themselves of.  Are you

11   with me so far?

12   A.   Yes.

13   Q.   Okay.  Now, assume two additional facts.  Assume

14   that federal law says that all detainees must have a

15   reasonable opportunity for private consultation with

16   counsel, and further assume that the detention facility

17   in question has publicly advertised that it ensures

18   confidential communications between attorneys and their

19   clients.

20        Given those facts, what are the ethical

21   responsibilities of an attorney who receives a phone

22   call from the institution and hears that preamble?

23   A.   Well, it-- if the lawyer is aware of the policy

24   that the institution has or aware of the law, then it's

25   reasonable, again, for the attorney to assume that this

1  phone call, although it might be subject to some type of

2  recording or monitoring, will not, in fact, be listened

3  to by someone else.

4       Q.   Could you explain why?

5       A.   Well, because, again, they're-- they're

6  reasonably relying on a policy that the institution has

7  made public and they're also reasonably relying on the

8  law.

9            I would think also, though you didn't ask, that

10  the attorney would also be relying on what their

11  experience has been with other institutions or maybe, in

12  fact, this-- this own institution.

13       Q.   Okay.  Is waiver of the attorney-client privilege

14  the same-- or is the same analysis employed in waiver

15  analysis of the attorney-client privilege and waiver

16  analysis under the Sixth Amendment?

17       A.   Well, in large part.  But, you know, there may be

18  some distinctions, so let me explain.

19       Q.   Sure.

20       A.   So for a Sixth Amendment waiver, it has to be a

21  knowing and intelligent waiver.  And, again, for waiver

22  in attorney-client privilege, it needs to, in large

23  part, be knowingly and intelligent.

24            There is a concept of inadvertent waiver in

25  attorney-client privilege.  And that occurs if a lawyer

1   has not taken reasonable steps to protect the

2   communication or in-- in discovering that this

3   communication, you know, has been released, hasn't taken

4   reasonable steps to try to remedy it.

5        So an example might be a lawyer receives a letter

6   from a client and mistakenly forwards it on to opposing

7   counsel but realizes that they've done it.  If they

8   contact opposing counsel, that would not be the

9   inadvertent waiver because now they've taken a

10  reasonable step to-- to basically retrieve this

11  communication.  But if they purposefully sent it to

12  opposing counsel, that would be waiver.

13     Q.   Okay.  And didn't the law used to be otherwise?

14  Didn't an inadvertent waiver used to operate to waive

15  the privilege?

16     A.   In some jurisdictions, absolutely.  In fact,

17  Federal Rule of Evidence 502 was amended in 2008 to

18  basically try to settle this issue, because there was a

19  division among courts.

20       The old provision-- or not even provision, I

21  should just say old case authority had that inadvertent

22  waiver was, you know, absolute waiver basically.  And

23  then at the other extreme, inadvertent waiver was not

24  waiver.  And then there was middle ground.  And the

25  ethics-- the Federal Rule of Evidence was amended to

1    take more of a middle ground.

2         So when I was describing kind of the elements of

3    how to prevent the inadvertent waiver, I was referring

4    to what's in Evidence Rule 502(b), which tries to strike

5    this middle ground.  So since 2008, in the federal

6    system, it's Federal Rule of Evidence 502(b) that

7    applies to waiver to federal agencies or agents or in

8    a-- a court proceeding.

9    Q.   Is waiver a strictly legal question or is it a

10   mixed question of facts and law?

11   A.   Oh, I mean, absolutely you need to know all the

12   facts to figure out if there's waiver.

13   Q.   Typically-- let me back up to a question I asked

14   earlier.  You indicated that one of your obligations,

15   one of your ethical obligations if you receive

16   privileged material is to notify opposing counsel; is

17   that right?

18   A.   That's correct.

19   Q.   And what's the rationale for that rule?

20   A.   Well, that's because of the protection we have

21   for attorney-client privilege as well as client

22   confidentiality.  So it's-- it basically puts this extra

23   obligation on lawyers, because client confidentiality

24   and attorney-client privilege are kind of bedrock

25   principles of how the adversary system works.  And

1    that's why the ethics rule explicitly puts that

2    requirement; if you receive the material, you have to

3    notify the other side.  And that's-- that's just to-- to

4    basically recognize how important client confidentiality

5    and attorney-client privilege is.

6        Q.   Okay.  If the other side is notified, as you

7    prescribe, and there's ongoing litigation, do they have

8    the ability to then go to court and litigate whether

9    there's been a waiver?

10       A.   Absolutely.  And I think in the typical

11   situation, if you're notified by the other side, you see

12   if you can resolve the matter yourselves.  And I believe

13   that that likely happens in most instances.  But if the

14   other side says, "Okay, well, we've notified you, but

15   we're going to use it," well, then absolutely you would

16   go to the court to try to have that issue litigated.

17       Q.   Okay.  I want to return to the two hypotheticals

18   that I posed to you and view them this time into the

19   lens of waiver law.

20            So just to re-orient you.  The first hypothetical

21   is that an attorney privatizes their phone number with a

22   correctional institution.  Their client housed at that

23   correctional institution calls them on a-- what-- a

24   preamble plays that says, "This call is subject to

25   recording or monitoring."  By discussing attorney-client

1   privileged items with his client, has that attorney

2   waived the privilege?

3       A.   Again, no.  No.

4       Q.   Why not?

5       A.   Because they've taken the step of privatizing

6   their call and are reasonably relying on the fact that

7   they've done what's necessary to privatize that call.

8   So that's why there wouldn't be waiver.

9       Q.   What if the call was not, in fact, privatized?

10      A.   Again, that would depend on the facts.  Did this

11  lawyer know that there was a policy to not record the

12  calls between attorneys and clients because that's what

13  the institution says it doesn't do?  And were they aware

14  of the law that says that attorney-client communications

15  are not going to be recorded?

16          Or even if the attorney thought it may be

17  recorded, they could be relying on the fact that that

18  recording would not be used or listened to by anybody

19  because, again, there was this communication between the

20  client and attorney and they were relying on the policy

21  and the law.

22      Q.   Okay.  The second hypothetical then.  The

23  attorney who is unaware of the privatization process

24  receives a call from a client in a correctional facility

25  with the preamble that we've discussed.  By speaking

1    with that client and assuming the two facts that I--

2    that we've discussed--

3        A.  Right.

4        Q.  -- has that attorney waived the attorney-client

5    privilege by speaking with their client?

6        A.  Again, assuming that they know that the

7    institution says we don't record these calls and

8    knowing-- or if we-- well, and also knowing-- or

9    knowing, I should say, that there's a law that these are

10   not going to be used, the lawyer might think it might be

11   recorded but nobody is going to listen to it, because,

12   again, I'm relying on the policy that they're not going

13   to be listening because they say they're protecting

14   attorney-client communications.

15               MR. REDMOND:  Could I have just a moment,

16   Your Honor?

17               THE COURT:  Yes.

18               (Counsel confer).

19   BY MR. REDMOND:

20       Q.  I did forget a question, Professor.  We talked

21   about the actual language of the preamble.  Do you

22   remember that?

23       A.  Yes.

24       Q.  "Is subject to recording and monitoring"?

25       A.  Right.

1     Q.  As a lawyer or as an ethicist-- actually as an

2  ethicist, how do you read that?  What does that sentence

3  mean to you?

4     A.  Well, I-- I read it to say there's the capability

5  of recording and monitoring.  I-- I don't-- I mean,

6  clearly even somebody who just-- you know, just the

7  English language, it's not saying "this is being

8  recorded and monitored."

9        And so using your two hypotheticals, in the first

10  hypothetical where you privatized, you, you know-- I

11  think you reasonably, as an attorney, can rely on the

12  fact that although they have the capability, either

13  they're not using it or, if they have recorded it, it's

14  not going to be made available to anybody.

15        Some systems actually have a way of-- although

16  they might record it, they then erase it.  Somebody

17  monitors just in the sense of seeing, oh, this went to a

18  privatized number, now we're just going to delete it

19  from what we're maintaining.

20        And then in the second instance hypothetical

21  where an attorney is aware of the policy that protects

22  attorney-client communications and/or the law, again,

23  they could be relying on that because the recording says

24  "subject to" but not "we are recording."

25                MR. REDMOND:  Those are my questions.  Thank

1  you, Professor.

2          THE WITNESS:  Okay.

3                  EXAMINATION

4  BY THE COURT:

5      Q.  Professor Joi, before we see if there's cross

6  examination, I want to ask you something following up on

7  something you testified to.

8          You said that the obligation, the ethical

9  obligation, for a party that possesses or receives an

10 attorney-client communication, the obligation to report

11 that or give notice to the other attorney then allows

12 them to see if they can resolve the matter.  And, if

13 not, then they can litigate the matter.  Correct?

14     A.  That's correct, yes.

15     Q.  And in terms of-- and the language you-- I think

16 you used in-- in describing that is to-- to litigate or

17 to resolve or litigate around the question of-- in part,

18 I guess, of whether the recipient has used the

19 communication in some fashion?

20     A.  That's right.

21     Q.  All right.  My question about that is that when

22 an attorney-- and I'm getting back to sort of your

23 generic testimony about how important of a bedrock

24 principle this is.

25          When one attorney hears another attorney's

1   communication with their client in the context of a case

2   in which they're all very intimately involved with the

3   evidence, is it always possible to determine or to draw

4   a line even in terms of whether that person can use that

5   information or not?

6      A.   Oh, okay.  I-- no, it's not always possible to

7   draw the line.  I mean, once you've heard it, say you've

8   heard the communication, you have to report to the

9   attorney "I heard this," whether or not subjectively the

10  person who heard it thinks this is usable.

11       You have to put them on notice so there could be

12  a discussion between the two attorneys in the first

13  place about, you know, how much of this did you hear,

14  what did you hear, and give that lawyer the opportunity

15  to go to-- to a judge and say, Your Honor, I think, for

16  example, that the opposing lawyer should be disqualified

17  because they heard this conversation I had with my

18  client.  And then the judge would make an inquiry and

19  make a decision, would that be an appropriate remedy.

20       So the subjective belief of the person who either

21  receives, you know, confidential information or

22  attorney-client privileged information or listens to

23  such information is not a factor.  I mean, the rule

24  doesn't-- you know, the rule doesn't speak to that.

25       It's an absolute obligation, because that's-- you

1   know, the adversary process really depends on if the

2   parties can't work things out themselves, you have a

3   judge to go to who's impartial who's going to make a

4   call.

5       Q.   Well, I imagine there may be scenarios that

6   perhaps all the recipient might've heard was something

7   along the lines of, "I'm going to come up and see you

8   sometime next week," and the attorney that spoke that

9   knows that that's all that was said, and that might be

10  something that they could negotiate.

11        In other words, the attorney may think that his

12  or her communication was not something that would be--

13  that the other-- that the prosecutor, whoever, knowing

14  that would be adverse to the client; is that fair?

15      A.   That's fair, yes.

16      Q.   On the other hand, there might be something that,

17  from an outsider looking in, may seem not particularly

18  adverse to the client, it may be very nuanced, but the

19  client's attorney may think that it could be adverse

20  based on his or her knowledge of everything, and perhaps

21  the other party-- or the other attorney doesn't think it

22  would be adverse.  But that would be a scenario where

23  they could not negotiate and they would both present

24  their positions to a judge hopefully for a

25  determination?

1    A.    Absolutely.  Absolutely.

2    Q.    All right.  Thank you.

3    A.    Also, Your Honor, there is one other kind of

4  dynamic here that we haven't talked about but your

5  example brings out for me.

6         Even in-- in the first situation where it's

7  likely that everybody is going to negotiate it, if I'm

8  the defense lawyer or even in a civil case I'm just a

9  lawyer for a client and that happens, I'm going to

10  consult with my client too, because it's important for

11  my client to be in the loop in how this gets resolved,

12  because I don't want later on my client thinking that,

13  you know, I didn't protect his or her interests in the

14  matter.  So that's another reason for the notice

15  provision.

16    Q.    And it gets back to sort of the-- the reason for

17  this bedrock principle in part is so that the client,

18  who's not an attorney and not sophisticated, has the

19  assurance that whatever he or she says to their attorney

20  is between them and only between them?

21    A.    Absolutely.

22              THE COURT:  All right.  Cross examination.

23                    CROSS EXAMINATION

24  BY MS. VANBEBBER:

25    Q.    Professor, I just have I think one or two

1  questions for you.  First, would you please assume that

2  it has long been the position in the Kansas City, Kansas

3  Office of the U.S. Attorney that CCA's attorney-client

4  calls are not privileged based upon the warning and,

5  therefore, they don't need to be disclosed in discovery.

6  Would you make that assumption?

7      A.   Okay.  All right.

8      Q.   Would you say that if there is a doubt about the

9  waiver of the attorney-client privilege, it's going to

10  be the defense counsel that needs to ask a court to

11  decide the waiver issue?

12      A.   That-- that's right, but it also requires the

13  defense counsel to know that that's the position of the

14  U.S. Attorney's Office.

15      Q.   That's my next question for you.

16      A.   Okay.

17      Q.   Will the defendant's attorney have any reason to

18  seek the assistance of the court if the prosecutor fails

19  to notify him that they have the calls with his client?

20      A.   Absolutely no reason.

21      Q.   So the prosecutor would be deliberately depriving

22  the defendant of his opportunity to consider or control

23  the privilege?

24      A.   That's right.  I mean, if they've adopted a

25  policy that is so contrary to what is generally

1  understood about attorney-client privilege and client

2  confidentiality, at a minimum they need to notify all

3  the defense lawyers this is-- this is our position, to

4  give them an opportunity to-- to seek, you know, court

5  resolution of it.

6      Q.  Now, let me ask you:  We have had a number of

7  people in the press and elsewhere wonder why this hasn't

8  come up in the past, why has this not been litigated

9  before.  And you indicated that you saw listings of

10  hundreds, if not thousands, of phone calls that included

11  attorney-client calls for a small period of time and

12  not-- not just recently?

13      A.  Well, I said I read a report that somebody from

14  the Federal Public Defender's Office had prepared.  I

15  personally have not listened to anything.

16      Q.  Well, given that there are thousands of calls and

17  given that this issue has never been litigated in this

18  court before, would you assume that this office is

19  regularly not notifying attorneys that they have calls

20  from their clients?

21          MR. CLYMER:  Judge, I'm going to object to

22  that because it's pure speculation.  It's based on

23  erroneous facts.

24          THE COURT:  Overruled.  You can answer it if

25  you can.

 1            THE WITNESS:  I think that would be the only

 2   assumption, because-- I mean, absent evidence that they

 3   have notified defense lawyers, that would be the logical

 4   assumption.  If there is evidence that they've been

 5   notifying defense lawyers all along, that's a different

 6   story.

 7            MS. VANBEBBER:  Thank you.

 8                     CROSS EXAMINATION

 9   BY MR. CLYMER:

10     Q.  Professor Joi, you've also written on advocacy

11   issues.  Correct?

12     A.  On a variety of issues, that's right.

13     Q.  And I take it as a-- as a legal scholar and a

14   professor, you're aware of the role that hypothetical

15   questions play when questioning an expert?

16     A.  Yes.

17     Q.  And I-- so I assume you're-- you'll be capable

18   when testifying today to realize that the hypotheticals

19   you've been given are just that, they're hypothetical.

20   Correct?

21     A.  I-- I-- yes, absolutely.

22     Q.  And you won't assume the truth of a hypothetical

23   simply because a lawyer asked you?

24     A.  No, I just assumed it for the purpose of

25   rendering an opinion.

1     Q.   And the fact-finder, of course, should do the

2  same thing.  Correct?

3     A.   Absolutely.

4     Q.   Okay.  And are you aware, Professor Joi, that

5  there's been no finding in this case of any violation of

6  the attorney-client privilege or the Sixth Amendment?

7     A.   I don't believe there's been a finding, but I--

8  I've read some findings that would-- or some testimony

9  that would lead to such a finding.

10     Q.   Do you realize that there's conflicts in the

11  evidence here?

12     A.   Yes.

13     Q.   Okay.  I'm going to show you what's been marked

14  as Government's Exhibit 37.  This is the Court's

15  Phase III order.  You said you've read this.  Correct?

16     A.   Yes.

17           MR. CLYMER:  Your Honor, I move 37 into

18  evidence.

19           MR. REDMOND:  It's already in the record,

20  so...

21           THE COURT:  What is this?  What order?

22           MR. CLYMER:  The Phase III order, Your

23  Honor.

24           THE COURT:  It's already-- it's a part of

25  the record.

 1              MR. CLYMER:  I'll refer to it.

 2              THE COURT:  If you want to refer to it as

 3   Exhibit 37, that's fine.

 4              MR. CLYMER:  Thank you.

 5   BY MR. CLYMER:

 6      Q.  I'll just ask you to read to yourself the first

 7   full sentence on Page 16, Professor.

 8      A.  The one that begins with "furthermore" or the one

 9   that begins "while?"

10      Q.  "While."

11      A.  "While"?  Okay.  All right.

12      Q.  Just read it to yourself.

13      A.  Okay.  Yes, I've read it.

14      Q.  Does that refresh your recollection about whether

15   there's been any finding in this case about whether

16   there's been a violation of the attorney-client

17   privilege?

18      A.  Yes.  I believe I've said that there hasn't been

19   a finding.

20      Q.  So what we're talking about here, just to ensure

21   there's no confusion, are allegations of violations of

22   the attorney-client privilege.  Do you understand that?

23      A.  Yes.

24      Q.  And allegations of violations of the Sixth

25   Amendment.  You understand that as well?

1      A.   Yes.

2      Q.   Thank you.  You were asked some questions by

3  Mr. Redmond about whether an attorney waived the

4  privilege under a certain set of hypothetical facts.  Do

5  you remember those questions?

6      A.   I do.

7      Q.   Okay.  I want to ask a different question.  And

8  the question is:  Are you aware of the law about whether

9  a client waives the attorney-client privilege under

10  various facts when their client is an inmate who makes

11  an outgoing phone call from a detention facility?

12      A.   I'm aware of several cases addressing variations

13  on that, yes.

14      Q.   And would it be safe to say that there are

15  federal cases from various circuits around the country

16  that hold when an inmate makes an outgoing call and is

17  warned by a recording about the possibility or certainty

18  of recording and monitoring of the call, that there can

19  be a waiver of the privilege?

20      A.   Under certain sets of circumstances, yes.

21      Q.   Okay.  So would it be safe to say that a litigant

22  in federal court who was aware of those cases would be

23  perfectly permitted and ethically permitted to make an

24  argument to a court that there's been a waiver of the

25  attorney-client privilege under the circumstances where

1    one of those warnings was played before a call was made?

2        A.   If I understand your question correctly, if they

3    brought the matter to the court to say, we believe

4    there's been a waiver here?

5        Q.   Exactly.

6        A.   Yes.

7        Q.   And not only is an attorney permitted to do that,

8    but under some circumstances an attorney would be

9    ethically required in Kansas to do that; is that right?

10        A.   Well, that's right.  If they came into possession

11   of, say, a telephone call and they thought that

12   privilege had been waived and they initiate with the

13   court, "We want to listen to this, but we want your

14   approval because we believe waiver has happened," that

15   would be the ethical thing to do.

16        Q.   And what if an attorney came into possession of

17   such material and for the sake of simplicity-- actually,

18   let me rephrase the question.

19        For the same of simplicity, let's refer to

20   alleged attorney-client privileged material just so-- we

21   realize it's a finding.  Fair to do?

22        A.   If that's what you prefer to do, I'll go right

23   along with you.

24        Q.   Thank you.  Suppose an attorney comes into

25   possession of alleged attorney-client privileged

1  material but doesn't realize it until a defense attorney
2  makes an assertion of the violation of the privilege to
3  the attorney who has the material.  Would it be
4  appropriate for the attorney for the government then to
5  notify the Court at that point?
6      A.   Absolutely.
7      Q.   Do you realize from reading the pleadings that
8  that's exactly what happened in this case?
9      A.   In some instances, yes.
10     Q.   Okay.  What instances do you recall where that
11 happened?
12     A.   I-- I believe the instance involving former AUSA
13 Tomasic.
14     Q.   And what do you remember about Tomasic's
15 notification to this Court?
16     A.   That this-- and I'm not exactly sure because it's
17 be a while since I've reviewed the pleadings, if she
18 notified the Court or if somebody else in the office
19 notified the Court.
20         But my recollection is it came to light that she
21 had listened to a conversation.  Her subjective opinion
22 was that waiver had-- was involved or it wasn't in some
23 way protected by attorney-client privilege.  And then
24 later there was a determination that the Court should be
25 notified.

1     Q.  Would it be safe to say that your recollection

2  and understanding of the facts of this case may not be

3  complete, Professor?

4     A.  That's very possible.

5     Q.  Would it be safe to say then it would not be wise

6  for you as a expert witness to make opinions about the

7  actual facts in this case?

8     A.  I made opinions to the questions presented to me.

9     Q.  Yeah, I know you did.  But my question is:  Would

10  you say it would not be wise for you to make opinions

11  based on the actual facts in this case?

12            MR. REDMOND:  Objection to relevance.  We

13  proceeded by hypotheticals during the direct

14  examination.  I'm not sure-- I mean, Mr. Joi has not

15  been asked to say here's what you should do in this

16  case, Judge.

17            THE COURT:  I can draw the distinction.  I'm

18  going to-- I'm going to find-- I'm going to make the

19  factual findings.  I'm going to evaluate the evidence.

20  It's not going to be based on pleadings and it's not

21  going to be based on hypotheticals.  It's going to be

22  based on what I find the evidence to be.

23            And I appreciate Professor Joi's opinions

24  because, based on what my findings ultimately are going

25  to be, I think it will be helpful to me in determining

1   whether there have, in fact, been violations.

2   BY MR. CLYMER:

3       Q.   Professor Joi, you were questioned about your

4   testimony in this matter in an earlier hearing.  Do you

5   recall that testimony?

6       A.   The earlier testimony in 2016, yes.

7       Q.   And if I understood you correctly, what you

8   testified about earlier was that people can communicate

9   soundlessly.  Correct?

10      A.   That's correct.

11      Q.   And, in fact, the Federal Rules of Evidence

12  recognize that, don't they?

13      A.   Yes, it does.

14      Q.   So the ethical rule regarding attorney-client

15  confidences, which can be anything a client communicates

16  to an attorney, would certainly cover soundless

17  communication by a client to an attorney.  Correct?

18      A.   That's correct.

19      Q.   Is it also true with regard to your testimony

20  earlier and today that you have not expressed an opinion

21  about whether soundless video can reveal attorney-client

22  communications?  I'm just asking you about your

23  testimony, and I'm not asking you--

24      A.   My recollection of my testimony was that

25  soundless video could reveal attorney-client

1   communications.

2       Q.  Would you be able to determine that without

3   watching the video?

4       A.  Well, as I said, I said it could reveal.

5       Q.  And that's my follow-up question.

6       A.  I didn't say that this one did reveal.

7       Q.  This one did reveal.

8       A.  But yes, you're right.  As a general proposition,

9   it could reveal.  But one would look at each individual

10  video to say if, in fact, it did reveal.

11      Q.  Because without looking at each individual video,

12  you would not see whether a person used any hand

13  gestures.  Correct?

14      A.  Or the camera caught-- captured something that

15  had been written that the client passed to the lawyer,

16  the lawyer passes to the client.  But-- but it could

17  also-- you know, again, you'd have to watch the video to

18  see whether the client was upset in talking to the

19  attorney or whether the attorney was remonstrating with

20  the client, all of which would be communication that--

21  that would be covered by attorney-client privilege.

22      Q.  Now, you're aware that this case involves claims

23  of a violation of the Sixth Amendment right to counsel

24  with respect to soundless video of attorneys meeting

25  with clients.  Correct?

1          MR. REDMOND:  Your Honor, I'm going to

2   object.  I let this go for a while, but this is

3   explicitly outside the scope and we said at the

4   beginning of the direct we were not going to talk about

5   what Professor Joi previously talked about.

6          MR. CLYMER:  Your Honor, if this is outside

7   the scope, I'll ask to take the witness on my own rather

8   than to have to recall him.  I believe this is an

9   appropriate question.  I want to ask the witness some

10  questions about the ethics rules and how they apply to

11  hypotheticals, just the way defense counsel did.

12          THE COURT:  Well, it is outside the scope.

13  This witness has already given an opinion about

14  attorney-client communications.  I'll allow you to-- to

15  ask him further about that.  I'm going to consider the

16  opinions that he gave at the hearing before as part of

17  this record.  So if you want to ask him further about

18  that, that's fine.

19  BY MR. CLYMER:

20    Q.   And you're also-- are you aware that it involves

21  soundless videos of attorneys meeting with clients?

22    A.   That's correct.

23    Q.   And you're aware that it also involves

24  audio-recordings of outgoing inmate calls to attorney

25  telephone numbers.  Correct?

1     A.   That's right.

2     Q.   And as you testified earlier, here the Sixth

3  Amendment claims are premised on an assertion that there

4  were violations of the attorney-client privilege.

5  Correct?

6     A.   That's right.

7     Q.   And so, as you said earlier, whether or not

8  there's a violation of the privilege is relevant to the

9  Sixth Amendment claims?

10    A.   That's correct.

11    Q.   Are you aware that with respect to the soundless

12 video, there's a dispute about whether those videos are

13 privileged?

14    A.   Yeah, I believe that was a subject matter of the

15 prior hearing.

16    Q.   And are you aware that there's also a dispute

17 about whether the privilege was waived as to the

18 audio-recordings?

19    A.   Yes.

20    Q.   Okay.  I want to ask you some questions about how

21 the attorney-client privilege works in this context, if

22 I could.  So I want to begin by asking you a couple of

23 questions about the privilege itself and then I'll get

24 to the specifics.

25         In order for there to be a privileged

1  communication, there has to be communication by either
2  the client or the attorney for the purposes of either
3  receiving or giving legal advice or legal strategy.
4  Correct?
5      A.  That's correct.
6      Q.  And the communication must be between a client of
7  the attorney and either the attorney or someone working
8  on the attorney's behalf; is that right?
9      A.  That's right.  And in some instances it could
10 also be an agent of the client talking to the attorney
11 or somebody working on the attorney's behalf.
12     Q.  Fair enough.  And there are situations when even
13 if the privilege does apply; in other words, if those
14 requirements you just described are satisfied, the
15 privilege can be waived; is that correct?
16     A.  That's correct.
17     Q.  For example, there's a crime fraud exception.
18 Correct?
19     A.  That's right.
20     Q.  And there's times where communications are
21 knowingly disclosed to third parties and that will waive
22 the privilege as well?
23     A.  That's correct.
24     Q.  Would it be safe to say-- or would it be accurate
25 to say that in order to tell whether the privilege

1  applies and it hasn't been waived, one needs to know the

2  content of the communication and the circumstances

3  surrounding the communication?

4      A.   That's correct.

5      Q.   In litigation over whether the privilege applies

6  or not, who has the burden of proof about presenting

7  facts showing that the content of the communications and

8  the circumstances surrounding the communications

9  establish the privilege?

10     A.   The party asserting the privilege.

11     Q.   So if there's a failure of proof in litigation

12  where there's a claim of attorney-client privilege, the

13  party asserting the privilege should lose.  Correct?

14     A.   If-- I just want to restate for you my

15  understanding.

16     Q.   Sure.  Yeah, please do.

17     A.   If you're saying that the party asserting the

18  privilege fails to demonstrate that all the conditions

19  for the privilege were met, then yes, they have not

20  established the privilege.

21     Q.   And the privilege belongs to the client, not to

22  the attorney.  Correct?

23     A.   That's correct.

24     Q.   And the privilege is unique to that client.

25  Correct?  Let me ask a better question.

```
 1        A.   Yeah.

 2        Q.   I'm sorry, you look--

 3        A.   Well, by--

 4        Q.   You communicated nonverbally to me.

 5             THE COURT:  Stop talking over each other,

 6   please.  Stop.

 7   BY MR. CLYMER:

 8        Q.   Excuse me.

 9        A.   Okay.  So we're not--

10             MS. REPORTER:  I'm sorry, I didn't hear you.

11             THE WITNESS:  I said but we're not in an

12   attorney-client privileged relationship.

13   BY MR. CLYMER:

14        Q.   So let me try to ask the question in a better

15   way.  If an attorney represents multiple clients and the

16   privilege is violated as to one of those clients, that

17   does not violate the privilege for other clients of the

18   attorney, does it?

19        A.   Well, I mean, it could if there was, like, a

20   joint defense situation, yes.

21        Q.   Absent a joint defense situation, two completely

22   unrelated clients.

23        A.   Oh, okay.  Let me-- I just want to be sure.

24        Q.   Yeah, go ahead.

25        A.   So if you're saying an attorney represents Client
```

1    A on one matter and Client B on a separate matter--

2        Q.   Correct.

3        A.   -- and there's no attorney-client privilege or

4    there's been waiver as to B, it doesn't affect A,

5    absolutely.

6        Q.   And that's consistent with the Sixth Amendment as

7    well, which is a personal right.   Correct?

8        A.   That's correct.

9        Q.   Okay.   I want to ask you some questions more

10   specifically about the attorney-client privilege.   But

11   before I do, I want to make sure I clarify for you what

12   I'm asking and what I'm not asking, because I think that

13   there was a misunderstanding previously with another

14   witness.

15       I am not making any assertion that it's good

16   policy to have government officials recording

17   attorney-client meetings, okay?   There's no question

18   about that.   There's not a policy question here.   Do you

19   understand that?

20       A.   Okay.

21       Q.   I'm not making an assertion that prosecutors

22   should be free to act on their own decisions regarding

23   whether there's a waiver or not.   Do you understand

24   that?

25       A.   Okay.

1    Q.   I'm asking questions specifically about how the

2    attorney-client privilege works in certain situations.

3    That's all I'm asking you about.

4    A.   Okay.

5    Q.   Would you agree that there are situations,

6    numerous situations, where litigants can have a

7    good-faith dispute about whether the privilege applies

8    to a certain communication?

9    A.   In the abstract, yes, but-- but I guess I'd need

10   to know the particular facts to say is it legitimate or

11   not.

12   Q.   Fair enough.   But in general.

13   A.   In general.

14   Q.   And would it be also fair to say that there can

15   be good-faith disputes about whether the privilege has

16   been waived?

17   A.   Again, in general.

18   Q.   I want to give you a hypothetical.   Suppose a

19   prosecutor has agents execute a search warrant at a law

20   office seeking materials and the materials include

21   attorney-- attorney-client files.   In this situation,

22   it's very likely that the search warrant may result in

23   the government obtaining possession of arguably

24   privileged materials.   Does the execution of that

25   hypothetical search warrant violate the attorney-client

1  privilege?

2     A.   In and of itself, no.  But what happens after the

3  search takes place may.

4     Q.   We'll get to that.  Why doesn't the mere

5  execution and the government's acquisition of that

6  arguably attorney-client privileged material violate the

7  privilege?

8     A.   Why doesn't it?

9     Q.   Why doesn't it?  You said it doesn't, I'd like to

10  know why you say that.

11     A.   Okay.  Because the search warrant at that point

12  has been reviewed by a judge.  And, you know, I don't

13  know the terms of the search warrant, but I'm assuming

14  for the sake of the question you've asked that the only

15  thing that happens when the search warrant is executed

16  is that materials are gathered--

17     Q.   Correct.

18     A.   -- and that nobody reviews those materials.

19     Q.   Correct.  That's part of the hypothetical.

20  Correct.

21     A.   Okay.

22     Q.   So why is-- why is there no violation?

23     A.   Well, that's why, because-- because, you know,

24  I-- I don't know what the judge has said with the search

25  warrant, but I'm thinking of Michael Cohen's search.

1    Q.   Fine.

2    A.   And there, the judge determined that there was

3  going to be a special master who was going to review

4  everything and work out with the parties as much as

5  possible what was privileged and what wasn't privileged.

6  So in that situation, that's-- that's really protecting

7  the attorney-client privilege.

8    Q.   So in answer to my-- I want to make sure I ask

9  the question again, and I appreciate your response.  Can

10 you tell us why the privilege does not violate it in

11 that set of circumstances?

12   A.   Again, because there was a judicial oversight in

13 whatever conditions were placed on the search warrant

14 itself.

15   Q.   Does it matter that there's been no judicial

16 finding that there's any privileged materials among the

17 things taken from the law office?

18   A.   Do you mean at the time the search warrant is

19 approved?

20   Q.   At the time the search warrant is executed and

21 the government comes into possession of the materials.

22 In my hypothetical, there's no judicial determination of

23 privilege.  Does that matter for purposes of a

24 determination whether the privilege has been violated?

25   A.   I-- I'm having trouble imagining the-- the

1    situation that you say.  But-- but, again, assuming that

2    the search warrant gets executed, materials are taken--

3        Q.   Correct.

4        A.   -- nothing is reviewed--

5        Q.   Correct.

6        A.   -- there hasn't yet been a judicial

7    determination.

8        Q.   Correct.

9        A.   Okay.  And the party who the search warrant was

10   executed against knows that the search warrant has been

11   executed.

12       Q.   Maybe, maybe not.

13       A.   Okay.  Well, if it's a-- I'm going to give you

14   answers under both circumstances if I may.

15       Q.   Oh, yeah, that's fine, Professor.  I'd just ask

16   that the answers pertain to whether the attorney-client

17   privilege is violated.

18       A.   Okay.  And in a situation where the search

19   warrant is executed and the party against whom it's been

20   executed now knows it's been executed, now they're on

21   notice the government has this material, I better go to

22   court and get some judicial supervision to make sure

23   that attorney-client communications aren't revealed.

24            In a situation where there's no notice to the

25   person, that's more problematic.  And I guess I-- you

 1   know, I would need to know more facts.  It's problematic

 2   because now the government has material that in your

 3   hypothetical includes attorney-client privileged

 4   material.

 5       Q.   Alleged attorney-client privileged.

 6       A.   Okay, alleged.  But since it's been alleged, that

 7   party needs to be on notice that now the government is

 8   in possession of this, this material, so they could

 9   assert whether or not there is attorney-client

10   privilege.

11       Q.   Now, in the state of Kansas there's a Rule of

12   Professional Responsibility that limits a prosecutor's

13   use of a subpoena in order to get materials from a law

14   office; is that correct?

15       A.   That's right.

16       Q.   Okay.  Putting that rule aside, because we're

17   not-- that's not an issue in this litigation, putting

18   that rule aside because there hasn't been any law office

19   search, in my hypothetical-- let's change the facts.

20           A grand jury subpoena is issued to a lawyer for

21   client files and the attorney complies with the subpoena

22   and turns over the client files.  Does the government's

23   possession of those client files violate the

24   attorney-client privilege?

25       A.   If the attorney turns over those files without

1  getting the client's consent, the attorney has violated

2  his client's attorney-client privilege by turning those

3  files over.

4    Q.  Has the prosecutor violated the attorney-client

5  privilege?

6    A.  I-- I don't think so, but I think that that might

7  be a matter that would then be litigated.

8    Q.  Fair enough.  But my question is simply this:

9  Does it violate the attorney-client privilege?

10    A.  As I said, I think under that set of

11  circumstances, that would be subject to litigation for a

12  judge to decide.

13    Q.  So until the judge makes a ruling, there's no

14  attorney-client privilege violation?

15    A.  Well, but the judge-- judge's ruling may be there

16  was an attorney-client privilege violation.  I'm just

17  saying it hasn't yet been adjudicated.

18    Q.  Fair enough.  So would it be safe to say then

19  that the government's mere possession of alleged

20  attorney-client privileged materials, without the

21  government looking at any of those materials, just

22  possessing them through some means of legal process,

23  does not violate the attorney-client privilege?

24    A.  As I said, a judge might make a ruling that that

25  mere possession did.

1    Q.   Do you know of any case that would suggest that

2  that mere possession without review would violate the

3  attorney-client privilege?

4    A.   I'm not aware of a case that says that.

5    Q.   And, in fact, the rule in Kansas that discusses

6  attorney confidences, which includes attorney-client

7  privilege, has the word "reveal" in it; is that right?

8    A.   That's right.

9    Q.   And the word "reveal" tends to mean somebody has

10  reviewed the content of the documents.  Correct?

11    A.   Or in your hypothetical, that attorney who turns

12  over those files has revealed those files to the

13  government, whether or not the government looks at those

14  files.

15    Q.   But from the government's perspective, nothing

16  has been revealed because they haven't viewed it?

17    A.   Again, you know, I think that might be litigated,

18  and it would depend on the facts and circumstances.

19  But-- but under your strict hypothetical, yes.

20    Q.   Okay.  Suppose that after this happens, and let's

21  stick with the-- to make sure we're clear, let's stick

22  with the situation where there's been a subpoena served

23  on the law firm or the lawyer, he's turned over files,

24  the government has not reviewed anything in any of that

25  material.

1    A.   Uh-huh.

2    Q.   Suppose the attorney then asserts the

3    attorney-client privilege as to some but not all of the

4    documents that were seized, just like in the *Cohen* case.

5    Let's assume that happens.

6    A.   Yeah.

7    Q.   Suppose the government believes that some or all

8    of the materials to which the assertion of the privilege

9    was made are, in fact, not privileged or the privilege

10   has been waived, and the government makes that assertion

11   in court but does not unilaterally look at any of the

12   seized material.   Does that violate the attorney-client

13   privilege?

14   A.   It's then up to the Court to make that

15   determination.   But-- but from the way you've described

16   it, it seems to me that the government is taking steps

17   to ensure that it doesn't violate attorney-client

18   privilege and is raising the issue with the Court for

19   the Court to make its determination.

20   Q.   Has the government in the hypothetical I've just

21   given you where it subpoenas the material, holds the

22   material without looking at it, and then notifies the

23   Court of the fact that there's been an assertion of the

24   attorney-client privilege, has the government acted

25   unethically in that hypothetical?

1        A.   Under that set of circumstances where the lawyer

2   voluntarily turned over the files, then subsequently

3   asserts attorney-client privilege as to some files,

4   where the government hasn't looked at everything and

5   where the government then also goes to court to assert

6   its position, I don't see an ethical violation.

7        Q.   In the litigation before the Court, if the

8   government asserts that either there's no privilege or

9   the privilege has been waived, is it unethical for the

10  government to do so if there's case law supporting the

11  government's position?

12       A.   When you say "in the litigation before the

13  Court," do you mean the Court in your hypothetical?

14       Q.   Yes.

15       A.   Okay.  And could you repeat the question again?

16  I just want to make sure I don't lose track of things.

17       Q.   Fair enough.  Fair enough.  To walk us back

18  through this, the government has obtained arguably

19  attorney-client privileged materials by subpoena.

20       A.   From a lawyer.

21       Q.   From a lawyer.  Let's change that hypothetical.

22  Fair enough.  Let's change it.  Suppose it's not from a

23  lawyer, suppose it's from some third party that's in

24  possession of the attorney-client privileged materials.

25  Does that change the analysis under the attorney-client

 1   privilege?

 2       A.   Well, okay, so there are a lot of steps here, so

 3   I'm going to have to unwind--

 4       Q.   Please do.

 5       A.   -- some of this stuff.

 6       Q.   Please do.

 7       A.   So in your original hypothetical where the lawyer

 8   turns over the files without the client's consent, there

 9   was a violation there.  But here we don't have the

10   lawyer doing a violation, so we take that out of the

11   equation.

12           Also, I-- I guess for the purpose of your

13   hypothetical just-- just where I want to-- I'm going to

14   articulate this to be-- to be clear, the search warrant

15   is executed on a third person.

16       Q.   Subpoena.

17       A.   I mean subpoena.

18       Q.   Correct.

19       A.   Grand jury subpoena on a third person, not a

20   lawyer, where the government doesn't know if there's any

21   attorney-client privileged material there?

22       Q.   The government suspects that there very well may

23   be but doesn't know.

24       A.   Okay.  Suspects that there may be but doesn't

25   know.

1        Q.   Correct.

2        A.   Okay.   The search warrant gets executed.

3        Q.   Subpoena.

4        A.   I'm sorry, the subpoena gets executed on this

5    third person who now is on notice that this material is

6    in the government's hands.   And now what's the next step

7    in your hypothetical?

8        Q.   Let's just stop there.   Is there any violation of

9    the privilege up to that point?

10       A.   Up to that point where the government doesn't

11   know if it has privileged communication, based on your

12   hypothetical, I don't see it, but it depends on other

13   facts that-- that we haven't gotten to yet.

14       Q.   If the facts I've given you are the only facts;

15   in other words, the government hasn't looked at

16   anything, it's got this material by way of grand jury

17   subpoena and the government knows there may be

18   attorney-client privileged materials in the stuff, but

19   they haven't looked at it, all they do is possess it,

20   has there been-- any attorney-client privileged

21   communication been revealed to the government at that

22   point?

23       A.   Based on your hypothetical, I don't see it.   But

24   again, you know, there may be other facts.   But-- but

25   based on just those facts, I don't see it.

1        Q.    Thank you.   Now, let's take the hypothetical a

2   couple steps further.   Suppose that an attorney learns

3   that the government is in possession of this material

4   and comes to believe that attorney-client privileged

5   materials pertaining to one of her clients is among this

6   material.   Are you with me so far?

7        A.    Yes.

8        Q.    She asserts the privilege to the prosecutor.

9        A.    Yes.

10       Q.    The prosecutor notifies the Court.

11       A.    Yes.

12       Q.    Are with me?

13       A.    Right.

14       Q.    Up to that point, if no one has looked at the

15   materials from the government-- no one from the

16   government has looked at the materials up to that point,

17   is there any violation of the privilege?

18       A.    I don't see it.   But now that it's before the

19   judge, the judge is going to make a determination on

20   that.

21       Q.    But in your-- in your understanding of the ethics

22   rules, you don't see an attorney-client privilege

23   violation in my hypothetical to this point?

24       A.    Okay.   Well, you interjected the ethics rules.

25   And so, again, based on just those facts and no other

1    facts, where the government may be in possession, but we

2    don't know, and it's alleged to be attorney-client

3    privilege, but the government may be saying it's not,

4    I-- I don't see it.

5      Q.   Okay.  Now, suppose in litigation before that

6    court, that very same court who the prosecutor notified

7    about the government's possession of this material and

8    the attorney's assertion of the privilege as to the

9    material, the government takes the litigation position

10   that the material is not privileged.  Is it a violation

11   of the ethics rules for the government to do that if it

12   has a good-faith basis to assert that claim?

13     A.   If there is a good-faith basis - and that's

14   objective, it's not subjective - to assert that

15   position, and it's now before the Court, I don't see an

16   ethical violation.

17     Q.   Okay.  Now, suppose at some point down the road,

18   somewhere down the road-- actually, strike that.  I'll

19   ask a different question.

20         Now suppose while the government is in possession

21   of this information and before the Court was ever

22   notified, one government agent - perhaps acting on the

23   instructions of a prosecutor, perhaps not, in dispute -

24   watches a video of one attorney meeting with one client

25   among the materials the government has.

1         And suppose those facts are brought to the

2  attention of the judge and suppose the judge ultimately

3  rules, No. 1, the material is all privileged?

4      A.   Not privileged?

5      Q.   Privileged.

6      A.   Oh, is privileged.

7      Q.   Judge rules the material is privileged.

8      A.   Right.

9      Q.   The judge rules that the agent watched a video of

10  an attorney-client meeting.  The judge rules the

11  prosecutor instructed the agent to do it.  And the judge

12  rules that the government then used the information

13  gleaned from that video.  Assume all those facts.

14      A.   Okay.

15      Q.   Would that violate the attorney-client privilege

16  of any other people who had privileged material in the

17  government's possession if the government had never

18  viewed any of that material?

19      A.   Well, there's definitely the violation of the

20  attorney-client privilege in the hypothetical that you

21  put forward.

22      Q.   I gave that to you.

23      A.   Okay.

24      Q.   I made that part easy for you, Professor.

25      A.   Okay.  Well, I just don't want to lose track

1   because you've layered a lot of things here.

2      Q.   Fair enough.

3      A.   And it comes to light now that the government is

4   in possession of additional videos that nobody has

5   reviewed.   Right?

6      Q.   Correct.

7      A.   Right.   That would be a basis then for a judge to

8   tell the government don't look at any of these other

9   videos.   And also if there's a practice in the office

10   that says we can look at these videos, then, you know,

11   that in and of itself would be-- would be at least an

12   ethical violation.

13      Q.   Let's take away the second fact but keep the

14   first one; in other words, once the judge is notified,

15   the judge demands all the videos be turned over.

16      A.   Yes.

17      Q.   And they're all turned over.   So the only video

18   in my hypothetical that's ever watched is the video of

19   the one attorney who asserted the privilege that I

20   described to you earlier.

21      A.   Right.   Right.

22      Q.   My question specifically is:   Has the

23   attorney-client privilege been violated as to anybody

24   else who has unwatched privileged material in that set

25   of stuff?

1     A.   Well, I-- there's some factual issues here.

2   Right?  So, you know, one factual issue, if I understand

3   it correctly, is the government is in possession of

4   these other videos.  Right?

5     Q.   Until the judge orders them to be taken away.

6     A.   Okay.  All right.  And it's now-- okay.  So if

7   one assumes as an absolute certainty that nobody else

8   has viewed any other video, then there-- like turning

9   over all the videos may prevent any additional violation

10  of attorney-client privilege, but that's-- that's an

11  assumption.

12        And a lot of it also then would depend on what

13  was the position of the office.  If the office has a

14  position we can watch whatever we want to watch, then I

15  think that raises a question of, well, did anybody else

16  watch something but now is afraid to come forward to say

17  that they did watch it.

18    Q.   Suppose in my hypothetical nobody has watched it.

19  Does it violate the privilege under that set of facts as

20  to any other clients?

21    A.   Okay.  I mean, it would've violated if the

22  government knowingly took possession of the

23  attorney-client privileged material without notifying

24  the lawyers involved.  That in and of itself, in my

25  opinion, would be a violation.

1     Q.   My question to you, Professor, is:  Is a
2  violation of the privilege as to one client in my
3  hypothetical a violation of the privilege as to the
4  other clients?
5     A.   Oh, no, there would have to be a finding for the
6  other clients.
7     Q.   Okay.  So let's-- let's talk about it in terms of
8  a finding.  Would it be accurate to say that those other
9  clients have the burden of establishing that their
10  privilege was violated?
11     A.   That's right.
12     Q.   Are you aware, Professor, that in this case there
13  was a broad grand jury subpoena issued to a detention
14  facility for all video for a certain period of time?
15     A.   That's my recollection, and I'll rely on-- on you
16  affirming that.
17     Q.   Are you aware that the video was soundless video
18  of attorney-client meeting rooms?
19     A.   Soundless video.
20     Q.   Correct.
21     A.   That's correct.  That's my understanding.
22     Q.   Are you aware that despite the fact that a
23  prosecutor notified the Court and the defense attorneys
24  in-- during a hearing, during a court hearing in a case
25  that resulted from the seizure of this video-- strike

1    that.

2         Are you aware that a-- there was an indictment

3    and people were indicted as a result of the

4    investigation that involved the subpoena for the video?

5    A.   That is my recollection.  I-- I can't recall how

6    many people were indicted.

7    Q.   Are you aware that there was a hearing before the

8    Court in that case in which a government attorney told

9    the Court and told all the attorneys in that case that

10   the government was in possession of soundless video of

11   the attorney-client meeting rooms?

12   A.   That's my recollection.  Again, you know, I don't

13   have a specific-- the specifics of that, but that's my

14   general understanding.

15   Q.   Are you aware that after that hearing, none of

16   those attorneys made an assertion of the attorney-client

17   privilege?

18   A.   That, I'm not-- I don't have a clear recollection

19   of that.

20   Q.   Are you aware that at some point down the road

21   one of the attorneys made an assertion of the

22   attorney-client privilege, but it was an attorney from a

23   different case?

24   A.   I-- I know that there was-- I-- I don't-- I don't

25   recollect that specifically.

1     Q.   I'm going to show you, Professor, what's been

2   marked as Government Exhibit 27.

3              MR. CLYMER:   May I have the ELMO on?

4   Thanks.

5   BY MR. CLYMER:

6     Q.   I'm going to show you the-- part of Government

7   Exhibit 27, which is a multi-page document that consists

8   of a long e-mail chain, Professor.

9     A.   Okay.

10             MR. REDMOND:   And I'm going to object as to

11  relevance.  This has never been a question of Professor

12  Joi's knowledge of the facts of the case.  We're a long

13  way down this road.  I'm not sure where it's heading.

14             MR. CLYMER:   I plan to ask questions about

15  whether under facts, Your Honor, there's been a

16  violation of the attorney-client privilege.  Counsel

17  asked those facts with respect to hypotheticals.  I

18  believe I'm permitted to do so as well.

19             THE COURT:   I don't think it's going to be

20  at all helpful because I don't think there's a way that

21  you can frame this in a way that's going to present all

22  of the relevant evidence on this issue for the factual

23  finding and legal determination that I'm going to have

24  to make.

25             For example, the last question you asked him

1  was:  Are you aware that no one-- none of the attorneys

2  raised the privilege?  Well, I'm aware that at the time

3  that I impounded the videos, attorneys didn't know

4  whether they were on the videos or not.  Nobody had

5  revealed that to them one way or the other, other than

6  the *Dertinger* matter.

7          So, I mean, I'm just saying, you know, you

8  can pose these kinds of questions.  It's not at all

9  helpful to me because I'm going to have to consider all

10 of the evidence and the context of all the evidence.

11 And picking apart at various things is not going to get

12 you there.  So I'm going to sustain this particular

13 objection.

14          These questions have been framed as

15 hypotheticals by the FPD.  You framed some

16 hypotheticals.  I've allowed you all to do that.  I'm

17 going to consider what his opinions are with respect to

18 those hypotheticals in the light of what I find the

19 evidence to be.  But I think it's a very different

20 matter to start going-- drilling down to pieces of the

21 evidence without him having the entire picture that I

22 have and will have once this evidentiary record is

23 closed.

24          I should also say that Professor Joi, in

25 response to questions by all parties, has touched on in

1    my view ultimate opinions, and he-- I'm not-- I'm not

2    being critical of him, he's just responding to

3    questions.  But again, I remind the parties that the

4    ultimate opinions as to whether there were violations of

5    the Sixth Amendment, violations of confidential-- of

6    client confidentiality, violations of attorney-client

7    privilege are mine and mine alone to make.

8    BY MR. CLYMER:

9        Q.   Professor, you testified about a rule.  I believe

10   it was 4.4.  Does Rule 4.4 apply when a party

11   inadvertently discloses privileged information?

12       A.   Yeah, 4.4(b).

13       Q.   Does it apply when a government attorney comes

14   into possession of arguably privileged communications as

15   a result of lawful legal process or lawful

16   investigation?

17       A.   That's-- there may be some facts in which it

18   does, yes.

19       Q.   Can you describe those facts?

20       A.   Yes.  Prosecutors involved in a case where there

21   is a search warrant that's legally executed, there's no

22   expectation that there's going to be attorney-client

23   privilege that is going to be picked up.  It turns out

24   that, in fact, there is and the prosecutor comes into

25   possession of it and doesn't notify the attorney

1    involved.  That would fit under 4.4.

2        Q.  How do you define the term "inadvertent

3    disclosure" in 4.4?

4        A.  Well, what I was-- what I was referring to there

5    initially was 4.4(b).  But under what I just described,

6    I think that would fit into 4.4(a), which focuses on

7    obtaining material.  And I have the rule with me, but I

8    don't want to paraphrase this and not get it right.  If

9    you would let me take a look at the rule, I could, you

10   know, refresh my recollection and then say the exact

11   words.

12       Q.  I don't have the rule with me, Professor.  Sorry.

13       A.  Okay.  Well, I could hand the rule to you and you

14   could look at it and decide if you want me to--

15       Q.  Do you have it with you?

16       A.  I do.

17       Q.  Yeah, I'll take a look at it.  Actually, you can

18   take a look at it.  Why don't we take a look at it

19   together.

20       A.  Okay.  Sure.  And also take a look at Comment

21   No. 1.

22       Q.  Are you done, Professor?

23       A.  I am.

24       Q.  I'm going to put it up on the screen so everyone

25   can see it, okay?

1      A.   Okay.

2           MR. CLYMER:   Professor Joi has handed me a

3    copy of what appears to be of a Rule 4.4 of the Kansas

4    Rules of Professional Conduct.   Your Honor, because this

5    is a legal rule, I'm not sure I need to mark it as an

6    exhibit.   But if the Court would like me to, I will.

7           THE COURT:   I don't think you need to.

8    BY MR. CLYMER:

9      Q.   And 4.4(a) to which you referred, Professor,

10   says, "In representing a client, a lawyer shall not use

11   means that have no substantial purpose other than to

12   embarrass, delay, or burden a third person, or use

13   methods of obtaining evidence that violate the legal

14   rights of such a person."   Is that correct?

15     A.   That's correct.

16     Q.   There's nothing explicit in 4.4(a) that describes

17   any disclosure obligation, is there?

18     A.   No, not-- not in 4.4(a).

19     Q.   And that's the provision you just referred me to;

20   is that right?

21     A.   That's right.

22     Q.   And so the-- the comment of 4.4(a) to which you

23   also referred me says, "Responsibility to a client

24   requires a lawyer to subordinate the interest of others

25   to those of the client, but that responsibility does not

1  imply that a lawyer may disregard the rights of third

2  persons.  It is impractical to catalog all such rights,

3  but they include legal restrictions on methods of

4  obtaining evidence from third persons and unwarranted

5  intrusions into privileged relationships, such as the

6  attorney-client relationship."

7        Professor, do you-- do you interpret an alleged

8  failure to disclose potentially privileged material as

9  an unwarranted intrusion into a privileged relationship?

10  A.  I'm doing a combination of 4.4(a) and (b).  So in

11  the hypothetical we were discussing-- discussing, there

12  was a search warrant, the government attorney came into

13  possession of the privileged information and didn't do

14  anything, just held onto it.

15        So I think it kind of cuts across 4.4(a) and (b)

16  because the government, you know, arguably has this now

17  inadvertently, even though it wasn't sent inadvertently.

18  And, again, as I said on direct, this rule doesn't cover

19  every instance of a lawyer coming into privileged

20  communications, but I think when read together, it-- a

21  reasonable attorney would say, I should notify the other

22  side.

23  Q.  Do you know of any court decision that interprets

24  this rule or a similar rule in any jurisdiction in that

25  way?

1    A.  I don't know of a specific decision.

2    Q.  Thank you, Professor.

3    A.  Yep.

4         MR. CLYMER:  Could I have a moment, Your

5    Honor?

6         THE COURT:  Yes.

7         (Counsel confer).

8    BY MR. CLYMER:

9    Q.  May I see that rule again for a second,

10   Professor?

11   A.  Sure.

12   Q.  Thank you.

13   A.  Oh, I'm sorry.

14   Q.  I'm going to show you the same rule, Professor.

15   I'm going now to the second comment in the rule, and I

16   want to point you to a particular sentence and ask you a

17   question about it.

18   A.  Okay.

19   Q.  Do you see the sentence that begins "similarly,"

20   and I'm-- and I put my pen where it starts for your

21   assistance.

22   A.  Right.

23   Q.  "Similarly, this rule does not address the legal

24   duties of a lawyer who receives a document or

25   electronically-stored information that the lawyer knows

1    or reasonably should know may have been inappropriately

2    obtained by the sending person."  Do you see that

3    sentence?

4        A.  Yes, I do.

5        Q.  That seems to suggest a limit on disclosure

6    obligations by an attorney under this rule, does it not?

7        A.  Well, it says that the rule doesn't specifically

8    address it, and that's what I indicated both on direct

9    and then recently on cross.

10           However, I think in reading the rules together--

11   and also there's an ABA opinion that in a footnote

12   suggests that there is some obligation on the lawyer,

13   though it's not clearly defined, about what you should

14   do.  And it's my opinion that that obligation is to

15   notify the attorney involved.  And I've written about

16   that as well, along with my co-author.

17       Q.  Has any court adopted your opinion, to your

18   knowledge?

19       A.  Not that I know of.  Thank you.

20       Q.  Professor, in your understanding, is there a

21   difference between a prosecutor taking a position in

22   litigation before a court and a prosecutor acting on

23   that litigation position during an investigation?

24       A.  I'm--

25       Q.  Let me--

1    A.   I'm having a hard time of--

2    Q.   That's fine.

3    A.   -- understanding your question.

4    Q.   If a prosecutor has a good-faith legal basis to

5  make a argument in court that the privilege has been

6  waived or that the privilege doesn't apply, does that

7  mean the prosecutor has to, when he or she is doing an

8  investigation, act in accordance with that opinion when

9  coming into potentially privileged material?

10   A.   Again, I'm-- I'm sorry, because it-- I just want

11 to-- I want to make sure I understand your question,

12 which is, you're saying the prosecutor takes a position

13 in litigation that it's either not attorney-client

14 privileged material or there's been waiver?

15   Q.   Correct.

16   A.   But then in an investigation treats it like it is

17 attorney-client privileged material without a waiver?

18   Q.   Correct.

19   A.   Okay.  And the question is-- just--

20   Q.   Is there anything unethical about that dichotomy?

21   A.   No.  I mean, there wouldn't be something

22 unethical about that dichotomy in-- I mean, in and of

23 itself kind of in the abstract, I don't see it, but--

24 yeah, so-- so just based on the way you've stated in the

25 abstract, I don't see something unethical about that.

1    Q.  In fact, it would be the prudent thing for a

2  prosecutor to do, to treat it as if it was privileged

3  until a court ruled on it.  Correct?

4    A.  That's correct.

5              MR. CLYMER:  Nothing further, Your Honor.

6              MR. REDMOND:  We have no questions based on

7  that, Your Honor.

8              THE COURT:  All right.  May Professor Joi be

9  excused?

10              MR. REDMOND:  He may.

11              MS. VANBEBBER:  No questions.

12              THE WITNESS:  Thank you very much, Your

13  Honor.  Your Honor, should I leave the courtroom or

14  should I stay?

15              THE COURT:  You can stay I think.  It's up

16  to the party that subpoenaed you, I suppose.

17              THE WITNESS:  Okay.  Thank you.

18              THE COURT:  All right.  Next witness.

19              MR. REDMOND:  We'd call Justin Gelfand, who

20  is coming into the courtroom now.

21                      JUSTIN GELFAND,

22  called as a witness on behalf of the Federal Public

23  Defender's Office, having first been duly sworn,

24  testified as follows:

25              MR. REDMOND:  Your Honor, before I begin,

1  I'd move two exhibits for admission.  Exhibit 558 is

2  Mr. Gelfand's curriculum vitae, and Exhibit 677 I would

3  move to submit under seal.  That exhibit contains two

4  separate items.  One is an e-mail authored by Tanya

5  Treadway-- or actually authored by Mr. Beall.  And the

6  attachment to that e-mail is a Department of Justice

7  memorandum on filter teams and the guidance on use of

8  filter teams to avoid ethical problems.  We would move

9  to admit that under seal.  I will not be publishing it

10  during the direct examination of Mr. Gelfand.

11            MR. CLYMER:  That's 677, counsel?

12            MR. REDMOND:  Yes.

13            THE COURT:  Are you going to be showing

14  Mr. Gelfand the exhibit?

15            MR. REDMOND:  I am not.

16            THE COURT:  Okay.  So Exhibit 677 is under

17  seal.  Do all the parties have a copy of that and

18  understand that it's under seal?  Special Master's

19  counsel is indicating no.

20            MS. VANBEBBER:  We don't have any objection

21  with going forward with it.

22            MR. REDMOND:  I think we e-mailed it around

23  yesterday, but we will double-check.

24            THE COURT:  Do you have-- well, do you have

25  another copy?

1        MR. REDMOND:  I've provided Ms. VanBebber

2   with another copy.

3        THE COURT:  All right.  677 admitted under

4   seal without objection.  Exhibit 558 admitted without

5   objection.

6        MR. REDMOND:  Thank you very much, Your

7   Honor.

8                  DIRECT EXAMINATION

9   BY MR. REDMOND:

10     Q.   Could you please state your name for the record,

11  please.

12     A.   Yes, sir.  Justin Gelfand.

13     Q.   Mr. Gelfand, what do you do for a living?

14     A.   I'm an attorney in St. Louis, Missouri.

15     Q.   Okay.  So starting with law school, could you

16  give us sort of a brief professional history?

17     A.   Sure.  I went to law school at Washington

18  University in St. Louis, Missouri.  After I graduated

19  law school, I went to work directly after law school for

20  the United States Department of Justice's Tax Division

21  in Washington, D.C.

22          In particular, I was assigned to the Southern

23  Criminal Enforcement Section basically prosecuting

24  primarily, but not exclusively, financial fraud,

25  criminal-tax-type cases throughout largely the southern

1    region of the United States as defined by the Department

2    of Justice Tax Division.

3        Q.  Can I pause you just for a second, Mr. Gelfand?

4        A.  Yes.

5            MR. REDMOND:  I forgot to put something on

6    the record, Your Honor.  There was a *Touhy* notice that

7    we filed in this case because Mr. Gelfand is a former

8    Department of Justice attorney.

9            In consultation with Mr. Clymer, he does not

10   intend to put any limitations on Mr. Gelfand's

11   testimony, including his discussion of Exhibit 677.

12   I've also advised Mr. Gelfand that the procedure we've

13   been following is that if Mr. Clymer has an objection,

14   if he thinks somebody is exceeding the permission that

15   they've received under *Touhy*, he'll affirmatively raise

16   his hand and interject.  But I just wanted to make sure

17   that that was on the record for Mr. Gelfand.

18            THE COURT:  So noted.

19            MR. CLYMER:  Your Honor, I want to amend

20   that.  Mr. Gelfand has authorization to answer the

21   questions that counsel sent to me and Mr. Gelfand also

22   has-- or the topics-- testify about the topics that

23   were-- we received notice of.

24            In addition to that, Mr. Gelfand has

25   authorization to answer questions about Exhibit 677.

1   Mr. Gelfand does not have authorization to reveal any

2   other privileged Department of Justice information.

3              THE COURT:  All right.  So to the extent you

4   think it-- the question is asking for something beyond

5   the scope of the authorization, you'll make a record,

6   you'll intervene?

7              MR. CLYMER:  Although-- yes, although

8   initially the obligation is on Mr. Gelfand.  The

9   regulation applies to him.

10             THE COURT:  I understand.

11             MR. REDMOND:  But to be clear, if the

12  government believes that he is contravening the scope of

13  his notice, which I don't expect, it's the government's

14  obligation to say something.  And that's how we've been

15  proceeding so far.

16             THE COURT:  Well, if Mr. Gelfand doesn't

17  raise the objection or doesn't pose a question, then

18  yes, I-- but Mr. Clymer thinks that it is beyond the

19  scope, it's up to Mr. Clymer to make that record.

20  Nobody else can make it.

21             MR. REDMOND:  Thank you, Your Honor.

22             THE WITNESS:  Thank you.

23  BY MR. REDMOND:

24    Q.  Okay.  So I interrupted you.  You're working for

25  DOJ.  What years were you working for DOJ?

1    A.   From 2009 through 2014.

2    Q.   Okay.  So during that time, do you spend your

3    entire five years with Main Justice?

4    A.   Yes, but with one slight twist.  I was detailed

5    to the United States Attorney's Office for the Eastern

6    District of Virginia for approximately six or seven

7    months at the beginning of my employment at the

8    Department of Justice.  And I was-- I was still a Tax

9    Division trial attorney.  That was my formal position,

10   that was my employment, but I was working full-time each

11   and every day at the U.S. Attorney's Office for the

12   Eastern District of Virginia during that time.

13   Q.   Okay.  And so during that five-year period, are

14   you mostly working on tax cases or exclusively working

15   on the tax cases?

16   A.   Mostly working on the tax cases.  The detail at

17   the U.S. Attorney's Office in the Eastern District of

18   Virginia was in no way, shape, or form limited to tax

19   cases.  It was a much more traditional AUSA-type

20   position.  I was technically a SAUSA, a Special

21   Assistant U.S. Attorney, cross-designated in that

22   office.  So I was prosecuting a wide variety of

23   different kinds of cases, everything ranging from, you

24   know, passport fraud, drug-related matters, just the

25   whole gamut.

1    Q.   Outside of that six or seven months, though, it's

2    almost all tax cases; is that right?

3    A.   Tax and financial fraud cases with a tax angle.

4    And so it was fairly common to prosecute alleged

5    investment-fraud-type cases or things like that that

6    also had a criminal tax angle and a criminal tax count.

7    Q.   Okay.  Based on your six or seven months in the

8    Eastern District of Virginia, were you more likely to

9    encounter privileged information in tax cases or with

10   sort of a regular criminal draw?

11   A.   Just in my anecdotal experience, I encountered

12   privilege issues fairly commonly more in my tax cases

13   than I did in the cases I was working on as a SAUSA.

14   Q.   And that's the questions that I have for you

15   today, is your experience and training as a Department

16   employee in assessing and dealing with privilege issues.

17   Okay?  Sort of explain generally what kind of privilege

18   issues you would come across.

19   A.   So it's fairly frequent.  Many cases I handled I

20   began handling at what we would call the investigative

21   stage of the case.  So this was pre-indictment,

22   pre-charge.  One or multiple people would be targets of

23   federal criminal investigations.

24        And in those cases, it was not uncommon when

25   obtaining evidence to, in certain instances, exercise

1    search warrants, in certain instances use other methods

2    to obtain evidence, both physical, documentary evidence

3    and electronic evidence.

4         And especially when it came to electronic

5    evidence or particular instances involving search

6    warrants executed at certain offices, accounting offices

7    for example, things like that, it was fairly common to

8    come across concerns regarding at least the possibility

9    that there would be privileged communications contained

10   within the subset of-- of evidence seized.

11   Q.   Okay.  So did your training and experience lead

12   you to attempt to safeguard attorney-client privileged

13   information or potentially attorney-client privileged

14   information?

15   A.   Yes.

16   Q.   And explain the process by which you would go

17   through to do that.

18   A.   So based on my training and experience, it was

19   fairly common to assemble what we referred to as a taint

20   team.  I've come to understand that the word "filter

21   team" is also a term that's used.

22        But what we would do is immediately and as early

23   as possible, every case is different of course, identify

24   that there is a possibility of privileged communications

25   or privileged materials that should ideally never make

1    it into the hands of the prosecution team, both the

2    prosecutor or prosecutors and the agents who are

3    assisting in the investigation.

4         At that point a-- either a team, or sometimes it

5    wasn't necessary to have agents, but a different

6    prosecutor who had absolutely nothing to do with the

7    prosecution or investigation of the case that I was

8    handling would be the taint reviewing attorney.  And if

9    that person needed - especially in document-intensive

10   cases where there was a high volume - assistance, then

11   special agents who had nothing at all to do with the

12   investigation of the case would work with that person.

13        And the process was that the potentially

14   privileged or potentially tainted, if you will,

15   materials would end up in the hands of the taint team.

16   The taint team would be briefed, sometimes in writing in

17   the form of a memorandum, sometimes orally, honestly

18   oftentimes a combination of the two, and the taint team

19   would be briefed on, A, just a general overview of the

20   case, kind of who the relevant players are as the

21   government understood it and, B, where the potential

22   privilege concerns came in.

23        And so, for example, if there were attorneys who

24   were known to be individuals who had represented the

25   individual whose material was seized, that person would

1   be disclosed, the names of law firms would be disclosed.

2        In electronic-discovery-type situations or

3   electronic-evidence-type situations, certain other

4   keywords would be provided where there was a concern;

5   for example, work product, privilege, words that

6   attorneys sometimes, but not always, include in e-mail

7   correspondence with their clients, all in an effort to

8   make it easier for the taint team to identify and

9   isolate potentially privileged communications so that

10  the prosecution team doesn't become tainted.

11       At that point the taint team would be responsible

12  for isolating the potentially privileged, if any,

13  materials.  And if there was a defense lawyer already

14  representing the target or the defendant in the case,

15  usually the taint team would make direct contact with

16  that person so as to, at the very least, get input from

17  that person as to the defendant's or target's view of

18  what might be privileged, what might not be privileged.

19  Perhaps there are other names of attorneys that were not

20  known to the government that could easily be disclosed

21  so that the taint team could do its job.

22       Once the taint team identified particular

23  materials that were potentially or clearly tainted,

24  those materials would remain within the possession of

25  the taint team, not within the possession of the

1   prosecution team.

2        And my understanding of the process, at least

3   anecdotally in the cases I was involved in, is that

4   there would be substantial efforts to memorialize

5   basically everything that was done, including how the

6   evidence was maintained, so that in the event there was

7   some sort of challenge or even some sort of inquiry by a

8   court or by the defense at some later date, at the very

9   least there was a clear trail of what was done and what

10  happened.  And that trail could obviously be

11  communicated to a court or to anyone else asking

12  questions about it.

13       Q.   That sounds like a lot of work.

14       A.   It depends on the case, to be honest.  I mean, in

15  certain instances, you might have agents executing a

16  physical search warrant and come across a single

17  envelope that appears that it might be, you know, from

18  an attorney's office.  And what's in that envelope might

19  be unknown, and so the entire taint review, once the

20  taint team is assembled, could take, you know, ten

21  minutes.  I'm perhaps hyperbolizing a little, but it

22  would be very, very quick.

23       In electronic cases, it was sometimes a lot of

24  work.  But it was-- nevertheless, in my experience, it

25  was done.

1     Q.   I want to follow up with a couple of things you

2   said.   No. 1, you said that oftentimes the-- I'm sorry,

3   you said that the-- you referred this to a taint

4   attorney; is that right?

5     A.   Yes.   In my experience, if I was concerned about

6   this, I would go to my supervisor, the section chief

7   that was in charge of my division.   I would basically

8   say that we need to assemble a taint team.   That

9   supervisor would then select who the taint attorney was.

10     Q.   But it's a taint attorney; it's not a taint

11   agent?

12     A.   Correct.

13     Q.   You need somebody with legal training to make

14   privilege determinations?

15     A.   I think that's a fair statement at the very

16   least.   There was always-- I never came across a

17   situation where there was not-- with-- no attorney was

18   involved.   I did come across situations where no agents

19   were involved because the attorney could end up handling

20   it.

21     Q.   You also mentioned that when the defendant had

22   counsel, that you often notified them?

23     A.   Yes.   To kind of clarify that, if I was the

24   prosecuting attorney on the case, I would notify them

25   that we were doing a review and then provide them with

1    the name of the taint attorney who might reach out to

2    them.

3       Q.   Right.

4       A.   There might've been cases, to be honest, where

5    the taint attorney would just directly reach out to the

6    counsel at first without some sort of prior notice by

7    me.

8       Q.   The reason you would not have any discussions

9    with the defense counsel is that you are attempting to

10   insulate yourself from any privileged material at all?

11      A.   Yes.

12      Q.   When you were the prosecuting attorney in the

13   case?

14      A.   Yes.  With the sole exception being perhaps just

15   obtaining a list of names of attorneys, for example,

16   that could be used in keyword searches.

17      Q.   Okay.  Did you-- you also mentioned that you're

18   trying to lay out as clean a record of the process if a

19   court has to review the question.  Did I get that right?

20      A.   Yes.  I mean, in a lot of these situations, it

21   was never the subject of any sort of judicial challenge,

22   but there was always at least a possible anticipation of

23   perhaps some sort of suppression motion or some sort of

24   challenge as to the process that was used to isolate

25   potentially privileged materials from non-privileged

1   materials.

2       And so my training and my experience was that

3   efforts would be made to memorialize, basically just to

4   document what was done, who was involved in it, and to

5   document how the so-called tainted materials were

6   maintained so that they did not make it into the hands

7   of anyone on the prosecution team.  And so those

8   documents, at least ideally, would remain part of the

9   case file, if you will, and be available to the extent

10  that they needed to be reviewed or used in any capacity.

11      Q.  And you're doing all this work because you're

12  aware that certain courts will impose a presumption that

13  taint team information was communicated to the

14  prosecution team unless there's a record that shows

15  otherwise?

16      A.  I'm aware of that concept.  As a practical

17  matter, from the moment I started at the Department of

18  Justice, I was trained that we're doing all this work

19  because that's what we do in these situations.  And so

20  as a practical matter, it was just kind of something

21  taken for granted, if you will, as opposed to, you know,

22  some very, you know, thorough analysis of why we're

23  doing it.

24      Q.  But in the back of your mind as you're doing all

25  this work, there's always the possibility that you're

1   going to end up in front of a judge and need to explain

2   how this went down; is that fair?

3       A.   Yes.   And there's always the possibility that

4   there's a suppression motion or some similar type, you

5   know, pretrial motion practice that raises concerns.

6               MR. REDMOND:   Could I have just a moment,

7   Your Honor?

8               (Counsel confer).

9               MR. REDMOND:   That's all.   Thank you, Your

10  Honor.   Thank you, Mr. Gelfand.

11              THE WITNESS:   Sure.

12              THE COURT:   Any questions?

13              MS. VANBEBBER:   Yes, please.

14                     CROSS EXAMINATION

15  BY MS. VANBEBBER:

16      Q.   Is this the first time you've been in this

17  courthouse?

18      A.   No.

19      Q.   As a matter of fact, you have served as defense

20  counsel in some tax cases, haven't you?

21      A.   I have, ma'am.

22      Q.   And did you appear in this courtroom for a

23  defendant named Kathleen Stegman?

24      A.   Yes.

25      Q.   Was that a tax fraud case?

16-20032-JAR  USA v. Karl Carter (Black)  10.10.18          1819

1     A.   It was a case with allegations of five counts of

2   tax evasion and one count of a *Klein*-type conspiracy.

3     Q.   And which U.S. Attorney's Office were you dealing

4   with in that case?

5     A.   It was a combination of offices.  The U.S.

6   Attorney's Office for the District of Kansas staffed the

7   case with one attorney and then my former division, the

8   United States Department of Justice's Tax Division,

9   staffed the case with two attorneys.

10     Q.   And what was the name of the first person you

11   referenced?

12     A.   The AUSA here?

13     Q.   Uh-huh.

14     A.   Jabari Wamble.

15     Q.   Okay.  During that case did you have occasion to

16   have contact with the U.S. Attorney's Office about the

17   topics you've been discussing this morning?

18     A.   About privilege and taint issues?

19     Q.   Yes.  Uh-huh.

20     A.   Not that I recall.  There was an issue that was

21   raised pretrial because the IRS had, in the defense's

22   view, at the very least destroyed evidence that we

23   believed was either exculpatory or potentially

24   exculpatory.

25     Q.   And what was the outcome of that dispute?

1    A.   The Court ruled-- Judge Robinson ruled that--

2  that our client was not entitled to relief as to that

3  issue.

4    Q.   Your client was what?

5    A.   Not entitled to relief as to that issue.

6    Q.   Was Ms. Stegman also charged in an FDA fraud?

7    A.   She was.  I did not represent her in the

8  post-indictment matter.

9    Q.   Did you deal with the attorney for the United

10  States Attorney that worked that case?

11    A.   I had one meeting with the Assistant United

12  States Attorney who worked that case.

13    Q.   And that person was?

14    A.   I believe Tanya Treadway.  My co-counsel, Sara

15  Neill, and I met with her once at the U.S. Attorney's

16  Office I believe in Topeka, another city.

17    Q.   Did the issue of privileged material come up in

18  that meeting?

19    A.   No, I don't believe so.

20         MS. VANBEBBER:  All right.  Thank you.

21                   CROSS EXAMINATION

22  BY MR. CLYMER:

23    Q.   Mr. Gelfand, defense counsel asked you about the

24  importance of using the taint team to prepare for

25  possible litigation over privilege issues down the road.

1    Do you remember that testimony?

2         A.   Yes.

3         Q.   Isn't it also true that the Department of Justice

4    uses taint teams because it's the right thing to do?

5         A.   I think that's a fair statement.  I mean,

6    without-- I'm not in a position to comment on whether a

7    taint team approach is the best possible approach that

8    can be employed.

9         Q.   Let me ask a better question then.  Isn't it true

10   that a federal prosecutor working on an investigation or

11   a prosecution should want to affirmatively avoid any

12   exposure to privileged material?

13        A.   Yes.

14        Q.   It's also true, however, that sometimes there are

15   disputes about whether materials are privileged.

16   Correct?

17        A.   I think that's fair.

18        Q.   And there's also disputes sometimes about whether

19   the waiver applies to allegedly privileged material.

20   Correct?

21        A.   Absolutely.

22        Q.   And so prosecutors may at times take a litigating

23   position that something is not privileged, even if they

24   stayed away from it during an investigation or

25   prosecution.  Correct?

1    A.  I can certainly see scenarios where that would be

2  appropriate.

3    Q.  Did you ever have litigation where you made

4  assertion-- as a prosecutor, where you made assertions

5  in court that either some allegedly privileged material

6  was not privileged or that the waiver-- a waiver applied

7  to the privilege?

8    A.  I don't recall any such scenario.  What I do

9  recall are scenarios where-- it's not uncommon in a

10  criminal tax case for someone to assert a reliance on

11  professional defense.  And when somebody asserts that

12  defense, that - based on case law - constitutes a full

13  waiver of the attorney-client privilege.

14      And so there were-- there were certainly cases

15  where those issues were discussed; in other words, the

16  concept of waiver of privilege in the context of a

17  criminal tax defendant asserting a reliance on

18  professional defense.

19    Q.  Did you ever argue in court that the privilege

20  had been waived under those circumstances?

21    A.  I'm sure that I did.

22    Q.  Would you have taken the same position during an

23  investigation and looked at privileged material before a

24  court ever ruled on the issue of privilege?

25    A.  No.  I would certainly do my best to take

1   precautions not to.

2        Q.   And why is that, if you had a good-faith

3   reasonable belief that the privilege had been waived?

4        A.   Well, because, first of all, some-- in a reliance

5   on professional defense, for example, the privilege

6   hadn't been waived at the investigative stage but may

7   very well have been waived post-litigation consciously

8   and knowingly.

9        Q.   What if the activity that gave rise to the claim

10  by the government that the privilege had been waived had

11  occurred during the investigative stage, would you have

12  simply made a unilateral decision that the privilege was

13  waived and viewed the privilege-- allegedly privileged

14  material?

15       A.   No, I'd like to believe I wouldn't have.

16       Q.   Why not?

17       A.   Because, as a practical matter, I was always

18  trained and it was always instilled in me at the

19  Department within my division that one-- as a prosecutor

20  on a case, one should not be reviewing material that is

21  very likely, if not unambiguously, to be privileged.

22  And if the argument is that there's a waiver, there's

23  certainly systems whereby a court can make a ruling,

24  whereby it can be brought to a court.  Sometimes there

25  can be an in camera review to the extent necessary.

1        Every case is different.  Every procedural

2   posture is different.  But as a practical matter, the

3   goal should always be not to review privileged

4   communications.

5       Q.  Or potentially privileged communications; is that

6   right?

7       A.  I think that's right.

8       Q.  And for one thing, a judge may ultimately

9   determine that the waiver didn't apply and the material

10  was privileged.  Correct?

11      A.  Yes.

12      Q.  And then you would've done great damage to the

13  case you worked on for a lengthy period of time.

14  Correct?

15      A.  I think so.  There's also situations where you

16  could be essentially compelled to either be disqualified

17  or recused from the case subsequently.

18      Q.  Are there ever privilege claims that are so

19  far-fetched that it's prudent for a prosecutor to ignore

20  the privilege claim, despite the fact it's been made?

21      A.  It's tough to answer that question in extremes.

22      Q.  Let me give you a hypothetical.

23      A.  Sure.

24      Q.  Suppose an inmate from a prison makes a phone

25  call.  The phone call is subject to a warning that the

1  call may be monitored or recorded, and the call is to a

2  non-attorney third-party friend of the inmate's mother.

3  Are you with me so far?

4      A.  Yes.

5      Q.  While that conversation between the inmate and

6  the non-attorney friend of mom is going on, somebody in

7  the same room as friend of mom is talking to the

8  inmate's attorney on a separate telephone.  Are you with

9  me so far?

10     A.  So the recipient-- the person who's not in

11  custody is in a room, someone else is in that room

12  talking to that person's attorney?

13     Q.  The attorney represents the inmate who's in

14  custody making the original call.

15     A.  Okay.  So the attorney-- the inmate's attorney

16  and the inmate's mother friend or someone, not attorney,

17  are in a room together?

18     Q.  Correct.  And the attorney-- the inmate's

19  attorney is in another place.  The inmate's attorney is

20  on a phone conversation with someone in the room.

21     A.  A three-way call?

22     Q.  No, there's two different phone calls.

23     A.  Okay.

24     Q.  So there's one phone call between inmate who got

25  the warnings and mom's friend.  That's Call No. 1.

1       A.   Okay.

2       Q.   Mom is in a room.  Same room as mom, same room as

3    mom's friend, and she's on a separate phone conversation

4    with the attorney for the inmate who's somewhere else.

5       A.   Okay.

6       Q.   Are you with me?

7       A.   I am.  I think.

8       Q.   The attorney never communicates directly with the

9    inmate and the people in between are not serving as

10   conduits between the two of them, they're just two

11   separate phone conversations going on.  But when the

12   recording is obtained, you can hear the attorney's

13   voice.

14        In your view as a former prosecutor or-- and as a

15   present defense attorney, is there a colorable claim of

16   a violation of the attorney-client privilege if somebody

17   listens to that phone call?

18      A.   I don't know that I'm in a position to evaluate

19   the claim.  But I think it would behoove the prosecutor

20   listening to that phone call to treat that as at least

21   potentially privileged communications and let someone

22   else make the determination of whether it is tainted or

23   not.

24      Q.   Thank you.

25      A.   I anticipate that that person making that

1  determination may very well conclude that it's not

2  tainted, but I think the precaution should still be

3  taken to try to do the right thing.

4     Q.  Thank you.  You testified about what to do in

5  terms of a taint team if you either execute a subpoena

6  or a search warrant and get potentially privileged

7  information.  Do you remember that testimony?

8     A.  Yes.

9     Q.  Are there ever situations where prosecutors

10  obtain evidence and they don't have advanced notice that

11  there's privileged information in it, and that takes

12  them by surprise when they stumble across it?

13     A.  Yes.

14     Q.  And I'd like to ask you questions about what a

15  prosecutor should do in that situation.

16         So suppose there is a phone conversation between

17  an inmate, subject to a warning about recording and

18  monitoring, and that inmate's attorney.  And the

19  prosecutor subpoenas or gets by informal request all of

20  the attorney-- I'm sorry, all of the inmate's

21  communications from jail.

22         And an agent is listening to that bundle of calls

23  and realizes ten seconds in this is an attorney-client

24  call, shuts the machine off and reports that to a

25  prosecutor.  What should that prosecutor do in your

1  understanding of the DOJ policy and practice?

2     A.   So at least based on my training and experience,

3  I think that prosecutor should immediately treat that

4  communication and other-- perhaps other communications

5  from the same phone numbers or other ways of searching

6  for similar calls as potentially tainted.  I think that

7  prosecutor at that point should assemble some sort of a

8  taint team, consistent with my prior testimony on this.

9        I also think that if that person is obviously in

10 custody and is a represented party, I think that that

11 prosecutor should notify the defense attorney that this

12 occurred.  I think it's fair to notify the defense

13 attorney that immediately upon discovery that this was a

14 call between counsel and client, the agent stopped

15 listening, we implemented proper procedures.  But I

16 think a notification should be made as soon as it's

17 practicable.

18       And I think other efforts should be taken, for

19 some reason in your hypothetical they weren't before,

20 but to-- to not, either by subpoena or more commonly in

21 my experience by informal request, when obtaining in

22 your hypothetical recorded phone calls, to not include

23 in that request phone calls between the inmate and known

24 phone numbers of the attorney.

25       Sometimes you can't anticipate-- for example,

1   some-- an inmate may very well contact an attorney that

2   the prosecutor has no idea at that point or the agent

3   has no idea is representing that person.  And so you

4   can't precautions in that sense.  But when you know who

5   the inmate's attorney is, you can take precautions and I

6   think that you should.

7       Q.   Is there any reason why you'd use a taint team if

8   the agent and the attorney both don't listen to any more

9   calls-- I'm sorry, the agent and the prosecutor don't

10  listen-- don't want to listen to any more calls

11  involving the inmate and his attorney?

12      A.   You're suggesting that the calls are still within

13  the custody of the prosecution team?

14      Q.   But nobody-- I'm going to take it a step at a

15  time.  Is there any need for a taint team if you accept

16  the fact that the calls either are or may be privileged

17  and shut off all access to those calls?

18      A.   I think that you're on notice that the inmate is

19  communicating with legal counsel, and so I think that

20  there's a-- there's at least an argument, a compelling

21  one in my opinion, for a taint team because--

22      Q.   To review what?

23      A.   Communications between attorney and client that

24  might be with different phone numbers; in other words,

25  to not put the attorney or the agent in the exact same

1    position again to, quote/unquote, stumble across a call,

2    when it's avoidable.

3        Q.   But in this particular investigation, suppose

4    there are a set of calls from that inmate to that

5    attorney.  If no one is going to listen to those calls,

6    is there anything for the taint team to review in that

7    case?

8        A.   I don't believe there's anything for the taint

9    team to review as long as there are other mechanisms to

10   ensure that those potentially privileged communications

11   don't remain in the custody of the prosecution team, in

12   the possession of the prosecution team.  And I--

13       Q.   Would it be appropriate to notify the defense

14   attorney?

15       A.   I think it would be.

16       Q.   If the defense attorney doesn't request that the

17   calls be given to him but simply acknowledges receipt of

18   the e-mail without making that request, is there

19   anything improper with the government not giving the

20   calls to the defense attorney at that time?

21       A.   I mean, as a practical matter, I think there

22   still might be discovery obligations on the prosecutor

23   that exist under Rule 16 or other authority.

24       Q.   Which are triggered by a defense request.

25   Correct?

1      A.   Well, at least in my practice candidly, as both

2   the prosecutor and a defense attorney, there's almost

3   exclusively a general defense request at the outset of

4   any case.   And so it's-- it's essentially a standing

5   obligation.

6      Q.   Would it be appropriate for the prosecutor to

7   reach out to the Professional Responsibility Advisory

8   Office in order to get guidance?

9      A.   Absolutely.

10      Q.   If an attorney-- prosecutor himself came across

11   an attorney-client privileged call, would it be

12   appropriate for the prosecutor to not listen anymore and

13   get a set of calls that did not include attorney-client

14   communications?

15      A.   I'm not sure that I understand your question.

16   Meaning?

17      Q.   Suppose a prosecutor was given a set of

18   recordings from an inmate and heard a defense attorney's

19   voice when listening, shut the machine off at that point

20   and ordered-- would it be proper for the attorney to

21   then order a set of the same calls without any calls to

22   that attorney's number?

23      A.   I think it would be appropriate to-- to attempt

24   to obtain that, but I think at that point there's

25   still-- I mean, every day attorneys are speaking to

1  clients on phone numbers that might be different from

2  the, for example, main office line in this day and age,

3  and so I still think that it would be appropriate to

4  take reasonable precautions at that point when you're on

5  notice that the attorney and the client are speaking to

6  each other while the client is in custody.

7            MR. CLYMER:  No further questions, Your

8  Honor.

9            MR. REDMOND:  No questions, Your Honor.

10           MS. VANBEBBER:  No questions.

11           THE COURT:  May Mr. Gelfand be excused?

12           MR. REDMOND:  He may for us.  Thank you.

13           THE COURT:  You're excused.

14           THE WITNESS:  Thank you.

15           THE COURT:  Let's take a 15-minute break.

16           (Recess).

17           THE COURT:  All right.  You can be seated.

18  Call your next witness.

19           MR. BELL:  We call Tammy Loehrs.

20                    TAMMY LOEHRS,

21  called as a witness on behalf of the Federal Public

22  Defender's Office, having first been duly sworn,

23  testified as follows:

24                  DIRECT EXAMINATION

25  BY MR. BELL:

1    Q.   Good morning.  Would you state your full name,

2  spelling the last for the record?

3    A.   Tammy Loehrs.  L-O-E-H-R-S.

4    Q.   Ms. Loehrs, what do you do for a living?

5    A.   I'm a computer forensics expert and I own a

6  computer forensics company in Tucson, Arizona.

7    Q.   What sort of history have you had with computer

8  forensics?

9    A.   Well, I've had a long history with computers in

10 general.  I used to own an IT company, so I've done

11 everything with computers from an IT standpoint, from

12 creating entire systems and maintaining those.  Then

13 when I started doing computer forensics I-- well, I have

14 a bachelor of information-- Bachelor of Science in

15 information systems.

16        And when I started doing computer forensics, I

17 started getting a lot of training in that.  So I have

18 hundreds of hours of computer forensics training through

19 various agencies and software companies.  I have four

20 computer forensic degrees-- certifications in the

21 industry; the ENCE, ACE, CHFI, which is certified

22 hacking forensic investigator, and CCFE, which is

23 certified computer forensic examiner.

24    Q.   You mentioned you have a-- you own a company.

25 What does that company do?

1    A.  We do-- we only do computer forensics now.  So we

2   collect data, we analyze it, report on it and testify

3   about it.

4    Q.  Have you-- you mentioned testimony.  Have you

5   testified in court before as an expert?

6    A.  Over 120 times, all over the U.S. and

7   internationally, yes.

8    Q.  Did we ask you to review certain documents in

9   preparation for your testimony?

10    A.  Yes.

11    Q.  Do you recall what those documents were?

12    A.  Probably not by name.  There was some testimony

13   of Mr. Steeby, there was the government's response to

14   a-- a request for some documents which had some

15   attachments which included some appendixes regarding the

16   upgrades at the U.S. Attorney's Office.

17    Q.  And through the documents that you looked at, did

18   we ask you some questions regarding a specific computer

19   in the United States Attorney's Office referred to as

20   the AVPC?

21    A.  Yes.

22    Q.  And did you become aware in reviewing those

23   documents at a certain point--

24         THE COURT:  Can't hear you, Mr. Bell.

25         MR. BELL:  I'm sorry.

1    BY MR. BELL:

2      Q.  Through your review of those documents, did you

3    become aware that the government at one point informed

4    us that the hard drives to the AVPC had been wiped?

5      A.  Yeah, I think there's been some question as to

6    what wiping means, but yes, they were altered.

7      Q.  So let's talk generally about what happens if you

8    format or reformat a hard drive.  Could you tell the

9    Court what happens when that-- as part of that process?

10     A.  Yeah, a reformat is actually simply removing a

11   pointer that tells the hard drive there's an operating

12   system.  So there's-- it does nothing with the data at

13   all, it just takes that pointer that says, hey, I have

14   an operating system, and it removes it.  So now the

15   drive doesn't think it has an operating system and it

16   thinks its blank and ready to go for a new operating

17   system.

18     Q.  And is there a specific term about how the

19   computer now treats the data on the hard drive after its

20   been reformatted?

21     A.  All of that data would now been in unallocated

22   space.

23     Q.  And how will a computer treat unallocated data or

24   data in an unallocated space if it attempts to write new

25   data onto that drive?

1    A.  Well, if-- if you're talking about installing a

2    brand-new operating system, it's going to start from the

3    beginning and install the operating system.

4         Once an operating system is installed, data

5    starts to get spread throughout unallocated space, so it

6    will just grab the first sectors it can get to.  It's

7    kind of somewhat random, it's just looking for sectors

8    that it can fill with data.

9    Q.  Once a hard drive on a computer has been

10   formatted or reformatted and its data has been

11   classified as unallocated, does that mean that that

12   data, even though it's classified as unallocated, is

13   unrecoverable?

14   A.  Absolutely not.

15   Q.  How is that data still recoverable, even though

16   it's classified as unallocated?

17   A.  Well, going to a format, if you've just formatted

18   the drive, you've removed that pointer.  I, as a

19   forensic expert, can put that pointer back and all of

20   your data is there and it's completely intact.

21        Now, if you start writing over that data, so if

22   you have a formatted drive and now you start adding a

23   new operating system, that's going to start overwriting

24   some of the data that's already there.  That data then,

25   forensically speaking, I can get pieces of it,

1  fragments.  And then anything that hasn't been

2  overwritten will still be accessible.

3      Q.  Did you learn through your review of the

4  documents that we asked you to look at that the AVPC's

5  hard drive was formatted on or about September 6th of

6  2016?

7      A.  I believe it was September 7th, yes.  Or no, I'm

8  sorry, you're right.  I think it was September 6th.

9      Q.  That computer-- assume that the computer was

10 taken out of circulation in November of 2016, so two

11 months after the drive is formatted.

12     A.  Correct.

13     Q.  And let's say you wanted to determine when a

14 particular program on that computer had last been

15 opened.

16     A.  Okay.

17     Q.  Is that something you expect that you would be

18 able to determine from a forensic image of that hard

19 drive?

20     A.  I-- there's a lot of variables, depending on the

21 software application, how it stores data, and how much

22 has been overwritten.  Yes, I find data like that all

23 the time.

24     Q.  Are there certain places in the computer where

25 that data that would show when a computer was last-- or

 1   when a program was last opened might reside on the hard

 2   drive-- on the hard drive?

 3       A.   Again, depending on the software, when-- when

 4   data goes into a computer, it's kind of like a shotgun

 5   blast.  So if I opened a file or opened a program, that

 6   information is kind of being spread out throughout the

 7   computer.

 8           So there's a bunch of different areas that I

 9   could go and potentially find that information.  And,

10   again, depending on the software application and how

11   much it records, it may be in a couple of areas, it may

12   be in dozens of areas.  So I-- I would just search for

13   it.

14       Q.   Would one of those areas be in the computer's

15   registry files?

16       A.   Yes.

17       Q.   Are you familiar with what a pre-fetch file is?

18       A.   Yes.

19       Q.   What's a pre-fetch file?

20       A.   When you open a software application, a pre-fetch

21   file is created by the Windows-- by the Windows

22   operating system that shows that that application has

23   been opened.  And each time that application has been

24   opened, the pre-fetch file will get a new date stamp so

25   you can kind of see when the first time it was opened

1    and when the last time it was opened.

2       Q.   As part of your professional experience, have you

3    dealt with software players that play surveillance

4    videos?

5       A.   Yes.

6       Q.   Do those software players normally keep an

7    internal log of what specific videos were displayed by

8    that player?

9       A.   Many players-- again, it depends on the

10   application you're using.  Many of those players do keep

11   some sort of record on its own outside of the operating

12   system of the activity that is happening with that

13   application.

14      Q.   The player in this specific case was made by a

15   company called PELCO.  Are you familiar with PELCO's

16   video player software?

17      A.   Well, I'm somewhat familiar with it now because I

18   went and looked at it.

19      Q.   All right.  What did you learn about it regarding

20   its ability to log the activity that occurs in the

21   program?

22      A.   Actually, I don't know about its logging.  I

23   learned that it's actually a plug-in for a web browser,

24   so it doesn't run as an independent application like

25   Windows Media Player.  It's actually part of your

1    Internet browser.

2          I was unable to actually get it installed because

3    you have to have an account with PELCO in order to use

4    it and it's obviously proprietary.  I don't know how it

5    would log.  But since it's part of the Internet browser,

6    it may also be logged by the Internet browser itself.

7      Q.   Did you learn that the circumstances surrounding

8    the reformat of the AVPC hard drives was an upgrade from

9    the Windows 7 operating system to the Windows 10

10   operating system?

11     A.   Yes.

12     Q.   Are you familiar with that upgrade process, of

13   upgrading a computer from Windows 7 to Windows 10?

14     A.   Specifically from 7 to 10, I don't know that I've

15   done any of those.  Typically we've gone from 7 to 8,

16   but they're all very similar.  I haven't seen much of a

17   difference until you get into the new-- 8 is a

18   brand-new-- like a mobile system.

19     Q.   And you've said that you've had experience

20   upgrading machines from Windows 7 to Windows 8?

21     A.   Correct.

22     Q.   Have you also had experience upgrading the

23   machines from Windows 8 or some other operating system

24   to Windows 10?

25     A.   Yes.

1   Q.   Is it standard when performing that upgrade to

2   format the hard drive of the computer that you're

3   performing the upgrade on?

4   A.   It's an option.   So Microsoft will give you the

5   option.   When you upgrade, you can-- and again, this is

6   going back from 7 to 10, because once you get into 8,

7   all of that-- because it's a mobile operating system,

8   that's all kind of changed and become different.

9        But going from 7 to 10 is more of the standard

10   old-style upgrade where it prompts you to-- whether or

11   not you want to just do an upgrade and save all your

12   data or if you want to do an upgrade with a format.

13   Q.   So you said it prompts you.   Do I take that to

14   mean that the process is not automatic, the software

15   itself will not format the hard drive?

16   A.   Correct.   It has to have some sort of interaction

17   during a Windows upgrade.

18   Q.   Would that mean that it's not necessary to format

19   the hard drive in order to perform the upgrade?

20   A.   No.

21   Q.   I asked that-- that was a bad question.   Is it

22   necessary to format the hard drive in order to perform

23   the upgrade?

24   A.   It is not necessary, no.

25   Q.   From the materials that you read and the

1  testimony that you read, did it appear that the way the

2  AVPC was described contained-- as it was described

3  contained more than one hard drive?

4      A.  Yes.

5      Q.  Was that significant for the questions we asked

6  you to answer?

7      A.  It's very significant to me.

8      Q.  Why is that?

9      A.  Well, if it has two hard drives, there's a

10  reason-- there should be a reason.  Typically the

11  operating system would be on-- installed on one drive.

12  And then a lot of times on the second drive you'd just

13  put data, so maybe programs you've installed or data

14  that you're working with.  That way the operating system

15  drive can be upgraded and changed out without ruining

16  the data or touching the data.

17          That's just a common reason for having two

18  drives.  I don't know in this particular case why there

19  were two drives or what was on both of those drives, but

20  to me that seems incredibly important.

21      Q.  Is it possible that an operating system like

22  Windows 7 would be housed on-- across both drives?

23      A.  I-- if it was set up as some sort of RAID

24  configuration, then that's possible.  But I wouldn't see

25  that on a desktop computer, doesn't really make sense.

1    Q.   Is it usual then when performing an upgrade to

2  Windows 10 that if you were going to choose to format

3  the hard drive, you would only need to format one of

4  those hard drives?

5    A.   Correct.  You'd format the operating system

6  drive.

7    Q.   And if instead-- you mentioned that the second

8  hard drive normally contains data such as files,

9  executable files?

10    A.   Files, programs.  Correct.

11    Q.   Have you heard the AVPC referred to as a PC that

12  contains specialized discovery software for video and

13  audio purposes?

14    A.   I understand there's some specialized software

15  for surveillance.

16    Q.   Would formatting both the drives result in the

17  loss of that special software?

18    A.   Yes.  I mean, it would be in unallocated at that

19  point.

20    Q.   Assuming that-- that the computer is configured

21  the way you said it regularly is, with the operating

22  system on one hard drive and the software on the second

23  hard drive, would there be a reason not to reformat the

24  second hard drive that contains that special software?

25    A.   Well, that's kind of the point of having two hard

1   drives in a computer.  Again, in my experience, if you

2   have to upgrade and you do want to reformat for some

3   reason, you can do that to the operating system drive

4   without affecting your data, because it's your every day

5   data that you need.  So I don't know why you would

6   format a data drive, other than you wanted to get rid of

7   all the data.

8       Q.  As part of your professional experience, have you

9   been involved in civil litigation before?

10      A.  Yes.

11      Q.  Are you familiar with the term in civil

12  litigation of a litigation hold?

13      A.  Yes.

14      Q.  What do you understand and what have you been

15  advised or advised clients to do once they reasonably

16  expect litigation to occur?

17              MR. CLYMER:  Objection, relevance.

18              THE COURT:  Overruled.

19              THE WITNESS:  Again, in my experience, we've

20  done a lot of consulting in litigation cases.  As soon

21  as the attorneys call us or the client calls us and lets

22  us know there's litigation, we instruct them to get the

23  drives imaged as soon as possible so that they're

24  preserved and not to change anything.  Save your

25  backups.

1           Obviously if they're work computers, they

2   have to be-- they continue to have to be used, so we ask

3   them to use them minimally until we can get in and image

4   them.  If they're not computers that need to be used, we

5   tell them not to touch them until we can get in and

6   image them.  Not to change anything with the backup

7   rotation.

8   BY MR. BELL:

9      Q.   Based on your experience in civil litigation, is

10  it well-known that once a party reasonably expects

11  litigation to occur, that they have an obligation to

12  preserve anything that might reasonably be relevant to

13  that litigation?

14     A.   That's my understanding, yes.

15     Q.   And that that obligation exists regardless of

16  whether the party on the other side of the litigation

17  has made a specific request or not?

18     A.   Correct.  My understanding is as soon as they

19  know it's going to be an issue-- and, again, the way we

20  consult them, as soon as you know it's going to be an

21  issue, preserve it.  Image it, get it stored, and then

22  you can go on about your day.

23     Q.   And is that a well-known or ironclad rule on the

24  civil cases you've consulted on?

25     A.   In the 20 years I've been doing this, that has

 1  been the rule.

 2          MR. BELL:  Thank you.  I have no further

 3  questions, Ms. Loehrs.

 4          MS. VANBEBBER:  I have no questions, Your

 5  Honor.

 6                  CROSS EXAMINATION

 7  BY MR. CLYMER:

 8    Q.  I'm not as familiar with you and with computer

 9  technology, so if I use the wrong terminology, please

10  feel free to correct me.

11    A.  Okay.

12    Q.  As I understand it, we're talking about a

13  computer that had two hard drives and a Windows 7

14  operating system; is that right?

15    A.  Correct.

16    Q.  And at some point somebody located a piece of

17  software, proprietary software, from a company called

18  PELCO that's used for viewing video feed from an

19  institution that has numerous video cameras?

20    A.  I don't know about the institution.  My

21  understanding is there was some PELCO software installed

22  on that computer.

23    Q.  Okay.  And do you know the level of

24  sophistication of that piece of software?

25    A.  I do not.

16-20032-JAR  USA v. Karl Carter (Black)  10.10.18          1847

1    Q.   Okay.  And you tried to actually download and use

2    that software, but you couldn't get it done because you

3    don't have a password or a PIN number?

4    A.   You need to have an account with PELCO because

5    it's proprietary.

6    Q.   And did you do that on behalf of the Federal

7    Public Defender's Office?

8    A.   Yes.  Once-- well, once I found out about the

9    software and I was asked some questions about it, I

10   wanted to see if I could get in and test it and see what

11   it did.

12   Q.   Do you know if anybody from the Federal Public

13   Defender's Office contacted PELCO to try to persuade

14   them to let you have an account number just for purposes

15   of trying the software out?

16   A.   I have no idea.

17   Q.   You never got to try the software out?

18   A.   So this was all done kind of last minute, because

19   I was out of town, so no.

20   Q.   But to your knowledge, nobody ever tried to get

21   PELCO to let you try the software out?

22   A.   Not to my knowledge.

23   Q.   Do you recall specifically what the number or

24   version of PELCO software it was that the Federal Public

25   Defender's Office asked you to try to test?

1    A.   They didn't ask me to test it.  I went out to

2    look for it.  I have no idea what version it was.

3    Q.   Where did you find the software package you found

4    to try to download the software into a computer?

5    A.   I googled PELCO Media Player and it took me to a

6    download site for PELCO.

7    Q.   And so the media player that you got, you don't

8    even know if it was the same one that PELCO used to

9    distribute back in 2016?

10   A.   Oh, I'm sure it's not.  I mean, it's 2018 and

11   software changes all the time, so I'm quite sure

12   whatever version I tried to download was a newer version

13   of what was on there previously.

14   Q.   Did you suggest to the Public Defender's Office

15   at any point that they should make efforts to try to

16   locate any versions of the PELCO software that was in

17   existence in 2016?

18   A.   No.

19   Q.   Did they suggest to you that you should try to do

20   that?

21   A.   No.

22   Q.   Now, you testified I believe that a Windows 7

23   operating system performs certain logging functions.

24   Correct?

25   A.   Yes.

1    Q.   And it will perform those logging functions

2  independently of what kinds of proprietary software the

3  user loads onto the system?

4    A.   Correct.

5    Q.   And one of those things it will tell you, for

6  example, is when was the last time somebody used this

7  particular piece of software on the system?

8    A.   It will show you when it was last opened.

9    Q.   Thank you.  That-- that's the terminology.

10   A.   Yes.

11   Q.   In other words, I can open it today and use it a

12 month from now and the Windows logging system would show

13 me the day I opened it up?

14   A.   Well, if you opened it a month from now--

15   Q.   Never closed it.

16   A.   Oh, never closed it?

17   Q.   Never closed it.

18   A.   I don't know if that would happen, but okay, I

19 guess.  Yeah, I mean, I guess if you never closed it,

20 sure, it would show the last open date from when it was

21 opened.

22   Q.   So based on your understanding of the logging

23 function of the Windows operating system, it would show

24 when a piece of software was opened, but it won't show

25 the instance the piece of software was used?

1      A.   Not Windows specifically, no.

2      Q.   Okay.  In addition to whatever logging functions

3  are on a Windows 7 operating system, the PELCO player

4  itself may have had logging functions.  Correct?

5      A.   Correct.

6      Q.   But you simply don't know if it did or what they

7  are from where you sit?

8      A.   That's correct.

9      Q.   And in addition to that, you said that your

10 understanding was the PELCO software that you download

11 would interact with some server somewhere on the

12 Internet in order to run; is that correct?

13     A.   No.  It's a plug-in to your web browser.

14     Q.   Okay.

15     A.   So your Internet Explorer, it's actually

16 connected to your Internet Explorer so it becomes part

17 of your web browser.

18     Q.   So the Internet Explorer may have some logging

19 function that works in conjunction with the PELCO

20 player?

21     A.   Exactly, yes.

22     Q.   But you don't know that because you couldn't open

23 the PELCO player?

24     A.   Well, I know Internet Explorer logs files that

25 have been opened, so I do know that that has logging

1  functions.  I don't know what PELCO specifically has in

2  combination with that.

3      Q.  So you couldn't tell us, for example, if you had

4  the PELCO player loaded as a plug-in to a web browser

5  exactly what sort of logging would occur?

6      A.  I'm not sure I understood that.

7      Q.  Sure.

8      A.  I'm sorry.

9      Q.  Are you able to tell us what sort of logging

10  would occur?  If the PELCO plug-in to Internet Explorer

11  was operational, would you know what logging would

12  occur?

13      A.  I do not.

14      Q.  Would different kinds of web browsers have

15  different logging functions?

16      A.  Yes.

17      Q.  Now, I want to talk to you about the reformat

18  process.  Are you aware from Mr. Steeby's testimony that

19  the way the reformat occurred, it was all done remotely

20  based on DOJ?

21      A.  It's done through the network.  I wouldn't call

22  that remotely.  It's-- it's pretty common.  They just

23  grab the installation files from the server so that they

24  can do the upgrade process.

25      Q.  So based on your understanding of that process,

1  once Mr. Steeby altered the computer's BIOS to boot from

2  the network rather than boot locally, what else would

3  Mr. Steeby have done?

4      A.  I don't think that's what he did.  The BIOS is a

5  completely separate thing.  That's just updating the

6  motherboard software.  Once that's done, he would

7  actually have to log into the computer, is my

8  understanding, or connect to the network and install it.

9  And then you said what-- what was the rest of your

10  question, what would he have--

11      Q.  Do you remember him testifying that the

12  reformatting process was not done by him, that it was

13  done automatically once the computer opened to the

14  network?

15      A.  I did hear that, yes.

16      Q.  Can you describe what that means?

17      A.  Well, I don't know how his software was set up.

18  And my understanding is it's software that-- the

19  installation on the server was done by HP, so it may be

20  that they have-- that they have automated part of that

21  process.  I don't know.  I don't know if he sat in front

22  of it and told it to format or if it was automated

23  somehow by HP.

24      Q.  So as you sit here right now, you don't know

25  whether the way the reformat worked was done based on

1    some DOJ or HP protocol as opposed to decisions that Mr.

2    Steeby made?

3        A.  I have no idea.

4        Q.  Do you do forensic analysis of computers?

5        A.  Yes.

6        Q.  Is it common to recover either partial or

7    entirely intact files from unallocated space?

8        A.  Do it every day.

9        Q.  And has anybody asked you in this case to do a

10   forensic analysis of either one of the hard drives that

11   was taken out of that AVPC?

12       A.  No.

13              MR. CLYMER:  No further questions.

14                    REDIRECT EXAMINATION

15   BY MR. BELL:

16       Q.  Ms. Loehrs, when a hard drive is taken out of a

17   computer, put in a bag and then put on a shelf, is there

18   a physical process that will start affecting that hard

19   drive?

20       A.  Oh, sure.

21       Q.  What's it called?

22       A.  What's the name of the process?  It's just-- it

23   can degrade.  The hard drive itself can stop functioning

24   just from getting old and sitting, because it has moving

25   parts.

1    Q.  And when that happens, when you said the hard

2  drive will start to degrade, what effect does it have on

3  the ability to retrieve data from that hard drive?

4    A.  Well, if the hard drive stops functioning, you

5  can't spin it up to get the data anymore.  That's why we

6  make forensic images.

7    Q.  So the data is lost?

8    A.  It would be lost, yes.

9    Q.  Mr. Clymer asked you some questions about

10  forensics and the unallocated space.  I think your

11  testimony was that data, even though it might be marked

12  unallocated, is still retrievable depending on how much

13  of the data has been overwritten; is that right?

14    A.  Correct.

15    Q.  Would it be fair to say that you don't know if

16  anything is retrievable from the unallocated space until

17  you've actually examined the hard drive?

18    A.  That's correct.

19    Q.  So it could be potentially there's no data left

20  from the unallocated space or it could be all the data

21  from the unallocated space or more likely somewhere in

22  between those two?

23    A.  More likely somewhere in between.

24          MR. BELL:  I have no further questions.

25              RECROSS EXAMINATION

1    BY SPECIAL MASTER COHEN:

2       Q.  Good morning.

3       A.  Good morning.

4       Q.  I just like asking questions of experts, so I'm

5    going to ask a few questions about computers.  And

6    again, I, like Mr. Clymer, am not an expert at all and

7    probably will use some of the wrong terminology.

8            The reason that-- that we're talking to you about

9    this today is because, as I think you know, there was

10   what we're calling the AVPC and the judge had requested

11   that that computer kind of be taken out of service and

12   preserved but that didn't happen.

13      A.  Correct.

14      Q.  And during the time that it didn't happen, it was

15   reformatted?

16      A.  Yes.

17      Q.  So what's going to help me is-- is a visual.  And

18   I'm sitting here listening to all this and I'm looking

19   at that wall there which has seven by four squares.  Do

20   you see that?

21      A.  Yes.

22      Q.  Can we pretend that that's the hard drive?  Does

23   that kind of make sense?

24      A.  That actually does make sense.

25      Q.  Okay.  I thought it might.  So if-- if

1   immediately that AVPC had been, in fact, taken out of

2   service and there was data on half of those squares,

3   those sectors of the hard drive, then somebody like you,

4   a forensic expert, could go in and see what that data

5   was.  Correct?

6       A.  Are you talking about if it had already been

7   formatted?

8       Q.  If it had not been formatted.

9       A.  Oh, sure.  All the data would be there.

10      Q.  All the data is still there, you could see what

11  it is.  And if the data includes a PELCO log, then you

12  would be able to see that PELCO log data?

13      A.  Correct.

14      Q.  Now, as far as the PELCO log, I actually thought

15  that you could get-- you could download the viewer, I'm

16  calling it the viewer, the client, the app, I thought

17  you could download that for free.  Was that not your

18  experience?

19      A.  Oh, no, I did, I downloaded it for free and it

20  showed that it installed on my system.  But when you try

21  to use it through your browser, it forces-- it takes you

22  to their website and forces you to log in, and so I

23  didn't have an account.

24      Q.  Okay.  So do you know whether the PELCO logs

25  would include when the software was used?

1   A.   I have no idea what the logging function is.

2   Q.   Would you expect it to, or you just don't know?

3   A.   Most of those media players have some sort of

4  logging, but usually it's about files that are opened,

5  not when the player itself is used.  It's typically

6  recording link files of when actual video files are

7  being opened.

8   Q.   Okay.  That actually was my next question.  So

9  the first question was:  Will the log tell you when the

10  software was opened and used?  And you're not sure.

11       The second question is:  Would the logging

12  function tell you, for example, which videos were

13  viewed?

14   A.   That is my experience with most media players is

15  they document by the file name with a date and time of

16  when the file was opened.

17   Q.   Okay.  And given that this was a computer that

18  was used by different folks, I'm guessing but asking,

19  the logging function wouldn't tell you who was actually

20  using the software or viewing videos?

21   A.   No, you'd have to do a timeline analysis to make

22  that determination.

23   Q.   Timeline analysis meaning if you knew who was

24  using the computer when, you could kind of figure it

25  out?

1     A.   Actually opposite of that.  You take a date and

2  time a file was opened and then you go into all the data

3  on that computer for that date and time and try to see

4  if you can identify a person at the keyboard.  We do

5  that a lot as well.

6     Q.   Okay.  So we've talked about what you can do if

7  the computer was taken offline right away.  But it

8  wasn't and, in fact, it was instead reformatted?

9     A.   Correct.

10    Q.   Now, if-- if I understand what you said, on all

11 of those squares there was data.  Some of those squares

12 the data was immediately overwritten when it was

13 formatted?

14    A.   No.

15    Q.   Okay.  Tell me what happened.

16    A.   So think of that as a library, those are all

17 books on your shelves.  This is your card catalog that

18 tells you where all those books are.  I deleted that

19 card catalog.

20    Q.   Got it.

21    A.   Those books are all still there, but this isn't

22 telling me where they're at.

23    Q.   Okay.  So as of that moment the data is still all

24 there, it's just you can't find it as easily, you kind

25 of have to go back and reverse engineer to be able to

1    figure out where-- where the data is and what it is?

2        A.   Two seconds.  You put that card catalog back

3    forensically and then it's all there.

4        Q.   Got it.  Okay.  So now over a period of say six

5    weeks, the computer is being used.  And because the card

6    catalog was removed, now the data that is in those

7    squares, those books, is being overwritten bit-by-bit?

8        A.   That's correct.

9        Q.   And if six weeks later I were to ask you, okay, I

10   know that some of this data was overwritten, I want to

11   see what is still there.  And in particular, I want to

12   see what the PELCO logs, to the extent they're still

13   there, would reveal, it may be that it-- that none of

14   the PELCO logs were overwritten during that six-week

15   period and you can still tell me everything that you

16   could've if it had been taken offline immediately.

17   Correct?

18       A.   That's possible, yes.

19       Q.   And it's also possible that none of it is there,

20   you just don't know until you get into it?

21       A.   That's correct.

22       Q.   So if I say to you, all right, it's been six

23   weeks, but let's see what's there, let's find out what's

24   still on that computer, can you give me an estimate of

25   how long it would take and how much it would cost?

1    A.  If all I'm looking for is information about the

2  PELCO activity, probably not long because those searches

3  would be fairly specific.  I'd say less than a week.

4  Cost, maybe 20 to 40 hours at our rate.  5 to $10,000

5  tops.

6    Q.  Okay.  I think that's all I have.  Thank you very

7  much.

8    A.  Thank you.

9                    RECROSS EXAMINATION

10  BY MR. CLYMER:

11    Q.  When you answered questions about the logging

12  functions of other viewers you've used, you don't know

13  which of those functions the PELCO software has, do you?

14    A.  Correct.

15    Q.  Would the best way to figure out what logging

16  function the PELCO software in use in 2016 had-- strike

17  that.

18        If you were trying to find out the logging

19  function the PELCO software that was used in 2016 had,

20  would the best way to do it to be to locate an

21  executable file, to download that software and test it?

22    A.  The best way would be the computer that had it,

23  if that computer still has the software or the

24  executable file.

25    Q.  Did anybody ask you to look for that?

1        A.  No.

2        Q.  Would the next best way to be to find the same

3    software and test it on another computer?

4        A.  Yes.

5        Q.  Did anybody ask you to do that?

6        A.  No.

7        Q.  Would the best way to be able to figure out if

8    there's any relevant data on either one of those two

9    hard drives from the AVPC would be to do a forensic

10   examination?

11       A.  Yes.

12       Q.  Did anybody ask you to do that?

13       A.  No.

14            MR. CLYMER:  Nothing further.

15                 REDIRECT EXAMINATION

16   BY MR. BELL:

17       Q.  Mr. Cohen asked you a question about after the

18   hard drive is overwritten what data that you can still

19   pull off of it.  And he asked you about whether it might

20   show all of the PELCO log files or none of the PELCO log

21   files.  Do you remember those questions?

22       A.  Yes.

23       Q.  So let's say in his example that it's six weeks

24   later and you've examined the hard drive and you don't

25   see any PELCO log files.  Does that mean they never

 1  existed?

 2      A.  No.

 3      Q.  It just means we can't see them anymore?

 4      A.  Correct.

 5      Q.  Thank you.

 6      A.  Well, it could be one or the other.  You don't

 7  know because they're not there.  Right.

 8              MR. BELL:  Thanks.

 9                    RECROSS EXAMINATION

10  BY SPECIAL MASTER COHEN:

11      Q.  I'm going to ask you an obvious question, but

12  this is part theater and so also I'm a kind of thespian.

13  You said that no one asked you to examine this computer

14  to-- to see what was still there.  Right?

15      A.  Correct.

16      Q.  The government didn't ask you either, did it?

17      A.  No.

18              SPECIAL MASTER COHEN:  Thank you.

19              THE COURT:  All right.  Anything more from

20  this witness?

21              MR. CLYMER:  Not from the government, Your

22  Honor.

23              THE COURT:  All right.  You're excused.

24  Thank you.

25              THE WITNESS:  Thank you.

 1            THE COURT:  Ready with your next witness?

 2            MS. VANBEBBER:  Your Honor, our next witness

 3   will be one of two people and we'd like to-- I'd like to

 4   ask the Court-- actually the government, do you want me

 5   to go ahead and put on Mr. Patton since he will be a

 6   shorter witness?  The other witness will probably go

 7   past into the lunchtime.

 8            MR. CLYMER:  Mr. Slinkard has already left

 9   the room to get a witness, I don't know who he went to

10   get, so...

11            MS. VANBEBBER:  Well, then I'm going to call

12   Leon Patton.

13            THE COURT:  All right.  It's your call to

14   make.  Can you communicate with him?

15            (Counsel confer).

16            MS. VANBEBBER:  Your Honor, while we're--

17   while we're waiting, I would like to admit exhibits and

18   I do have one question.  I think we're all familiar with

19   the fact that the other-- that the original exhibit list

20   had a number of documents that were admitted

21   conditionally pursuant to admission or stipulation.  Are

22   the parties willing to stipulate that those can now be

23   fully admitted?

24            MR. CLYMER:  Counsel, are you referring to

25   the ones that Mr. Cohen had at the first hearing?

1    MS. VANBEBBER:  Yeah, they were re-numbered.

2    MR. CLYMER:  I think we just admitted to

3  the-- yeah, there's no objection to the admission of

4  those documents.

5    MS. VANBEBBER:  All right.  With that then,

6  excuse me, Your Honor, we would admit the following

7  exhibits:  1010, 1011, 1013, '14, '15, '16, '17, '19,

8  '20, 1028 through 1035.

9    COURTROOM DEPUTY:  1028?

10   MS. VANBEBBER:  Through 1035.

11   COURTROOM DEPUTY:  They've already been--

12   MS. VANBEBBER:  They have a star by them,

13 so...

14   COURTROOM DEPUTY:  -- admitted subject to

15 pending relevant objection, so that was from last time.

16   MS. VANBEBBER:  And then Exhibits 1068

17 through-- through 1106, which were also stipulated

18 subject to.  1108-- strike that, please.  1113, '14,

19 '15, '16, and '17, 1119 through 1132 and 1145, excuse

20 me, through 1157.  1158 through 1165.

21   THE COURT:  Is that it?

22   MS. VANBEBBER:  And I will produce a-- a

23 reasonable-looking list.  I would like to point out,

24 again, though, that I don't think we're through with

25 exhibits, but this would be taking care of I think

1  everything through-- 1001 through 1160.

2              THE COURT:  Okay.  So, again, admitted by

3  stipulation and not subject to relevance now because of

4  the stipulation?

5              MS. VANBEBBER:  Is that the agreement?

6              MR. CLYMER:  Your Honor, we'd like to just

7  maintain our general objection to relevance, but we

8  understand the Court may just have them admitted at this

9  point.  We question the relevance of much of the

10  documentation.

11             THE COURT:  All right.  I'm going to deem

12  your objection, to the extent you're still making one on

13  relevance, to weight rather than admissibility.  So I'll

14  consider and determine how relevant and how much weight

15  to give all of these.

16             So admitted by stipulation with that caveat

17  are the following exhibits:  1010 through 1011, 1013

18  through 1017, 1019 through 1020, 1028 through 1035, 1068

19  through 1106, 1113 through 1117, 1119 through 1132, 1145

20  through 1157, and 1158 through 1165.

21             MR. CLYMER:  Your Honor, the only other

22  thing I would mention is I did not get advanced notice

23  of counsel's motion, and I don't blame her for that,

24  there's no suggestion she's done anything wrong.  But I

25  haven't had a chance to line up all the exhibits to make

 1    sure there's no errors.

 2                If I find something with which I disagree,

 3    I'll bring it to the Court's attention.  If the Court

 4    doesn't hear from me, you can assume I agree with her

 5    assessment that those new numbers correlate to the old

 6    numbers to which we discussed earlier.

 7                THE COURT:  All right.

 8                MS. BRANNON:  Judge, while we're waiting on

 9    Mr. Patton, I spoke with Mr. Cohen for a moment.  We'd

10    like to put one other thing on the record just to make

11    sure that it's clear regarding the last witness.

12                The AVPC hard drives that we are talking

13    about are technically in the Court's possession.  I

14    believe they're actually in the vault of the U.S.

15    Attorney, but they are in the Court's possession and

16    control.  And secondly, that those hard drives have

17    never been imaged.

18                THE COURT:  They've never been imaged and I

19    think the testimony was that one or both of them are

20    sitting on a shelf and are not wrapped; is that correct?

21                MS. BRANNON:  That's my understanding, Your

22    Honor.

23                THE COURT:  Okay.  So noted.

24                MS. VANBEBBER:  Your Honor, I apologize for

25    this delay.  I was just hopeful we could get through by

1    lunch and not be in the middle of something.

2              MR. SLINKARD:  While we're idle, I guess I'd

3    like to confirm that so we can maybe avoid doing it

4    again.

5              My understanding is after Mr. Patton that

6    the Special Master today would intend, if time allowed,

7    to call Mr. Oakley and Ms. Morehead, and that those are

8    the only witnesses from the U.S. Attorney's Office that

9    are likely to be called today.

10             And if there's additional time, I think the

11   parties were going to ask to take that time to be able

12   to review discovery that's been produced to them that

13   they're in the process of reviewing.  So that's our

14   understanding and that's how we've communicated to

15   people.

16             THE COURT:  All right.  Everyone agree?

17             MS. BRANNON:  Yes, Your Honor.

18             MS. VANBEBBER:  Yes, Your Honor.

19             THE COURT:  Okay.  Okay.

20                       LEON PATTON,

21   called as a witness on behalf of the Special Master,

22   having first been duly sworn, testified as follows:

23                    DIRECT EXAMINATION

24   BY MS. VANBEBBER:

25     Q.  Mr. Patton, you've been with the U.S. Attorney's

1    Office a long time, haven't you?

2       A.   Yes.

3       Q.   How many years with the U.S. Attorney's Office?

4       A.   31 years, eight months.

5       Q.   And you've done both civil and criminal work.

6    Right?

7       A.   And appellate.

8       Q.   And appellate.  All right.  How long have you

9    been located in the Kansas City, Kansas office?

10      A.   31 years.

11      Q.   Eight months before you were in Topeka.  Right?

12      A.   Yes.

13      Q.   Generally-- well, let me ask you first, have you

14   primarily done criminal work since you've been located

15   here in Kansas City?

16      A.   Primarily I did a mixture of civil and criminal,

17   50/50, from approximately October of 1987 through

18   sometime in 1990.  I then did criminal work for 23 years

19   with-- from December of 2004 through June of 2013,

20   primarily doing appellate.  I did nothing but civil work

21   with the exception of an occasional revocation

22   proceeding, but I did civil work from June of 2013

23   through April of 2016 and then came back to do criminal

24   work at that time.

25      Q.   So are you currently doing criminal work?

1    A.   Yes.

2    Q.   And you have been so since 2016?

3    A.   Yes.

4    Q.   All right.  Generally, would you agree just in

5  general that attorney-client calls, excuse me, are

6  privileged and the prosecutors may not listen to them?

7    A.   That's not on my list of matters to which I have

8  authorization to testify.

9         MR. CLYMER:  You may answer the question,

10  Mr. Patton.

11         THE WITNESS:  I'm sorry.  Would you repeat

12  the question?

13  BY MS. VANBEBBER:

14    Q.   Would you generally agree that attorney-client

15  calls are privileged and prosecutors may not listen to

16  them?

17    A.   Generally, yes.

18    Q.   Okay.  So would you also agree, excuse me, that

19  it was the common underlying assumption in this office

20  amongst the AUSAs as to calls from CCA inmates not being

21  privileged?

22    A.   I'm sorry, an assumption that they are not

23  privileged?

24    Q.   Uh-huh.

25    A.   You're asking me whether it's a general

1  assumption in our office--

2      Q.   Yeah.

3      A.   -- that calls are not privileged?

4      Q.   That's right--

5      A.   That's not my understanding.

6      Q.   -- the CCA calls.

7      A.   That's not my understanding.

8      Q.   All right.  What's your understanding?

9      A.   That if it is an attorney-client call where

10 they're the two-- they're speaking, I would personally

11 view that as being a privileged call.

12     Q.   Is it your understanding that other people in the

13 office wouldn't agree with you about that?

14     A.   I can't say that that's the case.

15     Q.   You've never heard anybody say differently?

16     A.   I can't say that I have.

17     Q.   Okay.

18     A.   Now, there are some circumstances where-- like

19 they'll do a third-party-- you know, sometimes people

20 will call a third party and then they'll get on with an

21 attorney, so there's not a confidential communication.

22     Q.   And that wouldn't-- would or would not be

23 privileged?

24     A.   Correct.

25     Q.   Would or would not?  Which?

1    A.  Would not be privileged.  It's not confidential.

2    Q.  Now, is it your understanding that if an attorney

3  had privatized his number at CCA, then there wouldn't be

4  a record of that call that a client made to his

5  attorney?

6    A.  What do you mean by privatized?

7    Q.  Given CCA the number so that they would know that

8  that was an attorney with a client at CCA?

9    A.  I just want to--

10        THE WITNESS:  Your Honor, if I may inquire

11  of Mr. Clymer whether I have continuing authorization to

12  answer this line of questions.

13        MR. CLYMER:  Yes, sir, you do.

14        THE WITNESS:  Okay.  And I'm sorry?

15  BY MS. VANBEBBER:

16    Q.  If an attorney had privatized his number, then

17  there wouldn't be a record of a call that the client

18  made to that attorney; is that right?

19    A.  Well, from what I know the way things should've

20  occurred or the way I've heard that things have

21  occurred?  Because I've heard that there were mistakes

22  that were made.  And when you say no record, I presume

23  you mean no recording of the call.  I presume that there

24  would be some record of the call having been made, but I

25  presume you mean no recording.

1      Q.   (Nods head up and down).  Okay.  If-- do you

2   believe that you're expected to notify an inmate's

3   attorney that you have the inmate's calls to that

4   attorney if it comes from CCA?

5      A.   If I came into-- if I had come into possession of

6   such a call, I would've notified that attorney.

7      Q.   Okay.  You believe you have an obligation to do

8   that?

9      A.   I believe I would've had that obligation.  I

10  don't remember that ever happening in my experience.

11     Q.   That's never happened to you?

12     A.   Not that I recall.

13     Q.   All right.  I want to turn to the issue of the

14  Special Master's investigation.  Were you not aware soon

15  after October the 11th, 2016, that the Court had

16  appointed a special master?

17     A.   I don't remember a date.  I know there was an

18  appointment at some point.

19     Q.   And if I say that the record reflects October the

20  11th, 2016, was that date, do you have any reason to

21  disagree?

22     A.   No.

23     Q.   Okay.  Did you ever read that order of

24  appointment?

25     A.   I don't recall that I did.

1    Q.   Were you aware that the United States Attorney's

2    Office was to fully cooperate with the Special Master in

3    his investigation?

4    A.   In a general sense, I'm sure I was, but I don't

5    have a specific recollection.  I know that late in 2016

6    we had a meeting concerning a litigation hold.  We were

7    to search through for a particular period of time to see

8    whether we had any recordings of conversations between

9    inmates-- or prisoners at CCA.

10         And, of course, having primarily been in-- doing

11   civil work for nearly three years during that period of

12   time and having primarily done appellate work for

13   eight-and-a-half years before that, I didn't have very

14   many people who had been incarcerated at CCA.

15   Q.   But that-- now, that was a litigation hold letter

16   that came from Emily Metzger, wasn't it?

17   A.   Well, I don't know that it was a letter, there

18   was some sort of communication.  I know we had a meeting

19   where she explained what we were to do.  So I know that

20   as part of this whole process, you know, I searched

21   through what I had.

22   Q.   And you-- you gave whatever you had to Ms.

23   Metzger pursuant to that request.  Right?

24   A.   I didn't have anything.

25   Q.   Didn't have anything.  All right.  I want to draw

1   your attention to a meeting on December the 8th of 2016

2   at the Kansas City, Kansas office.  Is that the meeting

3   you're talking about?

4       A.   It was a meeting in December.  I don't remember

5   that it was the 8th, but it could have been.

6       Q.   Was Emily Metzger there?

7       A.   Yes.

8       Q.   Who else in management was there?

9       A.   Deb Barnett, Scott Rask.

10      Q.   Those three?

11      A.   That's all I recall.

12      Q.   All right.  What instructions-- other than--

13  other than the litigation hold information, what

14  instructions were you given at that meeting about how to

15  cooperate with the Special Master?

16      A.   Well, our instructions were to provide things to

17  our management, who were then making the decisions as to

18  what to do in terms of cooperation with the Special

19  Master.

20      Q.   If I suggest to you that the order itself said

21  that the U.S. Attorney was to provide access to-- to

22  persons as well as access to documents, would you

23  disagree with that?

24      A.   I don't know what it-- I don't know what it said.

25  I have no reason to disagree.

1    Q.   All right.  So management says to you don't talk

2    to the Special Master unless through management?

3    A.   I don't recall that ever being stated.

4    Q.   How did you know that you were supposed to go to

5    management then before you talked to the Special Master?

6    A.   Management was telling us to provide information

7    to them.

8    Q.   To them?

9    A.   Right.

10   Q.   Not to the Special Master?

11   A.   Right.

12   Q.   Did you question that at all at that meeting?

13   A.   Not that I recall.

14   Q.   Did you grow irate at that meeting?

15   A.   There was-- there was a moment in which I was

16   upset.

17   Q.   Why were you upset?

18           THE WITNESS:  May I continue?

19           MR. CLYMER:  You can answer the question,

20   sir.

21           THE WITNESS:  Kim Flannigan asked a question

22   to the effect:  What do we do if we go through searching

23   for recordings and there are some recording that for

24   whatever reason we don't find it, we don't get it turned

25   over.  And then as it turns out, we had, in fact,

1   provided it in discovery at some earlier point and a

2   defense attorney provides it?

3           Emily Metzger, who was in charge of the

4   meeting, said, I understand you're scared.  Kim said,

5   I'm not scared, I'm terrified.  And I said, and the

6   reason we're terrified is we know that if something goes

7   wrong, management won't back us up.

8           When Erin Tomasic was sent to make that

9   second delivery up to the judge's chambers that day, she

10  was carrying out a plan that had been formulated by

11  management and had been approved by two levels of

12  management.  And when she was in the courtroom getting

13  chewed out by Judge Robinson, nobody in management stood

14  up for her and explained that it was actually their idea

15  to do it.

16  BY MS. VANBEBBER:

17      Q.  Which members of management are you talking

18  about?

19      A.  None of them stood up for her.

20      Q.  Well, excuse me.

21      A.  But that goes beyond the scope of what I said in

22  that meeting.

23      Q.  But when you say management wouldn't stand up for

24  her, which-- which members of management, other than Ms.

25  Metzger and Ms. Barnett, had been involved in the

1    decision to send Erin to the judge's chambers?

2        A.    I did not articulate in that meeting to whom I

3    was referring.

4        Q.    But did you know who you were referring to?  Did

5    you know which management?

6        A.    I did.

7        Q.    And did you know that it was Emily Metzger and

8    Debra Barnett?

9              THE WITNESS:   Do I have permission?

10             MR. CLYMER:   You can answer, sir.

11             THE WITNESS:   I considered it primarily Tom

12   Beall and Deb Barnett.  Deb Barnett being the person who

13   was in charge.  I didn't really hold it against Emily

14   Metzger, she had sort of gotten roped into this,

15   participating in it as the civil chief.  But Deb Barnett

16   was the lead attorney during that hearing, Tom Beall was

17   the acting U.S. Attorney and could've taken action to

18   correct the record afterwards.

19             It was apparent to me from having been in

20   that hearing in which Judge Robinson was addressing Erin

21   Tomasic that it was apparent that Judge Robinson-- or

22   apparent to me that Judge Robinson somehow thought it

23   was Erin Tomasic's idea to do it that way and that she

24   somehow had permission.  It was my understanding of the

25   facts that she was told to do it, it wasn't even her

1    idea.

2    BY MS. VANBEBBER:

3        Q.   So getting back to the Special Master.  You have

4    said you didn't ask to speak to him, you didn't ask

5    management to speak with him?

6        A.   I did not.

7        Q.   And do you know whether he ever asked to speak

8    with you?

9        A.   He did.

10       Q.   And how do you know that?

11       A.   Because he called me.

12       Q.   And what did he ask you?

13       A.   If I would speak with him.

14       Q.   And what did you say?

15       A.   We met.

16       Q.   And what did you tell him?

17       A.   I told him essentially the same thing that I had

18   articulated.  That Erin Tomasic, in my view, had been

19   unfairly accused, that she-- it was not her idea to make

20   that 5:30 - or whatever the time was - delivery.  And

21   yet it appeared that it had come out as if that was her

22   idea.  It was my knowledge-- my knowledge, she was not

23   the one who came up with that plan, it had been approved

24   by two levels of management, and that the Court likely

25   misunderstood what had happened.

1    Q.  You said no one specifically told you not to

2  speak to the Special Master.  Right?

3    A.  Not that I recall.

4    Q.  Do you know if anybody else in the office was

5  told not to speak with the Special Master?

6            THE WITNESS:  May I?

7            MR. CLYMER:  Yes.

8            THE WITNESS:  I believe at some point Erin

9  Tomasic told me that she had been told not to speak to

10  him.

11  BY MS. VANBEBBER:

12    Q.  Okay.  Anybody else?

13    A.  Not that I recall.

14            MS. VANBEBBER:  Thank you, Mr. Patton.

15            MR. REDMOND:  Mr. Patton, we have no

16  questions.

17                    CROSS EXAMINATION

18  BY MR. CLYMER:

19    Q.  Mr. Patton, were you involved in the litigation

20  that resulted in the case *U.S. versus Black*?

21    A.  Involved only in responding to requests from

22  management to provide whatever information such as I've

23  already testified to.

24    Q.  Did you have any input into the drafting of the

25  grand jury subpoena that was used to obtain video

1    evidence--

2        A.   No, sir.

3        Q.   -- from CCA-Leavenworth?

4        A.   No, sir.

5        Q.   Did you ever watch any video of any attorney

6    meeting with any inmate from CCA-Leavenworth?

7        A.   No, sir.

8        Q.   To your knowledge, did any Assistant United

9    States Attorney in your office watch any video of any

10   attorney-- inmate meeting with an attorney at

11   CCA-Leavenworth?

12       A.   No, sir.

13       Q.   To the best of your recollection, did you ever

14   seek by subpoena or other means telephone calls made by

15   a inmate at CCA-Leavenworth to an attorney?

16       A.   No, sir.

17       Q.   To your knowledge, did you ever seek by use of a

18   subpoena or any other means telephone calls made by any

19   inmate to an attorney?

20       A.   No, sir.

21       Q.   Have you ever listened to inmate-attorney

22   telephone calls?

23       A.   Not that I recall.

24       Q.   Have you ever been told by an agent working on a

25   case that you handled that he had come across an

1   inmate-attorney telephone call?

2       A.   Not that I recall.

3       Q.   Did anybody ever tell you not to cooperate with

4   the Special Master?

5       A.   No, sir, not that I ever remember.

6       Q.   Did you tell anybody not to cooperate with the

7   Special Master?

8       A.   No, sir.

9       Q.   Did you do anything to try to obstruct or

10  interfere with the Special Master's investigation?

11      A.   No.

12      Q.   Did you comply with all requests by management to

13  obtain documents or locate documents based on the

14  request of the Special Master?

15      A.   Yes.

16      Q.   Were you present during the communications

17  between Ms. Metzger, Ms. Barnett, Ms. Flannigan and Ms.

18  Tomasic on the evening when Ms. Tomasic entered Judge

19  Robinson's chambers without permission?

20      A.   No.

21      Q.   What's the source of your information about what

22  was told to Ms. Tomasic by Mr.-- Ms. Barnett and

23  Ms. Metzger during that interaction?

24      A.   The statements from Erin Tomasic, from Kim

25  Flannigan, the reactions of Emily Metzger and Deb

1  Barnett in that meeting that I described earlier, and

2  then a subsequent conversation with Emily Metzger.

3      Q.  Were you present during a meeting between then

4  United States Attorney Tom Beall and Chief Judge

5  Robinson?

6      A.  No.

7      Q.  Do you know what Mr. Beall told Judge Robinson

8  during that meeting?

9      A.  Not directly.

10             MR. CLYMER:  Nothing further, Your Honor.

11             MS. VANBEBBER:  Thank you, Mr. Patton, no

12  more questions.

13             THE WITNESS:  Your Honor, am I released from

14  my subpoena?

15             THE COURT:  May he be excused from his

16  subpoena?

17             MS. VANBEBBER:  Yes, ma'am.

18             THE COURT:  Yes.

19             THE WITNESS:  Thank you.

20             THE COURT:  All right.  It's ten 'til 12:00.

21  It sounds like the next witness will be longer.  Did you

22  want to start or do you want to take a lunch break?

23             MS. VANBEBBER:  I would like to take a lunch

24  break now, Your Honor, if it's possible.

25             THE COURT:  All right.  Let's take a break

 1   until 1:00.

 2              (Recess).

 3              THE COURT:  All right.  You can be seated.

 4              MS. VANBEBBER:  Your Honor, I'd call Chris

 5   Oakley to the stand.

 6                     CHRISTOPHER OAKLEY

 7   called as a witness on behalf of the Special Master,

 8   having first been duly sworn, testified as follows:

 9                     DIRECT EXAMINATION

10   BY MS. VANBEBBER:

11      Q.  Mr. Oakley, how long have you been with the U.S.

12   Attorney's Office in Kansas City?

13      A.  In Kansas City, since 2009.

14      Q.  And were you with the U.S. Attorney's Office

15   before that?

16      A.  I started in Wichita as a SAUSA in 2006.

17      Q.  All right.  What's the nature of the work you do

18   for the U.S. Attorney's Office now?

19      A.  I'm a criminal prosecutor and I handle primarily

20   white-collar cases.

21      Q.  Do you recall when Erin Tomasic came, as you did,

22   to the SA-- to the U.S. Attorney's Office as a SAUSA?

23      A.  I know that she did, I don't recall the-- the

24   date.  But yes, she was a SAUSA.

25      Q.  And were you aware even at that time that she

1   didn't have any experience at all in criminal

2   prosecution, never done a trial?

3       A.   I didn't know what her trial experience was.   I

4   knew that she had been an intern for us and I think she

5   was a law clerk prior to that.

6       Q.   Well, are you aware that Sheri Catania was

7   assigned to be Erin Tomasic's mentor?

8       A.   When I started in Kansas City, Sheri was mine.

9   So that doesn't surprise me, I don't know if I was aware

10  of that.

11      Q.   As a matter of fact, you recall when Erin was no

12  longer able to go to Sheri for assistance.   Right?

13      A.   I'm sorry.   Could you repeat that?

14      Q.   You recall the time, a time when Erin was no

15  longer able to go to Sheri for assistance?

16      A.   I don't recall that.

17      Q.   That-- you just don't remember that?

18      A.   No.

19      Q.   Well, then who do you think was Erin Tomasic's

20  mentor when she was no longer being mentored by Catania?

21      A.   I didn't know that-- that she wasn't being

22  mentored.

23      Q.   Do you recall spending time with Erin trying to

24  help her learn how the office functioned, how to try a

25  case, that sort of thing?

1     A.  I recall spending time with her, yes.

2     Q.  Why did you want to help her?

3     A.  I'm sorry, I'm not authorized to answer that

4  question.

5            MR. CLYMER:  You can answer the question.

6            THE WITNESS:  Okay.  Could you repeat it,

7  please?

8  BY MS. VANBEBBER:

9     Q.  Why did you want to take it upon yourself to help

10 her?

11    A.  I guess for the same reason that I help other

12 people in my office.  I view us as a team, I guess, that

13 I try and provide support if asked and if able.

14    Q.  So the AUSAs has a team approach in litigating in

15 this office; is that right?

16    A.  I wouldn't say in litigation.  My personal

17 approach is if somebody asks me for help and I'm able, I

18 try to provide that help.

19    Q.  And is it fair to say that she did rely on you

20 for help from time to time?

21    A.  I think that's probably fair.

22    Q.  Do you recall an incident where Erin went to

23 class at the Advocacy Institute in South Carolina to

24 learn about discovery?

25    A.  As I sit here, no.  I'm sure that she did, I know

1    that there are classes.

2        Q.  Did you have occasion to discuss methods of

3    discovery with Erin Tomasic?

4        A.  As I sit here, I don't recall having any specific

5    conversations, no.

6        Q.  Do you recall an instance when you were gathering

7    in the lunchroom or somewhere with a bunch of the other

8    assistants and she informed them that the people at the

9    Advocacy Institute had told her that you were never

10   supposed to listen to attorney-client calls without a

11   taint-- without a taint team?

12            THE WITNESS:  Your Honor, may I speak with

13   Mr. Clymer?

14            THE COURT:  Yes.

15            (Confer).

16            THE WITNESS:  I'm sorry, could you repeat

17   that question?

18            MS. VANBEBBER:  Would you read it back?

19            (The question was read back).

20            THE WITNESS:  No, I don't recall that.

21   BY MS. VANBEBBER:

22       Q.  Well, let me ask you, are you supposed to listen

23   to attorney-client calls without using a taint team?

24       A.  I-- no, I can't think of a situation where--

25   where I would, no.

1     Q.   Where you would or would not?

2     A.   Where I would listen to calls without a taint

3  team.

4     Q.   And how do you get a taint team?

5     A.   I would ask my supervisor, if it was a situation

6  where I believed that one was appropriate.

7     Q.   What's the appropriate use of a taint team?

8     A.   I think it depends on the situation.

9     Q.   Well, basically what is it?

10    A.   I think anytime that you are involved in a

11 situation where you're likely to encounter information

12 that may be privileged.

13    Q.   You do what?

14    A.   Obtain a taint team.

15    Q.   And what's the objective of the taint team?

16    A.   To make sure that neither the AUSA nor the

17 investigating agent is exposed to privileged material.

18    Q.   Did Erin tell you she had consulted with Emily

19 Metzger as the professional responsibility office--

20 officer and received the same advice she received in

21 South Carolina?

22    A.   I don't recall her specifically telling me that,

23 no.

24    Q.   You don't recall that she told you, in fact, that

25 a taint team should be used in circumstances where you

1    were likely to obtain privileged information?

2        A.   I don't specifically-- I agree with that

3    statement, but I don't specifically recall a situation

4    where Erin directly told that to me.

5        Q.   Do you recall whether Erin told you that Emily

6    had also advised her, as did the DOJ attorneys in South

7    Carolina, to let the defense attorney know if his own

8    calls had been recorded?

9        A.   I don't specifically recall having that

10   conversation, no.

11       Q.   Did you ever give her any advice on what should--

12   what she should do if she came on to attorney-client

13   calls that had been recorded?

14       A.   I don't recall having that conversation with her,

15   either.

16       Q.   Well, why don't you tell me what you think then.

17   Do you think that you are obligated when you come on--

18   come into possession of attorney-client calls to let the

19   attorney know that you've got his calls?

20       A.   I think it depends upon the situation, what part

21   of the investigation.

22       Q.   Can you think of any time when you came in

23   contact with attorney-client calls that you would fail

24   to tell that attorney that the prosecutors have his

25   calls?

1    A.   I only recall one situation as a state prosecutor

2    in which I came into possession of a call involving a

3    client and an attorney and I notified that attorney.

4         As a federal prosecutor, there was another

5    instance where I came into possession of a call between

6    an inmate and a law firm, not someone that she had

7    retained.  Those are the only two times that I have--

8    that I recall, as I sit here, ever having that

9    experience.

10   Q.   Did you call the law firm?

11   A.   In that case I did not because they were not

12   retained.

13   Q.   How do you know?

14   A.   Because it was a charged case, the defendant had

15   counsel and the law firm that was called never entered

16   their appearance.

17   Q.   Did you know who was going to end up being that--

18   that person's attorney?

19   A.   Yes, she had counsel at the time.  And to be

20   clear, it was not a conversation between an inmate and

21   an attorney.  As soon as I heard a voice say "law

22   office" and-- and identify the law office, I stopped

23   listening.

24   Q.   Do you recall telling Erin Tomasic that attorney

25   calls from CCA are not privileged and can be listened to

1    by case attorneys and their agents?

2        A.   No.   No, I do not.

3        Q.   Have you heard other AUSAs around the office say

4    that that's the rule?

5        A.   Not that I recall.

6        Q.   As far as you know, attorney-client calls from

7    CCA are privileged and cannot be listened to by the case

8    attorneys then?

9        A.   I don't know that that is a factual legal

10   statement, no.   I've never heard anyone-- to my

11   knowledge, I have never heard anyone-- I've heard Erin

12   say that, I've never operated that way.

13       Q.   Have you read the pleadings in this case?

14       A.   Yes.

15       Q.   Are you aware that the Department of Justice has

16   taken the position that those calls from CCA are not

17   privileged?

18       A.   Yes.   That's why I said that I know that that--

19   that legally I do not believe that they are privileged.

20   Your question was whether I've heard anyone say that or

21   whether or not I operate that way.

22       Q.   So do you-- your position in this case-- or DOJ's

23   position in this case is that those calls are not

24   privileged.   Are you telling me that you've never heard

25   anybody say that around the office?

1    A.  I've heard-- yes, I've heard that argument made

2    in this case.

3    Q.  You've never heard it unofficially, you've never

4    heard it in any other case?

5    A.  That I've been involved with personally?  Not

6    that I can recall.

7    Q.  No, Mr. Oakley, that you've heard around the

8    office.

9    A.  Yes, I've heard that argument made.

10   Q.  By whom?

11   A.  I've heard Erin made that.  I've heard just

12   generally that the legal research shows that if-- if the

13   calls are recorded, that the inmate is aware that

14   they're being recorded, that they're not privileged.

15   Q.  So it's your testimony that you did not tell Erin

16   Tomasic that she had no obligation to tell an attorney

17   his call had been recorded because it was too much of a

18   litigation risk?

19   A.  I don't recall having that conversation with her.

20   At-- at what point are you-- are you referring to?

21   Q.  While she was in the office employed and you were

22   in the office employed.

23   A.  Okay.  I don't recall having that conversation

24   with Erin as I sit here today, I don't recall having

25   that conversation specifically.  After this arose, we

1   certainly had conversations about whether or not the

2   calls were privileged.  But prior to this, I don't

3   recall having that conversation.

4       Q.  If she had asked you, is that what you would've

5   told her?

6       A.  If she asked me what?

7       Q.  Whether she had an obligation to tell an attorney

8   that his call had been recorded, but that it was too

9   much of a litigation risk?

10      A.  I mean, you're asking me to speculate then.  I--

11  I guess it would depend on the circumstance, I-- I don't

12  know.

13      Q.  And did you tell her that it might cause trouble

14  down the road if you notified a defendant's attorney

15  that his calls were in the hands of the prosecution?

16      A.  No, I didn't.  I didn't say that, because we

17  never had the conversation.

18      Q.  If she asked you that question today, is that

19  what you would tell her?

20      A.  Again, it would depend on the circumstance.

21      Q.  Pardon me?

22      A.  It would depend on the circumstance in which the

23  question was asked.

24      Q.  What kind of a circumstance would make anyone

25  give that answer?

1    A.   Give the answer to--

2    Q.   That it's--

3    A.   -- not notify a defense attorney?

4    Q.   Don't tell them because it will cause too much

5    trouble down the road.

6    A.   I don't know that I would ever say it like that.

7    Q.   Well, how would you say it?

8    A.   If it was a pending investigation, I-- that might

9    affect my answer.

10   Q.   How would it-- how would it affect it?

11   A.   Well, and you're saying if calls were recorded.

12   There's a difference if a call is recorded or if a call

13   is listened to.  So I guess it would-- what I would say

14   would depend on the specific factual situation, and I

15   don't know that I-- your question gives me enough to be

16   able to answer that question.

17   Q.   All right.  The specific fact might be the calls

18   were recorded, you had them in your possession.  Is

19   there ever an instance when you should not call the

20   attorney and say, hey, I've got your calls?

21   A.   If I knew that they were recorded and in my

22   possession?

23   Q.   You would know-- yes.

24   A.   No.  In that situation, I would likely notify the

25   attorney.

1    Q.   Is there any situation like that where you

2   wouldn't?

3    A.   I'm sure there is, but I can't think of one right

4   now.

5    Q.   In 2016 didn't the upper management for the KCK

6   office include Kim Flannigan and then later Scott Rask

7   as criminal coordinator?

8    A.   Yes.

9    Q.   Is that the same thing as we would think of as

10  the supervisor for the AUSAs that did criminal work?

11   A.   Yes.

12   Q.   Okay.  And Debra Barnett was the criminal chief

13  for the entire district?

14   A.   Yes.

15   Q.   And Tom Beall was the acting U.S. Attorney?

16   A.   Yes.

17   Q.   And to your knowledge, he also kept his title,

18  former title as First Assistant AUSA?

19   A.   That's my recollection, yes.

20   Q.   Did you believe at the time, 2016, that this

21  management team supported the idea that CCA calls were

22  unprivileged if they were recorded?

23   A.   I-- I don't know that I had an idea at that time

24  what their position would be.

25   Q.   And you didn't know whether management supported

1   the position that AUSAs had no duty to inform defense

2   counsel that their calls were in the possession of the

3   prosecutors?

4       A.   As of 2016?

5       Q.   Uh-huh.

6       A.   I don't recall being involved in a situation

7   where that arose.

8       Q.   Has it arisen since?

9       A.   Since, yes.

10      Q.   When?

11      A.   In this case.

12      Q.   Outside this case?

13      A.   Not to my knowledge.

14      Q.   Well, then outside this case, are they-- is the

15  position still that those calls-- attorney-client calls

16  from CCA are not privileged?

17      A.   I don't believe I'm authorized to answer that.

18           MR. CLYMER:  Yeah, I'm not sure this witness

19  can speak for the Department of Justice, Your Honor.

20  Our legal position is stated in the papers we filed in

21  court.

22  BY MS. VANBEBBER:

23      Q.   Have you ever heard Mr. Beall or Ms. Barnett or

24  Ms. Flannigan or Mr. Rask say that attorney-client calls

25  from the CCA are not privileged?

1    A.   In-- in discussions, I believe so, yes.  I can't

2   think of a specific time, but I know that that-- those

3   statements have been made.

4    Q.   So is it your testimony that there's no written

5   policy statement or-- or just statement from management

6   espousing the idea that those calls would not be

7   privileged?

8    A.   Are you talking about now or are you talking

9   about prior to 2016?

10    Q.   Well, let's start with 2016.

11    A.   I know of no written policies specifically

12   related to that.

13    Q.   Would you say that-- would you consider that, as

14   a-- a prosecutor, a pretty significant matter for

15   litigators?

16    A.   As to whether or not the calls are privileged?

17    Q.   Yes.

18    A.   I-- I think it's something that would need to be

19   researched, yes.  I mean, it's an issue.

20    Q.   If it came up, you'd want to know what the office

21   policy was, wouldn't you?

22    A.   I would want to know what the law is.

23    Q.   What if the-- the way you read the law is

24   different than the office policy?

25    A.   Then I would have a discussion with my supervisor

1    and make sure that I understood both the law and the

2    office policy.

3        Q.   Is it fair to say that on this particular issue

4    and on other significant litigation issues, the position

5    of the individual AUSA was pretty much left up to the

6    individual AUSA?

7        A.   I think that we were directed to follow the law,

8    and so that might require the individual AUSA to

9    familiarize himself or herself with the law.

10       Q.   And then the AUSA should do as he saw fit,

11   according to his own reading of the law?

12       A.   Well, I personally, if I had any concerns, would

13   have that discussion with my supervisor.

14       Q.   Have you never had a discussion with one of your

15   supervisors about the office policy on a serious matter

16   of litigation?

17       A.   I'm-- I'm sure that I have.

18       Q.   But you don't recall one today?

19       A.   A specific instance of a specific conversation?

20       Q.   Yep.

21       A.   I mean, I frequently have conversations with my

22   supervisor about-- about a lot of things, including my

23   interpretation of the law or how best to appropriately

24   represent my client in court or-- or other matters.

25       Q.   Is it fair to say that as far as you know, the

1  office-- your KCK office position on privileged

2  telephone calls is not reduced to writing?

3      A.   Are you talking about now or prior to 2016?

4      Q.   Prior to this case, 2016.

5      A.   I know of no specific policy that specifically

6  addressed attorney-client calls.  We were required to

7  follow the law.

8      Q.   You and Tomasic were co-counsel on the *Black*

9  case, weren't you?

10     A.   Yes.

11     Q.   Who was-- who was lead?

12     A.   She was.

13     Q.   At that time you were a seasoned prosecutor.

14  Right?

15     A.   Yes, two years ago I-- I started in 2009, so I

16  guess you could say that.

17     Q.   And she was a rank beginner, never tried a case

18  before?

19     A.   I think she had some trials, yeah.

20     Q.   Name one.

21     A.   I didn't try a case with her, but my recollection

22  is that she tried a case with others in the office.

23     Q.   And if it was her testimony that once she started

24  in *Black,* she had not yet had a courtroom trial?

25     A.   I thought that she did, but I-- I've never tried

1  a case with her.

2      Q.  And if she did, she would've only had the

3  opportunity to have had one.  Right?

4      A.  I don't know specifically what her trial

5  experience was.

6      Q.  Since you were the seasoned prosecutor and she

7  was the rank beginner, were you surprised that she was

8  designated lead attorney in this case?

9      A.  I-- you say designated, I don't know that anyone

10  officially designated it.  She--

11      Q.  Didn't-- go ahead.

12      A.  She was assigned the case and-- and eventually I

13  was asked to help out--

14      Q.  So you considered yourself--

15      A.  -- months after the investigation started.

16      Q.  I'm sorry.  So you considered yourself to be

17  second-chairing?

18      A.  We weren't yet proceeding to trial, so I don't

19  know, but I was assisting her is the way that I viewed

20  it.  I had never had a discussion with anyone as far as

21  I was first chair, I was second chair or anything of

22  that nature.

23      Q.  And this was a multi-defendant case designated by

24  the Court as a-- as complex criminal litigation.  Right?

25      A.  Yes.

1    Q.   Did you work with Ms. Tomasic on preparing the

2    grand jury subpoenas for *Black*?

3    A.   Not that I recall.

4    Q.   Did you review them before they went out?

5    A.   I don't recall reviewing any of the subpoenas

6    that she signed, no.

7    Q.   Is it your recollection that there were two

8    subpoenas issued in the *Black* case to the grand jury?

9    A.   I don't recall specifically how many subpoenas

10   were issued.

11   Q.   Do you recall that one went out in April of 2016

12   for telephone recordings of 17 individual detainees?

13   A.   Yes.

14   Q.   And then do you recall a second one was served on

15   May the 4th, 2016 for all surveillance at CCA?

16   A.   Yes.

17   Q.   Do you know of any others?

18   A.   As I sit here, no.

19   Q.   Isn't it true that before the surveillance

20   subpoena was issued-- or, excuse me, was served, that a

21   cooperating witness had told Ms. Tomasic that the

22   attorney-client rooms were recorded?

23   A.   I don't know, I was not involved in the case at

24   that time.

25   Q.   That's before you became involved?

1    A.  Yes.

2    Q.  By mid-June, you learned that the attorney

3  conference rooms were recorded, didn't you?

4    A.  No.

5    Q.  You were on the case by then, weren't you?

6    A.  Yes.

7    Q.  Then how is it that you didn't know in mid-June

8  that the conference rooms were recorded?  Because you

9  had received six hard drives, including one that the

10 index showed-- at least one that showed-- was views of

11 the attorney-client conference rooms?

12   A.  I never viewed the-- the video and I don't recall

13 seeing the index.

14   Q.  You're co-counsel on this case and you didn't

15 look at the index to see whether attorney-client rooms

16 were included?

17   A.  Well, I certainly didn't look at the index to see

18 if attorney-client rooms were included, and I don't

19 recall looking at the index at all.

20   Q.  Do you think you would've noticed it if you had

21 seen that there were hard drives with DVRs in them that

22 had attorney-client on the index-- attorney-client rooms

23 listed on the index?

24   A.  I don't recall seeing the index, so I--

25   Q.  Did you get a taint team selected for *Black*?

1    A.   There was a taint team, yes.  I was not involved

2    in selecting it, no.

3    Q.   And you recall seeing the surveillance subpoena

4    at some point, don't you?

5    A.   I've seen it since, I don't recall if I saw it

6    prior to its issuance.

7    Q.   If you had seen it, would you have suggested that

8    attorney-client rooms should be excepted from all

9    surveillance?

10    A.   I didn't know at the time that the subpoena was

11    issued that-- that-- what rooms were recorded and what

12    rooms weren't.

13    Q.   So you hadn't had a conversation at all with Ms.

14    Tomasic about the fact that she had an informant who

15    told her that they were recorded?

16    A.   No, not at that time.

17    Q.   Were you present at the discovery conference that

18    was held in *Black* in July?

19    A.   Yes.

20    Q.   Do you recall that Ms. Tomasic-- well, you and

21    Ms. Tomasic were both there.  Correct?

22    A.   Yes.

23    Q.   And do you recall that she told the judge that

24    she was prepared to offer-- to provide copies of the

25    DVRs of the-- that had been delivered to you from CCA to

1   defense counsel?

2       A.   Yes.

3       Q.   And that she was also going to provide relevant

4   e-mails and photographs as normal?

5       A.   I don't specifically recall a discussion of

6   relevant e-mails and photographs.

7       Q.   Do you recall that she did not tell the judge

8   that there was a return on a subpoena for the phone

9   calls?

10      A.   I don't recall the discussion about a subpoena

11  for phone calls coming up at that hearing.

12      Q.   At that hearing do you recall Tomasic telling the

13  Court that the attorney-client rooms were only monitored

14  when a panic button was pushed inside the room, and

15  didn't you hear her tell the judge that she didn't

16  believe the rooms were videotaped?

17      A.   Yes, that's my recollection.

18      Q.   Now, this is-- this is July 21st, 2016.  Right?

19      A.   The date of the status conference?  I believe

20  that's correct.

21      Q.   You had-- you and Ms. Tomasic had assigned KBI

22  Agent Jeff Stokes to review the videotapes.  Right?

23      A.   I did not assign Jeff Stokes to review

24  videotapes, no.

25      Q.   I'm going to show you what's been marked as

1    Special Master's Exhibit 10-- 1078.  And look at the top

2    of it and see the date.  Have you ever-- do you recall

3    having seen this before?

4        A.  Is this the-- the entire e-mail?  I don't recall

5    ever seeing this, no.

6        Q.  You have-- you can see that it-- that it was

7    dated July the 12th, 2016.  Right?

8        A.  Yes, it appears.

9        Q.  Which was before July 21st, isn't it?

10       A.  I agree with that, yes.

11       Q.  Do you disagree that-- that Agent Stokes had

12   already been assigned as the case agent to review the

13   CCA video?

14       A.  I was not involved in assigning that to him, I

15   don't know if he was or not.

16       Q.  You don't know who the case agent was that was

17   supposed to be reviewing the videotapes?

18       A.  I know that he was the case agent, I don't know

19   what his specific tasks were.

20       Q.  If you've only got two attorneys on a case,

21   wouldn't you think they'd talk to each other?

22       A.  I would agree with that, yes, they would talk

23   to-- I don't know if they would talk to each other about

24   everything.

25       Q.  Would you think they'd talk to each other about

1    the very important things in the case?

2        A.   I think that's a fair general statement, yes.

3        Q.   And would you say that in this case the existence

4    of videotaped recordings of attorneys and their clients

5    would be very important?

6        A.   To this proceeding, yes.

7        Q.   To the case?

8        A.   While I was in the case, I never knew that there

9    were any-- any such video, so I never had that

10   conversation.

11          The video itself as it relates to the charges

12   that were filed at that time did not play an important

13   part of the case.  So no, I would disagree that the

14   overall video was important.

15       Q.   So it's your testimony that in-- that when the

16   subpoenas went out in April and May, you didn't review

17   them?

18       A.   Review the subpoenas?

19       Q.   Uh-huh.

20       A.   I do not recall reviewing the subpoenas before

21   they went out, no.

22       Q.   And do you recall reviewing the subpoenas when

23   they came back in, when the agents-- when the agents

24   began providing-- providing what was returned with the

25   subpoenas?

1    A.   No.

2    Q.   And Ms. Tomasic didn't-- wasn't excited enough to

3  tell you that there's a-- there's an informant who told

4  us the attorney-client rooms are recorded?

5    A.   No, she never told me that.

6    Q.   And do you know that Jeff Stokes was the agent?

7    A.   I do know that Jeff Stokes was one of the agents,

8  yes.

9    Q.   And you don't remember what his assignments were?

10    A.   Not specifically, no.

11    Q.   All right.  Please take a look at Special

12  Master's Exhibit 1139 and just read it to yourself.

13    A.   Okay.

14    Q.   Since it's your testimony that you had very

15  little knowledge about the innerworkings of this case in

16  July, who's this e-mail addressed to?

17    A.   Well, this-- this e-mail is dated August 20th.

18  It's addressed to me and cc'd to others.

19    Q.   So you're saying you didn't know anything in July

20  and now Agent Stokes believes he should address this to

21  you and not to Ms. Tomasic?

22    A.   Well, I think Ms. Tomasic is cc'd on--

23    Q.   She's cc'd.  Correct?

24    A.   Correct.  May I-- it looks like there's another

25  e-mail.  May I see the entire e-mail?

1      Q.  If I had been given it in discovery, you could,

2  but I haven't.  To my knowledge at least, nothing I've

3  seen yet.  This is what came in.  If I'm missing it,

4  then your counsel can-- can provide it to you, but I

5  don't have it.

6      A.  I just couldn't tell if there was anything not on

7  the screen.

8      Q.  Well, apparently the-- the address line on yours

9  says, "Subject.  Re: Verify information related to

10  videos."  So one would assume it was about that.

11        But in any event, in August it's addressed to you

12  and it tells you that he's viewed the attorney-- he's

13  viewed a video where there were 16 camera views on the

14  screen and the attorney-client rooms were included in

15  that.

16      A.  Yes, that e-mail was sent in August.

17      Q.  So it's your testimony that by July the 21st

18  after the index came-- after the hard drives came in,

19  the index labeled at least one of them as being of the

20  attorney-client rooms, you were scheduled for a hearing

21  with the judge on discovery, and you don't recall

22  anything that Tomasic told the judge about those videos?

23      A.  I don't think that was my testimony, no.

24      Q.  Well, what's wrong with-- what's wrong with my

25  summation of your testimony?

1    A.  I think you specifically asked me if I did recall

2  Erin telling Judge Robinson the way that she understood

3  the system to work.  Yes, I do recall that coming up

4  during that status conference in July.

5    Q.  And given what you knew by the 21st of July,

6  didn't you elbow her and say, oh, wait, don't forget

7  about the fact that we have these recordings in the

8  office?

9    A.  No, because I didn't know that we had those

10  recordings.  When she made that statement to Judge

11  Robinson in open court, that's the first time that I

12  heard that possibility.

13        THE COURT:  Are you talking about

14  video-recordings or audio-recordings?

15        MS. VANBEBBER:  Video.

16  BY MS. VANBEBBER:

17    Q.  That's the first time-- on the 21st, that's the

18  first time you heard mention that Erin Tomasic had been

19  informed by an informant that the video-- that the

20  attorney-client rooms were videoed?  And you had

21  received videos, one of them was labeled as

22  attorney-client, and you didn't know anything about

23  this; is that right?

24    A.  Well, there's-- there's a lot of statements made

25  in that question.  The first time that I--

1    Q.  Well, let me break it down for you just so it
2  will be just one-- one question.
3        By July 21st it's true that you knew that Erin
4  had an informant that claimed the attorney-client rooms
5  were videoed?
6    A.  No, I didn't know that.  I don't believe I knew
7  that.
8    Q.  And by July the 21st, you didn't know that Agent
9  Stokes, who was an agent on your case, had been assigned
10 to look at those videos?
11   A.  I don't remember specifically what he was
12 assigned to do.
13   Q.  And you heard what Erin Tomasic told the judge
14 with regard to what she was willing to provide in
15 discovery, and you also heard her say that she didn't
16 think that the attorney-client rooms were videoed?
17   A.  Yes, I was present in the hearing and I heard
18 that.
19   Q.  Now, you said you believed there was a taint team
20 selected for *Black*?
21   A.  My understanding is that as part of the execution
22 of the search warrant at CCA that there was a taint
23 team, yes.
24   Q.  Do you know who was supposed to be in charge of
25 that taint team?

1   A.   I do not recall.  I believe that it was IRS, but

2   I don't recall.

3   Q.   That what was who?

4   A.   I believe it was comprised of IRS agents, but I

5   don't recall who was in charge.

6   Q.   Do you know whether they were attorneys or not?

7   A.   I don't know.

8   Q.   To your knowledge, was there a taint team ever

9   used in this case?

10   A.   At the search warrant I believe so, yes.

11   Q.   And that was when?

12   A.   I believe that was April-- I think it was Friday,

13   April 8th.  I may have the date wrong.

14   Q.   So, to your knowledge, after June the 10th when

15   the hard drives from the attorney-client rooms were

16   provided, was there a taint team?

17   A.   Yes.  And-- and, I'm sorry, Tanya in Topeka was

18   assigned to be the AUSA related to that.

19   Q.   Which Tanya?  Treadway or--

20   A.   Treadway.

21   Q.   Isn't it true that you and Tomasic were not

22   allowed to attend the *Black* emergency hearing set for

23   August the 9th, 2016?

24   A.   We did not attend.  I don't know that I wasn't

25   allowed.  I-- I remember having that conversation.

1    Q.  Well, why didn't you attend?

2    A.  I wasn't involved in that aspect of the

3    litigation.

4    Q.  The *Black* litigation?

5    A.  At that point Deb Barnett, I don't know if Duston

6    was involved at that time, and I think Annette Gurney.

7    So I wasn't involved in that aspect at that point.

8    Q.  So you were aware that Tomasic was not allowed to

9    attend?

10   A.  I know that she didn't attend.  When you say "not

11   allowed," I-- I wasn't privileged-- I wasn't present

12   during any conversation where that came up with her, so

13   I don't know what she--

14   Q.  She didn't tell you that she wasn't allowed?

15   A.  She told me later.

16   Q.  You were involved in a meeting outside the

17   hallway where you were neither one to attend the

18   meeting?

19   A.  I don't recall--

20   Q.  Excuse me, attend the hearing.

21   A.  I don't recall a meeting out in a-- in a hallway

22   where she was not directed to attend.

23   Q.  Where was it?  Where was the meeting?

24   A.  I recall I had a meeting that she was not present

25   at.  I don't recall--

1    Q.  Isn't it true that only you and Tomasic knew the

2  details of the *Black* investigation and the case at that

3  time?

4    A.  I don't know what-- what anyone else knew.

5    Q.  Well, do you know of anyone else, besides you and

6  Tomasic, who knew the details of what had happened

7  during the investigation of that case?

8    A.  At the time of the hearing?

9    Q.  On August the 9th, 2016.

10    A.  I don't know what was conveyed to others related

11  to the investigation, I don't know what they--

12    Q.  That's not what I asked you.  I asked you if you

13  knew of anybody besides the two of you who knew all the

14  details.  You personally, did you know anybody?

15    A.  I certainly didn't know all of the details.  I

16  was involved in the case and Erin was involved in the

17  case.  And at that time we were the only ones who had

18  entered our appearance, but I don't know what

19  information was conveyed to others, if any.

20    Q.  Were you able to go to the August 16th hearing?

21    A.  I don't specifically recall that hearing, and I

22  don't remember if I was there in the audience or not.

23    Q.  You just don't recall?

24    A.  I-- there-- I know that there was a hearing in

25  which I was behind the bar.  I know that there was a

1    hearing in which Erin and I presented evidence.  And I

2    know the first hearing I was not at.  If there was a

3    second hearing-- I do not specifically recall.

4        Q.  You just don't remember.  You weren't at the

5    first one?

6        A.  Correct.

7        Q.  You were at-- the first one is August 9th.

8        A.  Correct.

9        Q.  You were not there.  You were at the

10   September 7th hearing, the third one?

11       A.  Yes.  Is that the-- the hearing that evidence was

12   presented?

13       Q.  Yes.

14       A.  Yes.

15       Q.  But you don't remember whether you were at the

16   August 16th hearing?

17       A.  I-- I did not participate as counsel.  I believe

18   that I may have been behind the bar, if that's the

19   hearing I'm--

20       Q.  Does it help you if I state to you that that's

21   the hearing where the audio-recordings were also

22   directed to be brought to the judge?

23       A.  I'm sorry, I-- I cannot recall.

24       Q.  Can you tell me if anyone else, other than Jackie

25   Rokusek and her investigator on August the 5th, viewed

1    the DVRs?

2        A.   Did anyone else view them?

3        Q.   Yes.

4        A.   No.  I-- no.

5        Q.   Well, you can't say no, can you--

6        A.   I don't know who did.

7        Q.   -- because you don't know?

8        A.   I know that I did not.

9        Q.   All right.  So you don't know of anybody else

10   other than you, and you didn't either review?

11       A.   I've never viewed any of that video.  So I-- I

12   guess if you're-- I don't understand your question.

13       Q.   Are you saying you didn't look at them?

14       A.   Correct.

15       Q.   And you don't know of anyone else who looked at

16   them?

17       A.   Correct.

18       Q.   Other than Stokes?

19       A.   I don't know what Stokes did.

20       Q.   Let's look at 1139.  August the 20th, Stokes,

21   "When I viewed the video."

22       A.   Correct.  I don't know at what point he viewed

23   the video I guess is my answer.

24       Q.   I'm asking you as you stand here today, Stokes

25   viewed the video, some video, correct, according to him?

1    A.   From that e-mail, yes, he looked at some portion

2    of the video.  I don't know what he observed.

3    Q.   After October the 11th, 2016, you knew that the

4    Court had appointed a Special Master to look into the

5    circumstances surrounding the video and the audio from

6    CCA--

7    A.   That's correct.

8    Q.   -- right?  Did you read the order?

9    A.   Yes, at the time, yes.

10   Q.   And do you know from reading the order that the

11   USAO was ordered to fully cooperate with the Special

12   Master, including providing access to people as well as

13   doing other things?

14   A.   It's been a while since I viewed the order, but

15   yes, I believe that's an accurate statement.

16   Q.   Did you think that that order applied to you?

17   A.   Yes.

18   Q.   Did you endeavor to carry out that order?

19   A.   Yes.

20   Q.   All right.  When management talked to the AUSAs

21   from time to time, are you aware that they told anybody

22   that they were not to speak with the Special Master?

23   A.   No, I was not told that or heard anyone else that

24   was told that.

25   Q.   You personally were not told that.  Correct?

1    A.   I was not told not to cooperate.  There's a lot

2    of negatives.  I was always told to cooperate.

3    Q.   And it's your testimony that you don't know of

4    anybody who was told not to cooperate?

5    A.   Correct.

6    Q.   How did management indicate to you that you were

7    to cooperate with the Master?

8    A.   I was told we need to cooperate.

9    Q.   Were you told that you should do that only

10   through management?

11   A.   I don't recall being told that, no.

12   Q.   It wasn't your understanding that you should

13   check with management before you dealt with the Special

14   Master?

15   A.   I don't know if I was told that.  That was

16   certainly the position that-- that I took if I had any

17   dealings with the Special Master.

18   Q.   Why would you do that when you were under orders

19   from the Court to cooperate fully with the Master?

20   A.   I didn't ask their permission to cooperate, I let

21   people know what I was doing.

22   Q.   Do you recall that about a week after the

23   appointment you had to report to Deb Barnett and Scott

24   Rask that you took a call from the Special Master?

25   A.   You say had to report as though I was directed,

1    I--

2        Q.   Well, did you?

3        A.   If I took a call from the Special Master, I

4    would've reported it to Deb or Scott, yes.

5        Q.   And you told them that he would like somebody to

6    contact him about certain pieces of information that he

7    wanted.  Correct?

8        A.   I don't specifically recall that, but that sounds

9    like something I would've told them, yes.

10       Q.   And the information he wanted was information you

11   could've provided, wasn't it?

12       A.   I don't recall specifically what he was looking

13   for.

14       Q.   Did you also tell them that you didn't-- you

15   didn't mean to take the lead on providing this

16   information?

17       A.   That I didn't mean to take the lead?

18       Q.   Yes.  Let me just show you what's in Special

19   Master's Exhibit 1140 and let's walk through it.  All

20   right.  The date, October the 19th.  Correct?

21       A.   Yes.

22       Q.   It says you took a call--

23       A.   Yes.

24       Q.   -- right?  You said you didn't realize who he was

25   until he introduced himself.  Right?

1     A.   Correct.

2     Q.   Well, does that mean that you wouldn't have taken

3   the call if he-- if you had known who it was?

4     A.   You're asking me to speculate back then if I-- I

5   don't know that I wouldn't have taken the call.  I

6   would've tried to have gotten Scott or someone else

7   involved at the time.

8     Q.   Well, you either take a call or you don't take a

9   call, correct, when your phone rings?

10    A.   Sure.  But it's also possible to loop other

11  people into the call.

12    Q.   And if-- if you had recognized the name, would

13  you have continued with the call, do you know, or you

14  would've called Scott?

15    A.   You're asking me to speculate.  My-- obviously I

16  spoke to him, so I had no problems speaking to him.  My

17  preference would've been-- would've been that my

18  supervisor would've been involved in that conversation,

19  yes.

20    Q.   So then he gives you a list of things-- or you

21  give Deb and Scott a list of things that the Special

22  Master wanted information about.  Correct?

23    A.   I'm sorry, I was reading the e-mail.  Could you

24  repeat your question?

25    Q.   Second sentence.  He gave you-- you gave them

1    information about what the Master was looking to find.

2    Correct?

3         A.   Correct.

4         Q.   All right.  And you told him that Deb is

5    representing the government on this issue?

6         A.   Correct.

7         Q.   So you weren't able to say, "I can go find them,"

8    he should talk to Deb?

9         A.   I think I told him that Deb was representing the

10   government so that she would be the better person to

11   talk to.

12        Q.   All right.  Look at the bottom paragraph.  He

13   wants somebody to contact him.  Right?  He gave you his

14   information?

15        A.   Correct.

16        Q.   You asked Deb, "Do you want to call him or do you

17   want me to find that information?"  Couldn't you make

18   that decision on your own?

19        A.   Deb was handling the case, she was my

20   supervisor's supervisor.  I wanted to do whatever I

21   could to help out, but I also knew that other people

22   were-- were handling this.  So that's why I said that.

23   Do you want me to do it or do you want to do it?

24        Q.   And you said, "I didn't mean to take the lead on

25   this."

1    A.   Correct.

2    Q.   Would you agree that an objective reader could

3    find your tone in this e-mail to be somewhat apologetic

4    to your superiors?

5    A.   Well, I think part of the problem with e-mail is

6    discerning tone.  I-- I don't know if it was apologetic.

7    I-- I intended it as recognition that both Deb and Scott

8    were my supervisor, I didn't want to step on anybody's

9    toes, but yet I wanted to be responsive.

10   Q.   Would you agree that this mail could sound like

11   you think you might've been in trouble for talking to

12   Mr. Cohen without permission?

13   A.   Certainly not, that's not what I intended.

14   Q.   Well, there wouldn't be any reason that you would

15   think you were in trouble unless you had been warned or

16   told not to speak with him without permission, would

17   there?

18   A.   I certainly didn't think that I was in trouble.

19   I wanted to pass on information to-- to my management

20   chain to let them know what was going on and also in

21   case there was something that I could do to be

22   responsive.

23   Q.   Do you recall a meeting called by management

24   for-- on December the 8th in the Kansas City, Kansas

25   office to discuss cooperation with the Special Master?

1    A.  I generally recall having a meeting, yes.

2    Q.  Was the meeting run by Emily Metzger?

3    A.  I believe so.

4    Q.  And Debra Barnett and Scott Rask were there?

5    A.  I don't have specifically-- specific recollection

6    of that, but I would certainly assume so.

7    Q.  Do you recall what instructions you were given by

8    the management staff that was there?

9    A.  I don't recall specific instructions, other than

10   we generally were encouraged to cooperate.

11   Q.  Do you recall being told not to talk to the

12   Special Master without clearing it first?

13   A.  I do not recall that.

14   Q.  After that meeting did anyone ever tell you not

15   to talk to the Special Master about anything?

16   A.  I don't recall being specifically told not to

17   talk to the Special Master about anything.

18   Q.  And you did talk to him a few times, didn't you?

19   A.  I did, yes.

20   Q.  And in each of those instances, did management

21   know you were talking to him?

22   A.  I don't know that management knew at the time,

23   I-- I let someone know after the contact.

24   Q.  When the Special Master was ordered on May 27th,

25   2017, to go forward with Phase III of the investigation,

1    you were aware of that, weren't you?

2        A.   I recall reading the order at the time.

3        Q.   And you knew that management vehemently opposed

4    Phase III?

5        A.   My recollection in the pleadings that we filed,

6    yes, we were in opposition.

7        Q.   Did you receive any more instruction after that

8    time as far as providing cooperation with the Special

9    Master on Phase III?

10       A.   I'm sure we did, I don't specifically remember

11   any.

12       Q.   Did you have any more meetings or discussions

13   with the Special Master after that time?

14       A.   Me personally, I don't recall any.

15       Q.   Did you preserve any notes or other written or

16   electronic documents concerning your participation in

17   the *Black* prosecution?

18       A.   Yes.

19       Q.   And where are those?

20       A.   In my office.

21       Q.   Are they on the system or are they just your

22   notes and-- and other items?

23       A.   I have both paper copies of some things and

24   electronic notes.

25       Q.   You were-- you recall receiving a litigation hold

1    letter on December the 19th, 2016.  Right?

2         A.   I remember Emily Metzger forwarding the letter, I

3    don't remember the dates.

4         Q.   Did you respond to that letter as she requested?

5         A.   Yes.

6         Q.   Did you tell her that you had things that would

7    be responsive to the 19 items that were in that letter?

8         A.   Yes.

9         Q.   Did you give her your notes and your other

10   documents that we just discussed?

11        A.   I did not give her anything at that time.  As I

12   recall, I just let her know that-- that I had segregated

13   it.

14        Q.   Did you identify what you had?

15        A.   I don't recall specifically identifying anything.

16        Q.   Are those-- those items are still in your office?

17        A.   Yes.

18        Q.   Had-- why had you not turned them over to your

19   counsel, to Emily Metzger, to-- for the purposes of

20   production to the Special Master?

21        A.   I have once the office received the Special

22   Master's instruction, that's part of what I reviewed.

23        Q.   So you turned all that stuff over to them already

24   and you just kept copies?

25                  THE WITNESS:  Your Honor, may I have a

1   moment with Mr. Clymer?

2            THE COURT:  Yes.

3            (Confer).

4            THE WITNESS:  Yes, in response to the

5   Special Master's subpoena, that's part of what I

6   reviewed to see if I had anything that was-- was

7   responsive.

8   BY MS. VANBEBBER:

9       Q.   And you did?

10      A.   I did.

11      Q.   And those were those things you just described?

12      A.   Correct.

13      Q.   And they're still in your office?

14      A.   Well, yes, I kept-- I made copies and kept what I

15   had and forwarded copies.

16      Q.   Well, you're aware that all the e-mails, all the

17   written documentation that is held by the U.S.

18   Attorney's Office is on the Cloud, aren't you?

19      A.   I'm aware that we have some things, yes, on,

20   quote, a Cloud.

21      Q.   Then what was the purpose of keeping copies for

22   yourself?

23      A.   I guess I wanted to have copies so if it ever

24   became an issue or so I knew that it was provided and so

25   that I still maintained it.  And additionally, it was

1    easier to transmit in electronic format.

2        Q.  Did-- did you ever record any calls?

3        A.  Did I record any calls?  No.

4        Q.  Uh-huh.  No?

5        A.  No.

6        Q.  Have you got any-- any of the documents that you

7    think are important at your home?

8        A.  No.

9            MS. VANBEBBER:  All right.  No other

10   questions, Your Honor.

11           MR. BELL:  May I inquire, Your Honor?

12                   CROSS EXAMINATION

13   BY MR. BELL:

14       Q.  Good afternoon, Mr. Oakley.

15       A.  Yes, sir.

16       Q.  Did you know that the subpoena to CCA for the

17   video was--

18           MS. VANBEBBER:  I'm sorry, I can't hear.

19           MR. BELL:  I'm sorry.

20   BY MR. BELL:

21       Q.  Did you know that the subpoena to CCA for the

22   video was going to go out before it was issued?

23       A.  We-- Erin and I had discussed acquiring CCA video

24   generally.

25       Q.  And was that discussion limited to just you and

1    Ms. Tomasic or were there others involved in that

2    discussion?

3        A.   I believe that the agents, at least some of the

4    agents, were-- would've been involved.

5        Q.   You said the agents, which agents might that be?

6        A.   The case agents that were-- were actively working

7    on it were at the time John Seubert, Matt Cahill, Henry

8    Herron, Jeff Stokes, and Glen Virden as I recall.

9        Q.   And do you recall there being a specific

10   discussion about limiting the scope of the subpoena for

11   the surveillance video to certain areas within CCA?

12       A.   I don't-- I don't specifically recall that

13   conversation.

14       Q.   Do you recall any conversations or e-mail chains

15   discussing widening the scope of the request to all of

16   the video at CCA?

17       A.   I recall having discussions about the video,

18   about it-- the potential of the video being both

19   inculpatory and exculpatory and whether or not we-- and

20   the fact that it was being overwritten periodically and

21   whether or not we should just ask for everything.

22       Q.   So at a certain point there's a discussion about

23   whether you should just ask for all of the video?

24       A.   I-- I don't specifically recall that

25   conversation, but I-- but I know that we discussed the

1   video.

2      Q.  Did there come a point when a decision was made

3   about how much of the video was going to be requested?

4      A.  I'm sure there-- there was, yes.

5      Q.  Who made that decision?

6      A.  I believe it was Erin.

7      Q.  Was anyone else involved-- to your knowledge, was

8   anyone else involved in that decision?

9      A.  Erin and I discussed it.  And at the time we

10  believed-- she believed that this investigation was

11  ongoing, that there were many persons who had not yet

12  been indicted that would be indicted.

13      The concern was, because the video was being

14  overwritten, that at some point a cooperator or someone

15  else would come to us and say, I received contraband on

16  this date in this location.

17      And so I recall having conversations with Erin

18  that that video could prove to be important, both could

19  be incriminating if the video, in fact, corroborated the

20  cooperator's statement, it could also potentially be

21  exculpatory if the video disproved.

22      And so, yes, we generally had this discussion of

23  the video and-- and should we just ask for all of the

24  video.

25      Q.  So when you-- at the end of that discussion that

1  you've just described, did you walk away with the

2  feeling that the decision had been made to ask for all

3  of the video, or at least that's what was going to

4  happen?

5      A.  Yes.

6      Q.  When you're having these discussions with Ms.

7  Tomasic, does she ever mention to you or allude to the

8  fact that she knows that there are recordings-- that the

9  surveillance video will include recordings from the

10  attorney-client meeting rooms?

11     A.  No.

12     Q.  And in the discussions with the agents about how

13  much of video to request, does any agent say anything or

14  allude to anything about the fact that there are

15  recordings of the meetings from the attorney-client

16  rooms?

17     A.  No, not that I recall.

18     Q.  When did you first get assigned or become

19  involved in the *Black* case?

20     A.  So, as I recall, the CCA search warrant I believe

21  it was April 8th, it was a Friday.  It was either that

22  day or the day before.

23     Q.  Okay.  So pretty quickly--

24     A.  Or a day or two before.  It was closely

25  associated with the date of the search warrant.

1     Q.   So around early April of 2016?

2     A.   If the search warrant was April 8th, then it was

3   6, 7, 8.

4     Q.   At some point were you made aware of a proffer

5   interview that a cooperator gave, with Ms. Tomasic and

6   other agents present, where the cooperator says that

7   there are recordings of the meetings in the

8   attorney-client rooms?

9     A.   I don't recall learning of that specific proffer

10   where that statement was made until after this

11   litigation.

12     Q.   And your understanding of that was that Ms.

13   Tomasic and several of the agents that were involved in

14   the CCA or *Black* investigation had been present when the

15   inmate made that-- when the cooperator made that

16   statement?

17     A.   I wasn't-- my understanding is that happened

18   before I was involved, so I don't know who was present

19   or the circumstances of that.

20     Q.   After you learned about that meeting where the

21   cooperator told those people present that the-- there

22   were videos made of the meetings in the attorney-client

23   room, did you ever go back to Ms. Tomasic or the other

24   agents and say, why didn't you tell me this when we were

25   having these discussions about how much video to

1  request?

2     A.  No, I did not have that conversation.

3     Q.  Had you known about that, what the inmate's

4  proffer statement had been, at the time you're having

5  this discussion about how much video to request, would

6  that have changed your thinking about the scope of the

7  request in the subpoena for the video?

8     A.  I don't know specifically what was said or when

9  it was said, so I guess it would depend if I was

10  thinking of that at the time.  I don't know, I can't

11  answer that right now.

12    Q.  So you don't know whether it would've affected

13  your decision-making process about whether to request

14  all the video?

15    A.  Well, if-- if your question is if I believed that

16  there was the potential for getting privileged video,

17  would it affect what I had suggested that we ask for,

18  absolutely.

19    Q.  Would that have caused you to limit the request

20  or at least argue to limit the request so that it

21  excluded any potential video of those meeting rooms?

22    A.  Again, it depends what I knew along-- you know,

23  the more information the better.  So not only video,

24  whether there was audio, what the circumstances-- and

25  it-- I guess you're asking me to speculate today.  And I

1    don't know, it would depend on the circumstances, on

2    what I knew at the time.

3        Q.   Have you read the-- or listened to the recording

4    of the interview of that cooperator?

5        A.   I have-- I have not listened to the recording.  I

6    believe when this case was set for trial in trial

7    preparation I looked at-- at interview reports and

8    perhaps a transcript.

9        Q.   And so those interview reports and transcripts,

10   as well as the pleadings in this case, describe what the

11   cooperator told the people at the proffer session.

12   Right?

13       A.   I-- I would assume so.

14       Q.   You've read these materials?

15       A.   Well-- yes, I reviewed-- as I recall, I don't

16   know that we're referring to the same thing, I recall

17   looking at proffer reports at a time after this

18   litigation arose that we were set for a trial and it

19   appeared that we may be heading that way.

20       Q.   Right.  So-- and in those reports, transcripts

21   and the pleadings that at least Ms. Tomasic described

22   that proffer session, she describes what the cooperator

23   said during the session?

24       A.   It's been a while since I've reviewed those, but

25   I would assume so.

1     Q.   Okay.  So assuming that's all accurate, the

2    transcripts, the proffer report, and Ms. Tomasic's

3    description of what the cooperator said during that

4    proffer session, had you known that before the subpoena

5    was issued, would that have changed your thinking about

6    the volume of video to request from CCA?

7     A.   Certainly, yes.  If-- if-- if those things

8    described the fact that CCA had recordings of attorneys

9    meeting and I knew that and I was thinking of that and

10   aware of that at the time that we're talking about what

11   to request, that would have affected my input.

12    Q.   And would the reason for that have been that the

13   subpoena as currently drafted, there was a chance, a

14   possibility, that you would come into possession of

15   arguably privileged material?

16    A.   Well, you-- you say privileged and I guess that--

17   that assumes certain things.

18    Q.   How about potentially-- potentially privileged?

19    A.   To avoid dealing with the issue, then yes, if I

20   would've known at that time with hindsight absolutely.

21   I'd say we don't-- unless there was some other reason,

22   such as allegations that attorneys were introducing

23   contraband.  But absent that, then yes, knowing what--

24   you know, now, I would've tried to segregate.  But at

25   the time, that certainly wasn't on my radar.

1    Q.   Because if there is a possibility, a reasonable

2    possibility that you, the prosecution team, could come

3    into even potentially privileged materials, you want to

4    either segregate it out and make sure you never get it

5    or that if you do get it, it doesn't go to you, it goes

6    to a filter team first.

7    A.   Generally speaking, you're asking me my practice,

8    yes, I would agree with that.

9    Q.   And does that practice, your individual practice,

10   differ from any policy or procedure that was in place in

11   your office in 2016?

12   A.   Not to my knowledge.

13   Q.   Was there any-- was there any policy written down

14   in 2016 in your office that would describe that

15   situation, when there's a reasonable possibility you

16   might come into contact with potentially privileged

17   material?

18   A.   That specific situation?  We were instructed and

19   required and obligated, of course, to follow the law.

20   But as far as a specific written policy that addresses

21   that specific circumstance, I know of none.

22   Q.   So-- and I just want to make sure I have your

23   testimony clear, I don't want to put words in your

24   mouth, that as far as you knew at the time, there was no

25   policy that applied in your office that told you how to

 1   deal with the reasonable possibility that you're going
 2   to come into potentially privileged information?
 3       A.   When you say "policy," do you mean any written
 4   policies and procedures?
 5       Q.   Yes, sir.
 6       A.   We have the U.S. Attorney's manual how to handle
 7   certain things.  But as far as a specific policy that
 8   addresses this specific instance, I know of none.  I
 9   know that we are generally required to follow the law.
10   But as far as a written policy, I-- I know of none.
11       Q.   Did you ever become-- did you later become aware
12   of the Department of Justice's guidance on the use of
13   filter teams?
14       A.   Yes, and I was generally aware of the use of
15   filter teams prior.
16       Q.   Did you understand that the Department of
17   Justice's written guidelines on the use of a filter team
18   required a prosecution team, when there was a chance
19   that they could come into potentially privileged
20   information, to submit it to a filter team first?
21       A.   Yes.
22       Q.   And you knew that in 2016?
23       A.   That if I believed that I was going to come into
24   contact with potentially privileged information to
25   submit it to a filter team?  Yes.

1    Q.   Okay.  So would you agree that that-- and I want

2    to make sure we're clear about this.  You're aware that

3    there's a written policy from the Department of Justice

4    that handles that?

5    A.   I believe there's a written policy, yes.

6    Q.   So would that have been something you were aware

7    of in 2016?

8    A.   Specifically that there was a written policy?  I

9    don't--

10   Q.   Did you subsequently-- after 2016, did you become

11   aware that there was a written policy?

12   A.   I don't recall when I specifically became aware

13   of that.

14   Q.   With Ms. VanBebber you stated there are a couple

15   of times when you came into contact with recorded

16   telephone calls that either were to an attorney or were

17   to a law firm--

18   A.   Correct.

19   Q.   -- did I understand that correctly?

20   A.   Correct.

21   Q.   And these were calls that the defendant made

22   while they were in custody?

23   A.   Correct.

24   Q.   And that had been recorded by the facility that

25   was housing the defendant?

16-20032-JAR  USA v. Karl Carter (Black)  10.10.18            1936

1       A.   Correct.

2       Q.   And that you-- you requested for your review as

3  part of the prosecution?

4       A.   I mentioned two incidents.  One was a state

5  prosecution, one was a federal prosecution.  I don't

6  recall the specifics of how I came into possession of

7  those recordings.

8       Q.   Are there times when you have requested recorded

9  phone calls from defendants you're prosecuting?

10      A.   Yes.  Either myself or agents that are working

11  the case, yes.

12      Q.   Some member of the prosecution team?

13      A.   Correct.

14      Q.   And at least once when you were in the state you

15  came across a call between a defendant and an attorney

16  and another time a call to a law firm.  So when you

17  request these calls, you're aware there's a possibility

18  that within this massive calls that you get there might

19  be a call between a defendant and an attorney?

20      A.   The first call was a three-way call, so the

21  inmate first called someone else and then that person

22  got the attorney on the line.

23      Q.   Uh-huh.

24      A.   The second call was a call to a law firm that was

25  not associated with the-- the defendant's attorney.  So,

Kelli Stewart, CSR, RPR, CRR, RMR

 1  yeah, I am aware that if an inmate makes a call that

 2  it's-- I guess it's possible that they could be calling

 3  an attorney through some manner.

 4      Q.   And there are also-- you know, you've had your

 5  experiences.  You know around the office there are other

 6  times when attorneys have requested calls and somewhere

 7  in the pile of calls there's a call from the defendant

 8  to their attorney?

 9      A.   I know that attorneys have-- the prosecutors have

10  requested jail calls.  I don't specifically, until this

11  investigation, recall discussing whether or not they've

12  received attorney calls.

13      Q.   You've never heard of that happening before this

14  case that an attorney requested jail calls-- or I'm

15  sorry, a prosecutor requested jail calls for the

16  defendant they're prosecuting and stumbled across a call

17  between the attorney and the defendant?

18      A.   Well, no, I know it's happened because it's

19  happened to me.

20      Q.   Right.  And, again, it's-- your experiences

21  aren't isolated.  Right?  There are-- that's happened to

22  other prosecutors in your office?

23      A.   I think that's a fair assumption, yes.

24      Q.   And so when you request the jail phone calls,

25  you're aware there's a possibility that there might be a

1    call between a lawyer and the defendant somewhere within

2    the pile of calls that you receive?

3        A.   Since I've had it happen, yes.  I also know

4    that-- well, yes.

5        Q.   Okay.  For instance, you requested phone calls

6    from a defendant you were prosecuting named Herman

7    Gilkey?

8        A.   I know that name.  I don't remember specifically

9    if we got jail calls in that case.

10       Q.   Would it surprise you if you did?

11       A.   Not-- I-- I don't remember if Mr. Gilkey was a

12   Wichita case or a KC, but it would not surprise me, no.

13       Q.   And what about a defendant named Mendy Forbes?

14       A.   That's the case that I was referring to earlier,

15   so yes.

16       Q.   So in both those cases, you did request jail

17   phone calls for the defendant?

18       A.   I don't specifically remember doing that in the

19   Gilkey case.  In the Mendy Forbes case, yes, either I or

20   the agent requested jail calls.

21       Q.   When you request these calls to listen to, do

22   you, yourself, listen to all of them or do you have

23   the-- an agent help out or listen to them for you?

24       A.   Generally speaking, the agent listens.  There are

25   occasions where I've listened myself.

1     Q.   And when you have the agent listen to those phone
2   calls, does the agent write a report of the content of
3   each and every phone call?
4     A.   I would suspect that that depends on the
5   particular agent.
6     Q.   Are there times when an agent might just give you
7   an oral summary of some calls that the agent has
8   listened to?
9     A.   I don't know if that's ever happened.  I suppose
10  it's possible.  If it was something that was relevant,
11  then I would-- would prefer a written report.  But
12  again, I-- I don't know.  It depends.
13    Q.   And are there times where an agent will actually
14  write a written report about the content of the calls
15  they've reviewed?
16    A.   I would-- again, it depends on the agent, but I
17  would assume so.
18    Q.   Now, you discussed this a little bit with Ms.
19  VanBebber, but you would agree with me that unless some
20  exception applies, any call between an attorney and the
21  defendant would be privileged?
22    A.   Certainly, unless some exception applies or the
23  privilege was waived in some manner.
24    Q.   And your office is taking the position, and I
25  think you've written in pleadings that you signed, that

1   in these circumstances at CCA-- at CCA, the privilege

2   has been waived?

3       A.   Yes.

4       Q.   And I think your-- your name is on a couple of

5   pleadings where you state that the courts have

6   overwhelmingly held that the privilege has been waived?

7       A.   Correct.

8       Q.   Can you cite one Tenth Circuit case for the

9   proposition that a call from CCA to an attorney, the

10  privilege has been waived in that call?

11      A.   As I sit here right now, off the top of my head,

12  no.

13      Q.   Would it be safe to say that if there was a Tenth

14  Circuit case that said that, it would've been in the

15  pleadings that you signed?

16      A.   I-- I would assume so, but...

17      Q.   Is there a single District of Kansas case that

18  holds that a call from a defendant at CCA to their

19  attorney, that the privilege has been waived?

20      A.   Again, you're asking me off the top of my head

21  legal research.  I can't cite to one right now.

22      Q.   Again, would it be fair to say that if there was

23  one, it would've been in the pleadings that you signed?

24      A.   One would assume if the case were identified,

25  yes.

1   Q.  Let's assume for a moment that that's true, that

2   the courts have overwhelmingly held that the privilege

3   has been waived and that your office's position is

4   correct, that privilege has been waived and there is

5   nothing-- there's no privilege that attaches to those

6   calls.

7       Is there anything stopping you from listening to

8   each and every one of those phone calls?

9   A.  I-- I suspect not.

10  Q.  Now, this conclusion that the privilege has been

11  waived, it's based on certain facts.  Right?  To find a

12  waiver, there have to be certain facts that amount to

13  the legal conclusion that the privilege has been waived.

14  Right?

15  A.  I-- I think that's an accurate statement of the

16  law, yes.

17  Q.  And I think you had signed some pleadings that

18  you claim that the privilege has been waived because the

19  inmate signed a document telling them that their calls

20  are subject to recording and monitoring?

21  A.  Correct.

22  Q.  And that the privilege has been waived because

23  the inmates are warned on the phone, on the actual

24  preamble to the recordings, that the calls are subject

25  to recording and monitoring?

1      A.  That's correct.

2      Q.  But as to the first reason, you don't know that

3  each and every inmate at CCA signs this form with that

4  warning, do you?

5      A.  I know as part of the litigation in this, I

6  believe that we introduced copies of-- of forms that

7  were signed.  And so, yes, I believe that inmates are

8  required by CCA's policies and procedures to sign a form

9  acknowledging that they understand.

10     Q.  Well, I didn't-- so my question was a little

11 different.

12     A.  Okay.

13     Q.  You don't know that each and every inmate that

14 uses the phone at CCA has signed this form.  You know

15 they're supposed to, that there are policies and

16 procedures why they're supposed to, but you don't know

17 that it actually occurs?

18     A.  Well, I'm not at CCA.  So I would assume that CCA

19 abides by their own policies and procedures.  But if

20 your question is do I personally have firsthand

21 knowledge that each inmate signs that form?  No, I'm not

22 there when that form is signed.

23     Q.  So if that turned out to be wrong, let's say that

24 only some inmates signed the form or the form wasn't

25 given to anyone for six months, there would be no way

1  for you to know that unless you went to CCA and asked.

2  Right?

3      A.  Correct.

4      Q.  But that would-- didn't stop your legal

5  conclusion by saying that the privilege had been waived,

6  even though you didn't know whether the particular

7  inmates or all the inmates had signed that form?

8      A.  Well, I think it's similar to a situation when,

9  based upon information that you receive from your

10 client, you file a motion to suppress saying that an

11 officer did something in accordance with what you're

12 getting from-- from your client.

13      Yes, as a prosecutor or a defense attorney or a

14 lawyer, we rely upon information given to us by other

15 people.

16      Q.  But in the situation and the analogy you're

17 describing, I might file a motion with facts given to me

18 by a client.  You would file a response from facts given

19 to you by your officer.  And then a judge would

20 determine which facts and law would apply after an

21 adversarial hearing.  Right?

22      A.  Correct.

23      Q.  Under the scenario you describe in your papers,

24 there would never be a hearing about whether the calls

25 were privileged, because you would've made a decision

1    that the privilege had been waived and there would be

2    nothing, in your words, nothing stopping you from

3    listening to them?

4        A.  If someone listened to calls.  I have not.

5        Q.  And I'm not saying that you have, sir.  All I'm

6    saying is the analogy you describe is where a court

7    makes a decision with a motion to suppress.  But what

8    we're talking about is if you have concluded that the

9    privilege has been waived, that's not a decision that a

10   court is going to make, it's a decision you have made

11   and that would allow you to review-- listen to the

12   calls.  Fair?

13       A.  I think because the argument was made in a

14   pleading, presumably, the Court will make a decision on

15   that argument.

16       Q.  So if you think that the privilege-- the law is

17   clear, overwhelming clear, that the privilege has been

18   waived under those circumstances, why would there be any

19   need to submit it to the Court to determine it at all?

20       A.  If your question is to me, why don't I go out and

21   intentionally listen to calls of attorneys, I just don't

22   think it's worth it.  That's my personal practice.

23   There is an argument that they're-- that they're not

24   privileged and certainly the law supports that

25   conclusion, but my personal practice is-- is different I

1    guess.

2        Q.   You've never, I assume, placed a call from CCA?

3        A.   From one of their-- their inmate phones?  No.

4        Q.   I assume you've never received a call from CCA?

5        A.   No.

6        Q.   So while you might've been told what the preamble

7    says to certain attorneys, you don't know what the

8    inmate hears or what the attorney hears when they get

9    the call.  Right?

10       A.   I-- I don't have firsthand knowledge of that, no.

11       Q.   You're also aware that CCA has a privatization

12   procedure by which defense attorneys can ask CCA to not

13   record calls to their telephone numbers?

14       A.   Correct.

15       Q.   And this was one of the reasons that in your

16   pleadings you claim that the privilege had been waived?

17       A.   Correct.

18       Q.   At the time you didn't know how that

19   privatization procedure worked?

20       A.   Correct.

21       Q.   So you didn't know whether CCA even told

22   attorneys about the privatization procedure?

23       A.   Correct.  I didn't have firsthand knowledge of--

24       Q.   You didn't know what steps an attorney who

25   happened to discover this procedure would have to follow

1    to get their number privatized?

2        A.   That's correct.

3        Q.   It was only later that you determined or

4    discovered that, in fact, the attorney couldn't initiate

5    the process at all, that the request had to start with

6    the inmate?

7        A.   I believe that's correct, yes.

8        Q.   And, in fact, that the inmate couldn't complete

9    the process to have their attorney's number privatized,

10   that the inmate could only start the process and then it

11   had to be finished by the attorney?

12       A.   I believe that's correct.  That CCA required the

13   attorney to verify somehow that they were an attorney

14   and that that number was associated with them.

15       Q.   And you didn't know-- even if someone had jumped

16   through all those hoops, you didn't know if CCA ever

17   actually fulfilled the privatization requests?

18       A.   Correct.  I have no firsthand knowledge as to

19   what they do with those--

20       Q.   You didn't know if attorneys had, in fact,

21   requested CCA to privatize their numbers that their

22   calls were still recorded even after that request?

23       A.   That's a correct statement.

24       Q.   You didn't know how long it took CCA to fulfill

25   the requests?

 1    A.  That's a correct statement.

 2    Q.  And didn't even know if they were ever fulfilled

 3 at all?

 4    A.  That's a correct statement.

 5    Q.  You did learn that the preamble states that this

 6 call is subject to recording and monitoring.  Right?

 7    A.  Correct.

 8    Q.  And that's the same thing the inmates are told

 9 when they sign the form, that the calls are subject to

10 recording and monitoring?

11    A.  I believe so, yes.

12    Q.  You'd agree with me that that's different from

13 saying the calls will be recorded?

14    A.  Grammatically, yes, that is different.

15    Q.  And, in fact, grammatically, the phrase "will be

16 recorded" has a more-- a higher level of certainty that

17 the fact will occur, that the recording will occur?

18    A.  That's grammatically correct, yes.

19    Q.  And whereas, if a call was subject to recording,

20 that means-- just like a menu is subject to change,

21 maybe-- maybe it will happen, maybe it won't.  Right?

22    A.  Grammatically, I agree with you.  Correct.

23    Q.  So if an attorney has followed the privatization

24 procedures and has been told by CCA that their calls are

25 not going to be recorded and then they hear this

1    preamble that says your call is subject to recording and

2    monitoring, a reasonable attorney might conclude:  Not

3    talking about my calls because I followed the procedure?

4        A.   That's a conclusion to be drawn, yes.

5        Q.   When you make these requests for jailhouse phone

6    calls, do you ever ask that the defense attorneys'

7    telephone numbers be excluded from the batch of phone

8    calls that you'll get?

9        A.   I'm doing mostly white-collar cases.  I don't

10   have a lot of defendants who are locked up, so I don't

11   have a lot of experience.  So whether I have

12   specifically done that, I don't recall.  As-- where--

13   have an agent specifically exclude it, I don't recall.

14       Q.   So it's something you could do, right, the

15   defense attorney's phone number is on ECF?

16       A.   Yes.

17       Q.   It's available to you?

18       A.   Yes.

19       Q.   You could whenever-- however you transmit the

20   request, either by an e-mail to the agent or an e-mail

21   to CCA, there's nothing stopping you from saying, "But

22   don't give me calls to this number"?

23       A.   Yes.

24       Q.   Your office doesn't have a policy that requires

25   you to make the requests for jail calls in a certain

1   fashion?

2       A.   When?

3       Q.   Let's say before--

4       A.   Are we talking about now or--

5       Q.   Let's talk pre-August 2016.

6       A.   I believe that to be a correct statement, yes.

7       Q.   So it could've been either a verbal request, an

8   e-mail, or just a form or a subpoena?

9       A.   I don't-- yes, I don't know exactly how the

10  marshals service wanted-- how they would accept

11  requests.

12      Q.   And so is it possible then-- let's say again that

13  the request is made either orally through a telephone

14  call or something like that.  If you had requested calls

15  in a certain case, there might not be evidence of that

16  request in the file?

17      A.   Correct.  If there-- if that request was made

18  orally, that would be a correct statement.

19      Q.   You're aware that Ms. Tomasic and Mr. Zabel

20  prosecuted a defendant named Mr. Herrera-Zamora?

21      A.   I've heard that, yes.

22      Q.   And you were present during a conversation

23  between Ms. Tomasic and Mr. Zabel around the fall of

24  2016?

25                THE WITNESS:  Your Honor, may I speak with

1    Mr. Clymer again?

2              THE COURT:  Yes.

3              (Confer).

4              THE WITNESS:  I'm sorry, could you repeat

5    the question?

6              MR. BELL:  Could you repeat the question,

7    please?

8              (The question was read back).

9              THE WITNESS:  Related to that case?

10   BY MR. BELL:

11       Q.  Yes.

12       A.  I don't have a specific recollection of that.

13       Q.  Let me show you what's been marked as

14   Exhibit 579A.  Take a few moments to review that and see

15   if that is-- if you find it to be accurate.

16       A.  Yeah, I've read it.

17       Q.  Does it appear accurate?

18       A.  This memo?

19       Q.  Yes.

20       A.  As far as I can tell, yes.

21       Q.  And is this memo a summary written by Mr. Rask of

22   conversations he had with you regarding Ms. Tomasic, Mr.

23   Zabel, and the *Herrera-Zamora* case?

24       A.  It appears so, yes.

25              MR. BELL:  Your Honor, I'd move to admit

 1   Exhibit 579A.

 2              MR. CLYMER:  No objection, Your Honor.

 3              THE COURT:  579A admitted.

 4   BY MR. BELL:

 5     Q.  So I want to turn your attention to the first

 6   couple of paragraphs on the first page.  Here Mr. Rask

 7   relates statements you say are accurate where you were

 8   present during a conversation with Erin or Ms. Tomasic

 9   and Mr. Zabel.  And you believed it might've been during

10   the fall of 2016; is that right?

11     A.  I don't recall that Mr. Zabel was present when I

12   had this conversation with Ms. Tomasic.

13     Q.  Okay.  So is that something that's inaccurate

14   about what Mr. Rask has written?

15     A.  The conversation that I recall was between Erin

16   and I, and Mr. Zabel was not-- was not present during--

17   during the conversation that I recall.

18     Q.  So as recounted by Mr. Rask in Exhibit 579A, he

19   says that you told him something different, that Ms.

20   Tomasic and Mr. Zabel were present for this

21   conversation.  So are you telling me that what's written

22   here is inconsistent with your recollection of the

23   meeting?

24     A.  Well, I don't know if he's referring to a

25   different conversation, but the-- the conversation that

 1   I had with Erin that's specifically set forth, I recall

 2   it was just Erin and I.

 3      Q.   So what did she tell you then during the

 4   conversation that you recall was just between you and

 5   Ms. Tomasic?

 6      A.   Essentially what is set forth here, that at some

 7   point after the-- the *Black* litigation started, that

 8   Erin had told me that she was involved in another case

 9   in which she had obtained recorded jail calls; that she

10   had received a PRAO opinion that they were not

11   privileged, but that it was suggested that she utilize a

12   taint team; that she had a disk that she put into her

13   computer; that the conversations were in Spanish; that

14   she immediately recognized that she couldn't understand

15   the dialect and, therefore, did not listen to any

16   content and pulled the disk out.

17      Q.   And your recollection is that during this

18   conversation that Mr. Zabel was not present?

19      A.   During that conversation when she told me that,

20   Mr. Zabel was not present.

21      Q.   Was there another conversation about this topic

22   where Ms. Tomasic and Mr. Zabel were present?

23      A.   Not where that amount of detail was discussed,

24   no.

25      Q.   All right.  So what amount of detail was

1   discussed at the other conversations where Ms. Tomasic

2   and Mr. Zabel were present?

3       A.   So this conversation that's referred to here

4   where Erin told me what I just explained to you, Mr.

5   Zabel was not present.  I don't recall any other

6   conversation that was that specific in which Mr. Zabel

7   was-- was present.

8       Q.   Okay.  So--

9       A.   There may have been a conversation where there

10  was the three of us where an off-handed comment was made

11  by Erin, but nothing-- nothing like-- like this.  Scott

12  must've misunderstood or I was not clear, if that's what

13  he--

14      Q.   So you know there's one conversation with this

15  detail where Mr. Zabel is not present?

16      A.   Correct.

17      Q.   You know there are other conversations that did

18  not include this amount of detail that Mr. Zabel was

19  present?

20      A.   I-- Erin had-- had told me this, I know that Mr.

21  Zabel was not present.  Whether or not there was other

22  conversation in which this generally came up, I do not

23  specifically recall.

24      Q.   So there may have been other conversations where

25  this, and we'll define "this" here in a moment, would've

1    come up between you, Mr. Zabel and Ms. Tomasic?

2       A.   Not in any level of detail.

3       Q.   I didn't ask about level of detail, I'm just

4    asking-- this topic came up in conversations between the

5    three of you?

6       A.   I don't recall.  I don't recall.

7       Q.   And when we say "this," "a conversation about

8    this," is that a conversation about the receipt of

9    recorded phone calls between a defendant and the

10   defendant's attorney?

11      A.   Correct.

12      Q.   And when we talk about "this," do we mean that

13   the general topic of conversation was the acquisition of

14   those calls and did it also extend to the potential

15   review or not review of those calls?

16      A.   The conversation that I had with-- with Erin was

17   just what I told you.

18      Q.   And I'm not-- I'm not worried about the

19   conversation with Erin now.

20      A.   Okay.

21      Q.   Put that aside.  I'm talking about your

22   conversations with Mr. Zabel and Ms. Tomasic where

23   there's the three of you there.  You said this subject

24   could've come up through off-hand comments or whatever

25   during other conversations, and I want to figure out

1  exactly when you say "this subject" what you mean.

2  Because the way I read it, "this subject" is the

3  acquisition of a recorded call between an attorney and a

4  defendant.

5     A.   Okay.  So at some point down the road, Erin tells

6  me that she told Dave about this and-- and--

7     Q.   Hang on.  And I don't mean to interrupt you.

8  When you say "told Dave about this," are you talking

9  about what she later--

10    A.   What she had explained to me.

11    Q.   Okay.  So what's in the content of this memo?

12    A.   The way I understood it, correct.  Correct.

13    Q.   Got it.

14    A.   The conversation that I had.  I could not recall

15 her ever having a conversation, certainly not where this

16 came out, because it was just Dave and I.

17         So in racking my brain, trying to remember

18 anything like that, the only thing that I can remember

19 where it even possibly came up was an off-handed comment

20 that Erin made in Dave's office that I-- that was not to

21 any level of detail.  And I don't remember specifically

22 what was said.

23    Q.   Could you paraphrase what the off-hand comment

24 was?

25    A.   No, it was just a-- no, I don't-- I don't

1    remember.

2         Q.   So back to this memo.   These things that Ms.

3    Tomasic tells you that are described in this memo, she

4    later comes to you and says, "I have told Dave Zabel the

5    same thing that I have told you," that's described in

6    this exhibit?

7         A.   No, at some point-- and, again, I wasn't involved

8    in the *Zamora* case.

9         Q.   I understand.

10        A.   But at some point it must've been an issue

11   whether or not Dave knew, and Dave told me that he-- he

12   didn't know.

13        Q.   And Ms. Tomasic told you something different?

14        A.   And she said something like, well, I think I told

15   him in front of you.   And I can't remember that

16   conversation, and I tried to rack my brain, and

17   certainly nothing where she specifically said that.   As

18   close as I could come up with was perhaps an off-handed

19   comment when she said something to the equivalent of,

20   you know, the *Zamora* mess.   That's the only thing.

21             So to the extent that this says that that

22   conversation between Erin and I occurred with Dave is

23   not accurate.

24        Q.   When Ms. Tomasic gives you this information that

25   she has a call between an attorney and a defendant and

1  that she put it in her computer and played at least some

2  portion of it, long enough to determine that she

3  couldn't understand what was being said, did you give

4  her any instructions about what obligations she had?

5      A.   Well, again, she told me that PRAO had given her

6  advice, that she had followed the advice.  And the only

7  thing I said, well, talk to Scott, I'm-- so that

8  would've been the only advice that I would've given her.

9      Q.   And I think you said that she told you the advice

10 she got from PRAO, the professional responsibility

11 office, was that the calls were not privileged--

12     A.   That's the way it was relayed to me.

13     Q.   -- is that right?  Would, in your experience,

14 PRAO give an opinion on a substantive legal question

15 like that?

16     A.   I would assume so, but I don't know, I've not had

17 many dealings with--

18     Q.   It didn't strike you as odd that they would give

19 a legal opinion, even though they're a professional

20 responsibility office?

21     A.   No, it did not.

22     Q.   Did Ms. Tomasic also describe to you that there

23 was a filter team in place in the *Herrera-Zamora* case,

24 and that the disk that she had inserted into her

25 computer was supposed to go to the filter team first?

1      A.   Our conversation was not that detailed, no.

2      Q.   She didn't tell you about a filter team?

3      A.   Not to my recollection.

4      Q.   Did you and Ms. Tomasic have a meeting with Tanya

5  Treadway around September of 2016?

6      A.   We had a meeting with Tanya Treadway.  I would

7  assume that that time frame is accurate.

8      Q.   Was-- during that meeting, did Ms. Treadway

9  express an opinion as to whether you should have

10  excluded attorney phone numbers from the request for

11  phone calls from CCA?

12     A.   I don't recall Tanya giving that opinion.  I-- I

13  don't have a recollection as I sit here today of that.

14     Q.   Was the acquisition of telephone calls from CCA a

15  topic during that meeting?

16     A.   As I recall, we were discussing the law library

17  computer.  I don't know whether or not telephone calls

18  came up.

19     Q.   And why were you meeting with Ms. Treadway about

20  the law library computers in the *Black* case?

21     A.   Because Erin had concerns as to whether or not

22  there could potentially be attorney-client privilege on

23  those law library computers and Tanya was acting as the

24  taint attorney.

25     Q.   And was that a role-- you said taint attorney.

1    Is that a role Ms. Treadway typically played in the

2    district when issues like that arose?

3        A.   I-- she obviously was one, I don't-- she wasn't

4    the only.

5        Q.   Ms. VanBebber asked you some questions about an

6    e-mail between yourself and Jeff Stokes, and I think you

7    asked if you could see the entirety of the e-mail.  Do

8    you remember that?

9        A.   Yes.

10       Q.   All right.  Let me show you what's been marked as

11   Exhibit 611.  Do you recognize Exhibit 611 to be e-mail

12   communications between you and Agent Stokes?

13       A.   Yes.

14            MR. BELL:  Your Honor, I'd move to admit

15   Exhibit 611.

16            THE COURT:  611 admitted, hearing no

17   objection.

18            MS. VANBEBBER:  No, Your Honor.

19            MR. CLYMER:  No objection, Your Honor.

20            THE COURT:  Admitted.

21   BY MR. BELL:

22       Q.   So let's start off at the originating request.

23   This is an e-mail that you sent to Agent Stokes and

24   you're asking Agent Stokes and the other agents on the

25   case saying--

 1              MR. CLYMER:  May I have a minute to speak to

 2    counsel, Your Honor, before he proceeds?

 3              THE COURT:  Yes.

 4              (Counsel confer).

 5              MR. CLYMER:  Just let me look at it before

 6    you proceed.

 7              MR. BELL:  Knock yourself out.

 8              MR. CLYMER:  Go ahead.  Thank you.

 9    BY MR. BELL:

10        Q.   This is an e-mail that you sent to Agent Stokes

11    and the other agents on the *Black* case stating that you

12    understood that no one had viewed any of the video from

13    CCA's attorney-client rooms?

14        A.   Correct.

15        Q.   And said, "If I'm wrong, let me know."  Right?

16        A.   Oh, that's correct.

17        Q.   And in response, Agent Stokes tells you on

18    August 20th, "I reviewed the video.  There are 16 views

19    and the attorney-client rooms were included in that."

20    Is that right?

21        A.   That's what it says, yes.

22        Q.   Okay.  And so this is information that you're

23    getting ready to file in a pleading and you just want to

24    verify that it's true--

25        A.   Correct.

1    Q.   -- is that right?  So let me show you what's been

2    previously admitted as Exhibit 489.  This is a pleading

3    filed on September 6th.  And if we look at the 38th page

4    of the pleading, it has your signature on it?

5    A.   That's correct, I mean, that's my signature

6    block.

7    Q.   Document 133?

8    A.   Yes.  Can I see the page before that too, sir?

9    Okay.

10   Q.   So this is a pleading that gets prepared and

11   filed after your e-mail exchange with Agent Stokes?

12   A.   Correct.

13   Q.   And in this pleading on Page 12, Footnote 9, this

14   is where you put the information that Agent Stokes had

15   given you.  He briefly viewed a portion of the

16   recordings that contained approximately 16 views and one

17   of those depicted an empty interview room.

18   A.   That's in there.  I don't recall if I drafted

19   that or someone else did, but yes, that's in there.

20   Q.   Well, that's consistent with the information

21   Agent Stokes gave you--

22   A.   Correct.

23   Q.   -- in response to your request.

24   A.   Correct.

25   Q.   So let's look at what Agent Stokes told you

1    compared to what ended up in the pleadings.  Agent

2    Stokes tells you that there are 16 camera views on the

3    screen and the attorney-client rooms, plural, were

4    included in that.  Right?

5        A.  Correct.

6        Q.  What gets written to the Court and to the parties

7    is that Stokes viewed a portion of the recordings that

8    contained 16 views, one of those 16 camera views

9    depicted an empty interview room.  Did I read that

10   correctly?

11       A.  Yes.

12       Q.  And so when Stokes writes, I saw the

13   attorney-client rooms, that's not what gets written into

14   the pleading.  It gets re-titled an interview room.

15   Right?

16       A.  Yes.

17       Q.  And when he says plural, attorney-client rooms,

18   what makes it into the pleading is there's a single

19   interview room that he sees?

20       A.  Correct.

21       Q.  All right.  So you said you don't remember if you

22   wrote this portion of the document.  Who else could've

23   written it?

24       A.  Erin.

25       Q.  You know that Ms. Tomasic was fired in May of

1    2017?

2        A.  I assume that date is correct, I don't know for

3    sure.

4        Q.  Do you know why she was fired?

5        A.  Not precisely, no.

6        Q.  Is it your understanding that she was fired

7    because she did later admit, contrary to what she had

8    told you, that she had, in fact, listened to the call

9    between Mr. Moran and Mr. Herrera-Zamora?

10       A.  I don't know.

11       Q.  Would that-- would you have viewed that admission

12   as grounds to be fired?  If she had, in fact, made that

13   admission, would you expect her to be terminated?

14              MR. CLYMER:  Objection, calls for

15   speculation.  It's not this witness' role to hire or

16   fire people.

17              MR. BELL:  It's a proper basis for lay

18   opinion.

19              THE COURT:  All right.  Proceed.

20              THE WITNESS:  I don't know what criteria

21   would be used because I'm not involved in-- in

22   management.

23   BY MR. BELL:

24       Q.  You would expect there-- wait a minute.  You'd

25   expect there to be consequences if someone admitted that

1  they had listened to a call between an attorney and a

2  defendant?

3      A.   That wouldn't surprise me, no.

4      Q.   Those consequences could include losing your law

5  license?

6      A.   Well, I suspect it depends on the circumstances

7  and other things.  There may be consequences, though,

8  yes.

9      Q.   That consequence could include an OPR

10  investigation?

11      A.   Again, depending on the circumstances.

12      Q.   An OIG investigation?

13      A.   Depending on the circumstances.

14      Q.   Some sort of sanction short of termination?

15      A.   Depending on the circumstances.  I-- I'm not sure

16  what all is-- is available, but I-- those are some

17  things, yes.

18      Q.   The reversal of convictions in the case that the

19  prosecutor listened to the call in?

20      A.   Again, depending on circumstances.

21      Q.   Well, you know what happened with Herrera-Zamora.

22  Right?

23      A.   No, I wasn't involved in that case.

24      Q.   So would you agree with me that there are several

25  potential consequences that would be triggered by a

1    prosecutor's admission that they listened to a call

2    between a defendant and the defense counsel?

3        A.  Depending on the circumstances, there could be,

4    yes.

5        Q.  Thank you.

6            MR. BELL:  I have no further questions.

7    Thank you, Mr. Oakley.

8            THE COURT:  Unless you're going to be very

9    brief, we'll take a break for 15 minutes.  Mr. Clymer,

10   we'll take a break?

11           MR. CLYMER:  That's fine.

12           THE COURT:  All right.  15 minutes.

13           (Recess).

14           THE COURT:  All right.  You can be seated.

15                       CROSS EXAMINATION

16   BY MR. CLYMER:

17       Q.  Mr. Oakley, you were asked some questions earlier

18   about-- asking you to speculate about what consequences

19   would result from an attorney in your office listening

20   to attorney-inmate calls.  Do you remember that-- those

21   questions?

22       A.  Correct.

23       Q.  Do you know that Erin Tomasic's conduct in the

24   *Herrera-Zamora* case was a reason or the sole reason for

25   her termination as a Special Assistant U.S. Attorney?

1    A.   I don't know why she was terminated.

2    Q.   You do know, however, that Erin Tomasic as part

3  of her conduct when she was serving as a Special

4  Assistant U.S. Attorney was to be less than fully candid

5  with Judge Robinson; is that right?

6    A.   Could you repeat that?

7    Q.   Were you aware that-- that Erin Tomasic was less

8  than fully candid with this Court?

9    A.   In the letter, yes.

10   Q.   Okay.  Are you aware that your office submitted a

11 letter-- or a record correction to Judge Robinson in the

12 *Black* litigation as a result of learning that Erin

13 Tomasic had not been fully forthcoming with Judge

14 Robinson?

15   A.   Yes.

16   Q.   Okay.  So do you know whether the fact that Ms.

17 Tomasic was not fully honest with the Court played a

18 role in her termination as a SAUSA?

19   A.   I could only speculate.  I don't know the precise

20 reason.

21   Q.   Do you think that that would further somebody's

22 career?

23   A.   I would suspect not.

24   Q.   Since we're on the subject of Erin Tomasic's

25 credibility, I want to ask you some questions about the

1    memo that's been marked as 579A, the memo that Scott

2    Rask appears to have prepared based on conversations

3    that you had.

4        A.   Yes.

5        Q.   Do you remember the memo?

6        A.   Yes, sir.

7        Q.   Okay.  Now, would it be accurate to say that this

8    memo is in two parts?

9        A.   Yes.

10       Q.   Okay.  I'm going to put it up on the screen, the

11   first page of it.  And would it be-- do you recall that

12   Scott Rask talked to you once after Erin Tomasic first

13   disclosed to him that she had not been candid with Judge

14   Robinson?

15       A.   Yes.

16       Q.   And do you recall that there was a second

17   interview of you when the office learned additional

18   information based on Erin Tomasic giving Chief Judge

19   Robinson a letter purporting to describe what happened

20   in *Herrera-Zamora*?

21       A.   Yes, I think I asked to speak to Scott after.

22       Q.   Does it appear to you from the front page of 579A

23   that the first three paragraphs on the first page of the

24   memo purport to summarize what you told Scott Rask the

25   first time you spoke to him, and the remainder of the

 1   memo purports to summarize what you said to him the

 2   second time?

 3        A.   That's correct.

 4        Q.   And as you sit here right now having read the

 5   memo, I take it, just on the witness stand-- actually

 6   strike that.

 7             Did you ever see this memo before today?

 8        A.   Not that I recall, no.

 9        Q.   Okay.  So-- and I take it you read it once

10   through when it was given to you?

11        A.   That's correct.

12        Q.   Having read it once through, can you, as you sit

13   here right now, identify anything else in the memo that

14   recounts something inconsistent with the facts as you

15   recall them, other than the fact that Dave Zabel was not

16   present during the critical conversation with Erin

17   Tomasic?

18        A.   Based upon my one review, everything else seems

19   accurate.

20        Q.   Now, do you know, as you sit here right now,

21   whether that inaccuracy came about because you said

22   something to Mr. Rask in error, whether you

23   miscommunicated, or whether Mr. Rask just misunderstood

24   you?

25        A.   I suspect that I was less than clear, but I don't

1    know for sure.

2        Q.   So the-- the critical conversation that's

3    described in the later parts of the memo, that Erin

4    Tomasic passed along information to you, that was simply

5    you and Erin Tomasic.  Correct?

6        A.   Correct.

7        Q.   Where did that conversation take place, if you

8    recall?

9        A.   I think it was either in my office or outside of

10   my office in the hall.  I don't recall specifically.

11       Q.   Would it be safe to say that the things that Erin

12   Tomasic related to Chief Judge Robinson in her letter

13   to-- to the Court are inconsistent with the things that

14   you know to have happened?

15       A.   That I know that was said to me, yes.

16       Q.   By Erin?

17       A.   Yes.

18       Q.   In what way were they inconsistent?

19       A.   Well, I think as it states in here, the letter

20   said that-- that shortly after the-- whatever happened,

21   that she had a conversation.  And that-- that's not my

22   recollection.

23            And then the description that she had told me, as

24   I described earlier, that she put a CD in, quickly

25   determined that she wasn't able to understand it and

 1    withdrew it.

 2        Q.   And that was the extent of the information that

 3    she revealed to you?

 4        A.   Yes.

 5        Q.   And then she revealed something different to

 6    Chief Judge Robinson.   Correct?

 7        A.   Yes.

 8        Q.   Are you aware that since that time Erin Tomasic's

 9    story has changed again?

10        A.   No, I'm not aware.

11        Q.   Did Erin Tomasic ever tell you in any

12    conversation you had with her that she retained an

13    interpreter to try to interpret attorney-inmate calls in

14    the *Herrera-Zamora* case?

15        A.   No.

16        Q.   Is that the first time you've heard that?

17        A.   That she-- Erin retained an interpreter?

18        Q.   Yes.

19        A.   Yes, that's the first time I've heard that.

20        Q.   She didn't disclose that to you when she spoke to

21    you?

22        A.   No.

23        Q.   She didn't disclose that to Judge Robinson when

24    she wrote that letter to Judge Robinson.

25             Are you aware that Erin Tomasic now claims that

1  Dave Zabel, who speaks no Spanish, was actually
2  listening to Spanish-speaking inmate-attorney phone
3  calls?
4      A.  I was not aware of that, no.
5      Q.  She never told that to you, did she?
6      A.  No.
7      Q.  Are you aware that Erin Tomasic now claims that
8  Dave Zabel was present with the interpreter, even though
9  the interpreter denies that fact?
10      A.  I did not know that, no.
11      Q.  Erin Tomasic never told that to you, did she?
12      A.  No.
13      Q.  And Erin Tomasic never put those things in the
14  letter she wrote to Judge Robinson?
15      A.  No.  No.
16      Q.  You were asked when you were examined before
17  about an assertion in a pleading regarding the strength
18  of the legal authority for the proposition that a
19  admonition about the recording and monitoring of
20  attorney calls-- strike that.  I lost my train of
21  thought.
22          Do you recall testimony before about a consensus
23  of legal authority that the attorney-client privilege is
24  waived when an inmate makes a call subject to a warning
25  about monitoring and recording?

1    A.  Yes, I recall that.

2    Q.  I'm going to show you some court cases.  Do you

3  recall citing a case in your pleadings called *United*

4  *States versus Hatcher*?

5    A.  I don't specifically recall that case.

6    Q.  Do you recall being-- there being a case from the

7  Eighth Circuit that found that there was a waiver of the

8  privilege based on similar warnings in that case?  If

9  you recall.

10    A.  I don't recall if I was assigned to that portion

11  or if I drafted that.  Certainly you've handed me that

12  case.  And looking at the headnote, it-- it appears that

13  that's what the case says.

14    Q.  Do you recall citing a case called *United States*

15  *versus Mejia* out of the Second Circuit?

16    A.  I don't specifically recall citing that case, but

17  you've handed me a copy of it.

18    Q.  Let me ask you a question, and I-- I don't know

19  myself whether you cited those cases in that-- that

20  pleading.  But is it your understanding that the

21  District of Kansas-- that the courts will look to other

22  circuits to see if there is persuasive authority?

23    A.  Yes, that's my experience.

24    Q.  Do you recall citing any cases from the Tenth

25  Circuit on a related issue, namely the issue about

1  whether someone has consented to recording under the

2  provisions regarding consent in Title III?

3     A.  As I sit here, I don't specifically recall citing

4  that case, but it's very possible that I did.

5     Q.  Do you recall seeing any of these cases cited,

6  *Hatcher or Mejia* or *Faulkner,* in any of the pleadings

7  that the government has filed in this case regarding an

8  attorney waiving the privilege?

9     A.  As I say, I don't specifically remember those

10  cases.  But I suspect that we would have, certainly if

11  they support our position, which it sounds like they do.

12     Q.  If there was authority in this district or in

13  this circuit that the attorney-client privilege was

14  waived based on the warnings given at CCA-Leavenworth,

15  would you run out and subpoena attorney-inmate phone

16  calls and start to listen to them?

17     A.  No.

18     Q.  Why not?

19     A.  Would I personally?  No.

20     Q.  Yeah.  Why not?

21     A.  I guess the-- the risk of litigation is not worth

22  it to me, compared to whatever value I would likely

23  attain from-- from such communications.  I would just

24  choose not to, it wouldn't seem to be-- to be worth it

25  to me.

1    Q.   Would you also realize you were subject to the

2   ethical requirements that govern attorneys in this

3   district?

4    A.   Certainly.

5    Q.   And do you know whether those ethical

6   requirements would be violated by an attorney listening

7   to those calls?

8    A.   Well, certainly if the calls are privileged, yes.

9   Now, if they were not privileged, then I-- I guess it

10   would depend.

11    Q.   And is it possible that there could still be

12   other ethical rules that would limit your ability to do

13   so?

14    A.   Sure.

15    Q.   Would you want to make sure you didn't do

16   anything that was considered professional misconduct?

17    A.   I strive every day to-- to avoid doing anything

18   that would be remotely considered to be misconduct.

19    Q.   Now, when you were assigned in *Black*, it was

20   shortly before the grand jury subpoena went out in

21   April.  Correct?

22    A.   Yes.

23    Q.   And you've described the conversations you had

24   with Erin Tomasic.  To your knowledge, was there any

25   discussion about using that subpoena to obtain video of

1   attorney-inmate meetings?

2       A.   There was no conversation whatsoever to-- to

3   obtain attorney-client meetings.  That wasn't the

4   purpose of obtaining the video.

5       Q.   You were asked some questions about what you

6   might've done had you known about a proffer that Erin

7   Tomasic was involved in.  Do you remember that

8   questioning?

9       A.   Yes, sir.

10      Q.   Now, as you sit here today, can you tell us that

11  had you done that proffer, whenever it is that Erin

12  Tomasic did it, however long a period of time elapsed

13  between that proffer and the grand jury subpoena and

14  whatever else transpired in that time, it would've

15  occurred to you at the time you drafted the subpoena,

16  hey, we got a problem, that there might be potentially

17  attorney-client privileged materials in here?

18      A.   No, I can't say that.

19      Q.   Do you know if it occurred to Erin Tomasic?

20      A.   I would assume not, but I don't know for certain.

21      Q.   Is there anything she said to you during that

22  time that suggested to you that she had a concern that

23  was in her mind about attorney-client privilege--

24      A.   No, not at all.

25      Q.   -- when you were speaking to her?  Did you ever

 1   watch any of the video that was delivered on those hard

 2   drives to your office from CCA-Leavenworth?

 3       A.   No.

 4       Q.   Did you ever-- I'm sorry, go ahead.

 5       A.   The only time that I've seen-- that I recall

 6   seeing any video from CCA I don't believe came from

 7   those hard drives.  It was video of the night of the

 8   search warrant from one of the pods.

 9       Q.   Have you ever seen video of an attorney meeting

10   with an inmate?

11       A.   No.

12       Q.   To your knowledge, has any Assistant U.S.

13   Attorney in your office ever seen video of an attorney

14   meeting with an inmate?

15       A.   No.

16       Q.   To your knowledge, did anybody in your office

17   direct an agent to watch a video of an attorney meeting

18   with an inmate?

19       A.   No.

20       Q.   Are you aware, Mr. Oakley, that for a short time

21   some or all the hard drives of the CCA video were in the

22   possession of Agent Stokes?

23       A.   I was not aware of that.

24       Q.   Are you aware of that now?

25       A.   Yes.

1    Q.  You did not know it at the time?

2    A.  No.  No.

3    Q.  Did you ever go over to Agent Stokes' house to

4    watch video with him?

5    A.  I don't know where he lives.

6    Q.  I'm going to ask you some general questions about

7    audio-recordings.  To the best of your recollection, as

8    part of a criminal investigation or prosecution in this

9    district, are the only times you've ever obtained

10   audio-recordings from CCA-Leavenworth the times you've

11   already testified about?

12   A.  That I've obtained audio-recordings?

13   Q.  Yes.  Yes.

14   A.  I suspect there may be more, but those are the

15   only ones that-- that I recall.  And from CCA, yes.  I

16   have a current investigation involving recordings from

17   the Johnson County jail.  But CCA, those are the only

18   ones as I sit here that I recall, but I could be

19   forgetting some.

20   Q.  And one of those times you got it, you were a

21   state prosecutor.  Correct?

22   A.  Yes.

23   Q.  Put that one aside.

24   A.  Yes, sir.

25   Q.  For the cases where you were a federal

1   prosecutor, and I think you were questioned about two

2   instances, Gilkey and Forbes.  Correct?

3       A.  Correct.

4       Q.  In those two instances, do you recall how you

5   obtained the video?  Was it by subpoena, informal

6   request, e-mail, phone call?

7       A.  I don't believe that it was by subpoena.

8       Q.  Do you recall in-- you don't recall getting the

9   phone calls in the Gilkey case.  Correct?

10      A.  I believe I've had two defendants with the last

11  name Gilkey, one was a Wichita case-- at least I'm-- in

12  my mind I'm-- it could be one of two cases.  I don't

13  recall much about that case.  I don't recall

14  specifically obtaining phone calls.

15      Q.  Do you recall why you obtained the phone calls in

16  the Forbes case?

17      A.  I believe the agent obtained them initially and

18  she was discussing the case with-- with other people,

19  and so it had some evidentiary value.

20      Q.  When the calls came in, did you listen to them or

21  did the agent listen to them?

22      A.  I-- I believe I listened to some of them, but I

23  believe primarily that was the agent who listened.

24      Q.  In listening to those calls, did you come across

25  a call that you believed was to a law firm?

1    A.  Yes.

2    Q.  Please describe for us what you did as soon as

3    you realized it was a call to a law firm.

4    A.  As I recall, I was listening to the audio, I

5    heard someone answer something to the effect of "law

6    office" or "office of Kurt Kerns."  I immediately

7    stopped listening to that call and sent an e-mail to the

8    agents involved alerting them to-- to the fact that that

9    call was on there.

10   Q.  Was that attorney-- was that law firm a firm

11   where the attorney representing Forbes practiced law?

12   A.  No.  She-- she had separate counsel.

13   Q.  Did you send an e-mail out to the agents after

14   stopping?

15   A.  I did.

16   Q.  I'm going to show you what's been marked as

17   Government Exhibit 40.  Do you recognize Exhibit 40?

18   A.  I do.  That's a copy of two e-mails.

19   Q.  And is the bottom e-mail an e-mail message from

20   you to Agent Henry Herron and another agent named Conn

21   and Micky Rantz?

22   A.  Yes, and I think there's another agent, Leiker.

23   Q.  Thank you, I missed that.  And is there a cc to

24   somebody?

25   A.  Yes.

1     Q.   Who's the cc to?

2     A.   Jabari Wamble.

3     Q.   Why Mr. Wamble?

4     A.   As I recall, him and I were-- well, I know that

5  we were prosecuting the case.

6     Q.   And what did you communicate in that e-mail

7  message?

8     A.   I told the agents that I have the jail calls and

9  have been listening to a few, parenthesis, there's some

10  good stuff.  And then I said, "One thing we need to be

11  cognizant of is respecting her attorney-client privilege

12  rights.  There is one phone call that I found to Kurt

13  Kerns' office.  I stopped listening immediately after

14  the receptionist answered the phone and identified

15  herself.  Since we don't know what attorneys in addition

16  to Kerns (who is not representing her) she called, we

17  can't, quote, block those numbers from the calls that

18  CCA gives us.  Any conversation with any attorney she

19  consults with, even if she doesn't ultimately hire that

20  attorney, is subject to the privilege."

21     Q.   Now, you've testified that it's your

22  understanding, as you stated in pleadings, that when an

23  inmate makes a phone call from CCA-Leavenworth subject

24  to the warning, the privilege is waived.  Correct?

25     A.   Correct.

1    Q.   Then why did you go through the trouble of

2  sending this e-mail that's been marked as Exhibit 40?

3    A.   Again, because it-- my practice, I just would

4  prefer not to deal with that and-- and not to make those

5  arguments.

6    Q.   In your understanding, is your practice of

7  avoiding listening to attorney-inmate telephone calls,

8  despite whatever litigation position your office may

9  take, consistent with what other people in your office

10  believe about attorney-client phone calls?

11          MR. BELL:  Objection, speculation.

12          THE COURT:  Overruled.  You can answer it if

13  you can.

14          THE WITNESS:  I don't know for certain, but

15  I suspect that most people in my office take a stance

16  that's similar to mine.

17  BY MR. CLYMER:

18    Q.   Is that why what Erin Tomasic did in

19  *Herrera-Zamora* has been such a problem?

20    A.   I don't know precisely what she--

21          THE COURT:  Just a minute.  Your objection?

22          MR. BELL:  Speculation.

23          THE COURT:  I think he's already answered he

24  doesn't know, so I'll sustain.

25  BY MR. CLYMER:

1    Q.  Mr. Oakley, have you ever intentionally obtained

2    any attorney-client communications for the purpose of

3    listening to or reading those communications?

4    A.  Absent a court order, no.

5    Q.  To your knowledge, have you ever used attorney

6    privileged communications to further an investigation or

7    prosecution?

8    A.  No.

9    Q.  Have you ever listened to an attorney-inmate

10   call, either intentionally or inadvertently?

11   A.  No.  The only one is the one referenced in that--

12   that e-mail.

13   Q.  And you didn't listen to the attorney in that

14   e-mail?

15   A.  Absolutely not, no.

16   Q.  You simply heard somebody answer the phone from a

17   law firm.  Correct?

18   A.  Correct.

19   Q.  Did you ever receive any substantive information

20   from an agent about an inmate-attorney call?

21   A.  No.

22   Q.  Did you ever use information from an

23   inmate-attorney call in an investigation or a

24   prosecution?

25   A.  No.

 1     Q.   Did you ever refuse a request by the Special
 2   Master to cooperate in his investigation?
 3     A.   No.
 4     Q.   Did you ever tell anybody else in your office
 5   that they should not cooperate with the Special Master's
 6   investigation?
 7     A.   No.
 8     Q.   Did anybody ever tell you in your office that you
 9   were prohibited from cooperating with the Special
10   Master's investigation?
11     A.   No.
12     Q.   Did you do anything to frustrate or impair the
13   Special Master's investigation at any point?
14     A.   Not to my knowledge, no.
15           MR. CLYMER:  Nothing further.
16                  REDIRECT EXAMINATION
17   BY MS. VANBEBBER:
18     Q.   I just have a couple questions for you.  You told
19   both Mr. Clymer and the Public Defender that you had
20   discussions about sending out the surveillance subpoena.
21   Correct?
22     A.   I had discussions about the video.  I don't
23   recall having--
24     Q.   The surveillance subpoena is the video subpoena.
25     A.   Correct.  We had discussions about the video,

1    yes.

2       Q.   And you had these discussions with Ms. Tomasic

3    and with your agents.   Right?

4       A.   Discussions about obtaining video, yes.

5       Q.   And it's your testimony a few moments ago that

6    obtaining video from the attorney-client rooms was not

7    the intention of the subpoena?

8       A.   That's correct.

9       Q.   But you didn't exclude them, did you?

10      A.   I didn't-- no, the subpoena doesn't specifically

11   exclude it.

12      Q.   If you had an unprivileged call from an inmate to

13   one of his cohorts on the outside, you'd listen to it,

14   wouldn't you?

15      A.   An unprivileged call?   Yes.

16      Q.   An unprivileged call.   Because it would be sort

17   of prosecutor malpractice not to listen to it, wouldn't

18   it?

19      A.   Or to have an agent.   A lot of times we have

20   agents that will do that and let us know if there's--

21      Q.   You or--

22      A.   -- good information.

23      Q.   -- someone working with you?

24      A.   Correct.

25      Q.   So you agree that your office pleadings and

1    everything we've heard in this case about the policy of

2    the office was that all CCA calls are not privileged.

3    Right?

4        A.   Yes.

5        Q.   And that includes attorney calls?

6        A.   Yes.

7        Q.   So given that the policy of this office is that

8    these are unprivileged calls, you ought to be listening

9    to them, hadn't you?

10       A.   I don't know that that's the office policy.

11       Q.   Isn't that what's in the pleadings in this case

12   with people's signatures on the pleadings?

13       A.   Well, certainly that may be the law, but I don't

14   know just because the law--

15       Q.   I'm not asking about the law.

16       A.   -- says that, that doesn't make it a policy.

17       Q.   Sir, I'm not asking you about the law.  I'm

18   asking you about the office policy in the Kansas City

19   U.S. Attorney's Office as expressed in the pleadings and

20   documents filed in this case.  And they say, our

21   position is they're not privileged and, therefore,

22   there's no problem.  Right?  I'm not saying you wrote

23   them, I'm just saying isn't that what they say?

24       A.   If you're saying did we have a policy that told

25   us to listen to those calls, the answer is no.

1      Q.   The policy is that they're unprivileged.  Right?

2      A.   I don't think we have a policy that specifically

3   states they're un--

4      Q.   Then why has it been argued for a week-and-a-half

5   now that those calls are not privileged?

6      A.   I'm not aware of what's been argued for a

7   week-and-a-half.  But just because the law may say that

8   the calls are privileged, that doesn't-- that the calls

9   are not privileged, that doesn't mean that we had a

10  policy that told us to listen to the calls.

11     Q.   I'm going to ask you one more time.  Not about

12  the law, and I don't want to have to be in disagreement

13  about that, I'm not asking you what the law is.

14     A.   Okay.

15     Q.   I'm saying aren't you aware that the pleadings in

16  this case have indicated that your office believes that

17  the calls from CCA that include attorney calls are all

18  not privileged?

19          MR. CLYMER:  Objection, it misstates what

20  the pleadings say.

21          THE COURT:  Overruled.

22  BY MS. VANBEBBER:

23     Q.   Is that how you read them?

24     A.   I-- I'm aware that there are pleadings that were

25  filed that say that.  I have not read any pleadings or

 1  been present for anything that's happened over the last

 2  couple of weeks.

 3     Q.  Well, then if the judge decides that the

 4  pleadings state the truth, what the office's policy is,

 5  then can we agree that, just like any other not

 6  privileged phone call--

 7          MR. CLYMER:  Objection, misstates the facts.

 8  There's no--

 9          MS. VANBEBBER:  Could I finish the question?

10          MR. CLYMER:  There's no pleading--

11          THE COURT:  Let her finish the question.

12          MR. CLYMER:  -- that the government's policy

13  is to do anything.

14          THE COURT:  I haven't heard the whole

15  question.  Restate the question, please.

16          MS. VANBEBBER:  I'll just restate it.

17  BY MS. VANBEBBER:

18     Q.  Then if the judge is to accept as the truth the

19  pleadings filed in this case and the arguments that have

20  been made in this case by Mr. Clymer and others, that

21  the phone calls from CCA, including the attorney phone

22  calls, are all unprivileged, then would you agree that

23  just as it would've been bad practice not to listen to

24  an inmate's call to his cohort on the outside, it would

25  also be bad practice not to listen to the

1    attorney-client calls coming out of CCA?  Would you

2    agree to that?

3        A.   I don't know of anything that would in that

4    situation require me to listen to those calls.  And I

5    suppose it would be up to others as to whether to draft

6    a policy related to that.

7              MS. VANBEBBER:  Thank you.

8                     RECROSS EXAMINATION

9    BY MR. BELL:

10       Q.   Mr. Oakley, Mr. Clymer asked you some questions

11   about Government Exhibit 40.  Do you remember those

12   questions?

13       A.   Yes.

14       Q.   So let me put it back up on the screen for you.

15   You title this message-- you're telling the agents that

16   you need to respect the defendant's attorney-client

17   privilege rights; is that correct?

18       A.   Correct.

19       Q.   And then you state, "Any conversation with any

20   attorney she consults with, even if she doesn't

21   ultimately hire that attorney, is subject to the

22   privilege."  Did I read that correctly?

23       A.   Correct.

24       Q.   So am I correct that this is a legal conclusion

25   that you are sharing with the agents regarding the

1    applicability of the attorney-client privilege?

2        A.   Yes.

3        Q.   And here you're telling the agent that even if we

4    come across these recorded calls and even if they are to

5    some other attorney that is not her attorney on the ECF

6    notice on a case, those calls are still privileged under

7    the law?

8        A.   I was assuming that she was contacting other

9    attorneys because she wasn't-- she was trying to find a

10   new attorney I guess, I--

11       Q.   So in that-- and then back to-- my question is:

12   You are giving them the legal conclusion that these

13   other calls made to attorneys who are not her attorney

14   noticed in the case would still be covered by the

15   privilege?

16       A.   Yes, I just wanted them to not listen to them.  I

17   didn't want to--

18       Q.   And so based on your understanding of how the CCA

19   phone system works, any of those calls, including the

20   ones to the Kerns Law Firm, would've had the preamble or

21   admonition that warned that the call was subject to

22   recording and monitoring.  Right?

23       A.   That would be my assumption, yes.

24       Q.   In fact, it's likely that you heard that preamble

25   right before the call to the Kerns Law Office?

1     A.   I suspect so, but I cannot recall.

2     Q.   And immediately or some point shortly thereafter

3  you heard that call with the preamble to the law office,

4  you told the agents that these calls are subject to the

5  attorney-client privilege?

6     A.   Correct.

7     Q.   When did your judgment change?

8     A.   So if you're-- there is a valid legal argument

9  that those calls where the inmate knows they're being

10 recorded made to an attorney are not privileged.  I have

11 chosen back then and, frankly, today would make the same

12 choice to instruct my agents don't listen to them

13 because it's not worth it.

14    Q.   Would you agree with me that that's not in the

15 text of the e-mail you send to the agents?  To the

16 agents you're telling them what the law is.

17    A.   Sure.  I'm not telling them, look, we have an

18 argument that these could be privileged, so I just made

19 the decision, regardless of whether there's an argument,

20 that we're not going to listen to them.

21    Q.   When you sent out this e-mail to the agents, is

22 this because the agents were also in the process of

23 reviewing attorney-client calls-- or, I'm sorry,

24 reviewing CCA calls in this case?

25    A.   This is 2012, so it's been a while.  But judging

1    from the content of this e-mail, I believe yes, that I

2    have obtained the calls, was going to give them to the

3    agent and, for whatever reason, was bored or interested

4    or whatever, decided to listen to at least one myself.

5        Q.  So in this e-mail, you do not tell the agents the

6    telephone number that the defendant called when reaching

7    the Kerns Law Office?

8        A.  In the e-mail I do not.

9        Q.  You don't tell them, so if you see a call to this

10   telephone number, don't listen to it?

11       A.  In the e-mail I do not.

12       Q.  So an agent who reads your e-mail has just been I

13   guess warned to listen for a receptionist answering "law

14   office" or something to that effect?

15       A.  Well, again, this was 2012.  But looking at the

16   e-mail, I believe that I had the disk and was going to

17   give it to the agent.  I don't recall if when I did that

18   I specifically identified the phone number or-- or the

19   phone call that I had found.  But you are correct that I

20   do not identify specifically the phone number in this

21   particular e-mail.

22       Q.  So-- and you said that as soon as you heard the

23   receptionist say "Kerns Law Firm," or whatever the

24   greeting was, you stopped listening?

25       A.  Correct.

1     Q.   So you don't know if the rest of that phone call

2   was the receptionist saying, you can reach Mr. Kerns at

3   his cell phone at this other number?

4     A.   I have no idea what was contained in the

5   remainder of that call.

6     Q.   And you don't know if the next phone call you

7   listened to was actually the defendant calling Mr. Kerns

8   on his cell phone?

9     A.   No, I do know that because I have never listened

10   to a phone call between an inmate and an attorney.

11     Q.   That you know of.  Right?

12     A.   Correct.

13     Q.   Because I assume when you answer a call on your

14   cell phone, you don't answer it "United States

15   Attorney's Office"?

16     A.   No, but I've also never heard a phone call that I

17   believed was with an attorney.

18     Q.   And when you say "believed," that's because you

19   didn't recognize the voice of the person on the other

20   line as being an attorney that you know?

21     A.   No, I would suspect based on context.

22     Q.   So you think--

23     A.   Or content.

24     Q.   So from listening to the content or context of

25   the call, that can also tell you whether a call is

1    between a defendant and an attorney?

2        A.   If-- could you repeat the question?

3             MR. BELL:  Would you read the question,

4    please?

5             (The question was read back).

6             THE WITNESS:  Correct.

7    BY MR. BELL:

8        Q.   But in order to reach that conclusion, you have

9    to listen to some of the content of the call.  Right?

10       A.   I would-- I would suppose in that situation, yes.

11       Q.   There are other times where, as you mentioned in

12   your e-mail here, that a defendant might be calling

13   other lawyers to consult with them even if that

14   defendant hasn't hired those other lawyers to represent

15   them in the case you're prosecuting?

16       A.   I'm sorry.  Could you repeat that question as

17   well?

18       Q.   There are situations where a defendant, an

19   inmate, might be calling other lawyers to consult with

20   them, even if they are not the lawyers that have been

21   hired to represent the client in that case?

22       A.   Correct.

23       Q.   And that's what you reference in your e-mail?

24       A.   Correct.

25       Q.   In those situations, unless there's some greeting

1    that says "law firm" or something when the call was

2    answered, how is anyone supposed to tell whether the

3    call is to an attorney or to someone else?

4        A.   I-- other than content or identifying the number

5    or the-- or the voice, I don't know.

6        Q.   What was the last part?  I'm sorry, I didn't

7    hear.

8        A.   Or the voice, if someone recognized the voice.  I

9    don't know.

10       Q.   So we have one way, listen to content, don't

11   really want to do that.  Right?

12       A.   Correct.

13       Q.   Second way is if we recognize the phone number.

14   Right?

15       A.   Correct.

16       Q.   Do you do anything to educate yourself or your

17   agents about the phone numbers that are within the calls

18   that are produced to you, whether they belong to

19   attorneys or not?

20       A.   Not that I know of.

21       Q.   And then the third way was recognizing the voice.

22   So that depends on you or the agents being able to

23   recognize the voice of the speaker on the other line?

24       A.   Correct.  If that's what you're relying upon,

25   yes.

1    Q.  So is it possible, Mr. Oakley, in the cases that

2  you have where you've had-- you've listened to calls,

3  you have agents listen to calls, that there's been a

4  call from a defendant to an attorney for consultation

5  purposes and no one recognized the voice and no one paid

6  attention to the phone number and it was a call to an

7  attorney?

8    A.  Not to my knowledge.  I would assume based on

9  content you would be able to determine if that happened,

10  I've never had that happen.

11    Q.  That you know of?

12    A.  Again, that I know of.

13    Q.  Ms. VanBebber asked you some questions about

14  whether there was a policy that required you to listen

15  to calls between attorneys and clients that are

16  detained.  Do you remember those questions?

17    A.  Yes, I do.

18    Q.  In 2016, August 2016, was there any policy you're

19  aware of that prohibited you from doing it?

20    A.  No.

21          MR. BELL:  No further questions.

22          BY MR. CLYMER:  Your Honor, I believe I

23  neglected to move Exhibit 40 into evidence.

24          THE COURT:  Any objection?

25          MR. CLYMER:  And I'll do it now.

 1            MR. BELL:  No objection.

 2            THE COURT:  Exhibit 40 admitted.

 3            MS. VANBEBBER:  No objection.

 4                    RECROSS EXAMINATION

 5   BY MR. CLYMER:

 6      Q.  Mr. Oakley, as a result of the *Black* litigation,

 7   has your office developed a policy regarding having a

 8   taint team review all attorney-- I'm sorry, all inmate

 9   calls from CCA-Leavenworth?

10      A.  Yes.

11      Q.  So any call that's obtained by an AUSA now goes

12   through a taint team?

13      A.  Correct.

14            MR. CLYMER:  Nothing further.

15            THE WITNESS:  Your Honor, Mr. Clymer,

16   there's one thing that-- that I'd like to clarify that

17   you asked me on--

18   BY MR. CLYMER:

19      Q.  Sure.

20      A.  -- redirect.  You had asked me if I had ever

21   obtained attorney-client communications, and I said no,

22   other than getting court authority.  On recross--

23      Q.  Yes.  You want to elaborate on that?

24      A.  Yes, there is one other incident that I recall

25   that does not in any way involve phone calls.

1   Q.   Why don't you elaborate on that real quick.

2   A.   I had a case in which an attorney gave me

3   information, I told them I didn't want attorney-client

4   communications.  He said it's okay, there's-- there's a

5   bar complaint that's pending, I can tell you this.

6        Later he told the agent that he may not have been

7   correct, and I immediately contacted that-- the client's

8   new attorney and explained the situation.  Not involving

9   phone calls, but I don't think your question to me was

10  limited to phone calls.  So other than the court

11  pleading that I filed and that situation, that's it.

12  Q.   Do you recall when that happened?

13  A.   That-- I made the-- the phone call here recently.

14  I don't recall-- it's-- it's a case that's pending.  The

15  investigation was a few years ago.

16              MR. CLYMER:  Nothing further.

17              THE WITNESS:  But I just wanted to be clear,

18  because that was in my mind.

19              MR. CLYMER:  I appreciate that.  Thank you.

20  Nothing further, Your Honor.

21              THE COURT:  Anything more?

22              MS. VANBEBBER:  No.

23                    RECROSS EXAMINATION

24  BY MR. BELL:

25  Q.   Who was the attorney who gave you the information

1    that said it's okay because there's a bar complaint?

2        A.   It was a Texas attorney.  Butch Dunbar.

3               MR. BELL:  Thank you.  No further questions.

4               THE COURT:  Any further questions?

5               MR. CLYMER:  Your Honor, there's one

6    question that I wanted to ask that I neglected to on

7    redirect.  May I ask just a question or two?

8               THE COURT:  Go ahead.

9                    RECROSS EXAMINATION

10   BY MR. CLYMER:

11       Q.   I'm going to show you what's been marked as

12   Exhibit 447.  Does it appear to be the transcript from

13   the proceeding on July 21st--

14       A.   It does.

15       Q.   -- 2016?

16       A.   It does.

17       Q.   And was that the proceeding where you first heard

18   word that there might be attorney video-- video of

19   attorney-inmate meetings among the CCA video evidence?

20       A.   It is.

21       Q.   The Special Master asked you a number of

22   questions characterizing what did or did not occur at

23   that proceeding.  Would it be accurate to say

24   Exhibit 447 is the best record of exactly what was said

25   at that proceeding?

```
 1      A.  It would be.
 2              MR. CLYMER:  Nothing further.
 3              MS. VANBEBBER:  No questions from here.
 4              THE COURT:  Anything else?
 5              MR. BELL:  No, Your Honor.
 6              THE COURT:  All right.  May Mr. Oakley be
 7   excused?
 8              MS. VANBEBBER:  Yes.
 9              MR. BELL:  Yes, Your Honor.
10              MR. CLYMER:  No objection, Your Honor.
11              THE COURT:  You're excused.  Call your next
12   witness.
13              MR. BELL:  Call Terra Morehead.
14                       TERRA MOREHEAD,
15   called as a witness on behalf of the Federal Public
16   Defender's Office, having first been duly sworn,
17   testified as follows:
18                     DIRECT EXAMINATION
19   BY MR. BELL:
20      Q.  Good afternoon.  Would you state your full name
21   and spelling the last for the record?
22      A.  I'm sorry, I didn't-- I couldn't hear you.
23      Q.  Good afternoon.  Would you state your name for
24   the record, spelling the last?
25      A.  Spell the last?  Okay.  Terra Morehead, M-O-R--
```

1                MS. VANBEBBER:  Excuse me, Your Honor, I

2    can't hear either one of them.

3                THE WITNESS:  I couldn't hear him very well.

4                MS. VANBEBBER:  Pull the microphone up.

5                THE COURT:  All right.  Try it again.

6    BY MR. BELL:

7        Q.   Would you state your name, spelling the last,

8    please?

9        A.   Terra Morehead.  M-O-R-E-H-E-A-D.

10       Q.   What do you do for a living?

11       A.   I'm an Assistant United States Attorney.

12       Q.   Here in the District of Kansas?

13       A.   Yes.

14       Q.   In the Kansas City office?

15       A.   Yes.

16       Q.   How long have you held that position?

17       A.   16 years last month.

18       Q.   I'd like to talk to you a little bit about the

19   policies in your office regarding discovery.  Generally

20   do the prosecutors in the office only disclose material

21   that they intend to use as part of a trial or

22   sentencing?

23       A.   I'm not able to answer that as I don't have

24   authorization to answer that.

25                MR. CLYMER:  You can answer that question,

1   Ms. Morehead, if you know.

2                THE WITNESS:  Could you repeat that question

3   then?

4                MR. BELL:  Could you read the question,

5   please?

6                (The question was read back).

7                THE WITNESS:  No.

8   BY MR. BELL:

9       Q.  Is there material that prosecutors in your office

10  will not disclose to defense counsel?

11      A.  I'm not authorized to answer that.

12               MR. CLYMER:  You can answer these questions

13  about discovery.

14               THE WITNESS:  Okay.  I-- first of all, I

15  can't speak necessarily to other prosecutors, I can

16  certainly speak to myself, but-- so if you want me to

17  answer that part of the question, I certainly can.

18  BY MR. BELL:

19      Q.  Let's start with yourself then.

20      A.  Okay.  What was the question again about myself?

21      Q.  Are there materials that you will not disclose to

22  defense counsel as part of discovery?

23      A.  There may be, depending on a specific case.

24      Q.  What circumstances would lead you not to disclose

25  discovery to defense counsel in a case?

 1                MR. CLYMER:  Your Honor, could we-- I just

 2   ask for a clarification.  Does he mean legally-obligated

 3   discovery or does he mean documents about a case

 4   generally?  It's not clear.

 5                THE COURT:  I don't know.  Do you want to

 6   clarify?

 7                MR. BELL:  Certainly.

 8   BY MR. BELL:

 9      Q.  Let's just say generally, are there any

10   circumstances that would cause you not to disclose

11   discovery to a defense counsel in a criminal case?

12                MR. CLYMER:  Same objection.  It's not clear

13   what he means by the word "discovery."

14                THE COURT:  Overruled.

15                THE WITNESS:  And so, first of all, I'm not

16   clear on the question simply because I'm not sure what

17   time frame you're talking about.  There have been

18   different policies and procedures in place from the time

19   I came 16 years ago until now.  So are-- are you talking

20   about now?

21   BY MR. BELL:

22      Q.  Well, so let's back that up because I think you

23   just partially answered my question.  There might be

24   what a policy tells you to disclose or-- disclose to

25   defense counsel, that might be one of the circumstances

1   that would affect your decision.  Right?

2       A.  Yes.

3       Q.  Aside from policy reasons, what other reasons

4   might cause you not to distribute discovery to defense

5   counsel?

6       A.  Well, there's statutory parameters involving

7   discovery, what is and isn't required to be disclosed.

8   And then obviously there's-- there would be potentially

9   court orders, pretrial orders and the like, that would

10  provide guidance on things that should or shouldn't be

11  disclosed.

12      Q.  One of the things you mentioned was statutory

13  requirements about what should-- or what should and

14  doesn't have to be disclosed.  If there's no-- if

15  there's no statutory requirement to disclose certain

16  information to defense counsel in a case, does that mean

17  that you would not disclose it or will not disclose it

18  to defense counsel?

19      A.  I-- I don't have enough information to be able to

20  answer that question.

21      Q.  All right.

22      A.  I think it's too broad I guess for me to be able

23  to answer that.

24      Q.  Would you agree with me that the prosecution has

25  an obligation to make a timely disclosure of relevant

1   evidence that it intends to use against the defendant at

2   trial?

3       A.   Yes.

4       Q.   Would you agree that-- would you agree that the

5   prosecution does not have an obligation to disclose

6   evidence in its possession that it does not intend to

7   use against the defendant at trial?

8       A.   Say that again.

9       Q.   Would you agree that the prosecution does not

10  have an obligation to turn over evidence that it does

11  not intend to use against the defendant at trial?

12      A.   No, I don't agree with that statement.

13      Q.   Would you agree that the prosecution then has an

14  obligation to turn over all evidence that it has in its

15  possession regarding the investigation into a defendant?

16      A.   When you say "obligation," again there's varying

17  parameters along that line.  There's statutory, legal,

18  and then there's beyond that.  And also, again, I am not

19  clear on what time frame you're talking about, because

20  there's been various things that have occurred from--

21  over the last 16 years.

22      Q.   Okay.  So let's talk about how you view the

23  obligations during the office-- that started in 2016 and

24  continue to present day.  Have I narrowed the time frame

25  enough for you?

1       A.   Possibly.

2       Q.   All right.

3       A.   I know there were some changes about that time

4    frame, so I'm not sure exactly when that happened.  But

5    generally, that's about the time I think the changes

6    were made.

7       Q.   Is there material that you might have in your

8    possession in regard to or connected with a criminal

9    prosecution that you deem that are just not relevant to

10   the issues at the trial?

11      A.   That I might deem not relevant?  I would say

12   probably in every case there's stuff that I have that I

13   don't think is relevant.

14      Q.   And if you have a piece of evidence that you

15   don't think is relevant or that it's not material to the

16   issues in the case, do you have a duty to disclose

17   that-- that evidence to the defense?

18      A.   Without something more, I'm-- I don't feel like I

19   can answer that.

20      Q.   So are there times then when you have evidence

21   that you don't think is relevant or material to a case,

22   that you don't think you have an obligation to turn it

23   over?

24      A.   I am-- that's not what I said.  I said that I

25   couldn't answer the question as you phrased it.

1     Q.   Have you ever heard the phrase or the saying

2   around the office that if you don't intend to use it,

3   then you don't have to disclose it?

4     A.   I've never heard that phrase.

5     Q.   Is that how you understand generally discovery

6   obligations to work?

7     A.   No.

8     Q.   So it's your position that even if you don't

9   intend to use a piece of evidence at trial or

10  sentencing, you're still under the obligation to

11  disclose it to defense counsel?

12    A.   Again, I-- I don't feel comfortable answering

13  that.  There may be a basis upon which not to disclose

14  it.

15    Q.   Such as what?

16    A.   Well, I don't-- I don't know.  I'd have to... I--

17  I don't know.  I-- you know, there's certain materials

18  that we can't disclose for legal reasons, for instance,

19  tax information comes to my mind or financial

20  information in some cases.  So there may be limitations

21  on that, not necessarily because we're not going to use

22  it at trial but for other reasons.

23         But I know now there's pretty concerted efforts

24  with protection.  Before, PII information was often not

25  disclosed.  Now we're able to do that.  So, again, it

16-20032-JAR  USA v. Karl Carter (Black)  10.10.18        2007

1   just-- I can't-- I guess I can't answer the question

2   fully, I'm sorry.

3       Q.  Do you remember a defendant you prosecuted with

4   the last name Orozco?

5       A.  Yes.

6       Q.  Do you recall that case originally being set for

7   trial to commence on December 12th?

8       A.  Of what year?

9       Q.  I actually didn't write down the year, but I'm

10  pretty sure it was 2017.

11          MR. CLYMER:  Objection at this point, Your

12  Honor, relevance.

13          THE COURT:  Overruled.

14  BY MR. BELL:

15      Q.  Do you recall that case was set for trial

16  December 12th, 2017?

17      A.  It was not set in December of 2017.

18      Q.  Was it December 2016?

19      A.  It might've been December of 2016.

20      Q.  Do you remember that when that case was set for

21  trial, you came to court the morning of the trial and

22  gave defense counsel some evidence that the marshals had

23  not-- had not discovered promptly?

24      A.  He-- that's not accurate.

25      Q.  Tell me what's incorrect.

1    A.    Actually it was disclosed the day it was

2  discovered.

3    Q.    On December 9th?

4    A.    On that Friday.

5    Q.    So it was disclosed to defense counsel?

6    A.    Yes, over the phone.

7    Q.    All right.

8    A.    And then it was physically given on the-- that

9  day of trial.

10    Q.    And briefly, without going too far into the facts

11  of that case, this was a case where the defendant was

12  found in a car with several other people and the SIM

13  cards were discovered in a bag of methamphetamine that

14  was discovered in the car; is that right?

15    A.    The SIM cards were not in the-- the bag of the

16  methamphetamine.

17    Q.    Where were they at?

18    A.    They were in a small zippered pouch, like a

19  camera-- I think it was like a camera case of some sort

20  or a-- like a little pouch.

21    Q.    And did that pouch also contain methamphetamine?

22    A.    Yeah, the methamphetamine was also in a plastic

23  bag in that pouch.

24    Q.    So December 9th is when the agents find the SIM

25  cards.  Right?

1      A.   The-- the SIM cards were found upon arrest, but
2   they didn't believe they had possession of them until it
3   was discovered on December 9th.
4      Q.   So they knew they had them when they performed
5   the arrest?
6      A.   No, they were present at the arrest.  There was a
7   photograph of this pouch, but the pouch wasn't known to
8   be in custody-- in their possession up until
9   December 9th.
10     Q.   So the item was in the government's possession?
11     A.   It was in the marshal's custody, yes.
12     Q.   December 9th the SIM cards are discovered, or
13  re-discovered, and at that point a search warrant is
14  gotten to examine the SIM cards?
15     A.   That's correct.
16     Q.   And as of December 12th is the first time that
17  the evidence from the SIM cards is given to the defense
18  attorney?
19     A.   Physically, yes.  There was-- Mr.-- I want to-- I
20  can explain that if you want me to.
21     Q.   Feel free.
22     A.   So Mr. Campbell was advised of that on the 9th.
23  His office is about two hours, two-and-a-half hours from
24  Kansas City.  He indicated-- I told him the information
25  was too much to be e-mailed, and he-- he said, that's

1    fine, you can give it to me on Monday.  So that's what

2    we arranged.

3        Q.   So it's the Friday before trial?

4        A.   I think it was that Friday.

5        Q.   Then you tell him by the-- you know, we found the

6    SIM card, we did a search warrant, it has all these

7    photos, your office is two-and-a-half hours away.  And

8    he says, all right, well, I'll come look at it on Monday

9    when I come up for trial?

10        A.   We had discussed that he would receive them on

11    Monday, yes.

12        Q.   That morning of trial, December 12th, before you

13    come to court you file an 851 notice in the case?

14        A.   Yes.

15        Q.   And then after you file that notice, you come

16    down to the courtroom to give the material to Mr.

17    Campbell?

18        A.   Yeah, I-- I'm not sure what time the 851 notice

19    was filed that day, but yes.

20        Q.   Was there any discussion with Mr. Campbell

21    between December 9th and December 12th or the 11th about

22    having an agent bring the material out to his office so

23    he could review it before the day of trial?

24        A.   No, there was no discussion about that.

25        Q.   So you show up on the day of trial,

1    December 12th.  851 gets filed, evidence given to Mr.

2    Campbell, and he asks to continue it, continue the

3    trial?

4        A.  Yes.

5        Q.  Did you object to that request?

6        A.  No.

7        Q.  Did you--

8        A.  No-- well, I don't-- I-- I don't recall.  I

9    should say I don't specifically recall.

10       Q.  Did you tell the Court that you had reviewed the

11   photos and that you had deemed them to be irrelevant?

12       A.  I don't know if I used the word "irrelevant," I

13   can't remember specifically what word I used.

14       Q.  Do you recall that Mr. Campbell took a different

15   view once he had a chance to review them, and that they

16   were potential *Brady* or exculpatory information?

17       A.  Yeah, I don't know if I had that conversation

18   with Mr. Campbell.

19       Q.  You don't recall him ever referring to them or

20   characterizing these photographs as exculpatory?

21       A.  I-- he may have used that word, but I don't

22   remember specifically what words he used.

23       Q.  When you told the Court that the photos were

24   irrelevant, you, I assume, made a decision based on the

25   rules of evidence that determines what is and is not

1   relevant?

2      A.   First of all, I think I mentioned I don't

3   remember what word I used or what I said about the

4   photographs.   I think I characterized them that they

5   were just random pictures.

6          But I had-- I mean, I turned them over to Mr.

7   Campbell, yes.

8      Q.   So let's say that-- you said they're just random

9   pictures.   So if the pictures had depicted Mr.

10  Campbell's client in the presence of large amounts of

11  methamphetamine or multiple firearms, that would make

12  the pictures relevant, right, you wouldn't call those

13  irrelevant?

14     A.   That would be one way they would be relevant,

15  yes.

16     Q.   But the pictures didn't have pictures of-- of Mr.

17  Campbell's client with methamphetamine or with firearms?

18     A.   No.

19     Q.   So they weren't relevant to your prosecution of

20  the client?

21     A.   Of who?

22     Q.   Of the client, of Mr. Campbell's client.

23     A.   Oh, no, they weren't relevant to any sort of-- to

24  any of the charges.

25     Q.   Had you performed any analysis or judgment in

1  your head as to whether those photos would be

2  exculpatory to Mr. Campbell's client?

3      A.  There were some of the photos that I think were

4  photos of-- of the-- of a witness that was present.  So

5  obviously they were connected to her.  But aside from

6  that, I didn't know of any other relevance or importance

7  of any of the photos.

8      Q.  So you didn't reach a judgment one way or the

9  other about whether these photos were exculpatory?

10     A.  As I said, the-- there were a number of the

11  photos that were photos that included one of the

12  witnesses that was present, so they were obviously

13  relevant for that witness-- to that witness.  They

14  would've been-- they did not depict the client, so

15  arguably they were exculpatory-- exculpatory because

16  they didn't show him.

17     Q.  And had you reached that conclusion as of the

18  time you gave the exhibits to Mr. Campbell that morning?

19     A.  Yeah.  I mean, I turned them over to him that

20  day.

21     Q.  So when you-- by the time you handed them over to

22  him that morning, you had reached a judgment that this

23  evidence was potentially exculpatory?

24     A.  I don't know that I made that sort of conclusion

25  or suggestion or anything.  I just turned them over.

1    I-- I don't really often make a judgment about what they

2    might-- what a piece of evidence might be for a

3    particular case, for a particular defense.

4        Q.  So at the time you turned them over to Mr.

5    Campbell that morning, you hadn't reached a conclusion

6    one way or the other about whether they were

7    exculpatory?

8        A.  As I said, I think they were clearly exculpatory

9    to the extent that they didn't show Mr. Orozco in any

10   photos that I produced.  Beyond that, I don't know that

11   I would've made any sort of judgment about the defense.

12   Mr. Campbell never shared that with me or discussed that

13   with me.

14       Q.  So at that time-- at that morning, did you notify

15   Mr. Campbell or the Court during the motion to continue

16   the trial that the photographs contained potentially or

17   I think, as you said, clearly exculpatory evidence?

18       A.  Again, I don't remember it was-- what was said.

19   My recollection is the only thing I represented was I

20   didn't think they were any photographs that I would use

21   at trial.  But beyond that, I didn't make any sort of

22   conclusion or suggestion or anything.  That's my

23   recollection of that hearing.

24       Q.  Had you determined otherwise, had you determined

25   that the photos were not potentially exculpatory, that

1  there's no way they were exculpatory, would you still

2  have had an obligation to disclose them?

3      A.  I don't know.  I think that calls-- that would be

4  complete speculation on my part about what I might've

5  done or what I would've been obligated to do.

6      Q.  In your 16 years, is there material that you have

7  had that you determined was not relevant and was not

8  exculpatory and, on that basis, did not disclose it to

9  defense counsel?

10      A.  I don't know.

11      Q.  In your experience at the U.S. Attorney's Office,

12  you've conducted or been present at a number of initial

13  appearances and detention hearings?

14      A.  Yes.

15      Q.  On cases that you would bring?

16      A.  Yes.

17      Q.  There are times when you would tell defense

18  attorneys and their clients that if they asked for

19  release, then you would immediately file a 851 notice?

20              MR. CLYMER:  Objection, relevance.

21              THE COURT:  Overruled.  This is impeachment.

22              THE WITNESS:  That I would-- if-- if they

23  asked for release, I would file an 851 notice?

24  BY MR. BELL:

25      Q.  (Nods head up and down).

1    A.   There were times that that happened, yes.

2    Q.   And so by making that threat, defendants would

3  not ask for release and would agree to be detained?

4    A.   It really-- well, you've characterized it as a

5  threat, I--

6    Q.   How would you characterize it?

7    A.   Well, it was something that was approved at the

8  time to do.

9    Q.   By who?

10    A.   By my supervisory chain.  And it was--

11    Q.   Who specifically?

12    A.   Marietta Parker.  And it was-- there's a Ninth

13  Circuit case that approved that.  Specifically I had

14  learned of that from actually a, I'm sorry, defense

15  attorney from California, and so that's when and how

16  that happened.

17    Q.   So did any of these things your supervisor, the

18  Ninth Circuit, or the defense attorney from California

19  ever tell you, that this was anything other than a

20  threat?

21    A.   Well, I think anytime you filed an 851, it's a

22  threat that you're going to enhance someone's sentence.

23  So I-- it was-- it was done in cases where individuals

24  were subject to the 851 enhancement.

25    Q.   So you said filing the 851 is a threat to an

1    enhanced sentence, but I must've misheard you because

2    filing an 851 is what actually triggers the enhanced

3    sentence.  What I'm talking about is the threat of

4    filing an 851.

5        A.   Yeah, that's done frequently in plea negotiations

6    and so, yeah, I mean, I--

7        Q.   So you want an outcome, you don't want the

8    defendants to ask for release.  Right?

9        A.   Well, it wouldn't-- it wasn't done in all cases.

10       Q.   That wasn't my question.

11       A.   Oh, okay.  Because you said "defendants," so--

12       Q.   Right.  You've done it in more than one case?

13       A.   Right.

14       Q.   So you want the defendants that you've done it

15   with, you don't want them released, you want them to

16   agree to be detained?

17       A.   Right.

18       Q.   And the vast majority of defendants who are going

19   to be detained will be detained at CCA?

20       A.   Yes.  Or they might-- in fact, then there were a

21   lot of private facilities, like Atchison or Leavenworth

22   that they might be detained at also.

23       Q.   Some of them might go to those locations, but the

24   majority of defendants are going to go to CCA?

25       A.   Yes.

1    Q.   And you know that if they're at CCA or one of

2 these other facilities, that, among other things, you

3 can get recordings of their telephone calls.  Right?

4 You knew that?

5    A.   Right.  But that wasn't a consideration for the

6 851.  I-- just to be clear.

7    Q.   And the phone calls that these people-- these

8 defendants made once they're incarcerated, they're

9 recorded and they're given to you, those can be valuable

10 discovery?

11    A.   Phone calls at CCA being valuable discovery?  I--

12 I guess I'm confused, I--

13    Q.   Have you ever requested recorded phone calls

14 between-- of a defendant while they're in CCA?

15    A.   Have I what?  I'm-- your voice trails off and I

16 really-- I can't--

17    Q.   Have you ever requested recorded telephone calls

18 from a defendant at CCA in a case you're prosecuting?

19    A.   Yes.

20    Q.   You did that for a reason?

21    A.   It was usually for a reason, yes.

22    Q.   And the reason was there was valuable evidence in

23 those recorded calls most of the time?

24    A.   There were various reasons that we might ask for

25 the phone calls from CCA.

1    Q.  Okay.  Among them was that they contained

2    valuable evidence that might help you convict the

3    defendant who's speaking on the call?

4    A.  I don't ever--

5         THE WITNESS:  Is it okay for me to answer

6    this?

7         MR. CLYMER:  Yes.

8         THE WITNESS:  Okay.  I don't ever remember

9    asking for calls in the hopes that it would help convict

10   a defendant.  Usually there were reasons for getting

11   specific calls of-- of a specific individual.

12   BY MR. BELL:

13   Q.  Have you ever played a defendant's recorded jail

14   calls during that defendant's trial?

15   A.  I would say there probably were some.

16   Q.  Have you ever argued to a jury in closing

17   arguments that the defendant confessed in his own voice

18   on a recorded call?

19   A.  There may have been some where that happened.

20   Q.  So would you agree that in those cases the

21   defendant's recorded phone calls were helpful to you in

22   your effort to prosecute the defendant?

23   A.  Yes.  That would be helpful.

24   Q.  If a person ends up not being released-- or, I'm

25   sorry, not being detained, they don't go to CCA, they

1    don't go to Atchison, there's no way for you to listen

2    to their phone calls except for maybe a wiretap?

3       A.  That's not true.  Actually I'm amazed how often

4    defendants who are released will talk to other inmates

5    at CCA, which has been one of the reasons that I've

6    gotten phone calls on numerous occasions, because those

7    individuals released were told not to have contact with

8    other defendants.  So we end up getting their phone

9    calls where they're recorded with inmates who are

10   actually in custody.

11      Q.  Right.  So unless they call-- unless they're in

12   CCA or they get a phone call from CCA, if they're

13   released, except for a wiretap, there's no way for you

14   to listen to their conversations?

15      A.  That would be true.

16      Q.  When you request the calls from CCA, do you limit

17   your request to only certain telephone numbers or

18   exclude certain phone numbers from your request or do

19   you just ask for all the calls?

20      A.  You know, it depends.  I've done it before where

21   I've asked for a specific phone number.  Again, we're

22   talking about a pretty long period of time.

23      Q.  Well, then let me narrow the question for you.

24   Have you ever said, "But don't give me any calls to this

25   telephone number"?

1     A.   Don't give me calls to this number?  I don't ever

2     remember excluding any numbers.

3     Q.   You never-- including excluding numbers, you

4     never excluded defense attorneys' telephone numbers?

5     A.   I'm sorry, I lost you there.  Could--

6     Q.   So you've never asked-- when you make these

7     request for calls, told CCA, "Don't give me the defense

8     attorney's telephone calls with the client"?

9     A.   Not that I'm aware of.

10    Q.   There's nothing stopping you from doing that,

11    right, the defense attorney's telephone number is on

12    ECF?

13    A.   Some of their numbers are on ECF.

14    Q.   Okay.  When you make the request, you could say,

15    "Don't give me calls to this telephone number"?

16    A.   I'm really not sure about that because I've never

17    asked that phone numbers be excluded.  I'm-- I'm

18    honestly not aware if that can happen.

19    Q.   You've never tried?

20    A.   Never tried, no.  I've-- that I know of.  And--

21    and I say that because I wasn't the one that actually

22    would always make the requests, sometimes it might be a

23    support staff, so they would be tasked with that.  But

24    I-- I would've never directed them to exclude any calls.

25    Or numbers, sorry.

1    Q.   So there are times when you received these

2  calls-- where your office receives these calls that

3  there are calls between a-- the defendant and the

4  defendant's attorney?

5    A.   Not that I'm aware of.

6    Q.   You are not aware of a single instance in which

7  an attorney-- a prosecutor in your office has requested

8  phone calls from CCA and within those calls was a call

9  between the inmate and the inmate's attorney?

10   A.   Am I aware now?

11   Q.   Yes.

12   A.   I've-- I've been made aware of-- of that now, but

13  I never knew it before.

14   Q.   When did you become aware that that was a

15  possibility or that that had occurred, I should say, in

16  the past?

17   A.   I think in connection with this situation.  I

18  wouldn't have known before anything like that.

19   Q.   So before-- you said "this situation," do you

20  mean the allegations in this case?

21   A.   Yes.

22   Q.   So before September of 2016, you had no idea that

23  attorney-client phone calls would be produced as part of

24  a request for all of an inmate's calls at CCA?

25   A.   I was unaware of that.

1    Q.   The times you requested defendants' phone calls

2    from CCA, you never found, I assume, any calls between

3    an attorney and a client?

4              THE WITNESS:  Am I authorized to disclose

5    that?

6              MR. CLYMER:  Yes.

7              THE WITNESS:  I was never made aware and I

8    never encountered any situation where an attorney call

9    was included in any phone calls that I ever requested.

10   BY MR. BELL:

11   Q.   Sometimes you have agents on your cases assist in

12   reviewing the calls?

13   A.   Correct.

14   Q.   Is it your testimony that no agent ever told you,

15   hey, I found a call between an attorney and the

16   defendant?

17   A.   With regards to CCA calls, I was never made aware

18   of that.

19   Q.   Okay.  Let's-- so let's widen the circle.  Not

20   just CCA, any other facilities?

21   A.   Any other what?  Facilities?

22   Q.   Facilities.

23   A.   No, no other facilities.

24   Q.   So in the years that you have requested and

25   obtained jail calls from any facility, you have never

1   come across a call between a client and an attorney, nor
2   has any agent ever told you that they have come across a
3   call between a client and an attorney?
4       A.   That was a compound question, so... I have never
5   encountered phone calls, nor have I been told that phone
6   calls included attorney calls.
7       Q.   You're aware, of course, that clients talk to
8   their attorneys at CCA?
9       A.   On-- on phone calls?  Yes, I-- yeah, I'm aware of
10  that.
11      Q.   So all the times you requested calls, you never
12  heard an attorney-client phone call, how was it that you
13  thought those calls weren't included in the ones you
14  requested?
15              THE WITNESS:  Am I able to answer that?
16              MR. CLYMER:  Yes.
17              THE WITNESS:  I thought that attorneys
18  contacted the facility and had their numbers blocked.
19  That's-- that was what my understanding was.
20  BY MR. BELL:
21      Q.   I want to show you what's been marked and
22  admitted as Defense Exhibit 630A.
23              THE COURT:  630A?
24              MR. BELL:  I believe that's right.
25              THE COURT:  I think you have 603.

```
 1              MR. BELL:  No, 603A, my apologies.
 2    BY MR. BELL:
 3      Q.  Did you prosecute a defendant named Enoch Clark?
 4      A.  Yes.
 5      Q.  Richard Cornejo?
 6      A.  Yes, I think so.
 7      Q.  Desmond Gaines?
 8      A.  Yes.
 9      Q.  Dalevon Dixon?
10      A.  Yes.
11      Q.  Salvadore Florez?
12      A.  It says Savadore.  It's S-A-L-V-A-D-O-R-E, yes.
13      Q.  Is that yes?
14      A.  Yes, Salvadore Florez.
15      Q.  Kevin Fondren?
16      A.  Yes.
17      Q.  Jay Giannukos?
18      A.  Yes.
19      Q.  Damian Harlin?
20      A.  Damon Harlin, yes.
21      Q.  Tyrssverd Harssfell?
22      A.  Yes.
23      Q.  Dominic Hayes?
24      A.  Yes.
25      Q.  Cody Heather?
```

1    A.   I-- possibly.  I don't know if I remember that

2    name.

3    Q.   Brandon Jackson?

4    A.   Yes.

5    Q.   Brian Jackson?

6    A.   Yes.

7    Q.   Jemel Knox?

8    A.   Yes.

9    Q.   Edward McLinn?

10   A.   Yes.

11   Q.   Ashley Morgan?

12   A.   Yes.

13   Q.   Troyton Mozingo?

14   A.   Yes.

15   Q.   Brittany Mullen?

16   A.   I'm not sure.

17   Q.   Alonzo Timley?

18   A.   Yes.

19   Q.   David True?

20   A.   Yes.

21   Q.   Nancy Viveros?

22   A.   Yes.

23   Q.   Jamerl Wortham?

24   A.   I recognize the Wortham, I don't recognize that

25   first name at all.

1     Q.   Nohemy Bobadilla-Oliva?

2     A.   Yes.

3     Q.   Kelly Winegar?

4     A.   Yes.

5     Q.   Steven Hohn?

6     A.   Yes.

7     Q.   Michael Redifer?

8     A.   Yes.

9     Q.   Sadie Brown?

10    A.   Yes.

11    Q.   Dwone Heard?

12    A.   Yes.

13    Q.   Did you request phone calls of these inmates in

14    all these cases that you prosecuted?

15    A.   I know there were some I remember, but I couldn't

16    tell you on all of them.

17    Q.   Are there any on this list that you know you did

18    not request jail calls on?

19    A.   Well, the ones that I'm not sure about, like this

20    Jamerl Wortham, I don't-- I honestly do not remember

21    that guy at all.  I mean, there's some that I

22    specifically remember that we did for certain reasons,

23    but there's others that I-- I can't independently say

24    they're--

25    Q.   Were your-- I'm sorry, I didn't mean to cut you

1  off.

2      A.   And I can probably explain that, why I might not

3  necessarily know.  If an agent had a reason to get

4  calls, he might call my assistant to get those, so I

5  might not necessarily be the one to ask for those, so...

6      Q.   So the agent might, without involving you, go to

7  your assistant and ask for calls for a defendant?

8      A.   I think-- I'm pretty sure that's happened before.

9      Q.   And in those cases, the agent themselves would

10 most likely be the one reviewing the calls?

11     A.   Yeah.  That was more often than not the case

12 where they would be the one to review it.

13     Q.   And when the agents would review the calls,

14 sometimes they would write a report about a pertinent

15 phone call that they thought they had heard?

16     A.   Correct.

17     Q.   Other times, if they didn't view it pertinent or

18 not big enough to write a report about, they might just

19 give you an oral summary of what was described in the

20 call?

21     A.   That-- that probably might've happened.  Usually

22 there was some sort of little synopsis that I would get.

23     Q.   So these calls, I'm sure you've listened to

24 dozens, if not hundreds of them, do you believe that the

25 calls-- that if there's a call between a defendant and

1   an attorney, that the privilege is waived on those

2   recorded phone calls?

3       A.   Do I believe that?  That would be my belief based

4   upon my understanding of the law.

5       Q.   Okay.  Is there a Tenth Circuit case that you

6   know of that stands for that proposition?

7       A.   I-- I don't-- I don't know.  I just know there's

8   a lot of case law out there about calls not being

9   protected at a facility like this.

10      Q.   Have you ever had to research that issue

11  yourself?

12      A.   About attorney calls?  I-- I don't know that it

13  came in the context of attorney calls.  It may have just

14  been just generally in the context of calls at the

15  facility being privileged.  But it-- it wouldn't have

16  been in the context of-- of it being attorney calls,

17  because I never had that come up.

18      Q.   So you-- you're aware, at least your impression

19  is, that there is case law out there that says in this

20  context the attorney-client privilege has been waived.

21  You've never had to specifically research that issue

22  yourself that you remember?

23      A.   Again, as it applies to attorney calls, no.  But

24  just generally about whether calls to the facility would

25  be privileged, I'm fairly confident I've researched that

1    during my time here.

2        Q.  And why is that?

3        A.  I specifically remember one of the cases I

4    prosecuted was a capital murder case.  The defendant was

5    also charged with trying to have a federal witness

6    killed while he was at CCA.  And we actually built the

7    prosecution on calls that came from CCA.  And, again, it

8    wasn't calls to an attorney, it was just, you know,

9    general calls.

10       Q.  Was there any privilege issue at all?

11       A.  I'm sorry?

12       Q.  What was the privilege issue?

13       A.  I just remember us looking at the calls and that

14   we could use the calls because they weren't in any way

15   privileged.  I mean, that was definitely some of the

16   thoughts that would've went into that prosecution.

17       Q.  So I would imagine that during the fall of 2016,

18   in the office at least, the discussion about whether the

19   privilege has been waived on these calls was a pretty

20   hot topic?

21       A.  I'm not sure I'm authorized to--

22            MR. CLYMER:  You can answer that question.

23            THE WITNESS:  Okay.  So I really wasn't part

24   of very many conversations related to all of this.  So

25   I-- I may have heard banter, but I wasn't-- I wasn't an

1   integral part to any of it, so I don't know that I would

2   feel comfortable to talk about what the specifics were

3   at that time and what was and wasn't discussed.

4   BY MR. BELL:

5       Q.   So if it's your position, based on research that

6   you haven't done, that the privilege has been waived,

7   did that-- and that there's cases that supports that,

8   did that understanding come from conversations with

9   others in your office?

10      A.   There were probably some conversations.  I think

11  some of it was from pleadings that I had reviewed

12  connected to this-- to this litigation.  And, you know,

13  it's obviously became more of a relevant subject I

14  guess, so I've tried to read some of the pleadings.  I

15  know I haven't read all of them.

16      Q.   So if you were-- if you were to come across a

17  call between a defendant and an attorney in jail calls

18  that you requested and if you say there that legal

19  authority says that those calls aren't privileged, the

20  privilege has been waived, is there anything stopping

21  you from listening to that call?

22      A.   Legally, no, I don't think, but I-- I think if I

23  had ever heard that, I would've been so shocked that I

24  would've immediately stopped.  I wouldn't have listened

25  to it.  And--

1      Q.   Why not?

2      A.   Why?  I don't-- I don't want to listen to a call

3   between a defendant and his attorney.

4      Q.   Why not?

5      A.   I don't know.  I just don't.  I don't need to, I

6   don't want to.  I haven't had-- I haven't had a reason

7   to I guess.  I guess if there was something nefarious

8   going on, maybe.  But just generally speaking, I

9   wouldn't see the need for that.

10     Q.   So there's nothing legally that would stop you

11  from listening to the call, just your own feelings about

12  it is you wouldn't want to listen to it?

13     A.   Right.

14     Q.   So you would feel comfortable listening to that

15  call from a legal standpoint, not necessarily your own

16  practice, but legally, because you had concluded that

17  the privilege had been waived?

18     A.   Legally I think I could listen to the call.

19     Q.   So let's unpack that for a second.  Because, I

20  mean, the end of that sentence is the privilege has been

21  waived if, right, if certain facts are true; is that

22  fair?

23     A.   I-- I don't-- I'm lost I guess.  I don't know

24  what you're referring to.

25     Q.   Okay.  Well, privilege waiver-- determination of

1    a waiver is a legal conclusion that depends on certain

2    facts?

3        A.   Right.  Okay.  I didn't know what-- I thought I

4    had missed something.  Okay.

5        Q.   So among those facts are that-- whether the

6    client has made a knowing and intelligent waiver of the

7    privilege.  Right?

8        A.   That's one of the points, yes.

9        Q.   So I assume you've listened to enough of these

10   calls, you're familiar with the preamble that says,

11   "This call is subject to recording and monitoring"?

12       A.   Yes.

13       Q.   I also assume that you've never had to make a

14   call yourself from the phones in the pods at CCA?

15       A.   I've never made a call.  I've gotten a few calls,

16   though, so...

17       Q.   And so you hear-- or when you got the call, did

18   you hear the preamble, the admonition about subject to

19   recording and monitoring?

20       A.   Yes.  That's why I-- that's why I knew it was

21   coming from a facility.

22       Q.   You don't know what the person, the caller hears

23   on their end of the extension?

24       A.   I-- I don't know what's-- all I know is what's

25   recorded.  The preamble is recorded and then--

1     Q.   You've heard it at least a couple of times on

2   your end of the line.   Right?

3     A.   From the recordings, yes.

4     Q.   Right.

5     A.   And-- yes.

6     Q.   But you don't know that the inmate hears that.

7     A.   I think I know that because-- yeah, I know that.

8   I know that because the-- the inmate waits before they

9   speak, and they also-- I've also had-- I've heard

10   numerous times them make statements that the calls are

11   being-- they know they're being recorded, so--

12     Q.   We don't know that that belief comes from a

13   preamble or not?

14     A.   Yeah, I-- I guess, because it's recorded-- the

15   calls are recorded-- it records the entirety from the

16   time the inmate-- like you hear them dialing.

17     Q.   Right.

18     A.   And then you hear the preamble and then you hear

19   the call start.   So it's-- it's a continuous recording.

20     Q.   But the recipient of the call, they don't hear

21   the person dialing the number.   Right?

22     A.   They don't hear that.

23     Q.   So it's--

24     A.   They don't hear that until they answer.

25     Q.   Right.   No, but they never hear the inmate

1   dialing the number, do they?

2      A.   No, they don't-- they don't hear it until the

3   call is connected.

4      Q.   Right.  So the recording that you are talking

5   about doesn't show exactly what both sides hear, right,

6   it shows what one side might hear.  And you don't know

7   what one side to the call or the other side to the call

8   hears?

9      A.   Well, so the recording actually-- the preamble

10  starts once the person answers, once there's a

11  connection.

12     Q.   You hear the preamble on the recording once the

13  call is connected.  Right?

14     A.   Right.  The inmate is on there at that time.

15     Q.   You have never-- again, I think your testimony

16  was you've never made a call from CCA?

17     A.   No.

18     Q.   You have no personal knowledge of what the inmate

19  hears when they make the call?

20     A.   No, I don't.

21     Q.   Okay.  You also don't know whether the inmate

22  fully understands that the call is actually being

23  recorded?

24     A.   Well, like I said, there are a number-- I mean,

25  routinely in the calls there's an indication that they

1  know they're being recorded.

2    Q.  But you don't know what they understand about

3  whether they're being recorded or not.  Right?

4    A.  When they say they know they're being recorded,

5  I--

6    Q.  Have they all said that?  Do they all say they

7  know that they're being recorded?

8    A.  I would-- I don't know that I could say all, but

9  I would say many or most will make some comment about,

10 hey, don't say that because-- you know, or they'll use

11 coded language or something that is pretty indicative

12 that they know they're being recorded.

13   Q.  You also-- the preamble they hear is the call is

14 subject to recording and monitoring, it doesn't say it

15 will be recorded.  Right?  It just says it's subject to

16 recording and monitoring?

17   A.  Yeah.  And I don't-- again, 16 years, I don't

18 know if that preamble has changed over time, it may

19 have.

20   Q.  Is that what you recall it being?

21   A.  There-- I remember some language like that, yes,

22 sir.

23   Q.  All right.  And would you agree with me that's

24 different than saying the call will be recorded?

25   A.  That-- I don't-- I don't know that it says the

1    calls will be recorded.

2        Q.   Right.  When it says, "Subject to recording and

3    monitoring," that's different than saying "the call will

4    be recorded"?

5        A.   That's different, yes.

6        Q.   Okay.  You said that in the history of all of the

7    call requests you've made and all the calls you've

8    reviewed and all the calls you've had the agents review,

9    that you've never come across an attorney-client call

10   yourself or heard of the agents doing it; is that right?

11       A.   Right.  Of ones listened to, never.

12       Q.   How would you know?

13       A.   How would I know?

14       Q.   That the call was to an attorney that you

15   listened to.

16       A.   I-- I think generally with any case I'm on, I

17   know who the attorney is, I'm-- I would be able to

18   definitely recognize their voice.

19       Q.   What if it's a call to an attorney that's not on

20   the case?

21       A.   I think after a brief conversation, that would

22   become apparent that it was an attorney.  If it wasn't

23   the attorney of record, is that what you're saying, that

24   I wasn't familiar with?

25       Q.   (Nods head up and down).  How would it become

1  apparent?

2     A.  Well, I assume based upon what they-- maybe what

3  was heard on the call.

4     Q.  What about the agents?  How are the agents

5  supposed to know that what they're listening to is a

6  call between an attorney and a client?

7     A.  I would assume the same-- the same way I do, by--

8  if they heard a voice that they recognized as being the

9  defense attorney, then they would know that was the

10  defense attorney.

11     Q.  So if it depends on voice recognition, out of all

12  of the calls you've ever reviewed, is it possible that

13  you or your agents listened to an attorney-client phone

14  call?

15     A.  I know I have never.

16     Q.  How do you know?

17     A.  I'm sorry?

18     Q.  How do you know?

19     A.  I just know.  I know I've never listened to a

20  phone call between a defendant and his attorney, ever.

21     Q.  All right.  So have you gone through all the CDRs

22  of all the calls you've ever requested and made sure

23  they don't belong to any attorney phone numbers?

24     A.  No.  You know, depending on the case, there might

25  be a huge number of calls.  And, again, I-- I think I

1  mentioned to you that usually there was a reason that we

2  might get the calls and it might be that we're just

3  looking for a particular person that they're talking to,

4  so we don't listen.

5        If there's 300 calls that an inmate has done,

6  probably not going to have time to listen to all of

7  those calls.  So of the calls accessed are the only ones

8  that I can speak to.

9     Q.  So you mentioned that you might get, I think you

10  threw out the number, 300 calls, but you might be

11  looking for something specific so you're not going to

12  listen to all 300 calls?

13     A.  Right.

14     Q.  And the other let's say 290, the ones you don't

15  listen to, those aren't important because they don't fit

16  the criteria of what it is you're looking for?

17     A.  Or I just-- we just don't have time to listen to

18  them.  And that might include calls that didn't connect.

19  There's a lot of-- you know, if you have 300 calls,

20  there might be a large amount where the inmate has tried

21  to call someone and nobody answered, so-- but the call

22  still exists, but--

23     Q.  But you also just might not have time to review

24  completed calls, right, because they don't fit the

25  criteria of what you're looking for?

1      A.   Right.  Or we're looking at a specific time

2   frame, you know, like a week time.  And so we've gotten

3   a month's time, but we're just going to look at a small

4   time frame.

5      Q.   So you have these pile of calls, you've listened

6   to a portion of them because they fit what you're

7   looking for, you haven't listened to the rest of them.

8   They're in your possession.  How do you know that they

9   don't contain *Brady* or *Giglio* information in the calls

10  you didn't listen to?

11     A.   I-- I don't know.

12              MR. BELL:  No further questions.

13              MS. VANBEBBER:  Your Honor, may I be

14  permitted to inquire as though I had called this witness

15  on the issue of the Special Master's cooperation?

16              THE COURT:  Yes.

17              MS. VANBEBBER:  I'd like to do that first

18  then.

19                   CROSS EXAMINATION

20  BY MS. VANBEBBER:

21     Q.   You said you've been here 16-- oh, I'm sorry, go

22  ahead.  You said you've worked here 16 years; is that

23  right?

24     A.   Yes.

25     Q.   And in 2016 what was the nature of your practice?

1     A.   I was a criminal AUSA.

2     Q.   And working what kind of cases?

3     A.   I primarily was assigned to firearm and

4  narcotic-related cases, but I might do, you know, any

5  kind of case.  I've done a little bit of everything.

6     Q.   All criminal?

7     A.   Yeah.  Well, aspects of civil in there if it's

8  connected to a criminal case.

9     Q.   After October of 11th, 2016, you knew that the

10  Court had appointed a Special Master to look into the

11  circumstances surrounding the videos and the phone

12  recordings at CCA.  Right?

13     A.   I was generally made aware of that, yes, ma'am.

14     Q.   But you didn't work on the *Black* case?

15     A.   I did not.

16     Q.   You didn't work on the *Rapp* case?

17     A.   I did not.

18     Q.   You didn't work on *Herrera-Zamora*?

19     A.   I did not.

20     Q.   So did you read the-- the order that the judge

21  issued on that appointment of the Special Master?

22     A.   I'm sure I did.  I was out of the office a lot in

23  2015 and 2016.  And so as time permitted, I would review

24  pleadings so that-- I-- I couldn't tell you without

25  looking at whether-- I don't know which order you're

1   talking about.  I know there were a lot.  So I tried as

2   my time allowed to familiarize myself with whatever was

3   available.

4       Q.  So it's your understanding that the U.S.

5   Attorney's Office was ordered to fully cooperate with

6   the Special Master.  Right?

7       A.  Yes.

8       Q.  And you also knew-- generally knew that that

9   included doing a lot of things, such as providing

10  documents and providing access to people as well.

11  Right?

12      A.  I don't know if I had all of those specific

13  details.

14      Q.  Did you think that the order applied to you as

15  well as to anyone else in the office?

16      A.  What part of the order?

17      Q.  Pardon?  The order to cooperate with the Special

18  Master.

19      A.  Oh, certainly if I was called upon, I-- yeah.

20      Q.  All right.  Do you--

21      A.  I would've assumed that anyway.

22      Q.  Do you recall a meeting here in the U.S.

23  Attorney's Office that was called by management for

24  December 8th, 2016, to discuss cooperation with the

25  Special Master?

1    A.   You know, again, I was out a lot in 2016 so I

2   would have to look at my calendar to even see if I was

3   here at that time.

4    Q.   Did you attend-- did you remember-- do you recall

5   attending a meeting that was run by Emily Metzger and

6   included Debra Barnett and Scott Rask where they talked

7   to you about how you should deal with the Special Master

8   on any date?

9    A.   I don't remember ever being at a meeting with

10   those individuals, but I could've been if-- was that on

11   December 8th?

12    Q.   Yes.

13    A.   I would have to look at my calendar.  If-- if I

14   was-- I mean, I could've been in trial, I was in trial a

15   lot, but I was also out of the office a lot, so...

16    Q.   I guess my question is simply:  At any time did

17   you attend such a meeting?

18    A.   Again, I don't recall-- I don't recall that, but

19   I could have.  I have no recollection of that.

20    Q.   All right.  Did you do-- do you recall on

21   December the 19th or thereabouts getting-- everybody

22   getting a litigation hold letter from Emily Metzger with

23   19 things you were supposed to preserve for the Special

24   Master?

25    A.   I-- I think I remember that.  I would probably

1  have to look at it just to make sure, but I remember

2  getting some-- some correspondence from Emily about

3  that.

4      Q.  And did you provide-- or did you tell her about

5  anything that you had that was responsive to that?

6      A.  We-- my recollection--

7              THE WITNESS:  Am I authorized on this?

8              MR. CLYMER:  I'm sorry, could you repeat the

9  question, counselor?

10             MS. VANBEBBER:  Yeah, if she recalls whether

11  she provided or-- excuse me, provided to or simply

12  retained anything that Ms. Metzger identified in the

13  letter.

14             MR. CLYMER:  You can answer the question.

15             THE WITNESS:  I-- I remember there was a

16  form that we were given, I think it was a lit hold form,

17  and it was-- we were asked if we possibly had any of the

18  information.  And so to the best of my ability, I went

19  through that form and provided it.

20  BY MS. VANBEBBER:

21      Q.  All right.  Were you ever told--

22      A.  I think that was possibly the time frame that

23  you're talking about.

24      Q.  Were you ever told not to talk to the Special

25  Master?

1      A.  No, I was never told that.

2      Q.  Were you ever told not to ask to speak with him?

3      A.  Not to ask to speak to him?

4      Q.  Other than talking-- I'm sorry, did you-- were

5  you ever told not to talk to him on the telephone?

6      A.  No.

7      Q.  Were you ever told not to send him e-mails?

8      A.  Not that I ever remember.

9      Q.  Was it ever suggested to you that you could

10  volunteer information to the Special Master?

11     A.  Not that I recall.

12     Q.  Are you aware of anyone in the office who was

13  told not to speak with the Special Master?

14     A.  I don't know of anyone that was, not that I

15  recall.

16     Q.  And did you ever-- you never did speak with him

17  at any time?

18     A.  I-- until today I don't even-- I assume that's

19  him over there.

20     Q.  Yes, it is.

21     A.  I wouldn't have-- I don't think I've ever laid

22  eyes on him before just now.  I probably couldn't have

23  picked him-- I know I couldn't have picked him out in a

24  lineup.

25     Q.  All right.  Let's move to cross examination.

1    What's the largest indicted case that you have at the

2    moment that you're presently working on?

3        A.   Like numbers of defendants?

4        Q.   No, just important, the one that's most

5    important.

6        A.   Could you-- could you-- I thought you said the

7    number.  What was the question?

8        Q.   I want to know what you think right now is your

9    most important, your biggest indicted case.

10       A.   Oh, biggest indicted.  Well, there's several

11   multi-defendant cases that are pending right now, so I

12   would say that.

13       Q.   Okay.  Just pick one in your head.

14       A.   Okay.

15       Q.   Do you know who the defense counsel is in that

16   case for the main defendant?

17       A.   Yes.

18       Q.   Would you recognize that attorney's telephone

19   number if you saw it on a log or an index of calls that

20   the-- that the-- that you got from CCA?

21       A.   I think, yes, I would.

22       Q.   And if you saw that number come up several times,

23   would that trigger you to form a taint team?

24       A.   I don't know that I--

25            THE WITNESS:  Can I answer that?

1              MR. CLYMER:  Sure.

2              THE WITNESS:  I don't know that I have the

3    authority to form a taint team.  I would probably

4    consult with my supervisor and then let that decision be

5    made through the proper chain of command.

6    BY MS. VANBEBBER:

7       Q.  Would you call that attorney and say, hey, we've

8    got your client calls?

9       A.  Are you saying if their number came up just on

10   the listing of calls?

11      Q.  And you saw it several times, would that trigger

12   you to understand that that was the person you had been

13   dealing with?

14      A.  I think if I saw that there was actually minutes

15   associated with that call, that would indicate to me

16   that there was potentially a recording of that.  If it

17   had a zero as far as, you know, content, then I-- I

18   would-- I think that would confirm to me that, oh,

19   this-- yeah, the call came up, but it's blocked, you

20   know.  That's I think what I would presume in that

21   situation.

22      Q.  Would you immediately call that attorney and tell

23   him, hey, we've got your client's calls?

24      A.  I think, again, if I saw that there were-- was

25   actually content to the call and I had recognized that

1  that was, for instance, Carl Cornwell's number, then I--

2  I would probably say, hey, we've-- that this is the

3  situation.

4     Q.  Do you think you'd have an obligation to do that

5  or would you just be being nice?

6     A.  I don't know that I would say that I would be

7  doing it to be nice.  I think I would be doing it

8  because I think it would be the right thing to do.

9     Q.  When was the last time you informed any attorney

10  on any one of your cases that his calls had been

11  recorded and that they were in the hands of the

12  prosecution?

13           THE WITNESS:  Am I able to answer that?

14           MR. CLYMER:  Sure.

15           THE WITNESS:  I've never had that happen

16  because I've never been aware of that.

17  BY MS. VANBEBBER:

18     Q.  I would like to refer you back to Defendant's

19  Exhibit 603A.

20     A.  Uh-huh.

21     Q.  And you indicated that with the exception of

22  Mr.-- which one, Wortham, I believe?

23     A.  I think there were a couple that I really wasn't

24  completely familiar with--

25     Q.  Well, just look at the number of them.

1    A.  -- but--

2    Q.  Go ahead.

3    A.  Jamerl Wortham I wasn't familiar with that I

4  recall.

5    Q.  Well, just look at the category that's called

6  "number of attorney calls accessed."

7    A.  Okay.

8    Q.  And there's 24 there, aren't there?

9    A.  Yes.

10    Q.  And you just indicated to me that you had never

11  had an occasion where you felt the necessity to call an

12  attorney and tell him you had intercepted his client

13  calls.  Right?

14    A.  I-- I think what I said was that I was never

15  aware of any attorney calls being-- being recorded, so

16  that I would've never done that.

17    Q.  But there they are.

18    A.  I-- I don't know.

19          MR. CLYMER:  I'm going to object, Your

20  Honor, that misstates the testimony.  The testimony is

21  not that those are attorney calls, they're calls to an

22  attorney telephone number.

23          THE WITNESS:  Yeah.  I--

24          THE COURT:  Overruled.

25          THE WITNESS:  I don't know.  I don't know

1    what this document represents.  I've never seen it

2    before.

3    BY MS. VANBEBBER:

4        Q.   So you're-- you-- you will agree that it looks

5    like you accessed-- you made calls and accessed attorney

6    calls to a given number that is an attorney's number and

7    that there's 24 of them.  So your recollection today is

8    that in all of those 24 calls that either you or your

9    agent accessed, in not one of them, not one of those

10   attorney numbers was called back by you to say we have--

11   we have your client calls?

12       A.   Okay.

13       Q.   Correct?

14       A.   First of all, first of all, the word "accessed,"

15   you're saying that we accessed them.  I-- again, I've

16   never accessed an attorney call, listened to the call.

17   So I don't know what this document represents.  If it

18   represents that calls were obtained from each of these

19   defendants and within there there were actually

20   recordings of attorneys, I don't know.

21            I never heard any calls, I was never made aware

22   of any calls to an attorney, so we-- I never accessed

23   any attorney calls; in other words, I never listened, I

24   never had occasion to listen to an attorney call.  If

25   they were in a batch of calls, I wouldn't have known.

1     Q.   You indicated that you believe you can listen--

2   or that-- that the office typically takes the position

3   that you can listen to CCA's attorney calls because

4   they're not privileged?

5             MR. CLYMER:  Objection, there's no testimony

6   to that effect in this record.

7   BY MS. VANBEBBER:

8     Q.   Well, then what do you believe?

9     A.   That's not-- I didn't say that.  What I-- what I

10  spoke of was what I-- what I believe.  And I think what

11  I testified to with Mr. Bell was my belief is that

12  attorney calls-- if an attorney call was intercepted,

13  that it wouldn't qualify as being privileged.  And

14  that's my understanding based upon what I know.

15    Q.   So if it's not privileged, then you're free to

16  listen to it?

17    A.   Legally, I could listen to it I think.  Would I?

18  No.

19    Q.   I'm going to give you a hypothetical I gave

20  someone else earlier.  If you obtained a call from an

21  inmate to a cohort outside the walls, any good

22  prosecutor would really want to listen to that call,

23  wouldn't she?

24    A.   Just a cohort?

25    Q.   Yeah.

1    A.   Like a co-defendant?

2    Q.   Yes, a co-defendant or an unindicted

3  co-conspirator.

4    A.   Potentially, yes.

5    Q.   Because that case-- your case could be-- excuse

6  me.  Your case could depend upon the content of that

7  call, couldn't it?

8    A.   I-- I have never filed a case where my case would

9  be dependent upon a call from CCA after I had indicted

10  someone.  So my case would not depend upon that call.

11    Q.   Well, someone else's case could, couldn't it?

12    A.   I don't know.

13    Q.   And it would be something that you would as a

14  matter of good practice, good prosecutorial practice,

15  you would want to know what's in that call, wouldn't

16  you?

17    A.   Again, I-- I wouldn't-- I've never had a

18  situation where I've needed CCA calls to make a case.

19  So I don't need it.  There may have been a reason that

20  we want to listen to a particular defendant's calls, but

21  it wouldn't be to make our case.

22    Q.   It would certainly be to help develop your case

23  if you bothered to listen to it, wouldn't it?

24    A.   If I've already indicted the case, my case is

25  already developed.

1      Q.   There's nothing there you could possibly use for

2   sentencing or negotiation of a settlement or anything

3   else; is that your testimony?

4      A.   That's not my testimony.  I-- I didn't say that.

5   I said there may be a particular reason that we want to

6   listen to the calls.

7      Q.   And if you had such a call, you'd listen to it,

8   wouldn't you?

9      A.   Again, there have been-- we don't listen to all

10  the calls that we get.

11     Q.   Ma'am, you've listened to an awful lot of inmate

12  calls to people outside the walls who are not attorneys,

13  haven't you?

14     A.   That an inmate has made to someone, yes, I've--

15  I've listened to a number of those calls.

16     Q.   So it's your testimony then that if the CCA calls

17  are unprivileged, that you could listen to them, but you

18  would choose not to?

19     A.   Are you talking about attorney calls in that

20  context?

21     Q.   Yeah.  If it's true that those calls are not

22  privileged because they've been waived, the privilege

23  has been waived, wouldn't it be fair game if you or an

24  agent wanted to listen to those calls?

25     A.   Again, I've never encountered that so I've never

1    really contemplated that, but I wouldn't want to listen

2    to those calls.

3       Q.   Even if that could help the progress of your

4    case, you wouldn't listen to it?

5       A.   Again, I-- I don't know in what context it could

6    possibly help my case.  I-- I-- I have my own belief

7    that they wouldn't be helpful.

8       Q.   Let me ask you a couple of instances.  What if

9    they were talking about what kind of a plea the client

10   ought to be taking?

11      A.   With the attorney?

12      Q.   Uh-huh.  It's an unprivileged call, wouldn't you

13   want to know that?

14      A.   I don't-- I guess my belief would be I-- I would

15   have a hard time believing that a defense attorney would

16   talk about that on a call knowing-- I-- I guess I've

17   never thought that they probably talked about that stuff

18   on the phone.

19           I've-- I've had many defense attorneys tell me

20   that they would never talk to their client about things

21   like that on the phone, so I guess I've never

22   contemplated that, but I-- I just would never see the

23   need to want to listen to those.

24      Q.   All right.  Now, I'd like to go over-- for the

25   last category I'm going to have for you, I'd like to go

1    over the materials that you were asked about concerning

2    the *Orozco* case.

3          You were asked first are there not materials that

4    you must disclose to defense counsel as a matter of

5    criminal discovery.  Do you remember that question-- do

6    you remember those questions?

7      A.   I remember Mr. Bell asking some questions about

8    discovery, yes.

9      Q.   It's fair you have to turn over *Brady*

10   information, isn't it?

11     A.   Yes.

12     Q.   And eventually at the right time you have to turn

13   over *Jencks*?

14     A.   Yes.

15     Q.   And you have to turn over *Giglio*?

16     A.   Yes.

17     Q.   So those would all be categories of things that

18   you would be required to disclose at the appropriate

19   time.  Correct?

20     A.   Correct.

21     Q.   And in every instance you have to do it in a

22   manner that is timely as required by the statute or as

23   required by case law or as required by local rule; isn't

24   that right?

25     A.   Correct.

1    Q.   So I'm going to direct you then to-- back to

2    December the 12th, 2016, when the trial was set-- was

3    originally set for *Orozco*.   That morning before jury

4    selection you filed a sentencing information to

5    establish a prior conviction.   Right?

6    A.   That's correct.   They have to be filed before the

7    commencement of trial.

8    Q.   And you filed it right before the jury was

9    selected.   Correct?

10    A.   Before the trial.

11    Q.   How long had this case been pending before it

12    went to trial?

13    A.   I don't remember when it was filed.   I'd have to

14    look back at the docket sheet.

15    Q.   Just take a ballpark.   A year?

16    A.   Possibly a year.   I know--

17    Q.   More than a year?

18    A.   I-- I don't know.   2015, 2016 are pretty fuzzy.

19    I-- I know it had been pending for some time.

20    Q.   It would be at least a year, wouldn't it?

21    A.   I can't say.

22    Q.   And during that period of time you never decided

23    that you needed to file the sentencing information to

24    establish a prior conviction until the day the jury is

25    going to be sitting?

1      A.   Actually that's not correct.

2      Q.   Oh, it isn't?  What is incorrect about that?

3           THE WITNESS:  Am I able to answer that?

4           MR. CLYMER:  Sure.

5           THE WITNESS:  I had been seeking approval to

6  file an 851 in that case for at least six months.

7  BY MS. VANBEBBER:

8      Q.   And you're saying that the-- that approval didn't

9  come in until the morning of trial?

10     A.   It came in on Saturday before the trial started

11  on Monday.

12     Q.   But you didn't ECF it, you didn't file it?

13     A.   I wasn't in the office that weekend and so I

14  filed it first thing-- I-- I think I got it Saturday

15  morning by-- and I don't even know if I saw it Saturday

16  because-- I mean, I had my work phone, but I don't

17  remember what I was doing that weekend.  But I did not

18  get the approval until Saturday morning.

19          And promptly Monday morning when I got to the

20  office I-- and I think I got there super early that

21  morning, I filed it that morning.  But I had been trying

22  to get it filed for at least six months.  It may have

23  been longer, maybe seven or eight months.

24     Q.   And that sentencing information would've resulted

25  in increasing a 10-year mandatory sentence to a 20-year

1  mandatory sentence.  Right?

2      A.  And actually I sought approval for a double 851,

3  which would've made him eligible for life.  He had eight

4  or nine prior felony drug convictions.

5      Q.  Do you recall that the judge found that that

6  would've been an excessive sentence for the charged

7  offense?

8      A.  I'm not sure I feel comfortable answering that.

9      Q.  If the record reflects that, would you deny that

10  that is what it says?

11      A.  I'm not sure I feel comfortable answering that.

12  I-- I think there was a comment about that, but I don't

13  believe the judge had seen the presentence report yet

14  because it hadn't been submitted.

15      Q.  So the record would be the best evidence of

16  what's in the record.  Right?

17      A.  I-- as far as the presentence report?

18      Q.  No, as far as what the judge noted in the-- in

19  the opinion.

20      A.  Again, I-- I think I remember something along

21  those lines, but again, there-- there was never a

22  presentence report-- or the-- the final presentence

23  report was not submitted, so I'm not sure what

24  information that was in connection with.

25      Q.  You also introduced some evidence that morning?

328 of 336

 1      A.   What morning?

 2      Q.   The morning of December the 12th.  These are all

 3 questions about December the 12th that I'm going to ask

 4 you here and I'll tell you if it's a different day.

 5 Okay?

 6      A.   Uh-huh.

 7      Q.   Okay.  You introduced some evidence the morning

 8 of trial, the 12th?

 9      A.   I didn't introduce any evidence.

10      Q.   Excuse me, I said that wrong.  You gave the judge

11 some information that morning that you did not describe

12 as *Brady*.  Correct?

13           MR. CLYMER:  Your Honor, I'm going to object

14 at this point.  This is far afield from the allegations

15 made in the Rule 41 motions and Carter's motion to

16 dismiss.  And I've just got concerns because it seems to

17 be inquiring about a matter that was before this Court

18 where this Court saw what happened, knows what happened,

19 and I'm not sure the point of this.

20           And I have concerns about inquiry into

21 decisions made by another branch of the government in a

22 case.  The government's position in that case and what

23 it said and did is a matter of public record, and I'm--

24 I question the propriety of permitting inquiry into

25 things that go beyond what was in the record and what

1   was done in open court.

2          MS. VANBEBBER:  This is cross examination

3   and this was gone into in direct.

4          MR. BELL:  Well, and, Your Honor, on behalf

5   of the Federal Public Defender, Mr. Clymer spent a lot

6   of time asking every Assistant United States Attorney

7   whether they ever listened to phone calls or videos.

8   One of our problems is, that denial aside, there's no

9   way for us to prove that they did because I think, as

10  this shows, practice in that office is that not

11  everything gets turned over to defense counsel, so it's

12  a black box.

13          So this is relevant.  What this prosecutor

14  believes their discovery obligations were are relevant

15  to the issue of whether defense would ever be able to

16  prove that a particular prosecutor or agent listened to

17  the recorded calls of them and their client.

18          MR. CLYMER:  This line of questioning

19  doesn't deal with discovery, Your Honor.

20          THE COURT:  Actually it does, it has to do

21  with *Brady*.  I've heard evidence about discovery

22  practices, about what prosecutors' opinions were, either

23  corporately or individually, about their discovery

24  obligations, about attorney-client privilege, et cetera.

25          I agree with the FPD in the sense that I'm

 1    going to have to determine based on the evidence whether
 2    I think any or all or no prosecutors listened to calls,
 3    reviewed videos, absent an admission such as Ms.
 4    Tomasic's admissions.  That's the kind of thing that
 5    can't be proved other than through circumstantial
 6    evidence.  So I think that the parties should have
 7    latitude to explore this.
 8             And questions about the discovery practices
 9    of *Brady*, *Giglio*, or whatever, really are relevant to
10    the larger question, the attorney-client privileged
11    documents just being-- I should say alleged privileged
12    documents being part of a bigger picture.  That's the
13    evidence I've heard thus far.  So I do think it's
14    relevant.
15             I will say this, I'm not necessarily
16    foreclosing inquiry into this, but I can judicially
17    notice the findings that I made in the *Orozco* order.  I
18    will tell you that I remember them pretty well.
19             And I think if you read the order, my
20    findings were that on the morning of December 12th,
21    which was the morning of the first day of trial and the
22    jury was about to be brought up, Mr. Campbell asked for
23    a continuance because he had just discovered SIM cards
24    that were located in a pink pouch where a bag of
25    methamphetamine that was all-- also located, that there

1    were three people in the vehicle when the officers did

2    the traffic stop, whatever police encounter it was.

3    There was a woman and two men, including Gregory Orozco.

4    Only Gregory Orozco was charged.

5              There was obviously going to be an issue

6    about who possessed the methamphetamine as well as other

7    matters that were seized from the truck.  Whether they

8    jointly possessed them, they constructively possessed

9    them, they actually possessed them were going to be

10   issues at trial, no question about that, particularly

11   since only one person was charged.

12             And I asked Ms. Morehead-- because I'm

13   somewhat befuddled why she's disclosing evidence

14   literally minutes before we're going to start selecting

15   the jury, I asked Ms. Morehead pointedly, is the

16   government going to use this evidence?  And Ms. Morehead

17   said no, it's just a bunch of random photographs that

18   have nothing to do with anything.

19             I granted Mr. Campbell's motion for

20   continuance.  I believe we then tried the case two or

21   three months later.  It turns out that the SIM cards

22   included 200 photos of-- photographs of the woman that

23   was in the car - and I don't remember her name, she was

24   a witness, but the woman that was in the car - giving

25   birth to a baby, having a birthday party with some other

1    child, having her children at the playground.  No hint

2    of any photographs of Gregory Orozco.  Gregory Orozco

3    and the woman were not related.

4            So it was clear to the Court, and it's in my

5    order, that this was exculpatory evidence because it was

6    evidence that was co-located in the pink pouch with

7    methamphetamine, a bag of methamphetamine.  So it was

8    clear to the Court that it was *Brady* information, it was

9    clear that Ms. Morehead had not disclosed that until the

10   morning of trial.  And when I asked her about the nature

11   of the evidence, she did not reveal to me that it was

12   exculpatory or even potentially exculpatory, she called

13   it random irrelevant evidence.

14           So it's all in my order.  I remember it

15   clear as a bell.  You can read the order for yourself.

16   I'm going to judicially notice the findings I've made.

17   I'm not foreclosing further inquiry, but I don't know

18   that you need to inquire any more into it at this point

19   based on my judicial notice of what I've already

20   decided.

21           MS. VANBEBBER:  I'll trim it down from what

22   I was going to ask then.

23   BY MS. VANBEBBER:

24      Q.  You-- you did not describe the evidence that

25   you-- that we've just talked about as *Brady*, did you?

1    A.   No, I described it as-- I think the question was

2    if I-- there was any indication I was going to use it in

3    my case, and my answer was no.  That was the only

4    question that was asked.  That was what I said.

5    Q.   All right.  Then let me ask you in general the

6    practice in this office.  Is it your position that if

7    you're not going to use evidence, you don't need to turn

8    it over?

9    A.   And I-- I think I answered that before that I'm

10   unaware of any such practice.

11   Q.   Well, you had-- you do have to turn over *Brady*

12   timely.  Correct?

13   A.   Correct.

14   Q.   And, excuse me, in this case you were turning it

15   over on the morning of trial.  Correct?

16   A.   Again, I think I explained that we first-- I

17   first learned of it on Friday and I promptly called Mr.

18   Campbell to tell him about that, and physically I gave

19   that to him on Monday.

20   Q.   You found out about it on Friday, it's *Brady*,

21   it's integral to his case, and you waited until Monday

22   to turn it over?

23   A.   I gave-- I physically gave it to him on Friday,

24   yes, ma'am-- I mean, on Monday, yes, ma'am.

25             MS. VANBEBBER:  I'm just seeing if I have

1  anything else with regard to that case.  That, as the

2  Court has pointed out, she's taking judicial notice of

3  it, anybody can go and read it, I assume.  I think

4  that's all.

5              THE COURT:  Mr. Clymer.

6              MR. CLYMER:  No questions, Your Honor.

7              THE COURT:  Mr. Bell?

8              MR. BELL:  One moment, Your Honor.  No

9  questions.

10             THE COURT:  All right.  May Ms. Morehead be

11  excused?

12             MR. BELL:  Yes, Your Honor.

13             THE COURT:  All right.  You're excused.  All

14  right.  Let's recess for the evening.  How are we doing

15  time-wise?

16             MS. BRANNON:  I think we're in fairly good

17  shape, Your Honor.  I think we have everyone lined up

18  for tomorrow.  I think the Special Master is going to

19  defer and let us call a couple of people out of order,

20  but I think we're in good shape schedule-wise.

21             THE COURT:  All right.

22             MR. CLYMER:  Your Honor, I want the Court to

23  know that, depending on whether either the Special

24  Master or the Public Defender's Office calls a certain

25  Assistant U.S. Attorney, if they don't call him as a

1    witness, I would like to call him as a rebuttal witness.

2    I've let them know that.  I've asked them to arrange

3    their scheduling so there's enough time to get that done

4    before the end of the week.

5              THE COURT:  Okay.  All right.  Is there

6    anything else we need to talk about before we close out

7    as far as documents, exhibits, discovery or production

8    of records, anything along those lines?

9              MS. BRANNON:  No, Your Honor.

10             THE COURT:  Okay.  Oh, did you have

11   something?

12             MS. BRANNON:  No.

13             THE COURT:  No?  Okay.  All right.  So let's

14   reconvene at 8:30 tomorrow morning.

15             (5:30 p.m., proceedings recessed).

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4

5      I, Kelli Stewart, a Certified Shorthand Reporter and

6   the regularly appointed, qualified and acting official

7   reporter of the United States District Court for the

8   District of Kansas, do hereby certify that as such

9   official reporter, I was present at and reported in

10   machine shorthand the above and foregoing proceedings.

11      I further certify that the foregoing transcript,

12   consisting of 335 pages, is a full, true, and correct

13   reproduction of my shorthand notes as reflected by this

14   transcript.

15      SIGNED October 29, 2018.

16

17

18

19            /s/ Kelli Stewart

20            Kelli Stewart, CSR, RPR, CCR, RMR

21

22

23

24

25