1              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF KANSAS
2

3  UNITED STATES OF AMERICA,

4       Plaintiff,

5  v.                        Docket No. 16-20032-02-JAR

6  KARL CARTER,                 Kansas City, Kansas
                             Date:  11/16/2018
7

     Defendant.              Day 10
8  ....................        Pages 2486-2819

9
                      REDACTED
10        TRANSCRIPT OF MOTIONS HEARING
      BEFORE THE HONORABLE JULIE A. ROBINSON
11          UNITED STATES DISTRICT JUDGE

12
   APPEARANCES:
13
   For the Government:  Mr. Steven D. Clymer
14                      Department of Justice - USAO
                       Lrm Eckert, William
15                      100 S. Clinston Street
                       Suite 9000
16                      Syracuse, New York 13261

17                      Mr. Duston J. Slinkard
                       Office of United States Attorney
18                      444 Southeast Quincy
                       Suite 290
19                      Topeka, Kansas 66683-3592

20                      Mr. Stephen R. McAllister
                       Office of United States Attorney
21                      500 State Avenue
                       Suite 360
22                      Kansas City, Kansas 66101

23

24

25

```
 1   APPEARANCES:

 2   (Continued)

 3   For the Defendant Karl Carter:
                     Mr. David J. Guastello
 4                   The Guastello Law Firm, LLC
                     811 Grand Boulevard
 5                   Suite 101
                     Kansas City, Missouri 64106
 6
     For the Movant Federal Public Defender:
 7                   Ms. Melody J. Brannon
                     Mr. Kirk C. Redmond
 8                   Mr. Branden A. Bell
                     Office of Federal Public Defender
 9                   117 Southwest Sixth Street
                     Suite 200
10                   Topeka, Kansas 66603

11   For the Special Master David R. Cohen:
                     Mr. David R. Cohen
12                   David R. Cohen Co., LPA
                     24400 Chagrin Boulevard
13                   Suite 300
                     Cleveland, Ohio 44122
14
                     Ms. Alleen VanBebber
15                   VanBebber Law Firm, LLC
                     2029 West 95th Street
16                   Leawood, Kansas 66206

17

18

19

20

21

22
     _____
23
           Kelli Stewart, CSR-KS, CRR-MO, RPR, CRR, RMR
24                   Official Court Reporter
             259 U.S. Courthouse, 500 State Avenue
25                   Kansas City, Kansas 66101
```

1               I N D E X

2
   Special Master's Witnesses:                    Page

3
   DAVID STEEBY
4    Direct Examination By Ms. VanBebber         2493
     Cross Examination By Mr. Redmond            2526
5    Cross Examination By Mr. Clymer             2540

6  THOMAS E. BEALL
     Direct Examination By Ms. VanBebber         2548
7    Cross Examination By Ms. Brannon            2580
     Cross Examination By Mr. Clymer             2620
8    Redirect Examination By Ms. VanBebber       2626
     Recross Examination By Ms. Brannon          2634
9    Recross Examination By Mr. Clymer           2640

10 EMILY METZGER
     Direct Examination By Ms. VanBebber         2645
11   Cross Examination By Ms. Brannon            2686
     Cross Examination By Mr. Clymer             2716
12   Redirect Examination By Ms. VanBebber       2728
     Recross Examination By Ms. Brannon          2731

13
   SPECIAL MASTER DAVID COHEN
14   Direct Examination By Ms. VanBebber         2735
     Cross Examination By Ms. Brannon            2758
15   Cross Examination By Mr. Clymer             2767

16


17               E X H I B I T S

18   Special Master's
     Exhibits           Offered        Received
19
        1189**           2540           2543
20      1194             2541           2544
        1195             2541           - - - -
21      1196             2541           2544
        1197             2541           2544
22      1198             2541           2544
        1199             2541           2544
23      1200             2541           2544
        1201             2541           2544
24      1202             2541           2544
        1203             2541           2544
25      1204**           2541           2543
        1205             2541           2543

```
 1                            E X H I B I T S

 2

 3         Federal Public Defender's
           Exhibits               Offered              Received
 4
                705                2784                   2784
 5              706                2701             2701,  2783
                707                2782                   2783
 6              708                2782                   2783
                709                2782                   2783
 7              710                2783                   2783
                711                2783                   2783
 8              712                2783                   2783
                713                2783                   2783
 9              714                2783                   2783

10

11         Government's
           Exhibits               Offered              Received
12
                 44                2784                   2785
13               45                2705                   2705
                 46                2784                   2784
14

15

16    **  Denotes admitted under seal

17

18

19

20

21

22

23

24

25
```

1              (9:08 a.m. proceedings commenced).

2              THE COURT:  All right.  You can be seated.

3    All right.  We're here in United States versus Karl

4    Carter, 16-20032.  Your appearances, please.

5              MR. CLYMER:  Good morning, Your Honor.

6    Steven Clymer for the United States.  I'm accompanied

7    this morning by Stephen McAllister, the United States

8    Attorney, First Assistant United States Attorney Duston

9    Slinkard and Special Agent John Seubert.

10             THE COURT:  All right.

11             MR. GUASTELLO:  May it please the Court.

12   David Guastello on behalf of Mr. Carter, who has waived

13   his appearance for purposes of today.

14             MS. BRANNON:  Your Honor, appearing for the

15   Federal Public Defender, Melody Brannon, Kirk Redmond

16   and Branden Bell.

17             THE COURT:  All right.  Thank you.

18             MS. VANBEBBER:  Alleen VanBebber, attorney

19   for the Special Master appears and Special Master

20   appears in person.

21             THE COURT:  All right.  Thank you.  All

22   right.  So at the conclusion of the evidentiary hearing

23   in October, I advised you all that I would set this

24   hearing on outstanding issues concerning production of

25   documents.  At that point in October, the Special Master

 1   and the Public Defender advised the Court that they

 2   needed more time to finish going through all of the

 3   documents the government had produced on a rolling basis

 4   throughout the hearing.

 5        Since that time, the Public Defender has filed a

 6   second supplemental motion for order to show cause.

 7   That was filed on October 26th, it's Document 668.  The

 8   government responded in Document 683.

 9        The Public Defender has filed a motion for leave

10   to file exhibits.  That was filed on-- on November 2nd,

11   it's Document 679.  Also on November 12th, in

12   Document 686, the Ethics Bureau of Yale University filed

13   an Amicus brief in support of the positions of the

14   defendant and the Public Defender.

15        I amended the notice of today's evidentiary

16   hearing to include the Public Defender's second-- I

17   should call it second supplemental motion for order to

18   show cause, Document 668.  And so those are the matters

19   that are before me.

20        But, as I said in October, this hearing is also

21   to focus on a number of things, a number of questions

22   about production of records and discovery and

23   cooperation with the Special Master and his requests on

24   behalf of the Court.

25        The Public Defender, and I think it's in their

1    second supplemental motion as well, but expressed

2    concern and a request for an accounting of what's been

3    withheld by virtue of privilege or some other ground.

4    In October I had a discussion with Mr. Clymer about the

5    fact that it's-- that a log needed to be produced with

6    whatever grounds for privilege the government was

7    relying upon to withhold certain documents.

8         I know I heard in the course of the evidentiary

9    hearing and it also I think is in perhaps some exhibits

10   as well, the government took the position that it needed

11   to withhold Privacy Act, attorney-client privilege,

12   *Touhy*, and national security matters from production.

13        And then, of course, today's hearing is also to

14   hear from the Master and the Public Defender or both

15   with respect to any further relief they're seeking with

16   respect to production of documents.

17        So that is essentially where we're at today.  It

18   is an evidentiary hearing.

19        Ms. Brannon, are you calling witnesses?  Ms.

20   VanBebber?

21             MS. BRANNON:  Your Honor, we've asked for

22   four witnesses-- or three witnesses to be available, but

23   I believe the Special Master is interested in those

24   witnesses as well, so we would defer to the Special

25   Master at this time.

```
 1              THE COURT:  All right.  So, Ms. VanBebber,
 2  you have witnesses to call?
 3              MS. VANBEBBER:  Yes, Your Honor, I do.
 4              THE COURT:  All right.  Now, before we start
 5  with the witnesses, is there anything else anyone wants
 6  to bring up at this point?
 7              MR. CLYMER:  No, Your Honor.
 8              THE COURT:  All right.  All right.  Ms.
 9  VanBebber.
10              MS. VANBEBBER:  We call David Steeby to the
11  stand, please.
12                          DAVID STEEBY,
13
14  Called as a witness on behalf of the Special Master,
15  having first been duly sworn, testified as follows:
16                    DIRECT EXAMINATION
17  BY MS. VANBEBBER:
18     Q.  Good morning, Mr. Steeby.
19     A.  Hello.
20     Q.  You testified in October, did you not?
21     A.  I did.
22     Q.  Today I think we want to go into a little more
23  information about the same topics that you-- that you
24  discussed back in October.
25          We've heard-- we want to get some additional
```

 1  information about the laptop PCs that were assigned to

 2  the Kansas City, Kansas AUSAs prior to August 31st,

 3  2016.

 4        You're familiar with that topic, aren't you?

 5  A.   Yes.

 6  Q.   Is it fair to say that for the HP laptops, the

 7  word "refresh" as used in the prior hearing really means

 8  replace, so that each of the AUSAs that were assigned to

 9  an older laptop got it replaced with a fresh new one; is

10  that right?

11  A.   As far as the laptops, yes.  It wasn't just AUSAs

12  who were assigned laptops however.

13  Q.   There were many other people other than the

14  AUSAs.  Right?

15  A.   And not all AUSAs had laptops, no, ma'am.

16  Q.   Okay.  Now, I'm going to show you, and I will

17  bring a copy up if you need to see one, but I think

18  you'll-- I think you'll remember these.

19        I'm going to show you what's been marked as

20  Special Master's Exhibit 1201 and see if you recognize

21  it.

22  A.   Yes, I do.

23  Q.   And what is it?

24  A.   This is the nationwide phased refresh schedule

25  for both the multi-function printer refresh and the PC

1    refresh that occurred the same year.

2        Q.   Did you receive this from DOJ?

3        A.   Yes.

4        Q.   And does it show that some of the refreshes were

5    to start as early as April?

6        A.   That's my recollection, they started in the

7    spring, yes.

8        Q.   But Kansas was scheduled?

9        A.   Between August 22nd and September 1st of 2016.

10       Q.   And were you the person who received this

11   information from DOJ in order to help implement the

12   refresh?

13       A.   Yes, this was published on an intranet web page

14   that was available to all systems managers.

15       Q.   And so you reviewed it when it came out.  Right?

16       A.   I did.

17       Q.   And how long before April did you get this

18   initial notice of when you were going to have your

19   refresh?

20       A.   To my recollection, it was around April of 2016

21   that this information was first available.

22       Q.   So that gave you several months to get ready; is

23   that right?

24       A.   For our district, that's true.

25       Q.   Now, I'm going to show you what's been marked as

1   Special Master's Exhibit 1202 and ask you to just look

2   at the front page.  And that is a sample of where you

3   signed off that you, in fact, deployed a certain number

4   of HP laptops, 58 to be exact.  Right?

5       A.   The numbers on this page don't represent laptops

6   only.  This would be a mix of laptops and work stations

7   at the Wichita site.

8       Q.   In any event, between the HP deployed ones and

9   the district deployed ones, you-- you took in 61 units.

10  Right?

11      A.   Yes.

12      Q.   In Wichita?

13      A.   Yes, that's what it appears.

14      Q.   And you did one also for Kansas City, did you

15  not?  Let me show you the last page of that exhibit.

16      A.   Can you zoom out a bit on the camera?

17      Q.   Yeah, I'm having a little trouble here with my

18  document.  There we go.  And you signed off on it.

19  Correct?

20      A.   Yes.

21      Q.   Thank you.  Now, so there were 48 new units

22  brought in and in-- you replaced all of the HP laptops.

23  Correct?

24      A.   Yes.

25      Q.   All right.  Now I'm going to show you what's been

 1  marked as Exhibit 1199.  It's awfully little, can you

 2  see it?

 3              THE COURT:  You can adjust the camera.

 4              MS VANBEBBER:  I can?  Oh, I can zoom on

 5  this.

 6  BY MS. VANBEBBER:

 7    Q.  All right.  Just a second.  If that helps any, we

 8  will just move down the road here.  Starting at the

 9  bottom, Ms. Barnett is asking you if you can-- that the

10  drives are available if you need them; is that your

11  understanding?

12    A.  Yes.

13    Q.  Okay.  And then you answered a lot of questions

14  to her to memorialize the conversation you had with

15  Duston Slinkard that same day.  Right?

16    A.  Yes.

17    Q.  And you assured her that the-- what was going to

18  happen to the chassis was they were going to be traded

19  in and sent-- and they were going to be rendered

20  unreadable, and that the old hard drives are encrypted

21  and it can't be read unless you hook it up to the

22  chassis.  Right?

23    A.  That's my understanding.

24    Q.  And that you're planning on holding them just for

25  another month before they go to the data destruction

1   center?

2       A.   That was the original plan, yes.

3       Q.   But you've got them all labeled and in storage at

4   the Kansas City, Kansas office for the Kansas City,

5   Kansas laptops.  Right?

6       A.   For Kansas City, yes.  All the hard drives that

7   had been removed were--

8       Q.   All right.  Then Mr. Slinkard writes to you and

9   says, well, we are to retain the units and whatever

10  hardware is necessary to ensure the ability to access

11  the hard drives from the old laptops.  Did you

12  understand that you weren't supposed to send those off

13  in a month like you had planned?

14      A.   Yes.

15      Q.   And so you said you'd do it, didn't you?

16      A.   I did.

17      Q.   All right.  And did you do that, did you keep

18  them?

19      A.   Yes, we kept all of the hard drives and all of

20  the laptop chassis as that e-mail states.

21      Q.   Okay.  Are they in the vault, to your knowledge,

22  at your-- outside your office?

23      A.   The laptop hard drives are, yes.

24      Q.   Okay.  Now, let me ask you some questions about

25  that.

1      A.   I'm sorry, did you say outside of our office when

2  you mentioned the vault?

3      Q.   They're not internal-- the vault is not inside

4  your office, is it?

5      A.   Can I speak to Mr. Clymer?

6           MS. VANBEBBER:  Sure.

7           MR. CLYMER:  May I, Your Honor?

8           THE COURT:  Yes.

9           MS. VANBEBBER:  I can withdraw that, Your

10  Honor, because it's not really necessary.

11  BY MS. VANBEBBER:

12     Q.   You have-- the Office of the United States

13  Attorney has control over that particular vault; is that

14  right?

15     A.   Yes.

16     Q.   Okay.  So you were careful to let management know

17  in that exhibit we just looked at that-- that these

18  particular units are encrypted.  Right?

19     A.   Right.

20     Q.   And they're fully encrypted so they can only be

21  read if the hard drives were reunited with the original

22  chassis; is that right?

23     A.   Yes.  That would be the first step of trying to

24  read those hard drives.

25     Q.   All right.  Now, I'm going to show you what's

1   been marked Exhibit 1203 and show it to you only for the

2   purpose of looking at the first page to illustrate what

3   we're talking about.  Are you familiar with this

4   particular report, the PC Refresh Report, District of

5   Kansas?

6       A.  Yes, the daily deployment lists, yes, I'm

7   familiar with those.

8       Q.  Okay.  Now, in there is included the

9   identification of the old system name.  Right?

10      A.  Right.

11      Q.  And the serial number, right, MAC address if

12  that's relevant?

13      A.  I can't tell if the serial number is the old

14  machine or the new one here.

15      Q.  Oh, okay.  Let me go back over here.  Old system

16  is named this.  New system is named that.  Correct?

17      A.  Correct.

18      Q.  With this information, would you be able to go

19  into the vault and pick up a hard drive and figure out

20  which chassis it belongs to and put it back together?

21      A.  Yes, I would.

22      Q.  If you were to do that, would-- is it fair to say

23  that anyone with your education and training and skills

24  could-- would be able to do that, not just you?

25      A.  To re-unite the hard drive with the chassis?

 1      Q.   Uh-huh.

 2      A.   Yes.

 3      Q.   Then would you-- would they still be encrypted?

 4      A.   At that point upon log-in, if my understanding on

 5   how the full drive encryption works is correct--

 6      Q.   Uh-huh.

 7      A.   -- the system would decrypt the drive so that the

 8   system could boot.  Now, as it sits at the log-in

 9   prompt, as you know, you can't really access any data at

10   that point so some valid credentials would have to be

11   supplied to the machine to get it to log in to Windows

12   where someone could access the file system.

13      Q.   And that could be readily done, couldn't it?

14      A.   I wouldn't say that, no, ma'am.

15      Q.   Well, would you-- anybody who had the information

16   could do it, who had the numbers?

17      A.   If somebody has valid credentials from over two

18   years ago for that laptop, yes.

19      Q.   Uh-huh.  And would that be the person who was

20   originally assigned as the, quote, owner of the laptop?

21      A.   It would've been the last person that logged in

22   to the laptop, the operating system would've cached

23   their credentials, so that as it stands not connected to

24   the network, it would still authenticate with the last

25   credentials that had accessed the laptop.

1    Q.  And at that point you'd be able to-- whoever

2  accessed it would be able to read whatever was on the

3  hard drive at the time it was removed from the chassis

4  the first time?

5    A.  Yes, that's my understanding.

6    Q.  Would there be any way to read the metadata?

7    A.  Metadata of?

8    Q.  Of that particular-- that's involved in that

9  particular hard drive.

10    A.  At that point when the drive is encrypted and--

11  and the user has access, I would imagine they'd have

12  access to all files, including metadata, yes.

13    Q.  I'm going to show you the exhibit that's been

14  marked 1200.

15          THE COURT:  Let me just ask a question for

16  clarification.  So if the laptop and chassis were-- a

17  given laptop and chassis were married up, the system

18  would re-boot, but you'd need valid log-in credentials.

19  Would you know which person, which user's log-in

20  credentials the system would be looking for?

21          In other words, would there be some sort of

22  screen that would pop up that would populate that the

23  last user that used this laptop is this user name, so

24  it's just the credentials or the password that would

25  need to be inserted, or would you not know even who the

 1   user had been whose credentials had been cached?

 2            THE WITNESS:  We would need to draw that

 3   conclusion based upon who the laptop had been assigned

 4   to at the date that it was removed from service.

 5            THE COURT:  Okay.  And you know that?  Is

 6   that on the daily deployment list or in one of your

 7   lists, you've got an assignment list by serial number?

 8            THE WITNESS:  Yes.

 9            THE COURT:  Oh, all right.

10   BY MS. VANBEBBER:

11     Q.  So that means there would be identification on

12   the computer itself that would indicate which person had

13   been assigned to that computer?

14     A.  We would know from our logs who the computer was

15   assigned to in August or September of 2016.

16     Q.  And presumptively that would be the last person

17   who was on it?

18     A.  Yes, in most cases.

19     Q.  I'm showing you 1200 and I'm going to represent

20   to you that this is Page 10 of the DOJ 2016 PC

21   Refreshment Plan, which is, for the record, Defendant's

22   Exhibit 614.

23            When you were sent the information for how to

24   implement the refresh, there was a whole packet of-- of

25   things you had to do and days you had to do them on.

 1    Correct?

 2        A.  Yes.

 3        Q.  So is this page, Page 10, your notification of

 4    when you're supposed to tell people what's going to

 5    happen during the refresh?

 6        A.  Can I see which appendix this is?  Can you scroll

 7    to the bottom of the page?

 8        Q.  I'm sorry.

 9        A.  Yes, this is either the implementation plan

10    itself or one of the appendices, I can't tell from the

11    document.

12        Q.  What does it tell you up at the top on 4.13 that

13    you are supposed to do?

14        A.  Within seven days of the user's scheduled

15    migration, they are to be notified of the--

16        Q.  Does scheduled migration mean the day the

17    computer leaves the hands of the owner?

18        A.  Yes.

19        Q.  Okay.  And does that-- what are you supposed to

20    do, what are you supposed to tell them?

21        A.  I'm supposed to notify them about a software

22    popup, ask the users to leave their system powered on.

23        Q.  So they're supposed to leave their system on

24    for-- for this balloon to pop up to remind them what's

25    going to happen.  Correct?

1        A.   That's right.

2        Q.   So if you're an AUSA say and you got a laptop,

3   you're going to tell people watch for the balloon and

4   it's going to remind you when your laptop is going to

5   disappear, so to speak?

6        A.   Well, the-- the purpose of that software balloon

7   was a task that I believe happened after hours.

8        Q.   Okay.

9        A.   That would back up some of the user's information

10  from their desktop, say their favorites or their desktop

11  icons, things that weren't normally backed up.

12       Q.   And they were supposed to leave their system

13  powered on for the next two weeks so that this process

14  could keep going.  Correct?

15       A.   Correct, yes, just to make sure they got a good

16  capture of that data.

17       Q.   And then it says you're supposed to coordinate a

18  day to back up files with them.  Did you do that?

19       A.   I don't recall what my initial notice to the

20  users were.  I would think I would've mentioned

21  something about backing up any important information

22  that they thought may have been lost during the refresh,

23  but I can't be sure at this point.

24       Q.   You've done that at other times when you need to

25  give them a heads-up that something was going to happen

1  with-- in the computer world and that they might need to

2  back up things?

3      A.   As a general rule, we try to give as much notice

4  as possible.

5      Q.   Would you consider yourself pretty much a rule

6  follower?

7      A.   I would like to think so, yes.

8      Q.   With DOJ telling you to coordinate-- telling

9  people when they need to back up their files, do you

10  believe you probably did that?

11     A.   Yes.

12     Q.   So at least seven days before the computer

13  disappears, any given AUSA would've known that this was

14  about to happen, wouldn't they?

15     A.   They would've received an announcement from me,

16  possibly not including all this technical information,

17  but maybe in general terms that-- that this was about to

18  happen, yes.

19     Q.   And then on migration-- and migration means the

20  day the computer leaves the owner's hands, right, and

21  migrates into never-never land?

22     A.   Well, the day that the HP technicians were

23  scheduled to be onsite for that particular user's

24  upgrade.

25     Q.   And you would have-- you knew the date that the--

1    they were planning to come?

2        A.  Yes.

3        Q.  And you knew where the training was going to be

4    and you were-- were going to tell the people, the users,

5    that they should plan not to have access to their system

6    for the day of the migration; is that right?

7        A.  That's right.

8        Q.  So that AUSAs knew when their computers were

9    going to disappear and that they would not have access

10   after that day.  Correct?

11       A.  Yes.

12       Q.  And then there were things that you had to do

13   after the migration.

14           Mr. Steeby, there's been testimony that some--

15   from some people that they just didn't know when this

16   was going to happen, they had no way to know.  Do you

17   find that credible?

18       A.  I can't answer for them.

19       Q.  Do you believe that you went through the steps we

20   just discussed and let them know?

21       A.  Yes, I do.

22       Q.  Do you recall assisting Emily Metzger with coming

23   up with search terms for the Special Master's use to

24   review information on AUSA repositories?

25       A.  Yes.

1    Q.   And did you meet with the Special Master on that

2    project?

3    A.   I did.

4    Q.   Do you remember about how often you met with him?

5    A.   It may have been every two to three weeks by

6    phone for a period of time there.  We also had some

7    meetings in person with other members of our staff.

8    Q.   If I say that that time, according to e-mails,

9    was from the 29th of November, 2016 up to June the 5th,

10   2017, would that be what you recall?

11   A.   Yes, that sounds right, yes.

12   Q.   Is it correct that the-- you did finally come up

13   with a set of search terms, didn't you?

14   A.   Yes, we had been developing them for a few months

15   there.

16   Q.   Uh-huh.  And in June when you finally ended up

17   with a set that everybody could agree on--

18            MR. CLYMER:  Objection to the

19   characterization.

20            THE COURT:  Overruled.

21   BY MS. VANBEBBER:

22   Q.   I can certainly restate that.  You did end up

23   with a set of search terms.  Correct?

24   A.   We-- we had search terms throughout the whole

25   process.

16-20032  USA v. Karl Carter (Black) REDACTED  11.16.18      2509

1    Q.  But you ended up with a final set that the

2  Special Master and Ms. Metzger and you agreed could be

3  useful?

4    A.  I always thought we could make more progress.

5    Q.  But in any event, the Special Master and Ms.

6  Metzger decided to go forward--

7    A.  I'm not sure--

8    Q.  -- with looking at Erin Tomasic's ProofPoint

9  repository, didn't they?

10    A.  The Special Master at a certain date seemed

11  pleased with what we had, and yes, they-- he wanted to

12  go forward with the search there.

13    Q.  And he sent you e-mails saying go forward as soon

14  as possible, didn't he?

15    A.  Yes.

16    Q.  And how soon was that?

17    A.  Yeah, it would've been as soon as I could get to

18  it, I believe.

19    Q.  So a day or two?

20    A.  Probably so, definitely within the week.

21    Q.  If the material that we've received says June the

22  8th was when it happened, does that sound right?

23    A.  If you have an e-mail from me about that, yes,

24  I-- I would say that was correct.

25    Q.  All right.  The syntax that you used on the set

1  terms was specifically set up for the ProofPoint e-mail

2  archive system, wasn't it?

3      A.  Yes.

4      Q.  And those-- that syntax wouldn't be useful on any

5  other system that you know of, would it?

6      A.  Highly doubtful, unless certain things about the

7  syntax were changed.

8      Q.  So that particular set of terms was specifically

9  for use for the ProofPoint archives.  Right?

10     A.  Yes.

11     Q.  And isn't it true that every AUSA-- and I'm just

12  going to speak about AUSAs now because that's the-- the

13  ones we're particularly interested in.  Every AUSA at

14  some point would end up with an archive of their e-mails

15  that will be permanently kept by DOJ; is that right?

16     A.  I wouldn't say permanently.  The standard

17  procedure is three years unless they are placed on a

18  litigation hold, and then that three-year limit is

19  dropped and-- and then it's kept permanently from the

20  date of the litigation hold going back three years.

21     Q.  The individual AUSA would no longer be in

22  possession of that particular archive, it would be held

23  by someone other than the local person who originally--

24  who originated it.  Correct?

25     A.  May I speak to Mr. Clymer?

1    Q.  Sure.

2              MR. CLYMER:  May I approach, Your Honor?

3              THE COURT:  Yes.

4              (Confer).

5              THE WITNESS:  Could you repeat the question?

6              MS. VANBEBBER:  Could you read it back,

7    please.

8              (The question was read back).

9              THE WITNESS:  I would say that the individual

10   user, AUSA, no matter who it is, never had possession in

11   the first place, that that data is always stored offsite

12   at one of our DOJ data centers.

13   BY MS. VANBEBBER:

14   Q.  Let's say that an AUSA wanted to get into their--

15   the archive that was identifiable to them, could that be

16   done?

17   A.  It could.

18   Q.  You can get into your archive; is that right?

19   A.  Yes.

20   Q.  Can you get into anybody else's archive but

21   yours?

22   A.  Not unless special permissions are granted.

23   Q.  How are special permissions obtained?

24   A.  They're obtained through an ESI access form that

25   is signed by the First Assistant U.S. Attorney and then

1  submitted to our e-mail team at the Network Operations

2  Center.

3      Q.  And that's a national center?

4      A.  Yes.

5      Q.  And then someone decides whether AUSA No. 1 can

6  look at AUSA No. 2's archive?

7      A.  Correct.

8      Q.  All right.  And that is instigated by the First

9  Assistant U.S. Attorney in the district; is that right?

10     A.  That would be the person who signs off on that

11  form.  I would typically prepare that and then send it

12  for their review and approval.

13     Q.  Now, once I, as Assistant U.S. Attorney No. 1, am

14  looking at my own archive, can I go in there and delete

15  stuff?

16     A.  No.  And to look at one's own archives, no

17  special permission is needed.  I hope I made that clear.

18     Q.  Okay.  Yes, I think I-- I was just going to start

19  there.  So I'm looking at my own and I can go in there

20  and I can't delete anything.  Right?

21     A.  No.

22     Q.  Can I add stuff?

23     A.  No.

24     Q.  Can I edit anything?

25     A.  No.

1    Q.  Can I write any notes, do anything to it?

2    A.  No.

3    Q.  And that inability to change anything occurs

4  when?

5    A.  As soon as the original item is ingested into the

6  ProofPoint system.

7    Q.  And is that at the time that I write my e-mail,

8  is that when it goes in there?

9    A.  It's at the time that it's sent or received or

10  traverses through the e-mail system back-end.

11    Q.  So my own ProofPoint e-mail archive, once

12  created, remains for at least three years?

13    A.  Right.  At that point messages start dropping off

14  due to storage concerns for the repository.

15    Q.  So it's a rolling dissolution--

16    A.  Correct.

17    Q.  -- is that right, of the e-mails that are in

18  there?

19    A.  Yes.

20    Q.  And then you said if the lit hold went out, then

21  that could extend the time period?

22    A.  That would stop that rolling dissolution, as you

23  say, from the point that the lit hold was instituted.

24    Q.  So nothing would drop off after that until

25  further orders were given?

1      A.   Until the lit hold was over, yes.

2      Q.   Do you remember working on any search terms that

3   would've helped the Special Master to review

4   repositories other than the power-- the ProofPoint

5   archive system?

6                THE COURT:  Before you go there, let me ask a

7   follow-up question.  So in this case there was a

8   litigation hold.  So is it fair to say that e-mails that

9   were generated, well, really anytime from whenever the

10  litigation hold was put in place until today's date have

11  not been deleted through-- out of the archival system?

12               THE WITNESS:  Yes, that's correct.  And also

13  three years back from that date.

14               THE COURT:  All right.  And the date being

15  when the litigation hold was put in place?

16               THE WITNESS:  Yes.

17               THE COURT:  And when was the litigation hold

18  put in place?

19               THE WITNESS:  To the best of my recollection,

20  it would've been the first half of 2017 when the

21  official litigation hold was applied to the user's

22  mailboxes.

23               THE COURT:  When you say "official litigation

24  hold," what are you talking about?

25               THE WITNESS:  When the mechanism was put in

1    place to stop those messages from dropping off that were

2    older than three years.

3              THE COURT:  That didn't happen until sometime

4    in the first half of 2017?

5              THE WITNESS:  Yes, to the best of my

6    recollection.

7              THE COURT:  All right.  Go ahead.

8    BY MS. VANBEBBER:

9       Q.   Mr. Steeby, you are aware, are you not, as an

10   employee of the office that Ms. Metzger sent out another

11   litigation-- what she called a litigation hold on

12   December the 17th I believe of 2016-- December 19th of

13   2016?

14      A.   I don't recall the exact date.

15      Q.   And that was internal to all people working at

16   the U.S. Attorney's Office.  Correct?

17      A.   If I remember right, there was a preservation

18   order with some instructions and I think it also

19   included some outside agencies.

20      Q.   Do you-- do you have any reason to believe that

21   that particular hold was communicated to the ProofPoint

22   archive system?

23      A.   On the date that it was submitted to our office

24   and agencies?

25      Q.   In December of 2016.

1    A.  No, not in December of 2016.

2    Q.  Then in May of 2017, to your recollection, was

3  another litigation hold sent out?

4    A.  Well, you say "another litigation hold."  I-- I

5  believe we were just talking about a preservation order.

6  And the litigation hold, I'm not sure exactly when in

7  2017 that that was started, but--

8    Q.  When you use the term "litigation hold," are you

9  talking about a government-- let me show you-- I'll

10  need--

11         MS. VANBEBBER:  Your Honor, if I may have a

12  moment to go and-- to go and retrieve it from a

13  different file.

14         THE COURT:  Go ahead.

15  BY MS. VANBEBBER:

16    Q.  Mr. Steeby, I'm not trying to confuse you, I just

17  want to make sure we're all talking about the same

18  document.  I'm going to show you what's been marked as

19  Exhibit 1196 and that first page of it is an e-mail from

20  Emily Metzger.  Have you seen this before?

21    A.  Yes, I've seen that.  I'm in the recipients list.

22    Q.  So this is Ms. Metzger sending what she calls an

23  enhanced litigation hold notice and attached form.

24  Let's look at Page 2.  When you say "litigation hold,"

25  is this what you're referring to?

1       A.   Yes.

2       Q.   And is this a standard form?

3       A.   Yes.

4       Q.   At the bottom it says, Attachment 1, USAP

5    3-13.300.003.  Is that the government information that

6    you're referring to?

7       A.   Yes.

8       Q.   This was not sent out until May of 2017?

9       A.   I don't think I saw any of those forms before

10   then, no.

11      Q.   Does that mean from your earlier testimony that

12   everything before May 17th-- or, excuse me, May 19th,

13   2017, was rolling off?  Everything in 2016 had already

14   rolled off?

15      A.   No, no, because that's within the three years

16   prior of May 2017.

17      Q.   All right.  So whatever was prior to May 17th,

18   2017, would still be there for the past three years?

19      A.   Going back-- going back to sometime in 2014, yes,

20   May of 2014.

21      Q.   How did this litigation hold notice get to the

22   archives, whoever runs the archives?

23      A.   Users who identify that they have-- that they

24   need to be part of that litigation hold, I'm given a

25   list, and then I submit a ticket to our mail team at the

 1   Network Operations Center, inform them to stop the

 2   three-year roll-off of those messages for their

 3   mailboxes.

 4       Q.  So page-- the next page is Page 2, which includes

 5   a certification and some checkoffs.  Sorry.

 6           Let's start with 1 again.  This tells the

 7   recipient that they're supposed to identify all

 8   information subject to the lit hold; is that right?

 9       A.  Yes.

10       Q.  They're supposed to tell you that they might have

11   something and they're supposed to tell you where it is.

12   Right?

13       A.  Where they think they have it and where they

14   think it is.

15       Q.  Uh-huh.  And then there's more of that on the

16   next page.  Correct?

17       A.  Correct.

18       Q.  There are a number of repositories here.  Are

19   these the ones that, to your knowledge, the government

20   thinks probably would be in the-- in the control of a--

21   the recipient of this lit hold?

22       A.  Some of the other groups of electronically-stored

23   information, yes.

24       Q.  And there are also things that are not

25   electronically stored, too.  Right?

1      A.  I think there's a section there for paper files

2  and notes, so...

3      Q.  So it's-- pretty much covers the waterfront of

4  anything that-- that the government would expect its

5  employees to have available to them for keeping things.

6  Correct?

7      A.  Yes.

8      Q.  So then they're also told they've got to certify

9  what they-- the boxes they've checked; isn't that right?

10     A.  I think they're certifying that they will

11  preserve what they believe they have, yes.

12     Q.  And that they are warned that if they don't do

13  that, they could get sanctioned or there could be

14  professional conduct rules that are implicated.  Right?

15  In Paragraph 2, the certification.

16     A.  Yes, I see that.

17     Q.  And then they have to sign to acknowledge that

18  they've read it, they've read the whole thing, they

19  understand their obligations, they accept them and then

20  they're supposed to send the thing back to the lit hold

21  coordinator.  Right?

22     A.  Correct.

23     Q.  Right.  And that would be Emily Metzger.

24  Correct?

25     A.  At that time, yes.

 1    Q.   Who is the-- is she not still the lit hold
 2   coordinator?
 3    A.   She still is, yes.
 4    Q.   So in this particular one, and I'll represent to
 5   you that that's AUSA Krug's signature and they were told
 6   to turn them back in by May the 31st, and this is dated
 7   May the 31st.  Right?
 8    A.   Yes.
 9    Q.   And then what was supposed to happen to it after
10   that?
11    A.   After that--
12    Q.   Uh-huh.
13    A.   -- they would've been collected by the lit hold
14   coordinator and then sent to me.
15    Q.   And, in fact, I'm going to point you to the last
16   two pages of this exhibit.  And that-- and go to the
17   very end, which that is just your signature, and look at
18   the e-mail that you sent to Trent Krug.  So you did
19   receive what he filled out, did you not?
20    A.   Yes.
21    Q.   And you wanted to get some more information.
22   Right?
23    A.   Right.
24    Q.   What-- these-- the little logos, and what's below
25   those that isn't printed?

1      A.   Those would've been screen captures from his

2   original attachment of the items that he checked.

3      Q.   From the-- the part of the exhibit that I just

4   showed you?

5      A.   Yes.

6      Q.   And so then you-- you would have done what?

7      A.   I would've tried to schedule a time with him to

8   go over what-- the items on the form that he had

9   checked.

10     Q.   Now, once they said they have something, then

11  what do they-- are they supposed to do something with

12  it, are they supposed to keep it or what are they

13  supposed to do?

14     A.   Well, first they're supposed to identify what it

15  is so they can be sure that it's not accidentally

16  deleted or destroyed somehow and then make sure it's--

17  it's in a place that's not going to get lost during the

18  course of the lit hold.

19     Q.   So it's just at this point a hold, they don't

20  have to print it off and give it to anybody or even

21  themselves, they just have to make sure it didn't

22  disappear?

23     A.   There-- there may be an exception for paper

24  documents.  But for the ESI, we just try to identify it

25  and make sure we know about it so it doesn't disappear,

1   yes.

2       Q.   All right.  All these different repositories that

3   are identified on the lit hold form, did you ever speak

4   about those to the Special Master?

5       A.   It's possible we may have gone over this in one

6   of the very early meetings, perhaps the very first

7   meeting we met, just in general terms of what our

8   typical lit hold procedures were.

9       Q.   Did you ever see to it that he had a copy of what

10  went out on May 19th, 2017, in the way of a lit hold?

11      A.   Did I see to that?

12      Q.   Uh-huh.

13      A.   No.

14      Q.   Do you know whether Ms. Metzger did?

15      A.   I don't know.

16      Q.   You did run the search terms for a search of Erin

17  Tomasic's ProofPoint repository, didn't you?

18      A.   Yes.

19      Q.   And were you aware that that was produced to the

20  Special Master in response to a subpoena *duces tecum* in

21  this case?

22      A.   I am as of recently, yes.

23      Q.   And to your knowledge, that's Thumb Drive 5?

24  It's one of the thumb drives.

25      A.   I'm not familiar with the exact mechanism they

1    produced that to you in.

2        Q.   At any rate, it was produced whole with no

3    changes made to it; is that right?

4        A.   I'm not sure--

5        Q.   From you, what you had when you-- when you ran

6    it, you didn't change anything in it, did you?

7        A.   When I ran my search?

8        Q.   Uh-huh.

9        A.   No, I-- I applied the search and--

10       Q.   And then what did you do with the results?

11       A.   I would've saved the results to a folder in

12   ProofPoint, shared the folder with our mail team

13   engineers at the Network Operations Center with a

14   request that they convert the contents of that folder

15   into an Outlook data file, a .pst file.

16       Q.   And so they did the conversion?

17       A.   Yes.

18       Q.   And to your knowledge, that did get done and

19   everything was okay.  Right?

20       A.   Correct.

21       Q.   Then were you ever asked to produce-- did Ms.

22   Metzger ever ask you to run that same search on other

23   ProofPoint repositories of Assistant U.S. Attorneys or

24   staff members at the U.S. Attorney's Office?

25       A.   I don't think she asked me to do that, because I

1   wouldn't have had access to do that, no.

2       Q.   How would you have gotten access?

3       A.   I would've had to go through the ESI

4   authorization form that I mentioned earlier that

5   required review and signature by the First Assistant

6   U.S. Attorney and then would've had to be forwarded down

7   to our Network Operations Center so that they could make

8   those permission changes on the repository.

9       Q.   So we were talking before about Assistant U.S.

10  Attorney No. 2 and let's say the First Assistant wants

11  to look at the-- the ProofPoint repository for AUSA

12  No. 2, how would the AUSA No. 2 know that their file was

13  being searched?

14      A.   We're talking about a currently employed--

15      Q.   Current employees.  Current employees, yes.

16      A.   If that process was followed, there may have been

17  no notification to that employee that that was

18  happening.

19      Q.   So if I am Assistant U.S. Attorney No. 2, I won't

20  know that the First Assistant has requested leave to

21  basically copy what's in my ProofPoint repository?

22      A.   There's no system mechanism that would notify

23  them.  Whether or not they had had a discussion about

24  it, I can't be sure.

25      Q.   Okay.  There's no requirement within the system

16-20032  USA v. Karl Carter (Black) REDACTED  11.16.18      2525

1  to do that, to tell the person whose repository is being

2  looked at?

3      A.  I don't think so, but I don't have that policy

4  fresh in my mind here.

5      Q.  Have you had occasion to have to go through that

6  ESI policy we just described before in the past?

7      A.  Yes.

8      Q.  How often?

9      A.  Very-- I think the first time I ever had to do it

10  was here in the last couple of years in my entire

11  career.

12      Q.  And was that always for people who were no longer

13  with the office or was that for current AUSAs or other

14  staff members?

15      A.  There-- there was one who was a current AUSA at

16  the time, yes.

17      Q.  And then Ms. Tomasic, of course, was a former?

18      A.  Correct.

19      Q.  So you didn't have to go through that-- jump

20  through that hoop for her; is that right?

21      A.  No.

22      Q.  You didn't?

23      A.  Well, I still had to do the ESI authorization

24  form, yes.

25      Q.  And the First Assistant signed off on that?

16-20032  USA v. Karl Carter (Black) REDACTED  11.16.18      2526

```
 1      A.   Correct.

 2      Q.   And it was sent up.

 3           MS. VANBEBBER:  I don't think I have any

 4   other questions.  Thank you, Mr. Steeby.

 5                  CROSS EXAMINATION

 6   BY MR. REDMOND:

 7      Q.   Mr. Steeby, I don't have very many questions for

 8   you, but I do have a couple of things that I'm not clear

 9   on.  I believe you testified that the laptop hard drives

10   are in the vault; is that right?

11      A.   Yes.

12      Q.   And where are the chassis?

13      A.   They're in a storage room on the first floor of

14   the Kansas City courthouse.  That would be for the

15   Kansas City machines.

16      Q.   Okay.  The way to unlock the information on those

17   hard drives is to enter-- is to join the laptop chassis

18   with the hard drive and enter the credentials; is that

19   what your testimony was?

20      A.   Yes.

21      Q.   And by "credentials," do you mean password?

22      A.   User name and password, correct.

23      Q.   Okay.  And so the-- do you keep a copy of

24   everyone's credentials?

25      A.   No.
```

1    Q.   You, I assume, have or could re-create everyone's

2  user name?

3    A.   Yes.

4    Q.   But you do not know what the passwords of the

5  individual users are?

6    A.   No.

7    Q.   And it was your-- so if we took one of those hard

8  drives out of the vault and joined it with the laptop

9  chassis and that user does not remember what their

10  password was, you cannot access that machine?

11    A.   There may be a couple other things that could be

12  tried at that point.  We--

13    Q.   Tried?

14    A.   Yes.  Yes, there's a system account, local system

15  account that's a-- it's an administrator account.  I'm

16  not sure whether or not that would work to-- to get into

17  the work station at that point.  Like I said, we haven't

18  tried it.  But if the user was unable to recall their

19  user name and password from that time two years ago,

20  we'd need to try something else at that point.

21    Q.   But you have no idea if that something else would

22  work?

23    A.   Not at this point, no.

24    Q.   Okay.  And so at some point in 2016 after the

25  Court ordered that those laptops be sequestered, was

1  there an attempt made to ensure that the passwords for

2  those laptops were collected?

3      A.  No.

4      Q.  You knew at that point that you would likely have

5  a lot of trouble accessing the information on those

6  laptops unless you had the passwords; is that fair?

7      A.  That's fair.

8      Q.  And you knew that the Court was sequestering

9  those-- that equipment to safeguard the information that

10  was contained on those hard drives?

11      A.  Yes.

12      Q.  And you knew that the Court's goal of being able

13  to access that information, if necessary, would be

14  frustrated if the end user could not remember their

15  password?

16      A.  I understood that it would be frustrating in any

17  case to try to get information from those encrypted

18  drives, which is why I brought my concerns to Duston

19  back then.

20      Q.  Well, but your testimony was that as long as you

21  have the user name and the password and you joined the

22  hard drive with the chassis, you could get that

23  information back off the computer.  Right?

24      A.  That would be one way, yes.

25      Q.  Well, but the other way we don't know if it works

1    or not.  Right?

2        A.  That's correct.

3        Q.  Okay.  And so at no point was anyone asked to

4    provide their passwords?

5        A.  Not that I'm aware of.

6        Q.  By anyone in the U.S. Attorney's Office?

7        A.  No.

8        Q.  Okay.  I want to make sure I'm clear on what

9    ProofPoint is.  Is it an e-mail client?  Am I even using

10   that term correctly?

11       A.  I believe it's a big data repository and a search

12   tool.  It's a web interface.  As far as our folks are

13   concerned, it's a web page that they log into where

14   they're able to run simple or complex searches against

15   all of their messages sent or received for a time

16   period.

17       Q.  Okay.  And so anytime a U.S. Attorney-- or

18   anytime anybody who works for the U.S. Attorney's Office

19   sends or receives an e-mail, that e-mail has gone

20   through ProofPoint?

21       A.  Yes.

22       Q.  Okay.  And is that true of deleted e-mails?

23       A.  Yes.

24       Q.  They remain in ProofPoint?

25       A.  Right.

1    Q.   And is that true regardless of the device on

2  which the e-mail is sent?

3    A.   Yes.  If a user has a mobile device that's

4  connected to their DOJ e-mail address, those messages

5  also get ingested into the ProofPoint system, yes.

6    Q.   Okay.  Does ProofPoint include documents produced

7  by the user?  Say I write a Word file, I save it on my

8  desktop, that has nothing to do with ProofPoint; is that

9  right?

10    A.   No, not unless it's an attachment to an e-mail.

11    Q.   Which was my next question.  However, if I attach

12  that document, it will continue to exist in ProofPoint?

13    A.   Correct.

14    Q.   Okay.  And does ProofPoint have any connection to

15  the discovery drives in the U.S. Attorney's Office?

16    A.   No.

17    Q.   Those-- okay.  The search terms that you

18  discussed with Ms. VanBebber, were those search terms

19  run only through ProofPoint?

20    A.   Yes.

21    Q.   And so those same search terms could've been run

22  on the discovery drives; is that fair to say?

23    A.   I don't think Windows would've-- the Windows

24  advanced search mechanism, I don't believe that that

25  would've interpreted the ProofPoint specific syntax, so

1    they were never run on that, no.

2        Q.   Right.  But you could have-- once you figured out

3    which words were most likely to generate relevant

4    documents, you could've easily run those same words

5    through any portion of the U.S. Attorney's computer

6    system?

7        A.   Yes, with some adjustment of the syntax.

8        Q.   Right.  It wouldn't be that hard.  What you're--

9    the search terms are-- the way that you're formulating

10   search terms is to try to generate relevant results.

11   Right?

12       A.   Correct.

13       Q.   And it's not ProofPoint-specific?  That's a

14   terrible question.

15            The search terms that you hit on eventually even

16   if you weren't entirely satisfied, those same search

17   terms could've been run through, say, the discovery

18   drive?

19       A.   After some adjustment by me and-- and some

20   considerable work to make it fit it, yes, that could've

21   been done.

22       Q.   So it would've been work, but it could've been

23   done?

24       A.   I believe so, yes.

25       Q.   Okay.  That-- to your knowledge, was that ever

1  done?

2      A.   No, it wasn't done.

3      Q.   Were the only-- were the search terms only used

4  in relation to ProofPoint?

5      A.   Yes.

6      Q.   And no other portion of the U.S. Attorney's

7  computer system?

8      A.   Not that I'm aware of.

9      Q.   Okay.  So if there's a Word document that-- say,

10  just for example a description of a phone call, unless

11  that document was sent as an attachment to an e-mail,

12  your search terms would not have found it?

13      A.   Unless that document was in the ProofPoint system

14  and it hit as part of that search, no.

15      Q.   Okay.  I want to make sure I-- I'm clearly

16  understanding the process by which you alter the normal

17  three-year e-mail deletion rule.  What do you have to do

18  precisely to alter that policy, the three-year deletion

19  rule?

20      A.   I log into a system called USA Tech Center and

21  create a ticket to do so.  And so this will send a

22  notice down to the mail team - and this is per user -

23  that they are a part of a litigation hold and that their

24  mailbox is to be put into that mode where messages no

25  longer drop off.

1      Q.   And until you do that, the three-year rule

2  continues to apply?

3      A.   Yes.

4      Q.   Okay.  So I am looking at Exhibit 1196, which

5  seems to indicate that we're talking about a litigation

6  hold that is sent out approximately May 19th of 2017.

7  Does that accord with your memory generally, or would

8  seeing a copy of the document help?

9      A.   Yes, that would help.

10              MR. REDMOND:  Could I approach, Your Honor?

11              THE COURT:  Yes.

12              MR. REDMOND:  Thank you.

13  BY MR. REDMOND:

14      Q.   Mr. Steeby, I'm looking at the first page of the

15  exhibit.  The relevant portion is just the date that the

16  e-mail was sent.  Do you have an independent

17  recollection of receiving that e-mail?

18      A.   Yes, I-- I see that I'm a recipient here.

19      Q.   Okay.

20      A.   There were-- it seemed like to me there were a

21  lot of e-mails about this topic at the time, so whether

22  I would remember this specific one, I'm not sure.

23      Q.   That e-mail was sent May 17th of 2017 or May 19th

24  of 2017?

25      A.   May 19th.

1    Q.   So May 19th of 2017, the members of the U.S.

2   Attorney's Office that are copied there are told that by

3   May 31st they need to respond to that litigation hold;

4   is that right?

5    A.   Yes.  They're supposed to have the form filled

6   out and returned by May 31st it appears.

7    Q.   So at what point do you write your ticket to USA

8   Tech to get the three-year e-mail deletion rule set

9   aside?

10    A.   In this case, when I would've received the

11   documents.  And I recall doing it as a batch, so I think

12   I-- I did probably 20 or 30 at a time there in the USA

13   Tech Center, if I recall correctly.

14    Q.   But when you said-- you said when you received

15   the documents, so not before May 31st, which was the

16   deadline; is that right?

17    A.   I'm not sure if I received any before May 31st.

18    Q.   Okay.  So the-- starting May 19th all the way

19   through May 31st, e-mails are getting deleted every day

20   according to the normal three-year deletion cycle; is

21   that right?

22    A.   E-mails from 2014.

23    Q.   Correct.  And the-- those e-mails are just gone

24   now, there's nothing anyone can do to find them?

25    A.   Yes, I don't think that there's anything that can

1  be done about it.

2      Q.  Okay.  So what date did you-- if you remember,

3  what date did you actually send in that batch of tickets

4  to USA Tech?

5      A.  I don't remember.

6      Q.  Are we talking-- and--

7          MR. REDMOND:  Can I approach again, Your

8  Honor?

9          THE COURT:  Yes.

10         MR. REDMOND:  Thank you.

11 BY MR. REDMOND:

12     Q.  At the end of this exhibit there's e-mails

13 between you and Mr. Krug in July of 2017; is that right?

14     A.  Yes.

15     Q.  Okay.  So you're asking him questions about his

16 response to the litigation hold?

17     A.  Correct.

18     Q.  And had you-- at that point in the normal course

19 of business, would you have sent in your ticket to set--

20 to stop the three-year deletion rule?

21     A.  Yes.

22     Q.  Okay.  So you think it's sometime between

23 May 31st of 2017 and July of 2017 that you did that?

24     A.  And July 26th, yes, that would be fair to say.

25         MR. REDMOND:  Could I have just a moment,

1    Your Honor?

2                 THE COURT:  Yes.

3                 MR. REDMOND:  That is all I have, Mr. Steeby.

4    Thank you very much.

5                 THE COURT:  I have a couple questions.  So

6    with respect to the discovery drive, no one ever asked

7    you to-- internally asked you to attempt to modify

8    syntax and run those same search terms through the

9    discovery drive; is that correct?

10               THE WITNESS:  That's correct.

11               THE COURT:  All right.  Is the discovery

12   drive-- the data on the discovery drive archived in some

13   way, preserved and archived in some way?

14               THE WITNESS:  Yes.

15               THE COURT:  Tell me about that.

16               THE WITNESS:  The data on the discovery-- you

17   say discovery drive, but I'll just say our network

18   drives in general that we might use for discovery and

19   other things do not have a three-year retention policy

20   like the e-mails do.  So unless somebody takes a

21   specific action on that, nothing is ever lost.  The data

22   is backed up, both locally on a backup appliance and

23   also to an offsite location somewhere else in the

24   country in a different geographic location.

25               And this happens-- every night the system looks

1   at what changed and then it backs up the differential.

2   And then every week, a full backup is run on those

3   drives.

4            THE COURT:  All right.  And as far as the

5   discovery drive, can any of the employees access that?

6            THE WITNESS:  The drive itself, yes.

7   However, it will depend on the specific permissions on

8   the folder, whatever case folder it is, whether or not

9   the employee has access to it or not.

10            THE COURT:  We've heard other testimony that

11  a specific AUSA would have their own folder on a

12  discovery drive and would have access to their own--

13  their own folder; is that fair?

14            THE WITNESS:  Yes, if a folder was set up for

15  an AUSA, I would-- I would expect them to have access to

16  everything under that folder.

17            THE COURT:  You don't know whether that was

18  the case, whether there were specific folders by AUSA?

19            THE WITNESS:  I'm aware that there are

20  folders by AUSA that contain their cases, yes.

21            THE COURT:  All right.  So you would expect

22  that if there's a folder under the name of a specific

23  AUSA, they have user rights or access rights to that

24  folder?

25            THE WITNESS:  Correct.

1              THE COURT:  All right.  Does that mean they

2      have the right to add, edit, or delete items in the

3      folder?

4              THE WITNESS:  Yes, add, update or delete

5      access.

6              THE COURT:  I'm sorry?

7              THE WITNESS:  Add, update or delete.

8              THE COURT:  And if something is deleted or

9      modified, is the-- is the document in its pre-deleted or

10     pre-modified state on a cloud somewhere or stored

11     somewhere?

12             THE WITNESS:  We can-- yes, if something gets

13     accidentally deleted or just lost, we frequently go back

14     and restore data from the backups.

15             THE COURT:  That's if somebody asks you to do

16     that?

17             THE WITNESS:  Yes.

18             THE COURT:  And is that a fool-proof process?

19     Are you always able to restore something that was

20     accidentally deleted or modified?

21             THE WITNESS:  Yes.  Yes, if it's been within

22     the time frame that we have backups on.

23             THE COURT:  And what's that?

24             THE WITNESS:  Six months.

25             THE COURT:  But if someone deleted something

1    and didn't ask you to restore it, it-- after six months,

2    it's-- the change is-- I mean, pre-changes cannot be

3    restored?

4                    THE WITNESS:  That's my understanding.

5                    THE COURT:  All right.  Any other questions?

6                    MR. REDMOND:  Yeah, just two based on that,

7    Your Honor.  Thank you.

8    BY MR. REDMOND:

9        Q.  If you could generally access most things on the

10   cloud and understanding that after six months you can't,

11   there are things that people would keep on their

12   computers, on drives, know one else could access in the

13   office; is that right?

14       A.  That's possible.  But we never recommend that

15   because if a computer crashes, we have no way to back up

16   that data.  So users are told during their-- the new

17   user orientation and whenever we see that, if we see it,

18   we have to say something.  And I always encourage people

19   to make sure their most important data is in a place

20   that gets backed up.

21       Q.  If they don't follow your instruction, that data

22   would still continue to exist on the hard drives that

23   are in the vault.  Right?

24       A.  Yes, if they had saved something to the local

25   hard drives.

1              MR. REDMOND:  That's all I have.  Thank you,

2    Your Honor.

3              THE COURT:  Mr. Clymer.

4                    CROSS EXAMINATION

5    BY MR. CLYMER:

6      Q.  Was the final version that you saw of the search

7    terms run on the Erin Tomasic e-mail repository called

8    etomasicblack7_0.pst?

9      A.  That sounds familiar to me, yes.

10             MR. CLYMER:  Nothing further.

11             MS. VANBEBBER:  I have no redirect, Your

12   Honor.

13             THE COURT:  Did you intend to offer these

14   exhibits that you had the witness testify about?

15             MS. VANBEBBER:  Yes, Your Honor.  At this

16   time perhaps it would be a good thing for-- for me to

17   move to admit or perhaps all of us to move to admit the

18   exhibits that we plan to use today but that have not yet

19   been admitted.

20             I believe all of these exhibits except-- of mine

21   except for Exhibit 1195 came from the production given

22   to us by the government.  And so it's my understanding

23   that they are not going to be subject to any objection

24   except relevance.

25             So I would like to move to admit Exhibit 1189.  I

1  would state that counsel does not have copies of 1189

2  because they are the actual physical thumb drives that

3  we were given and they're in a-- we would like to have

4  them admitted as evidence in and of themselves so that

5  they'll be sequestered for this case.

6        As for the rest of them, I would like to ask for

7  the admission of Exhibits 11-- excuse me, 1194 through

8  Exhibit 1205 sequentially.

9             THE COURT:  I don't think I have

10  Exhibit 1205.

11            MS. VANBEBBER:  I think that's one we just

12  received and I can-- may I approach?

13            THE COURT:  Okay.  So this isn't-- is this

14  not marked?  It's a November 30--

15            MS. VANBEBBER:  Yes, it is, I just pulled up

16  an extra copy.

17            THE COURT:  Okay.  So that's Exhibit 1205.

18            MS. VANBEBBER:  Yes, ma'am.

19            THE COURT:  And Exhibit 1193 you're

20  withdrawing?

21            MS. VANBEBBER:  Yes.

22            THE COURT:  Okay.  So you're offering

23  Exhibit 1189 and then 1194 through 1205.  Are there any

24  objections to these?

25            MR. CLYMER:  Your Honor, may I speak to

1   counsel for just a moment?

2           THE COURT:  Sure.

3           (Counsel confer).

4           MR. CLYMER:  Your Honor, my understanding is

5   that counsel collectively took the thumb drives that are

6   described in Exhibit 1194 and marked them as 1189 and is

7   offering those into evidence.  If that understanding is

8   correct, I have no objection to the admission of 1189.

9       Counsel I think misspoke when she said 1194 was

10  part of the production.  1194 wasn't part of the

11  production, but nonetheless, we have no objection to the

12  admission of 1194 either.

13          THE COURT:  Okay.  So 1194 is not part of the

14  production, but it is a log prepared by Ms. VanBebber of

15  the production, which was 1189, which is the actual

16  thumb drives.

17          MR. CLYMER:  Exactly.  And I have no

18  objection to the admission of the thumb drives or to

19  1194.  I take counsel on her word that this is an

20  accurate description of what was produced and when it

21  was produced.

22          THE COURT:  And on Exhibit 1194, I won't hunt

23  for it now, but does it indicate the-- the size of the

24  files?

25          MS. VANBEBBER:  Yes, Your Honor, it does.  It

 1  indicates when it was-- when it was received and the

 2  number of bytes that are in the-- in that particular

 3  file.

 4                THE COURT:  All right.  Any objection by the

 5  FPD?

 6                MS. VANBEBBER:  Your Honor, I do have one

 7  other request, which the-- this is-- this is with

 8  respect to Exhibit 1204.  And the Special-- the Federal

 9  Public Defender has requested that that be put under

10  seal.  I understand the reasons for that and I have no

11  objection.

12                MR. CLYMER:  Neither do we, Your Honor.

13                THE COURT:  All right.  Exhibit 1204 is

14  admitted under seal.  Exhibit 1205 is admitted.

15  Exhibit 1189 is admitted.

16                MR. CLYMER:  Your Honor, I'm going to ask

17  that 1189 be under seal because there are sealed

18  documents within 1189.

19                MS. VANBEBBER:  I believe that is correct,

20  Your Honor.

21                MR. REDMOND:  We agree with that, Your Honor.

22                THE COURT:  All right.  1189 is admitted

23  under seal as well as 1204.

24                MR. CLYMER:  And I have a comment on just one

25  other of the exhibits, Your Honor, when the Court is

```
 1   ready.
 2              THE COURT:  Okay.  All right.  Well, I'm
 3   trying to admit.  Is there an objection to any of these
 4   other exhibits?
 5              MR. CLYMER:  My understanding on 1195 is that
 6   there's no witness that can authenticate that and Ms.
 7   VanBebber simply wants to use 1195 for purposes of
 8   questioning another witness.  I have no objection to use
 9   of the document to question another witness, but I do
10   have an objection to its admission as-- as evidence,
11   because there's no witness that can authenticate it
12   here.  But I-- as I said, I do not object to her using
13   it to question a witness.
14              THE COURT:  All right.  I'm admitting
15   Exhibit 1189 under seal.  1194 I'm admitting.  1195 I
16   won't admit at this time but will allow questioning
17   about it.  And then Exhibits 1196 through 1203 are
18   admitted.  Exhibit 1204 admitted under seal.  And then
19   Exhibit 1205 is admitted.
20              MR. SLINKARD:  May we approach for a moment
21   on Exhibit 1189?
22              THE COURT:  Yes.
23              (Proceedings had at the bench, outside the
24   hearing of open court). █████
25   ████████████████████████████████████████████████████
```



16-20032  USA v. Karl Carter (Black) REDACTED  11.16.18      2546



1

2

3              (Proceedings continued in open court).

4              THE COURT:  All right.  Ms. VanBebber, did

5    you have any other questions of this witness?

6              MS. VANBEBBER:  No, Your Honor, no redirect.

7              THE COURT:  All right.  I assume no other

8    questions?

9              MR. REDMOND:  We have no other questions.

10   We'd just ask the Court to remind the witness of his

11   responsibilities under the sequestration order.

12             THE COURT:  All right.  There is a

13   sequestration order, Mr. Steeby, in this case, meaning

14   that you cannot discuss the content of your testimony

15   with any other witness.  Do you understand that?

16             MR. CLYMER:  Your Honor, I-- I'd like to

17   bring to the Court's attention at the end of the last

18   hearing the Court lifted the sequestration order.  We

19   have no objection to the Court re-imposing the

20   sequestration order, but I believe it was communicated

21   to government witnesses that after the last hearing the

22   sequestration order had been lifted.

23             THE COURT:  All right.  With respect to this

24   hearing there are now witnesses and the rule has been

25   invoked, and so I'm advising Mr. Steeby to not discuss

 1   the content of your testimony with any other witnesses
 2   that will testify in this hearing.
 3                   THE WITNESS:  Yes, Your Honor.  Am I also
 4   released from any subpoena that may be in place at this
 5   point?
 6                   THE COURT:  Is he released?
 7                   MR. REDMOND:  He is.
 8                   THE COURT:  You're released.
 9                   THE WITNESS:  All right.  Thank you, Your
10   Honor.
11                   THE COURT:  Thank you.  All right.  You can
12   call your next witness.
13                   MS. VANBEBBER:  Call Tom Beall.
14                        THOMAS E. BEALL,
15   called as a witness on behalf of the Special Master,
16   having first been duly sworn, testified as follows:
17                     DIRECT EXAMINATION
18   BY MS. VANBEBBER:
19       A.  Good morning.
20       Q.  Good morning, Mr. Beall.  Do you recall that you
21   testified earlier in this matter?
22       A.  I do.
23       Q.  In October?
24       A.  Yes.
25       Q.  We're asking you to come back today to testify

1   more about the same topics for which you were given

2   authority under *Touhy* in light of information that we

3   received during the process of the hearing.  You did

4   testify earlier that you delegated work on the Special

5   Master's investigation to Criminal Chief Deb Barnett; is

6   that correct?

7       A.  Correct.

8       Q.  Why did you feel the need to do that?

9       A.  I just needed to identify a primary contact.  She

10  was lead counsel for-- for us in the litigation so it

11  made sense to me.

12      Q.  Okay.  I'm going to show you what has been marked

13  for-- for purposes-- for evidentiary purposes as

14  No. 1195, and I'm going to ask you-- so I'm not going to

15  publish it, I just would like for you to take a look at

16  it for me.  I'll represent to you that this was obtained

17  in the Special Master's discovery process with the

18  United States Marshals Service.

19      A.  Okay.

20      Q.  Have you seen this document before?

21      A.  I have not.

22      Q.  Are you familiar with Frank Papish?  Do you know

23  who he is?

24      A.  Yes.

25      Q.  And what is his position with the KBI?

1     A.  He's with the KBI, I couldn't tell you his title.

2     Q.  Are you familiar with Laura Graham?

3     A.  I'm sorry?

4     Q.  With Laura Graham?

5     A.  Laura Graham, she's an attorney at KBI, or at

6  least that's--

7     Q.  According to this-- according to this exhibit,

8  were you aware that Agent-- KBI Agent Stokes refused to

9  speak with Debra Barnett about the CCA video-recordings?

10    A.  I recall that there were problems getting an

11 interview with him early on.

12    Q.  And isn't it your idea that you had to go

13 basically up through the process of KBI and talk-- and

14 get attorneys involved in order to get him to cooperate?

15    A.  That generally sounds right.  I don't remember

16 exactly who was spoken to.

17        Is this too loud, Judge?  I'm sorry.  It sounds

18 very loud to me.

19    Q.  Well, if you're like me, without Mr. Microphone,

20 you can't function, so...

21        You said that you are familiar with Laura-- Laura

22 Graham?

23    A.  Yes.

24    Q.  And you were-- you've worked with her before,

25 haven't you?

1    A.  I think she was at KBI even back when I was in

2  the state Attorney General's Office.

3    Q.  In this e-mail written to-- written from Mr.

4  Papish to Ms. Graham, and the e-mail is-- says that he

5  is the Assistant Director of the KBI.  To your

6  knowledge, does he still hold that position?

7    A.  I believe so, I-- I don't know.

8    Q.  At any rate, they are far higher up the food

9  chain of the KBI than Agent Stokes; is that correct?

10    A.  Yes.

11    Q.  All right.  And in this e-mail Mr. Papish speaks

12  to his lawyer, Ms. Graham, and says that Deb told her

13  that she was brought in to insulate the KCK office

14  prosecutors.  Is that the reason that she was brought

15  in, to insulate the prosecutors?

16    A.  No.  And I don't-- I don't read that sentence

17  that way.

18    Q.  You don't read it that way?  It says, "She

19  convinced me that--"

20    A.  They are working to build a background to defend

21  any argument by defense that she was brought in to

22  insulate.  That doesn't-- I don't read that to mean that

23  she was brought in to insulate.  I mean, I don't think

24  I'm reading it the same way you are.  This is the first

25  time I've seen this document, but that's not how I'm

1    reading it.

2       Q.   So when it says that, she convinced me that she

3    was brought in to insulate the KCK office prosecutors,

4    that's not what it says?

5       A.   Maybe I'm misunderstanding, but it says that she

6    was brought in to knock back an argument that she was

7    brought in for that, unless I'm misreading.

8       Q.   Was she brought in to insulate the KCK

9    prosecutors?

10      A.   Specifically, no.

11      Q.   What, in your mind, would insulating the KCK

12   prosecutors mean?

13      A.   I don't know, it was never discussed.

14      Q.   Why was she brought in then?  What was she

15   supposed to do?  You said she was going to be in charge,

16   what was she supposed to be in charge of?

17      A.   She was supposed to be the chief litigator for

18   the team of people that were litigating the matter.  And

19   I assembled that team to include people who were not

20   closely connected to the claims or issues in the matter.

21   And she was out of Wichita, which was geographically

22   removed.

23      Q.   She had not been the chief prosecutor up to

24   August, had she, August 2016?

25      A.   Had not been the chief prosecutor?  Do you mean

1  the head of the--

2      Q.  The chief prosecutor of that case.  The lead

3  counsel in that case was not Debra Barnett until

4  August 6, 2016.  Correct?

5      A.  I don't think the matter really existed until

6  then, did it?  I mean, isn't that about the time that

7  this whole thing started?

8      Q.  Well, your recollection-- I don't know how to

9  refresh your recollection, but would you-- do you recall

10 that Erin Tomasic and Chris Oakley had entered their

11 appearances in the litigation and, yes, there had

12 already been an indictment on file since May?

13     A.  I'm sorry, I misunderstood your question.  I was

14 referring to the litigation that we're engaged in here,

15 not the underlying CCA investigation.  That's-- what you

16 said is correct.

17     Q.  So when you said she was the chief attorney on

18 the litigation, you didn't mean *U.S. v. Black*?

19     A.  I meant this matter that we are here for that

20 includes those same parties and matters.

21     Q.  So when you brought her in, do you recall, if at

22 all, what you told her she was supposed to be doing

23 other than, A, being lead counsel on *U.S. v. Black* and,

24 B, being in charge of the Special Master's

25 investigation?

16-20032  USA v. Karl Carter (Black) REDACTED  11.16.18      2554

1    A.  I believe I testified before that my initial

2   instructions were that she and Emily together were to

3   conduct interviews and try to find out what had gone on

4   here.  That was the primary early function.

5    Q.  Was there a reason you did not remove Deb Barnett

6   as the lead counsel in *United States versus Black* when

7   you put her-- also put her in charge of the

8   investigation of the Special Master?

9    A.  I'm sorry, I don't-- can you rephrase the

10  question?

11   Q.  Was there a reason you did not remove Deb Barnett

12  as the lead counsel of record for *United States versus*

13  *Black* when you decided to put her in charge of the

14  investigation of the Special Master?

15   A.  I don't recall.

16   Q.  You didn't take her off the case, the underlying

17  case?

18   A.  You're talking about Deb Barnett, not Erin

19  Tomasic?

20   Q.  Yes.  I'm talking about Deb.  You did not take

21  her off the active attorney role in *U.S. v. Black,* the

22  underlying case, when you put her, Deb Barnett, in

23  charge of the Special Master's investigation?

24   A.  I don't recall what--

25   Q.  Well, either you did or you didn't.

1      A.   Yeah, I-- I don't recall.

2      Q.   You don't recall that you did it or you don't

3   recall why you did it?

4      A.   I don't recall the circumstances of how that

5   decision was made.

6              THE COURT:   Okay.  So I'm-- I'm a little bit

7   confused.  So Erin Tomasic and Chris Oakley were

8   attorneys of record in *United States versus Black*, the

9   criminal case, the drug-- the contraband smuggling case.

10  And then there came a time that you assigned Deb Barnett

11  to be the counsel of record in the contraband smuggling

12  criminal prosecution or not?

13             THE WITNESS:   I believe that is correct, yes.

14             THE COURT:   And at the same time, though, you

15  delegated her to be the person to represent the

16  government's interests in the-- with respect to the

17  Special Master's investigation?

18             THE WITNESS:   Right, along with a team of

19  people, that's correct.

20             THE COURT:   All right.  So two roles for her

21  then?

22             THE WITNESS:   Yes.  I-- I'm struggling to

23  separate the two right now.  But yes, I think the point

24  was to-- to get somebody else involved in the underlying

25  case who was also not accused of any wrongdoing in the

1    *Dertinger* matter.

2    BY MS. VANBEBBER:

3      Q.   You didn't see there being a conflict in having

4    Ms. Barnett both be helping the Special Master with his

5    investigation of your office, among others--

6      A.   I don't know--

7      Q.   -- and-- and conduct the litigation in the

8    underlying criminal case?

9      A.   I don't recall that-- an issue of conflict coming

10   up in that regard.

11     Q.   All right.  I'm going to show you what's been

12   marked as Special Master's Exhibit 1178.  Is it all

13   right if I put it on the screen for you?

14     A.   Sure.

15     Q.   I'm going to direct your attention to the

16   bottom-- well, you can see what it is.  It's a-- it's

17   from Tomasic's file, it's an e-mail chain that begins

18   with Debra Barnett writing to Scott Rask.  And according

19   to this, would you agree that Ms. Barnett was reporting

20   that you and she explained to Kim Flannigan that Debra

21   had spoken to the Office of Public Integrity about

22   taking over this case.  Is that-- is that correct?  Did

23   you and she speak to Public Integrity about taking over

24   this case?

25     A.   It appears that she did.  I don't recall if I was

1  in that conversation or not.

2      Q.   Okay.  She took it-- it wasn't you, it was just

3  she, okay.

4      A.   I'm not sure about that.

5      Q.   Then the duty attorney seemed willing to review

6  it, but then they talked again, the duty attorney-- duty

7  attorney informed me that you'd have to go through GCO

8  before Public Integrity would consider taking it.  She's

9  talking there about the Executive Office of the United

10  States Attorney's General Counsel's Office.  Correct?

11      A.   Correct.

12      Q.   And then she says, "So I'm working on a memo

13  requesting recusal."  The date on this is October 11th,

14  2016.  Right?

15      A.   I see that.

16      Q.   What else happened on October the 11th, 2016?

17  Can you recall something important that happened that

18  day?  Wasn't the Special Master appointed that day?

19      A.   Could well be.

20      Q.   And so on the very day that the Special Master

21  was appointed to investigate many things, including

22  whether there was any wrongdoing in your office, you

23  were seeking recusal from the case, you were having--

24  you were having Deb Barnett start a memo seeking

25  recusal.  Right?

1    A.  Yes, we-- as I testified before, we engaged in--

2    with Main Justice in discussions about being recused

3    from the case or getting outside counsel.

4    Q.  And you're referring to your former testimony

5    about Defendant's Exhibit 660a, which is the letter that

6    you wrote on October the 12th, 2016 asking for recusal?

7    A.  I recall that from the prior testimony.

8    Q.  What were your instructions to Debra Barnett

9    about how much she ought to cooperate with the Special

10   Master since, after all, we're investigating your case--

11   excuse me, your office?

12   A.  To cooperate.

13   Q.  You told her to cooperate?

14   A.  Yes.

15   Q.  Did she indicate to you whether she intended to

16   cooperate or not?

17   A.  Never indicated otherwise.

18   Q.  She didn't tell you, sure, I'll cooperate?  She

19   didn't say, I plan to do that?  She didn't-- she just

20   didn't say anything?

21   A.  I would suspect she did, I just don't

22   specifically recall the conversation.

23   Q.  Do you recall when you first met with the Special

24   Master-- when you first talked to the Special Master on

25   the phone, would that have been in October as well?

1    A.   The first time I talked to him on the phone?  I
2   don't-- I don't know if I talked to him on the phone
3   before I met with him in person, I'm not sure.  I-- I
4   don't think so.
5    Q.   Do you recall what-- what happened in the
6   conversation, other than introducing yourself?
7    A.   Not specifically, no.
8    Q.   When did you first personally meet with the
9   Special Master?
10    A.   I-- I couldn't tell you the date, but it was in
11   this building.
12    Q.   Was it around the time of the hearing that
13   occurred on the 28th of October?
14    A.   Probably.  I mean, I'm sure there's documents
15   that show that, I just don't recall the date.
16    Q.   Do you recall what your conversation was about?
17    A.   Only in a general sense.
18    Q.   General sense of what?
19    A.   What he was there to do and I-- probably
20   generally the subject of cooperating.
21    Q.   Do you recall him asking you that-- telling you
22   that there were some people that he thought were obvious
23   witnesses that he should be talking to and asking you to
24   facilitate that for him?
25    A.   I think I covered this last time.  I don't recall

1   the specifics of that conversation, I only know that a

2   number of people were produced to be interviewed by him.

3       Q.   Do you recall that he said specifically that he

4   wanted to talk to Erin Tomasic?

5       A.   I just-- as I said, I don't recall that part of

6   the conversation.

7       Q.   Do you recall if he asked you that more than

8   once, asked you to speak to people more than once?

9       A.   I don't know how many times that I spoke to him

10  on the subject of interviewing people, I just know that

11  it occurred.

12      Q.   Within two weeks of the appointment of the

13  Special Master, an-- an e-mail came out, and I would

14  like to have you take a look at it.

15          This is Exhibit 1171.  And I'm showing you that

16  it was Monday, October 31st, 2016.  Right?

17      A.   Yes.

18      Q.   Just a few-- just a couple of weeks after the

19  Master was appointed on the 11th.  Right?

20      A.   Okay.

21      Q.   And you do recall now that Erin Tomasic was

22  attorney-- until Debra Barnett entered her appearance,

23  Erin Tomasic was the lead attorney on *U.S. v. Black*.

24  Right?

25      A.   Right.

1    Q.   In this e-mail Deb Barnett writes to Scott Rask,

2    she tells him, "I don't want Erin interacting with the

3    Court or court personnel on this case."  And then she

4    says she can explain why.

5        Was the Special Master part of the court

6    personnel on this case?

7    A.   Is the Special Master part of the court

8    personnel?

9    Q.   Yeah.

10   A.   Yes, but I don't know that I'm going to agree

11   with what you're presuming this means.

12   Q.   Do you recall earlier testimony-- or, I'm sorry,

13   you don't-- there was a sequestration, otherwise you

14   don't.

15       If I represent to you that there are-- that two

16   witnesses have testified that Erin Tomasic was told not

17   to speak to the Special Master in October of 2016...

18   A.   I don't know about October of 2016.  I know early

19   on there was concern that-- that she might-- that she

20   was emotional and-- and might create some problems, but

21   not about--

22   Q.   Were you--

23   A.   I don't think that relates to cooperation.

24   Q.   Weren't you really afraid that she was emotional

25   enough to actually tell the truth?

1       A.   I'm the one who permitted her to be interviewed

2   by the Special Master with no representative from the

3   U.S. Attorney's Office present, so I--

4       Q.   Do you know how long that took before you let her

5   talk to the Special Master?

6       A.   I don't, but I know it occurred.

7       Q.   Are you aware that she was-- that she made that

8   written request because she was told by Pauletta Boyd

9   that the Special Master wanted to talk to her?

10      A.   That-- I do recall there being something of that

11  nature, yes.

12      Q.   I'm going to show you now what's been marked as

13  Exhibit 1166.  This, again, is a-- an e-mail from Debra

14  Barnett to you indicating that she has, in December

15  2016, met for the first-- met with the Special Master.

16  And she says she's telling you this in confidence and

17  she recites what she-- her version of what the Special

18  Master said to her during that meeting.  Is that the way

19  you understand this?

20      A.   Yes.

21      Q.   Look at what has been-- what is underlined in--

22  in the yellow.  It says, "I don't know--"  He tells her

23  that no single attorney spoke ill about her.  "I don't

24  know why that was relevant except he said that causes

25  him to believe he can trust me, for what that is worth."

1          What did you take that sentence to mean, the one

2     that's in-- underlined in yellow there?

3          A.   I don't know other than what it says.

4          Q.   What does it say to you?  You're the recipient of

5     it.

6          A.   It says what it says.

7          Q.   Which is she doesn't know why it was relevant,

8     but he said that causes him to believe he can trust me.

9     She's telling you she thinks that the Special Master

10    believes her to be trustworthy; is that right?

11         A.   That's-- yeah.

12         Q.   For what that is worth.  In other words, is she

13    not meaning to be trustworthy and helpful to him at all?

14         A.   I don't read it that way.

15         Q.   How do you read it?

16         A.   For what it says.

17         Q.   He will-- the next line, "He will finish up the

18    review of evidence for us by the first of the year."

19    Now, at this point you're talking about December the

20    10th, did you read that to mean January?

21         A.   That-- that would be my assumption.

22         Q.   And then he was going to start an investigation.

23    Right?

24         A.   I see that.

25         Q.   And the end goal was to turn over whatever is

1   found to OPR, Office of Professional Responsibility, or

2   the Office of the Inspector General?

3       A.   I see that, yes.

4       Q.   And that would be of DOJ.  Right?

5       A.   Correct.

6       Q.   So it's her impression that the goal-- the

7   Special Master's goal is to find that somebody needs to

8   be sent to be further investigated.  Right?

9       A.   That's-- that's what that suggests.

10      Q.   Would you say that that might present a conflict

11  of interest for Ms.-- for any member of your office to

12  be helping the Special Master?

13      A.   I don't-- I don't follow why.

14      Q.   If the goal, as Debra Barnett sees it, is to send

15  people up to OIG or OPR for criminal investigation, and

16  those are your people, would you not think that Debra

17  Barnett might feel-- be very reluctant to actually help

18  the Special Master?

19      A.   No.  Her job was to get to the truth and to

20  represent the Department of Justice.

21      Q.   There certainly would be an incentive to not help

22  the Special Master, wouldn't there?

23      A.   I wouldn't agree with that.

24      Q.   And it would certainly be an incentive to slow

25  down that investigation as long as she could in the hope

1    that DOJ would take it over, wouldn't there?

2      A.  To be clear, I said I would not agree with that.

3    I don't know if that came out clearly.  I'm sorry.

4      Q.  You would not agree that that-- that there was an

5    incentive to-- to not help the Special Master?

6      A.  I do not believe that she was incentivized not to

7    assist the Special Master for the reasons you state, no,

8    I do not.

9      Q.  You're saying that she didn't accept the

10   incentive or that there is no incentive?

11     A.  I do not believe that she was incentivized not to

12   cooperate.

13     Q.  That she took advantage of the incentive, is that

14   what you mean by incentivized?

15     A.  I do not believe that she was incentivized by

16   anything not to cooperate.

17     Q.  Will you agree that an objective-- will you agree

18   that an objective observer could conclude that Barnett

19   intended to use the Special Master's trust in her to

20   keep him away from certain people and certain

21   information that might inculpate the KCK AUSAs and

22   expose misconduct?

23     A.  I cannot speak to what anybody that does not have

24   the information or knowledge of Deb Barnett that I do,

25   what they would conclude.  I can only tell you what I

 1    would conclude.

 2        Q.  And your conclusion is?

 3        A.  That she was not incentivized to not cooperate.

 4        Q.  Okay.  I'm going to show you what has been

 5    marked-- put under seal as Exhibit 1204-- oh, first,

 6    before I do that, look at the-- looking at the bottom of

 7    this same exhibit, 1166, Debra Barnett asks you to

 8    consider firing Erin Tomasic.  Right?

 9        A.  I see that, yes.

10        Q.  It's her position that Erin continues to create

11    strife and discord; is that right?

12        A.  Yes, I see that.

13        Q.  Would you agree with her about that, that she was

14    creating strife and discord?  That Erin was creating

15    strife and discord?

16        A.  I don't have direct knowledge of that, but that

17    would be consistent with things that I've learned.

18        Q.  You did consider firing Erin Tomasic in December

19    of 2016, didn't you?

20        A.  In the sense that I received that message and I

21    would consider anything that Deb Barnett recommended to

22    me.

23        Q.  And then you did actually fire Erin Tomasic in

24    May of that year?

25        A.  I did terminate our district's relationship with

 1   her.  She was not an employee of the U.S. Attorney's

 2   Office, so I--

 3       Q.  Let me ask you a little bit about-- that makes a

 4   big difference, doesn't it, that she was a Special

 5   Assistant U.S. Attorney and she was simply delegated to

 6   work in your office by her agency, the Social Security

 7   Administration; is that right?

 8       A.  It makes a big difference in what sense?

 9       Q.  In the ability to fire somebody.

10       A.  It is different.

11       Q.  So you could decline to continue having her

12   services and she'd go back to her agency.  Correct?

13       A.  That is, in fact, what occurred.  I simply

14   terminated our relationship.

15       Q.  So as an acting-- you were not a

16   presidentially-approved, appointed by the Attorney

17   General--

18       A.  That's correct.

19       Q.  -- United States Attorney, were you?

20       A.  No, I was not.

21       Q.  And prior to your taking on the acting attorney--

22   U.S. Attorney's position, you were the First Assistant;

23   is that right?

24       A.  That's correct.

25       Q.  And during-- during the time all this was going

1    on and you were the acting assistant-- the acting United

2    States Attorney, did you have hiring and firing

3    authority, direct hiring and firing authority?

4        A.   That's a complicated question to answer because

5    it would depend.

6        Q.   Depend on what?

7        A.   It would depend on-- I would have to consult up,

8    because there's-- there's limitations to what an acting

9    can do with regard to changes in management and other

10   personnel actions.  And, in fact, I really never took a

11   personnel action without consulting up.

12       Q.   And, in fact, to your knowledge, an acting U.S.

13   Attorney just simply doesn't have authority to do things

14   like hire and fire people without consulting with the

15   Attorney General's Office at-- at some level?

16       A.   Even posting a position to hire requires

17   permission.  I mean, there are processes that are

18   involved, yes.

19       Q.   So I'm-- now I'm going to show you - if I may

20   approach, Your Honor - the exhibit that has been sealed,

21   so I will not put it on the screen.  And ask you to look

22   at the very last paragraph, Page 1, going over to

23   Page 2.

24            THE COURT:  What's the-- is this 1195?

25            MS. VANBEBBER:  No, this is 1204.

1                  THE COURT:  1204.

2                  THE WITNESS:  Which part do you want me to

3     look at?

4     BY MS. VANBEBBER:

5          Q.  Right there.

6          A.  Okay.  Okay.  Ending at the top paragraph on the

7     next page?

8          Q.  Yeah.

9          A.  Okay.

10         Q.  And the-- the second paragraph after-- the next

11    paragraph afterward.

12         A.  Okay.  (Reads document).  Okay.

13         Q.  In those two paragraphs, Ms. Barnett gives you

14    some pretty difficult and concerning information about

15    two Assistant United States Attorneys in Kansas City,

16    Kansas.  Correct?

17         A.  Yes.

18         Q.  She wanted you to fire Tomasic because she

19    believes she causes disruption and eventually you do

20    fire Tomasic.  Correct?

21         A.  Well, in the sense that--

22         Q.  You let her go.

23         A.  Yep.

24         Q.  Even though you do not personally know of

25    instances that were-- that would require that, you took

1    Debra Barnett's word for it.  Right?

2        A.  Can you rephrase the question?

3        Q.  Even though you just testified that you didn't

4    personally know of these instances, but you accepted Ms.

5    Barnett's word?

6        A.  Are you-- are you referencing forward to ending

7    the relationship with her in the office or at that time?

8        Q.  At that time you didn't know, but then later you

9    did end the relationship.  Correct?

10       A.  Correct.

11       Q.  And did you have a different reason?

12       A.  The conduct in the *Herrera-Zamora* case was a

13   specific.

14       Q.  And that was a court finding that she had behaved

15   improperly; is that right?

16       A.  Well, and this is a matter of record, that she--

17   she had admitted to conduct in that case--

18       Q.  Right.

19       A.  -- to her supervisor and I took action based on

20   that.

21       Q.  So Ms. Barnett tells you of really bad behavior

22   by two Assistant United States Attorneys, you would

23   agree that what she's saying is pretty bad behavior,

24   wouldn't you?

25       A.  I would say that the-- the documents says that

16-20032   USA v. Karl Carter (Black) REDACTED  11.16.18      2571

 1   and--
 2      Q.   And why didn't you let-- why didn't you let those
 3   two go as well?  Or ask, why didn't you ask DOJ to allow
 4   you to let those two go, given that you're willing to
 5   accept Ms. Barnett's word here?
 6      A.   Well, again, I think you're conflating two
 7   things.  My actions with Ms. Tomasic weren't based on
 8   representations from Ms. Barnett, they were based on
 9   admissions from Ms. Tomasic.
10      Q.   All right.  Let-- let's set that aside and let's
11   look at the allegations made by Debra Barnett in this
12   e-mail.  Did you call those lawyers in and ask them if
13   that's what they were doing?
14      A.   I-- I don't recall that I did.
15      Q.   Did you do anything at all, having received this
16   information?
17      A.   I don't know where we left that subject with Deb.
18   I believe that at the time that Treadway was--
19      Q.   Would you please not use names.
20      A.   I'm sorry.
21      Q.   It's under seal.
22      A.   I apologize.  It's just-- it's in front of me.
23   Can you ask your question again, please?
24              MS VANBEBBER:  Would you please read it back?
25              (The question was read back).

1          THE WITNESS:  I'm sure we discussed it, I

2     don't recall what counseling may have taken place as a

3     consequence of that.

4          THE COURT:  We probably ought to take a break

5     unless you're about finished.  It's almost 11:00.

6          MS. VANBEBBER:  Yeah, I-- this would be a

7     good time.  I don't have too much more, but enough that

8     we might as well go ahead and break.

9          THE COURT:  All right.  Let's take 15.

10          (Recess).

11          THE COURT:  All right.  You can be seated.

12     BY MS. VANBEBBER:

13     Q.  Mr. Beall, I just have a few more questions for

14     you.  You did testify previously that you created a

15     formal procedure for obtaining and handling recordings

16     of inmate phone calls while you were acting U.S.

17     Attorney.  Correct?

18     A.  Yes.

19     Q.  And we-- of course, an exhibit was admitted to

20     that effect.  But then you-- in addition, there have

21     been-- there was testimony that nobody seemed to know

22     about it.  And so I'm going to show--

23          MR. CLYMER:  Objection.  I don't believe

24     there's any testimony to that effect at all, Your Honor.

25          THE COURT:  I do.  I recall specific people

1    testifying that as of the time they were testifying they

2    were unaware of any such policy.

3    BY MS. VANBEBBER:

4        Q.  I'm going to show you what's--

5            THE COURT:  I don't think-- I don't think

6    "everyone" would be the right characterization, but

7    there were some witnesses that testified to that.

8            MS. VANBEBBER:  Maybe I could rephrase that

9    question then.

10   BY MS. VANBEBBER:

11       Q.  There was testimony-- there were testimonies from

12   some witnesses in the prior hearing that to date they

13   weren't aware of any such written policy.  So I'm going

14   to show you what's been marked as Exhibit 1198 and ask

15   you if you recognize it.

16           Mr. Beall, I'm going to show you this e-mail from

17   yourself on May 26th, 2017, that goes to everybody, all

18   AUSAs.  Correct?

19       A.  Yes.

20       Q.  And does it tell them that there's the new

21   policy?

22       A.  Yes, it certainly does.

23       Q.  That's going to formalize the procedure for

24   inmate phone calls?

25       A.  Yes.

 1    Q.   And then on the next page is the authorization to

 2   obtain the calls that they're going to have to do--

 3    A.   Correct.

 4    Q.   -- from now on.  And then on the next page is the

 5   procedure, the next few pages are the procedures that

 6   they are required to follow.

 7    A.   Yes.

 8    Q.   To your knowledge, was this sent out to all the

 9   recipients it says it was sent out to?

10    A.   It was.  I don't know if it's reflected on there,

11   but there's usually a number of recipients indicated on

12   an e-mail that would be somewhere in the neighborhood of

13   103 or 4 people, depending on the time.

14    Q.   And this went to USAKS_All, which was everybody?

15    A.   That's correct.

16    Q.   Including support staff?

17    A.   That's right.

18    Q.   So did you feel reasonably good about having put

19   this thing together and gotten it out to everybody so

20   that maybe these things wouldn't happen again that

21   happened in the cases we've been talking about in this--

22   in this case?

23    A.   I did.  I thought it was important to do and I

24   was happy to get that done, yes.

25    Q.   So in addition to that, I'm going to show you

1    what is marked as Exhibit 1197 and ask if you have seen

2    it before.  You may not have.  As you can see, it is a

3    June 26th, 2017 letter under your-- your office's

4    letterhead to the Public Defenders.  And you're-- this

5    is written by an Assistant United States Attorney named

6    Brian Sheern.  Are you-- are you acquainted with Mr.

7    Sheern?

8         A.  I am.

9         Q.  And I want you to look at the penultimate

10   paragraph there and read that, just read it to yourself.

11        A.  Okay.  Beginning with "in your letter"?

12        Q.  "In your letter," uh-huh.

13        A.  (Reads document).  Okay.

14        Q.  Did you-- do you work with Mr. Sheern or did you

15   work with Mr. Sheern?

16        A.  Yes.

17        Q.  He was one of-- one of your subordinates at the

18   time?

19        A.  Yes.

20        Q.  And apparently he read-- apparently he read the

21   e-mail, didn't he?

22        A.  Yes.

23        Q.  Does he accurately reflect what's in that e-mail?

24        A.  I think so.

25        Q.  To your-- you're still with the office.  Right?

1       A.   That's correct.

2       Q.   You're a Topeka AUSA?

3       A.   That's correct.  I'm based in Topeka.

4       Q.   And to your knowledge, does everybody in your

5  office follow what's in that memo?

6       A.   As far as I'm aware, yes.

7       Q.   To your knowledge, by 2017-- before 2017, I

8  wasn't sure from your testimony the last time, did you

9  know as the First Assistant at that time before 2017

10  that there was any written policy in the entire office

11  with regard to how recorded inmate phone calls should be

12  treated?

13       A.   Did I-- I'm sorry, can you rephrase?

14       Q.   Well, while you were the First Assistant.

15       A.   While I was First Assistant did I know...

16       Q.   Did you know whether there was any written policy

17  that you had seen that talked about how to handle

18  recorded inmate phone calls?

19       A.   I-- I did not know any policy at that time.  I

20  knew there was training on the subject, but there was no

21  policy that I was aware of.

22       Q.   Were you trained on the subject?

23       A.   Yes.

24       Q.   And were you trained to behave as the memo

25  suggests you should behave?

1    A.  Yes.

2    Q.  Can you truthfully say that a number of the AUSAs

3    in the Kansas City, Kansas office, to your knowledge,

4    didn't follow the policy that's outlined in the memo we

5    just discussed?

6    A.  I'm not aware of any incidents where the policy

7    was not followed since it's been instituted in Kansas

8    City.

9    Q.  No, before that.

10   A.  Oh, before that.  Well, there was no policy.  I'm

11   sorry, I must've misunderstood the question.

12   Q.  Let me ask you again.  Can you truthfully say, to

13   your knowledge, while you were First Assistant that a

14   number of the AUSAs in the Kansas City, Kansas office

15   did not follow what was later turned in to a formal

16   policy?

17   A.  I'm aware of-- of the same things that are known

18   in-- in terms of conduct.  Earlier we referenced

19   Tomasic's admissions, those sorts of things, I'm aware

20   of that.

21   Q.  It wasn't just Tomasic who took that attitude

22   toward recorded phone calls, was it?

23   A.  I don't know.

24   Q.  You never found out one way or the other?

25   A.  I don't know.

1    Q.   In hindsight-- just a minute.  In hindsight, can

2    you agree that Barnett and those who worked closely with

3    her deliberately kept information from the Special

4    Master?

5    A.   I'm not aware of-- what information?  I'm not

6    sure I understand the question.

7    Q.   Any information.

8    A.   We have privileges and confidences and

9    communications that would not be subject to discussion,

10   so I don't know how to-- how I can answer that question.

11   Q.   Are you aware that she kept information and those

12   working with her kept information from the Special

13   Master that should legitimately have been provided to

14   him in a timely fashion?

15   A.   I can't think of anything that would meet that

16   description.

17   Q.   Do you believe that Ms. Barnett and those-- her

18   associates worked as hard as they could to slow-walk the

19   cooperation that they provided?

20   A.   I do not.

21   Q.   You don't know of any instance where they were

22   late getting things put together or took a long time to

23   get things put together that should've taken a short

24   time?

25   A.   That's a different question.  I think there are

1   times when all of us would liked to have moved more

2   quickly on some items, but I believe that the effort to

3   get things right versus fast was governing that, and the

4   consultations above and some delays created by that were

5   factors.

6       Q.  So you don't think there was any deliberate

7   slow-walking, is that it?

8       A.  I agree, there was not.

9       Q.  All right.  Are you aware of a time when the

10  Special Master wanted access to grand jury transcripts

11  to see whether calls, inmate calls were used there?

12      A.  I recall that that was desired, yes.

13      Q.  And do you remember that-- that your appellate

14  lawyer was working on a motion to terminate Phase III at

15  that time?

16      A.  I'm not sure-- am I authorized to...

17              MS. VANBEBBER:  May I have a second, Your

18  Honor?

19              THE COURT:  Yes.

20              MS. VANBEBBER:  Sorry, Your Honor.

21  BY MS. VANBEBBER:

22      Q.  Are you aware that Ms. Barnett and Ms. Metzger

23  determined that there was really no need to hurry up

24  about providing the information that the Special Master

25  had requested because they were trying to stop Phase III

```
 1    at that time?
 2        A.  No.
 3              MS. VANBEBBER:  Okay.  No other questions.
 4              THE COURT:  Yes.
 5                     CROSS EXAMINATION
 6    BY MS. BRANNON:
 7        Q.  Mr. Beall, before you testified today, did you
 8    review anything in preparation?
 9        A.  My Touhy instructions.
10        Q.  Okay.  Anything else?
11        A.  No.
12        Q.  Since the--
13        A.  Oh, no, I'm sorry, the transcript of the prior--
14    only my testimony from the prior hearing.
15        Q.  All right.  Since the close-- since the recess in
16    the prior hearing, have you reviewed any other
17    transcripts--
18        A.  I have not.
19        Q.  -- of that hearing?  Have you had any discussions
20    with anyone about what happened during that hearing?
21        A.  I have heard a few things about what occurred.
22    I've not sought the information particularly and I've
23    not read any press accounts, but I'm aware of some
24    things that occurred.
25        Q.  You didn't sit down and have a meeting with
```

1   anyone about what happened and what to do about it?

2       A.   What happened and what to do about it?

3       Q.   Uh-huh.

4       A.   I'm sure I was involved in conversations, I just

5   don't-- I'm not aware of a lot of what went on.

6       Q.   So did you ever have a specific meeting regarding

7   the evidence that was elicited during the prior hearing?

8       A.   I have learned some of what occurred in the prior

9   hearing in conversation, I don't know about a specific

10  meeting.  I don't know if I can view it as a specific

11  meeting for that purpose.

12      Q.   Were you ever part of a conversation about any

13  actions to take in your office as a result of the

14  evidence that was elicited?

15      A.   I don't recall being involved in a conversation

16  of that nature.

17      Q.   Let's talk about your delegation of authority to

18  other people in your office during this investigation.

19  If I understand, you designated Deb Barnett as lead

20  counsel in *Black* but also as kind of the lead in working

21  with the Special Master in his investigation?

22      A.   True.

23      Q.   Did you designate Emily Metzger as litigation

24  hold director or coordinator?

25      A.   She was-- she already occupied that position.

1     Q.   Did you designate Tanya Treadway as the head of

2     the taint team?

3     A.   No, I did not.

4     Q.   Do you know who did?

5     A.   I don't recall who did.  Do you mean specifically

6     for the-- for the *Black* investigation?

7     Q.   Yes.

8     A.   I don't know.

9     Q.   You were acting U.S. Attorney at that time?

10    A.   At the time that that occurred, I'm not sure.

11    That would've been pretty close to-- can you give me a

12    date of when-- I think I became-- it was January of '16,

13    so it's close to that time frame.

14    Q.   Close.  All right.  But you were not the one that

15    selected Tanya Treadway to be on the taint team or head

16    of the taint team in this case?

17    A.   No.

18    Q.   Did you designate a specific role to Duston

19    Slinkard in this case?

20    A.   I asked him to be part of the team, the

21    litigation team.  And I don't recall what-- when he

22    entered an appearance, but he represented us in the

23    litigation, the investigation litigation component of

24    this.

25    Q.   After you made all these delegations-- I'm sorry,

1    did you have something else?

2        A.  Together with Deb and-- yeah, go ahead.

3        Q.  All right.  After you made these delegations,

4    what exactly was your role?

5        A.  I was involved in all the discussions, convened

6    meetings of that group, discussed how to proceed, what

7    was going on.

8        Q.  If there was a decision to be made about what to

9    produce to the Special Master, did you have to approve

10   that?

11       A.  I-- I believe I did.  I approved the-- the

12   interviews that took place, the process of working

13   toward search terms, the things that were going on, the

14   process of developing the lit hold that Emily was

15   working on.

16       Q.  Do you remember any information that was actually

17   produced to the Special Master that you approved that

18   production?

19       A.  I answered written questions at one point from

20   the Special Master.  I recall that.  I think the

21   question of production, if you mean-- by that you mean

22   e-mails and that sort of thing, electronic documents,

23   that was-- the concern I had, and I expressed it at the

24   time, was that the privileges involved and the authority

25   involved and the possession and control of that

1    information was not exclusive to the District of Kansas.

2       Q.  So you would've had to have approval from up

3    above before you produced any actual documents, for

4    example?

5       A.  I believe that to be true, yes.

6       Q.  Did you receive any approval to do that?

7       A.  I don't believe I did.  I think I was engaged in

8    an ongoing discussion about that subject and the fact

9    that-- that-- seeking to get outside counsel or recusal

10   in the matter entirely.

11      Q.  You made application for-- to recuse the office

12   in October of 2016.  Correct?

13      A.  Right.

14      Q.  July or so of-- was it 2017, did Mr. Clymer enter

15   the picture?

16      A.  That sounds right.  I'm sure the record reflects

17   when.

18      Q.  During that time did you understand that you had

19   authority to provide information that the Special Master

20   had requested?

21      A.  In consultation, I did exercise authority to

22   provide some information and those interviews I talked

23   about, but I-- I'm sorry, maybe I'm not answering your

24   question.  Can you ask it again?

25      Q.  Well, I'm not talking about the interviews

1   necessarily--

2       A.  Okay.

3       Q.  -- but production of actual documents that the

4   Special Master was seeking.  Did you have authority to

5   produce those during that time period when the recusal

6   request was made?

7       A.  Not in my view.

8       Q.  And so to produce any information that the

9   Special Master was asking for in that time period, you

10  had to go to-- was it DOJ, for approval?

11      A.  Yes.

12      Q.  And did you go to DOJ for approval to produce

13  documents during that time period?

14      A.  I'm limited in authority, how much I can discuss

15  about those interactions, but I can say that I had

16  multiple engagements at Main Justice on the subject.

17      Q.  My question is:  Did you ever go to them and ask

18  for authority to provide material to the Special Master

19  that he had requested during that time period?

20      A.  I suspect that that was part of the conversation,

21  but the conversations that I had were driven by the fact

22  that I did not believe that it was appropriate for the

23  decision-making to be in the district on the subject.

24      Q.  I understand that you believed that you did not

25  have the authority to produce these documents or this

1   material.  My question is:  Did you specifically ever go
2   to DOJ and say, here's this material that the Special
3   Master is requesting, I'd like to provide it to him, I
4   need your approval to do that?
5       A.  I don't recall a specific conversation like that.
6   It could be that Emily or Deb did, but I don't recall
7   having that conversation.
8       Q.  Setting aside whether you remember a
9   conversation, do you remember ever getting any approval
10  from DOJ to provide material to the Special Master
11  during that time frame?
12      A.  I got approval to provide in camera the policy,
13  the filter policy.
14      Q.  And that would've been in May?
15      A.  Whenever-- whenever that occurred that I got
16  authority to do that.
17      Q.  Is that the only thing you can think of?
18      A.  It's the only thing I can think of as I sit here.
19      Q.  Did you share with the Special Master that you
20  did not have the authority to produce this material to
21  him but that you had to get DOJ approval to do so?
22      A.  I believe it was discussed and-- and I-- I think
23  I was pretty clear that I did not believe that I had the
24  authority, that I was-- that I was seeking that
25  representation, outside representation or recusal.

1    Q.   Did you ever represent to the Special Master that

2    you were seeking approval to provide that material to

3    him from DOJ?

4    A.   I may have and that may have occurred, I just

5    don't recall the specific conversations.

6    Q.   Because you were waiting on this decision, you

7    held back information from the Special Master, basically

8    slow-walked your responses to him; is that right?

9    A.   I don't agree with that.  I believe there's a

10   clear record that shows an ongoing effort to establish

11   search terms and samples run and those sorts of things.

12   Q.   Do you remember when the Special Master was

13   seeking the grand jury transcripts from this case?

14   A.   I don't.

15   Q.   You don't remember--

16   A.   I don't remember the "when."  You said "when," I

17   don't remember the date.

18   Q.   Do you remember him asking for grand jury

19   transcripts?

20   A.   Yes, yes.

21   Q.   And you had some exchange with Emily Metzger and

22   Deb Barnett about whether to produce these to the

23   Special Master?

24   A.   That could well be, yes.

25   Q.   And you would've had to get permission from DOJ

16-20032  USA v. Karl Carter (Black) REDACTED  11.16.18    2588

1   to provide those?

2       A.  I think so.  I don't think we did anything

3   without consulting above.

4       Q.  Was it your decision about-- well, it would be

5   your decision about when and whether to take a specific

6   request to DOJ?

7       A.  Fair.

8       Q.  Were there times that you delayed your request to

9   DOJ for material that the Special Master requested?

10      A.  Did I delay?  Not by design.

11      Q.  Do you remember an e-mail that you sent to Ms.

12  Metzger and Ms. Barnett about the grand jury saying, "I

13  think we can hold back for a bit as we wait for the

14  decision on recusal counsel"?

15      A.  That could be.

16          MS. BRANNON:  May I approach the witness?

17          THE WITNESS:  Because, as I-- and I said, and

18  I believe there's probably e-mail that shows this, that

19  I was unwilling-- and I made this statement I believe to

20  the Special Master, that I was unwilling to commit the

21  office to a decision that would bind outside counsel if

22  we got it and we were pursuing that at the time--

23          MS. BRANNON:  May I approach the witness?

24          THE WITNESS:  -- for recusal.

25          THE COURT:  Yes.

1          MS. BRANNON:  May I approach the witness,

2    Your Honor?

3    BY MS. BRANNON:

4      Q.   I showed you Special Master Exhibit 1182.  Do you

5    recognize that e-mail?

6      A.   I mean, I don't specifically recall it, but I see

7    what it is.

8      Q.   And the subject is producing grand jury

9    transcripts to the Special Master.

10     A.   I see that.

11     Q.   And you specifically say in that that I think we

12   should hold back in producing this, waiting for recusal

13   counsel.

14     A.   And that relates to what I said earlier, which is

15   that I didn't want to bind a decision.

16     Q.   That's what that e-mail says.  Correct?

17     A.   It says what it says.  "A bit."

18     Q.   Do you remember ever going to DOJ to request

19   authority to provide the grand jury transcripts on that

20   date or near that date?

21     A.   I don't know.

22     Q.   And for the record, what is the date on that

23   e-mail?

24     A.   The-- July 10th, '17.

25     Q.   If the Court ordered you to produce material to

1    the Special Master, was it your understanding that you

2    still had to get DOJ approval to do that?

3        A.   We would've consulted above.

4        Q.   And informed them that there was a specific court

5    order for you to provide material?

6        A.   Right.

7        Q.   But regardless of DOJ's response-- well, let me

8    ask you--

9        A.   I was never in that--

10       Q.   -- which controls?  Would it be the court order

11   or would it be DOJ's decision on what to provide?

12       A.   That's a hypothetical.  I was never in that

13   position.

14       Q.   Well, when you're making decisions as the U.S.

15   Attorney during this investigation about what to provide

16   to the Special Master when, if you had a court order to

17   provide specific material and you had to have DOJ

18   approval, which would've controlled?

19       A.   Well, I have bosses that I work for, I would've

20   had to consult with them.

21       Q.   And if they had told you no, don't produce that

22   yet, would you have gone with that?

23       A.   Again, I was never in that position so I never

24   had to do that analysis.

25       Q.   You knew that there was a court order early on

1  for your office to cooperate with the Special Master?

2      A.  Yes, and I believe we did.

3      Q.  And you knew that the Special Master early on was

4  asking for particular material.  Right?

5      A.  Yes.

6      Q.  And you did not produce it at the time he asked

7  for it because you were consulting with DOJ?

8      A.  No, because I did not feel I was authorized to do

9  so.

10      Q.  You did not feel you were authorized to do so,

11  despite the presence and issuance of a court order for

12  you to cooperate with the Special Master?

13      A.  I believe that the privileges involved are not

14  those of the District of Kansas but that of the

15  Department of Justice.

16      Q.  Some of the material that the Special Master was

17  requesting was not privileged, you would agree?

18      A.  There would've been *Touhy* implications as well.

19      Q.  Would you agree that there was some information

20  that the Special Master was seeking that was not

21  protected or privileged?

22      A.  I'm sure that's true.  And I provided-- like I

23  said, I provided written answers to questions and--

24      Q.  Well, aside from that material that the Special

25  Master was seeking that was not subject to privilege or

1    *Touhy* that was within the Court's order to cooperate,

2    did you provide that to the Special Master?

3              MR. CLYMER:  Objection, Your Honor, assumes a

4    fact not in evidence; that there was material that was

5    requested by the Special Master that was not governed by

6    the *Touhy* regulations.  I believe that's inaccurate as a

7    matter of fact.

8              THE COURT:  I think he has testified that

9    he's sure there's-- the Special Master requested some

10   things that were not under those limitations, so I think

11   the question is based on that.  So reframe the question.

12   BY MS. BRANNON:

13   Q.  Was there information that the Special Master was

14   requesting that did not fall within *Touhy* or

15   protections, as you understood it, that you did not

16   produce because you were waiting on DOJ?

17   A.  I don't know that there was that wouldn't have

18   been subject to *Touhy* or a privilege.

19   Q.  Did you ever actually review material that the

20   Special Master was seeking?

21   A.  I know we ran--

22   Q.  Not we, you.

23   A.  -- several searches.  I'm sure I did see some of

24   it.

25   Q.  Was it part of your role to go through all of the

1   material that the Special Master requested and decide

2   what was privileged and what was not?

3       A.   We never got to that point, because we were still

4   doing searches and still getting voluminous results that

5   would've required-- we never got to that point.

6       Q.   Those searches were just about e-mails.  Correct?

7       A.   Right.

8       Q.   And the Special Master asked for material that

9   was-- fell outside of e-mails.  Correct?  He wasn't just

10  asking for communications that were sent by e-mail or

11  received by e-mail, there was other material he

12  requested that would've been outside that search?

13      A.   I don't know that.

14      Q.   You don't know that?

15      A.   I don't know that as I sit here, I'm not sure

16  what you're talking about.

17      Q.   You had a copy of Mr. Cohen's request for

18  material?

19      A.   There-- there were requests.  I think that was

20  something that was handed off to Mr. Clymer.

21      Q.   So that would've been July of 2017?

22      A.   Right.

23      Q.   Did you ever--

24      A.   If you have a request for that kind of material

25  that you can show me that would help me, I could respond

1    to that, but I don't know specifically what you're

2    referring to.

3        Q.   I'm just asking what you recall.

4        A.   I don't--

5        Q.   And you don't recall any material that the

6    Special Master requested outside of e-mails?

7        A.   Or-- okay, I was thinking outside of *Touhy* or

8    privilege issues.  There may well have been, I just

9    can't recall what that would've been.

10       Q.   Whose role was it to go through material and

11   decide what would've been protected by *Touhy* or

12   privilege and what would not have been?

13       A.   We never got to that point of doing that level of

14   filtering of material.

15       Q.   When did you stop having a role or did you ever

16   stop having a role in this investigation?

17       A.   At the time-- at the time of the transition to

18   the new U.S. Attorney, I certainly had a lesser role.

19   And I have no role at this time that I'm aware of.

20       Q.   During that time, up until Mr. McAllister was

21   appointed, did you have any role in reviewing material

22   to determine what was privileged and what was not?

23       A.   I did-- not in this matter specifically, but in

24   the-- I believe in the *Dertinger* matter I did.

25       Q.   And you understand there was overlap between

1   *Dertinger* and this investigation?

2      A.   Yes, yeah.

3      Q.   And when you went through material in *Dertinger*

4   to determine what was privileged and what was not, did

5   you keep track of that separation?

6      A.   It was tracked, but I did not maintain that

7   record.

8      Q.   Who did?

9      A.   I believe Chris Allman.

10     Q.   Did-- and Chris Allman is an AUSA in your office?

11     A.   True.

12     Q.   Is he part of the civil division?

13     A.   Yes.

14     Q.   Okay.  Was Chris Allman charged with reviewing

15   any material that was requested in the *Black* litigation?

16     A.   I have not been involved in that part of the

17   process.

18     Q.   Did you designate Chris Allman to have any role?

19     A.   Back at that time, no, I don't believe so.

20     Q.   Do you remember how it was he came to be involved

21   in *Dertinger*?

22     A.   Emily may have requested his involvement in that,

23   I don't recall that.

24     Q.   You have a civil background--

25     A.   That's true.

1    Q.  -- is that right?

2    A.  Yes.

3    Q.  And in your background there have been other

4  cases where you had to go through documents and decide

5  what should be produced and what was protected?

6    A.  Sure.

7    Q.  In your experience, you knew that it was

8  important to track that division?

9    A.  Yes.

10   Q.  You know what a privilege log is?

11   A.  Sure.

12   Q.  You know how to keep a privilege log?

13   A.  Yes.

14   Q.  You know the importance of a privilege log?

15   A.  I understand.

16   Q.  You do?

17   A.  Yes.

18   Q.  Did you ever direct anyone in the *Black* case who

19  may review material to keep a privilege log?

20   A.  As I said before, I don't believe we ever reached

21  the stage that that was done.

22   Q.  So your answer would be no?

23   A.  No, because we never reached the stage where that

24  was done.

25   Q.  Well, surely in the process of knowing what the

1  Special Master was requesting and knowing that you're

2  running these search terms, you gave-- you had to decide

3  on a process for that.  Correct?

4      A.  Right.

5      Q.  And did you decide on the process?

6      A.  David Steeby ran the technical side of running

7  searches, and Emily was engaged directly with the

8  Special Master on search terms, as was David Steeby.

9      Q.  When you got to that point of looking through

10  material that would be produced to the Special Master,

11  you had not decided who was going to go through that and

12  make the decisions?

13      A.  And it's my recollection that we never got beyond

14  running the sample searches, we never got to the point

15  where we were actually dealing with a body of documents

16  that were to be produced.

17      Q.  But you knew that was coming?

18      A.  It was-- it was coming at some point if-- yeah,

19  it was coming at some point, that analysis.

20      Q.  And you were preparing for that?

21      A.  We would've been prepared to do that when we got

22  to that point.

23      Q.  But your testimony is you didn't have a plan in

24  place about whose role was what in reviewing documents

25  to provide to the Special Master?

1     A.   That had not been determined at that point.

2     Q.   Do you remember when it-- if it ever was

3  determined?

4     A.   I don't recall that being determined.

5     Q.   In your designation of Deb Barnett and her role

6  in dealing with the Special Master, did you put any

7  limitations on her about what information she could

8  provide to the Special Master aside from the material,

9  the written material or the documents that we've been

10 discussing?

11    A.   I don't recall doing so.

12    Q.   So she had complete authority on her own?

13    A.   She communicated with the Special Master

14 without-- I mean, she didn't need my permission to do

15 so, if that tracks with what you're asking.

16    Q.   All right.  Correct.  And did she have any duty

17 or obligation to report back to you what information she

18 gave the Special Master?

19    A.   I believe she did and I believe-- I believe she

20 did so.

21    Q.   Did she have an obligation to do so?

22    A.   I believe she did.

23    Q.   And was that memorialized routinely?

24    A.   It could-- it could've been.  I know it was, at

25 least I've seen an exhibit to that effect.

1    Q.   Sure.  But was there a requirement or a standard

2    procedure for her to memorialize what information she

3    gave the special master?

4    A.   I don't recall there being so, and I think there

5    were communications that were less of-- you know, of

6    less substance, of less import that probably conveyed

7    verbally.

8    Q.   If the Special Master had requested for employees

9    in your office to be made available for interviews and

10   made that request to Deb Barnett, would you expect her

11   to report that to you?

12   A.   I would.

13   Q.   Do you remember her doing that?

14   A.   I remember the-- the subject that-- I remember

15   being asked what-- whether we would do that or not, and

16   I remember making the decision that we would.  But I

17   can't-- I can't tell you how that communication exactly

18   took place.

19   Q.   Do you remember when?

20   A.   I don't.

21   Q.   And do you remember maybe deciding that they

22   would be made available, but that you wanted to wait to

23   do that?

24   A.   I don't recall that.  I recall there being a lot

25   of discussions and consulting on the subject.

1    Q.   Were people in your office told that they were

2    required to go through you or Deb Barnett before

3    providing any information to the Special Master?

4    A.   I don't know whether that was communicated, but I

5    think it would've been appropriate to be aware.

6    Q.   Was that your expectation, that they would go

7    through you?

8    A.   I don't know if go through me, but I think I

9    should be-- I think I should be aware of contact.

10    Q.   Did you make your employees aware of that?

11    A.   I may have.  I'm not sure.  If there's an e-mail

12    or something that would go to that, I-- I don't know.

13    Q.   There was a meeting in Topeka in December of

14    2016.  Were you present for that?

15    A.   If you tell me more about what-- the meeting that

16    occurred, I can tell you whether I was there.

17    Q.   Management meeting, maybe regarding a litigation

18    hold.

19    A.   Probably.  If it involved this subject, I would

20    probably be there.

21    Q.   Your testimony is you don't have any specific

22    recall of that meeting?

23    A.   I don't.

24    Q.   Okay.  Do you remember ever telling people in

25    your office that they were free to contact the Special

1  Master with information and encouraged to do so?

2      A.  I don't recall that.

3      Q.  You don't recall--

4      A.  I don't recall making that communication.

5      Q.  You don't recall or it didn't happen?

6      A.  I don't recall making that communication.

7      Q.  Is that something you would've said to them in

8  this context?

9      A.  I don't know.

10      Q.  Let's talk about this e-mail.

11      A.  I'm sorry, I would say certainly that I-- I did

12  not discourage anyone from communicating-- who was

13  interviewed by the Special Master in any way on any

14  subject.

15      Q.  Do you remember approving those interviews?

16      A.  I do remember that I did, yes.

17      Q.  Before that, though, and I'm not talking about--

18  discouraging--

19      A.  Yeah, I--

20      Q.  You don't have any memory of discouraging or

21  telling people that they could not talk with the Special

22  Master or give the Special Master information without

23  going through you?

24      A.  I don't recall that-- any communication like

25  that.

 1      Q.   Would that have been something you did in this

 2   context?

 3      A.   I don't know.

 4      Q.   Do you believe that would've been an appropriate

 5   process?

 6      A.   I think it would've been appropriate to be aware

 7   of communication.  I don't believe I ever insisted on

 8   approval.

 9      Q.   And the decision about whether to provide

10   information to the Special Master rested with Deb

11   Barnett, but you expected her to report any information

12   that she provided?

13      A.   Yes.

14      Q.   She had that discretion?

15      A.   Yes.

16      Q.   All right.

17      A.   And Emily Metzger had a lot of direct

18   communication as well, similarly.

19      Q.   Let's talk for a minute about this exhibit that

20   has not been admitted, 1195, regarding Laura Graham.

21      A.   Uh-huh.

22      Q.   You testified that it was your reading that Ms.

23   Barnett was brought in to insulate the KCK office

24   prosecutors, that that phrase was tied to defending

25   against defense arguments?

1    A.  Yes.

2    Q.  Can you point to any pleading that the defense

3    filed alleging that Deb Barnett was-- had a role of

4    trying to insulate prosecutors?

5    A.  I don't-- I don't know.

6    Q.  Can you think of anything that ever happened in a

7    hearing where we made that allegation that Deb Barnett

8    was brought in to insulate the prosecutors?

9    A.  I don't recall any such.

10   Q.  Can you remember any context whatsoever that the

11   defense made an allegation that Deb Barnett was brought

12   in to insulate prosecutors?

13   A.  I don't know of any.

14   Q.  As part of your role as U.S. Attorney, did you

15   have to approve pleadings that were filed on behalf of

16   your office in this case?

17   A.  I did read and approve a number of pleadings.  I

18   believe I did, yes.

19   Q.  So it was a requirement that you had to see and

20   approve of any filings?

21   A.  All of the pleadings that were filed went through

22   that working group that I established, and I read and I

23   think opined on all of-- at least the significant ones.

24   There were probably some more routine matters that I may

25   not have.

1    Q.  You did not enter an appearance in this case?

2    A.  No.

3    Q.  You did not sit at counsel table during any of

4   the hearings?

5    A.  No.  I was present for at least two of the early

6   hearings, but no, I did not-- I sat in the front row

7   there.

8    Q.  And you weren't present for all of the hearings?

9    A.  I was not present for all of the hearings, I was

10   present for some of the earlier hearings.

11    Q.  And you weren't present for the entirety of some

12   of those early hearings, were you?

13    A.  I don't recall leaving the hearing early.

14    Q.  Did Deb Barnett or anyone else in your office

15   ever tell you that the defense was arguing that Deb

16   Barnett was brought in to insulate KCK prosecutors?

17    A.  I don't recall that.

18    Q.  At the time-- let's talk about October when the

19   Special Master was appointed and brought into this case.

20   At that time was there any OPR complaint pending against

21   Deb Barnett?

22              MR. CLYMER:  Objection.

23              MS. BRANNON:  I'm not asking about content,

24   I'm asking whether it existed and goes to--

25              MR. CLYMER:  The objection stands, Your

1   Honor.  It's a Privacy Act matter on whether there's an

2   existing OPR complaint naming a particular person.  I

3   don't think the witness is legally permitted to answer

4   that question.

5          MS. BRANNON:  I think it goes to credibility

6   and her interest in making decisions in this case and in

7   the testimony that she gave.

8          THE COURT:  Approach the bench both of you.

9          (Proceedings had at the bench, outside the

10   hearing of open court).

11   ████████████████████████████████████████

12   ████████████████████████████████████████████

13   ██████████████████████████████████████████

14   ███████████████████████████████████████████████

15   ██████████████████

16   ████████████████████████████████████████████████

17   ████████████████████████████████████████████████

18   ██████████████████████████████████████████

19   ██████████████████████████████████████████

20   ███████████████████████████████████████████████

21   ██████████████████████████████████████████

22   ██████████████████████████████████████████

23   ████████████████████████████████

24   ██████████████████████████████████████████

25   ████████████████████████████████████████





16-20032  USA v. Karl Carter (Black) REDACTED  11.16.18       2608



1

2

3

4

5

6              (Proceedings continued in open court).

7  BY MS. BRANNON:

8      Q.   Mr. Beall, in your communications with the

9  Special Master, did you ever reveal or tell him that

10 there was any sort of investigation pending against Deb

11 Barnett?

12     A.   I don't recall that.

13     Q.   Your answer "I don't recall" is not the same as

14 "I did not tell him that"?

15     A.   If I don't recall, I don't know.

16     Q.   Is it possible you told him that?

17     A.   Is it possible?  I don't know.  It's-- I suppose

18 it's possible.

19     Q.   In October of 2016 when the Special Master became

20 involved--

21     A.   Wait a minute.  Did you say investigation?

22     Q.   Yes.

23     A.   I don't-- I don't see how I can answer that.  I

24 mean, there's an-- can I consult with counsel?

25              THE COURT:  Certainly.

 1                    (Confer).

 2                    MR. CLYMER:  May I speak to Ms. Brannon for a

 3    second, Your Honor?

 4                    THE COURT:  Yes.

 5                    (Counsel confer).

 6    BY MS. BRANNON:

 7      Q.   Mr. Beall, let me rephrase the question.  During

 8    October of 2016 when the Special Master first came into

 9    this case, are you aware of whether there were any

10    allegations or complaints against Ms. Barnett?

11      A.   And I don't-- I believe I'm not authorized to

12    answer that.

13                    MR. CLYMER:  May I speak to Ms. Brannon for a

14    second?

15                    THE COURT:  Yes.

16                    (Counsel confer).

17                    MR. CLYMER:  Your Honor, in response to the

18    question that was just posed, I do not believe the

19    witness has authorization to answer that and I am not in

20    a position to give him that authorization.  I can try to

21    check during the lunch break to see whether-- what sort

22    of response I get from the Department of Justice on that

23    issue.

24                    THE COURT:  All right.  Let's proceed.

25    BY MS. BRANNON:

1    Q.  Mr. Beall, excluding OPR, were you aware of any

2  complaints or allegations against Ms. Barnett in October

3  of 2016?

4    A.  I believe that's Privacy Act material.  I don't

5  believe I'm authorized to answer that.

6              THE COURT:  You said excluding OPR?

7              MS. BRANNON:  Yes.

8              MR. CLYMER:  And, again, Your Honor, it's

9  something I should check on, I believe.

10             THE COURT:  All right.  Please check.

11  BY MS. BRANNON:

12   Q.  Do you remember ever telling the Special Master

13  that there were allegations or complaints against Ms.

14  Barnett during that time period?

15   A.  I do not recall that.

16   Q.  Okay.  There was a reference in one of the

17  exhibits to GCO.  Can you tell us for the record what

18  that is?

19   A.  General Counsel's Office.  It's just sometimes

20  those letters are flipped, but it's Office of General

21  Counsel, General Counsel's Office, same thing.

22   Q.  Is that part of the EUSAO or DOJ?

23   A.  The Executive Office.

24   Q.  Okay.  The Special Master asked you about the

25  phone policy that was put into effect in May of 2017.

1    Between August of 2016 and May of 2017, was there any

2    sort of moratorium placed on your office for requesting

3    recorded calls from CCA or other institutions?

4        A.   I feel like there-- I'm certain we had more

5    scrutiny of all those kind of activities, but I can't

6    tell you specifically about a moratorium, because--

7    excuse me.

8        Q.   Do you remember any limitations that were placed

9    during that time period when there was no policy in

10   effect?

11       A.   A higher level of scrutiny is how-- is the best I

12   could say for that.

13       Q.   What is that?

14       A.   That is coordinators-- the-- the criminal

15   managers and the supervision up the chain in criminal

16   being far more aware of any of those kind of activities.

17       Q.   And in Kansas City that would've been Kim

18   Flannigan?

19       A.   Until I-- until that was changed.

20       Q.   To Scott Rask?

21       A.   Yes.

22       Q.   So those two would've been charged with reviewing

23   requests for recorded calls?

24       A.   With responsibilities through Deb Barnett.

25       Q.   Would Deb Barnett have to approve those?

1    A.   I don't believe there was a procedure in place

2    for that until I instituted the policy.

3    Q.   Was there any sort of requirement in that time

4    frame to take precautions to avoid getting

5    attorney-client calls?

6    A.   As I said, there was a heightened level of

7    scrutiny and activity in that area.

8    Q.   There's one exhibit that was discussed with--

9    between you and the Special Master that said Judge

10   Robinson was aware that past OPR investigations have

11   gone nowhere.  My question on that, for the record, is

12   whether you're aware whether those OPR investigations

13   had anything to do with your office obtaining

14   attorney-client communications?

15   A.   I don't-- I'm not sure if I can-- I don't believe

16   so.

17   Q.   Okay.

18   A.   But I-- I can't say for sure because I'm not even

19   sure what we're talking about necessarily.  Some of that

20   may predate my knowledge.

21   Q.   You talked a little bit about Tanya Treadway.

22   Are you aware--

23              MS. BRANNON:  May I approach the witness,

24   Your Honor?

25              THE COURT:  Yes.

1   BY MS. BRANNON:

2      Q.  Mr. Beall, I've handed you Special Master

3   Exhibit 1166.  If you could look at that highlighted

4   information for a moment about the OPR complaint.

5      A.  Yes.

6      Q.  Does that refresh your recollection at all about

7   whether prior OPR investigations had anything to do with

8   attorney-client communications being obtained by your

9   office?

10     A.  I don't think I would be able to answer your

11  question if I knew, but I'm not even-- I can't be

12  certain what the reference is.  And this could be

13  involving stuff that I don't even know about because

14  it's not specific.

15     Q.  My question is yes or no, does it refresh your

16  recollection?

17     A.  No.

18     Q.  Okay.  We've talked a bit about Tanya Treadway

19  and her role in this case.  During your tenure as First

20  Assistant or as interim U.S. Attorney or whatever title

21  you had, did you ever receive any complaints about Tanya

22  Treadway-- ethical complaints about Tanya Treadway from

23  inside your office or from law enforcement?

24     A.  I'm not sure if I'm authorized to answer that

25  question.

 1              MR. CLYMER:  I think that would be a problem,

 2    too.

 3              THE COURT:  I'm sorry?

 4              MR. CLYMER:  Yeah, I'm not sure he's

 5    authorized to answer that question, Your Honor.  And I--

 6    it's certainly outside the scope of the authority he's

 7    given.  We've been given no notice that the question is

 8    going to be asked and nobody has had a chance to check

 9    on it.  So I can-- I can try to check at lunchtime,

10    that's the best I can do.

11              THE COURT:  Okay.  I appreciate that.

12    BY MS. BRANNON:

13         Q.  In talking about the phone policies you said, if

14    I understand it, and correct me if I'm wrong, that there

15    wasn't a policy in place, but that you had had training

16    on the issue?

17         A.  Yes.

18         Q.  And what was that training?

19         A.  It was provided through our Main Justice training

20    program in the DOJ.

21         Q.  Was that before or after this investigation

22    began?

23         A.  I-- I experienced that training before.

24         Q.  And was that required in your office?

25         A.  I can't recall if that particular training module

1    was mandatory or not.

2        Q.   Do you remember the content of that training?

3        A.   Only generally.

4        Q.   Huh?

5        A.   Only generally.  We're talking about years ago,

6    but...

7        Q.   How many years ago?

8        A.   I don't know, at least three.

9        Q.   And, I'm sorry, what was the source of that

10   training?  Who put that on?

11       A.   It's one in DOJ, it's the internal training

12   program.  It's online or-- or video.

13              THE COURT:  And so I'm clear, what training

14   specifically is this on, about attorney-client

15   privilege, is it about jail calls or is it--

16              THE WITNESS:  It was about filtering and

17   attorney-client communications, filter teams, and how

18   that works.

19   BY MS. BRANNON:

20       Q.   How to handle privileged communication if you

21   came in--

22       A.   (Nods head up and down).

23       Q.   And that training was that a filter team needed

24   to be used?

25       A.   Right.

1    Q.   Was there any training about whether an AUSA

2    could intentionally obtain attorney-client

3    communications?

4    A.   There's specific prohibitions against that, both

5    in the Model Rules and DOJ policy.

6    Q.   Is there anything in that training about taking

7    precautions not to obtain attorney-client

8    communications?

9    A.   I think that's the thrust of it.

10   Q.   Okay.  Do you know if that training is still

11   available online?

12   A.   May be.

13            MS. BRANNON:  Your Honor, if it is, we would

14   ask for the government to produce that to the defense.

15            THE COURT:  Any objection?

16            MR. CLYMER:  Again, Your Honor, that's an

17   internal Department of Justice training module.  I can't

18   authorize that, I can look into it.

19            THE COURT:  Okay.  I'm keeping a list.

20            MS. BRANNON:  Could I have just a moment,

21   Your Honor?

22            THE COURT:  Yes.

23   BY MS. BRANNON:

24   Q.   When you-- when you put your name on pleadings or

25   approved pleadings that were filed in this case, was

1  that after you had this training that you're talking

2  about?

3      A.   The training I'm talking about predates any of

4  this.

5      Q.   And you're aware that these pleadings assert that

6  you can listen to attorney-client communications?

7      A.   I'm aware that there are arguments made in the

8  pleadings about what constitutes privilege and what

9  constitutes constitutional violations.

10     Q.   You endorsed the representations of your office

11 made in these pleadings?

12     A.   They were filed under my name, correct.

13     Q.   Yes.  And you understood that it asserted that

14 your office could unilaterally determine whether

15 attorney-client communications were privileged?

16     A.   I don't know if that-- if that's accurate, I'd

17 have to see the pleading.  I don't know if that

18 characterization is fair.

19     Q.   Was that the policy in your office?

20     A.   Could unilaterally determine... the filter team

21 would make a determination, so I don't know if you would

22 call it unilateral, but the determination could be made.

23     Q.   If a filter team was not used, was it the policy

24 and practice in your office that the AUSA could

25 unilaterally determine whether those communications were

1   privileged?

2       A.   There was no policy in the office in that regard

3   until I put one in place.

4       Q.   I also said practice.

5       A.   I'm not aware of it.

6       Q.   Would that have been contrary to the training you

7   received?

8       A.   I believe so.

9       Q.   Those pleadings also took the position that if

10  that line attorney decided the privilege did not apply,

11  that they could go ahead and listen to attorney-client

12  calls?

13           MR. CLYMER:  Objection, Your Honor.  There's

14  nothing in any pleading the government has filed that

15  says that.

16           THE COURT:  All right.  You can inquire

17  further.

18           THE WITNESS:  I'm sorry?

19  BY MS. BRANNON:

20      Q.   You don't remember my question?

21      A.   Yeah, ask the question again, please.

22           (The question was read back).

23           THE WITNESS:  That the pleadings stated that?

24  BY MS. BRANNON:

25      Q.   Yes.

1    A.   I'd have to see the pleading.  I don't-- I

2    couldn't tell you exactly what-- if that's a fair

3    characterization.

4    Q.   Do you agree with that principle?

5    A.   I would not operate that way.

6    Q.   Was it contrary to the training you had received?

7    A.   Again, I believe it would be, but that training

8    is pretty distant at this point.

9    Q.   And, again, that training was by DOJ?

10   A.   Right.  And we encourage consultation with our

11   what we call PROs, professional responsibility officers.

12   There's a criminal and there's a civil.

13   Q.   Are your line attorneys required to follow the

14   information that you receive from the PROs?

15   A.   If they're going to disregard it, I think that

16   would be problematic.

17   Q.   So they would be required to follow it?

18   A.   I believe they-- well, I believe they would be.

19   Q.   Okay.

20        MS. BRANNON:  Thank you.

21                   CROSS EXAMINATION

22   BY MR. CLYMER:

23   Q.   Mr. Beall, as the United States Attorney for the

24   District of Kansas, did you represent the Kansas City

25   AUSAs or did you represent the United States?

1        A.   The United States.

2        Q.   Was it ever your position or belief that it was

3   your responsibility to defend the conduct of individual

4   AUSAs if it was improper?

5        A.   No.  No.

6        Q.   Did you ever try to defend conduct by individual

7   AUSAs that was improper?

8        A.   No.

9        Q.   Was it your understanding that you had an

10  obligation to make legal arguments to defend the United

11  States?

12       A.   Yes.

13       Q.   Did you try to do so?

14       A.   I did.

15       Q.   Was it your understanding when the Special Master

16  made requests for internal documents that you had the

17  authority to make disclosures of those documents without

18  any approval, guidance, or consultation without-- with

19  components at Main Justice?

20       A.   I don't believe that I had that authority.

21       Q.   Did you think you had a legal obligation or an

22  obligation to the Department of Justice in order to make

23  such inquiry?

24       A.   I do.

25       Q.   In addition to that belief that you had about the

1    lack of authorization, did you develop concerns about

2    whether you personally and whether your office more

3    generally had a conflict of interest regarding complying

4    with demands for disclosure by the Special Master?

5         A.   I did.

6         Q.   Can you explain that to the Court, please?

7         A.   Multiple conflicts really from multiple fronts.

8    In one sense-- and it occurred to me as I was looking at

9    Exhibit 1182 where the focus is on whether or not-- or

10   how quickly we're going to produce documents or the--

11   the grand jury documents.  And the next sentence says,

12   "We've been very clear with the Special Master that we

13   don't want to get ahead of the litigative decisions of

14   new counsel."

15        The problem is that every time we make what we

16   believe to be a-- a legitimate legal argument based on

17   sound research, those decisions would be re-cast as not

18   being transparent or not being cooperative.  And that's

19   a conflict.

20        There are also-- there were active things that

21   I've been not authorized to testify about internally,

22   personnel matters that also created conflict.  And we

23   had the fact that there were privileges and *Touhy*

24   issues, not exclusive to the District of Kansas but

25   rather resided with the Department of Justice and the

1   Executive branch.

2        All of those, that whole morass of contravening

3   conflicts made it very difficult, a very difficult

4   position to be in.  And I believe the better

5   decision-making would be made by somebody who had come

6   in from the outside and had none of those sort of

7   issues, and that the line of authority would come

8   directly from DOJ.

9    Q.  Did you discuss these conflicts with the other

10  people on your management team who were trying to work

11  through the issues in this litigation?

12   A.  Yes.

13   Q.  Did you reach out to the Department of Justice to

14  try to get assistance in making the decisions that you

15  believed that you were both unauthorized to make on your

16  own and be-- may have presented conflict of interest

17  issues to you?

18   A.  Yes, multiple times.

19   Q.  Was the request for a recusal the only instance

20  of you doing that?

21   A.  No.

22   Q.  Can you explain as a general matter what you

23  tried to accomplish?

24   A.  There were multiple what I would call runs at

25  Main Justice to try to persuade of-- those issues that

1   you just presented.

2        Q.   And what were you trying to get done?

3        A.   Trying to either be recused from the case or to

4   get outside counsel for decision-making purposes and

5   remove those decisions from the district.

6        Q.   Did you feel that the better thing to do was to

7   have somebody other than someone in this district make

8   those disclosures?

9        A.   I did.

10       Q.   Did you communicate these concerns to the Special

11  Master?

12       A.   Yes.

13       Q.   Did you ever tell the Special Master that you at

14  the end of doing the word search experiments were going

15  to turn over the documents?

16       A.   No.

17       Q.   Did you ever do anything to bind a future

18  attorney who the Department of Justice may appoint in

19  order to make these disclosure decisions?

20       A.   No.

21       Q.   You referred a minute ago to re-casting arguments

22  that were made in the pleadings.  Do you recall in the

23  pleadings that were filed under your name explaining to

24  the Court that there is case law in existence that says

25  a warning on a recorded telephone conversation that the

1  call will be recorded constitutes either a waiver of the

2  privilege or precludes the privilege from attaching in

3  the first instance?

4       A.  Yes.

5       Q.  Are you aware of that case law?

6       A.  I am generally.  I couldn't cite it for you

7  sitting here, but yes.

8       Q.  Are you aware that those arguments were made in

9  your pleadings?

10      A.  Yes.

11      Q.  Do you interpret that-- making that argument on

12  behalf of the United States as the equivalent of saying

13  that any line AUSA can unilaterally listen to any call

14  with that warning on it?

15      A.  I do not.

16      Q.  Are those the same things?

17      A.  No.

18      Q.  Is accusing you of making that argument

19  re-casting an argument that you never really made?

20      A.  Yes.

21           MR. CLYMER:  Can I have one moment, Your

22  Honor?

23           THE COURT:  Yes.

24           MR. CLYMER:  I have no further questions of

25  this witness, Your Honor.

1                    REDIRECT EXAMINATION

2    BY MS. VANBEBBER:

3        Q.   I have just a couple questions, Mr. Beall.  You

4    had-- you just testified that you-- if you had a court

5    order to produce documents, I don't mean the e-mails, I

6    mean documents-- in Exhibit 1182, there was the

7    suggestion that you should stall and not comply with the

8    Court-- with the Special Master's demand for the grand

9    jury documents, because I believe it was your testimony

10   that you didn't think you ought to get ahead in dealing

11   with investigative matters, you didn't want to get ahead

12   of litigative decisions; is that right?

13       A.   I think at that time we believed we were pretty

14   close to achieving-- getting outside counsel.  And,

15   again, what the next sentence says after that is making

16   it very clear that we did not want to get ahead of

17   litigative decisions of new counsel, yes.

18       Q.   So you also testified that you would not feel

19   authorized to comply with certain demands that were made

20   by the Special Master or the Court.  Right?

21       A.   Not without approval.

22       Q.   And it's your testimony that you consistently

23   tried to cooperate with the Special Master?

24       A.   Yes.  Within my authority.

25       Q.   When you decided that you couldn't comply with

1   something because you hadn't gotten the word yet from

2   above, did you call the Special Master and explain to

3   him that you couldn't comply or did you just not comply?

4       A.   I think I was pretty clear in my interactions

5   with the Special Master why I was doing what I was doing

6   when I--

7       Q.   Is that a yes, I told him, or no, I didn't tell

8   him?

9       A.   I can't tell you the specific instance of-- of a

10  conversation, but I believe I was forthcoming.

11      Q.   I'm giving you the specific instance of 1182,

12  Exhibit 1182.  In that instance, which was a late

13  instance, you were asked to provide certain documents,

14  you decided you weren't going to because you didn't want

15  to get ahead of litigative decisions.

16          My question is:  Did you tell the Special Master

17  about that?

18      A.   I don't-- I don't know that I did, but the next

19  sentence references that.

20      Q.   No, the next sentence is not what you told the

21  Special Master.  Did you or did you not tell him about

22  why you were not timely complying?

23      A.   I don't-- I don't know whether I did or not.

24      Q.   All right.  As an officer of the court, isn't it

25  generally true that if you got a court order, you're

1   going to have to comply with it whether you think it's

2   right, whether you think it's wrong, whatever, unless

3   you take steps such as seeking mandamus or appeal or

4   reconsideration?

5              MR. CLYMER:  Objection, Your Honor, that

6   misstates the law.

7              THE COURT:  Overruled.  You can answer it if

8   you can.

9              THE WITNESS:  I don't know that I can answer

10  that question.

11  BY MS. VANBEBBER:

12     Q.  It's your understanding as an attorney that if

13  you are given a court order in a case, you can decide

14  whether or not to comply with it, without either asking

15  the Court to reconsider its order, appealing the order,

16  seeking mandamus?

17     A.  I understand that those are options available,

18  and I've never been in a position of--

19     Q.  Is simply not complying an available option, to

20  your knowledge, as an attorney?

21     A.  I don't believe I've ever done that.

22     Q.  I didn't ask you that.

23     A.  Okay.

24     Q.  I asked you is that an option, a viable,

25  legitimate option, simply not complying?

1       A.   There may be circumstances under which that would

2    be true.

3       Q.   Can you tell me any right now?

4       A.   (Shakes head from side to side).

5       Q.   You expressed concern, legitimate concern about

6    when-- when you were asked to produce someone's

7    documents whether there's a-- a statutory privilege or a

8    common-law privilege or a regulatory concern such as

9    *Touhy*.  Right?

10      A.   Yes.

11      Q.   Did you have any concerns about *Touhy* or

12   common-law privileges or statutory privileges on June

13   the 8th when Tomasic's archive was printed for--

14   specifically for the use of the Special Master, even

15   though it wasn't given to him?

16      A.   If you're referring to the trial run, is that

17   what you're referring to?

18      Q.   It was a complete run.  It has now been produced

19   and it was run for them-- for the benefit of the Special

20   Master, wasn't it?

21      A.   I'm sorry?

22      Q.   You ran that-- you ran that archive for the use

23   of the Special Master.  Correct?

24      A.   We ran a test against the e-mail to determine--

25   to get a sense of what kind of volume it produced is my

1    recollection.

2        Q.  Was that for the use of the Special Master?

3        A.  That was for purposes of informing the Special

4    Master as to what the results gleaned in terms of

5    volume.

6        Q.  Did anybody test it for *Touhy*, anybody test it

7    for privilege?

8        A.  I don't believe so.

9        Q.  So that's an exception to your concerns about

10   privilege and *Touhy* whenever someone's-- whenever

11   someone's documentation is revealed?

12       A.  It wasn't produced, so I'm not sure what the

13   implications of *Touhy* would be in that question.

14       Q.  Why wasn't it produced?  Why didn't you give it

15   to him right then, June the 8th?  Why didn't you give it

16   to the Special Master?

17       A.  For exactly the reasons I just said, because of

18   *Touhy* implications and privilege implications and

19   because we were awaiting counsel.

20       Q.  That's your testimony and you're sticking to it.

21   Right?

22       A.  We never agreed to produce it--

23       Q.  You never--

24       A.  -- at that time.

25       Q.  -- agreed to produce-- you never agreed to

1   produce the work product that was requested by the

2   Special Master and worked on for six months with the

3   Special Master?  You don't think that that was intended

4   to be produced to the Special Master?

5       A.  It may have been when that process was concluded,

6   yes.

7       Q.  And you had an agreed set of search terms and a

8   finite number of archives that could be looked at.

9   Correct?

10      A.  No, it's-- I've testified to this already.  I

11  don't believe that that process ever concluded to

12  finality.

13      Q.  Well, let's take it in two parts.  Did you have

14  an agreed set of search terms?

15      A.  I don't believe so.

16      Q.  Did you tell the Master, we are not going to

17  agree to this last set of search terms that Steeby and

18  Metzger and the Special Master came up with?

19      A.  I didn't have any interaction, I don't believe,

20  on that specific subject with the Special Master.

21      Q.  Okay.  You-- once again, you have testified that

22  you didn't want to follow a court order to produce

23  documents because you didn't want to get ahead of

24  litigation decisions.

25      A.  I've given no such testimony.

1      Q.   What?

2      A.   I've given no such testimony.

3      Q.   Let me ask you right now then.  Is it your

4  testimony that you didn't want to produce things in the

5  investigation in order to not get ahead of the

6  litigation decisions in the case?

7      A.   I think that's clear and I think I made that

8  clear to the Special Master, that we were seeking

9  outside counsel and I was not going to make a decision

10 to bind that counsel.

11     Q.   Did that-- did that determination not to timely

12 produce things occur more than once in this

13 investigation?

14     A.   I can't think of--

15     Q.   Except what's in document-- what's in

16 Exhibit 1182.

17     A.   I can't think of a time.

18     Q.   So your concern that you not produce documents,

19 even-- even though it's untimely, because you didn't

20 want to get ahead of a litigation decision, does that

21 include in your mind a litigation decision not to comply

22 with the investigation-- with Phase III of the

23 investigation of the Special Master?

24     A.   I don't-- can you ask that question again?  I

25 never made a decision not to comply with the Special

1    Master or not to cooperate.

2        Q.   Your-- your position is that it's okay not to

3    produce documents in this case because you didn't want

4    to get ahead of litigation decisions.  Right?  You've

5    said that three or four times now.

6        A.   Right.

7        Q.   All right.  What if the litigation decision is a

8    decision not to comply with something that's been

9    requested?

10       A.   I don't believe we ever received an order to

11   produce or agreed to do so, so I'm not in agreement with

12   your basis.

13       Q.   Well, perhaps I'm not making myself clear here.

14   Let's just do a hypothetical.  Given your theory that

15   you sometimes have to slow down and not comply because

16   you don't want to get ahead of litigation, let's assume

17   the Special Master asks you for the paper-- excuse me,

18   the criminal case files of a given U.S. Attorney in the

19   Kansas City, Kansas office that are relevant to the

20   *Black* investigation and you decide-- and you don't do

21   it.  If the decision is made because it's a litigation

22   decision not to ever comply, does that comport with your

23   theory of why one would not obey a court order?

24       A.   I can't follow that question.

25       Q.   You say you don't want to get ahead of a

1    litigation decision.  Does that include a litigation

2    decision that you're not going to comply with Phase III?

3        A.   There was no such decision.

4        Q.   Does it comport with your theory that you can

5    slow-walk an investigation because you want to have the

6    litigation decision take precedence?

7        A.   That did not occur.

8             MS. VANBEBBER:  Okay.  No other questions.

9             THE COURT:  All right.

10                    RECROSS EXAMINATION

11   BY MS. BRANNON:

12       Q.   Do you remember on December 4th of 2017 the

13   Special Master issued an order for production?

14       A.   Of what items at that time?

15       Q.   Well, there's a whole list of items.

16       A.   I believe that is the request that ended up being

17   responded to by Mr. Clymer, if I'm not mistaken.  Is

18   that right or am I thinking of something else?

19       Q.   Well, my question is:  December 4th of 2017, the

20   Special Master issued a very broad order for production

21   of-- for production.  Correct?

22       A.   Sounds right.

23       Q.   You did not produce that material?

24       A.   I recall there being a process for so many days

25   to object, and I don't-- frankly, as I sit here, I can't

1   recall what we procedurally did in response to that, but

2   I assume we availed ourselves of that process.

3       Q.   You did not produce any material in response to

4   that order for production?

5       A.   I don't know.  I don't think so.

6       Q.   Was that a decision you made not to respond to

7   the order for production?

8       A.   Again, I don't recall what we did in response to

9   that, and I imagine we availed ourselves of the process

10   of objecting and-- and motions practice.  I don't

11   believe that we ever just refused to-- to follow an

12   order without following the process.

13       Q.   Well, at the end of following that process, if

14   the order still stood, you did not produce any material

15   in response to that order for production?

16       A.   I don't know-- I mean, I don't know the order

17   you're referring to, but I-- I believe that's correct.

18       Q.   All right.  You took the position in your

19   pleadings, the legal position, that if an

20   attorney-client call was made and there was a preamble

21   on it that warned that it was recorded, that that

22   privilege was waived.  You took that legal position in

23   pleadings.  Correct?

24       A.   That the case law would support that, yes.

25       Q.   At the time you took that legal position, had you

1  done any investigation about how calls were recorded at

2  CCA?

3      A.  We learned quite a bit about that process in the

4  process of this investigation.

5      Q.  Well, my question is:  When you first took that

6  position in pleadings with this Court, had you

7  investigated how calls were recorded?

8      A.  I don't know-- outside of this investigation, I

9  don't believe so.

10      Q.  At the time you took that position, had you done

11  any investigation into whether CCA recorded calls,

12  despite a request for privatization?

13      A.  No, I learned of that through this investigation.

14      Q.  After you took that position?

15      A.  I don't-- I don't know exactly the timing of when

16  we learned that in connection with the-- when the

17  pleadings would've been filed.

18      Q.  You approved the pleadings in this case.

19  Correct?

20      A.  Correct.

21      Q.  September 7th of 2016.

22              MS. BRANNON:  Is that the correct date?

23              MR. REDMOND:  (Nods head up and down).

24  BY MS. BRANNON:

25      Q.  Do you remember taking that position in a

1    pleading?

2        A.  Yes.

3        Q.  At that time had you done any investigation into

4    whether CCA still recorded calls, despite a

5    privatization request?

6        A.  Had we done an investigation independent of what

7    was revealed--

8        Q.  Yes.

9        A.  -- in this investigation, no.

10       Q.  When you took that position, did you--

11       A.  I don't believe so.

12       Q.  When you took that position, did you know how

13   calls were privatized at CCA?

14       A.  Same answer.

15       Q.  No?

16       A.  Again, whatever we-- whatever we knew as a

17   consequence of what occurred between August and that

18   time in this matter would've informed that, but...

19       Q.  You've consistently taken that legal position.

20   Correct?

21       A.  Yes.

22       Q.  And you took that position as early as September

23   of 2016.  Correct?

24       A.  Sounds right.

25       Q.  In that time you had not done any investigation

1  into whether CCA published how to privatize a call?

2    A.  Same answer.

3    Q.  No?

4    A.  Not outside of what was learned by virtue of this

5  investigation or this matter.

6    Q.  So the answer is no?

7    A.  Not that I recall, no.

8    Q.  You and your office had not done any

9  investigation into the procedure for privatizing a call

10  by CCA?

11    A.  Not that I'm aware of.

12    Q.  You had not done any investigation on whether CCA

13  did it appropriately?

14    A.  Not that I'm aware of.

15    Q.  You had not done any investigation into whether

16  specific attorneys had privatized their number?

17    A.  Specific defense attorneys had privatized their

18  number?

19    Q.  Yes.

20    A.  Not that I know of.

21    Q.  And you had not done any investigation into

22  whether, despite specific attorneys' requests for

23  privatization, those calls were still recorded?

24    A.  No.  What I know on that subject and what we know

25  on that subject I believe is a result of this matter.

1    Q.    When you took that position with the Court, that

2    legal position with the Court, had you done any

3    investigation at all into how calls were privatized by

4    CCA?

5    A.    I'm not aware of any outside this matter.

6    Q.    What you have learned in the course of these

7    proceedings that you refer to, does that change your

8    position, your legal position?

9    A.    I'm not in a position to represent the-- the

10   office's legal position at this point.  I'm not

11   authorized to do so.

12   Q.    Why not?

13   A.    Because the DAG authorized Mr. Clymer to

14   represent the district's position, legal position on the

15   matter.

16   Q.    Your names were on those pleadings taking that

17   legal position.  Correct?

18   A.    Yes.

19   Q.    Based on what you know now factually, would you

20   still take that position?

21   A.    I think we've argued the law correctly.

22   Q.    So you would still take that position, despite

23   what's been developed in this case?

24   A.    I do, I think we argued the law correctly.

25   Q.    You don't know-- can you recall what that law is

```
 1    today?
 2        A.   Only in the general sense.  I don't have it in
 3    front of me.  I can't quote the case law to you.
 4        Q.   Do you remember whether that case law took into
 5    account whether calls were erroneously recorded?
 6        A.   I don't recall that being in the case law.
 7             MS. BRANNON:  Nothing further.  Thank you.
 8                     RECROSS EXAMINATION
 9    BY MR. CLYMER:
10        Q.   You were asked a series of questions about what
11    you would do or what you did concerning a desire not to
12    bind a future attorney assigned to handle this matter.
13    Do you recall those questions?
14        A.   Yes.
15        Q.   Throughout the decision-making, were you
16    operating under the view that you lacked the
17    authorization to disclose the information or produce the
18    information that the Special Master was asking you to
19    produce?
20        A.   Yes.
21        Q.   Did you feel that you needed input from the
22    Department of Justice to do that?
23        A.   Yes.
24        Q.   Are you aware that there's a federal regulation
25    that prohibits you from complying with a court order,
```

 1   even one coming from a federal district court judge,

 2   unless you have authorization to disclose information?

 3       A.  Yes.

 4              MS. BRANNON:  Judge, we would ask them to

 5   identify what this regulation is.

 6   BY MR. CLYMER:

 7       Q.  I'm going to direct your attention, Mr. Beall, to

 8   Title 28 of the Code of Federal Regulations,

 9   Section 16.27.  Could you read that into the record,

10   please?

11       A.  "In response to the demand--" excuse me.  "If

12   response to a demand is required before the instructions

13   from the appropriate Department official are received,

14   the responsible official or other Department attorney

15   designated for the purpose shall appear and furnish the

16   court or other authority with a copy of the regulations

17   contained in this-- on this subject and inform the court

18   or other authority that the demand has been or is being,

19   as the case may be, referred for the prompt

20   consideration of the appropriate Department official and

21   shall respectfully request the court or authority to

22   stay the demand pending receipt of the requested

23   instructions."

24       Q.  Did you tell Mr. Cohen that you were making

25   inquiry to the Department of Justice regarding whether

1    the disclosures could be made?

2       A.  I made it very clear that I was consulting on all

3    of these matters, including that.

4       Q.  At the time you received a request for the grand

5    jury materials, had you already had those

6    conversations-- or at least some of those conversations

7    with Mr. Cohen?

8       A.  I believe so.  It's hard for me now to put that

9    timeline together, but yes, I believe so.

10      Q.  Did you ever get a direct order from Chief Judge

11   Robinson to produce any of the material?

12      A.  Not that I recall, no.

13             MR. CLYMER:  Nothing further.

14             THE COURT:  Anyone else?  All right.  Is Mr.

15   Beall released from his subpoena?

16             MS. BRANNON:  He is, Your Honor, but we would

17   ask him to be advised about the sequestration order.

18             THE COURT:  The rule has been invoked.  Mr.

19   Beall, do you understand what that means, witness

20   sequestration?

21             THE WITNESS:  I do.

22             THE COURT:  All right.  All right.  Let's

23   take a break until 1:30.

24             (Recess).

25             THE COURT:  All right.  You can be seated.

1    All right.  You can call your next witness.

2              MS. VANBEBBER:  Yes, Your Honor.

3              MS. BRANNON:  I think we may-- just for a

4    moment.  Mr. Clymer did check on those matters and--

5              THE COURT:  Okay.

6              MS. BRANNON:  -- put that on the record.

7              THE COURT:  All right.  Sure.

8              MR. CLYMER:  Your Honor, I did check, and I--

9    we tried to reach a resolution on the questioning

10   regarding Ms. Tanya Treadway, but Ms. Brannon-- what Ms.

11   Brannon wants to get at I-- is going to run up against

12   the Privacy Act, no matter how we ask the question.

13        And given the short period of time we've had to

14   analyze it, I cannot get authorization.  I'm certainly

15   willing to work with Ms. Brannon on that question to try

16   to see if we can reach a stipulation somewhere down the

17   road.  But right now, Mr. Beall does not have

18   authorization.

19        The same answer with respect to the question

20   regarding Ms. Barnett.  I just think the way the

21   question is phrased, it's going to run against the

22   Privacy Act no matter how we try to re-characterize it.

23   But I'm willing to work with Ms. Brannon to try to see

24   if we can get a resolution.

25        We will try to identify the DOJ training module

 1    that Mr. Beall watched.  And if we're able to do so,

 2    we'll watch it and then provide the Court and the

 3    parties with a position on whether or not the Department

 4    is willing to disclose it.  But without knowing which

 5    one it is and what's in it, I can't give an answer to

 6    that.

 7                 THE COURT:  All right.

 8                 MS. BRANNON:  And, Your Honor, if I may.

 9    Just based on how the record was made, I want to make

10    sure that Mr. Clymer was able to reach somebody at DOJ

11    or whoever to get an answer to this, and it's not simply

12    an answer at this level.

13                 MR. CLYMER:  Correct, that's correct.

14                 MS. BRANNON:  Okay.  Thank you.

15                 THE COURT:  All right.  Are you ready with

16    your next witness?

17                 MS. VANBEBBER:  We call Emily Metzger.

18                 MR. CLYMER:  May Mr. Beall be excused at this

19    point, Your Honor?

20                 THE COURT:  May Mr. Beall be excused?

21                 MS. BRANNON:  He may.

22                 MR. SLINKARD:  I'll communicate that when I

23    get Ms. Metzger.

24                 THE COURT:  Thank you.

25                       EMILY METZGER,

1    called as a witness on behalf of the Special Master,

2    having first been duly sworn, testified as follows:

3                    DIRECT EXAMINATION

4    BY MS. VANBEBBER:

5       Q.   Ms. Metzger, you testified earlier in this

6    hearing, correct, in October?

7       A.   Yes, I did.

8       Q.   And so we're going to continue.  Given what we've

9    learned from our review of what was produced in

10   discovery, we have some other questions for you.

11           You testified earlier that for some time you

12   served as both the civil chief and the U.S. Attorney's

13   litigation hold coordinator.  Correct?

14      A.   Yes.

15      Q.   How long-- off and on, how long were you the

16   civil chief?

17      A.   I've been the civil chief since I believe

18   September of 1991.

19      Q.   And you're still the civil chief?

20      A.   Yes.

21      Q.   And as the litigation hold coordinator?

22      A.   I, frankly, do not recall, I'm sorry.  It's been

23   some years.

24      Q.   A number of years.

25      A.   Uh-huh.  The program is a newer program, so it

1   didn't exist until whenever it did, and I was the--

2       Q.   So you were on board about the same time it

3   started to exist?

4       A.   Yes.

5       Q.   All right.  So would that be more than five

6   years, do you think?

7       A.   Yes.

8       Q.   As civil chief, you've supervised many cases that

9   involved litigation holds, haven't you?

10      A.   Yes.

11      Q.   And it's true certainly in civil cases, and I

12  suppose also in criminal cases, that the time to issue a

13  litigation hold is as soon as you have a reasonable

14  suspicion that you are about to be sued or that you are

15  being accused of something; is that correct?

16      A.   Generally, yes.  That-- that would be true, at

17  least in civil cases.  We don't routinely issue them in

18  criminal cases.

19      Q.   You have issued them before, though, haven't you?

20      A.   In criminal cases?

21      Q.   In criminal cases.

22      A.   Not that I recall.

23      Q.   You-- you typically would represent client

24  agencies who-- when they're sued.  Correct?

25      A.   Yes.

1       Q.   And so you've had other people that issued

2   litigation holds against your clients, haven't you?

3       A.   We don't-- when we represent clients, we direct

4   the agency, the client agency to issue the lit hold, we

5   can't actually--

6       Q.   But they do that?

7       A.   -- issue it ourself.  We--

8       Q.   They do that?

9       A.   -- direct them to do that.  We issue a letter to

10  them directing them to do that, yes.

11      Q.   And so in this case, your own agency is

12  essentially your client?

13      A.   Well, the United States would be our client in

14  any case.  In every case.

15      Q.   As the litigation hold coordinator for Kansas,

16  you've got responsibility for litigation holds-- overall

17  responsibility for litigation holds in most-- all cases.

18  Correct?

19      A.   No.

20      Q.   Who else is there?  Who else is a litigation--

21      A.   The litigation hold-- well, to clarify, the

22  litigation hold coordinator's function is to issue a

23  litigation hold when it's sort of internal for us.

24      Q.   Uh-huh.

25      A.   In other words, there-- when civil attorneys are

1    handling civil cases, they will issue their own

2    directives regarding lit holds, the coordinator doesn't

3    do that.

4        Q.   But when you're in that situation, when your

5    office is in that situation, you issue it?

6        A.   Yes, I-- usually.

7        Q.   Have you had to do that very often?

8        A.   No, not very often.

9        Q.   Have you had to do it in civil cases?

10       A.   Yes.

11       Q.   Had to do it in criminal-- some criminal cases?

12       A.   I'm sorry?

13       Q.   In some criminal cases?

14       A.   Some criminal?  I don't recall we've done it in

15    criminal cases.

16       Q.   Other than this one?

17       A.   I don't recall one other than this one that I was

18    personally involved in.

19       Q.   Okay.  What kind of training did you get as a

20    litigation hold coordinator?

21       A.   Actually there hasn't really been formal

22    training.  There's some guidance.

23       Q.   Have you ever been a speaker or an organizer at

24    training where the subject came up and was discussed?

25       A.   I don't remember-- ever recall being at specific

1    litigation hold training.  It's probably come up in some

2    other training settings.

3        Q.   Have you taken or taught CLE sessions that

4    concerned how to handle ESI in preparation for

5    litigation?

6        A.   Yes.

7        Q.   Have you taken them or have you taught them?

8        A.   I've taken them.

9        Q.   All right.  On August 9th, 2016, there was an

10   emergency hearing in this case.  Do you remember that?

11       A.   Yes.

12       Q.   Were you in the courthouse that day?

13       A.   Yes.

14       Q.   Were you in court?

15       A.   Yes.

16       Q.   You sat in the courtroom?

17       A.   Yes.

18       Q.   You didn't appear as counsel, but you sat--

19       A.   No.

20       Q.   And you drove over with Deb Barnett.  Right?

21       A.   No.

22       Q.   No?  You came by yourself?

23       A.   Yes.

24       Q.   So when you were in the courtroom, you heard the

25   allegations that were being made against your colleagues

1   in the Kansas City, Kansas office.  Correct?

2       A.   Yes.

3       Q.   And you knew that they were serious accusations

4   of professional misconduct-- prosecutorial misconduct

5   against people in the KCK office.  Right?

6       A.   I don't know that I would clarify it as

7   prosecutorial misconduct.  I recall there was testimony

8   about a meeting and what had transpired and about videos

9   and what were on those.

10       Q.   And you also knew that at that point your office

11   was joining in a motion for appointment of a special

12   master to investigate what had happened in the *Black*--

13   in *United States versus Black* up to then.  Correct?

14       A.   I-- I'm not sure that I ever understood we joined

15   in the motion.  I walked into the hearing cold, so I

16   didn't have a background.

17       Q.   Well, if the record reflects that they moved--

18   all the parties, including the United States, moved for

19   the appointment of a special master, would you accept

20   that that's correct?

21       A.   I'll accept the record, whatever the record says,

22   yes.

23       Q.   Then you went on back to Wichita and you did not

24   issue a lit hold?

25       A.   No.

16-20032  USA v. Karl Carter (Black) REDACTED  11.16.18    2651

1     Q.   Now, by August the 16th, there was another

2  hearing, wasn't there?  Did you come to that one as

3  well?

4     A.   No.

5     Q.   You became aware, though, immediately afterward

6  that the Court had ordered that the CCA video-recordings

7  had been impounded?

8     A.   I became aware of it at some point soon after I

9  think, yes.

10    Q.   And so you were aware that there was still

11  serious accusations against members of the U.S.

12  Attorney's Office.  Right?

13    A.   I don't know if I knew all the accusations, but I

14  knew there were concerns, as I said, expressed about the

15  videos, who had watched them and about a meeting with

16  Ms. Rokusek.

17    Q.   So at that point you still didn't issue a lit

18  hold?

19    A.   No.

20    Q.   September the 7th, the Court indicated its

21  intention to appoint the Special Master.  Were you at

22  that hearing?

23    A.   Yes.

24    Q.   Were you in the courtroom?

25    A.   Yes.

1    Q.  So by that time, you knew that the-- the judge

2  was-- was very upset by what had happened, that there

3  were allegations about illegal entry-- or entry into her

4  chambers after hours.  There were all kinds of-- of

5  concerns, including now phone records as well of inmates

6  at CCA.  You knew all that, didn't you?

7    A.  I knew there were concerns about the entry into

8  chambers.  I knew there were concerns, yes, about calls.

9    Q.  And you knew that the Court had ordered--

10  included-- not only ordered impoundment of the CCA

11  video, but they had also issued a-- a clawback and

12  impoundment order for the recorded inmate calls from

13  CCA?

14    A.  I saw an order at some point with regard to that.

15    Q.  Ms. Metzger, we had a long conversation about

16  August 25th and the entry into chambers.

17    A.  Yes.

18    Q.  And that had to do with the clawback order,

19  didn't it?

20    A.  Yes, that's the order I saw.

21    Q.  So October the 11th, the Special Master is

22  appointed, were you-- were you there when-- well, that

23  was just an appointment.  Still no lit hold?

24    A.  I'm sorry, when?

25    Q.  Still no lit hold?

1       A.  In August?

2       Q.  In October.

3       A.  No.

4       Q.  All right.  You were aware that on October the

5   25th, the Special Master demanded that the United States

6   Attorney identify and preserve all information and

7   sources of information relative to the issues in this

8   case, which is Document 155?

9       A.  I-- are you referencing the appointment order

10  and-- yes.

11      Q.  No, I'm representing the order of the Special

12  Master dated October 25th, 2016.

13      A.  The preservation order?  Yes, I saw that.

14      Q.  All right.

15      A.  Yes.

16      Q.  Let's talk about the words "litigation hold" and

17  "preservation."  Litigation hold orders are by

18  definition preservation orders, aren't they?

19      A.  Yes, they're preservation efforts.

20      Q.  So when we speak of a preservation order, it

21  could be a lit hold or it could be some other kind of

22  order for preservation?

23      A.  Yes.

24      Q.  All right.  So if we-- if I use those terms

25  interchangeably, that would be normal, wouldn't it?

 1      A.  It could be.  I mean, you could have preservation

 2   I suppose without a lit hold.

 3      Q.  When you speak of a preservation order in an

 4   e-mail or anything that you have-- you have entered,

 5   when you talk about a lit hold or a preservation order,

 6   you're talking about the same thing, aren't you?

 7      A.  I would say generally, yes, probably.

 8      Q.  Now, I'm going to show you an excerpt of a

 9   transcript from Document 172, which has been

10   previously-- I don't think you testified about it but

11   has been previously testified to.

12          I'm going to ask you to read what is circled on

13   Page 9 and circled on Page 10.  You can read those to

14   yourself.  I'll bring those to you.

15              MR. CLYMER:  Is it an exhibit or a document,

16   counsel?

17              MS. VANBEBBER:  It's a document,

18   Document 172.

19              THE COURT:  It's filed in the record, it's

20   filed in this case?

21              MS. VANBEBBER:  Yes.  Yes.  I think.  That's

22   this case, yeah.

23              THE WITNESS:  Okay.  I've read that.

24   BY MS. VANBEBBER:

25      Q.  All right.  Now, granted, this is not your

1    testimony, but it is the testimony of Ms. Barnett.

2    You're familiar with that testimony, are you not?

3    You've read this before?

4        A.  I may have.  I don't specifically recall.

5        Q.  Were you in the courtroom that day?

6        A.  I'm sorry, what day was that?

7        Q.  Were you in the courtroom on October 28th, 2016?

8        A.  No.

9        Q.  Okay.  Do you understand from this transcript

10   that-- well, I'll go ahead and-- I'll go ahead and put

11   it up.

12          The circled piece of this transcript, is it

13   evident that the-- is this on?  Is it evident that this

14   is Ms. Barnett speaking and saying that, "Within our

15   office we have a lock-down on information or records."

16   That's her testimony; is that correct?

17       A.  I think her-- as I read it, her testimony was

18   that, yes, we've locked down information related to how

19   we acquired information from CCA.

20       Q.  And then the Court questions her and asks her

21   to-- whether she's telling her that you have, in fact,

22   through some sort of lock-down procedure preserved all

23   e-mails, all handwritten notes and so on.  Was there--

24       A.  With regard to acquiring information from CCA,

25   yes.

1     Q.   Isn't it true that, in fact, there was no

2  lock-down?

3     A.   No, that's not true.  As I understand it, Ms.

4  Barnett directed that everyone respond and acquire that

5  information and provide her that information.

6               THE COURT:  Can you put that--

7  BY MS. VANBEBBER:

8     Q.   But you have not issued a lit hold--

9               THE COURT:  Can you put that back up on the

10  screen?

11              MS. VANBEBBER:  I'm sorry?

12              THE COURT:  My question.

13              MS. VANBEBBER:  Thank you.

14              THE COURT:  That part of it where I'm

15  describing what I'm asking about.

16         So what I said was, "So what you're telling me is

17  that you have, in fact, through some sort of lock-down

18  procedure preserved all e-mails, all handwritten notes

19  of, I suppose, conversations where you made a request to

20  the marshals service, any communications back from CCA,

21  Securus, the marshals service, or anyone else involved

22  in the acquisition-- in the production of videos or

23  audio-recordings in this case and beyond this case?"

24  That was my question.

25  BY MS. VANBEBBER:

1     Q.   Was there a lock-down or not?  Well, first of

2   all, your term, what would you use as language to define

3   the term "lock-down"?

4     A.   I would define it-- I'm not sure what Ms. Barnett

5   was using at the moment, but I would define it as

6   preservation, we've preserved or maintained.

7     Q.   And you would usually do that with a preservation

8   order, wouldn't you?

9     A.   An order or a directive or a request for the

10  information.

11    Q.   And you're the lit hold coordinator?

12    A.   Yes.

13    Q.   Did Ms. Barnett ask you to issue a lit hold?

14    A.   Not with regard to this.  She herself issued the

15  request for all of that information and directed that it

16  be maintained and actually produced.

17    Q.   And do you know where that directive would be

18  located?  Have you seen it?

19    A.   I believe I saw it at the time or we talked about

20  it, yes.

21    Q.   So we get to the end of October, that's October

22  the 28th.  And even though the Special Master had issued

23  this discovery order requiring the United States

24  Attorney to ID and preserve all information relative to

25  the appointment and the matters he was to-- he was to

1    investigate, you didn't see fit to issue a lit hold?

2      A.   We did issue it with regard to the October

3    preservation directive.

4      Q.   Right away?

5      A.   We began working on it right away.

6      Q.   Let me ask you this:  Are lit holds meant to

7    avoid inadvertent loss or destruction of information

8    that might be valuable to the prosecution or defense of

9    a case?

10     A.   Yes.

11     Q.   Are lit holds also meant to insulate management

12   and others from allegations that they condoned

13   deliberate spoliation by one of their employees?

14     A.   I would say yes.  I mean, I think the primary

15   purpose is preservation, but it would serve that as a

16   secondary purpose.

17     Q.   It would also protect management if somebody went

18   rogue and started tearing things up, wouldn't it, if

19   they told them not to and they did it anyway?

20     A.   It could, yes.

21     Q.   Litigation holds were also meant to preclude

22   credible deniability for an employee that might want to

23   go ahead and destroy relevant information.  Correct?

24     A.   It could, yes.

25     Q.   Would you agree that absent a lit hold in a

1   situation like this one, information is pretty likely to

2   disappear, either inadvertently or with intent?

3       A.  I know of no situation here where information

4   was-- disappeared.

5       Q.  You don't know?

6       A.  No.

7       Q.  How do you know that-- how do you prove that

8   negative?

9       A.  I can't prove that negative, but I know there

10  were directives that this information be held and that

11  the videos be submitted and that calls be maintained and

12  that closed files not be-- anything removed from any

13  files.  And we have a normal retention policy

14  requirement for the U.S. Attorney's Office that requires

15  retention of all case materials when cases are pending.

16      Q.  So if somebody decides to disobey that, then it

17  happens, doesn't it?

18      A.  I suppose if someone wanted to disobey that or

19  disobey a preservation order or even a litigation hold--

20  could someone disobey, yes, I suppose they could, yes.

21      Q.  So the Special Master ordered you to preserve, or

22  the United States Attorney, to preserve all the

23  information you could and all the information sources

24  relative-- relevant to the *Black* case.  Right?

25      A.  There was a listing, it was about a two-page

 1   listing that we worked from.

 2       Q.  And that was October the-- that was October the

 3   25th.  And on December the 18th, you still didn't have a

 4   lit hold out, did you?

 5       A.  No, it was issued on December 19th.

 6       Q.  Took you 60 days to develop a lit hold?

 7       A.  It took less than 60 days, but there was a

 8   back-and-forth with the Special Master to refine-- we

 9   wanted to ensure that we got the litigation hold as the

10   Court intended it to be, so we went back and forth with

11   the Special Master for his approval.

12       Q.  Why did you do that?  Why did you create your own

13   lit hold and then tell the Special Master he needed to

14   participate in that with you?

15       A.  We created it and then we wanted to ensure that

16   it encompassed all that was intended, so we reached out

17   to him to see if it-- he thought it was inclusive and

18   covered everything.  As I recall, he made some

19   refinements and we incorporated those.

20       Q.  I'm going to show you what's been marked Exhibit

21   Special Master 1205 and ask you if you've seen that

22   before.  And I want you to-- this is-- the top of it, of

23   course, is just that I pulled it off my documents.  But

24   starting with the original message and working down.

25       A.  I'm sorry, I can't see.

1      Q.   I'm sorry, here.

2      A.   I think it needs to moved.

3      Q.   Just a second.  Starting from the original

4  message and working down, I've marked a paragraph.

5      A.   Where the checkmark is?

6      Q.   Yes.

7      A.   Okay.

8      Q.   And what I want you-- I want you to read that to

9  yourself and then I'll ask you a question about it.

10      A.   All right.  Okay.  Just the checked paragraph?

11      Q.   Yes.

12      A.   Yes, I've read that.

13      Q.   And then the proposed language below it is

14  language, of course, that you had proposed, adding in

15  the agents who should get the lit hold.

16          Now, you said you wanted the change in the last

17  sentence that, "I have no authority to be the litigation

18  hold repository for the agencies, nor any enforcement

19  mechanism for such."

20      A.   Right.

21      Q.   Is the converse true, you did have the authority

22  to be the litigation hold repository for your own

23  office, didn't you?

24      A.   Yes, I could have been, yes.

25      Q.   Did you choose not to be?

16-20032  USA v. Karl Carter (Black) REDACTED  11.16.18      2662

```
 1      A.  No.
 2      Q.  You were very clear to the employees when you
 3   sent out the lit hold on December the 19th, 2016, that
 4   they were only to preserve, not to produce.  Right?
 5      A.  That's correct.  I believe I indicated we'd
 6   provide search terms for the production.
 7      Q.  So you said just collect it and-- or just tell me
 8   where it is-- just tell me if you have anything, right,
 9   that's all you told them to do?
10      A.  Yes.
11      Q.  Tell me--
12      A.  Well, preserve and let me know if you think if
13   you have it, yes.
14      Q.  So at that point at least all they had done is
15   said no, I don't have anything, or yes, I think I might
16   have something?
17      A.  Yes.  Or yes, I do.
18      Q.  And they didn't identify for you where it was to
19   be found or what the nature of it was or anything like
20   that?
21      A.  Not initially, no.
22      Q.  Were all the responses that you received from
23   that-- that December 19th lit hold notice given to your
24   superiors to be responsive to the subpoena *duces tecum*
25   entered in August of 2018?
```

 1    A.   I'm sorry, I'm not sure I followed your question.

 2   Were all the responses--

 3    Q.   All the responses--

 4    A.   -- that I received?

 5    Q.   Uh-huh.

 6    A.   I believe so, yes.

 7    Q.   And many of the people-- many of them were just

 8   "I don't think I have anything," weren't they?

 9    A.   Yes, or I don't-- yes, I don't have any.

10    Q.   All right.  Did you-- did you take a follow-up

11   step and ask them to tell you what they had?

12    A.   We took a follow-up step to identify where it

13   might be located.

14    Q.   All right.  I'm going to now show you-- so you

15   spent-- let's see, you started worked on the lit hold in

16   October-- or when did you start working on it?

17    A.   After the order was issued.

18    Q.   So in late October.

19    A.   Yes.

20    Q.   And it took you 60 days to come up with it?

21    A.   It was less than 60, but it took until

22   December 19th.

23    Q.   And you never did get out of that a knowledge of

24   what each person had from that lit hold?

25    A.   Do you mean actual items?

1      Q.   From that lit hold, did that produce anything

2   other than yes, I have something, or no, I don't have

3   anything?

4      A.   No, other than the location of where they might

5   be or where they were.

6      Q.   Were those included in what was produced in this

7   subpoena *duces tecum* from-- I'm talking about the

8   December 19th lit hold.

9      A.   I don't know.  I produced them.

10      Q.   All right.  I'm now going to show you what's been

11   marked as Exhibit 1196.  Have you seen that before?

12   Clearly, since you sent it.

13      A.   Yes.

14      Q.   And who are the recipients of that e-mail?

15      A.   Individuals who had-- excuse me, individuals who

16   had materials, indicated they did have materials or may

17   have materials.

18      Q.   Isn't it-- isn't this to virtually every

19   prosecutor and their secretaries?

20      A.   No.  I think it's only to those who indicated

21   they may have or did have materials.

22      Q.   All right.  So these people got this e-mail and

23   they say-- it says, "Please see the attached enhanced

24   litigation hold notice."  What's being enhanced?

25      A.   I guess I called it enhanced, it's actually just

1    an internal form that we used to identify the location

2    of the items.

3         Q.   I'm showing you the first page of that.

4         A.   Yes.

5         Q.   And that's written by you, isn't it, the top

6    part, the notice, No. 1?

7         A.   The-- the part referencing *U.S. versus Black* is,

8    yes.

9         Q.   All right.  And is the rest of it boilerplate?

10        A.   Yes.

11        Q.   All right.  Then let's go down to No. 2.  There

12   are a large number of repositories there where the

13   government believes the individual might have put

14   things.  Right?

15        A.   There are some repositories, yes.

16        Q.   And there's a bunch more on the next page, aren't

17   there?

18        A.   There are more, yes.

19        Q.   And that includes electronic stuff, that includes

20   paper things, that includes personal things?

21        A.   Yes.

22        Q.   As long as they're on the system or kept-- kept

23   there, they have to be checked off, right, if there's

24   anything in it?

25        A.   Yes.

1      Q.   And then there's a certification, isn't there?

2      A.   Yes.

3      Q.   That the individual has to sign and date.  And

4   there's a warning there, isn't there, that if you

5   don't-- if you fail to preserve and retain the

6   information, you could be sanctioned and it could

7   implicate your professional conduct rules?

8      A.   I don't see that specifically.  I believe it--

9      Q.   Right under the three stars.

10     A.   Yes.

11     Q.   Now, to your knowledge, everybody who's on this

12   list got a copy of this, didn't they?

13     A.   Yes.

14     Q.   Did they respond?  Did anybody respond to you?

15     A.   Yes.

16     Q.   How many people responded to you?

17     A.   I think we got everyone--

18     Q.   So everybody responded to you?

19     A.   -- over time.  Uh-huh.

20     Q.   If those responses were not-- well, did you

21   include all those responses in the recent response to

22   the subpoena *duces tecum*?

23     A.   I believe we did.

24     Q.   What did you do-- who did you give them to?

25     A.   I believe we uploaded them into a production

 1   file.

 2      Q.   Were you the-- were you the holder basically of

 3   these responses?

 4      A.   Ultimately, yes.

 5      Q.   So if they're not in anything we received, do you

 6   know how that could've happened?

 7      A.   No.

 8      Q.   If there's one or two in the information we

 9   received and none in the others, especially Drive 3 that

10   you were the one who was-- who has indicated is-- has

11   been responsive in that-- to that drive?

12      A.   I-- I understood I submitted them for scanning

13   and submission.

14      Q.   Who-- to whom did you submit them?

15      A.   My legal assistant.

16      Q.   Pardon me?

17      A.   My legal assistant.

18      Q.   To whom did she submit them?

19      A.   She just uploaded them into the folder.

20      Q.   And what happened to the folder after that?

21      A.   It went to the administrator officer.  I think he

22   uploaded it somewhere else.

23      Q.   Who is?

24      A.   Randy Miller.

25      Q.   Let me ask you about this form.  Where did you

 1   get this form?

 2       A.   It's a U.S. Attorney's Office form-- or U.S.

 3   Attorney's Office procedure form.

 4       Q.   And it's intended to be used for lit holds, isn't

 5   it?

 6       A.   Yes.

 7       Q.   But you saw fit to-- to let the Master-- Special

 8   Master spend his time for almost two months ostensibly

 9   working with you on a litigation hold of your own making

10   when you had this one available to you from day one.

11   From August 9th you could've sent this lit hold out to

12   everyone, couldn't you?

13       A.   We could have.

14       Q.   Why did-- but yet you chose to waste your efforts

15   on the December 19th litigation hold that had none of

16   these categories that gave-- would give the Special

17   Master none of the information about what attorneys

18   believed they had and what they did not believe they

19   had, and you would have-- and he would've had a signed

20   certificate acknowledging from that person that that

21   person had certain documents that he should be concerned

22   about.   Correct?

23       A.   Our efforts in doing the litigation hold that we

24   issued in December was to comply with the Court's order.

25   And we wanted to be sure we covered all that.   This lit

1  hold is just a sort of general lit hold for the case and

2  we wanted to cover everything, because it was broader

3  than *Black*, the Court's order.

4       Q.   Not broader than this lit hold, though, was it?

5       A.   It-- it may-- well, I incorporated that lit hold

6  into this lit hold, otherwise it would have been not as

7  broad.

8       Q.   So you and the Special Master for almost 60 days

9  spent your time in this very important case cobbling

10  together a lit hold and you could've gotten--

11  accomplished this same thing with a form pleading, with

12  a form?

13       A.   No, the form pleading incorporated that

14  litigation hold.  We would still have to develop the

15  actual hold.

16       Q.   When did you tell the Special Master about the

17  May 17th lit hold?  May 17th--

18       A.   That's an internal form, I didn't discuss that

19  with him.

20       Q.   You didn't tell the Special-- you told the

21  Special Master you-- you had given out your

22  December 19th lit hold.  Right?

23       A.   Yes.

24       Q.   And when we got to the end, he had yet to see

25  anything except a list of names from you that said these

1   people say they have something.  Right?

2       A.  Yes.

3       Q.  And you didn't even tell him that you issued the

4   May 17th lit hold?

5       A.  I don't believe so.  I don't think it came up

6   that I recall, no.

7       Q.  And you didn't tell him that you had received

8   responses, of course, since you didn't tell him about

9   the lit hold.  Right?

10      A.  Well, he knew that the December 19th lit hold

11  went out.  That is the same lit hold.  This is an

12  internal form that helps implement it.

13      Q.  Were the responses-- you didn't give the Special

14  Master any responses from the individuals who responded

15  to the December 19th lit hold, right, other than to-- a

16  list of names?

17      A.  Any-- did I share these responses with him, no.

18      Q.  You didn't share the responses even at the

19  December 19th lit hold, did you, other than to give him

20  a list of names and--

21      A.  I gave him a list of names, that's correct.

22      Q.  All right.  In that list of the names, let's say

23  Jabari Wamble, did you tell him what Jabari had told you

24  he had?

25      A.  No.

 1     Q.   Do you think the Special Master was entitled to
 2   know what Jabari Wamble had since he participated in the
 3   litigation hold, trying to assist you in getting one to
 4   your satisfaction?
 5     A.   I don't know that he asked me specifically what
 6   any particular individual had.  We talked about the
 7   systems at times.  I mean, if he had asked me, I
 8   would've discussed that with management.  We would've
 9   made a decision.
10     Q.   All right.  Let's use Mr. Krug's actual response.
11     A.   Mr. who?  I'm sorry.
12     Q.   Mr. Krug.  You do-- you remember Assistant United
13   States Attorney Trent Krug?
14     A.   Oh, Trent Krug, I'm sorry, I didn't understand
15   you.  Yes.
16     Q.   Mr. Krug says he has printed e-mails, he has case
17   files, he has public folders, he has notes, he has
18   e-mails, his .pst files.  He has personal files and
19   folders on three different drives.  He has shared
20   folders, he has local drives, stuff on local drives,
21   portable thumb drives, deleted items.  The Special
22   Master didn't know any of that, did he?
23     A.   He didn't ask me and I didn't ever provide him--
24     Q.   Why would he ask you when you never told him that
25   you issued the lit hold?

 1    A.  He knew that we issued the litigation hold, he

 2  helped me develop it.

 3    Q.  Ms. Metzger, the result to the Special Master

 4  from the December 19th lit hold was a list of names.

 5  Right?

 6    A.  Yes.

 7    Q.  The result from May 17th was a-- the certified

 8  response of an individual human being who-- who was

 9  telling you that he had things in certain repositories,

10  right, and you did not see fit to share that with the

11  Special Master?

12    A.  No.  I was never asked for that information.

13    Q.  It's a little hard to ask for something when you

14  don't know it exists, isn't it?

15          MR. CLYMER:  Judge, I'm going to object to

16  the commentary from counsel, I believe the witness--

17          MS. VANBEBBER:  I withdraw that.

18  BY MS. VANBEBBER:

19    Q.  All right.  Let's switch to-- let's switch to the

20  search terms.  You-- both you and Mr. Steeby helped--

21  helped the Special Master come up with a-- or amongst

22  you, you came up with search terms that could be used to

23  search the repositories of employees of the office.

24  Correct?

25    A.  Yes.  I wouldn't say I helped, it wasn't my

1    specialty.  David Steeby and the Special Master

2    predominantly did that.

3        Q.  And you're included on all the e-mails?

4        A.  Yes.

5        Q.  And you had plenty to say about it--

6        A.  Yes.  I--

7        Q.  -- right?

8        A.  I was involved in the discussion.

9        Q.  All right.  You spent from November the 29th--

10   the record reflects you spent from November the 29th to

11   June the 5th, that's November 29th, 2016, to June the

12   5th, 2017, working on this project.  Right?

13       A.  Yes.

14       Q.  And the whole object was to devise search terms

15   for the use of the Special Master in searching ESI of

16   the-- of the employees.  Right?

17       A.  It was-- it would've searched e-mail, yes.

18       Q.  And that project ended with a set of search terms

19   that the three of you could agree on to run past Erin

20   Tomasic's repository in her ProofPoint e-mail archive.

21   Right?

22       A.  We-- we were test-running to see what kind of

23   response we would get.  And, yes, we did run some terms

24   against Erin Tomasic's repository.

25       Q.  And do you recall that the-- that the Special

1    Master wanted you then to begin running those on other

2    individuals' repositories?

3        A.   He-- yes, at the end that's what he was

4    requesting.

5        Q.   And you allowed the Special Master during this

6    whole project to believe that once you came up with

7    these search terms, he'd be able to search the ESI of

8    each individual that he wanted to.  Right?

9        A.   We were working towards-- once we came up with

10   those search terms, the individuals would search, not

11   the Special Master.

12       Q.   That wouldn't have been your call, would it, Ms.

13   Metzger, it would've been the Special Master's call,

14   wouldn't it?

15       A.   He could've made the request that he run it and I

16   would've taken it up with management.

17       Q.   You allowed the Special-- as a matter of fact,

18   because of the syntax terms, the terms that you all came

19   up with during this like six-month period were only

20   going to be effective on the individuals' ProofPoint

21   e-mail archives.  Right?

22       A.   Yes.

23       Q.   And if he wanted to search the other repositories

24   that I just read off, he couldn't use those search

25   terms, could he?

1    A.   No.

2    Q.   You didn't tell him that, did you?

3    A.   I didn't.  I don't know whether Mr. Steeby

4  discussed that with him.

5    Q.   You never discussed that at all with the Special

6  Master, did you?

7    A.   I didn't, no.

8    Q.   Do you think that that slowed down the ability of

9  the Special Master to complete the search that he was

10  appointed to do?

11    A.   The development of the search terms?

12    Q.   Yes.

13    A.   I mean, they had to be developed to search for

14  the materials, so yes, it took some time.

15    Q.   They had to be developed to search the archives.

16  Right?

17    A.   Yes.

18    Q.   They weren't useful for anything else, were they?

19    A.   They were for the e-mail, the electronic e-mail

20  storage, yes.

21    Q.   And what about the thumb-- what about the other

22  drives, the other repositories that are sitting in the

23  offices of the individual AUSAs, things like CDs, things

24  like thumb drives, things like open files, things like

25  e-mails that haven't yet gone to the archive?  They

1    couldn't be used for those, could they?

2        A.   Probably-- not that syntax, maybe some variation.

3        Q.   In any event, you're aware that the Special

4    Master wanted you to start searching the archives for

5    the other-- for other KCK attorneys.  Right?

6        A.   Yes.  I think in early June he indicated he'd

7    like to run them on-- I think he had an initial group of

8    individuals he was going to identify or did identify.

9        Q.   You were well aware, weren't you, that the office

10   had on the very day after the Special Master was

11   appointed sought recusal for the office from the *Black*

12   investigation and the *Black* case?

13       A.   I don't remember the exact date, but yes, I

14   recall we did.

15       Q.   You knew early on?

16       A.   Yes.

17       Q.   You knew it was happening?

18       A.   Yes.

19       Q.   And you in that office made a decision that you--

20   you just didn't want to be involved with the case

21   anymore; isn't that right?

22       A.   No.  That wasn't our decision.  That wasn't a

23   decision I made.  I--

24       Q.   Who made it?

25       A.   I guess I need to ask-- defer to Mr. Clymer if I

1  can reveal internal discussions regarding this.

2      Q.  Well-- yeah, go ahead if you want to, but I'm

3  not-- I'm just looking for who made the-- who made the

4  final decision.  I assume it was Mr. Beall since he

5  wrote the letter.

6      A.  The final decision on whether we would be--

7  someone else would be involved in this investigation?

8  I-- I believe I understood it was made by the Deputy

9  Attorney General's Office.

10      Q.  I didn't ask that question very well.

11      A.  I'm sorry.

12      Q.  At the time you requested recusal--

13      A.  Yes.

14      Q.  -- was that a group decision?

15      A.  Yes.

16      Q.  Were you included?

17      A.  Yes.

18      Q.  And so you decided-- you, the group, decided you

19  needed to get out of the case.  Right?

20      A.  I don't know if "get out" is the right word.  We

21  thought there was an appearance of a conflict of

22  interest and that that needed to be taken up.

23      Q.  Well, what else does recusal mean besides get

24  out, step away from, step down from?

25      A.  I think it does mean that.  Although, as I said,

1  we were concerned about an appearance of a conflict of

2  interest, and that could potentially be waivable.

3      Q.  There's been testimony that some Kansas City,

4  Kansas attorneys advised their agents not to make notes

5  or record proffers or other conversations so that they

6  wouldn't be disclosable in discovery.  Do-- are you one

7  of the-- are you one of the people who was aware of that

8  practice?

9      A.  I'm not aware of that practice, no.  And I'm not

10  aware of that testimony.

11     Q.  Wouldn't you agree that that's generally your

12  modus operandi on your own, that you would rather have

13  people not putting things in e-mails because they can be

14  discovered?

15     A.  That would be a general, probably an advisable

16  observation.

17     Q.  So when-- so when--

18     A.  I don't know if it's my personal practice, but...

19     Q.  All right.  So when Kim Flannigan and Erin

20  Tomasic-- on behalf of herself and Erin Tomasic came

21  essentially begging in September 2016 to Debra Barnett

22  to help them deal with the narrow interpretation that

23  they were taking of the-- of the judge's clawback order,

24  there was an e-mail chain, wasn't there?

25     A.  I-- I'm sorry, I don't recall what you're

1   referencing.

2       Q.   Let me show you what's been marked as Special

3   Master 1174.  And let's start at the part-- the later

4   part is not relevant, but let's start at the very

5   bottom.

6       A.   Okay.

7       Q.   From Debra Barnett to you, Beall-- you and Beall.

8   She indicates to you that-- that she's gotten this--

9   this request from Flannigan and from-- wanting to know

10  how to handle the narrowness of the clawback-- of how

11  you're interpreting the clawback order.

12           And Debra says at the bottom on Wednesday,

13  September 21st, "I don't want to say anything too

14  explicit here, but based on the discussion the three of

15  us had on Monday, I'm exceedingly reluctant to give any

16  advice or approval via e-mail discussions?"

17      A.   I'm sorry, I-- I-- could I see the beginning of

18  the e-mail?  I'm just trying to recall.

19      Q.   Sorry.  Read the whole thing, it's long.

20      A.   Well, I'll try to skim it.

21      Q.   Go ahead.  Take your time.

22      A.   Excuse me.  I've skimmed it.  I'm sorry for the

23  length of time.

24      Q.   Kim Flannigan was the-- at that time the criminal

25  coordinator for the Kansas City, Kansas office.  Right?

1    A.  Yes, she was.

2    Q.  And Erin Tomasic was a Special Assistant U.S.

3  Attorney there?

4    A.  Yes.

5    Q.  And they're both heavily involved in the *Black*

6  case.  Right?

7    A.  Yes.

8    Q.  You read what you just skimmed as seeking

9  guidance from their superior, Debra Barnett?

10    A.  Yes.

11    Q.  They wanted-- they want help, right, and Debra

12  Barnett's response to you and Beall is, I'm not-- I

13  don't want to give them any advice or approval via

14  e-mail.  Right?

15    A.  Right, yes.

16    Q.  And then moving on up, you respond, "I agree that

17  e-mails are subject to being incomplete and

18  misunderstood, so I think a verbal conversation is the

19  best approach."

20    A.  Yes.

21    Q.  What's the usual reason for not wanting to

22  communicate in e-mail with someone who has communicated

23  with you in e-mail?

24    A.  Because I thought there could be confusion and

25  misunderstanding, because for the first time we became

1    aware at some point that the-- there were calls

2    impounded in *Black* that they had copies of for other

3    cases.  And that was never indicated to us.

4        Q.  And anything you said to them in e-mail was

5    likely to be discovered, wasn't it?

6        A.  That was not my thought.  My thought was having a

7    conversation with the people involved so that we were

8    clear in where we stood.  I wasn't thinking in terms of

9    discovery at that point.  This was just internal

10   discussion.

11       Q.  There had been quite a bit of-- of disagreement

12   as to how broadly to interpret the Court's clawback

13   order.  Correct?

14       A.  Disagreement?  No, I don't think there was

15   disagreement.

16       Q.  Some people wanted it interpreted more broadly

17   than other people did?

18       A.  No.  I don't recall that.

19       Q.  If you testified differently in October--

20       A.  Then I--

21       Q.  -- is there a reason for it?

22       A.  Perhaps I didn't understand the question.  But I

23   don't recall people arguing that it was broader.

24       Q.  Given that you spent a huge amount of time

25   working on things with the Special Master that didn't

1    bear much fruit, is it safe to say that you were trying

2    to slow-walk this as much as you possibly could?

3       A.   Absolutely not.

4       Q.   I'm going to show you what's been marked

5    Exhibit 1122 [sic].  Do you recall this e-mail?  Do you

6    recall the situation?

7       A.   No, I'm sorry, I would need to see the e-mail.

8       Q.   Do you recall that Mr. Brown was-- let's look at

9    the issue in this, the grand jury motion is something we

10   should pull back on.

11       James, which is Mr. Brown, from-- this is from

12   you, you're saying to James, "The Special Master wants

13   access to grand jury transcripts," and then you go on to

14   say, "It would seem this production would be encompassed

15   in the motion to terminate the Phase III investigation

16   that you are drafting."

17       So, is that correct, Mr. Brown was in the process

18   of trying to draft a motion to terminate Phase III of

19   the Master's investigation?

20       A.   I-- I believe so, yes.

21       Q.   And so although he has given you an order to give

22   him access to grand jury transcripts, excluding, of

23   course, what would be privileged, you're saying maybe we

24   should pull back on that?

25       A.   I was asking, because James had recommended this

1    motion, and that if it was going to be encompassed in

2    the motion, that we-- we decide one way or the other.

3    We either do it or we encompass it with the motion.

4       Q.   And you would have-- you would have a situation

5    where that disclosure might fight with your motion, huh?

6       A.   It could, yes.

7       Q.   So then the next thing that Beall says is, "I

8    think we can hold back for a bit as we await the

9    decision on recusal counsel."

10      A.   Yes.

11      Q.   We've been pretty clear we don't want to get

12   ahead of the litigative decisions of that counsel.

13      A.   Right.

14      Q.   So you made-- the three of you at least made a--

15   an administrative decision that you weren't going to

16   comply with the Special Master's request because you

17   were more concerned about your litigation decision?

18      A.   We were more concerned about-- that we didn't do

19   anything that anyone who came into the case, in this

20   instance it was-- proved to be Mr. Clymer, but that

21   whoever came in the case would think that we should do

22   it differently.  We were just wanting to consult with

23   him.

24      Q.   In your training all these years as an attorney,

25   isn't it pretty cut and dried that if you have a court

1   order, you obey it.  And if you don't feel you can obey

2   it, then there are options, such as mandamus or a motion

3   for reconsideration or a request for an enlargement of

4   time that you can make?

5       A.   Yes.  And that was the motion I think somewhat

6   being contemplated.

7       Q.   It may have been contemplated-- according to the

8   e-mail, the motion that was being contemplated was to

9   shut down Phase III.  Right?

10      A.   Yes.

11      Q.   A good way to shut down Phase III is to make sure

12  that the Special Master doesn't get his job done before

13  DOJ comes in to rescue you.  Correct?

14      A.   We were not trying to shut down the Special

15  Master.

16      Q.   Well, how else would you interpret the motion to

17  terminate the Phase III investigation?  Isn't that

18  shutting it down?  Termination generally means shut

19  down, doesn't it?

20      A.   That was going to be through the court, not

21  behind the scenes.

22      Q.   The easiest way to not let it happen was to

23  slow-- for what the U.S. Attorney's Office could do was

24  to slow it down until it was taken out of your hands,

25  right, before it did you any harm?

1    A.  At this point due to what appeared to be a

2  conflict of interest, we knew that we weren't going to

3  be handling it going forward, and so we were trying to

4  just ensure that we preserved decisions for the new

5  decision-maker.

6    Q.  You were trying to preserve-- or, excuse me, to

7  prevent the Special Master from creating damaging

8  evidence before the case got into the hands of DOJ.

9  Correct?

10   A.  That is absolutely not true.

11   Q.  You didn't try to slow anything down?

12   A.  We did not--

13   Q.  Excuse me.

14   A.  We did not try to prevent disclosure of damaging

15  information.  In fact, we tried to, if we became aware

16  of it, disclose it.

17   Q.  And this memo doesn't say you're trying-- you're

18  not going to timely comply with the Special Master

19  because you have other concerns?

20           MR. CLYMER:  Objection.  The document speaks

21  for itself, and this is just simply argument at this

22  point, Your Honor.  It's not questioning anymore.

23           THE COURT:  All right.  I'll sustain.

24  BY MS. VANBEBBER:

25   Q.  Is it your testimony that, to your knowledge,

1   neither you, nor anybody else, tried to slow down the

2   Special Master's work?

3       A.   That is my testimony, yes.

4       Q.   You would agree, wouldn't you, that creation of

5   deliberate delay is the same thing as obstruction?

6       A.   I don't know, but I don't believe there was

7   deliberate intentional delay here--

8       Q.   Well--

9       A.   -- to impede the Special Master in any way.

10      Q.   That's not the question I asked.  I asked you if

11  you agree that deliberate delay is the equivalence of

12  obstruction?

13      A.   I think obstruction requires intent.

14           MS. VANBEBBER:  Okay.  No other questions.

15                    CROSS EXAMINATION

16  BY MS. BRANNON:

17      Q.   Ms. Metzger, you started working with the Special

18  Master on the litigation hold in late November of 2016.

19  Correct?

20      A.   It was November.  Initially Deb Barnett was

21  making contact with him, and at some point she suggested

22  I just do it directly.  It would be more efficient than

23  having a middle person.  So at some point in November, I

24  don't recall the exact date.

25      Q.   November 22nd perhaps?

 1       A.   Could've been.

 2       Q.   If I understand, you testified that you were

 3   being careful about the wording of the litigation hold

 4   because you wanted to make sure it was what the Court

 5   wanted it to be; is that right?

 6       A.   That it was in compliance with the preservation

 7   directive, yes.

 8       Q.   Did you also understand that the Court wanted

 9   preservation to be immediate?

10       A.   Yes.

11       Q.   And did you understand--

12       A.   Or as soon as reasonably possible, yes.

13       Q.   Well, that the Court wanted preservation to be

14   immediate because the Court didn't want anything to be

15   destroyed--

16       A.   Yes.

17       Q.   -- correct?

18       A.   Yes.

19       Q.   And that would've required immediate

20   preservation.  Correct?

21       A.   As soon as possible, yes.

22       Q.   You mentioned that Deb Barnett may have sent out

23   something ordering material not to be destroyed; is that

24   right?

25       A.   There were some directives that she issued

1    regarding impoundment of certain items that-- the things

2    I reiterated earlier.  But the closed files would not--

3    nothing would be removed from closed files, they would

4    not be sent to the records center.  And she acquired

5    certain information, the requests that we referenced

6    earlier for CCA information.  Excuse me.

7        Q.  And those would've been in writing?

8        A.  Pardon?

9        Q.  That would've been in writing?

10       A.  I don't know if they were all in writing or if

11   she discussed them at criminal division meetings.  I

12   think many of them would've been by e-mail.

13       Q.  And you would've received those e-mails as well?

14       A.  Not necessarily.  No, I wasn't receiving criminal

15   e-mail, per se.

16       Q.  Well, at that point you were involved in the

17   litigation.  Correct?

18       A.  I was involved in the management team.  I didn't

19   necessarily get all the e-mails sent to the criminal

20   division.  So I could've, I just don't recall that I

21   would've received anything.

22       Q.  If you had received it, you would still be in

23   possession of it because you wouldn't have destroyed it;

24   is that right?

25       A.  Yes.

1    Q.   And it would've been something that you produced

2    as part of the subpoena *duces tecum* to Mr. Clymer?

3    A.   Probably, if it fell within the scope of one of

4    the production requests, yes.

5    Q.   Did you understand that it would fall in the

6    scope of one of the production requests?

7    A.   I think it-- depending how it was framed, I think

8    it would and, yes, I would've produced it.

9    Q.   In talking about the scope of the directives,

10   preservation requests, litigation orders, whatever, you

11   understood from your presence at the early hearings that

12   one of the issues was whether videos of attorney-clients

13   were viewed.  Correct?

14   A.   Yes.

15   Q.   And who viewed them.  Correct?

16   A.   I mean, I certainly knew there was an issue of

17   whether they were viewed, so I guess coordinated with

18   that would be potentially, if they were viewed, who--

19   who viewed them.

20   Q.   Did you do any investigation about how those

21   videos would be viewed?

22   A.   How they would be viewed?

23   Q.   Yes.

24   A.   I'm not sure what you're asking me, I'm--

25   Q.   Well, you've come to find out that there was a

1    special AVPC computer.  Right?

2        A.   Oh, yes, I did come to find that out, yes.

3        Q.   There maybe was a chassis that was necessary to

4    view them.  Right?

5        A.   Yes.

6        Q.   Did you do any investigation into that after the

7    August 9th hearing?

8        A.   No.

9        Q.   Did you ever do any investigation into how it

10   would be viewed?

11       A.   No.

12       Q.   And so do you know whether Ms. Barnett did any

13   investigation into how those videos would be viewed?

14       A.   I don't know.

15       Q.   You were asked a question by the Special Master

16   about prosecutorial misconduct.  And if I understood,

17   you said there were concerns about what was viewed and

18   so forth.

19            The allegations were that video of

20   attorney-clients were obtained by your office and then

21   used to remove defense counsel from cases.  Those were

22   the allegations as you understood them.  Correct?

23       A.   Yes.  That nature, yes.

24       Q.   And that would be prosecutorial misconduct.

25   Right?

1   A.  If they were deliberately acquired knowingly or--

2   I-- I don't know that it would be, I guess it would

3   depend on the circumstances.  I mean, if your

4   hypothetical is were they intentionally trying to

5   acquire attorney-client information and use that to

6   disqualify, potentially yes.

7   Q.  The allegation was that they were using those

8   attorney-client communications in order to remove

9   defense counsel from a case.  That would be

10  prosecutorial misconduct.  Correct?

11  A.  Potentially, yes.

12  Q.  You talked about the reasons for a litigation

13  hold, that it was meant to preserve and perhaps insulate

14  management.

15      One reason for a litigation hold also is to

16  prevent destruction of evidence that might arise to a

17  criminal act?

18  A.  Yes.

19  Q.  You're familiar with 18 U.S.C. 1519,

20  Sarbanes-Oxely Act?

21  A.  Not specifically.  Generally.  Generally.

22  Q.  Makes it criminal to intentionally destroy

23  evidence.  Right?

24  A.  Generally, yes.

25  Q.  And one of the reasons for a litigation hold is

1   to prevent that kind of criminal act?

2      A.   A litigation hold has a lot of purposes, that--

3   that would encompass that I would think, yes,

4   absolutely.

5      Q.   That was my question, yes.

6      A.   Yes.

7      Q.   Are you familiar with 18 U.S.C. 1512, also making

8   it a criminal act to destroy evidence intentionally?

9      A.   I couldn't tell you that I know that statute by

10  number or-- or what it precisely says, but generally

11  that premise, yes.

12     Q.   I'm curious about this enhanced litigation hold

13  that you've testified to.  In the last hearing we talked

14  for quite a while about litigation holds, and you never

15  mentioned an enhanced litigation hold.  Do you remember

16  your testimony?

17     A.   Generally.

18     Q.   Did you review your testimony before you

19  testified today?

20     A.   Yes.

21     Q.   Did you review anything else in preparation for

22  your testimony?

23     A.   No, not really.  No.

24     Q.   And at that hearing we discussed the

25  December 19th litigation hold.  Correct?

1      A.   Yes, we did.

2      Q.   And when you were testifying, you were asked,

3  "Were there other preservation directives that you have

4  not yet described?"  Do you remember being asked that

5  question?

6      A.   I don't remember it, but I could've been, yes.

7      Q.   And your answer was, "I don't believe so"?

8      A.   Right.  Yes.

9      Q.   And, in fact, there was an enhanced litigation

10 hold that was issued in May of 2017.  Right?

11     A.   It was the same litigation hold.  I called it

12 enhanced so that the attorneys would look at it and--

13 and view it.  It was an incorporation of the initial lit

14 hold, so it wasn't a new and different lit hold.

15     Q.   It was a preservation directive.  Correct?

16     A.   Yes.  Well--

17     Q.   And the question was were there other

18 preservation directives, and you said, "I don't believe

19 so."

20     A.   I guess I didn't understand it to mean something

21 that was the same litigation hold.

22     Q.   Let's talk about the content of the enhanced

23 litigation hold.  When you sent it out on May 19th, that

24 was two days after the judge's Phase III order came out.

25 Correct?

1    A.   I-- I'm sorry, I don't recall the date, but...

2    Q.   Was your enhanced litigation hold in response to

3  the Court's Phase III order?

4    A.   No.

5    Q.   It had nothing to do with it?

6    A.   No.

7    Q.   What was it in-- on May 19th, two days after the

8  Phase III, that prompted you to send out an enhanced

9  litigation hold?

10   A.   What prompted me to send it out was we had

11 e-mails that were preserved through our system, but the

12 investigation was going on and I wanted to ensure that

13 we locked down the e-mails for a longer period through--

14 we have to go through a national technical process to do

15 that.  So we did those forms so we could do that.

16   Q.   Your notice was not limited to e-mails, was it?

17   A.   My lit hold notice?  No.

18   Q.   Well, I mean, you were just talking about

19 preserving e-mails, but your litigation hold extended to

20 paper, ESIs in the native format, removable or portable

21 or electronic storage?

22   A.   It did, uh-huh.

23   Q.   Really didn't exclude anything.  Correct?

24   A.   That's true.

25   Q.   The second part of this litigation hold, this

1    enhanced litigation hold, is a series of repositories?

2       A.   Yes.

3       Q.   Help me understand the way this works.  When you

4    sent this out, was it up to the person you sent it to to

5    choose which repositories to go through?

6       A.   Yes.

7       Q.   And this did not require them to go through all

8    of these repositories?

9       A.   It requires them to do what's necessary to

10   identify the locations where they believe they have

11   information.

12      Q.   They're to check every repository that they

13   believe may contain that information?

14      A.   If they need to check.  I mean, often they'll

15   know where they've-- they've placed information, but

16   yes.

17      Q.   The point of checking it is to say that we may

18   have the requested information in these repositories.

19   Correct?

20      A.   If they need to check it, yes.

21      Q.   There's nothing on here that tells us where the

22   recipient actually checked for this information.

23   Correct?

24      A.   Correct.

25      Q.   Was there any information you received from any

1  of these people that said, I checked these repositories

2  and there was nothing there?

3      A.   I don't believe so, no.

4      Q.   You just relied on the recipient to go through

5  these repositories and report to you?

6      A.   Yes, that's--

7      Q.   I'm sorry.

8      A.   Go ahead.

9      Q.   I didn't mean to interrupt.

10      A.   No, I'm sorry, I didn't mean to cut you off.

11      Q.   There was no audit?

12      A.   No.

13      Q.   There was no--

14      A.   No, this is pursuant to U.S. Attorney procedure.

15      Q.   There's no spot-checking?

16      A.   No.

17      Q.   And the same was true of the initial litigation

18  hold and the responses there.  Correct?

19      A.   Correct.  Yes.

20      Q.   You just relied on the person reporting back to

21  you?

22      A.   That's correct.

23      Q.   So if Kim Flannigan came back and said, "I don't

24  have anything," nobody went back and checked her files,

25  her e-mails, anything like that, you just relied on her

 1   word?

 2      A.   That would be true unless I had reason to believe

 3   someone I thought might have something and made a

 4   mistake, I would ask them to recheck, but I don't recall

 5   that that occurred.

 6      Q.   In this case looking at the particular

 7   categories, if there were printed e-mails, they would

 8   have to check that if it included information that fell

 9   within the scope of your litigation hold.  Right?

10      A.   Yes.

11      Q.   Did you understand from this particular form that

12   this person only checked the ProofPoint e-mail archive?

13      A.   I can't see the next page, but on this page, yes.

14      Q.   Looking at the second page, same answer?

15      A.   Well, they also checked shared files and the

16   USA-5 or Alcatraz/LIONs.  This form is somewhat dated,

17   it's actually a CaseView program now, but it would be

18   our case management system.

19      Q.   Do you remember if Jabari Wamble filled out this

20   form and returned it to you?

21      A.   I would have to check.  I believe he did, yes.

22      Q.   And if he did return that to you, it would've

23   been provided and uploaded as you described and given to

24   Mr. Clymer?

25      A.   Well, I thought so.

1    Q.   And if-- if Mr. Wamble asked for phone calls from

2    CCA by e-mail, that should be checked on this form,

3    e-mails should be checked on this form?

4    A.   I'm sorry, could you repeat that?

5    Q.   If Mr. Wamble used e-mail to request phone calls

6    from CCA, then the e-mail box on this form should be

7    checked.  Right?

8    A.   Yes.  Probably, yes.

9    Q.   And if he sent a message through his Blackberry

10   to request phone calls from CCA, there's the box for

11   Blackberry.  Right?

12   A.   That's really outdated, they're iPhones

13   currently.

14   Q.   But if Mr. Wamble-- and we have in evidence, I'll

15   refer to Defendant's 607, Mr. Wamble used a Blackberry

16   to communicate with CCA to request phone calls, then

17   that box should be check-marked.  Correct?

18   A.   Yes, although it could have duplicated e-mail.  I

19   mean, I-- our iPhones and our e-mail, they're

20   duplicative.

21   Q.   So if he used his Blackberry, he didn't

22   necessarily have to check that box?

23   A.   I-- I think it would be advisable to check that

24   box, but it could've been printed e-mail or e-mail.  I

25   mean, it could've been maintained in a different manner.

16-20032  USA v. Karl Carter (Black) REDACTED  11.16.18    2699

 1    Q.  All right.  Everyone was supposed to return this
 2  form to you?
 3    A.  Everyone to whom I sent it, yes.
 4    Q.  All right.  And I want to understand this
 5  process, both with the original litigation hold and with
 6  this.  You sent these out by e-mail and asked for
 7  responses back about whether people had information.
 8  Right?
 9    A.  Yes.
10    Q.  Everybody was required to respond to you in
11  writing.  Correct?
12    A.  Are you talking about this form?
13    Q.  This form or your original--
14    A.  Yes.
15    Q.  -- litigation hold request.  And they were also
16  to return this form to Mr. Steeby?
17    A.  No.  I mean, we would operate off the same form,
18  Mr. Steeby and I.
19    Q.  So at the bottom it says this was copied to the
20  litigation hold coordinator, that would be you.  Right?
21    A.  Yes.
22    Q.  USAO system manager, that would be Mr. Steeby.
23  Right?
24    A.  Yes.
25    Q.  And that it's also copied to the national

1    preservation officer.  Who is that?

2        A.   That is-- presently it's Shabon Sperry

3    (phonetic), the-- it may have been Bonnie Curtin at the

4    time this started.  But usually the user doesn't do

5    that, I or Mr. Steeby are doing those other things.  For

6    example, I would supply it to Mr. Steeby.

7        Q.   Did you provide these forms to the national

8    preservation officer?

9        A.   Yes.

10       Q.   Okay.  So you get these responses back, these

11   mandatory responses back from people saying I have

12   information.  What happens then, do they give you this

13   information?

14       A.   If we asked to-- that it be collected and

15   produced to us, yes.

16       Q.   Did you do that?

17       A.   No.

18       Q.   You never did that?

19       A.   No.

20       Q.   Were they required to in any way catalog or

21   report which cases they had this information in?

22       A.   No.

23       Q.   They were simply told to preserve it and required

24   to preserve it without identifying for you what that

25   actual information was?

1      A.  Yes.

2      Q.  Was there any other accounting from any of these

3   people about what they had that fell within the

4   litigation hold request?

5      A.  I mean, some folks asked me questions about what

6   they had or where it was or that maybe they didn't

7   have-- maybe they initially thought they had it and on

8   checking they didn't have any such information, if they

9   were a maybe, but...

10     Q.  My question was about accountability.  Were they

11  required to tell anybody or document in any way what

12  information they had that fell within the litigation

13  hold that you and Mr. Cohen had put together?

14     A.  No, not other than where it would be located.

15     Q.  And that's true today?

16     A.  That's true-- well, now they've produced some

17  information, so I mean, I guess it's different today,

18  but...

19          MS. BRANNON:  Your Honor, when we filed the

20  motion to supplement the record, we attached what we

21  marked as Defendant's 706, which is an e-mail.  I would

22  ask to admit that into evidence at this time.

23          MR. CLYMER:  No objection.

24          THE COURT:  All right.  Exhibit 706 is

25  admitted.

1          MS. BRANNON:  May I approach the witness?

2          THE COURT:  Yes.

3   BY MS. BRANNON:

4      Q.  Ms. Metzger, I'll give you just a minute to look

5   through that, see if you recognize it.

6      A.  Okay.  Yes, I've looked at this time.

7      Q.  And can you describe for the Court what that is?

8      A.  What this is?

9      Q.  Yes.

10     A.  I had supplied Mr. Cohen with a list of

11  individuals who had responsive-- who had indicated they

12  had, as the list attached reflects, either responsive

13  material to the lit hold or thought perhaps they may

14  have.  And I had updated this list because I think there

15  were several individuals who thought they now had some

16  information responsive.

17          It's also advising him of Kim Flannigan's-- Kim

18  Flannigan had learned that she-- that maybe Mr. Cohen

19  wanted to speak with her, and so she had contacted me

20  and said, I'm willing to speak with him.  So I was

21  letting him know she's willing to speak with you.

22     Q.  And what is the date on that e-mail?

23     A.  March 13th of 2017.

24     Q.  So this was before your enhanced litigation hold?

25     A.  I believe-- I believe so, yes.

1    Q.   Which I think it's dated May 19th.

2    A.   Yeah, okay.

3    Q.   Do you remember whether you got any different

4  responses to your enhanced litigation hold than you got

5  to your initial litigation hold request?

6    A.   No, I don't believe so.

7    Q.   Okay.

8    A.   I mean, not other than this addition.

9    Q.   All right.  That particular exhibit, 706, lists

10  the AUSAs and the staff who told you they thought they

11  had responsive material to your December 19th hold?

12    A.   They thought they did or they maybe believed they

13  did or they had some other sort of really unrelated

14  event that might arguably be responsive, so they had

15  informed me of that.

16    Q.   Is that description on there?

17    A.   Huh?  Is that description--

18    Q.   The thing about the arguably related?

19    A.   Yes, I tried to put little sort of footnotes, if

20  you will.

21    Q.   Okay.

22    A.   Where I indicated for Robin Anderson, for

23  example, that it was likely not within the scope.

24    Q.   And August 24th of this year, did you help Mr.

25  Clymer identify people who might have information

1  responsive to the subpoena *duces tecum*?

2      A.  I'm sorry, on what date?

3      Q.  In August of this year.

4      A.  Might have-- I had-- I had provided him with this

5  list.

6      Q.  Okay.

7      A.  I provided him with this list and I-- I may have

8  made suggestions on who might have material responsive

9  to the production requests.  Was that your question?

10      Q.  Yes.

11      A.  Okay, yes.

12              MS. BRANNON:  May I approach the witness

13  again, Your Honor?

14              THE COURT:  Yes.

15  BY MS. BRANNON:

16      Q.  I'm going to hand you what's been marked as

17  Government Exhibit 45.  Is that an e-mail from Mr.

18  Clymer?

19      A.  To Mr. Clymer?

20      Q.  I mean, who sent that e-mail?

21      A.  Duston Slinkard.

22      Q.  And are you cc'd on that e-mail?

23      A.  Yes, I am.

24      Q.  Okay.

25              MS. BRANNON:  Your Honor, we would move this

1    into admission I guess as Government Exhibit 45.

2              MR. CLYMER:  45.

3              THE COURT:  Exhibit 45 admitted.

4              MS. VANBEBBER:  No objection.

5    BY MS. BRANNON:

6        Q.  So what I'd like to do, Ms. Metzger, is compare

7    these two lists, your March list about people who

8    responded and said we might have responsive material to

9    the list that Mr. Clymer-- or the-- I'm sorry, the list

10   that is on Mr. Slinkard's e-mail.

11             So I think if you look at the-- the second page

12   of Exhibit 706 where your list is, if you compare these,

13   there are a number of people omitted from the

14   August 2018 list that were on your original e-mail

15   saying these people may have responsive material.

16       A.  Uh-huh.

17       Q.  Would you agree with that?

18       A.  Well, this was a different purpose than perhaps

19   this was, but yes, I would agree with that.

20       Q.  Okay.  And so that first list in 706, you did not

21   know, again, what material those people had, correct,

22   because they didn't have to--

23       A.  Correct, other than it was potentially responsive

24   to the litigation hold.  Correct.

25       Q.  And in the second list, you believe that response

 1  would be more narrow?

 2      A.  I'm-- would the people be more narrow?

 3      Q.  Yes.

 4      A.  Yes.  Potentially or it would encompass some of--

 5  I mean, some of us would have something that would

 6  encompass another.  Some of this would be duplicative as

 7  well.

 8      Q.  All right.

 9      A.  Yeah.

10      Q.  Let me see those.  And so in looking through Mr.

11  Slinkard's list in Government's Exhibit 45, it says he

12  tried-- they were trying to identify individuals that

13  were likely to have information responsive to different

14  requests.  Your name is on there several times.  Right?

15      A.  Yes.

16      Q.  Jabari Wamble's name is not on those lists.  Do

17  you know why Jabari Wamble was excluded from the

18  production in August of 2018?

19              MR. CLYMER:  Your Honor, may I just have a

20  moment to speak to counsel?

21              THE COURT:  Yes.

22              (Counsel confer).

23  BY MS. BRANNON:

24      Q.  So just with this initial list, do you know why

25  Jabari Wamble was not on that initial list?

1    A.  I-- I don't know that I can speak to that.  I

2  didn't compile this list, but-- and I would have to look

3  at the individual requests.  I assume they did not

4  believe that there was information responsive to-- that

5  he held that were actually responsive to these

6  particular requests.

7    Q.  Did you have anything to do with deciding what

8  material was responsive in August of 2018?

9    A.  Only my own.

10   Q.  Okay.  So you didn't have anything to do with

11 compiling the list in Government's Exhibit 45?

12   A.  No.  I might've offered some comments if I

13 thought someone had something.

14   Q.  Did you ever compare it to the responses you had

15 received from your original December 19th litigation

16 hold?

17   A.  No.

18   Q.  Did you ever compare it to any responses you got

19 from your enhanced litigation hold?

20   A.  No.

21   Q.  In terms of what you produced to Mr. Clymer or

22 Mr. Slinkard, did you produce everything you had?

23   A.  There may have been a few documents or e-mails

24 that were not responsive to anything, but I produced a

25 great deal, predominantly most of it, yes.

1    Q.   Okay.  Were you responsible for going through and

2    deciding what might be privileged material or national

3    security or have Privacy Act--

4    A.   No.

5    Q.   You were just to provide everything you had?

6    A.   That was responsive, yes.

7    Q.   And it was someone else that might review it just

8    to see if there was--

9    A.   Yes.

10   Q.   Do you know who that was?

11   A.   I believe that I understood, and I could be

12   wrong, that it was Steve Clymer and Steve McAllister,

13   the United States Attorney.

14   Q.   All right.  In your experience in the civil

15   world, you have had experience in kind of sorting

16   through documents about what might be privileged and

17   what might not be?

18   A.   Yes.

19   Q.   You know what a privilege log is?

20   A.   Yes.

21   Q.   You know how to do that?

22   A.   Yes.

23   Q.   You did not do one in this case?

24   A.   I did not personally, no.

25   Q.   Because that was not your responsibility?

1      A.   That's correct.

2      Q.   Right.  Did Mr. Clymer or Mr. McAllister ever

3   consult you on privilege logs or how to do a separation

4   accounting like this?

5      A.   How to do it?  No.

6      Q.   Were you ever consulted at all on whether

7   something might be privileged or not from what you

8   produced?

9      A.   No, I produced some documents that I believe were

10  privileged or Privacy Act protected and I tried to label

11  those as such.

12     Q.   How did you label them?

13     A.   That-- just like that.  I mean, that they were

14  private-- potentially Privacy Act or were privileged,

15  for example, if they were general counsel-- materials

16  from general counsel.

17     Q.   Did you produce these in hard copies or

18  electronic form?

19     A.   Electronic form.

20     Q.   So if they were in electronic form, how was it

21  that you noted that a particular document might be

22  subject to the Privacy Act?

23     A.   In some instances I put a cover paper in front of

24  the document indicating that.  In the other instances,

25  for example if it was a correspondence with the Office

1   of General Counsel or a component that would be

2   privileged in that fashion, I uploaded it, I believe I

3   recall-- we uploaded it separately and just noted that

4   it was that kind of file.

5       Q.   Did you provide-- you provided things other than

6   the e-mails.  Correct?

7       A.   Other than e-mails?

8       Q.   Uh-huh.

9       A.   Yes.

10      Q.   And so if we're looking at that particular

11  litigation hold form where there are different

12  categories, what did you mark?  Did you have to fill one

13  of these out?

14      A.   I did.

15      Q.   Do you know what you marked?

16      A.   I would've marked e-mail and I would've marked

17  files or folders, N drive.

18      Q.   What's an N drive?

19      A.   I'm sorry, I'd have to look at the form.  It's a

20  storage in Word, where I would store Word documents.

21      Q.   Would things under that first section, like the N

22  drive--

23      A.   That would be-- where it says, "Personal (N, H &

24  M) Drive Document/Files/Folders," I would've marked

25  that.

1     Q.   Okay.  So like I have an N drive where I can save

2   things and it's stored on the server but other people

3   don't have access to it.  Would that be the same thing?

4     A.   Yes.

5     Q.   All right.

6     A.   Well, people could have access to it if I

7   authorized it.

8     Q.   But it's not a shared drive?

9     A.   It's not a-- it could be.  There are shared

10   drives, but that would not be.

11     Q.   Did you turn this particular form that you filled

12   out over to Mr. Clymer?

13     A.   I thought I did.  If-- if we didn't turn over all

14   the forms, that's an oversight on my part.

15     Q.   So there's not a reason you would've withheld it?

16     A.   No reason, no.

17     Q.   Okay.  So when you were filling out this form, it

18   would've included many things other than just e-mails?

19     A.   Not many things, because I would've had very

20   limited storage.  It would've been predominantly e-mails

21   and probably the N drive, maybe calendar, calendaring,

22   hard copy documents.

23     Q.   If you provided hard copy documents, did you scan

24   those and provide them in electronic form?

25     A.   Yes.

1    Q.  All right.  We talked about your use of this

2    particular form.  You used this form if you have like a

3    1983 action?

4    A.  No.  Well, I-- you mean 1983 action-- we don't--

5    we don't usually get 1983 actions.  But if we have

6    *Bivens* actions, is that your example, if an agency

7    representative were sued?  No, we would not use this

8    form.  This is internal to the U.S. Attorney's Office.

9    Q.  What about a malicious prosecution allegation,

10   would you use this sort of form?

11   A.  It would depend.  Not typically.  I mean, there

12   are allegations of malicious prosecution that wouldn't

13   rise to a litigation hold being issued.

14   Q.  So it's possible, you just don't recall any?

15   A.  It's possible.

16   Q.  Okay.

17   A.  That it could-- it could be used if it needed to

18   be.  I don't recall it ever being used in that setting,

19   but it could be.

20   Q.  You were asked by the Special Master-- by Ms.

21   VanBebber about the search that you ran on Ms. Tomasic's

22   repository.  Do you remember that?

23   A.  Yes.

24   Q.  And that would've just been her e-mails.  Right?

25   A.  Yes.

1      Q.  And you understood that Mr. Cohen wanted the

2   results of that as soon as possible?

3      A.  I understood he wanted the results, yes, as soon

4   as-- I guess as soon as possible.  I understood he

5   wanted the results, yes.

6              MS. BRANNON:  May I approach the witness,

7   Your Honor?

8              THE COURT:  Yes.

9   BY MS. BRANNON:

10     Q.  Just have you look at that and see if it

11  refreshes your recollection.

12     A.  Okay.

13     Q.  I think just that second page might be helpful.

14     A.  Okay.

15     Q.  Looking at that, did you understand Mr. Cohen

16  wanted this-- the results of this as soon as possible?

17     A.  Well, I understood he wanted the results.  I

18  mean, I-- I would assume when someone wants something,

19  they'd like it as soon as they can get it.  Oh, I do

20  see, yes.

21     Q.  He wants--

22     A.  I'm sorry, I was skimming.

23     Q.  All right.  He wanted the results as soon as

24  possible and he wanted those results to go to Ken

25  Smiley.  Correct?

 1      A.   Yes.

 2      Q.   And you never provided those results to Mr.

 3   Cohen?

 4      A.   No.

 5      Q.   And you never told him that it was going to be

 6   delayed?

 7      A.   We met with him on-- in June in person here in

 8   Kansas City and we talked about the production and the

 9   problems that we had.

10      Q.   At that point-- I mean, you did run the search

11   terms within-- with Erin Tomasic's repository.  Correct?

12      A.   We did.  And in this-- I'm sorry.

13      Q.   Okay.  You did.  You did?

14      A.   Yes.

15      Q.   And you knew that he wanted them as soon as

16   possible?

17      A.   Yes.

18      Q.   And you did not provide those to them?

19      A.   No.

20      Q.   And when was it that you advised him that you had

21   those results, but you weren't going to provide them to

22   him right now?

23      A.   He added three new group terms to this and I

24   don't know if we had run those on the repository,

25   because he-- he often would add some additional terms,

 1   but-- so we had three new terms, but we did run a-- a

 2   check on her repository.

 3        We met with him, as I started to say, in June of

 4   2017 here in person and talked with him about the

 5   issues.  I think sometime between this e-mail

 6   correspondence and that meeting we probably started

 7   having discussions about that and then he wanted to have

 8   the meeting.

 9   Q.   Did you ever tell him that you had those results,

10   but you were not providing them to him yet?

11   A.   We did-- we did tell him we'd run the repository,

12   yes, and that I-- I told him I had started an initial

13   review and we encountered a substantial volume of

14   responsive [sic] material.  When I say non-responsive,

15   it was responsive to the search terms, but the content

16   of the material produced was not relevant.

17   Q.   Not relevant?

18   A.   Yeah.

19   Q.   Was it your-- was it your job to review the

20   search results from her repository to determine what

21   might be privileged and not produced?

22   A.   Initially I was looking to see what kind of

23   volume we had that was not responsive, and then I

24   volunteered to start to go through it to look to see

25   what might be privileged.  And it-- it seemed like there

 1    were so many materials that were non-responsive, then we

 2    started to talk about that.

 3       Q.    When you started to go through it to determine

 4    what was privileged and what was not, did you keep a

 5    privilege log?

 6       A.    Not at that point, it was just looking at it to

 7    see what kind of materials were in there.    I started to

 8    segregate it I guess, yes.

 9       Q.    And when you started to segregate it, did you

10    preserve that segregation?

11       A.    Yes.

12       Q.    But you didn't document like a separate privilege

13    log for those documents?

14       A.    No.

15       Q.    Okay.

16             MS. BRANNON:    Could I have just a moment,

17    Your Honor?

18             THE COURT:    Yes.

19             MS. BRANNON:    That's all.    Thank you.

20                       CROSS EXAMINATION

21    BY MR. CLYMER:

22       Q.    Ms. Metzger, you were asked some questions about

23    what you did to comply with the Special Master's most

24    recent subpoena *duces tecum*, the one in August.    And you

25    were asked some questions about whether you produced

1    documents to me.

2         You and I had no interaction with respect to that

3    subpoena *duces tecum*, did we?

4         A.   No.

5         Q.   And, in fact, the-- the person who was named on

6    the subpoena *duces tecum* was the United States Attorney,

7    Mr. McAllister, not me; is that correct?

8         A.   Yes.

9         Q.   And any interaction you had with respect to what

10   you produced as responsive to that subpoena went

11   internally to your office; is that right?

12        A.   Any response I produced?

13        Q.   Yes.

14        A.   Yes.

15        Q.   You didn't send anything to me personally, did

16   you?

17        A.   No, nothing.

18        Q.   Exhibit 45 which you've been shown, I'll give you

19   my copy in case you don't have one up there with you,

20   that's an e-mail from Mr. Slinkard; is that correct?

21        A.   Yes, it is.

22        Q.   Okay.  I'm going to show you a couple things on

23   that e-mail and ask you some questions about it.  On the

24   second page of that e-mail, is there a place where Mr.

25   Slinkard says to the recipients, about halfway through

1    the second page, "Any thoughts you have on persons you

2    believe are likely to have responsive information on a

3    particular request who are not listed above for that

4    request"?

5        A.  Do I see that?  Yes.

6        Q.  Did you-- did you interpret that to mean that Mr.

7    Slinkard was soliciting from the people who he sent this

8    e-mail to that if there were others in the office, for

9    example people who were on the other list that you had

10   sent to Mr. Cohen, that he wanted that information from

11   people in your office?

12       A.  Yes.

13       Q.  I'll ask you to look at the bottom of that second

14   page.  Does he say, Mr. Slinkard say, "This is going to

15   remain a work-in-progress and we will handle unforeseen

16   issues as they arise; however, we need to identify and

17   collect materials responsive to the subpoena as quickly

18   as possible and this should serve to get us started"?

19       A.  Yes.

20       Q.  Do you see that?  Do you recall that Mr. Slinkard

21   later sent follow-up e-mails to a wider distribution

22   group soliciting documents responsive to the Special

23   Master's subpoena?

24       A.  I believe he did.

25       Q.  Okay.  And do you know as you sit here right now

1  who in your office collected materials that they

2  believed were responsive to the subpoena and submitted

3  them internally within your office?

4      A.  Could I name every person?  No.

5      Q.  And you certainly-- it's not your testimony here

6  that the responses are limited to who's listed on

7  Exhibit 45?

8      A.  No, I offered some additional names myself to Mr.

9  Slinkard.

10      Q.  Ms. VanBebber asked you some questions about an

11  e-mail message that concerned Mr. Brown working on a

12  pleading regarding termination of Phase III.

13      A.  Yes.

14      Q.  Do you recall that-- those questions?

15      A.  Yes.

16      Q.  And she asked you about options you would've had

17  about what to do if you thought that compliance with a

18  request from the Special Master was unwarranted or

19  improper in any way.  Do you remember that questioning?

20      A.  Yes.

21      Q.  Would moving the Court to terminate Phase III of

22  the investigation be a proper response in-- to a belief

23  that the Special Master's requests were inappropriate?

24      A.  Yes.  I thought that's what I testified to, that

25  that was one option we were engaging in, moving the

 1    Court.

 2        Q.  And certainly if you turned over confidential

 3    federal grand jury material to the Special Master before

 4    deciding whether to file that, filing that may not serve

 5    the purpose it was supposed to serve; isn't that

 6    correct?

 7        A.  Correct.

 8        Q.  So you had to kind of make an either/or decision;

 9    is that right?

10        A.  Yes.

11        Q.  Did you see it as improper or deliberately

12    obstructive to take some time to make a reasoned,

13    measured decision on that before turning over that

14    confidential grand jury material to the Special Master?

15        A.  I never saw anyone trying to be deliberative--

16    deliberately obstructive.  My testimony was no to that.

17        Q.  That e-mail talks about having been concerned and

18    communicating to the Special Master the concern about

19    not wanting to bind a future Department of Justice

20    attorney.  Do you remember that part of the e-mail

21    message?

22        A.  I'm sorry, could you repeat that?

23        Q.  Do you remember there's a part of the e-mail

24    message that refers to not wanting to pre-determine

25    litigation decisions your new attorney may make?

1      A.  Yes.

2      Q.  Do you remember that?

3      A.  Yes.

4      Q.  Did you have any idea who the new attorney to be

5  assigned to the case was at the time you wrote that?

6      A.  No idea.

7      Q.  Did you have any idea what position that person

8  was going to take with respect to disclosure?

9      A.  None.  No, I had no idea.  Didn't know who--

10      Q.  So there was no effort to wait for someone from

11  DOJ to come on because you knew in advance that person

12  was going to make a decision one direction or another,

13  was there?

14      A.  No, I didn't-- I had no idea what the position of

15  the person or the DAG's Office would be.

16      Q.  The Special Master's counsel showed you a

17  transcript from a document, Document 172, where Ms.

18  Barnett asks a question-- or makes a statement to the

19  Court and Chief Judge Robinson asked a question.  Do you

20  remember that?

21      A.  Yes, I do.

22      Q.  Does Ms. Barnett then answer the judge's

23  question, to the best of your recollection?

24      A.  Yes.

25      Q.  But that wasn't shown to you by the Special

1   Master, is that correct, or counsel when you testified
2   here today, the answer wasn't shown to you?
3       A.  I-- I just looked at the circled portions that I
4   was asked to look at.
5       Q.  And only the question was circled?
6       A.  Yes.
7       Q.  You were asked some questions about e-mail
8   traffic regarding the clawback order where Ms. Barnett
9   expresses some reluctance to respond to an e-mail
10  message she got in writing, and you concurred that
11  sometimes it's better to communicate in person and not
12  e-mail.  Do you remember that?
13      A.  Yes.
14      Q.  I'd like to go back and unpack that because there
15  was a long e-mail chain there.  Do you still have that
16  e-mail in front of you by any chance?
17      A.  I don't believe so.
18      Q.  See if I can find a copy quickly here.
19              MS. VANBEBBER:  Mr. Clymer.
20              MR. CLYMER:  Oh, thank you very much.
21  BY MR. CLYMER:
22      Q.  This was Special Master's Exhibit 1174.  And I'd
23  like to start at the-- the beginning of this e-mail
24  chain and just ask you, when you went to Kansas City for
25  a discussion about the litigation hold, did a question

1    come up about interpreting the judge's clawback order

2    during that meeting?

3        A.   When I discussed the lit hold, no, I don't

4    believe it did.

5        Q.   Did it come up at some later point?  After the

6    clawback order was issued, was there a meeting or a

7    conference in Topeka where--

8        A.   Yes.

9        Q.   -- the issue came up?

10       A.   Yes.

11       Q.   Can you describe the issue that came up?

12       A.   Well, there was a general discussion about the

13   order in general.  It was a group meeting.  And I think

14   the question that I was asked was whether the-- the

15   question of the scope of the order arose.  And there was

16   a question asked about whether the order should be

17   interpreted as applying in other cases I believe.

18       Q.   And who raised that question to that issue?

19       A.   I recall that it was Kim Flannigan.

20       Q.   Okay.  And I'm going to show you now a part of

21   1174.  Was there an e-mail from Kim Flannigan that was

22   sent to Ms. Barnett regarding that issue?

23       A.   Yes.

24       Q.   And did you learn at some point after the

25   initial-- the issue was originally raised that there was

1    some important facts that were not disclosed to you when

2    Ms. Flannigan initially raised the question about

3    interpreting the clawback order?

4         A.   Yes.

5         Q.   Can you describe that to us, please?

6         A.   Subsequently, I don't know if it was here or

7    later, Ms. Flannigan reported that she had some calls in

8    cases that were I guess duplicates or identical to the

9    material that was impounded in the *Black* case.

10        Q.   So in other words, when the question was first

11   asked to you, did you understand the question to pertain

12   to recordings or calls that were completely unrelated to

13   the *Black* litigation?

14        A.   Yes.

15        Q.   And did anybody disabuse you of that

16   misunderstanding you had?

17        A.   No, I was shocked to learn this.

18        Q.   So was Ms. Tomasic present when this issue was

19   raised?

20        A.   Yes.

21        Q.   Did she say to you the calls we're asking about

22   are exactly the same phone calls that the Court has

23   clawed back in the *Black* case?

24        A.   I don't recall Ms. Tomasic asking anything.  I

25   recall Ms. Flannigan asking the question.

1      Q.   But did either Ms. Tomasic or Ms. Flannigan--

2      A.   No, that was not-- Ms. Barnett and I were shocked

3   to learn that.

4      Q.   So when this issue was raised and you had to make

5   a decision about interpreting Chief Judge Robinson's

6   clawback order, you thought the issue involved

7   completely unrelated calls?

8      A.   Yes.

9      Q.   And only later did you learn that when they asked

10   that question without-- when Ms. Flannigan asked that

11   question, without disclosing it, she was talking about

12   recordings of the very same phone calls that were clawed

13   back?

14      A.   Yes.

15      Q.   When you and Ms. Barnett exchanged the e-mail

16   messages that appear on the first page of 1174, were you

17   expressing concern about not communicating with Ms.

18   Flannigan and Ms. Tomasic by e-mail because you wanted

19   to conceal something somewhere down the road in

20   discovery?

21      A.   I did not-- I thought I explained it, maybe I

22   didn't do it well in my testimony.  I was not trying to

23   conceal anything, I was trying to ensure we had clarity

24   in understanding.

25      Q.   And did you think you would get better clarity if

1    Ms. Barnett sat down and talked to Ms. Flannigan

2    face-to-face, rather than trade e-mail messages?

3        A.   Yes.

4        Q.   Was that the nature of the conversation you were

5    having in Exhibit 1174?

6        A.   Yes.

7        Q.   You were asked some questions about whether the

8    search efforts regarding the e-mail traffic and the

9    ProofPoint system could be used to search non-e-mail

10   repositories as well.  Do you remember that questioning?

11       A.   Yes, yes.

12       Q.   Was Mr. Smiley involved in the conversations with

13   Mr. Steeby and the Special Master regarding use of

14   particular kinds of syntax to do word searches?

15       A.   Yes.

16       Q.   Was it your understanding that Mr. Smiley is a

17   computer forensics expert?

18       A.   Yes.

19       Q.   Did Mr. Smiley, to your knowledge, ever exhibit

20   any confusion about the fact that the syntax useful in

21   ProofPoint may not be completely useful in other

22   circumstances?

23       A.   Not that I'm aware of.

24       Q.   Did you or, to your knowledge, anyone else in the

25   management team ever communicate to the Special Master

1  that when the word searches were modified sufficiently,

2  you would produce information from those searches to the

3  Special Master?

4      A.  No.

5      Q.  Was it your understanding that Department of

6  Justice approval was necessary to disclose internal

7  communications?

8      A.  Yes.

9      Q.  And did-- from conversations with Mr. Beall, Mr.

10  Slinkard, Ms. Barnett, and the rest of your management

11  team, did you understand that you would have to go back

12  to Main Justice and discuss that before anything was

13  done?

14     A.  Yes.

15     Q.  To your knowledge, was that communicated to the

16  Special Master?

17     A.  Yes.  We always indicated that production would

18  be a problem and a concern for us.  I think we expressed

19  that we wished we could just open up our files, but that

20  just wasn't an option for us.

21     Q.  And is it your understanding that federal law

22  prohibits you from doing that?

23     A.  I understand, yes.

24     Q.  Were you also of the view, you and other members

25  of the management team, that because of potential

1  conflicts of interest, it was advisable to have an

2  attorney not from the District of Kansas make disclosure

3  decisions in this case?

4      A.   That was my initial assessment as well as a

5  professional responsibility officer and I consulted and,

6  yes, that was my understanding.

7           MR. CLYMER:  No further questions.

8           THE COURT:  Will you be very long?  We need

9  to take a break, Ms. VanBebber.  Is this going to be

10 very short?

11          MS. VANBEBBER:  It's going to be short, but

12 we could go ahead if you'd like.

13          THE COURT:  All right.  Let's take a break

14 for about 15.

15          (Recess).

16          THE COURT:  All right.  You can be seated.

17                REDIRECT EXAMINATION

18 BY MS. VANBEBBER:

19     Q.   I just have a few questions, Ms. Metzger.

20     A.   Okay.

21     Q.   You indicated to Mr. Clymer that there was no bad

22 faith in the-- you all's decision to not timely comply

23 with the Special Master's order to produce the grand

24 jury records?

25     A.   Yes.

1    Q.  Well, then if there was no bad faith, why didn't

2  you tell the Special Master that you were going to need

3  more time to produce the grand jury material?

4    A.  I believe we did discuss that in our June

5  meeting, that we were going to-- that we were in the

6  process of having someone come on board and we could

7  not-- come on board to take over the investigation side

8  of this.

9    Q.  So we're not going to comply with your order?

10   A.  We didn't say we wouldn't comply, we didn't know

11 what the decision would be.

12   Q.  You also talked to Mr. Clymer about Document 172

13 that I showed you with the testimony of Debra Barnett--

14   A.  Yes.

15   Q.  -- on October the 28th, 2016?

16   A.  Yes.

17   Q.  And you indicated that you thought that when the

18 Court asked Ms. Barnett about the lock-down, that she

19 answered her; is that correct?  Do you think Debra

20 Barnett answered when she said I suppose-- well, let's

21 just look at it.

22       The judge has already quoted to you what she

23 said.  Correct?  You heard that, didn't you?

24   A.  The circled part, yes, I read that.

25   Q.  All right.  So she's asking her specifically

1    twice, this is the second time, she's asking about

2    e-mails and handwritten notes.  Right?

3        A.  E-mails and handwritten notes where we made

4    requests for-- basically for acquisition of videos or

5    audio-recordings.

6        Q.  And will you look at the text below that to see

7    that Ms. Barnett does not answer her question, rather

8    Ms. Barnett leaps immediately into discussing the

9    computers that are under lock-down, which carries on in

10   the next page and still talking about the computers.

11   There is no answer from Ms. Barnett to the Court's

12   question of whether they have on lock-down the

13   appropriate e-mails and notes, is there?

14       A.  I didn't read all that, I couldn't read all that.

15   I mean, the record will say whatever the record says.

16       Q.  And if the record reflects that she never

17   answered the question, then I guess you're mistaken,

18   correct, when you say she did?

19       A.  I saw that she had responded and that she

20   responded to the question.  I-- I haven't read this

21   transcript.

22       Q.  Okay.  I'm just suggesting you didn't make that

23   up, you just didn't know.  Right?

24       A.  I'm just saying the record would say what it

25   says.  She made a response, yes.

1              MS. VANBEBBER:  No other questions.

2              MS. BRANNON:  Just one question.

3                    RECROSS EXAMINATION

4   BY MS. BRANNON:

5      Q.  Ms. Metzger, when was the very first time that

6   you provided material to anyone in your office for

7   production to the Special Master?

8      A.  I don't recall, because it was rolling, so it

9   would've started after Mr. Slinkard sent out-- you're

10  talking about the recent production, I assume.

11     Q.  When is the very first time you produced material

12  to anyone in your office?

13     A.  Oh, anyone for the Special Master.  Well, I

14  provided the material directly myself at various times.

15  And I don't know when that started.  It would've been

16  long before Mr. Clymer was involved in the case.

17     Q.  And who did you provide that to?

18     A.  Well, I provided material directly to the Special

19  Master at different times, some materials.

20     Q.  This last production that we're talking about--

21     A.  Oh, I'm sorry.

22     Q.  No, no, no.  This is a separate question.

23     A.  Okay.

24     Q.  This last production that we're talking about,

25  that we've been talking about today, when is the first

1    time you provided any of that material to someone in

2    your office for production?

3       A.   Well, probably soon after the e-mail came out

4    from Mr. Slinkard.

5       Q.   The one that we reviewed?

6       A.   Yes.

7              MS. BRANNON:  Okay.  Thank you.

8              THE WITNESS:  Uh-huh.

9              THE COURT:  All right.  May Ms. Metzger be

10   excused from her subpoena?

11             MR. CLYMER:  Nothing further from the

12   government, Your Honor.

13             THE COURT:  All right.  You're excused.

14             THE WITNESS:  Thank you, Your Honor.

15             THE COURT:  Ms. VanBebber.

16             MS. VANBEBBER:  Yes, Your Honor, I do have--

17   we're finished with the original set of witnesses.  I do

18   have one rebuttal witness.

19             THE COURT:  All right.

20             MS. VANBEBBER:  And that would be the Special

21   Master.

22             MR. CLYMER:  Your Honor, we're going to have

23   to discuss this at sidebar.

24             THE COURT:  Come forward.

25             (Proceedings had at the bench, outside the

1   hearing of open court).







20       (Proceedings continued in open court).

21          SPECIAL MASTER DAVID COHEN,

22   called as a witness on behalf of the Special Master,

23   having first been duly sworn, testified as follows:

24              DIRECT EXAMINATION

25   BY MS. VANBEBBER:

1    Q.  Mr. Cohen, to begin with, there was a number--
2    there were a number of witnesses who have testified with
3    regard to when-- whether the government was in good
4    faith with regard to the document production requests
5    and with the search terms that were to facilitate your
6    requests.  I'm going to show you what's been marked
7    Exhibit 1206, start at the bottom.  There's an e-mail
8    from you, is there not, to Tom Beall?
9    A.  Correct, and others.
10   Q.  And you want-- you're telling him that Judge
11   Robinson would like to discuss the matter of your
12   production of documents.  Correct?
13   A.  Yes.  And that was in connection with statements
14   by Mr. Beall and his staff that they were concerned
15   about now that we've gotten to the point of production,
16   matters of relevance, matters of national security, and
17   matters of privacy in connection with some of the
18   documents that would be produced responsive to the
19   search terms.
20   Q.  And in-- excuse me, as we go on to the next page,
21   you continue and say precisely that, that you are aware
22   that they've got national security or privacy issues to
23   be concerned about.  Did they ever list any other things
24   that you ought to be concerned about with regard to
25   production?

1    A.   That they were concerned about, they-- again,

2  they mentioned relevance but also national security and

3  privacy.  And the privacy issues in particular I think

4  had to do with internal documents regarding

5  employment-related matters, as I understood it.

6    Q.   So at that point you asked them to go ahead with

7  the Tomasic documents?

8    A.   At that point, yes, we had agreed on the search

9  terms.  We agreed to run those search terms against the

10  Tomasic repository, kind of as a test to see how many

11  documents would be produced, and we came to a final

12  agreement on the search terms.

13    Q.   And the search terms agreement was about June 5th

14  that we've talked about earlier today?

15    A.   I think that's right.

16    Q.   I'm going to then show you what's been marked

17  Defendant's Exhibit 655.  This is an e-mail exchange

18  that comes from Emily Metzger to you-- to Beall and

19  Barnett saying there's another copy of my e-mail to the

20  Special Master.  That e-mail is below.  And then your

21  e-mail, which is replying to Ms. Metzger's e-mail.

22        And what do you tell them about Erin Tomasic's

23  custodial file at the very end where I have

24  check-marked?

25    A.   All right.  So at this point we had agreed on the

1    search terms fully, and I asked them to-- and as I

2    recall the iteration before, there was something like

3    7,500 responsive documents.  We had gotten that down to

4    about 4,500 responsive documents by tweaking the search

5    terms.

6         And at that point it seemed to me we were close

7    enough that they should produce those documents, subject

8    to whatever withholding they needed to do for relevance,

9    national security and/or privacy concerns.

10   Q.   So you had already moved to-- this is

11   Document 1156.  You had already moved in May or asked

12   them in May to move on, we needed to move forward.

13   Correct?

14   A.   Right.  This was essentially the culmination of a

15   month's long process of trying to work with the United

16   States Attorney's Office to figure out how best to

17   produce relevant documents.

18   Q.   And in this last e-mail, which is July the 11th

19   that we just looked at, you told them to produce them as

20   quickly as possible, right, immediately?

21   A.   Yes.

22   Q.   And in what was shown to the witness before in

23   another e-mail, you told them that you needed it ASAP.

24   Right?

25   A.   Yeah.  It was always my intention to get these

 1    documents as quickly as I could reasonably.

 2        Q.   So when did you finally get Ms. Tomasic's

 3    repository?

 4        A.   My understanding is that we only-- you and I only

 5    received it-- those documents in September of this year.

 6        Q.   After first asking in June, we received them in

 7    September.  That's correct.

 8             Let's talk about some of the things that they

 9    said-- that both witnesses today-- well, not so much Mr.

10    Steeby, but the last two witnesses today.  They talked

11    about the request for recusal, which they admitted was

12    on October the 12th, 2016.  Right?

13        A.   Correct.

14        Q.   When did they let you first know that they had

15    asked for recusal?

16        A.   I did not know that they had asked for recusal

17    until the recusal occurred.

18        Q.   Do you-- would you have been--

19        A.   Or just before-- excuse me, or maybe just a

20    couple weeks before.

21        Q.   Would it have been helpful to you to show-- to

22    know what to believe and what not to believe if they had

23    told you that they were trying to get out of the case?

24        A.   I-- I think that I was working with them under an

25    impression that was not correct.

1    Q.   And what impression was that?

2    A.   Well, during the period of several months

3    beginning in October, November of 2016 and through 2017,

4    while I was working with Mr. Steeby and the United

5    States Attorney's Office to come up with search terms

6    that weren't overbroad, the understanding during-- my

7    understanding during that entire time was that there

8    would come a point where we would agree on what the

9    search terms were and that there would then be an issue

10   as to those documents that they would have to resolve.

11   And we talked about different ways to resolve whether

12   they would produce documents.

13        The issue was, as I said, some would not be

14   relevant, some would have privacy concerns, some would

15   have national security concerns.  Part of the reason we

16   chose Tomasic was because it seemed like the national

17   security concerns would be minimal with her.

18        But the discussion that I had with Mr. Beall and

19   Emily Metzger and everybody else, I think Scott Rask was

20   in on as well, always had to do with how they would

21   produce the documents but address those issues.

22        One approach that we discussed was, because I'm a

23   special master and do that kind of thing all the time,

24   they would simply give them to me anyway and that they

25   would never see the light of day because I wouldn't

1  allow them to become public.  One approach was to give

2  them to the judge, one approach was to find a-- a

3  different judge in this courthouse.

4        But the discussion was always that they would run

5  the search, they would give me the documents, and that

6  we would figure out a mechanism for those documents to

7  be reviewed before they gave them to me.  It was never

8  explained to me that there was a possibility that they

9  wouldn't produce documents at all and would instead go

10 to DOJ and kind of hand off the whole thing to somebody

11 else.

12    Q.  Now, you have heard testimony today from both

13 witnesses that they kept you apprised the whole time

14 that they were seeking recusal and that they were going

15 to have to go to Justice to get permission for almost

16 everything you wanted them to do; is that correct?

17    A.  That was never my understanding.  I don't think

18 that's right.

19    Q.  So what about the request for recusal, you said

20 that it was June before they-- before they had notified

21 you that they had long ago requested recusal?

22    A.  I certainly didn't know it-- apparently they

23 asked for recusal shortly after I was appointed.  That's

24 all news to me.

25    Q.  And what about the insistence that they kept you

1    apprised that they were going to have to get approval

2    from Justice on practically everything you wanted from

3    them?

4       A.   I-- I just do not believe that I was ever told

5    that by Emily or Mr. Beall or anybody else.  And I had

6    several conversations, informal conversations on the

7    phone with Mr. Beall.  He was-- he was keeping me

8    apprised of what was going on, I believe, in other

9    respects but not in that respect.  And either there was

10   a very severe misunderstanding or they did not say what

11   they're saying they said.

12      Q.   When you-- when you were first appointed in

13   October of 2016, did you almost immediately begin to

14   speak with Tom Beall on the phone?

15      A.   Yes.

16      Q.   At what time, if any, did he ever tell you that

17   they were not going to cooperate with you?

18      A.   Well, he-- he never said he wasn't going to

19   cooperate with me.  And he-- anything that he or anyone

20   in his office ever told me was that they were going to

21   cooperate with me.

22      Q.   When the investigation was looking at CCA, was

23   the U.S. Attorney cooperative in terms of did CCA do

24   something wrong, did they record, did they view people

25   in their audio-- excuse me, in their attorney-client

1  rooms?  Were they cooperative in helping you to the
2  extent that they could to discover what actually went on
3  at CCA, aside from the U.S. Attorney's Office part in
4  it?
5     A.  I'm not sure I understand your question fully.
6  They didn't have much of a role.  I mean, I just went to
7  CCA directly, I went to Securus directly.  They were not
8  obstructionists in trying to preclude me or prevent me
9  from learning what I could from CCA and from Securus.
10    Q.  So in Phase I and Phase II, you had no reason to
11  suspect that they wouldn't-- that they were not going to
12  cooperate when you had to continue with the
13  investigation?
14    A.  That's correct.
15    Q.  Did you talk to-- to Debra Barnett in December
16  after you were appointed?
17    A.  I talked to Debra Barnett numerous times, but I
18  met with her in person for the first time I think it was
19  in December.
20    Q.  So that would be consistent with a-- with the
21  document that was presented this morning showing a
22  December 10th meeting with her when she was of the
23  opinion that you trusted her?
24    A.  Oh.  Yes.
25    Q.  Did you trust her?

1    A.  I did.

2    Q.  What made you think you could trust her?

3    A.  She gave me some inside baseball, she explained a

4  few things that were happening in the office that I

5  otherwise would not have known in a-- in a number of

6  areas.  I can't really remember exactly what those were,

7  but I remember thinking, okay, she's being honest, she's

8  telling me what's happening, she's being revealing and

9  letting her guard down, so I trusted her.

10    Q.  Did there come a time when you chose not to trust

11  her anymore?

12    A.  Yes.

13    Q.  And explain how that happened.

14    A.  Well, I learned-- so one of the first things I

15  said to everybody I spoke with at the United States

16  Attorney's Office, and most particularly Tom Beall and--

17  and Deb Barnett, was that I would like to speak with

18  Erin Tomasic.  I also mentioned Pauletta Boyd and I also

19  mentioned Kim Flannigan, but primarily it was Erin

20  Tomasic from the very first conversations I had with

21  anybody.

22    Q.  Would that be in October of 2016?

23    A.  Correct.  And the reason is because Erin had been

24  accused of something pretty serious.  And I suspected

25  that there was a-- a misunderstanding.  It was hard for

 1    me to believe that a former law clerk for two

 2    different-- or for at least one federal judge - and I

 3    guess she had been an intern for another - would,

 4    quote/unquote, break into chambers and try and retrieve

 5    evidence.  It just didn't seem likely.

 6         And so I wanted to talk to her to give her a

 7    chance to explain to me what happened.  And I thought

 8    that was something that she would want to do.  And I

 9    tried to explain to both-- well, to everybody who would

10    listen to me that it would inure to her benefit to talk

11    to me.  And I figured that in that conversation I might

12    learn some other things that would be helpful to my

13    investigation.

14         And so when I learned much later that there was

15    in writing a directive-- there was an e-mail that showed

16    that Deb Barnett, to the contrary, had directed Tomasic

17    not to talk to me, I was stunned.  I was taken aback.

18    Q.   And if the record shows that Barnett's admonition

19    to Tomasic not to talk to you occurred around the end of

20    October 2016, does that comport with your recollection?

21    A.   Yes, I think that's what the e-mail said.  And

22    I-- I have to add that I think that-- that Tom Beall was

23    a part of that e-mail thread too.  And so I was

24    extremely disappointed to see that.

25    Q.   So you began asking to speak with Tomasic in

1    October of 2016.  And when did you finally get to

2    interview her and Ms. Boyd?  Well, if the record

3    reflects February the 1st and 2nd, is that consistent?

4        A.   Yeah.  Yeah, it was in February.

5        Q.   What about Flannigan, did you ever get to talk to

6    her?  She had-- she had indicated to her superiors that

7    she wanted to talk to you, we do have that e-mail in

8    evidence.  Did you ever talk to her?

9        A.   I don't think I did.  I think she ended up taking

10   the stand and I asked her questions while she was on the

11   stand at a hearing, and so I never met with her

12   privately.

13       Q.   Would that be the *Dertinger* hearing in 2017, June

14   2017?

15       A.   Right.  Right.

16       Q.   Your first discovery order went out October the

17   25th after your appointment on the 11th.  Right?

18       A.   That sounds right.

19       Q.   And in that you asked-- you told the USAO that

20   they shall identify and preserve all information and

21   sources of information relevant to the applicable part

22   of your appointment order.  Correct?

23       A.   That sounds correct.

24       Q.   Okay.  What happened with that discovery request

25   or order?  Did you ever get the computers-- you wanted a

1  forensic examination of the computers of several people,

2  did you ever get that, an imaging, forensic imaging?

3      A.   I don't-- I don't recall-- the answer is no, we

4  never got a forensic examination.  I'm not sure that we

5  ever actually decided-- that I ever decided to pursue

6  that because it would be extremely expensive.  I'm not

7  sure that it was going to be worth it.  The United

8  States Attorney's Office at that point was paying for

9  everything, and I was trying to not incur charges I

10  didn't need to.

11     Q.   So you issued the order, but then they talked you

12  out of it; is that right?

13     A.   Well, no.  I mean, I-- you'd have to show me the

14  exact language you're talking about.  The order that I

15  recall putting on was a directive for them to preserve,

16  not-- I think at that time it was not to produce, but to

17  preserve evidence.  And it-- it was kind of a belt and

18  suspenders.  I thought that the judge had already done

19  that as well.  And, frankly, my understanding of how

20  litigation holds work is that the obligation had arisen

21  of its own force.  But those were-- I was trying to be

22  careful and make sure that they-- that they made sure

23  that nothing disappeared.

24     Q.   Did you-- did you first learn there was a

25  litigation hold coordinator on November 22nd when Emily

1    Metzger sent you an e-mail that introduced herself?

2        A.   Yes.

3        Q.   Did you almost immediately start working with her

4    on the-- first on the lit hold, the December 19th lit

5    hold?

6        A.   Yeah.  I mean, I don't think of it as working on

7    the lit hold, I thought of it-- I thought the lit hold

8    had been put on by virtue of my order and that we were

9    now getting more specific to make sure that everybody in

10   the office knew exactly what they were supposed to do.

11       Q.   Did Ms. Metzger ever tell you that there was, in

12   fact, a form lit hold notice that she was required to

13   send out by the U.S. Attorney's procedures manual and

14   had not sent it out by December the 19th?

15       A.   I didn't know anything about that form until

16   today.

17       Q.   And to your knowledge, is that-- is that because

18   Drive 7 that was provided in discovery produced one

19   copy?

20       A.   Right.  I didn't know that there was such a form

21   or that she had filled out a form.  And apparently it

22   was only because it was produced in discovery recently

23   that we know that today.

24       Q.   So she indicated that she had communicated with

25   you about what results she got on the-- on the

1    December 19th lit hold.  Did she ever give you any

2    information other than that there were-- the names of

3    some people who had responded they probably had

4    something?

5        A.   I don't recall ever learning anything else, no.

6        Q.   You knew in the beginning that there were three

7    people you wanted to talk to.  Right?

8        A.   Correct.

9        Q.   And you told them-- you repeatedly asked Barnett

10   and Beall for access to them?

11       A.   So my thinking at the time, and I'm not sure in

12   retrospect that this was wise, although it did

13   ultimately work, was that I was not going to direct

14   anybody to talk to me, I wasn't going to subpoena

15   anybody to talk to me.  That I wanted to let the message

16   out that if anybody wanted to talk to me, they could

17   talk to me and that I would receive any information they

18   had.

19            And my hope was that people would volunteer,

20   whether formally or informally.  And, in fact, that did

21   lead to my receiving phone calls from Assistant United

22   States Attorneys to tell me what they knew.  And it was

23   my hope, again, as I said, that Erin Tomasic would be

24   one of those persons, because it seemed obvious to me

25   that she should.

1          And I said I-- I tried very hard to let it be

2     known, everybody I spoke to, whether on the defense, on

3     the government or former United States Attorneys, I told

4     everybody I could in this town if anybody needs to talk

5     to me, they should call me.

6          Erin Tomasic eventually did pick up the phone

7     about the time-- I think it was right after I spoke with

8     Pauletta Boyd.  And I believe what happened was that,

9     despite my having told Mr. Beall and Ms. Barnett

10    explicitly that they should let Tomasic know she could

11    call me, that it wasn't until I told that to Boyd, who

12    then told it to Tomasic, that Tomasic finally called me.

13    Q.   And, in fact, you hadn't been allowed to talk to

14    Pauletta Boyd either between October and February.

15    Correct?

16    A.   I'm not certain whether I wasn't allowed to, but

17    it didn't occur.

18    Q.   Did-- so Emily Metzger gave you a list of people

19    who informed her from the December 19th lit hold that

20    they had stuff, they had things.  And that's all they

21    told her, right, according to her testimony today?

22    A.   I apologize.  My attention wandered and I did not

23    hear your question.  Can you ask it again?

24    Q.   When-- the December 19th lit hold.  You received

25    from Emily Metzger, according to her testimony today, a

1    list of people that had told her that they thought they

2    had things, and that's all?

3        A.   Right.  We had-- she and I and I think others had

4    talked about those persons against-- whose repositories

5    should be searched using the search terms that we were

6    negotiating.  And we-- I think I got from Deb Barnett

7    actually, and I-- I think that this was pursuant to a

8    kind of off-the-record conversation where she said she

9    would help me out.

10        She gave me a list.  It wasn't a full personnel

11   list of the office, but it was a list of people in the

12   office that I would want to know about.  And using that

13   list, I identified folks that it seemed to me that the

14   search terms should be run against.  And so that was in

15   the beginning.

16        Later Emily Metzger gave me the list.  And so

17   those two lists were kind of both in play as far as I

18   was concerned.

19       Q.   When you told them that you wanted to talk to

20   people, it took a long time for you to be able to get to

21   speak with those people.  Correct?

22       A.   (Nods head up and down).

23       Q.   Now, they've given you a list of people who have

24   told them that they have information-- or they may have

25   information that would be responsive to the needs of

1   your investigation.  By that time, did you have any

2   expectation that Beall or Barnett was going to set up

3   interviews for you with any of their employees?

4       A.  You know, I was pursuing different aspects of my

5   investigation kind of in parallel, including visiting

6   Leavenworth many times to understand how the systems

7   worked there, working with Securus to get phone calls,

8   all kinds of stuff.

9           And I don't remember exactly what my thinking was

10  except that at some point I was going to talk to

11  everybody I needed to talk to.  If it came down to my

12  demanding it via subpoena or otherwise, then I would.

13  It continued to be my hope that I, first of all, would

14  receive documents so that I could understand what it was

15  I needed to talk to those folks about.  And second of

16  all, that people would call me voluntarily, which by the

17  way, I should add has happened as recently as yesterday.

18      Q.  If you had had the-- excuse me, the form that you

19  were shown today, which is the May 2017 litigation hold

20  that's the official one for the-- for the United States

21  Attorney's Offices, that included all those repositories

22  with checkmarks as to where-- as to which individuals

23  had which things, would that have helped you in your--

24  in your investigation?

25      A.  So I have to answer this this way:  It was my

1    understanding and belief that the search terms that we

2    were negotiating, excuse me, would be applied to all

3    relevant collections of documents in the United States

4    Attorney's Office.  And I don't believe that I ever

5    understood or knew that the syntax that we worked on

6    would work only in the ProofPoint e-mail system.

7         But, frankly, it's irrelevant to me because the

8    search terms that we created in a given syntax might

9    only be-- might only work on the e-mail repository, but

10   so you change the syntax and use the same terms in other

11   repositories.

12        And, in fact, that's exactly what ended up

13   happening when I asked the United States Marshals

14   Service to take those same terms and apply them and

15   search for documents, which they did, and within a month

16   or two produced them.  Same thing with KBI; they took

17   those documents-- excuse me, those search terms, had to

18   change the syntax, ran the search terms against their

19   repositories, produced documents in a relatively short

20   period of time, including privilege review.

21        So it was always my understanding that the terms

22   that we were negotiating would be used against all

23   relevant documents in the United States Attorney's

24   Office.  I didn't care really that they might've called

25   those an e-mail repository, and an old document

1   repository and a discovery drive repository, didn't
2   matter to me.  The point was that the search terms would
3   be run against all relevant repositories.  That was
4   always my understanding.
5       Q.  But instead, the search terms-- or any search
6   terms were run only against Tomasic's ProofPoint e-mail
7   archive.  Correct?
8       A.  That's what I understand.
9       Q.  In June of 2017-- and you didn't receive it-- we
10  didn't receive it until September the 30th.  And to your
11  knowledge, although they said they cooperated with you
12  and were willing to get information for you, they didn't
13  do the simple-- the simple task of running the search
14  terms through the other repositories; is that right your
15  understanding?
16      A.  I don't know if they did or not.  I do know that
17  they did run it finally apparently against the Tomasic
18  ProofPoint repository and produced documents.
19      Q.  And have you had any other documents produced
20  besides that?
21      A.  I don't believe so, although you would know
22  better than I.
23      Q.  I'm going to give you a laundry list of things
24  that according to these witnesses happened.  They
25  indicated there was a request for the recusal on October

1    the 12th, 2016.  It's your testimony that they never

2    mentioned that to you until June of-- of 2017?

3         A.   That is correct.

4         Q.   They told-- they said that they intended--

5    they've admitted that they intended to terminate Phase

6    III with a motion and then-- and in so doing then they

7    delayed the production.  That was the testimony today,

8    wasn't it, to your understanding?

9         A.   Yeah.  I mean, I-- I don't hold it against them

10   that they tried to assert that-- their rights in that

11   matter.  It's a due process issue.

12        Q.   And they did a lit hold that produced nothing

13   except a list of names and took 60 days to do it; is

14   that right?

15        A.   Again, my understanding and impression was that

16   the litigation hold should've occurred immediately and

17   that we were now only working on refining it to make

18   sure that-- again, kind of a belt and suspenders, as I

19   mentioned.

20        Q.   And you learned today that that was not true?

21        A.   Well, I--

22        Q.   There was no litigation hold until December the--

23        A.   I think that's right.  I'm not entirely sure what

24   Emily said, but it sounded like she did not, in fact,

25   instruct everybody in the office to preserve documents

1    as soon as I thought she should have.

2        Q.   And when you named only three individuals out of

3    all this office that you wanted to talk to, they took

4    from October 11th to February the 1st to get you an

5    interview with any-- with either Boyd or Tomasic?

6        A.   To be fair, I didn't demand an interview, but it

7    didn't happen until then.

8        Q.   And they failed to tell you about the May 17th

9    lit hold which would've identified for you who had-- who

10   had documents and where they had them?

11       A.   Correct.

12       Q.   And that's-- since you're investigating the

13   office, that would've been helpful to you?

14       A.   Yes.

15       Q.   Do all those things suggest to you the extent to

16   which the office cooperated with you when it came down

17   to the possibility of inculpating their own employees,

18   other than Tomasic?

19       A.   I think that I would summarize it by saying that

20   there was-- that I was told things that weren't true and

21   that there was a lack of transparency.  And had those

22   things not occurred, that is to say, if there had been

23   more transparency and I had been told what they were and

24   were not willing to do, my investigation would've gone

25   forward in a very different way.

1    Q.  Is it your impression then that they slowed

2  down--

3    A.  That's what happened, yes.

4    Q.  They slow-walked the investigation to the extent

5  of their ability?

6    A.  I don't know what their motivations were, but

7  that's what happened.

8    Q.  Do you have any-- have I missed asking you some

9  questions you'd like to answer?

10    A.  My very first meeting-- the very first thing I

11  did after I was appointed was to call United States

12  Attorney Grissom, who, of course, had just recently left

13  office.  And he advised me that I should call Mr. Beall.

14  And so I made arrangements the very first time I came

15  into Kansas City to meet with Mr. Beall, and I sat with

16  him for a good hour, maybe-- maybe not quite that long,

17  but it was a lengthy period of time, at least a half an

18  hour.

19        And I told him that I thought this was an

20  opportunity for things to get fixed that were wrong and

21  that because I was from out of town, I was perfectly

22  happy being the bad guy.  He could blame everything on

23  me and he could be the hero as far as I was concerned,

24  but let's get it fixed.

25        I think there are problems in your office, let's

1    fix them.  Let me do that, let me help you.  I'm hearing

2    stories that, if half of them are true, something is

3    very wrong.  That has proved correct.

4         And unfortunately, that's not what happened in

5    this investigation.  I wasn't allowed to help the way I

6    wanted to.  I wasn't given the tools to, as I called it,

7    burn the cancer out.  And it's a sad state of affairs

8    that it's two years later and I'm not sure that the

9    problem is yet fixed.

10              MS. VANBEBBER:  Thank you.

11                   CROSS EXAMINATION

12   BY MS. BRANNON:

13        Q.  Mr. Cohen, in December of 2016 did you believe

14   the government was still cooperating with you?

15        A.  December of 2016?

16        Q.  Uh-huh.

17        A.  Yes.

18        Q.  And at that time did you think perhaps your

19   investigation would wrap up by February of 2017?

20        A.  I was optimistic, yes.

21        Q.  Do you remember telling me that?

22        A.  I do.

23        Q.  Okay.  And in February of 2017, it didn't wrap

24   up.  Right?

25        A.  No.

1    Q.   But you were still optimistic that it would not

2    take long?

3    A.   I continued to believe that the negotiation of

4    the search terms would eventually lead to the production

5    of documents and that it was going to take longer.

6    Surprise, things take longer than you think they will.

7    But yes, that-- that my investigation would continue and

8    that I would be able to discover things and figure out

9    what to do about it.

10   Q.   Because at that point you believed the government

11   was still cooperating and acting in good faith?

12   A.   Correct.

13   Q.   And you relayed that information to me?

14   A.   I remember we bumped into each other at the Legal

15   Revitalization Conference here in Kansas and you asked

16   me the extent to which you thought you should pursue

17   things, and I said to you that I believe that my

18   investigation is working and I can't tell you what to

19   do, but I don't want your actions to work across

20   purposes.  And I left it at that.

21   Q.   And there was nothing that-- that you suggested

22   to me that would cause me not to rely on your

23   estimation?

24   A.   I'm not sure what you're asking, but I don't

25   think so.

1    Q.   There was nothing you told me that suggested I

2    shouldn't rely on your estimated timeline?

3    A.   I certainly believed myself in what I then

4    believed.

5    Q.   But your suggestion was that perhaps I should

6    defer to your investigation, rather than pursuing an

7    independent course for the time being?

8    A.   I-- I guess that's fair.

9    Q.   Okay.  Why did you issue an order for production

10   in December of 2017?

11   A.   I'd have to see it to be certain that I answer

12   your question correctly.

13   Q.   All right.  Do you remember issuing an actual

14   subpoena *duces tecum* and an order for production in

15   December of 2017?

16   A.   In 2017?

17   Q.   2017.

18   A.   I think that was in anticipation of this hearing.

19   Q.   And what--

20         THE COURT:  There was a hearing set

21   January 2018.  This hearing was actually initially set

22   January 2018.

23         THE WITNESS:  Look, at that point it was

24   pretty clear.  Once I received the letter from Mr.

25   Clymer, it was clear that many of my assumptions were

1   incorrect and that the only way I was going to get the

2   discovery that I had hoped I would receive voluntarily

3   was to force it, that is to say, via subpoena and so on.

4   BY MS. BRANNON:

5      Q.  So by that time, you understood that you weren't

6   going to get these documents or this information

7   voluntarily from the U.S. Attorney's Office and, from

8   your point of view, they weren't cooperating.

9          Did you have any information about whether the

10  U.S. Attorney's Office interfered with cooperation of

11  other agencies?

12     A.  I guess I have to answer that this way.  So as I

13  mentioned, I-- as I wrote in a report shortly after Mr.

14  Clymer sent me his letter, because it had become clear

15  that I was not going to get documents voluntarily out of

16  the United States Attorney's Office or other agencies, I

17  sent requests for production to Kansas Bureau of

18  Investigation, the United States Marshals Service and

19  the United States Secret Service.

20         And the United States Secret Service, after I had

21  negotiated-- been negotiating with them for several

22  months, contacted me and said, we're not sure we're

23  going to produce documents after all using the search

24  terms that we agreed to use, the same ones that had been

25  negotiated with the United States Attorney's Office,

1    because we've seen Mr. Clymer's letter and we think that

2    that logic might apply and that we also should not

3    produce documents.

4         So I-- I'm not sure I would phrase it the same

5    way you did, but the effect of Mr. Clymer's letter was

6    to cause at least some concern within the United States

7    Secret Service.

8    Q.   Did the Secret Service eventually cooperate with

9    your request?

10   A.   I-- I believe they did, yes.

11   Q.   You talked some about your dealings with Deb

12   Barnett.  And at some point you saw an e-mail or there's

13   an e-mail in evidence where Erin Tomasic indicates that

14   she was directed by Scott Rask or by Deb Barnett not to

15   contact you and not to cooperate with you.  Do you

16   remember that exhibit?

17   A.   I do.

18   Q.   Did that come as a surprise to you?

19   A.   It came as a-- it's hard to understate-- excuse

20   me, hard to overstate how surprised I was to see that

21   document.

22   Q.   Why?

23   A.   Because it was antithetical to what I believed

24   Deb Barnett was doing, which was helping me, and

25   antithetical to what I had told her, asked her to do on

1    my behalf and she said she would do.

2        Q.   And in your investigation, did you ever figure

3    out why Deb Barnett issued that order to Erin Tomasic?

4        A.   I guess the short answer is no.  I don't know why

5    she did that.

6        Q.   Do you have a theory?

7        A.   Well, it seems to me it had to have been one of

8    two things.  She was protecting the office or protecting

9    herself, but I-- I don't know.

10       Q.   Where did you first see that e-mail?

11       A.   I mean, for example--

12       Q.   Go ahead.

13       A.   I'm sorry, it just occurs to me.  So Ms. Tomasic

14   has testified, and I think there is other evidence

15   supporting her testimony, that she went into the judge's

16   chambers with the blessing and perhaps even direction of

17   Ms. Barnett.  And so one reason that Ms. Barnett perhaps

18   didn't want me to talk to Ms. Tomasic is because it

19   would've revealed her own role and that it wasn't Ms.

20   Tomasic, it was Deb Barnett.  So that's one possibility.

21   There are probably others.

22       Q.   When was the first time you saw that e-mail?

23       A.   I don't remember the date.  I could figure it out

24   if I went back to my calendar and-- and my billing

25   records, but it was when Ms. Tomasic produced to me

1  several notebooks of documents that she had kept from

2  her time with the United States Attorney's Office after

3  she was let go.

4      Q.  And that included e-mails, memos, what else?

5      A.  She provided me with a number of notebooks, which

6  included internal e-mails, memos, motions and draft

7  motions.  And I believe that there were also some OPR

8  complaints.

9      Q.  And you may have testified to this already, but

10  did Tom Beall tell you that there were OPR complaints

11  pending against Deb Barnett?

12      A.  I don't think so.  I learned that-- I-- so as I

13  proceeded with my investigation and spoke with literally

14  dozens of attorneys in the defense bar and who worked

15  for the government here in Kansas City, there was a lot

16  of scuttlebutt that I became aware of, which included

17  stories of relation-- stories of schisms within the

18  United States Attorney's Office and bad blood between

19  folks in the United States Attorney's Office and

20  complaints that had been filed by United States

21  Attorneys against other United States Attorneys within

22  the office and so on.

23          And I-- I don't believe that Mr. Beall ever said

24  anything about that, but I did-- I don't know, I don't

25  have a memory one way or the other.  But I did come to

1  learn, both formally and informally - when I say

2  informally, I mean through conversations I've had with

3  folks, by formally I mean actually seeing some of them -

4  that there were complaints filed by United States

5  Attorneys against other United States Attorneys.  There

6  were a variety of those.

7       Q.  Did Mr. Beall ever blame those sorts of conflicts

8  for his asking for-- to be recused in that letter of

9  recusal?

10      A.  I don't recall.

11      Q.  Okay.  And just to go back to our conversations

12  in December of 2016, February of 2017.  Do you remember

13  if you ever informed me or the defense that the

14  government had stopped cooperating?

15      A.  I believe I had not informed you of that, because

16  I don't think I came to believe that until later.

17      Q.  All right.  And if you know, do you know when the

18  defense would've learned that the government was no

19  longer cooperating or not cooperating with you in this

20  investigation?

21      A.  I think at the earliest when I issued my report

22  saying that I had received Mr. Clymer's letter.

23      Q.  All right.  Who was it that called you yesterday?

24      A.  He asked that I keep that confidential and I'd

25  prefer not to answer unless there's a reason to.

1      Q.  Sure.

2      A.  It was a special agent who had some information

3  with regard to Ms. Treadway.

4      Q.  Do you mind sharing what that information was,

5  without revealing a name?

6      A.  Well, it's obviously hearsay, but I'm willing to

7  tell you what-- a little bit about what I was told.  And

8  that was that the agent called me, he said that his

9  career had been virtually destroyed by Ms. Treadway,

10  that he had worked with her and she had directed him to

11  do things and done things herself that he believed were

12  not ethical.

13      And that when he challenged her, she took action

14  to try and ruin his career, get him *Giglio*-ed out is

15  what he said.  That he himself went to his own special

16  agent in charge and asked that it be investigated so

17  that his name could be cleared.

18      And he also recited several other examples of

19  what he believed to be unethical behavior by Ms.

20  Treadway and other folks who would know about those,

21  other agents who would know about what she did,

22  including things along the lines of directing agents not

23  to write written reports of interviews so that defense

24  counsel would not be able to obtain that information.

25      Q.  Was there anything in that conversation that led

1  you to believe that Mr. Beall would've known about these

2  complaints?

3     A.   I don't know about Mr. Beall.  The person I spoke

4  with did say that his special agent in charge had gone

5  to-- I'm sorry, suddenly lost the name, Mr.--

6     Q.   Grissom?

7     A.   Thank you.  The special agent in charge had gone

8  to Mr. Grissom and explained all of that to him and had

9  gotten nowhere.

10          MS. BRANNON:  All right.  Could I have just a

11  moment, Your Honor?  Thank you.

12                    CROSS EXAMINATION

13  BY MR. CLYMER:

14     Q.   Mr. Cohen, how long have you worked as a special

15  master?

16     A.   I believe my first appointment was in November of

17  1994.

18     Q.   And you've done that continuously since then?

19     A.   Yes.

20     Q.   In this case you've served a number of different

21  roles; is that correct?

22     A.   I agree.

23     Q.   You started as an investigator with-- as an arm

24  of the court to try to find out what was going on with

25  respect to CCA-Leavenworth and Securus regarding video

1    and audio-recordings.   Correct?

2        A.   That's one of the things I've done, yes.

3        Q.   And at some point, and perhaps I can take a

4    little bit of credit for this one, you became an

5    advocate and responded to some motions that I filed

6    regarding termination of-- of Phase III of the

7    investigation and regarding a motion to quash a

8    subpoena?

9        A.   Yes, I remember trying not to be an advocate and

10   trying to remain as neutral as I could, but I did have

11   to respond to your--

12       Q.   Yeah, and I didn't mean to use "advocate"

13   pejoratively, but perhaps we can't avoid that.

14       A.   Okay.

15       Q.   And in terms of-- you said you tried to remain

16   neutral.  I noticed today in your testimony you've tried

17   to be very careful to draw a line between conclusions

18   you're willing to reach and those you're not willing to

19   reach.  Is that safe to say?

20       A.   I'm being as careful as I can with my

21   recollections.

22       Q.   And you try to be fair?

23       A.   Absolutely.

24       Q.   And so, for example, in response to a question

25   about slow-walking, you're willing to say that the

1    actions of the United States in this case delayed your

2    investigation, but you're not willing to say there was

3    any deliberate effort to slow down your investigation

4    for the sake of doing so?

5        A.   I don't think that it's my job to reach that sort

6    of conclusion.  I can point to things that-- I can point

7    to the fact that it took a long time.  I can point to

8    the fact that the same search terms in the hands of the

9    United States Marshals Service resulted in documents in

10   my hands very quickly, but I'm unwilling to ascribe evil

11   motive.

12       Q.   And part of that is being fair, correct, you're

13   trying to be fair?

14       A.   I'm trying to be fair.  Again, I don't think it's

15   my job to do that.

16       Q.   In addition to being an investigator and an

17   advocate, you've also in a way become a party because

18   you're now represented by counsel in this matter; is

19   that right?

20       A.   I don't know that I'm a party as much as it-- it

21   seemed to me that it was optically better for someone

22   other than myself to be questioning United States

23   Attorneys.

24       Q.   And so you-- at the first hearing you questioned

25   some witnesses, at the second hearing you had-- where we

 1   had an evidentiary hearing, you had counsel represent

 2   you?

 3       A.   Right.  I backed off that role of doing

 4   questioning myself.

 5       Q.   But you couldn't help yourself and you had to do

 6   some questioning.  Right?

 7       A.   There were a couple that-- a couple witnesses

 8   where-- and I have to apologize publicly here to Ms.

 9   VanBebber, that I thought that I was the only one who

10   could ask the questions because of what's in my head

11   that she just didn't have.

12       Q.   That's a delusion a lot of trial lawyers share.

13       A.   Yes, I'm sure I think I'm better than I am.

14       Q.   And finally, you're here as a witness today?

15       A.   Indeed.

16       Q.   Have you ever served this range of roles in any

17   other case where you've been a special master?

18       A.   No.

19       Q.   Is this the first time you were a special master

20   in a case involving criminal prosecution?

21       A.   It is.

22       Q.   Would it be safe to say that, like the rest of

23   us, you've probably learned a lot during the course of

24   this investigation?

25       A.   I learned a lot and probably not enough.

1    Q.   Did you learn for the first time, for example,

2    that there's these things out there called the *Touhy*

3    regulations?

4    A.   I had heard of those, but I have become much more

5    intimately familiar with them in this case.

6    Q.   And will you start to drink to try to forget them

7    when this is over?

8    A.   No, I'm afraid that I probably need to remember

9    them.

10   Q.   And, in fact, when you first got involved in the

11   investigation and you tried to understand the lay of the

12   land, as you testified yourself, you thought there was a

13   cancer and you were willing to do what you could do

14   properly to help fix it; is that fair to say?

15   A.   In my role as a neutral, yes.

16   Q.   And you had a conversation with Deb Barnett at a

17   barbecue place that she later recounted in an e-mail

18   that's been admitted into evidence where she was telling

19   Mr. Beall what had happened at that meeting.  Correct?

20   A.   Yes.

21   Q.   Was that e-mail message that she-- where she

22   recounted your meeting, was that substantially accurate

23   in your mind?

24   A.   Honestly, I'd have to read it.  I don't remember

25   it well enough to be able to say right now that it was

1  accurate or not.

2      Q.   Do you remember looking at it and thinking, I've

3  got to correct the record on this, this is just wrong?

4      A.   I remember thinking that her impression, her--

5  her impression of our relationship wasn't exactly the

6  same as what mine was at that juncture.

7      Q.   Let me ask you a specific question, but I want us

8  both to be careful and not use any names in this part of

9  my question.

10         Do you remember telling her that based on the

11  investigation you had done to date, you had identified

12  some people in the office, the U.S. Attorney's Office,

13  who you would characterize as bad apples or problematic

14  and that you were willing to help do what was necessary

15  and be the, quote, bad guy in order to get those people

16  fired?

17      A.   I'm not sure I said it then, but I certainly said

18  it to her at some point.  And probably then.

19      Q.   Okay.  And at the time you said that, I take it

20  you said it because, from what you had learned, you

21  thought that that would improve things in this district,

22  to take out people who were, at least from what you had

23  learned, repeatedly problematic AUSAs that were

24  contributing to what you later describe as a culture of

25  distrust?

1     A.  And those who it hadn't even been repeated.  Just

2  if there were problem actors that we needed to-- that I

3  would help as much as I could.

4     Q.  To get them out of the district?

5     A.  To-- I don't know what the cure was.  If the cure

6  was to get them out of the district, if the cure was to

7  retrain them, whatever it was, whatever was necessary, I

8  was willing to help the United States Attorney's Office

9  do that so that it could identify the issues, identify

10  the people, identify the problems, and take whatever the

11  appropriate action was to get that fixed.

12     Q.  Did you remember-- do you recall telling Ms.

13  Barnett, either in that conversation or in a later

14  conversation, that one of the things you'd help do is

15  get them fired?

16     A.  I don't recall saying that, but if-- if that was

17  what it took to cure the problem, then I would do that.

18  I would-- I would do whatever I could to help her get

19  them fired.

20     Q.  Did you have any idea at that time how

21  administratively challenging it is--

22     A.  None.

23     Q.  -- to get a-- let me finish the question first.

24  To get an Assistant U.S. Attorney fired?

25     A.  Actually, I-- I didn't.  I very quickly-- in

1   fact, it might've been in my conversation with Deb

2   Barnett, I very quickly learned that you don't just fire

3   somebody in the United States Attorney's Office.

4       Q.  And I take it that in your past practice doing

5   work as a special master in civil cases when you're

6   dealing with private organizations, there's a lot of

7   more freedom of movement of the principals than there is

8   in, say, the United States Attorney's Office?

9       A.  I mean, this issue has never come up before or

10  anything analogous in any other matter that I've ever

11  been a special master on.  But I mean, through my own

12  experience as an employee before I was a lawyer and even

13  while I was a lawyer in private practice for a very

14  brief period of time, I understand that it's easier to

15  fire somebody if they're not an Assistant United States

16  Attorney.

17      Q.  Do you remember the testimony of Mr. Warner, the

18  former First Assistant who sat here in Kansas City?

19      A.  Vaguely, yes.

20      Q.  Do you remember him claiming that even though he

21  knew there were all sorts of problems, there was nothing

22  that he could do to change anything?

23      A.  I believe that he said there was nothing he can

24  do without the support of his United States Attorney,

25  yes.

16-20032  USA v. Karl Carter (Black) REDACTED  11.16.18    2775

1        Q.   Do you recall-- strike that.

2             Would it be safe to say you learned for the first

3    time during the course of this litigation that a United

4    States Attorney may have to go back to Main Justice to

5    get approval for things that he wanted to do?

6        A.   Yeah, I guess I would have no reason to know or

7    not know that before this case.

8        Q.   And as you know now, for example, Mr. Beall could

9    not make decisions on his own about a lot of the

10   disclosures that you were requesting him to make?

11       A.   That may be, but I was never told that.

12       Q.   Okay.  And would it be safe to say that when you

13   were doing your investigation, you had a whole set of

14   concerns about what you had to get done to get your

15   investigation done?

16       A.   I'm sorry, can you say that again?

17       Q.   Would it be safe to say that during your

18   investigation, you had a whole set of concerns about

19   things that needed to be done for you to complete your

20   investigation properly?

21       A.   I mean, as a-- as a generic broad statement, I

22   can only say that that is true.

23       Q.   Okay.  You had to hire Mr. Smiley, for example.

24   Correct?

25       A.   Yes.

1      Q.   You had to arrange interviews with people.

2    Correct?

3      A.   Correct.

4      Q.   You had to get over to CCA-Leavenworth and see

5    whatever they had over there.  Is it-- are you cognizant

6    now after doing the investigation that the U.S.

7    Attorney's Office may have had a whole different set of

8    concerns from its perspective, being involved not only

9    with your investigation but with litigation with the

10   Federal Public Defender in this case, plus an underlying

11   criminal case to handle?

12     A.   Well, certainly the concerns that I had and have

13   as I was pursuing my investigation and the concerns that

14   the United States Attorney's Office had as it was

15   dealing with my investigation as well as the underlying

16   criminal case were different concerns.

17     Q.   Fair enough.  And would it be safe to say that

18   you didn't feel obligated to share all of your concerns

19   with Tom Beall when you talked to him?

20     A.   It would be fair to say that, with the caveat

21   that it is equally true that I felt obligated not to

22   hide what I was doing from Mr. Beall.

23     Q.   Fair enough.  And from your perspective right

24   now, you have learned during the course of this

25   prolonged evidentiary hearing about concerns the U.S.

1   Attorney's Office may have had that you didn't know when

2   you were talking to Mr. Beall; is that safe to say?

3       A.   It's hard for me to say yes without your being

4   more precise, but again--

5       Q.   Sure.  I'll try to be more specific.  Would it be

6   safe to say that when you got the letter from me where I

7   laid out a bunch of factors for reasons why the

8   Department may be concerned about disclosing the

9   information you were asking for, that Mr. Beall hadn't

10  raised a lot of those things with you?

11      A.   Not only had he raised none of those concerns as

12  far as I know, as far as I recall, but the concerns he

13  had raised suggested that the concerns you raised

14  weren't concerns he had.

15      Q.   But you're not willing to ascribe bad faith to

16  him, you simply know that he didn't raise those

17  concerns?

18      A.   Again, I think it's not my role to determine

19  motivation.

20      Q.   Fair enough.  And it certainly is true, is it

21  not, that the U.S. Attorney did provide you with some

22  information?

23      A.   Sure.

24      Q.   Turned over the taint policy.  Correct?

25      A.   They did.

1      Q.   And you knew that Mr. Beall had to go back to

2   Main Justice to get approval or authorization before he

3   could do that.  Right?

4      A.   So I just want to make sure we're talking about

5   the same thing.  When you say taint policy--

6      Q.   The new taint policy, the one that he drafted

7   after this litigation.

8      A.   Correct.  He contacted me and said, this is

9   something we're adopting and I'd like to share this with

10  you.  And I actually don't know that he had to or--

11  whether he had to go back to DOJ Main Justice to-- to

12  give that to me.  It may be true, I just don't recall.

13     Q.   Okay.  I'm going to show you, and try to refresh

14  your recollection, what's been marked as Defense

15  Exhibit 655.  I'm going to show you the third page and

16  just ask you to read the top part to yourself and see if

17  this refreshes your memory on that topic.  Take a look

18  right there.

19     A.   I've read it.

20     Q.   So does that refresh your memory about whether

21  Mr. Beall was open about having to go back to Main

22  Justice to get approval to-- to disclose that policy to

23  you?

24     A.   Yeah, I-- I'm sure when I read that it didn't

25  occur to me that he had to before he could give it to

1   me, but it certainly does say that he went to Main

2   Justice to consult before he gave it to me.

3       Q.   And he apparently-- he actually did communicate

4   that to you?

5       A.   Correct.

6       Q.   I'm going to come and take that away so it's not

7   in front of you.

8           Now, you mentioned the request that the United

9   States Attorney's Office here submitted to Main Justice

10  for-- with a request for recusal, and you talked about

11  it as if that happened.

12          Are you aware that there is no recusal in this

13  case?  And if you're not, that's the-- I'm not asking

14  you to explain it, I'm just asking you--

15      A.   So there are different recusal possibilities.

16  I'm certainly aware that counsel didn't recuse from the

17  *Black* case itself.  It seems to me that the people I

18  worked with initially have recused themselves from

19  working with me on the investigation.  But if-- if the

20  term "recusal" as I just used it is inaccurate, then I--

21      Q.   Yeah, and I guess that-- maybe that's an example

22  of you not knowing the way the Department of Justice

23  works because this is your first experience; is that

24  fair to say?

25      A.   I'm sure I don't know how they work even after

1    this experience.

2       Q.   And certainly that's just an example perhaps of

3    something that happens to all of us, sometimes we make

4    honest mistakes.   Right?

5       A.   I'm not certain what mistake you think I made,

6    but I'm-- I'm willing to say that I've made an honest

7    mistake if I made one.

8       Q.   Well, you testified that the U.S. Attorney's

9    Office is recused, and you were just mistaken about

10   that.   No bad intentions, it's a mistake?

11      A.   Yeah, I mean, I-- I think I'm-- I was adopting a

12   term that was used by some of the United States

13   Attorneys.

14      Q.   Would it be safe to say that there is no written

15   request from you before February of 2017 to interview

16   Erin Tomasic?

17      A.   Yes.

18      Q.   Would it be also safe to say that what you did

19   was made aware to Tom Beall and others, as you recall

20   it, that you would like to interview her, but you never

21   made a specific request of, "I want to interview Erin

22   Tomasic"?

23      A.   No, I think that's not true.

24      Q.   Okay.   Can you describe it?

25      A.   So I told Mr. Beall and Ms. Barnett and others

1    that I wanted to meet with and interview Ms. Tomasic,

2    but that I wasn't going to direct her to do it, that I

3    wasn't going to demand it formally.  And that they

4    should convey to Ms. Tomasic-- and I think also Ms. Boyd

5    and Ms. Flannigan, but it was primarily Ms. Tomasic whom

6    I wanted to talk to, they should please convey to Ms.

7    Tomasic I would like to talk to her.

8           When I didn't get any response after having said

9    that to Mr. Beall and Ms. Barnett, who had promised

10   cooperation and that they would work with me as best

11   they could, I assumed that Ms. Tomasic didn't want to.

12   And I was going to play the waiting game and wait for

13   her to come to me, which eventually finally worked.  It

14   took a lot longer than I thought.  So that's how that

15   worked.

16     Q.   And you also wanted to interview Ms. Flannigan

17   and Ms. Boyd; is that right?

18     A.   Correct.

19     Q.   But ultimately, you ended up not doing an

20   interview with Ms. Flannigan but simply questioned her

21   when she testified?

22     A.   That's correct.  I didn't need to do the

23   interview after I was given an opportunity to ask her

24   questions under oath.

25           MR. CLYMER:  May I have one moment, Your

1    Honor?

2              THE COURT:  Yes.

3              MR. CLYMER:  Thank you, Mr. Cohen.  Nothing

4    further, Your Honor.

5              THE WITNESS:  Thank you.

6              THE COURT:  Anything further?

7              MS. VANBEBBER:  No.

8              MS. BRANNON:  No, Your Honor.  Thank you.

9              THE COURT:  All right.  You may step down.

10             THE WITNESS:  Thank you, all.

11             THE COURT:  Any other witnesses, Ms.

12   VanBebber?

13             MS. VANBEBBER:  No, Your Honor, I have no

14   other witnesses.

15             THE COURT:  Ms. Brannon?

16             MS. BRANNON:  Your Honor, we have no

17   witnesses, but we have a couple of exhibits to take care

18   of.

19             THE COURT:  Okay.

20             MS. BRANNON:  And, again, these were attached

21   to our motion to admit.  I believe 706 has been

22   admitted, but we would ask to admit 707 and 708.  709 we

23   have basically a replacement exhibit because we left off

24   the last page.  So we provided that to the government

25   and we'll provide that to the Court as well.  And then

 1    710 through 714 we would move for admission.

 2              THE COURT:  And those are all in your motion

 3    to admit?

 4              MS. BRANNON:  Yes.

 5              THE COURT:  Any objection?

 6              MR. CLYMER:  No, Your Honor.

 7              THE COURT:  All right.  The motion to admit

 8    exhibits is-- is granted, so Exhibits 706 through 714

 9    are admitted.  Note that 709 is-- you've submitted a

10    replacement that has an additional page.  So those are

11    all admitted.

12         All right.  Mr. Clymer, do you have any evidence?

13              MR. CLYMER:  Your Honor, Ms. Brannon used

14    Government Exhibit 45 to question a witness.  And

15    unbeknownst to her, because she hadn't gotten the

16    document yet, there was more e-mail traffic related to

17    that.  And I-- the Court may recall I asked for

18    permission to interrupt her examination and I let her

19    know that.

20         I've got the full document now, I want to give

21    her a copy and I'm going to give a copy to counsel for

22    the Special Master.  And it's essentially e-mail traffic

23    regarding-- from Mr. Slinkard and his colleagues

24    regarding tasking people in his office to collect

25    documents responsive to the Special Master's subpoena

1  *duces tecum* and provide them.  And I'm going to ask that

2  it be marked as Exhibit 46 and I'll move it into

3  evidence.

4            MS. BRANNON:  Judge, it's 11 pages and I

5  haven't seen this before, we would ask to be given a

6  chance at least to read through it.

7            MR. CLYMER:  No objection.

8            MS. BRANNON:  If we have any objections,

9  perhaps we could notify the Court later.

10           THE COURT:  All right.  I'll conditionally--

11  I'll conditionally admit Exhibit 46 subject to objection

12  after review.

13           MS. BRANNON:  Judge, I also missed

14  Exhibit 705, which was attached to our earlier-- or what

15  we filed.

16           THE COURT:  All right.  Exhibit 705 admitted.

17       Mr. Clymer, did you have any other exhibits or

18  evidence?

19           MR. CLYMER:  No, Your Honor.

20           THE COURT:  Okay.

21           MR. CLYMER:  Well, actually, Your Honor, just

22  so that-- to make the record complete since Mr.

23  Slinkard's e-mail traffic refers to the subpoena *duces*

24  *tecum*, I'm going to move Exhibit 44-- Government Exhibit

25  44, which is the subpoena itself, into evidence just so

1    it's in the record.

2             THE COURT:  All right.  Exhibit 44 is the

3    Special Master's subpoena *duces tecum.*  The most current

4    one.  Correct?

5             MR. CLYMER:  That's correct, Your Honor, the

6    one from August.

7             THE COURT:  All right.  Exhibit 44 admitted.

8        Okay.  I have a few questions.  I intend to issue

9    a written order after today specific to some production

10   issues.  But when we adjourned the hearing in October,

11   there was still an open question as to whether the

12   government had completed its production of discovery

13   under the subpoena *duces tecum* that continued to roll in

14   throughout the two-week hearing.  So is it complete or

15   not at this point?

16             MR. SLINKARD:  Your Honor, and I don't recall

17   exactly what was in the record in October, so I don't

18   want to-- if I'm repeating myself, stop me.  But in that

19   e-mail that was just admitted, which was the-- the main

20   body of instructions that were given to people to be

21   collecting and submitting for-- for review in response

22   to the subpoena *duces tecum.*

23        On August 11th, 2018, during the hearing at

24   2:01 p.m., I think while the hearing was going on, I

25   sent to everyone who was involved in that an e-mail

 1    requesting positive responses by 5:00 p.m. that day if

 2    they had anything that they had not yet submitted for

 3    review.

 4         I received no positive responses to that except

 5    from the attorneys who were reviewing Ms. Tomasic's

 6    e-mail archives.  And if you'll recall, I believe it--

 7    at approximately that same time in the October hearing,

 8    I raised the issue of we had produced the file that was

 9    created, the file Mr. Steeby testified about this

10    morning that was the result of running the search terms

11    against Ms. Tomasic's e-mail in full, unreviewed to

12    counsel and the parties.

13         And so I asked the question of whether or not

14    that satisfied the Special Master's request with respect

15    to Ms. Tomasic or if I needed those people to continue

16    to do that.  I believe his response at the time was he

17    wanted a chance to review that, and we haven't heard.

18    So that piece would be the only thing I'm aware of

19    that's undone.

20              THE COURT:  Okay.  So we're talking Thumb

21    Drive 5.  The only thing that was Thumb Drive 5, the

22    only thing you produced was Erin Tomasic's repository,

23    the results of the search--

24              MR. SLINKARD:  Right.

25              THE COURT:  -- for the terms that had been

 1   agreed to.  And so what are you needing to hear back

 2   from Mr. Cohen on?  I'm not clear on that.

 3          MR. SLINKARD:  In response to the subpoena--

 4   to the specific requests or specific demands of the

 5   subpoena, we had-- we gained-- got people access to Ms.

 6   Tomasic's e-mail archive and directed them to do

 7   targeted review to identify any documents that were

 8   responsive to the specific subpoena demands of the

 9   Special Master.

10          When it became apparent that reviewing someone

11   else's e-mail archive was not something they could do

12   with great speed, the determination was made to turn

13   over what resulted in Thumb Drive 5, the earlier search

14   that had been run using the Special Master's terms.

15          So the question that we posed at the end of the

16   hearing last time was:  With that production of Erin

17   Tomasic, was the Special Master satisfied, having

18   received that with his terms run, or did he want to

19   continue-- for me to continue to have people reviewing

20   her overall e-mail archive with respect to the specific

21   subpoena demands.  And he indicated at that time-- my

22   recollection is he indicated he did not know, that he

23   would let us know.  So we haven't had further

24   conversation on that point.  That would be the only

25   issue I'm aware of.

1          THE COURT:  All right.  Mr. Cohen?  And just

2     so I'm clear, when you say you need to have a response

3     as to whether Mr. Cohen wanted this group of neutral

4     reviewers to continue to go through her e-mail archive,

5     is that the archive as limited by the search terms or

6     the entire--

7          MR. SLINKARD:  No, that is-- that is whatever

8     is available of her prior e-mails while a Special

9     Assistant-- assigned as a Special Assistant USA.

10          THE COURT:  Okay.  Got it.  Mr. Cohen, did

11     you have a response to that?

12          SPECIAL MASTER COHEN:  Judge, if I understand

13     Mr. Slinkard correctly, there is really nothing more to

14     produce in connection with Ms. Tomasic's repositories,

15     wherever they are.  It sounds like you went through her

16     e-mail repository, and perhaps there are no other

17     repositories, and everything having to do with Ms.

18     Tomasic has been produced.  That's what I understand.

19          MR. SLINKARD:  I want to-- I want to take

20     some issue with that characterization.  The search

21     terms-- and-- and my understanding of the testimony is

22     it's somewhat disputed that they were ever finally

23     agreed, but regardless, the search terms that were run

24     against Ms. Tomasic's e-mail resulted in the

25     tomasicblack7_0 file.  That has been produced in toto

1    and was not reviewed for purposes of privilege, *Touhy* or

2    anything else out of a desire to get it in your hands.

3        We had directed people prior to doing that after

4    receiving your August subpoena to go through her entire

5    e-mail archive looking for responsive documents.  I

6    don't warrant-- I mean, I guess in my mind it comes down

7    to your confidence in your search terms.

8        If-- if you are comfortable that your search

9    terms and the result of that search satisfies you, we're

10   obviously very pleased with that, but we didn't ever

11   have any-- because it was taking so long, we did not

12   have anyone complete reviewing the entirety of her

13   e-mail archive with respect to the subpoena requests.

14       SPECIAL MASTER COHEN:  So, Judge, here are my

15   concerns.  I think that I'm probably satisfied with the

16   United States Attorney's Office search using my search

17   terms of Ms. Tomasic's custodial e-mail file.  I still

18   am not clear, it's never been very well explained to me,

19   whether there are other sources of documents, for

20   example a discovery file, just to name something that

21   I've heard used, whether that has been searched for Ms.

22   Tomasic.

23       More broadly, I'm still not sure that other

24   sources have been searched for other United States

25   Attorneys.  More broadly, I believe the process that you

1    undertook involved asking each Assistant United States
2    Attorney to produce responsive documents, which allows
3    for self-editing and it is deeply concerning to me,
4    especially given what-- some of what we've seen here,
5    that that is insufficient.  And finally, we haven't
6    gotten a privilege log.  So there are a bunch of things
7    that still concern me about the way this went forward.
8                 THE COURT:  All right.  So--
9                 SPECIAL MASTER COHEN:  But I'm, frankly,
10   trying hard not to impose unnecessary or extraordinary
11   burdens on the United States Attorney's Office.
12                THE COURT:  All right.  Well, in my view, to
13   have the U.S. Attorney's Office now do a manual review
14   of the entirety of the ProofPoint for Ms. Tomasic, which
15   is larger than Thumb Drive 5, which was based on the
16   search terms, is not-- is not-- I mean, you-- you agreed
17   to those search terms, as I understand it, Mr. Cohen,
18   that ought to be the universe of what's produced.
19         And I-- I don't think it's a good use of anyone's
20   time to go back and to manually cull through a much
21   larger universe.  That's the whole point of why you have
22   search terms with ESI.
23         The second issue you raise was one that I was
24   going to ask, and that is:  Have those search terms,
25   whatever syntax has to be used, but have those search

1   terms been applied to the ProofPoint of any other AUSAs

2   as the subpoena *duces tecum* contemplated?

3       The third question I have is:  Have those search

4   terms, however the syntax would be written, been applied

5   to other repositories, including I think you called it

6   the N drive, the discovery drive, other maybe-- maybe

7   personnel folders and files, but other ESI of these

8   individual Assistant U.S. Attorneys?

9       And then again, consistent with the subpoena

10  *duces tecum*, I'm probably throwing too much at you at

11  once, but has there been a search and are you ready to

12  produce all other documents?  And that would be in paper

13  format or otherwise.

14      MR. CLYMER:  Your Honor, I-- if I could, I'd

15  like to not answer directly but give the Court some

16  information and then make a proposal that may resolve

17  that-- help at least move us in the direction of

18  resolving this.

19      My understanding is the subpoena *duces tecum* was

20  the Special Master's stopgap for not having gotten the

21  word searches run through the repositories.  And he can

22  either confirm or dispute that.  But I think it was a

23  method to try to get at the same sorts of things he was

24  looking for just in a different way.  My guess is he

25  would tell me it's a less satisfactory way, and I

 1    wouldn't argue with him about that.

 2              THE COURT:  And I think it's a very-- there's

 3    too much focus just on the ProofPoint.

 4              MR. CLYMER:  I think that was true.

 5              THE COURT:  That's just one repository.

 6              MR. CLYMER:  That's not-- when we-- when the

 7    government collected documents, Your Honor, for purposes

 8    of responding to the subpoena *duces tecum*, the Assistant

 9    U.S. Attorneys who Mr. Slinkard tasked did not limit

10    themselves to the ProofPoint by any stretch of the

11    imagination.  They were tasked to look through all their

12    files, all their records for responsive documents.  And

13    there were paper documents in there, there were Word

14    documents in there, there were e-mail messages in there,

15    there were attachments to e-mail messages.  So I think

16    in terms of the-- the scope of the kinds of documents,

17    the subpoena *duces tecum* was broader than just

18    ProofPoint.

19              SPECIAL MASTER COHEN:  May I ask a question?

20              MR. CLYMER:  Sure.

21              SPECIAL MASTER COHEN:  I agree with you that

22    the subpoena *duces tecum* was broader than the search

23    terms.  But what you just described-- I just want to

24    make sure I understand what you said.  When you said

25    that attorneys went and looked for all of those

 1   materials, they looked through their own materials.

 2          MR. CLYMER:  That's correct.  I'm not

 3   trying-- exactly.  That is true.  Attorneys were tasked

 4   to look through their own materials.  I understand

 5   there's an issue there and I'm not-- I'm not trying to

 6   start a fight about that, but I'm just trying to

 7   describe what happened.

 8          Now, I also don't want to mislead the Court.  All

 9   of those responsive documents were not turned over.

10   After individual AUSAs-- and Mr. Slinkard and Mr.

11   McAllister will correct me if I misspeak here.  After

12   the AUSAs were tasked to go through all their files and

13   all their e-mail and identify responsive documents,

14   Mr. McAllister, Mr. Slinkard and I went through, based

15   on the instructions that were given from the Department

16   of Justice, to turn over documents that related in any

17   way to conduct that's been-- alleged misconduct in this

18   case.  So any of the alleged misconduct in this case, we

19   turned over.

20          There were certain documents that in our view

21   were clearly simply deliberative process, work product,

22   attorney-client.  We did not turn that material over.

23   We notified the parties of that.  I notified Ms.

24   VanBebber in a letter and we notified her that when we

25   first turned it over.  So there were some that were

1   taken out.  But I think Mr. McAllister and Mr. Slinkard

2   will tell the Court we bent over backwards to try to be

3   overly inclusive.

4        When we did that, we were working under the press

5   of time, we were going as quickly as possible, but we

6   tried to be as inclusive as we possibly could.

7        My suggestion at this point, Your Honor, is for

8   Mr. Slinkard and I to speak to Mr. Cohen after court,

9   and it may take a couple days or longer, and try to work

10  out a resolution so we're not reinventing the wheel, but

11  we're getting him a body of documents that he's

12  comfortable with.  It may be that we can't reach a

13  resolution.  I would like to try because I think it's

14  better than litigating it and fighting over it, it's not

15  going to waste as much of the Court's time.  And I think

16  maybe if we can narrow down the request, there's some

17  hope of us getting something that's satisfactory to him

18  and hopefully ultimately satisfactory to the Court.

19            THE COURT:  Well, I can tell you I think

20  there's a number of problems with the way this

21  production has happened mechanically and otherwise.

22  Problem No. 1, people that have been alleged to engage

23  in wrongdoing are the ones doing their own culling of

24  their own documents.  Huge problem.  That's not what

25  would happen in any other case.  I don't know why it's

1    happened here.  Problem-- it should be a neutral

2    reviewer.

3         Problem No. 2, a year-long process of developing

4    search terms with the-- with the intention that they be

5    applied across repositories hasn't happened except with

6    respect to Ms. Tomasic's ProofPoint, but it hasn't

7    happened with respect to the other AUSAs' ProofPoints

8    and Pauletta Boyd or whoever else was on that list.

9         So the search terms need to be applied to all

10   ProofPoints of the relevant people and those documents

11   then produced, subject to your privilege review and all

12   of that.  Those documents need to be produced and they

13   need to be produced by repository.

14        You're telling me what you did, but I can tell

15   you in going through these thumb drives, it's a dump.

16   We can't tell where some of these documents came from.

17   We can't tell, you know, that AUSA Zabel produced 10,000

18   pages or two pages.  I mean, it's completely hidden and

19   not transparent.  So there needs to be a search using

20   those search terms against all folks', relevant folks'

21   ProofPoint repositories.

22        Those same search terms need to be used for all

23   other ESI repositories, whatever they may be,

24   understanding you might-- you may use a Boolean syntax

25   or something else.  I don't need to get into those

 1    details, but you all know what I mean.  So they need to

 2    be applied to all the other ESI.

 3        Then there needs to be further production of any

 4    other documents in any other repositories, because

 5    repositories are defined as any collection of documents,

 6    paper or ESI.  In going back to my preservation order,

 7    going back to Mr. Cohen's October 25th order, it always

 8    contemplated that all repositories were going to be

 9    preserved and now contemplated going to be produced

10    using those search terms.

11        Third, the people whose repositories are being

12    searched shouldn't be the ones controlling who's

13    searching them.  It needs to be a neutral-- somebody

14    else doing that.

15        Fourth, you're entitled to do a privilege review,

16    a *Touhy* review, a national security review, a Privacy

17    Act review.  I'm entitled and the parties are entitled

18    to have a privilege log or whatever you want to call it,

19    a production log.  So that if they think it needs to be

20    litigated, they can bring that to me and litigate it.

21    And I can look at it, the log, plus any other in camera

22    submissions if I feel like I need those.

23        This is no different than any other litigation.

24    But you all have, it sounds to me, consistently acted

25    like there's something special here.  You've put a

1    litigation hold in place, you've preserved the wide

2    universe and then that universe typically gets narrowed

3    down to some specific search terms.  And then there's

4    production and then you're entitled to, you know, to

5    withhold, but you've got to be transparent about what

6    you're withholding.  And you do that in a log.

7          So all of those things, from what the record

8    shows me, have not been accomplished.  The only thing

9    that's been accomplished to date is there's been a run

10   of the search terms on Ms. Tomasic's ProofPoint.  That's

11   just one of her repositories.

12         And to the extent there was additional gathering

13   and culling of other AUSAs' and employees' records,

14   that's not been done transparently, it hasn't been

15   produced in a way where it can be identified by AUSAs

16   and it certainly hasn't been produced in a way where

17   anyone, were they inclined to object to what you

18   withheld, would be in-- in a position to do that,

19   because that's not been transparent either.  So all of

20   those things have to be done.

21         I told you this before, Mr. Clymer, I told you

22   this, if not before, I know I told you this at the

23   October hearing, that you've got to produce a log.  You

24   told me at that time it's too much trouble, it's too

25   much work, it's too voluminous.  I'm sorry.  Those are

1   not justifiable reasons to not produce a log in any case

2   and certainly not in this one.

3       So there's-- I'm going to put all this in a

4   written order.  If you want to talk to Mr. Cohen and Ms.

5   VanBebber and the FPD and Mr. Guastello and you want to

6   try to resolve these things, you do what you're going to

7   do, but I am going to put a-- place an order that spells

8   out these are the things that have to be done, because

9   these are the things that have to be done irrespective

10  of what kind of litigation it is.

11      And these are the things that should've been done

12  two years ago, two years ago.  Even if you were going to

13  fight production, even if, you know, the Justice

14  Department is going to come in and do what they did,

15  which is to file a motion to terminate the Phase III

16  litigation, you're entitled to do all of that.

17      But at the same time, you knew that if you lost

18  on those, you're going to have to produce.  And you also

19  knew that, you know, if you have to produce, you may

20  still have other rights to challenge certain things, but

21  that doesn't mean you just shut down and don't do

22  anything.

23      So, I'm sorry, it falls on, you know, sort of

24  deaf ears for you to stand here now and tell me how much

25  work it is and the crush of time and all this sort of

1   stuff, because for two years this has been going on, and

2   for two years we've gotten almost nowhere.

3        And, frankly, that rolling discovery that you all

4   did was a document dump.  There's no other way to

5   characterize it.  Literally there were things coming

6   into the Special Master and the FPD two days before that

7   hearing was over.  And I need to hear from them, are

8   they done with that document review.  But what I'm

9   telling you is, even if you're done with that document

10  review, I'm not satisfied that all the documents have

11  been produced because you haven't gone through the

12  appropriate steps.

13       So, Ms. Brannon, have you gone through all-- I--

14  I know there's an exhibit that tells me the gigabytes,

15  and I don't know if it tells me the number of pages, but

16  I know it was a substantial number of pages that came

17  in.  Have you gone through all of them?

18       MS. BRANNON:  Your Honor, I think we've tried

19  to go through all of them.  The problem is that in going

20  through it, it makes-- just there are glaring gaps in

21  this.  It is a document dump.  It's an incomplete

22  document dump, because we get some documents like we

23  went through today, the second litigation hold, we get

24  it from three people, but there are 30 involved in this

25  that we didn't get, including Ms. Metzger 's.  So I

1    mean, we can go through this, but all we're finding is

2    that there are more questions raised.

3         And based on their conduct so far and the time

4    that it's taken, I have no confidence that production is

5    ever going to be complete or it's ever going to be

6    reliable.  They're relying on their own people to

7    produce this and not checking or auditing in any way?  I

8    mean, every day that the government has delayed, they

9    win and my clients lose.

10        I-- you know, they come in and complain about

11   it's so much work.  You know, DOJ is willing to come in

12   and send Mr. Clymer and to blow up our deal and to put

13   resources towards obstructing this and then delaying on

14   the recusal, but they're not willing to send people in

15   to do this review and help fulfill the Court's order?  I

16   mean, where is-- where are those resources?  How do they

17   answer for that lack of commitment?

18             THE COURT:  They do have-- DOJ does have

19   resources.  They have teams they send out to do this

20   very thing.  I'm aware of that.

21             MS. BRANNON:  Well, where are they?

22             MR. CLYMER:  Well, Your Honor--

23             MS. BRANNON:  I'm not finished.  Where are

24   they?  I mean, this has been going on for so long.  And

25   DOJ has interfered, they've been involved in this and

```
1    known about this since October of 2016.  Where are they

2    coming in and fulfilling their obligations to this

3    Court?

4         We've heard today that they believe federal

5    regulations trump court orders.  I think that's all we

6    need to know.  This is never going to be done, it's

7    never going to be completed and it's certainly way past

8    being timely.

9         I think it should be stopped and the Court should

10   just draw adverse inferences at this point from what

11   they haven't produced, treat everything like Michelle

12   Reulet and those notes that Tanya Treadway had, find

13   that based on their conduct and what they haven't

14   produced that they have reviewed attorney-client

15   communications in every case we've identified, and that

16   they've relied on it for their-- to their advantage.

17   Because that's where we are right now.

18        They're just going to-- the things that have been

19   described are going to take another six months and we're

20   still going to be struggling with this.  This is enough.

21   This really is enough.  They've been given chances.

22   Deadlines mean nothing to them.

23        They're still in possession of attorney-client

24   communications that they haven't turned over, and they

25   know it and they've identified them and we've identified
```

1   them.  They still have them.  They haven't sequestered

2   them.  They haven't produced them to the Court.  They're

3   still available to people in their office.  Two years

4   later.  I-- this is enough.

5            MR. CLYMER:  Your Honor, I don't want to

6   mislead the Court, and one of my reasons for wanting to

7   speak to Mr. Cohen about trying to resolve matters about

8   litigation is, it remains the position of the Department

9   of Justice that there is no legal basis for the

10  disclosures that have been ordered in this case.

11       This is a federal criminal case.  Rule 16 governs

12  disclosure.  The disclosures that have been demanded of

13  the government are beyond Rule 16.  It is our position

14  that the disclosures that have been made in response to

15  the subpoena *duces tecum* were made voluntarily by the

16  government.

17            THE COURT:  Mr. Clymer, the Tenth Circuit has

18  authorized this Court to have Phase III of the Special

19  Master investigation.

20            MR. CLYMER:  I agree, Your Honor.

21            THE COURT:  Which means that the Tenth

22  Circuit has authorized this Court through the Special

23  Master to obtain these documents.

24            MR. CLYMER:  I have to push back on that,

25  Your Honor.  There is nothing in the-- the decision of

```
 1  the Tenth Circuit that says that the government has an

 2  obligation to turn over these materials.

 3            THE COURT:  All right.  So do you want me to

 4  close the record now on that note?  You're not-- you're

 5  not going to turn over anything, you're--

 6            MR. CLYMER:  I didn't say that, Judge.

 7            THE COURT:  You didn't put the litigation

 8  hold--

 9            MR. CLYMER:  I did not say that.

10            THE COURT:  -- in place when you should have.

11  You're not willing to turn over anything.

12            MR. CLYMER:  I did not say that, Your Honor.

13            THE COURT:  To the extent there were

14  documents, they may be intact, they maybe not, because

15  the people that are alleged of wrongdoing-- with the

16  exception of Erin Tomasic and Tanya Treadway, the people

17  alleged of wrongdoing managed their own documents and

18  their own culling and their own production.  So we can

19  close the record right now and I think probably adverse

20  inferences would be in order.

21            MR. CLYMER:  Your Honor, I never said that.

22  What I said to the Court, and I will say it again, is I

23  would like to speak to Mr. Cohen to try to work out an

24  accommodation that satisfies him.  I can't guarantee

25  that we will be able to, we are willing to do so.  If
```

 1    the Court--

 2              THE COURT:  How are you going to satisfy Ms.

 3    Brannon?

 4              MR. CLYMER:  It sounds to me like Ms. Brannon

 5    believes that there's nothing I can do to satisfy her,

 6    and I'm not going to quibble with her about that.

 7              THE COURT:  Well, I mean, she's a party in

 8    this case.  So when you're telling me you want the

 9    chance to resolve it, I mean, to me you have to resolve

10    it with all parties.

11              MR. CLYMER:  I'm happy to talk to all

12    parties, Your Honor.  I will continue to be willing to

13    do that.

14              THE COURT:  Well, here's what I'm going to

15    do, you all are free to talk, I have always encouraged

16    you all to talk about resolution.  Mr. McAllister did

17    resolve this case by and large and then the Justice

18    Department decided they didn't like it, so here we are.

19         So you all are free to talk, but I'm going to

20    issue an order and it's going to be just the kind of

21    order that most judges don't have to issue because

22    everybody understands how discovery works and what their

23    obligations are.

24         And this may be a criminal case, but as you will

25    recall, you've told me repeatedly, you're not here in

1     the criminal case, you're here with respect to the

2     Special Master's Phase III investigation.  And there

3     have been subpoenas *duces tecum*, there have been

4     requests for production, there have been all kinds of,

5     you know, attempts to gain discovery specific to his

6     investigation and, you know, we're not going to talk

7     about Rule 16 because that's not the-- we're not talking

8     about the criminal case.  All right?

9            We're talking about something different, we're

10    talking about an investigation of-- of alleged

11    prosecutorial misconduct within the context of this case

12    and that will likely raise its head hundreds of times

13    again in the context of habeas actions to come, which

14    are-- which is civil litigation.  And I will tell you

15    that in civil litigation, you're going to have-- you

16    know, whether it's discovered now or later, you're going

17    to be under those same obligations.

18           But I can't worry about that, those cases aren't

19    filed.  Or if they are, they're not before me.  But what

20    I can tell you is I expect the government to comply with

21    the ordinary typical discovery obligations that attach

22    in any case.  And in this case with respect to the Phase

23    III investigation, I'm going to enter an order telling

24    you what to do.

25                 MR. CLYMER:  And--

1           THE COURT:  Now, if you all are able to

2   resolve this, maybe you can even resolve it on the

3   merits, that's great.  But in the meantime, I'm going to

4   work on getting an order out because I'm not at all

5   confident that six months from now we're not going to

6   still be sitting here with no production, no way for me

7   to-- to move forward on-- on making a decision about

8   what to do with these pending motions, short of making a

9   lot of adverse inferences that are not going to be in

10  your favor at this point.

11          MR. CLYMER:  Your Honor, I would ask the

12  Court for permission to brief the issue about

13  disclosure-- further disclosures then.  If the Court is

14  inclined to issue an order, we'd ask for permission to

15  brief the Court about what we believe is the appropriate

16  legal standard that applies.

17          THE COURT:  No, I'm going to issue an order

18  and then if you want to file a motion or you want to

19  appeal that order, you go right ahead.  But I'm going to

20  issue an order and it's going to be pretty

21  straightforward.  You've got to have a privilege,

22  production, national security log.  You have to have

23  neutral people do the searches, not the people accused

24  of wrongdoing.  You have to-- the agreed upon search

25  terms have to be applied across the ProofPoint

 1   repositories of everyone.

 2          And consistent with all of the other preservation

 3   orders and now production requests, you have to produce.

 4   You have to produce those parts of the repository that

 5   meet the search term, which is really a relevance-- it's

 6   a relevance search.  But, of course, subject to your own

 7   review.  You have-- you have the right to cull out

 8   things that you-- that the parties are not entitled to

 9   have, Privacy Act and privilege and, you know, *Touhy*,

10   but you're going to have to produce a log so that it can

11   be litigated, if necessary.

12          So that's where my order is going.  And you will

13   be free to file a motion to reconsider, but I'm not

14   going to delay this with more rounds of briefing and all

15   of that sort of stuff.  Because if you really thought

16   that there was a problem with this, you could've filed a

17   brief or a motion to quash or something with the

18   subpoenas *duces tecum*, but you didn't do that, so...

19              MR. CLYMER:  Your Honor, Your Honor, I-- I'm

20   sorry, I have to push back a little.  We filed two

21   motions to quash with two earlier subpoenas *duces tecum*.

22   The Court did not rule on either one of those.

23              THE COURT:  That's right, because they were

24   based on *Touhy* and I decided to go forward with the

25   evidentiary hearing because at that point we were 18

1    months into this, and I just decided we're going to go

2    forward with the evidentiary hearing and deal with the

3    documents later.  Understanding at that point you hadn't

4    produced documents anyway and you were fighting on the

5    basis of *Touhy*.

6          So we went forward.  We had a hearing in May, you

7    advised your people to essentially invoke *Touhy* on a

8    blanket basis.  Then we stopped because we thought it

9    was going to be settled.  Then we re-convened in

10   October.  Until the last minute, I thought it was going

11   to be another blanket invocation of *Touhy*, but it turned

12   out it wasn't and it was an evidentiary hearing.

13         Those earlier subpoenas *duces tecum* aren't

14   operative anymore.  They were broader, and some of them

15   were problematic with respect to *Touhy*.  So the Special

16   Master and the FPD narrowed it and tried to comply with

17   *Touhy* to the best of their ability, which is what should

18   happen in litigation.

19         The parties should-- if there's a *Touhy* concern,

20   the parties should negotiate and try to come up with

21   subpoenas *duces tecum* that comply with *Touhy* and satisfy

22   the government's legitimate concerns about that.  That

23   apparently happened, because there was no new motion to

24   quash with this latest round of subpoenas *duces tecum*.

25   Instead, they weren't-- they weren't complied with on a

 1   timely basis and document dump, et cetera.

 2        So, you know, you have the ability to file

 3   another motion to quash, you didn't.

 4             MR. CLYMER:  I only ask the Court to give

 5   full consideration to our motion for reconsideration

 6   before filing such an order.

 7             THE COURT:  Well, when it's filed, I'd ask

 8   you to consider my order and decide whether you in good

 9   faith should even file a motion for reconsideration.

10             MR. CLYMER:  I will.

11             THE COURT:  We're talking hypothetically at

12   this point.

13             MR. CLYMER:  We'll do so, Your Honor.

14             THE COURT:  Okay.

15             MS. BRANNON:  Judge, the only thing I would

16   add is I would ask the Court to take into consideration

17   Mr. Steeby's testimony that they've not done these

18   searches and Ms. Metzger's testimony about how they

19   proceeded, as well as what we've heard from the

20   government today and what has been produced and not

21   produced and hold the government in contempt.

22             THE COURT:  All right.  That is under

23   advisement.  And I think you reminded me of the

24   individual at the Justice Department that contempt would

25   attach to if I were to order contempt.  And that

1   person's name is?  It starts with a D?

2           MR. CLYMER:  The person to whom I report, his

3   name is Brad Weinsheimer.

4           THE COURT:  Weinsheimer, that's correct.

5           MR. CLYMER:  He's an Associate Deputy

6   Attorney General.

7           THE COURT:  Okay.

8           MR. CLYMER:  Your Honor, if I may ask, on the

9   substantive matters that are before the Court in this

10  proceeding, is the Court going to at some point ask for

11  proposed findings of fact and conclusions of law?

12          THE COURT:  Yes, I intend to.

13          MR. CLYMER:  Thank you, Your Honor.

14          THE COURT:  But, of course, you know, the

15  record is not closed.

16          MR. CLYMER:  I understand that, Your Honor.

17          THE COURT:  And right now I think I'm going

18  to issue this order, although Ms. Brannon is asking me

19  not to, she's asking me to essentially close the record.

20  And I think you're asking me not to, which is

21  interesting if you're not going to produce what you're

22  ordered to produce.

23          MR. CLYMER:  No, what I asked, Judge, and I--

24  just to make the record clear.  Mr. Cohen had

25  conversations with Mr. Slinkard after the last hearing

 1   where we agreed at that time to discuss with Mr. Cohen

 2   the possibility of further production to help his

 3   investigation.  Mr. Cohen can tell you that I've

 4   communicated with him since then.

 5        Unfortunately, since the last hearing, we were--

 6   we both sequentially took out-of-country trips and so

 7   I'm not sure we were on the same continent at the same

 8   time.  Mr. Cohen only returned recently.

 9        I'm simply asking the Court for time, and Ms.

10   Brannon is welcome to join us, to sit down and see if we

11   can work something out for further production without

12   getting the Court involved that satisfies the parties.

13   I can't guarantee that's going to happen, I am willing

14   to try.

15             THE COURT:  All right.  Well, I'm not going

16   to delay my order.  And actually, it might help your--

17   your discussions if you had my order in front of you

18   because, I mean, unless everybody comes in here and

19   tells me that they've resolved this otherwise, I'm going

20   to live and die by the order.  I am.

21             MR. CLYMER:  Thank you for hearing me out,

22   Your Honor.

23             THE COURT:  Okay.  All right.  Anything else

24   we need to take up this evening?

25        Let me ask you this:  This part of the process

 1   where the AUSAs were told to go through their

 2   repositories and to I guess segregate materials and hold

 3   on to them, whose idea was-- was that?

 4         MR. CLYMER:  I'm sorry, are you talking about

 5   in response to the subpoena *duces tecum*, Your Honor?

 6         THE COURT:  Yes.

 7         MR. CLYMER:  Mr. Slinkard could probably

 8   speak to that better than I can.

 9         MR. SLINKARD:  It was just collectively, Your

10   Honor.  The subpoena was served and I think the e-mail

11   correspondence reflects everything from the receipt of

12   that subpoena in the office in Kansas City to the U.S.

13   Attorney's initial direction on doing that.

14         It occurred approximately the same time as the

15   Tenth Circuit conference was going on.  We met at the

16   conference to try and figure out persons who needed to

17   be involved and potentially having responsive documents

18   and started that direction at that time.  We put the

19   obligation, as noted in there, upon them, first of all,

20   to be complete and, second of all, to make us aware of

21   anyone that they were aware of that was not currently

22   working on it so that we could expand that group.

23         And ultimately, the addresses would-- would show

24   the group, but ultimately it comprised certainly

25   everyone who was under subpoena for testimony at the

 1   October hearing as well as several other individuals.

 2            THE COURT:  All right.  Well, it sounds like

 3   that's the right universe of people, but I'm going to

 4   order-- my order is going to include that you run a

 5   search with those same search terms against their

 6   ProofPoint repository and that somebody neutral do it,

 7   not them.  And further, that all of their repositories

 8   be searched by neutral parties, not them.

 9            And I would say, consistent with e-mails that

10   I've read from Ms. Barnett and-- and Mr. Beall and

11   others, it seems to me like the U.S. Attorney's Office

12   has long recognized that it's best to get someone from

13   another office to do that.  I think that's why at one

14   point Ms. Treadway was going to serve as the taint

15   attorney here, et cetera, et cetera.

16            But I mean, it seems to me like you all have

17   recognized you-- you know, you have to have some divorce

18   of who reviews certain matters, and I just think it's

19   highly unusual that each AUSA was going to do their own

20   doc review and produce their own.  So I'm going to order

21   otherwise.  That is contrary to anything I've ever heard

22   about.

23            But certainly with respect to searching the

24   PowerPoint repository, there's no reason that one person

25   couldn't run the searches, probably Mr. Steeby, just

1   like he did with Erin Tomasic's.  But with respect to

2   the other repositories, somebody else needs to do it, a

3   neutral person, whether that's you, Mr. Slinkard, or

4   someone else in-- in another office at a management

5   level perhaps, I don't know.

6           Ms. Brannon.

7               MS. BRANNON:  Judge, there was one other

8   thing.  We believe the testimony today was that there is

9   sort of a rolling six-month destruction of the backup

10  files.  We would ask them to stop that and ask for a

11  court order that they cease destruction of the backup or

12  of any files or of destruction of any discovery or any

13  part of any files.

14              THE COURT:  Okay.  Let's get some

15  clarification, because I thought what I heard was that

16  once the litigation hold went into place, which did not

17  happen from the Department of Justice's standpoint until

18  May of 2017, that stopped.  Am I correct?  Or do I need

19  to enter an order specific that says no more six-month

20  retention and destruction?

21          I thought that that May-- I thought Mr. Steeby

22  was saying that May 27 litigation hold meant there would

23  be no more destruction of things on the discovery drive,

24  the N drive, I mean, the network drive.

25              MR. CLYMER:  I don't know the answer to that,

 1    Your Honor.

 2              THE COURT:  Okay.  Well, that is my order.

 3    I'm saying it orally, I'm going to have to put it in

 4    writing.  I've learned that the hard way.  But I'm

 5    telling you that.  It's, you know, 5:35 on

 6    November 18th, Friday evening.

 7              Please send an e-mail to whoever you need to, and

 8    I assume that would be to Mr. Steeby, and direct him to

 9    contact whoever his person is at the Department of

10    Justice that he sent that-- I think he called it a

11    ticket to make sure that litigation hold was in place as

12    of May 2017, to make sure that the Department of Justice

13    network center understands no destruction.  Hopefully--

14    I understood him to say it hadn't happened since May,

15    but maybe I misunderstood.

16              MS. BRANNON:  I think he said just about the

17    e-mails.  We're concerned about everything.

18              MS. VANBEBBER:  I think that's right, Your

19    Honor.  I think what he was talking about was the

20    ProofPoint e-mail system.

21              THE COURT:  So in other words-- in other

22    words, things that have been on the discovery drive and

23    all of that?

24              MS. VANBEBBER:  Well--

25              THE COURT:  Unless they're backed up on a

1    thumb drive or something like that, they're already gone

2    if they're more than six months old?

3              MR. CLYMER:  No, Your Honor.  What he said--

4    what he said was this-- and what I don't remember is

5    whether they preserved those drives or not.  He said

6    that anything that's on the drive now will not go away

7    as long as it's not changed or edited.  It's on forever.

8    It's backups of previous versions of documents is what's

9    destroyed after six months.

10         So I'm not trying to convince the Court it should

11   do otherwise, I'm not trying to take issue with the

12   order, Your Honor, I'm just trying to inform the Court

13   of my understanding of the testimony.

14         So, for example, if the government obtained

15   recorded phone calls of an inmate from CCA-Leavenworth,

16   unless somebody deleted them from the discovery drive,

17   they're not going to get automatically deleted in six

18   days [sic], they're going to stay on the drive.  If

19   somebody deletes them from the discovery drive, then six

20   months later, there will be no backup to recover them

21   from.  That's what I think his testimony was.

22              THE COURT:  All right.  So--

23              MS. VANBEBBER:  I don't think any of us have

24   a clue what we're talking about.

25              THE COURT:  Well, I was just going to say--

```
 1    I need-- I need--
 2              MS. VANBEBBER:  Why don't we just get the
 3    information from the government's IT people?
 4              THE COURT:  Well, I think in order to really
 5    do an order I would need language from Mr. Steeby and
 6    the IT people at Justice Department, so there's no more
 7    of this ships passing in the night.  But you understand
 8    the spirit of my order, oral.
 9              MR. CLYMER:  I think we do, Your Honor.
10              THE COURT:  No more destruction of anything.
11    I mean, whether it's been deleted or modified, it needs
12    to remain intact.
13              MR. CLYMER:  Any backups should not be
14    destroyed in the six-month period.
15              THE COURT:  Correct.
16              MR. CLYMER:  We understand.
17              THE COURT:  Until further order of the Court.
18              MR. CLYMER:  I understand.
19              THE COURT:  But I would ask-- that's
20    something that I would like you all to work on, Mr.
21    Clymer and Mr. Cohen, Ms. VanBebber, to give me the
22    magic language I need to put in an order.  And I'll do a
23    quick order on that on Monday.  But at least I've orally
24    ordered it for now over the weekend.
25              What else?
```

1              SPECIAL MASTER COHEN:  I don't think the

2    Special Master has anything else, Judge.  Thank you.

3              THE COURT:  All right.  Thank you.  All

4    right.  We will be in recess.

5                   (5:38 p.m., proceedings recessed).

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2

3

4

5       I, Kelli Stewart, a Certified Shorthand Reporter and

6   the regularly appointed, qualified and acting official

7   reporter of the United States District Court for the

8   District of Kansas, do hereby certify that as such

9   official reporter, I was present at and reported in

10  machine shorthand the above and foregoing proceedings.

11      I further certify that the foregoing transcript,

12  consisting of 333 pages, is a full, true, and correct

13  reproduction of my shorthand notes as reflected by this

14  transcript.

15      SIGNED November 21, 2018.

16

17

18

19          /s/ Kelli Stewart

20          Kelli Stewart, CSR, RPR, CCR, RMR

21

22

23

24

25