**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | **Case No. 16-CR-20032-JAR** |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Government's Notice Of Receipt Of** |
| ) | **Information** |
| **KARL CARTER,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

The United States of America, by and through its counsel of record, Assistant United States Attorney Steven Clymer, appointed as Special Attorney pursuant to 28 U.S.C. § 515 to represent the United States in connection with Phase III of the Special Master Investigation, hereby notifies the Court of its receipt of information.

On December 27, 2018, government counsel received an electronic mail message from District of Kansas Assistant United States Attorney Kim Flannigan. Attached to the message were four transcript pages from the evidentiary hearing in this matter, and copies of documents that the government voluntarily produced after receipt of the Special Master's most recent subpoena *duces tecum*. In short, the parties already have copies of all of the materials that were attached to AUSA Flannigan's message. Much of AUSA Flannigan's message consists of her personal observations about the attached transcripts and documents.

Her message also includes, however, factual assertions about a matter that was the subject of testimony at the evidentiary hearing, specifically, a meeting that apparently occurred in Topeka,

Kansas, at which this Court's August 18, 2016 "clawback order" [Docket #113] was discussed. According to testimony at the evidentiary hearing, attendees at this meeting included First Assistant United States Attorney Emily Metzger, Criminal Chief Debra Barnett, Kansas City Criminal Coordinator Scott Rask, AUSA Duston Slinkard, Special Assistant United States Attorney Erin Tomasic, AUSA Christopher Oakley, AUSA Flannigan, and possibly others.

Although the government does not have an ethical or legal obligation to disclose these assertions in AUSA Flannigan's message, which essentially repeat her testimony at the hearing (R.T. 2205-08), it nonetheless does so in an abundance of caution because AUSA Flannigan's assertions differ from sworn testimony from AUSAs Metzger and Barnett. AUSA Flannigan's message says this:

> I specifically recall discussing the fact that Ms. Tomasic and I had obtained many of the same phone calls during our investigation and prosecution of Rap [sic] et. all [sic]. We asked whether the order should be read to encompass those calls as well and not just the Black calls. Ms. Metzger (and maybe others, I can only recall Ms. Metzger) believed strongly that the order only applied to the Black case.

In contrast, AUSA Barnett testified as follows:

Q: Do you recall that, on whatever date it was, there were a number of concerns that the judge had and that she ordered that all of the audio materials that had been gathered for the Black case be turned in as well?

A: I remember at a hearing that, yes, that was a concern and that was ordered.

Q: And then a couple of days later, she entered an order to that effect, didn't she?

A: I don't remember when the order-- written order was entered.

Q: Pardon me?

A: I don't remember when the written order was entered.

Q: But there was one. Correct?

A: I recall that there was one.

Q: And shortly after that, you and a number of other Assistant U.S. Attorneys met in Topeka to discuss how you were going to comply with the judge's order. Right?

A: There was a meeting, I don't know when it fell in terms of these hearings, just because I-- I'm not good with dates right now without a calendar. But there was a meeting in Topeka in the morning where we were discussing the order and how it would be applied to the Black case and potentially other cases.

Q: Were you there?

A: Yes.

Q: At the meeting?

A: Yes.

Q: Was Tomasic there at the meeting?

A: Yes.

Q: And a number of others?

A: Yes.

Q: Who was it who decided at that meeting that there would be a very narrow interpretation of the Court's order limiting it to calls collected only in the Black case and not in other cases?

A: It was a collective decision by all of us sitting there, including the other supervisors in the meeting, based upon the information that was provided to us by Kim Flannigan, Erin Tomasic, and Chris Oakley.

Q: You would-- you would have the authority in that meeting to make the call if it-- if you couldn't agree. Right?

A: If Mr. Beall hadn't been there, and I don't remember whether he was there or not.

Q: So you were in agreement with what you say was a collective decision?

A: I was in agreement based upon what I was told at that time, but I later changed my mind based upon what I learned after that meeting. And, frankly, I learned information after that meeting that I should have been told at that specific meeting and I was not told, deliberately in my opinion.

Q: Do you-- do you recall that there were at least some who said it should be interpreted more broadly because of the confluence of the phone calls in more than one case, the same calls in Rapp as were going to come in in Black?

A: No, that discussion didn't happen at that meeting. And that's what I'm talking about. At that specific meeting that we had in Topeka, looking back on it now, I realize that we were being given very limited information by the people from Kansas City about what was involved in how they wanted to interpret the order. They wanted it interpreted extremely narrowly, they wanted it to only apply to the Black calls. After that, I became aware of the Dertinger-Rapp case and the fact that calls had been obtained in that case by Ms. Tomasic and Ms. Flannigan as part of that investigation. Eventually I became aware that there was a subset of calls that were collected in the Rapp case that were some of the exact same calls that were collected in Black. And when I became aware of that, my position was that it's all then impounded, it all has to be held back. Ms. Flannigan and Ms. Tomasic did not want to do that. They wanted to argue with me, and did, about whether or not they could use those calls and keep them in Dertinger and Rapp. And I told them that they either were to turn those calls in Dertinger and Rapp over to Judge Robinson and the Court, or they had to go to their judge in Dertinger and Rapp and tell the judge about this, tell the judge about Judge Robinson's decision in this case, and they had to ask the Court what they should do and let the Court go to Judge Robinson and work it out.

