# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | **Case No. 16-CR-20032-JAR** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Government's Proposed Findings of** |
| | ) | **Fact and Conclusions of Law** |
| **KARL CARTER,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

The United States of America, by and through its counsel of record, Assistant United States Attorney Steven Clymer, appointed as Special Attorney pursuant to 28 U.S.C. § 515 to represent the United States in connection with Phase III of the Special Master's Investigation, hereby submits its proposed findings of fact and conclusions of law, in accordance with this Court's orders [Docket #690, #713].

Respectfully submitted this 21st day of March, 2019.

Steven D. Clymer
Assistant United States Attorney
Special Attorney for the United States
NDNY Bar Roll # 509281

United States Attorney's Office
Northern District of New York
900 Federal Building
100 South Clinton Street
Syracuse, NY 13261
(v) 315-448-0672
(f) 315-448-0658

# TABLE OF CONTENTS

I.     **Introduction** ................................................................................................1

II.    **Proposed Findings of Fact** ......................................................................6

      A.     <u>**Sixth Amendment Claims**</u> ..........................................................6

          The CCA-Leavenworth Video Evidence [¶¶ 1-2] ................................6

          The Contraband Smuggling Investigation and Grand Jury Subpoena
          for Video Evidence [¶¶ 3-11]...............................................................7

          Production of the Subpoenaed Video Evidence and Storage at the
          USAO [¶¶ 12-20] ................................................................................10

          Discovery and Related Proceedings [¶¶ 21-23] ..................................12

          KBI Agent Stokes and the Video Evidence [¶¶ 24-34] ......................13

          Rokusek Views the Video Evidence [¶¶ 35-43] ..................................16

          Rokusek, Dertinger, and the Conflict of Interest Issue [¶¶ 44-57] ......18

          The FPD Return of Property Motion [¶ 58] ........................................23

          The FPD Video Evidence Memorandum [¶¶ 59-61] ...........................24

          The Audio Evidence: the Securus Telephone Service and Warnings
          to Inmates [¶¶ 62-67] .........................................................................25

          The Securus Call Platform and Designating Telephone Numbers
          as "Private" [¶¶ 68-78] .......................................................................28

          Requesting Call Recordings and Call Detail Reports [¶¶ 79-84] ........32

          Accessing Call Recordings [¶¶ 85-88] ................................................34

          AUSA Use of Recorded Inmate Telephone Calls [¶¶ 89-90] .............34

Page

AUSA Practices Concerning Inmate-to-Attorney Telephone
Calls [¶¶ 91-97] ...................................................................35

The FPD Analysis of Transactional Data Regarding Requested
and Accessed Inmate Calls [¶¶ 98-105] ....................................43

The *Herrera-Zamora* and *Reulet* Cases [¶ 106] ...................................49

SAUSA Tomasic and the *Herrera-Zamora* Case [¶¶ 107-129] ...........................49

AUSA Treadway and the *Reulet* Case [¶¶ 130-39] ...........................................62

B.    **The Impoundment (Clawback) and Preservation Orders**...............................65

The DOJ-Mandated Computer Refresh Project [[¶¶ 140-41] ...............................65

The Brannon Electronic Mail Message [[¶¶ 142-49] ...........................................66

The Upgrade of the AVPC Operating System [[¶¶ 150-52] .................................68

The Computer Preservation Efforts [[¶¶ 153-66] ...............................................69

Tammy Loehrs' Computer Forensics Testimony [[¶¶ 167-72] ...........................73

The Court's Clawback Order for Audio Recordings [[¶¶ 173-75] ......................75

The Appointment of the Special Master [[¶¶ 176-82] ...........................................77

The Special Master's Status Quo Order [[¶¶ 183-87] ...........................................80

The Government's Preservation Directive (Litigation Hold)
[[¶¶ 188-96] ...................................................................85

C.    **Cooperation with the Special Master**...............................................89

Interviews of USAO Employees [[¶¶ 197-212] ...............................................89

The Word Searches [[¶¶ 213-37] ...................................................................95

Page

**III.**   **Proposed Conclusions of Law** ...................................................................................106

   **A.**      <u>**Sixth Amendment Claims: Governing Law**</u>....................................................106

   LEGAL CONCLUSION #1:  The FPD's claim that the government, by obtaining soundless video recordings of inmate-attorney meetings at CCA-Leavenworth, violated the Sixth Amendment rights of each of those inmates is meritless <u>because there is no evidence that any AUSA or government agent watched any video recording of any inmate meeting with legal counsel</u> ..........................................110

   LEGAL CONCLUSION #2:  The FPD's claim that the government, by obtaining soundless video recordings of inmate-attorney meetings at CCA-Leavenworth, violated the Sixth Amendment rights of each of those inmates is meritless <u>because the FPD has not identified any of those inmates</u>..................................................114

   LEGAL CONCLUSION #3:  The FPD's claim that the government, by obtaining soundless video recordings of inmate-attorney meetings at CCA-Leavenworth, violated the Sixth Amendment rights of each of those inmates is meritless <u>because the FPD has chosen not to have the Court view the video of each meeting, which forecloses a judicial finding that the soundless video of any particular meeting reveals privileged communications about legal advice or strategy</u> ....................114

   LEGAL CONCLUSION #4:  The FPD's claim that the government violated the Sixth Amendment rights of inmates whose outgoing recorded telephone calls were requested by the government, accessed by CCA-Leavenworth employees, and included calls to attorney telephone numbers is meritless <u>because there is no evidence that any AUSA or law enforcement agent listened to any attorney-client privileged call in this case</u>..................................................................117

   LEGAL CONCLUSION #5:  The FPD's claim that the government violated the Sixth Amendment rights of inmates whose outgoing recorded telephone calls were requested by the government, accessed by CCA-Leavenworth employees, and included calls to attorney telephone numbers is meritless <u>because there is no evidence that any particular call in this case was between an inmate and an attorney and related to legal advice or strategy</u>. ..................................................123

Page

LEGAL CONCLUSION #6:  The FPD's claim that the government violated the
Sixth Amendment rights of inmates whose outgoing recorded telephone calls
were requested by the government, accessed by CCA-Leavenworth employees,
and included calls to attorney telephone numbers is meritless <u>because there is
insufficient evidence for the Court to determine whether, under circumstances
related to any particular inmate and any particular telephone call, the privilege
was defeated by the multiple written and audible warnings about recording and
monitoring</u>............................................................................................................125

LEGAL CONCLUSION #7:  The FPD's Sixth Amendment claims fail because
there has been no showing of prejudice to any inmate ........................................129

LEGAL CONCLUSION #8:  The FPD's reliance on *Shillinger v. Haworth*, 70
F.3d 1132 (10th Cir. 1995), is misplaced............................................................131

**B.**      **<u>Preservation of Evidence Claims: Governing Law</u>** ........................................135

LEGAL CONCLUSION #9: The USAO had no legal obligation to self-impose a
litigation hold ......................................................................................................141

LEGAL CONCLUSION #10: The USAO did not violate this Court's September
7, 2016 oral preservation order by the formatting the AVPC hard drives on
September 6, 2016. .............................................................................................142

LEGAL CONCLUSION #11:  The USAO did not violate this Court's August 18,
2016 audio clawback order. ................................................................................145

LEGAL CONCLUSION #12:  The Special Master's orders to the USAO were
unlawful and should not be enforced because his appointment exceeded what
Rule 53 of the Federal Rules of Civil Procedure permits and violated the
separation of powers ...........................................................................................146

LEGAL CONCLUSION #13:  The USAO promptly and fully complied with the
Special Master's Status Quo order........................................................................147

**Page**

C.   **Cooperation with the Special Master** .............................................................150

LEGAL CONCLUSION #14:  The USAO cooperated with the Special Master by arranging an interview of SAUSA Tomasic when requested to do so. ...............150

LEGAL CONCLUSION #15:  The USAO cooperated with the Special Master by testing his proposed search terms and reporting the results, cooperated within its authority regarding production of requested results of the word searches, and promptly notified him that another DOJ attorney might have to make production decisions.......................................................................................................153

D.   **The Requested Order to Show Cause** .............................................................159

LEGAL CONCLUSION #16: There is no basis for the Court to issue an order to show cause regarding contempt of court. ..........................................................159

E.   **The Requested Adverse Inferences**................................................................163

LEGAL CONCLUSION #17: There is no basis for the Court to draw any adverse inference against the government in this litigation. ............................................163

**IV.   Conclusion** .......................................................................................................165

**GOVERNMENT'S PROPOSED FINDINGS**
**OF FACT AND CONCLUSIONS OF LAW**

**I**

**Introduction**

These proposed findings of fact and conclusions of law are organized topically.  They address the following issues pending before the Court: (A) whether the Federal Public Defender's ["FPD"] claims of Sixth Amendment violations have been proven; (B) whether there is evidence of bad faith failure by the USAO to comply with orders by this Court and the Special Master to produce and preserve evidence; (C) whether there is evidence of bad faith failure by the USAO to comply with this Court's order requiring cooperation with the Special Master; (D) whether there is merit in any of the FPD's various allegations in its several motions related to an order to show cause; and (E) whether there is merit to the FPD's requests for adverse inferences.

The factual findings and legal conclusions set out below demonstrate the following:

**A.     Sixth Amendment Claims**

The FPD claims that the government violated the Sixth Amendment rights of inmates at the Leavenworth, Kansas facility of Corrections Corporation of America[1] ["CCA-Leavenworth" or "CCA"] by obtaining soundless video recordings of their meetings with legal counsel and audio recordings of their outgoing telephone calls to counsel made after multiple warnings that these calls were subject to recording and monitoring.  These claims are unfounded.  In fact, although the government bears no burden in this context, there is compelling evidence affirmatively disproving the alleged Sixth Amendment violations as to both the video and audio evidence.

---

[1] Now called "CoreCivic."

With respect the video evidence, the record demonstrates the following deficiencies in the FPD's showing, each of which are independently fatal: First, there is no evidence that any Assistant United States Attorney ["AUSA'] or other law enforcement official watched video of any inmate meeting with legal counsel.  In fact, the evidence proves that this did not occur.  Second, there is no evidence in the record identifying inmates whose meetings with counsel were recorded and produced to the USAO, preventing a finding of a violation of the Sixth Amendment which, as an FPD expert witness correctly testified, is a personal right.  Third, the soundless video recordings are not in evidence, making it impossible to determine which, if any, reveal attorney-client privileged information.

Similar deficiencies undermine the FPD's showing concerning the recorded telephone calls.  First, aside from conduct by two former prosecutors in two already-resolved cases before other district court judges, there is no evidence that any AUSA or other law enforcement official listened to the content of an inmate-attorney telephone conversation.  In fact, the record shows that AUSAs, agents, and interpreters avoided exposure to such conversations and terminated review upon realization that an attorney possibly was involved in a call.  In addition, there is no evidence in the record about the content of any CCA-Leavenworth inmate's telephone call to an attorney telephone number.  Thus, there is no proof of who participated in any particular call or what was said.  Under these circumstances, no finding of a Sixth Amendment violation is possible, despite the FPD's extensive analysis of transactional call data.  Further, even if one were to assume without supporting proof that AUSAs listened to attorney-client calls about legal matters, there is insufficient evidence in the record of circumstances surrounding any particular call to permit a determination whether the multiple warnings that each calling inmate received about monitoring and recording foreclose an attorney-client privilege claim and/or establish a waiver.  Finally, the

FPD's Sixth Amendment claims fail because there has been no showing of prejudice, a requirement to establish a constitutional violation resulting from an intrusion into the attorney-client relationship.

The FPD's evidentiary presentation touched on tangential questions of AUSA discovery and notice obligations concerning inmate-attorney telephone calls.  Accordingly, these matters also are discussed below.  These proposed factual findings and legal conclusions demonstrate that there is no proof of discovery or ethical violations.

An additional point is necessary.  The evidentiary hearing was replete with false suggestions that District of Kansas AUSAs believed that they could unilaterally determine that there had been a waiver of the privilege and thereby listen to inmate-attorney telephone calls. These falsehoods were based on distortions of the government's good faith and legally proper reliance in litigation on legal authority showing that an outgoing inmate telephone call made after warnings that it is subject to recording either is not privileged or any privilege is waived.  So, to avoid further distortion of the government's position, it again endeavors to be clear: by explaining that there have been no proven Sixth Amendment violations here, that there are legal grounds for finding that the inmate calls are not privileged or that the privileged was waived, and that there have been no discovery violations or breaches of any ethical duty of notice, the government is NOT suggesting that federal prosecutors have listened to or should listen to inmate-attorney calls based on a unilateral determination that there has been a privilege waiver; that prosecutors should refrain from producing inmate-attorney calls in discovery; or that they should withhold notice to defense counsel when they inadvertently come upon such a call.  Indeed, as the Court is well aware, the USAO has affirmatively agreed to a standing order addressing these very issues.  Similarly, the government does not suggest that it should have access to or view video of inmate-attorney

meetings.  The point here is very different – that the evidence in the record does not establish that any inmate before this Court has suffered a violation of his or her Sixth Amendment rights.

**B.**       **Compliance with Preservation and Production Orders**

The record demonstrates that the USAO complied in good faith with this Court's "clawback" orders to impound the video and audio evidence that CCA-Leavenworth produced pursuant to grand jury subpoenas; and its September 7, 2016 order to preserve evidence stored in USAO hard drives.  The evidence shows that, as part of a pre-scheduled, DOJ-mandated computer upgrade, the hard drive of an audio-visual personal computer ["AVPC"] used to view a CCA-Leavenworth video was formatted the day *before* this preservation order.  Although the FPD had previously requested preservation of such digital data, there has been no showing that any relevant data was stored on the AVPC when it was formatted or that any such data has been lost.  Further, any failure to prevent the formatting was not due to bad faith.

The record also demonstrates good faith compliance with the Special Master's "Status Quo Order."  The USAO worked with the Special Master to draft a comprehensive, office-wide preservation directive acceptable to the Special Master and, upon receipt of his final approval, promptly circulated it to the USAO.  It later provided him with a list of USAO employees who reported that they had responsive documents.  The Special Master's Status Quo Order required no more.  The USAO's implementation of a preservation directive that the Special Master himself endorsed cannot have violated the Special Master's own order.  The Special Master's erroneous belief that this Court previously had issued a preservation order or that the USAO had instituted a litigation hold, which it had no obligation to do, does not establish non-compliance with the Status Quo Order.  Nor does it matter that some months later, the USAO took additional steps to ensure compliance with the previously-approved preservation directive.

## C.     Cooperation with the Special Master's Investigation

The USAO and its officials complied in good faith with the Special Master's investigation. When requested to do so, the USAO helped arrange private interviews of Pauletta Boyd and Erin Tomasic.  The USAO's earlier decision to exclude Tomasic from a Special Master-requested inventory project resulted from concerns about whether she would behave professionally and was not an effort to frustrate, delay, or obstruct the Special Master's investigation.

Further, the USAO conducted numerous tests in its ProofPoint electronic mail archive at the Special Master's request.  When, upon completion of those tests, the Special Master directed the USAO to produce the results of a test search of Tomasic's electronic mail account, the USAO lacked authority to comply without DOJ approval and was in the process of seeking guidance about the assignment of new counsel.  Although the Special Master does not recall this, there is documentary evidence showing that the USAO notified him that it could not make production while a decision on appointment of new counsel was pending.  Ultimately, the USAO produced the results of the Tomasic search to the Special Master.

## D.     FPD Motions for a Show Cause Order

For reasons described in this document and in Docket # 346, # 596, and #683, which are hereby incorporated by reference, there is no basis for this Court to issue an order to show cause.[2]

## E.     FPD Requests for an Adverse Inference

The FPD's multiple requests for "adverse inferences" are meritless.  There is no basis here for the Court to draw any inference adverse to the government and, even if there was, what the FPD apparently seeks is not an adverse inference from circumstantial evidence but for the Court

---

[2]  Citation to docket entries in this case are preceded by "Docket."  References to pages of the reporter's transcript of the proceedings are preceded by "R.T."  References to exhibits are preceded by "Exh."

to invent constitutional violations that have not been proven and did not occur. This Court should reject that request.

**F.      Preservation of Previous Arguments**

Throughout this litigation, the government has maintained that a federal district court lacks authority to conduct a wide-ranging investigation into the operations of a USAO, either directly or through a court-appointed special master, and similarly cannot sponsor an FPD's efforts to conduct such an investigation. This is especially the case where, as here, there are only still-unproven allegations of constitutional violations. Among other things, the government has argued that there are limits to the authority a district court can vest in a special master in a criminal case over government objection, that Special Master's Phase III investigation here violates the constitutionally-mandated separation of powers, and that the Special Master should have been recused and his investigation disregarded as tainted. The government will not repeat these arguments here but expressly preserves its right to contest any adverse finding, decision, or sanction on these grounds and hereby incorporates by reference its earlier arguments, including those made in the following documents: Docket #120; #133; #163; #192; #197; #306; #336; #361; and #697.

**II**

**Proposed Findings of Fact**

**A.      Sixth Amendment Claims**

**The CCA-Leavenworth Video Evidence**

1.      In 2016, the CCA-Leavenworth detention facility used a PELCO video system consisting of approximately 154 cameras to record events occurring throughout the facility. Docket #193 at 2. The "CCA-Leavenworth[ ] PELCO multi-camera video system *record[ed] only*

*video*; it [did] not record audio." Docket #214 at 2 (emphasis in original; brackets added). The cameras recorded the video feed to six hard drives.[3] Docket #193 at 2. "Each . . . drive held, at most, about three months' worth of video, with new video replacing old video in a looping fashion." *Id*. *See also* Exh. 47 at ¶ 14 ("Such silent video recordings are recorded on a loop and overwritten on a thirty-to-sixth-day cycle . . . .").

2.      Nine rooms at CCA-Leavenworth could accommodate meetings between inmates and lawyers or legal staff. Seven of these interview rooms had cameras in them. *Id*. Two of the rooms with cameras were not used for inmate-attorney meetings. *Id*. at 2-3. The cameras in the other interview rooms recorded attorney-inmate meetings. *Id*. at 2. All of the video of these meetings was recorded on hard drive #6. *Id*. The events in these rooms were silently recorded "[i]n order to ensure safety, security, and order" at the facility. Exh. 47 at ¶ 14. There is no evidence of USAO involvement in the decision to record these meetings.

**The Contraband Smuggling Investigation and Grand Jury Subpoena for Video Evidence**

3.      In 2016, (now former) Special Assistant United States Attorney ["SAUSA"] Erin Tomasic participated in an investigation of contraband smuggling into CCA-Leavenworth. R.T. 478; 676-77. Initially, Tomasic was the only prosecutor assigned to the case. AUSA Christopher Oakley was assigned to assist around the time search warrants were executed at CCA-Leavenworth in early April 2016. R.T. 479; 1928-29.

4.      On April 12, 2016, Tomasic issued a subpoena on behalf of a grand jury demanding from CCA-Leavenworth "all video footage or still images currently retained . . . depicting any

_____

[3] Some of the parties referred to the hard drives containing the CCA-Leavenworth video evidence as "DVRs," *see, e.g*., R.T. 992, which typically is used as an abbreviation for "digital video recorder." *See* https://en.wikipedia.org/wiki/Digital_video_recorder. Because the devices at issue here stored electronic evidence, they are referred to as "hard drives."

internal or external surveillance video or still image taken between July 2014 and April 12, 2016."
Exh. 438; R.T. 485; 679-80.  This was done to support the contraband smuggling investigation.
R.T. 485.  Tomasic learned that CCA-Leavenworth retained the video evidence for only a short
period of time and knew that if she did not get it all, it soon would be lost.  R.T. 485-86; 678-79.
It was not Tomasic's intent to obtain video of attorney-client meeting rooms.  R.T. 680.

5.      AUSA Oakley explained that he and Tomasic discussed the scope of the grand jury
subpoena and that they decided to ask for all of the video because the contraband smuggling
investigation was ongoing, they did not know who might become a cooperator and what any
cooperators might report, and that they were concerned about the video being overwritten.  He
further explained that from these facts, they realized that the video could possibly incriminate a
person by corroborating a cooperator's version of events occurring in the facility or could
exculpate by disproving such an account.  Accordingly, Oakley and Tomasic decided to obtain all
of the video.  R.T. 1926-27.  Oakley testified that it was not the purpose of the grand jury subpoena
to obtain video of attorney-client meetings.  R.T. 1974-75.[4]   Tomasic never mentioned that
surveillance video would include attorney-client meeting rooms; nor did Oakley recall any agent
referring to the interview rooms.  R.T. 1928.

6.      At some point before the grand jury subpoena was drafted, Tomasic learned from
a cooperating inmate that there were cameras in the attorney-client rooms but she did not think

_____

[4] Special Agent John Seubert of the United States Secret Service ["USSS"] testified that there had
been an incident report concerning the discovery of a bullet or a weapon in one of the interview
rooms, but he could not recall if the investigative team learned of this report before or after the
grand jury subpoena was issued.  R.T. 822.  He further explained that information concerning
passing contraband in the interview rooms came to the attention of investigators only after the
grand jury subpoena for video evidence was issued.  R.T. 822-23.  Seubert testified that he did not
discuss "anything about an attorney-client meeting room" in connection with the grand jury
subpoena.  R.T. 823

about these cameras when she drafted the grand jury subpoena. "It did not register, it did not come to mind, it was not in any way part of my calculus in how I wrote the subpoena." R.T. 486; 682.

7.     In March or April 2016, Tomasic learned from a cooperating inmate at CCA-Leavenworth that another inmate – Richard Dertinger – was spreading information at CCA-Leavenworth about the contraband smuggling investigation. R.T. 483-84; 710. Later, in early July 2016, two additional cooperating inmates provided similar information, causing one of the agents working on the case to remind "everyone" about the initial information. R.T. 710. This additional information about Dertinger was obtained after Tomasic had drafted the grand jury subpoena and after the subpoenaed video evidence had been produced. R.T. 710. The cooperating individuals reported that Dertinger received the information he was spreading from his attorney, Jackie Rokusek. R.T. 484.

8.     The information about Dertinger and Rokusek did not play a role in the drafting of the grand jury subpoena for video evidence. R.T. 485. At the time the grand jury subpoena was served, there was not that much evidence about Dertinger spreading information at CCA-Leavenworth regarding the contraband smuggling investigation. R.T. 485.

9.     When Tomasic drafted the grand jury subpoena, it did not occur to her that four months later (in early August 2016), she would be discussing a possible conflict of interest with attorney Rokusek in the *Dertinger* case based on information the cooperators reported about Dertinger and Rokusek. R.T. 680.

10.     As part of the contraband smuggling investigation, agents searched the law library at the facility. Because of the possibility of attorney-client privileged material being located there, investigators established a "taint team" to screen potentially privileged information that might have been seized when a search warrant was executed there. R.T. 682. Had it occurred to Tomasic that

the grand jury subpoena for video feed would produce potentially privileged information, she would have established a taint team for that evidence as well.  R.T. 682.

11.     Special Agent Seubert served the grand jury subpoena on CCA-Leavenworth on April 14, 2016.  R.T. 818.  On May 17, 2016, USSS Special Agent Andrew Matushek took custody of the original six hard drives from CCA-Leavenworth containing video feed from all of the facility cameras.  One of the hard drives was still in the DVR unit.  Matushek provided the facility with replacement hard drives.  R.T. 860.

**Production of the Subpoenaed Video Evidence and Storage at the USAO**

12.     The video captured on hard drive #6 by the cameras located in the interview rooms covered the period from February 20, 2016 to May 16, 2016.  Docket #193 at 5.  An analysis of visitor logs at CCA-Leavenworth showed that there were over 700 inmate-attorney meetings during this time period.  *Id*. at 5-6; Docket #214 at 2.  ***"[N]one** of the thousands of hours of video-recordings (including the recordings of the 700-plus attorney-inmate meetings) include[d] audio."* Docket #214 at 2 (bold, italics, and parentheses in original; brackets added).

13.     On Seubert's instructions, Matushek made one copy of each hard drive from CCA-Leavenworth and secured the original drives in the USSS vault.  R.T. 861-62.

14.     On June 2, 2016, Special Agent Seubert took the six hard drives with the copied video evidence to the USAO, first to SAUSA Tomasic and then to an employee named Pauletta Boyd.[5]  R.T. 862.

---

[5] Boyd's recollection of events was slightly different than Seubert's.  As she recalled, Seubert first brought the original hard drives to her and she requested that he take them back and bring her copies.  R.T. 978-79.  Seubert explained that he "would have a difficult time believing after 23 years [that] I would take the original evidence over to the United States Attorney's Office . . . ." R.T. 863.  All of the witnesses agreed that the hard drives with the copied video evidence ended up in Boyd's possession.  R.T. 708; 863; 979.

15.     Boyd attempted to see what was on the drives but was unable to do so because she needed an external docking station for the hard drives.  She obtained one but remained unable to view the video evidence because she lacked the necessary viewing software.  R.T. 980.  She contacted Special Agent Seubert, who put her in touch with Special Agent Matushek, who provided her with software necessary to install the viewing software, a "PELCO player."  R.T. 979-80.  The hard drives, the docking station, and the PELCO software all were needed to view the CCA-Leavenworth video.  R.T. 1026-27.

16.     Using an executable file on a disc that she received from the USSS, Boyd installed the PELCO player on the AVPC, a special DOJ-issued computer used to make audio and video clips.  R.T. 984-86; 1041-42.  She did not store the video evidence itself on the AVPC.  R.T. 986.

17.     Boyd is employed by the USAO as a "litigation support specialist" and is tasked to prepare and display electronic evidence at trial.  R.T. 976.  In her job, she controls five laptop and three desktop computers, including the AVPC.  R.T. 994-95.  Boyd found the PELCO viewer to be "very complicated."  She called Matushek again and he found instructions on line and helped her learn to use the viewer.  R.T. 981.

18.     Boyd connected hard drive #1 to the AVPC to try to figure out the viewer.  She did not see anything but the CCA-Leavenworth parking lot.  R.T. 994.

19.     Boyd had sole possession of the hard drives with the CCA-Leavenworth video and did not make copies.  R.T. 981.  She also had "total possession" of the AVPC, which was in her office, and had to log onto it with her password in order to use it.  R.T. 985-86; 988.  She did not share her password with others.  R.T. 986-87.  Boyd did not let anyone else use the AVPC to view the CCA-Leavenworth video evidence.  R.T. 988.  No one ever asked her for access to the AVPC. R.T. 988.

20.     Boyd stored the hard drives in her office.  R.T. 988.

**Discovery and Related Proceedings**

21.     Both before and after CCA-Leavenworth produced the subpoenaed video evidence, Tomasic notified defense counsel in the case that resulted from the CCA-Leavenworth smuggling investigation – initially captioned as *United States v. Black* and later as *United States v Carter* – of her intent to produce the video evidence in discovery.  Exh. 8; Exh. 23; R.T. 685-86; 704-05. She made no effort to conceal that she had subpoenaed the video evidence.  R.T. 686-87.  In addition, on July 25, 2016, the USAO sent out in discovery a "camera roster" (later marked as Exhibit 439), showing that the CCA-Leavenworth video evidence included video from attorney room.  Exh. 1231.

22.     On July 21, 2016, the Court held a discovery conference in *Black*.  Tomasic, Oakley, and attorneys representing the six defendants indicted in *Black* attended.  Docket #75; Exhibit 447.  At that conference, the Court questioned Tomasic about tracking an inmate's location as he moved through the detention facility.  Exh. 447 at 11; R.T. 693-94.  The following colloquy then occurred:

> THE COURT:     And there are cameras that are identified with particular-- the visitor room and attorney/client room as well, or no?
>
> MS. TOMASIC:  Yes. Except that there is no-- there are no audio in attorney/client unless someone at CCA, an employee, took it upon themselves to turn on the audio. But I don't believe it's recorded.  It's just that it would allow a particular CCA employee to listen in without recording if--if the employee believes something was afoot that he needed to be aware of.

Exh. 447 at 11-12; R.T. 694-95.

23.     The information that Tomasic disclosed to the Court and the parties at this hearing was based on the information from the cooperator who told Tomasic about the cameras in the interview rooms at CCA-Leavenworth.  By this time, Tomasic realized that the video evidence

might potentially intrude on the attorney-client relationship and she intended to raise this at the hearing. R.T. 695-96. During the hearing, she discussed this with one of the defense attorneys, who advised her to raise it at the "next meet and confer." R.T, 494-95; 695-96; Exh. 1170. Despite Tomasic's acknowledgement that there were cameras in the interview rooms, no one present at the hearing raised a concern about the attorney-client privilege and no defense attorney asserted the privilege. R.T. 697; Exh. 447.

**KBI Agent Stokes and the Video Evidence**

24.     In early July 2016, Boyd made a copy of the disc containing software used to install the PELCO player for Special Agent Jeff Stokes of the Kansas Bureau of Investigation ["KBI"]. R.T. 982; 1025; 1032.   She also provided Stokes with a "cheat sheet" to inform him how to use the player. R.T. 982-83.   She discussed with Stokes how to load the player. R.T. 983. She did not, however, provide Stokes with the hard drives containing the CCA-Leavenworth video evidence. R.T. 983; 1025. Nor did she make copies of the video evidence for him. R.T. 1020.[6]

25.     On July 12, 2016, Stokes sent Boyd an electronic mail message with the subject line "CCA Video." In the message, he asked, "Did we get in video from the attorney visitation rooms, law library, and pods at CCA?" Boyd responded the same day, providing Stokes with a digital copy of an index that CCA-Leavenworth had created showing the location of the cameras that supplied video feed to each of the six hard drives. Exhibit 644; R.T. 1019-20.   This exchange occurred before Stokes had taken the hard drives from Boyd's office.[7] R.T. 1020.

---

[6] Boyd later made copies of the five hard drives that did not contain video of attorney-client meetings to send out in discovery. R.T. 1020.

[7] Stokes was not involved in drafting the subpoena. R.T. 56. He was not aware that a grand jury subpoena was going to be issued. R.T. 56. He was unable to recall when he first learned that the subpoena for video evidence had been issued. R.T. 56.

26.     Sometime later in July, Stokes took possession of the video evidence on the hard drives.  R.T. 57-58.  He was interested in viewing portions of the video.  R.T. 58.  He understood that the USSS had the originals and the USAO had copies.  R.T. 59.  Stokes did not recall the details of acquiring the videos.  R.T. 67.  Boyd has no recollection of Agent Stokes taking the hard drives.  R.T. 1050.  Stokes took the videos and docking station to his residence, where he has a home office.  R.T. 68.  His agency – the KBI – did not make copies of the videos.  R.T. 69.

27.     Stokes kept the videos in his home office.  Exh. 508 at 133.[8]  His home office is secure and his computer is password-protected.  *Id*. at 134.  Only he can access the computer.  *Id*.  Stokes did not view the video anywhere other than in his home.  R.T. 134.

28.     Stokes did not view video of any meeting involving an attorney and an inmate.[9]  Exh. 508 at 127.  He did see a "thumbnail" image of an empty room with a table and chairs.[10]  *Id*. at 127, 152.

29.     Tomasic directed Stokes to view video around the time of Rokusek's visits to CCA-Leavenworth but told him to not view any video of an attorney-client meeting because a filter team

---

[8] Exhibit 508 is a transcript of Stokes' testimony at a hearing on June 20, 2017, in *United States v. Dertinger*, Case No. 14-20067-06-JAR.  This exhibit was admitted into evidence at the *Carter* evidentiary hearing at R.T. 47-48.  Citations to relevant pages of transcripts in evidence refer to the original pagination.

[9] In a written response to a subpoena *duces tecum* from the Special Master, AUSA Barnett listed Stokes as a person "known to have accessed . . . [a]ny video recording of attorneys meeting at CC with detainees."  Exh. 659; R.T. 2364-65.  Barnett explained, however, that she did not mean by this response to communicate "that Jeff Stokes saw video of a meeting between an attorney and a detainee."  R.T. 2365.  Rather, she understood that Stokes "had tried to go in and locate a meeting" but that she (Barnett) did not know "whether he actually ever saw a meeting between Ms. Rokusek and her client or not."  R.T. 2365.

[10] On August 20, 2016, in response to a request from AUSA Oakley about whether anyone had viewed any "CCA video taken from the attorney-client rooms," Stokes sent an electronic mail response stating: "When I viewed the video there were about 16 camera views on the screen and the attorney client rooms were included in it.  I only viewed CCA video for a short amount of time and there was no activity that I saw in any of those rooms."  Ex. 611; R.T. 1959-60.

would have to do this.  Both Tomasic and Stokes described this conversation.  R.T. 75-76; 89-91; 123; 661; 663; 711-13; 793-94.  Stokes believes that this conversation occurred in July 2016.  R.T. 76-77.  Tomasic was interested in events occurring after Rokusek met with Dertinger, not those during their meetings.  R.T. 712.

30.     Stokes viewed the video to try to determine what Richard Dertinger did after he met with Rokusek, who was suspected (based on information from cooperators) of communicating to Dertinger information relevant to the contraband smuggling investigation and identifying cooperators.  R.T. 64-65, 69; 712.  Investigators were aware that this information had been provided to Rokusek as part of discovery in another criminal case in which she was defense counsel.  R.T. 710-11; 714-15.  Dertinger's dissemination of this information throughout CCA-Leavenworth jeopardized the contraband smuggling investigation and the safety of a person.  R.T. 714.

31.     Stokes believes that, after watching the video, he communicated to Tomasic that he possibly had seen Dertinger walking down a hallway.[11]  R.T. 74; 89.

32.     Co-counsel on the *Dertinger* case, AUSA Flannigan did not instruct Stokes to watch any video of attorney-client meetings at CCA-Leavenworth.  R.T. 2265.  To her knowledge, Stokes never did so.  R.T. 2266.

33.     Stokes went on vacation in late July.  R.T. 70.  He testified that he probably picked up the video evidence a week or two before he left on vacation.  R.T. 70.  He viewed the video evidence in the time period before he left.  R.T. 70-71.

---

[11] At some point much later, the Special Master had Stokes view a video of a defendant meeting with an attorney and asked him if it was familiar.  It was not.  R.T. 88-89.

34.     After Stokes returned from vacation, Special Agent Seubert came to his home and retrieved the hard drives to deliver to the USAO.  *Id*. at 121; 135.  This occurred around August 4 or 5, 2016.  *Id*. at 122.

**Rokusek Views the Video Evidence**

35.     The box of hard drives was returned to Boyd's office by August 5, 2016.  R.T. 1029.  The following Monday, August 8, 2016, the hard drives were gone again.  R.T. 1029.  Boyd learned that the hard drives had been placed into the USAO vault.  R.T. 707; 1030.  The Court ordered the hard drives impounded the next day, August 9, 2016.[12]  R.T. 1047-49.

36.     On August 5, 2016, Boyd assisted Jackie Rokusek and her investigator in viewing CCA-Leavenworth video evidence.  R.T. 922.  To do so, Boyd loaded the PELCO player on a stand-alone computer in an attorney room outside the USAO office area, and showed Rokusek and the investigator how to use the docking station and the viewing software to watch the video evidence on the hard drives.[13]  R.T. 991-92.   Boyd then left the room without seeing what they viewed and retrieved the items after they had finished and left.[14]  R.T. 991-93.

**USAO Access to the Video Evidence**

37.     To Boyd's knowledge, no one from inside or outside the USAO viewed any of the CCA-Leavenworth video evidence while it was in her possession other than (a) Rokusek and her investigator; (b) the participants in an *in camera*, *ex parte* proceeding, *see* Docket #253 at 24; and

---

[12] This video evidence remains in the Court's possession.  R.T. 1041.

[13] Boyd later loaded the PELCO player onto a laptop computer for the Court to use in a closed hearing on August 9, 2016.  R.T. 1032; 1047-48.

[14] The FPD does not represent Richard Dertinger.  R.T. 1646.  On October 5, 2017, as part of an agreement with the government, Dertinger agreed to a time-served sentence in *United States v. Dertinger*, 14-20067, in exchange for withdrawing all of his pending motions in his own case and in the *Black* litigation.   Dertinger Docket #558.

(c) Boyd herself.  R.T. 993-94.  Neither Tomasic nor any AUSA asked Boyd to view any of the video.  R.T. 1046.   When asked to describe the level of "computer sophistication" of USAO attorneys, Boyd explained that "I just know that I helped them with a lot of things that are a lot less complicated than [watching the CCA-Leavenworth video]."  R.T. 1046.

38.      When questioned about the "form" in which the subpoenaed video evidence was produced to the USAO, Tomasic expressed a lack of understanding of the technology involved.  "I only know this because I've talked -- this case has going on for a long time ago [sic] and I've talked to a lot of people about it.  I wouldn't have known what it was at the time.  It's called a PELCO and it has six different boxes that somehow fit into a machine and – I don't know how – beyond that I don't know."  R.T. 486-87.  She recalled that the boxes containing the hard drives were originally brought to her but she had them taken to Boyd.  "I knew that that was not going to be anything I needed to be doing, so I sent it directly to Pauletta – or it stayed on my desk for a period of time, I don't know.  But I know that in some short time frame it went to Pauletta."  R.T. 488.

39.      Tomasic never had access to the software used to watch the CCA video.  She did not know how it worked.  She never installed it on a computer.  R.T. 708.   She never went to Stokes' house to view video.  R.T. 710.

40.      Tomasic never watched any video of any attorney-client meeting at CCA-Leavenworth.  R.T. 573; 707.  To her knowledge, no USAO employee watched any such video.  R.T. 707.  To Tomasic's knowledge, the only government personnel who watched any of the video were Stokes and Boyd.  R.T. 573.  Tomasic never notified others in the USAO that there was video of attorney-client meetings.  R.T. 689.

41.     Tomasic's co-counsel in the contraband smuggling investigation and *Black* litigation, AUSA Oakley, also never saw any of the subpoenaed CCA-Leavenworth video evidence.  R.T. 1901; 1976.  Oakley never saw a video of an attorney meeting with an inmate.  R.T. 1976.  He did not know of anyone in the USAO either watching such a video or directing an agent to do so.  R.T. 1976.  He never went to Stokes' house to watch video and does not know where Stokes lives.  R.T. 1976-77.

