## In the United States District Court
## for the District of Kansas

---

**United States of America,**
             **Plaintiff,**

**v.**                                                          **Case No. 16-cr-20032-JAR-02**

**Karl Carter,**
             **Defendant.**

---

### FPD Proposed Findings of Fact
### and
### Conclusions of Law

---

There is no template for this case. Other cases present isolated governmental intrusions into attorney-client communications or other anomalous misconduct. In the few cases of systematic and pervasive governmental misconduct, the government often initiated a global remedy, thus avoiding published legal scrutiny. Here, we tread new ground, with a massive and systematic incursion into attorney-client communications, surreptitiously and unilaterally controlled by the District of Kansas United States Attorney's Office (USAO). The government has responded with denial and opacity, arguing that these issues are beyond the Court's remit.

The Court should hold that the government violated the Sixth Amendment when it collected and saved recorded attorney-client communications. These violations, and the government's conduct during this investigation, call for extraordinary remedies for individual litigants to deter future governmental misconduct. The FPD asks the Court to grant these pending motions:

1. The USAO motion to dismiss charges against Defendant Karl Carter.[1]

2. Defendant Karl Carter's motion to dismiss.[2]

3. The FPD motion for return of attorney-client communications under Fed. R. Crim. P. 41(g) based on USAO Sixth Amendment violations.[3]

4. The FPD motions for an order directing the USAO to show cause why it should not be held in contempt of court.[4]

This submission has six parts. Part One details CCA's recording practices. Part Two reviews how and why the USAO collected, saved, and concealed these recordings. Part Three traces the course of the investigation, including the government's resistance and the failed negotiation. Moving to the conclusions of law, Part Four explains the Sixth Amendment violations, Part Five considers contempt, and Part Six proposes remedies.

We offer the following proposed findings of fact and conclusions of law.[5] Each proposed fact is numbered and in bold typeface, with record citations and arguments in support. We follow the same pattern for proposed conclusions of law— a numbered conclusion in bold typeface, followed by authority and arguments.

---

[1] Tr. 5/16/18 at 324-25; D.E. 478; D.E. 554 at 2. Defendant Bishop was already dismissed upon motion of the government, D.E. 478.

[2] D.E. 333.

[3] D.E. 82 & 85.

[4] D.E. 301; D.E. 585; D.E. 668.

[5] *See* D. Kan. Rule 52.1.

# Table of Contents

Proposed Findings of Fact ............................................................................... 1

Part One: CCA's recording practices ............................................................. 1

1.    CCA-Leavenworth, now known as CoreCivic, was a remote detention
      facility where the United States Marshal for the District of Kansas
      housed defendants during the pendency of district court litigation,
      including trials, sentencings, and revocation proceedings. .............................. 1

2.    Attorneys met with clients at CCA in designated meeting rooms to give
      legal advice and discuss legal strategy. With no notice to the attorneys
      or detainees, since 2008, CCA-Leavenworth video-recorded in-person
      meetings between attorneys and clients in five of the nine designated
      legal visitation rooms. .............................................................................. 1

3.    CCA video recordings did not include audio, but visually captured
      meaningful communication between attorneys and clients. ............................ 1

4.    CCA provided phone service to detainees through Securus
      Technologies, which detainees used to call their attorneys. Per the
      terms of the contract, CCA recorded all outgoing phone calls unless the
      call was to a number that was privatized. Securus maintained
      recordings of these calls and also documented detailed data relating to
      every call, including whether any outside party accessed those calls. ............. 6

5.    CCA failed to either publish or reliably implement its privatization
      option, thereby recording calls without adequate notice to the
      attorneys and detainees, and recording calls even after attorneys'
      phone numbers should have been privatized. ................................................ 8

Part Two: How and why the USAO used the recordings ........................... 20

Video Recordings ......................................................................................... 20

6.    The USAO could obtain video recordings from CCA by subpoena or
      informally, which would leave no written record of the production.
      Here, the USAO obtained 700 attorney-client in-person meetings with
      a grand jury subpoena for 22 months of all video footage ........................... 20

7.    The USAO and its agents knew that they had obtained video recordings
      of attorney-client communications, and they intended to retain those
      recordings. ............................................................................................... 22

8.    The USAO's knowledge and intent are demonstrated by its efforts to use the content of videotaped attorney-client meetings to gain a tactical advantage. ................................................................. 23

9.    The USAO's denials of knowledge and intent are not creditworthy ............... 24

10.   The USAO destroyed evidence of whether and when other persons viewed the video recordings. ................................................................ 31

Phone Recordings ................................................................................... 34

11.   The USAO would routinely collect and review CCA phone calls recorded by Securus by subpoena, by written request through the U.S. Marshal's Service, by email, and by phone call; the latter means would avoid any paper trail of the request. ................................................. 34

12.   Individually and collectively, the AUSAs knew that a general request for all recorded calls could capture attorney-client calls, and took no preventive measures to avoid the protected communications. ...................... 37

13.   The USAO unilaterally determined that attorney-client privilege was waived on any recorded call, and therefore did not notify the courts, counsel, or the defendants of the calls. ........................................... 51

14.   The USAO did not investigate how calls were recorded or the procedure for privatizing, and took no reasonable measures to exclude attorney-client calls. ......................................................................... 53

15.   The USAO systematically attempted to hide its intrusion into recorded attorney-client communications, thus preventing the courts or defense from discovering the widespread practice. ......................................... 62

16.   The USAO gained an advantage when defendants were detained because CCA provided unfettered access to protected communications. ....... 65

Part Three: The Court's investigation ....................................................... 68

17.   The USAO did not cooperate with the Court's inquiry, causing unnecessary delay and the loss of evidence. ................................................. 68

18.   The Court ordered production of relevant material; the government failed to timely or completely comply. ............................................... 75

19.   The USAO did not take adequate, reasonable, or routine measures to preserve evidence of its access to or reliance on attorney-client communications. ................................................................. 79

iv

20.  The USAO knew evidence would be lost absent an effective litigation hold. ...................................................................................... 85

21.  Evidence was purposefully removed from the USAO. ....................... 87

22.  Today the government remains in possession of attorney-client communications. .................................................................................. 89

23.  The government's negotiation tactics have disadvantaged Section 2255 litigants. ............................................................................................. 92

24.  The government's litigation tactics point to intentional delay. ....................... 96

Proposed Conclusions of Law ...................................................................... 100

Part Four: Sixth Amendment violations. ...................................................... 100

1.  The government violated the Sixth Amendment by intentionally obtaining and retaining attorney-client communications without notice to the Court or counsel. .................................................................... 100

2.  Video-recorded attorney-client meetings contained constitutionally protected confidential attorney-client communications. .............................. 104

3.  The audio recordings of attorney-client phone calls contained constitutionally protected confidential attorney-client communications. .... 108

4.  Alternatively, CCA was an agent of the prosecution and its purposeful and surreptitious recording of confidential attorney-client communications violated the Sixth Amendment. .......................................... 109

5.  The USAO purposefully collected and saved attorney-client communications, both audio and video, violating the Sixth Amendment. .................................................................................... 110

6.  Alternatively, the Court should adversely infer that the government reviewed and relied on every attorney-client communication in its possession. ...................................................................................... 122

7.  The knowledge of individual AUSAs regarding the collection of attorney-client communications should be imputed to the entire office. ...... 125

8.  The recorded preamble that played at the beginning of a CCA call did not operate as a knowing and intelligent waiver of the Sixth Amendment right to confidential communications with counsel. ................. 127

9.    The USAO's continued and intentional retention of recorded attorney-client communications without notice to the Court or counsel is a separate Sixth Amendment violation...............................................................131

10.   The USAO violated Rule 16 disclosure requirements and this Court's standing discovery order when it purposefully obtained, and did not timely disclose, recorded attorney-client communications...........................133

Part Five: Contempt ........................................................................................136

11.   The Court should find the United States Attorney's Office for the District of Kansas in contempt of court for refusing to cooperate and failing to preserve evidence. ...........................................................................136

12.   The Court should find Department of Justice and Special Prosecutor Steven Clymer in contempt of Court for refusing to comply with this Court's orders to produce information or to create a privilege log for this Court's review. ...........................................................................................137

Part Six: Remedy .............................................................................................140

13.   The USAO's wide-spread, long-term, and systematic collection of recorded attorney-client communications was gross and flagrant misconduct that warrants dismissal with prejudice against refiling. ..........140

14.   An extraordinary remedy is needed to deter future misconduct. ..................142

15.   The Court may consider global settlements in other cases, and the need for an efficient, fair and consistent outcome..................................................145

Proposed Global Remedy......................................................................................159

Conclusion ...........................................................................................................161

## Proposed Findings of Fact

## Part One: CCA's recording practices

1.  **CCA-Leavenworth, now known as CoreCivic, was a remote[6] detention facility where the United States Marshal for the District of Kansas housed defendants during the pendency of district court litigation, including trials, sentencings, and revocation proceedings.**

2.  **Attorneys met with clients at CCA in designated meeting rooms to give legal advice and discuss legal strategy. With no notice to the attorneys or detainees,[7] since 2008,[8] CCA-Leavenworth video-recorded in-person meetings between attorneys and clients in five of the nine[9] designated legal visitation rooms.[10]**

3.  **CCA video recordings did not include audio, but visually captured meaningful communication between attorneys and clients.**

---

[6] Exh. 520 (KCK Branch Chief AFPD Bartee affidavit; CCA-Leavenworth, now rebranded as CoreCivic-Leavenworth, is located in Leavenworth, Kansas, over 30 miles from either the Topeka or Kansas City, Kansas federal courthouse.); (AFPD Bell affidavit, same). References to exhibits are to defense exhibits unless otherwise noted.

[7] Exh. 403, 408-410, 415, 417, 423, 424, 427 (photos of CCA legal visitation rooms).
Exh. 520 (KCK Branch Chief AFPD Bartee affidavit; he was unaware that his in-person meetings with clients at CCA were video recorded); tr. 8/9/16 at 25:4-10 (testimony of FPD Investigator Zay Thompson).

[8] Tr. 8/9/16 at 27:17-19 (Thompson testimony); Exh. 434 at 1 (Report of FPD Investigator Zay Thompson, 8/9/16, interviews with CCA Warden Linda Thomas and Chief of Security Wayne Bigelow).

[9] Exh. 585 (FPD report on video recordings, based on Special Master's "First Report Regarding Video Recordings," and CCA visitation logs and calendars).

[10] This was initially confusing, because the Warden at CCA falsely denied that there were cameras or recording in the attorney-client meeting rooms, and that erroneous information was repeated by the USMS and USAO. See Exh. 458 (Warden Thomas denied cameras or recording). Recordings were kept for 60 to 90 days before being overwritten. Tr. 8/9/16 at 109:17-23 & 111:15-21.

CCA's cameras captured visual, but not audio communications. Witnesses testified that camera operators could zoom and focus on certain areas.[11] CCA's Video Recording Procedures require designated employees to be trained to record.[12] This included training on "Use," "Focusing," and "Zoom function."

This Court viewed video footage and found that

> the Court could easily observe non-verbal communications, including the communicants' use of their hands, fingers, and other body language. Communication, needless to say, can be verbal and non-verbal; and non-verbal communication is at times highly communicative and easily subject to understanding through observation.[13]

The Court also took judicial notice that the videos were clear, facial expressions were easy to see, and, although documents could not necessarily be read (they were pixelated), it was possible to discern the nature of the document as a photograph, spreadsheet, or text.[14] Viewers could also zoom, pan, and tilt for better viewing.[15]

---

[11] Exh. 490 at 120:18-11 (Cahill testimony about reviewing CCA video; but he did not view video of attorney-client rooms).

[12] Exh. 436 at 2.

[13] D.E. 253 at 12, Phase III Order (listing examples of non-verbal communications, and finding that, "confidential non-verbal communications between an inmate and the defense team must be protected just as much as verbal communications.").

[14] Exh. 490, *Dertinger* tr. 8/9/16 at 43:8-25; *Dertinger* tr. at 25:14-27:5, 39:20-25 (Bussell testimony: the picture quality was "very good. It appeared to be fairly sharp. The only time I had a problem was when I was trying to zoom in on something specific and—and finite. Other than that, if it was just normal, that I remember thinking how clear that quality was.").

[15] Exh. 437 (Bussell affidavit).

AUSA Flannigan testified that video-only recordings could communicate reactions in a manner that would be meaningful to the prosecution.[16]

Between February 20 and May 16, 2016, the USAO obtained 700 video recordings of attorney-client meetings by a grand jury subpoena over 86 days.[17] CCA kept those recordings on digital video recorders ("DVRs"), and the USAO received copies of those DVRs from CCA. The original copies of the DVRs were stored by the United States Secret Service, and copies of those DVRs were housed in the KCK USAO.

Richard Ney, former FPD and criminal defense attorney, testified as an expert witness to explain why video recording, *sans* audio, of an attorney-client meeting was a "huge problem."[18] "I'm a baseball fan and every time the catcher goes to the mound, the pitcher and catcher cover their mouths with their gloves. Why? Because television is there and their conversation could be found."[19] Ney went on to explain that video recording would reveal the types of experts a defendant used, or testing

---

[16] Exh. 504 at 165-66, *Dertinger* tr. 6/21/17 hearing (Flannigan explaining why they were of watching the video of a CCA pod after Dertinger returned from meeting Rokusek, rather than looking for video of Dertinger and Rokusek to see if she handed him any papers).

[17] D.E. 193, Special Master Report at 5 & 6.

[18] Tr. 8/9/16 at 62:10-23 ("I'm defense counsel and I see a video of someone who's an informant against my client, wouldn't I love to know what's going on there and don't I have an obligation, if I can reasonably find out what that individual is saying to find out. A lip reader would do that. I mean, and that's not far-fetched.")

[19] Tr. 8/9/16 at 63:1-3.

done; it could inform competency or literacy questions.[20] And if an attorney were aware of the recording, they would be obligated to inform the client that the meeting was not confidential.[21] This strains an already tenuous relationship:

> If—if the attorney-client room, the one place in the world I can meet with a client, is not secure from government intrusion and recordings, then what does attorney-client privilege mean? It's a slope . . . it's stunning to me, if you think about it. Even under SAMS restrictions, even in Guantanamo . . . they're not being recorded. They may be being monitored by outside individuals, but recordings aren't being made.[22]

Meaningful information can be conveyed visually, but meaning is often in the mind of the viewer. That a defendant is right-handed instead of left could be material in a case where a gun was brandished in a left hand; that a defendant met at length with counsel absent an interpreter could be relevant if the defendant is challenging a consent to search requested in English. To an outside observer, neither fact may carry significance. To the prosecutor, it could be very significant.

The Court inquired of AFPD Rich Federico, "has there ever been a time when you visited with a client at CCA or otherwise where you would've been comfortable to have the prosecutor watch your interaction through a window?"[23] Federico said, "uncomfortable, Your Honor, every time" because:

---

[20] Tr. 8/9/16 at 63:3-65:25.

[21] Tr. 8/9/16 at 60:6-22.

[22] Tr. 8/9/16 at 72:9-21.

[23] Tr. 10/9/18 at 1639:2-9.

my interaction with my client is significant, in my view and my experience, as to the nature of my relationship with that client. And that, in turn, I believe is not just relevant to the communication of legal advice but to the overall case posture. It also communicates their individual state of mind.[24]

Further, "when I go to talk to them, I'm talking to them about their case. And so how they react, even if you can't hear the words, gives information about how they feel about their case at that particular point in time."[25]

The Court also asked, "have you ever been invited by the prosecutor to look through a window as they are pretrial prepping one of their witnesses?" Federico: "No, Your Honor, I have not."[26]

The USAO itself demonstrated the communicative value of the videos, when it used the alleged content of a video recording between defense attorney Jackie Rokusek and her client Richard Dertinger to try to force Rokusek off the case.[27] *See* Section 8, below.

---

[24] *Id*. at 1639:8-16.

[25] *Id*. at 1639:17-21.

[26] *Id*. at 1639:22-24.

[27] The USAO also challenged whether Rokusek had a conflict because Rokusek's husband was a law enforcement officer, and issued a grand jury subpoena for her fee arrangement with her client, Richard Dertinger. Exh. 504 at 107-08, 128-133 (Court noting that USAO sought conflict determinations against Rokusek three separate times on three different bases).

**4. CCA provided phone service to detainees through Securus Technologies, which detainees used to call their attorneys. Per the terms of the contract, CCA recorded all outgoing phone calls unless the call was to a number that was privatized. Securus maintained recordings of these calls and also documented detailed data relating to every call, including whether any outside party accessed those calls.**

CCA provided phone service through Securus Technologies. Securus recorded every outgoing call by default,[28] except for calls to phone numbers that had been privatized.[29] Josh Martin, general counsel for Securus Technologies, testified that an admonishment (or preamble) plays for all non-private calls, but could not explain why different admonishments would be played.[30] For every call, whether recorded or not, Securus kept detailed data, including the PIN identifying the caller,[31] number called, date, time, duration, and so forth. These details could be produced on a spreadsheet called a Call Detail Report.[32]

Likewise, Securus kept track of every time recorded calls were later accessed,[33] including which customer made the request. It also kept records reflecting which

---

[28] Tr. 10/9/18 at 1368:1-6 (Joshua Martin, General Counsel for Securus Technologies).

[29] Tr. 10/9/18 at 1387:15-17 ("Q. All right. If a number is private, that call is just not recorded. Correct? A [Martin] Correct.").

[30] Tr. 10/9/18 at 1401:16-25; 1423:4-12 (Cohen: "Have you ever been in a facility and actually used the Securus phones to call out to different numbers? [Martin]: No. [Cohen]: I did and heard different admonishments, depending on the number that I was calling. Can you explain that to me? [Martin]: I cannot.").

[31] PINs were sometimes shared by detainees, and thus did not necessarily identify the caller.

[32] Tr. 10/9/18 at 1368:1-6; 1369:2-18.

[33] Tr. 10.9.18 at 1382:23-1383:3 (Martin: access means "any transaction or activity within the call platform that involves access to a call recording").

calls were accessed, when they were accessed, and how they were accessed, i.e., by play-back (listened to but not copied), by download to another platform, or by copying to another medium.[34] The data was tracked on recording access logs; if there is no underlying recording, there is no access data.[35] Securus did not track why calls were accessed.[36]

Thus, if a prosecutor wanted to discover who a defendant was calling from CCA, she could ask CCA to order the calls and related data from Securus.[37] The calls would either be downloaded and copied, then delivered on hard media to the USMS,[38] or, on request, Securus would email a link to its call record platform, and the calls could be accessed directly.[39] Likewise, if a prosecutor wanted to know if any defendant had called a particular number, that too could be produced by Securus through CCA. And if the prosecutor wanted to exclude any numbers from a request, Securus could do that as well.[40]

---

[34] Tr. 10/9/18 at 1411:23-1412:20.

[35] Tr. 10/9/18 at 1414:2-8.

[36] Tr. 10/9/18 at 1383:19-25.

[37] Exh. 483 (email request for calls made by defendant Quentin Lawton).

[38] Tr. 6/20/17 at 167:8-17 (Cahill); Exh. 501 (spreadsheet maintained by CCA IT Lajiness).

[39] Exh. 485 (email from Securus to CCA employee Bigelow with a link to download and access call recordings).

[40] Exh. 720 (11/28/16 AUSA Maag's written request for phone records of Quentin Lawton, excluding phone numbers for Lawton's attorney, Branden Bell) *See also* Exh. 721 (AUSA Treadway excluding Melanie Morgan's phone number from recorded call request).

Securus technology allowed the customer (CCA) to "privatize" certain phone numbers on request. Privatize meant that calls to that number would not be recorded. Whether calls to a particular number would be recorded was left to the "sole discretion" of the customer, CCA.[41]

**5. CCA failed to either publish or reliably implement its privatization option, thereby recording calls without adequate notice to the attorneys and detainees, and recording calls even after attorneys' phone numbers should have been privatized.[42]**

CCA promised confidential attorney-client communications, without qualification. The website page titled "Protecting Inmate and Detainee Rights" boasted that it "fully compl[ied] with any and all inmate and detainee rights policies [sic] our government partners require," and:[43]

## Access and Representation

- Access to the court system and confidential contact with their attorneys, as well as access to the media.

CCA Spokesman Jonathan Burns proclaimed that "[w]e do not record inmate/attorney telephone conversations at Leavenworth or any other CCA

---

[41] Tr. 10/9/18 at 1375:1-15 (Martin).

[42] D.E. 253, 5/17/17 Phase III Order at 4 ("CCA has inadequate procedures to apprise inmates and instruct attorneys how to arrange for their calls to not be recorded," and CCA continued to record attorney-client calls even after numbers had been privatized in their system). Evidence adduced in the last two years has only confirmed the Court's findings.

[43] Exh. 435 at 1 (8/9/2016 screen shot of www.cca.com/protecting-inmate-and-detainee-rights).

facility."[44] CCA's written policy also "ensured that all inmates/residents are afforded the following rights," including:[45]

> B.   Access to Counsel:  Inmates/residents will be able to have confidential contact with their attorneys.

Phone billing records from CCA to attorneys did not include any notice that the calls were recorded or advice that there was a process to privatize legal calls.[46]

CCA did *not* advertise that to have access to confidential communications, attorneys had to ask CCA, in writing, not to record calls with their clients. This "privatization" protocol was not posted at the facility, on CCA's website, or otherwise published in a manner that notified counsel that calls were recorded unless this specific protocol was followed. In contrast, Sedgwick County Adult Detention Facility posts notice, in plain view of attorneys and detainees, of actions necessary to ensure the confidentiality of attorney-client communications: [47]

---

[44] Dan Margolies, *Discovery of Video Recordings at Leavenworth Detention Center Spurs Outrage,* KCUR (Aug. 12, 2016), *available at* https://www.kcur.org/post/discovery-video-recordings-leavenworth-detention-center-spurs-outrage#stream/0.

[45] Exh. 435 at 6 (CCA Policy on Inmate Rights, 14-4.4 (B)).

[46] Exh. 459 at 14 (CJA panel attorney Jackson affidavit).

[47] In Sedgwick County, instructional signs are posted in the jail elevator that takes attorneys to the visitation areas and above all inmate telephones. Also, privatization information is provided during quarterly meetings between the Undersheriff and criminal defense attorneys. (Tr. 10/3/18 at 246: 9-25; 247:1-21)(Schecter testimony); Exh. 595.



Even when asked, CCA provided inconsistent or erroneous information.[48]

Many experienced, conscientious defense attorneys who practice in the District

of Kansas or the Western District of Missouri were unaware that CCA recorded

---

[48] Exh. 459 at 13-14 (Jackson affidavit).

attorney-client calls or that there was an attorney registry at CCA to privatize their phone numbers to avoid recording.[49] Attorney Robert Calbi swore,

> In 31 years of practicing criminal law I have never been informed by a client at the CCA or any other facility in which my clients informed me that they were instructed by the facility that our calls with them were being recorded unless I proactively contacted the facility and informed them not record these calls and took steps with the facility to stop these recordings.[50]

As with in-person conversations, phone communications between attorneys and their clients were necessary to provide legal representation and to discuss legal matters.[51] This was particularly important given CCA's remote location.[52]

Experienced defense attorneys attested that the purpose of phone calls was legal communication that they believed to be confidential and protected.[53] AFPD Tom

---

[49] Exh. 459 at 3 (Ambrosio affidavit, "I was never informed, and was completely unaware, that an attorney registry existed at CCA."; Jenab affidavit, who is a defense attorney in the *Black* case: "I was unaware until August 2016 that CCA kept a registry of attorney phone numbers to exclude from recording or monitoring."; Joseph affidavit, in 13 years representing federal clients at CCA, unaware of any requirement to register attorney numbers to avoid recording—"I have always believed, despite the recorded disclaimer, that attorney-client calls were not monitored or recorded." Exh. 537 (Affidavit of Carlos Moran, counsel for Juan Herrera-Zamora, "I was concerned my calls with Juan were being recorded" but even after contacting CCA, "no one at CCA told me about a formal process to privatize my phone numbers.").

[50] Exh. 459 at 4 (Calbi affidavit).

[51] Exh. 520 (KCK Branch Chief AFPD Bartee affidavit), (AFPD Bell affidavit, same), (AFPD Burdick affidavit, same).

[52] Exh. 459 (Joseph affidavit).

[53] Exh. 459 at 7-8 (affidavits of CJA panel counsel Morgan, Ambrosio, Calbi, Jenab, Joseph, Dodge, Vermillion, Jackson, Rokusek, Haney, and Johnson); Exh. 520 (affidavits of FPD Brannon, KCK Branch Chief AFPD Bartee, and AFPDs Burdick, Ross, Ramsey, Magariel, and Bell).

Bartee understood that calls to the FPD from CCA were not recorded, and he informed clients that their phone calls with him were confidential and not recorded. As he noted in his affidavit, "the law requires our clients be afforded a reasonable opportunity for private consultation with counsel."[54] Yet at least one client call to Bartee was recorded and obtained by the USAO.[55] AFPD Branden Bell, formerly in private practice, always told his clients that calls were confidential; he had no reason to think otherwise.[56] The AFPDs generally believed that FPD calls were not recorded, since the only purpose for the calls was to discuss legal matters.[57]

Even when attorneys were suspicious of recording, they did not believe that recorded calls would be provided to the prosecution. "Many of my clients are concerned by the recorded disclaimer and are initially reluctant to talk by phone. I routinely assure clients that it is my understanding that attorney client calls are not recorded. I further assure them that, even if the calls were inadvertently recorded or monitored, any listener who realized that the call was an attorney-client communication would immediately stop listening and notify me of the situation."[58]

---

[54] Exh. 520 (KCK Branch Chief AFPD Bartee affidavit); (AFPD Bell affidavit, same).

[55] Exh. 451 (Hart affidavit).

[56] Exh. 520 (Bell affidavit).

[57] Exh. 520 (affidavits of FPD Brannon, KCK Branch Chief AFPD Bartee, and AFPDs Bell, Magariel, McGowan, Ramsey, and Ross).

[58] Exh. 459 (Joseph affidavit).

Apart from privatization protocol, by contract, no call to the Federal Public Defender was to be recorded.[59] Yet calls to the FPD were recorded, repeatedly and without notice to the FPD. The FPD even followed CCA protocol to privatize all numbers, including cell phones.[60] Still, client calls to those numbers were recorded.[61]

Take for example Defense Exhibit 564, a Call Detail Report, which showed multiple recorded calls to the FPD main lines. A client call to the FPD main line in KCK, 6712, was documented but not recorded. An hour later, another client called the main line in KCK, 6712, and his call was recorded.[62] The explanation? CCA had privatized FPD numbers for only a limited set of inmates designated to the Wyandotte County population.[63] All other calls to the FPD were recorded. So the first call would not have included an admonishment; the second would have;[64] and there would be no obvious explanation for the inconsistency.

---

[59] *See* 636 (2011 email between Securus and another service provider reporting that, "Earlier this month CCA executed an amendment to their contract . . . ... inmates are to be provided with free and private phone calls to Federal Defender offices nationwide."); tr. 10/8/18 at 1394:22-1395:2.

[60] Exh. 568 (Securus Privatization Report).

[61] Tr. 10/9/16 at 1399:9-25; 1403:1-25 (Josh Martin, general counsel for Securus, testimony); D.E. 183 (Special Master First Report regarding Telephone-Call Audio Recordings).

[62] Tr. 10/9/18 at 1398:25-1399:25; 1400:2-17 (Cohen inquiry of Martin).

[63] *Id.*

[64] Tr. 10/9/18 at 1401:16-25.

But CCA recorded attorney-client calls even after attorneys followed CCA protocol to privatize their numbers. CCA employee Wayne Bigelow testified several times in this litigation. One of his responsibilities was to privatize numbers, upon request, within the Securus Call Platform.[65] Not until the October hearing did some facts come into focus, such as the reason that some attorneys' calls were still recorded after they had asked CCA not to record. One explanation is this: when CCA received an attorney number not to be recorded, CCA marked the wrong box on Securus Call Platform, as explained by Securus General Counsel Josh Martin.[66] Instead of privatizing the number for the whole facility, CCA selected a subset that privatized the number for some clients of that attorney, but not others.[67] The default selection would privatize all outgoing calls to that number. The subsets would not.[68] That would explain why a call to the FPD that was recorded would be followed by a call that was not. And, per Securus, the preamble would play on one and not the other. Because no call to the FPD was to be recorded, the preamble, which played sometimes and not others, garnered little attention or concern. There

---

[65] Exh. 490 at 71-99, tr. 9/7/16 hearing (Bigelow testified but seemed confused about the distinction between "blocked" and "privatized," as well as when the preamble warning of recording played, and whether the inmate could privatize; he could not explain how a privatized number would still be recorded).

[66] Tr. 10/19/18 at 1389:24-1391:5.

[67] There is also evidence that numbers were entered incorrectly; Securus could only rely on the data entered to determine what calls not to record. Tr. 10/9/18 at 1454:2-18.

[68] Tr. 10/9/18 at 1388:2-23.

was no rhyme or reason why Bigelow did not understand (nor was he trained to know by Securus) that his selection made any difference. He thought selection of any dropdown field would still privatize the number for the entire facility. Perhaps Securus "worked as designed."[69] CCA did not.

In short, Bigelow believed that when he privatized at any site level, no calls to that number would be recorded.[70] He was wrong, and it has been a costly error. Whether or when Bigelow understood this error, whether this was a training failure by Securus,[71] or whether others made the same mistake is unclear. What is clear is that neither Bigelow or any other CCA employee ever told attorneys that there were different levels of privatization. Thus, even if an attorney had been placed on notice of the need to privatize, the attorney never knew to ask for certain site levels.[72] When Bigelow confirmed with the FPD that all numbers had been privatized, he did not say anything about the site level he chose, or that some calls to the FPD would still be recorded.[73] He believed that when he privatized at any site level, no calls to that number would be recorded.[74]

---

[69] Tr. 10/9/18 at 1389:12.

[70] Tr. 10/9/19 at 1476:14-20.

[71] Tr. 10/9/18 at 1473:11-21.

[72] Tr. 10/9/18 at 1473:8-21.

[73] Tr. 10/9/18 at 1473:22-1474:23; Exh. 539.

[74] Tr. 10/9/18 at 1476:14-20.

CCA and the USAO tried to force responsibility for ensuring that attorney-client communications were not recorded onto the detainees by citing handbooks and intake forms;[75] however, the evidence does not support that claim. The content of the handbook was not reviewed with the detainee during intake, nor did the intake officer explain how to "properly place" a call to an attorney.[76] Nor were the detainees told that CCA would make a recorded call available to the prosecution or law enforcement.[77] And the handbook did not explain how an unmonitored legal call could be placed.[78]

Instead, detainees were advised that "[a] properly placed phone call to an attorney is not monitored. You must contact your unit team to request an unmonitored attorney call."[79] But they were also advised that the only purpose of monitoring was "to preserve the security and orderly management of the institution and to protect the public," not that the information gathered may be provided to the prosecution.

---

[75] Exh. 460 (8/24/16 email of CCA counsel Alyssa Brockert, citing to language in the handbook and the right to call from a counselor's office); Gov't Exh. 1 (inmate acknowledgement form); Gov't Exh. 2 (CCA Handbook); Gov't Exh. 3 (signage in inmate pods).

[76] Exh. 490, tr. 9/7/16 at 107:7-109:11 (testimony of CCA employee Laurie Harrison who handled some intake responsibilities).

[77] *Id.* at 113:19-23.

[78] S.M. Exh. 1021. (8/19/16 Tomasic email to CCA asking why this information is not in CCA's inmate handbook).

[79] Exh. 643 at 43 (Reulet acknowledgement).

