**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 4, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>KARL CARTER,<br><br>    Defendant.<br><br>------------------------------<br><br>DAVID PAXTON ZABEL; SHERI CATANIA; KIM I. FLANNIGAN; TERRA D. MOREHEAD,<br><br>    Objectors – Appellants,<br><br>v.<br><br>FEDERAL PUBLIC DEFENDER,<br><br>    Movant - Appellee. | Nos. 20-3038, 20-3039,<br>20-3040, 20-3043 |

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:16-CR-20032-JAR-2)**
_____

Trevor C. Wohlford, Morris Laing Evans Brock & Kennedy Chtd, Topeka, Kansas, on behalf of Objector-Appellants.

Melody Brannon, Federal Public Defender (Paige A. Nichols, Assistant Federal Public Defender with her on the briefs), Kansas Federal Public Defender, Topeka, Kansas, on behalf of the Movant-Appellee.

_____

Before **TYMKOVICH**, **BALDOCK**, and **BACHARACH**, Circuit Judges.

_____

**BACHARACH**, Circuit Judge.

_____

The four appellants—Mr. David Zabel, Ms. Sheri Catania, Ms. Kim Flannigan, and Ms. Terra Morehead—are Assistant United States Attorneys (AUSAs) for the District of Kansas who testified in court about practices of the United States Attorney's Office (USAO). At the close of the proceeding, the district court made statements reflecting negatively on the four AUSAs. They appeal, arguing that the district court deprived them of due process.

We dismiss the appeals for lack of appellate standing: As fact witnesses, the four AUSAs lack a particularized and significant stake in the appeal.

**I.     The four AUSAs participated in the proceeding only as fact witnesses.**

This appeal arose from a criminal case, *United States v. Black, et al.* In that case, the government investigated a suspected drug conspiracy

among detainees and employees at a detention facility in Kansas. The government ultimately charged six individuals.

After charges were lodged, the district court learned that a prosecutor (E.T.) had obtained recordings of conversations between detainees and their attorneys. These recordings included soundless videos of meetings and audio recordings of telephone calls.

The *Black* defendants moved for return of the recordings on the ground that they contained privileged communications between attorneys and their clients. The motions triggered a lengthy investigation into the USAO's possession of recordings containing attorney-client communications.

For the investigation, the district court appointed a Special Master, who conducted the inquiry in three phases. Phase I addressed the feasibility of separating attorney-client communications from other recordings in the USAO's possession. In Phase II, the Special Master culled the recordings of attorney-client communications. Phase III involved an investigation into

> the actions and conduct of the government, the USAO attorneys and staff, and the participating investigative agencies . . . in procuring, obtaining and perhaps using video and audio recordings of attorney-client meetings and phone calls at [the detention facility].

Joint App'x vol. 5, at 981. In Phase III, the four AUSAs testified as fact witnesses.

3

## II. The district court made statements reflecting negatively on the four AUSAs.

When Phase III was complete, the district court made negative statements about the four AUSAs. They rely on these statements for appellate standing.

Some of the statements reflected generally on attorneys in the office:

> For years, prosecutors in the Kansas City division had received, or knew others had received, attorney-client calls when they made a general request for all of the detainee's calls from [the detention facility]. . . . There is also circumstantial evidence that prosecutors, both individually and collectively, were aware or should have been aware that a general request for detainee calls at [the detention facility] might well yield attorney-client calls.

Joint App'x vol. 5, at 1071.

The court also referred to each of the four AUSAs. For example, the district court recited a former supervisor's testimony about Ms. Morehead, Ms. Flannigan, Mr. Zabel, and Ms. Catania:

> [The former supervisor] testified that during his tenure, some of the Kansas City prosecutors engaged in heavy-handed, unfair prosecutorial practices, including discovery practices such as late disclosure of *Brady* and *Giglio* information and evidence relevant to sentencing issues, and were "extremely oppositional" to management's attempts to adopt standard discovery policies in Kansas City that were consistent with how discovery was handled in the Topeka and Wichita offices. [The former supervisor] identified Morehead, [S.R.], Catania, Flannigan, and Zabel as most resistant to management's attempts to adopt policies addressing abusive prosecutorial practices in discovery, retaliatory use of § 851 sentencing enhancements, abusive charging practices in drug cases, and "bait and switch" § 5K1.1 agreements, all of which [the former supervisor] testified "reeked of ambush prosecution."