Q: Do you recall that it was Tomasic who suggested at the meeting that the best way to handle the interpretation of the order would be to file something and ask the Court to clarify the limits that she intended?

A: No, I do not recall her saying that.

R.T. 2292-96.

AUSA Metzger testified as follows:

Q: This was Special Master's Exhibit 1174. And I'd like to start at the-- the beginning of this e-mail chain and just ask you, when you went to Kansas City for a discussion about the litigation hold, did a question come up about interpreting the judge's clawback order during that meeting?

A: When I discussed the lit hold, no, I don't believe it did.

Q: Did it come up at some later point? After the clawback order was issued, was there a meeting or a conference in Topeka where—

A: Yes.

Q: -- the issue came up?

A: Yes.

Q: Can you describe the issue that came up?

A: Well, there was a general discussion about the order in general. It was a group meeting. And I think the question that I was asked was whether the—the question of the scope of the order arose. And there was a question asked about whether the order should be interpreted as applying in other cases I believe.

Q: And who raised that question to that issue?

A: I recall that it was Kim Flannigan.

Q: Okay. And I'm going to show you now a part of 1174. Was there an e-mail from Kim Flannigan that was sent to Ms. Barnett regarding that issue?

A: Yes.

Q: And did you learn at some point after the initial-- the issue was originally raised that there was some important facts that were not disclosed to you when Ms. Flannigan initially raised the question about interpreting the clawback order?

A: Yes.

Q: Can you describe that to us, please?

A: Subsequently, I don't know if it was here or later, Ms. Flannigan reported that she had some calls in cases that were I guess duplicates or identical to the material that was impounded in the Black case.

Q: So in other words, when the question was first asked to you, did you understand the question to pertain to recordings or calls that were completely unrelated to the Black litigation?

A: Yes.

Q: And did anybody disabuse you of that misunderstanding you had?

A: No, I was shocked to learn this.

Q: So was Ms. Tomasic present when this issue was raised?

A: Yes.

Q: Did she say to you the calls we're asking about are exactly the same phone calls that the Court has clawed back in the Black case?

A: I don't recall Ms. Tomasic asking anything. I recall Ms. Flannigan asking the question.

Q: But did either Ms. Tomasic or Ms. Flannigan—

A: No, that was not-- Ms. Barnett and I were shocked to learn that.

Q: So when this issue was raised and you had to make a decision about interpreting Chief Judge Robinson's clawback order, you thought the issue involved completely unrelated calls?

A: Yes.

Q: And only later did you learn that when they asked that question without-- when Ms. Flannigan asked that question, without disclosing it, she was talking about recordings of the very same phone calls that were clawed back?

A: Yes.

Q: When you and Ms. Barnett exchanged the e-mail messages that appear on the first page of 1174, were you expressing concern about not communicating with Ms. Flannigan and Ms. Tomasic by e-mail because you wanted to conceal something somewhere down the road in discovery?

A: I did not-- I thought I explained it, maybe I didn't do it well in my testimony. I was not trying to conceal anything, I was trying to ensure we had clarity in understanding.

Q: And did you think you would get better clarity if Ms. Barnett sat down and talked to Ms. Flannigan face-to-face, rather than trade e-mail messages?

A: Yes.

Q: Was that the nature of the conversation you were having in Exhibit 1174?

A: Yes.

R.T. 2722-26.

AUSA Flannigan's message also communicates her belief that "the other attendees of the meeting, specifically Mr. Oakley and Mr. Rask also remember that Erin and I were seeking guidance about broadening the scope of the claw back order, given we had obtained some of the

same exact calls in the Rapp case." AUSAs Oakley and Rask were not questioned about this subject at the evidentiary hearing.

Respectfully submitted this 2nd day of January, 2019.

Steven D. Clymer
Assistant United States Attorney
Special Attorney for the United States
NDNY Bar Roll # 509281

United States Attorney's Office
Northern District of New York
900 Federal Building
100 South Clinton Street
Syracuse, NY 13261
(v) 315-448-0672
(f) 315-448-0658

**Certificate of Service**

I hereby certify that on the 2nd day of January, 2019, the foregoing was electronically filed with the clerk of the court for the District of Kansas using the CM/ECF system, which will send a notice of electronic filing to all counsel.

*S/Deanna Lieberman*
Deanna Lieberman
Paralegal Specialist
United States Attorney's Office
Northern District of New York