42.     Similarly, AUSA Kim Flannigan, Tomasic's co-counsel on the *Dertinger* case, never watched any video of an attorney meeting with a client at CCA-Leavenworth and did not know how to use the equipment necessary to do so.  R.T. 2265.  She was unaware of any AUSA watching video of an attorney-inmate meeting at CCA-Leavenworth.[15]  R.T. 2265.

43.     Other AUSAs were unaware that there was video of inmate-attorney meetings subpoenaed and produced to the USAO.  They never watched such video and did not know of any others who did so.  R.T. 919 (Wamble); 1701-02 (Catania); 1879-80 (Patton); 2123-24 (Krug); 2141-42 (Hunt).

**Rokusek, Dertinger, and the Conflict of Interest Issue**

44.     The information provided by cooperating inmates about Dertinger disseminating information at CCA-Leavenworth that he had obtained from his attorney, Jackie Rokusek, caused concerns about a possible conflict of interest between Dertinger and Rokusek.  R.T. 715.  SAUSA Tomasic and AUSA Flannigan met with Rokusek on August 2, 2016, to discuss this.  R.T. 715-16.  In a telephone call to arrange the meeting, neither Tomasic nor Flannigan told Rokusek that they had video of Dertinger meeting with Rokusek.  R.T. 498.

---

[15] On April 17, 2017, Flannigan sent an electronic mail message to AUSA Rask explaining that Stokes "had not encountered any attorney/client video prior to the [Special Master] taking over." Exh. 618.

45.     Attorney Jackie Rokusek testified that the following occurred during the August 2, 2016 meeting with SAUSA Tomasic and AUSA Flannigan:  "At the – near the conclusion of this conversation, I was informed by Ms. Flannigan that they had a case agent on the case who was reviewing attorney-client meetings from CCA to determine whether or not this document [a proffer statement] had been provided to Richard Dertinger, which I told them it had not."  Exh. 462 at 35.[16]  Rokusek then reiterated that she was told "[t]hat the case agent was reviewing the videos to determine whether or not I had provided the document and that all he had seen so far was me walking down the hall.  That was the – what they had told me, but that he would be reviewing those."  *Id*.

46.     Later, Rokusek was asked the following questions and gave the following answers:

MS. BRANNON:  And just to be clear, was it your understanding from Ms. Tomasic and from Ms. Flannigan that they intended to view the video and to look for a particular document that you were handing a client?

MS. ROKUSEK:  By – if by "they" you mean an agent working for them, yes, their case agent.

MS. BRANNON:  Their case agent.  And to look for a specific action on your part in handing a document to your client?

MS. ROKUSEK:  Correct.

*****

MS. BRANNON:  Ms. Rokusek, when you said that the case agent was looking for you handing a document, you've mentioned that a prosecutor said that, do you remember who specifically said that?

MS. ROKUSEK:  Ms. Flannigan is the one that told me that the agent was looking at the video.

Exh. 462 at 47, 49.

---

[16] Exhibit 462 is the reporter's transcript of an evidentiary hearing in this case on August 16, 2016.

47.     Tomasic testified that during the meeting with Rokusek, AUSA Flannigan mentioned the video but did not mention attorney-client meeting rooms.  Tomasic agreed that "nobody mentioned attorney-client videotapes."  R.T. 655; 657; 660.  There was mention of Stokes looking for video, but Flannigan did not refer to "attorney-client video" or "attorney-client rooms" or "anything attorney-client."  R.T. 660.  Flannigan testified that she did not tell Rokusek that she (Flannigan) had tasked Stokes or that she was going to task Stokes to watch video of Rokusek meeting with Dertinger.  R.T. 2266.

48.     At 11:47 a.m. on August 3, 2016, the day after the meeting, Rokusek sent an electronic mail message to Tomasic and Flannigan.  The message stated, in part, that "[y]ou mentioned that you were reviewing video of my visits with Dertinger at CCA" and requested an opportunity to review the same video before making a decision about the conflict of interest issue. Exh. 441.

49.     Tomasic responded at 5:41 p.m. on the same day, August 3, 2016, informing Rokusek that the surveillance video was available for Rokusek's review.  The Tomasic message did not acknowledge that there had been mention at the meeting of "reviewing video of [Rokusek's] visits with Dertinger."  Instead, her message to Rokusek indicated that there had been no mention of such review and no such review.  It explained that "the agent looking through the video for your visits said that he has locate[d] the time/date of your visits but has not paired those dates up to the video yet."  Exh. 441; R.T. 718.  Tomasic had not viewed the video and, to her knowledge, the agent (Stokes) had not either, and she did not intend to communicate to Rokusek that she had viewed the video.  R.T. 718.

50.     At 6:10 p.m. on August 3, 2016, Flannigan also responded to Rokusek, stating that "it might be best, I [sic] you have time, for you to come over and try to find the video."  R.T. 441.

In short, there seemed to be a miscommunication at the meeting, one that was later reflected in the differences between Rokusek's message and Tomasic and Flannigan's responses.  R.T. 720.

51.     Rokusek tried to arrange to view the video the following day, on August 4, 2016, but Tomasic explained to her in an electronic mail exchange that Boyd was out of the office that day "and she is the only person in the office who can get the CCA footage to play."  Exh. 24; R.T. 721-22.

52.     Later that same day, August 4, 2016, Tomasic received an electronic mail chain from another AUSA that included a message from Criminal Justice Act ["CJA"] Resource Counsel, Laura Shaneyfelt, expressing concern about the CCA-Leavenworth video and the attorney-client privilege.  Exh. 25; R.T. 724.  Around the same time, Tomasic had been alerted to these concerns by something that AUSA Scott Rask sent to her.[17]  R.T. 725.  That evening, the USAO Criminal Chief, AUSA Debra Barnett, circulated an electronic mail message to the entire USAO staff, including Tomasic, which described information that Barnett had learned from the United States Marshals Service ["USMS"] based on a conversation one of its officials had with the "new warden" at the CCA detention facility.  This information – later proven to be inaccurate – was that the cameras in the interview rooms were activated only by pressing a panic button and then could be used only to monitor what occurred in the room, and that the cameras did not record events occurring there.  Exh. 26; R.T. 725-26.

---

[17] The communication from Rask, which was in another electronic mail chain, Exhibit 41, included a message from FPD Melody Brannon expressing concern about the inconsistency between information that AUSA Barnett had obtained from the CCA-Leavenworth warden through the USMS (namely, that there was no recording in the interview rooms, *see* Exh. 26; R.T. 725-26) and what Tomasic had told the Court at the July 21, 2016 discovery conference (that there was video recording with no audio, *see* ¶ 22).  There was no mention in the Brannon electronic mail message or anywhere else in this electronic mail chain about the FPD or any other defense attorney filing a motion with the Court.  R.T. 728-29.

53.     A short time later that evening, on August 4, 2016, Rokusek sent an electronic mail message to Tomasic and Flannigan asserting the attorney-client privilege as to the video of her meeting with Dertinger.  She requested that no one view the video until she had an opportunity to do so.  Exh. 27; R.T. 726-28.  This was the first time that anyone had asserted the privilege as to the CCA-Leavenworth video.  R.T. 727.  To Tomasic's knowledge, no one had viewed video of any attorney-client meeting.  R.T. 727-28.

54.     Tomasic responded to Rokusek's privilege assertion, acknowledging receipt of Rokusek's message, explaining that Flannigan was "out" that day, stating that "I understand your position and do not intend to view the video until this matter is resolved," and promising to "instruct the agent and any other pertinent parties regarding your position."[18]  Exh. 27; R.T. 733.  Tomasic thereafter refrained from watching CCA video and it was later secured.  R.T. 733.

55.     Tomasic forwarded the electronic mail chain that began with Rokusek's privilege assertion to Criminal Chief Barnett, explaining that she had agreed to Rokusek's request not to watch the video and "will maintain that position unless you disagree."  Exh. 27; R.T. 734-35.  Barnett expressed agreement and suggested the possible use of a taint team.  Exh. 27.

56.     The following day, August 5, 2016, Tomasic took steps to secure both the hard drives in USAO possession that contained the copied CCA-Leavenworth video feed and the original hard drives, which remained in the USSS vault.  Exh. 30; R.T. 741-42.

57.     Later that same day, at 2:57 p.m., August 5, 2016, Tomasic sent an electronic mail message to the Court through its clerk, with copies to defense counsel in the *Black* case.  In this

---

[18] Tomasic later sent Rokusek a message clarifying her response to the privilege assertion.  It explained that although the agent, USAO staff, and Tomasic would refrain from watching "attorney/client exchanges if any such videos exist," Tomasic intended to continue review of other surveillance video.  Exh. 27; R.T. 734.

message, Tomasic (a) recounted what she had asserted at the July 21, 2016 discovery conference regarding cameras in the interview rooms; (b) explained that "[s]ince the hearing, defense counsel has expressed concerns that the government may be in possession of video footage of attorney/client interactions at CCA, and that footage may contain privileged communications"; and (c) further explained that, in response, the government reached out to the warden through the USMS and was informed (as described above, *see* ¶ 52) that there was a "panic button" in each interview room to initiate monitoring, but that there was no recording. The message described Rokusek's privilege assertion (without naming either Rokusek or Dertinger) and that the attorney who had made the assertion planned to review video that day.[19]  Finally, the message explained the government's uncertainty about whether the video included attorney-client meetings and, in the event that it did, promised to work with defense counsel and possibly use a taint team to resolve any concerns. Exh. 445; R.T. 736-39.  Tomasic endeavored to be as complete and truthful as possible when drafting this message to the Court.[20]  R.T. 739.

**The FPD Return of Property Motion**

58.    After Tomasic sent her message to the Court, at 5:06 p.m. on August 5, 2016, the FPD filed its first motion in the *Black* case (although it did not represent any defendant who had been indicted), seeking relief under Rule 41 of the Federal Rules of Criminal Procedure and

---

[19]  The preceding day, August 4, 2016, Rokusek had asked Tomasic if she (Rokusek) could view the videotape "tomorrow" – August 5, 2016.  Tomasic responded on the morning of August 5, 2016, stating that "[t]he CCA surveillance video is available for you to review whenever you are available." Exh. 28; R.T. 741.

[20]  When asked by government counsel about Exhibit 444, a document that the FPD showed to Tomasic earlier during her testimony, R.T. 656, which contained information about video recording of attorney visits at CCA-Leavenworth and other detention facilities, Tomasic explained that she was not sure when she saw this document, that it may have been after the events in early August, and that the document, an electronic mail message, was not sent or "cc'ed" to her.  R.T. 740-41.

alleging Sixth Amendment violations.[21]   Docket #82; Exh. 31, 34; R.T. 739.  The FPD filed an
amended motion soon thereafter.  Docket #85.

**The FPD Video Evidence Memorandum**

59.     The FPD entered into evidence at the evidentiary hearing a memorandum
recounting information contained in a Special Master's report concerning CCA-Leavenworth
video recordings.  The memorandum explains that the FPD obtained and analyzed the facility's
visitor logs and attorney visitation calendars to identify inmates who had meetings with legal
counsel during the time period from February 20, 2016 to May 16, 2016.  Exh. 585; R.T. 1505-08.
This is the same time period for which CCA-Leavenworth had captured the soundless video that
was produced in response to the grand jury subpoena issued in the contraband smuggling
investigation.   *See* ¶ 12.  The analysis identified 102 inmates who met with legal counsel during
this time period.  R.T. 1504.  The FPD memorandum does not identify the CCA-Leavenworth
inmates who met with legal counsel during this time period.  Exh. 585.

60.     The Assistant Federal Public Defender ["AFPD"] who prepared the memorandum,
Richard Federico, acknowledged that he was not aware of any evidence that any Assistant United
States Attorney had watched a video of an inmate meeting with legal counsel at CCA-
Leavenworth.  R.T. 1644.

61.     The video recordings of the meetings described in the FPD memorandum were not
introduced into evidence and the FPD did not ask the Court to view those videos.  R.T. 1638.
AFPD Federico conceded that he did not "know whether there is sufficient communication, non-

---

[21] Two days later, the FPD filed an amended return of property motion, adding allegations
concerning audio recordings of outgoing inmate telephone calls from CCA-Leavenworth.  Docket
#85.

verbal communication on any one of those videos to represent attorney-client privileged material."[22]  R.T. 1638.

**The Audio Evidence: the Securus Telephone Service and Warnings to Inmates**

62.     During the time period relevant to the allegations of Sixth Amendment violations concerning recordings of outgoing inmate telephone calls from CCA-Leavenworth [hereinafter "inmate telephone calls"], a company called Securus Technologies, Incorporated ["Securus"] provided inmate-related voice-over internet protocol-enabled telephone service to CCA-Leavenworth.  R.T. 1365, 1367.  When an inmate used one of the 121 Securus-serviced telephones at CCA-Leavenworth to make an outgoing call, the call was recorded (except in circumstances described below).  Docket #214 at 14-15 ("The Securus telephone system normally records all telephone calls made by inmates from Securus phones."); R.T. 1368 (explaining that "default" at CCA-Leavenworth was to record inmate calls).   Recordings of outgoing inmate telephone calls from CCA-Leavenworth were stored on the Securus system for five years.  R.T. 1402-03.

63.     There was a pre-recorded audio preamble that played (and was recorded) when an inmate made an outgoing telephone call.  The standard preamble stated:

> Hello. This is a prepaid collect call from [inmate's self-recorded name], an inmate at CCA-Leavenworth Detention Center. *This call is subject to recording and monitoring.*  To accept charges, press 1.  To refuse charges, press 2.  If you would like to permanently block your number from receiving calls from this facility, press 6.  For balance and rate quotes, press 7.

---

[22] The Court watched a soundless video of Rokusek meeting with Dertinger, see Docket #253 at 24 ("At the conclusion of the August 9 hearing, the Court viewed *in camera*, a video recording of a meeting between inmate Richard Dertinger and his attorney, Jacqueline Rokusek, in one of  the attorney-client conference rooms at CCA-Leavenworth.").

Docket #214 at 20 (emphasis added); Exh. 47 at ¶ 13.  This preamble was audible to both the inmate making the call and to the call recipient.  *Id*.  A calling inmate could choose to hear the preamble in Spanish.  *Id*. at n. 15.[23]

64.   The audible warning about recording and monitoring was one of a number of notices that CCA-Leavenworth inmates received concerning the recording and monitoring of their outgoing telephone calls.  When inmates were initially received at CCA-Leavenworth, they were given an "Intake Booking Packet," which included forms that the inmates had to review and sign.  One was titled "MONITORING OF INMATE/DETAINEE TELEPHONE CALLS."   It stated:

> Corrections Corporation of America reserves the authority to monitor (this includes recording) conversations on any telephone located within its institutions, said monitoring to be done to preserve the security and orderly management of the institution and to protect the public.  An inmate's use of institutional telephones constitutes consent to this monitoring.  A properly placed phone call to an attorney is not monitored.  You must contact your unit team to request an unmonitored attorney call.
>
> I have read or had read to me (cross out one) the above notification on the monitoring of inmate telephone calls.  I understand that telephone calls I make from institution telephones may be monitored and recorded.

Docket #214 at 15-16; Exh. 1.  At intake, a CCA-Leavenworth employee explained this form and asked the incoming inmates to sign it.  A refusal to sign the form did not prevent the recording of the inmate's outgoing telephone calls.  Exh. 490 at 102-106.

---

[23] Fernando Hurtado, an interpreter certified in Arizona, submitted a sworn declaration concerning a translation of a sample of the Spanish version of that portion of the preamble that refers to recording and monitoring.  This declaration stated in part:

> I certify the accuracy of both my original transcription and translation of the phrase "This call may be recorded and is subject to being monitored."  A more literal rendition would be: "This call may be recorded and monitored."  "Subject to" implies the same idea of "possibility" of the verb "puede."

Exh. 656.

65.     In addition to the audible warning and the intake form, within a few days of arrival, CCA-Leavenworth inmates received an "Inmate Handbook."  It included the following passage:

> Access to telephone: Telephones are provided for inmates/detainees in the housing unit dayroom.  Dayroom telephones are subject to monitoring.
>
> * * *
>
> Procedures for telephone use include:
>
> * * *
>
> 6. Your attorney may request of our facility that calls to their office not be recorded to ensure Attorney/Client privilege.  They may request this by way of sending CCA/LDC a fax on their office letterhead.  This request must include contact information and signature.  They may fax it to (913) 727-2231.  <u>IT IS YOUR RESPONSIBILITY TO ENSURE THAT YOUR ATTORNEY IS AWARE OF THIS PROCEDURE; THEIR TELEPHONE CALLS ARE SUBJECT TO BEING RECORDED IF THEY DO NOT REQUEST THEY BE RESTRICTED.</u>

Docket #214 at 16-17; Exh. 2; Exh. 490 at 107-08.  The CCA-Leavenworth forms were available in Spanish, and a Spanish-speaking officer was involved in the intake process.  *Id.* at 114-15. Interpreters also were available by telephone for the intake process.  R.T. 38.  Occasionally the handbook was pulled for revisions, making it difficult to obtain, and then was reissued.  R.T. 35-36.  Sometimes inmates claimed that they did not have or had not received the handbook.  R.T. 36, 41.  A former CCA-Leavenworth employee explained that when inmates approached her with questions about making confidential calls to legal counsel, she would refer them to the handbook and sometimes contacted defense counsel herself on the inmate's behalf.  R.T. 36-37.  She never refused an inmate's request for assistance regarding telephone calls.  R.T. 43-44.  This employee, who was put on administrative leave, had her security clearance terminated, and then was fired, R.T. 39, 43, was unfamiliar with the intake form addressing inmate telephone calls.  R.T. 37-38.

66.     CCA-Leavenworth also posted signs on the walls near the telephones that stated in English and Spanish: "ALL CALLS MAY BE RECORDED/MONITORED."  Docket #214 at 17-18; Exh. 3; Exh. 490 at 74-75.

67.     Finally, on the telephones themselves, there was an additional warning in English that read: "Calls are subject to monitoring and recording."  Some of the telephones also contained this warning in Spanish.  Docket #214 at 17-18; Exh. 5, 6; Exh. 490 at 75-76.  The process used at CCA-Leavenworth to warn inmates during their intake and incarceration that their outgoing telephone calls would be recorded and monitored is described in Exh. 47 at ¶¶ 2-13.

**The Securus Call Platform and Designating Telephone Numbers as "Private"**

68.     The software used to control and maintain records of inmate telephone usage was called the Securus Call Platform.  The platform enabled a user to designate a telephone number as "private."  Docket #214 at 11.  When a telephone number had been designated as "private" in the Securus Call Platform, the post-connection portion of any inmate telephone call to that number would not be recorded.  R.T. 1378; 1417.  In order to designate a telephone number as "private," a user with administrative privileges in the Securus Call Platform would go to a specific "page" of the software application, input the telephone number to be designated as "private," click in a "private" box, and submit the information.  he system immediately recognized the number as a private one.  R.T. 1387-88.

69.     When a telephone number was designated "private" within the Securus Call Platform and CCA-Leavenworth inmates' telephone calls to that number were therefore not recorded post-connection, there still was a prefatory preamble on the call as described in ¶ 63 above, but the preamble did not include the warning about the recording and monitoring.  R.T. 1401-02.  The warning about recording and monitoring was played, however, for every call to a telephone number that was not successfully designated as "private."  R.T. 1434.  This warning would be heard by the caller and the call recipient.  R.T. 1434-35.  All calls to a telephone number not successfully designated as private were recorded.  R.T. 1424.

70.     As a general matter, Securus did not process requests to designate telephone numbers as "private."  This was done by facilities that were Securus customers.  R.T. 1374-75; 1434.

71.     An attorney representing an inmate at CCA-Leavenworth could ask to have his or her telephone number(s) designated as private in order to ensure that calls to this number would not be recorded.  This was accomplished by sending a letter or facsimile transmission on attorney letterhead to CCA-Leavenworth and providing a list of the attorney telephone numbers to be designated as private.   R.T. 340-47; Exh. 490 at 68- 71; Exh. 550; *see also* ¶ 65 (instructions in inmate handbook).

72.     CCA-Leavenworth did not undertake efforts to affirmatively communicate to defense attorneys the option to have their telephone numbers designated as private.  It did not send letters out or post a notice in the lobby.  R.T. 350.  Nonetheless, information concerning the need to privatize telephone numbers was circulated to at least some members of the federal defense bar in the District of Kansas, and at least some defense attorneys were aware of the process for requesting to have their telephone numbers designated as private.  R.T. 10-11-18: 68-69 (attorney Morgan describing notice sent to CJA panel attorneys informing them of the need "to send letters to CCA to make sure our calls were not recorded" and assuming that this notice was sent "from the Public Defender's Office, whoever was coordinating CJA matters . . . .")[24]; *see also* Exh. 459 (Morgan affidavit at ¶ 5; Fowler affidavit at ¶ 4).

---

[24] The court reporter created a separately paginated partial transcript for a portion of the proceedings on October 11, 2018 and marked the transcript as "sealed."  Much of the testimony and discussion with the Court in this transcript was not sealed.  References to pages of this partial transcript are preceded by "R.T. 10-11-18."

73.     There were flaws in CCA-Leavenworth's processing of the attorney "privatization" requests that it received.  This resulted in partial or complete failures to comply with the requests, meaning that an attorney telephone number that an attorney requested to be designated as private remained subject to recording and monitoring.  Docket #214 at 21 ("The Special Master's review of Securus Data reveals, however, that the designation of a telephone number as "Private" does not necessarily prevent calls to that number from being recorded or listened to.") (footnote omitted).[25]  A complete failure of a privatization request would occur if CCA-Leavenworth did not fulfill the request or the person responsible for input into the Securus Call Platform entered the wrong number.  R.T. 1374-76; 1425-26; 1433.

74.     In addition, for reasons unrelated to the call privatization process, inmates in CCA-Leavenworth were designated by "site" within the Securus platform based on whether they were housed at CCA-Leavenworth under its contract with the USMS; Wyandotte County, Kansas; or the Maryland Department of Corrections.   When a user entered a privatization request with respect to a particular attorney telephone number into the relevant page of the Securus software, the user could specify on a drop-down menu whether the request pertained to the entire population of CCA-Leavenworth inmates or instead to one of the sub-populations according to those sites.  If the user specified one of the sites rather than the entire population, the attorney telephone number would be designated as private – and calls to it would not be monitored or recorded – only when called by an inmate within that sub-population.  Calls to that attorney telephone number from an inmate at another site would be recorded.  R.T. 1371-72; 1387-91; 1434; Docket #214 at 22-23 & n.21.

_____

[25] Even when a request to designate an attorney telephone number as private was completely successful – meaning that, going forward, the post-connection portion of an inmate telephone call to that number would not be monitored and was not recorded – recordings of earlier, pre-privatization inmate calls made to that telephone number remained in the Securus system and could be accessed.  Docket #214 at 21-22; R.T. 1424.

75.     There was no evidence in the record showing how many attorneys requested that one or more telephone numbers be designated "private" or how many times CCA-Leavenworth failed to properly fulfill the requests.  R.T. 1512; 1615-16.

76.     A CCA-Leavenworth official named Wayne Bigelow testified about inputting attorney privatization requests into the Securus software and selecting sites based on how the inmates were housed.  R.T. 1472-73.  Inmates from different sub-populations or "sites" were housed separately.  Bigelow did not notify defense attorneys that he had limited their privatization requests by site.  R.T. 1474-75.  When he testified in October 2018, Bigelow did not recall the drop-down menu on the privatization screen that enabled users to limit privatization to less than their full inmate population.  He did not know the consequences of selecting one option on the drop-down menu over the others.  R.T. 1477-78.

77.     When CCA-Leavenworth received a request to designate an attorney telephone number as private, it did not share that information with the USAO.  The USAO did not receive notice of which attorneys had sought to have their numbers designated as private or whether any of these requests resulted in the numbers actually being designated private.  R.T. 370-71; 1439-40.

78.     According to the Special Master, "[a]s of December 15, 2016, CCA-Leavenworth's list contains 528 telephone numbers marked "Private." This compares with the roughly 18,500 "Known Attorney Telephone Numbers" belonging to attorneys in the Kansas / Missouri / Nebraska area that were compiled by the Special Master.  Docket #214 at 25.  The Special Master's report does not state how many of the 528 telephone numbers consist of multiple numbers submitted by a single attorney; nor does it state how many of the attorneys whose numbers were "known" and on the Special Master's list practice federal criminal law and represent CCA-Leavenworth inmates.

**Requesting Call Recordings and Call Detail Reports**

79.     Federal prosecutors, law enforcement officials, and defense attorneys all could request copies of recordings of outgoing CCA-Leavenworth inmate telephone calls stored on the Securus system, as well as an associated document containing transactional data referred to as a "call detail report" or "CDR" that lists information such as the date, time, and duration of outgoing calls and the telephone numbers to which the calls were placed.  Docket #214 at 21 n.19; 1368-69.  The call detail records do not show who answered the telephone number called or who was on line during the call.  R.T. 1445.  Only the content of the call can show this information.  R.T. 1446.

80.     There is nothing in the recordings themselves or the call detail reports that would alert an AUSA that a telephone number called by a CCA-Leavenworth inmate was the subject of a failed privatization request.  R.T. 1439-40.

81.     AUSAs in the District of Kansas (or legal assistants acting on their behalf) used a variety of methods to request recordings of outgoing telephone calls by inmates at CCA-Leavenworth and corresponding call detail reports.  These requests typically were made to CCA-Leavenworth through the USMS.  R.T. 881; 883; 2021; 2230.  Sometimes AUSAs did this by completing a pre-printed one-page USMS form, providing, among other information, the name and registration number of the inmate and the dates of the requested calls, and submitted that form to the USMS.  R.T. 1529-30.  At the bottom of these forms the following text appeared: "NOTE: ATTORNEY CLIENT CONVERSATIONS WILL NOT BE INCLUDED IN THESE RECORDINGS."  *See, e.g.*, Exh. 606.  This assertion sometimes led AUSAs to believe that they would not receive inmate-to-attorney calls.  R.T. 885.

82.     On other occasions, requests were made by electronic mail, by subpoena, or by telephone.  R.T. 1515-16, 1531-36.  Examples of various documented requests are located in

Exhibits 600 (Catania); 601 (Flannigan); 602 (Krug); 603 (Morehead); 604 (Oakley); 605 (Rask); 606 (Tomasic); 607 (Wamble); and 608 (Zabel); *see* R.T. 1559-63; 1582-84.  Sometimes agents requested recordings of inmate telephone calls.  R.T. 482-83; 2267.

83.     AUSAs or their agents made requests for recordings of outgoing inmate telephone calls for a host of reasons specific to particular investigations or prosecutions.  R.T. 754.  These included:  for voice identification purposes in wiretap cases, in the event that claims concerning the identity of those whose communications had been intercepted arose at trial, R.T. 1705; to determine whether there had been violations of a "no contact" order, R.T. 1705-06; to investigate possible threats against witnesses, R.T. 1706; to determine if an inmate was providing instructions to an associate to conceal or destroy evidence, R.T. 1706; to prepare for a detention hearing, R.T. 886; and to see if the inmate had made incriminating statements to family members or friends, R.T. 2267.  AUSAs did not request recordings of outgoing inmate telephone calls in order to obtain or listen to conversations between the inmate and legal counsel.  R.T. 915-16; 1706; 1717; 1982; 2267.

84.     Other than a request made in *United States v. Herrera Zamora* (discussed below), there was no evidence that any AUSA or law enforcement agent ever requested calls made to a known attorney telephone number.  R.T. 1585; 756.  In all other cases, to the extent that one or more inmate-attorney telephone calls were accessed by CCA-Leavenworth staff and produced to the USAO, it was because the recordings of inmate-attorney telephone call(s) were commingled with recordings of other calls made to non-attorneys by the inmate whose telephone calls had been requested.  R.T. 1586-87.

**Accessing Call Recordings**

85.     In order to comply with USAO requests for recordings of outgoing inmate telephone calls and call detail reports, CCA-Leavenworth employees would access the calls on the Securus Call Platform.  R.T. 1594.

86.     There are four ways to "access" a recording stored in the Securus system: "playback," which permits a user to listen to the call; "save to folder," which permits a user to save a digital file of the recording to a designated folder in the Securus Call Platform; "downloading," which permits a user to download a call file to a local computer; and "CD burning," which creates a compact disk with the call file on it.  R.T. 1411-13; 1537-38.  Only users with appropriate credentials can do these things.  R.T. 1414.

87.     Recordings were sent to AUSAs (or others who made requests) either on a disc or in an electronic mail message that contained a hyperlink to a location where digital versions of the recordings were located.  The link expired in 24 hours.  R.T. 880-81; 913; 1609.

88.     The Securus Call Platform recorded data about transactions related to access to recorded inmate telephone calls stored in the system.  R.T. 1383.  This information includes the credentials of the "user" who accessed the recordings.  R.T. 1383.  A facility that is a Securus customer is given the ability to create user accounts.  R.T. 1385.  Almost all of the users for the CCA-Leavenworth account were CCA employees.  R.T. 1408.

**AUSA Use of Recorded Inmate Telephone Calls**

89.     When AUSAs received recordings of inmate telephone calls, they often tasked law enforcement agents to listen to them.   R.T. 482-83; 603-04; 754-55; 2023; 2127; 2229; 2268. When the outgoing inmate telephone calls were in a foreign language, AUSAs retained an

interpreter, often Spanish language interpreter Sarah Gardner, to listen to and interpret the calls. R.T. 1708; 2117; 2125.

90.     Sometimes, no one listened to recorded inmate telephone calls that had been requested and produced.  R.T. 2039-40.  This happened, for example, when calls had been requested in anticipation of trial and then the case resolved without trial, R.T. 1710, or when the AUSA or investigators were looking for something specific and did not need to listen to most of the calls.  R.T. 2039-40.  In some cases, there was not enough time to listen to the calls.[26]  R.T. 2040.  AUSA Catania taught other AUSAs that they should gather as much evidence in a case as possible even if they were never going to use it.  R.T. 1711.

**AUSA Practices Concerning Inmate-to-Attorney Telephone Calls**

91.     AUSAs were aware of and had varying degrees of familiarity with legal decisions holding that when an inmate makes a telephone call to legal counsel after receiving a warning that the call is subject to recording or monitoring and nonetheless discusses legal strategy or advice during the call, the call is not attorney-client privileged or any privilege is waived.  R.T. 614; 1180; 1199; 1711; 2028-29; 2156-57; 2228; 2269.  AUSAs also were aware that the government had relied on this legal authority in court filings in the *Black* litigation.  *See, e.g.*, R.T. 2031.  Some knew the names of some of the pertinent decisions, such as *United States v. Hatcher*, 323 F.3d 666 (8th Cir. 2003), and *United States v. Mejia,* 655 F.2d 126 (2d Cir. 2011).[27]  R.T. 614; Exh. 33.

92.     AUSAs described their understanding of a federal prosecutor's obligations when either an AUSA, or an agent, or an interpreter working with the AUSA, comes across a recording

---

[26] Some inmates had thousands of telephone calls accessed.  R.T. 1523.

[27] At least some of the AUSAs also were aware that these decisions addressing the effect of making a telephone call to legal counsel despite such a warning are cited in USABook (now called DOJBook), an on-line DOJ legal information source considered reliable and authoritative by federal prosecutors.  R.T. 1233-34; 1250; Exh. 33.

of an inmate-to-attorney telephone call commingled with recordings of other calls that the inmate had made.  There was a consensus that, upon realizing that a recording in government possession involves an inmate and legal counsel, the AUSA, agent, or interpreter should immediately discontinue review of the recording and thereafter refrain from listening to it and/or use a taint team.  R.T. 1200-01 (describing prevalent view of the USAO); 2031-33; 2051 ("Legally I could listen to it I think.  Would I? No."); 2157 ("Just because you can do something doesn't mean you should do it.  And what we did historically in this office was we treated communications wherein legally a privilege, if it existed, had been waived, but we treated it as if it existed."); 2270.  This consensus held without regard to AUSA knowledge of and/or agreement with the above-described legal authority concerning such calls either not being privileged or the privilege being waived.  R.T. 1712; 1201-02; 1651-52; 2156-57; Exh. 1165.

93.     Accordingly, AUSAs uniformly and unequivocally denied wanting to listen or having listened to recordings of inmate-attorney telephone calls.  R.T. 220 (Q: "How many times have you listened to recorded attorney-client conversations?" A: "Never."); 904 ("I personally don't want attorney calls because I don't want to be accused of doing anything improper."); 1200-01 ("As a prosecutor, I do not want communications between an attorney and a client unless I am investigating him [sic] for some kind of crime together, some conspiracy, and then I think you would have to get approval."); 1651-52 (describing "practice" as not listening to inmate-attorney calls); 1715-16; Exh. 1165 ("I have NEVER sought or listened to an attorney speak to their client during any calls, CCA, recordings, or otherwise.") (emphasis in original); 1982; 1992 ("I have never listened to a phone call between an inmate and an attorney."); 2038 ("I know I've never listened to a phone call between a defendant and his attorney, ever."); 2127 (Q: Have you ever personally listened to an attorney-client call from an inmate at CCA-Leavenworth?" A: "No sir.").

They also refrained from obtaining such information from agents or interpreters or using such information in an investigation or prosecution.  R.T. 1982; 2127.

94.     Other evidence corroborated this testimony about AUSA attitudes and practices concerning not listening to recordings of inmate-to-attorney calls.  For example:

a.  When interviewed by attorneys from the Federal Public Defender's Office, interpreter Sarah Gardner testified that when she came across text messages about a lawyer, AUSA Krug told her that he did not want to hear it and that she should not summarize it.  Exh. 554 at 12.  AUSA "Sheri" (Catania) and "Tris" (Hunt) also both instructed Gardner with respect to attorney calls, "don't tell me about it." *Id*. at 23.  When asked about this practice by an AFPD, Gardner reiterated: "like I said, Trent Krug is one that was recent within the last couple of years and I said hey, I've got some calls here with an attorney and he immediately, he's like please do not listen to that.  I don't want to hear it.  Sheri (Catania), that's happened before and she's told me that.  Tris (Hunt), I can remember, you know, in his case years ago he had one and he's told me that, so." *Id*. at 25.  Catania also testified about providing these instructions to Gardner.  R.T. 1708-09.

b.  Gardner further explained that when listening to recordings of inmate telephone calls from CCA-Leavenworth, "if it has been an attorney call I'll skip, you know, skip it and then just put attorney call and give it to the AUSA.  And I mean, I've not ever been asked to, hey, transcribe this call for me or what did it say.  They've not done that." *Id*. at 24.  Indeed, when translating and summarizing recordings of inmate calls for AUSA Krug related to *United States v. Villa-Valencia*, Case No. 16-20008-CM-7, Gardner indicated that one call involved an attorney and provided

no information about the content of the call on her summary.  In contrast, Gardner summarized the content of the interpreted non-attorney telephone calls that the inmate had made.  Exh. 718; Exh. 718A.

c.   When describing having once been instructed by Tomasic to interpret attorney-client calls, Gardner explained that "this kind of thing has never happened to me before."  Exh. 554 at 12.  When a contractor working for Gardner had told her about coming across an attorney-client call and she told an AUSA, the AUSA would tell her "nope, nope, we don't want to hear about it."  Exh. 554 at 13.

d.   During further questioning of Ms. Gardner on this topic, the following colloquy between the AFPD and Gardner occurred:

> Q:   All right.  So the – as you understand it, or the practice you followed when you were interpreting these calls, is if you came across a call that seemed to you like it was between an attorney and a client, that you would stop listening to it and you would notify the Assistant United States Attorney who had asked you to work on the case.
>
> A:   Correct.
>
> Q:   And the traditional response when that – when those situations would arise would be don't listen to that call.  Don't tell me anything about it.
>
> A:   Correct.

*Id*. at 25-26.  When pressed, Gardner made clear that these instructions from AUSAs, sometimes given at the outset of her interpretation work on a case and sometimes given as issues arose, pertained to jail calls, "mainly" from CCA-Leavenworth.  *Id*. at 26-27.

e.   On December 22, 2014, before the *Black* litigation began, when AUSA Jabari Wamble obtained a disk of recordings of CCA-Leavenworth calls made by inmate

38

Brenda Wood and began listening to them, he recognized the voice of her defense attorney. R.T. 913. He immediately stopped listening and tasked his legal assistant to obtain a new disk without those calls on it. R.T. 913. As documented in an electronic mail message, she requested a disk without calls to the attorney's telephone number. Exh. 42. He did not listen to any of the attorney-involved calls. R.T. 914. Wamble explained that he then notified defense counsel that he had heard the call. R.T. 916.[28]

    f.   When AUSA Oakley was listening to recordings of inmate telephone calls in the case of *United States v. Mendy Forbes*, he came across a call that he realized was made to a law firm. R.T. 1978-79. He testified that: "I immediately stopped listening to that call and sent an e-mail to the agents involved alerting them to – to the fact that that call was on there." R.T. 1979. Oakley's account of these events was corroborated by an electronic mail message that he sent to two federal agents, with a copy to co-counsel AUSA Wamble, on August 17, 2012, before the *Black* litigation began, in which Oakley described having heard the law office receptionist answer the telephone, after which he "stopped listening immediately" and warning the agents that such calls are "subject to the privilege."[29] Exh. 40.

---

[28] The defense lawyer did not recall AUSA Wamble notifying him of this. R.T. 935. He testified that had Wamble notified him, "I would have been really upset and would've made every precaution to make sure that my future calls were not recorded." R.T. 935. But, this same attorney, upon learning that inmate telephone calls to him were recorded, made no effort to have his office telephone number, which inmate clients used to call him, designated as private. R.T. 938-40 ("I haven't done anything to do that.").

[29] After being questioned whether he was sharing a "legal conclusion" with the agents that the telephone call was privileged, Oakley explained that "there is a valid legal argument that those calls where an inmate knows they are being recorded made to an attorney are not privileged," but said that he chose then "and, frankly, today would make the same choice to instruct my agents don't listen to them because it's not worth it." R.T. 1988-90.

g.  As documented in a series of electronic mail communications, in January 2016, before the allegations of Sixth Amendment violations were made in *Black*, Tomasic received notice from Special Agent Stokes that recordings of telephone calls from CCA-Leavenworth made by the defendant in *United States v. Rapp* in the government's possession included some calls involving defense counsel. R.T. 749-50; Exhibit 33; Exh. 1003.  Stokes discontinued listening to these calls as soon as he realized one of the speakers was an attorney.  Exh. 33.  Tomasic made inquiry about how best to proceed and learned of the *Hatcher* decision and its holding that "where an inmate chooses to make a prison call on a recorded line, the calls to his attorney are not privileged because the presence of the recording device was the 'functional equivalent of the presence of a third party'." Exh. 33.  Despite this, no one listened to the suspected attorney calls.  R.T. 753.