Moreover, just as CCA did not reliably privatize calls, it did not reliably advise incoming detainees about how to obtain a confidential call to counsel. Former CCA Unit Manager Leslie West testified that on at least five occasions, detainees alerted her that they had followed the privatization procedure, to no avail:

> [A]n inmate would say, I went through the correct procedure, I put in a request form to be able to ensure that my attorney was taken off the [record] list. But when I tried to call them on the housing unit phones, the little blurb that's placed at the beginning that says, you know, 'your call is being recorded' is still playing.[80]

CCA and the USAO's reliance on the CCA handbook to provide notice and instructions to detainees for obtaining confidential calls was also misplaced. West testified that it was common for inmates to never receive a rule book.[81] Even CCA management had trouble getting copies; twice it was pulled from the facility for revision.[82] Even when it was available, distribution could be delayed for the first three to six days—a critical time for attorney-client communications.[83] "You were more likely to talk to an inmate who didn't have a handbook than one that did."[84]

---

[80] Tr. 5/15/18 at 36:19-37:5.

[81] Tr. 5/15/18 at 36:2-9.

[82] Tr. 5/15/18 at 35:18-36:9

[83] Tr. 5/15/18 40:11-41:9.

[84] Tr. 5/15/18 at 41:13-14.

CCA claimed that counsel could also request a "legal" call with a client, whereby the client could call from a counselor or case manager's office phone.[85] That was not confidential either, as a CCA employee remained present in the office listening to the detainee's side of the call in person.[86] The calls were still recorded, just not under the detainee's PIN.[87] And calls made by inmates from employee offices could be located if needed.[88]

In apparent response to this litigation, CCA later offered detainees the option of privatizing attorney phone numbers.[89] Defendant Greg Rapp made such a request on December 13, 2016, on a preprinted CCA form that said, "[t]elephone calls between inmates and their attorneys are privileged and should not be recorded or monitored." The form instructed the inmate to provide attorney phone numbers so that those numbers, after verification, would be marked as "privileged/do not record."[90] CCA responded that calls to that number would "no longer be monitored

---

[85] Tr. 5/15/18 at 294:22-295:2 (testimony of former CCA Captain Leslie West).

[86] Exh. 490, tr. 9/7/16 at 82:18-83:11 (Bigelow testified that when a legal call is from a counselor's office, a member of CCA is present and can listen: "We do it for security reasons. We don't leave the inmate unattended in the—in an office situation.").

[87] Exh. 469 (Grand jury subpoena for, *inter alia,* inbound/outbound call records to Unit Manager's office number).

[88] Exh. 723 (1/29/14 email exchange between CCA employees and USAO trying to locate inmate calls, including calls made from a Unit Manager's office telephone); Exh. 469 (GJ subpoena for "all inbound/outbound call records" associated with Unit Manager's office phone number).

[89] S.M. Exh. 1052 (CCA Oct. 26, 2016 memo and forms). This would have the odd effect of privatizing that attorney's number for all calls from any client, and without necessarily notifying the attorney of that action.

[90] Exh. 649 at 2 (Rapp form with his attorney Richard Johnson's phone number).

or recorded."[91] Yet CCA continued to record Rapp's calls to his attorney Rick

Johnson.[92]

---

[91] Exh. 649 at 1.

[92] D.E. 728-1 (Declaration of Roger D. Moore, Para. 15); Exh. 676 (Rapp Call Detail Report re recorded calls 1/2017 – 4/2017).

## Part Two: How and why the USAO used the recordings

## Video Recordings

**6.  The USAO could obtain video recordings from CCA by subpoena or informally, which would leave no written record of the production. Here, the USAO obtained 700 attorney-client in-person meetings with a grand jury subpoena for 22 months of all video footage.**

This case was not the first time the USAO obtained video footage from CCA.

Tomasic explained that, "typically, when only particular and limited video recordings are requested . . . CCA burns those recordings to a disc."[93] A subpoena is unnecessary to obtain video from CCA.[94] The USAO could obtain video recordings of detainees by grand jury request, or just informally, even by phone. The latter, of course, would leave no paper trail of the request or production.[95]

In this case, the USAO used a grand jury subpoena for:[96]

> All video footage or still images currently retained by the Corrections Corporation of America (CCA) depicting any internal or external surveillance video or still image taken between July 2014 and April 12, 2016 at the CCA facility in Leavenworth, Kansas.

---

[93] D.E. 133 at 8; *see also* Exh. 501 (CCA employee Lajiness's log of USMS requests between 3/16/16 and 6/6/16; during that three-month time, USMS requested video recording from CCA three times).

[94] Exh. 478, *Dertinger* tr. 5/20/17 at 80:3-12; 83:19-84:1.

[95] S.M. Exh. 1067 (USAO email recounting review of retired DUSMS Cahill's material: "They encountered several burned discs containing surveillance footage. None of the footage (based on the label of the disc) contains depictions of atty-client meeting rooms. The footage was not burned from the USAO video recordings obtained in response to the subpoena. Rather, it appears as though *the footage was obtained directly from CCA in response to informal requests from Cahill.*") (emphasis added).

[96] Exh. 475; *see also* Exh. 474 (email expanding the video request and asking for preservation of all footage going forward).

The videos were picked up from CCA on May 17, 2016 and delivered to the KCK USAO,[97] where a copy was made for viewing, and the originals were stored by the USSS.[98] The USAO obtained approximately 700 video recordings of in-person attorney-client meetings between February 20, 2016 and May 16, 2016.[99]

The video recordings could be viewed on a free-standing computer (identified as the AVPC),[100] once a Pelco player was installed.[101] The AVPC was a "special computer the Department of Justice bought that is made to help with audio and video. *It has special software on there that you can use to like enhance videos . . . .*"[102] In other words, a viewer in the USAO using the AVPC may have been able to enhance the video quality even more. It was "the only computer" in the office of the USAO used to view the video-recordings produced in this case."[103] However, a copy of the Pelco player was also given to KBI Agent Jeff Stokes.[104] So, besides the AVPC, Stokes had a copy of the videos on his KBI computer, with the necessary

---

[97] Exh. 501 (May 17, 2016 entry); Exh. 502, *Dertinger* tr. 6/20/17 at 3.

[98] Exh. 504, *Dertinger* tr. 6/21/17 at 43 (referring to a USSS copy of the videos).

[99] Exh. 585 (FPD report: Video recordings of in-person, attorney-client meetings: identifying potential clients).

[100] Exh. 502, *Dertinger* tr. 6/20/17 at 4 (Boyd testimony).

[101] Tr. 10/3/18 at 980:12-20 (Boyd testimony).

[102] Exh. 502, *Dertinger*, tr. 6/20/17 at 4 (Boyd testimony).

[103] Exh. 122 (11/4/16 AUSA Slinkard letter to Cohen explaining the wiping of the AVPC).

[104] Exh. 502, *Dertinger* tr. 6/20/17 at 10, 48.

Pelco player, to view at home.[105] Stokes used his laptop to view CCA videos, and even after the Court ordered preservation of all hard drives of computers used to view videos, Stokes did not turn his computer over to the Special Master or the government until the *Dertinger* hearing in June 2017.[106]

## 7.  The USAO and its agents knew that they had obtained video recordings of attorney-client communications, and they intended to retain those recordings.

The USAO knew that CCA recorded attorney-client rooms when it issued its subpoena. As Tomasic told the Court:

> [T]he government had a good-faith basis to believe that the CCA video-recordings contained attorney-client meetings at the time the issue— the subpoena was issued.[107]

Tomasic also described the basis of her knowledge: statements by a cooperator that the "attorney-client rooms are video-recorded, and that CCA can activate audio monitoring."[108]

---

[105] Exh. 502, *Dertinger* tr. 6/21/17 at 103; Exh. 508, *Dertinger* tr. 6/20/17 at 4 (Stokes: I obtained the six hard drives from Pauletta Boyd . . . I actually have them at my house.).

[106] Exh. 508, *Dertinger* tr. 6/20/17 at 20-21; D.E. 690 at 2 ("The USAO has been on constructive notice to preserve all information in its control or possession that relates to the allegations in the Black case since at least August 9, 2016—the date of the emergency hearing set to consider Defendants' and the FPD's allegations that the USAO wrongfully acquired and used recorded attorney-client confidential communications in the underlying investigation in the Black case. The USAO was also put on actual notice of the need to hold and preserve such information in an email sent by the FPD on August 30, 2016."). The USAO was also instructed to preserve and provide information by the Court's August 16, 2016 claw-back order.

[107] Exh. 490, tr. 9/7/16 at 13:10-14.

[108] D.E. 133 at 7. The KCK USMS also seemed to know that CCA video recorded attorney-client meeting rooms before this litigation arose. At the detention hearing in *United States v. Imon Wright*

On June 10, 2016, the USAO had an index or roster of the CCA cameras.[109] The roster identifies the six separate DVRs and the corresponding camera names identifying what area of the facility the cameras video-recorded.[110] This was used to isolate and identify videos for review. DVR #5 included "Low Custody Attorney." DVR #6 identified cameras in seven attorney rooms:

```
T-Building West
Parking Lot
Attorney Room
Attorney Room 4
Attorney Room 5
Attorney Room 6
Attorney Room 7
Attorney Room 8
Attorney Room 9
Medical Exit 3
```

By June 13, 2016, Tomasic was prepared to begin "downloading surveillance footage" to give to *Black* defense counsel.[111]

## 8. The USAO's knowledge and intent are demonstrated by its efforts to use the content of videotaped attorney-client meetings to gain a tactical advantage.

On August 2, 2016, Flannigan and Tomasic summoned defense attorney Jackie Rokusek to the USAO to discuss whether she had a conflict in continuing to

---

on August 5, 2016, USMS Deputy Thibault explained to the court that CCA had always recorded attorney-client rooms for security reasons. *See* Exh. 498.

[109] Exh. 502, *Dertinger* tr. 6/20/17 at 7; Exh. 490, tr. 9/7/16 at 22:12-23. It was disseminated on July 25, 2016. S.M. Exh. 1231.

[110] Exh. 439.

[111] Exh. 446 at 3.

represent Richard Dertinger and Petsamai Phommaseng.[112] The prosecutors accused Rokusek of disclosing confidential discovery from the Phommaseng case to her client Richard Dertinger, thereby interfering with an ongoing investigation.[113] As Tomasic later described, "based on the tipoff provided by Ms. Rokusek, cooperators suggest that a large-scale drug and contraband trafficking ring inside CCA altered the manner in which the participants conducted their operations."[114] Tomasic and Flannigan told Rokusek that they were having an agent review CCA video of attorney-client meeting rooms to see what transpired between Rokusek and Dertinger.[115]

Later, Flannigan and Tomasic denied even knowing about the attorney-client videos, denied threatening Rokusek, and denied directing Stokes to look for the attorney-client video.[116]

## 9. The USAO's denials of knowledge and intent are not creditworthy.

Tomasic, Flannigan, and Stokes were at the epicenter of the video controversy. Tomasic and Flannigan denied knowing about the videos or having Stokes review them to see if Rokusek gave Dertinger any documents. For example, Flannigan

---

[112] D.E. 253 at 33.

[113] *Id.*

[114] Exh. 516 (email from Tomasic to Rokusek's office refusing to disclose discovery because of "the tipoff provided by Ms. Rokusek").

[115] D.E. 253 at 34.

[116] Exh. 504, *Dertinger* tr. 6/21/17 at 16:9-14; 20:24-25; 46:10-20.

testified that "I didn't know we had attorney-client videos, I meant pod videos"[117] when she was talking to Rokusek. From Flannigan's account, Rokusek would have no basis to know that there was any attorney-client video.[118] She claims she told Rokusek they were looking for video "surrounding the time of her visits;" she denied ever directing agents to look at attorney-client video and denied even knowing that there was video of attorney-client rooms.[119]

A USAO pleading filed in September 2016 and signed by Tomasic, Oakley, and Barnett directly contradicts Flannigan's assertions:

> AUSA Flannigan only became aware of the attorney-client videos after Special AUSA Tomasic *explained during the meeting with Ms. Rokusek* that Agent Stokes was in the process of locating the videos.[120]

Flannigan also claimed that "[n]ot a single case agent who's working on the Black case has reviewed any of the video footage related to the attorney visiting rooms," and "[n]o case agents have reviewed it."[121] Likewise, that same day,

---

[117] Exh. 504, *Dertinger* tr. 6/21/17 at 15. Flannigan never explained what value pod videos would have to Rokusek in determining whether there was a conflict.

[118] *Id*. at 10, 27, *passim*. Flannigan also denied threatening Rokusek or trying to get evidence. *Id*. at 46-67. Compare to Exh. 516 (email from Tomasic to Rokusek's office refusing to disclose discovery because "based on the tipoff provided by Ms. Rokusek, cooperators suggest that a large-scale drug and contraband trafficking ring inside CCA altered the manner in which the participants conducted their operations.").

[119] Exh. 504, *Dertinger* tr. 6/21/17 at 15, 29-30, 89 (Flannigan testimony).

[120] Exh. 504, *Dertinger* tr. 6/21/17 at 151; *see also* Exh. 489 at 19.

[121] Exh. 457, *Benimon* tr. 8/22/16 at 4.

Tomasic announced that "[n]o employee of the United States Attorney's Office and no agent or law enforcement officer has viewed any of this footage."[122]

Two days earlier, however, Stokes told Tomasic, Oakley, and other agents that he viewed video of all 16 camera views, which included the attorney-client rooms: [123]

| | |
|---|---|
| From: | Jeff Stokes <Jeff.Stokes@KBI.STATE.KS.US> |
| Sent: | Saturday, August 20, 2016 5:29 PM |
| To: | Oakley, Chris (USAKS) |
| Cc: | JOHN SEUBERT (KCM); Herron Henry; Glen Virden; Howard, Zachary (USMS); Tomasic, Erin (USAKS) |
| Subject: | Re: Verify info related to videos |

When I viewed the video there were about 16 camera views on the screen and the attorney client rooms were included in that. I only viewed CCA video for a short amount of time and there was no activity that I saw in any of those rooms.

Jeff Stokes
Special Agent

The USAO pleaded that "in mid-July 2016 Tomasic instructed Agent Stokes not to review any video recordings of attorney-client meetings."[124] Instead, he was to look for footage of Dertinger returning to his pod after the attorney visit to see "everyone's reactions."[125] But he saw the attorney-client rooms. To see this, he had to be looking at DVR 6. The roster of the camera angles had been distributed, which

---

[122] Exh. 456, *Huff*, tr. 8/22/16 at 4.

[123] Exh. 611; Exh. 612 (Oakley in response to Stokes email in Exh. 610, suggests other language for the pleading).

[124] D.E. 133 at 12.

[125] Exh. 490, *Black* tr. 9/7/16 at 16 (Tomasic said she told Stokes, "I need you to look at this video of Mr. Dertinger leaving his meeting with Ms. Rokusek and look for everyone's reaction when he gets back.").

showed only DVR 6 included attorney rooms, but no pods.[126] If Stokes was looking for Dertinger as he walked back into his pod to see "everyone's reactions," he was looking in the wrong place. If he was looking to see whether Rokusek was handing documents to Dertinger, he was right where he needed to be.

Stokes also testified that he was unaware of the video recordings until early August, 2016.[127] On July 12, 2016, however, Stokes emailed Pauletta Boyd to ask: "Did we get in video from the attorney visitation rooms . . . ?"[128]

Rokusek's account is confirmed by the email she sent Flannigan and Tomasic the next day, asking to view the attorney-client video, because "[y]ou mentioned you were reviewing video of my visits with Mr. Dertinger at CCA."[129] In response, Tomasic did not deny that they were reviewing video of attorney-client visits, but instead confirmed that the "agent looking through the video *for your visits* said he has locate[d] the time/date of your visits but has not paired those dates to the video yet."[130] And she offered to have the agent (later identified as KBI Agent Jeff Stokes) pull the video upon his return from vacation.[131]

---

[126] Exh. 439.

[127] Tr. 5/15/18 at 54-55.

[128] S.M. Exh. 1004.

[129] Exh. 441.

[130] Exh. 441 (emphasis added).

[131] Exh. 441.

Flannigan was part of this email communication. She did not challenge Rokusek's characterization of the video, or contradict Tomasic's admission that the agent was reviewing video to locate Rokusek's visits with her client, or claim ignorance of the mission. Instead, she encouraged Rokusek to "try to find the video" herself, without the help of the agent."[132]

Despite the government's repeated resistance to any suggestion that Stokes intended or actually did view recorded attorney-client meetings, early government pleadings admit that "Tomasic explained [to Rokusek] that the agent was also tasked with locating attorney-client video recordings," and "Agent Stokes was locating the relevant footage."[133] Likewise, another AUSA comment on a draft pleading admits that, "because multiple cameras are viewed on a monitor at the same time, *and Jeff Stokes did view recordings from DVR 6,* would it be safer to explain that there was no intentional viewing of attorney-client meetings?"[134]

It is against this background that Tomasic contacted the Court the afternoon of August 5, 2018, by email, and admitted that she *had* believed that CCA attorney visitation rooms were recorded and that she had obtained that video. This was the basis for her remarks at the July 21, 2016 hearing that the rooms were video-

---

[132] Exh. 441.

[133] Exh. 709 at 4 (draft pleading attached to USAO email).

[134] Exh. 713 at 4 (email exchange and draft pleading between Rask and Tomasic, with Rask questioning Tomasic's blanket denial).

recorded, but not audio-recorded.[135] Thus, according to Tomasic, it was *only* upon learning of Oberly's August 4, 2016 email that she had reason to believe that she *did not* have video of the attorney-client rooms.[136]

> Thus, the government is not certain at this point whether any of the surveillance footage turned over by CCA in response to a subpoena by the government issued in *US v. Black* contains video footage of the attorney/client rooms, but, *based on the Warden's statements, counsel for the government **now believes*** the information provided by the cooperator was incorrect.[137]

Other factors that support Rokusek's account and discredit the USAO's:

1) Rokusek immediately contacted the FPD to ask about video of attorney-client meetings at CCA; in turn, Brannon called Barnett to inquire, and followed up with an email. Nothing explains this course of events except that Tomasic and Flannigan made that threat.[138]

---

[135] Exh. 445 (email from Tomasic to Bonnie Weist, AUSA Chris Oakley, and counsel for defendants in the *Black* case); D.E. 253 at 34-35 ("The fact that on August 2, 3, and 4, Tomasic and/or Flannigan discussed Rokusek viewing video recordings and the fact that on August 5 at approximately 2:30 p.m. Rokusek was viewing a video recording of her attorney-client meeting with Dertinger illustrates a number of misrepresentations or inconsistencies in Tomasic's August 5 email to the Court and counsel in this case. In fact, while Rokusek, at Tomasic's bidding, was in the USAO's office viewing video recordings, Tomasic transmitted the above-quoted email at 2:57 p.m. on August 5.").

[136] Exh. 445.

[137] Exh. 445 (emphases added).

[138] D.E. 253 at 36 ("[I]f Rokusek's version is correct, then it is clear that government counsel have made misrepresentations to the Court, have acted with a lack of transparency and candor, and have, at least through their investigative agent, viewed a recording of Rokusek and Dertinger."); D.E. 253 at 37 ("If Tomasic and Flannigan did not know about the existence of video recordings, why would they demand that Rokusek view video recordings as proof that she handed certain documents to Dertinger? Why did Flannigan suggest to Rokusek that there was urgency in Rokusek viewing the videos?").

2) There actually were video recordings, including one of Rokusek meeting with Dertinger.[139]

3) Tomasic argued from the outset that the USAO should keep the attorney-client video because "Jackie has been accused by two cooperators of aiding her client in the obstruction of justice. By extension, Jackie's actions constitute a knowing violation of a protective order . . . . I have not yet researched the 'crime/fraud' exception to the attorney/client privilege . . . ."[140]

4) Tomasic inadvertently confirmed what they were looking for. At the September 7, 2016 hearing, the Court asked when the government first knew about the video. Tomasic attributed her knowledge to a cooperator, but claimed she did not intend to get the video, as she had forgotten or not realized that her subpoena would capture the attorney-client meeting rooms. But then:

> I don't remember the exact moment.
>
> It could've been possibly one of two things triggered my memory; the concerns about Richard Dertinger obtaining information through his attorney at any attorney-client room may have spurred,

---

[139] Tr. 8/9/16 at 39: 10-19 (Rokusek testimony); Exh. 535, *Dertinger* Tr. 6/20/17 at 25:22-25 (Bussell testimony).

[140] S.M. Exh. 1026 (8/8/16 Tomasic email to Rask and Flannigan, and Flannigan's response advising her to contact AUSA Treadway about the crime-fraud exception).

> oh, I think we probably have that, given what I know based on what
> the cooperator says, and I got all surveillance footage . . .[141]

5) Rokusek has no reason to lie.

## 10. The USAO destroyed evidence of whether and when other persons viewed the video recordings.

While Stokes could review the video on his own KBI laptop, the KCK AVPC was the only other computer set up with a Pelco player to view the CCA recordings. The AVPC required a specific login to track the user.[142]

Between August 22, 2016, and September 1, 2016,[143] the Kansas USAO was scheduled for a PC "refresh" or laptop replacement. Systems Manager Dave Steeby had known of this refresh since April of 2016.[144] As part of this refresh, Steeby wiped the AVPC hard drive on September 6, 2016 because no one in USAO management—not Beall, not Metzger, not Barnett, and not Slinkard—told him not to.[145]

---

[141] Exh. 490, *Black* Tr. 9/7/16 at 13:19-14:3; D.E. 253 at 38 ("On August 3, Rokusek emailed Tomasic and Flannigan and asked to view the video before making a decision on how to proceed with the case. Rokusek's email stated, '[y]ou mentioned that you were reviewing video of my visits with [my client] at CCA. I would like an opportunity to review the same video footage . . . .' Neither Tomasic nor Flannigan challenged Rokusek's statement that they told her they were reviewing video of her visits with her client.").

[142] Tr. 10/3/18 at 986:15-25.

[143] S.M. Exh. 1201; Tr. 11/16/18 at 2494:6-12 & 2494:19-2495:16 (Steeby testimony).

[144] Tr. 11/16/18 at 2495:10-24.

[145] Tr. 10/4/18 at 1112-1113, 1114-1116, 1087:8-25.

By September 6, however, there had been two rather intense evidentiary hearings about whether anyone in the USAO viewed the video recordings.[146] The Court had impounded the recordings and copies and issued a claw-back order, as well as an order for facilities to stop recordings. And the week before, on August 30, 2016, the FPD had emailed Barnett:

> Out of an (over) abundance of caution, given that the Court has not yet ruled on the scope of the special master inquiry, it would probably be a good idea to maintain all existing computers, including hard drives and other media that could contain data related to the video recordings. I say this only because we were told that the computers in the USAO KCK were being replaced, and we want to make sure nothing is lost in the transfer.[147]

Barnett forwarded this email to Beall, Metzger, and Slinkard, causing Metzger to observe that Pauletta Boyd and Dave Steeby could verify "nothing will be lost."[148] Slinkard agreed: "Check with David to make sure."[149] Of the four members of the USAO management team on this email, though, not one ever consulted Boyd or Steeby to ensure "nothing" was lost.

Other than the events surrounding the attempted recusal of Rokusek and Stokes's limited admissions, it is unknown whether anyone else in the USAO

---

[146] *See* Tr. 8/9/16; Tr. 8/16/16.

[147] S.M. Exh. 1176; *see also* D.E. 690 (Order) ("The USAO was also put on actual notice of the need to hold and preserve such information in an email sent by the FPD on August 30, 2016.").

[148] S.M. Exh. 1176.

[149] S.M. Exh. 1176.

viewed or used these recordings. The USAO's inconsistent statements, the outright impeachment of Stokes, and the government's strong interest in vindication on this point discredit those denials, instead suggesting other use of the video.[150] But perhaps most incriminating is that the USAO wiped the AVPC and all the information that it held.[151] As this Court has observed, this one hard drive "could have provided meta data and information revelatory of when video recordings were played, perhaps by whom, and perhaps what video recordings were played. That critical evidence has been destroyed despite the Court's orders on September 7 [2016]."[152]

---

[150] *See* Exh. 622 (5/25/17 Flannigan email noting that "the computer used to view video was wiped prior to litigation in *and that there were many not just one computer*") (emphasis added).

[151] *Id*.

[152] D.E. 253 at 40 (Memorandum and Order Directing Phase III Investigation).

## Phone Recordings

**11. The USAO would routinely collect and review CCA phone calls recorded by Securus by subpoena,[153] by written request through the U.S. Marshal's Service,[154] by email,[155] and by phone call; the latter means would avoid any paper trail of the request.**

Recorded phone calls were commonly collected by the USAO.[156] Calls could be obtained informally, by just a phone call from the U.S. Marshals, for example. Retired DUSMS Matt Cahill testified that he would just call CCA and ask for recorded calls, and then a disc of calls would be delivered to the USMS office the next day by CCA transport.[157] Other times, emails were sent to CCA by the USMS or by individual AUSAs. In response, discs would be sent on the transport van or a link from Securus would be emailed to the requester.[158] One by-product of this procedure was that it left no paper trail about who requested the calls, when, or

---

[153] Exh. 643 (administrative subpoena used to obtain CCA calls in *Reulet).*

[154] Exh. 637 (2013 email from USMS to USAO providing a "form that is now required per our CDUSM for requesting phone calls from CCA . . ."). Notwithstanding this email, USAO continued to request calls by email and phone. *See, e.g.,* Ex. 627 (9/9/14 AUSA Catania email requesting CCA phone calls directly from CCA employee Wayne Hall, with copy to USMS).

[155] Exh. 608 (AUSA Zabel offering to request calls directly from CCA rather than through the USMS).

[156] S.M. Exh. 1141 (2/21/17 Catania email to Metzger: "As previously indicated, I routinely obtain CCA telephone calls in cases involving controlled buy recordings, wire interceptions, and consensual monitoring. These telephone calls are used as part of the voice identification package utilized by the testifying agent to id the speaker involved."). Exhs. 600-608A and 715B (different requests for calls in various cases by various prosecutors).

[157] Exh. 490, *Black* tr. 9/7/16 at 126:11-127:16; 129:11-15 (Cahill testimony).

[158] Exh. 485 (11/17/16 Securus email to CCA employee Bigelow for "Lawton.").

why. Today, it is difficult to trace whether the USAO has attorney-client calls in a
particular case, absent written documentation.

As for whether the USAO reviewed the calls it collected, after the first hearing in
this case, AUSA Rask asked Barnett by email,

> Deb,
>
> Because there is no evidence that any attorney-client telephone calls
> from CCA have been obtained and because those calls are
> automatically not recorded by the CCA technology as attorneys provide
> their telephone numbers and because there is a taint-team process in
> place and because this issue has been vetted through our criminal PRO
> and PRAO and because this was not an issue during yesterday's
> hearing, **may the prosecution team continue with their review
> of the tens of thousands of calls obtained?**[159]

Rask was wrong on almost every point, but the sentiment of the email was not
missed: the USAO relied routinely and heavily on CCA recorded phone calls, and
they reviewed those calls.[160]

The USAO used a grand jury subpoena to obtain "all CCA-Leavenworth inmate
recorded calls" "from July 1, 2014 until notified recorded calls are no longer needed"

---

[159] S.M. Exh. 1054 (emphasis added). The FPD did not learn of the recorded attorney-client calls
until after the hearing on August 9, 2016, but on August 7, 2016, before any hearing and before the
FPD's motion, Barnett sent out an email initiating an internal claw-back effort of all calls because
they could contain attorney-client calls.[159]

[160] Exh. 505 (7/7/15 email from Flannigan to USMS asking for defendant's calls "by noon today? Its
[sic] not vital but I just want to see what he's thinking!").

for 17 inmates.[161] Later, the time span was expanded by informal request.[162] Tomasic also emailed CCA directly, asking for all calls made by *Black* defendant Stephen Rowlette; "calls made by any inmate" to a list of certain phone numbers; and a "reverse" search on other numbers.[163] Eventually, Tomasic placed the number of defendants whose calls were collected at 40.[164] The agents reviewed the calls, tracking them on a spreadsheet.[165]

Once the calls were provided to the USAO, they were distributed in discovery to *Black* defense counsel; the KBI; the Secret Service; the U.S. Marshals Service; the Internal Revenue Service;[166] and the United States Probation Department.[167] Derivative reports were made, which were later made subject to the Court's claw-back order.[168] That spreadsheet included a summary of at least three calls from defendant Ashley Huff to a person the government named "Mom's lawyer friend." The calls from these 40 defendants also included at least 74 attorney-client calls.[169]

---

[161] Exh. 470.

[162] Exh. 490, *Black* tr. 9/7/16 at 27:6-20.

[163] Exh. 465 (3/24/16 email from Tomasic to CCA employee Kinney).

[164] Exh. 490, *Black* tr. 9/7/16 at 29:16-21.

[165] S.M. Exhs. 1002, 1003.

[166] Exh. 455 (those agencies may have redistributed the calls).

[167] S.M. Exhs. 1257, 1259 (emails confirming that USAO provided recorded phone calls from the Black investigation; probation returned them in response to the Court's claw-back order).

[168] Exh. 490, *Black* tr. 9/7/16 at 34:11-18.

[169] Exh. 449.

**12. Individually and collectively, the AUSAs knew that a general request for all recorded calls could capture attorney-client calls, and took no preventive measures to avoid the protected communications.**

The USAO knew that attorney-client calls could be obtained by a general request for all inmate calls from CCA. When they did acknowledge having attorney-client calls, they unilaterally concluded that any privilege was waived because of the recorded preamble. For instance, Barnett informed all criminal AUSAs that "I recognize that there are some cases where we have received jail house calls between lawyers and clients, however, those calls are not privileged due to the circumstances under which the calls and recordings are made."[170]

There was a clear pattern and practice of collecting and saving attorney-client calls, without notice to the courts or counsel. A survey of individual cases that came to light during this investigation reveals the USAO's knowledge, pattern, and practice.

*United States v. Forbes*[171]

AUSA Oakley, AUSA Wamble, and IRS Special Agent Henry Herron knew that they had obtained an attorney-client call in August of 2012 when Oakley identified a call from defendant Mendy Forbes to attorney Kurt Kerns.[172] Oakley's initial

---

[170] S.M. Exh. 1053 (8/13/16 Barnett email).

[171] D. Kan. 13-cr-20041-KHV; D. Kan. 12-cr-20099-KHV.

[172] Exh. 716 (8/17/12 email exchange among Oakley, Wamble, and agents, noting that in Oakley's review of calls, he identified one as an attorney-client call).

reaction was correct—he recognized that the call was privileged and did not listen to the substance—but neither Oakley nor Wamble notified counsel;[173] nor did they divest the USAO's possession of those calls until January 7, 2019.[174]

What happened next is key. The AUSAs requested calls again five times:

- October 29, 2014[175]

- November 10, 2014[176]

- March 9, 2015[177]

- April 6, 2015[178]

- April 30, 2015[179]

Not once did they notify Kerns.[180] Not once did they ask CCA to exclude calls to Kerns's number or to any other attorney's number in future requests. As Oakley pointed out, Kerns was not Forbes's attorney of record. Deb Vermillion and Shazzie

---

[173] Exh. 717 (Kerns affidavit).

[174] Exh. 715C at 2 (30 CDs/DVDs provided to the Court 1/7/19).

[175] Exh. 715B-11 (10/29/2013 Agent Herron's request for Forbes's calls, copying Wamble and Oakley).

[176] Exh. 715B-13 (11/10/2014 Herron request for Forbes's calls, going back to August 2012 (which included Kern's call)).

[177] Exh. 715B-15 (3/9/2015, same).

[178] Exh. 715B-15 (4/6/2015 Herron request for Forbes's calls, without accepting any numbers).

[179] Exh. 715B-16 (Forbes calls were pulled on a weekly basis).

[180] Tr. 10/2/18 at 471:13 (Tomasic testifying about her conversation with AUSA Oakley: So I respected Chris. I asked him what to do. He said he personally had encountered an attorney call one time, and he did not alert the defense attorney, he did not think we had an obligation to. But he discontinued listening, and he had instructed his agents to do so.").