*Id.* at 1087 (footnotes omitted).

The district court also discussed Mr. Zabel's possible knowledge of E.T.'s use of attorney-client calls in another case (*United States v. Herrera-Zamora*), where Mr. Zabel had served as lead counsel:

> Sara Gardner, a contract interpreter, testified that [E.T.] asked her to listen to and translate the recordings [of attorney-client calls]. Gardner stated that [E.T.] also asked her to come to the USAO during trial to listen to and provide oral summaries of conversations between Herrera-Zamora and [defense counsel] to learn defense strategy and so [E.T.] and Zabel could impeach the defendant should he testify in his defense.

*Id.* at 1067–68. Mr. Zabel denied knowledge of E.T.'s alleged misconduct, but the court did not find him credible:

> Zabel denies any knowledge that [E.T.] listened to Herrera-Zamora's and [defense counsel's] calls before [E.T.]'s admission on May 10, 2017. Zabel also claims he was unaware that [E.T.] asked Gardner to listen to and prepare oral summaries of the attorney-client conversations before trial. As lead counsel on the case, it defies logic that Zabel did not know what [E.T.] was up to, especially in light of [E.T.] and Gardner's contrary testimony. The Court finds Zabel's credibility lacking.

*Id.* at 1068 n.355.

In addition, the district court referred to Ms. Catania and Ms. Morehead, stating that they had received many recordings of attorney-client calls:

> AUSA Morehead denied any awareness of attorney-client calls. [An analyst's] research revealed that between May 24, 2013 and September 27, 2016, Morehead requested calls at least 33 times for 28 different defendants. In at least nine of those cases, attorney-client calls were recorded. Yet Morehead never

5

excluded any attorney numbers from her requests. Likewise, AUSA Catania testified that she had never encountered any attorney-client calls. [The] partial analysis showed that Catania received calls of 15 defendants between the period of June 28, 2013 to July 17, 2015, including attorney-client calls in at least six of those cases, without excluding any attorney numbers from her requests. And records "voluntarily" produced by the USAO in January 2019 showed that Catania obtained 76 attorney-client calls in the [*United States v.*] *Phommaseng* case.

*Id.* at 1075–76 (footnotes omitted).

The court also referred to actions by Ms. Flannigan and E.T. in prosecuting *United States v. Dertinger*. *Id.* at 1041–50. In that case, defense counsel testified that

- she had been accused by E.T. and Ms. Flannigan of sharing a confidential document with the defendant and

- Ms. Flannigan had said that an agent was watching recordings of defense counsel's meetings to see if she had passed the confidential document to the defendant.

The district court credited defense counsel's testimony and found that Ms. Flannigan had lacked credibility when denying knowledge of the recordings:

> [E.T.] and Flannigan later denied knowing whether there were video recordings of the attorney visitation rooms, denied threatening [defense counsel], and denied directing [an agent] to look for the attorney-client video. Instead, they claimed that [the agent] was going to merely view the video of the residential pod to see who Dertinger talked to immediately after his meeting with [defense counsel] and how Dertinger and others were acting . . . .
>
> None of this testimony is credible.

6

*Id.* at 1045, 1041–50 (footnotes omitted).[1]

### III. The four AUSAs lack appellate standing.

Appellate standing isn't triggered by the district court's statements about the four AUSAs.

#### A. Nonparty appellants must show appellate standing.

Under Article III of the U.S. Constitution, individuals can appeal only if they have appellate standing. *Sprint Nextel Corp. v. Middle Man, Inc.*, 822 F.3d 524, 528 (10th Cir. 2016). Appellate standing is restricted to parties "in the absence of most extraordinary circumstances." *Coffey v Whirlpool Corp.*, 591 F.2d 618, 619 (10th Cir. 1979) (per curiam). The circumstances may trigger appellate standing when nonparties show (1) "a particularized and significant stake in the appeal" and (2) cause for their failure to intervene in district court. *United States v. Osage Wind, LLC*, 871 F.3d 1078, 1084, 1086 (10th Cir. 2017); *see Abeyta v. City of Albuquerque*, 664 F.3d 792, 795–97 (10th Cir. 2011) (concluding that the Court lacked jurisdiction because the appellant was not a party and could have intervened in a prior proceeding but declined to do so).