95.  Other than the conduct of former SAUSA Erin Tomasic in the *Herrera-Zamora* case and former AUSA Tanya Treadway in *United States v. Michelle Reulet* (discussed below), AUSAs were unaware of any colleague who intentionally listened to an inmate-attorney telephone call.  R.T. 1706-07; 2128; 2158-59; 2270.

96.  Even witnesses who were critical of the prosecutorial conduct and attitudes of AUSAs working in the Kansas City, Kansas branch of the USAO did not claim to know of any Sixth Amendment attorney-client privilege violations or suggest that such misconduct had occurred.  Instead, these witnesses affirmatively denied knowledge that any AUSAs (other than Tomasic in *Herrera-Zamora* and Treadway in *Reulet*) had ever listened to or even suggested listening to a telephone call between an inmate and legal counsel.

40

a. Former First Assistant United States Attorney Michael Warner described in detail his experience supervising AUSAs in the Kansas City, Kansas Office and harshly criticized the practices and attitudes of some of those AUSAs.  Among other things, he expressed strong disapproval with AUSA conduct and viewpoints related to the filing of sentencing enhancement informations under 21 U.S.C. § 851; discovery practices; sentencing; pretrial detention; and consideration for cooperating defendants.  R.T. 10-11-18: at 10-21.  But, when asked the question: "While you were in the office, did the issue of getting recorded calls or of obtaining perhaps even inadvertently attorney-client calls, did that ever come up, to your knowledge?," Warner responded "no."  He then described his own practice in this area but said nothing critical about the practice of any AUSA.  R.T. 10-11-18: 22.

b. AUSA and former USAO Criminal Chief Debra Barnett testified that she wished that certain Kansas City, Kansas AUSAs practiced law differently, R.T. 2345-46, but stated that she did not know of any case other than *Herrera-Zamora* and *Reulet* in which an AUSA listened to an attorney-client telephone conversation.   R.T. 2393-94.  She further testified that other than those two cases, she had never heard of an AUSA acting on the belief that inmate calls made after a warning about recording are not privileged.  R.T. 2394.

c. Tomasic derogatorily described a conversation in the lunchroom in the Kansas City, Kansas branch office involving AUSAs whom she could not name.  She recounted that she told the other prosecutors about receiving advice from AUSA Emily Metzger to notify defense counsel upon an agent's inadvertent discovery that a recording of an inmate-to-attorney telephone call was commingled with other

inmate calls. Tomasic explained that the others at the table used "colorful language" and opined that Metzger's advice was "stupid" because "you have no obligation to alert [defense counsel]," leaving Tomasic with the impression "that the phone calls [to counsel] were fair game." But, Tomasic made clear to distinguish opinions about this notice-to-counsel issue from those concerning whether it was acceptable to listen to an inmate-to-attorney call – "[n]ot that everyone was going around listening to them."[30] R.T. 471. Tomasic also recounted discussing this topic with AUSA Oakley after the lunch conversation. She testified that Oakley told her that "he personally had encountered an attorney call one time, and he did not alert the defense lawyer, he did not think we had an obligation to. But he discontinued listening, and he instructed his agents to do so."[31] R.T. 471. Later, when again describing the lunchroom conversation, Tomasic repeated the expressed criticism of Metzger's advice by the unidentified lunchroom AUSAs but stressed that "no one took the next step and said, we listened to these calls. They didn't." R.T. 652. This was the practice despite the accepted view that, under the law, the attorney-client privilege was waived for such calls. R.T. 652. Still later, Tomasic reiterated that the lunchroom conversation did not involve listening to inmate-to-attorney calls. R.T. 761-62.

---

[30] Similarly, when later questioned about the effect of the case law showing that an inmate who makes a telephone call after a warning about recording waives the privilege and asked whether "that is fair game, that call?" Tomasic responded: "I don't know that I would take that last step." R.T. 615.

[31] Oakley likely was describing his experience in the *Forbes* case. *See* ¶ 94f. The involved attorney submitted an affidavit stating that Oakley did not notify him of the discovery of the call. Exh. 717. Oakley was not asked about this when he testified.

97.     Some AUSAs produced all recordings of inmate telephone calls in discovery, even to co-defendants.  R.T. 2119; 2125; 483; Exh. 718 (describing AUSA Krug's production to defense counsel of recordings and summaries of inmate calls in *Villa-Valencia* case, which included an inmate-attorney call that was not summarized).  This sometimes created difficulties when the recordings included inmate-to-attorney calls.  R.T. 2129-31.  Other AUSAs either did not produce recordings of commingled inmate-attorney calls, R.T. 894; or produced them upon defense request, Exh. 494.  Some AUSAs questioned whether inmate-attorney calls are discoverable under Rule 16.  R.T. 2231-38; Exh. 494.  Some AUSAs testified that they or their colleagues notified defense counsel upon discovery that they possessed a recording of an inmate's call to an attorney. R.T. 220 (Rask testifying about colleagues); 468 (Tomasic in *Birdsong*); 470 (Tomasic in *Rapp*); 916 (Wamble in *Wood*); *see also* Exh. 494 (Zabel in *Herrera-Zamora*) (describing having notified defense attorney); Exh. 34A (Tomasic notice to attorney Johnson about agent discovering three calls to him from Rapp).[32]

**The FPD Analysis of Transactional Data Regarding Requested and Accessed Inmate Calls**

98.     The Federal Public Defender's Office presented a statistical analysis of documented AUSA requests for inmate telephone recordings from CCA-Leavenworth; Securus data concerning accessed inmate recorded telephone calls; and identified attorney telephone numbers.[33]

---

[32] In May 2014, AUSAs Zabel and Tomasic had an electronic mail exchange about whether Zabel should produce recordings of non-pertinent inmate telephone calls (apparently *not* including any commingled inmate-attorney calls) in discovery.  Zabel expressed an inclination to do so and Tomasic responded: "I only turn them over if I'm going to use them."  Exh. 722.

[33] The FPD's analysis had not yet been completed at the time of AFPD Federico's testimony.  R.T. 1519-20, 1524.  The absolute number of accessed inmate telephone calls that the analysis will identify when complete can only increase.  R.T. 1553.  Further, for litigation purposes, the analysis intentionally was limited to a subset of all of the inmates for whom raw data is available.  R.T. 1515, 1520-21 (limiting analysis to inmates still in custody).  The absolute numbers for the entire present and former inmate population for whom data is available can only be greater.  R.T. 1553. There is an incomplete paper trail of USAO requests for recordings of inmate telephone calls,

R.T. 1509-68; Exh. 562; Exh. 562A.   That analysis both counted and analyzed instances of recorded outgoing inmate telephone calls from CCA-Leavenworth that an AUSA (or legal assistant) had requested, and those that were accessed in the Securus system.[34]   Among other things, this analysis determined how often the following things occurred: (a) the USAO made a request for an inmate's recorded telephone calls from CCA-Leavenworth; (b) recorded calls were accessed;[35] and (c) accessed recordings included calls made to a telephone number subscribed to an attorney.[36]  R.T. 1601-03.

99.     The analysis showed that there were documented USAO requests for the recordings of outgoing telephone calls made by 46 in-custody inmates charged in the District of Kansas.  R.T. 1551; Exh. 562.   Altogether, the FPD was able to document a total of 141 government requests (sometimes there were multiple requests at different times for recordings of the same inmate's calls) for inmates whose accessed calls included at least one call to an attorney telephone number.   R.T. 1549, 1551; 1600-01; Exh. 562.   Further, the analysis of the Securus

---

preventing the FPD from identifying all such requests.  R.T. 1515-21. The analysis thus can only have undercounted the total number of USAO-requested inmate telephone calls.  R.T. 1553.

[34] The FPD analysis was limited to CCA-Leavenworth inmates charged in a federal criminal case in the District of Kansas.  R.T. 1515.  Presumably, the USAO would most likely have requested recordings of outgoing telephone calls made by this pool of inmates rather than CCA-Leavenworth inmates who had been charged with offenses in other jurisdictions or federal districts.

[35] The witness who explained the analysis, AFPD Richard Federico, referred to the "USAO" accessing the recordings of inmate telephone calls.  Federico acknowledged that he used the term "USAO" to include officials employed by CCA-Leavenworth, a private detention facility that contracts with the USMS.  He did not testify or suggest that USAO officials had the ability to access recordings from the Securus Call Platform.  R.T. 1619-22.  He acknowledged that "access [was] done by employees at CCA."  R.T. 1594.

[36] Sometimes inmate telephones calls, including calls to an attorney telephone number, were accessed by CCA-Leavenworth employees based on a request from defense counsel, not the USAO.  R.T. 1549-1550.  On at least one occasion, the FPD mistakenly attributed a call request to an AUSA when, in fact, it had been submitted by a defense attorney.  R.T. 1596-1600.

platform showed that there were 372 in-custody District of Kansas inmates whose calls had been accessed (at someone's request, not necessarily by or on behalf of an AUSA).  R.T. 1548; Exh. 562.  It also showed that the accessed calls of 104 of those 372 inmates included at least one call to an attorney telephone number.  R.T. 1548; Exh. 562.  Accordingly, when an in-custody inmate charged in the District of Kansas had recordings of his or her outgoing telephone calls accessed, there was a 27.96% chance (104 ÷ 372) that those recordings included at least one call to an attorney telephone number.  Exh. 562.  But, of the 104 inmates whose accessed calls included one or more calls to an attorney telephone number, not all of these were included in the 141 government requests.[37]  R.T. 1551.

100.    The FPD analysis included tables showing documented USAO requests for inmate telephone recordings by certain AUSAs, organized by inmate, and also showing whether the named inmate's telephone calls were then accessed and, when the data was available, whether those accessed calls included one or more calls made to a known attorney telephone number; the total number of documented accessed inmate-to-attorney-number calls for each inmate; and the name of the attorney whose identified number had been called.  *See* Exh. 600A (AUSA Catania; requests for recorded telephone calls of 15 inmates, documentation showing that one such inmate had two inmate-to-attorney-telephone-number calls accessed); 601A (AUSA Flannigan; requests for recorded telephone calls of four inmates, documentation showing that one such inmate had 18

---

[37] The 27.96% figure appears to be unrelated to government requests for recorded inmate calls. Rather, it is the rate at which in-custody, District-of-Kansas-charged CCA Leavenworth inmates whose calls were accessed *at anyone's request* were likely to have made one or more calls to an attorney telephone along with their other outgoing calls.  So, the 27.96% figure appears to be a rough approximation of the percentage of CCA-Leavenworth inmates whose outgoing calls include calls to non-privatized attorney telephone numbers, without regard to whether or not the government requests their calls.  AFPD Federico testified, that "there was more than a one in four chance if the government requested calls of a CCA inmate that they were going to get attorney calls."  R.T. 1552.  If so, the same appears to be true for anyone who requests those calls.

inmate-to-attorney-telephone-number calls accessed);[38] 602A (AUSA Krug; requests for recorded telephone calls of 23 inmates, documentation showing that one such inmate had one inmate-to-attorney-telephone-number call accessed); 603A (AUSA Morehead; requests for recorded telephone calls of 28 inmates, documentation showing that ten such inmates had between one and eight inmate-to-attorney-telephone-number calls accessed); 604A (AUSA Oakley; requests for recorded telephone calls of two inmates, documentation showing that one such inmate had 32 inmate-to-attorney-telephone-number calls accessed);[39] 605A (AUSA Rask; requests for recorded telephone calls of two inmates, no documentation of any inmate-to-attorney-telephone-number calls accessed); 606A (SAUSA Tomasic; requests for recorded telephone calls of 31 inmates, documentation showing that 14 such inmates had between one and 12 inmate-to-attorney-telephone-number calls accessed);[40] 607A (AUSA Wamble; requests for recorded telephone calls of six inmates, documentation showing that three such inmates had between two and 32 inmate-

---

[38] There is a material error on Exhibit 601A.  The recordings of one of the listed inmates – Brett Williamson, the only inmate who, according to the exhibit, had recorded calls to a known attorney telephone number accessed – were requested by a defense attorney, not by AUSA Flannigan.  R.T. 1596-1600 (conceding "an error that we put this in Kim Flannigan's packet").

[39] With respect to Exhibit 604A: As Oakley explained in his testimony, and as was corroborated by a contemporaneous electronic mail message, Oakley realized that there was a call to a law firm among the other recorded telephone calls that inmate Mendy Forbes made, as reflected in Exhibit 604A.  Oakley discontinued listening to the law firm call and notified the agents who were working on the case.  *See* ¶ 94f.

[40] With respect to Exhibit 606A: As Tomasic explained in her testimony, and as was corroborated by contemporaneous electronic mail messages, when an agent realized that there were recordings of attorney calls commingled with the other recorded calls that inmate Gregory Rapp made, the agent discontinued listening to the calls and Tomasic notified defense counsel.  *See* ¶ 94g; Exh. 33; Exh. 34A.  Rapp is the inmate who, according to Exhibit 606A, made 12 calls to an attorney telephone number that were accessed; the attorney whose number Rapp apparently called is the one whom Tomasic notified.

to-attorney-telephone-number calls accessed);[41] 608A (AUSA Zabel; request for recorded telephone calls of one inmate, no documentation showing any inmate-to-attorney-telephone-number calls were accessed).  R.T. 1559-69.

101.    There were limitations in the FPD analysis based on the information used to create it.  For any particular "inmate-to-attorney-telephone-number call," the analysis did not show who made the call (only whose PIN was used) or who received the call or spoke to the calling inmate (only that the call was made from a Securus-serviced telephone at CCA-Leavenworth using an inmate PIN and made to a known attorney telephone number).  R.T. 1602-03.  The analysis did not show who answered any of the inmate-to-attorney-telephone-number calls, whether the call "rolled" to voicemail, whether the caller hung up without leaving a message, or which inmate made the call.[42]  R.T. 1605; 1632-33.

102.    The FPD analysis also did not show what percentage of the inmate-to-attorney-telephone-number calls involved only a discussion with a receptionist at a law firm, rolled over to voicemail, or resulted in a conversation between an inmate and someone other than an attorney.[43]

---

[41] Exhibit 607A erroneously double-counts inmate Mendy Forbes, who also appears on Exhibit 604A (Oakley).  Testimony established that AUSA Wamble was not involved in requesting or reviewing recorded calls made by Forbes.  R.T. 880; 1978-80; Exh. 40.  Forbes is the inmate who, according to Exhibit 607A, had 32 accessed calls to an attorney telephone number.

Further, with respect to Exhibit 607A, as Wamble explained in his testimony, and as was corroborated by a contemporaneous electronic mail message, as soon as Wamble realized that there was a call to an attorney among the other recorded calls that inmate Brenda Wood made, Wamble discontinued listening and asked his legal assistant to secure a disk that did not have attorney calls on it.  *See* ¶ 94e.

[42] Although the call detail reports available to the FPD showed the duration of all calls made to attorney telephone numbers, R.T. 1369, this information is not included in the FPD analysis.

[43] There was testimony that attorneys representing inmates at CCA Leavenworth practiced at law firms in which receptionists or other non-attorney staff answered telephone calls from clients and attorneys used voicemail or had the administrative staff take messages.  R.T. 10-11-18: 70-71; 1572-77; 2083-86; 2427-30.

R.T. 1606-07.  Nor does the analysis show whether, when an inmate spoke with an attorney, the call involved legal strategy or advice, rather than other topics, for example discussion of scheduling or other non-legal matters.  *See, e.g.*, Exh. 34A (attorney Rick Johnson stating "I typically use the jail lines for scheduling only).

103.    The FPD analysis does not show whether some of the "accessed" inmate telephone calls in the analysis were based on the generation of hyperlinks that expired before anyone clicked on the link to make the inmate recordings available.  R.T. 1608-10.  More generally, the analysis does not show whether anyone listened to any recording that was accessed.  R.T. 1610, 1612.  It does not show how often the inmate spoke a language unknown to the requesting AUSA, thereby requiring the use of an interpreter.  R.T. 1610-12.  The FPD analysis did not show that any AUSA listened to the substance of any inmate telephone call made between 2010 and 2017.  R.T. 1613-14; 1632.   Nor did it show the content of the call or whether any law enforcement official ever listened to it.  R.T. 1614; 1632-33.  Nor did it show whether a taint team was used with the calls.  R.T. 1618.

104.    The FPD analysis did not show whether any inmate call to an attorney telephone number was accessed after there had been a privatization request submitted for that telephone number.  R.T. 1615-16.

105.    The Special Master, who listened to the content of some recordings of outgoing inmate telephone calls from CCA-Leavenworth, provided this description:

> Of course, the great majority are calls from inmates to friends and loved-ones, not to attorneys. Also, the Securus Data includes very short calls where nothing meaningful occurred, such as calls where: (1) the recipient refused the call after hearing the Securus pre-recorded message; (2) the recipient attempted to join a third party to the call, which normally leads to immediate call termination; or (3) the inmate terminated the call after learning the intended recipient was not present (such as when a receptionist answers the phone and informs the inmate his attorney is unavailable).

48

Docket #214 at 21 n.19.

**The *Herrera-Zamora* and *Reulet* Cases**

106.     There was evidence that two (now former) District of Kansas federal prosecutors intentionally listened to inmate-to-attorney calls – Tomasic in *Herrera-Zamora* and Treadway in *Reulet*.[44]   Although both of these cases have been resolved by other district court judges in this District and neither Herrera-Zamora nor Reulet is involved in this litigation as a party, intervenor, or Rule 41 claimant, these cases were the subject of attention at the evidentiary hearing.  For that reason, they are described below.

**SAUSA Tomasic and the *Herrera-Zamora* Case**

107.     On April 18, 2014, a federal criminal complaint was filed against Juan Herrera-Zamora.  HZ Docket #1.[45]   Three days later, on April 21, 2014, SAUSA Tomasic entered her appearance.  *Id*. at #6.  On May 14, 2014, a federal grand jury returned an indictment naming Herrera-Zamora and a co-defendant.  *Id*. at #21.  On October 8, 2014, the grand jury returned a superseding indictment.  *Id*. at #42.   On January 5, 2015, AUSA David Zabel entered his

---

[44] There were suggestions that there was one or more intrusions into attorney-client communications in a third case as well, *United States v. Huff*, Case No. 14-20067-09-CM.  These suggestions involved two telephone calls: one between Huff and an unnamed individual described as "mom's lawyer friend," and another between Huff and her mother when, simultaneously with that telephone conversation, another person in the same room with Huff's mother was speaking to Huff's attorney, William Sessions, on a different telephone line.  The suggestions of violations of the privilege and/or the Sixth Amendment with respect to these events are baseless.  According to Tomasic, the unnamed friend of Huff's mother was not a lawyer.  R.T. 645.  There is no contrary evidence.  Nor is there proof that if this person is a lawyer, or that he represented Huff.  Similarly, Tomasic explained that there was no communication between Sessions and Huff during the two simultaneous telephone calls.  R.T. 755; see also Exh. 673 at 2.   There is no contrary evidence in the record.

[45] Citations to entries in the district court's docket report in *United States v. Herrera-Zamora*, District of Kansas Case No. 2:14-20049-CM-1, are preceded by "HZ Docket."

appearance.  *Id*. at #42; R.T. 1151-52.  On July 17, 2015, the district court granted a motion by attorney Carlos Moran to enter his appearance *pro hac vice* on behalf of Herrera-Zamora.  *Id*. at #80, #81.

108.    As interpreter Sarah Gardner recalled it, Zabel contacted Gardner to have her translate recordings of Herrera-Zamora's telephone calls from CCA-Leavenworth.[46]  This first set of calls will be referred to here as the "Herrera-Zamora CCA calls" to distinguish them from the later-obtained calls made from CCA-Leavenworth to the cellular telephone number of Herrera-Zamora's attorney, Carlos Moran (the "Moran CCA calls").   It appears that there were no recordings of inmate telephone calls to Moran or to other attorneys in this first batch, the Herrera-Zamora CCA calls.[47]  Exh. 554 at 13-14; 17-18.

109.    Gardner mistakenly believed that Zabel had brought Tomasic into the case when, in fact, Exh. 554 at 5-6, Tomasic had entered her appearance near the outset of the case and Zabel entered his appearance over eight months later.  *See* ¶ 107.  As Gardner did the translating work, which took from April until August 2014 because Herrera-Zamora used the telephone so much, she communicated with Tomasic about preparing summaries and the content of the CCA calls, some of which led to what Gardner described as an "ah-hah moment for Erin," apparently because of incriminating conversations.  Exh. 554 at 7-8.  The calls included Herrera-Zamora describing to his wife and girlfriend things that his lawyer told him.  *Id*. at 9-10; 17-18.  Gardner was not advised of any attorney-client calls by any of her contractors working on the Herrera-Zamora CCA calls.  Exh. 554 at 13-14; 17-18.  Gardner began the process of translating and summarizing these

---

[46] Gardner likely is mistaken about who contacted her to interpret the telephone conversations. Zabel did not enter his appearance in the *Herrera-Zamora* case until the next year.  *See* ¶ 107.

[47] The FPD analysis of Tomasic's request for these calls had not been completed by the time of the evidentiary hearing.  Exh. 606A.

calls in April and finished in August.  *Id*. at 7-9.  All of the USAO interaction that Gardner described concerning Gardner's translation of calls in the *Herrera-Zamora* case involved Tomasic.  Exh. 554 at 7, 8, 9, 14, *see id.* at 21 (describes sending e-mail to Erin  and explains that "I may have cced Dave too, but I mainly spoke with Erin").  At some point, the USAO produced these calls to the defense.  Exh. 576 (describing production of all of the Herrera-Zamora "pre-limine hearing calls pursuant to our decision to give them everything we got").

110.    On July 1, 2016, AUSA Zabel sent an electronic mail message titled "Jury Trial Prep" to remind Gardner that she had translated "recorded calls and text messages" in the case, explaining that trial was set to begin on July 11 and that Herrera-Zamora would likely testify on July 13 or 14, and asking if Gardner was available to prepare on Thursday, July 7, 2016.  Exh. 1149; R.T. 1157; 1162.   That same day, Gardner responded that she was on vacation from later that day through Thursday night (which was July 7).  She asked if they could prepare on Friday (July 8).  Exh. 1149.   Gardner sent a copy of her response to Tomasic.  *Id*; *see also* Exh. 554 at 27-28 (Gardner's description of these e-mail communications).

111.    On the same day, Tomasic responded by asking if Gardner could testify on Friday, July 8, 2016 (at a scheduled pretrial motion *in limine* hearing).  She described the nature of the necessary testimony, and explained that Gardner might also be needed at trial to testify about text messages that she had translated and, "[i]f the defendant ends up testifying," about some translated "jail calls."  Gardner agreed.  There were further amicable, non-substantive exchanges as part of the same chain.  *Id*.; R.T. 1162-63.

112.    Gardner recalled that she met with Zabel and Tomasic and they discussed Gardner testifying about calls that she had translated involving Herrera-Zamora and his wife and girlfriend.  Exh. 554 at 28-30.  This was based on the work that Gardner had already done.  *Id*. at 31.  Gardner

does not recall if she testified. *Id*. at 32.  There was some discussion about Gardner testifying the following week during trial. *Id*. at 32.

113.     At the July 8, 2016 *in limine* hearing, Herrera-Zamora's attorney, Carlos Moran, described having had contact with two CCA-Leavenworth inmates represented by other attorneys and learning from these inmates that they had information exculpatory to Herrera-Zamora.  R.T. 1172; Exh. 491.  Later that day, July 8, 2016, Tomasic sent an electronic mail message to the USAO Professional Responsibility Officer – AUSA Lanny Welch – and to AUSA Kim Flannigan, with a copy to AUSA Zabel.  In it, Tomasic described what Moran had disclosed in the hearing and expressed an interest in obtaining recent telephone calls made from inmates to Moran's cellular telephone.  Tomasic wanted to review calls made by the "two non-client inmates" to Moran and to use a taint team to "review the calls and screen out attorney/client calls."  Exh. 491.  Welch forwarded the message to an attorney in the DOJ Professional Responsibility Advisory Office ["PRAO"] and asked "whether there would be any ethical or policy reason why this plan should not be followed?"  Exh. 491; R.T. 1202-3.  The PRAO attorney responded, stating PRAO would not opine on substantive matters such as whether the telephone calls at issue were privileged or whether the privilege was waived, but if there had been a waiver, review of the calls by Tomasic "would be permissible."   The response further noted that "while not required under the rule, it would be prudent to have a filter attorney review the calls to avoid the risk that AUSA [sic] Tomasic's representation may be challenged if it looks like she may be trying to cull defense camp strategies from recordings on the eve of trial."  Exh. 666 at 2; R.T. 1172-74.  Tomasic and Zabel were copied on this response.  Exh. 491; R.T. 1228-31; 1260-61.

114.     Tomasic then requested recordings of telephone calls made from CCA-Leavenworth to Moran's cellular telephone number, which would have included any calls that

Herrera-Zamora made to Moran.  R.T. 644.  Tomasic received this second batch of calls – referred to here as the "Moran CCA calls" – either on July 11, 2016, the first day of the *Herrera-Zamora* trial, or on July 12.[48]  Exh. 666 at 2.

115.    According to Tomasic's later admissions to colleagues and to the Court in May 2017, despite having received the PRAO guidance, Tomasic listened to the Moran CCA calls before submitting them to a filter process. Exh. 497; Exh. 521.  By her own later account, Tomasic, upon receipt of a disc containing recordings of the Moran CCA calls on the first or second day of the Herrera-Zamora trial, decided to listen to the calls herself, in advance of filter review, to learn whether Moran had contact with inmates at CCA who would be potential defense witnesses.  While listening to the calls, Tomasic became aware that she was listening to conversations between Herrera-Zamora and Moran.  She would later claim that although she spoke Spanish, she was not familiar with the kind of Spanish spoken and thus was unable to discern much of what was said. She reported that she then "spot-checked" the conversations hoping to locate the voice of an inmate other than Herrera-Zamora.  She listened to portions of the entire disc and eventually stopped and later provided the disc to the filter agent.  Exh. 584; Exh. 497 at 4; Exh. 521.  Tomasic did not publicize that she had listened to attorney-client calls.[49]  R.T. 647.

---

[48] Apparently, CCA-Leavenworth first erroneously produced recordings of Herrera-Zamora's outgoing calls, and then, upon USAO request, produced the calls made to Moran's cellular telephone. Exh. 494.

[49] During the evidentiary hearing, Tomasic claimed, for the first time, that she listened to the Moran CCA calls herself because "the filter team still wasn't in place" and claimed that the filter agent was not conflicted out of the case until "much later" because initially no filter agent was available. R.T. 781-82.  Tomasic's claim that there was delay in obtaining a filter agent seems inconsistent with known facts.  The PRAO guidance was not sent until July 8, 2016, and trial began on July 11, 2016, and ended on July 18, 2016.  *See* ¶¶ 114, 119.  By that time, the filter agent already had been conflicted out and a decision made to no longer have a filter agent listen to the recordings because they were not needed. Ex. 666 at 3.  Thus, Tomasic's testimonial claim that there was "lag time" and that the filter agent was not assigned until "much later" is implausible.  Tomasic

116.     A Spanish-speaking agent assigned as a filter agent began to review the Moran CCA calls but then recognized the voice of a relative on a call.  Tomasic consulted with AUSA Tris Hunt, who advised her that the agent had to discontinue work on the case.  R.T. 2147-50; Exh. 497 at 2 n.1.  There was no other Spanish-speaking agent available and no "filtering" was ever done.  Exh. 497 at 2 n.1.

117.     During the *Herrera-Zamora* trial, interpreter Gardner received a telephone call from a member of the USAO support staff who asked if she could come to the USAO to listen to some calls.  The support staff employee  explained that "she was waiting for Erin (Tomasic) to step out of trial to come to talk to [Gardner] about what she wanted" and "that there were specific phone numbers of calls that she wanted me to listen to."  Exh. 554 at 33.  According to an invoice, Gardner arrived at 11:00 am that day.  Tomasic then arrived in the USAO and she and Gardner went into Tomasic's office where Tomasic told Gardner that she "would like for you to listen to some of these calls."[50]  *Id*. at 33.  Tomasic told Gardner that "I am specifically looking for a call with [Herrera-Zamora] and his attorney."  *Id*. at 33.  Tomasic explained that she "want[ed] to hear what he's been talking about with his lawyer because [Tomasic] want[ed] to use it to impeach him when he takes the stand."  *Id*. at 34.   Gardner made clear that only Tomasic was present for this discussion with her.  *Id*. at 36.  Zabel was unaware of the interaction between Tomasic and Gardner concerning the Moran CCA calls.[51]  R.T. 1164-65; 1193-95; *see also* Exh. 554 at 78-79.

---

herself later testified that the filter agent was listening to the recordings at the same time as interpreter Gardner, R.T. 782-83, who was listening during trial.

[50] Because Gardner had already completed her work translating and summarizing the Herrera-Zamora CCA calls (the first batch the USAO obtained), Exh. 554 at 7-9, these calls must have been the Moran CCA calls (the second batch), meaning the recordings of calls made from CCA inmates (including client Herrera-Zamora) to Moran's mobile telephone.

[51] Because she thought that Zabel was the lead attorney on the case, Gardner assumed that Zabel was aware of what Tomasic instructed her to do.  Exh. 54 at 49-50, 53, 68, 71, 78-79.  Gardner

118.    The USAO staff member communicated to Gardner that Tomasic was "like wanting this yesterday," but Gardner had difficulty locating the conversation ("[i]t's like picking out a needle in a haystack") and had difficulties with the computer.  *Id*. at 34-35.  Gardner located a call involving three men, one of whom identified himself as "Mr. Carlos," and translated and summarized it.  *Id*. at 35.  Tomasic returned, learned from Gardner what she had done, and told Gardner to wait there and that if Tomasic wanted her to testify, Tomasic would let Gardner know.  *Id*. at 35, 37-38.  Gardner had told Tomasic that she found a call that she believed involved an attorney named "Mr. Carlos" and two unknown other men.  *Id*. at 38, 63.  Tomasic told Gardner not to conduct further review.[52]  *Id*. at 38-40.

---

first reported Tomasic's conduct during a social encounter at a restaurant with AUSA Catania.  *Id*. at 54-65; R.T. 1718-20.  Gardner recalled Catania opining that Zabel "knew."  Exh. 554 at 60-61.  Gardner understood Catania to be saying this because first and second chairs on cases discuss case-related matters, not based on some knowledge that Catania had by working in the USAO.  *Id*. at 60-61.  When Catania later reported the Gardner conversation to AUSA Metzger and referred to "they" or "them" being involved in the conduct that Gardner had described, it was not because she recalled Gardner telling her that Zabel had been involved.  R.T. 1722-23 (agreeing that "it is possible that the brief conversation with Ms. Gardner did not implicate Mr. Zabel in this conduct at all").  Catania herself had no involvement in the *Herrera-Zamora* case and no basis to assert whether Zabel knew of Tomasic's conduct.  R.T. 1725.  Catania did not recall opining to Gardner that Zabel knew what Tomasic had instructed Gardner to do.  *Id*.  In short, Gardner expressly denied that Zabel was present when Tomasic tasked her to locate attorney-client calls to be used for impeachment and neither Gardner nor Catania had any factual basis for surmising whether Zabel knew about what Tomasic was doing regarding the Moran CCA calls.

[52] Tomasic provided a different account of these events than interpreter Gardner.  According to Tomasic, "the first batch of Herrera-Zamora's calls we got were just Mr. Herrera-Zamora and Carlos Moran."  R.T. 557.  (Gardner testified that there were no attorney calls in this first batch, that they involved Herrera-Zamora calling his wife and girlfriend.  ¶ 109.)  Tomasic claimed that "[t]he second batch that we got contained two calls from two different inmates, and that's the disk that I recall Dave Zabel listening to those calls in my presence on his computer."  R.T. 557-58.  Tomasic further claimed that "[m]y directions to [Gardner] . . . were to listen to all of Mr. Herrera-Zamora's calls with his attorney to find instances where he put someone else on the line . . .  I said, you're looking for someone else."  R.T. 555.  (Gardner testified that Tomasic tasked her to listen to conversations between Moran and Herrera-Zamora – that is, between attorney and client – in order to assist Tomasic in impeaching Herrera-Zamora in the event that he testified.  ¶ 117).

119.    On July 18, 2016, a jury found Herrera-Zamora guilty.  HZ Docket #127.

120.    At a hearing on September 7, 2016, in the *Black* litigation, the following colloquy occurred between the Court and Tomasic:

> THE COURT:    To your knowledge, in all instances where inmate calls have been recorded, have these inmates been notified of the recordings?
>
> MS. TOMASIC:   Prior to the August 9th hearing, the only instance I knew where an agent had encountered attorney-client video – or excuse me, attorney-client recordings, audio-recordings, inmate calls, he told me, I immediately contacted our professional responsibility point of contract [sic].  He e-mailed PRAO.  PRAO gave an advisory opinion.
>
> And then in further discussion with our professional responsibility point of contact, I e-mailed the attorney, let him know we had encountered them, let him know that an agent had inadvertently listened to between 10 and 15 seconds and that we did not intend to listen to them anymore.  And I have in evidence – the government can admit that e-mail to the defense attorney that was sent as part of this investigation.
>
> THE COURT:    All right.  I would suggest at the close of all of these questions – I assume you have these marked.  And what I'll have you do is just describe them by exhibit number and I'll admit all of that for the record.
>
> Have the inmates been given an opportunity to assert their privilege?
>
> MS. TOMASIC:   Could you clarify that point?
>
> THE COURT:    Well, if they're not notified that the recordings exist, when have they had an opportunity to assert their privilege with respect to those recordings?

---

Tomasic's belated assertion that Zabel was involved in listening to calls between Herrera-Zamora and Moran strains credulity.  Zabel does not speak Spanish, R.T. 1204, and would not have been able to understand these calls.  An electronic mail message that Zabel sent to Tomasic on March 6, 2017, further contradicts Tomasic's account.  In that message, Zabel states, with respect to the Moran CCA calls, "we (the investigative team) don't know for a fact that the recordings obtained were even the defendant."  Exh. 576 (parentheses in original).  Had Tomasic and Zabel listened to these calls together, as Tomasic claims, it is unlikely that Zabel would have written something inconsistent in an e-mail message sent only to Tomasic.  Zabel also expressly disputed Tomasic's account.  R.T. 1154-65; 1190-91.

MS. TOMASIC: The only inmate-attorney call that I was aware was encountered, I notified the attorney immediately. After this issue has arisen, I've spoken with all the agents who listened to calls in this case, and they did state that they had encountered some additional attorney calls, did not listen to them, minimized immediately. But neither Chris Oakley nor I were ever told about those particular calls, because an agent other than Jeff Stokes is the one who encountered the calls and they used a different procedure.

Exh. 490 at 25-26. Later in that same hearing, the Court asked Tomasic if she notified any other defense counsel "that their calls with clients at CCA were being recorded or perhaps were being recorded?" The following exchange then occurred:

MS. TOMASIC: No, Your Honor. Because this – based on my understanding, this was an exceptional circumstance where an attorney did not block his or her number.

THE COURT: Are you aware of any other instance in which an attorney or agent listed – listened to recordings attorney-client phone calls?

MS. TOMASIC: Since the first hearing, I have questioned the agents and I am aware of additional circumstances where, for example, Marshal Cahill encountered one attorney call. And he estimates that he listened to between 500 and 1,000 calls as part of this investigation. He encountered one call, it was an outgoing call from a female inmate. And when the phone picked up, it said, "law office," that's it. It was a receptionist he assumes, and then he hung up – he discontinued listening to that call.

THE COURT: Okay.

MS. TOMASIC: There may be additional instances where other agents encountered calls. Again, I would have only learned of those after this first hearing. For example, I believe Deputy U.S. Marshal Zac Howard encountered some attorney calls. But again, he said the phone was answered "law office," and he discontinued listening. So there was no substance that was encountered.

THE COURT: Okay. In the past, has the U.S. Attorney's Office used attorney-client recordings in any other cases, to your knowledge?

MS. TOMASIC: Used them?

THE COURT: In any way.

57

MS. TOMASIC:    I can think of – well, first of all, I'm not in a position to know for everyone else, so I don't want to speak to that. I can think of one instance in which I, along with another AUSA, subpoenaed calls to a particular attorney's – not subpoenaed, either requested or subpoenaed calls to an attorney's cell phone number. Those were provided to a Taint Team, because we had reason to believe, based on the attorney's representations, that he was communicating with other inmates who were represented by counsel without contacting their attorney first.

    And the Taint Team went through those calls to find the calls with the other inmates. And that information was provided to a Taint attorney not associated with the investigation, and that that investigation is – not that that investigation – that matter is pending at this time in another court.

THE COURT:    All right.

MS. TOMASIC:    And the purpose of those phone calls with the other inmates was to procure them as witnesses and wasn't necessarily beneficial to either interest. And the attorney knew that those other inmates were represented by counsel, and he was intentionally not going through their attorneys.

*Id*. at 50-53.[53]

121.    In the fall of 2016, likely in November 2016, Tomasic told AUSA Oakley about having obtained CCA-Leavenworth recorded inmate calls that included calls to an attorney and that she had put the disk into her computer but had not listened to the calls because she could not understand the Spanish. R.T. 1952; Exh. 579A. According to Oakley, Tomasic did not report having listened to the conversations, but instead said that she followed PRAO advice and that PRAO had advised her that the calls were not privileged.[54] R.T. 1957; Exh. 579A. Tomasic expressed concern that the Special Master would be able to determine from review of her computer that she had inserted the disk. Exh. 579A; R.T. 1966-69 (describing an inaccuracy in Exhibit

---

[53] The government later filed a record correction in this case, as well as the *Herrera-Zamora* and *Huff* cases, as to these statements. Docket # 276; Exh. 492; Exh. 497.

[54] PRAO does not give substantive advice like this. R.T. 1234.