Naseem were, and their numbers were listed on CM/ECF.[181] But the USAO never excluded the record attorney numbers either, or took any other precautionary measure. In all, the USAO collected at least 32 of Forbes's attorney-client calls.[182]

Oakley was also the assigned AUSA in *Black* in 2016, when the calls for at least 40 defendants were subpoenaed with no exception for attorney phone numbers or any other precautionary measure.[183] On June 29, 2016, co-counsel Tomasic advised six defense attorneys in *Black* that the USAO was "in the process of distributing CCA calls for approximately 50 inmates."[184] These calls comprised "thousands of hours" of call recordings.[185]

### *United States v. Wood*[186]

AUSA Wamble was on the *Forbes* case and privy to the collection of attorney-client calls there. He was also the lead prosecutor in *Wood,* a wide-ranging fraud case. Wood filed a Rule 41(g) motion. No calls had been produced in discovery but

---

[181] D. Kan. 13-cr-20041-KHV (listing Vermillion); D. Kan. 12-cr-20099 (listing Naseem and three other attorneys, along with phone numbers).

[182] Exh. 604A and 607A.

[183] Exh. 471 (sealed) (requesting "all CCA-Leavenworth inmate recorded calls" for 17 inmates, from July 1, 2014, "until notified recorded calls are no longer needed"; no exceptions for any attorney-client calls is noted); Exh. 449 (Jackson's list of attorney-client calls produced in *Black* discovery for nine defendants); *cf.* Exh. 715B-2 (list of all defendants whose calls were accessed as part of the *Black* investigation).

[184] Exh. 446 at 2.

[185] Exh. 446 at 2.

[186] D. Kan. 14-cr-20065-JAR.

there was evidence of both video and phone recordings. After months of silence, the

AUSA delivered six discs with recorded phone calls, and explained for the first time:

> 1. disc labeled "Brenda Wood jail calls" This disc may contain calls that
> were inadvertently included phone recordings of Brenda Wood's
> previous attorney Christian Cox. Upon hearing the voice of who I
> believed to be Mr. Cox, I stopped listening to the calls and requested
> calls from the Marshals Service that did not include Cox's phone
> number. Additionally, when I heard what I thought to be Mr. Cox's
> voice, I contacted Mr. Cox to alert him to this possibility and informed
> him how he could seek to have his calls not recorded at CCA.[187]

Cox roundly and credibly disputed Wamble's account in his affidavit:[188]

> I was never told by the AUSA that he had obtained, inadvertently or
> otherwise, recordings of calls with my client. No calls were ever
> produced in discovery. The AUSA never advised me that my calls were
> recorded or of the protocol required to privatize my calls.[189]

Cox also testified that he was unaware of Wamble's action, and had he known,

he would have proactively protected the communication.[190]

At the *Black* hearing, Wamble admitted that he did not tell Cox he had the

recordings.[191] He also admitted that he did not know how CCA privatization

---

[187] Exh. 571; Wamble testified that he usually reviewed calls himself. Tr. 10/3/18 at 876:4-17.

[188] Exh. 570 (Cox was unaware his calls were recorded or that Wamble had obtained them, until he was contacted by the FPD).

[189] *Id.*; tr. 10/3/18 at 935:4-11.

[190] Tr. 10/3/18 at 936:3-13.

[191] Tr. 10/9/18 at 895:1-4.

worked.[192] And he admitted that he never produced the calls to either Cox or the

FPD (Wood's subsequent counsel) in discovery.

Ultimately, the facts demonstrated:

1) Wood's calls to counsel Cox had been recorded, with at least 13 calls
   exceeding four minutes;[193]

2) The AUSA directly contacted CCA[194] to request Wood's CCA calls, making no
   exception for attorney calls.[195] The first request, on December 19, 2014, was
   just before a contested detention hearing.[196]

3) The AUSA had not disclosed his possession of the calls to either Cox or the
   FPD. Instead, he kept the calls for over three years.

---

[192] Tr. 10/3/18 at 886:12-14.

[193] Exh. 563 (Call Detail Reports documenting Wood calls to Cox); Exh. 657 (same, with call
duration); Exh. 573 (Securus access log showing calls to Cox were accessed 21/19/14 and again on
12/22/14 by CCA).

[194] Exh. 607-15 (Wamble emails with CCA requesting Wood calls) Exh. 607-16 (CCA asking Wamble
for a subpoena next time).

[195] Exh. 607-15. The records show Cox's number was privatized either by CCA or at the request of
the USMS, but without Cox's knowledge or involvement. Exh. 572.

[196] D. Kan. 14-cr-20065-JAR, D.E. 25.

Wamble accessed Wood's calls another four times, without making any exception for either Cox or the FPD.[197] He never confirmed that Cox's number had been privatized.[198]

*Wood* shows the ease with which calls were obtained, how the USAO handled those calls, how they retained the calls, and the lengths they would go to to conceal the calls from counsel and the court.

United States v. Herrera-Zamora[199]

Tomasic and Zabel prosecuted *United States v. Juan Herrera-Zamora*, D. Kan. 14-cr-20049. Carlos Moran, an attorney from Kentucky, represented Herrera-Zamora. After a contentious trial, Moran moved to discover whether the USAO had listened to his communications with his client.[200] The USAO was indignant, and bullied Moran into withdrawing his motions.[201] Moran later described his reaction to learning that the USAO had in fact obtained and reviewed his communications:

---

[197] Exh. 607-12 (12/3/15); Exh. 607-17; 607-19 (4/20/15); Exh. 607-20 (1/5/16); Exh. 607-22 (1/27/16); tr. 10/3/18 at 885:1-23 (did not exclude FPD phone numbers from subsequent requests). When Wamble used the USMS request form, it included a pre-printed note: "Attorney/Client Conversations will not be included in these recordings." But neither Securus, nor CCA, nor the USMS, nor the USAO took any action to fulfill this promise. As established at the hearing, it was essentially meaningless, as no one enforced or audited it. Tr. 10/3/18 at 886:1-8.

[198] Tr. 10/3/18 at 890:3-6.

[199] D. Kan. 14-cr-20049.

[200] Exh. 576 (email between Tomasic and Zabel; Zabel resisted providing the calls to Moran).

[201] Exh. 580 at 2-3 (Rask report describing Zabel's aggressive, and successful, effort to get Moran to withdraw the motions); *Herrera-Zamora,* D.E. 138.

> "I—I was pretty offended because I really believed that—when they
> assured me that they wouldn't. And, you know, to accuse another
> member of the bar is not an easy thing, or is not a very pleasant thing
> to do. And then when I—when I learned that, in fact, they did, I don't
> know, it's even worse."[202]

Tomasic had asked CCA to provide all calls *to Moran's phone number*, which included attorney-client calls.[203] No filter agent was used.[204] Tomasic listened to the calls, and also assigned an interpreter to listen to the calls,[205] because the calls were in Spanish. Eventually, Tomasic admitted that she had [a]ctually listened to recorded calls from CCA between Juan Herrera-Zamora and his attorney, Carlos Moran. Tomasic knew this was wrong: it was contrary to the filter-team advice given by PRAO, and she should have disclosed this information when the litigation about attorney-client videos and telephone calls erupted in *Black*.[206]

Tomasic revealed her misconduct on May 10, 2017.[207] The USAO waited until June 19, 2017, to file a Notice of Correction of Record. This was the day before the contested hearing in *Dertinger* was scheduled.[208]

---

[202] Tr. 10/4/18 at 1219:2-7.

[203] Exh. 509; Exh. 537 (Declaration of Moran that includes his telephone number).

[204] Exh. 581 at 1 (Rask report of Hunt's involvement in Herrera-Zamora).

[205] Exh. 546 at 1 (Government summary of Gardner interview); Exh. 547 (Government-filed Notice of Inquiry); Exh. 554 (Transcript of Gardner).

[206] Exh. 584.

[207] Exh. 585 (Rask memo of Tomasic interview).

[208] Exh. 535 (*Dertinger* tr. 6/20/17).

43

*United States v. Reulet*[209]

Treadway was the Senior Litigation Counsel and the primary taint attorney for the Kansas USAO.[210] The responsibility of that position demanded adherence to the highest ethical standards.[211]

Treadway prosecuted Michelle Reulet. In the process, she obtained and listened to Reulet's recorded calls to her various attorneys, made detailed notes about the content of those calls, and then used that information to gain an advantage in negotiations, ultimately convincing Reulet to forgo a trial and plead guilty.[212]

Then Treadway lied about listening to the calls in a proceeding in the case before Judge Crabtree.[213] Answering defense counsel's accusation that she had listened to the calls, she emphatically denied doing so.[214] None of this was discovered in the

---

[209] D. Kan. 14-cr-40005-DDC.

[210] D.E. 669, 602, 14-15; D.E. 669, 646, 15-18 (Testimony of Erin Tomasic) ("before it came out that Tanya Treadway had been listening to attorney calls, she met with me and everyone in the Black case because she was our filter attorney"); D.E. 669, 692, 5-6; D.E. 675, 2162, 21-25 (Testimony of Tris Hunt) ("Tanya Treadway, a senior litigation counsel, was often involved in the filter—in filter teams in the District of Kansas; is that accurate? A. Yes.").

[211] D.E. 669, 2163, 1-14.

[212] D.E. 675, 143, 19-23 (Testimony of Melanie Morgan) ("Q. The calls between your client, Ms. Reulet, and Mr. Grimes and Mr. Metzger, did the information contained in those calls bear on the criminal prosecution that you were representing Ms. Reulet in? A. They did."); D.E. 675, 144, 13-17 ("And at each of those opportunities-- or each of those hearings, things about her DUI, things about her custody situation with her child were coming into play at those particular hearings. So they were-- they were very relevant.").

[213] D. Kan. 14-cr-40005-003-DDC.

[214] D.E. 675, 96, 24-25, 97, 1-2 (Testimony of Tonya Treadway) (Judge Crabtree is 'asking me if I've listened to the calls between Ms. Reulet and Mr. Grimes, and I said, 'Except to identify them and identify who was present and that was it. Same thing with Mr. Metzger.'"); D.E. 675, 54, 17-23

*Reulet* litigation; rather, it surfaced later during the *Black* investigation. Days after Ms. Treadway's testimony in *Black*, Judge Crabtree signed an agreed order vacating Ms. Reulet's sentence.[215]

*United States v. Black*

In *Black*, the USAO's requests for defendant CCA calls netted a wide swath of attorney-client calls for defendants not charged in *Black* going back as far as 2011.[216] When Tomasic subpoenaed the calls in *Black,* she did not exclude any attorney numbers.[217] But by that time, she and co-counsel Chris Oakley knew or should have known that their subpoena for all calls would also net attorney-client calls. Tomasic knew, for instance, from *Rapp* that attorney-client calls could be obtained with a general request.[218] And she knew from *Herrera-Zamora* that she

---

(Testimony of Melanie Morgan) ("The Court specifically asked her, 'You're telling me as an officer of this court that you have not listened to the calls between Ms. Reulet and Mr. Grimes?' And she responded, 'Except to identify them and identify who was present.' And then he asked the same thing about her attorney, Mr. Metzger, and the response was the same."); D.E. 675, 63:18-25, 64:1-6 ("Q. The degree of content described in these calls, is that consistent with what Ms. Treadway represented to you and the Court about how she had listened to the calls between Mr. Metzger, Mr. Grimes and Ms. Reulet? A. Absolutely not. Q. Were you ever told that someone had taken down this amount of content or listened to this amount of the calls between Ms. Reulet and her attorneys? A. No. The understanding that we had, which she said repeatedly 'as an officer of the court'—I think 'officer of the court' was a term that was used multiple times in that hearing, was that all she had done was listen to identify who the speaker was in that conversation.").

[215] D. Kan. 14-cr-40005-003-DDC, D.E. 261.

[216] Exh. 449.

[217] Exh. 471 (sealed).

[218] Exh. 490, tr. 9/7/16 hearing (Tomasic testimony); S.M. Exh. 1003, 1/20/16 Stokes email to Tomasic reporting two recorded calls between defendant Rapp and attorney Rick Johnson). She was also aware from the 2013 case of Jerome Birdsong. Exh. 582 (partial letter to defense counsel explaining USAO inadvertently obtained attorney-client communications from Wyandotte County jail); Exh.

could tailor a request for only certain numbers, such as calls to an attorney.[219] Yet she took no such precaution in *Black,* where she obtained at least five attorney-client calls from Karl Carter, the remaining defendant in this case.[220] Ultimately, she obtained at least 74 attorney-client calls in *Black*, according to attorney Mike Jackson's review of the *Black* discovery.[221] The USAO then disseminated those calls to defense counsel and other law-enforcement personnel.

*United States v. Mitchell*[222]

*United States v. Mitchell* was prosecuted by Tomasic and Zabel.[223] Tomasic requested Mitchell's calls in December 18, 2013, and again on April 2, 2014.[224] Mitchell's attorneys' phone numbers, including John Duma's, were listed on CM/ECF.[225] Tomasic obtained 1,029 calls made by Mitchell from CCA, including 13

---

583 (10/2/13 Tomasic email exchange with Warner and Maag reporting that defense counsel had been notified of the recording, and inquiring about a filter team).

[219] Exh. 518 (subpoena for calls to attorney Carlos Moran's office); Exh. 519 (Call Detail Report showing that calls to attorney Carlos Moran's office were produced); Exh. 509 (7/12/16 Tomasic email asking for all calls to Herrera-Zamora's attorney's phone number); Exh. 511 (7/13/16 CCA email response confirming that they sent Tomasic all calls to Herrera-Zamora's attorney's phone number.

[220] Exh. 449.

[221] Exh. 449; tr. 8/16/16 at 18-20; *see also* Exh. 715 & 715A (noting defendants whose calls were returned to the Court in August 2016 in response to claw-back order).

[222] D. Kan. 12-cr-20051-CM.

[223] Exh. 582 at 11-13.

[224] Exh. 606-25, 606-27.

[225] D. Kan. 13-cr-20051-CM (Attorneys John Duma and John Jenab).

46

separate calls made by Mitchell to Duma.[226] The USAO surrendered calls from Mitchell's case to the Court on February 14, 2019.[227]

*Global case analysis*

The empirical data endorses the same conclusion suggested by the individual cases—that the USAO routinely obtained attorney-client communications with general requests for CCA phone calls. And it did so with enough frequency that the USAO knew, or should have known, that its unregulated practice resulted in possession of privileged communications.

The FPD conducted a comprehensive and exhaustive review of call data to identify CCA inmates whose attorney-client telephone calls were recorded, requested, accessed, or obtained by the government.[228] The data we analyzed primarily derived from information acquired by the Special Master, from CCA (both directly and from the Special Master), Securus, court exhibits, docket information, and the Bureau of Prisons. The details of the FPD process, data, and analyses are reported in Defense Exhibit 562, dated October 8, 2018.[229]

The analysis took several months and hundreds of hours to complete. Over **1,600** defendants were reviewed. The primary methodology consisted of five steps:

---

[226] Exh. 562 at 11-13; Exh. 606A.

[227] Exh. 715C (Mitchell entry).

[228] Exh. 562, 562A; tr. 10/10/18 at 1497 (testimony of AFPD Federico).

[229] Before the evidentiary hearing, the FPD presented their findings to the government and the Special Master to allow time for questions and to prepare for the hearing.

Step 1.     Cataloged all known government requests to CCA to produce recorded inmate phone calls;

Step 2.     Narrowed the Securus list of all CCA inmates who had calls recorded and accessed.

Step 3.     Obtained Securus call access logs, which were produced on a rolling basis of 40-50 names per "batch";

Step 4.     Identified attorney-client phone calls that were accessed from the Securus call access logs; and

Step 5.     Consolidated and analyzed all call information.

There were several limitations to the analyses, all of which, according to AFPD Rich Federico, led to underreporting the violations rather than over reporting. For example, we are certain that we did not have all of the evidence or documentation for every time the government requested production of a CCA inmate's phone calls.[230] Additionally, we only analyzed the call access logs for District of Kansas inmates who were detained at CCA and remained in federal custody at the time we conducted the analysis (October 2018). From that limited group:

1) Defendants had a greater than one in four chance (**27.96%**) that their phone calls to their attorneys were recorded and accessed by the government.

2) **735** attorney-client calls were accessed.

3) The government requested calls for at least **46** CCA inmates whose calls included recordings of attorney-client communications.

This data is incompatible with the USAO's claims of innocence.[231] Every time the USAO made a general request for all recorded calls, there was a 27.96 % chance

---

[230] New documentation was provided this month. *See* Exh. 715B.

that the calls would include attorney-client communications. These cases are not anomalous exceptions.

And the violations compound. Exhibits 600 through 609A are critical on this point. Each is a compendium (partial) of call requests by an individual AUSA (ex: 600), followed by a chart identifying requests that resulted in collection of attorney-client calls (ex: 600A).[232] Time after time, individual AUSAs requested phone calls without taking any precaution to avoid attorney-client calls. This was true even if attorney-client calls were provided in an earlier case, which would have alerted the AUSA of the possibility. This was true even when the AUSA collected attorney-client calls in a case and subsequently requested more calls *in that same case,*[233] thus knowing that attorney-client calls would be captured. And this was true even when the AUSA discovered a particular attorney's calls were recorded, and care was taken to avoid that defense attorney's calls when they were counsel in other cases.[234]

---

[232] This chart, too, is incomplete, because it relies on written requests that were actually provided to the defense, mostly by the Special Master. We suspect many are missing; new ones were provided just this month. The USAO did not track written requests. And calls could be obtained informally, without any paper trail.

[233] See Ex. 606A (William Mitchell); Ex. 607A (Brenda Wood).

[234] The one exception is AUSA Wamble in *Wood.* When Wamble found the attorney-client calls, he had Cox's number privatized, but without notice to Cox. Tr. 10/3/18 at 936:3-13 (Cox testifying that he "was never told by the AUSA that he had obtained, inadvertently or otherwise, recordings of calls with my client. No calls were ever produced in discovery. The AUSA never advised me that my calls were recorded or of the protocol required to privatize my calls.").

For example, AUSA Terra Morehead was a prolific requester of phone calls, as shown in exhibit 603. While she denied any awareness of attorney-client calls,[235] the FPD's research revealed that between May 24, 2013 and September 27, 2016, Morehead requested calls at least 33 times for 28 different defendants.[236] In at least 9 of those cases, attorney-client calls were recorded.[237] Yet Morehead never excluded any attorney numbers from her requests.[238]

Morehead also knew that if she was successful moving the Court to detain a defendant, they would likely be held at CCA.[239] She engaged in the practice of threatening to file mandatory sentencing enhancements, under 21 USC 851, against a defendant if they even requested release.  Although she denied it,[240] the obvious tactic was to increase the number of defendants detained and then have ready access to phone calls and other information harvested by CCA.

There was no written policy at the time that prevented or discouraged this practice,[241] as Tomasic explained: "I am certain [a written policy] didn't exist

---

[235] Tr. 10/10/18 at 2022:1-5.

[236] Exh. 603.

[237] Exh. 603A.

[238] Tr. 10/10/18 at 1020:1-1021:17 ("I don't ever remember excluding any numbers.").

[239] Tr. 10/10/18 at 2017:14-25.

[240] Tr. 10/10/18 at 2018:1-6.

[241] D.E. 669, tr. 650:17-651:16. "You know, the U.S. Attorney's Office issued a press release after I was fired that said that they had a policy in place not to listen to attorney calls, but I did it. Well, they did have a policy in place after I got fired, but . . . ." *Compare* S.M. Exh. 1181 (written policy).

because I brought it up on multiple occasions and I'm the only one bringing it up.

No one else ever in a group setting said, hey, you know, this keeps happening,

maybe we should do something about it."[242] There was little formal orientation or

training.[243] But the USAO compared practices, often around the lunch table,

including debates about whether calls had to be provided in discovery, or whether

the recorded preamble served as a waiver.[244]

The individual cases and the empirical data together support a finding that

USAO attorneys had both individual and collective knowledge that attorney-client

calls were available, and that they intentionally engaged in a regular pattern and

practice of collecting attorney-client communications.[245]

## 13. The USAO unilaterally determined that attorney-client privilege was waived on any recorded call, and therefore did not notify the courts, counsel, or the defendants of the calls.

AUSAs knew that attorney-client calls were recorded, did nothing to avoid the

calls, and only very seldom notified counsel. On the few occasions that calls were

---

[242] *Id.*

[243] Tr. 10/02/18 at 575:18-25.

[244] Tr. 10/02/18 at 470-1:16-25, 3-5 ("And the group discussion was that—and there was just some colorful language, but that that was stupid. If the defense attorney is stupid enough to make a call on a recorded line, then that's on them, and you have no obligation to alert them. And I left that discussion thinking that the phone calls were fair game.").

[245] Both statistical data and "historical, individual, or circumstantial evidence" are relevant to proving a pattern and practice of intentional conduct. *Pitre v. Western Elec. Co., Inc.*, 843 F.2d 1262, 1267-68 (10th Cir. 1988) (despite small sample sizes underlying plaintiff's statistical evidence, plaintiff presented "ample direct and circumstantial evidence of discrimination").

produced in discovery, they were either buried deep in volumes of calls or excused as inadvertent exceptions. When Tomasic notified attorney Rick Johnson that Stokes had discovered his calls with Rapp, rather than investigating, she cast it this way: "CCA inadvertently included at least three calls between you and your client," dismissing it as a one-off.[246] Those denials are also incompatible with evidence that individual AUSAs actually knew that they received attorney-client calls in response for requests for recorded CCA inmate calls.[247] "The law is fairly clear that any attorney client privilege has been waived . . . the CCA phone system begins each call with a banner stating the call is subject to recording and monitoring."[248]

The KCK USAO was an echo chamber of sorts, perpetuating without verifying this statement: "The law is clear that the presence of a prerecorded message constitutes a waiver if the attorney decides to engage in conversation thereafter."[249] The *ipse dixit* of the USAO was that recorded attorney-client calls were available for review, without approval from the Court or notice to the defense. With no

---

[246] Gov't Exh. 10 (1/22/16 Tomasic and Flannigan email to Johnson).

[247] *See* Exhs. 718 & 718A (3/31/16 AUSA Krug's request for defendant Villa-Valencia's calls for "discovery/investigation"; Krug had interpreter Sara Gardner listen to and summarize calls that were in Spanish; she noted in a report that she reviewed "attorney/client call," without providing more detail); Exh. 624 (Jan. 2016 email exchange between Tomasic, Catania, and agents, recounting that the agent encountered an attorney-client call, and notified AUSA Dave Smith, who notified the "professional responsibility folks" and defense counsel).

[248] S.M. Exh. 1034 (8/7/16 Tomasic email to Barnett); S.M. Exh. 1053 (8/13/16 Barnett email to all criminal AUSAs perpetuating the premise that "those calls are not privileged due to the circumstances under which the calls and recordings are made.").

[249] Exh. 650 (12/232/16 Flannigan email to Rask).

investigation, research, or even curiosity, the USAO unilaterally determined that the recorded calls were conditioned on a knowing waiver of attorney-client confidentiality. With this thesis, without factual support or accurate legal analysis, the USAO reached a group decision: attorney-client calls were "fair game."[250]

## 14. The USAO did not investigate how calls were recorded or the procedure for privatizing, and took no reasonable measures to exclude attorney-client calls.

Again, USAO prosecutors operated under the theory that "the law is clear that CCA's pre-call preamble warning the call was being recorded made the call non-privileged[.]"[251] But when evaluating waiver, "[f]acts mean everything."[252] And it turns out that the Kansas City USAO knew next to nothing about the facts of the CCA phone system as they harvested attorney-client calls.

---

[250] Tr. 10/02/18 at 469:18-23 (Testimony of Erin Tomasic) ("But in the interim I had also done some research and talked to other AUSAs about whether these calls were privileged. My own research and then my conversations with everyone in the office, no one disagreed that the phone calls aren't privileged."); Tr. 10/02/18 at 470-1, 16-25, 3-5 ("And the group discussion was that—and there was just some colorful language, but that that was stupid. If the defense attorney is stupid enough to make a call on a recorded line, then that's on them, and you have no obligation to alert them. And I left that discussion thinking that the phone calls were fair game."); *see also* Tr. 10/02/18 at 616:16-25; Tr. 10/02/18 at 617:1-5.

[251] Tr. 10/4/18 at 1177:8-11 (Testimony of David Zabel); D.E. 675, 2136, 18-25 (Testimony of Tris Hunt) ("Q. Okay. And when—so what I—I've heard from a lot of witnesses this same opinion that these calls are not privileged because the privilege is waived. I'm trying to trace the source of that opinion. Do you have—you said you've had that opinion since you've been here. Is that an opinion that's widely shared within the office? A. Yes.").

[252] Tr. 10/11/18 at 2136:13-17 (Testimony of Tris Hunt) ("Q. And I'm not trying to have you definitively opine on anything, my point is just—is that waiver is a determination that is based on the facts; is that fair to say? A. Yes. Facts mean everything.").

Only after the first two *Black* hearings did the USAO express an interest in the process: "Based on the allegations made at the hearing yesterday, I would like to begin fact finding for our response"[253] to determine how CCA handles attorney calls, and "what exactly does blocked mean."[254] Tomasic later described their post-motion efforts:

> Q. Do you remember after this particular litigation started an e-mail from Kim Flannigan saying, we need to investigate this and find out how [privatization] works?
>
> [Tomasic]: I don't recall an e-mail, but I know Chris Oakley and I undertook to figure it out.
>
> Q. So you didn't know—you didn't really know what privatization meant, whether it meant that the call would not be recorded or just not be available?
>
> A. I did not understand the mechanics of that, no.[255]

---

[253] S.M. Exh. 1020 (8/17/16 Flannigan email to Barnett, Metzger, Beall, Rask, Tomasic, and Oakley).

[254] *Id.*; S.M. Exh. 1021 (8/19/16 Tomasic email to CCA asking about unrecorded legal calls, and noting that procedure is not listed in CCA's inmate handbook).

[255] Tr. 10/02/18 at 672:18-22 (Testimony of Erin Tomasic) ("Q. Do you remember after this particular litigation started an e-mail from Kim Flannigan saying, we need to investigate this and find out how [privatization] works? A. I don't recall an e-mail, but I know Chris Oakley and I undertook to figure it out.").

The USAO had no understanding of CCA's privatization process,[256] or the defects within that process.[257] They didn't know:

- That CCA publicly promised detainees private contact with their attorneys;[258]

- That CCA told no one about the need to privatize attorney-client phone calls, either on its website or by posting information in the facility;[259]

- That many experienced criminal-defense attorneys were utterly unaware of CCA's privatization policy;[260]

---

[256] Tr. 10/02/18 at 623:3-9 (Testimony of Erin Tomasic) ("Q. So as part of your research in determining that a call—a recorded call to an attorney that has a preamble privilege is waived, did you do any investigation into what the inmates are told? A. I did not do any investigation as far as CCA goes. I only got on Westlaw and looked at cases and talked to the people I worked with.").

[257] Tr. 10/02/18 at 621:11-16 (Testimony of Erin Tomasic) ("Q. You understood the process to work—if I'm an attorney and I want to privatize my number, what was your understanding at the time, before August of 2016, how that worked? A. That you just had to contact CCA and your number would get privatized."); D.E. 669, 625, 17-22 ("Q. Did you ever check to see in a particular case if the inmate had asked for his calls not to be recorded? A. I did not. Q. Did you ever check into the efficacy of the privatization at CCA? A. I did not.").

[258] Tr. 10/4/18 at 1182:24-5, 1183, 1-3 (Testimony of David Zabel) ("Q. My question is whether you knew that CCA publicly promised detainees that confidential—excuse me, CCA publicly promised detainees confidential contact with their attorneys? Did you know that? A. No.").

[259] Tr. 10/4/18 at 1181:3-7 (Testimony of David Zabel) ("Q. did you know that CCA didn't publicize their privatization system in any way? A. Did I know that? Q. Correct. A. No."); D.E. 672, 1181, 8-10, 17 ("Q. Did you know that there were no signs in the lobby or at the front desk about how to privatize a phone call at CCA? A. Okay. I did not, no."); D.E. 672, 1182, 14-16 ("Q. Did you know that there's no privatization form available on CCA's website? A. No.").

[260] Tr. 10/4/18 at 1182:7-13 (Testimony of David Zabel) ("Q. Did you know that in the Black case, there's about 20 defense attorneys have submitted affidavits saying, I always thought my phone calls were privileged and not recorded and the government couldn't get them. Were you aware of that? A. No. I'm aware that there were one or two affidavits. But beyond that, no.")

- What CCA did when they received a privatization request;[261]

- The effect of a privatizing an attorney number;[262]

- Whether attorneys contacted by their clients heard the preamble;[263]

- What the preamble said;[264]

- What the Spanish translation of the preamble said;[265]

- What the idiomatic translation of the preamble might mean to a Spanish speaker;[266]

---

[261] D.E. 669, 626, 2-5 ("Q. Do you know how the privatization protocol actually worked in terms of when CCA got the request to privatize the number, what did they do? A. I did not.").

[262] Tr. 10/02/18 at 631:11-14 (Testimony of David Zabel) ("Q. So you didn't know—you didn't really know what privatization meant, whether it meant that the call would not be recorded or just not be available? A. I did not understand the mechanics of that, no.").

[263] Tr. 10/02/18 at 623:17-25 (Testimony of David Zabel) ("Q. Once it's connected. If the attorney, for example, isn't answering the phone, it's the front desk that's answering the phone, in a particular case do you know if the attorney who's receiving that call hears the preamble? A. I do not know. Q. Would that matter in your research? A. I—I won't make a legal conclusion. It seems important though."); D.E. 672, 1197, 5-10 (Testimony of David Zabel) ("Q. Do you know whether attorneys who would privatize their numbers still heard the preamble? A. Ask me again. Q. Do you know whether attorneys who had privatized their phone numbers still heard the preamble? A. I don't know.").

[264] Tr. 10/4/18 at 1183:24 (Testimony of David Zabel) ("A. It says this call is being recorded."). The actual language of the preamble is "this call is subject to recording and monitoring." D.E. 214 at 19 (Report of the Special Master). The Spanish version of the preamble is "esta llamada puede ser grabada y monitoreada" which translates to "this call may be recorded or monitored." Exh. 656A.

[265] Tr. 10/4/18 at 1184:15-17 (Testimony of David Zabel) ("Q. Okay. Do you have any knowledge of what the Spanish CCA preamble says? A. No.").

[266] Tr. 10/4/18 at 1184:18-19, 1185, 4 (Testimony of David Zabel) ("Q. Do you have any knowledge of the idiomatic translation of the Spanish CCA preamble? A. I do not know.").

- The advice defense attorneys were providing their clients concerning the legal effect of the preamble;[267]

- That defense counsel who completed the privatization process still had calls with their clients recorded;[268]

- That even when CCA correctly processed privatization requests, the process sometimes took months;[269]

- What CCA told detainees about procuring confidential phone calls;[270]

- Whether information about how to procure confidential phone calls was available to detainees;[271]

---

[267] Tr. 10/4/18 at 1185:5-8 ("Q. Okay. And did you know that, despite the preamble, some attorneys were advising their clients that their calls were confidential nonetheless? A. I did not know that.").

[268] Tr. 10/4/18 at 1187:4-10 ("Q. Okay. Did you know that the Federal Public Defender phone calls were recorded and disclosed to the government, despite the fact that we privatized I think five times? A. I know that that assertion has been made. I don't know what I knew about FPD's assertions specifically when I drafted the memo."); D.E. 672, 1187, 18-23 ("Q. Did you know that attorneys who sent in privatization requests and were sent confirmations from CCA that their phones had been privatized still had their phone calls recorded? A. No, I did not know that.").

[269] Tr. 10/4/18 at 1187:10-14 ("Q. Okay. Did you know that even after privatization requests were entered, it often took months for those requests to become effective? A. I did not know that.").

[270] Tr. 10/4/18 at 1185:10-14 ("Q. In the summer of 2016, do you know what the inmate handbook advised detainees at CCA about how to procure confidential phone calls? A. I believe I've seen it at some point, but I don't think I had when I wrote this.").

[271] Tr. 10/4/18 at 1185:15-20 ("Q. Okay. Did you know that the handbook was often called in for revisions by CCA? A. No. Q. And did you know that the—as a result, the handbook was often unavailable completely to detainees? A. No.").