---

[1] The four AUSAs also assert that the district court "accuse[d] [them] of not properly responding to the *Black* litigation hold." Appellants' Opening Br. at 18. But we do not address this assertion because the AUSAs have not provided record citations or developed a related argument. *See Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1249 (10th Cir. 2015).

### B. Attorneys have appellate standing only when they are directly aggrieved.

The four AUSAs urge a particularized, significant stake. For this argument, the AUSAs point to three Tenth Circuit opinions recognizing that attorneys sometimes have a particularized and significant stake in an appeal: *Weeks v. Independent Sch. Dist. No. I-89 of Okla. City, Okla., Bd. of Educ.*, 230 F.3d 1201 (10th Cir. 2000); *Teaford v. Ford Motor Co.*, 338 F.3d 1179 (10th Cir. 2003); and *Butler v. Biocore Med. Techs., Inc.*, 348 F.3d 1163 (10th Cir. 2003).

Under these opinions, attorneys have standing to appeal only when they are "directly aggrieve[d]" from an injury "in the legal sense." *Butler*, 348 F.3d at 1167–68 (quoting *Weeks*, 230 F.3d at 1207; *United States v. Gonzales*, 344 F.3d 1036, 1039 (10th Cir. 2003)). Attorneys may be directly aggrieved when they are the "specific object[s] of the challenged order." *Frank v. Crawley Petroleum Corp.*, No. 20-6018, slip op. at 7, ___ F.3d ___ (10th Cir. Mar. 29, 2021). Attorneys may be the specific objects of orders

- disqualifying attorneys or imposing sanctions (*Weeks*, 230 F.3d at 1207–08),

- finding misconduct even in the absence of sanctions (*Butler*, 348 F.3d at 1168), or

8

- restricting the ability to obtain clients and file suit (*Frank*, No. 20-6018, slip op. at 8).[2]

These types of orders may trigger appellate standing because "damage to an attorney's professional reputation is a cognizable and legally sufficient injury." *Butler*, 348 F.3d at 1168.

An example exists in *Butler*, where the attorney had standing to appeal because the district court had

- "made specific findings of fact regarding [the attorney's] misconduct and concluded that he had violated" two state ethical standards by repeatedly violating procedural rules and

- mailed the order "to every court where [the attorney] had been admitted to practice."

*Butler*, 348 F.3d at 1165–67. We reasoned that the findings of misconduct and mailing of the order had directly aggrieved the attorney by injuring him in a "legal sense." *Id.* at 1167, 1169 (quoting *Gonzales*, 344 F.3d at 1039).

The AUSAs liken this case to *Butler*. But in the absence of direct restrictions on an attorney (like orders disqualifying, sanctioning, or restricting the attorney's practice), a finding of misconduct is necessary for attorney standing. "[E]ven the broadest understanding of what constitutes an appealable sanction requires a finding of misconduct," *Teaford*, 338 F.3d at 1182–83, and an appeal will not lie from "every

---

[2] The AUSAs do not argue that the order restricted their ability to obtain clients or to sue.

9

negative comment or observation from a judge's pen about an attorney's conduct or performance . . . ." *Butler*, 348 F.3d at 1168 (quoting *Gonzales*, 344 F.3d at 1047 (Baldock, J. dissenting)).

We addressed the necessity of a misconduct finding in *Teaford v. Ford Motor Co.*, 338 F.3d 1179 (10th Cir. 2003). There the district court had referred a misconduct matter to the state bar association, but the court did not make any findings of misconduct. *Id.* at 1180. Given the absence of a finding of misconduct, we dismissed the attorney's appeal for lack of standing:

> To be sure, a referral to a disciplinary board, even unaccompanied by specific findings, may imply some level of judicial disapproval of the attorney's conduct and may affect the attorney's reputation. However, the judgment implicit in such a letter is below the level of a censure or specific finding of misconduct. Rather, the letter amounts to a suggestion that a violation of rules of conduct may have occurred, leaving further consideration, investigation, and judgment to the disciplinary board. Because the district judge's referral to the Oklahoma Bar Association is neither an implicit nor an explicit finding of misconduct, it is not an appealable sanction.

*Id.* at 1182.