579A).   Tomasic did not tell Oakley that there had been a filter process in place, R.T. 1957-58, that she listened to the conversations on the disk, R.T. 1969-70, or that she retained an interpreter to translate attorney-inmate calls.  What Tomasic told Oakley was inconsistent with the letter that Tomasic later sent to the Court.  *See* ¶ 128.

122.    On February 15, 2017, Herrera-Zamora's attorney, Carlos Moran contacted AUSA Zabel and asked if either Zabel or Tomasic had listened to his calls with Herrera-Zamora.  Zabel assured Moran that he had not done so and explained that Tomasic was out of the office and that he would discuss the matter with her and respond to Moran.  R.T. 1216, 1221; Exh. 666 at 3. Before that occurred, Moran filed motions alleging invasion of the attorney-client privilege.  Exh. 666 at 3.

123.    After Tomasic returned to the USAO, she met with AUSAs Rask, Hunt, and Zabel to discuss how to respond to the motions.  Tomasic did not disclose during this meeting that she had listened to calls between Herrera-Zamora and Moran.  Exh. 497 at 3.

124.    On February 22, 2017, Zabel and Tomasic had a conference call with Moran and his co-counsel.  *Id.* at 4.  According to Moran's testimony, in this conference call, Tomasic stated that she "didn't do it," meaning that she represented to him and co-counsel that she had not listened to recorded telephone calls between Herrera-Zamora and Moran.  R.T. 1217.  Tomasic was indignant, suggesting that Moran and his co-counsel had done something wrong by filing the motions.  R.T. 1222.  Based on these representations, Moran moved to withdraw his motions.[55] R.T. 1217-18; 1222-23.

---

[55] Much later, on May 10, 2017, Tomasic explained to Zabel that what she had said in the conversation with Moran was that she had not "substantively reviewed" telephone calls between Herrera-Zamora and Moran.  Exh. 666 at 4.  If this is true, Tomasic's one-word qualification understandably appears to have escaped the attention of others in the conversation.  R.T. 1222 (Moran: "she didn't tell me the truth"); Exh. 666 at 4 (Zabel: "Because I was acting under the

125.    On March 8, 2017, the district court granted Herrera-Zamora's motion to withdraw the motions alleging violation of the attorney-client privilege.   This prompted an exchange between Tomasic and Zabel whether to produce the Moran CCA calls to the defense.   (They already had produced the earlier-obtained Herrera-Zamora CCA calls.)   Zabel opined in an electronic mail exchange that there was no production obligation under Rule 16.  Exh. 576.  Zabel also sent an electronic mail message to AUSA Treadway seeking her advice on the discovery question.  Among other things, the message to Treadway, a copy of which was sent to Tomasic (as well as to AUSAs Rask and Hunt), stated that the Moran CCA calls "were *never* reviewed in *any* fashion by the prosecution team and, to this day, we do not know the content of the calls, nor do we know who the speakers are."  Exh. 494 (emphasis in original).  Tomasic, who had listened to at least some of these calls and had tasked Gardner to listen to them as well, made no effort to correct this statement.  The next day, March 7, 2017, before Treadway responded to Zabel, he notified her that Moran had requested the calls and that he had agreed to produce them.  R.T. 494.  The USAO, through AUSA Hunt, produced the recorded calls to Moran.  R.T. 1191; 1204-05; 2152; Exh. 496, Exh. 500.

126.    In May 2017, Tomasic informed a number of her colleagues – AUSAs Zabel, Rask, Hunt, and Flannigan – that she had listened to calls between Herrera-Zamora and legal counsel. Exh. 584 (Rask); Exh. 497 at 3-5 (Rask); Exh. 578A (Flannigan); Exh. 580A (Zabel); Exh. 581 (Hunt). Tomasic reported to Rask and Zabel on May 10, 2017, that she had listened to the Moran CCA calls before she gave the disk containing the calls to the filter agent and that, in doing so, she heard recorded conversations between Herrera-Zamora and Moran.  Exh. 584; Exh. 497 at 4.  She

---

assumption that Erin had not accessed, reviewed, or listened to the calls in any manner, I was not listening carefully to the words that she was using.").

further reported that she could not understand the conversations, because they were in a Spanish dialect that she did not understand.[56]  Tomasic further reported to Rask that she "spot-checked" the conversations to try to hear the voice of an inmate other than Herrera-Zamora.  *Id*.   Tomasic made similar statements to Flannigan.  Exh. 578A.

127.    After her termination as a SAUSA in mid-May 2017, Tomasic called AUSA Hunt and explained that she had been terminated for accessing Herrera-Zamora's calls.  R.T. 2154. Tomasic had previously told AUSA Hunt that she had not accessed attorney-client calls in the *Herrera-Zamora* case.  Exh. 581A.  When Hunt learned that she had, in fact, done so, he told Tomasic that he was angry with her and said: "You lied to me."  Tomasic said that she was sorry.[57] R.T. 2154

128.    On May 23, 2017, Tomasic wrote a letter to the Court.  Tomasic admitted that she had listened to attorney-client calls "[p]rior to submitting the calls to a taint team for substantive review."  In the letter, Tomasic attempted to justify what she described as "my decision regarding handling of the calls."  Tomasic claimed that, after the fact, she discussed her decision with two AUSAs.  Without disclosing what information she provided to these two AUSAs (or what she may

---

[56] Attorney Moran, who once worked as a linguist for the Federal Bureau of Investigation, testified that there are no separate dialects in Spanish.  R.T. 1208, 1223-24.

[57] Tomasic testified that sometime after August 2016 (when the *Black* litigation started), a folder containing the *Herrera Zamora* telephone calls mysteriously appeared on her desk, causing her to discuss this incident with AUSAs Hunt and Rask.  R.T. 807.  Tomasic first made this claim in October 2016.  Exh. 499 (referring to folder in her inbox).  Tomasic further testified, for the first time on redirect examination during the evidentiary hearing in this matter, that in connection with this incident, she told AUSAs Hunt and Rask that she tasked Sarah Gardner with listening to attorney-client calls during the *Herrera-Zamora* trial.  R.T. 807-09.  There is no evidence or testimony corroborating Tomasic's claim that she made this disclosure to Hunt and Rask in 2016. It is hard to reconcile this testimony with Tomasic having apologized to Hunt in May 2017 for lying to him about accessing attorney-client calls.  This claim also is at odds with Tomasic's statements in the May 23, 2017 letter to the Court.  *See* ¶ 128.

have refrained from telling them), Tomasic said that her co-counsel "stated that I did not have an obligation to bring this matter to the attention of my supervisor because I had not violated any law, substantive right, or ethical rule."  Tomasic made no mention in the letter to the Court of having instructed Sarah Gardner to listen for and translate conversations between an attorney and a client for Tomasic to use for impeachment purposes.  R.T. 784.  Further, contrary to claims that Tomasic has made for the first time during the evidentiary hearing, she made no mention of any other AUSA knowing about, agreeing with, or being involved in her efforts to listen to or have interpreted Herrera-Zamora's attorney-client communications.  Exh. 521.

129.    After some of Tomasic's conduct in this matter came to light, the parties reached an agreement by which the original judgment against Herrera-Zamora was vacated, he waived indictment, pled guilty to an information, and received a time-served sentence.  HZ Docket #200, 228-33.  Herrera-Zamora was later deported to Mexico.  R.T. 1500.

**AUSA Treadway and the *Reulet* Case**

130.    On January 15, 2014, Michelle Reulet was charged in federal court in Case No. 14-40005-DDC.  MR Docket #1.[58]  At one point, Reulet was represented on the federal charges by attorney Andino Reynal.  R.T. 10-11-18: 46; MR Docket #123.  Later, attorney Melanie Morgan entered her appearance, MR Docket #666, and Reynal moved to withdraw, MR Docket #650, #656, but this motion was not immediately granted.  R.T. 10-11-18: 46-47, 89; MR Docket #669 (court finding "that Mr. Reynal's duties as Ms. Reulet's counsel are complete now that Ms. Morgan has assumed the role of Ms. Reulet's counsel" but deferring motion to withdraw in part based on

---

[58] Citations to docket entries in the *Reulet* case are preceded by "MR Docket."

outstanding order to show cause concerning payment of juror costs).[59]  Reynal also represented Reulet on a civil asset forfeiture matter that was based on allegations similar to the federal criminal case.  R.T. 10-11-18: 49.

131.    On May 24, 2016, while on pretrial release, a federal judge remanded Reulet to custody at CCA-Leavenworth as a result of a driving under the influence arrest in Texas.  *Id*. at 47; MR Docket #747.  An attorney named Mark Metzger represented Reulet on this Texas DUI case.  R.T. 10-11-18*:* 48-49.   She also had a family law attorney named Richard Grimes.  *Id*. at 48-49.

132.    While Reulet was in custody, AUSA Treadway requested recordings of Reulet's outgoing telephone calls, expressly excepting calls made to attorney Morgan's telephone number.  *Id*. at 92.   Treadway listened to those calls, including communications that Reulet had with attorneys Reynal, Metzger, and Grimes, and took handwritten notes of at least portions of the contents of these communications.  *Id*. at 98-119; Exh. 592.

133.    Attorney Morgan became suspicious that the USAO prosecutors assigned to the case, including AUSA Treadway, were listening to telephone calls between Reulet and legal counsel.  R.T. 10-11-18: 50-51.  On October 25, 2016, Morgan filed a motion on Reulet's behalf for return of those calls.  *Id*. at 51; MR Docket #812.  On November 3, 2016, the government filed a response.  R.T. 10-11-18: 51; Exh. 592G.

134.    On October 26, 2016, Reulet had moved for joinder in the Rule 41(g) return of property motions in this litigation.  Docket #159.  That motion was granted on October 28, 2016.  Docket #166.  On November 14, 2016, the government moved for reconsideration.  Docket #175.

---

[59] Later, on August 15, 2016, the Court ordered attorney Reynal to pay juror costs and ordered that his motion to withdraw would be granted upon payment.  MR Docket #775.  Reynal's motion to withdraw as Reulet's attorney was granted on August 20, 2016.  MR Docket #787.

On November 28, 2016, this Court reconsidered its earlier order and denied Reulet's motion to intervene.[60]  Docket #181.

135.    At a hearing on Reulet's return of property motion on December 20, 2016, AUSA Treadway informed the district court that she had listened to the content of Reulet's telephone calls to Reynal.  R.T. 10-11-18: 97; Exh. 592H.  She further stated that she could not recall what the calls were about, but that they were not about Reulet's federal criminal case pending before the court.  R.T. 10-11-18: 97-98.   Treadway told the district court that, as to Reulet's calls to attorneys Metzger and Grimes, she had listened to them only to identify the calls and who was involved in the calls.  *Id*. at 96-97.  Treadway testified that she stopped listening to the calls to Metzger and Grimes "[b]ecause they were not important, not because they were attorneys."  *Id*. at 97.

136.    When asked at the evidentiary hearing in this litigation how she could reconcile what she told the district court judge with her handwritten notes documenting substantial portions of the content of conversations between Reulet and Metzger, and Reulet and Grimes, Treadway testified that "by December 2016 [when the *Reulet* hearing occurred, she] had forgotten because they were so unimportant."  *Id*. at 125-26.

137.    According to attorney Morgan, the information in Reulet's telephone conversations with attorney Grimes and Metzger bore on the federal criminal prosecution of Reulet.  *Id*. at 143.

---

[60] Reulet, through counsel, also moved to transfer her motion to this Court.  MR. Docket #812, #813.  On November 21, 2016, the *Reulet* Court denied that motion.  MR Docket # 837 ("First, the court denies the portion of Ms. Reulet's motion asking the court to transfer the motion to Judge Robinson as part of *Black* and related cases.  After close consideration of the issues raised by Doc. 812 and comparison of those issues with the gravamen of the attorney/client issues in *Black*, the court finds that the issues are too distinct to transfer them to another judge.  The substantive issues raised by Doc. 812 will be decided by the United States District Judge assigned to this case. Second, the court will conduct a hearing on the other relief Ms. Reulet seeks in her motion, i.e., her challenge to the government's procurement of specified audio and video recordings and written communications in violation of her attorney/client privilege.").

When asked to describe this, Morgan explained that Reulet's DUI case and her mother's estate "came into play" and "were coming into play" in district and appellate court hearings pertaining to Reulet's federal custody.  *Id*. at 144.

138.    The motion alleging that the government had listened to the Reulet-to-attorney calls was never resolved because Reulet pled guilty on January 9, 2017.  MR Docket #917.

139.    On October 19, 2018, eight days after Treadway testified in this case, the USAO and Reulet, through counsel, moved the district court to reduce Reulet's 60-month term of imprisonment, which had been imposed following her guilty plea to a felony charge of conspiracy to commit mail fraud, to a sentence of time-served.  The agreement explained that it had come "to light that conduct of a former Assistant United States Attorney assigned to the prosecution of this matter may have violated the defendant's constitutional rights."  MR Docket #1260.  That same day, the district court issued an order and an amended judgment imposing a time-served sentence on the single count to which Reulet had entered her earlier guilty plea.  MR Docket #1261, #1262.

## B.    The Impoundment (Clawback) and Preservation Orders

### The DOJ-Mandated Computer Refresh Project

140.    In August and September 2016, the USAO was in the process of complying with a DOJ-mandated upgrade of its computer hardware and software in its offices in Wichita, Topeka, and Kansas City.  Exh. 614, Exh. 615, Exh. 1201, Exh. 1202, Exh. 1203; R.T. 1084-86; 2494-96. The project included the use of Hewlett-Packard ["HP"] technicians to remove computers from users' desks, remove and label the hard drives from these computers, replace the removed computers with new ones, and initiate an imaging process on the new computers.[61]  R.T. 1085-86.

---

[61] The replaced hard drives were stored in the USAO evidence vault and the computer chassis were put into storage separately.  R.T. 1088-90.

The HP technicians finished their on-site work on September 1, 2016.  R.T. 1086.   Under a pre-determined schedule, USAO systems manager David Steeby had 15 business days from this date to upgrade from the Windows 7 operating system to the Windows 10 operating system any USAO computer eligible for that upgrade.  R.T. 1086.  He had 30 days from that date to certify that the project was complete.  R.T. 1117.

141.    The AVPC in Pauletta Boyd's office, which was an HP 8300 Tower, was eligible for the Windows 7 to Windows 10 upgrade.  R.T. 1087.  This was the only AVPC in the Kansas City office of the USAO.  R.T. 1091.

**The Brannon Electronic Mail Message**

142.    On August 30, 2016, at 5:58 p.m., FPD Melody Brannon sent an electronic mail message to USAO Criminal Chief Debra Barnett, titled "Special Master and Computers."  This message read:

> Out of an (over) abundance of caution, given that the Court has not yet ruled on the scope of the special master inquiry, it would probably be a good idea to maintain all existing computers, including hard drives and other media that could contain data related to the video recordings.  I say this only because we were told that the computers in the USAO KCK were being replaced, and we want to make sure nothing is lost in the transfer.

Exh. 589.

143.    Shortly after noon the next day, August 31, 2016, Barnett forwarded the Brannon message to AUSA Emily Metzger and Duston Slinkard, and to United States Attorney Thomas Beall, with the message "???"  Exh. 589.

144.    A short time later, on August 31, 2016, at 12:17 p.m., AUSA Metzger replied to AUSA Barnett and other USAO recipients of the forwarded Brannon message (Slinkard and Beall), explaining her understanding that "we copied everything regarding this case on thumb drives and submitted it to the court and we have locked it down on our computers."  She further

stated "I don't think any data will be lost" and then surmised that "it may be the computer that Pauletta has discovery on is not even being replaced," and opined that "Pauletta and David Steeby can likely verify that nothing will be lost."  Metzger continued:

> All videos and copies were submitted to the court, so I am not sure what Ms. Brannon means here.  Does she think we have some type of metadata on the videos?  In any event, it is probably best to confirm with Pauletta and David that no data is being lost so Ms. Brannon does not mistakenly assume some conspiracy behind the long-established computer replacement schedule determined by EOUSA [the Executive Office for United States Attorneys] for all USAOs.  She probably does not realize that this computer replacement is not within the control of the KC office or even the Kansas USAO, although we certainly can clarify that on Tuesday if any questions should surface at the hearing.

Exh. 589.

145.    Two minutes later, AUSA Slinkard replied to the USAO recipients, stating "Check with David to make sure, but I understand that we would be retaining all hard drives from the old computers."  Exh. 589.  Two minutes after that, AUSA Metzger replied to all: "I agree.  I think this is Melody being extra cautious and not, hopefully, assuming conspiracies around every corner."  Exh. 589.

146.    AUSA Barnett relied on AUSAs Metzger and Slinkard to address the Brannon message.  She did not supervise Steeby and understood Metzger to be in charge of litigation holds. R.T. 2367-69.  Barnett did not know what the AVPC was.  R.T. 2368.

147.    AUSA Metzger was uncertain about the nature of FPD Brannon's concern.  R.T. 1317.  She explained that "we" did not know that the AVPC was going to be "refreshed in place" (by a software upgrade).  R.T. 1319.  She believed that someone checked with Steeby concerning retention of the hard drives that were being replaced.  R.T. 1320.  Metzger believed that a "clawback" order that the Court had issued with respect to the video evidence "would be sufficient to preserve any computer data necessary to identify what was on those videos and who watched

the videos." R.T. 1355. It did not occur to her that the computer refresh project could jeopardize

data related to who had watched the CCA-Leavenworth video evidence. R.T. 1356.

148.    There is no evidence in the record that any USAO official responded to the Brannon

message of August 30, 2016, or that Brannon followed up to confirm that the USAO had taken

steps to preserve "hard drives and other media that could contain data related to the video

recordings."

149.    No one forwarded the Brannon message to Steeby or requested that he preserve the

data on the AVPC in late August or early September 2016. R.T. 1130. He did not see the message

from Brannon before September 6, 2016. R.T. 1140.

**The Upgrade of the AVPC Operating System**

150.    In late August and early September 2016, Steeby did not know much about the

*Black* litigation. He was aware that there was a large amount of data from CCA "coming into our

systems." R.T. 1114. Steeby was unaware that software related to the CCA video had been loaded

onto the AVPC. R.T. 1091-92. He also was unaware that the FPD had filed something related to

that data. R.T. 1114.

151.    On September 6, 2016, as part of the prescheduled upgrade project, Steeby went to

Boyd's office and applied a BIOS ("basic input/output system") update to the "old system" (the

AVPC). R.T. 1115. There were two hard drives in the AVPC. R.T. 1105. Steeby then restarted

the computer and instructed it to "boot" from the network. R.T. 1115. By doing this, the computer

acquired and installed the files necessary to upgrade the operating system from Windows 7 to

Windows 10. R.T. 1115. As part of this process – the "reimage task sequence" – the space on

the AVPC hard drives was formatted and prepared for the installation of the new operating system.

R.T. 1116.  Steeby himself did not format the hard drives.  This occurred as part of the task sequence after the network reboot.  R.T. 1119.

152.    The format done as part of the task sequence was a "quick format," which causes the data on a drive to be marked as unallocated.  R.T. 1121.  This space is treated as available to be overwritten by other data.  R.T. 1121-22.  Unallocated data is stored outside the file structure on the computer that a user would see in a directory but can be accessed by computer forensics tools.[62]  R.T. 1123.

**The Computer Preservation Efforts**

153.    On September 7, 2016, in advance of a court hearing, AUSA Slinkard discussed with Steeby "the preservation of computers replaced during the PC Refresh project."  Exh. 556 at 3.  According to Steeby, Slinkard "was concerned about what was going to happen to the hard drives that had been removed from most of the computers."  R.T. 1104.  Steeby did not then tell Slinkard that the AVPC had been upgraded in place on September 6, 2016.  R.T. 1105.  This topic did not come up because Slinkard was asking about the computers from which the HP technicians had removed hard drives.  R.T. 1105.

154.    Similarly, AUSA Barnett inquired of Steeby concerning preservation of data on computers whose hard drives were replaced during the DOJ refresh project.  Steeby's responsive electronic mail message referred only to the computers whose hard drives had been replaced during the project, not the "upgraded in place" AVPC.  Exh. 556 at 4; Exh 1199.

155.    At the hearing on September 7, 2016, AUSA Slinkard informed the Court of the storage of the hard drives that had been removed from the replaced computers.  During this

---

[62] When utilizing the Windows 7 operating system, the USAO had the computer hard drives defragmented weekly.  R.T. 1132-33.

discussion about the removed laptop hard drives, the Court stated that "it would be much safer to have everything preserved until further order." AUSA Slinkard responded: "That is the information that he [Steeby] provided today immediately prior to the hearing . . . So we will communicate with him [Steeby] that we need to retain the hard drives from the Kansas City office, unless the Court orders more broadly, retain the hard drives from the Kansas City office, as well as the ability to access the hard drives from the Kansas City office, if that's acceptable."[63]  Exh. 490 at 54-56; Exh. 556 at 6.

156.    During the September 7 hearing, AUSA Slinkard sent an electronic mail message to Steeby explaining that that "we reported the information from your message [to Barnett] to the court, and Judge Robinson ordered that the old hard drives from all of the computers in the Kansas City division be retained," along with "whatever hardware is necessary to ensure the ability to access the hard drives from the old laptops . . . ." Exh. 1199; Exh. 556 at 6.

157.    The next day, United States Attorney Beall sent an electronic mail message to Steeby about "the hard drives recently removed from the KC office computers," and directing him, consistent with the Court's order to "make sure those items are retained and secured until further notice." Exh. 556 at 7.  Steeby responded that he would "secure the KCK hard drives and keep the old laptop shells around until I hear differently." Exh. 556 at 7.

158.    On October 27, 2016, in response to a message to AUSA Slinkard from a defense attorney whose client was permitted to intervene in the *Black* litigation, Steeby again confirmed that the USAO was in possession of the removed hard drives and chassis. Exh. 556 at 8-9.  Steeby

---

[63] As a result of an encryption feature, each hard drive has to be reunited with its original chassis to make the data on the hard drive accessible.  R.T. 2499-2503.  Steeby was uncertain whether user credentials – user name and password – also would be necessary to access these hard drives. R.T. 2526-29.

also reported that one computer assigned to Boyd was not subject to the PC refresh project (this was referred to during the evidentiary hearing as the "law computer").  Exh. 556 at 10.  AUSA Slinkard conveyed this information about both the removed hard drives and the untouched computer to the Court in a hearing on October 28, 2016.  Exh. 556 at 10.

159.    In an electronic mail exchange with Steeby on October 31, 2016, AUSA Slinkard learned for the first time about the upgrade of the AVPC operating system.  Steeby wrote in part: "Duston, it didn't cross my mind at the time, but one of the three workstations under Pauletta's control was upgraded in-place, overwriting everything on the local hard drive in the process.  Of the other two workstations, one had the hard drive removed and labeled, and one was untouched." Exh. 556 at 12-13.  This passage concerning the "upgrade[ ] in-place" pertained to the AVPC. Exh. 556 at 14.  This was the AVPC onto which Pauletta Boyd loaded the PELCO software necessary to view the CCA-Leavenworth video and, using hard drive #1, observed what appeared to be video feed of a parking lot.  Exh. 556 at 14-15.

160.    Steeby later explained that the AVPC "was not the focus of our discussion on the 7th [of September].  The focus of our discussion on the 7th was the hard drives that had been removed from computers replaced during the cyclical PC refresh project."  R.T. 1141.

161.    On November 5, 2016, AUSA Slinkard sent a letter to the Special Master providing information about the computer refresh project, the focus on the removed hard drives, and the recent realization of the software upgrade to the AVPC.[64]  The letter explained that the upgrade

---

[64] The USAO notified the Special Master about the format of the AVPC before this, no later than November 3, 2016.  In an electronic mail message from AUSA Barnett to Metzger and Slinkard, with a copy to Beall, dated November 3, 2016, Barnett describes the Special Master asking that "our document (meaning the letter to the Special Master) include, among other things, "how it happened that he (Steeby) recorded over the AV PC even though he had been advised that the KC computers were protected/locked down whatever."  Exh. 1168.  The Special Master apparently

"result[ed] in all data on all drives being marked unallocated, and new operating and other software installed, resulting in some or all of the now-unallocated previously existing data being potentially over-written by the newly installed programs."  Exh. 556 at 14.  The letter further explained that "[d]ata that has been overwritten since the September 6, 2016 upgrade is no longer recoverable. Data that has not been overwritten since the September 6, 2016 may be recoverable.  Exh. 556 at 14; *see also* R.T. 1126.

162.    Until November, no one instructed Steeby to take efforts to avoid data on the AVPC hard drives from being overwritten.  R.T. 1142.   On November 7, 2016, AUSA Barnett sent an electronic mail message to Steeby stating in part: "Lock down immediately the AV PC.  In light of the recent events and our disclosure to the Master, he has asked that we lock down this particular computer immediately."  Exh. 588; Exh. 1147; *see also* Exh. 1265 (Special Master request that AVPC "immediately be taken out of service"); Exh. 1180 (message from the Special Master regarding preservation of "logs").  Steeby responded shortly thereafter that "Pauletta is powering down the KCK AV-PC and removing the power cord now."  Exh. 588; Exh. 1147.  Boyd confirmed that this had occurred.  Exh. 588; Exh. 1147.

163.    In December 2016, Steeby removed the AVPC hard drives and stored them in the vault.  R.T. 1105; 1127; 1138-39.  They had been in the AVPC with the Windows 10 operating system since September.  R.T. 1105.

164.    Steeby was unfamiliar with the logging capabilities of the PELCO software used to view the video feed from CCA-Leavenworth.  R.T. 1124.  He had no idea whether there was any such logging information on the AVPC hard drives before the format occurred.  R.T. 1124-25.

---

also asked whether it was possible to recover the data.  According to Barnett, he told her "don't worry, put in your raincoat, and I will hold your hand through the shit storm."  Exh. 1168.

165.     When asked if he knew of any way to retrieve data that had been on the AVPC hard drives on September 5, 2016, Steeby answered that he would be interested in looking in unallocated space.  R.T. 1106.  Steeby later explained that pre-existing data is stored in unallocated space as a result of a computer format.  R.T. 1121-22.  This may have occurred with the data on the AVPC.  R.T. 1123.  Computer forensic tools can be used to recover data in unallocated space. R.T. 1123.  Any logging information that was on the AVPC could have been moved to unallocated space.  R.T. 1125.

166.     The Windows 10 operating system uses less space than the Windows 7 operating system.  R.T. 1131.  A forensic expert would be best suited to determine if there was data that could be retrieved from the AVPC hard drives after the upgrade.  R.T. 1132.  The shift of data from allocated to unallocated space does not involve movement of the data or its fragmentation; the data stays where it previously was, just without a "table of contents" to direct a typical user to it.  R.T. 1134.   The data "would still be there in the same order that it was before."  R.T. 1135.

**Tammy Loehrs' Computer Forensics Testimony**

167.     Tammy Loehrs, a computer forensic expert retained by the FPD, explained that the Windows operating system logs when an application on the system has been opened.  R.T. 1838. Each time the application is reopened, a new date stamp is created in the Windows registry.  R.T. 1838.  If the application is not closed, the system records only the last "open" date.  R.T. 1849. The Windows system would not show when the software application was used, only when opened. R.T. 1849-50.

168.     When asked about the logging capabilities of the PELCO video viewer, Ms. Loehrs explained that she did not know.  R.T. 1839.  Testifying about a version of the viewer that she downloaded on behalf of the FPD in 2018, she described it as a "plug-in" to a web browser.  R.T.

1839-40; 1847; 1850.  She was unable to use the PELCO viewer that she downloaded because it is proprietary software that requires a password.  R.T. 1840.  She did not know if anyone with the FPD made efforts to contact PELCO to permit her to test the software.  R.T. 1847.  She was "quite sure" that the PELCO software that she downloaded in 2018 was different than the PELCO viewer distributed in 2016.  R.T. 1848.  The FPD did not suggest to her that she should try to locate the version of the PELCO software used in 2016.  R.T. 1848.

169.    The best way to determine the logging function of the 2016 version of the PELCO viewing software would be to examine a computer with the software already loaded on it.  R.T. 1860.  No one had asked Ms. Loehrs to look for this.[65]  R.T. 1860-61.  The next best way would be to load the software on another computer.  She was not asked to do that either.  R.T. 1861.

170.    Ms. Loehrs did not know what logging functions the PELCO viewer software had. R.T. 1850; 1851, 1856-57.  Different web browsers have different logging functions.  R.T. 1851.

171.    Ms. Loehrs also testified about how a computer classifies data as unallocated when the hard drive is formatted.[66]  R.T. 1836.  She explained that what occurs is that a "pointer" is removed.  If a computer forensics expert puts the pointer back, "all of the data is still there and it's completely intact," unless it has been overwritten.  R.T. 1836.  "[A]nything that hasn't been overwritten is still accessible."  R.T. 1837.  When asked whether it was common for her, as a computer forensics expert, to recover "either partial or entirely intact files from unallocated space," Ms. Loehrs answered: "Do it every day."  R.T. 1853.  When asked whether it was difficult to locate data in unallocated space, Ms. Loehrs replied: "Two seconds.  You put that card catalogue

---

[65] This PELCO viewer software was installed on KBI Agent Stokes' computer in 2016, *see* ¶ 24, which was produced to the Special Master.  R.T. 120.

[66] Ms. Loehrs could not say whether decisions regarding the format of the AVPC were made by "some DOJ or HP protocol" as opposed to Steeby.  R.T. 1853-54.

[showing the location of the data] back forensically and then it's all there." R.T. 1858-59. This would cost "5 to $10,000 tops" in the case of the AVPC. R.T. 1860.

172.    No one had asked Loehrs to do a forensic analysis of either of the hard drives removed from the AVPC. R.T. 1853. The best way to determine if there was relevant data on the two AVPC hard drives would be to do a forensic examination, but no one asked her to do this.[67] R.T. 1861.

**The Court's Clawback Order for Audio Recordings**

173.    On August 18, 2016, this Court issued an impoundment or "clawback" order concerning audio recordings of inmate-to-attorney telephone calls from CCA-Leavenworth.[68] Docket #113. In part, this order found that "[t]he Government has disseminated or made available to counsel for the defendants [in *United States v. Black*], and others [in related cases], discovery that contains audio recordings of attorney-client communications at CCA." *Id.* at 1. This clawback order required, among other things, that the government, "within seven business days, must return all recordings and derivative information, such as transcripts, notes, or reports concerning these recordings, to the Court." *Id.* at 2.

174.    Shortly thereafter, there was a meeting in Topeka among USAO employees, including United States Attorney Beall, AUSAs Metzger, Barnett, Slinkard, Rask, Flannigan, Tomasic, and Oakley, to discuss how to best comply with this clawback order. R.T. 521; 1283-84; 2201-02; 2292-93. One issue discussed at this meeting was whether the order applied to all

---

[67] The hard drives were stored by the USAO and are in the Court's possession. R.T. 1866.

[68] The Court had previously issued a clawback order related to the CCA-Leavenworth video evidence. Docket #102 at 3 (ordering "the Government [to] submit to the Court all originals and copies of DVR hard drives containing recordings of attorney-client communications that the Government is aware are in the possession of the United States Attorney's Office for the District of Kansas or in the possession of law enforcement agents").

audio recordings of inmate-to-attorney calls obtained from CCA-Leavenworth in all cases, or, instead, to only those inmate-attorney recordings that had been subpoenaed as part of the CCA-Leavenworth contraband smuggling investigation that resulted in the *Black* prosecution.  R.T. 521-22; 1311; 2292-93.  At the meeting, it was decided that the clawback order applied to recordings of inmate-attorney telephone calls obtained during the *Black* investigation.  R.T. 522; 1285; 1311; 2206-07; 2293-94.  The decision was based on information provided by SAUSA Tomasic and AUSAs Flannigan and Oakley.  On August 19, 2016, an appellate AUSA who was not involved in the *Black* investigation and prosecution reviewed the order and opined that, as to the USAO, the order "seems confined to the discovery that was collected and sent out in the Black case only."  Exh. 1247.  Flannigan and Tomasic recall Tomasic asking whether they should seek judicial clarification of the order.  R.T. 522; 2207.  Barnett did not recall this occurring.  R.T. 2295.  As she recalled it, the prosecutors from Kansas City – which would have included Tomasic – wanted to interpret the order to apply only to calls obtained in the *Black* investigation.  R.T. 2294-95.

175.    Later, AUSAs Barnett and Metzger learned that during their handling of the *Dertinger/Rapp* case, Tomasic and Flannigan had obtained some of the same inmate-attorney calls that had been "clawed back" in *Black*.  R.T. 2294-95; 2725.  Barnett promptly instructed Tomasic to "contact the Court and ask for clarification on what you should do with those calls."[69]  R.T. 2295; Exh. 1174.

---

[69] In an electronic mail message to government counsel after completion of the evidentiary hearing, AUSA Flannigan reported that, as she recalled, she discussed "the fact that Ms. Tomasic and I had obtained many of the same phone calls during our investigation and prosecution of [Rapp and his codefendants].  We asked whether the order should be read to encompass those calls as well and not just the *Black* calls.  Ms. Metzger (and maybe others, I can only recall Ms. Metzger) believed strongly that the order only applied to the *Black* case."  Docket #709 at 1-2.  It appears, however, that either AUSA Flannigan and/or SAUSA Tomasic raised this issue of duplicate telephone calls only some weeks after the Topeka meeting or, if they raised it in Topeka, it was not understood.

**The Appointment of the Special Master**

176.    The possibility of the appointment of a special master was first raised at a hearing

on August 9, 2016.  FPD Brannon proposed that the special master conduct an investigation, Exh.

462 at 10, 12, but the USAO representative, AUSA Barnett, described a more limited role:

> We agree that a special master should be appointed to review those items [CCA
> video footage] and determine whether or not they contain attorney-client privileged
> material, because we feel that that determination needs to be made before then we

Almost a month after the Topeka meeting, on September 13, 2016, Tomasic sent an electronic
mail message to Barnett, with copies to Oakley and Flannigan, stating in part:

> At our meeting on August 19, 2016 [the Topeka meeting], you, Emily, Tom, and
> Duston all agreed that the Court's order to impound recorded inmate calls in *United
> States v. Black*, applied only to the *Black* case.  I want to verify with you again that
> you do not believe any jail calls obtained as part of an investigation in another case
> need to be removed from our server, even if those calls are for defendants whose
> inmate calls were impounded in the *Black* case.

Exh. 1174.

Barnett responded the next day:

> I don't know if I understand your question correctly or not but – the Court has
> impounded the CCA calls so if you have any of those "impounded" calls in other
> cases/investigations, please contact the Court and ask for clarification on what you
> should do with those calls.  Right now, I think we need to use jail calls with great
> caution and care.

*Id*.

In a message sent to AUSA Flannigan on September 21, 2016, Tomasic proposed seeking guidance
from Judge Murgia, who was presiding in the *Dertinger/Rapp* case, after advising him of the
clawback order.  *Id*.  This prompted AUSA Flannigan to send a message to AUSA Barnett
explaining that "I believe it is prudent for you, Emily, and Dustin [sic] to know that the telephone
calls we obtained in the *Rapp* investigation were the same exact calls that we later received in the
*Black/CCA* investigation."  *Id*.  Had this issue of duplicative inmate-to-attorney telephone calls
been raised and discussed at the meeting in Topeka, it is unlikely that Flannigan would have written
this.  *See also* Exh. 710 (further message from Flannigan on this topic on September 30, 2016).

The only inmate-attorney calls obtained in the *Dertinger/Rapp* case were those that inmate Rapp
made to attorney Johnson, *see id*., and Tomasic had promptly notified the defense attorney about
these calls in January 2016.  Exh. 34A.

can adequately respond to and address to the Court the other issues that are raised by the Federal Public Defender's Office and the other defense attorneys in this case.

*Id*. at 15-16.

177.    On August 15 and 23, 2016, the FPD filed pleadings in support of its proposal for use of a special master.  Docket #106; #119.  On August 23, 2016, the government filed a pleading describing a more circumscribed role for the special master, essentially using him as a filter for potentially privileged information in the CCA video evidence.  Docket #120.

178.    At a hearing on September 7, 2016, the government through AUSA Barnett made clear that it was consenting only to a limited role for the special master:

> We consent to having a special master look at the recordings that have been provided to the Court and excise out the material that shows contacts with counsel, either through the phones or through the attorney-client interview rooms at CCA. Excising that material out.  And then the rest of the material that would arguably be permissible evidence for us to use and provide in discovery, then to be given back to the government and to defense counsel in the case so that the case could go forward.

Exh. 490 at 148-49.

179.    On October 11, 2016, the Court issued an order appointing a special master.  Docket #146.  At the outset, the Court tasked the Special Master to perform "Phase I" duties, which the appointment order described as:

> evaluating the feasability [sic] of: (1) identifying privileged and confidential information contained within the recordings and other materials submitted by the Government and CCA to the Court; (2) excising and retaining this information; and (3) providing to the Government and Coordinating Discovery Counsel copies of the remaining, non-privileged and non-confidential materials.
>
> The Special Master's feasability [sic] evaluation shall include an assessment of the time, labor, and cost to index, cull, and segregate the privileged and confidential materials.  This evaluation will include determination of: (1) the volume of the recordings (digital size and/or number of hours); (2) the number of audio and video recordings of the defendants and all other CCA detainees produced to the Government; (3) the number of audio and video recordings of attorney-client communications of defendants and all other CCA detainees produced to the

78

Government; (4) whether it is possible to index the recordings and cull and segregate the confidential information; and (5) the technology, equipment, software, and personnel required to undertake these tasks. This evaluation will inform the Court and the parties as to the appropriate process for discovery in this case.

*Id*. at 4-5 (footnote omitted).

180. The Appointment Order also described Phase II duties that the Special Master would undertake with future judicial authorization:

- Identify, excise, and retain privileged or confidential information from the video recordings made at CCA that have been submitted to the Court;

- Provide copies of these video recordings with the privileged or confidential information removed to the Government and Coordinating Discovery Counsel;

- Identify, excise, and retain privileged or confidential information from the audio recordings made at CCA that have been submitted to the Court;

- Provide copies of audio recordings with the privileged or confidential information removed to the Government and Coordinating Discovery Counsel;

- Identify, excise, and retain privileged or confidential information in the computers seized from CCA's inmate law libraries; and

- Provide images of law library computers with the privileged or confidential information removed to the Government and Coordinating Discovery Counsel.