- Whether detainee requests for private phone calls with their attorneys were honored;[272]

- That CCA regularly mishandled privatization requests, resulting in attorney-client phone calls being recorded even though the attorney had submitted an appropriate request for privatized phone calls.[273]

Nor did the USAO know the law regarding waiver. No member of the office had ever litigated the issue in the District of Kansas or the Tenth Circuit.[274] No member of the office identified any binding authority in support of its position.[275] Instead, the Kansas City USAO relied on lunchroom guesswork to acquire attorney-client communications in derogation of the "oldest of the privileges for confidential communications known to the common law," critical to "promote broader public interests in the observance of law and administration of justice." [276]

---

[272] Tr. 10/4/18 at 1185:21-25 ("Q. Did you know that detainees who filled out their forms to privatize calls at CCA complained to staff that their calls were still being recorded, despite the fact they filled out the form CCA gave them? A. I did not know that.").

[273] Tr. 10/4/18 at 1187:15-18 ("Q. Did you know that Securus would send back spreadsheets full of mis-entered privatization requests back to CCA to be corrected? A. I did not know that.").

[274] Tr. 10/4/18 at 1188:13-23 ("Q. Let's talk about the law. Have you ever participated in a case in federal district court, in Kansas, where a judge held that the preamble—CCA's preamble or any facility's preamble voided the attorney-client privilege or waived it? A. I've never litigated the issue or are aware of it being litigated. Q. Have any of your colleagues? A. Litigated the issue? Q. Yes. That you're aware of. A. Not that I'm aware of.").

[275] D.E. 672, 1189, 21-25, 1190, 1-3 ("Q. So you're then aware of no binding authority in this district holding that the law is clear that CCA's pre-call preamble warning the law was being recorded—the call was being recorded made the call non-privileged? You're not aware of one case? A. Specifically Tenth Circuit, no. Q. Or anything in Kansas? A. I don't know if there is or there isn't.").

[276] *Upjohn v. United States*, 449 U.S. 383, 389 (1991).

It seems important to note this view was limited to the Kansas City USAO. Lanny Welch, the Professional Responsibility Officer for the District of Kansas for 19 years,[277] attempted to advise the Kansas City USAO that "it would make me nervous to try to exploit these calls unless I'm convinced there's a waiver. One way to make sure is to notify defense counsel and the Court that you have these calls, have not listened to them, but you think you could given *Hatcher* and ask the Court for a ruling. This gets the issue out of the way before trial and will give you a firm answer."[278] That view was greeted with derision by the Kansas City USAO.[279]

The lack of any research, investigation, or even curiosity was deliberate ignorance, and allowed the USAO to exploit CCA's errors. CCA should not have recorded those attorney-client calls, but did. Securus's technology made those calls available to the prosecution. The juncture of these two factors left attorney-client calls vulnerable to disclosure. The USAO exploited that vulnerability. The USAO's secretive and unilateral conduct in collecting and saving, but not disclosing attorney-client calls allowed the practice to perpetuate for years, for hundreds of clients, and for thousands of attorney-client calls.[280] Only when the inexperienced and unsupervised SAUSA Tomasic disseminated phone calls in *Black* discovery did

---

[277] Tr. 10/4/18 at 1239:17-18 ("Q. 29 years. And how long were you the PRAO? A. From 1998 until 2017.").

[278] Tr. 10/4/18 at 1259:5-12.

[279] Tr. 10/02/18 at 470-1:16-25, 3-5.

[280] *See Johnson v. CCA, Securus,* W.D. Mo. 16-CV-947; *Johnson v. Securus,* D. Kan. 17-cv-2031; *Huff, et.al. v. CoreCivic,* D. Kan. 17-cv-2320.

the USAO's pattern and practice come into daylight. Individual cases discovered during *Black* reveal how the USAO operated and concealed routine collection of phone calls.

The USAO, including Tomasic, could have taken precautionary measures to avoid attorney-client calls. They could have asked CCA if phone numbers for a particular attorney had been privatized. They could have reviewed Call Detail Reports to identify attorney numbers before reviewing calls. They could have notified attorneys and the Court if they discovered those calls. And they could have explicitly excluded known attorney numbers, as was done, for example, in *United States v. Quintin Lawton.*[281]

The USAO's initial request for Lawton's CCA calls did not exclude calls to Lawton's attorney, AFPD Branden Bell, even though Bell was counsel of record.[282] But when AUSA Jared Maag realized that the calls included calls to Bell, he notified Bell and reissued the request:[283]

> *** **Excluding all calls to and from the following phone numbers 785-232-9828 and 785-246-6004.**

---

[281] D. Kan. 16-cr-40063.

[282] Ex. 720 at 3.

[283] Exh. 720 (11/28/16 AUSA Maag's written request for phone records of defendant Quentin Lawton, excluding phone numbers for Lawton's attorney of record, Branden Bell).

AUSA Maag tried to retroactively remedy the intrusion.[284] Nothing prevented this from being done in every case.[285]

This transpired *after* the *Black* litigation began, so the AUSA was on full notice. But the value in *Lawton* is to explain how easily attorney calls *could have been avoided* and that counsel could have been notified. The USAO simply chose not to.

Compare the relatively simple (although still incomplete) measure put in place in May of 2017. A written policy was implemented regarding the procurement and handling of jail calls.[286] This included a new form for requesting calls that requires written approval by the Criminal Chief and an Assigned Filter AUSA. It also requires: [287]

> Note: **All calls involving the telephone numbers of all known attorney(s) for the inmate** _____ **(including office telephone numbers/extensions and cellular phone numbers) are to be excluded from production.**

---

[284] Exh. 486 (AUSA Maag re-subpoenaed phone records with instructions to exclude attorney; CCA contacted Securus and obtained new set of calls that "purged" attorney phone number from the inmate's records).

[285] Exh. 721 (AUSA Treadway requesting defendant Michelle Reulet's calls, excluding attorney Melanie Morgan's phone numbers).

[286] S.M. Exh. 1181 (under seal). While the FPD acknowledges this is a move in the right direction, the heavy reliance on filter teams may still violate the Sixth Amendment. D.E. 130 at 25-27; *see, e.g., United States v. Pederson*, D. Or. 12-cr-00431, D.E. 479 at 55 ("The use of a taint team does not allow the government to intentionally obtain and review attorney-client material and when the government chooses to review such material it is *per se* intrusion into the attorney-client privilege.").

[287] S.M. Exh. 1198.

This was easily accomplished, and did not require an act of Congress.[288] But the USAO had no interest in these precautions. Describing a group of AUSAs lunching together in the KCK office, Tomasic testified:

> And the group discussion was that—and there was just some colorful language, but that that was stupid. If the defense attorney is stupid enough to make a call on a recorded line, then that's on them, and you have no obligation to alert them. And I left that discussion thinking that the phone calls were fair game.[289]

## 15. The USAO systematically attempted to hide its intrusion into recorded attorney-client communications, thus preventing the courts or defense from discovering the widespread practice.

Again, the AUSAs incanted an almost robotic claim that "privilege was waived, so we could listen to the calls, but we never would."[290] If the USAO was confident in its legal position, then there was no reason to hide its pattern and practice of collecting all calls without excepting attorney-client calls. Yet hide it did.

The USAO had neither a policy nor a practice of turning recorded calls over as part of discovery. From SAUSA Tomasic to AUSA Zabel: "I only turn them over if I'm gonna use them. I think the defense appreciates this BBC [sic] they feel obligated to listen to all if we disseminate them."[291] That seemed to be the USAO

---

[288] Tr. 10/12/18 at 2565:14-20 (Beall testimony).

[289] Tr. 10/2/18 at 470:21-471:3.

[290] See, e.g., Exh. 504 at 117, *Dertinger* tr. 6/21/17 hearing (Flannigan: "I don't think they are privileged, but I think just because you can do something doesn't mean that you should.").

[291] Exh. 722 (May 2014 USAO email exchange about recorded inmate calls revealing that the USAO had not set practice or policy on disclosing recorded phone calls; the agent had listened to "every

standard practice.[292] In *Herrera-Zamora*, for instance, AUSA Zabel argued against disclosure of recorded attorney-client calls in the USAO's possession, even under Rule 16.[293] Wamble did not disclose Wood's calls in discovery. Likewise in *United States v. Uriarte*, another case in which the government obtained attorney-client calls.[294] Attorneys whose calls were collected by the USAO attested that they never received, or never recalled receiving, attorney-client calls in discovery.[295] This seemed to be a routine practice. But DOJ training was to the contrary, as Tomasic learned at the National Advocacy Center: "[I]t was discussed at length that inmate calls are property of the government because we contract with the jails or we directly supervise them and, therefore, they're Rule 16 statements of the defendant

---

phone call in its entirety" and AUSAs Zabel and Tomasic debated whether to turn the calls over in discovery. Had the government disclosed in that case, it would have revealed that CCA calls to KCK Branch Chief AFPD Tom Bartee's office phone were still subject to recording, despite CCA's assurances to the contrary. Exh. 451 at 2.

[292] *See* Exh. 494 (AUSA Zabel asking Treadway's advice on producing phone calls, and arguing that Rule 16 does not require disclosure unless there was a specific request, and that the calls are only "relevant" if they are either inculpatory or exculpatory); Exh 495 (Treadway advises she would have disclosed under Rule 16 "out of an abundance of caution"). Treadway, it was later discovered, personally reviewed attorney-client calls in *Reulet* to gain a tactical advantage in plea negotiations).

[293] Exh. 494 at 2-3.

[294] In *United States v. Uriarte*, D. Kan. 15-cr-20043, the defendant, facing a potential guideline range of 360 months to life, was permitted to plead guilty to misprision of a felony and receive a time-served sentence. Before that plea agreement was reached, Uriarte had moved to join the litigation in *Black*. D.E. 132 at 1-2. As his motion explained, the government had obtained calls between Uriarte and counsel. D.E. 132 at 1. Uriarte's counsel at the time issued his own subpoena to Securus to verify that such calls had been recorded. That subpoena return included calls between Uriarte and his counsel, as well as between other clients and their counsel. Exh. 451.

[295] Exh. 459 (Calbi affidavit; Jenab affidavit).

and must be turned over."[296] By not disclosing calls in the regular course of Rule 16 discovery, the government's collection of attorney-client calls was easier to hide.

When attorney client calls *were* disseminated in discovery, it was often in large discovery cases where the calls may have gone unnoticed by counsel. And when one did come to light, the government would portray the recording as a one-off inadvertent or accident event.[297] Because of the USAO secretive practices, in most cases, individual defendants could not have discovered that the prosecution had obtained attorney-client communications. At the September 7, 2016 hearing, Tomasic acknowledged only one occasion that she obtained an attorney-client call from CCA and she notified counsel, Rick Johnson. When the Court asked if she "notified any other defense counsel that their calls with clients at CCA were being recorded or perhaps being recorded?"[298] Tomasic: "No, Your Honor . . . this was an exceptional circumstance where an attorney did not block his or her number."[299]

Actually, Tomasic had encountered attorney-client calls on several other occasions. One of the first was with defendant Jeremy Birdsong. Under FAUSA Mike Warner's supervision, Tomasic notified defense counsel, apologized, and used a filter team after protected communications were acquired.[300] Then there was

---

[296] Tr. 10/2/18 at 465:16-20.

[297] Tr. 10/11/18 at 2119: 1-15; Tr. 10/02/18 at 574: 7-20.

[298] Exh. 490, tr. at 50:16-24.

[299] *Id.* at 5O:24-51:3.

[300] Exh. 582; Exh. 583.

*Herrera-Zamora,* when Tomasic intentionally and explicitly subpoenaed only calls to the attorney. Besides revealing Tomasic's dissembling, this evidence also shows that encounters with attorney-client calls were not "exceptional circumstances." It happened repeatedly, in *Forbes*, *Wood*, *Rapp*, *Reulet*. It happened in 27.96% of the cases when the USAO collected calls.

## 16. The USAO gained an advantage when defendants were detained because CCA provided unfettered access to protected communications.[301]

CCA forms[302] advised that "[a] properly placed phone call to an attorney is not monitored. You must contact your unit team to request an unmonitored attorney call."[303] Unmonitored, in this context, meant unrecorded; however, a guard stayed in the room and could hear the conversation.[304] But the forms also advised that the only purpose of monitoring was "to preserve the security and orderly management of the institution and to protect the public," not to gather self-incriminating information to provide to the prosecution.

In reality, CCA recorded attorney-client communications for the benefit and use of the USAO. Whether a direct agent of the USAO, or an agent for the USAO

---

[301] *See* Exh. 643 (66 pages documenting AUSA Treadway's collection of defendant Reulet's communications from CCA including recorded calls, physical mail, phone logs, releases, and files; Treadway would later admit to reviewing attorney-client calls).

[302] Whether and how the content of these forms was explained to the incoming detainees is, at best, unclear.

[303] Exh. 643 at 43 (Reulet acknowledgement).

[304] D.E. 133 at 22 & n. 17.

through the USMS, CCA was an agent of the prosecution.[305] CCA considered the recordings to be USMS property. The USAO considered CCA to be a government actor.[306]

CCA was contractually bound to the USMS; CCA considered the recordings to be owned by the USMS.[307] The volumes of call requests show the close interdependent relationship between the USAO, the USMS, and CCA. If a prosecutor needed evidence, a call to the USMS or email to CCA would result in recorded calls delivered the next day.[308] The frequency of call requests also support this agency relationship—the three-month spreadsheet that CCA maintained showed almost 100 USMS requests for calls, videos, or records.[309] That is a steady flow of information.[310]

---

[305] *See* Conclusions of Law, Section 4, below.

[306] D.E. 669 at 601:7-17 (Tomasic testimony: as the NAC had also said, even if you as a prosecutor hadn't ordered the jail calls, it's the obligation of the government to provide them because you're contracting with the prison, so it's technically a government actor. So you either have to write a letter to the defense attorney and say, hey, these calls are available, or you might have to get them.").

[307] Exh. 490, tr. 8/9/16 at 55:17-12 (CCA employee Michelle Jensen-Schubert testified that "because we have a contract with the marshals" the records are "their property.").

[308] Exh. 490, tr. 9/7/16 at 126:11-127:16; 129:11-15 (Cahill testimony describing how he obtained calls from CCA for prosecutors).

[309] Exh. 501 (spreadsheet maintained by CCA IT Lajiness from 3/17/16 to 6/21/16).

[310] *See also* S.M. Exh. 1040 (W.D. Mo. USMS email to CCA requesting a "fresh pull on everything (visitation, commissary, phone logs, phone audio)" for nine inmates).

Every time a defendant was detained, a whole new source of investigation and evidence collection was set in motion.[311] The recorded phone calls represented an unauthorized and unsupervised eavesdropping, and that is exactly how they were used by the USAO.

---

[311] Tr. 10/10/18 at 2119:13-23.

## Part Three: The Court's investigation

### 17. The USAO did not cooperate with the Court's inquiry, causing unnecessary delay and the loss of evidence.

When the possibility of widespread Sixth Amendment violations first broke in the early days of August of 2016, the government was immediately defiant.[312] Much developed quickly through the next two months. The government held firm: "The United States has not violated the defendant's Sixth Amendment rights and any suggestion to the contrary is legally and factually incorrect."[313] The Court appointed the Special Master and ordered the parties to cooperate with the Special Master's inquiry.[314] Acting USA Beall said that he designated AUSA Barnett to head the litigation and to cooperate with the Special Master.[315]

---

[312] *See, e.g.*, Exh. 631 *United States v. Perez-Madrigal*, D. Kan. 16-cr-20044-01-JAR, D.E. 31 at 1 & 7 AUSA Terra Morehead (Government response to defense Rule 41(g), "Relying on partial and incomplete information in another case, and on nothing more than speculation and conjecture about this case, the defendant makes baseless and unfounded allegations against the Government" and arguing the motion should be denied "because any recordings are not his property."); Exh. 632, *United States v. Pryor*, (same). This was the government's usual response in cases where a Rule 41(g) motion was filed. See Exh. 477, *United States v. Huff*, (same response). *Compare* Exh. 584 (Rask's 5/17/18 memo documenting Tomasic's review of attorney-client call in Huff "and relating that Erin expressed deep remorse for having listened to the calls and for not revealing this action sooner."). The USAO did not file a Notice of Correction until June 19, 2017. Exh. 480.

[313] D.E. 120 at 27, 8/23/16 Gov't Recommendation re: Special Master. Exh. 480, 497, & D.E. 276 (notices of record correction admitting that Tomasic listened to attorney-client communications); Exh. 592 (Treadway's handwritten notes summarizing attorney-client calls between defendant and attorneys).

[314] D.E. 146 at 2, 13.

[315] Tr. 11/16/18 at 2552:14-22; 2558:13-14.

The Special Master held an October 28, 2016 discovery conference, and issued several reports in fairly quick succession.[316] Months passed waiting on the USAO to develop and execute search terms.[317] The Special Master communicated with the USAO regularly in an effort to advance the inquiry. By June of 2017, little if any progress had been made, and no documents had been produced.[318]

The USAO told the Special Master that they were trying. In reality, Beall had decided to recuse the office back in October 2016.[319] And until recusal was accomplished, the USAO had no intention of providing any information or meaningful cooperation. The USAO had effectively stalled the investigation.[320]

Eventually, the USAO attributed the delay to DOJ. A request to recuse the office had been sent to DOJ in October 2016, and there was no decision until July 2017, when special prosecutor Clymer was appointed. But the USAO never told the Special Master that it was waiting on DOJ directives or that it would not produce

---

[316] D.E. 176, 177, 183, 187, 193.

[317] Tr. 11/16/18 at 2592:19-2594:14 (Metzger explained that they never reached the point of filtering any material because they never finished running the searches); D.E. 298 at 3 ("the OUSA did not actually produce any documents" from the repository searches).

[318] D.E. 298 at 3.

[319] 2584:2-13.

[320] *See, e.g.*, 1182 (7/10/17 Beall email considering the Special Master's request for grand jury material: "I think we can hold back for a bit as we await the decision on recusal counsel." He goes on to claim that he has been clear with the Special Master about the delay; that was not the evidence adduced at the hearings.). *See* D.E. 298, 10/20/17 Special Master Report.

material until recusal was resolved. And Barnett had suggested in September 2017

that DOJ had already been consulted and the question of counsel was taken care of:

> THE COURT: Have you all followed the Department of Justice
> procedure in terms of seeking counsel about how to proceed? So, for
> example, a number of the allegations are probably directed at Ms.
> Tomasic, perhaps at others. Ms. Tomasic is still counsel of record. And
> so I just wonder if you followed any procedures in terms of how to
> handle that at this point.
>
> MS. BARNETT: Yes. We've consulted internally with the appropriate
> personnel that we would need to consult in terms of basically Ms.
> Tomasic or Mr. Oakley answering the Court's questions about what
> occurred.[321]

Not until July 2017 did the USAO supplement, revise, or correct its response to

the Court's question: "Have you all followed the Department of Justice procedure in

terms of seeking counsel about how to proceed?"

Beall claimed he did not have authority to produce the documents ordered by the

Court.[322] During that time, Beall and company did not do "anything without

consulting above."[323] Beall did nonetheless approve "the interviews that took place,

the process of working on the search terms, the things that were going on, the

---

[321] Exh. 490, tr. 9/7/16 at 11:21-12:12. *Compare* Tr. 11/06/18 at 2741:19-24 ("Q. So what about the request for recusal, you said that it was June before they—before they had notified you that they had long ago requested recusal? A. I certainly didn't know it—apparently they asked for recusal shortly after I was appointed. That's all news to me.").

[322] Tr. 11/16/18 at 2585:3-2586:18; Tr. 11/16/18 at 2586:1-13 (Beall could only remember getting approval to provide on document, the filter policy, to the Special Master).

[323] Tr. 11/16/18 2588:2-3.

process of developing the lit hold that Emily was working on."[324] USAO employees

were thus sequestered from the Special Master.

On October 30, 2016, just after the first discovery conference, the Special Master

asked for Erin Tomasic and Pauletta Boyd's assistance in identifying items in the

Court's vault, explaining: "I need your help" to "create a catalog / inventory that

fully and carefully describes all of the submitted evidence, including where and

from whom and when it was obtained."[325] But Beall and Barnett did not want the

Special Master to talk to Tomasic:[326]

| From: | Barnett, Debra (USAKS) 1 |
| To: | Rask, Scott (USAKS) |
| Cc: | Beall, Thomas (USAKS) 1 |
| Subject: | FW: Inventory |
| Date: | Monday, October 31, 2016 10:09:29 AM |

I just spoke to Chris about this email. He mentioned that he forwarded this email to Erin.

Scott, I do not want Erin interacting with the Court or court personnel on this case. I can explain why
whenever you want to clog your brain with this.

Ultimately, I think Erin will have to look at some of this in an attempt to identify it, but I am going to
suggest taking pictures of the materials and allowing her, agents and other relevant people to look at
it and identify it.

Beall admitted that, in the context of this email, the Special Master was

considered "court personnel."[327] And he admitted that "early on there was a concern

_____

[324] Tr. 11/16/18 at 2583:8-15.

[325] S.M. Exh. 1171 at 2.

[326] S.M. Exh. 1171 at 1.

[327] Tr. 11/16/18 2561:1-9.

that—that [Tomasic] might—that she was emotional and—might create some problems."[328] Indeed, Rask told Tomasic directly that she was not to contact the Special Master, as Tomasic recounted in a February email:

> I have not reached out to the Special Master for two reasons: (1) I believed management was weighing whether Kim and I should speak to the him, and (2) on October 31, 2016 Deb instructed Scott to direct me to have no contact with the Court, court personnel, or the Special Master about the *Black* case.  Given Deb's directive, I did not think it was appropriate for me to contact the Special Master.  During discussions with Scott over the past few months, Kim and I have stated that we would like to speak with the Special Master if management would permit us to do so.

Management's directive to withhold information from the Special Master was clear. That is how Tomasic understood it, as well.[329]

In contrast, Rask was called to testify May 15, 2018. He agreed that the Court's order to the USAO to cooperate with the Special Master applied to him, then refused to answer by claiming *Touhy* 84 times. But Rask broke rank and responded to this question:

> [Special Master] Q: Did any member of the United States Attorney's Office ever suggest or direct that you not cooperate with me or confer with me?
>
> [Rask] A: (Pause). No.

And:

> [Special Master] Q: Did any member of the United States Attorney's Office advise you not to provide me with documents or other materials in connection with my investigations; Phase III, Phase II, or Phase I?

---

[328] Tr. 11/16/18 2561:18-21.

[329] S.M. Exh. 1008 (2/21/17 Tomasic email to Metzger and Rask: "Thank you for the information. I especially appreciate you clarifying the basis for Deb's instructions in October that I have no contact with the Court, court personnel, or the Special Master.").

[Rask] A: No.

Rask's answers cannot be reconciled with the content of the emails. [330] When the government called Rask to testify some five months later, there was no attempt to explain or reconcile his testimony with the emails. USAO management had to approve AUSA unsupervised interviews with the Special Master. [331] Flannigan asked (again) for Metzger's approval on March 10, 2017. [332]

The USAO feigned cooperation, exchanging emails about search terms. But after months, the USAO had only searched Tomasic's Proofpoint email repository, [333] and no one else's. Nor had it searched any other relevant repositories. [334]

> Q: The search terms . . . . could've been run through, say, through the discovery drive?
>
> A [Steeby]: After . . . some considerable work to make it fit, yes, that could have been done.
>
> Q: So it would've been work, but it could have been done?
>
> A: Yes, I believe so.
>
> Q: . . . To your knowledge, was that ever done?

---

[330] Rask invoked *Touhy* 84 times to avoid answering questions before offering that he had never listened to attorney-client telephone conversations. Tr. 5/15/18 at 197:10-220:4. And said that he was aware of only a few instances over 20 years when an AUSA had listened to attorney-client calls, and that defense counsel was notified. Tr. 5/15/18 at 220:18-222:15.

[331] Tr. 11/16/18 2562:1-6.

[332] 1175 (3/10/17 Flannigan email to Metzger, who forwarded it to Rask).

[333] Tr. 11/16/18 at 2532:3-8; 2552:16-18; 2523:21-2524:1 (Steeby testimony).

[334] Tr. 11/16/18 at 2531:2-2532:2.

A: No, it wasn't done.[335]

The discovery drive was set up differently than the email archives. If a user added, updated, deleted, or modified a file on, say, the discovery drive, that original unchanged file would be available on the back-up drive—for six months. After that, the unmodified or deleted file could not be recovered.[336]

The Special Master's frustration with the progress—the USAO had not yet revealed its stall tactic—was first expressed in his March 16, 2017, report.[337] But he continued to communicate with USAO, and they pretended to respond, while producing no actual information.

Finally, the government's lack of cooperation was apparent in its witnesses' unhelpful testimony. Recall that AUSA Rask refused to answer questions at one hearing by claiming *Touhy* 84 times. And Special Agent Stokes claimed at least 84 times that he did not recall a fact or event during his eventual testimony.[338] Former USA Beall also had a hard time remembering key events and conversations,[339] including representations he had made to the Special Master:

---

[335] Tr. 11/16/18 at 2531:16-2532:2.

[336] Tr. 11/16/18 at 2537:10-2539:4.

[337] D.E. 214 at 2.

[338] Tr. 5/15/18 at 45-145 (claiming at least 84 times that he did not recall a fact or event).

[339] Tr. 11/16/18 at 2559:1-7; 2559:16-19; 2560:3-11.

74

Q: Did you ever represent to the Special Master that you were seeking approval to provide that material to him from DOJ?

A: I may have and that may have occurred, I just don't recall a specific conversation.[340]

On the critical issue of Special Master access to USAO witnesses, Beall similarly had little to no recall, and no enlightening answers to the questions open before this Court.[341]

## 18. The Court ordered production of relevant material; the government failed to timely or completely comply.

The Court ordered the government to produce relevant material. The government repeatedly failed to do so in a good-faith manner, starting with the AUSO's submission of materials to the Court's vault:

> The materials were pretty much a mess, much of it dumped haphazardly into boxes, and some inside of unlabeled, sealed envelopes. There is no record of what was collected, where it came from, even what it is. As an example, there was a blank, unlabeled, sealed envelope; upon opening it, I found two thumb-drives with cryptic letters written on them. No idea of what they are or who made them.[342]

---

[340] Tr. 11/16/18 2587:1-5.

[341] Tr. 11/16/18 2599:8-2600:23.

[342] S.M. Exh. 1171 (Cohen email to Oakley and Barnett describing the USAO material in the Court's vault as "pretty much a mess, much of it dumped haphazardly into boxes, and some inside of unlabeled, sealed envelopes. There is no record of what was collected, where it came from, even what it is. As an example, there was a blank, unlabeled, sealed envelope; upon opening it, I found two thumb-drives with cryptic letters written on them. No idea of what they are or who made them.").

This was the equivalent of a document dump, designed to hide relevant material, or hide the absence of relevant material, in a chaotic storm. The mess of material left for the Special Master in the Court's vault should be interpreted as lack of cooperation, if not intentional deterrence.

The Special Master's original production order was issued December 4, 2017.[343] The Court stayed that Order on December 21, 2017. The FPD moved to lift the stay before the May 15, 2017 hearing, again giving notice to the government that the evidence was material.[344] And again, the government cried that it had no time to seek DOJ guidance.[345]

The Special Master issued a new subpoena April 23, 2018, seeking much of the same material. This request was narrowed significantly by the time of the October 2018 evidentiary hearing.[346] Still, production was late, incomplete, and disorganized.

The government's objections to providing protected material were heard and accommodated by the Court's order for a privilege log. A privilege log allows a party to identify protected material, even by category rather than individual document, which is within the scope of the Court's production order, but there is reason to

---

[343] D.E. 317.

[344] D.E. 451.

[345] D.E. 460 at 3.

[346] D.E. 713 at 17 (Memorandum and Order).

withhold.[347] It allows a party to comply with the Court's order without violating privilege, and still remain accountable to the parties, the Court, and the law. And we know the USAO knows how to create a privilege log; when AUSA Chris Allman reviewed the *Dertinger* materials, he documented what was privileged and what was not.[348]

Despite Beall and Metzger's background in civil litigation, the USAO maintains it never saw the need to generate a privilege log "because we never reached the stage where it was done."[349] That stage was the Special Master's issuance of subpoenas duces tecum. But even as the government pretended that the August 17, 2018 subpoena presented an insuperable task,[350] it was mostly a subset of the Special Master's earlier production order that the government had successfully forestalled.[351] Even then, the Court granted more time and allowed rolling production, but with a hard deadline of September 21, 2018 (more time than the government requested), with the admonition that "no further extensions will be

---

[347] See D.E. 385 at 12 (FPD Memorandum, acknowledging that the government could claim privilege by providing a privilege log).

[348] Tr. 11/16/18 at 2595:3-13.
[349] Tr. 11/16/18 at 2595:24-2596:24.

[350] D.E. 583 (Gov't Motion to Stay Special Master's SDT because of the short time frame, the need for DOJ review, and concerns about privileged material.).

[351] See D.E. 461 at 2 (Gov't's May 7, 2018 Motion to Quash Special Master's SDT, arguing that, as of May 7, 2018, it had "insufficient time for the government to assess the demands in this subpoena . . .").

granted."[352] Rather than ask for another extension, the government simply ignored the Court's deadline.

And even when it produced materials, the government failed, and miserably so. Despite the protracted two-year litigation, and what we later learned about the May 19, 2018 litigation hold, the government's production was incomplete, disorganized, and often incomprehensible. For example, while many AUSAs and employees completed an initial litigation-hold certification, the government provided only two such certifications before the close of the October hearing, Trent Krug's and Bonnie Kaiser's. Others were not provided until February 5, 2019, well after the parties had any opportunity to inquire of the witnesses or make good use of the forms. Another example: despite its claim that the delay was to review documents before production, the government errantly produced Office of Professional Responsibility (OPR) complaints protected by the Privacy Act.[353] Another example: documents were produced identifying no source, provenance, or other context, rendering the document of little or no value.

The government balked at production despite the Court's efforts to accommodate its interests. For instance, the FPD asked for impeachment material that was protected by the Privacy Act. When the government objected, the Court denied the

---

[352] D.E. 582 (granting more time than the government requested, and on a rolling basis).

[353] The FPD notified the government and returned the protected material, as required by law and ethics.

FPD motion.[354] The Court consistently accommodated the government's privacy, privilege, and *Touhy* concerns by directing the government to provide a privilege log. The government steadfastly refused to do so.

The government's most recent—and still incomplete—production was February 5, 2019, after the Court's deadline. Late documents revealed that the formal litigation-hold process had proceeded through August of 2018, before the October hearing. AUSAs and other employees had to complete Attachment 4, which identified what relevant material was held and where.[355] But by the time these documents were produced, it was too late to examine any witness or investigate further.

## 19. The USAO did not take adequate, reasonable, or routine measures to preserve evidence of its access to or reliance on attorney-client communications.

In addition to the wiped AVPC hard drive, the USAO refused or failed to implement a timely litigation hold. From the outset, USAO management knew that it had a legal and ethical obligation to identify and preserve relevant information.[356]

---

[354] D.E. 605 (FPD Motion for Discovery of Impeachment Information); D.E. 617 (Government Response); D.E. 648 Minute Order denying FPD Motion.

[355] *See* S.M. Exh. 1228 (Attachment 4 for Catania, et. al.); S.M. Exh. 1287 (Attachment 4 for Metzger).

[356] Tr. 11/16/18 at 2687:8-21 (Metzger testified that the USAO understood the "Court wanted preservation to be immediate."), 2668:7-13 (Metzger could have issued a litigation hold on August 9, 2016).

The hearing on August 9, 2016 drove that message home,[357] when the Court enjoined any further recording of attorney-client communication, either by video or audio.[358] The next day, the Court issued an Order for the USAO to

> submit to the Court all originals and copies of DVR hard drives containing recordings of attorney-client communications that the Government is aware are in the possession of the United States Attorney's Office for the District of Kansas or in the possession of law enforcement agents.[359]

The USAO management knew that the Court intended for evidence to be preserved. On August 11, 2016, Beall asked Barnett and Metzger via email:

> Do you all think we need to put in place a litigation hold based on the allegations at the hearing?