### C. The district court's statements didn't directly aggrieve the four AUSAs.

The AUSAs rely on our attorney-standing cases, urging appellate standing based on damage to professional reputations. But reliance on these cases is misplaced. The AUSAs participated only as fact witnesses; they weren't parties or legal representatives for the parties. The AUSAs

10

thus differed from the attorneys in *Butler, Weeks*, and *Frank*; in these cases, the attorneys had participated in the underlying litigation as advocates.[3] In addition, the district court didn't find misconduct by the four AUSAs. The court instead addressed their credibility, commented generally about prosecutors in the office, and recited particular testimony.

*Statements about the AUSAs' credibility.* The four AUSAs claim standing based on the district court's adverse findings on credibility. Despite the importance of credibility to the AUSAs, their participation as fact witnesses differs fundamentally from their typical role as advocates.

In the AUSA's role as fact witnesses, an adverse finding on credibility would not amount to a finding of misconduct. *See United States v. El-Mezain*, 664 F.3d 467, 579 (5th Cir. 2011) (concluding that a finding of "a complete lack of candor" was not appealable because the district court did not "expressly conclude that [the attorney had] violated a legal or ethical duty or rule"). Given the lack of a finding of misconduct, treating the district court's credibility assessment as an appealable order would create a "stunning expansion of standing." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 789 n.10 (7th Cir. 2013); *see also In re*

---

[3] Because the AUSAs rely entirely on our attorney-standing cases, we need not address appellate standing of fact witnesses to challenge limits on their compensation. *See, e.g.*, *United States v. Tippett*, 975 F.2d 713, 718 (10th Cir. 1992); *Dietrich v. King Res. Co.*, 596 F.2d 422, 424 (10th Cir. 1979).

*Trans Union Corp. Priv. Litig.*, 629 F.3d 741, 749 (7th Cir. 2011) (concluding that a district judge's unwarranted criticism of an attorney is not an appealable order).

*General statement about Kansas prosecutors*. The four AUSAs also point to a general statement about Kansas prosecutors' receipt or knowledge of others' receipt of recordings involving attorney-client calls. Joint App'x vol. 5, at 1071. But this general statement did not refer to any of the four AUSAs.

*Recitation of a former supervisor's testimony*. In addition, the four AUSAs point to the district court's recitation of a former supervisor's testimony about their "prosecutorial practices." But this recitation did not endorse the testimony. Rather, the court simply recited the former supervisor's testimony about the four AUSAs' "prosecutorial practices."[4]

*Statements about Mr. Zabel*. Mr. Zabel argues that when the court questioned his denial of knowledge of E.T.'s alleged misconduct, the court was implying that he and E.T. had done the same thing. Oral Argument at 1:17:30–1:18:58. We disagree. The district court did not find or imply that Mr. Zabel had listened to attorney-client conversations, asked anyone to listen to the conversations, or knowingly assisted anyone in listening to the

---

[4]   At oral argument, counsel for the four AUSAs conceded that the district court had merely recited the testimony without making any factual findings. Oral Argument at 1:13:48–1:14:21.

conversations. The court said only that it didn't believe Mr. Zabel when he denied knowing of a subordinate's misconduct. That adverse credibility determination did not constitute or imply a finding of misconduct. *See* pp. 11–12, above.

*Statements about Ms. Catania and Ms. Morehead.* Ms. Catania and Ms. Morehead rely on similar statements. The district court found that the two AUSAs had acquired recordings of attorney-client calls after making general requests for call recordings to the detention facility. Joint App'x vol. 5, at 1075–76. Based in part on this acquisition of recordings, the district court found "that the [two AUSAs] had both individual and collective knowledge that attorney-client calls were available . . . ." *Id.* at 1076. But the district court did not find that Ms. Catania or Ms. Morehead had listened to attorney-client recordings, purposefully obtained them, or knew that they had the recordings. *Id.* at 1075–76.

The court not only declined to make these findings but also acknowledged that Ms. Morehead and Ms. Catania had denied awareness of any attorney-client calls: "AUSA Morehead denied any awareness of attorney-client calls," and "AUSA Catania testified that she had never encountered any attorney-client calls." *Id.* at 1075. The district court thus did not find or imply misconduct by Ms. Catania or Ms. Morehead.