*Id*. at 5.[70] The appointment order also described "complementary duties" of the Special Master.

*Id*. at 6. The order further noted that the Court was continuing to consider "whether to direct the Special Master to undertake additional investigative duties as requested by the FPD."[71] *Id*. at 7.

---

[70] On November 16, 2016, the Court ordered the Special Master to begin Phase II of the investigation. Docket #179. It is noteworthy that these Phase II duties included an obligation to "[i]dentify, excise, and retain privileged or confidential information from the video recordings made at CCA that have been submitted to the Court." Docket #146. If the Special Master completed these tasks, to the knowledge of government counsel, he did not identify any privileged or confidential information.

[71] On May 17, 2017, the Court issued an order authorizing the Special Master to conduct "Phase III" of his investigation, "to investigate the actions and conduct of the government, the USAO

181.    The Appointment Order further provided that "All Relevant Parties shall all provide full cooperation to the Special Master, and any staff or consultant employed by the Special Master, and observe faithfully the requirements of any orders of the Court and rulings by the Special Master. *Id*. at 13 (footnote omitted). It also provided that:

> All Relevant Parties will make readily available to the Special Master any and all individuals, information, documents, materials, programs, files, databases, services, facilities, and premises under their control that the Special Master requires to perform his duties. The Relevant Parties will make readily available to the Special Master any and all facilities, files, databases, computer programs, and documents necessary to fulfill the Special Master's functions under this Order. The Special Master is authorized to issue subpoenas for the production of documents or taking of testimony on the record.

*Id*. at 14.

182.    On October 27, 2016, the government moved for reconsideration of the appointment order. Docket #163. On November 29, 2016, the Court denied this motion. Docket #182.

**The Special Master's Status Quo Order**

183.    On October 25, 2016, the Special Master issued a "Discovery Conference Order." Docket #155. In this order, the Special Master posed a series of questions for the parties, asking them to be prepared to answer them at an upcoming hearing on October 28, 2016. *Id*. at 1-4. The order also "ask[ed] that knowledgeable individuals connected with CCA, CCA-Leavenworth, the United States Marshals Service ("USMS"), the United States Secret Service ("USSS"), and the U.S. Attorney's Office ("OUSA"), appear at the hearing," and listed "a *few* of the individuals who

---

attorneys and staff, and the participating investigative agencies (hereinafter, collectively the "government"), in procuring, obtaining and perhaps using video and audio recordings of attorney-client meetings and phone calls at CCA." Docket #253 at 5-6.

may have information or knowledge relevant to the questions listed above." *Id*. at 4 (emphasis in

original).  The only USAO employee listed was Pauletta Boyd.  *Id*. at 5.

184.    Then, in a section entitled "Status Quo," the Special Master's order further provided

as follows:

> The Court has contemplated the possibility of later directing me to pursue
> "additional investigative duties." *Appointment Order* at 7.  Solely for the
> purpose of maintaining the status quo, the Special Master **ORDERS** that
> (1) the OUSA, and (2) CCA-Leavenworth, and (3) CCA, and (4) the USMS,
> shall ***identify and preserve*** all information and sources of information
> relevant to the matters listed on pages 7-8 of the Appointment Order (docket
> no. 146).  This obligation includes preserving all emails (regardless of the
> device used to send or receive them) and other documents related to video-
> and audio-recording at CCA-Leavenworth or any other detention facility.
>
> ********
>
> The Special Master is not ordering that these materials be produced at this
> time.

*Id*. at 5-6 (emphasis in original).[72]  Hereinafter, this portion of the Special Master's order will be referred to as the "Special Master's Status Quo Order" or the "Status Quo Order."[73]

---

[72] The "matters listed on pages 7 and 8 of the Appointment Order" are:

- Determine what, if any, steps were taken by CCA or other pretrial holding facilities to protect confidential audio communications, such as blocking certain phone numbers or warning callers, and whether those measures were communicated to either detainees or their attorneys.
- Determine whether any other protected communications, such as legal mail or videoconferencing, were recorded by CCA or other pretrial holding facilities, or were obtained by the Government.
- Determine how the Government came into possession of any confidential or protected materials, and determine any Government policy or practice related to obtaining those materials; and identify any specific cases or specific Government attorneys or agents who obtained those materials.
- Determine the prior policy and practices of CCA and other pretrial holding facilities under contract with the United States Marshal Service with regard to recording protected communications.
- Identify past occasions when CCA or other pretrial holding facilities have made available to the Government or any law enforcement agency recordings of protected communications.
- Determine whether the Government intentionally sought production, formally or informally, of any protected communication from any pretrial holding facility for use in an investigation, grand jury proceeding, or prosecution; and by what means.
- Determine whether the Government inadvertently came into possession of protected materials from any pretrial holding facility, and whether appropriate remedial or protective measures were taken to notify the parties and protect the security of the communications.
- Determine whether and how the Government has used or attempted to use protected material in any investigation, grand jury proceeding, or litigation, regardless of whether the use or attempted use was disclosed to the Court or to the parties; and whether the Government did or attempted to interfere with a defendant's attorney-client relationship, such as requesting attorney fees or alleging conflicts of interest.
- Identify, by using visitation logs and other facility records, the attorneys and clients who met during the time span covered by the recordings of protected meetings in this case, or any other case involving Government possession of protected material discovered during this inquiry.
- Identify the attorneys and clients who communicated by phone or videoconferencing during the time span covered by the audio recordings in this case, or any other case involving Government possession of protected material discovered during this inquiry.
- Inspect and copy files, documents, communication, and electronic data of any pretrial holding facility, the United States Marshal Service, and the Government as necessary to complete the above duties.

185.    Other than the August 30, 2016 Brannon electronic mail message, *see* ¶ 142, and this Court's clawback orders regarding the video and audio evidence from CCA-Leavenworth, Docket #102, #113, this was the first request or order to the USAO asking or directing it to preserve or produce any documents or other items.  Although the Special Master would later testify that he believed that there already was a preservation order or litigation hold in place, R.T. 2747, it is not clear why he thought so.  The government had not been named in a civil lawsuit related to the CCA-Leavenworth recordings and the Court had, for the time being, *rejected* an FPD request that it permit an investigation of the USAO.  Docket #146 at 7.  Further, the Court already had clawed back the video and audio evidence.  Exh. #102, #113.

186.    The Court held a hearing on October 28, 2016.  The Court said this about the Special Master and the order that he issued:

> The order that he issued with all of the directives, consider it my order.  In fact, anything that you receive from him under his signature is the same as receiving something from me under my signature.  So he prepared this order after our conferral and issued it by his signature.  And -- but I just say that at the outset so there's no question that anything that comes from him comes from me and shall be complied with because it is, in fact, my order.

Docket #172 at 5-6.

---

- Report to the Court the identity of parties affected by any breaches of privilege, confidence, Constitutional rights, statutory rights, or ethical obligations, and recommend available remedies, in this case or others, if appropriate.

Docket #146 at 7-8.  The Appointment Order did not give the Special Master authority to undertake any of this investigation.  *Id*. at 7.

[73] The Special Master's Order also commanded the USAO "to immediately make a forensic image of the personal computers of Erin Tomasic, Kim Flannigan, and Pauletta Boyd, and also of any computer used to view the video-recordings produced in this case by individuals affiliated with the OUSA."  Docket #155 at 6.  After a discussion with AUSA Slinkard at a hearing on October 28, 2016, the Court indicated that preservation of these hard drives was sufficient.  Docket #172 at 12-18.  Later, the Special Master testified that "I'm not sure that we ever actually decided -- that I ever decided to pursue that because it would be extremely expensive.  I'm not sure that it was going to be worth it."  R.T. 2747.

187.   During the hearing, the following exchange occurred:

> MS. BARNETT:   What I will tell the court is we understand right now nothing in our office as related to obtaining information from CCA should be destroyed or gotten rid of in any way. So within our office we have, I guess, put a lockdown, so to speak, on information or records that we would currently have.
>
> THE COURT:   And you do understand that it goes beyond the bounds of the Lorenzo Black case?
>
> MS. BARNETT:   Yes. Yes.
>
> THE COURT:   All right. Because, as you know, there are Rule 41 motions pending in dozens and dozens of other cases in this district in this division and in other divisions, and so all of this is relevant to that as well.
>
> So what you're telling me is that you have, in fact, through some sort of lockdown procedure, preserved all e-mails, all handwritten notes of, I suppose, conversations where you made a request to the Marshal Service, any communications back from CCA, Securus, the Marshal Service, or anyone else involved in the acquisition -- in the production of videos or audio recordings in this case and beyond this case?
>
> MS. BARNETT:   Well, I will tell the court, as the court was previously advised, our -- we've gone through a new computer refresh, I guess is what they call it.  We have all of the Kansas City computers that have been set aside and maintained.  They're not – they were subject to destruction.  They are not.  They are being held pursuant to this litigation.  We have since been asked -- I think Mr. Slinkard was asked about preserving Topeka's computers.  I don't know if it was all of them or specific computers.
>
> MR. SLINKARD:   It was all of them . . . . [74]

*Id*. at 9-10.  Thereafter, the Court discussed with AUSA Slinkard the progress of preserving the

hard drives of the replaced USAO computers throughout the District of Kansas.  *Id*. at 10-11.   The

---

[74] At the time, AUSA Slinkard was unaware that the AVPC had been "upgraded in place," and was referring to the storage of the hard drives from the computers that had been replaced.  ¶¶ 153, 155, 156, 159.

Court then discussed the Special Master's Status Quo order.  *Id*. at 11-29.  The Court asked AUSA Barnett about "the preservation of e-mails . . . is that included in what you've already told me?," and Barnett replied: "Honestly, Your Honor, our e-mails are already preserved automatically.  But, yes, they're available, Your Honor."[75]  *Id*. at 12.  Later, AUSA Barnett described "the Department of Justice['s] . . . own archive systems" as the basis for her reference to a "lockdown."  *Id*. at 24.

**The Government's Preservation Directive (Litigation Hold)**

188.    Emily Metzger, Chief of the USAO Civil Division and the designated Litigation Hold Coordinator, R.T. 1316, was familiar with the use of litigation holds in civil cases, but testified that they are "almost never" used in criminal cases.[76]  R.T. 1301.  Metzger was aware that litigation holds are issued in civil cases when there is a reasonable likelihood that you will be sued or you are being accused of something but could not recall a single criminal case in which she had issued a litigation hold.  R.T. 2646; 2648.  Metzger did not institute a litigation hold in this case before the Special Master issued his Status Quo Order.  R.T. 1292-93; 1324; 1331-32.

189.    Metzger took an active role in implementing the Special Master's Status Quo order.[77]  R.T. 1322-23.  Despite concerns that the Status Quo Order might be too broad, Metzger

---

[75] USAO electronic mail message are automatically archived in the ProofPoint system for three years.  R.T. 2510.  Messages in the archive cannot be deleted or edited.  R.T. 2512.

[76] AUSA Metzger did not think a "litigation hold" was necessary after attending a court hearing on August 9, 2016.  R.T. 1292.  Metzger was not aware that there was concern about destruction of evidence.  R.T. 1305.  She knew only that there was concern about what might be on videos. R.T. 1305.  From her perspective, the video and audio recordings that were the subject of concern had been impounded, R.T. 1291-92, and that normal retention policies would apply.  R.T. 1292. The Criminal Chief, AUSA Barnett, directed that nothing be removed from closed files and that closed files be retained.  R.T. 1293.

[77] During her testimony, Metzger referred to the Special Master's Status Quo order as the Court's Order.  *See, e.g.*, R.T. 2668.

and the management team discussed an office-wide preservation effort.  R.T. 1323-24, 1331; 1333. The USAO began working on this "right away."  R.T. 2658.  Thereafter, Metzger drafted a written preservation directive that she thought, or hoped, met the terms of the Status Quo Order.  R.T. 1333.  The USAO management team vetted the draft, and then AUSA Barnett shared it with the Special Master.  R.T. 1333.  After some "back and forth" between Barnett and the Special Master on this topic, Metzger began to communicate directly with the Special Master about the preservation directive.  R.T. 1333.  They began an exchange in November 2016 to refine the draft to a point where the Special Master believed it was acceptable.  R.T. 1294; 1333.  The Special Master reviewed the preservation directive letter multiple times.[78]  R.T. 1294.

190.   As Metzger described this process, "we wanted to ensure that we got the litigation hold as the Court intended it to be, so we went back and forth with the Special Master for his approval."  R.T. 2660.  "We created it and then we wanted to ensure it encompassed all that was intended, so we reached out to him to see if it – he thought it was inclusive and covered everything. As I recall, he made some refinements and we incorporated those."  R.T. 2660; *see also* Exh. 1205. The Special Master made final suggestions on December 17, 2016, and directed Metzger to "please issue immediately."  Docket #298-1.

191.   On December 19, 2016, Metzger circulated the preservation directive to the USAO. R.T. 1293; 1333.  A copy of this written communication is marked as Exhibit 651.  This directive commanded all USAO employees to:

> immediately retain, preserve and prevent any destruction, deletion or purging of any and all written and electronic materials (including files, work product, pleadings, memoranda, subpoenas, administrative requests, handwritten notes,

---

[78]  The Special Master wrongly believed that the Court had already issued a preservation order by the time that he issued his.  R.T. 2747.  He had never before been involved in a criminal case, R.T. 2770, and also wrongly assumed that an obligation to institute a litigation hold "had arisen of its own force."  R.T. 2747.

calendar items, e-mails, phone records, tasks and any other electronic records), wherever located or recorded (please note that this includes ceasing purging of closed files that contain any such materials), and regardless of when created, that may contain information about any of the items set forth at the end of this e-mail.

The directive then set out 19 broad categories of information and materials that had been drafted with the assistance and approval of the Special Master. Exh. 651. Recipients also were directed to forward a copy of the directive to any law enforcement agent with whom the USAO employee had worked in the last five years (later reduced to two years) who may have responsive information. Exh. 651.

192. Everyone who received the preservation directive had to acknowledge receipt and inform Metzger whether they had responsive material. She received questions and inquiries. Eventually, she had a 100% response rate. R.T. 1294-95. Metzger received responses from approximately 30 people who believed they had responsive information. R.T. 1334. It took until February or March before Metzger heard back from all of the recipients of the preservation directive. R.T. 1333-34. Metzger gave the Special Master a list of the USAO employees who had responsive materials. R.T. 2750-51; Exh. 706.

193. On October 20, 2017, the Special Master described the process of working with the USAO to achieve a preservation directive consistent with his Status Quo Order: "Beginning in November of 2016, the Special Master worked cooperatively with the OUSA to craft language directing OUSA staff to: (1) preserve and collect information relevant to the *Black* investigation, and (2) let the other Agencies know they also had an obligation to preserve and collect the same information. On December 17, 2016, the language for this "Litigation Hold" was finalized and the OUSA issued it shortly thereafter.

194. On May 19, 2017, AUSA Metzger sent a "User Litigation Hold Notice and Certification Form," along with an explanatory memorandum and electronic mail message to

USAO employees who previously reported having responsive materials.  R.T. 2664; Exh. 1219; Exh. 1196.  This was an internal form used to identify the location of responsive materials.  R.T. 2264-65.  The explanatory memorandum was entitled "FURTHER IMPLEMENTATION OF LITIGATION HOLD."  It explained to recipients that although each of them "was previously . . . instructed to and is preserving all relevant information as instructed by the court, we are taking additional steps . . . ."  The cover electronic mail message referred to this effort as an "Enhanced Litigation Hold Notice."  Exh. 1219

195.    Recipients of this form sent in May 2017 were instructed to identify repositories where paper and digital copies of responsive materials were located and then certify their responses.  R.T. 2265-66.  Over time, all of the recipients responded to this request.  R.T. 2266. The USAO created the preservation directive that was issued in December 2016 in order to comply with the Special Master's Status Quo Order rather than use this internal form.  This later form "incorporated" the previous litigation hold/preservation directive and helped to implement it.  R.T. 2668-69.  The May 2017 documentation "was the same litigation hold," it was "an incorporation of the initial lit hold," not "a new and different lit hold."  R.T. 2693.  Metzger did not discuss this additional internal form with the Special Master.  R.T. 2669-70.  Metzger had informed him of the December 19, 2016 message and gave him a list of the names of the respondents.  R.T. 2669-72; Exh. 706.

196.    Metzger sent out the materials in May 2017 to institute a DOJ-wide hold on AUSA electronic mail messages, not because the Court issued its Phase III order.[79]  R.T. 2694; Exh. 1218. Recipients of the form were directed to identify repositories where responsive information is

---

[79] This ensured that electronic mail messages for the preceding three years would be preserved. R.T. 2517.

stored.  R.T. 2695.  Recipients were required to preserve responsive information but not identify it.  R.T. 2700.

## C.      Cooperation with the Special Master

**Interviews of USAO Employees**

197.      Shortly after his appointment, the Special Master met with United States Attorney Beall.  R.T. 2742.  Thereafter, the principal point of USAO contact with the Special Master initially was AUSA Barnett, and later AUSA Metzger.  R.T. 2323, 2372, 2743.  As the Special Master recalled it, in October 2016, "one of the first things I said to everybody I spoke with at the United States Attorney's Office, and most particularly Tom Beall and -- and Deb Barnett, was that I would like to speak with Erin Tomasic.  I also mentioned Pauletta Boyd and I also mentioned Kim Flannigan, but primarily it was Erin Tomasic from the very first conversations I had with anybody."  R.T. 2744.  The Special Master described how he proceeded with respect to possible witness interviews: "I tried very hard to let it be known, everybody I spoke to, whether on the defense, on the government or former United States Attorneys, I told everybody I could in this town if anybody needs to talk to me, they should call me."  R.T. 2750.

198.      Neither Beall nor Barnett recalled the Special Master asking before February 2017 for assistance in facilitating an interview with or wanting to speak to Tomasic.  R.T. 2319; 2450-51; 2559-60.  Barnett did recall the Special Master expressing an interest in speaking with Boyd. R.T. 2410.  As Barnett recalled it, the Special Master had told her that "if there was anyone that wanted to talk to [him], that anyone could call [him] and talk to [him]."  R.T. 2411.  She further recalled that the Special Master asked her to convey this message to Boyd, but not to Tomasic. R.T. 2411.  Similarly, Metzger was unaware that the Special Master was interested in speaking with Tomasic in October 2016.  R.T. 1281.  To AUSA Metzger's knowledge, no USAO employee

was directed not to speak to the Special Master.  R.T. 1282.  There was no written request from the Special Master to interview Tomasic before February 2017.  R.T. 2780.  Similarly, no internal USAO written communications reflect that such a request was made.

199.    The USAO employees who were asked about management direction concerning the Special Master's investigation testified either that they had been instructed to cooperate and/or were never discouraged from cooperating.  R.T. 229 (Rask); 1004 (Boyd); 1167 (Zabel); 1881 (Patton); 1916, 1983 (Oakley); 1262 (Hunt).  USAO employees further testified that each had cooperated to the extent requested to do so and/or had done nothing to impair the Special Master's investigation.  R.T. 909-10 (Wamble); 1003-04 (Boyd); 1092-1104 (Steeby); 1878, 1881 (Patton); 1916 (Oakley); 2161 (Hunt).  USAO witnesses denied knowing of another USAO employee obstructing or failing to comply with that investigation.  R.T. 1003-04; 1915, 1983; *but see* R.T. 1879 (Patton testimony of his belief that Tomasic was instructed not to speak to the Special Master).  Metzger helped arrange for Boyd to speak with the Special Master.  R.T. 1283.  When the Special Master told Boyd that he wanted to speak to Tomasic, Boyd notified AUSA Rask.  R.T. 1004-05.

200.    United States Attorney Beall intended to cooperate with the Special Master's requests to create a set of search terms that would allow the USAO to search e-mail messages of USAO employees and to hear from USAO employees as it became relevant.  R.T. 2451-52.  Beall consistently tried to cooperate with the Special Master within his authority.  R.T. 2626.  Beall instructed Barnett to cooperate with the Special Master.  R.T. 2558.  From AUSA Barnett's perspective, she and the USAO provided complete and timely information to the Special Master.  She complied with all of his requests and was not aware of any way in which the Kansas City office was non-compliant or dilatory in responding to his requests.  R.T. 2375-76; 2378-79.  No

member of the USAO management directed AUSA Metzger to refuse full cooperation with the Special Master. She did not refuse full cooperation. R.T. 1272.

201. On October 30, 2016, the Special Master sent an electronic mail message to AUSAs Oakley and Barnett seeking assistance in creating an inventory or catalogue of the evidence that had been gathered and submitted to the Court's vault. The Special Master described the persons who had done the collection and submission as "Evidence Submitters," whom he said that he assumed were Tomasic and Boyd, but acknowledged as to their identities that "you would know (or can find out) better than I." He asked for assistance from these submitters in the vault to create the inventory/catalogue. Exh. 1171. He also requested the names of these "Evidence Submitters." Exh. 1171. His message did not include a request to interview these people.

202. The next day, Barnett forwarded the Special Master's message to AUSA Rask, with a copy to Beall. This message read, in part: "Scott, I do not want Erin interacting with the Court or court personnel on this case. I can explain why whenever you want to clog your brain with this." Exh. 1171. Barnett's message further stated: "Ultimately, I think Erin will have to look at some of this in an attempt to identify it, but I am going to suggest taking pictures of the materials and allowing her, agents and other relevant people to look at it and identify it." Exh. 1171.

203. When questioned about this message to Rask, Barnett explained that she "did not trust [Tomasic] to conduct herself appropriately in light of all of the other things that had happened."[80] R.T. 2320. Barnett did not want Tomasic interacting with the Court and court

---

[80] Barnett already had testified about her concern that it would be "cruel" for Tomasic to have to appear in a hearing and "listen to the things that were going to be said about her," R.T. 2291-92; about Tomasic and Flannigan not wanting to submit for impound recordings of inmate-attorney telephone calls that were the same as those that were subject to the Court's clawback order, R.T. 2295; and about learning from the Court, not from Tomasic, certain facts about Tomasic's unauthorized entry into chambers, including a "certain comment" Tomasic made to a court clerk. R.T. 2297.

personnel, including the Special Master.  R.T. 2320-21.   Barnett did not recall the Special Master

requesting to speak to Tomasic and did not interpret his message as a request to interview her.

R.T. 2321; 2400-01.  Barnett further explained:

> At that point in time I had received a number of complaints about Erin's demeanor and her conduct toward defense attorneys, towards an agency, a federal agency that we work with. I had had an opportunity then, of course, through some of this litigation to see how she had conducted herself during this litigation, and then, of course, learning about the incident where she entered Court's chambers and made what I consider to be a grossly inappropriate comment to the Court's legal clerk about breaking in to the Court's chambers.
>
> I did not feel that Erin was an appropriate person to interact with the Court or court personnel because I did not feel that she understood how to be respectful, courteous and polite. She had demonstrated privately within the office an attitude of wanting to push back and fight with the Court and the Special Master on this, and that was not the attitude that I thought was appropriate for us to take. And so I did not want her to in any way convey that attitude to the Special Master or to make inappropriate comments to him or in his presence.

R.T. 2321-22.

204.    Barnett believed that the USAO provided the Special Master the inventory

assistance requested in his message.  R.T. 2402.  It was not Barnett's intent to prevent Tomasic or

anyone else from ever speaking to the Special Master or to "slow-walk" or impair his investigation.

R.T. 2402-03.  When questioned by the Special Master at the evidentiary hearing, Barnett testified:

"I didn't tell Erin not to talk to you."  R.T. 2413.  She further responded to the Special Master's

questioning about her message to AUSA Rask as follows:

> If you're referring to the e-mail where I didn't want her to participate in the inventory, that wasn't an instruction for her not to talk to you. It was an instruction for her to not come up and interact with you at that time, because I did -- as I said before, because of all of the complaints that have been made about her, because of the conduct that I had witnessed her exhibiting towards Mr. Beall, Mr. Slinkard and myself, I did not trust her to act appropriately in your presence.  And I thought it was appropriate and important that when we interacted with you that we were respectful, courteous and professional at all times.

But that was not designed to prevent you from ever being able to interview her or any other person in our office. It was meant to try to keep her where she would learn to act professionally and learn to conduct herself with respect towards the Court and come to see that we needed to -- we needed to be thoughtful in this litigation, and we needed to consider the Public Defender's perspective and we needed to interact appropriately with the Court. And candidly, she hadn't done that up until that point.

R.T. 2413-14.  Barnett did not recall ever telling Tomasic not to talk to the Special Master and had no reason to tell Tomasic not to contact him.  R.T. 2415.

205.    After receiving the message about the Special Master's inventory request from AUSA Barnett, Rask called Barnett to develop a better understanding of what she wanted Rask to communicate to Tomasic.  R.T. 2442.  As Rask recalled, Barnett was making an effort to ensure that the USAO was able to give the Special Master the best information in the best way and to avoid "further difficulties in communicating information or materials from Ms. Tomasic herself." R.T. 2442-43.  There were concerns about Tomasic's behavior and emotional state.  R.T. 2443. This also was part of Rask's conversation with Barnett.  R.T. 2443.  There was no discussion about trying to frustrate the Special Master's investigation or preventing people from speaking to the Special Master.  R.T. 2443.  There was no criticism of the Special Master's investigation and no implicit or explicit suggestion that the USAO should be anything less than fully cooperative.  R.T. 2443.

206.    After speaking to AUSA Barnett, AUSA Rask had a conversation with Tomasic. R.T. 2443.  Rask was Tomasic's supervisor and had a good relationship with her at that time.  R.T. 2443-44.  The Special Master's message regarding the inventory had been forwarded to Tomasic so she was aware of his request.  R.T. 2444.  As instructed by Barnett, Rask told Tomasic that "she should not have direct communication with the Court involving – this Court specifically or court personnel in connection with the *Black* litigation, which would also include the Special Master."

R.T. 2444.  Rask told Tomasic that the instructions were from AUSA Barnett.  R.T. 2444-45.

Tomasic, whose relationship with Barnett was "somewhat worse" than her relationship with Rask,

did not take the instruction well.  R.T. 2445.  Her response was emotional and some of it was

negative.  R.T. 2445.

       207.    The Special Master interviewed Pauletta Boyd on February 1 and 2, 2017.  R.T.

1004; 2746.

       208.    On February 6, 2017, Tomasic sent an electronic mail message to AUSAs Metzger

and Rask.  It stated in part:

> I spoke with Pauletta Boyd today, and she indicated the Special Master would like
> to speak with me.  I am more than happy to speak with him, and I do think it would
> be helpful because I have relevant information to aid in his analysis.
>
> I have not reached out to the Special Master for two reasons: (1) I believed that
> management was weighing whether Kim and I should speak to the [sic] him, and
> (2) on October 31, 2016 Deb instructed Scott to direct me to have no contact with
> the Court, court personnel, or the Special Master about the *Black* case.  Given Deb's
> directive, I did not think it was appropriate for me to contact the Special Master.
> During discussions with Scott over the past few months, Kim and I have stated that
> we would like to speak with the Special Master if management would permit us to
> do so.

Exh. 1151; Exh. 1032.

       209.    Metzger replied on February 21, 2017.  She told Tomasic that she (Metzger) had

informed the Special Master that Tomasic was willing to speak with him.  She further explained

that the Special Master would try to schedule a meeting on his next visit to Kansas City but did

not know when that would be.  Exh. 1151; Exh. 1032.  Metzger further related that she had

expressed concerns to the Special Master, including that the USAO did not want an interview to

be deemed a waiver of its objections to the scope of his investigation.  Metzger explained that the

USAO would not have expected Tomasic to reach out to the Special Master and that it has "simply

responded to requests for information from the Special Master as he presents them." Exh. 1151;

Exh. 1032. Metzger also addressed the earlier directive to Tomasic:

> The direction provided to you in October 2016 was, given the intensity with which
> the court reacted to the allegations in the Black case, simply intended to provide
> some separation to afford time for tension and intensity to subside. It was not
> intended to foreclose contact with the Special Master as he may request, although
> our office is concerned about the waiver issue . . . .

Exh. 1151; Exh. 1032.

210.    Tomasic thanked Metzger for the information.  "I especially appreciate you

clarifying the basis for Deb's instructions in October that I have no contact with the Court, court

personnel, or the Special Master.  I was unaware of the basis for her instruction until now." Exh.

1008.

211.    The Special Master interviewed Tomasic for the first time in February 2017.  R.T.

2746.  No one accompanied Tomasic to this interview.  R.T. 770.  Tomasic met again with the

Special Master in the summer of 2017, when Tomasic no longer worked at the USAO.  R.T. 771.

Tomasic produced work-related documents to him at this interview.  R.T. 772.  She did not obtain

authorization to do this.  R.T. 773.

212.    In March 2017, AUSA Metzger informed the Special Master that AUSA Flannigan

was willing to speak to him, R.T. 2702; Exh. 706, but he decided not to interview Flannigan

because he questioned her during the *Dertinger* hearing.  R.T. 2746.

**The Word Searches**

213.    In late 2016 or early 2017, the Special Master began working with the USAO to

develop a list of search terms to run against the DOJ ProofPoint electronic mail archive.  R.T.

1093-94.  An electronic mail message between the Special Master and AUSA Metzger shows that

the project was underway as of November 30, 2016.  Exh. 1146.  The search terms were "built

specifically to work with that system." R.T. 1094.  The USAO Systems Manager, David Steeby, along with AUSA Metzger, met with the Special Master and an information technology expert hired by the Special Master named Ken Smiley, on this project.  R.T. 1095.  A second meeting included United States Attorney Beall and AUSA Rask, with AUSA Barnett on the telephone. R.T. 1095-96.  Steeby also had telephone conversations with the Special Master.  R.T. 2508.  They discussed the ability to search different repositories.  R.T. 1096.  Steeby's understanding was that they were discussing searching e-mail accounts.  R.T. 1097.

214.    The Special Master proposed the search terms to be used.  R.T. 1158.  As the word search project continued, the Special Master periodically added more terms to the search string. Exh. 1155; Exh. 1160; *see also* Exh. 1146; Exh. 1157-1159; Exh. 1188, 1190-92.

215.    In early 2017, Steeby did a test run on his own repository.  It produced overbroad results.  R.T. 1098-99.  Metzger reported the results to the Special Master and provided the lengthy "search string resulting from Mr. Steeby's translation [of] it into our ProofPoint syntax."  Exh. 1155.  Metzger explained that "most of these search results would be non-responsive to the information you are seeking."  Exh. 1155.  They worked to enhance the search string up until the spring of 2017 and made "some good progress."  R.T. 1099, 1101.

216.    In late January 2017, AUSA Rask did a test run of a search string through his electronic mail repository and reported the results to Steeby and Metzger.  Exh. 1159.  He reported that the search had selected messages on topics unrelated to the Special Master's investigation, including "items from my health insurance company"; "attending a Royals game with folks in the office"; an "airline boarding pass"; and an "obituary for a witness."  Exh. 1159.  There also were multiple messages about USAO matters unrelated to the *Black* litigation.  Exh. 1159.  Rask further

reported that "[t]here were absolutely no emails about requests for recordings or calls from CCA" in cases other than *Black*.  Exh. 1159.

217.    On May 18, 2017, the Special Master sent Metzger a message, with copies to others, stating that, in light of the Phase III order (which had issued the day before), he wanted to "resolve our discussion regarding search terms, and then have the OUSA produce responsive documents." Exh. 1156.  He attached a search string that he had modified.  Exh. 1156.  The Special Master acknowledged that "David [Steeby] ran a search on his own repository and believed these search terms yielded many non-relevant results."  He further noted that they had discussed corrections, "[b]ut I do not believe we came to any resolution."  Exh. 1156.  The Special Master concluded by stating that "[w]e need to move forward on this as soon as possible" and asked AUSA Metzger to "let me know when you and Mr. Steeby are available to discuss this."  Exh. 1156.

218.    That evening, Metzger wrote an electronic mail message to United States Attorney Beall, with copies to other USAO employees, titled "Phone Call with Special Master."  The message referred to a telephone conversation that afternoon, "as requested," with the Special Master concerning the computer search issues.  Metzger explained that she "tasked" Rask (who was copied on the message) to participate in the telephone call in part because she "welcome[d] another set of 'ears' during the call, particularly with regard to [her] representation that production decisions are yet to be determined."  The message described what occurred during the call, including further efforts to work further on search terms.  It continued: "We will then assess the volume and nature of the responsive material and discuss with the Special Master how to proceed. I did inform him that we would need to review the material and determine our position on production, but that we would endeavor from our end to be as cooperative and forthcoming as possible."  Exh. 1288

219.   On October 20, 2017, in a report filed with the Court, the Special Master described his work with the USAO on the word searches as follows: "the Special Master also worked cooperatively with the OUSA to craft search terms to be applied to the OUSA's electronic repository of emails and other documents. In an effort to ensure the search terms were neither over- nor under-inclusive, the Special Master worked with the OUSA's technology staff to test and 'tweak' various iterations, a process that went on for several months."  Docket #298 at 3.

220.   On June 5, 2017, Steeby sent an electronic mail message to the Special Master, with a copy to Ken Smiley, reporting that some alterations to the search string, when run through Tomasic's electronic mail repository, reduced the number of results from 7,784 to 4,347.  In a responsive electronic mail message to Steeby dated June 5, 2017, with copies to AUSAs Metzger and Rask, the Special Master proposed additional changes to the search string, and directed Steeby to "run this search on Tomasic's repository and produce the results to me via Ken Smiley as soon as possible."  Exh. 1157.  This message also stated: "I am copying Mr. Rask and Ms. Metzger – if the OUSA has any issue with this directive, I need to know asap."  R.T. 1102-03; Exh. 1157.[81]

221.   The decision to produce the results of this search were not Steeby's to make.  R.T. 1103.  He delivered the results to AUSA Metzger and was not asked to do anything else on the project after that.  R.T. 1109-10.  Steeby did not know who made the decision concerning production.  R.T. 1104.

---

[81] A more complete copy of this electronic mail exchange appears at Docket #698-1 at 38-42 and Exh. 481.  The additional changes to the search string that the Special Master requested increased the number of results to 4,493.  *Id*. at 38.  A digital file created from these results "contains numerous internal DOJ messages that have no bearing on matters in this proceeding."  Docket #698-2 at 16; Exh. 481; *see also* R.T. 1271 ("the amount of non-responsive material was very, very voluminous and that it would need to have -- be reviewed for privilege and other kinds of things.").  This digital file was entitled ETOMASICBLACK7.0.pst.  R.T. 2540.  This file was produced to the Special Master on September 30, 2018.  R.T. 2754.

222.     On June 6, 2017, AUSA Metzger sent an electronic mail message to the Special Master stating in part that "[i]t is my understanding that you spoke today with USA Tom Beall regarding potential production processes and that future discussion is to occur in that regard."  Exh. 1206.  The following day, June 7, 2017, the Special Master sent a message to United States Attorney Beall, reporting that "Judge Robinson would like to discuss the matter of your production of documents" on a date that was "flexible."  Exh. 1206.  This message also stated in part that the Special Master had reported "that your office may have concerns regarding the production of some of the documents for various reasons, such as national security or privacy issues."  Exh. 1206. Another part of the message asked Beall (or someone else) to "take an initial pass through the Erin Tomasic documents that are responsive to the search terms we have agreed upon, to determine the nature and scope of any concerns you may have regarding production of those documents to me." Exh. 1206; R.T. 2736-37.

223.     When the Special Master later described the status of communications at this point, he said this:

> In response to this June 7th directive [sic], however, the OUSA contacted the undersigned and explained it had new concerns regarding production of Tomasic's documents for various reasons, primarily including unresolved internal personnel matters between the OUSA and Tomasic. The OUSA explained that, because of this internal dispute, the OUSA might have a conflict – and therefore might have to assign to some other entity all responsibility for document production, including review of the Tomasic documents for relevance, national security concerns, privacy issues, and so on.

Exh. 298 at 3-4.

224.     In an electronic mail exchange between the Special Master and Beall on June 29 and 30, 2017, Beall addressed several issues that USAO officials and the Special Master apparently had discussed on June 19, 2017, including production of the results of the word searches.  Exh. 655.  On June 29, 2017, Metzger reported that during this June 19, 2017 conversation, "I believe

we said [to the Special Master] with regard to the actual consent, search of other's materials, and potential production, that we were awaiting action on the recusal issue." Exh. 1187. This is consistent with a June 30, 2017 message from Beall to the Special Master about "the status of follow-up items." In it, Beall explained that despite an alteration to the word search request, there was not "a significant reduction in the volume of responsive emails in Scott Rask's case" and that "[t]here are still more than 5,000 responses and the number of non-relevant 'hits' remains exceedingly high." Exh. 655. The Special Master responded by stating "Okay. As earlier requested, please produce responsive documents related to custodian Erin Tomasic immediately." Exh. 655. But, at the outset of his message about the status of follow-up items, Beall had explained that:

> The over-arching issue we face is getting a determination on whether or not we have a conflict in our representation. We have pushed hard to get to a resolution on this issue. We are anticipating, but cannot guarantee an answer next week. If it is determined that we have a conflict, the matter will go before the Deputy A.G. to determine whether to waive the conflict, or appoint conflict counsel.

Exh. 655. The Special Master responded: "Thanks, please let me know."[82] Exh. 655.

225.    After the above-described exchange, AUSA Metzger sent a follow-up message to the Special Master on July 7, 2017. This message stated in part that:

> *As to the conflict issue and production requests*, we are awaiting a decision from the Deputy Attorney General as to whether this office, in light of conflict issues, will be continuing representation of the United States in this investigation. A conference call was held earlier this week and we were informed that we should be notified of a decision by the Deputy Attorney General very soon. We will keep you posted about that.

---

[82] Beall's message also addressed the USAO producing to the Special Master and the Court "for in camera review" a copy of the USAO "Jailhouse Recording Policy" based on Beall's consultation "with Main Justice"; and the need for a court order to produce grand jury material to the Special Master. Exh. 655.

Exh. 655 (emphasis added).  In an electronic mail message to Metzger on July 10, 2017, Beall

stated this:  "We have been pretty clear with the SM that we don't want to get ahead of the litigative

decisions of new counsel.  I just don't think he's going to be very patient if we don't get word

pretty soon from Main Justice on the decision."  Exh. 1182.