---

[357] Tr. 8/9/16 at 103:15-104:3 (The Court: "I wanted to make sure that I have—have the original and all copies of the recordings at issue from CCA. I heard something during the hearing, some suggestion that perhaps an investigator still had a copy or something and I just wanted assurance that what you're prepared to present—provide to the Court, Ms. Barnett, is everything. So there's no—nothing else in CCA's possession and nothing else in anyone's possession at this point? Ms. Barnett: Your Honor, I've been told there is simply two sets . . . . and we have both here.").

[358] Tr. 8/9/16 at 106:16-107:6 (The "U.S. Marshals Service will tell all of these facilities they are to cease to desist immediately from any audio or video-recording of any attorney-client communications, whether it's by phone or face-to-face, so that we can be assured that there's no further violations of the Sixth Amendment going forward."); D.E. 102 (Court's cease-and-desist Order).

[359] D.E. 102 at 3.

Barnett answered affirmatively, and Metzger offered, "Perhaps we can tomorrow also discuss the breadth and implementation of the hold."[360] Again, Metzger was the litigation hold director and knew how to do this.[361]

On August 16, 2016, after two evidentiary hearings and a storm of written pleadings, the Court recognized that, through the *Black* investigation, the USAO

> received that information, which raised all of the issues before us, including a very, serious Sixth Amendment violation. ***Well, actually hundreds of Sixth Amendment violations. Every—every person has their own right***.[362]

Even that serious admonition did not cause the USAO to implement a litigation hold—or perhaps it caused it to intentionally delay. But not until October 29, 2016—the day after the first hearing with the Special Master[363]—was there another mention of the litigation hold:

> **Barnett:** I need to instruct everyone about not destroying any document or written communication that requests CCA video or phone calls.[364] Judge didn't say it but I think she meant that if we have copies

---

[360] S.M. Exh. 1207 (notably, this email was not produced by the government until 2/5/19, after each witness had already testified.).

[361] S.M. Exhs. 1211, 1212 at 4 (Metzger introduces herself to the Special Master as the Civil Chief and Litigation Hold Director for the District of Kansas).

[362] Tr. 8/16/16 at 64:24-65:3.

[363] D.E. 166.

[364] Some "written communication that requests CCA video or phone calls" was not produced until March of 2019. Exh. 715B. The USAO did not track written requests for CCAL calls. S.M. Exh. 1124 (11/17/16 Oakley email to Cohen: "The requests were made verbally, and pursuant to the contract between USMS and CCA. Unless CCA kept a log, there is no known log which would set forth each request."); Exh. 712 (Tomasic email admitting there was no uniform practice for tracking written requests for CCA calls).

of CCA videos and phone calls in our cases we keep and isolate them
. . .

**Metzger:** We could implement a litigation hold if we do not think a
directive is sufficient.[365]

Weeks passed, and the USAO still did not impose a litigation hold. By November
16, 2016, the Special Master was asking for "the completed preservation letter that
Ms. Metzger is working on . . ."[366] The USAO knew of the urgency, and even
insistence, of the Special Master's directive to preserve the information: "the SM
told me today [Dec. 6, 2018] that he wanted this preservation email sent out
'yesterday' . . . . he wants the email sent out as soon as possible."[367]

Another six weeks passed. On December 19, 2016, Metzger sent an office-wide
email instructing individual employees to preserve and retain a list of information
in their own possession and control. She also asked each employee to confirm
receipt.[368]

---

[365] S.M. Exh. 1208.

[366] S.M. Exh. 1210; S.M. Exh. 1211 at 1 (circulating the proposed letter among USAO management,
but still not yet issued.).

[367] S.M. Exh. 1213 at 2. (12/7/16 Barnett email to Beall, Metzger, AUSA Scott Rask, and AUSA
Annette Gurney); *see also* S.M. Exh. 1211 (Nov. 22, 2016, Metzger email to Barnett and Beall
regarding the preservation email: "This has been in process so long, I suggest we wait until after
Monday's . . . meeting . . .").

[368] S.M. Exh. 1214 at 1-3.

Some responded; most did not. Another two months passed before Metzger sent a reminder on February 20, 2017 to 64 USAO staff, including Beall, Pauletta Boyd, Sheri Catania, Terra Morehead, Jabari Wamble, and Zabel.[369] By February 27, 2017, over 20 USAO employees had still failed to respond, including Boyd, Wamble, and Zabel,[370] each of whom played a significant role in this developing litigation.

Another three months passed. On May 19, 2017, Metzger distributed a User Litigation Hold and Certification Form,[371] this time to 29 USAO employees who had indicated that they had relevant material. Unlike the earlier emails, this was a DOJ form "**hereby instituting** a 'Litigation Hold,'" with instructions to sign and return by May 31, 2017.[372]

The USAO proclaimed that Litigation Hold Procedures had been completed for 34 USAO employees on May 22, 2017, including Flannigan and Zabel.[373] This was some ten months after Beall, Barnett, and Metzger first agreed that a litigation hold was needed.

---

[369] S.M. Exh. 1215.

[370] S.M. Exh. 1215.

[371] USAP 3-13.300.003 (Legal and Litigation Hold Procedures).

[372] S.M. Exh. 1216 (emphasis added).

[373] S.M. Exh. 1226. Another four names—including Emily Metzger—were added June 5, 2017. *Id.*

By June 22, 2017, Flannigan, Morehead, Wamble, and a few others still had not responded.[374] Neither Beall nor Barnett had responded to the Litigation Hold Notice as of June 27, 2017.[375]

Besides the emailed Notice, which was marked as Attachment 1 to the May 19, 2017 email, another form was associated with the Litigation Hold—Attachment 4, USAO Lit Hold Coordinator/ Systems Manager Certification.[376] Dave Steeby served as the Systems Manager Coordinator. Attachment 4 forms asked the user to identify material to be preserved, and then Steeby was to certify the preservation.[377] The forms are first dated May 22, 2017; Steeby's certification is dated and signed August 17, 2017; and Metzger's certification is missing from most forms. All that is apparent from the late and incomplete production is that the USAO litigation hold was never completed or enforced.[378]

As late as August 14, 2018, over two years after the initial hearing, the government still could not say that preservation measures were in place. In response to the FPD's request to preserve recorded phone calls and related information, Clymer informed the Court that, "I believe that the Department of

---

[374] S.M. Exh. 1227 (contemplating the possible need to issue "some form of a direct order").

[375] S.M. Exh. 1227 at 4 (Miller email to Barnett and Beall, cc'd to Metzger).

[376] S.M. Exh. 1228.

[377] S.M. 1228.

[378] SM 1228 (many forms include Steeby's certification, even when the forms are all but blank).

Justice has certain policies regarding automatically purging its e-mail system every—periodically, and I don't know how often that happens. So I can't guarantee the Court that tomorrow some e-mail message that's five or six or seven years old doesn't automatically get purged in the ordinary course of business."[379]

And despite the Court's recorded credibility concerns,[380] the USAO still entrusted individual AUSAs to review and produce their own material. The last minute round up of material, reflected in the email string between FAUSA Slinkard and the line attorneys,[381] establishes that AUSAs Barnett, Rask, Zabel, Morehead, Wamble, Catania, and even Flannigan were entrusted to identify and produce relevant material that may well have impeached them, and all with no supervision, check, or audit.[382]

## 20. The USAO knew evidence would be lost absent an effective litigation hold.

On December 20, 2016, the day after Metzger emailed the first Litigation Hold Notice, AUSA Jackie Rapstine, an attorney in the civil division, reminded Metzger that emails are only archived for three or five years and "what might appear today

---

[379] Tr. 8/14/18 status conference at 35:9-15.

[380] D.E. 253 at 30.

[381] D.E. 697-1 at 10-21.

[382] Tr. 11/16/18 at 2794:19-2795:3 (The Court: "Problem No. 1, people that have been alleged to engage in wrongdoing are the ones doing their own culling of their own documents. Huge problem. That's not what would happen in any other case. I don't know why it's happened here. Problem—it should be a neutral reviewer.").

might be gone next week."[383] This was not news to Metzger: "*I know we are losing some stuff in the interim . . . .*"[384]

But Metzger assured Rapstine that she intended to prepare lit hold forms for the people who responded to her December 19, 2016 emails and "ask Bonnie Curtain [USAEO] to issue a formal electronic hold."[385] That request was not made until May 19, 2017,[386] resulting in more than ten months of "losing some stuff in the interim."

USAO Systems Manager Dave Steeby confirmed this destruction: after three years in the email archive, "messages start dropping off due to storage concerns for the repository."[387] The Litigation Hold Form was sent to USAO staff May 19, 2017, with instructions to return the form by May 31, 2017.[388] Once the USAO sent out the Litigation Hold Notice on May 19, 2017, management relied on individual AUSAs to identify relevant material and notify Steeby. "They were supposed to identify what it is to be sure that it's not accidentally deleted or destroyed somehow."[389]

---

[383] S.M. Exh. 1214; *compare* S.M. Exh. 1225 (USAEO Bonnie Curtin advising a "3 year retention window where email is auto deleted from the USAMail/Proofpoint archives system").

[384] S.M. Exh. 1214 (Metzger response email to AUSA Jackie Rapstine).

[385] S.M. Exh. 1214.

[386] S.M. Exh. 1218.

[387] Tr. 11/16/18 at 251:11-19 (described as a "rolling dissolution.").

[388] S.M. Exh. 1216.

[389] Tr. 11/16/18 2521:10-2522:1 (Steeby testimony); S.M. Exh. 1196.

But it was not until Steeby received the completed form from individual AUSAs that he would notify USA Tech-or "write a ticket"—which would put the user's "mailbox . . . into that mode where messages no longer drop off."[390] Only after that would emails—and attachments—be preserved beyond the three-year window.[391] By delaying return of the form to Steeby, an individual ASUA would delay the preservation of emails. And even when returned, Steeby could delay, as he did with AUSA Krug, in an effort to collect more information.[392] Each day that Steeby delayed in sending the ticket, more email would "drop off," no longer recoverable.[393]

21. **Evidence was purposefully removed from the USAO.**

Tomasic was fired on May 17, 2017 for lying about listening to attorney-client phone calls.[394] Two days later, the Litigation Hold Notice was distributed to, among others, Flannigan and Zabel.[395] Zabel responded as directed by May 31, 2017; Flannigan, by June 26, 2017. They had to identify and preserve both ESI and hard copies of information in the USAO's possession, custody, or control.[396] They were

---

[390] Tr. 11/16/18 at 2532:15-25 (Steeby testimony).

[391] Tr. 11/16/18 at 2514: 6-22; 2517:11-20.

[392] S.M. Exh. 1196 (July 26, 2017 email from Steeby to Krug); tr. 11/16/18 at 2535:12-24.

[393] *See* tr. 11/16/18 at 2534:18-2535:1.

[394] Tr. 11/16/18 at 2567:11-14.

[395] S.M. Exh. 1219.

[396] S.M. Exh. 1219; S.M. Exh. 1196; tr. 11/16/18 at 2519:3-2522:1 (Steeby testimony describing the lit hold form).

also warned that "failure to preserve and retain this Information may result in sanctions and/ implicate professional conduct rules."[397]

These three attorneys—Tomasic, Zabel, and Flannigan—had an obligation under federal law to preserve information subject to a litigation hold; there are penalties for removal or destruction.[398] Prior written approval was necessary before originals or copies could be taken by departing employees.[399] Federal law obligates agency heads to notify the Archivist of removal or destruction of records.[400] Criminal penalties may attach to even accidental removal.[401]

Yet after receiving the notices and acknowledgements, either Flannigan or Zabel, or both, removed written material from Tomasic's former office, at her request, and delivered it to her at her home after her employment was terminated.[402] Some documents were later given to the Special Master by

---

[397] S.M. Exh. 1196 at 2 (certification form).

[398] S.M. Exh. 1217 (USAP3-16.200.003 "Acknowledgement of Duty to Preserve Federal Records").

[399] S.M. Exh. 1217.

[400] S.M. Exh. 1217; 44 U.S.C. § 3106.

[401] S.M. Exh. 1217; 36 CFR § 1230.12; 18 USC § 2071.

[402] Tr. 10/3/18 at 774:18-776:20 (Tomasic testified that Flannigan and Zabel brought her five to seven binders of documents, including emails, from her office after she was terminated). Removing printed material from the USAO was a common practice. Tr. 10/2/18 at 550:17-22 (Tomasic: "Because of the ongoing conflict in the office. I knew people were recording other people's phone calls. I knew people were printing out e-mails every night and taking them home in binders because they did not trust the people they worked with. I was instructed to do that as well."); *cf.* tr. 10/4/18 at 1170:1-25 (Zabel denied delivering binders, but was at Tomasic's house at the same time as Flannigan); tr. 10/12/18 at 2261:21-25 (Clymer interviewed Flannigan and reported to the Court: "the notebooks were in Ms.

Tomasic.[403] We do not know if these were originals, or the only surviving copies. There has never been a complete accounting, and at this late date, none is possible. Whether there were any consequences for removing these documents after the litigation hold was imposed is also unknown.

## 22. Today the government remains in possession of attorney-client communications.

The first motion for return of recorded attorney-client communications was filed August 5, 2016.[404] That was followed by a broad Court order for the government to identify and collect all communications and derivative material and surrender them to the Court.[405]

The USAO internally debated the Court's order,[406] but never sought clarification or advised the Court or the other parties of how it intended to interpret and implement the order. The USAO turned over calls obtained in *Black*, but no others, even after September 30, 2017, when Flannigan informed Barnett that "I am

---

Tomasic's office, [Flannigan] went in alone, she went from the office on her way home and stopped by Ms. Tomasic's residence, delivered the notebooks to Ms. Tomasic and then went on her way . . .").

[403] Tr. 10/3/18 at 777:3-12 (Tomasic gave the Special Master anything "remotely relevant" out of the binders, but pulled some other documents related to other matters).

[404] D.E. 82; an amended motion was filed 8/7/16, D.E. 85.

[405] D.E. 113 at 2.

[406] Exh. 609 (8/19/16 Oakley email to USAO management, Boyd, and others asking what to do about CCA calls stored on the USAO discovery drive; "I've reviewed the Court's order, and it doesn't seem to address recorded calls that are in our possession. Please advise what you think I should do."); Exh. 610 (8/19/16 Metzger email responding to Oakley suggesting an alternative of "delet[ing] them from the drive or lock them down and provide the court notice . . . .").

certain that there are other cases in the district where the prosecutors obtained CCA calls that were later also obtained in the *Black* investigation."[407]

Returning calls only related to *Black* created a particular challenge because *Black* collected so many calls of defendants charged in other cases. For example, consider Enoch Clark. Mr. Clark was housed at CCA, having been indicted by AUSA Terra Morehead in 2014 on charges unrelated to the CCA investigation.[408] His recorded calls were obtained as part of the *Black* investigation and then provided to the Court in response to the claw-back order in August 2016.[409] But the USAO, through Morehead, had also obtained those calls—including an attorney-client call—under Mr. Clark's case number.[410] AUSA Morehead neither notified the Court nor surrendered those calls until January 2019.

During that two-and-a-half-year gap, the USAO maintained and had access to the very attorney-client calls that the Court had ordered impounded. Calls that remained on the USAO server in a shared discovery folder or within the office on

---

[407] Exh. 710 (9/30/16 email from Flannigan to Barnett, copied to Tomasic).

[408] *United States v. Enoch Clark, et. al.,* D. Kan. 14-20130-02-JAR.

[409] This is according to the government's report, Exh. 715B. Because the FPD did not have access to the discovery in *Black,* and the impounded materials were neither disclosed nor inventoried, the FPD was unaware of this fact until January 2019.

[410] Exh. 60-051 (AUSA Terra Morehead requesting the USMS to obtain Enoch Clark's "CCA recorded (phone) conversations" on October 20, 2015 in case number 14-20130-JAR); 603-056 (same, on January 29, 2016); De. Exh. 603A (noting two calls to Clark's attorney Mark Thomason were accessed).

hard media were available to anyone with access to the USAO files.[411] And not just USAO employees had access—law enforcement agents could "log on to the [USAO] system and access [defendant] calls via the [USAO] network."[412]

In the individual cases that have come to the Court's attention, there is a consistent theme—when the USAO had attorney-client calls, those were 1) generally not disclosed, and 2) saved for future access or use, such as in *Wood*. And yet the government has insisted that the Rule 41(g) motion has been satisfied.[413]

Until all calls are accounted for, the FPD remains obligated to press the matter.[414] To that end, the FPD moved in August 2018 for the return of specific

---

[411] We understand that this was not always the case—sometimes the recordings were stored on hard media, such as a CD, and physically stored in a paper file. But the evidence is that a shared discovery drive was available in the office.

[412] Exh. 708 (9/5/16 email from SAUSA Tomasic, copied to AUSA Oakley, to KBI Agents Stokes and Virden, Secret Service Agent John Seubert, and IRS Special Agent Henry Herron arranging for agents to review Defendant Ashley Huff's recorded CCA calls to find evidence that she knew the government was recording the calls, apparently in an effort to establish waiver in defense of the USAO review of attorney-client calls in that case); S.M. Exhs. 1002, 1003 (notes reflecting Stokes's substantive review of at least three calls between defendant Huff and "Mom's lawyer friend"; Stokes's email to Tomasic and others, same).

[413] *See, e.g.*, D.E. 554 at 6 (on August 8, 2018, opposing the FPD motion to reconvene the evidentiary hearing, the government claimed that the "movants' telephone calls . . . have been impounded by the Court" and therefore there was no need for evidence on the issue. At the hearing, the FPD presented evidence that the government was still in possession of calls in dozens of cases; that has been confirmed by the government's most recent productions, *see* Exhs. 715, 715A, and 715B.).

[414] *Matter of 636 S. 66th Terrace KCK*, 835 F. Supp. 1304, 1306 (D. Kan. 1993) ("If the privileged communications materials are permitted to remain in the hands of the government it is apparent to the court that any confidentiality of the communications involved may well be lost, and the movants will be effectively denied the protection of the privilege. Once lost, confidentiality cannot be restored. Movants have no other remedy, and their injury is irreparable.").

attorney-client phone calls.[415] The FPD identified defendants whose calls we knew (by comparison of Securus data, attorney phone numbers, and written USAO requests)[416] the USAO had accessed and probably still had. The Court granted the motion in an order filed December 14, 2018.[417]

Production under that order is ongoing and the government remains in possession of attorney-client phone calls today.[418] Likewise, the FPD motion for return of property under Fed. R. Crim. P. 41(g) remains outstanding.

## 23. The government's negotiation tactics have disadvantaged Section 2255 litigants.

The USAO has known from the start of this litigation that individual defendants would have an interest in seeking habeas relief, and that time was of the essence for these defendants. This Court noted the likelihood of habeas litigants at the first hearing, where it considered the possibility of "hundreds of Sixth Amendment violations. . . . [E]very person has their own right."[419] The Court issued a standing

---

[415] D.E. 572.

[416] D.E. 562 & 562A; *see, e.g.*, tr. 10/10/18 (AFPD Federico testimony of FPD phone call review).

[417] D.E. 705.

[418] D.E. 726; Exhs. 715, 715A & 715C.

[419] Tr. 8/16/16 at 65:1-3.

order appointing the FPD to possible § 2255 litigants,[420] and questioned Clymer about DOJ's role in "the anticipated flood of 2255 motions that are yet to be filed."[421]

Presumably in anticipation of these motions, the government has steadfastly denied any Sixth Amendment violations. As late as December 5, 2018, the government maintained that "this record remains devoid of any evidence showing a violation of the Sixth Amendment right to counsel of any litigant in this case, whether a charged defendant or one of the yet-unidentified Rule 41(g) claimants whom the FPD purports to represent." Even after nine days of testimony and thousands of exhibit pages, the government told the Court that "there is no evidence, either testimonial or documentary, supporting the allegations of widespread Sixth Amendment violations that have been made in this case." The government's intransigence has foreclosed any meaningful effort at an agreed resolution. With one exception.

In July 2017, the FPD formally contacted the USAO "to invite your participation in further discussions" to reach an "understanding between the offices regarding USAO's continued procurement or recorded calls." The FPD expressed hope that the

---

[420] Tr. 6/15/18 at 8-9; Standing Order 18-3 issued 7/17/18.

[421] Tr. 8/1/18 at 13:19-25; 18:6-19:9 (THE COURT: "How about the future 2255s, some of which may be filed by people that were in this case as defendants, some of which may be filed by people that have Rule 41 motions, some of which may be filed by people whose recordings were obtained by the government in the course of the CoreCivic contraband investigation, and some of which may be filed by people whose recordings were not obtained by the government in the context of this investigation but perhaps obtained in some other way? So there's a whole—there's a whole universe of those different categories. Who has responsibility for those? MR. CLYMER: I have not been told that I have any responsibility over any of the 2255s . . ."); Tr. 8/14/18, *passim* (Court questions Clymer about his role in § 2255 cases).

parties "could reach common ground," and asked to meet in person with USAO management. Those suggestions were either rejected outright or met with silence.

The one exception occurred almost a year later, after the first full day of evidence on May 15, 2018. The USAO, with newly appointed U.S. Attorney Stephen McAllister replacing Beall, asked for an opportunity to meet with the FPD to negotiate a resolution. Some progress was made, and the USAO and FPD agreed to a remedy for a select group of defendants whose attorney-client communications were recorded and then held by the USAO. The resolution was outlined for the Court, and the evidentiary hearing remained in abeyance.

But DOJ then reneged. Deputy Attorney General Rosenstein rejected a global resolution, insisting that each case had to be evaluated separately and individually. The FPD has filed 74 § 2255 cases to do just that. More are coming. But DOJ's maneuver delayed the May 2018 hearing until October, and wasted significant time and resources on an illusory endeavor. Meanwhile, current and future § 2255 litigants continue to serve their sentences.

Additional time was spent on negotiations when the Special Master accepted Deputy Rosenstein's offer to work with him "as a mediator to further identify, refine, and possibly resolve issues in litigation."[422] The Special Master, in the unique position of mediating on behalf of the Kansas USAO[423] in negotiations with

---

[422] Exh. 555 at 2.

[423] The USAO later tried to recuse the Special Master for bias without acknowledging that he had served as the USAO's advocate with DOJ. D.E. 697 at 5-12 (Government's Motion for Reconsideration).

the Department of Justice, met with the special prosecutor and his superior in

Washington, D.C. The meeting was unsuccessful.

The Deputy Attorney General offered:

> It is important to the Department of Justice that we identify any
> defendant who was harmed by an unwarranted invasion of attorney-
> client privilege, and that we ensure an appropriate remedy . . . .  If any
> defendant has a valid claim, we will seek either to negotiate a
> resolution with counsel representing the individual defendant's
> interests, or to address it in litigation involving the aggrieved
> defendant.[424]

As for the offer to negotiate individual cases, the FPD took the Deputy Attorney

General at his word and reached out in almost every individual § 2255 case to

negotiate, with zero response from the USAO.[425]

As for the promise to remedy valid claims, that has also proven false. In the

§ 2255 petitions filed since Rosenstein's July 2018 letter, the government has raised

waiver, default, or other procedural bars *in every single response*, asking the courts

to dismiss on procedural grounds rather than reach the merits of whether the

---

[424] Exh. 555 at 1-2 (7/27/18 letter from Deputy Attorney General Rod Rosenstein to Special Master, explaining that DOJ would not back the agreement reached between Mr. McAllister, the U.S. Attorney, and the FPD).

[425] On August 14, 2018, the FPD initially refused to negotiate further: " We are not willing to commit the time and resources to sitting down at the table and negotiating. We did that before, it cost us a lot. Our time and resources belong to our clients, it cost our clients." Tr. 11/14/18 at 37:8-11. The FPD then relented and agreed to consider any offer to negotiate that had been pre-approved by Deputy Attorney General Rosenstein. *Id*. The government never responded.

95

litigant has "a valid claim"[426] under the Sixth Amendment.[427] This tactic is antithetical to Rosenstein's representation to the Court.

## 24. The government's litigation tactics point to intentional delay.

Two-and-a-half years have now elapsed. Defendants whose cases were infected by prosecutorial misconduct and Sixth Amendment violations have been convicted and imprisoned, and many have been in custody every day of the past two-and-a-half years waiting for relief. This Court has identified "the strategy and tactics of the U.S. Attorney's Office in not acting with transparency at the very outset of this" as a primary reason for the slow progress of the investigation.[428] The Special Master's October 20, 2017 Report laid to rest any doubt about the government's obstructive delay tactics, and that these tactics have violated the Court's Orders.[429] And the Court's recent Order and Memorandum documents the long road traveled in this litigation.[430]

---

[426] Exh. 555.

[427] *See, e.g.*, *United States v. Miguel Lopez-Garcia,* D. Kan. 13-cr-20125-JAR, D.E. 565 at 11-26 (Gov't Response to § 2255 motion, filed 9/30/18, arguing first that the petition should be dismissed without reaching the merits of the Sixth Amendment claim because "Defendant's Sixth Amendment Claim is either waived or procedurally barred" or defaulted because it was not raised on direct appeal.).

[428] *United States v. Dertinger*, D. Kan. 14-cr-20067-JAR, 6/21/2017 transcript 540:23-258:1.

[429] D.E. 713 at 35, 1/25/19 Memorandum and Order ("As the 60-day production deadline passes, it is clear that, despite giving it a fair chance to comply, compelling any further production from the government is an exercise in futility. Accordingly, in light of the protracted history of these proceedings, and in order to avoid further delay and waste of judicial resources, the Court will reconsider and modify its final production and briefing order on this ground. Rather than compel further production at this time, the Court will prepare to close the record"); *see also* Report of the Special Master, 10/20/17, D.E. 298; Report of Special Master, 3/16/17, D.E. 214 at 2.

[430] D.E. 713.

The USAO delayed taking the most basic measures to identify and preserve information, as with the delayed and ineffectual litigation hold described above. Either the USAO did not take the Court's concerns seriously, or it intentionally avoided implementing the litigation hold lest the evidence actually be preserved and available to the Court and parties. Perhaps the government thought it was worth the gamble. The Court's remedy should show it was not.

The government's approach to the Sixth Amendment issue in its pretrial and postconviction litigation in individual cases point also to an intent to delay relief. A few defendants with viable Sixth Amendment claims are still in district court.[431] Even as the government raises procedural defenses in the § 2255 cases, it attempts to avoid pretrial relief by urging courts to leave the Sixth Amendment issue for post-conviction litigation. In *United States v. Duarte-Tello*, D. Kan. 16-cr-20016-CM, for instance, the defendant sought a sentencing delay pending the outcome in *Black* and his own motion to dismiss based on a Sixth Amendment claim that the government had recorded his attorney-client communications. The government responded:

> The Court should also deny Defendant's request that the proceedings in this matter be stayed until final determination in *Black*, as the date of that final determination is unknown. Furthermore, should Defendant be convicted at trial in this matter, *he would still be able to*

---

[431] *See United States v. Escabedo-Gamboa,* D. Kan. 16-cr-20016-CM.

> *pursue Sixth Amendment claims on appeal or through collateral*
> *attack.*[432]

The government did not offer to waive procedural bar or waiver arguments in post-conviction litigation. This pretrial position cannot be reconciled with Rosenstein's promise to ensure relief to address "valid claims" of aggrieved defendants, much less the government's invocation of procedural bars in the § 2255 actions.[433]

Additionally, in those § 2255 cases, the government has repeatedly cited the *Black* litigation as a reason to *forestall* progress,[434] thus compounding the burden and delay. The government has delayed in *Black*, and then used that delay as a reason to delay its responses in post-conviction litigation. Meanwhile, defendants remain in custody under convictions infected with prosecutorial misconduct and Sixth Amendment violations.

Every day of government delay, whether in *Black*, in another defendant's pretrial proceedings, or in the § 2255 cases, reduces the remedy available to the

---

[432] *United States v. Duarte-Tello*, D. Kan. 16-cr-20016-2-CM, D.E. 258 (Government's objection to delaying trial; Mr. Duarte-Tello has a motion to dismiss pending based on *Black*-related claims) (emphasis added).

[433] Exh. 555.

[434] *See, e.g., United States v. Shutts*, D. Kan. 14-cr-20014-KHV-11, D.E. 758, 762, 770, 779 (requests for continuances pending litigation in *Black); United States v. Vazquez-Saenzpardo*, No. 16-cr-20017-CM-2, D.E. 78, 80, 85, 90 (same); *United States v. Jones*, D. Kan. 15-cr-20091-JAR, D.E. 128, 130, 132, 133 (requesting an extension until May 30, 2019 to file its response "to allow time for review of the proposed findings of fact and conclusions of law filed in *United States v. Carter* and subsequent rulings thereon").

defendants and concomitantly reduces the penalty for the government. The government's delay has been tactical, purposeful, and successful. The failed global resolution called for sentence reduction for defendants still in custody.[435] By delaying over these months, many affected defendants have now served their full custodial sentence, and therefore a sentence reduction is of no value to them, and would be no cost to the government.[436] Others have remained under conviction and in prison over the last two-and-a-half years, awaiting an opportunity to be heard.

---

[435] Tr. 8/14/18 at 317:7-17 (FPD argued that the government's delay was to the detriment of our clients, "We are not willing to commit the time and resources to sitting down at the table and negotiating. We did that before, it cost us a lot. Our time and resources belong to our clients, it cost our clients.").

[436] *See, e.g.*, *United States v. Clark Sloan,* D. Kan. 13-cr-40025-JAR; www.BOP.gov (showing Sloan at KC RRM, with release date of 6/8/19) (drug case prosecuted by then-AUSA Tanya Treadway, who was caught reviewing attorney-client calls in *Reulet*. Mr. Sloan's call with an attorney was accessed; under the agreement, Mr. Sloan would have been eligible for immediate release, but because of the backtracking and delay, Mr. Sloan has completed his custodial sentence and is on supervision by BOP); *United States v. Stephan Blackburn,* D. Kan. 09-cr-20133 (same, released December 2018).

## Proposed Conclusions of Law

## Part Four: Sixth Amendment violations

### 1. The government violated the Sixth Amendment by intentionally obtaining and retaining attorney-client communications without notice to the Court or counsel.

It is the Sixth Amendment, and not ethical or evidentiary rules, that frames the primary issue before this Court. The constitutional protection is broader and deeper than other sources of law, it "subsumes the attorney-client privilege, a necessary underpinning of that right," and places a greater obligation and consequences on the prosecution:

> [T]he protection that the sixth amendment affords private communication is not limited by the scope of the attorney-client privilege. The privilege prevents courts from compelling disclosure of confidential communications by those the privilege shields. The sixth amendment further prevents the government from infiltrating the defense camp to obtain information concerning defense preparations that it cannot obtain through compulsory process. Even when the attorney-client privilege is inapplicable, the constitutional right to counsel insulates confidential defense preparations and thus maintains the legitimacy of the adversary process.[437]

Professor Peter Joy succinctly explained the relationship between privilege and the Sixth Amendment: "[D]efense attorneys need to have full disclosure of the facts

---

[437] *Government Intrusions into the Defense Camp: Undermining the Right to Counsel,* 97 Harv. L. Rev. 1143, 1145-46 (1977) ("Although the right and privilege are clearly related, however, the protection that the sixth amendment affords private communication is not limited by the scope of the attorney-client privilege.").

to be able to be effective. And so if you can't have confidential communications which would include attorney-client communications, it would make it impossible to render effective assistance of counsel, which would thereby be a denial of the Sixth Amendment right to effective assistance of counsel."[438]

Privilege and other rules are helpful here. Ethical rules plainly prohibit obtaining, listening to, or using attorney-client communications.[439] Federal Rule of Evidence 502(b) protects attorney-client communications and refuses to equate inadvertent disclosure with intentional waiver. The Supreme Court protects confidential attorney-client communication.[440] Confidentiality encourages full disclosure, which encourages informed legal advice, which "promote[s] broader public interests in the observance of law and administration of justice."[441] Replete legal authorities render government claims of ignorance or mistake untenable.

---

[438] Tr. 8/9/16 at 93:4-13.