*Statements about Ms. Flannigan.* The district court found that Ms. Flannigan had lacked credibility when testifying about her knowledge of

13

issues in *Dertinger*. *Id.* at 1045. But an adverse credibility determination does not constitute a finding of misconduct. *See* pp. 11–12, above.

The district court credited testimony by defense counsel, who stated that Ms. Flannigan had said that she and E.T. had an agent watching soundless video recordings of attorney-client meetings. Joint App'x vol. 5, at 1041–50. But the district court didn't find or imply that

- this recording showed anything that would be privileged or
- Ms. Flannigan had committed misconduct.

*General suggestions of ethical violations.* Finally, the four AUSAs argue generally that the order "suggest[s]" "multiple ethics rule violations." Appellants' Opening Br. at 18. But a "suggestion" does not amount to a "specific finding of misconduct." *Teaford v. Ford Motor Co.*, 338 F.3d 1179, 1181–82 (10th Cir. 2003).[5]

\* \* \*

---

[5] The four AUSAs also urge appellate standing based on the district court's "indicat[ion] that its findings [would] be applied collaterally in the raft of § 2255 cases spawned by the [motions for return of property]." Appellants' Opening Br. at 22 n.2 (citing Joint App'x vol. 5, at 1150). But the four AUSAs concede that the "extent to which this will cause personal harm . . . is not yet clear." *Id.* This concession reflects the AUSAs' failure to develop an argument involving possible harm in the future. *See United States v. Harman*, 297 F.3d 1116, 1131 (10th Cir. 2002) (en banc) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived.").

The district court's statements did not directly aggrieve the four AUSAs because they had acted only as fact witnesses and the district court had not found any misconduct.

### D. Appellate standing isn't triggered by the possibility of collateral consequences.

The AUSAs also urge the potential for "collateral estoppel consequences in future disciplinary actions" or other litigation. Appellants' Opening Br. at 22; Appellants' Reply Br. at 6. For example, counsel for the four AUSAs represent that they face disciplinary proceedings. Oral Argument at 1:12:30–1:13:30.

This argument about disciplinary proceedings does not establish standing for four reasons. First, the district court made no finding of misconduct. Second, the record contains no mention of disciplinary proceedings involving the four AUSAs. Third, the AUSAs don't suggest that the district court started any disciplinary proceedings. Fourth, even if the court had made a referral for discipline, it would not confer appellate standing. *See Teaford*, 338 F.3d at 1182 (holding that a district court's referral to the state bar association was "not an appealable sanction" because it was "neither an implicit nor an explicit finding of misconduct").

\* \* \*

The four AUSAs were fact witnesses, the district court did not find misconduct, and the AUSAs don't point to any other concrete

15

consequences from the district court's statements. So the AUSAs lack a particularized, significant stake in the appeal. *Butler*, 348 F.3d at 1168.[6] In the absence of a particularized and significant stake, the AUSAs lack appellate standing and we dismiss their appeals.[7]

---

[6] Because we conclude that the four AUSAs lack a particularized and significant stake in this appeal, we need not address whether they had cause for failing to intervene in district court. *See Osage Wind, LLC*, 871 F.3d at 1086.

[7] Because we dismiss the appeals, we need not address the parties' disputes about the application of Federal Rule of Appellate Procedure 4 or the merits of the underlying claim for denial of due process.

FILED
United States Court of Appeals
Tenth Circuit

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

May 4, 2021

Christopher M. Wolpert
Clerk of Court

UNITED STATES OF AMERICA,

    Plaintiff,

v.

KARL CARTER,

    Defendant.

------------------------------

DAVID PAXTON ZABEL SHERI CATANIA; KIM I. FLANNIGAN; TERRA D. MOREHEAD,

    Objectors - Appellants,

v.

FEDERAL PUBLIC DEFENDER,

    Movant - Appellee.

Nos. 20-3038, 20-3039,
20-3040 & 20-3043
(D.C. No. 2:16-CR-20032-JAR-2)
(D. Kan.)

**JUDGMENT**

Before **TYMKOVICH**, Chief Judge, **BALDOCK**, and **BACHARACH**, Circuit Judges.

This case originated in the United States District Court for the District of Utah and was argued by counsel.

It is the judgment of the court that these appeals are dismissed.

Entered for the Court

CHRISTOPHER M. WOLPERT, Clerk