226.    On July 10, 2017, the Special Master sent a letter to United States Attorney Beall

requesting various categories of documents and information.  Docket #298-7; Exh. 481.  On July

14, 2017, Jay Macklin, General Counsel for the DOJ Executive Office for United States Attorneys,

sent a letter to the Court that stated in part that an AUSA from another district:

> was appointed under 28 U.S.C. § 515 to take overall responsibility for, and control
> of, the Department's participation in Phase III of the Investigation.  He will be the
> primary liaison between the USAO and you or the Special Master during the
> Investigation and will have full authority for making any necessary decisions on
> responses to requests from you or the Special Master related to Phase III of the
> Investigation.  The USAO has not been recused from either the underlying *Black*
> case, for which they will continue to be responsible, or the Investigation.

Docket #298-5; Exh. 481.

227.    The participants in the events that generated the above-described correspondence

had different perspectives on and recollections of their interactions.  As the Special Master

testified, once the search on Tomasic's e-mail repository produced "4,500 responsive documents

by tweaking search terms," that "it seemed to me we were close enough that they should produce

those documents, subject to whatever withholding they needed to do for relevance, national

security and/or privacy concerns."  R.T. 2738.

228.    The Special Master explained that he did not know "that they had asked for recusal

until the recusal occurred," but then noted that "maybe a couple of weeks before."[83]  R.T. 2739.

---

[83] The Special Master was mistaken about both the nature and the result of the USAO recusal
request, Exh. 660; *see* R.T. 2279-80.  The recusal request was to have different DOJ counsel
represent the United States in the underlying *Black* criminal prosecution and would have resulted

He further explained that "I was working with them under an impression that was not correct." R.T. 2739.   Based on his conversations with Beall, Metzger, and perhaps Rask, the Special Master believed that the USAO was going to produce the documents "but address" relevance, privacy, and national security concerns.  R.T. 2740.   He testified that "[i]t was never explained to me that there was a possibility that they wouldn't produce the documents at all and instead would go to DOJ and kind of hand off the whole thing to someone else."  R.T. 2741.  The Special Master disputed that he had been told there was a need for DOJ approval "on practically everything you wanted from them."   R.T. 2741-42.   He testified that "either there was a very severe misunderstanding or they did not say what they're saying they said."  R.T. 2742.

229.   When questioned whether he had been told that the USAO needed DOJ approval before it could produce a filter team policy to him, the Special Master acknowledged that the policy had been produced to him but did not know or could not recall whether he had been told that the USAO needed DOJ approval to do this.[84]  R.T. 2777-78.  When shown an exhibit to refresh his memory, however, he then recalled that, in fact, United States Attorney Beall had told him that Beall needed DOJ approval to produce that document.  R.T. 2778-79.

230.   The Special Master believed that the search terms would be run against "[a]ll relevant repositories," not only electronic mail accounts.  R.T. 2753-54.  "I don't believe that I

---

in the Kansas USAO having no involvement in that matter.  In fact, the USAO was not recused from either the *Black* prosecution or the Phase III investigation.  *See* Docket #298-5; Exh. 481. Instead, new counsel was appointed pursuant to 28 U.S.C. § 515.  *Id.*; R.T. 2462.  The USAO remained involved in both the underlying criminal case and the Phase III investigation.  Docket #298-5; Exh. 481.

[84] The policy is Exhibit 1181.

ever understood or knew that the syntax that we worked on would work only in the ProofPoint e-mail system."[85]  R.T. 2753.

231.    As Beall recalled, the search terms were "never fully resolved."  He explained that "there were multiple test runs done to evaluate different search terms to see what kind of results they generated."  R.T. 2453; *see also* Exh. 655 (explaining that "the number of non-relevant 'hits' remains exceedingly high" when the search string was run against Rask repository).

232.    Beall produced his Office's filter policy *in camera* only after having received DOJ authorization to do so.  R.T. 2586; Exh. 694.  He believed that this was discussed with the Special Master.  R.T. 2586; *see also* Exh. 655 ("I have consulted with Main Justice on the matter of sharing our jailhouse recording policy.").

233.    Beall also testified that "it's my recollection that I informed the Special Master that I was engaged in the effort to be recused or to get outside counsel appointed during my efforts to do so."  R.T. 2463; 2586; *see also* Exh. 655 (message to the Special Master listing as a follow-up item: "If it is determined that we have a conflict, the matter will go before the Deputy A.G. to determine whether to waive the conflict, or appoint conflict counsel."); Exh. 1182 ("We have been pretty clear with the SM that we don't want to get ahead of the litigative decisions of new counsel.").

234.    Beall explained that he needed approval from DOJ to produce documents to the Special Master.  R.T. 2584-85; 2621.  Beall did not believe that it was appropriate for the District of Kansas USAO to be making production decisions.  R.T. 2585.  Beall explained that there was

---

[85] The Special Master acknowledged, however, that the syntax could be modified to address this issue.  R.T. 2753 ("But, frankly, it's irrelevant to me because the search terms that we created in a given syntax might only be-- might only work on the e-mail repository, but so you change the syntax and use the same terms in other repositories.").

a conflict because when his Office made "legitimate legal argument based on sound research" in the litigation, "those decisions would be re-cast as not being transparent or not being cooperative." R.T. 2622.  He further stated that internal personnel matters that he was not authorized to disclose created a conflict.  He also explained that there were "privileges and *Touhy* issues, not exclusive to the District of Kansas but rather resided with the Department of Justice and the Executive branch." R.T. 2622-23.  These conflicts "made it . . . a very difficult position to be in" leading Beall to believe that "the better decision-making would be made by somebody who had come in from the outside and had none of those sort of issues, and that the line of authority would come directly from DOJ." R.T. 2623.  Beall discussed these issues with his management team, and with DOJ on multiple occasions.  The recusal request was only one instance of Beall seeking DOJ assistance because of his concern about conflicts of interest.  R.T. 2623-24; *see also* Exh. 1256 (internal discussion about asking the DOJ Public Integrity Section to take over the case).  Beall communicated his concerns to the Special Master.  He never represented that, at the end of the word search tests, the USAO would produce the documents.  He did not do anything to bind a future DOJ-appointed attorney.  R.T. 2624.

235.    AUSA Metzger recalled the USAO reaching out to DOJ to get assistance in this litigation in the late summer or early fall of 2016.  R.T. 1339-40.  Metzger knew that the appointment by DOJ would terminate the USAO's involvement in the Special Master's word search project but she did not know what position the new attorney would take regarding document production.  R.T. 1299; 2721 ("I had no idea.").   The USAO management did not want to bind the new attorney who could be appointed.  R.T. 2683, 2685.  Metzger steadfastly denied that there was any effort to shut down or slow down the Special Master's investigation or conceal damaging

information.  R.T. 2684-86.  She testified that when the USAO discovered damaging information, it disclosed it.  R.T. 2685.

236.    AUSA Metzger explained that she did not view the USAO's consideration of filing a motion to terminate the Special Master's Phase III investigation before producing grand jury materials that the Special Master had requested as improper or deliberatively obstructive. Production of these confidential grand jury materials before filing the motion would defeat the purpose of the motion.[86]  R.T. 2719-20.

237.    AUSA Metzger never represented to the Special Master that when the word searches in ProofPoint were sufficiently refined the USAO would produce the results to him. Rather, it was her understanding that DOJ approval was needed for disclosure of internal communications.  R.T. 2726-27.  This was communicated to the Special Master.  "We always indicated that production would be a problem and a concern for us. I think we expressed that we wished we could just open up our files, but that just wasn't an option for us."  R.T. 2727.  It was Metzger's understanding that federal law prohibits such open file disclosure.  This also was her assessment as a professional responsibility officer.  R.T. 2727-28.

---

[86] The Special Master's request for grand jury materials was the subject of internal USAO discussion on July 10, 2017.  Exh. 1182.  (The USAO had previously told the Special Master that it would "undertake some research" to determine "whether grand jury materials could be shared with [him.]"  Exh. 1187.)  By July 10, 2017, however, both Beall and Metzger had informed the Special Master that they had concerns about producing materials and that they planned to await a decision from DOJ about appointment of new counsel.  *See* ¶¶ 218, 222-25.  The grand jury materials later were produced to the Special Master after the Court issued the necessary authorization under Fed. R. Crim. P. 6(e).  Docket #307; *see also* Docket #298-9 at 19 (describing need for court order for disclosure of grand jury materials).

### III

### Proposed Conclusions of Law

**A.      Sixth Amendment Claims: Governing Law**

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy

the right ... to have the Assistance of Counsel for his defence."  U.S. Const. Amend. VI.  "The

Sixth Amendment right to counsel is personal to the defendant . . . ."  *Texas v. Cobb*, 532 U.S. 162,

171, n.2 (2001).  This personal right has three basic components: (a) the right to be represented by

counsel in a criminal proceeding that could result in imprisonment; (b) the right to counsel of one's

choice; and (c) the right to effective assistance of counsel.  *United States v. Nichols*, 841 F.2d

1485, 1496 n.7 (10th Cir. 1988).  The Sixth Amendment right to effective assistance of counsel

includes the ability to speak candidly and confidentially with counsel free from unreasonable

government interference.  *See Weatherford v. Bursey*, 429 U.S. 545, 554 n.4 (1977) ("One threat

to the effective assistance of counsel posed by government interception of attorney-client

communications lies in the inhibition of free exchanges between defendant and counsel because

of the fear of being overheard.").  "A violation of the attorney-client privilege implicates the Sixth

Amendment right to counsel *only* ... when the government interferes with the relationship between

a criminal defendant and his attorney." *Howell v. Trammell*, 728 F.3d 1202, 1222 (10th Cir. 2013)

(quoting *Partington v. Gedan*, 961 F.2d 852, 863 (9th Cir. 1992)) (emphasis in *Howell*).

Accordingly, "a claim of a Sixth Amendment violation based on intrusion of attorney-client

privilege is limited to government action which interferes with legal representation after the

initiation of criminal proceedings." *United States v. Kennedy*, 225 F.3d 1187, 1194 (10th Cir. 2000).

"In order to be covered by the attorney-client privilege, a communication between a lawyer and client must relate to legal advice or strategy sought by the client." *United States v. Merida*, 828 F.3d 1203, 1209 (10th Cir. 2016) (quoting *United States v. Johnston*, 146 F.3d 785, 794 (10th Cir. 1998)) (emphasis omitted)). "A party claiming the attorney-client privilege must prove its applicability, which is narrowly construed." *Id.* (quoting *Foster v. Hill* (*In re Foster*), 188 F.3d 1259, 1264 (10th Cir. 1999)). The Tenth Circuit described these principles in *In re Grand Jury Proceedings*, 616 F.3d 1172 (10th Cir. 2010):

> The attorney-client privilege protects "'confidential communications by a client to an attorney made in order to obtain legal assistance' from the attorney in his capacity as a legal advisor." *In re Grand Jury Subpoena Duces Tecum Issued on June 9, 1982*, 697 F.2d 277, 278 (10th Cir. 1983) (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)). "[T]he mere fact that an attorney was involved in a communication does not automatically render the communication subject to the attorney-client privilege," *Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1550–51 (10th Cir. 1995); rather, the "communication between a lawyer and client must relate to legal advice or strategy sought by the client," *United States v. Johnston*, 146 F.3d 785, 794 (10th Cir. 1998).

*Id.* at 1182.

"Under the common law, the privilege will only be recognized when 'the communication between the client and the attorney is made in confidence of the relationship and under circumstances from which it may reasonably be assumed that the communication will remain in confidence.'" *United States v. Ary*, 518 F.3d 775, 782 (10th Cir. 2008) (quoting *In re Qwest Commc'n Int'l. Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006)).

These legal principals are consistent with the hearing testimony of the FPD legal expert, Professor Peter Joy. He testified as follows:

Q:     Okay. I want to ask you some questions about how the attorney-client privilege
       works in this context, if I could. . . .   In order for there to be a privileged
       communication, there has to be communication by either the client or the attorney
       for the purposes of either receiving or giving legal advice or legal strategy.  Correct?

A:     That's correct.

Q:     And the communication must be between a client of the attorney and either the
       attorney or someone working on the attorney's behalf; is that right?

A:     That's right. And in some instances it could also be an agent of the client talking to
       the attorney or somebody working on the attorney's behalf.

Q:     Fair enough. And there are situations when even if the privilege does apply; in other
       words, if those requirements you just described are satisfied, the privilege can be
       waived; is that correct?

A:     That's correct.

Q:     For example, there's a crime fraud exception.  Correct?

A:     That's right.

Q:     And there's times where communications are knowingly disclosed to third parties
       and that will waive the privilege as well?

A:     That's correct.

Q:     Would it be safe to say-- or would it be accurate to say that in order to tell whether
       the privilege applies and it hasn't been waived, one needs to know the content of
       the communication and the circumstances surrounding the communication?

A:     That's correct.

Q:     In litigation over whether the privilege applies or not, who has the burden of proof
       about presenting facts showing that the content of the communications and the
       circumstances surrounding the communications establish the privilege?

A:     The party asserting the privilege.

Q:     So if there's a failure of proof in litigation where there's a claim of attorney-client
       privilege, the party asserting the privilege should lose. Correct?

A:     If-- I just want to restate for you my understanding.

Q:     Sure.  Yeah, please do.

A:     If you're saying that the party asserting the privilege fails to demonstrate that all the conditions for the privilege were met, then yes, they have not established the privilege.

Q:     And the privilege belongs to the client, not to the attorney. Correct?

A:     That's correct.

******

Q:     So let me try to ask the question in a better way. If an attorney represents multiple clients and the privilege is violated as to one of those clients, that does not violate the privilege for other clients of the attorney, does it?

A:     Well, I mean, it could if there was, like, a joint defense situation, yes.

Q:     Absent a joint defense situation, two completely unrelated clients.

A:     Oh, okay. Let me-- I just want to be sure.

Q:     Yeah, go ahead.

A:     So if you're saying an attorney represents Client A on one matter and Client B on a separate matter—

Q:     Correct.

A:     -- and there's no attorney-client privilege or there's been waiver as to B, it doesn't affect A, absolutely.

Q:     And that's consistent with the Sixth Amendment as well, which is a personal right. Correct?

A:     That's correct.

R.T. 1772-76.

******

**LEGAL CONCLUSION #1:  The FPD's claim that the government, by obtaining soundless video recordings of inmate-attorney meetings at CCA-Leavenworth, violated the Sixth Amendment rights of each of those inmates is meritless because there is no evidence that any AUSA or government agent watched any video recording of any inmate meeting with legal counsel.**

The FPD's Sixth Amendment claim concerning the video evidence fails because it has not shown and cannot show, as it must, that any government conduct violated the attorney-client privilege and interfered with the legal representation of any inmate whose meeting with legal counsel was recorded and produced to the USAO.  *Kennedy*, 225 F.3d at 1194.  This is because there is no evidence that any AUSA or law enforcement official watched any video of any inmate meeting with legal counsel.   In fact, as explained above, the evidence affirmatively shows that no AUSA or other law enforcement official watched any of these videos.  *See* ¶¶ 14-20, 24-43.

The mere *recording* of soundless video without proof of viewing cannot establish a violation of the privilege or of the Sixth Amendment.  There is no evidence that any inmate knew of and was chilled in his communications with counsel by the video recording.  Thus, even if *Case v. Andrews*, 226 Kan. 786 (1979), had been adopted instead of ignored by federal courts, it would have no application here.[87]  In *Case*, the defendant knew of, was troubled by, and protested the

---

[87]  In *Case*, the defendant-inmate brought a habeas corpus action alleging that he was denied his Sixth Amendment right to confer privately with his attorney while he was being held for trial in the Lyon County jail at Emporia, Kansas.  *Id*. at 786.  When defendant and his attorney attempted to confer in an attorney-client consultation room, the defendant's counsel placed his suit coat over the camera in the room to maintain a "confidential atmosphere."  *Id*. at 786-87.  The jail authorities interrupted the conference and ordered the coat removed.  *Id*. at 787.  The defendant appealed, arguing that the visual surveillance of the attorney-client conference room deprived the defendant of his Sixth Amendment right to effective assistance of counsel.  *Id*.

The court agreed with the defendant, finding that "under the factual circumstances presented, the Lyon County jail policy of visually monitoring all consultations between attorneys and clients is an unreasonable interference with the right to confidential attorney-client communications."  *Id*. at 790.  The court concluded: "Absent a showing of any risk to the order or security of the jail, the practice of visually monitoring an attorney-client conference when privacy is requested, is

recording of his meeting with defense counsel.  There is no similar evidence here.  Thus, there is

no showing of "interference."  Further, there is no evidence of USAO involvement in the decision

to record events occurring in the CCA-Leavenworth meeting rooms.

Similarly, the government's mere *possession* of the soundless video recordings without

proof that any AUSA or government agent viewed any video is insufficient to show that the

government violated the privilege or used the contents of the video recordings to interfere with

any inmate's legal representation.   Mere possession of a digital storage device containing

electronic evidence does not reveal attorney-client privilege communications.  And, as soon as an

attorney asserted the privilege as to the video evidence, the USAO agreed not to watch it, and

secured the evidence.  *See* ¶¶ 53-56.

---

unreasonable.  Such unreasonable interference violates an accused's Sixth Amendment right to effective representation by counsel."  *Id.* at 791.

*Case* has no application here.  First, it is a case from the Kansas Supreme Court and therefore has no precedential value.  To the government's knowledge, in the almost four decades since *Case* was decided, no other federal or state court has adopted its reasoning.

Second, *Case's* holding is fact-bound to jail meetings where "privacy is requested," *id.*, and there is no evidence of such a request here.  This is significant—and distinguishing—because the request for privacy in *Case* manifested the defendant's intent not to disclose his lip movements and gesticulations to third parties, leaving the inference that any disclosure was forced, involuntary, and not inadvertent.  Indeed, to read *Case* more broadly would require a determination that *all* soundless video surveillance of inmate-attorney meetings in interview rooms in detention facilities or prisons, even if done generally for purposes of institutional safety, *always* violates the Sixth Amendment.  There is no authority supporting such a radical proposition.

Third, *Case* runs counter to federal law because it does not speak to the issue of prejudice, which is a requirement for a Sixth Amendment violation.  To the extent that *Case* can be read as assuming that prejudice naturally accompanies any denial of the right to effective assistance of counsel, such assumption is unwarranted in light of the Supreme Court's post-*Case* declaration in *United States v. Cronic*, 466 U.S. 648, 658 (1984), that "the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.  Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated."  466 U.S. 648, 658 (1984).

The only video of an attorney-client that the FPD has even *claimed* was viewed – that of Rokusek meeting with Dertinger – involved an inmate who is not represented by the FPD and who has abandoned his claims in this litigation. *See* footnote 14, *supra*. Despite that, there has been much focus on whether comments made at the August 2, 2016 meeting involving Tomasic, Flannigan, and Rokusek circumstantially established that KBI Special Agent Stokes watched video of attorney Rokusek meeting with client Dertinger. But, even if viewed in a light most favorable to the FPD's Sixth Amendment claims, evidence concerning this meeting tends to show that Stokes *did not* watch an attorney-client meeting. If one accepts Rokusek's version of the August 2, 2016 meeting as wholly accurate, and rejects entirely the testimony of Stokes, who denied watching any such video, *see* ¶ 28; and Tomasic, who denied that Flannigan mentioned the attorney-client interview rooms during the meeting with Rokusek, *see* ¶ 47; and Flannigan, who denied telling Rokusek that she had or was going to task Stokes to watch video of Rokusek meeting with Dertinger, *see* ¶ 47, there remains insufficient proof, direct or circumstantial, that Stokes watched any video of any attorney-client meeting. This is because *Rokusek did not testify that Flannigan (or anyone else) told her that Stokes had watched video of her meeting with Deringer at CCA-Leavenworth*. Instead, under questioning by FPD Brannon, Rokusek testified that *Flannigan told her that Stokes was looking for video of her meeting with Dertinger in order to watch it*. *See* ¶¶ 45-46.

Specifically, Rokusek testified that Flannigan told her "[t]hat the case agent was reviewing the videos to determine whether or not I had provided the document *and that all he had seen so far was me walking down the hall*. That was the – what they had told me, but that he would be reviewing those." (Emphasis added). Rokusek then confirmed that it was her understanding from the meeting with Flannigan and Tomasic that "*they intended to view the video* and to look for a

particular document that [[Rokusek was] handing [to] a client . . . *to look for* a specific action on [Rokusek's] part in handing a document to [her] client." (Emphasis added). *See* ¶¶ 45-46.

Rokusek's account of what Flannigan told her at the August 2, 2016 meeting is the only evidence the FPD can muster in its attempt to prove that Stokes or any other government actor watched video of a Rokusek-Dertinger meeting at CCA-Leavenworth. All of the other witnesses with knowledge of the relevant events – Flannigan, Tomasic, and Stokes – have given accounts that undercut the FPD claim. Rokusek's testimony establishes, at most, that Flannigan expressed an intent to have Stokes view a soundless video of an attorney-client meeting. This alone cannot show a violation of the privilege because an expressed intent to have Stokes watch the meeting in the future did not reveal the content of any attorney-client communication.[88]  In short, the record is devoid of any evidence of an intrusion into the attorney-client privilege with respect to the CCA-Leavenworth video evidence.[89]

Even if there was evidence that a government agent watched a video of Rokusek meeting with Dertinger and that this violated Dertinger's constitutional rights, this could not serve as a

---

[88] The record further demonstrates, with no contradicting evidence, that Stokes did not watch any video after he left for vacation in late July, *see* ¶ 33, and that, upon Rokusek's assertion of the privilege, the video evidence was secured and later impounded. *See* ¶ 34, 56. Thus, whatever Flannigan and/or Stokes intended to do with respect to video of a Rokusek-Dertinger meeting, the evidence shows, without contradiction, that they did not have the opportunity to carry out such intent. Accordingly, if anything, Rokusek's testimony tends to prove that no one viewed any of the videos of her meeting with Dertinger at CCA-Leavenworth, which is consistent with all of the other testimony.

[89] Even if, contrary to the evidence, one assumes that Stokes or some other law enforcement official watched a soundless video of Rokusek meeting with Dertinger, this would not assist the FPD in meeting its burden of establishing a violation of the Sixth Amendment in this matter. The FPD does not represent Dertinger and, as part of the settlement in his own separate case, Dertinger abandoned his claims in this proceeding. *See* footnote 14, *supra*. Accordingly, any violations of Dertinger's personal Sixth Amendment rights are not at issue here.

basis for a finding of a Sixth Amendment violation here.  A violation of one inmate's rights does

not prove a Sixth Amendment violation as to others.  R.T. XXXX (testimony of Professor Peter

Joy).

**LEGAL CONCLUSION #2:  The FPD's claim that the government, by obtaining soundless video recordings of inmate-attorney meetings at CCA-Leavenworth, violated the Sixth Amendment rights of each of those inmates is meritless <u>because the FPD has not identified any of those inmates.</u>**

The FPD's report describing its investigation of the video-recording of inmate-attorney

meetings demonstrates that it is aware of the identity of the inmates whose meetings were subject

to recording and later produced to the USAO pursuant to the GJ subpoena.  Exh. 585; R.T. 1505-

08.  But, for reasons not apparent from the record, the FPD chose not to identify these inmates as

part of its evidentiary presentation in this litigation.  As a result, the record is silent as to which

inmates met with legal counsel.  But, as the Supreme Court has held and as FPD expert witness

Professor Peter Joy testified, Sixth Amendment rights are personal.  *Cobb*, 532 U.S. at 171, n.2;

R.T. 1776.  Because the record does not show the identity of any inmate whose meeting with

counsel was video-recorded, there is no basis for finding a constitutional violation.

**LEGAL CONCLUSION #3:  The FPD's claim that the government, by obtaining soundless video recordings of inmate-attorney meetings at CCA-Leavenworth, violated the Sixth Amendment rights of each of those inmates is meritless <u>because the FPD has chosen not to have the Court view the video of each meeting, which forecloses a judicial finding that the soundless video of any particular meeting reveals privileged communications about legal advice or strategy.</u>**

Even if there was evidence that AUSAs or their agents had viewed videos of inmate-

attorney meetings and even if those inmates had been identified, the record still would be

insufficient to establish any Sixth Amendment violations.  This is because there is no proof that

any of the soundless videos *reveal* attorney-client privileged information, that is, confidential

communications about legal advice or strategy.  It is not enough to show, as the FPD has attempted

to do through attorney affidavits and testimony, that some defense attorneys discuss legal matters with clients when meeting at CCA-Leavenworth.  For there to be an intrusion, which the Tenth Circuit requires, *see Kennedy*, 225 F.3d at 1194 ("a claim of a Sixth Amendment violation based on intrusion of attorney-client privilege is limited to government action which interferes with legal representation after the initiation of criminal proceedings."), the soundless video would have to disclose the contents of those communications to an observer.  Throughout this litigation, the government has explained that non-verbal communication is too rudimentary for an observer to discern whether it involves legal advice or strategy or to disclose the content of any accompanying verbal communications.  *See, e.g.*, Docket #336.  The government reiterates that contention here.

But, even if the Court rejects this proposition and finds that soundless video potentially can reveal privileged information, in order to find a Sixth Amendment violation as to any inmate, it would have to find that a soundless video of an inmate's meeting with legal counsel that was viewed by an AUSA *did in fact reveal privileged information*.  Professor Joy conceded this point.

> A:      My recollection of my testimony [from an earlier proceeding] was that soundless video could reveal attorney-client communications.
>
> Q.:     Would you be able to determine that without watching the video?
>
> A:      Well, as I said, I said it could reveal.
>
> Q:      And that's my follow-up question.
>
> A:       I didn't say that this one did reveal.
>
> Q:      This one did reveal.
>
> A:      But yes, you're right. As a general proposition, it could reveal. But one would look at each individual video to say if, in fact, it did reveal.

R.T.  1769-70.

AFPD Federico acknowledged that in order to "glean information" from a soundless video, "one would have to rely on hand gestures and face gestures and body language."  He further conceded that he had not watched any of the videos "to determine whether any hand gestures, body gestures were made during the communications" captured on the soundless videos of attorney-client meetings.  R.T. 1617.  Similarly, this Court cannot make any determination of what the videos do or do not depict without watching them.  And, as Federico testified, although the FPD represents the inmates whose meetings with counsel were video-recorded and produced pursuant to the grand jury subpoena, and the Court had impounded those videos, making them accessible to the FPD upon request, the FPD did not ask the Court to view any of them or attempt to view them itself.[90]  R.T. 1618.

Remarkably, the FPD seeks a judicial finding that the government violated the Sixth Amendment rights of CCA-Leavenworth inmates whose meetings with legal counsel were video-recorded and produced to the government through legal process without identifying a single such inmate, without proof that any government official watched any of the video evidence, and without proof of what any of these soundless videos depict.  The Court should not do this.

---

[90] As explained above, there are multiple reasons why no finding of a Sixth Amendment violation occurred here.  Accordingly, it is not necessary for the Court to view the inmate-attorney videos to reject the FPD's video-based Sixth Amendment claims.  Such viewing is, however, necessary to find that there has been such a violation.  Otherwise, there would be no proof that any video reveals privileged information.  If the Court reopens the record to watch any of the video evidence for the purpose of determining whether it reveals privileged information, the government should be provided an opportunity to do so as well for the purpose of litigation in this Court and/or on appeal.  If government viewing of the video could prejudice any claimant here in an underlying criminal prosecution, the government will have an attorney uninvolved in such prosecution view the video.

**LEGAL CONCLUSION #4: The FPD's claim that the government violated the Sixth Amendment rights of inmates whose outgoing recorded telephone calls were requested by the government, accessed by CCA-Leavenworth employees, and included calls to attorney telephone numbers is meritless <u>because there is no evidence that any AUSA or law enforcement agent listened to any attorney-client privileged call in this case</u>.**

The FPD's claim of a Sixth Amendment violation based on the fact that outgoing inmate calls from CCA-Leavenworth to telephone numbers of defense counsel sometimes were commingled with other calls made by these inmates also is meritless.  First, other than in the already-resolved *Herrera-Zamora* and *Reulet* cases, there is no evidence that an AUSA (or an agent working with an AUSA) listened to the content of such a call.  Indeed, when specifically questioned about this, USAO employees uniformly and unequivocally denied doing so.  *See* ¶ 93.  No documentary or other evidence in the record contradicts this testimony and a considerable amount of evidence corroborates it.  Interpreter Sarah Gardner described instructions that she received from at least three AUSAs – Krug, Catania, and Hunt – unequivocally forbidding her from listening to or disclosing the contents of any inmate-to-attorney call.  Exhibit 718 – a summary sheet that she created when interpreting inmate telephone calls, reflects her compliance with these instructions.  It shows that when Gardner came upon an inmate-attorney call in a case assigned to AUSA Krug, she did not summarize it, as she did with the recordings of other inmate telephone calls that she interpreted, but instead simply labeled it as an "attorney client call" and provided no further description.

Gardner further testified that the only exception to the guidance that she received and followed from other AUSAs came when former SAUSA Tomasic, acting alone, instructed her to locate and summarize recorded telephone conversations between inmate Herrera-Zamora and legal counsel Carlos Moran so Tomasic could use them to impeach Herrera-Zamora if he testified.  *See* ¶ 117.  When questioned by an AFPD, Gardner made clear that this was an exception, not the

norm.  *See* ¶ 94a-94d.  Testimony from critics of the way in which Kansas City, Kansas AUSAs practiced law – Warner, Barnett, and Tomasic – did not establish that any AUSAs had listened to attorney-client calls.  Instead, these witnesses expressly denied knowledge of AUSAs doing so.  *See* ¶ 96a-96c.  And, documentary evidence – contemporaneous electronic mail messages from AUSA Wamble's legal assistant, AUSA Oakley, and SAUSA Tomasic – showed that standard practice was to terminate listening to a recorded call upon realization that the inmate was speaking to an attorney.  *See* ¶¶ 94d-94f.

The FPD's analysis of USAO requests for recordings of inmate telephone calls, the Securus call access data, and known attorney telephone numbers does not establish Sixth Amendment violations or contradict the above-described evidence.  Significantly, it shows that the only case in which an AUSA requested recordings of calls made to the telephone number of an attorney was in the *Herrera-Zamora* case, which was done only after seeking and receiving guidance from the DOJ PRAO.  *See* ¶ 113.  As a result, it is clear that whenever an inmate's recorded calls to an attorney telephone number were accessed following an AUSA request, it was only because they were commingled with the inmate's other calls, not because there was an effort to obtain calls made to an attorney.   Indeed, without a call detail report or the recorded calls themselves, an AUSA would have no way of knowing in advance whether an inmate had made a telephone call to an attorney's telephone number.

The FPD's analysis, which was not entirely free of double-counting and other errors, *see* footnotes 38 & 41, *supra*, showed the approximate number of recorded telephone calls from inmates to known attorney telephone numbers that were accessed by a CCA-Leavenworth employee following USAO requests for all of the telephone calls made by specified inmates, as well as the frequency with which such calls were likely to be commingled with other accessed

outgoing inmate calls.   Assuming that some of these recordings captured privileged inmate conversations with legal counsel about legal advice or strategy, there is no proof that any AUSA listened to or learned the contents of any such recording.  AFPD Federico admitted as much.  *See* ¶ 103.  The record makes clear that it was common for AUSAs (and their agents) to not listen to inmate calls that they had requested.  For example, AUSAs often requested calls in anticipation of trial, only to have a case result in a guilty plea, obviating the need to review the calls.[91]  *See* ¶ 90. It also showed that interpreters and agents who knew that they should not listen to attorney-client calls acted to screen AUSAs from inmate-attorney-calls.  *See* ¶ 94a-94d, 94g.

Because there were rare occasions in which AUSAs nonetheless discovered that requested inmate calls included one or more involving legal counsel, there also was questioning at the evidentiary hearing about whether the government has a statutory or constitutional obligation to produce these recordings as part of the government's disclosure obligations in the criminal case against the inmate.  The Federal Rules of Criminal Procedure provide that:

> Upon a defendant's request, the government must disclose to the defendant, and make available for inspection, copying, or photographing, all of the following:
> (i) any relevant written or recorded statement by the defendant if:
> - statement is within the government's possession, custody, or control; and
> - the attorney for the government knows—or through due diligence could know—that the statement exists . . . .

Fed. R. Crim. P. 16(a)(1)(B).

Further, the government has a constitutional obligation to disclose to the defense information in the government's possession that is both material and favorable to the defendant

---

[91] The FPD presentation of its analysis showed that, at least in one instance, an AUSA requested recordings of an inmate's calls after a grand jury returned a superseding indictment and shortly before trial.  See R.T. 1545.  This is neither surprising nor sinister.  It simply reflects efforts to obtain recordings at a time when an inmate would be likely to make incriminating or otherwise relevant statements to associates (after indictment) and to have the most recent recorded calls when preparing for trial.

for the purpose of determining guilt (including by impeaching government witnesses) or imposing sentence. *Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Walters*, 269 F.3d 1207, 1214 (10th Cir. 2001) ("[T]o establish a *Brady* violation, a defendant must demonstrate that '(1) the prosecutor suppressed evidence; (2) the evidence was favorable to the defendant as exculpatory or impeachment evidence; and (3) the evidence was material.'") (quoting *Gonzales v. McKune*, 247 F.3d 1066, 1075 (10th Cir. 2001)).

There is no Rule 16 or *Brady* obligation, however, when information or evidence is equally available to the defendant. *See, e.g.*, *United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009) ("And the defendant must also show that the favorable evidence was in the possession or control of the government."). *Erickson* endorses the holding in *Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998), that "*Brady* obviously does not apply to information that is not wholly within the control of the prosecution." 561 F.3d at 1163. *Coe* rejected a defendant's claim that he was entitled to government disclosure when "information was not under the sole control of the government or improperly kept from Coe." 161 F.3d at 344.

Here, it is undisputed that, upon request, a criminal defendant can obtain copies of inmate recordings from CCA-Leavenworth. *See* ¶¶ 79, footnote 36, *supra*. Because these recorded statements of the defendant are not within the government's exclusive possession or control, but instead are equally available to the defendant, the government has no disclosure obligation.

Similarly, an AUSA who realizes that the government possesses a copy of a recording of an inmate-attorney telephone conversation has no ethical obligation to notify the attorney. Rule 4.4 of the Kansas Rules of Professional Conduct provides:

**Transactions with Persons other than Clients: Respect for Rights of Third Persons**

(a) In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person.

(b) A lawyer who receives a document or electronically stored information relating to the representation of the lawyer's client and knows or reasonably should know that the document or electronically stored information was inadvertently sent shall promptly notify the sender.

The commentary for this rule states in part:

[1] Responsibility to a client requires a lawyer to subordinate the interests of others to those of the client, but that responsibility does not imply that a lawyer may disregard the rights of third persons. It is impractical to catalog all such rights, but they include legal restrictions on methods of obtaining evidence from third persons and unwarranted intrusion into privileged relationships, such as the client-lawyer relationship.

[2] Paragraph (b) recognizes that lawyers sometimes receive a document or electronically stored information that was mistakenly sent or produced by opposing parties or their lawyers. A document or electronically stored information is inadvertently sent when it is accidentally transmitted, such as when an email or letter is misaddressed or a document or electronically stored information is accidentally included with information that was intentionally transmitted. If a lawyer knows or reasonably should know that such a document or electronically stored information was sent inadvertently, then this Rule requires the lawyer to promptly notify the sender in order to permit that person to take protective measures. Whether the lawyer is required to take additional steps, such as returning the document or electronically stored information, is a matter of law beyond the scope of these Rules, as is the question of whether the privileged status of a document or electronically stored information has been waived. Similarly, this Rule does not address the legal duties of a lawyer who receives a document or electronically stored information that the lawyer knows or reasonably should know may have been inappropriately obtained by the sending person. For purposes of this Rule, "document or electronically stored information"' includes, in addition to paper documents, email and other forms of electronically stored information, including embedded data (commonly referred to as "metadata"), that is subject to being read or put into readable form. Metadata in electronic documents creates an obligation under this Rule only if the receiving lawyer knows or reasonably should know that the metadata was inadvertently sent to the receiving lawyer.

Both the text of this ethical rule and the associated comment make clear that the rule has

no application in this content.  Professor Joy conceded that there is no disclosure obligation in

subpart (a).  R.T. 1799.   It is equally clear that subpart (b) has no application here.  When an AUSA, upon request, receives from CCA-Leavenworth a recording of an inmate telephone call that may relate to legal representation of the inmate, the AUSA cannot be said to "know[ ] or reasonably should know that the . . . electronically stored [conversation] was inadvertently sent," as the rule requires.  This is because the digital recording was not "inadvertently sent" by opposing counsel, but rather *deliberately sent* to the AUSA by CCA-Leavenworth.  Further, because the commentary makes clear that this ethical rule "does not address the legal duties of a lawyer" even when he or she "receives a document or electronically stored information that the lawyer knows or reasonably should know may have been inappropriately obtained by the sending person," it is doubly clear that the rule cannot possibly apply to an AUSA when either: (a) CCA-Leavenworth properly "obtains" and sends the AUSA an inmate-attorney conversation by recording an outgoing inmate telephone call made to an attorney telephone number that was not subject to a privatization request; or (b) unbeknownst to the AUSA, there was an unfulfilled privatization request as to that telephone number.  If the call was made to an attorney at a telephone number when there was no privatization request, the call was not "inappropriately obtained" by the sender, CCA-Leavenworth, and there can be no notice obligation under the rule.  Likewise, the rule clearly does not apply to an inmate-attorney call made to a telephone number subject to an unfulfilled privatization request because, for reasons explained in ¶ 77, the AUSA would not know and would have no reason to know of the privatization request or CCA-Leavenworth's failure to fulfill it.  Professor Joy did not testify that the rule requires disclosure under the circumstances present here, instead expressing only his personal view that, based on Rule 4.4, "a reasonable attorney would

say, I should notify the other side."[92]  R.T. 1800.  Further, he acknowledged that there is no court decision expressing the view that the rule imposes a notice obligation in this context.  R.T. 1800-02.

Despite the above, the evidence here shows that AUSAs often produced recordings of inmate telephone calls, including those made to legal counsel, in discovery and/or notified defense counsel after discovering that CCA-Leavenworth had produced a copy of such calls to the USAO. *See* ¶ 97.