[439] The value of the attorney-client relationship can be measured by the courts' response when defense counsel breaches the duty. A Kansas conviction for criminal threat was overturned because the defendant's state public defender testified, at trial, that he threatened to kill his ex-fiancé while they were discussing another case. In so doing, the Court noted that the "right of a criminal defendant to speak freely with his or her attorney is interwoven with the right of effective assistance of counsel." *State of Kansas v. Boatwright*, 54 Kan. App. 2d 433 (Kan. 2017) (internal citations omitted); *see also United States v. Edgar*, 82 F.3d 499 (1st Cir. 1996) (if an attorney violates his duty to not reveal client confidences, that he "is at risk at least of a malpractice suit and of professional discipline."); *Damron v. Harzog*, 42 F.3d 1013 (9th Cir. 1995) (acknowledging that a professional malpractice action may be brought against a lawyer based on the breach of the duty of confidentiality).

[440] *Upjohn v. United States,* 449 U.S. 383, 389 (1981) ("Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.").

[441] *Upjohn*, 449 U.S. at 389; *Fisher v. United States,* 425 U.S. 391, 403 (1976) ("As a practical matter, if the client knows that damaging information could more readily be obtained from the attorney

But it is the Sixth Amendment that controls the inquiry and the remedy. Extant Tenth Circuit law—*Shillinger v. Haworth*—placed the government on full notice that an intentional intrusion into attorney-client communications, unjustified by legitimate law enforcement interest, violated the Sixth Amendment, without showing prejudice.[442]

> [E]ven in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection.[443]

The Sixth Amendment confers the "right of an accused, confined in jail or other place of detention pending a trial of the charge against him, to have an opportunity to consult freely with his counsel without any third person, whose presence is objectionable to the accused, being present to hear what passes between the accused and his counsel"; it is "one of the fundamental rights guaranteed by the American criminal law—a right that no Legislature or court can ignore or violate."[444]

---

following disclosure than from himself in the absence of disclosure, the client would be reluctant to confide in his lawyer and it would be difficult to obtain fully informed legal advice.").

[442] 70 F.3d 1132, 1142 (10th Cir. 1995).

[443] *Lanza v. State of N.Y.*, 370 U.S. 139, 143-44 (1962); Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* 2 (3d ed. 1997) ("An independent judiciary and a sacrosanct confidential relationship between lawyer and client are the bastions of an ordered liberty.").

[444] *Ex parte Rider,* 195 P. 565 (Cal. 1920) ("In this state the Legislature has expressly provided that a prisoner in jail may be visited by his counsel, and that any officer having charge of the prisoner who willfully refuses or neglects to allow the attorney to visit the prisoner is guilty of a misdemeanor. Pen. Code, § 825."). Kansas has no comparable law.

102

Persons detained at CCA-Leavenworth have either been charged with or convicted of a federal offense, and are held pending critical proceedings in their cases, whether trial, sentencing, revocation, or appeal. The Sixth Amendment right to effective assistance of counsel has attached.[445] Through the right to counsel, the accused has the ready means to exercise other constitutional rights, such as access to the courts or to file an appeal.[446]

"It is well established that an accused does not enjoy the effective aid of counsel if he is denied the right of private consultation with him."[447] This right is reflected in federal statutory law.[448] 18 USC § 3142(h)(i)(3) requires that, "A detention order . . . shall . . . direct that the person be afforded reasonable opportunity for private consultation with counsel." Federal Rule of Criminal Procedure 5(d)(2) requires the "judge to allow the defendant reasonable opportunity to consult with counsel."

---

[445] *Jae Lee v. United States,* 137 S.Ct. 1958, 1964 (2017) (Sixth Amendment guarantees effective assistance of counsel at critical stages of a criminal proceeding, including when defendant enters a guilty plea); *Kirby v. Illinois*, 406 U.S. 682, 688, 690 (1972); *Brewer v. Williams,* 430 U.S. 387, 398 (1977) (Sixth Amendment counsel rights attach when "judicial proceedings have been initiated . . . 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment'"); *Evitts v. Lucey,* 469 U.S. 387 (1985) (right to effective counsel on appeal).

[446] *Cf. Bounds v. Smith,* 430 U.S. 817, 821 (1977); *Garza v. Idaho,* − U.S. −, 2019 WL 938523 at * 2-3 (counsel ineffective for failing to file notice of appeal on behalf of client, even when there was an appellate waiver provision; prejudice was presumed).

[447] *Coplon v. United States*, 191 F.2d 749, 757 (D.D.C. 1951) ("The sanctity of the constitutional right of an accused privately to consult with counsel is generally recognized and zealously enforced by state as well as federal courts.").

[448] 18 USC § 3006A requires that the court provide adequate representation for persons charged with crimes and a plethora of other circumstances, including probation or supervised release revocations, material witnesses, or when threatened with a loss of liberty.

The opportunity to meet with counsel, in person, with confidence that the communication is confidential,[449] is necessary to the Sixth Amendment right to effective assistance of counsel. Because CCA-Leavenworth is a remote holding facility about an hour's drive time from either Topeka or Kansas City, Kansas, access to confidential legal calls with counsel is critical, as immediate or regular in-person meetings are not always possible.[450]

## 2. Video-recorded attorney-client meetings contained constitutionally protected confidential attorney-client communications.

The Sixth Amendment protected the in-person attorney-client meetings at CCA. The video-only recordings of attorney-client in-person meetings at CCA were constitutionally protected communication, even if there was no audio recording. The Court has concluded that verbal and non-verbal communication "falls within the ambit of privileged, confidential attorney-client communications."[451] As a matter of fact and law, "Non-aural communication is still communication, and that communication can be valuable to the observer."[452]

---

[449] Exh. 490, *Dertinger* tr. 6/21/17 at 230:14-22 (Brannon testimony: "We had been in those rooms with those cameras many times. I had assured clients that they were only for monitoring purposes and not for recording purposes. So the idea that they were recording, much less the idea that they would be made available to the prosecution, just seemed beyond the pale . . .").

[450] *Mann v. Reynolds,* 828 F. Supp. at 906 ("meaningful access to the courts, in a remote location like OSP, requires confidential telephone communication").

[451] D.E. 253 at 12, Phase III Order.

[452] *Id.*

"Certain actions, such as nods of the head, are obviously communications. The same is true of actions such as the client's rolling up his sleeve to reveal a scar, opening her desk drawer to show a hidden revolver, or pointing to identify a person or a figure in a ledger book. Where such actions convey facts which would not otherwise have been apparent to the lawyer and where they were intended as confidential communications to the attorney, they fall within the privilege."[453]

The law has long recognized recognize the value of non-verbal communication. A police officer's physical gesture to get out of the car can communicate to a reasonable person that they are not free to drive away, thus constituting a seizure under the Fourth Amendment.[454] Consider law enforcement's heavy reliance on furtive movements to justify search or even arrest.[455] Interrogation techniques rely on demeanor and body language. "[N]on-verbal conduct contains a testimonial component whenever the conduct reflects the actor's communication of his thoughts

---

[453] David M. Greenwald, Robert R. Stauffer, and Erin R. Schrantz, *Testimonial Privileges,* §1.17 (2017-2018 Ed.). Also, at § 1.12 ("Privileged communications include any expression undertaken to convey information in confidence for the purpose of seeking or rendering legal advice. . . .Privileged communications encompass not only verbal communications, but . . . even non-verbal communications, such as a facial expression or nod of affirmance.").

[454] *United States v. Gaines,* −F.3d−, 2019 WL 1120405 (10th Cir. March 12, 2019); see *Santos v. Frederick Cty. Bd. of Comm'rs,* 725 F.3d 451, 462 (4th Cir. 2013) (holding that two deputy sheriffs' gestures to stay seated constituted a seizure).

[455] *United States v. Bong,* 596 Fed. Appx. 607, 612 (10th Cir. 2014) (evasive body positioning relevant to reasonable suspicion); *DeJear,* 552 F.3d 1196, 1201 (10th Cir. 2009) (furtive movements and apparent nervousness factor into reasonable suspicion analysis); *United States v. Holmes,* 487 F. Supp. 2d 1206, 1215 (D. Kan. 2007) (furtive gestures justified handcuffing defendant).

105

to another."[456] A "nod or head-shake is as much a 'testimonial' or 'communicative' act in this sense as are spoken words."[457] Federal Rule of Evidence 801 allows that "non-verbal conduct" can be a statement, if intended as an assertion, subject to the rules governing hearsay.[458] Non-verbal conduct can, when "considered with other factors, constitute voluntary consent to search."[459] The government relies on non-verbal communication to beat back *Batson* objections.[460] Appellate courts often defer to the trial court because in-person observation may capture more than the transcribed written word. For example,

> A contempt holding depends in a very special way on the setting, and such elusive factors as the tone of voice, the facial expressions, and the physical gestures of the contemnor; these cannot be dealt with except on full ventilation of the facts. Those present often have a totally different impression of the events from what would appear even in a faithful transcript of the record.[461]

---

[456] *Pennsylvania v. Muniz*, 496 U.S. 582, 595 & n.9 (1990).

[457] *Schmerber v. California,* 384 U.S. 757, 761 n.5 (1966).

[458] Fed. R. Evid. 801(a).

[459] *United States v. Gordon,* 173 F.3d 761, 765-66 (10th Cir. 1999) (when police encountered a locked bag and asked, "Can you open that?", defendant "reached into his pocket voluntarily" to provide the key; this was consent to search); *United States v. Jones*, 701 F.3d 1300, 1321 (10th Cir. 2012) (in response to an officer's request to search home, Jones's "actions here—though non-verbal—could have been reasonably interpreted" as consent: leading police to the backdoor, unlocking the door, and gesturing with his hand for them to look inside; *United States v. Livingston,* 429 Fed. Appx. 751, 754 (10th Cir. 2011) ( "Ms. Adams's "non-verbal conduct" in pointing to the closet and stepping out of the bedroom constituted a voluntary consent to search.").

[460] *Thaler v. Haynes*, 559 U.S. 43, 44 (2010) (prosecutor argued, in part, that black venire-person's "body language" belied "her true feeling" about the death penalty; remanded).

[461] *In re Little*, 404 U.S. 553, 556 (1972).

Non-verbal communication is also scientifically recognized.[462] "Kinesics refers to the interpretation of visual body movements, or what is commonly referred to as 'body language,' such as facial expressions, hand gestures, and other body movements. These studies indicate that sixty to ninety-three percent of the communicative message is composed of nonverbal information."[463]

The value of knowing a defendant is angry, or left-handed, or reviewing certain documents, or speaking to counsel absent an interpreter, or refusing to view discovery—perhaps none of that is apparent to a court or outside viewer, but it can grant a tactical advantage to a shrewd prosecutor, such as in *Reulet*. Or it can have more concrete, obvious meaning, as the prosecution's theory that a document exchange between attorney Rokusek and client Dertinger would be reflected on the video recording.[464] The ample evidence provided by the testimony of Professor Peter Joy and attorney Richard Ney support this conclusion that non-aural communication is meaningful. The Court also credits the testimony of Rokusek and

---

[462] Formal research into kinesics, or body language, began with Ray Birdwhistall's 1952 book, *Introduction to Kinesics*.

[463] Comment, Keith A. Gorgos, *Lost in Transcription: Why the Video Record is Actually Verbatim, 57 Buff. L. Rev.* 1057, 1061 (May 2009).

[464] Tr. 8/9/16 at 34:12-8 & 35:3-8 (Rokusek testimony); Tr. 9/7/16 at 13:19-14:3 (Tomasic explaining that she remembered there was video recording of the attorney-client rooms when trying to determine whether Rokusek passed information to Dertinger); Tr. 6/20/17.

Bussell regarding the quality of the video, which the Court confirmed with its own observations.[465]

The weight of the evidence, including Ney, Joy, the defense attorneys, and the Special Master's First Report Regarding Video Recordings,[466] favors the conclusion that each video of a documented attorney-client meeting[467] contained protected attorney-client communication. Two other reasons favor this determination: first, the videos are not available to the parties, and extraction of individual recordings for review would be resource-intensive, expensive, and given the subjective value of the content, of limited value to this Court's evaluation. And second, the defendants should not be required to expose their attorney-client communications to review to prevail on this point.

**3. The audio recordings of attorney-client phone calls contained constitutionally protected confidential attorney-client communications.**

The Sixth Amendment protected phone calls between attorneys and clients housed at CCA. Attorney-client phone calls from this remote holding facility were necessary to ensure adequate representation. The content of the phone calls was constitutionally protected communication because the purpose of the phone calls was to discuss matters pertaining to legal representation. CCA routinely recorded

---

[465] *Dertinger* tr. 6/20/17 at 43:8-44:10; *see id.* at 26:1-19 (Bussell description of video clarity, and noting there is enhancing software).

[466] D.E. 193 ("Hundreds of Attorney-Inmate Meetings were Recorded"; "every attorney-inmate meeting listed on the attorney visitor log that took place in an attorney room that held a video camera was, in fact, recorded").

[467] D.E. 193 and Exh. 585 (verified by cross comparison with CCA calendars and visitation logs).

constitutionally protected attorney-client calls, even when it was contractually obligated not to or when counsel had followed CCA protocol to privatize attorney phone numbers. CCA's provision of a "legal call" from a CCA employee office was not confidential, as a CCA employee remained in the room during the call.

## 4. Alternatively, CCA was an agent of the prosecution and its purposeful and surreptitious recording of confidential attorney-client communications violated the Sixth Amendment.

Defendants were housed at CCA under a contract with the U.S. Marshals Service. CCA was an agent of the USMS and of the USAO when it recorded attorney-client communications. CCA considered the recordings the property of the U.S. Marshal;[468] the USMS is undeniably an arm of the USAO.[469] The communication and cooperation among CCA, the USMS, and the USAO established that CCA served as a law enforcement agent of the federal prosecution, and that the recordings procured by the USAO were predominantly for investigative purposes related to the criminal prosecution.[470]

Agents of the government are "instrumentalities of the State and subject to its constitutional limitations."[471] A group or individual is an agent of the government

---

[468] Exh. 490, tr. 8/9/16 at 55:17-12 (CCA employee Michelle Jensen-Schubert testified that "because we have a contract with the marshals" the records are "their property.").

[469] U.S. Attorney General, Department of Justice, Organizational Chart, https://www.justice.gov/agencies/chart#USAtt (last visited March 20, 2019).

[470] *Smith v. Sec'y Dept. Corrections,* 50 F.3d 801, 824 (10th Cir. 1995) (in analogous context of *Brady,* the prosecution "encompasses not only the individual prosecutor handling the case, but also extends to the prosecutor's entire office []as well as law enforcement personnel and other arms of the state involved in investigative aspects of a particular criminal venture.").

[471] *Evans v. Newton*, 382 U.S. 296, 299 (1966).

when they are "endowed by the State with powers or functions governmental in nature."[472] Under Tenth Circuit law, CCA was endowed with such powers or functions under its contract with the USMS as it was gathering and providing evidence for the government's use.[473] Because CCA was an agent of the prosecution, CCA's intentional and knowing recording of attorney-client communications for a purpose other than security and safety was a Sixth Amendment violation under *Shillinger v. Haworth,* as explained below.

## 5. The USAO purposefully collected and saved attorney-client communications, both audio and video, violating the Sixth Amendment.

A "prosecutor's intentional intrusion into the attorney-client relationship constitutes a direct interference with the Sixth Amendment rights of a defendant, and because a fair adversary proceeding is a fundamental right secured by the Sixth and Fourteenth Amendments, we believe that absent a countervailing state interest, such an intrusion must constitute a per se violation of the Sixth Amendment."[474] When the government purposefully intrudes into the attorney-client relationship to become "privy to confidential communications," absent a

---

[472] *Id.*

[473] *United States v. Ackerman,* 831 F.3d 1292, 1294 (10th Cir. 2016) (considering factors that determine whether entity is a government agent or actor, and therefore subject to Constitutional restraints); *accord United States v. Souza,* 223 F.3d 1197, 1202 (10th Cir. 2000).

[474] *Shillinger v. Haworth,* 70 F.3d 1132 (10th Cir. 1995); D.E. 253 at 10 & n. 16, Phase III Order quoting *Shillinger;* David M. Greenwald, et. al., Testimonial Privileges, § 1.1 Rationale for the Privilege, n. 18 ("In the Tenth Circuit, prejudice may be presumed if the intrusion into the attorney-client relationship was purposeful and without legitimate justification.") (citing *Shillinger*).

110

legitimate justification, the Tenth Circuit presumes prejudice.[475] The Court offered

two rationales: first, "no other standard can adequately deter this sort of

misconduct;" and second, "a case-by-case inquiry is not worth the cost."[476]

Long before *Shillinger*, other courts deemed prejudice irrelevant:

> [T]he interception of supposedly private telephone consultations
> between accused and counsel, before and during trial, denies the
> accused his constitutional right to effective assistance of counsel, under
> the Fifth and Sixth Amendments. And the denial invalidates the trial
> at which it occurred and requires a verdict of guilty therein to be set
> aside, *regardless of whether prejudice was shown to have resulted from
> the denial*.[477]

Under Tenth Circuit law, the government's purposeful intrusion into

confidential attorney-client communications violates the Sixth Amendment, with no

affirmative showing of prejudice.

---

[475] Greenwald, at § 1.1 (comparing other Circuit requirements for a Sixth Amendment violation).

[476] *Shillinger*, 70 F.3d at 1142.

[477] *Orman*, 417 F.2d at 1134, quoting *Caldwell v. United States*, 205 F.2d 879, 882 (D.C. 1953), where a government agent intercepted phone calls between defendant and counsel (emphasis added); *Coplon v. United States,* 191 F.2d at 759 ("We think it is further true that the right to have the assistance of counsel is so fundamental and absolute that its denial invalidates the trial at which it occurred and requires a verdict of guilty therein to be set aside, regardless of whether prejudice was shown to have resulted from the denial."); *United States v. Levy,* 577 F.2d 200 (3d Cir. 1978) (co-defendant acting as government agent disclosed defense strategy to the government; the appellate court "Where there is a knowing invasion of the attorney-client relationship and where confidential information is disclosed to the government, we think that there are overwhelming considerations militating against a standard which tests the sixth amendment violation by weighing how prejudicial to the defense the disclosure is.").

Prejudice is difficult to price, as the *Shillinger* Court acknowledged.[478] Evidence of individual prejudice will often be, as it is here, out of reach for most defendants, as it rests, or rested, within the exclusive control of the prosecution. Value is in the mind of the viewer or listener, and not necessarily apparent in hindsight:

> In cases where wrongful intrusion results in the prosecution obtaining the defendant's trial strategy, the question of prejudice is more subtle. In such cases, it will often be unclear whether, and how, the prosecution's improperly obtained information about the defendant's trial strategy may have been used, and whether there was prejudice. More important, in such cases the government and the defendant will have unequal access to knowledge. ***The prosecution team knows what it did and why. The defendant can only guess.***[479]

The same problem is posed for a reviewing court: "The prosecution makes a host of discretionary and judgmental decisions in preparing its case. It would be virtually impossible for an appellant or a court to sort out how any particular piece of information in the possession of the prosecution was consciously or subconsciously factored into each of those decisions."[480] This is especially true when

---

[478] *Shillinger,* 70 F.3d at 112.

[479] *United States v. Danielson*, 325 F.3d 1054, 1070 (9th Cir. 2003) ("The government's interference with Danielson's attorney-client relationship was neither accidental nor unavoidable, but was rather the result of deliberate and affirmative acts. We therefore hold that if there was prejudice there was a violation of the Sixth Amendment under *Weatherford v. Bursey*.").

[480] *Danielson*, 325 F.3d at 1071, *quoting Briggs v. Goodwin,* 698 F. 2d 486, 494-95 (D.C.C. 1983), opinion vacated on other grounds, 712 F.2d 1444 (D.D.C. 1983) (U.S. Attorney who gave false sworn testimony in grand jury proceedings enjoyed absolute immunity).

the court must rely on the USAO for a truthful explanation or reliable assessment.[481] It cannot be done here.

The Supreme Court has held, in other Sixth Amendment contexts, that no showing of prejudice is necessary when counsel is denied at critical phases of the proceeding.[482] "The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial."[483]

And the Supreme Court has allowed a presumption of prejudice where the government intentionally invaded confidential attorney-client communications. In *Black v. United States,* 385 U.S. 26 (1966) (per curium),[484] the Court found a Sixth Amendment violation when the FBI overheard attorney-client conversations, even though the prosecutor was unaware. And citing *Black,* the Court in *O'Brien*

---

[481] The problem here is analogous to that in *Kastigar v. United States,* 406 U.S. 441, 469 (1972) as Justice Marshall explained in his dissent: "For the information relevant to the question of taint is *uniquely within the knowledge of the prosecuting authorities.* They alone are in a position to trace the chains of information and investigation that lead to the evidence to be used in a criminal prosecution. . . .").

[482] *Garza v. Idaho,* – U.S.–, 2019 WL 938523 at * 3 (February 27, 2019) ("In certain Sixth Amendment contexts, however, prejudice is presumed. For example, no showing of prejudice is necessary if the accused is denied counsel at a critical stage of his trial, or left entirely without the assistance of counsel on appeal. Similarly, prejudice is presumed if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing. And, most relevant here, prejudice is presumed when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken. We hold today that this final presumption applies even when the defendant has signed an appeal waiver.") (internal citations and markings omitted).

[483] *Holloway v. Arkansas*, 435 U.S. 475, 488 (1978).

[484] *Black v. United States*, 385 U.S. 26, 30-31 (1966) (accused's hotel room was monitored during grand jury investigation).

113

reversed a conviction when the FBI overheard one attorney-client conversation about bail, but had not relayed that to the prosecutor.[485] "It is certainly true that where there is gross misconduct on the part of the Government, no prejudice need be shown."[486]

Two Supreme Court cases, *Weatherford v. Bursey*[487] and *Morrison v. United States,* were decided before *Shillinger.* The government has argued that these cases require prejudice to find a Sixth Amendment violations. They do not.

First, *Shillinger* rejected this same argument. With a detailed analysis and distinction of *Weatherford,*[488] the Tenth Circuit concluded, "[a]lthough the Court held that the Fourth Circuit's 'per se right-to-counsel rule' was more restrictive than necessary to vindicate the Sixth Amendment interests at stake, the Court also explained that under some circumstances a prosecutor's intrusion may violate the Sixth Amendment, although such circumstances were not present in *Weatherford*'s case." The key in *Bursey* was "the absence of purposefulness in the prosecutor's

---

[485] *O'Brien v. United States,* 386 U.S. 345, 346-47 (1967).

[486] *South Dakota v. Long,* 465 F.2d 65, 72 (8th Cir. 1972), citing *Black v. United States,* 385 U.S. 26 (1966) and *O'Brien v. United States,* 386 U.S. 345 (1967) as cases with "surreptitious invasion of the grossest kind by the government into attorney-client comminutions). D.E. 289, Phase III Order, at 10 & n.18 (See *Black v. United States*, 385 U.S. 26 (1966), and *O'Brien v. United States*, 386 U.S. 345 (1967) (explaining that United States has an affirmative obligation to bring to the court's attention any overhearing of attorney-client communications, whether or not the defendant demands such)).

[487] 429 U.S. 545 (1977).

[488] *Shillinger*, 70 F.3d at 1338-39.

intrusion" and the absence of legitimate law enforcement interests.[489]

"*Weatherford* may not dictate a rule that would require a showing of prejudice in cases where intentional prosecutorial intrusions lack a legitimate purpose."[490]

Simply put, there was no purposeful intrusion in *Weatherford*.[491]

Likewise, *Shillinger* explained that *Morrison v. United States*[492] "left open the question of whether intentional and unjustified intrusions upon the attorney-client relationship may violate the Sixth Amendment even absent proof of prejudice."[493] *Morrison* never reached the prejudice question, "holding only that even if the defendant's Sixth Amendment rights were violated, dismissal of the indictment was an inappropriate remedy in that case."[494]

Here, *Shillinger* compels the conclusion that the Sixth Amendment was violated when the government purposefully invaded the attorney-client relationship by collecting and saving recordings that it knew would, or were likely to, include attorney-client communications. The USAO knew it would obtain video recordings

---

[489] *Id.*

[490] *Shillinger*, at 1140.

[491] *Weatherford*, 429 U.S. at 558 ("There being no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion by Weatherford, there was no violation of the Sixth Amendment insofar as it is applicable to the States by virtue of the Fourteenth Amendment.").

[492] 449 U.S. 361, 364 (1980).

[493] *Shillinger*, 70 F.3d at 1140.

[494] *Id.*

of attorney-client communications as a result of the grand jury subpoena. Its failure

to target or limit its collection is powerful evidence of purpose.

Similarly, the USAO systematic collection of all recorded telephone calls, with no

exception for attorney-client calls or any other precautionary measures, was a

purposeful and massive invasion of attorney-client communications. The USAO

either knew that attorney-client calls would be captured by the general request, or

knew that it was likely. Setting aside other factors, there was a 27 percent

likelihood that the USAO would obtain attorney-client calls when it made a general

request for the recorded calls of a detainee.[495] Purposefully collecting and saving

recordings was beneficial to the prosecution, if not immediately so, then

prospectively, as it could dial up whatever recording was needed, as long as it was

retained in USAO custody. Its purpose in both collecting and saving recordings was

to further its prosecutorial goals—to investigate and collect evidence to prepare for

litigation in individual cases indicted in the District of Kansas. Here, the

government's repeated intrusions were purposeful, systematic, and surreptitious.[496]

---

[495] Exh. 562.

[496] *See, e.g., State v. Quattlebaum*, 527 S.E.2d 105, 109 (S.C. 2000) ("*Weatherford* is inapplicable to the case *sub judice,* where a member of the prosecution team intentionally eavesdropped on a confidential defense conversation;" "a defendant must show ***either*** deliberate prosecutorial misconduct ***or*** prejudice to make out a violation of the Sixth Amendment, but not both. Deliberate prosecutorial misconduct raises an irrebuttable presumption of prejudice.").

Turning to *Shillinger*'s second prong, the government never proposed a legitimate justification for its mass collection of attorney-client communications.[497] A select video of certain activity, such as that described by DUSMS Matt Cahill, could serve a legitimate law enforcement purpose.[498] Likewise, the law recognizes a crime-fraud exception to justify review of some attorney-client communications. But the occasional specific law-enforcement purpose does not justify the USAO's large-scale non-specific collection here.

*Shillinger,* faithfully applied, requires a conclusion that the Sixth Amendment was violated. There is no reason to "bend the presumption-of-prejudice rule" here.[499] *Shillinger* provides a clear line that makes confidentiality meaningful:

> [I]f the purpose of the privilege is to be served, the participants in the confidential conversation must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all.[500]

The Third Circuit offered a similar view in *United States v. Levy*:

> The purpose of the attorney-client privilege is inextricably linked to the very integrity and accuracy of the fact finding process itself. Even

---

[497] The Court acknowledges that CCA recorded communications for institutional security and order.

[498] Exh. 490 at 120:8-11 (viewing select video for specific illegal conduct; although not attorney-client communication, it shows how a circumscribed selection of video could be justified).

[499] *Compare Garza v. Idaho*, 2019 WL 938523 at *3.

[500] *Jaffee v. Redmond*, 518 U.S. 1, 17-18 (1996) (internal marking omitted) ("the purpose of the attorney-client privilege is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.").

guilty individuals are entitled to be advised of strategies for their defense. In order for the adversary system to function properly, any advice received as a result of a defendant's disclosure to counsel must be insulated from the government. No severe definition of prejudice, such as the fruit-of-the-poisonous-tree evidentiary test in the fourth amendment area, could accommodate the broader sixth amendment policies. **We think that the inquiry into prejudice must stop at the point where attorney-client confidences are actually disclosed to the government enforcement agencies responsible for investigating and prosecuting the case**. Any other rule would disturb the balance implicit in the adversary system and thus would jeopardize the very process by which guilt and innocence are determined in our society.[501]

As Justice Marshall observed, "[a] rule that offers defendants relief only when they can prove 'intent' or 'disclosure' is, I fear, little better than no rule at all."[502]

There are other reasons, beyond *Shillinger*, that compel a presumption of prejudice. *Weatherford,* which involved an informer attending an attorney-client meeting, offers one such reason: "a fear that some third party may turn out to be a government agent will inhibit attorney-client communication to a lesser degree than the fear that the government is monitoring those communications through electronic eavesdropping."[503] A third party can simply be excluded as a protective measure. The latter—recording by electronics that were not discernible to the

---

[501] *United States v. Levy*, 577 F.2d 200, 209 (3d Cir. 1978) (emphasis added); *Shillinger,* 70 F.3d at 1140 (citing *Levy).*

[502] *Weatherford v. Bursey*, 429 U.S. 545, 565 (1977) (Marshall, J., dissenting, joined by Brennen, J.).

[503] *Weatherford*, 429 U.S. at 554 & n 4.

118

parties—is more likely to inhibit "free exchanges between defendant and counsel."[504]

The scenario contemplated in *Weatherford*—using attorney-client communications against the defendant at trial—is not all the Sixth Amendment prohibits. For instance, the USAO's move to disqualify Jackie Rokusek—the third such attempt—was an attempt to remove a smart, experienced, and aggressive defense lawyer from her client. And in *Reulet*, the USAO's review and reliance on attorney-client phone calls was used to induce a plea agreement, rather than garner evidence to use at trial. Other defendants were preparing for release hearings, like in *Wood,* or sentencing, as in *Ash,* or most likely, just trying to evaluate the evidence or negotiate a plea to even decide whether to go to trial. *Weatherford's* trial context is simply too restrictive to remedy this widespread invasion of privilege.

The government's conduct in this investigation also justifies a finding of per se prejudice. This Court found that "*Weatherford* illustrates the weakness in the government's argument,"[505] given the "environment of many unknowns" in this case.[506] Today, those "unknowns" remain largely unknown for this reason—much of the evidence of prejudice is subjective and in the sole control of the government.

---

[504] *Weatherford*, 429 U.S. at 554 n.4.

[505] D.E.253 Phase III Order at 15 & n. 27. ("in *Weatherford* there was no evidence that the informant, who was present during two attorney-client meetings, had conveyed information about defense strategy to the government.").

[506] *Id.* at n. 27; *Weatherford*, at 552-57 ("(1) whether the government purposely intruded

When this Court ordered the government to either produce evidence relevant to attorney-client communications, or to create a privilege log to document non-production, the government refused to do so. Moreover, the government failed to preserve evidence with either a litigation hold or timely directives to identify and produce relevant information. And the government destroyed the primary source of evidence that could have confirmed or discounted whether anyone in the USAO ever viewed the 700 video recordings of attorney-client meetings.[507] For these reasons, in this case, presumed prejudice is appropriate.

*Reulet* provides the prime example. There, the AUSA reviewed attorney-client calls and used that information to negotiate the case. That evidence, which was in the sole control of the USAO, was not revealed while litigating the issue in *Reulet* before Judge Crabtree; there the AUSA denied any misconduct. But then the AUSA retired, and in *Black* her notes were finally revealed.[508] The government also used calls to its benefit, or attempted benefit, in *Huff* and *Herrera-Zamora*. As in *Reulet,*

---

into the attorney-client relationship; (2) whether any evidence offered at trial was obtained directly or indirectly from the intrusion; (3) whether the prosecutor obtained any details of the defendant's trial preparation or defense strategy; and (4) whether overheard conversations had been used in any other way to the substantial detriment of the defendant.").

[507] D.E. 253 at 12, Phase III Order ("There is also a troubling development that may constitute either an intentional or an inadvertent spoliation of evidence concerning the video recordings.").

[508] The retired AUSA was not in the office to review her own material before a rather unorganized and late production; the same was true for Tomasic, whose unredacted material also proved insightful. In contrast, other AUSAs were permitted to review their own material and identify what should be disclosed, and there was a strong incentive to withhold evidence of knowledge or review of attorney-client communications.

those calls were not revealed in the course of litigation in those cases—the government insistently denied access, review, or reliance, at least until forced to file a belated Notice of Correction.[509]

The USAO's self-interested and persistent denials have lacked credibility, as in the debate surrounding whether Flannigan and Tomasic threatened Rokusek with review of her attorney-client video recordings. The Court should find Rokusek credible, and reject the accounts proffered by Tomasic, Flannigan, and Stokes.[510] As the Court observed in May of 2017:

> the government has demonstrated a lack of transparency to the Court and counsel about its possession, knowledge and use of video recordings. The government has made inconsistent, inaccurate or misleading statements to the Court about the video recordings.[511]

The Court's concern expressed in the Phase III Order has been heightened, not dispelled, by the government's conduct in the last two years.[512] For these reasons, in accordance with *Shillinger*, prejudice should be presumed.