**LEGAL CONCLUSION #5:  The FPD's claim that the government violated the Sixth Amendment rights of inmates whose outgoing recorded telephone calls were requested by the government, accessed by CCA-Leavenworth employees, and included calls to attorney telephone numbers is meritless because there is no evidence that any particular call in this case was between an inmate and an attorney and related to legal advice or strategy.**

There is no dispute that for a recorded inmate call to be privileged, it must be made to an attorney (or member of the defense team working with legal counsel) and be made for the purpose of receiving or providing legal advice or strategy.  *Merida*, 828 F.3d at 1209.  Professor Joy acknowledged this, R.T. 1773-74, and further explained that one cannot determine whether an attorney-client communication is privileged without knowing the content of the communication. R.T. 1773-74.

Neither the FPD analysis, nor any other evidence in the record, establishes the content of any outgoing inmate telephone call other than the calls in the *Reulet* case, the contents of which were documented, at least in part, in AUSA Treadway's handwritten notes.  *See* ¶ 132.  Even if

---

[92] Professor Joy also testified as to an opinion that he shared with a co-author of an article or book that if "somebody anonymously sent you the [attorney-client privilege] material or somebody surreptitiously obtained the material and gave it to you, at a minimum, we believe that when you read the rules (Rules 4.4(a) and (b)] together, it would require notifying the-- if an attorney is involved, notifying the attorney who's involved that you're now in receipt of those materials." R.T. 1745.

one assumes that every accessed inmate telephone call documented in the FPD's analysis was made by the inmate whose calls were requested (rather than by a different inmate misusing a PIN), it is conjecture how many of these calls actually connected to a lawyer, rather than to a receptionist or voicemail, *and* involved legal advice or strategy.  Information about call duration, which was accessible to the FPD, would have provided some illumination, but the FPD analysis did not include that data.  *See* ¶ 79 and footnote 42, *supra*.  The FPD, which represents the intervening inmates who are not indicted in this case, and has access to the recordings, which are in the Court's possession, could have asked the Court to listen to any recorded call that it claims is privileged.  It chose not to do this for *any* call.  As a result, the only evidence in the record of the content of any of these calls comes from the Special Master:

> Of course, the great majority are calls from inmates to friends and loved-ones, not to attorneys. Also, the Securus Data includes very short calls where nothing meaningful occurred, such as calls where: (1) the recipient refused the call after hearing the Securus pre-recorded message; (2) the recipient attempted to join a third party to the call, which normally leads to immediate call termination; or (3) the inmate terminated the call after learning the intended recipient was not present (such as when a receptionist answers the phone and informs the inmate his attorney is unavailable).

Docket #214 at 21 n.19.

Without any evidence of the content of any inmate-to-attorney-telephone-number calls, it is not possible to determine if any particular recorded call includes privileged communications. "A party claiming the attorney-client privilege must prove its applicability, which is narrowly construed.  The party must bear the burden as to specific questions or documents, not by making a blanket claim."  *In re Foster*, 188 F.3d at 1264 (internal citation omitted).  "It is not the Government's responsibility to sort out what is privileged from what is not; the burden of establishing a privilege is on the one who asserts it." *Matter of Grand Jury Subpoena Duces Tecum Issued on June 9, 1982, to Custodian of Records*, 697 F.2d 277, 280 (10th Cir. 1983).  As Professor

Joy put it, "If you're saying that the party asserting the privilege fails to demonstrate that all the conditions for the privilege were met, then yes, they have not established the privilege."  R.T. 1774.    With no evidence that any particular recording of an outgoing inmate call captured a conversation with legal counsel and that such conversation related to legal advice or strategy, no finding of a Sixth Amendment violation is possible.[93]  There is no such evidence here.

**LEGAL CONCLUSION #6:  The FPD's claim that the government violated the Sixth Amendment rights of inmates whose outgoing recorded telephone calls were requested by the government, accessed by CCA-Leavenworth employees, and included calls to attorney telephone numbers is meritless <u>because there is insufficient evidence for the Court to determine whether, under circumstances related to any particular inmate and any particular telephone call, the privilege was defeated by the multiple written and audible warnings about recording and monitoring</u>.**

Notice to an inmate that his jailhouse calls are subject to recording and monitoring destroys any reasonable expectation of confidentiality in the communications, without which, no privilege ever attaches to the monitored communications.  *See Hatcher*, 323 F.3d at 674 (finding no attorney-client privilege attached to calls between inmates and attorneys because "the parties to these conversations were aware that they were being recorded by the prison" and "[t]he presence of the prison recording device destroyed the attorney-client privilege"); *Mejia*, 655 F.3d at 132-34 (holding that communications that a prisoner knows to be recorded by prison authorities are not covered by the attorney-client privilege because the prisoner could not intend such communications to be confidential; further declaring that "[t]he fact that the call was being recorded amounts essentially to the presence of an unsympathetic third party—[Bureau of Prisons]—listening in"); *United States v. Lentz*, 419 F. Supp. 2d 820, 827-28 (E.D. Va. 2005) (concluding, based on well-settled principles involving privilege, "that an inmate's telephone

---

[93] If the Court chooses to listen to any of the recorded inmate-to-attorney-telephone-number calls, the government requests permission to do so as well.  *See* footnote 90, *supra*.

conversations with counsel are not protected by the attorney-client privilege where, as here, the inmate is notified at the outset that the calls are recorded and subject to monitoring" because the inmate "could not reasonably have assumed that his conversations with [counsel] would be confidential," and the inmate's decision to proceed with conversation despite notification "is no different from [defendant] electing to proceed with these conversations notwithstanding the known presence of a third party within earshot of the conversation"); *see also Watson v. Albin*, 2008 WL 2079967 at *5 (N.D. Cal. May 12, 2008) (finding attorney-client privilege waived where inmate placed calls from jail on a monitored phone line); *United States v. Eye*, 2008 WL 1701089 at *13 (W.D. Mo. Apr. 9, 2008) (finding defendant waived his attorney-client privilege by calling his attorney when he well knew that the calls could be monitored and recorded by CCA). In effect, a recording device is deemed to be a third party to whom disclosure of the communication is being made. *See Hatcher*, 323 F.3d at 674 ("Because the inmates and their lawyers were aware that their conversations were being recorded, they could not reasonably expect that their conversations would remain private. The presence of the recording device was the functional equivalent of the presence of a third party.").

The Tenth Circuit has applied this principle in a different context. In *United States v. Faulkner*, 439 F.3d 1221 (10th Cir. 2006), the Tenth Circuit found, for purposes of Title III's consent requirement, that the defendant-inmate "impliedly consented to recording" of his calls with non-attorney associates while being detained at CCA, where: (1) the defendant-inmate received an orientation manual upon arrival, which stated that the "[t]elephones are subject to recording and monitoring"; (2) inmates were advised during orientation that their calls "could be" recorded; (3) inmates received an inmate handbook warning that "[t]elephone conversations may be monitored and/or recorded for security reasons"; (4) signs posted over the phones announced

126

that calls are subject to monitoring; and (5) "it appears that when a call is placed from CCA, a recorded voice states, "This call is subject to monitoring and recording."  *Id.* at 1222-25 (internal quotation marks omitted; alterations in *Faulkner*).

Similarly, and more recently, the Tenth Circuit, in a case arising from CCA-Leavenworth involving the same warnings given here, found that an inmate had given "implied consent" to monitoring and recording.   "A prisoner's voluntarily made choice—even a Hobson's choice—to use a telephone he knows may be monitored implies his consent to be monitored."  *United States v. Verdin-Garcia*, 516 F.3d 884, 894 (10th Cir. 2008); *see also Faulkner*, 439 F.3d at 1224 ("It is generally accepted that a prisoner who places a call from an institutional phone with knowledge that the call is subject to being recorded has impliedly consented to the recording.").   In doing so, the Court rejected an argument advanced in this case, that an audible warning telling an inmate that his call is "subject to" monitoring and recording is an insufficient warning.  *Verdin-Garcia*, 516 F.3d at 894.  As the *Faulkner* Court explained:

> We are dealing here with incarcerated persons who received very specific warnings about particular phones.   To be sure, the prisoners at CCA did not have the opportunity to choose another, unmonitored phone.  But loss of some choice is a necessary consequence of being confined, and prison inmates have very few expectations of privacy in their communications.  Rarely are choices in life totally free from opportunity costs; something must be foregoing whenever one comes to a fork in the road.  The real issue is whether imposition of a condition is acceptable, so that a choice subject to that condition is considered a voluntary, consensual one.  Because of the undeniable need to control prisoner communications to the outside world, we have no hesitation in concluding that a prisoner's knowing choice to use a monitored phone is a legitimate "consent" under the Wiretap Act.

439 F.3d at 1224-25 (internal quotation marks, citations, and alterations omitted).[94]

---

[94] During the evidentiary hearing, government counsel, when referring to the Tenth Circuit's decisions in *Faulkner* and *Verdin-Garcia*, mistakenly told the Court that these cases involve inmate telephone calls to legal counsel. R.T. 2438.  They do not.  The government apologizes for the error.

To be sure, the FPD has shown facts here that may not have been proven in the above-described cases. For example, there was testimony that some CCA-Leavenworth inmates may not have timely received an inmate handbook containing one of the several sets of written warnings about the recording and monitoring of telephone calls, *see* ¶ 65, and that some attorneys' requests to have their telephone numbers designated as private were not fulfilled,[95] *see* ¶¶ 73-75, and that the audible Spanish-language warning about recording and monitoring may have been slightly different than the English version of the warning. *See* footnote 23, *supra*. These and other circumstances that could differ from inmate to inmate arguably could have a bearing on whether there was consent to recording and thus whether the attorney-client privilege attached. More generally, as FPD legal expert Professor Peter Joy explained, a court cannot determine whether a communication is privileged without consideration of both its content and the circumstances under which it is made. R.T. 1773-74.

But, not only did the FPD choose not to present evidence of the content of inmate telephone calls, it also made no showing of the circumstances surrounding *any* inmate's outgoing calls to *any* attorney telephone number. Thus, there is no proof here which inmates, if any, may have been denied access to the written warnings in the CCA-Leavenworth handbook; which inmates, if any, were mistakenly advised that their conversations with counsel were private by defense lawyers who relied on faulty CCA-Leavenworth representations that their privatization requests had been fulfilled; or which inmates, for other reasons, may have a colorable fact-based argument that

---

[95] There was, however, no testimony or other evidence that any attorney communicated to an inmate/client that calls to his telephone number were not being recorded because of a privatization request. And, it was clear that when a privatization request was not fulfilled, the inmate and the call recipient would hear the warning about recording and monitoring, R.T. 1439-40, 1468, which would have provided notice that the call was being recorded despite the privatization request.

*Hatcher*, *Mejia*, *Faulkner*, and *Verdin-Garcia* do not apply to their calls to counsel despite the multiple written and audible warnings about recording that they received.  Without such evidence of inmate-specific circumstances, the FPD has failed to meet its burden of showing an absence of inmate consent to recording.   As Professor Joy explained, when "the party asserting the privilege fails to demonstrate that all the conditions for the privilege were met, then yes, they have not established the privilege." R.T. 1774.  This forecloses a finding that any particular inmate-attorney conversation was privileged.[96]

**LEGAL CONCLUSION #7:   The FPD's Sixth Amendment claims fail because there has been no showing of prejudice to any inmate.**

The component of the Sixth Amendment applicable here is the right to the effective assistance of counsel.  In order to receive effective assistance, a criminal defendant must have the ability to speak candidly and confidentially with counsel, free from unreasonable government interference.  *See Weatherford*, 429 U.S. at 554 n.4 ("One threat to the effective assistance of counsel posed by government interception of attorney-client communications lies in the inhibition of free exchanges between defendant and counsel because of the fear of being overheard.").   The Supreme Court has explained that to prove a violation of "the right to the effective assistance of counsel," a defendant "generally [must] establish prejudice."  *United States v. Gonzalez-Lopez*, 548 U.S. 140, 146 (2006).  Prejudice can result from "the introduction of evidence gained through the interference against the defendant at trial, from the prosecution's use of confidential

---

[96] As the Court is aware, the FPD has filed and apparently intends to continue to file motions under 28 U.S.C. § 2255 on behalf of in-custody inmates whose meetings with legal counsel were video-recorded and produced to the USAO and whose telephone conversations with legal counsel were recorded and produced to the USAO.  Most or all of these motions are procedurally defaulted and/or waived for various reasons.   To the extent that any are not, they present a more appropriate forum for an inmate to raise claims that he was prejudiced by a government intrusion into privileged conversations with his legal counsel.

information pertaining to defense plans and strategy, and from other actions designed to give the prosecution an unfair advantage at trial." *Williams* v. *Woodford*, 384 F.3d 567, 585 (9th Cir. 2004). Accordingly "a violation of the Sixth Amendment right to effective representation is not 'complete' until the defendant is prejudiced." *Gonzalez-Lopez*, 548 U.S. at 147 (emphasis omitted). Without "at least a realistic possibility of injury to [the defendant] or benefit to the State, there can be no Sixth Amendment violation." *Weatherford*, 429 U.S. at 549.

Federal appellate courts have recognized that a criminal defendant must show prejudice in order to prove a Sixth Amendment violation based on intrusion by the government into the attorney-client relationship. *See, e.g.*, *Williams v. Woodford,* 384 F.3d 567, 584-85 (9th Cir. 2004). ("When the government deliberately interferes with the confidential relationship between a criminal defendant and defense counsel, that interference violates the Sixth Amendment right to counsel *if it substantially prejudices the criminal defendant*.") (emphasis added); *United States v. Castor*, 937 F.2d 293, 298 (7th Cir. 1991) ("Without any proof of governmental intrusion or actual prejudice, the defendant cannot assert that the mere relationship of an investigator working for his attorney with an FBI agent assigned to the case violates his constitutional right to counsel."); *Clark v. Wood*, 823 F.2d 1241, 1249-50 (8th Cir. 1987) ("[W]e hold that assuming the alleged monitoring took place, and assuming that the monitoring constituted a Sixth Amendment violation, Clark is not entitled to relief because he has failed to demonstrate that the substance of the overheard conversations were used against him."); *United States v. Kelly*, 790 F.2d 130, 137 (D.C. Cir. 1986) ("Critically, *Weatherford* went on to make it clear that some prejudice must be shown as an element of a sixth amendment violation."); *United States v. Steele*, 727 F.2d 580, 586 (6th Cir. 1984) ("Even where there is an intentional intrusion by the government into the attorney-client relationship, prejudice to the defendant must be shown before any remedy is granted."); *United*

*States v. Brugman*, 655 F.2d 540, 546 (4th Cir. 1981) ("We have been cited to no authorities supporting a per se rule that whenever conversations with counsel are overheard the Sixth Amendment is violated.  Indeed, the Supreme Court of the United States has rejected any such suggestion.").  *See also Carrier v. Lundstedt*, 2015 WL 1041835, at *3 (D. Colo. Mar. 4, 2015) (finding that plaintiff failed to state a claim for violation of his Sixth Amendment right to counsel; noting that "[p]laintiff must . . . allege sufficient facts to state a plausible claim that he suffered prejudice as a result of such conduct.") (unpublished); *Rodriguez v. Zavaras*, 42 F.Supp.2d 1059, 1086 (D.Colo. 1999) ("Petitioner has not established that the monitoring of his attorney-client relationship and/or interference with same prejudiced his ability to litigate in state criminal proceedings").

There has been no showing of prejudice to any claimant in this case.  Indeed, as explained above, except for the *Herrera-Zamora* and *Reulet* cases, both of which have been resolved in other courts, there is no evidence that any AUSA or law enforcement official watched any video recording or listened to any audio recording that captured inmate-attorney communications, or that any such communications in government possession related to legal advice or strategy.  Further, there has been no showing that the government made use of any such recordings, thereby prejudicing any defendant.  As a result, there can be no Sixth Amendment violation here.

## LEGAL CONCLUSION #8:  The FPD's reliance on *Shillinger v. Haworth*, 70 F.3d 1132 (10th Cir. 1995), is misplaced.

Throughout this litigation, the FPD has relied on the Tenth Circuit's decision in *Shillinger v. Haworth* as the cornerstone of its Sixth Amendment claims.  *See, e.g.*, Docket #230, #358.  But, evidence presented during the evidentiary hearing makes clear that *Shillinger* has no application here.

131

In *Shillinger*, a deputy sheriff was responsible for transporting Shillinger from jail to a courtroom so that Shillinger's attorney could conduct trial preparation sessions. The deputy remained present during these sessions, enabling him to overhear attorney-client communications. 70 F.3d at 1134. The prosecutor deliberately learned from the deputy what occurred during these preparation sessions. *Id*. at 1135. ("The prosecutor admitted . . . that his knowledge of the preparatory sessions was acquired through a conversation with the deputy that was initiated by the prosecutor."). The prosecutor planned to use the information against Shillinger at trial. *Id*. at 1137. The *Shillinger* Court explained that:

> This is not a case in which the state's interest in effective law enforcement is at issue. Rather, this is a case in which the prosecutor, by his own admission, proceeded for the purpose of determining the substance of Haworth's conversations with his attorney, *and attorney-client communications were actually disclosed*. This sort of purposeful intrusion on the attorney-client relationship strikes at the center of the protections afforded by the Sixth Amendment and made applicable to the states through the Fourteenth Amendment.

*Id*. at 1141 (emphasis added). Because of inadequate fact-finding in the lower court, however, the Tenth Circuit was uncertain how much the prosecutor had learned from the deputy. *Id*. at 1137-38.

The Court nonetheless concluded that:

> Because we believe that a prosecutor's intentional intrusion into the attorney-client relationship constitutes a direct interference with the Sixth Amendment rights of a defendant, and because a fair adversary proceeding is a fundamental right secured by the Sixth and Fourteenth Amendments, we believe that absent a countervailing state interest, such an intrusion must constitute a *per se* violation of the Sixth Amendment. In other words, we hold that *when the state becomes privy to confidential communications because of its purposeful intrusion into the attorney-client relationship and lacks a legitimate justification for doing so*, a prejudicial effect on the reliability of the trial process must be presumed.

*Id*. at 1142 (emphasis added) (further explaining that this "*per se* rule recognizes that such intentional and groundless prosecutorial intrusions are never harmless because they necessarily

132

render a trial fundamentally unfair.").  Accordingly, the Court remanded "the case to the district court for factfinding procedures to determine the extent of the intrusion as well as the proper remedy." *Id*. at 1143.[97]

*Shillinger* has no application here for at least two reasons.  First, in *Shillinger*, there was undisputed evidence, based on the prosecutor's own admissions, that the prosecutor learned the contents of attorney-client communications made during trial preparation.  *See, e.g.*, *id*. at 1141 ("attorney-client communications were actually disclosed"); 1142 ("when the state becomes privy to confidential communications").  Indeed, it concerned the Tenth Circuit that it did not know exactly how much the prosecutor had learned from the deputy.  Here, the opposite is true.  After an extensive evidentiary hearing, there is no evidence that any AUSA or agent learned the contents of *any* attorney-client communication involving any claimant in this case.  Indeed, there is considerable evidence showing that this did not occur.   For this reason alone, the *Shillinger* presumption of prejudice does not apply here.

---

[97] It is questionable whether *Shillinger* is good law in light of the Supreme Court's view that prejudice must be *demonstrated* to substantiate a Sixth Amendment violation of the kind alleged here, and a presumption falls short of a demonstration.  *See United States v. Morrison,* 449 U.S. 361, 365-66 (1980) (assuming without deciding that a Sixth Amendment violation occurred where federal agents met with represented defendant without counsel's permission and advised defendant she could benefit by cooperating with them, but reversing Sixth Circuit's dismissal of indictment with prejudice for assumed violation because defendant "has demonstrated no prejudice of any kind . . . to the ability of her counsel to provide adequate representation in these criminal proceedings," and "[t]here is no effect of a constitutional dimension which needs to be purged to make certain that [defendant] has been effectively represented and not unfairly convicted"); *Weatherford*, 429 U.S. at 557-58 (no Sixth Amendment violation found where undercover agent attended meetings between defendant and attorney but agent did not communicate substance of conversations to government; opining that without "at least a realistic possibility of injury to [the defendant] or benefit to the State, there can be no Sixth Amendment violation"); *Gonzalez-Lopez*, 548 U.S. at 147 ("[A] violation of the Sixth Amendment right to effective representation is not 'complete' until the defendant is prejudiced.") (emphasis omitted).

Second, despite its *per se* rule, the *Shillinger* Court recognized that where the government acts with a legitimate law enforcement purpose, a Sixth Amendment violation will lie only if the defendant can show that he was prejudiced by the intrusion.  *See* 70 F.3d at 1142 (noting that *per se* rule does not "affect[] the analysis to be undertaken in cases in which the state has a legitimate law enforcement purpose for its intrusion" and that "[s]uch cases would, of course, require proof of 'a realistic possibility of injury to [the defendant] or benefit to the State' in order to constitute a violation of a defendant's Sixth Amendment rights") (quoting *Weatherford*, 429 U.S. at 558) (first and second alterations added; third alteration supplied in *Shillinger*).  Here there was a legitimate law enforcement purpose in the government's acquisition of video and audio recordings.  As both Oakley and Tomasic testified, they drafted the grand jury subpoena to obtain all of the CCA-Leavenworth video evidence because of concern that the video would be periodically overwritten and thus lost, and they were uncertain about what video would later become relevant to their investigation and prosecution.[98]  *See* ¶¶ 4, 5.  Even if the Court were to be cautious about accepting Tomasic's later account of her reasoning in drafting the subpoena, her conduct at the time the video evidence was produced to the USAO is inconsistent with any nefarious intent.  Tomasic promptly notified defense counsel that the video was available for discovery, had sent to defense counsel a camera roster showing that there was video feed from attorney rooms, and disclosed to the court and defense counsel at a hearing that there were cameras in the attorney rooms.  *See* ¶¶ 21-23.  Tomasic also arranged for a filter team to safeguard any privileged materials found during a search of the CCA-Leavenworth inmate law library, suggesting her fidelity to the privilege.  *See* ¶¶ 10.

---

[98] Although a cooperator had told Tomasic that cameras captured video in the interview rooms, she testified that she did not consider this information when drafting the grand jury subpoena, *see* ¶ 6, and there is no contrary evidence.

Similarly, there were legitimate law enforcement reasons to obtain recordings of inmate telephone calls.  *See* ¶ 83.   The government's acquisition of audio recordings of inmate calls to attorney telephone numbers resulted from those calls being commingled with recordings of the inmates' other outgoing telephone calls.  There was no evidence of a deliberate government effort to obtain privileged information, as was the case in *Shillinger*.  *See* ¶¶ 84, 92-96.   Indeed, the FPD's own statistical analysis showed that in over 70% of the cases in which inmate calls were accessed, there were no calls to attorney telephone numbers.  *See* ¶¶ 99.

Even if the Court were to harbor concerns about the motives of individual prosecutors (despite a lack of evidence of intrusions into privileged communications), it is clear that the USAO had a legitimate programmatic purpose to obtain audio and video evidence relevant to its investigations and prosecutions.  *See, e.g.*, *City of Indianapolis v. Edmond*, 531 U.S. 32, 46 (2000) (inquiring into "purpose at the programmatic level," not the subjective mental state of individuals).

## B.    Preservation of Evidence Claims: Governing Law

Federal courts recognize that, under certain circumstances, a party involved in or expecting litigation has a duty to preserve relevant evidence without a court order.   "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation."  *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (also known as "*Zubulake IV*") (quoting *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)).  This duty to preserve sometimes has been interpreted to impose an obligation to affirmatively implement a "litigation hold" or "legal hold."  As explained in *F.D.I.C. v. McCaffree*, 289 F.R.D. 331 (D. Kan. 2012):

> Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a "litigation hold" to ensure the preservation of relevant documents.  This applies to evidence that the party knew

135

or should have known was relevant to imminent or ongoing litigation. But a litigant
is not required to keep or maintain every document in its possession.

*Id.* at 336-37 (footnotes and quotation marks omitted); *see also Helget v. City of Hays*, No. 13-

2228-KHV-KGG, 2014 WL 1308893, at *3 (D. Kan. Mar. 31, 2014) ("A 'litigation hold' is an

affirmative act taken by a party's attorney or management directing the party's employees or

agents to take affirmative steps to preserve evidence which otherwise might be lost. The purpose

of the hold is to avoid the loss of evidence through intentional or negligent actions, or even through

routine document management.").

"But not every case requires a legal hold. For example, 'where all potentially relevant

information is already secure'" a legal hold notice 'will not be necessary.'"   *Radiologix, Inc. v.

Radiology & Nuclear Med., LLC*, No. 15-4927-DDC-KGS, 2019 WL 354972, at *10 (D. Kan. Jan.

29, 2019) (quoting The Sedona Principles, Third Edition: Best Practices, Recommendations &

Principles for Addressing Electronic Document Production, 19 Sedona Conf. J. 1, 104, 103–08

cmt. 5.d. (2018)).

The obligation to implement a litigation hold is grounded in the Federal Rules of Civil

Procedure.  The seminal district court case, *Zubulake IV*, *supra*, describes "[t]he broad contours of

the duty to preserve" by quoting and citing to Federal Rules of Civil Procedure 34(a) (defining the

term "document"); 26(a)(1); and 26(b)(1) (setting out relevance requirement).  220 F.R.D. at 217–

18 & nn. 24, 25, 26.  More recently, in 2015, the federal civil discovery rules were modified to

expressly address sanctions for a party's failure to preserve electronically stored information.  Fed.

R. Civ. P. 37(e); *see generally Marten Transp., Ltd. v. Plattform Advert., Inc.*, No. 14-CV-02464-

JWL-TJJ, 2016 WL 492743, at *4 (D. Kan. Feb. 8, 2016) (explaining that the amended rule

"addresses the failure of a party to preserve electronically stored information").  No comparable

rule or amendment appears in the Federal Rules of Criminal Procedure.  Accordingly, when

explaining what triggers the obligation to implement a legal hold – "whenever litigation is reasonably anticipated, threatened, or pending against an organization, that organization has a duty to undertake reasonable and good faith actions to preserve relevant and discoverable information and tangible evidence" – the Sedona Conference makes clear that the triggering event – anticipated, threatened, or pending "litigation" – refers "primarily to civil litigation," and also to "regulatory investigations and proceedings."   The Sedona Conference Commentary on Legal Holds: The Trigger & the Process, 11 Sedona Conf. J. 265, 267 & n.1 (2010).

There is no mention, however, of a similar generalized legal obligation to preserve evidence or impose a hold in response to threatened or actual claims of government misconduct arising during criminal litigation.  Indeed, when confronted with a claim that the government failed to preserve text messages between FBI agents and cooperating witnesses, a federal court drew a distinction between "the breadth of discovery permitted in civil cases" and the more specific and limited obligations imposed by Fed. R. Crim. P. 16, the Jencks Act, and the *Brady* doctrine.  *United States v. Suarez*, No. CRIM.A. 09-932 JLL, 2010 WL 4226524, at *4-6 (D.N.J. Oct. 21, 2010). This is consistent with the hearing testimony of AUSA Metzger, who explained that she was familiar with litigation holds in civil cases, but could not recall one ever being used in a criminal case.  R.T.  2646; 2648.  To the knowledge of government counsel, no federal district or appellate court has ever held that the government, in response to anticipated, threatened, or actual misconduct claims in a criminal case, has a duty, without a court order, to implement a litigation hold.

Associated with the doctrine of litigation holds is the law governing sanctions in civil litigation for a party's failure to preserve relevant evidence, known as "spoliation."  "As a general rule, '[s]poliation sanctions are proper when (1) a party has a duty to preserve evidence because it

137

knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence.'" *Equal Employment Opportunity Comm'n v. JetStream Ground Servs., Inc.*, 878 F.3d 960, 964 (10th Cir. 2017) (quoting *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1150 (10th Cir. 2009)).  "Federal courts possess the inherent powers necessary to manage their own affairs so as to achieve the orderly and expeditious disposition of cases, including imposing appropriate sanctions" for spoliation.  *Helget v. City of Hays, Kansas*, 844 F.3d 1216, 1226 n.6 (10th Cir. 2017) (quotation marks and citations omitted).  District courts have 'substantial weaponry' in their arsenal to shape the appropriate relief: "Among the options, a court may strike witnesses, issue an adverse inference, exclude evidence, or, in extreme circumstances, dismiss a party's claims."  *Id*. at 1225-26 (quotation marks and citations omitted).

"But if the aggrieved party seeks an adverse inference to remedy the spoliation, it must also prove bad faith. Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case. Without a showing of bad faith, a district court may only impose lesser sanctions."  *Turner*, 563 F.3d at 1149 (quotation marks and citations omitted); *see also Aramburu v. Boeing Co*., 112 F.3d 1398, 1407 (10th Cir. 1997) ("Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case.").

As explained in the Advisory Committee Notes to Fed. R. Civ. P. 37:

Adverse-inference instructions were developed on the premise that a party's intentional loss or destruction of evidence to prevent its use in litigation gives rise to a reasonable inference that the evidence was unfavorable to the party responsible for loss or destruction of the evidence. Negligent or even grossly negligent behavior does not logically support that inference. Information lost through negligence may have been favorable to either party, including the party that lost it, and inferring that it was unfavorable to that party may tip the balance at trial in ways the lost information never would have. The better rule for the negligent or grossly negligent loss of electronically stored information is to preserve a broad range of measures to

138

cure prejudice caused by its loss, but to limit the most severe measures to instances
of intentional loss or destruction.

To the knowledge of government counsel, there is no legal authority permitting a federal
court to apply spoliation doctrine when the government has destroyed evidence that may support
a claim made in a criminal case of government misconduct.  Indeed, in *United States v. Hood*, 615
F.3d 1293 (10th Cir. 2010), when a defendant raised a civil spoliation claim based on his
allegations that law enforcement agents increased the quantity of methamphetamine attributed to
him by including in it methamphetamine seized from another person and then improperly
destroyed the bags which contained his methamphetamine, *id.* at 1296, the Tenth Circuit, in
rejecting his claim, noted that Hood "has cited to no case applying this civil discovery doctrine to
the criminal context."  *Id.* at 1301.

*Hood* also described the different, due-process-based standard that applies in criminal
cases, articulated by the Supreme Court in *California v. Trombetta*, 467 U.S. 479 (1984) and
*Arizona v. Youngblood*, 488 U.S. 51 (1988).  In *United States v. Pearl*, 324 F.3d 1210 (10th Cir.
2003), the Tenth Circuit applied these decisions to a claim in a criminal case that a detective
destroyed exculpatory electronic mail messages.  It described their holdings as follows:

> For police destruction of evidence to rise to the level of affecting a defendant's Due
> Process rights under *California v. Trombetta*, the evidence "must both possess an
> exculpatory value that was apparent before the evidence was destroyed, and be of
> such a nature that the defendant would be unable to obtain comparable evidence by
> other reasonably available means." 467 U.S. 479, 489 (1984). In addition, unlike a
> *Brady* analysis, the defendant must show that the government acted in bad faith.
> *Youngblood,* 488 U.S. at 58.

*Id.* at 1215.[99]  The *Pearl* Court found that the defendant failed all three requirements: he did not
demonstrate that (a) the messages were exculpatory; (b) comparable evidence was unavailable

---

[99] Elsewhere, the Tenth Circuit explained:

elsewhere; or (c) the detective acted in bad faith.  *Id.*  The *Hood* Court reached a similar conclusion. 615 F.3d at 1299-1300.

The Tenth Circuit has explained that "[t]he mere fact that the government controlled the evidence and failed to preserve it is by itself insufficient to establish bad faith."  *United States v. Richard*, 969 F.2d 849, 853–54 (10th Cir. 1992).  Further, "mere negligence on the government's part in failing to preserve such evidence is inadequate for a showing of bad faith."  *United States v. Bohl*, 25 F.3d 904, 912 (10th Cir. 1994).  "[I]t it is the defendant who bears the burden of showing bad faith under *Youngblood*," and a destruction of evidence claim without such proof "must fail."  *United States v. Donaldson*, 915 F.2d 612, 614 (10th Cir. 1990).

******

---

Under the two-prong *Trombetta* test, the government violates a defendant's right to due process when: (1) it destroys evidence whose exculpatory significance is "apparent before" destruction; and (2) the defendant remains unable to "obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489. The Court in *Youngblood* extended *Trombetta* to provide that, if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was "potentially useful" for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence. *Youngblood*, 488 U.S. at 58.

******

To invoke *Trombetta*, a defendant must demonstrate that the government destroyed evidence possessing an "apparent" exculpatory value. *Trombetta*, 467 U.S. at 489. However, to trigger the *Youngblood* test, all that need be shown is that the government destroyed "potentially useful evidence." *Youngblood*, 488 U.S. at 58. The Court in *Youngblood* defined "potentially useful evidence" as evidence of which "no more can be said than that it could have been subjected to tests, the results of which *might* have exonerated the defendant." *Id*. at 57 (emphasis added).

*United States v. Bohl*, 25 F.3d 904, 909-10 (10th Cir. 1994).

140

**LEGAL CONCLUSION #9: The USAO had no legal obligation to self-impose a litigation hold.**

The USAO had no obligation here to self-impose a "litigation hold" or "legal hold" beyond this Court's orders.  There was no civil litigation anticipated, threatened, or instituted against the USAO or any other federal law enforcement agency.  The FPD's Sixth Amendment claims as to the video and audio evidence from CCA-Leavenworth in its original and amended return of property motions [Dockets #82, #85] did not create a government obligation to preserve any and all evidence potentially relevant to such claims.  Instead, the government's obligation to preserve evidence in the *Black* case were defined by well-established federal criminal disclosure obligations: Rule 16, the Jencks Act, and the *Brady* doctrine.

Further, there were mechanisms in place – the USAO standard file retention policy and the automatic electronic mail archival system – that ensured that paper and electronic evidence was preserved between the FPD's intervention in the *Black* case in early August 2016 through its return of property motions, and the implementation in December 2016 of a USAO-wide preservation directive that had been edited and approved by the Special Master.

On October 28, 2016, AUSA Barnett explained to the Court that the hard drives that had been removed from the computers of Kansas City AUSAs and USAO staff "are being held pursuant to this litigation."  *See* ¶ 187.[100]  During the evidentiary hearing in this matter, AUSA Metzger elaborated on Barnett's statement to the Court on October 28, 2016, that "we understand right now nothing in our office as related to obtaining information from CCA should be destroyed or gotten rid of in any way. So within our office we have, I guess, put a lockdown, so to speak, on information or records that we would currently have."  *See* ¶ 187.  Metzger testified that the CCA-

---

[100] Barnett was not then aware of the format of the AVPC.  *See* ¶ 154 and footnote 64, *supra*.  This issue is discussed in Legal Conclusion 10, *infra*.

Leavenworth video and audio recordings obtained during the contraband-smuggling investigation had been impounded, R.T. 1291-92, that normal document retention policies would apply, R.T. 1292, and that AUSA Barnett, had directed that nothing be removed from closed files and that closed files be retained.  R.T. 1293; *see also* 2655-57.  In addition, Barnett informed the Court that electronic mail messages would be preserved in the DOJ archive system.  *See* ¶ 187.  Because the USAO was not threatened with civil litigation, it had no obligation to do more than this.

Further, even had there been some generalized USAO obligation to preserve evidence beyond what the Court ordered, there is no proof here that it failed to do so.  The absence of a written "litigation hold" is not tantamount to a failure to preserve evidence.  There has been no showing here that any evidence in existence as of August 5, 2016, the date on which the FPD first filed a return of property motion, no longer is available.[101]  Thus, even if a duty to preserve arose on or around that date based on the FPD's allegations, there has been no showing that "the adverse party was prejudiced by the destruction of the evidence.'"  *JetStream Ground Servs., Inc.*, 878 F.3d at 964.

**LEGAL CONCLUSION #10**: **The USAO did not violate this Court's September 7, 2016 oral preservation order by the formatting the AVPC hard drives on September 6, 2016.**

On August 10, 2016, this Court issued the first of two orders directly related to the CCA-Leavenworth video evidence:  a written "clawback" order requiring that "the Government shall submit to the Court all originals and copies of DVR hard drives containing recordings of attorney-client communications that the Government is aware are in the possession of the United States Attorney's Office for the District of Kansas or in the possession of law enforcement agents."

---

[101] Because the Special Master-approved preservation directive was implemented in December 2016, and even without the directive, electronic mail was archived and preserved for three years, *see* footnote 75, *supra*, there was no risk that any relevant electronic mail was lost.

Docket #102 at 3.  There is no allegation that the government failed to fully and promptly comply with this order.

On August 30, 2016, FPD Melody Brannon sent an electronic mail message to AUSA Barnett stating in part that, in light of the pending computer upgrade, "it would probably be a good idea to maintain all existing computers, including hard drives and other media that could contain data related to the video recordings." *See* ¶ 142.   In a series of electronic mail exchanges, AUSAs Barnett, Metzger, and Slinkard expressed some confusion about the Brannon request, apparently based on their mistaken belief that all digital evidence relevant to the CCA-Leavenworth videos already had been preserved.  They seemed to agree, however, that it would be prudent to check with the USAO systems manager, David Steeby, to confirm this.   But, because of a misunderstanding about who would contact Steeby, no one did.  *See* ¶¶ 143-49.

On September 7, 2016, the Court issued an oral order regarding preservation of computer evidence.  This order reasonably could be interpreted to apply to any metadata that may have existed on USAO computers, including the AVPC, related to the viewing of the CCA-Leavenworth video evidence.  *See* ¶ 155.  The day before, September 6. 2016, the hard drives of the AVPC – which Pauletta Boyd had used to view hard drive #1 containing CCA-Leavenworth video evidence, *see* ¶¶ 150-52 – had been formatted through a network process of upgrading the computer operating system from Windows 7 to Windows 10.  This occurred as part of a DOJ-mandated and pre-scheduled upgrade of the USAO computer systems.  *See* ¶ 151.  When the reformat occurred on September 6, 2016, any data then stored on the AVPC hard drives would have been designated as "unallocated," making it available to be overwritten by new data. *See* ¶¶ 152, 161, 165-66, 171.  When AUSA Duston Slinkard learned that the AVPC hard drive had been formatted, he promptly notified the Special Master by letter dated November 5, 2016.  *See*

¶ 162 and footnote 64, *supra*.  On November, 7, 2016, in response to a request from the Special Master, the USAO secured the AVPC hard drives.  *See* ¶¶ 162-63.