---

[509] Exh. 480.

[510] D.E. 253 at 12 (""Based on the evidence gathered to date, there is evidence suggesting that the government procured, viewed and used video recordings of an attorney-client meeting of at least one CCA inmate, Richard Dertinger.").

[511] D.E. 253 at 12, Phase III Order.

[512] D.E. 253 at 11, Phase III Order ("The government's denials that it listened to any attorney-client phone calls does not obviate the need for a Phase III investigation into their conduct. To be sure, with respect to the audio recordings, the *government's conduct has encouraged such suspicion.* Before the Special Master was appointed, *the government was not forthcoming* about how it procured all of the audio recordings . . . . And, *the government's litigating posture*, as well as its past practices in obtaining jail calls, has *fueled other defendants' suspicion* that the government has listened to their audio recordings as well.").

### 6. Alternatively, the Court should adversely infer that the government reviewed and relied on every attorney-client communication in its possession.

If, however, prejudice were required, this government's conduct in false denials, evidence destruction, and defiance of this Court's production orders would compel this Court to adversely infer that the government reviewed and relied on every attorney-client communication in its possession, to its tactical advantage and the defense's detriment.

The Rule 41(g) motion is a civil motion.[513] Federal Rule of Civil Procedure 37(b)(2) allows the court to impose sanctions on a party that fails to obey an order to provide discovery:

> **(A)** *For Not Obeying a Discovery Order*. If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:

---

[513] D.E. 706 at 17-19 ("Rule 41(g) proceedings are civil in nature, not criminal. *In re Special Grand Jury 89-2*, 450 F.3d 1159, 1167 (10th Cir. 2006) ("[W]e agreed with every other circuit that had ruled on the issue in holding that a motion for return of property under Fed.R.Crim.P. 41(g) is civil rather than criminal. Such proceedings are essentially civil because they 'represent a means by which a criminal defendant can determine her rights in property, and not a part of the trial and punishment process that is criminal law.'"); *United States v. Madden*, 95 F.3d 38, 39 (10th Cir. 1996) ("proceedings surrounding the motion for return of property seized in a criminal case are civil in nature."); *United States v. Maez*, 915 F.2d 1466, 1468 (10th Cir. 1990) (same); *United States v. Clark*, 84 F.3d 378, 381 (10th Cir. 1996) ("a district court should treat a rule 41(e) [now amended as 41(g)] motion as a civil complaint").

**(i)** directing that the matters embraced in the order or other designated **facts be taken as established** for purposes of the action, as the prevailing party claims;

**(ii)** prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

. . . .

**(v) dismissing** the action or proceeding in whole or in part; [or]

**(vi)** rendering a default judgment against the disobedient party[.][514]

"The administration of the rules lies necessarily within the province of the trial court with power to fashion such orders as may be deemed proper to vouchsafe full discovery for the just, speedy and inexpensive determination of the lawsuit."[515]

This Court ordered an investigation into the "government's knowledge and intent, the government's procurement of the recordings, and whether the government listened to, watched, or otherwise used the audio and video recordings of attorney-client communications."[516] Echoing the earlier orders to cooperate, the Court again required "'All Relevant Parties' to provide the Special Master with Access to Information."[517]

---

[514] (In relevant part; emphasis added).

[515] *Robinson v. Transamerica Ins. Co.*, 368 F.2d 37, 39 (10th Cir. 1966).

[516] D.E. 253 at 43-44.

[517] D.E. 253 at 47.

123

The government resisted and misled that investigation, as documented in the Special Master's October 20, 2107 Report.[518] By June 5, 2017, the USAO had not produced any documents.

For the first time, on June 30, 2017, the Special Master learned that the USAO had stalled production and cooperation waiting on an internal ruling from DOJ.[519] Then, on September 12, 2017, Clymer sent a letter "respectfully declin[ing] to provide most of the information and documents sought . . . ."[520]

The Court laid out the course of events at the August 1, 2018 hearing:

> Once you entered, they opposed the Phase III order, they opposed the evidentiary hearing, they filed a petition for writ of mandamus to stop the hearing. The Tenth Circuit did not stop the hearing, they sent it back. We proceeded to the hearing.
>
> You on behalf of the Department of Justice then engaged in a strategy of invoking in my view blanket Touhy objections. And for the most part, the witnesses answered almost nothing at the hearing. All under the control and auspices I suppose of the Dept of Justice, represented by you.[521]

The record is heavy with other instances of government failure to honor the Court's order. Much of the October hearing was spent trying to sort out the late

---

[518] D.E. 298; Exh. 481.

[519] D.E. 298 at 4.

[520] D.E. 298 at 7.

[521] Tr. 8/1/18 at 12:10-20.

document dumps, that, despite their volume, remained incomplete and without provenance.[522] The most recent is the failure to produce material ordered by this Court, filing a misplaced and ill-considered motion to reconsider, and then *still* failing to produce what the Court ordered.

Perhaps must damning, however, is the USAO intransigent refusal to create a privilege log.

## 7. The knowledge of individual AUSAs regarding the collection of attorney-client communications should be imputed to the entire office.

Individual AUSAs knew that they could obtain recorded attorney-client calls when requesting CCA calls without any exception or other precautionary measure, and they routinely did so. They showed no due diligence in investigating when, how, or why attorney-client calls were recorded, and thus were, at the least, reckless in collecting calls. When a USAO member obtained attorney-client calls the first time, he or she was on notice that the procedure was likely to capture confidential attorney-client communications. Tomasic, Treadway, Oakley, Wamble, Krug, Hunt, Rask, Zabel, Morehead—all had individual experience obtaining attorney-client calls. It was a common topic of debate and discussion within the KCK office.

---

[522] Tr. 11/16/18 at 2795:16-19 (The Court: "We can't tell where some of these documents came from. We can't tell, you know, that AUSA Zabel produced 10,000 pages or two pages. I mean, it's completely hidden and not transparent."); *id.* at 2799:3-12 ("And, frankly, that rolling discovery that you all did was a document dump. There's no other way to characterize it. Literally there were things coming into the Special Master and the FPD two days before that hearing was over. And I need to hear from them, are they done with that document review. But what I'm telling you is, even if you're done with that document review, I'm not satisfied that all the documents have been produced because you haven't gone through the appropriate steps.").

That actual knowledge on the part on an individual AUSA should be imputed to the other members of the USAO. Individual AUSAs denied knowledge, or claimed that it was a rare occurrence. The government cannot avoid the consequences of its Sixth Amendment violations by claiming ignorance on the part of individual prosecutors. That some individual prosecutors may have been kept in the dark about their office's intrusion into the attorney-client relationship does not lessen the impact of that intrusion or the office's responsibility for it. "The staff lawyers in a prosecutor's office have the burden of 'letting the left hand know what the right hand is doing' or has done."[523] Thus, one prosecutor's plea agreement binds any other prosecutor who appears for the government at sentencing.[524] One prosecutor's promise to a witness will be attributed to any other prosecutor who puts that witness on the stand.[525] And one prosecutor's knowledge of exculpatory evidence

[523] *Santobello v. New York*, 404 U.S. 257, 262 (1971); *accord id.*, 404 U.S. at 263 (Douglas, J., concurring) ("The staff of the prosecution is a unit and each member must be presumed to know the commitments made by any other member.").

[524] *Santobello*, 404 U.S. at 262.

[525] *Giglio v. United States*, 405 U.S. 150, 154 (1972) ("The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government."); *accord Demjanjuk v. Petrovsky*, 10 F.3d 338, 353 (6th Cir. 1993) ("the prosecution cannot escape its disclosure obligation by compartmentalizing information or failing to inform others in the office of relevant information").

will be imputed to the entire office.[526] The government cannot escape its obligations

by constructing a wall between actors within its office.[527]

## 8. The recorded preamble that played at the beginning of a CCA call did not operate as a knowing and intelligent waiver of the Sixth Amendment right to confidential communications with counsel.[528]

The FPD has previously addressed the government's waiver argument.[529] And

the Court has previously found that: (1) detainees cannot obtain unmonitored calls

unless their attorney's number is privatized;[530] (2), CCA has failed to advise

attorneys about the existence and particulars of the privatization process;[531] and

---

[526] *Smith v. Secretary of New Mexico Dept. of Corrections,* 50 F.3d 801, 824-25 (10th Cir. 1995) ("the 'prosecution' for *Brady* purposes encompasses not only the individual prosecutor handling the case, but also extends to the prosecutor's entire office . . . as well as law enforcement personnel and other arms of the state").

[527] *Id*. at 832 ("It appears that the various investigative agencies involved in this case constructed a wall separating the Bernalillo County investigation of Mr. Smith from the Torrance County investigation of Mr. Newell. But this lack of communication and coordination among arms of the state cannot be, and is not, a defense to the prosecution's failure to disclose favorable, material information to the defendant when that failure to disclose amounts to denying a criminal defendant a fair trial.").

[528] D.E. 253 at 8, Phase III Order (noting that any waiver must be done knowingly and intelligently, citing *Patterson v. Illinois*, 487 U.S. 285, 292 (1988), holding a waiver of the Sixth Amendment right to counsel valid only when it reflects an intentional relinquishment or abandonment of a known right or privilege)

[529] D.E. 130, 28-46.

[530] D.E. 253 at 17 ("Despite this language, if an inmate contacts their unit team to request an unmonitored call, CCA allows them to place the call from their counselor or unit team's office, but only in the presence of the counselor or unit team leader. In other words, their call is not private, it is monitored."); D.E. 253 at 17 ("In fact, the only way attorney-client calls are not recorded or monitored is if the inmate places the call from one of the 121 Securus pay phones installed at CCA, and all calls to that attorney's phone number have previously been designated as 'private' within the Securus system. And the only way calls are designated as private, is if the inmate's attorney has initiated the CCA phone call procedure.").

[531] D.E. 253 at 20 ("CCA's phone procedure has not been adequately communicated to inmates or their attorneys. This raises a serious question as to whether there was any knowing and intelligent

(3) the privatization process simply doesn't work; even privatized numbers are recorded.[532]

We make two additional points. First, CCA says it monitors phone calls to "preserve the security and orderly management of the institution and to protect the public" not to gather self-incriminating information to provide to the prosecution.[533] Attorneys "who gave credence to CCA's website and published policies that tout its commitment to protect Sixth Amendment rights"[534] could reasonably assume that any recordings were limited to that purpose. CCA served as a necessary party for

---

waiver of attorney-client privilege."); D.E. 253 at 17-18 ("But this procedure is inadequate for several reasons. First, the only notice or explanation of the procedure is buried in the inmate handbook, provided to inmates at the time of their admission. CCA does not inform attorneys of the procedure, yet CCA requires that the attorney initiate the procedure."); D.E. 253 at 19-20 ("Further, despite touting their policy to protect attorney-client communications, CCA does not post this phone call procedure on its website or otherwise communicate this procedure to inmates' attorneys. This surely explains the many affidavits of seasoned, experienced, highly competent counsel, who are members of the Court's selective panel of court-appointed lawyers, who aver that they were never aware of CCA's procedure for blocking calls to attorneys, and who gave credence to CCA's website and published policies that tout its commitment to protect Sixth Amendment rights.").

[532] D.E. 253 at 20 ("As troubling is the fact that the Securus system has not blocked phone calls to all numbers that attorneys have duly designated as private through the CCA phone procedure. Both anecdotal evidence and the Special Master's analysis demonstrates that the Securus system has failed to block recording of calls to all 'private' numbers."); D.E. 253 at 9 ("Moreover, even when phone numbers are input into the Securus system as 'Private' numbers, meaning numbers that should not be recorded, at times the system nonetheless records telephone calls placed to those numbers.").

[533] D.E. 243 at 16 ("The Court recognized that CCA's inmate handbook provides that "Corrections Corporation of America reserves the authority to monitor (this includes recording) conversations on any telephone located within its institutions, said monitoring to be done to preserve the security and orderly management of the institution and to protect the public" not to gather self-incriminating information to provide to the prosecution.").

[534] D.E. 253 at 20.

attorneys to speak with their clients about their cases; the fact that it monitored

phone calls for internal security does not vitiate the privilege.[535]

The Tenth Circuit employed this approach in *Shillinger v. Haworth*.[536] There,

the incarcerated defendant and his counsel used the trial courtroom to prepare Mr.

Haworth to testify. The "sheriff required that one of his deputies remain with

Haworth during these trial preparation sessions."[537] That deputy then relayed the

contents of Haworth's preparatory session to the prosecutor.[538] Under the

government's theory here, the *Shillinger* Court should have found the privilege

waived; counsel and the defendant knew a third party was in the room during

Haworth's preparatory sessions. But the panel found a Sixth Amendment violation

---

[535] *Pure Power Boot Camp v. Warrior Fitness Boot Camp*, 587 F.Supp.2d 548, 564–65 (S.D.N.Y. 2008) (emailed attorney-client communications were privileged even where client's employer accessed his email account and viewed privileged emails, given that party had a "reasonable subjective and objective belief that his communications would be kept confidential"); *Jenkins v. Bartlett*, 487 F.3d 482 (7th Cir. 2007) (presence of a police liaison officer during a meeting between a police officer and his attorney did not destroy attorney-client privilege where liaison officer was "present solely to assist the attorney in rendering legal services to the client"); *Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1098 (S.D. N.Y. 1984) (presence of nonemployee author at libel review meeting attended by representatives of studio, its attorneys, and its insurer's attorneys did not destroy privilege; author was akin to employees in Supreme Court's *Upjohn* decision whose communications are necessary to corporation's receiving informed legal advice, or alternatively was a potential joint defendant with the studio); *Miller v. Haulmark Transport Systems*, 104 F.R.D. 442, 445 (E.D. Pa. 1984) (presence of insurance agent at meeting between attorney and client did not waive privilege where agent was necessary for representation); *Kevlik v. Goldstein*, 724 F.2d 844, 849, 14 Fed. R. Evid. Serv. 1719 (1st Cir. 1984) (presence of third party does not destroy privilege as long as client intended communications to be confidential; presence of father acting in "normal and supportive parental fashion" did not destroy privilege).

[536] 70 F.3d 1132 (10th Cir. 1995).

[537] 70 F.3d at 1134.

[538] *Id*. at 1135.

and reversed instead.[539] Just like the sheriff's deputy in *Shillinger*, CCA's third

party presence in attorney-client phone calls does not waive the privilege.

Second, the government has presented no evidence to carry its heavy burden[540]

of demonstrating that detainees at CCA subjectively intended to waive their Sixth

Amendment rights by speaking on recorded lines. The "key question in determining

the existence of a privileged communication is whether the client reasonably

understood the conference to be confidential."[541] A detainee's assumption that her

conversations with counsel are confidential is objectively reasonable.[542] The

government presented no contrary evidence.

---

[539] *Id.* at 1142.

[540] *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) ("A waiver is . . . an intentional relinquishment or abandonment of a known right or privilege"); *Patterson v. Illinois*, 487 U.S. 285, 292 (1988) (internal citations and quotation marks omitted) ("In the past, this Court has held that a waiver of the Sixth Amendment right to counsel is valid only when it reflects an intentional relinquishment or abandonment of a known right or privilege. In other words, the accused must know what he is doing so that his choice is made with eyes open."); *United States v. Ary*, 518 F.3d 775 (10th Cir. 2008) (explaining that attorney-client privilege is waived when disclosure of communication is voluntary).

[541] *Kevlik v. Goldstein*, 724 F.2d 844, 849 (1st Cir. 1984); David M. Greenwald, Robert R. Stauffer and Erin R. Schrantz, 1 Testimonial Privileges § 1:75 (3d ed. 2017) ("The attorney-client privilege is personal to the client and may, in general, be waived only by the client or by the attorney acting with the client's express or implied consent."); *Hanson v. U.S. Agency for Intern. Development*, 372 F.3d 286, 64 Fed. R. Evid. Serv. 823 (4th Cir. 2004) (attorney may not unilaterally waive his client's work-product protection without the consent of his client); *Martin Marietta Materials, Inc. v. Bedford Reinforced Plastics, Inc.*, 227 F.R.D. 382, 390 (W.D. Pa. 2005) ("Generally, 'the attorney-client privilege belongs to the client.'") (listing authorities).

[542] D.E. 675, 45, 16-20 (Testimony of Christopher Joseph) ("I think that as I hear that preamble, that it means that it is possible that certain calls could, but 'subject to' means not every call. And I certainly believed that my calls would not be recorded because I had taken those steps."); *Evans v. Inmate Calling Solutions*, 2011 WL 7470336 at *15 (D. Nev. 2011) ("[I]t is objectively reasonable for confidential communication between an inmate and his attorney to remain private."); *Gennusa v. Shoar*, 879 F.Supp.2d 1337, 1347 (M.D. Fla. 2012) ("In correctional facilities, an expectation of privacy is reasonable when a lawyer and her client speak alone about privileged matters[.]"); *Lonegan v. Hasty*, 436 F.Supp.2d 419, 432 (E.D.N.Y. 2006) ("[I]n the prison setting, attorney-client

9. **The USAO's continued and intentional retention of recorded attorney-client communications without notice to the Court or counsel is a separate Sixth Amendment violation.**

Assuming, arguendo, that the USAO did not purposefully collect attorney-client communications, once it knew that it had possession and control, it kept them without notifying the court or counsel. This continued retention meant that the calls were available for review by anyone with access to the USAO files, including law enforcement; that they were available for re-dissemination to other law enforcement entities; that they were available for ongoing litigation, such as sentencing; or for future litigation, like revocation proceedings, § 2255 petitions, or *Bivens* actions. This purposeful retention of confidential attorney-client communications violated the Sixth Amendment, under *Shillinger*. And for the same reasons explained above, prejudice is presumed.

*United States v. Wood* presents a good example of this. Perhaps the AUSA was unaware when he requested the defendant's recorded CCA calls that his request would capture communications with counsel. But it did, and the AUSA became aware. Once he was aware, however, he kept the communications. He did not disclose them in discovery, did not disclose them in response to the defendant's initial motion for return of the calls, and did not disclose his possession to the Court

---

communications generally are distinguished from other kinds of communications and exempted from routine monitoring."); Danielle Burkhardt, *Read, White, and Blue: Prosecutors Reading Inmate Emails and the Attorney-Client Privilege*, 48 J. Marshall L. Rev. 1119, 1135 n.123 (2015) ("Most commonly what happens is that a client will call from a phone at the federal detention center or prison and ignore the sign that says telephone calls are monitored. He or she can certainly reasonably believe that the facility has no authority to monitor attorney-client calls. Lawyers often have the same belief.").

or counsel until defense counsel discovered independent evidence of the calls. That knowing and undisclosed possession was a separate Sixth Amendment violation. The same is true in *United States v. Uriarte,* and *United States v. Reulet.*

These are not isolated cases, as shown by the FPD empirical study, but rather indicative of the secretive pattern and practice within the USAO. The FPD filed numerous Rule 41(g) motions in pending district court cases. The Court issued a claw-back order in August 2016. The FPD filed a specific motion for the USAO to identify and return recorded attorney-client phone calls in August 2018. By January of 2019, the USAO was still in knowing possession of attorney-client phone calls; some were identified and returned in January and February 2019.[543] But it has yet to fully divest itself of all calls.[544] And because the USAO did not document or track its procurement or retention of recorded calls, it is impossible to have a full accounting. This is an ongoing, systematic Sixth Amendment violation.

---

[543] *See* Exh. 715, 715A-C.

[544] D.E. 726 (joint status report on return of attorney-client calls).

10. **The USAO violated Rule 16 disclosure requirements and this Court's standing discovery order when it purposefully obtained, and did not timely disclose, recorded attorney-client communications.**[545]

Recorded CCA calls were recorded statements of the defendant and should have been produced in discovery under Fed. R. Crim. P. 16,[546] absent notification of confidentiality or other issue. Non-disclosure also violated this district's standard pretrial order, both the current version and its predecessor required mandatory disclosure of Rule 16 material.[547]

The law placed the USAO on clear notice it had to notify counsel, if not the Court, when it came into possession of attorney-client communications.[548] Professor Peter Joy[549] explained that a prosecutor who came into possession of such

---

[545] The FPD, in its Second Supplemental Motion to Show Cause, asked, *inter alia*, "Whether, when the government knew it was in possession of attorney client communications, it complied with its obligations of disclosure under the Kansas Rules of Professional Conduct, *Brady*, and this Court's standing discovery order." D.E. 668 at 2.

[546] Fed.R.Crim.P. 16(a)(1)(B)(i) ("Defendant's Written or Recorded Statement. Upon a defendant's request, the government must disclose to the defendant, and make available for inspection, copying, or photographing, all of the following: any relevant written or recorded statement by the defendant if: •the statement is within the government's possession, custody, or control; and •the attorney for the government knows—or through due diligence could know—that the statement exists").

[547] *See, e.g.,* D.E. 60.

[548] *See* Fed. R. Civ. P. 26(5) (B): "If information produced in discovery is subject to a claim of privilege or of protection as trial-preparation material, the party making the claim may notify any party that received the information of the claim and the basis for it. *After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified*; and may promptly present the information to the court under seal for a determination of the claim. The producing party must preserve the information until the claim is resolved." (emphasis added).

[549] Exh. 448 (Joy CV).

communications would be obligated to notify the attorney who had been recorded.[550]
"[E]very lawyer, prosecutor and defense lawyer, is also an officer of the court and
has an ethical obligation to try to promote justice. And in this instance where a
Sixth Amendment right is involved and also the ethics rules, promoting justice
would mean taking those kind of actions."[551] Defense attorney Richard Ney agreed:
"To hold onto that information, to use that information in any way I think is a
violation of ethics and—certainly by a prosecutor—violates the client's Sixth
Amendment right to private consultation with his attorney."[552]

Former U.S. Attorney for the District of Kansas Randy Rathbun explained that
if an AUSA even accidentally came into possession of potentially privileged
materials, she has an affirmative duty to notify the Court and defense counsel.[553]
Former DOJ attorney Justin Gelfand rejected the premise that a prosecutor could
make a unilateral determination of waiver: "I was always trained and it was always
instilled in me at the Department within my division that one—as a prosecutor on a
case, one should not be reviewing material that is very likely, if not unambiguously,
to be privileged. And if the argument is that there's a waiver, there's certainly

---

[550] Tr. 8/9/16 at 99:1-7.

[551] Tr. 8/9/16 at 99:8-13.

[552] Tr. 8/9/16 at 66:17-25.

[553] Tr. 8/9/16 at 86:3-13.

systems whereby a court can make a ruling, whereby it can be brought to a court. Sometimes there can be an in camera review to the extent necessary."[554]

Instead, the USAO unilaterally determined waiver, without notice, and did no due diligence to determine what steps the holder took to protect the information or rectify the disclosure.[555] This allowed long-term and pervasive misconduct to remain undetected. Even if an occasional isolated call was produced in discovery,[556] it was often in the course of overwhelmingly voluminous discovery. On the rare occasion when attorney-client calls were acknowledged, they were dismissed as exceptional anomalies.[557]

---

[554] Tr. 10/10/18 at 1823:17-25.

[555] Compare F.R.E. 502(b)(distinguishing between intentional waiver or inadvertent disclosure).

[556] See *United States v. Villa-Valencia*, D. Kan. 16-cr-20008-CM.

[557] Exh. 707 (4/1/16 Krug email to defense counsel acknowledging that "[i]nadvertently, the facility captured several calls between [defendant] and [counsel's] office"; Gov't Exh. 34A (Tomasic email to Rick Johnson regarding defendant Gregory Rapp: "In the course of transmitting Rapp's jail calls, CCA inadvertently included at least three calls between you and your client . . ."; compare Exh. 606A (12 attorney-client calls were recorded).

## **Part Five: Contempt**

**11. The Court should find the United States Attorney's Office for the District of Kansas in contempt of court for refusing to cooperate and failing to preserve evidence.**

This Court ordered the government to cooperate with the Special Master's investigation:

> **All Relevant Parties shall all provide full cooperation to the Special** Master, and any staff or consultant employed by the Special Master, and observe faithfully the requirements of any orders of the Court and rulings by the Special Master. The Relevant Parties shall timely comply with rulings of the Special Master issued pursuant to this Order.[558]

But the government neither cooperated nor preserved evidence essential to the Court's investigation, as described in Part Three above.[559] The AVPC hard drive was wiped, and, as this Court has already found,[560] this one hard drive "could have provided meta data and information revelatory of when video recordings were played, perhaps by whom, and perhaps what video recordings were played. That critical evidence has been destroyed despite the Court's orders on September 7 [2016]."[561] Further, Stokes's computer was not surrendered until June of 2017, almost a year after the Court's order.

---

[558] D.E. 146 at 13 & 14; D.E. 253 at 47.

[559] *See also* D.E. 298.

[560] D.E. 253 at 40 (Memorandum and Order Directing Phase III Investigation).

[561] D.E. 253 at 40 (Memorandum and Order Directing Phase III Investigation).

The litigation hold was late, ineffective, and incomplete, and material was removed from the USAO with no accounting for the content. The government failed to timely suspend routine DOJ destruction of emails. There is simply no way to even know or catalog what was lost. The government should be held in contempt.[562]

## 12. The Court should find Department of Justice and Special Prosecutor Steven Clymer in contempt of Court for refusing to comply with this Court's orders to produce information or to create a privilege log for this Court's review.

As an arm of the Court, the Special Master issued Requests for Information[563] and subpoenas duces tecum.[564] The Court advised that there would be no further extensions beyond September 21, 2018. This is the schedule of actual production:[565]

| NAME | RECEIVED BY | DATE | SIZE |
|------|-------------|------|------|
| Carter_Doc1 | Chambers | 9/17/2018 | 7.07 GB |
| Carter_Doc2 | Chambers | 9/18/2018 | 7.09 GB |
| Carter_Doc3 | Chambers | 9/25/2018 | 7.07 GB |
| Carter_Doc4 | Chambers | 9/28/2018 | 6.20 GB |
| Carter_Doc5 | ACV | 9/30/2018 | 2.11 GB |
| Carter_Doc6 | ACV, During Hearing | 10/9/2018 | 0.32 GB |
| Carter_Doc7 | ACV, During Hearing | 10/11/2018 | 0.06 GB |

And that production was incomplete.

---

[562] "A district court has broad discretion in using its contempt power to require adherence to court orders." *Dartez v. Peters*, ___ Fed. Appx. ___, 2018 WL 6822283 at *4 (10th Cir. Dec. 27, 2018) (citation omitted).

[563] D.E. 298 and attachments.

[564] D.E. 586 (granting additional time for the government to respond to the SDT).

[565] S.M. Exh. 1194.

The Court issued another production order, again advising that there would be no extensions.[566] The government moved to reconsider (though it nonetheless stated that even with an extension, DOJ "likely will respectfully decline to comply with the production order if it remains in place as presently drafted"),[567] and when that was denied, the government again failed to produce the material as ordered by the Court.[568]

The government repeatedly claimed that the material was protected by *Touhy* or by the Privacy Act or by national security or by work product.[569] Sensitive to those concerns, the Court ordered the government to create a privilege log to identify the documents, or categories of documents, that were withheld.[570] The government never did so. Privilege logs are a common discovery tool, one that both Beall and Metzger were familiar with. Fed.R.Civ.P. 26(b)(5)(A) requires the creation of a privilege log:

> '[w]hen a party withholds information otherwise discoverable by
> claiming that the information is privileged or subject to protection as

---

[566] D.E. 713.

[567] D.E. 713 at 34-35.

[568] Tr. 11/16/18 at 2793:8-9 (Clymer: "Now, I also don't want to mislead the Court. All of those responsive documents were not turned over."). The government did produce some material the following week, but made clear this was "voluntary" and not in response to the Court's order. D.E. 713 at 33 ("AUSA Clymer informed the Court that it remains the position of the DOJ that there is no legal basis for the disclosures that have been ordered in this case, and that the disclosures made in response to the SDT were made *voluntarily* by the government.") (emphasis in original).

[569] *See, e.g.,* D.E. 298-9 (Clymer's 9/12/17 letter refusing to produce the requested material).

[570] D.E. 690 at 10.

trial-preparation material.' Fed.R.Civ.P. 26(c), however, permits the court, upon a finding of good cause, to enter an order protecting a party from discovery that imposes an undue burden or expense. Additionally, Fed.R.Civ.P. 26(b)(2)(c) provides that the court must limit the extent of discovery if it determines that the burden of the proposed discovery outweighs its likely benefit.[571]

If too burdensome, the party can catalog documents by category rather than individually. "Such a categorical approach is contemplated in the advisory committee notes accompanying Rule 2612 and has been approved in other cases involving large numbers of documents."[572] But the government did not do this, either.

The government's refusal to create a privilege log or to produce the documents for the Court's review defied the Court's explicit and repeated order.[573] The government should be held in contempt.

---

[571] *In re Motor Fuel Temperature Sales Practices Litig.*, 2009 WL 959491 at *1 (D. Kan. Apr. 3, 2009).

[572] *Id.* at *3 (rather than log each individual document, defendants asked to give a categorical description of the privileged documents "through counsel declarations providing information concerning the number of documents withheld, the time period encompassed by those documents, and a statement declaring that the documents fall within the attorney-client privilege and/or work product doctrine").

[573] D.E. 713 at 31, Memorandum & Order ("it is now apparent to the Court that the government had no intention of complying with the Court's Final Production Order, despite asking the Court to keep the record open at the conclusion of the November 16 hearing"); *id.* at 32 ("Clymer's argument that such production, particularly a privilege log, would be too much work and too time consuming fell on deaf ears, as this matter has been going on for two years and had resulted in a 'document dump' shortly before and continuing throughout the two-week hearing in October 2018."); *id.* at 35 ("As the 60-day production deadline passes, it is clear that, despite giving it a fair chance to comply, compelling any further production from the government is an exercise in futility. Accordingly, in light of the protracted history of these proceedings, and in order to avoid further delay and waste of judicial resources, the Court will reconsider and modify its final production and briefing order on this ground.").

## Part Six: Remedy

**13. The USAO's wide-spread, long-term, and systematic collection of recorded attorney-client communications was gross and flagrant misconduct that warrants dismissal with prejudice against refiling.**[574]

Any remedy for an individual litigant, including Defendant Carter, should consider 1) the individual Sixth Amendment violation; 2) the government's cumulative and systematic Sixth Amendment violations in collecting and saving attorney-client communications; and 3) the government's conduct in this investigation, including intentional delay that deprived litigants of certain lesser remedies. The remedy must be "tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests."[575] But any competing interests here were diminished by the government's systematic collection of attorney-client communications, concealed from the defense and the court, and its misconduct during this investigation. The balancing interest is not competing, but is complimentary—the need to deter future misconduct.

Dismissal with prejudice against refiling is an appropriate remedy, and for many, the only meaningful remedy available.[576] The individual Sixth Amendment

---

[574] *Levy,* 577 F.2d at 207, quoting *United States v. Cooper,* 397 F. Supp. 277 (D.Neb. 1975) ("Prejudice will not be presumed unless the intrusion can be called "gross." Transmittal of the information to the prosecutors is a significant, if not conclusive, factor in determining the grossness of the intrusion. Absent grossness, prejudice must be shown.").

[575] *United States v. Morrison,* 449 U.S. 361, 364 (1981).

140

violation was also part of the overarching, widespread USAO pattern and practice by the USAO to obtain attorney-client communications, without notice to the courts or counsel.