The events of September 6, 2016 – the formatting of the AVPC hard drives and installation of the Windows 10 operating system – could not have violated the Court's oral preservation order, which was not issued until the next day.  Further, there has been no showing that any relevant evidence was lost as a result of the upgrade process.  This is true for several reasons.

First, there is no proof that anyone other than Pauletta Boyd used the AVPC to view any CCA-Leavenworth video evidence and, in fact, evidentiary hearing testimony shows that no one did.  *See* ¶¶ 14-20, 24-43.  And, the only video that Boyd watched was of a parking lot, from hard drive #1, which did not contain video of attorney-client meeting rooms.  *See* ¶ 18; Exh. 439.  As a result, there has been no showing that the pre-formatted AVPC hard drives contained any data relevant to the constitutional claims here.

Second, even assuming that some unidentified AUSA or other government official managed to surreptitiously gain access to the AVPC and CCA-Leavenworth video in Boyd's office, managed to load and use the necessary PELCO video player software, and locate the video evidence, there is no proof that either the Windows operating system, the PELCO software, or the web-browser on the AVPC logged any information about this activity other than the date and time the PELCO player was opened.  *See* ¶¶ 164, 167-70.  Significantly, the FPD's computer forensics expert could have ascertained the relevant logging capabilities if she had been asked to do so.  *See* ¶¶ 168-69.

Third, even if there was some reason to believe that some government official used the AVPC to view attorney-client videos, and even if this would have left tell-tale metadata on the AVPC hard drives, there is no proof that such meta-data was overwritten, either when the Windows

10 operating system was installed, or between the installation and the time the AVPC was taken out of service in early November 2016. *See* ¶¶ 165-66, 171.   In other words, any metadata that was on the AVPC hard drives that is responsive to either the Court's September 7, 2016 order or the Brannon electronic mail message may still be there.  And, again, the FPD's computer forensics expert could have made this determination had she been asked to do so. *See* ¶¶ 171-72.

Finally, it bears mention that even if there had been proof that there was relevant evidence on the AVPC hard drives that was lost through the upgrade process, or since then, there is no showing of bad faith.  Indeed, the record shows the opposite.  It makes clear that the USAO officials responsible for ensuring compliance with this Court's orders and those aware of FPD Brannon's request failed to take steps to prevent loss of any data on the AVPC because (a) the upgrade preceded the Court's September 7, 2016 order; and (b) they did not realize, until a Steeby-Slinkard communication on October 31, 2016, that the AVPC hard drives may contain relevant data.  And, once they realized this, they acted expeditiously to ensure that the AVPC hard drives were preserved. *See* ¶¶ 153-63.  Further, the record is replete with evidence that USAO officials made efforts to preserve what they believed to be the relevant digital evidence, demonstrating their good faith, not bad faith. *See* ¶¶ 153-54, 156-58.

**LEGAL CONCLUSION #11:  The USAO did not violate this Court's August 18, 2016 audio clawback order.**

On August 18, 2016, this Court issued a clawback order requiring the USAO to produce to it audio recordings of inmate-attorney telephone conversations, copies of which had been produced to defense counsel in *Black* and related cases.   Docket #113; *see* ¶ 173.  On or about August 19, 2016, members of the USAO met in Topeka, Kansas to discuss compliance with this clawback order.  They discussed what the order required and concluded that it applied to recordings that had been obtained as part of the investigation that resulted in the indictment in *Black*. *See* ¶ 174.  This

was consistent with the language of the order, which identified the relevant recordings as those that "[t]he Government has disseminated or made available to counsel for the defendants [in *United States v. Black*], and others [in related cases] . . . ." Docket #113 at 1. Materials demanded by this order were produced to the Court's chambers on or about August 25, 2016. *See, e.g.*, R.T. 271.

Although USAO supervisors Barnett and Metzger did not know this at the time, some of the same telephone calls that were subject to this clawback order had been obtained by and were in the possession of the government in connection with another case, specifically, *United States v. Rapp*. As soon as Barnett learned this from SAUSA Tomasic and AUSA Flannigan, she promptly instructed Tomasic to seek clarification about how to handle these recordings. *See* ¶ 175 and footnote 69, *supra*. The only duplicative inmate-attorney calls were those that Rapp had made to his attorney. The USAO had notified the attorney about its possession of these calls in January 2016, well before the Court's clawback order. *See* footnote 69, *supra*.

To the extent that there was imperfect compliance with this Court's audio clawback order by the USAO's failure to deliver the duplicate recordings of Rapp's calls to his attorney, this was unknown to the USAO supervisors and, once AUSA Barnett learned of the existence of the duplicate calls, she instructed SAUSA Tomasic, who was assigned to the *Rapp* case, to take appropriate steps.

**LEGAL CONCLUSION #12: The Special Master's orders to the USAO were unlawful and should not be enforced because his appointment exceeded what Rule 53 of the Federal Rules of Civil Procedure permits and violated the separation of powers.**

The government hereby incorporates by reference its previous filings, including but not limited to those in Docket #120; #133; #163; #192; #197; #306; #336; #361; and #697.

**LEGAL CONCLUSION #13**:  The USAO promptly and fully complied with the Special Master's Status Quo order.

On October 25, 2016, the Special Master issued the "Discovery Conference Order," Docket #155, which included within it his "Status Quo Order."  *See* ¶¶ 183-84.  Three things about this order are relevant here.

First, this was the first general order issued in this case requiring preservation of categories of records.  Before this, the Court had issued more specific clawback orders regarding the audio and video evidence obtained from CCA-Leavenworth and an oral order regarding preservation of the hard drives that had already been removed from USAO computers and secured.[102]  *See* ¶¶ 173, footnote 68, *supra*.

Second, the Status Quo Order did not describe with specificity the materials that were subject to the order.  Rather, it applied to "all information and sources of information relevant to the matters listed on pages 7-8 of the Appointment Order (docket no. 146).  This obligation includes preserving all emails (regardless of the device used to send or receive them) and other documents related to video- and audio-recording at CCA-Leavenworth or any other detention facility."  Docket #155.  The cross-referenced section of this Court's Appointment order lists 12 potential investigative tasks for the Special Master, tasks that had yet to be assigned to him.  *See* ¶ 184 and footnote 72 *supra*.

Third, the Special Master's Status Quo Order demands only that the USAO "identify and preserve" the designated documents and materials.  It does not require that the USAO report to the Special Master where the documents are located or identify the internal steps the USAO takes to

---

[102] This oral order also reasonably could be construed to apply to the AVPC, but the USAO officials responsible for implementing the Court's order did not realize this until later, at which time they took steps to comply.  *See* ¶¶ 159-62.

accomplish the preservation task.  Nor does the Status Quo Order require production of any materials.  "The Special Master is not ordering that these materials be produced at this time." Docket #155 at 6.

Because of the lack of specificity in the Status Quo Order, the USAO management team endeavored to translate the order into a set of specific instructions for the USAO attorneys and staff.  It began this process "right away."  *See* ¶ 189.  Thereafter, the USAO, first through AUSA Barnett, and then through AUSA Metzger went "back and forth" with the Special Master to create a document that was acceptable to him.  During this process, the Special Master reviewed multiple drafts of the preservation directive. *See* ¶¶ 189-90.

On December 17, 2016, the Special Master made final edits and instructed AUSA Metzger to "issue immediately."  She did so on December 19, 2016.  *See* ¶ 190-91.  The preservation directive was thorough and comprehensive.  *See* ¶ 191.  Although it took some time for Metzger to hear back from all of the recipients of the preservation directive, she ultimately attained a 100% response rate and was able to identify approximately 30 USAO employees who possessed responsive documents.  AUSA Metzger provided the Special Master with a list of these people. *See* ¶ 192.

There is no evidence of the Special Master ever communicating to any USAO official that he was dissatisfied with either the preservation directive that AUSA Metzger circulated or her response to him identifying people with responsive materials.   Indeed, as the Special Master described it in a report filed on October 20, 2017, "the Special Master worked cooperatively with the OUSA to craft language directing OUSA staff to (1) preserve and collect information relevant to the *Black* investigation, and (2) let the other Agencies know they also had an obligation to preserve and collect the same information. On December 17, 2016, the language for this

"Litigation Hold" was finalized and the OUSA issued it shortly thereafter."  Docket #298 at 2; *see* ¶ 192.

**In short, the Special Master himself expressly approved the USAO December 19, 2016 preservation directive that was crafted to comply with his own Status Quo Order.  In his report in October 2017, the Special Master gave no indication that he was dissatisfied with the USAO's compliance with the Status Quo order.  Further, there is no evidence in this record that the USAO has failed to preserve any document or item subject to the Status Quo Order and the preservation directive.**

Two related matters that came to light during the evidentiary hearing bear mention.  First, the Special Master testified that when he issued the Status Quo Order, he believed that the Court had already issued a preservation order or that a litigation hold "had arisen of its own force."  R.T. 2747.  This may be true, but, to the extent the Special Master believed that the Court had issued an order other than those discussed above, he was simply wrong.  Further, as explained above, there is no authority for a required litigation hold in criminal cases, a fact about which the Special Master may have understandably been unaware due to his lack of experience in criminal litigation.  R.T. 2770.  Significantly, there is no evidence that the Special Master communicated these misunderstandings to any USAO official.  From its perspective, consistent with the above-quoted report, the USAO had done exactly what the Special Master had asked it to do and the Special Master had approved.

Second, there was testimony about AUSA Metzger issuing paperwork in May 2017 to further implement the already-existing preservation directive that she had circulated in December 2016.  This action by Metzger did nothing to undercut, dissolve, or modify the preservation directive that she previously had implemented with the Special Master's express approval.  Instead,

it simply required those USAO employees who had responsive documents to provide additional information on a standard DOJ form about where the responsive documents were stored and communicated to DOJ officials that they should suspend the normal DOJ destruction of archived electronic mail after three years.[103]  *See* ¶¶ 194-96.  As Metzger explained, the documents that she circulated "incorporated" the preservation directive that the Special Master had already approved.  *See* ¶ 195.  There is no Court Order or Special Master Order in this case that either required Metzger to implement this "enhanced litigation hold" or prohibited her from doing so.  Nor is there any order that required her to notify the Special Master or the Court that she had done so.  Thus, Metzger's additional efforts to document and ensure the preservation of evidence did nothing to undo the USAO's previous compliance with the Special Master's Status Quo Order.

## C.    Cooperation with the Special Master

**LEGAL CONCLUSION #14:  The USAO cooperated with the Special Master by arranging an interview of SAUSA Tomasic when requested to do so.**

As the Special Master recalled it, he communicated to "everybody I spoke to, whether on the defense, on the government or former United States Attorneys, I told everybody I could in this town if anybody needs to talk to me, they should call me."  He testified that these communications

---

[103] In an order dated January 25, 2019, the Court stated that "the USAO had not put an effective litigation hold in place until May 2017, nine months after the Government was placed on notice to implement a litigation hold preserving all its information relative to the Sixth Amendment allegations in the *Black* case."  Docket #713.  But, the notice to the USAO "to implement a litigation hold preserving all its information relative to the Sixth Amendment allegations in the *Black* case" came in the form of the Special Master's Status Quo Order.  The Special Master personally helped to draft and then approved the preservation directive that the USAO circulated on December 19, 2016, to comply with this Special Master order.  In his report dated October 20, 2017, the Special Master described the USAO as having issued this preservation directive with his approval.  Docket #298 at 2-3.  Once the USAO had done what the Special Master ordered, with his participation and to his approval, any *additional* preservation efforts, like those the USAO undertook in May 2017, did not undo the Special-Master-approved preservation directive issued on December 19, 2016.  Nor was there any obligation for the USAO to notify the Court or the Special Master about additional efforts it made to ensure preservation of responsive documents.

included telling then-United States Attorney Beall and then-Criminal Chief Debra Barnett that he would like to speak to SAUSA Erin Tomasic, as well as to Pauletta Boyd, and AUSA Kim Flannigan. *See* ¶ 197.

Neither Beall nor Barnett recalled the Special Master telling them before February 17, 2017, that he wanted to interview Tomasic. Barnett did recall the Special Master expressing an interest in speaking to Boyd. *See* ¶ 198. Barnett's recollection is consistent with the Special Master's Discovery Order dated October 25, 2016, Docket #155, in which the Special Master expressed an interest in speaking to ten named people at a discovery conference scheduled for October 28, 2016. Boyd was on this list but Tomasic and Flannigan were not. *See* ¶ 183. There is no written communication in the record, either from the Special Master to the USAO or within the USAO, evidencing a request to the USAO by the Special Master, before February 2017, to interview Tomasic or Flannigan. *See* ¶ 198. Beall and Barnett believed that they were fully cooperating with the Special Master and communicated to USAO employees that they should cooperate. *See* ¶¶ 199-200.

It is undisputed that, in February 2017, the Special Master interviewed Boyd and, during that interview, communicated an interest in interviewing Tomasic. *See* ¶¶ 207-08. As a result of the Special Master's request to Boyd, his first interview of Tomasic was arranged. Tomasic still was a SAUSA at that time. The Special Master interviewed her on multiple occasions, both before and after her separation from the USAO, and she provided documents to him. *See* ¶ 211. Although the USAO informed the Special Master that Flannigan was willing to speak to him as well, he decided not to interview her. *See* ¶ 212. There is no evidence in the record that the Special Master was unable to interview any USAO employee as a result of obstructive efforts by any USAO official.

On October 30, 2016, shortly after the above-described discovery conference, the Special Master sent an electronic mail message to Barnett and AUSA Oakley seeking assistance in creating an "inventory" or "catalogue" of evidence that had been produced to the Court.  He requested that the persons who submitted this evidence assist in this project.  The Special Master said that he assumed that this would be Tomasic and Boyd, but acknowledged that Barnett and Oakley were in a better positon that he was to determine this.  In this message, the Special Master did not ask to interview anyone.  *See* ¶ 201; Exh. 1171.  At the time that he made this request, the Special Master's authority was limited to the Court's Phase I order.  *See* footnote 70, *supra.*

Barnett had received complaints about Tomasic's demeanor and conduct toward both defense attorneys and a federal agency that worked with the USAO.  She also knew that Tomasic had entered this Court's chambers after hours and without invitation and, when inside, made an unprofessional comment to a court clerk.  She had observed Tomasic's reaction to the *Black* litigation and her interaction with Beall, Slinkard, and Barnett herself.   Based on this, Barnett concluded that Tomasic did not understand how to "be respectful, courteous and polite" and did not trust Tomasic to behave professionally during interaction with the Court and court personnel, including the Special Master.  *See* ¶ 203.  Based on this, Barnett sent a message about the Special Master's inventory request to AUSA Scott Rask, who was Tomasic's direct supervisor and subordinate to Barnett in the USAO, and explained to Rask that she did not want Tomasic to have contact with the Court or court personnel regarding this case.  This included the Special Master. *See* ¶¶ 202-03.

After speaking with Barnett, Rask concluded that her objective was to attempt to have the USAO provide the best information in the best way to the Special Master, and to avoid difficulties due to concerns about Tomasic's behavior and emotional state.  *See* ¶ 205.  There was no

discussion about trying to frustrate the Special Master's investigation, s*ee* ¶ 205, which, at that point, was limited to the Phase I feasibility investigation and did not extend to the USAO.  *See* ¶ XX.  As directed, Rask informed Tomasic that Barnett had instructed that she was not to have contact with the Court or court personnel, including the Special Master.  *See* ¶¶ 179-80.  This was not an effort to frustrate the Special Master's investigation.  *See* ¶¶ 204-05.  When Tomasic later learned, in February 2017, that the Special Master had communicated to Pauletta Boyd an interest in interviewing Tomasic, and requested to speak to the Special Master, she was given authorization to do so and did have that meeting. *See* ¶ 208-11.

These events demonstrate that there was no effort to be less than fully cooperative with the Special Master with respect to witness interviews.  Although the Special Master recalls communicating an interest in speaking with Tomasic, Boyd, and Flannigan, it appears that neither Beall nor Barnett understood or remembered this oral request, which is not documented anywhere in the record.  Beall and Barnett believed that they were fully cooperating with the Special Master.  Barnett's response to the Special Master's inventory request was to comply in a manner that did not involve Tomasic.  This was because of concerns about Tomasic's professionalism, not an effort to frustrate the Special Master.  And, in any event, the Special Master ultimately interviewed the USAO employees whom he wanted to interview, including Tomasic, and did so before this Court had authorized the Phase III investigation on May 17, 2017.

**LEGAL CONCLUSION #15:  The USAO cooperated with the Special Master by testing his proposed search terms and reporting the results, cooperated within its authority regarding production of requested results of the word searches, and promptly notified him that another DOJ attorney might have to make production decisions.**

Although present memories of events that occurred in 2017 may differ, the existing record conclusively demonstrates that the USAO cooperated within its authority with respect to the Special Master's proposed digital word searches until that authority was removed in July 2017,

and did nothing to mislead the Special Master about limits to its authority to produce internal DOJ documents.  Between November 2016 and June 2017, in the Special Master's estimation, he and the USAO "worked cooperatively . . . to craft search terms to be applied to the OUSA's electronic repository of emails and other documents."  Docket #298 at 3.  The principal issue was narrowing the search terms so that they did not generate numerous non-responsive e-mail messages.  *See* ¶ 213-16.

Before the word search tests were complete and before the Special Master directed production of any results of the word searches, AUSA Metzger informed him, no later than May 18, 2017, that once the search terms had been finalized, the USAO would need to review the material to determine its position on production.  *See* ¶ 218; Exh. 1288.  This information was communicated to the Special Master in a telephone call that day, one in which the USAO arranged to have AUSA Scott Rask participate, in part to have "another set of 'ears' during the call, particularly with regard to [Metzger's] representations [to the Special Master] that production decisions are yet to be determined."  Exh. 1288.  The day before, the Court had ordered the Special Master to initiate an investigation into the operations of the USAO.  Before that, USAO officials could reasonably expect that the Special Master might never seek production of internal DOJ records.

On June 5, 2017, the Special Master instructed the USAO Systems Manager, David Steeby, to make additional alterations to the search string and run the terms through "Tomasic's repository."  In this message, *for the first time*, the Special Master also directed the USAO "produce the results to me via [the Special Master's information technology expert] Ken Smiley as soon as possible."  Docket #298 at 3 (Special Master's Report stating "on June 5, 2017, the Special Master directed the OUSA to run the latest iteration of search terms against the document

154

repository of a single custodian, SAUSA Erin Tomasic, and to produce responsive documents"). Apparently aware from his May 18, 2017 telephone conversation with AUSA Metzger that there might be issues concerning production of the records, the Special Master sent copies to AUSAs Metzger and Rask (the other participant in the call), and stated: "if the OUSA has any issue with this directive, I need to know asap."  Docket #298-4; ¶ 220.

United States Attorney Beall and the Special Master appear to have discussed the issue of production the next day.  On June 6, 2017, AUSA Metzger sent an electronic mail message to the Special Master stating in part that "[i]t is my understanding that you spoke today with USA Tom Beall regarding potential production processes and that future discussion is to occur in that regard." Exh. 1206.   The Special Master's Report dated October 20, 2017, indicates that, in this conversation, Beall communicated to Special Master that the USAO had a potential conflict of interest "and therefore might have to assign to some other entity all responsibility for document production, including review of the Tomasic documents for relevance, national security concerns, privacy issues, and so on.[104]  Docket #298 at 3.  Beall described these conflict issues in more detail in his hearing testimony and also explained that he lacked legal authority to produce the documentation based on the *Touhy* regulations.  *See* ¶¶ 233-34.   The Special Master later acknowledged that by this time – just two days after he directed the USAO for the first time to

---

[104] This conversation between Beall and the Special Master almost certainly occurred on June 6, 2017.  The Special Master's report states that "[i]n response to this June 7th directive, however, the OUSA contacted the undersigned and explained it had new concerns regarding production of Tomasic's documents for various reasons, primarily including unresolved internal personnel matters between the OUSA and Tomasic."  Docket #298.  The reference to the "directive" on "June 7th" must be a mistaken reference to the Special Master's directive of June 5 that is described in the preceding paragraph of the report.  Docket #298 at 3 ("Finally, on June 5, 2017, the Special Master directed the OUSA to run the latest iteration of search terms against the document repository of a single custodian, SAUSA Erin Tomasic, and to produce responsive documents."). The independently-documented June 6 Beall-Special Master conversation "regarding potential production processes" must have been in response to the directive the proceeding day.

produce the results of the search of the Tomasic repository – that the USAO had notified him that "it had new concerns regarding production of Tomasic's documents for various reasons, *primarily including unresolved internal personnel matters between the OUSA and Tomasic. The OUSA explained that, because of this internal dispute, the OUSA might have a conflict – and therefore might have to assign to some other entity all responsibility for document production, including* review of the Tomasic documents for relevance, national security concerns, privacy issues, *and so on*." *See* ¶ 223; Docket #298 at 3-4 (emphasis added).   The Special Master's own report makes clear that Beall promptly put the Special Master on notice that there were significant concerns about the USAO producing internal DOJ documents.

It appears that Beall and the Special Master discussed production issues again on June 19, 2017, as referenced in an electronic mail exchange on June 29 and 30, 2017.  The June 19, 2017 conversation included discussion that, with respect to "potential production," the USAO was "awaiting action on the recusal issue." *See* ¶ 224; Exh. 1187.   At his end of the June 29-30 exchange, Beall explained that "[t]he over-arching issue we face is getting a determination on whether or not we have a conflict in our representation. We have pushed hard to get to a resolution on this issue. We are anticipating, but cannot guarantee an answer next week.  If it is determined that we have a conflict, the matter will go before the Deputy A.G. to determine whether to waive the conflict, or appoint conflict counsel." *See* ¶224; Docket #298 at 4.

On July 7, 2017, Metzger updated the Special Master, explaining that "[a]s to the conflict issue and production requests, we are awaiting a decision from the Deputy Attorney General as to whether this office, in light of conflict issues, will be continuing representation of the United States in this investigation. A conference call was held earlier this week and we were informed that we

should be notified of a decision by the Deputy Attorney General very soon. We will keep you posted about that." *See* ¶ 225.

On July 10, 2017, the Special Master sent a letter to Beall demanding production of categories of information and four days later, on July 14, 2017, DOJ notified the Court that a Special Attorney had been appointed. *See* ¶ 226.

This paper record conclusively establishes the following:

- On May 18, 2017, approximately three weeks *before* the Special Master first requested that the USAO produce the results of a word search through a digital repository and the day after the Court first gave him authority to investigate the USAO, the USAO advised the Special Master "that production decisions are yet to be determined."

- On June 6, 2017, *the day after* the Special Master first directed the USAO to make production of the results of a word search through Tomasic's repository, United States Attorney Beall told the Special Master that the USAO had a potential conflict of interest "and therefore might have to assign to *some other entity all responsibility for document production*, *including* review of the Tomasic documents for relevance, national security concerns, privacy issues, *and so on*." (Emphasis added).

- On June 19, 2017, during a telephone conversation with the Special Master, USAO officials explained that "potential production" was "awaiting action on the recusal decision." Then, in a follow-up electronic mail message on June 30, 2017, Beall told the Special Master that the question of new counsel due to a conflict of interest was an "over-arching issue" that Beall expected to be resolved soon. Metzger reiterated this point in early July.

Although the Special Master may have, at one time, expected that production would follow if a satisfactory search string could be developed, there is no evidence that the USAO ever agreed

to this or that it was discussed.  Further, until the Court's Phase III order in mid-May 2017, there remained a possibility that the issue of production would not have to be addressed.  In addition, it was not clear that such a successful search string would ever be developed or that there was a common notion of what was "successful" in this context.  What is clear, however, according to the Special Master's report, is that the USAO fully cooperated in the process of testing the Special Master's proposed search terms.  This was consistent with the testimony of numerous USAO employees who testified that they were instructed to and did cooperate with the Special Master's investigation.  *See* ¶ 199.

Further, according to the paper record, on May 18, 2017, weeks before this process was completed, Metzger told the Special Master that production of the results was a separate issue.  This corroborates Metzger's hearing testimony that: "We always indicated that production would be a problem and a concern for us. I think we expressed that we wished we could just open up our files, but that just wasn't an option for us."  *See* ¶ 237.  And, indeed, the Special Master acknowledged on June 7, 2016, "that your office may have concerns regarding the production of some of the documents *for various reasons*, such as national security or privacy issues."  Exh. 1206.  In his own report, he made even clearer that national security and privacy concerns were not the only possible impediments to production, noting the possible assignment to "*some other entity all responsibility for document production*, *including* review of the Tomasic documents for relevance, national security concerns, privacy issues, *and so on.*"  Docket #298 at 3-4 (emphasis added).  The paper record also shows that the USAO reiterated orally on June 19, 2017, and in writing on June 30, 2017, that production decisions would have to await a DOJ determination whether to appoint new counsel.  This too is consistent with the testimony that Beall and Metzger

gave during the evidentiary hearing.  *See* ¶¶ 232-37.  It also is consistent with Beall having had to

obtain DOJ approval to produce the USAO filter policy to the Special Master.  *See* ¶¶ 228, 231.

The Special Master may have been frustrated and disappointed with the outcome of his

request for the Tomasic search results, but Beall was bound to comply with his ethical and

regulatory obligations and he and Metzger were forthcoming with the Special Master about the

conflict of interest and possibility that new DOJ counsel might be appointed.[105]  Beall could not

then know, of course, what position new counsel would take and, due to the conflict, could not be

involved in the production decision.  And, the record is clear that the USAO communicated this

problem to the Special Master promptly upon receipt of the directive to produce the Tomasic

results.

## D.    The Requested Order to Show Cause

**LEGAL CONCLUSION #16**: **There is no basis for the Court to issue an order to show cause
regarding contempt of court.**

The FPD has filed three motions asking the Court to issue an order requiring the

government to show cause why it should not be held in contempt of court.  The first of these

motions, filed October 25, 2017, was based principally on allegations of USAO non-compliance

with the Special Master's investigation and the formatting of the AVPC hard drives.  Docket #301.

The government responded.  Docket #346.  There was no reply.   On August 31, 2018, the FPD

filed a "Supplemental Motion to Show Cause."  Docket ##585.  In this document, the FPD asked

the Court to "to assess costs against the government if it is held in contempt."  The government

---

[105] Independent of the issue of appointment of new counsel to respond to the Phase III investigation,
the USAO unsuccessfully sought recusal from the criminal case and also sought to transfer the
case to another DOJ component.  *See* ¶ 234 and footnote 83, *supra*.  There was nothing in the
Court's orders or the Special Master's orders that required the government to notify either the
Court or the Special Master about these internal DOJ communications.

responded.  Docket # 596.  On October 26, 2018, the FPD filed a second supplemental motion to

show cause.  Docket #688.  Here, the FPD asked the Court to take certain matters into account

when deciding its two previous motions.  This motion made no allegations.  The government

responded.  Docket #683.  The government hereby incorporates by reference its above-described

responses, including supporting memoranda and exhibits.  Because the FPD's most recent motion

suggests, without clearly alleging, that United States Attorney Stephen R. McAllister and/or

members of his staff committed contempt of court in connection with McAllister's response to the

Special Master's subpoena *duces tecum* dated August 17, 2018, and served on August 21, 2018,

the government also incorporates by reference the affirmation of Stephen R. McAllister, filed on

December 4, 2018.  Docket #696-2.

Contempt may be criminal or civil.  *F.T.C. v. Kuykendall*, 371 F.3d 745, 751 (10th Cir.

2004).  The FPD does not specify which form of contempt sanction it seeks.  Docket #301 at 7

("Contempt may be civil or criminal, direct or indirect.").  "Criminal contempt is a crime in the

ordinary sense, and criminal penalties may not be imposed on someone who has not been afforded

the protections that the Constitution requires of such criminal proceedings."  *Int'l Union, United
Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 826 (1994) (citations and quotation marks

omitted).  "In contrast, civil contempt sanctions, or those penalties designed to compel future

compliance with a court order, are considered to be coercive and avoidable through obedience,

and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be

heard. Neither a jury trial nor proof beyond a reasonable doubt is required."  *Id*. at 827.

Title 18, United States Code, Section 401 empowers federal courts to punish criminal

contempt.  It provides:

> A court of the United States shall have power to punish by fine or imprisonment,
> or both, at its discretion, such contempt of its authority, and none other, as—

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
(2) Misbehavior of any of its officers in their official transactions;
(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

18 U.S.C. § 401.  Criminal contempt requires a willful violation of a court order.  *United States v. Themy-Kotronakis*, 140 F.3d 858, 864 (1998); *Yates v. United States*, 316 F.2d 718, 723 (10th Cir. 1963).   Criminal contempt is further governed by Fed. R. Crim. P. 42, which, except for summary dispositions "if the judge saw or heard the contemptuous conduct and so certifies," Fed. R. Crim. P. 42(b), requires notice and a prosecutor.  Specifically, Rule 42(a) provides:

> (a) Disposition After Notice. Any person who commits criminal contempt may be punished for that contempt after prosecution on notice.
> (1) *Notice*. The court must give the person notice in open court, in an order to show cause, or in an arrest order. The notice must:
> (A) state the time and place of the trial;
> (B) allow the defendant a reasonable time to prepare a defense; and
> (C) state the essential facts constituting the charged criminal contempt and describe it as such.
> (2) *Appointing a Prosecutor*. The court must request that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney. If the government declines the request, the court must appoint another attorney to prosecute the contempt.
> (3) *Trial and Disposition*. A person being prosecuted for criminal contempt is entitled to a jury trial in any case in which federal law so provides and must be released or detained as Rule 46 provides. If the criminal contempt involves disrespect toward or criticism of a judge, that judge is disqualified from presiding at the contempt trial or hearing unless the defendant consents. Upon a finding or verdict of guilty, the court must impose the punishment.

Fe.d R. Crim. P. 42(a).

Contempt punishable under subsection (b) is referred to as "direct contempt" (as opposed to "indirect contempt.").  "[D]irect contempt would have occurred in the judge's presence, and would allow the judge to issue such a summary order which would be a swift response to contumacious conduct that may portend a threat to a court's immediate ability to conduct its

proceedings." *In re Contempt Order*, 441 F.3d 1266, 1268 (10th Cir. 2006). "It bears repeating that the summary contempt power is reserved for exceptional circumstances." *Id*. at 1269 (quotation marks and citation omitted).

"Succinctly, '[c]ivil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance.'" *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1438, 1442 (10th Cir. 1998) (quoting *McComb v. Jacksonville Paper Co*., 336 U.S. 187, 191 (1949)). For a court to impose a civil contempt sanction, it must afford the accused person or entity "reasonable notice and an opportunity to be heard." *Kuykendall*, 371 F.3d at 754. As the Tenth Circuit has explained:

> A civil fine is by definition either compensatory or coercive. The Supreme Court has made this plain. A fine payable to a complainant "must of course be based upon evidence of complainant's actual loss." *United Mine Workers*, 330 U.S. at 304. The offending party is punished, but a critical feature of civil contempt is that "the punishment is remedial." *Hicks* [*v. Feiock*], 485 U.S. [624], 631 [(1988)] (quoting *Gompers v. Bucks Stove & Range Co*., 221 U.S. 418, 441 (1911)). "A fine payable to the complaining party and proportioned to the complainant's loss is compensatory and civil." *Hicks*, 485 U.S. at 646–47. One reason given by the Supreme Court in *Bagwell* for finding a fine criminal was that no one "suggested that the challenged fines are compensatory." 512 U.S. at 834; *see also Yanish v. Barber*, 232 F.2d 939, 944 (9th Cir. 1956) (civil fine cannot exceed actual loss to complainant).

*Law*, 134 F.3d at 1443.

Here, the FPD has offered no reason for a criminal or civil contempt citation. As explained above, the USAO has not violated any of this Court's orders. When ordered to do so, it produced the video and audio recordings obtained from CCA-Leavenworth. The pre-scheduled format of the hard drives of the AVPC preceded the Court's oral order that could be interpreted to require their preservation. Further, there is no proof that any relevant data was on those hard drives or, if there was, that it has been lost. To the extent that the Special Master perceived that there was non-compliance with his investigation, the paper record described above indicates that there were, at

the very least, good faith efforts to comply within the limits on the USAO's authority.  And, as explained in the government's response to the FPD's original show cause motion, when a DOJ official withholds internal documents for want of authorization to produce them, a contempt sanction does not lie.  Finally, there has been no showing that the USAO failed to preserve any relevant evidence or that any contemptuous conduct resulted in any prejudice to any party involved in this litigation.

E.      **The Requested Adverse Inferences**

**LEGAL CONCLUSION #17: There is no basis for the Court to draw any adverse inference against the government in this litigation.**

At various times in this litigation, the FPD has suggested that the Court draw unspecified adverse inferences against the government.  R.T. 311 (suggesting adverse inference based on a witness's compliance with *Touhy* regulations); R.T. 1285 (questioning witness about an adverse inference based on interpretation of a court order); Docket #301 at 7 ("An array of sanctions are available, including adverse inferences or dismissing the action in whole or in part.").  More recently, the FPD argued that "the Court should just draw adverse inferences at this point from what they haven't produced, treat everything like Michelle Reulet and those notes that Tanya Treadway had, find that based on their conduct and what they haven't produced that they have reviewed attorney-client communications in every case we've identified, and that they've relied on it for their-- to their advantage."  R.T. 2801.

It would be error for the Court to any adverse inferences, including those recently requested, for several reasons.  First, as explained above, there has been no showing of the government's failure to produce any relevant records demanded of it, other than those withheld because of lack of necessary DOJ authorization.  The McAllister affirmation, Docket #696-2, makes clear the extent to which the USAO made efforts to produce documents described in the

Special Master's most recent subpoena *duces tecum*. Exh, 44. And, as the Court is aware, that production was voluminous. Exh. 1194. Similarly, there is no showing of a failure to preserve any evidence described in the Special Master's Status Quo order or in the subpoena *duces tecum*.

Second, as explained above, *supra* at pp. 137-40, even if the civil doctrine of spoliation applies here, it requires proof of loss of relevant evidence. There has been no such showing here.

Third, even assuming non-compliance with a preservation order and resulting loss of evidence, a party seeking sanctions must establish prejudice. *See supra* at p. 138-39. None has been proven here.

Fourth, the extreme sanction of an adverse inference is available only on a showing of non-compliance with a preservation obligation, loss of evidence, prejudice, and *bad faith*, which also is absent here. "Adverse-inference instructions were developed on the premise that a party's intentional loss or destruction of evidence to prevent its use in litigation gives rise to a reasonable inference that the evidence was unfavorable to the party responsible for loss or destruction of the evidence. Negligent or even grossly negligent behavior does not logically support that inference." Fed. R. Civ. P. 37, Advisory Committee Notes to the 2015 Amendments.

Finally, even if there was a basis for an adverse inference here, what the FPD seeks is not an adverse inference, it is the creation out of whole cloth of constitutional violations that have not been proven and did not occur. The FPD has not shown that any privileged communications occurred as to any identified CCA-Leavenworth inmate involved in this litigation; nor that if there were such communications, that any government official gained access to them by watching a soundless video of an inmate-attorney-meeting or listening to an inmate-attorney telephone call; nor that if such communications occurred and a government official intruded into them, that there

was any prejudice to the unidentified inmate(s).  Thus, to pretend that these events occurred, as the FPD urges, would be error.[106]

## IV

## Conclusion

There is no proof here of Sixth Amendment violations; no proof of a failure to comply with this Court's or the Special Master's impoundment and preservation orders; no loss or destruction of relevant evidence; no proof of a failure to cooperate with the Special Master; no basis for an order to show cause; and no basis for an adverse inference.  Further, there is no proof of any government conduct causing any prejudice to any party to this litigation or that the government acted in bad faith.   The government already has explained that it does not oppose the return to the

---

[106] In a recently-filed "Motion to Admit Exhibits," Docket #730, the FPD points to (a) its own letter to United States Attorney McAllister regarding the government's rejection of FPD invitations to negotiate sentencing reductions for certain FPD clients who have filed motions under 28 U.S.C. § 2255, Exh. 724; and (b) a letter from the Deputy Attorney General ["DAG"], Exh. 555, stating, among other things, that "[i]f any defendant has a valid claim, we will seek either to negotiate a resolution with counsel representing the individual defendant's interests, or to address it in litigation involving the aggrieved defendant."   Docket #730 at 8.   The FPD argues that the government's unwillingness to negotiate "reflects that vapidity of DOJ's promise, the incredibility of the government's conduct, and the reason that extraordinary remedies are the only meaningful remedies in this extraordinary circumstance."   *Id.*   The FPD has drawn the wrong conclusions. The DAG's letter makes clear that the government is willing to negotiate with "any defendant [who] has a valid claim," and further explains:

> However, the Department of Justice cannot approve blanket sentencing reductions absent evidence of particularized harm. Criminal sentences must be based on an individualized evaluation of the facts relevant to each defendant. If there is no evidence of a Sixth Amendment violation that prejudiced a defendant's criminal case, there is no basis to revisit that defendant's sentence.

Exh. 555.   As explained in detail in the text above, the FPD has not demonstrated a Sixth Amendment violation as to any claimant it represents in this litigation or in § 2255 litigation. Further, most or all of the § 2255 claimants have waived or procedurally defaulted any Sixth Amendment claims.   The United States cannot agree to undeserved windfalls for convicted and sentenced defendants whose rights have not been violated and who have not suffered prejudice.

relevant inmates of the audio and video evidence obtained from CCA-Leavenworth, and it has moved for dismissal of the outstanding charges against the last remaining defendant, Karl Carter, with prejudice.  Beyond that, this Court should deny all other outstanding motions and terminate this litigation.  If any present or former CCA-Leavenworth inmate has a valid Sixth Amendment claim that has not been procedurally defaulted or waived, he or she can raise it in a motion under 28 U.S.C. § 2255.

**Certificate of Service**

I hereby certify that on the 21st day of March, 2019, the foregoing was electronically filed with the clerk of the court for the District of Kansas using the CM/ECF system, which will send a notice of electronic filing to all counsel.

_S/Deanna Lieberman_
Deanna Lieberman
Paralegal Specialist
United States Attorney's Office
Northern District of New York