Dismissal is not a novel remedy in this context. In *United States v. Orman,* a federal district court dismissed an indictment after learning that a law-enforcement agent had eavesdropped on conversations between the defendant and her public defender.[577] The court did so even though the U.S. Attorney did not know of or use any information learned.[578]

*Orman* was decided long before *Shillinger,* but this Colorado district court foreshadowed the Tenth Circuit's presumed prejudice approach:

> where there is surveillance of attorney-client conferences, prejudice
> must be presumed, and by no stretch of the imagination has the DEA

---

[576] *C.f. United States v. Bergman*, 746 F.3d 1128, 1135 (10th Cir. 2014) (in context of a § 2255 Sixth Amendment claim: "We haven't suggested that a discharge with prejudice to any further prosecution is always an inappropriate habeas remedy, or even always an inappropriate remedy for the violation of a defendant's Sixth Amendment right to effective representation. Neither have we attempted to catalog the reasons that might suffice to justify granting a discharge with prejudice. To resolve this particular appeal, we need only observe that a discharge with prejudice to further prosecution efforts is a powerful remedy requiring powerful justification to qualify as tailored to the problem at hand—and in this case the district court failed to offer any reason suggesting so much might be called for here.").

[577] 417 F.Supp. 1126 (D.Colo. 1976).

[578] *Orman,* 417 F.Supp. at 1127 ("In fact, the Assistant United States Attorney in charge of this case, Daniel T. Smith, was aghast as the facts crept out, and at all times he has acted in complete accordance with the highest ethical standards. He did not participate in, and he reported to the Court posthaste developments in the case . . .").

141

> here justified its eavesdropping nor has it overcome the strong
> presumption of that which I think causes incurable prejudice.[579]

"[O]ur society is not bettered by law enforcement that, although it may be swift and sure, is not conducted in a spirit of fairness or good faith."[580]

## 14. An extraordinary remedy is needed to deter future misconduct.

Finally, the need to deter future misconduct by the government compels an extraordinary remedy. [581] Deterrence is an appropriate factor to consider in fashioning a remedy,[582] as the Supreme Court has recognized:

> [H]ere, as in other areas of the law, the most severe in the spectrum of
> sanctions provided by statute or rule must be available to the district
> court in appropriate cases, not merely to penalize those whose conduct
> may be deemed to warrant such a sanction, but **to deter those who**

---

[579] *Orman*, 417 F.Supp. at 1133 ("One class of cases in which the courts have had little difficulty in trying to strike a balance between liberty and authority involves 'eavesdropping' on counsel-client conversations, either by electronic devices installed in conference rooms or by means of paid informers who gain access to the privileged communications of the defense. In such instances, courts have not hesitated to rule as unconstitutional and in violation of the attorney-client privilege such underhanded methods of the prosecution.").

[580] *Orman*, 417 F.3d at 1133 (quoting *United States v. Banks*, 383 F.Supp. 389, 397 (D.D.C. 1974)).

[581] The government, while denying all wrongdoing, has alluded to internal consequences in the form of an OPR or OIG investigation. Exh. 555 (Rosenstein's letter). There is evidence that past OPR investigations into this same office have gone nowhere. And it appears that there have been few consequences here, save for the termination of one SAUSA and partial resignation of another. In the end, DOJ internal investigations do nothing to deter misconduct much less to restore confidence of the defense, the courts, or the public.

[582] *Farmer v. Banco Popular of N. Am.*, 791 F.3d 1246, 1256 (10th Cir. 2015) (citation and marks omitted); *accord United States v. Lilly*, 810 F.3d 1205, 1218 (10th Cir. 2016) ("The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury; and finally, as a remedy designed to deter illegal conduct.") (citations omitted); *Lundahl v. Halabi*, 600 Fed. Appx. 596, 605-06 (10th Cir. 2014) (unpublished) (district court retains inherent authority over sanctionable conduct).

**might be tempted to such conduct in the absence of such a deterrent.** If the decision of the Court of Appeals remained undisturbed in this case, it might well be that these respondents would faithfully comply with all future discovery orders entered by the District Court in this case. But other parties to other lawsuits would feel freer than we think Rule 37 contemplates they should feel to flout other discovery orders of other district courts.[583]

Deterrence is a necessary consideration here for at least four reasons.

First, the government has been recalcitrant throughout this investigation. Mere orders, warnings, and lesser sanctions have had little or no effect on the government. The Court's orders to date[584] carefully document the history of the case, the warnings given to the government, and the repeated opportunities to comply. If words have not worked to spur compliance, then action, in the form of actual sanctions, are required.

Second, it appears that some Kansas jails that house federal pretrial detainees continue to record attorney-client calls. And even if CCA has improved its system, the attorney-client calls that were already recorded there may still be available and accessible to the government. "The evidence also suggests that . . . earlier recorded [attorney-client] calls have not been erased by the Securus system, and are still accessible to the government."[585]

---

[583] *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) (emphasis added).

[584] *See* D.E. 690; tr. 11/16/18 at 2808-09 (sealed).

[585] D.E. 253 at 11, Phase III Order.

Third, the deterrent value of a strong remedy will extend beyond the malfeasant actors in this case. The extensive Sixth Amendment violations here undermined attorney-client trust and tainted the entire adversarial system.[586] The government's conduct has harmed the class of criminal defendants, the courts, the bar, the adversarial system, and the public that relies on the integrity of that system. As this Court observed after DOJ defaulted on the global resolution:

> people in the defense bar have been outraged. Their clients have been outraged. There's been a lot of public interest in this and I think a lot of people in the public are if not outraged, they're quizzical as to how this could be. I think the U.S. Attorney's Office's reputation has been damaged . . . .[587]

The "fear of government access to confidential communications tends to discourage frank exchanges between attorney and client,"[588] and this in turn erodes the efficacy of and respect for the adversarial system.[589] There has been a social and utilitarian cost to the government's conduct here.[590] In a system that relies so

---

[586] *See* D.E. 686 (Amicus Brief of Ethics Bureau at Yale).

[587] Tr. 8/1/18 at 68:20-69:3.

[588] *Government intrusions into the defense camp: Undermining the right to counsel,* 97 Harvard L. Rev. 1143 (1984) ("But if courts simply ensure access to counsel, without recognizing the client's underlying right to communicate privately with his attorney, they may render ineffective the legal assistance that the Constitution guarantees.).

[589] *United States v. Levy*, 577 F.2d at 210 (Third Circuit dismisses an indictment after the government intruded into attorney-client communications; "public confidence in the integrity of the attorney-client relationship would be ill-served by devices to isolate new government agents from information which is now in the public domain.").

[590] Kansas City Star Editorial Board, *Why were private attorney-client calls recorded? Now, Kansas inmates could go free*, June 11, 2018 ("Then there's the lingering damage that this case leaves

heavily on agreed resolutions—about 98% of cases do not go to trial—injury to this relationship has reverberations far beyond any single defendant.[591] Given society's interest in a reliable justice system, a strong remedy is necessary to deter others from similarly undermining that system.

Finally, the government must be deterred from further delaying any remedy for defendants whose rights have been violated, and whose convictions and sentences are contaminated by prosecutorial misconduct and Sixth Amendment violations. The more time these defendants serve, the less meaningful a reduced sentence becomes.

## 15. The Court may consider global settlements in other cases, and the need for an efficient, fair and consistent outcome.

As the government fought to parse the litigation, the Court assessed the record this way:

> And so I don't view that every 2255 is going to have its own unique and separate record. To be sure . . . it's going to be particularized in the 2255 ligation to what recordings, if any, did the government obtain with respect to this particular defendant. But all of the circumstances leading up to obtaining that and how they were used and—and if they were and—and why that, you know, mattered and whether there was

---

behind. How can defense attorneys gain the trust of their often destitute clients at a facility like the one in Leavenworth when those clients suspect that their conversations are being recorded?").

[591] Note, *The Attorney-Client Privilege: Fixed rules, balancing, and constitutional entitlement,* 91 Harv. L. Rev. 464, 466 (1977) ("Concerned with the growing complexity of the legal system, nineteenth-century courts looked to [attorney-client] privilege as a method of increasing lawyers' information and thus as an aid in the management of litigation. This same goal of fostering legal communication has remained the virtually unchallenged justification for attorney-client privilege since the mid-nineteenth century.).

prejudice, all of those questions I think are going to be related to, you know, the wider-scale Phase III investigation and the record that's developed as a consequence of that. So this is not something that can be sliced and diced into little bitty 2255s that are all unrelated.[592]

To date, the Federal Public Defender has filed 75 petitions for relief based on the Sixth Amendment violations and misconduct discovered in *Black*. The first were filed on August 13, 2018;[593] the most recent, *United States v. McDaniel,* D. Kan. 15-cr-20050-JAR, was filed March 15, 2019.

The government's constant drum beat has been that this Court should confine its authority to individual inquiries in individual cases.[594] But the government's pitch for discrete, siloed litigation is simply another means of evading responsibility.[595] It was only the wide-angle view that *Black* that allowed the landscape of the government's conduct to come into focus. The most obvious example is *Reulet*. AUSA Treadway's personal review of attorney-client calls in *Reulet* was only discovered through the *Black* inquiry. Only by comparison of Treadway's notes found in *Black* with the transcript of her comments to another court—Judge Crabtree—could we appreciate the depth and breadth of the

---

[592] Tr. 8/14/16 at 40:3-22.

[593] Tr. 8/14/16 at 29-30.

[594] Tr. 8/1/18 at 37:4-10 (Clymer: "Your Honor, again, as I said, we have not opposed focused questions that go to whether there was Sixth Amendment violations with respect to individual defendants by individual Assistant U.S. Attorneys.").

[595] Exh. 456 at 5, *United States v. Huff*, tr. 8/22/16 (AUSA Tomasic argument to Judge Murguia in response to Defendant's Rule 41(g) motion).

wrongdoing. Neither the notes nor her review were ever discovered *in Reulet,* even though the issue was litigated in that case.[596] And but for counsel's common involvement in *Black* and *Reulet*, Treadway's conduct would have gone undetected. Once the conduct came to light, the government quickly agreed to reducing Reulet's sentence to time served. Even then, it still resisted admitting any Sixth Amendment violations.[597] Again, but for the wide-angle view that can detect patterns and practices, much of the government misconduct, and the Sixth Amendment violations, would have evaded detection.

The Court should consider the outcome of defendants like Reulet who have won relief, as well as the USAO's attempted global resolution, which called for significant sentence reductions of 35 and 40 percent. That resolution is no longer sufficient in light of DOJ's subsequent conduct.

The Court may draw on other examples of global remedy for systematic governmental misconduct. Other prosecutors have faced similar issues of widespread misconduct that infected many prosecutions, including cases post-conviction. Usually, the government steps up to remedy the wrongdoing; sometimes the courts must step in. Below we survey some cases involving multiple or mass violations.

---

[596] *Reulet,* D. Kan. 14-cr-40005-DDC, D.E. 837.

[597] D. Kan. 14-cr-40005-DDC, D.E. 1261 (Agreed Order Granting Motion to Vacate because "former Assistant United States Attorney assigned to the prosecution of this matter *may have* violated the defendant's constitutional rights.") (emphasis added)).

### State of New Jersey

In 2016, New Jersey State Police lab technician Kamalkant Shah was suspended without pay after being caught falsely identifying substances as marijuana without conducting the proper tests and analyzing the samples. The state attorney general was responsive, identifying thousands of drug cases touched by Shah, and instructing prosecutors to contact defense attorneys in any case that Shah did the testing or even signed off on as supervisor. The Supreme Court of New Jersey issued a statewide centralized case-management administrative order appointing Judge Edward A. Jerejian to oversee "all litigation seeking relief in adjudicated cases . . . where the relief sought is based on allegations that Kamalkant Shah, forensic scientist at the New Jersey State Police Office of Forensic Sciences, North Regional Laboratory (Little Falls) Drug Unit, failed to appropriately conduct laboratory analyses, peer review, or administrative review of purported drug evidence . . . ."[598] The Court later issued a Case Management Order, with Phase I, II, and III to resolve affected cases.[599] Ultimately, prosecutors moved to dismiss at least 1,169 drug cases undermined because the evidence was destroyed before it

---

[598] Supreme Court of New Jersey, Administrative Order (April 25, 2016), available at https://tinyurl.com/yy8mz4uu ("[I]t appearing desirable that there be coordination in the management of such adjudicated cases . . . on a statewide basis in order to develop better processing of these cases, to provide greater consistency and efficiency, and to minimize conflicts and delays . . . .").

[599] Supreme Court of New Jersey, Case Management Order (May 9, 2018), *available at* https://njcourts.gov/notices/2018/n180509a.pdf.

could be retested. "In a statement, Attorney General Gurbir Grewal said his office was 'committed to ensuring that no conviction is upheld unless we are satisfied that any drug testing conducting was in fact reliable.'"[600]

### Chicago Stash House Cases

The Federal Criminal Justice Clinic at the University of Chicago Law School filed Motions to Dismiss based on racially selective law enforcement practices on behalf of 43 defendants who were facing 15-25 year mandatory minimum sentences and far higher sentences under the Guidelines.[601]

After nine federal judges presiding over the cases held a joint evidentiary hearing and thereafter urged the U.S. Attorney's Office to focus on resolving each case fairly rather than continuing to fight,[602] the U.S. Attorney's Office made plea offers in all of the cases, offering to dismiss all of the remaining mandatory-minimum gun and drug charges."[603] "This isn't about winning cases," said [Judge]

---

[600] S.P. Sullivan, *More than a thousand drug cases will be tossed after N.J. State Police lab Scandal*," NJ ADVANCE MEDIA FOR NJ.COM (May 10, 2018), *available at* https://www.nj.com/politics/2018/05/judge_gives_ag_deadline_for_dealing_with_drug_case.html.

[601] Alison Siegler, Stash House Sting Sentencing Victories (Oct. 26, 2018), *available at* https://www.law.uchicago.edu/news/alison-siegler-stash-house-sting-sentencing-victories.

[602] Jason Meisner, *Under pressure by judges, prosecutors to offer plea deals in controversial drug stash house cases*, CHICAGO TRIBUNE (Feb. 21, 2018) (since the evidentiary hearing, "several judges . . . have urged the U.S. attorney's office to rethink its approach to the cases, many of which have dragged on for years . . . [and] focus on resolving each case fairly rather than continuing to fight the issue all the way to the U.S. Supreme Court"), *available at* https://www.chicagotribune.com/news/local/breaking/ct-met-atf-stash-house-prosecutions-20180221-story.html).

[603] Alison Siegler, Stash House Sting Sentencing Victories (Oct. 26, 2018), *available at* https://www.law.uchicago.edu/news/alison-siegler-stash-house-sting-sentencing-victories.

Castillo, who got the ball rolling on the litigation nearly five years ago when he ordered prosecutors to turn over evidence about the racial makeup of the stash house defendants. "It's about doing justice. Some of these defendants have already served a lot of time. The government needs to think about that and needs to think about it very, very seriously.'" Judge Castillo also said that "fairness" seemed to have gotten lost in the process.'"[604]

Of the 43 clients who participated in the selective enforcement challenge in Chicago, at least 34 have now been sentenced; 27 of the 34 received sentences of "time served," despite requests by the government for within-Guidelines sentences that ranged as high as 12 years, and the remaining clients received significantly below-Guidelines sentences.[605] Notably, the Chicago stash-house litigation has generated positive changes in the law across the nation in an effort to combat racially selective enforcement.[606]

---

[604] Jason Meisner, *Under pressure by judges, prosecutors to offer plea deals in controversial drug stash house cases*, CHICAGO TRIBUNE (Feb. 21, 2018) (since the evidentiary hearing, "several judges . . . have urged the U.S. attorney's office to rethink its approach to the cases, many of which have dragged on for years . . . [and] focus on resolving each case fairly rather than continuing to fight the issue all the way to the U.S. Supreme Court"), *available at* https://www.chicagotribune.com/news/local/breaking/ct-met-atf-stash-house-prosecutions-20180221-story.html).

[605] Alison Siegler, Stash House Sting Sentencing Victories (Oct. 26, 2018), *available at* https://www.law.uchicago.edu/news/alison-siegler-stash-house-sting-sentencing-victories (citing *United States v. Davis*, N.D. Ill. 13-cr-00063, D.E. 670-5 (Exhibit 5: Stash House Defendant Sentencing Chart depicting the time-served and below-guideline sentences imposed).

[606] *See, e.g., Untied States v. Sellers*, 906 F.3d 848, 855 (9th Cir. 2018) (relaxing the legal standard for defendants seeking discovery to support a race-discrimination claim against law enforcement officers by eliminating onerous burdens placed on defendants); *United States v. Washington*, 869 F.3d 193, 216 (3d Cir. 2017) (same); *United States v. Davis*, 793 F.3d 712 (7th Cir. 2015) (same).

## The Massachusetts lab-scandal cases[607]

In 2011 and 2013 respectively, it came to light that two forensic laboratory technicians responsible for testing drugs in criminal cases in two separate cities— Boston and Amherst—had engaged in extensive misconduct. This misconduct called into question the testing results in tens of thousands of criminal cases. Each respective scandal generated massive litigation by defendants seeking a remedy for the misconduct. Ultimately, the Massachusetts Supreme Court invoked its powers of superintendence to craft a different remedy for each scandal.

In the Boston case, the Massachusetts Supreme Court adopted a protocol through which eligible defendants would be appointed counsel and could seek to vacate their convictions. In short: (1) defendants in whose cases the technician signed a drug certificate were granted a conclusive presumption that egregious government misconduct occurred; (2) the defendants were *not* granted a conclusive presumption of prejudice; rather, they bore the burden of proving prejudice in each individual case; and (3) defendants who won a new trial could not be charged with a more serious offense than the offense of original conviction, and, if convicted again, could not be given a more severe sentence than that originally imposed.[608] The court declined to impose a global remedy presuming prejudice and ordering a remedy for

---

[607] *Committee for Public Counsel Services v. Attorney General*, 108 N.E.3d 966 (Mass. 2018); *Bridgeman v. Dist. Attorney for Suffolk Dist.*, 67 N.E.3d 673 (Mass. 2017).

[608] *Bridgeman v. Dist. Attorney for Suffolk Dist.*, 30 N.E.3d 806, 811 (Mass. 2015).

all eligible defendants. The court explained that the technician was the sole

wrongdoer, and a global presumption of prejudice was not necessary for deterrence

purposes "given the absence of any misconduct by a prosecutor or investigator."[609]

The court noted that it was relying nonetheless on the cooperation of the district

attorneys to identify and voluntarily move to vacate and dismiss with prejudice a

substantial number of cases without requiring the defendants to make an

individual prejudice showing.[610]

In the Amherst case, in contrast, the Massachusetts Supreme Court adopted a

global remedy, presuming prejudice for all eligible defendants rather than requiring

them to make a case-by-case showing, and ordering their convictions vacated and

dismissed.[611] The difference between the Boston and Amherst cases was the fact

that in Amherst, the laboratory technician was not the sole wrongdoer. Rather, two

state's attorneys had "perpetrated a 'fraud upon the court' by withholding

exculpatory evidence and by providing deceptive answers to another judge in order

to conceal the failure to make mandatory disclosure to criminal defendants whose

cases were affected by [the technician's] misconduct."[612] The court concluded that

"[t]he government misconduct by [the technician] and the assistant attorneys

---

[609] 67 N.E.3d at 692.

[610] 67 N.E.2d at 694-95.

[611] 108 N.E.2d at 987-89.

[612] *Id*. at 970.

general was 'so intentional and so egregious'" that "the very strong medicine of dismissal with prejudice" was required.[613]

While both sets of Massachusetts cases are informative, the situation in the District of Kansas is closer to the Amherst case. Here, we do not have an outside, sole wrongdoer. Rather, we have Sixth Amendment violations that were perpetrated by the Office of the United States Attorney for the District of Kansas, that were systemic within that office, and that were compounded by that office's conduct during this Court's investigation. The strong medicine of a global order presuming prejudice from the government's misconduct, and vacating and dismissing all eligible defendants' convictions with prejudice, is fully justified here.

### Baltimore, Maryland

Baltimore recently saw a federal corruption investigation against eight Baltimore city police officers suspected of mishandling evidence. Over 100 cases were nol prossed, over 300 hundred have been dismissed, and closed cases are still under review.[614]

---

[613] *Id.* at 986.

[614] Staff, *Baltimore drops nearly 300 cases over alleged police misconduct*, CBS News (Sept. 27, 2017) ("Baltimore prosecutors say nearly 300 cases have been dropped due to four allegations of police misconduct, including three body camera videos appearing to show officers planting evidence or reenacting searches, and a federal indictment of eight officers on racketeering and fraud charges."), *available at* https://www.cbsnews.com/news/baltimore-drops-nearly-300-cases-over-alleged-police-misconduct/.

### Chicago, Illinois

At least 59 convictions have been vacated as the result of misconduct tied to former Chicago police Sergeant Ronald Watts, who was accused of using "shakedown tactics against a drug courier who actually was a FBI informant."[615] The Cook County state's attorney's office took action to remedy the misconduct, reporting that "the review of the cases determined that it was appropriate to vacate the convictions and dismiss the charges 'in the interest of justice.'"[616]

### *People of the State of California v. Bilbao*

In the 2010 case *People of the State of California v. Bilbao, et. al.*, a Superior Court judge detailed the credibility problems of a state crime lab technician, including stolen drugs, substance abuse, and a criminal record. Some 60 defendants asked for *Giglio* and *Brady* disclosures and to dismiss their individual prosecutions because the district attorney's office had not disclosed information about the technician. After hearing evidence, the court found that the district attorney "had an obligation to identify and produce the information [and] did not comply with that

---

[615] Elvia Malagon, *Drug convictions overturned for 10 framed by Chicago police sergeant*, CHICAGO TRIBUNE (Feb. 19, 2019), *available at* https://www.chicagotribune.com/news/local/breaking/ct-met-watts-police-drug-convictions-overturned-20190211-story.html; *see also* Phil Rogers, *4 more convictions overturned in CPD scandal*, Chicago 5, *available at* https://www.nbcchicago.com/news/local/4-More-Convictions-Overturned-in-CPD-Scandal-505786801.html.

[616] Elvia Malagon, *Drug convictions overturned for 10 framed by Chicago police sergeant*, CHICAGO TRIBUNE (Feb. 19, 2019), *available at* https://www.chicagotribune.com/news/local/breaking/ct-met-watts-police-drug-convictions-overturned-20190211-story.html.

obligation."[617] The motion to compel was granted in the most part, and the motions to dismiss were denied without prejudice to refiling. After the court's initial decision, the prosecutor took responsibility for the failings of the police crime lab and failing to disclose by "dismissing about 1,000 drug-related cases, including many in which convictions had been obtained and sentences were being served." "'No excuses,' [Kamala] Harris said, 'The buck stops with me.'"[618]

In both *Bilbao* and *Black,* different defendants were affected differently.[619] But unlike DOJ here, the California prosecutor recognized that there was more at stake than parsing particular evidentiary impact. "Some of Harris's aides raised the possibility that only those cases with a proven taint should be dismissed, not all of those that might have been affected. 'And I said, 'No, we have to deal with the fact this now called into question the integrity of the system,'" Harris said. "There has to be consequences paid for that."[620] That lesson, missed by DOJ, must be taught by the Court here.

---

[617] *People of the State of California v. Brian Bilbao, et. al.*, Cal. Super. Ct. No. 2443262 (May 17, 2010) (Order) (over 60 defendants moved for dismissal and to compel; by the time of the order, the D.A. had already dismissed 20) The court denied the motion to dismiss, but with prejudice to allow the defense to "justify the requested remedy" in each case.

[618] Michael Kranish, *Crime lab scandal rocked Kamala Harris's term as San Francisco's district attorney,* Washington Post, March 6, 2019.

[619] *Bilbao*, Cal. Super. Ct. No. 2443262 (May 17, 2010) at n.5 ("The joint defendants' cases fall into three categories"—cases where the challenged lab tech actually tested the drugs, cases where she confirmed the results, and cases where she was merely present in the lab).

[620] Michael Kranish, *Crime lab scandal rocked Kamala Harris's term as San Francisco's district attorney,* Washington Post, March 6, 2019.

While the constitutional violations differ in *Black* and *Bilbao*, both developed from a common flaw: neither office had a policy, written or otherwise, for handling sensitive material, whether *Brady* or attorney-client communications. And absent a policy, there was no oversight or accountability, which led to the magnitude of the offenses in both jurisdictions.[621] Here, the USAO had no policy, written or otherwise, about avoiding or handling attorney-client communications, only the KCK echo chamber perpetuating the falsity that a recorded call was fair game because the government—not the Court or the holder of the privilege—was entitled to unilaterally determine whether privilege existed or whether privilege had been waived. As Flannigan described, lore was just handed down, with no real training.[622]

Another common issue from *Bilbao*—the court there ordered the government to create a "*Brady* log" to identify the document at issue—something like the privilege log this Court ordered. The *Brady* log allowed the court to determine whether documents, or categories of documents, should be produced or were protected by work-product, privacy rights, or other legitimate reasons. The difference is that the California district attorney complied with the California court's order.[623] The helpfulness of the log is readily apparent in the order, as the court addressed and

---

[621] *Bilbao*, Cal. Super. Ct. No. 2443262 (May 17, 2010) at 7 & 12-13 & n. 7.

[622] *Dertinger* tr. 6/21/17 at 193:7-21 (Flannigan); Tr. 10/2/18 at 466 (Tomasic).

[623] *Bilbao*, Cal. Super. Ct. No. 2443262 (May 17, 2010) at 6, 7, & n. 6.

156

rule on each contested document.[624] Here, the Court ordered such a log; but the government openly refused to comply.[625]

Finally, the government has suggested that the Court and parties need not worry; it will address any problem internally.[626] The Court should reject that remedy for three reasons. First, the government has never acknowledged that there is any problem. Second, DOJ has been ineffective in addressing other problems in this district.[627] To date, DOJ's involvement has been to appoint Mr. Clymer as special prosecutor and to undercut the global resolution that the local U.S. Attorney brokered. Third, the inefficacy of DOJ and OPR is notorious, and is of limited value to the pubic anyway because of secrecy.[628] And finally, there have been few apparent consequences within the USAO to date. Tomasic was terminated, but for lying about listening to the calls, not for listening to them. AUSA Flannigan

---

[624] *Bilbao,* Cal. Super. Ct. No. 2443262 (May 17, 2010) at 17-23.

[625] D.E. 690 (Government ordered to produce log within 60 days); *see also* D.E. 713 at 32.

[626] Exh. 555 (Rosenstein letter).

[627] S.M. Exh. 1166 (Email from Barnett to Beall, "Judge Robinson is aware of past OPR investigations that have gone nowhere," noting with hope that judicial findings might spur an OPR reaction.).

[628] Radley Balko, *Another study finds few consequences for prosecutor misconduct,* Washington Post, March 8, 2017, https://www.washingtonpost.com/news/the-watch/wp/2017/03/08/another-study-finds-few-consequences-for-prosecutor-misconduct/?utm_term=.9757d57f74fd (last visited February 4, 2019) (listing studies of prosecutorial misconduct and the lack of consequence for individual prosecutors); Brad Heath & Kevin McCoy, *Prosecutors' conduct can tip justice scales,* USA Today, September 23, 2010, http://usatoday30.usatoday.com/news/washington/judicial/2010-09-22-federal-prosecutors-reform_N.htm?csp=usat.me (last visited February 4, 2019) (documenting the secrecy and lack of consequence for federal prosecutor misconduct). See, also, government's objection to providing pending OPR complaints in this litigation, despite the value to the Court in assessing credibility.

resigned as criminal coordinator under pressure,[629] but remains in place as a line AUSA, suggesting there have been no ethical consequences wrought by the government.[630] As Mr. Clymer asked the Special Master, "Did you have any idea at that time how administratively challenging it is . . . to get an Assistant U.S. Attorney fired?"[631]

---

[629] Exh. 620 (10/3/16 Flannigan stated to Beall, "It was my understanding . . . that I had the choice to resign or be demoted.").

[630] The Kansas Supreme Court rarely names prosecutors when a case is reversed for prosecutorial misconduct.

[631] Tr. 11/16/18 at 2773:20-22.

## Proposed Global Remedy

The survey of other cases involving systemic misconduct suggests that a global remedy is both justified and feasible. "The imposition of sanctions is one of the many matters within a trial court's broad discretion."[632] Ordering a global remedy in this case to be implemented in individual 28 U.S.C. § 2255 actions is consistent with this Court's inherent authority to impose "a sanction for abuse of the judicial process, or, in other words, for bad faith conduct in litigation."[633] A global remedy will also promote judicial economy, prevent needless duplicative litigation, and ensure that the § 2255 claims arising from the facts developed in this case will be resolved consistently across the district, without regard to geography or courtroom.[634]

For the reasons detailed below, we propose the following remedy for the government's misconduct, to be imposed in the case of any defendant whose Sixth Amendment rights have been violated by the USAO's possession of attorney-client communications, and who opts in by filing a 28 U.S.C. § 2255 petition (or amending an existing petition) in his or her own case, invoking this Court's order in this case.

---

[632] *Xyngular v. Schenkel*, 890 F.3d 868, 875 (10th Cir. 2018); *cf. Nat. Hockey League v. Met. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) ("[T]he most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent").

[633] *Farmer v. Banco Popular of N. Am.*, 791 F.3d at 1256.

[634] *Id.* at 327-28.

159

We define eligibility to mean a defendant who was detained as a result of charges resulting in conviction, and whose attorney-client communications during that detention were obtained by the government (regardless of whether the government ever looked at, listened to, or used those communications). For these eligible defendants, we propose that this Court impose, across the board, one of the following three alternative remedies and sanctions:

> That the convictions of all such defendants be vacated and the indictments against them dismissed *with prejudice*.[635]

> In the alternative, that the convictions of all such defendants be vacated and the indictments against them dismissed *without prejudice*, but with the following three-part caveat: (1) no individual defendant may be recharged unless the government demonstrates, beyond a reasonable doubt, that it has never looked at, listened to, or in any way used any attorney-client communication previously obtained; (2) that no defendant may be charged with a more serious offense than that with which he or she was initially convicted by plea or trial; and (3) that no defendant, if convicted again, may be given a more serious sentence than that previously imposed.[636]

> In the alternative, for affected clients who are still in custody, that the prison sentences of all such defendants remaining in custody be reduced by 50%.

Regardless of which remedy and sanction this Court imposes, we propose further that the government be disallowed from asserting any procedural defenses or

---

[635] *See Committee for Public Counsel Services v. Attorney General*, 108 N.E.3d 966 (Mass. 2018); *King v. Fleming*, 899 F.3d 1140 (10th Cir. 2018); *Xyngular v. Schenkel*, 890 F.3d 868 (10th Cir. 2018). We will discuss the relevance of these cases to our remedy request below.

[636] *See Bridgeman v. Dist. Attorney for Suffolk Dist.*, 30 N.E.3d 806, 816-18 (Mass. 2015).

160

invoking any claimed waivers in individual § 2255 actions raising claims under this Court's order in this case. However, we agree that the government may seek relief from this Court's order in individual § 2255 actions if it establishes either (1) that the defendant is not eligible (because the government did not obtain the defendant's attorney-client communications); or (2) that the reasons this Court adopts for imposing its remedy and sanction are outweighed by the need to further punish a particular defendant in a particular case.

## Conclusion

From Justice Brandeis:

> Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.[637]

The government—in secretly collecting and saving protected attorney-client communication and in thwarting this Court's inquiry−broke the law. It violated the Constitution, defied this Court's authority, and misrepresented material facts to avoid consequences. By its defiance, it forces the Court to hold the government accountable, to sort out the appropriate recompense for individual defendants, and to rebuild confidence in the adversarial system. Toward these ends, we ask the Court to adopt our proposed findings of fact and conclusions of law.

---

[637] *Olmstead v. United States*, 277 U.S. 438 486 (1948).

Respectfully submitted,

s/ Melody Brannon
MELODY BRANNON #17612
Federal Public Defender
for the District of Kansas
117 SW 6th Avenue, Suite 200
Topeka, Kansas 66603-3840
Phone: 785-232-9828
Fax: 785-232-9886
E-mail Address: Melody_Brannon@fd.org

s/ Kirk Redmond
KIRK REDMOND, #18914
First Assistant Federal Public Defender
117 SW 6th Avenue, Suite 200
Topeka, Kansas 66603-3840
Phone: 785-232-9828
Fax: 785-232-9886
E-mail Address: Kirk_Redmond@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 21, 2019, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the Special Master and all parties, including Movant Parties and Interested Parties .

<u>s/ Melody Brannon</u>
Melody Brannon